# Tab C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AES PUERTO RICO, L.P., <br><br>   Plaintiff, <br><br> v. <br><br> ALSTOM POWER, INC., <br><br>   Defendant. | Civ. No. 04-1282-JJF |

## DECLARATION OF DANIEL D. WILLIAMS

I, DANIEL D. WILLIAMS, declare as follows:

1. I am an attorney at Williams & Connolly LLP and I represent AES Puerto Rico, L.P. ("AES-PR") in the above-captioned matter.

2. AES-PR filed this action on September 20, 2004. The parties requested that the Court refer the matter for mediation and the Court did so by order dated January 7, 2005. The matter is set for mediation before Magistrate Judge Thynge on August 1, 2005.

3. In February 2005, counsel for ALSTOM and I agreed that the parties would commence document discovery and exchange interrogatories. I made this agreement believing that such discovery is needed to prepare appropriately for the mediation.

4. AES-PR served document requests on ALSTOM on March 7, 2005. It requested that responsive documents be produced at my offices on or before April 14, 2005. ALSTOM objected to the production at my offices and refused to produce documents by that date.

5. I held two teleconferences with Anthony F. Vittoria, Esquire and Michael A. Schollaert, Esquire, counsel for ALSTOM, on April 12 and 13, 2005, to meet and confer

concerning ALSTOM's responses to AES-PR's document requests. During these teleconferences, ALSTOM's counsel agreed, *inter alia*, to make available the documents responsive to AES-PR's document requests either during the week of April 26 or during the week of May 2. ALSTOM's counsel said that the documents would be available for review at ALSTOM's headquarters in Windsor, Connecticut.

6.   Mr. Schollaert subsequently advised by letter dated April 19, 2005 that the documents would be made available during the week of May 2. He ultimately made the documents available in Windsor as of Saturday, May 7, 2005.

7.   Prior to traveling to Windsor to inspect the documents, I asked Mr. Schollaert for an index of the documents. Mr. Schollaert stated that he had such an index but that he would not share it. He claimed that the index is attorney work product. Again before traveling to Windsor, I asked Mr. Schollaert's co-counsel Mr. Vittoria for a copy of the index and by e-mail dated May 17, 2005 he refused to share it.

8.   Also prior to traveling to Windsor, my co-counsel Jeb Boatman and I each asked ALSTOM's counsel why such a large number of boxes was being produced given the limited scope of our document requests. ALSTOM's counsel explained that the boxes were culled from the set of boxes collected for other litigation by determining from a document index whether each box might contain any responsive documents. Mr. Vittoria confirmed that ALSTOM's counsel did not undertake to review individual documents for responsiveness. We requested that ALSTOM review each document for responsiveness and produce only the responsive documents. ALSTOM's counsel refused to do so.

2

9. Mr. Boatman and I traveled to Windsor, Connecticut to review the documents on May 19, 2005. When we arrived, we were directed to a room with 208 boxes numbered non-contiguously in four series. Each series contained the prefix "A," "P," "X," or "O."

10. We were informed that all except 18 boxes with the "O" prefix had been gathered over a year before for purposes of other litigation. The boxes with the "O" prefix, we were told, were boxes recently collected to supplement the productions in those other lawsuits.

11. Mr. Boatman and I reviewed a sample of twelve of the boxes, including boxes from each of the four series, and quickly discovered that their contents were not organized in any systematic manner. While a few of the boxes had names of individuals on the front of them and some of the folders inside them contained titles, the boxes and folders did not provide consistent information identifying source, date, or subject-matter of the documents. Rather, it appeared that each employee from whom documents were collected for purposes of other litigation simply dumped his or her files into a cardboard box. Indeed, it is not clear whether some boxes contain files from multiple individuals.

12. The vast majority of the documents in the boxes Mr. Boatman and I reviewed was unrelated to this litigation. Some boxes contained as little as 2% responsive files. Others had important responsive documents buried within stacks of unrelated files.

13. The documents unrelated to this litigation that Mr. Boatman and I discovered in the sample we reviewed included: (1) stacks of employee time-sheets for ALSTOM employees performing unrelated services; (2) an entire folder of Tax Decrees from the Governor of Puerto Rico; (3) an entire folder of NAFTA and importation-related advice; (4) litigation documents from an unrelated lawsuit pending in Missouri; (5) a folder of irrelevant business cards; and (6) folders with nothing in them at all.

3

14. Based on our review of the documents, it appeared to Mr. Boatman and me that ALSTOM's counsel had simply used its document index for documents produced in other litigation and produced boxes that contained any documents relating to construction of the power plant's boilers and related equipment. The scope of this litigation and of AES-PR's document requests is much narrower. They relate to only two discrete components of the plant's boilers and related equipment.

15. On Friday, May 20, 2005, I wrote to counsel for ALSTOM and repeated my earlier request that ALSTOM produce only responsive documents. Although I requested a response by noon today, counsel for ALSTOM has provided none.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 23rd day of May, 2005, at Washington, D.C.

_____
Daniel D. Williams