# Tab 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## AFFIDAVIT OF EDWARD BULEWICH, JR.

PURSUANT TO the terms and provisions of 28 U.S.C. § 1746(2), the undersigned makes oath in due form of law as follows:

1.  I, EDWARD BULEWICH, JR., am over 18 years of age and am competent to testify as a witness. I am a Project Administrator for ALSTOM Power, Inc. ("ALSTOM") and, as such, maintain an office at 2000 Day Hill Road, Windsor, Connecticut. In addition, I am currently the custodian of ALSTOM's documents relating to the Guayama, Puerto Rico power plant project (the "Project").

### A.  THE PROJECT

2.  AES Puerto Rico, L.P. ("AES") is the owner of the Project and a joint venture of Duke Energy and Fluor-Daniel ("D/FD") was the "Engineer-Procure-Construct" ("EPC") general contractor. As the EPC contractor, D/FD was ultimately responsible for the entire Project – from design, engineering, and construction to final testing and turn-over.

3.  ALSTOM was a subcontractor to D/FD, and furnished and installed two boilers and the "back-end" pollution control equipment for the Project. ALSTOM was also responsible for the design and construction of the "back-end" pollution control equipment for the Project.

4.  As a subcontractor responsible for such a large array of equipment for the Project, ALSTOM dealt not only "up-stream" with D/FD, but also had to interact and communicate "downstream" with literally dozens of sub-subcontractors, material suppliers, designers, engineers, shippers and expeditors.

B.  **DOCUMENT CREATION AND RETENTION**

5.  ALSTOM employed hundreds of individuals who had some responsibility on the Project. Importantly, certain employees had responsibility for several aspects of the Project. ALSTOM's employees were located in four principal locations – ALSTOM's United States headquarters in Windsor, Connecticut, another major office located in Knoxville, Tennessee, a construction office in Penuelas, Puerto Rico, and the site office in Guayama, Puerto Rico.

6.  During work on the Project, a certain amount of "official" company-wide Project files were created and were generally maintained in three-ring binds. In addition, many of the employees who worked on the Project also maintained their own personal Project files. These files were generally stored in desk drawers or file drawers in manila or hanging file folders, although some employees also maintained their files in binders. Because certain employees worked on several different aspects of the Project, they would generally label each folder or binder to correspond to the information contained in each folder or binder. Of course, there were occasions in which an employee chose or forgot to label a given folder or binder.

7.  As a subcontractor on the Project, ALSTOM was required to demobilize from the site upon completion. In the process of demobilizing, I personally "boxed-up" all of ALSTOM's files at the site office. Specifically, I removed the manila or hanging file folders and three ring-binders from desks, file cabinets, shelves and drawers and placed them, as they were, into banker's boxes to be shipped back to the home office in Windsor.

C.  **LITIGATION BETWEEN ALSTOM AND D/FD**

8.  Following the completion and turn-over of the Project, ALSTOM and D/FD became involved in litigation. During the course of that litigation, ALSTOM was required to gather and produce essentially all of the Project documentation from the four ALSTOM locations described above.

9.  I was tasked with gathering all of the documents for production to D/FD. Those documents included the documents that I "boxed-up" at the site, as well as documents created and obtained by ALSTOM employees who worked on the Project from the other ALSTOM offices. To obtain those documents, I contacted each and every ALSTOM employee who worked on the Project and instructed them to, without going through or re-arranging their files, place all of the Project-related documents and files into bankers' boxes in the exact manner as they were stored in their desks, file cabinets and drawers.

D.  **ALSTOM'S DOCUMENT PRODUCTION**

10. While I was not personally involved, I am aware that, in the last week of April and first week of May 2005, ALSTOM's counsel spent over 6 man-days preparing ALSTOM's documents for production to AES. I am personally aware of four of those "man-days" as I let two of ALSTOM's counsel into the room in which the documents were stored and met with them briefly on both of the days they were working. I have been informed that one of those attorneys returned with a legal assistant for another two days of work.

11. ALSTOM's documents were ready for production to AES during the week of May 2, 2005. It is my understanding, however, that, at about the same time, D/FD demanded to review the additional documents that had been created and gathered since its last review. It is my understanding that D/FD's attorneys were allowed to review the documents during the week

of May 2, 2005 because counsel for AES failed to commit to reviewing the documents during that week.

12.    The documents that were produced by ALSTOM were the documents that I boxed up at the site or had been provided by the other ALSTOM employees who worked on the Project. Those documents were in the exact same order as arranged by myself or the other ALSTOM employees and were in the exact same boxes into which either I or the other ALSTOM employees placed them.

13.    By May 7, 2005, the documents were again available for review by AES. AES, however, did not review the documents until May 19, 2005.

14.    In regard to that review, I am aware that AES's counsel spent only about 11 man-hours reviewing the documents produced by ALSTOM. Specifically, AES's two attorneys arrived at ALSTOM's offices in Windsor at approximately 10:30 a.m. on the day of the review, left by 5:00, and took a 1 hour break for lunch.

15.    I have taken photographs of how those boxes of documents, folders and binders appeared at the time of AES' review. Photographs of boxes of project three-ring binders are attached hereto as Exhibit 1. Photographs of different employees' personal files are attached hereto as Exhibit 2. Photographs of the front of several of these boxes, some of which are labeled, and some of which are not, are attached hereto as Exhibit 3. These photographs are a fair and accurate representation of how the boxes of documents appeared when they were produced to AES.

16. As can be seen in the attached photographs, many of the boxes are marked to indicate from whom or where the documents were obtained. In addition, the photographs clearly show that the contents of the boxes generally contain either three ring binders, manilla folders or hanging file folders, and that the vast majority of those binders and folders have labels indicating the subject matter of the enclosed documents.

I SOLEMNLY SWEAR AND AFFIRM under the penalties of perjury that, to the best of my knowledge and information, the contents of this Affidavit are true.

DATE: 6-7-05

_Edward Bulewich Jr._
EDWARD BULEWICH, JR.