# TAB 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,                    *

     Plaintiff,                           *

v.                                        *    C.A. No. 04-1282-JJF

ALSTOM POWER, INC.,                       *

     Defendant.                           *

 *    *    *    *    *    *    *    *    *    *    *

## ALSTOM POWER, INC.'S
## FIRST SET OF INTERROGATORIES

TO:    AES Puerto Rico, L.P.
        c/o John S. Spadaro, Esquire
        Murphy Spadaro & Landon
        824 Market Street, Suite 700
        Wilmington, DE 19801

     ALSTOM Power Inc., defendant and counterclaim plaintiff, in accordance with Fed. R. Civ. P. 33, serves this First Set of Interrogatories upon Plaintiff AES Puerto Rico, L.P. ("AES"). AES shall file a response within thirty (30) days after service of these Interrogatories, answering each Interrogatory separately and fully in writing under oath, and shall include all information available to it directly or through his agents, representatives, or attorneys.

## DEFINITIONS AND INSTRUCTIONS

     A.    These Interrogatories are continuing in character, and therefore require you to file supplementary answers if you obtain further or different information before trial.

     B.    Unless otherwise indicated, these Interrogatories refer to the time, place and circumstances mentioned or complained of in the pleadings.

C.    Where knowledge or information in possession of a party is requested, such request includes knowledge of the party's agents, employees, representatives, and unless privileged, its attorneys. The term "representative" shall mean and include any and all agents, servants and employees.

D.    "Person" means any natural person, corporation, partnership or other private organization or governmental or legal entity.

E.    "You" or "AES" or "Owner" refers to Plaintiff, AES Puerto Rico, L.P., a Delaware limited partnership, and any officers, directors, employees, agents, contractors, representatives or attorneys on behalf of AES.

F.    "CDS" refers to the Circulating Dry Scrubber equipment provided by ALSTOM for the Project.

G.    "ESP" refers to the Electrostatic Precipitator equipment provided by ALSTOM for the Project.

H.    "FBHE Handcuffs" refers to the fluidized bed heat exchanger handcuff equipment provided by ALSTOM for the Project.

I.    Any reference to a contract, subcontract, change order, purchase order, or other formal agreement means all of the provisions of the contract, subcontract, change order, purchase order or formal agreement including exhibits, attachments, amendments (whether with or without effect), modifications, (whether with or without effect), addenda and specifications.

J.    If an act, event, transaction, occasion, instance, matter, course of conduct, course of action, person or writing is mentioned or referred to in response to more than one of these Interrogatories, you need not completely identify and describe it or the person in every instance, provided you supply a complete identification in one such instance, and in each other such

2

instance make a specific reference to the place, paragraph and page number in the answers to these Interrogatories where it, the person is fully identified and described.

    K.    The terms "identify," "identity," "identification," when referring to a natural person, mean to provide an identification sufficient to serve such person with process to require his or her attendance at this Court and shall include, without limitation, his or her full name, present or last known address, present or last known business affiliation, title or occupation, and each of his or her positions during the applicable period of time covered by any answer referring to such person. When used in reference to a writing or document (including, without limitation, any business records), such words mean to give a sufficient characterization of such writing or document as properly to identify it in a subpoena issued pursuant to the Federal Rules of Civil Procedure and shall include, without limitation, the following information with respect to each such document:

    1.    The date appearing on such document, and if it has no date, the answer shall so state and shall give the date or approximate date such document was prepared;

    2.    The identity or descriptive code number, file number, title, or label of such document;

    3.    The general nature and description of such document, and if it was not signed, the answer shall so state and shall give the name of the person or persons who prepared it;

    4.    The name of the person to whom such document was addressed and the name of each person other than such addressee to whom such document, or copies of it, were given or sent;

5.    The name of the person having present possession, custody or

control of such document; and

6.    Whether or not any draft, copy or reproduction of such document

contains any postscripts, notation, change or addendum not

appearing on the document itself, and if so, answer shall give the

description of each draft, copy or reproduction.

L.    The terms "writing" and/or "document" as used herein mean all records, papers

and books, transcriptions, pictures, drawings or diagrams of every nature, whether transcribed by

hand or by some mechanical, electronic, photographic or other means, as well as sound

reproductions of oral statements or conversations by whatever means made, whether in your

actual or constructive possession or under control or not, relating or pertaining in any way to the

subject matters in connection with which it is used and includes originals, all file copies, all other

copies, no matter how prepared, and all drafts prepared in connection with such writing, whether

used or not, including by way of illustration and not by way of limitation, the following: books,

records, contracts, agreements, expense accounts, canceled checks, catalogues, price lists, sound

and tape recordings, memoranda (including written memoranda of telephone conversations, other

conversations, discussions, agreements, acts and activities), minutes, diaries, calendar or desk

pads, scrapbooks, notebooks, correspondence, bulletins, circulars, forms, pamphlets, notices,

statements, journals, postcards, letters, telegrams, reports, intra-office communications,

photostats, microfilm, maps, and deposition transcripts, whether prepared by you for your own

use or for transmittal or received by you.

4

## INTERROGATORIES

INTERROGATORY NO. 1

    Identify each person who assisted in the preparation of your answers to these

Interrogatories.

INTERROGATORY NO. 2

    Identify all persons who have personal knowledge of the CDS, ESP and FBHE Handcuff

equipment, state the knowledge that each person possesses, and identify those persons whom you

intend to call to testify at the trial of this matter.

INTERROGATORY NO. 3

    Do you have a policy for the retention and/or destruction of documents, including but not

limited to business records? If so, please state that policy and include a copy of that policy, if

written, that existed at the time of the termination of the Concrete if different than the current

policy.

INTERROGATORY NO. 4

    Has the destruction or overwriting of documents been suspended? If so, on what date did

the suspension begin?

INTERROGATORY NO. 5

    Identify all persons who are responsible for implementing the policies identified in your

answer to Interrogatories 4 and 5 above.

INTERROGATORY NO. 6

    Identify each person whom you propose to call as an expert witness at the trial of this

case, state the subject matter on which each expert is expected to testify, and the substance of the

facts and opinions to which each expert is expected to testify.

INTERROGATORY NO. 7

With respect to each person identified as an expert in response to the preceding Interrogatory, set forth the qualifications of the witness, including listing all publications authored by the witness within the last ten years, specify the compensation to be paid to the expert for the study and testimony, and list any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

INTERROGATORY NO. 8

For each expert witness, state whether the expert's findings and opinions are memorialized in a report or other written document, identify the data or other information considered by the expert in forming such opinions, and identify any exhibits to be used as a summary of or support for such opinions.

INTERROGATORY NO. 9

Identify all individuals or entities that performed any of the work or supplied any materials or services, including testing, in regard to the CDS and/or ESP equipment.

INTERROGATORY NO. 10

For any work performed on or materials/equipment provided for the CDS and/or ESP equipment, itemize the payments made by you to any vendor, subcontractor and/or any other entity by date, amount, and reason for payment.

INTERROGATORY NO. 11

Identify all individuals or entities that performed any of the work or supplied any materials or services, including testing, in regard to the FBHE Handcuffs.

INTERROGATORY NO. 12

For any work performed on or materials/equipment provided for the FBHE Handcuffs, itemize the payments made by you to any vendor, subcontractor and/or any other entity by date, amount, and reason for payment.

INTERROGATORY NO. 13

Identify any and all litigation regarding the Project in which you are a party or in which you are involved in any other capacity, including the court or other dispute resolution tribunal in which the action was filed, the date the action was filed, the names of all parties, the case number, the amount or issue in controversy, and the present status of the matter.

INTERROGATORY NO. 14

Set forth in detail and itemize each element of damage which you contend you are entitled to recover in this action, describing in detail how you computed each element of damage and the provision(s) in the Purchase Order pursuant to which you contend that you are entitled to recover such damages, and identify all documents which refer or relate to and all persons with knowledge of the subject matter of your answer to this Interrogatory.

ALSTOM POWER INC.

Richard R. Wier, Jr. (#716)  / by APV
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222

John Anthony Wolf, Esquire
James E. Edwards, Esquire
Anthony F. Vittoria, Esquire
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:     (410) 547-0699

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this __12ᵗʰ__ day of April, 2005, a copy of the foregoing

First Set of Interrogatories was served, via electronic mail and first-class mail, postage prepaid,

on:

> John S. Spadaro, Esquire
> Murphy Spadaro & Landon
> 1011 Centre Road, Suite 210
> Wilmington, Delaware  19805
>
> Dane H. Butswinkas, Esquire
> R. Hackney Wiegmann, Esquire
> Daniel D. Williams, Esquire
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C.  20005
>
> Attorneys for Plaintiff

_Richard R. Wier, Jr._
Richard R. Wier, Jr.        by AFV

759950

8

# TAB
# 2

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) ) ) | |
| Plaintiff, | ) ) | Civ. No. 04-1282-JJF |
| v. | ) ) | |
| ALSTOM POWER, INC. | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFF'S RESPONSES TO ALSTOM
## POWER, INC.'S FIRST SET OF INTERROGATORIES

Plaintiff AES Puerto Rico L.P. ("AES PR") objects and responds to Defendant ALSTOM Power, Inc.'s (ALSTOM's) first set of interrogatories as follows:

### GENERAL OBJECTIONS

The following general objections are incorporated in, and serve as additions to, each of AES PR's responses and objections to each of ALSTOM's specific interrogatories.

A. AES PR objects to ALSTOM's interrogatories to the extent that they call for information protected by the attorney-client privilege, the attorney work product doctrine, or other applicable statutory or common law privileges or immunities. To the extent that any interrogatory may be construed as seeking the disclosure of information subject to these privileges or immunities, AES PR invokes the same.

05-16-05    12:08pm    From-WSL Copy Room 2, Right    302 225 3674    T-728    P.004    F-351

B.  AES PR objects to ALSTOM's interrogatories to the extent that they seek confidential or proprietary information of third parties as to which AES PR has entered into an agreement to protect the confidentiality of such information.

C.  AES PR objects to the first sentence of the interrogatories insofar as it characterizes ALSTOM as a "counterclaim plaintiff." ALSTOM has not asserted any counterclaims against AES PR.

D.  AES PR objects to Definition (C) to the extent that it calls for information from agents of AES PR that is not properly imputed to AES PR.

E.  AES PR objects to Definition (D) as overbroad and unduly burdensome. AES PR is providing in these responses information sufficient "to identify" persons and things as that term is reasonably understood. AES PR further objects to the definition regarding identification of persons because it presupposes that each person to be identified could be compelled to be a witness in Court.

F.  AES PR objects to ALSTOM's interrogatories to the extent they attempt to impose requirements beyond those set forth in Fed. R. Civ. P. 33 or the rules or orders of this Court.

G.  These interrogatory responses and objections are not intended to be, and shall not be construed as, an agreement or concurrence by AES PR with ALSTOM's characterization of any facts, circumstances, or legal obligations.

2

H. These interrogatory responses reflect AES PR's present knowledge based on inquiry to date. AES PR expressly reserves the right to rely upon any additional information located or obtained in the future.

## RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

The following responses and objections are made subject to and without waiver of any of the general objections set forth above.

INTERROGATORY NO. 1

Identify each person who assisted in the preparation of your answers to these Interrogatories.

RESPONSE

AES PR objects to the extent that this interrogatory seeks the disclosure of information protected by the attorney client privilege. Subject to the general and specific objections specified above, and without waiver thereof, AES PR states that the following individuals assisted in the preparation of these answers:

Allan B. Dyer, President, AES PR

Maria M. Torres, Administrative Assistant

INTERROGATORY NO. 2

Identify all persons who have personal knowledge of the CDS, ESP and FBHE Handcuff equipment, state the knowledge that each person possesses, and identify those persons whom you intend to call to testify at the trial of this matter.

RESPONSE

AES PR objects to this interrogatory as vague, overbroad and unduly burdensome to the extent that it purports to require AES PR to identify "all

3

05-16-05     12:08pm     From-WSL Copy Room 2, Right          302 225 3674        T-728   P.006/025   F-351

persons" with any "personal knowledge" whatsoever concerning the CDS, ESP and FBHE handcuff equipment and to state for each person all "knowledge [the person] possesses" on these broad topics. AES PR further objects to the request that it identify persons it intends to call to testify at trial. Such request is premature in that it calls for the disclosure of information before such information is required to be disclosed under the Federal Rules of Civil Procedure and other Court rules and orders governing this action. AES PR will provide this information at the time specified by rules or orders of this Court or as agreed to by the parties.

Subject to the general and specific objections specified above, and without waiver thereof, AES PR states that current and former AES PR personnel and consultants with knowledge concerning the CDS, ESP, and FBHE equipment include the following:

Gary Bates, AES Shady Point

Harry Bonilla, Material Handling Team Leader

Allan B. Dyer, President

Tracy Jarvis, Turbine Team Leader

William A. Kownurko, Consultant

Csaba Little, Maintenance Team Leader

Ron McParland, AES Sri Lanka

Ernest Pagaduan, AES Hawaii

Radames Rodriguez, Boiler Team Leader

Elias Sostre, Control Room Team Leader

05-16-05    12:09pm    From-MSL Copy Room 2, Right    302 225 3674    T-728    P.007/025    F-951

Paul Stinson, Principal Engineer, AES Generation Group

David Stone, Commercial, Engineering Manager

John Toher, Consultant

INTERROGATORY NO. 3

Do you have a policy for the retention and/or destruction of documents, including but not limited to business records? If so, please state that policy and include a copy of that policy, if written, that existed at the time of the termination of the Concrete if different than the current policy.

RESPONSE

AES PR objects to the second sentence of the interrogatory because it

is incoherent. Subject to the general and specific objections specified above, and

without waiver thereof, AES PR states that it does have document retention

policies, the terms of which are as specified therein. AES PR responds to the

interrogatory's request for information concerning the terms of the policies by

directing ALSTOM to the policies themselves, which are being made available in

response to ALSTOM's first set of requests for production. See Fed. R. Civ. P. 33(d).

INTERROGATORY NO. 4

Has the destruction or overwriting of documents been suspended? If so, on what date did the suspension begin?

RESPONSE

Subject to the general objections specified above, and without waiver

thereof, AES PR states that, on September 29, 2004, AES PR personnel were

directed to retain and not destroy all electronic and paper records that relate to the

5

subject matter of this litigation, and they subsequently have been reminded of that

obligation.

INTERROGATORY NO. 5

Identify all persons who are responsible for implementing the policies identified in your answer to Interrogatories 4 and 5 above.

RESPONSE

Subject to the general objections specified above, and without waiver thereof, AES PR states that, with regard to Interrogatory 4, all AES PR personnel with documents relating to the subject matter of this litigation are responsible for complying with the September 29, 2004 directive and subsequent directives. With respect to Interrogatory 5, this interrogatory does not request that AES PR identify any policies.

INTERROGATORY NO. 6

Identify each person whom you propose to call as an expert witness at the trial of this case, state the subject matter on which each expert is expected to testify, and the substance of the facts and opinions to which each expert is expected to testify.

RESPONSE

AES PR objects to this request because it is premature in that it calls for the disclosure of information before such information is required to be disclosed under the Federal Rules of Civil Procedure and other Court rules and orders governing this action. AES PR will provide this information at the time specified by rules or orders of this Court or as agreed to by the parties.

6

05-16-05    12:09pm    From-MSL Copy Room 2, Right                302 225 3674            T-728   P.009/025   F-351

INTERROGATORY NO. 7

   With respect to each person identified as an expert in response to the preceding Interrogatory, set forth the qualifications of the witness, including listing all publications authored by the witness within the last ten years, specify the compensation to be paid to the expert for the study and testimony, and list any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

   RESPONSE

   AES PR objects to this request because it is premature in that it calls

for the disclosure of information before such information is required to be disclosed

under the Federal Rules of Civil Procedure and other Court rules and orders

governing this action. AES PR will provide this information at the time specified by

rules or orders of this Court or as agreed to by the parties.

INTERROGATORY NO. 8

   For each expert witness, state whether the expert's findings and opinions are memorialized in a report or other written document, identify the data or other information considered by the expert in forming such opinions, and identify any exhibits to be used as a summary of or support for such opinions.

RESPONSE

   AES PR objects to this request because it is premature in that it calls

for the disclosure of information before such information is required to be disclosed

under the Federal Rules of Civil Procedure and other Court rules and orders

governing this action. AES PR will provide this information at the time specified by

rules or orders of this Court or as agreed to by the parties.

05-16-05    12:09pm    From-MSL Copy Room 2, Right    302 225 3674    T-728    P.010/025    F-351

<u>INTERROGATORY NO. 9</u>

Identify all individuals or entities that performed any of the work or supplied any materials or services, including testing, in regard to the CDS and/or ESP equipment.

<u>RESPONSE</u>

Subject to the general objections specified above, and without waiver thereof, AES PR states the following:

(1)    With respect to the reverse osmosis system, the suppliers of materials and for services are set forth in Attachment A to these interrogatories.

(2)    With respect to the ESP collecting plates, the following suppliers provided materials and for services:  Environmental Elements Corp., PIC, ICE, Raymond Group, F.L. Smidth Airtech, Combustion Engineering and/or its corporate affiliates, and Brand Scaffold.

(3)    With respect to the ESP stabilization program, the following suppliers provided materials and for services:  Combustion Engineering and/or its corporate affiliates, and ADECCO.

AES PR supplements this response by referring ALSTOM to the documents AES PR is producing in response to ALSTOM's first set of requests for production.  <u>See</u> Fed. R. Civ. P. 33(d).

<u>INTERROGATORY NO. 10</u>

For any work performed on or materials/equipment provided for the CDS and/or ESP equipment, itemize the payments made by you to any vendor, subcontractor and/or any other entity by date, amount, and reason for payment.

8

RESPONSE

Subject to the general objections specified above, and without waiver thereof, AES PR states that it has made and/or expects to make the following payments:

Water Treatment

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| Various (see Attachment A) | 02-06-04 / 03-31-05 | $ 1,786,559.12 | Reverse Osmosis System |
| Various | Estimate | 6,850,000.00 | Crystallizer – brine concentrator |
| | | | |
| Total | | $8,636,559.12 | |

Collection Plates

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| | | | |
| EEC | Various | $ 925,120.00 | Replacement collecting plates for Unit 2 |
| PIC | Various | 40,649.10 | Labor |
| ICE | Various | 240,409.74 | Freight |
| Raymond | Various | 2,942.49 | Consulting |
| FL Smidth Airtech | 12/31/2003 | 92,935.28 | Consulting/Inspection |
| EEC | Various | 219,250.00 | ESP Curtains Fabrication Rigitrodes Material & labor |
| Combustion Engineering | 1/23/2004 | 167,181.10 | Prep. Curtains Labor |
| Brand Scaffold | Various | 21,450.00 | Services |
| Replacement collection plates (incl. related parts, consulting, inspection, labor and shipping) for Unit 1 | Estimate | 1,709,937.71 | |
| Labor to install all plates | Estimate | 2,000,000.00 | |
| | | | |
| Total | | $5,419,875.40 | |

9

Stabilization Program

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|--------|------|--------|-------------------|
| Various | Various | S  481,069.00 | Initial Stabilization of corroded plates |
| Various | Various | S   54,544.45 | Additional work during July 2004 |
| Various | Various | 53,812.99 | Additional work during October 2004 shutdown |
| TOTAL | | S  589,426.44 | |

AES PR supplements this response by referring ALSTOM to the documents AES PR is producing in response to ALSTOM's first set of requests for production. See Fed. R. Civ. P. 33(d).

## INTERROGATORY NO. 11

Identify all individuals or entities that performed any of the work or supplied any materials or services, including testing, in regard to the FBHE Handcuffs.

### RESPONSE

Subject to the general objections specified above, and without waiver thereof, AES PR states that the following preformed work and/or supplied materials regarding the FBHE Handcuffs:  Combustion Engineering Caribbean and/or its corporate affiliates, United Titanium, Inc., and Alstom Caribe, Inc. and/or its corporate affiliates.

## INTERROGATORY NO. 12

For any work performed on or materials/equipment provided for the FBHE Handcuffs, itemize the payments made by you to any vendor, subcontractor and/or any other entity by date, amount, and reason for payment.

10

05-16-05    12:10pm    From-MSL Copy Room 2, Right        302 225 3674        T-726  P.013/025  F-351

RESPONSE

Subject to the general objections specified above, and without waiver thereof, AES PR states that it has made and/or expects to make the following payments:

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| CEC | 11-25-03 | $ 40,542.00 | Handcuffs |
| United Titanium, Inc. | 10-31-03 | 18,488.53 | Bolts |
| United Titanium, Inc. | 12-19-03 | 56,229.52 | Bolts |
| Alstom Caribe, Inc. | 01-23-04 | 10,810.59 | Labor |
| Total | | $126,070.64 | |

AES PR supplements this response by referring ALSTOM to the documents AES PR is producing in response to ALSTOM's first set of requests for production. See Fed. R. Civ. P. 33(d).

INTERROGATORY NO. 13

Identify any and all litigation regarding the Project in which you are a party or in which you are involved in any other capacity, including the court or other dispute resolution tribunal in which the action was filed, the date the action was filed, the names of all parties, the case number, the amount or issue in controversy, and the present status of the matter.

RESPONSE

AES PR objects to this interrogatory because it is overbroad and requests information beyond that required to be disclosed pursuant to Fed. R. Civ. P. 26(b)(1) and 33(a). AES PR further objects to the use of the term "Project" because that term is not defined. AES PR further objects to the request insofar as it seeks information that is a matter of public record. Subject to the general and specific objections specified above, and without waiver thereof, AES PR states that,

11

in addition to this lawsuit, it currently is a party to the following lawsuits relating to the construction of the plant: (a) <u>Brand Scaffold Builders, Inc. v. AES Puerto Rico, L.P., et al.</u>, No. 04-1117 (JAG), pending in the United States District Court for the District of Puerto Rico; (b) <u>Duke/Fluor Daniel Caribbean, et al. v. J.R. Insulation Sales and Services, et al.</u>, No. 05-01321, pending in the United States District Court for the District of Puerto Rico and (c) <u>J.R. Insulation Sales and Services v. Combustion Caribbean Caribe, Inc., et al.</u>, No. G-AC-2003-0334, pending in the Puerto Rico Tribunal de Primera Instancia.

<u>INTERROGATORY NO. 14</u>

Set forth in detail and itemize each element of damage which you contend you are entitled to recover in this action, describing in detail how you computed each element of damage and the provision(s) in the Purchase Order pursuant to which you contend that you are entitled to recover such damages, and identify all documents which refer or relate to and all persons with knowledge of the subject matter of your answer to this Interrogatory.

<u>RESPONSE</u>

AES PR objects to the interrogatory's request that AES PR "identify all documents which refer or relate to and all persons with knowledge of the subject matter of your answer to this Interrogatory" because it is vague and ambiguous. Subject to the general and specific objections specified above, and without waiver thereof, AES PR states that the damages to which it is entitled to recover are currently estimated to be the amounts listed in response to interrogatories 10 and 12 above, plus interest. Because all of the work has not yet been completed, these estimates are subject to revision. AES PR refers ALSTOM to the Complaint for an explanation of the provisions in the Purchase Order pursuant to which AES PR is

12

05-16-05    12:11pm    From-MSL Copy Room 2, Right                302 225 3674        T-728  P.015/025  F-351

entitled to reimbursement.  AES PR supplements this response by referring

ALSTOM to the documents AES PR is producing in response to ALSTOM's first set

of requests for production.  <u>See</u> Fed. R. Civ. P. 33(d).


John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135


OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  May 16, 2005            Attorneys for AES Puerto Rico, L.P.

13

05-16-05    12:11pm    From-MSL Copy Room 2, Right          302 225 3674          T-728  P.016/025  F-351

## VERIFICATION

I, Allan B. Dyer, declare under penalty of perjury that:

1.  I am President of AES Puerto Rico, L.P.

2.  I have read the foregoing response of AES Puerto Rico L.P. to

ALSTOM Power Inc.'s First Set of Interrogatories and, to the best of my knowledge,

information and belief, they are true and accurate.

_5- 13-2005_
Date

Allan B. Dyer

14

05-16-05    12:11pm    From-MSL Copy Room 2, Right                    302 225 3674          T-728   P.017/025   F-351

# Tab A

05-16-05    12:11pm    From-MSL Copy Room 2, Right          302 225 3674        T-728   P.018/025   F-351



**Puerto Rico**

CAPITAL PROJECT

Account Number 1401-07-000
AR Date February 8, 2004
AR Originator Tracy Jones - Water Treatment Team Leader
AR Title Reverse Osmosis Process- Water Treatment Modification (ESP Corrosion Elimination ) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 02/06/04 | Rafael Brow/ Hitti Caribe | - | CRF/10447674 | 890.00 | 02/06/04 CK 10668 |
| 02/10/04 | Environmental Resources Management | - | 1550016 | 4,004.22 | 03/12/04 CK 10993 |
| 02/10/04 | Puerto Rico Wire Products, Inc. | 04-0165 | 9256919-001 | 220.00 | 03/12/04 CK 10996 |
| 02/10/04 | Puerto Rico Wire Products, Inc. | 04-0165 | 9256919-002 | (70.00) | 03/23/04 CK 11111 |
| 02/19/04 | Puerto Rico Wire Products, Inc. | 04-0165 | NUMBER15367 | 242.13 | 03/12/04 CK 10974 |
| 02/16/04 | Fastenal Company | - | 434366 | 150.00 | 02/26/04 CK 10840 |
| 02/10/04 | Miguel Ortiz | - | P43309 | 331.15 | 03/19/04 CK 11052 |
| 02/20/04 | CTB Corporation | 04-0219 | 60688 | 276.50 | 03/26/04 CK 11161 |
| 02/20/04 | La Electrical | 04-0254 | 29180 | 4,633.00 | 03/12/04 CK 10994 |
| 02/23/04 | Pump Biz, Inc. | 04-0177 | 163747 | 342.60 | 03/18/04 CK 11037 |
| 02/18/04 | Universal Steel Trading Corp. | 04-0197 | | 1,260.00 | |
| 02/29/04 | A/P Accrual | | | 12,232.66 | |
| | Balance as of February 29, 2004 | | | (1,260.00) | |
| 03/01/04 | A/P Accrual reversing entry | | | 68.97 | 03/26/04 CK11165 |
| 02/27/04 | McMaster-Carr | 04-0263 | 84910084 | 100.56 | 03/31/04 CK11220 |
| 03/01/04 | Ferry Products | 04-0219 | IN20243 | 1,360.00 | 04/14/04 CK11281 |
| 03/03/04 | Reclen & Johnson | 04-0233 | 362081 | 450.00 | 03/12/04 CK10964 |
| 03/26/04 | Eagle USA Air-freight AIREX (C. Kettle) | American Express | 028204 | 81.00 | 03/31/04 CK11281 |
| 03/04/04 | Vives Equipment Rental | 04-0263 | 9824573 | 29.14 | 03/26/04 CK11182 |
| 03/06/04 | United Parcel Service (Freight McMaster) | | A1071V104 | 149.70 | 03/23/04 CK11095 |
| 02/19/04 | National Lumber & Hardware(Credit Card) | Banco Popular CK | CH031004 | 876.41 | |
| | Balance as of March 31, 2004 | | | 650.00 | |
| 04/06/04 | Bury Brothers, Inc. | Rod Jorgensen | A3260 | 1,275.00 | |
| 03/26/04 | Caribbean Irrigation Sales (BPPR Credit Card) | Calvin Katrila | 22447 | 1,925.00 | |
| | Balance as of April 30, 2004 | | | 143.10 | 05/28/04 CK 11848 |
| 04/30/04 | Graybar International PR | 04-0449 | 201646 | 1,960.00 | |
| 05/13/04 | Environmental Resources Management | | 1550019 | 3,000.00 | 05/11/04 CK 11648 |
| 05/05/04 | Junta de Calidad Ambiental | Bill Vela | WASTEWATER | 100.00 | 05/11/04 CK11649 |
| 05/07/04 | Junta de Calidad Ambiental | Bill Vela | WATER | 1,388.00 | 05/11/04 CK 11672 |
| 05/10/04 | Secretario de Hacienda | Bill Vela | CLARO05/04 | 5,921.00 | 05/11/04 CK 11673 |
| 05/10/04 | Secretario de Hacienda | Bill Vela | ROMGO0604 | 21,500.00 | 05/28/04 CK 11882 |
| 05/25/04 | The Nu-Tex Company | 04-0654 | 00013611 | 44,000.06 | |
| 05/20/04 | Surplus Material & Equipment | 04-0374 | 1679 | 79,159.10 | |
| | Balance as of May 30, 2004 | - | A1071V224 | 17.30 | 06/03/04 CK 11972 |
| 05/29/04 | UPS | | 45321 | 1,377.50 | 06/10/04 CK 12051 |
| 05/28/04 | Bury Brothers, Inc. | 04-0587 | 1550018 | 3,446.00 | 06/16/04 CK 12050 |
| 06/04/04 | Environmental Resources Management | Bill Vela | 1550020 | 1,828.50 | 06/16/04 CK 12050 |
| 06/04/04 | Environmental Resources Management | Bill Vela | 00024280 | 16,753.67 | 06/18/04 CK 12067 |
| 06/08/04 | Caribbean Irrigation Sales | 04-0733 | | 8,543.89 | 06/25/04 CK 12150 |
| 05/25/04 | Puerto Rican International Companies | 04-0384 | 80333 | 2,628.90 | 06/25/04 CK 12150 |
| 05/26/04 | Puerto Rican International Companies | 04-0384 | 80333-B | 6,665.33 | 06/25/04 CK 12150 |
| 05/26/04 | Puerto Rican International Companies | 04-0384 | 80333-C | 27,875.25 | 06/25/04 CK 12150 |
| 05/28/04 | Puerto Rican International Companies | 04-0384 | 80334 | 6,503.50 | 06/25/04 CK 12150 |
| 05/29/04 | Puerto Rican International Companies | 04-0384 | 80334-9 | 17,318.24 | 06/25/04 CK 12150 |
| 05/29/04 | Puerto Rican International Companies | 04-0384 | 80334-C | 7,423.12 | 06/25/04 CK 12150 |
| 05/01/04 | Puerto Rican International Companies | 04-0384 | 80342 | 6,153.17 | 06/25/04 CK 12150 |
| 05/01/04 | Puerto Rican International Companies | 04-0384 | 80342-C | 1,297.00 | 06/25/04 CK 12150 |
| 05/01/04 | Puerto Rican International Companies | 04-0384 | 80342-B | 690.00 | 07/15/04 CK 12427 |
| 06/16/04 | Reclen & Johnson | 04-0710 | 469693 | 150.00 | 07/13/04 CK 12489 |
| 06/21/04 | General Electric del Caribe, Inc. | 04-0777 | 990-030672 | 1,216.80 | 07/15/04 CK 12430 |
| 06/18/04 | Rafael Benitez Caribe | 04-0749 | 997173 | 5,126.00 | 08/19/04 CK 12082 |
| 05/21/04 | ICE | | 109-025421 | 5,126.00 | 08/19/04 CK 12082 |
| 05/21/04 | ICE | | 109-025421 | 4,106.50 | N/A |
| 06/30/04 | Accounts Payable Accrual | June | J8.J0605 05 | 2,111.28 | N/A |
| 06/30/04 | Spare Parts | June | | 126,338.42 | |
| | Balance as of June 30, 2004 | | | 149,006.80 | 05/01/04 NC03-033 |
| 02/26/04 | S.E. Opromica | 04-0191 | IN00134901 | | |

4/18/2005 1:15 PM                                                      CAPEX LOG 2006.xls



**AES**

**Puerto Rico**

## CAPITAL PROJECT

Account Number 1401-37-600
AR Date February 8, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Reverse Osmosis Process- Water Treatment Modification (ESP Corrosion Elimination ) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 05/26/04 | Buck Sales, Inc. | 04-0565 | AMEX C.Xorria | 284.05 | 07/07/04 CK 12279 |
| 06/08/04 | Caribbean Irrigation Sales, Inc. | 04-0733 | 24220 | 27,938.45 | 07/08/04 CK 12301 |
| 06/14/04 | Overnite Transportation Co. | 04-0749 | 655804446 | 160.11 | 07/14/04 CK 12421 |
| 06/18/04 | Graybar International PR | 04-0742 | 204239 | 590.00 | 07/15/04 CK 12403 |
| 05/29/04 | ICE | 04-0191 | 109-025399 | 5,234.50 | 07/15/04 CK 12406 |
| 06/25/04 | ICE | 04-0191 | 109-026680 | 6,265.68 | 07/15/04 CK 12406 |
| 06/24/04 | CIS Corporation | 04-0622 | P44762 | 460.80 | 07/22/04 CK 12476 |
| 06/24/04 | General Electric del Caribe, Inc. | 04-0777 | 989-030913 | 97.50 | 07/22/04 CK 12489 |
| 06/24/04 | General Electric del Caribe, Inc. | 04-0777 | 989-030914 | 25.00 | 07/22/04 CK 12489 |
| 06/24/04 | General Electric del Caribe, Inc. | 04-0777 | 989-030915 | 756.00 | 07/22/04 CK 12489 |
| 06/24/04 | General Electric del Caribe, Inc. | 04-0777 | 989-030918 | 1,929.00 | 07/22/04 CK 12489 |
| 06/24/04 | General Electric del Caribe, Inc. | 04-0777 | 989-090917 | 1,403.20 | 07/22/04 CK 12489 |
| 06/15/04 | Overnite Transportation Co. | 04-0742 | 443964670 | 173.28 | 07/23/04 CK 125428 |
| 06/24/04 | Overnite Transportation Co. | 04-0191 | 145078226 | 1,543.49 | 07/23/04 CK 125420 |
| 07/26/04 | The Hur-Tex Company | 04-0654 | 13985 | 21,650.00 | 07/26/04 WCO7-109 |
| 07/01/04 | Puerto Rican International Companies | 04-0384 | 80365 | 9,803.50 | 07/30/04 CK 12587 |
| 07/01/04 | Puerto Rican International Companies | 04-0384 | 80356 | 22,932.90 | 07/30/04 CK 12587 |
| 07/01/04 | Puerto Rican International Companies | 04-0384 | 80352 B | 483.00 | 07/30/04 CK 12587 |
| 07/01/04 | Puerto Rican International Companies | 04-0384 | 80355 B | 770.27 | 07/30/04 CK 12587 |
| 07/01/04 | Puerto Rican International Companies | 04-0384 | 80356 B | 2,544.50 | 07/30/04 CK 12587 |
| 07/01/04 | Puerto Rican International Companies | 04-0384 | 80356 C | 26,174.44 | 07/30/04 CK 12587 |
| 07/05/04 | ICE | 04-0191 | 109-026651 | 3,104.42 | 08/03/04 CK 12623 |
| 07/09/04 | Engineered Parts & Services | 04-0879 | 205750 | 3,709.00 | 08/03/04 CK 12660 |
| 07/02/04 | General Electric del Caribe, Inc. | 04-0777 | 989-030912 | 115.00 | 08/05/04 CK 12662 |
| 07/07/04 | BioMPR, Inc. | Bill Vela | 1850021 | 1,572.90 | 08/05/04 CK 12674 |
| 07/01/04 | Accounts Payable Accrual | June | Reversal | (4,105.50) | N/A |
| 07/30/04 | Accounts Payable Accrual | JE-JG75 05 | A/P Accrual | 20,543.07 | N/A |
| 07/30/04 | Warehouse July Issues | JE-JG78 08 | Cost of Sales | 1,935.77 | N/A |
| 07/13/04 | Cankor Engineering services | 04-0693 | 54060091 | 5,861.50 | 08/19/04 CK 12747 |
| 07/26/04 | Graybar International P2 | 04-0558 | 206124 | 390.00 | 08/27/04 CK 12857 |
| 07/27/04 | Redlen & Johnson | 04-0901 | 513150 | 90.16 | 08/27/04 CK 12891 |
| | Balance as of July 31st, 2004 | | | 312,766.28 | |
| 07/30/04 | Accounts Payable Accrual | JE-JG75 05 | A/P Accrual | (20,543.07) | N/A |
| 07/27/04 | Hill Caribe, Inc. | 04-0899 | 2540 | 2,648.00 | 08/27/04 CK 12860 |
| 07/28/04 | Hill Caribe, Inc. | 04-0899 | 2549 | 236.00 | 08/27/04 CK 12860 |
| 07/28/04 | Steel and Pipes, Inc. | 04-0957 | 723023 | 1,675.00 | 08/27/04 CK 12902 |
| 07/27/04 | Tonos Steel | 04-0955 | 254483 | 799.00 | 08/31/04 CK 12905 |
| 07/22/04 | ICE | 04-0078 | 109-026250 | 2,585.86 | 08/19/04 CK 12762 |
| 08/06/04 | ICE | 04-0654 | 109-026447 | 22,171.74 | 08/19/04 CK 12762 |
| 08/06/04 | ICE | 04-0654 | 109-026448 | 22,171.74 | 08/19/04 CK 12762 |
| 07/28/04 | Prams Controls | 04-0965 | 11673 | 1,508.00 | 08/27/04 CK 12888 |
| 08/02/04 | Redlen & Johnson | 04-0954 | 518842 | 275.32 | 09/02/04 CK 12962 |
| 07/31/04 | iStrel and Pipes, Inc. | 04-0957 | 724357 | 570.00 | 09/02/04 CK 12960 |
| 07/31/04 | Puerto Rican International Companies | 04-0384 | 80366 | 40,482.31 | 08/31/04 CK 12922 |
| 07/31/04 | Puerto Rican International Companies | 04-0384 | 80365 B | 30,904.33 | 08/31/04 CK 12922 |
| 07/31/04 | Puerto Rican International Companies | 04-0384 | 80369 | 23,777.50 | 08/31/04 CK 12922 |
| 07/31/04 | Puerto Rican International Companies | 04-0384 | 80365 B | 21,827.42 | 08/31/04 CK 12922 |
| 08/12/04 | Universal Alloy Valve & Fitting | 04-1048 | 4903 | 24,234.30 | WTA08-117 |
| 08/05/04 | General Electric del Caribe, Inc. | 04-0777 | 989-032445 | 366.00 | 09/02/04 CK 12953 |

05-16-05    12:12pm    From-MSL Copy Room 2, Right          302 225 3674        T-726   P.020/025   F-351



**Puerto Rico**

CAPITAL PROJECT

Account Number 1401-07-000
AR Date February 8, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Reverse Osmosis Process - Water Treatment Modification (ESP Corrosion Elimination) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 08/05/04 | Environmental Resources Management | | 1050022 | 1,629.80 | 09/02/04 CK 12977 |
| 08/16/04 | Sherry Electrical Services & Associates | 04-1040 | 04-0003 | 1,676.80 | 08/19/04 CK 12797 |
| 08/05/04 | Steel and Pipes, Inc. | 04-1008 | 726386 | 1,480.00 | 08/10/04 CK 13061 |
| 08/13/04 | CIB Corporation | 04-1047 | P45307 | 123.58 | 09/20/04 CK 13139 |
| 08/11/04 | JQ Controls Automation | 04-0948 | 104-393 | 2,132.50 | 09/10/04 CK 13044 |
| 08/09/04 | JQ Controls Automation | 04-0948 | 104-387 | 3.70 | 09/10/04 CK 13044 |
| 08/20/04 | Sherry Electrical Services & Associates | | 04-0004 | 1,576.80 | 08/27/04 CK 12955 |
| 08/16/04 | Steel and Pipes, Inc. | 04-1008 | 728463 | 1,325.00 | 09/30/04 CK13175 |
| 08/16/04 | Steel and Pipes, Inc. | 04-1059 | 729490 | 82.50 | 10/08/04 CK 13247 |
| 08/30/04 | Steel and Pipes, Inc. | 04-1063 | 1034019-00 | 854.38 | 10/00/04 CK13276 |
| 08/19/04 | Wholesale Electric del Caribe, Inc. | 04-1042 | 45280 | 342.00 | 09/30/04 CK 13189 |
| 08/17/04 | Warren del Caribe | Calvin Garcia | AMEX 06/04 | 911.80 | 07/15/04 CK 12445 |
| 06/01/04 | Hilti Caribe, Inc. | 04-1060 | P45339 | 364.35 | 09/30/04 CK 13139 |
| 08/16/04 | CIB Corporation | 04-0948 | 104-363 | 3,808.00 | 08/27/04 CK 12881 |
| 07/27/04 | JQ Controls Automation | 04-0948 | 104-368 | 196.90 | 08/27/04 CK 12855 |
| 07/30/04 | JQ Controls Automation | 04-2936 | 508156401 | 144.13 | 08/27/04 CK 12881 |
| 07/23/04 | Overnite Transportation Co. | 04-1050 | P07321 | 818.00 | 09/02/04 CK 12943 |
| 08/06/04 | CIB Corporation | 04-1090 | P45396 | 31.20 | 10/08/04 CK 13247 |
| 08/20/04 | CIB Corporation | 04-1110 | 207642 | 39.70 | 10/08/04 CK 13247 |
| 08/26/04 | Graybar International PR | 04-1091 | 297755 | 33.00 | 10/15/04 CK 13244 |
| 08/26/04 | Graybar International PR | 04-1051 | 434420 | 2,511.00 | 10/18/04 CK 13255 |
| 08/20/04 | Magnetrol | 04-1126 | 9316082-001 | 1,350.00 | 10/18/04 CK 13250 |
| 08/25/04 | Puerto Rico Wire Products, Inc. | 04-1089 | 543420 | 373.00 | 10/15/04 CK 13392 |
| 08/26/04 | Reslon & Johnson | | 9624 | 82.59 | 09/02/04 CK 13002 |
| 08/30/04 | Crimon Diesel | 04-1154 | 45364 | 11,612.21 | 09/02/04 CK 12936 |
| 07/09/04 | Bury Brothers, Inc. | 04-1154 | 45398 | 10,447.15 | 09/02/04 CK 12936 |
| 07/30/04 | Bury Brothers, Inc. | 04-0954 | A1071V314 | 15.63 | 09/02/04 CK 13001 |
| 07/31/04 | UPS | 04-1089/04-1051 | A1071V314 | 277.24 | 09/02/04 CK 13001 |
| 08/14/04 | UPS | JE-J075 05 | A/P Accrual | 537,525.81 | N/A |
| 08/31/04 | Accounts Payable Accrual | | | 2,593.76 | N/A |
| 08/31/04 | To Record Cost of Sales | | | 242.76 | N/A |
| 08/31/04 | Accrual Outages Invoices | | | 758,785.10 | |
| | **Balance as of August 31st, 2004** | | | | |
| 09/01/04 | Accounts Payable Accrual | JE-J075 05 | A/P Accrual | (537,525.81) | N/A |
| 09/01/04 | Accrual Outages Invoices | | | (242.76) | N/A |
| 08/10/04 | Harmageena Arroyano | | CAFT095 | 304.00 | 09/02/04 CK 13015 |
| 08/30/04 | Reslon & Johnson | 04-1089 | 543634 | 66.00 | 10/15/04 CK 13382 |
| | | | 905375452 | 952.56 | 09/30/04 CK 13128 |
| 09/02/04 | Indecca | 04-1087 | 609-001462 | 3,400.00 | 09/30/04 CK 13015 |
| 08/27/04 | Amotep, Inc. | | 201 | 2,480.00 | 09/21/04 CK 13093 |
| 07/24/04 | ASJ Maintenance Services | | 299-436 | 242.76 | 09/30/04 CK 13188 |
| 08/30/04 | Brand Services | | 1200 | 1,996.56 | 09/30/04 CK 13151 |
| 09/01/04 | J3 Puerto & Asociados | 04-1059 | 3270662980 | 500.65 | 09/30/04 CK 13142 |
| 09/01/04 | Menlo Worldwide Forwarding | 04-1150 | 803778 | 20,549.30 | 09/30/04 CK 13199 |
| 09/01/04 | Puerto Rican International Companies | 04-0384 | 803778 | 11,945.25 | 09/30/04 CK 13099 |
| 09/01/04 | Puerto Rican International Companies | 04-0384 | 803779 | 50,874.61 | 09/30/04 CK 13199 |
| 09/01/04 | Puerto Rican International Companies | 04-0384 | 803779 | 35,223.42 | 09/30/04 CK 13199 |
| 09/01/04 | Puerto Rican International Companies | | 04-0006 | 2,347.52 | 09/30/04 CK 13099 |
| 09/02/04 | Sherry Electrical Services & Associates | | 04-0002 | 986.02 | 09/12/04 CK 12993 |
| 06/05/04 | Sherry Electrical Services & Associates | | 05A043 | 1,922.30 | 09/30/04 CK 13133 |
| 07/07/04 | Bi-State Rubber, Inc. | 04-1057 | 00075 | 1,955.17 | 09/14/04 CK 13077 |
| 08/04/04 | Contero de Jesus | 04-0191 | 1400146214 | 521,353.80 | 10/08/04 WT09-129 |
| 07/05/04 | GE Osmonics | 04-1290 | 04-1290 | 10,254.75 | 09/21/04 CK 13088 |
| 09/21/04 | Caribbean Irrigation Sales | | 1050023 | 1,512.82 | 10/08/04 CK 13286 |
| 09/03/04 | ERM-PR, Inc. | 04-1033 | 642991031 | 264.11 | 09/30/04 CK 13164 |
| 08/03/04 | Overnite Transportation Co. | 04-1033 | 5661506030 | 136.47 | 09/30/04 CK 13164 |
| 08/05/04 | Steel and Pipes, Inc. | 04-1154 | 732387 | 708.20 | 10/08/04 CK 13393 |
| 08/30/04 | Bury Brothers, Inc. | 04-1115 | 45439 | 13,388.08 | 09/30/04 CK 13130 |
| 09/07/04 | Bury Brothers, Ir | 04-1115 | 45450 | 7,149.50 | 09/30/04 CK 13130 |
| 08/27/04 | CIB Corporation | 04-1090 | P45476 | 43.68 | 10/15/04 CK 13333 |

4/16/2005 1:16 PM                                                                 CAPEX LOG 2005.xls

05-16-05    12:12pm    From-MSL Copy Room 2, Right    302 225 9674    T-728  P.021/025  F-351



**AES**
**Puerto Rico**

## CAPITAL PROJECT

Account Number 1401-07-000
AR Date February 8, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Remrate Osmosis Process - Water Treatment Modification (ESP Corrosion Elimination ) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 08/31/04 | CIB Corporation | 04-1181 | P45505 | 86.10 | 10/15/04 CK 13333 |
| 09/01/04 | CIB Corporation | 04-1167 | P45518 | 2,664.00 | 10/15/04 CK 13333 |
| 09/03/04 | CIB Corporation | 04-1181 | P07355 | 43.58 | 10/15/04 CK 13333 |
| 09/07/04 | Puerto Rico Wire Products, Inc. | 04-1201 | 9319003001 | 1,586.00 | 10/16/04 CK 13376 |
| 09/10/04 | Puerto Rico Wire Products, Inc. | 04-1201 | 9320567001 | 742.00 | 10/15/04 CK 13376 |
| 09/13/04 | Puerto Rico Wire Products, Inc. | 04-1201 | 9321107001 | 840.00 | 10/15/04 CK 13376 |
| 09/14/04 | Puerto Rico Wire Products, Inc. | 04-1201 | 9321565001 | 252.00 | 10/15/04 CK 13376 |
| 09/12/04 | Cortes Industrial Organization | 04-1349 | 50047 | 280.00 | 10/31/04 CK 13542 |
| 09/21/04 | Rosemount Analytical | 04-1130 | U41829 | 2,652.00 | 10/29/04 CK 13499 |
| 09/23/04 | Graybar International PR | 04-1185 | 209071 | 70.00 | 10/28/04 CK 13468 |
| 09/23/04 | Graybar International PR | 04-1212 | 209031 | 288.00 | 10/28/04 CK 13468 |
| 09/20/04 | Graybar International PR | 04-1295 | 208854 | 580.39 | 10/29/04 CK 13468 |
| 09/08/04 | El Principe de los Terrriios | 04-1215 | 5879 | 223.69 | 10/15/04 CK 13338 |
| 09/01/04 | Universal Steel Trading Co. | 04-1164 | 173522 | 76.32 | 10/15/04 CK 13399 |
| 09/04/04 | Bowman Distribution | 04-1284 | 4190154001 | 323.42 | 10/15/04 CK 13383 |
| 09/03/04 | More Steel & Aluminum Products | 04-1181 | 18173 | 886.00 | 10/15/04 CK 13356 |
| 09/25/04 | Universal Alloy Valve & Fitting | 04-1232 | 5027 | 2,170.00 | 10/15/04 CK 13358 |
| 09/25/04 | Wholesale Electric del Caribe, Inc. | 04-1286 | 1034956-00 | 918.50 | 10/29/04 CK 13521 |
| 09/30/04 | Accounts Payable Accrual | JE-J0905 05 | A/P Accrual | 9,649.39 | N/A |
| 09/30/04 | To Expense Spare Parts | JE-J0908 08 | Spare Parts | 9,842.06 | N/A |
| | Balance as of September 30, 2004 | | | 197,613.74 | |
| 10/01/04 | Accounts Payable Accrual | JE-J0905 05 | A/P Accrual | 19,473.30 | N/A |
| 10/07/04 | Puerto Rican International Companies | 04-0384 | 80386 | 20,221.20 | 11/30/04 CK 13605 |
| 10/07/04 | Puerto Rican International Companies | 04-0384 | 80386 B | 17,262.39 | 11/10/04 CK 13605 |
| 10/07/04 | Puerto Rican International Companies | 04-0384 | 80387 | 44,190.80 | 11/10/04 CK 13605 |
| 10/07/04 | Puerto Rican International Companies | 04-0384 | 80387 B | 10,704.42 | 11/10/04 CK 13605 |
| 10/20/04 | Puerto Rican International Companies | 04-0384 | 80394 | 4,990.40 | 11/23/04 CK 13779 |
| 10/20/04 | Puerto Rican International Companies | 04-0384 | 80391 B | 1,440.30 | 11/23/04 CK 13779 |
| 10/20/04 | Puerto Rican International Companies | 04-0384 | 80392 | 17,105.48 | 11/23/04 CK 13779 |
| 10/20/04 | Puerto Rican International Companies | 04-0384 | 80392 B | 8,913.76 | 11/23/04 CK 13779 |
| 10/20/04 | Puerto Rican International Companies | 04-1232 | 9270668632 | 1,397.26 | 10/13/04 CK 13302 |
| 09/10/04 | Menlo Worldwide Forwarding | 04-1048 | 305456419 | 1,492.88 | 10/15/04 CK 13373 |
| 08/15/04 | Overnite Transportation Co. | | 849378066 | 635.54 | 09/10/04 CK 13019 |
| 08/29/04 | Adecco | | 54497730L | 316.30 | 10/15/04 CK 13305 |
| 09/10/04 | Overnite Transportation Co. | 04-1232 | 654997304 | 121.55 | 10/06/04 CK 13226 |
| 09/28/04 | United Parcel Service (Freight Rosemount) | 04-1130 | A1071V394 | 121.55 | 10/06/04 CK 13226 |
| 09/30/04 | Cortes Industrial Organization | 04-1349 | 50047 | 280.00 | 10/31/04 CK 13542 |
| 09/27/04 | Automation Technologies, Inc. | 04-1235 | A0928 | 2,545.00 | 10/29/04 CK 13427 |
| 10/22/04 | Rubber & Plastic Specialties | 04-1921 | 35924 | 76.54 | 11/23/04 CK 13763 |
| 09/30/04 | Wholesale Electric del Caribe, Inc. | 04-1286 | 1034956-01 | 49.80 | 10/31/04 CK 13565 |
| 09/30/04 | Wholesale Electric del Caribe, Inc. | 04-1286 | 1034956-02 | 27.00 | 10/31/04 CK 13565 |
| 10/07/04 | Wholesale Electric del Caribe, Inc. | 04-1286 | 1034956-03 | 27.30 | 11/11/04 CK 13691 |
| 09/01/04 | More Steel & Aluminum Products | 04-1177 | 18768 | 1,454.50 | 10/29/04 CK 13487 |
| 09/01/04 | More Steel & Aluminum Products | 04-1177 | 18769 | 811.50 | 10/29/04 CK 13487 |
| 09/22/04 | More Steel & Aluminum Products | 04-1348 | 19569 | 799.00 | 10/29/04 CK 13407 |
| 09/22/04 | Universal Alloy Valve & Fitting | 04-1048 | 4916 | 163.31 | 10/29/04 CK 13516 |
| 09/01/04 | Universal Alloy Valve & Fitting | 04-1150 | 5005 | 1,820.90 | 10/25/04 CK 13516 |
| 09/09/04 | Universal Alloy Valve & Fitting | 04-1232 | 5031 | 3,845.75 | 10/25/04 CK 13516 |
| 09/23/04 | General Electric del Caribe, Inc. | 04-0620 | 089-033017 | 675.00 | 10/29/04 CK 13466 |
| 09/23/04 | General Electric del Caribe, Inc. | 04-0620 | 089-033841 | 276.00 | 10/29/04 CK 13466 |
| 10/21/04 | Universal Alloy Valve & Fitting | 04-1507 | 5233 | 1,335.51 | 11/23/04 CK 13799 |
| 10/27/04 | Bolt & Nut, Inc. | 04-1471 | 286804 | 330.00 | 11/23/04 CK 13535 |
| 10/07/04 | La Casa de los Tornillos | 04-1445 | 730066 | 130.00 | 11/17/04 CK 13656 |

05-16-05     12:13pm     From-MSL Copy Room 2, Right          302 225 3674          T-728   P.022/025   F-351



**AES**

**Puerto Rico**

**CAPITAL PROJECT**

Account Number 1401-07-000
AR Date February 8, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Reverse Osmosis Process - Water Treatment Modification (ESP Corrosion Elimination ) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 09/13/04 | La Casa de las Tornillos | 04-1256 | 730740 | 1236 | 10/29/04 CK 13484 |
| 09/10/04 | Universal Steel Trading Corp. | 04-1251 | 172143 | 838.06 | 10/15/04 CK 13399 |
| 09/27/04 | Raclan & Johnson | 04-1273 | 508247 | 97.20 | 10/29/04 CK 13501 |
| 09/26/04 | American Express (Teddy Diaz) | AMEX | C. Kamria | 1,032.95 | 10/13/04 CK 13294 |
| 10/10/04 | Banco Popular (Harrington) | Visa | C. Kamria | 360.56 | 10/29/04 CK 13438 |
| 10/31/04 | Accounts Payable Accrual Journal Entry | JE-21005 | | 23,836.23 | N/A |
| 12/31/04 | Spare Parts Expense | JE-21008 | | 2,037.77 | N/A |
| | Balance as of October 31st, 2004 | | | 183,197.96 | |
| 11/01/04 | Accounts Payable Accrual Journal Entry | JE-21005 | | (23,836.23) | N/A |
| 10/28/04 | Fastenal Company | 04-1322 | PRMER116902 | 426.96 | 12/02/04 ck 13851 |
| 07/07/04 | ERM-PR, Inc. | Bill Vela | 1550051 | (1,520.25) | 06/20/04 CK 12574 |
| 08/05/04 | ERM-PR, Inc. | Bill Vela | 1550022 | (1,522.30) | 09/02/04 CK 12977 |
| 10/29/04 | Puerto Rican International Companies | 04-1384 | 80988 | 1,293.75 | 12/02/04 CK 13932 |
| 10/11/04 | Bury Brothers, Inc. | 04-1154 | 45491 | 11,646.51 | 11/11/04 CK 13614 |
| 10/14/04 | Bury Brothers, Inc. | 04-1154 | 45500 | 5,922.51 | 11/11/04 CK 13614 |
| 10/20/04 | Automation Technologies, Inc. | 04-1225 | 040086 | 5,600.00 | 12/17/04 CK 13737 |
| 10/25/04 | Fastenal Company | 04-1322 | PRMER116909 | 242.29 | 12/02/04 CK 13851 |
| 10/30/04 | Puerto Rican International Companies | 04-0394 | 80393-B | 1,959.42 | 11/23/04 CK 13779 |
| 10/23/04 | UPS | 04-1507 | A1071V434 | 366.82 | 11/31/04 CK 13687 |
| 10/20/04 | Caribbean Irrigation Sales, Inc. | 04-0733 | 00024220 | 14,581.76 | 11/22/04 CK 13698 |
| 08/18/04 | Oversite Transportation Co. | 04-1033 | 542996655 | 248.12 | 11/19/04 CK 13713 |
| 10/31/04 | Brand Services | | 291-451 | 1,400.12 | 12/02/04 CK 13632 |
| 10/04/04 | Teddy Diaz Fastening PR (American Express) | Calvin Kotria | AMEX102604 | 360.00 | 11/23/04 CK 11/23/04 |
| 09/17/04 | Cortez Industrial Organization | 04-1235 | 54930 | 280.00 | 11/23/04 CK 13734 |
| 11/23/04 | S E S A Electrical Services | - | 04-0010 | 795.48 | 11/30/04 CK 13922 |
| 11/10/04 | M.R. Franceschini, Inc. | 04-1567 | 157701 | 6,995.70 | 12/09/04 CK 13925 |
| 11/18/04 | Univar USA, Inc. | 04-1230 | NM-225920 | 300.00 | |
| 07/22/04 | Caribbean Architects & Engineers | - | 90026744 | 23,975.16 | 12/02/04 CK 13827 |
| 09/15/04 | Caribbean Architects & Engineers | - | 90031728 | 11,563.13 | 12/02/04 CK 13827 |
| 11/30/04 | Spare Parts Expense | JE-21008 | | 836.32 | N/A |
| | Balance as of November 30, 2004 | | | 62,843.34 | |
| 10/26/04 | GE Osmonics, Inc. | 04-1284 | 10400835 | 4,590.00 | 12/17/04 CK 14034 |
| 08/14/04 | Cortez de Jesus | 04-1057 | 00075 | (277.58) | 03/14/04 CK 13777 |
| 12/15/04 | Puerto Rican International Companies | - | 80405 | 7,800.00 | 01/14/05 CK 14276 |
| 09/14/04 | Raymond Professional Group | 04-0566 | 128767 | 9,910.00 | 12/17/04 CK 14076 |
| 12/21/04 | Patent Construction Systems | 04-1671 | 5046612000 | 1,902.87 | 12/21/04 CK 14151 |
| 12/25/04 | Patent Construction Systems | 04-1671 | 5046611900 | 1,123.32 | 12/31/04 CK 14151 |
| 12/31/04 | Accounts Payable Accrual Journal Entry | JE1205 | Journal Entry | 1,405.80 | N/A |
| | Balance as of December 31st, 2004 | | | 26,116.41 | |
| 01/01/05 | Accounts Payable Accrual Journal Entry | JE0105 | Journal Entry | (1,405.80) | N/A |
| 11/30/04 | Magnetrol International, Inc. | 04-1205 | 603761 | 1,405.80 | 01/07/05 CK 14206 |
| 08/17/04 | Caribbean Irrigation Sales, Inc. | 04-1280 | 26309 | 10,294.75 | 05/21/04 CK 13068 |
| 08/17/04 | Caribbean Irrigation Sales, Inc. | 04-1280 | 26309 | (10,294.50) | 09/21/04 CK 13068 |
| 12/20/04 | Caribbean Irrigation Sales, Inc. | 04-1280 | 27598 | 6,089.50 | 01/25/05 CK 14316 |
| 01/03/05 | Caribbean Irrigation Sales, Inc. | 04-1280 | 28138 | 14,500.00 | 01/25/05 CK 14316 |
| 11/30/04 | Oversite Transportation Co. | 04-1556 | 347927384 | 232.08 | 01/14/05 CK 14471 |
| 12/31/04 | Brand Services | | 291-464 | 1,022.40 | 01/31/05 CK 14584 |
| | Balance as of January 31st, 2005 | | | 11,349.63 | |
| 02/03/05 | Secretario de Hacienda | | | 3,100.00 | 02/11/05 CK 14577 |
| 10/30/04 | Contard de Jesus | 04-1639 | 206 | 336.11 | 02/11/05 CK 14639 |
| 12/23/04 | S E S A Electrical Services | 04-1040 | 04-0013 | 670.79 | 12/30/04 CK 14123 |
| 02/18/05 | Patent Construction Systems | 04-1671 | 5046611900 | 997.82 | 02/28/05 CK 14715 |
| | Balance as of February 28th, 2005 | | | 5,604.66 | |
| 03/11/05 | Automation Technologies, Inc. | 04-0142 | 50210 | 2,252.50 | 03/10/05 CK 14802 |
| 02/18/05 | Puerto Rican International Companies | 04-1539 | 80420 | 4,100.00 | 03/18/05 CK 14940 |
| 03/18/05 | Patent Construction Systems | 04-1671 | 5046611900 | 897.82 | 04/01/05 CK 15075 |
| | Balance as of March 31st, 2005 | | | 7,250.70 | |

06-16-05     12:13pm     From-MSL Copy Room 2, Right          302 225 3674     T-728   P.023/025   F-351



**Puerto Rico**

CAPITAL PROJECT

Account Number 1401-07-000
  AR Date February 8, 2004
  AR Originator Tracy Jarvis - Water Treatment Team Leader
  AR Title Reverse Osmosis Process - Water Treatment Modification (ESP Corrosion Elimination ) Project
  AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is
      occurring in the precipitator.
  AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | 1,786,559.12 | |
| Total Amount Used in 1401-07-000 | | | | 1,786,559.12 | |
| Total Amount Approved in Capex 1401-07-000 | | | | 1,600,000.00 | |
| Balance in Capex 1401-07-000 | | | | (186,559.12) | |
| Percentage Over run | | | | -11.66% | |

Capex Recommended Status
  ☐   Closed
  ☐   Supplemental
  ☐   Continue

05-16-05   12:14pm   From-MSL Copy Room 2, Right        302 225 3674       T-728   P.024/025   F-351

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AES PUERTO RICO, L.P., | ) |
| Plaintiff, | ) |
| v. | ) Civ. No. 04-1282JJF |
| ALSTOM POWER, INC. | ) |
| Defendant/ Third-Party Plaintiff, | ) |
| v. | ) |
| ENVIRONMENTAL ELEMENTS CORPORATION and LIBERTY MUTUAL INSURANCE COMPANY, | ) |
| Third-Party Defendants. | ) |

### NOTICE OF SERVICE

I, John S. Spadaro, hereby certify that on May 16, 2005, I caused true and correct copies of Plaintiff's Responses to Alstom Power, Inc.'s First Set of Interrogatories to be served on all counsel of record by electronic filing.

In addition, the following party was served in the manner indicated:

**HAND DELIVERY**
Richard R. Wier, Jr.
Daniel W. Scialpi
1220 Market Street, Suite 600
Wilmington, DE 19801

In addition, I certify that the following attorneys were served with the document by facsimile at the number shown:

Anthony F. Vittoria
James E. Edwards
Ober Kaler, Grimes & Schriner
Fax: (410) 547-0699

120412

05-16-05    12:14pm    From-MSL Copy Room 2, Right                302 225 3674        T-728  P.025/025  F-351

Respectfully submitted,

/s/ John S. Spadaro
John S. Spadaro, No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  May 16, 2005                    Attorneys for AES Puerto Rico, L.P.

120412

# TAB
# 3



**O B E R | K A L E R**
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699
www.ober.com

**Anthony F. Vittoria**
afvittoria@ober.com
410-347-7692

**Offices In**
Maryland
Washington, D.C.
Virginia

August 15, 2005

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

> **Re:** *AES Puerto Rico, LP v. ALSTOM Power Inc.*
> **Civil Action No. 04-1282-JJF**

Dear Dan:

As you will recall from the mediation, Judge Thynge encouraged the parties to work together on issues that might arise during discovery. Accordingly, I am writing to you regarding ALSTOM's concerns about AES's Answers to ALSTOM's Interrogatories and AES's hard-copy document production. I will address AES's Answers to ALSTOM's Interrogatories first.

## I.    AES's Answers To ALSTOM's Interrogatories

As you know, the parties agreed to exchange limited Interrogatories prior to the Mediation. ALSTOM served AES with its Interrogatories on or about April 12, 2005. AES served its Answers on or about May 16, 2005. While AES's Answers are lacking in many respects, its Answer to Interrogatory No. 2 is particularly deficient and must be supplemented as soon as possible. Interrogatory No. 2 requests the identity of persons with knowledge of the CDS, ESP or FBHE Handcuff equipment and a description of the knowledge possessed by those individuals. In response, AES provided the names of only 13 individuals and failed to provide any information as to the knowledge possessed by those individuals.

A brief review of the hard-copy documents produced by AES provides the identity of several more individuals who had significant roles on the Project and who have knowledge and information regarding the CDS, the ESP or the FBHE Handcuff equipment. Those individuals include, but are certainly not limited to, Chip Bergeron, Jerry Cagle, Anibal Davila, Jorge Diaz, Stewart Ferguson, Rod Jorgensen, Calvin Kotrla, Luis Lopez, Gary Martin, Jorge Martinez, Julio Ortiz, Carlos Reyes, Carlos Gonzalez Rivera, Fernando Rodriguez, Eduardo Santiago, Brian Thompson, Doug Tomlin, Rich Triffinoff, Bill Vela, Rick Wylie, WeiLi Yu. The formal identification of all AES personnel who have knowledge and information regarding these matters is important because ALSTOM expects that AES will produce both the electronic document files and hard-copy document files for all of these individuals. As you know, it is AES's obligation to



O B E R | K A L E R
A Professional Corporation

Daniel D. Williams, Esquire
August 15, 2005
Page 2

identify all individuals responsive to this Interrogatory – it is not ALSTOM's obligation to
identify those individuals AES failed to identify. Accordingly, AES should formally supplement
its Answer to Interrogatory No. 2 with the identities of **all** persons having material knowledge
regarding the CDS, the ESP or the FBHE Handcuff equipment, as well as a description of the
information they possess, as soon as possible.

## II.    AES's Production Of Hard-Copy Documentation

In addition to limited Interrogatories, the parties agreed to exchange document requests
prior to the Mediation. ALSTOM served AES with a Request for the Production of Documents
on or about March 18, 2005. AES replied to the Request with its Responses and Objections on
or about April 27, 2005.

As you know, ALSTOM had concerns regarding many of the objections asserted by AES
to ALSTOM's various requests. Those concerns were detailed in my letter to you dated May 16,
2005. While I never received a substantive response from AES, you did offer to "meet and
confer" regarding ALSTOM's concerns. At about the same time as your offer, AES began the
production of its hard-copy documents. Accordingly, rather than attempt to discuss, in the
abstract, all of AES's objections, it was simply more efficient for ALSTOM to review AES's
hard-copy document production prior to a "meet and confer" so that it could determine whether
any of AES's objections remained a concern. Having completed an initial review of the hard-
copy documents that AES produced, ALSTOM not only still has concerns regarding AES's
Responses and Objections to ALSTOM's Request for the Production of Documents, but it also
has serious concerns regarding the form and substance of AES's hard-copy document
production.

### A.    The Improper Format of AES's Hard-Copy Document Production

Rather than produce its hard-copy documents "as they are kept in the usual course of
business", AES ostensibly produced the hard-copy documents organized and labeled to
correspond with the categories in ALSTOM's request. Upon cursory review, however, it was
immediately apparent that AES failed to fulfill its obligations under the Federal Rules to properly
organize and label its hard-copy documents according to ALSTOM's categories. Rather, it is
apparent that AES simply took copies of certain "binders" (which appear to be AES's project
binders) and then simply placed several labels in front of those binders in a half-hearted attempt
to comply with the Federal Rules. However, AES's placement of those "labels" was haphazard
at best and, in certain instances, appeared completely random.

The following is not a comprehensive list, but simply sets forth examples of the
seemingly arbitrary manner in which AES attempted to "categorize" and "label" its hard-copy
document production.

O B E R | K A L E R
A Professional Corporation

Daniel D. Williams, Esquire
August 15, 2005
Page 3

- Binder 35 (AESPR 006738 through AESPR 006779) was labeled
to be responsive to ALSTOM Document Request No. 32, which
requested documents related to the "design, procurement and/or
construction and installation of the CDS and/or the ESP, or Water
Treatment System." Binder 35, however, contained CDS Water
Quality and CPCO Condensate Return Logs. It did not contain any
hard-copy documents responsive to Request No. 32. Interestingly,
the hard-copy documents contained in Binder 35 were responsive
to Document Request No. 53, which sought any "data compilations
. . . relating to the CDS", but that Request was not identified on
AES's label.

- Binder 1 (AESPR 007742 through AESPR 008216) was labeled to
be responsive to ALSTOM Document Request No. 13, which
requested documents related to the "application for the air permit
submitted to the governmental agency or agencies having authority
over the emissions from the Project." Binder 1, however, which
was entitled "AES-PR Correspondence", did not contain any
documents dating back to the time at which AES prepared or
submitted its application to EPA for the air permit. Rather, Binder
1 contained several documents related to the Project's compliance
with air emission standards, which is directly responsive to
Request No. 56. That Request, however, was not identified on
AES's label. In addition, Binder 1 contained a great number of
hard-copy documents related to the coal crushers on the Project.
Those hard-copy documents are not responsive to any of
ALSTOM's Requests.

- Binders 4, 5 and 6 (AESPR 009225 through AESPR 010161) were
each labeled to have been responsive to ALSTOM Document
Request No. 69, which requested "documents related to any
physical or operational modifications AES made to the CDS and/or
ESP equipment, the Water Treatment System, or the Closed
Cooling Water Cycle." Binders 4-6, however, contained D/FD
Construction Weekly Status Reports and correspondence between
AES and D/FD during the construction phase of the Project. None
of the Binders contained documents dated from after November
28, 2002 – the date on which AES took operational control of the
Project – and therefore do not, and cannot, contain any documents
regarding modifications that AES made to the Project.

O B E R | K A L E R
A Professional Corporation

Daniel D. Williams, Esquire
August 15, 2005
Page 4

- Binders 40 and 42 (AESPR 022494 through AESPR 022646 and AESPR022736 through AESPR023621, respectively) were both labeled to have been responsive to ALSTOM Document Request No. 49, which requested "photographs, videotapes, drawings, or other graphic depictions of any aspect of the CDS and/or the ESP equipment, or the Water Treatment System." Neither Binder 40 nor 42, both of which contained emissions compliance reports, contained a single photograph or videotape. In addition, the few drawings contained in those binders relate to equipment other than the CDS, ESP or FBHE Handcuff equipment. Moreover, the graphs contained in Binders 40 and 42 simply chart the emissions from the Project and do not depict "any aspect of the CDS and/or the ESP equipment or the Water Treatment System."

- Documents AESPR 006780 through AESPR 009224, Binder 15 (AESPR 012555 through AESPR 012757), Binder 32 (AESPR 016396 through AESPR 016833), Binder 36 (AESPR 021506 through AESPR 022012) and Binder 22, (AESPR 025969 through AESPR 026614) were all labeled to be responsive to "Multiples". There simply was not an ALSTOM Document Request that was either entitled, or could be described as, "Multiples". Accordingly, AES produced approximately 4,225 pages of hard-copy documentation with absolutely no explanation as to which Request or Requests the hard-copy documents were supposedly responsive. Further, it is troubling that AES labeled those documents as being responsive to "Multiples" when it labeled other hard-copy documents as being responsive to up to 12 separate Requests. Finally, some of the documents contained in the "Multiples" category were directly responsive to other requests made by ALSTOM. For example, an AES e-mail entitled "Preservation of Documents for Lawsuit" (AESPR 007242 to AESPR 007245) is directly responsive to ALSTOM request No. 5, which sought any documents relating to the retention/destruction of electronic documents.

In addition to the foregoing examples, AES produced many hard-copy documents that simply were not responsive to any of ALSTOM's requests, including, but not limited to, hard-copy documents related to (1) archaeological information concerning the Project site, (2) the required reforestation of land in Puerto Rico, (3) the Project's switchyard, (4) climatological data dating back to 1931, (5) coal sizing, (6) soil liquefaction, (7) the erection and commissioning of



OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
August 15, 2005
Page 5

the turbine, (8) the refractory at the Project and (9) an unrelated lawsuit involving Brand Scaffold.

AES neither produced its hard-copy documents "as they are kept in the usual course of business", nor did it produce them organized and labeled to correspond with the categories in ALSTOM's request. Rather, AES produced a small portion of its documents – the "binders" – as they were kept in the usual course of business, but then haphazardly grouped those hard-copy documents with labels. By improperly and inadequately combining the two formats, AES has failed to satisfy its obligations under the Federal Rules.

**B.      The Substantive Inadequacies Of AES's Hard-Copy Document Production**

In addition to the inappropriate format of AES's hard-copy document production, there were several glaring substantive deficiencies to the production. First, a simple cross-check of the "labels" accompanying AES's hard-copy documents with ALSTOM's Document Request indicates that AES failed, by its own admission, to produce a single document responsive to ALSTOM Document Request Nos. 2 through 11, 20, 21, 30, 31, 34, 37 through 45, 60, 63, 67, 68, 70 through 72, and 74 through 76. Although AES objected to several of those Requests, those objections were addressed in my May 16, 2005 letter to you.

More importantly, there is a noticeable absence of specific categories of documentation in AES's hard-copy document production. In particular, AES produced very few of the personal files of the employees who worked on the Project. Specifically, AES produced the personal files of only David Stone and Rick Wylie. AES did not produce the personal files of any of the individuals identified in its Answers to ALSTOM's Interrogatories or any of the other individuals identified above (and in AES's own documents) who had significant roles on the Project.

In addition to the dearth of personal files, AES failed to produce the following highly relevant hard-copy documents that were specifically requested by ALSTOM:

- AES did not produce a copy of its air-permit application to EPA, the supplementations to that application, any of the hard-copy documentation leading up to the submission of the application, or EPA's approval of that application, as requested in Document Request No. 13.

- AES failed to produce any hard-copy documents relating to the original Water Treatment System at the Project, as requested by ALSTOM Request No. 14. AES is claiming damages relating to the modification of that system, so hard-copy documents relating

OBER|KALER
A Professional Corporation

Daniel D. Williams, Esquire
August 15, 2005
Page 6

to the original design and performance of that system are highly
relevant and material to AES's claim for damages.

• AES did not produce any hard-copy documents relating to the
consideration, design or construction of the equipment that
recirculated the ash from the ESP to the boilers. Those hard-copy
documents would have been responsive to either or both Document
Request Nos. 18 and 19.

• Document Request No. 34 requested all daily, monthly and other
periodic reports relating to the Project. Despite this specific
request, AES did not produce D/FD Monthly Report Nos. 1-2, 6,
10-11 or any dated after December, 2001. Further, AES produced
weekly reports for the period of March of 2001 through June of
2002, only.

• AES failed to produce any insurance policies relating to the
Project, as requested by Document Request No. 37.

• AES failed to produce all of the EEC Operations and Maintenance
("O&M") Manuals, as request by ALSTOM Request No. 52.
Specifically, while AES produced O&M Volumes I-II and IV-VI,
it failed to produce Volumes III and VII-IX. In addition, AES's
production of Volume I – the Volume that contains specific
instructions related to the daily operation and maintenance of the
CDS and ESP equipment – was completely defective. Specifically,
the Manual was completely out of order – it went from the cover
page and table of contents, to Appendices A through C, then
skipped to Appendix E, then to Appendix G, then to Appendix I,
then to Appendix J, before going to Chapter 2, then to Chapter 5,
then Chapters 8 through 10, then back to Chapter 1, then to
Chapter 7, then to Appendix D, then to Appendix F, then H, and
finally to Appendices K through O. In addition to this haphazard
arrangement, the Manual was missing all of Chapters 3, 4 and 6
and parts of Chapters 2 and 5.

• AES has also failed to produce the Test and Monitoring Plan,
which was expressly requested by ALSTOM by Request No. 60,
despite the fact that other documentation – specifically, a May 31,
2001 letter from D/FD to AES's Stewart Ferguson – shows that
AES was provided with a copy of that Plan on May 15, 2001.

O B E R | K A L E R
A Professional Corporation

Daniel D. Williams, Esquire
August 15, 2005
Page 7

- Document Request No. 62 requested documents related to the chloride content of the water used in the CDS. AES did not produce any hard-copy document records of chloride testing of the CDS water dating prior to September of 2003.

- Document Request No. 64 requested documentation relating to the chloride content of the ash within the CDS and ESP equipment. Despite the fact that the CDS/ESP O&M Manuals instructed AES to regularly monitor the chloride content of the ash, AES produced only anecdotal information regarding such monitoring.

- AES failed to produce any hard-copy documentation relating to the consumption of lime and limestone at the Project, despite the fact that such hard-copy documentation would be responsive to Document Request Nos. 53 and 75.

- Finally, and perhaps most troubling, AES neglected to provide any hard-copy documentation related to the calculation of AES's claim for over $10M in "estimated" damages. Those hard-copy documents would have been responsive to several of ALSTOM's Requests, including, but not limited to, Request No. 35, which specifically requested all documents relating to any damages sustained by AES as a result of problems with or failure of the CDS or ESP equipment.

While the documents and document-types identified above are simply examples of the substantive deficiencies of AES's hard-copy document production, they demonstrate the need for AES to revisit ALSTOM's Requests and supplement it hard-copy document production as soon as possible.

**C.     Illegible Hard-Copy Documents Produced by AES**

AES did not produce the originals of the hard-copy documents that it produced to ALSTOM. Rather, AES produced copies of those originals. While it is unclear from our review what the "generation" of those copies were (i.e. copies of the originals, copies of copies, etc.), it is clear that AES rendered a large number of the hard-copy documents illegible by the manner in which it copied and produced them. In addition, most of the photographs, the originals of which were presumably in color, were rendered illegible when they were converted to black-and-white copies by AES prior to production to ALSTOM. A list of the Bates numbers of the illegible



Daniel D. Williams, Esquire
August 15, 2005
Page 8

documents is attached hereto.  ALSTOM requests that AES produce legible copies of the hard-copy documents contained in the attached list as soon as possible.

Because AES has (1) neglected to produce its hard-copy documentation in a proper format, (2) failed to produce highly relevant and responsive documents, and (3) produced several hundred illegible documents, it is appropriate that AES make a second production in which it produces **all** of its original hard-copy documents "as they are kept in the usual course of business".

I look forward to hearing from you in the near future regarding these matters.

Sincerely,

Anthony F. Vittoria

Attachment

AFV:
cc:    James E. Edwards, Jr., Esquire
       Michael A. Schollaert, Esquire

770997

## ILLEGIBLE HARD-COPY DOCUMENTS PRODUCED BY AES

| | | |
|---|---|---|
| AESPR 000395-000402 | AESPR 004799 | AESPR 005902-005903 |
| AESPR 000495-000508 | AESPR 004801 | AESPR 005953 |
| AESPR 004100 | AESPR 004806 | AESPR 005955 |
| AESPR 004102 | AESPR 005570 | AESPR 005963 |
| AESPR 004109-004112 | AESPR 005575 | AESPR 005966-005967 |
| AESPR 004114-004116 | AESPR 005602-005603 | AESPR 005969 |
| AESPR 004123-004124 | AESPR 005615 | AESPR 006028 |
| AESPR 004123 | AESPR 005617-005618 | AESPR 006043 |
| AESPR 004133-004134 | AESPR 005667 | AESPR 006147 |
| AESPR 004138 | AESPR 005669 | AESPR 006231 |
| AESPR 004140 | AESPR 005672 | AESPR 006334-006336 |
| AESPR 004145 | AESPR 005674 | AESPR 006341 |
| AESPR 004147-004148 | AESPR 005686-005693 | AESPR 006343-006344 |
| AESPR 004171-004191 | AESPR 005728-005729 | AESPR 006352 |
| AESPR 004262-004270 | AESPR 005735 | AESPR 006358 |
| AESPR 004317-004318 | AESPR 005746 | AESPR 006364 |
| AESPR 004424 | AESPR 005748 | AESPR 006412 |
| AESPR 004437-004439 | AESPR 005781 | AESPR 006432 |
| AESPR 004507 | AESPR 005788 | AESPR 006443 |
| AESPR 004778 | AESPR 005790-005791 | AESPR 006446 |
| AESPR 004789-004790 | AESPR 005841-005842 | AESPR 006466-006469 |
| AESPR 004796 | AESPR 005896 | AESPR 006482 |

afv
769415

1

AESPR 006484

AESPR 006587

AESPR 006595

AESPR 006604

AESPR 006606

AESPR 006611

AESPR 006613-006614

AESPR 006621-006622

AESPR 006624-006625

AESPR 006657

AESPR 006664

AESPR 006666

AESPR 006675

AESPR 006681

AESPR 006688

AESPR 006695

AESPR 006719-006720

AESPR 006722

AESPR 006735

AESPR 006874-006877

AESPR 006935-006936

AESPR 006949-006978

AESPR 006982

AESPR 006983

AESPR 006990-007001

AESPR 007008

AESPR 007014

AESPR 007022-007029

AESPR 007038-007043

AESPR 007045-007047

AESPR 007153

AESPR 007210-007214

AESPR 007245

AESPR 007247-007248

AESPR 007339-007342

AESPR 007391-007399

AESPR 007496-007497

AESPR 007515

AESPR 007538-007550

AESPR 007561-007592

AESPR 007663-007676

AESPR 007685-007686

AESPR 023679-023682

AESPR 025612

AESPR 025745-025759

AESPR 025763-025836

AESPR 025851-025853

AESPR 025855-025857

AESPR 025859-025861

AESPR 025863-025865

AESPR 025909-025919

AESPR 025930-025935

AESPR 025938-025939

AESPR 026093-026099

AESPR 027034-02735

AESPR 027039-027040

AESPR 027042-027046

AESPR 027049

AESPR 027055

AESPR 027057

AESPR 027061

AESPR 027073

AESPR 027079

AESPR 027090

AESPR 027109-027117

AESPR 027123-027124

AESPR 027129

AESPR 027142

AESPR 027147-027151

afv
769415

| | | |
|---|---|---|
| AESPR 027155-027156 | AESPR 027183 | AESPR 027204-027205 |
| AESPR 027157 | AESPR 027185 | AESPR 027207 |
| AESPR 027160-027161 | AESPR 027195 | AESPR 027211 |
| AESPR 027165 | AESPR 027201 | AESPR 027213 |

AESPR 027215

AESPR 027219-027237

AESPR 027244

AESPR 027246-027248

AESPR 027256

AESPR 027260-027261

AESPR 027273

AESPR 027279

AESPR 027507-027508

AESPR 027651-027652

# TAB
# 4

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

DANIEL D. WILLIAMS
(202) 434-5263
ddwilliams@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

September 6, 2005

Anthony F. Vittoria, Esquire
Ober, Kaler, Grimes & Schriver
120 East Baltimore Street
Baltimore, MD 21202-1643

**Re:  AES Puerto Rico, LLP v. ALSTOM Power, Inc.**

Dear Tony:

Thank you for your letter of August 15, 2005. For purposes of clarity, I address seriatim the issues you raise.

First, you claim that AES-PR's answer to Interrogatory No. 2 is "deficient." AES-PR objected to that interrogatory as overbroad and unduly burdensome to the extent it required AES-PR to identify "all persons" with any "personal knowledge" regarding the CDS, ESP, and FBHEs and to state for each person all "knowledge [the person] possesses." AES-PR stands by that objection. In response to what was plainly an overbroad interrogatory, in the spirit of cooperation, AES-PR provided you the names of current and former AES-PR employees who would, in its opinion, have the most pertinent knowledge of the CDS, ESP, and FBHEs. ALSTOM is capable of identifying persons with more peripheral knowledge of those issues by reviewing the documents produced by AES-PR.

Second, you claim that AES-PR failed to "properly organize and label its hard-copy" production. Frankly, AES-PR is surprised at this complaint, given that you did not raise this issue on May 25, 2005, when you spent the better part of the day reviewing the documents at our offices in Washington, D.C., and that you have not raised it in the over three months since then.

I can assure you that, in an effort to make our production more user-friendly, we spent significant time and resources reviewing and organizing our

WILLIAMS & CONNOLLY LLP

Anthony F. Vittoria
September 6, 2005
Page 2

responsive documents. Because categories of your document requests overlapped, and many of the requests were vague, we labeled the documents as best we could to correspond to your requests, although it is possible that documents labeled for one request are also responsive to other requests.

Third, you point to nine documents (for which you do not provide bates numbers) that AES-PR included in its production that you claim are "not responsive" to ALSTOM's requests. I can assure you that <u>an attorney reviewed each and every document</u> that was produced to you. In doing so, we attempted to provide you only with documents that were responsive to ALSTOM's requests. However, if there was a close call as to responsiveness or if we felt that including a document would add greater clarity to other documents, we erred on the side of inclusion. Given that our entire production was only thirteen boxes (of which you took only five), I cannot imagine this presents a genuine issue.

Fourth, you claim that AES-PR failed to produce a number of documents responsive to your requests. Initially, for several of your requests, AES-PR simply does not have responsive documents. As to others, as you note in your letter, AES-PR objected to several of ALSTOM's documents requests on April 27, 2005. You claim that "those objections were addressed in [your] May 16, 2005 letter to [AES-PR]." You omit, however, that I responded to your May 16th letter on May 17th. In that letter, I requested clarification on several of your objections and suggested that we meet and confer to clarify the outstanding issues regarding document production. You never responded to me and did not meet and confer. If your August 15th letter represents a desire to begin the meet-and-confer process, I remain available to discuss these issues at your convenience.

Fifth, you claim that several of the documents that AES-PR produced to ALSTOM were illegible. As you will recall, AES-PR offered to provide ALSTOM a full copy set of documents when you were in Washington, D.C. on May 25, 2005. Those documents were copies of the originals. ALSTOM refused to make timely payment for those copies and opted to make copies of copies. It is certainly possible that certain of your copies of copies may be difficult to read. We currently are reviewing the list of documents you provided which you claim are illegible and will attempt to locate in our copy set the originals for those that truly are illegible. I will let you know when we can make them available to you.

WILLIAMS & CONNOLLY LLP

Anthony F. Vittoria
September 6, 2005
Page 3

AES-PR remains committed to a quick and fair resolution of discovery issues as they arise. To that end, I'm happy to meet with you at any time about these issues.

I trust that this letter finds you and your colleagues well.

Best regards,

Daniel D. Williams

cc: Michael Schollaert, Esq.

# TAB
# 5



December 12, 2002                                               AES-DFD-80

**Mr. Larry Copeland**
**Project Director**
**Duke/fluor Daniel 2300**
Yorkmount **Road**
**Charlotte, NC 28217**

Subject: Environmental Compliance.

Dear Larry:

As was determined and acknowledged by DFD prior to performance testing that the ESP and CDS do not operate per design or reliably. These shortcomings ha\.e become even more apparent as we accumulate full load operation experience. Below is a summary of the mechanical and emissions violations experienced by the facilit:. since the completion of performance testing. .

|        | S02 Exceed. 5 | Opacity Exceed. 15 | RV failures 2 | TR set trips / failures 45 |
|--------|---------------|---------------------|---------------|-----------------------------|
| Unit 1 |               |                     |               |                             |
| Unit 2 | 3             | 12                  | ?             | ₹                           |

During the final commissioning phase of the project it was determined that major system modifications would be necessary to rectify these shortcomings. It was agreed by all parties that to allow the project to move forward with performance testing, the ESP/CDS and its auxiliary equipment could be controlled in a semi-manual mode utilizing additional manpower and temporary DCS logic. It was also agreed that the materials required for these modifications would be fabricated on expedited basis and be available to be installed at the first opportunity .Alstom further agreed to ..provide operators to run the precipitator and dry scrubber system until the permanent modifications are completed. Please see the item I of the agreement reached on October 131h , :?00:?. ( attached I)

A review of our operator logs indicates the temporary DCS logic does not work and manual intervention of the rotary valve controls is required approximately every I to 2 hours. This mode of operation has lead to the excessive opacity failures, and caused the ash removal system to be overloaded.

The CDS lime injection system continues to operate intermittently with the back up feed path being unavailable. Again, the material for this modification was to be expedited and available for installation at the first opportunity .

Carr. 83 Km. 1–2.0. Bo. Jobo~ .P.O. Box 1890. Guayama. Puerto Rico 00785 .Tel. ( /–7, S66-1) 117 .Fax ( 787) X66-x 1.,9

.PI 0675695



**The first opportunity to install these parts was this week when we had an outage on unit 2 due to the dry scrubber. However parts and design are not available.**

AES is concerned that the facility as presently configt:lfed can not reliably achieve the requirements set out in our air permits. We are requesting DFD to take an active lead in ensuring these modifications are implemented in a timely manner. Additionally, we request DFD increase the operations support to three people (I man ,24 hrs, 7 days) and to remain on site until these modifications are complete.

Recently, we have learned that the facility didn't meet environmental compliance during the test. Please see the attached letter from our environmental consultants (ENSR). This exposes AES to environmental enforcement actions.

The CEMS logs and all other applicable records have recently been given to you site representative Mr. Cardin.

Also please note that your submitted Declaration of Performance Acceptance was to have accurately complied with the following section "6.2.6 Completed Perfornlance Tests.
By the declaration and report described in Section 6.2.6.1 hereof, Contractor may declare any Perfornlance Test completed in accordance with Section 6.2.1 above to be a Completed Performance Test if and **only** if during such test the operation of the Facility (a) complies with all Applicable Laws and Applicable Permits (including, without limitation, air emissions standards there under), (b) does not exceed the Guaranteed Emissions Limits, (c) achieves the Process Steam Requirements and (d) achieves zero discharge of process wastewater in a manner consistent with the Project's Pennits and that is reasonably likely to persist for the long-ternl operation of the Facility.

Please advise of your plans to immediately correct this situation.


**Sincerely,**

*f.#;/;::Z' ~~, /:.* **Stewart J. Ferguson**
**President**
**AES Puerto Rico, L.P .**


Cc :    Richard Trionoff
        Ron McParland

# TAB
# 6

**From:** WeiLi Yu [/O=THE AES CORPORATION/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=WEILI.YU]
**Sent:** Friday, January 23, 2004 1:28 PM
**To:** Paul Stinson; Puerto Rico Leaders
**Cc:** Wilfredo Diaz; Gustavo Acosta; Heriberto Rodriguez; Justo Echandy
**Subject:** RE: Additional T/C for ESP

These are the first set of readings. We will start logging these readings.

*Weili*

CONFIDENTIALITY: This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please delete the email and notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium. All information contained in the email and any attachments is sent without Prejudice.

    -----Original Message-----
    **From:** Paul Stinson
    **Sent:** Friday, January 23, 2004 10:07 AM
    **To:** WeiLi Yu; Puerto Rico Leaders
    **Cc:** Wilfredo Diaz; Ardy Cruz; Gustavo Acosta; Heriberto Rodriguez; Jaime Cortez; Julio Torres; Justo Echandy; Manuel Davila
    **Subject:** RE: Additional T/C for ESP

    Now these are interesting readings. We would expect things to be hotter at the top because heat rises. I wonder if the lower reading on the upper thermocouple means either:

    1) We have significant air in-leakage, or

    2) Perhaps some of the water that is sprayed into the CDS continues to evaporate after if gets past the CDS outlet T/Cs and cools the gas further.

    Is this based on one reading only? Perhaps we should check again?

    Paul Stinson

        -----Original Message-----
        **From:** WeiLi Yu
        **Sent:** Friday, January 23, 2004 9:43 AM
        **To:** Puerto Rico Leaders
        **Cc:** Wilfredo Diaz; Ardy Cruz; Gustavo Acosta; Heriberto Rodriguez; Jaime Cortez; Julio Torres; Justo Echandy; Manuel Davila
        **Subject:** Additional T/C for ESP

        Two each thermocouples installed in Unit 2 ESP. one at the top of the third mechanical field, and one at the side. The reading we got from yesterday afternoon was top – 159.6 deg F. bottom – 167.2 deg F. I think the bottom thermowell is buried in ash since it is attached to the walkway.

        *Weili*

        CONFIDENTIALITY: This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please delete the email and notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium. All information contained in the email and any attachments is sent without Prejudice.

AESPR-029125

# TAB
# 7

| From: | Charles.B.Jones.Jr@d-fd.com |
|---|---|
| Sent: | Monday, October 14, 2002 4:30 PM |
| To: | Carlos Reyes <Carlos.Reyes@AES.com> |
| Cc: | Anna.Solis@d-fd.com; Charlie.Lyda@d-fd.com; ervin.carden@d-fd.com; Fred Campbell/USWIN01/Power/ALSTOM@GA; Gary.Petrie@d-fd.com; Guy.Boyd@d-fd.com; Jerry Cagle <Jerry.Cagle@AES.com>; Lou Conti <Lou.Conti@AES.com>; Michael.Feakins@d-fd.com; Richard Trifonoff <Richard.Trifonoff@AES.com>; Ron McParland <Ron.McParland@AES.com>; Tim Maidenford/USWIN01/Power/ALSTOM@GA |
| Subject: | RE: AES-PR - Unit 2 Load Profile Request to PREPA |

Carlos,
Unit 2 load:

Oct 14, '02

16:00 to 20:00 - 255 MW
20:00 to 24:00 - 180 MW

Oct,. 15, '02

00:00 to 09:00 - 180 MW
09:00 to 11:00 - 130 MW
11:00 to 14:00 - 180 MW
14:00 to 16:00 - 130 MW
16:00 to  24:00 - 180 MW

Oct. 16, -02

00:00 to 09:00 - 180 MW
09:00 to 11:00 - 130 MW
11:00 to 14:00 - 180 MW
14:00 to 16:00 - 130 MW
16:00 to  24:00 - 180 MW


"Carlos Reyes"
<Carlos.Reyes@        To:    <Charles.B.Jones.Jr@d-fd.com>
AES.com>           cc:    "Richard Trifonoff" <Richard.Trifonoff@AES.com>,
"Ron McParland"
<Ron.McParland@AES.com>, <Charlie.Lyda@d-fd.com>,
10/14/02 04:12        <ervin.carden@d-fd.com>, <Guy.Boyd@d-fd.com>,
PM            <Michael.Feakins@d-fd.com>, <Gary.Petrie@d-fd.com>,
<Fred.Campbell@power.alstom.com>, "Jerry Cagle" <Jerry.Cagle@AES.com>,
"Lou Conti" <Lou.Conti@AES.com>, <Tim.Maidenford@power.alstom.com>,
<Anna.Solis@d-fd.com>

MAID-EMAIL-002457

Subject:    RE: AES-PR -   Unit 2 Load Profile Request to PREPA

Bo,

An hourly schedule is needed for PREPA to be able to evaluate and
confirm their approval. You may find more details on the SOP II, section
4.1.

Regards

C.Reyes
Carlos A. Reyes, PE
Team Leader - AES Puerto Rico
cel-787.487.2618, tel-787.866.8117 x.208, fax-787.866.8139
Carlos.Reyes@aes.com


-----Original Message-----
From: Charles.B.Jones.Jr@d-fd.com [mailto:Charles.B.Jones.Jr@d-fd.com]
Sent: Monday, 14 de October de 2002 02:59 p.m.
To: Carlos Reyes
Cc: Richard Trifonoff, Ron McParland; Charles.B.Jones.Jr@d-fd.com;
Charlie.Lyda@d-fd.com; ervin.carden@d-fd.com; Guy.Boyd@d-fd.com;
Michael.Feakins@d-fd.com; Gary.Petrie@d-fd.com;
Charles.B.Jones.Jr@d-fd.com; Fred.Campbell@power.alstom.com; Jerry
Cagle; Lou Conti; Tim.Maidenford@power.alstom.com; Anna.Solis@d-fd.com
Subject: AES-PR - Unit 2 Load Profile Request to PREPA

Carlos,

Based on conversations with API and EEC, the requested Unit 2 load
profile
for the next  2 days should be 180 MW to 130 MW.

API and EEC  plan to improve the sequencing of the CDS into and out of
service during this period, and the expected load will be ramped between
130-180 MW's.

Thank you, Bo Jones.

---

This email has been scanned for all viruses by the MessageLabs service.

---

This email has been scanned for all viruses by the MessageLabs service.

# TAB
# 8

**CONFERENCE CALL MINUTES**
Wednesday, December 18, 2002 – 2:30 p.m. EST
and
Thursday, December 19, 2002 – 1:30 p.m. EST**

AES Puerto Rico Total Energy Plant
Progress of Action Items identified during conference call on 12/12/02
Discussion of Emission Compliance Test Results

| Participants: | | |
|---|---|---|
| | Ron McParland | AES |
| | Doug Tomlin | AES |
| | Bill Vela | AES |
| | Mitch Cohen | API** |
| | Bill Jarvis | API** |
| | Tom Wardell | API** |
| | Bruce Wilhelm | API** |
| | Bo Jones | D/FD** |
| | Bart Vince | D/FD** |
| | Reid Watson | D/FD** |
| | Rob Callahan | Trigon |
| | Paul Jenkins | Trigon |
| | Larry Copeland | D/FD – AV |
| | Dave Shea | ENSR |
| | Bob Hall | ENSR |
| | Richard Triffinoff | AES |

** indicate individuals participating in 12/19/02 meeting and items presented

Purpose of Meeting
To discuss path forward and action plan for remedies for exceedances of plant emission limits that were observed in the emission compliance test results. The following permit exceedances were discussed and corrective action plan status (**in bold type**) has been presented:

UNIT 1:
- Particulate Matter less than 10 microns (PM10) = 59.0 lb/hr (permit limit is 36.9 lb/hr)
- Particulate Matter less than 10 microns (PM10) = 0.023 lb/mmBtu (permit limit is 0.015 lb/mmBtu)
- Sulfuric Acid Mist = 11.4 lb/hr (permit limit is 5.9 lb/hr)
- Sulfuric Acid Mist = 0.004 lb/mmBtu (permit limit is 0.0024 lb/mmBtu)

UNIT 2:
- Particulate Matter (PM) = 117.8 lb/hr (permit limit is 36.9 lb/hr)
- Particulate Matter (PM) = 0.048 lb/mmBtu (permit limit is 0.015 lb/mmBtu)
- Particulate Matter less than 10 microns (PM10) = 46.7 lb/hr (permit limit is 36.9 lb/hr)
- Particulate Matter less than 10 microns (PM10) = 0.019 lb/mmBtu (permit limit is 0.015 lb/mmBtu)

LIMESTONE DRYER:
9) Particulate Matter less than 10 microns (PM10) = 0.101 lb/mmBtu (permit limit is 0.095 lb/mmBtu)

$PM_{10}$ (Units 1 and 2)
The potential for exceeding the $PM_{10}$ limit was recognized during initial permitting. Consequently, there is a provision in the permit that allows the $PM_{10}$ limit to be adjusted upward to as much as 0.05 lb/mmBtu based on the stack test results. This change can be made through an administrative amendment, which

1

WILH-EMAIL-005724

is a relatively easy way to modify a permit. However, the filterable portion of $PM_{10}$ must be within the existing permit limit of 0.015 lb/mmBtu. Since the test results indicated that the filterable portion of $PM_{10}$ was only 0.003 lb/mmBtu, this is not an issue.

1)  AES/ENSR Action Item – Seek an administrative amendment to the PSD permit to raise the $PM_{10}$ limit for Units 1 and 2. D/FD to provide data and technical assistance, as needed, to support this effort.

   **Status:**

   **ENSR to provide DFD a draft letter for input prior to sending final letter to the EPA.**

Sulfuric Acid Mist (Unit 1)

It is not clear at this point whether this failure was due to measurement errors or process problems. Measurement errors could result from not performing the method properly, or they could be caused by biases inherent in the test method.

The fact that there was a factor of ten difference between the highest and lowest emission rates observed during testing without a corresponding fluctuation in measured $SO_2$ concentrations suggests that there may have been a measurement error. Bruce Wilhelm of API suggested that this might be due to fine particulate "breakthrough" from the filter installed at the front-end of the sample train. However, Paul Jenkins of Trigon replied that the Method 8 procedure involves adding the filter to the contents of the first impinger, so the test results will be the same regardless of whether breakthrough occurred. In addition, free ammonia or other components of the flue gas might affect the Method 8 results.

2)  API Action Item – Look up internal API information related to the fine particulate breakthrough issue and, after review, determine whether this remains an issue in light of the Method 8 procedure.

**Status:**

**API reports that reason for acid mist failure is due to all sulfur captured in the sample is detected as sulfuric acid mist. Testing method cannot distinguish between scrubbed $SO_2$ and mist nor calcium sulfate compounds and other sulfate compounds. ~~Process-wise, may need to reduce moisture in scrubber as over-spraying may have contributed to excessive mist detection.~~ Additional moisture in the flue gas skews the test results. This is a result of the combsution process and the water spray in the CDS. Moisture may be able to be redcued slightly in the CDS but design is 12%**

**ENSR will look into the moisture issue on Method 8 and will, as a last resort, pursue a test method change/exemption with the EPA.**

**AES suggests preliminary testing prior to formal re-test.**

**An on-line mist test is not available, but titration can be done on site to determine if process is balanced properly prior to formal re-test.**

**\*\*Trigon, API, and DFD will retest Unit 1 as soon as possible to obtain permitted results. Corrective actions to the unit will consist of the following:**

- **Need to stabilize unit for 24 hours (load between 210 MW and 250 MW), stable $SO_2$, and opacity below 5%.**
- **Run a Method 5 test before and after the Method 8 testing to the filterable fraction – analyze to $CaSO_4$ material catch or other constituents that can bias test results.**
- **Watch $SO_2$ stack peaks during the stack tests and correlate for balancing unit prior to testing.**
- **Titrate samples on site to determine if test was a good run.**

1

WILH-EMAIL-005725

3) Trigon Action Item – Research possible factors such as the presence of free ammonia that could bias the Method 8 results high. Prepare short summary of findings.

**Status:**

**Trigon stated that Method 8 was developed primarily to test sulfuric acid mist plants with little or no moisture in the exhaust gas. Moisture collected in the isopropanol impinger could scrub SO2 and bias the test results high, presumably since the SO2 would combine with the water to form sulfuric acid. Moisture content of the flue gas during the Method 8 tests was about the same: between 12 and 13 percent. It is not known at this point how much bias can be expected from this level of moisture.**

**[Note to Trigon – please add some text here regarding the effects of free ammonia, if any.]**

While measurement errors are a possibility, process problems cannot be ruled out. The fact that the Method 8 test result for Unit 2 was well below the permit limit suggests that there was a process problem with Unit 1 at the time of the test, since presumably any method bias issues should have affected both units equally. API apparently has data that indicates a correlation between $SO_2$ removal in the boiler and the degree of $H_2SO_4$ control that is achieved. Based on this information, Ron McParland suggested that, at the time of the tests, a relatively higher percentage of total $SO_2$ removal might have occurred in the scrubber vs. the boiler. If $H_2SO_4$ mist is removed in the boiler but not the scrubber, this might account for the high test result. Another theory was offered that calcium sulfate not captured by the ESP may have biased the results high. This would point to the ESP, rather than the $SO_2$ control system as the source of the problem. Dust deposits have been regularly observed on the CEMS probe filters, so there is some evidence to support this theory.

4) API Action Item – Research the operating data collected on both units during the $H_2SO_4$ tests. Look for differences in the data that may indicate whether there was a process problem that could have caused the test failure. D/FD to provide process data, as necessary, to support this effort.

**Status:**

**According to Unit 1 boiler data at time of testing, trend indicates $SO_2$ in boiler declines during the test and aligns with sulfuric acid mist changes.**

**In contrast, Unit 2 was more stable. Unit 1 ran no more than 4 hours at MCR prior to testing and Unit 2 was running stable for more than 24 hours prior to testing.**

**May consider X-ray diffraction tests to show that Method 8 is flawed for this specific application.**

5) D/FD Action Item – Arrange for re-testing following identification of problem and implementation of corrective actions.

**Status:**

**Re-test as soon as possible in parallel with collection of data. If the results are not favorable, then provide sufficient test data to show method is flawed.**

**During any preliminary testing that we may choose to do, pay close attention to factors that may affect the test results.**

**Consider the use of EPA experts to point out potential shortcomings of the Method 8 testing.**

**Determine when formal re-testing can realistically be accomplished.**

4

WILH-EMAIL-005726

Particulate Matter (Unit 2)

The results of this test suggest that a process problem, rather than a measurement error, was responsible for the failure. Emission rates during all three test runs were well above the emission limit, and the observed variability of emission rates during individual test runs was relatively low: within 25 percent of the mean. Therefore, the consensus of the conference call participants was that the ESP was likely the source of the problem.

6) API/EEC Action Item – Review PM problem, investigate possible ESP problems, and provide solution.

**Status:**

~~API proposes installation of additional baffles to equalize flow thru the ESP. API has completed engineering and expect fabrication completed by 12/30/02 and on site by 01/06/03.~~ **The baffles are not required to meet the emissions. This addresses a warrany issue and the need to purge ash from the ESP through the ash removal system and can be added at any time convenient to AES. Unit 1 passed test without baffles. API believes the PM was related to operational issues in CDS. Stablized oeration before testing should result in meeting  permitted emissions levels**

\*\*

- ~~API is not convinced that the baffles are needed in the ESP prior to testing.~~ **Maintain opacity to less than 5% during the testing with proper DCS controls and a proper rapping program.**
- **Avoid a re-test for Unit 1 due to changes of the ESP equipment made after completion of a successful test.**

7) D/FD Action Item – Arrange for re-testing following identification of problem and implementation of corrective actions.

**Status:**

**Arrangements for re-testing are currently underway.  Schedule will be provided once logistics by testing company are provided to DFD.  If a formal re-test is desired, the earliest test date will be impacted by when the EPA/EQB can witness it.**

PM$_{10}$ (Limestone Dryer)

The "condensable" fraction of PM$_{10}$ comprised about three-quarters of total PM$_{10}$ and was the primary reason that this test failed. The only theory that surfaced during this discussion was the possibility of a reaction involving the limestone to create a product that is measured as condensable PM$_{10}$. It was noted that there were two automatic process shutdowns that occurred during the second and third PM$_{10}$ sampling runs. These shutdowns were caused by excessive particulate buildup on the main dust collector. It is not known whether or how these shutdowns could have affected the condensable PM$_{10}$ results.

8) API/Raymond Action Item – Investigate baghouse and filter design, as well as possible reactions involving limestone that may be contributing to the high condensable PM$_{10}$ emissions.

**Status:**

**Raymand suggests decreasing the frequency of bag cleaning to reduce PM$_{10}$ emissions and using a metering system to calculate the firing rate.**

1

WILH-EMAIL-005727

API points out that the amount of condensables in the $PM_{10}$ emissions account for 75% of the catch. The condensable fraction was comprised mostly of inorganic material. It seems unlikely that these condensables could be due to combustion by-products since there is essentially no sulfur in propane and NOx emissions are low. Chlorides in the limestone could be a contributing factor. Additives in the Propane may contibute to the condensibles.

The effects of firing rate were also discussed. It was noted that a decrease in the limestone moisture content results in a lower firing rate and therefore a higher lb/mmBtu emission rate, assuming that the condensables are not due to combustion byproducts. In that scenario, increasing the firing rate could decrease the emission rate. However, if combustion byproducts make a significant contribution, then an increase in the firing rate may increase the emission rate of PM10. No conclusion was reached on the firing rate issue.

Need to pursue an amendment to the permit.

~~AES reported that trash in the baghouse has been observed.~~ ?????????

API to see if Raymond can provide an upper temperature limit for the equipment.

AES has concerns with the amount of time required to obtain an amendment/change to the permit.

ENSR feels that change is not a big problem due to passing on lb/hr.

AES refused to go to the EPA for a "reading / temperature check" on the permit amendment issue.

**Retest for $\underline{PM_{10}}$ as soon as possible.

- Analyze condensables and get a propane analysis.
- Unable to determine on site if test are passing.
- AES limestone is unwashed and may have significant amount of chlorides that show up as $PM_{10}$ particulate/condensable. The chloride content on the Cedar Bay aragonite analyzed was 0.12% but was washed. Need to analyze the raw limestone at AES site. API to determine if chlorides could be a possible reason for the problem.

PATH FORWARD
All parties make progress on action items. Additional communications by parties involved to develop a schedule for corrective measures and implementation. AES and ENSR will develop an action plan for presentation to EPA and EQB using the information gathered during the conference calls.

WILH-EMAIL-005728