# TAB
# 3

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

DANIEL D. WILLIAMS
(202) 434-5263
ddwilliams@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

December 1, 2005

**Via Facsimile & U.S. Mail**

Michael A. Schollaert, Esq.
Ober, Kaler, Grimes & Schriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re:    **AES Puerto Rico, L.P. v. ALSTOM Power, Inc.**

Dear Mike:

I am writing in response to your letter of November 29, 2005 concerning ALSTOM's Second Set of Requests for Production. Those requests are, either in whole or in part, duplicative of ALSTOM's First Set of Requests. Therefore, AES-PR already has produced the overwhelming bulk of its hardcopy documents that are responsive to ALSTOM's Second Set of Requests.

For a handful of requests, however, AES-PR has noted in its Responses that it is currently ascertaining whether it has any additional responsive hardcopy documents. AES-PR will complete this process as quickly as possible, but, given our desire to make sure that the production is fully complete, it is unlikely that this search will be completed by next Wednesday. We are happy to work with you, however, to find a mutually agreeable date for both parties to complete their productions of all documents.

Also, if you still have not received AES-PR's Responses to ALSTOM's Second Set of Requests for Production, please let me know and I will fax it to you immediately.

Sincerely,

Daniel D. Williams

# TAB
# 4

# PART III - GENERAL TERMS

## 1.0  WARRANTIES

1.1.1 Contractor warranties Duke/Fluor Daniel Caribbean S.E. ("D/FDC") and Owner that the Work shall comply with the provisions of this Contract and all specifications and drawings referred to in this Contract, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Contractor. Contractor further warranties D/FDC and Owner that all materials, equipment and supplies furnished by Contractor for the Work shall be new and fit for their specified purposes as set forth in this Contract and be in full compliance with the requirements of this Contract. As described in this Agreement, if any defect in the Work in violation of the foregoing warranties arises within the period set forth below, Contractor shall upon receipt of prompt written notice from D/FDC or Owner of such defect promptly furnish, at no cost to D/FDC or Owner, design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties.

1.2 Contractor, at its expense, (including, without limitation, costs of removal, packing, transportation and reinstallation) shall remedy promptly any defective Work which exists during the applicable warranty period as set forth in this Article 1.0, and of which D/FDC gives written notice within a reasonable time after discovery of the defect or damage. Upon such notification by D/FDC, Contractor shall promptly commence and proceed to make all needed adjustments, repairs, additions, corrections, and replacements which arise out of or are necessitated by such defective Work or damage. Contractor shall conduct such warranty work on a overtime schedule basis if D/FDC determines such a schedule is necessary to avoid or minimize the effects of an outage or load reduction and D/FDC shall reimburse Contractor the premium differential for performing warranty work on an overtime basis. Contractor shall coordinate its warranty Work with D/FDC to minimize interference to D/FDC's and Owner's operations. D/FDC will permit reasonable access to as much of the Unit(s) as Contractor may reasonably require for performance of warranty Work, but any costs of uncovering Work shall be the responsibility of the Contractor. Contractor shall perform warranty Work so that such adjustments, repairs, additions, corrections, and replacements do not degrade the performance of, nor impair the use of the Equipment, Materials or other Work in question, other systems, or the Unit(s) as a whole to an extent that the Equipment, Materials, or other Work, systems or Unit(s) will not meet the requirements of this Contract in all respects, and Contractor shall repair or replace all other facilities to the extent they are destroyed or damaged as result of Contractor's performance of warranty Work.

1.2.1 The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance with the following exceptions:

    a.    The warranty period for the Boiler Hot Loop shall be twenty-four (24) months after Performance Acceptance;

    b.    The warranty period shall be extended for corrective Work as set forth below.

1.2.2 At the mutual agreement of Contractor and D/FDC, warranty Work provided hereunder may be deferred until the time of the Unit's next regularly scheduled maintenance outage, provided that such outage shall commence not later than six (6) months after D/FDC's notice to Contractor of the defective condition, and the warranty provisions hereunder shall apply notwithstanding that such outage occurs after the time the warranty would otherwise expire.

Contractor shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

1.3 The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Contractor's submittal to D/FDC of written Notice of Completion unless D/FDC, within ten (10) days thereafter, furnishes Contractor with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Contractor warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

1.3.1   In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, D/FDC shall so notify Contractor in writing prior to expiration of the Warranty Period, as applicable, and Contractor shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

1.3.2 A chronic failure ("Chronic Failure") shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, D/FDC and Contractor shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance.

1.4 In the event Contractor shall have been notified in writing of any defects in the Work in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, D/FDC and Owner shall have the right upon written notice to Contractor to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay D/FDC or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with back-up documentation supporting written claim.

1.5 In the event of an emergency when, in the reasonable judgment of D/FDC, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by D/FDC, or by a third party chosen by D/FDC, without giving prior notice to Contractor, and the reasonable cost of the remedial work shall be paid by Contractor but Contractor shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by D/FDC to Contractor as soon as practical.

1.6 The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to

materially affect in the next two (2) years (i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Contractor and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth in Article 1.3, applicable to this Article 1.6.

1.7 Contractor agrees that D/FDC may assign its rights under this warranty and other parts of this Contract to Owner and Owner's Lenders, and Contractor hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

1.8 Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feedstocks from the limits specified in the Contract are excluded from any warranty obligations of the Contractor.

1.9 Contractor's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

1.10 ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

## 2.0 INSPECTION, TESTING AND QUALITY CONTROL

2.1 Contractor shall inspect all materials, supplies and equipment which are to be incorporated in the Work. In addition, Contractor shall conduct a continuous program of construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to D/FDC for review and approval, and shall be in sufficient detail to delineate those items to be inspected and the manner in which they are to be inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

2.2 Contractor shall, during the course of performance of the Work hereunder, without additional compensation, make or cause to be made all tests required by this Contract. D/FDC may require additional inspections and tests for which Contractor shall be compensated for. Contractor shall furnish D/FDC with satisfactory documentation of the results of all inspections and tests. For those tests which are specifically listed in the Contract as "D/FDC Witness Tests", D/FDC shall be given not less than five (5) working days notice by Contractor in order that D/FDC and/or Owner may witness any such tests.

# TAB
# 5

# OPERATION AND MAINTENANCE MANUAL, VOLUME 1







## ENVIRONMENTAL ELEMENTS

C O R P O R A T I O N

*Innovation • Customer Satisfaction*









*AES PUERTO RICO,*
*L. PARTNERSHIP (AES-PR)*
*GUAYAMA, PUERTO RICO*

*AES-PR TOTAL ENERGY*
*PROJECT M.O. 420584*

## AIR QUALITY CONTROL SYSTEMS

*Electrostatic Precipitators • Fabric Filters • Scrubber Systems • Repair, Rebuild, and Enhancement*

EEC-05970

# AIR POLLUTION CONTROL SYSTEM
## (DESULPHURIZATION & PARTICULATE CONTROL)
## OPERATION AND MAINTENANCE MANUAL

### AES PUERTO RICO, L. PARTNERSHIP (AES-PR)
### AES-PR TOTAL ENERGY PROJECT
### GUAYAMA, PUERTO RICO

### DFDC PO NUMBER: 3674004SB0001
### EEC M.O. NUMBER 420584

### *AUGUST 2001 ISSUE*

**REPLACEMENT SPARE PARTS**
TEL    800-PART-EEC
TEL    800-727-8332
FAX    410-368-7059

**24-HR EMERGENCY SERVICE**
800-928-HELP
800-928-4357

**ENVIRONMENTAL ELEMENTS CORP.**
3700 Koppers Street
Baltimore, MD 21227
Phone: (410) 368-7000
Fax:    (410) 368-6896

Office Hours: 8:15 a.m.-5:00 p.m. EST
Monday through Friday

*Chapter 9*

*Maintenance*
*of*
*APCS*

EEC-06082

## 9.0   Introduction to Maintenance

Proper maintenance is important to any system for problem free operation and extended life span. This chapter is written as a guideline for the maintenance of the air pollution control equipment supplied by Environmental Elements Corporation.

**This is not meant to supersede any vendor requirements as outlined in their respective O & M manuals or plant maintenance practices. The vendor manuals pertaining to the auxiliary equipment supplied are included in subsequent volumes of this manual.**

It is the responsibility of plant personnel to review this material and incorporate the requirements in their already existing maintenance schedules. The customer may decide to alter or customize the maintenance as determined through operating experience.

The guarantees provided by EEC are based on proper operation and maintenance procedures. The following overview of the maintenance and monitoring plan is geared specifically to minimizing corrosion of surfaces that handle flue gas.

Inleakage of cold air is a major contributor to corrosion and during initial operation all penetrations, doors, etc. must be checked for proper closure and gasketing. Improper installation of gaskets or defective material must be identified and corrective action taken. $O_2$ readings should be taken during operation at the air heater outlet and stack. This information should also be trended in the DCS. Increases in the Stack $O_2$ are indicative of additional ambient air inleakage. Normal leakage rates are in the 1-2% range. If the trend indicates excessive air inleakage, then corrective action by the plant personnel is necessary to locate and eliminate the causes.

During operation, close control of critical process parameters is necessary to minimize corrosion. For $SO_2$ control, the CDS scrubbing process will use a nominal 30°F flue gas approach temperature to adiabatic saturation. This is controlled by regulation of the water flow rate into the nozzles at the CDS. The key is to ensure that the flue gas temperature at the CDS outlet does not fall below preset limits. This temperature should be trended by the plant DCS. Initially, the wet bulb temperature of the flue gas is physically measured, and readings should be repeated daily to correlate this parameter with operation conditions. Once this relationship is determined, it should be checked on a regular basis by plant personnel. It is assumed that this relationship will be constant and this physical temperature measurement need only be made on a monthly basis during the warranty period. Operating logs of this data must be maintained by plant personnel.

The second critical parameter is the Chloride Content or maximum allowable concentration of $CaCl_2$ in the ash. The range is 1.0 to 3.5% (3.5% maximum). This concentration is influenced by the spray water and coal chloride content. Plant personnel will measure water conductivity and correlate this to chloride content to establish the flue gas approach

EEC-06083

temperature. This measurement should be taken on a pre-established schedule. In the beginning, this should be carried out on a weekly basis, and may be modified later, depending on plant operating characteristics. These readings must be maintained in the plant operating logs.

The third critical process parameter is the operation of the soot blowers. Operation of the soot blowers can elevate the flue gas wet bulb temperature. Therefore, during soot blowing cycles, the CDS outlet temperature will be ramped up after receiving an input signal indicating that a soot blowing cycle is beginning to occur. Another signal will indicate the end of the cycle and the CDS flue gas outlet temperature will return to the normal set point.

## *9.1   Maintenance Periodic Summary*

As part of routine maintenance, the following items should be inspected periodically to promote trouble-free operation and should become part of the operator walkdown:

### DAILY / EACH SHIFT

- Verify CDS inlet and outlet pressure signal by checking the DCS indication of PI-103A/B and PI-104A/B and comparing with the field pressure gages at the inlet and outlet of the CDS.

- Verify CDS outlet temperature at CDS indication TI-106A/B/C is active and that each of them is approximately the same.

- Verify that the CDS bed differential pressure at DCS indicator PDY-105 is steady and not oscillating.

- Observe that there are no high level alarms in the CDS hopper or ESP fields 2 through 6 hoppers.

- Ensure that the ash level in ESP field 1 hoppers does not fall below the low-level alarm.

- Observe pressure drop across cooling water system pump strainer filters. Clean as required.

- Check water tank level.

- Observe pressure drop across medium pressure aeration air blowers and low pressure airslide air fan filters. Clean as required.

420584/APCS

- Verify continuous flow of material on airslides.

- Observe that all insulation doors and hatches have been returned to their place if removed for work.

- Twice each shift verify local airslide temperature gauges read about 135°F.

- Twice each shift verify local temperature gages on the ESP field 1 overflow chutes read at least 135°F.

- Twice each shift check the water pressure gages at the lances to ensure all lances are operating alike.

- Take wet bulb temperature measurements at the outlet of the CDS.

- Twice each shift open CDS hopper poke tubes to ensure suction is present.

- Verify that all blowers and fans are operating properly.

- Verify that all rotary feeder at all ESP hopper outlets are operating.

- Verify that all instrument air pressure regulators at all components are set properly. Clean filters as required.

- Twice each shift check the hopper heater panel for alarms and reset any.

- Check for level of lubrication in airline lubricator for the inlet nozzle rappers and lubricator for CDS hopper air cannon.

- Verify that medium pressure aeration air is getting to all ESP field 1 hoppers, lime silo hopper, and intermediate bin by checking temperature of pipe at the hopper.

- Look for signs that may indicate possible pluggage at the hydrated lime feed weigh belt or feeders.

- Take samples of the CDS fluidized bed. Sample should be dry, fine, and without lumps.

- Visually verify that all rappers are operating properly on roof area, under the ESP inlet nozzle, and the inlet nozzle curtain rapper.

- Check all T/R oil temperatures. Note the highest temperature recorded by the red "memory" needle.

*AUGUST 2001 ISSUE*

- Listen for sounds of arcing in and around the T/R sets.

- Twice each shift check the DMS computer for alarms and clear them.

- Verify that the automatic T/R controllers are functioning properly and take readings.

- Verify that the penthouse pressurization/heating system is operating properly. Observe pressure drop across the filters. Clean as required or replace filters. Verify that the flowmeter reading matches the reading displayed at the DCS.

- Check hydrated lime silo level for supply.

- Twice each shift, walk through hydrated lime feed system under the lime silo and look for signs of process leakage.

- Twice each shift check the lime feed system control panel for alarms and clear them.

- Measure the chloride content on the ash and measure cooling water conductivity to correlate to chloride content in the water and verify flue gas approach temperature.

- Twice each shift verify that the CDS water lance spray is not wetting excessively the bed material by inserting a wooden "broomstick" in the handholes located near the lance locations. The stick should become coated with ash upon removal. The coating should be fine, even, and just moist enough to stick to the broomstick. The presence of agglomerations or mud is not acceptable.

## DAILY FOR FIRST 3 MONTHS, THEN EVERY FOUR DAYS

The following procedure should be followed for each CDS cooling water nozzle. The CDS is provided with four (4) operating cooling water nozzles plus one (1) spare nozzle that is connected to the water lines, but not installed on the wall of the CDS.

1.   Install the spare nozzle in one of the unused nozzle ports on the CDS vessel wall. (The port cover must be removed prior to installing nozzle.)

2.   Select the first (out of four) operating nozzle to be removed and open the in-line strainer blow-off valve to clear out any accumulated debris. Close the strainer blow-off to minimize water spillage.

EEC-06086

*AUGUST 2001 ISSUE*

3.   Valve out the water nozzle by closing the manual valves on the water lines. The return line valve (ISV-206) must be closed first to minimize backflow, then follow by closing the water feed line valve (ISV-205).

4.   Momentarily open and close the strainer blow-off valve to relieve any water pressure in the water hoses. Verify that the water pressure is relieved by inspecting the pressure gages at the hoses (PI-205 and PI-206).

5.   Valve in the spare nozzle installed in step 1 above by opening the manual valves on the water lines. The water feed valve (ISV-205) must be opened first followed by opening the water return valve (ISV-206). Observe that the water pressure at the local gages increases to the operating range to match the other lances.

6.   Remove the operating nozzle that was valved out on step 3 above from the CDS wall. For ease of movement, it may be necessary to disconnect the water hoses from the nozzle. The hoses are provided with quick disconnect couplers at the nozzle. Do not disconnect while water is flowing.

7.   Inspect the nozzle tip as follows: First clean the tip of any ash buildup or cement like residue around the perimeter of the tube. There should be minimal buildup on the nozzle and should be no evidence that the buildup has been going on for any length of time. The nozzle tip opening should be perfectly round with well-defined edges. There should be no evidence of wear, hole elongation, smoothing out of edges, or wear streak lines.

8.   Any nozzle found to have excessive buildup of ash or apparent wear should be tested at the lance test stand to see the spray pattern. Nozzles found in good condition may be returned to service.

9.   The nozzle protector tube should be inspected for evidence of ash buildup. Any buildup should be cleaned at this time.

10.  Reinstall the operating nozzle back in its port on the CDS vessel. Ensure that the hoses are reconnected to the lance.

11.  Valve out the spare nozzle installed in step 1 by closing the manual valves. Close the return valve first, then close the water feed valve. Observe that the water pressure is relieved at the gages.

12.  Valve in the reinstalled operating nozzle by opening the manual valves. The water feed valve must be opened first, then followed by opening the water return valve. Observe that the water pressure at the hose gages increases to the operating range to match the other lances.

EEC-06087

*AUGUST 2001 ISSUE*

13.  Repeat steps 2 through 12 for the remaining operating nozzles and protector tubes.

14.  Remove the temporary spare nozzle from the CDS wall and reinstall the cover on the opening at the CDS wall.

## WEEKLY

- Check lubrication of all pumps, motors, and fans.

- Check all motor bearings for high temperature and signs of excessive vibration.

- Check water pumps for water leakage at shaft seals.

- Clean filters of low-pressure airslide air, medium pressure aeration air, and penthouse pressurization systems.

- Verify fluidizing air is being received at all ESP field 1 hoppers, lime silo, intermediate bin, and ash silo by checking that the pipes are warm at the hoppers.

- Check flexible expansion joints at hydrated lime feed system and ash system chutes for signs of breakage.

- Check all access doors for inleakage.  Ensure that all insulation covers are always installed over all doors and hatches.

- Check ductwork expansion joints for inleakage.

- Observe pressure readings at cooling water system gages for large changes.

- Check all temperature and pressure transmitter signals.

- Check cooling water lance hoses for leaks.

- Observe the operation of the lime silo bin vent filter and fan during a truck unloading operation.  Record pressure differential at bags and verify the cleaning timer operates.

EEC-06088

*AUGUST 2001 ISSUE*

## MONTHLY

- Observe all damper actuators, solenoids, and limit switches for proper operation.

- Check all drive belts for tightness and general condition.

- Check the overall condition of individual rappers, including (but not limited to) ground straps, boots, and rapper body.

- Visually inspect the general condition of all T/R's.

- Compare current readings of all motors, heaters, blowers, and pumps to initial start-up values and phase imbalance.

- Recalibrate weigh feeder and verify correct signal to DCS.

- Check motors, blowers and pumps for excessive vibration.

- Check all instruments to verify still functioning. Perform calibration checks at all transmitters.

- Verify lime silo bin vent filter is operating. Inspect bags for signs of tears requiring replacement.

## ANNUALLY

- Complete inspection of all internals.

- Check for depositing on the walls of the CDS vessel.

- Check for hopper bridging.

- Inspect nozzles for erosion.

- Check internals for signs of condensation and accelerated corrosion.

- Replace access door gasketing if necessary.

- Inspect the precipitator as follows in sections 9.3, 9.4 and 9.5.

420584/APCS

9-8

- The wall thickness of the vessel should be monitored prior to startup to develop baseline data and annually to record the rate of corrosion. A handheld, battery powered ultrasonic tester should be used to measure the wall thickness from inside the vessel. These measurements should then be transferred to an elevation drawing. A small "skyclimber" platform can be assembled inside the vessel that travels upward via a cable. Three (3) readings should be taken at 5' intervals on each quadrant of the wall. If a deviation greater than 5 mils occur in the readings at each elevation, then additional readings should be taken to determine the true average thickness.

## *9.2   Component Maintenance*

The air pollution equipment has components that require special attention where maintenance is concerned. The following is a more detailed description of the maintenance requirements organized by components/systems. All equipment is not described below. See auxiliary equipment manuals for additional information not covered here in later volumes of this manual. All instructions regarding lubrication, cleaning and periodic maintenance given in the individual manufacturer's manuals need to be followed when preparing the complete plant maintenance schedules.

### Hydrated Lime Receiving System

See additional instructions in the manual provided for the bin vent filter, bin vent fan, and the silo fill pipes. These components are included in Chemco instructions manual.

- Inspect fan for proper operation and signs of heating at the bearings. Lubricate as required.

- Inspect bag filters and replace any damaged bags to prevent discharging lime dust during truck fill operations.

- Inspect solenoid valves at bag cleaning pipes for proper operation.

- Maintain air line filter/regulator.

- Replace any silo level detector that is not operating reliability.

- Inspect the aeration pads inside the hydrated lime silo for damage during a lengthy shutdown.

# TAB
# 6

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

DANIEL D. WILLIAMS
(202) 434·5263
ddwilliams@wc.com

WASHINGTON, D. C. 20005·5901

(202) 434·5000

FAX (202) 434·5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

September 27, 2005

**<u>Via E-Mail and First Class Mail</u>**

Anthony F. Vittoria, Esquire
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re:    **<u>AES Puerto Rico, L.P. v. Alstom Power, Inc.</u>**

Dear Tony:

I write in response to your September 16, 2005 letter concerning AES-PR's interrogatory responses and production of paper documents. Your letter mischaracterizes AES-PR's document production to date, and it misconstrues AES-PR's positions with respect to various issues. This confusion is exactly why I have recommended repeatedly that we meet and confer concerning discovery. While you claim that the governing court rules do not require such a meeting, Fed. R. Civ. P. 37(a)(2)(B) requires exactly that, and it does so to promote the efficient resolution of discovery disputes. I request that you reconsider your refusal to meet and confer so that we can move beyond exchanges of long letters and instead proceed efficiently with discovery.

Your letter contains a set of issues you label "substantive," and this response focuses on those issues. It appears that you no longer are demanding action on my part with respect to the issues you have included in the "peripheral" categories. If you are requesting anything with respect to the issues you label "peripheral," I propose that we discuss them when we meet and confer.

I respond to your "substantive" issues as follows:

1.    AES-PR properly objected and responded to Interrogatory No. 2. As drafted, Interrogatory No. 2 would have required AES-PR to interview each of the over 100 plant employees, as well as any contractors, vendors, or other persons of

WILLIAMS & CONNOLLY LLP

Anthony F. Vittoria, Esquire
September 27, 2005
Page 2

which AES-PR was aware, to determine whether they had <u>any knowledge</u>
<u>whatsoever</u> of the CDS, ESP, and FBHE Handcuffs and then to discover and
document in detail the extent of each such person's knowledge. That request is
overbroad, and the effort required to comply with it would be unduly burdensome.
Decisions from federal courts in both Delaware and Puerto Rico make clear that
what Alstom demands is not required. *See Fischer & Porter Co. v. Sheffield Corp.*,
31 F.R.D. 534, 538 (D. Del. 1962) (finding a similar interrogatory to be "burdensome
and oppressive"); *Puerto Rico Aqueduct & Sewer Auth. v. Clow Corp.*, 108 F.R.D.
304, 313 (D. P.R. 1985) (finding a similar interrogatory to be "overbroad and unduly
burdensome"). In the spirit of cooperation, AES-PR provided Alstom with the
names of the thirteen employees who have substantive knowledge of the contested
systems and who AES-PR believes have information material to this lawsuit. Thus,
rather than simply stand on our well-placed objection, in order to avoid unnecessary
discovery disputes, we provided the relevant information that Alstom's
interrogatory appears to seek.

Notably, AES-PR propounded a similar but properly limited
interrogatory to Alstom asking for the names of employees who participated in
Alstom's efforts to analyze the cause(s) of and/or to remedy the ESP corrosion. In
response, Alstom gave AES-PR a list of employees who "may" have the requested
information. By failing to confirm whether anyone on Alstom's list <u>actually has</u>
relevant information, Alstom has not provided a meaningful disclosure. Alstom's
complaint about AES-PR's interrogatory response rings hollow in light of its own
refusal to provide a meaningful response to AES-PR's similar but properly limited
interrogatory.

2.    You claim that AES-PR failed to provide you with the personal files of
individuals who had significant roles on the Project. That is incorrect. Given the
industrial nature of the Plant, most of the plant's employees do not maintain
personal files. For those who do, however, AES-PR has produced responsive
documents from those files.

3.    You claim that AES-PR has not provided hardcopy documents relating
to the "original" Water Treatment System. That is incorrect. AES-PR produced a
number of documents relating to the original Water Treatment System, including
(by way of example only) the "Plant Design Book," which contains the design
specifications for the Water Treatment System, and several other design books that
contain information relating to the original Water Treatment System.

WILLIAMS & CONNOLLY LLP

Anthony F. Vittoria, Esquire
September 27, 2005
Page 3

4.    You claim that AES-PR did not produce documents concerning the re-circulation of ash to the boilers. That is incorrect. By way of example only, AES-PR produced a copy of EEC's August 2001 version of the O&M manual, which includes materials about the re-circulation of ash to the boilers.

5.    You claim that AES-PR failed to produce Volumes III, VII, VIII, and IX of EEC's August 2001 version of the Operations and Maintenance Manual. That is incorrect. We produced those volumes to Alstom on May 25, 2005. They are Bates-stamped AESPR 001541-001743, AESPR 023703-024190, AESPR 024191-024873, and AESPR 024874-025609, respectively.

6.    You claim that AES-PR did not produce hardcopy documents relating to the chloride content of the ash within the CDS and ESP. That is incorrect. By way of example, AES-PR made available to Alstom a multi-page document entitled "Ash Study Chloride Content," which is bates stamped AESPR 023622 – 023652.

7.    You complain that AES-PR has not produced its insurance policies for the plant. AES-PR is the <u>plaintiff</u> in this lawsuit, and accordingly its insurance policy will not compensate Alstom. For that reason, AES-PR's April 27, 2005 responses objected to this document request as "irrelevant to the issues in this litigation." *Accord* Fed. R. Civ. P. 26(a)(1)(D) (requiring initial disclosure of insurance policies only when the insurance company "may be liable to satisfy part or all of a judgment" or may be required to indemnify or reimburse payments made to satisfy the judgment). In the five months since Alstom received AES-PR's objection, it has not articulated any theory as to why the AES-PR's insurance policies would be relevant here.

8.    You claim that AES-PR failed to produce documents relating to the consumption of lime and limestone at the Plant. None of the 76 document requests Alstom issued requests lime or limestone consumption data. If you believe that such data are called for by any of Alstom's document requests, please advise me as to which one it is.

9.    You claim that there are various gaps in AES-PR's production of D/FD monthly and weekly reports. While we doubt that these reports contain information relevant to this lawsuit, we have conducted a good faith effort to locate all of the monthly and weekly reports in AES-PR's possession and have made all of the ones we could locate available to you.

WILLIAMS & CONNOLLY LLP

Anthony F. Vittoria, Esquire
September 27, 2005
Page 4

10.    You claim that AES did not produce any hardcopy documents reflecting chloride testing of the CDS water prior to September 2003. While we conducted a good faith effort to locate all such hard-copy documents in AES-PR's possession, we have not yet located any.

11.    With respect to two of the categories on your list, AES-PR recently located a small quantity of additional documents that it will be producing shortly. These documents relate to the Plant's air permits and the "Test and Monitoring Plan." In addition, as you know, AES-PR recently produced six boxes of documents to Alstom in response to Alstom's third-party subpoena to AES-PR in Alstom's state-court lawsuit against D/FD. Your partner Jeff Regner has copied and sent them to your offices in Baltimore. Some of these documents may be responsive to document requests in this litigation as well.

Finally, below I address briefly one of the issues your September 16 letter labels "peripheral," although I stand ready to discuss each of them point-by-point if you later decide that any of them raises a substantive area of disagreement concerning further discovery in this case. On page 4 of your letter, you accuse me of mischaracterizing our May 25, 2005 conversation and you go on to state that I have "a penchant for completely mischaracterizing" issues discussed during our telephone conversations. Those accusations are completely unfounded and unfair. As you no doubt recall, when you came to our offices on May 25, 2005 to review documents, I offered to provide Alstom a full copy set of the documents in question so long as you would agree to pay the copying charges. You stated that your law firm, Ober Kaler, would not pay the charges on behalf of its client. Instead, you suggested that I send a bill to Alstom in an attempt to collect from them directly, notwithstanding that Alstom already owes my client millions of dollars. I then asked if you could commit to a timeframe for <u>Alstom</u> to make payment for the copies (since Ober Kaler refused to make payment at any time ever), and you stated that you would not provide any timeframe whatsoever to make payment. It was only then that I refused to extend indefinite credit to Alstom and asked that you contract directly to have the photocopies made.

Sincerely,

Daniel D. Williams

# TAB
# 7



Unit #1 Water Samples Log Book

IMG_0737.JPG

# TAB
# 8



**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699
www.ober.com

**Anthony F. Vittoria**
afvittoria@ober.com
410-347-7692

**Offices In**
Maryland
Washington, D.C.
Virginia

September 16, 2005

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Re:    ***AES Puerto Rico, LP v. ALSTOM Power Inc.***
       **Civil Action No. 04-1282-JJF**

Dear Dan:

I am writing to respond to your letter of September 6, 2005 which, in turn, was in response to my letter of August 15, 2005 regarding AES's deficient Answers to Interrogatories and hard-copy document production in this matter. It is troubling that, in your September 6th letter, you focused on certain peripheral matters rather than responding to the substantive issues addressed in my August 15th letter. Accordingly, I will first set forth below the substantive issues that you either failed to address or addressed inadequately. I will then, as necessary, touch on the peripheral issues that you raised in your letter.

**I.    Substantive Deficiency Of AES's Answer To ALSTOM Interrogatory No. 2**

There is ample legal precedent, both in Delaware and under the Federal Rules, that an Interrogatory requesting the identities of all persons who have knowledge of the facts of the case is completely appropriate and must be adequately answered. *See Patterson-Schwartz & Assocs., Inc. v. R. B. R., Ltd.,* C.A. No. 84C-DE-18, 1986 Del. Super. LEXIS 1395, *4 (Del. Super. Ct. June 20, 1986); *In re Grand Casinos, Inc.,* 181 F.R.D. 615, 618 (D. Minn. 1998); *Moreno-Rodriguez v. Pride Construction, Inc.,* No. 5: 95-CV-583-BR(2), 1996 U.S. Dist. LEXIS 1321 (E.D.N.C. January 25, 1996).

ALSTOM has demonstrated that AES's Answer to ALSTOM Interrogatory No. 2 is deficient. Nevertheless, AES has thus far refused to supplement its Answer. It is my understanding from your letter that AES continues to refuse to supplement its Answer. Please inform immediately if my understanding is incorrect.



O B E R | K A L E R
A Professional Corporation

Daniel D. Williams, Esquire
September 16, 2005
Page 2

## II.     Substantive Deficiencies In AES's Production Of Hard-Copy Documentation

In my August 15th letter, I set forth several categories of hard-copy documents which were requested by ALSTOM but that AES has either failed or refused to produce. Those documents include the following:

- The personal files of any of the individuals identified in AES's Answers to ALSTOM's Interrogatories or any of the other individuals who had significant roles on the Project, as identified in my August 15, 2005 letter.

- AES's air-permit application to EPA, the supplementations to that application, any of the hard-copy documentation leading up to the submission of the application, or EPA's approval of that application.

- Hard-copy documents relating to the original Water Treatment System at the Project.

- Hard-copy documents relating to the consideration, design or construction of the equipment that recirculated the ash from the ESP to the boilers.

- Daily reports, D/FD Monthly Report Nos. 1-2, 6, 10-11 or any Monthly Reports dated after December, 2001 or any weekly reports, other than for the period of March of 2001 through June of 2002.

- Insurance policies relating to the Project.

- Volumes III and VII-IX of the EEC Operations and Maintenance ("O&M") Manuals, and Chapters 3, 4 and 6 and parts of Chapters 2 and 5 of Volume I.

- The Test and Monitoring Plan.

- Hard-copy document records of chloride testing of the CDS water dating prior to September of 2003.



Daniel D. Williams, Esquire
September 16, 2005
Page 3

- Hard-copy documentation relating to the chloride content of the ash within the CDS and ESP equipment.

- Hard-copy documentation relating to the consumption of lime and limestone at the Project.

- Hard-copy documentation related to the calculation of AES's claim for over $10M in "estimated" damages.

You failed to address any of these categories of hard-copy documentation in your September 6, 2005 letter. Accordingly, it is my understanding that AES continues to refuse to supplement its hard-copy document production and produce the hard-copy documents set forth above. Please notify me if my understanding in this regard is incorrect.

**III.    Peripheral Issues Raised In AES's September 6, 2005 Letter**

In addition to the substantive issues raised above, you raised several issues that would have to be characterized as peripheral, for lack of a better word. I will address those issues below.

First, you failed to explain how the five deficiencies in the format of AES's production outlined in ALSTOM August 15, 2005 letter occurred – including the fact that some documents were labeled to be responsive to up to 12 separate requests, while approximately 4,225 pages of hard-copy documentation did not have *any* meaningful label. Nor did you explain how hundreds of pages of non-responsive hard-copy documents were produced. (The Bates numbers of a short list of examples of those non-responsive hard copy documents is attached hereto.) Despite this fact, you assert that AES "spent significant time and resources reviewing and organizing responsive documents".

AES chose to produce its hard-copy documents in a format that, under the Federal Rules, required AES to (1) produce only those hard-copy documents that were responsive to ALSTOM's requests and (2) group and label those hard-copy documents according to ALSTOM's requests. Nevertheless, and despite allegedly expending "significant time and resources", AES produced at least 6,800 pages of documentation – approximately one quarter of AES's entire production – that were either irrelevant, incorrectly labeled or effectively unlabeled.

Next, as you know, ALSTOM had obtained thousands of pages of hard-copy documents from AES pursuant to a subpoena in a related case prior to AES's production in this case. Upon our review of AES's production on May 25, 2005, it was readily apparent that a great number of the hard-copy documents produced were the exact same hard-copy documents that had been produced previously. Accordingly, ALSTOM needed to copy only a portion of the hard-copy



OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
September 16, 2005
Page 4

documents produced on May 25, 2005 to have a complete set. Nevertheless, and despite having been informed of this on the day of our review, you insist on mischaracterizing the facts by asserting that ALSTOM "took only five" of the thirteen boxes of documents produced by AES.

Third, I clearly acknowledged and addressed your May 17th letter on page 2 of my August 15, 2005 letter. Nonetheless, you somehow assert that I ignored the fact that you did respond (although not substantively) to my May 16, 2005 letter regarding AES's objections.

Fourth, you blatantly mischaracterize our conversation of May 25, 2005 regarding the reimbursement of AES's copying costs. During our conversation on that day, you unreasonably demanded that Mike Schollaert and I "guarantee" that ALSTOM or Ober, Kaler, Grimes & Shriver, P.C. would pay AES's copying costs within seven days. Mr. Schollaert and I both explained to you that seven days was an arbitrarily short period of time and that because of certain client and firm policies, we could not guarantee payment in that time period on the spot. It was after that representation that you refused to allow us to take the copies of the hard-copy documents that we reviewed. Despite this, you improperly assert that "ALSTOM refused to make timely payment for those copies."

Finally, ALSTOM has gone through extraordinary lengths in its efforts to resolve this discovery dispute. ALSTOM has set forth its position on this dispute in this letter, the 9 page letter of May 16 and the 8 page letter of August 15. Nevertheless, you appear to assert in both your May 17, 2005 letter and your September 6, 2005 letter that ALSTOM has an obligation to go beyond the exchange of this detailed correspondence and "meet and confer" regarding this discovery dispute.

ALSTOM believes that face-to-face meetings and telephonic conferences are generally very beneficial in the resolution of discovery disputes. However, our experience with such meetings and telephone conferences in both this matter and in the related matter referred to above – and your continued penchant for completely misrepresenting what was discussed in those meetings and conferences – has convinced ALSTOM that such meetings and conferences are a hindrance, rather than an aid, to the efficient resolution of disputes in this case.

Further, there is no requirement in either the Federal Rules or the Local Rules of the District of Delaware that requires the parties to "meet and confer" to discuss discovery disputes. Rather, Local Rule 7.1.1 provides only that a party filing a non-dispositive motion must also file a "statement that the attorney making the motion has made a reasonable effort to reach an agreement with the opposing attorneys on the matters set forth in the motion." In light of the steps taken, ALSTOM is confident that the Court will conclude that ALSTOM has exerted more than a "reasonable effort to reach an agreement", as required by the Local Rules.

OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
September 16, 2005
Page 5

Please inform me immediately whether, in light of the foregoing, AES intends to alter its position and supplement its hard-copy document production or any of its Interrogatory Answers. If AES fails to provide such notice, ALSTOM will be forced to assume that AES refuses to supplement its deficient discovery and will take whatever steps are necessary and appropriate.

Sincerely,

Anthony F. Vittoria

Attachment

cc:    James E. Edwards, Jr., Esquire
       Michael A. Schollaert, Esquire
       Kevin S. Corwin, Esquire

AFV
772846

# TAB
# 9



IMG_0734.JPG

# TAB
# 10



IMG_0746.JPG