# Murphy Spadaro & Landon
### ATTORNEYS

1011 CENTRE ROAD, SUITE 210

WILMINGTON, DELAWARE 19805

PHONE 302.472.8100

FAX 302.472.8135

302.472.8101

jspadaro@msllaw.com

December 6, 2005

**BY ELECTRONIC FILING**
The Honorable Joseph J. Farnan, Jr.
United States District Court Judge
United States District Court
844 King Street
Wilmington, DE 19801

      RE:  **AES Puerto Rico, L.P. v. Alstom Power, Inc.**
            **C.A. No.: 04-1282JJF**

Dear Judge Farnan:

      I represent plaintiff AES Puerto Rico, L.P. ("AES-PR") in this matter.

      After 4:00 p.m. on Monday, December 5, 2005, defendant ALSTOM filed two motions to compel, one seeking production of documents and a second seeking to compel a further response to an interrogatory. ALSTOM's motions violate this Court's Scheduling Order. That Order provides that parties are to file "Memoranda on any disputes with Responses by December 5." Oct. 7, 2005 Order at 2 (Tab A). The clear import of that Order was that motions were to be filed sufficiently in advance of December 5 such that the opposing party could file a Response by the December 5 deadline. ALSTOM instead filed its motions in a manner so as to prevent AES-PR an opportunity to file Responses. There is no justification for ALSTOM to have done so – the facts presented in ALSTOM's motions took place weeks and months ago. Because ALSTOM failed to comply with this Court's Scheduling Order and filed its motions in a manner that denied AES-PR a full opportunity to respond, the motions should be denied. In addition, a brief review of a number of ALSTOM's complaints shows that they are factually baseless and, at the very least, premature. For that additional reason, the Motions should be denied.

      In its motion to compel production of documents, ALSTOM lists nine categories of documents that it claims AES-PR either failed to produce or, in ALSTOM's view, only partially produced. AES-PR strongly disputes ALSTOM's assertions for the reasons outlined below.

### 1. CDS Outlet and Flue Gas Temperature Readings

      First, ALSTOM complains that, in response to a request seeking documents related to CDS outlet temperature readings and flue gas temperature readings, "AES has produced a

126482

The Honorable Joseph J. Farnan, Jr.
December 6, 2005
Page 2

limited amount of documents, including a CD labeled 'CDS Temp,' and other anecdotal references, all of which contain the requested information, but only for limited date ranges."

In fact, the CD in question contains over 1400 Excel spreadsheets of CDS operating data, including flue-gas-temperature and CDS-outlet-temperature readings, each representing a specific day of readings from September 20, 2002 through late November 2004 (the time at which the information was produced) - or over two years of daily operating data. *See* Examples of Spreadsheets (Tab B). In addition to the thousands of pages of CDS operating data produced on that CD, AES-PR has produced electronically countless "Shift Reports," such as the examples collected at Tab C, that also log CDS operating temperature. Moreover, AES-PR has produced over 1000 CDS temperature readings logged in the "CDS Nozzle Cleaning Logs" discussed below. *See* Examples of Logs (Tab D). AES-PR believes it has produced all nonprivileged, hardcopy CDS temperature-related documents. Moreover, as explained above, ALSTOM's representation to the Court about what AES-PR has produced is demonstrably inaccurate.

### 2. Water Chloride Content Readings

Next, ALSTOM complains that, in response to a request seeking documents relating to the chloride content of the water used in the CDS, AES-PR has produced only a single log book entitled CDS Makeup Water Samples.

This complaint is incorrect on several fronts. First, contrary to ALSTOM's characterization, the "single log book" referenced by ALSTOM actually contains over 1000 daily water-chloride readings for the CDS in Units I and II from October 5, 2003 through September 29, 2004. *See* Examples of Logs (Tab E). Second, in addition to the log book, AES-PR has produced electronically a large number of "Shift Reports," such as the examples collected at Tab F, which log water-chloride readings from at least August 2004 through as recently as October 2005. AES-PR has not yet located any responsive documents from earlier periods. ALSTOM also complains specifically that AES-PR failed to produce a water sample log book that ALSTOM observed during a recent visit to the Plant. AES-PR believes that that log book contains records that are largely duplicative of water-chloride readings that AES-PR already has provided to ALSTOM, but AES-PR nonetheless is preparing to make the log book available to ALSTOM. Thus, ALSTOM's motion is premature with respect to that log book.

### 3. CDS Nozzle Cleaning and Maintenance Information

ALSTOM complains that, in response to a request seeking documents relating to CDS nozzle cleaning and maintenance, AES-PR has produced only a single log entitled "CDS Nozzle Cleaning Log: Unit 1 / Unit 2."

First, contrary to ALSTOM's characterization, the "single log book" referenced by ALSTOM contains over 200 pages and over 1000 entries related to the cleaning and maintenance of the CDS nozzles from January 2003 through November 2004. *See* Examples of Logs (Tab D). Second, in addition to the log book, AES-PR has produced electronically a large number of "Shift Reports," such as the examples collected at Tab G, which track CDS nozzle maintenance

from at least mid-2003 through as recently as September 2005. ALSTOM also complains specifically that AES-PR failed to produce a nozzle cleaning log book that ALSTOM observed

126482

The Honorable Joseph J. Farnan, Jr.
December 6, 2005
Page 3

during a recent visit to the Plant. AES-PR has confirmed that that log already has been produced.

### 4. Distributed Control System Data

ALSTOM's complaints about documents relating to the Distributed Control System Data ("DCS") are equally baseless. As ALSTOM correctly notes, AES-PR objected to ALSTOM's original request for "[a]ny and all documents related to the Distributed Control System" as "overly broad." The DCS is the central computer system for the Plant – it is not practical to download all of the information in that system, nor would the vast majority of that information be remotely relevant to the issues in this lawsuit. Nevertheless, on several occasions, AES-PR has offered to meet and confer with ALSTOM regarding AES-PR's objections to ALSTOM's First Requests. ALSTOM has never taken AES-PR up on that offer.

Recently, ALSTOM propounded a much more focused request relating to the DCS in its Second Set of Requests for Production. AES-PR currently is gathering all DCS data requested in ALSTOM's focused Request, and expects to have it ready to produce shortly.

### 5. Air Permitting and Exceedance Information

ALSTOM also asserts – without any support whatsoever – that AES-PR's production "regarding air emissions and the EPA . . . is incomplete." Again, ALSTOM is incorrect. First, AES-PR has produced over 150 pages of EPA permitting information to ALSTOM, including, for example, the correspondence attached at Tab H. Second, AES-PR has produced electronically a large number of "Shift Reports," such as the examples collected at Tab I, which log opacity exceedances. Third, AES-PR has produced electronically faxes it sent in compliance with US EPA and Puerto Rico regulations to notify the Puerto Rico Environmental Quality Board of opacity exceedances. *See* Examples of Faxes at Tab J. Third, although AES-PR believes it has produced all nonprivileged, hardcopy documents in its possession relating to air permitting and opacity exceedances, ALSTOM's Motion is premature because AES-PR may produce additional air permitting and exceedance-related documents as part of its continued rolling production of electronic documents. Indeed, after receiving ALSTOM's Motion, AES-PR performed a quick electronic search of the not-yet-reviewed documents in its electronic-document database and located an over 300-page document listing opacity exceedances for Units I and II in 2003 and 2004. As a courtesy, AES-PR produced that document to ALSTOM within hours of receiving ALSTOM's motion yesterday. *See* Portion of Document (Tab K).

### 6. Calibration Records

ALSTOM also complains that, in response to a Request seeking "all documents which constitute, pertain or relate in any way to AES' maintenance guidelines and records for the CDS and/or ESP equipment, or the Water Treatment System," AES-PR has failed to produce calibration records. Until AES-PR received ALSTOM's last-minute filing yesterday, it had not understood this Request to call for the production of calibration records. Had ALSTOM written or called counsel for AES-PR to request calibration records specifically, AES-PR would have undertaken a search to gather all such records in its possession. A motion is an inappropriate forum to make such a request for the first time, particularly when it is filed in such a manner as to prevent the opposing party from responding.

126482

The Honorable Joseph J. Farnan, Jr.
December 6, 2005
Page 4

### 7. Categories for Which ALSTOM Claims AES-PR Produced No Documents

ALSTOM's final complaint – that AES-PR has failed to produce documents responsive to eleven of ALSTOM's First Requests – is equally baseless. First, for some of ALSTOM's requests, such as Requests 2, 3, 4, 5, and 6 relating to, among other items, file-naming conventions and diskette-labeling standards, AES-PR simply does not have responsive documents. Second, ALSTOM is correct that, in an effort to make its hardcopy document production more user-friendly, AES-PR grouped its hardcopy documents according to ALSTOM's requests. Given that ALSTOM's requests substantially overlapped and the nature of the documents in question, many (if not most) documents were responsive to more than one category of request. AES-PR was not required to place a document that was responsive to multiple requests in each and every category to which it may have been responsive.

### 8. Interrogatory No. 2

Finally, ALSTOM complains in a separate motion to compel about the sufficiency of AES-PR's response to ALSTOM Interrogatory No. 2. AES-PR properly objected to ALSTOM's interrogatory as grossly overbroad because it sought the identities of all persons with any knowledge whatsoever of three of the plant's major components. But rather than simply stand on its objection, AES-PR then provided the names of 13 persons of which it is aware with information that is relevant to this lawsuit. ALSTOM does not explain why that is insufficient, or whether ALSTOM in fact seeks, for example, the names of all AES-PR employees who work at the Plant, and therefore would have some passing knowledge of these systems, as well as the names of any and all vendors with only a passing knowledge of these systems. Nor would that discovery be relevant. AES-PR has employed a reasonable interpretation of this interrogatory and has answered it – any additional information ALSTOM seeks can be gleaned from an examination of the documents AES-PR has produced already, a more targeted interrogatory, and depositions in this matter.

\* \* \* \* \* \*

Because ALSTOM filed these motions after the deadline established by this Court (and prejudiced AES-PR's ability to respond appropriately) and because ALSTOM's complaints lack merit, this Court should deny ALSTOM's motions. Alternatively, if this Court decides to entertain the motions ALSTOM filed yesterday, AES-PR should be given an opportunity to research thoroughly the factual issues presented and prepare formal responses to them.

Respectfully,

/s/ John S. Spadaro

John S. Spadaro

JSS/slr

126482