IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANT'S MOTION TO COMPEL PRODUCTION OF**
**"AESC.COM" E-MAIL AND ASSOCIATED ELECTRONIC DOCUMENTS**

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222

Of Counsel:

James E. Edwards
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:   (410) 547-0699

Counsel for Defendant
ALSTOM Power Inc.

Date: February 22, 2006

ALSTOM Power Inc. ("ALSTOM"), defendant, by its counsel, pursuant to Fed. R. Civ. P. 37(a)(2)(B), moves for an order compelling AES Puerto Rico, L.P. ("AES") to produce all "aesc.com" e-mail and associated electronic documents within its possession that are responsive to ALSTOM's two Requests for Production of Documents[1] and were either sent to or received by the twelve individuals identified by ALSTOM during the period from January, 2000 to the decommissioning of the aesc.com e-mail system.

## I.   INTRODUCTION

The design, construction, and operation of the power plant that is at issue in this case spanned more than a decade. During the course of construction, AES changed electronic mail ("e-mail") systems. As a result, some time during 2002, all of AES's employees' e-mail changed from having an "aesc.com" e-mail address to having an "aes.com" e-mail address. To date, AES has refused to produce any of the "aesc.com" e-mail. Consequently, AES has produced e-mail for only a fraction of the time during which this project was being designed, constructed, and operated. AES's failure of production is especially egregious because the issues at the core of this case were extensively analyzed and discussed during the "detailed design" phase in early 2000 when the aesc.com e-mail system was in use.

To date, AES has refused to produce the "aesc.com" e-mail, contending that the e-mail is only available on back-up tapes and would be expensive and time-consuming to retrieve. This position is untenable in light of this Court's Default Standard for Discovery of Electronic Documents – which provides that "[g]enerally, the costs of discovery shall be borne by each party" – and the fact that AES is now claiming approximately $40 million in damages in this

---

[1] ALSTOM served its First Request for Production of Documents on March 28, 2005. (*See* Tab 1.) It served its Second Request for Production of Documents on October 25, 2005. (*See* Tab 2 without exhibits.)

1

case. In addition, AES's position is not supported by any evidence, despite the opportunity to provide that evidence at a corporate designee's deposition. Accordingly, AES cannot sustain its burden of showing good cause as to why it should not have to produce the aesc.com e-mail or why the costs of retrieving and producing that e-mail should be shifted to ALSTOM.

## II.   FACTUAL BACKGROUND

This matter relates to the design, construction, and operation of a coal-fired power plant in Guayama, Puerto Rico (the "Plant"). AES is the owner of the Plant. D/FD Caribbean, S.E. ("D/FD") was the prime contractor responsible for the design and construction of the Plant. ALSTOM was a subcontractor to D/FD. Under its Purchase Order with D/FD (the "Purchase Order"), ALSTOM furnished and installed the boilers and related equipment for the Plant, including the pollution control equipment at issue in this case. Contending that it was assigned certain warranties made by ALSTOM to D/FD in the Purchase Order, AES filed this action against ALSTOM under those warranties.

AES's primary claim in this action is for alleged breach of the "Accelerated Corrosion Warranty" contained in the Purchase Order. The Accelerated Corrosion Warranty contains an express condition precedent. It provides that the "corrosion guaranty is conditioned upon operation and maintenance of the system in accordance with the Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors." (*See* Tab 3, Purchase Order, General Terms and Conditions, at §1.6.) One of ALSTOM's defenses in this case is that AES failed to operate and maintain the system in accordance with the Operation and Maintenance Manuals and cannot satisfy this condition precedent.

Under a Purchase Order with ALSTOM, Environmental Elements Corporation ("EEC") supplied the pollution control equipment for the Plant and gave to ALSTOM the same Accelerated Corrosion Warranty that ALSTOM gave to D/FD. Under its Purchase Order with ALSTOM, EEC prepared the Operation and Maintenance Manuals ("O&M Manuals"), which are a part of the Contract Documents under ALSTOM's Purchase Order with D/FD.

Chapter 9 of the first volume of the O&M Manuals contains an explicit warning to the operator, AES, regarding the link between proper operating procedures and the risk of corrosion. It states: "The following overview of the maintenance and monitoring plan is geared specifically to minimizing corrosion of surfaces that handle flue gas." (*See* Tab 4 at 9-2.) It also provides: "During operation, close control of critical process parameters is necessary to minimize corrosion." (*Id.*) What follows in the O&M Manual are a series of operating instructions specifically intended to minimize corrosion, none of which were adhered to by AES.

AES is a substantial and sophisticated power company with subsidiaries that operate multiple coal-fired power facilities throughout the world. As such, AES was an active participant in the process that resulted in the design and construction of this Plant. Indeed, as early as January 2000, during the pre-contract, due diligence phase, AES expressed concerns regarding potential corrosion in the pollution control equipment based upon reports of corrosion at existing facilities utilizing the type of equipment supplied by EEC.

Such concerns apparently first emanated from a Due Diligence Report authored by Black & Veatch, a consultant engaged by AES's lender. (*See* Tab 5.) Communications that followed the submission of Black & Veatch's Report establish that AES was intimately involved in design decisions relating to the pollution control equipment for the Plant and understood the interplay between operating procedures and the risk of corrosion. Indeed, AES, D/FD, ALSTOM, and

EEC engaged in a two-day long meeting in the winter of 2000 during which the issue of the prevention of corrosion was extensively discussed. (*See* Tab 6.)

During the 2000 meeting, AES requested additional information from ALSTOM and EEC relating to corrosion of the pollution control equipment, including a report on the corrosion experience of plants in Europe using the same technology, as well as a "'Test & Monitoring Plan' to ensure proper maintenance activities are conducted through the initial 2 years of commercial operation." (*See* Tab 6, at 003385.) ALSTOM provided the information relating to the corrosion experience of the European plants to D/FD on February 21, 2000 (*See* Tab 7.) ALSTOM and EEC provided the "Plan" to D/FD on or about May 15, 2001. (*See* Tab 8.)

Following the meeting, AES, through D/FD, requested additional information relating to the corrosion issue. (*See* Tab 9.) ALSTOM and EEC provided the requested information to D/FD on March 2, 2000. (*See* Tab 10.)

All of this information was undoubtedly analyzed and discussed by AES, D/FD, and Black & Veatch. Indeed, this is evidenced by the fact that the design was approved and construction was allowed to proceed utilizing the equipment to be furnished by EEC. To date, however, AES has failed to provide any of the e-mail that was sent by AES, (either internally or to other parties such as Black & Veatch) during this period or for the balance of the period of time in which the aesc.com e-mail system was in operation. This e-mail is highly relevant and material as to the question of AES's longstanding knowledge of the operational and maintenance procedures required to minimize the risk of corrosion, procedures that ultimately became a condition precedent set forth in ALSTOM's Extended Corrosion Warranty.

### III. AES'S DEFICIENT E-MAIL PRODUCTION

Even though there was no contractual privity between ALSTOM and AES, ALSTOM has over 60 e-mails in its collection that were either sent to or by an AES employee using an aesc.com e-mail address. The bulk of those e-mails span the time from December 21, 1998 through February 27, 2002; all such e-mail has been produced by ALSTOM to AES in this case.

Conversely, AES has failed and refused to produce any of its e-mail that predates the conversion from the aesc.com to the aes.com e-mail system that reportedly occurred in mid-2002.[2] Where, as here, material discussions took place between the parties by e-mail, AES's attempt to withhold production of discoverable e-mail is improper. The following are some examples of categories of discoverable e-mail that has not been produced:

1. AES provided the Black & Veatch report to D/FD, which subsequently provided it to ALSTOM, using an aesc.com e-mail address. (*See* Tab 12, without attachment.)

2. AES helped develop the agenda for meetings that involved discussion of the corrosion issue. (*See* Tab 13.) As indicated by e-mails relating to those agenda, more than one AES employee was involved. Again, AES's comments to proposed agenda were made from aesc.com e-mail addresses.

3. AES was provided the opportunity to make comments on a draft of the minutes of the February 2000 meeting. (*See* Tab 14.) A much more detailed final version of the minutes were finally issued approximately three weeks later. (*See* Tab 6.) Importantly, all drafts and final versions were sent to AES via aesc.com e-mail addresses.

---

[2] (*See* Tab 11, 30(b)(6) Deposition of Miguel Hernandez, at 45.)

In addition to these communications about which ALSTOM has direct proof, there is abundant circumstantial evidence that AES had relevant and material communications during the time period that it was using the aesc.com e-mail system:[3]

1. Soon after the February, 2000 meeting, ALSTOM provided to D/FD information relating to the corrosion experience of the plants in Europe using the same technology that was to be installed in the Plant. (*See* Tab 7.) It is likely that D/FD provided this information to AES since AES and its financier's engineer requested that information.

2. Three days later, D/FD stated that the AES's financier's engineer was requesting additional information relating to the corrosion issue. (*See* Tab 9.) ALSTOM provided that information on March 2, 2000. (*See* Tab 10.) This information was obviously shared with AES and its financier's engineer because, on March 7, 2000, D/FD reported that the engineer required clarification of that information. (*See* Tab 14.)

3. AES undoubtedly communicated with D/FD regarding the Corrosion Maintenance Plan provided by ALSTOM and EEC in May of 2001. (*See* Tab 8.) Although ALSTOM provided the Plan to D/FD, it is clear that the Plan was provided to AES because an AES employee shared the exact same document with other AES employees in the Fall of 2003. (*See* Tab 19.)

ALSTOM has both direct and substantial circumstantial evidence that AES had relevant and material communications while using the aesc.com e-mail system. Furthermore, the communications cited above that AES had with D/FD or directly with ALSTOM are only the communications about which ALSTOM has any knowledge. It is likely that AES exchanged hundreds, if not thousands, of e-mail communications, either internally, with D/FD, its prime

---

[3] In addition to communications relating to the corrosion issue, AES also had relevant communications relating to the pollution control equipment using the aesc.com e-mail system. Those communications included e-mails relating to the permitting process with the Environmental Protection Agency (*see* Tab 15), the limestone to be used at the Plant to reduce sulfur emissions (*see* Tab 16), and EEC design drawings (*see* Tab 17, without attachment).

contractor, or with other third parties such as Black & Veatch, using the aesc.com e-mail system. ALSTOM neither has, nor could have, copies of these communications in its possession. To the extent that those communications relate to the subject matter of this case, they are relevant and should be produced.

ALSTOM has complied fully with this Court's Default Standard. Specifically, ALSTOM did not make its request for the aesc.com e-mail until after AES had finally completed its initial e-mail search and production on January 30, 2006. (*See* Tab 20.) Likewise, ALSTOM has limited its request for aesc.com e-mails to the period of early 2000 until AES stopped using the aesc.com e-mail system in 2002 and the number of individuals whose e-mail must be retrieved and produced.[4] (*See Id.*) Despite the limitations on the scope of the aesc.com e-mail requested by ALSTOM, it has not been produced by AES. (*See* Tab 22.)

AES bases this refusal on its unsupported position that the retrieval of the "aesc.com" e-mail from back-up tapes would be expensive and time-consuming. (*See id.*) AES, however, has failed to provide any evidence regarding these issues, despite ALSTOM's request that it do so. Specifically, ALSTOM served AES with a notice of deposition under Federal Rule 30(b)(6), requesting that AES provide a corporate designee who could testify for AES regarding several electronic document retention/production issues, including the following:

> 10. The hardware, including laptop and desktop computers, servers and networks, and software programs utilized by AES to create, maintain, and store e-mail messages and related

---

[4] ALSTOM has limited its request to those aesc.com e-mails sent to or received by twelve individuals – Stewart Ferguson, Ron McParland, Gary Petrie, Dale Hoxie, David Stone, Richard Trifonoff, Elias Sostre, Gary Bates, Al Dyer, Tracy Jarvis, Doug Tomlin and Paul Stinson. Those individuals include the people who attended the February, 2000 meeting for AES, as well as the current and former presidents of the AES, a trouble-shooting engineer from AES Corporation, and a limited number of key AES employees who were with the company during the time that the aesc.com e-mail system was in use.

7

> attachments, including the means by which e-mail messages were backed up and preserved and the cost of retrieving those e-mails.
>
> . . . .
>
> 12. All information relating to when and how electronic data created, received, filed, stored, or maintained by AES relating to the Project or the subject matter of this action has been preserved and/or segregated.
>
> . . . .
>
> 16. The location of any back-up tapes of computer data, and the cost of retrieving data from those back-up tapes.

(*See* Tab 22.)

At the deposition, however, Miguel Hernandez, the person whom AES had designated as the individual to testify as to these matters, could not provide any of the information requested. In particular, Mr. Hernandez did not know how often AES archived its e-mail or preserved its e-mail onto back-up tapes during the time period that the aesc.com e-mail system was employed:

> Q. Do you know how often, prior to the switch from Indianapolis to Arlington, Indianapolis archived e-mail information contained on its servers?
>
> . . . .
>
> A. No.
>
> . . . .
>
> Q. Do you know, prior to the switch from Indianapolis to Arlington, how often Indianapolis created backup tapes of e-mail information on its servers?
>
> A. No.

(*See* Tab 11, at 42.) Mr. Hernandez also did not have any information regarding the steps taken to preserve AES's e-mails:

> Q. Did AES Puerto Rico take any steps to ensure that e-mail resident on the Arlington servers were not deleted after September 29th, 2004?
>
> . . . .
>
> A. That I understand? No.
>
> . . . .
>
> Q. Were any steps taken by AES Puerto Rico to ensure that AES Puerto Rico e-mails, resident on the Indianapolis servers, were not deleted following September 29th, 2004?
>
> . . . .
>
> A. I'm not sure, no.

(*See* Tab 11, at 73-74.) Most importantly, Mr. Hernandez also had no knowledge of the costs of retrieving e-mails from archives or back-up tapes:

> Q. Do you what the cost would be to retrieve archived e-mail messages, archived AES Puerto Rico e-mail messages?
>
> . . . .
>
> A. I have no idea.
>
> BY MR. VITTORIA:
>
> Q. Do you know the cost that would be incurred to retrieve AES Puerto Rico e-mail messages from backup tapes?
>
> . . . .
>
> A. No. I have no idea.

(*See* Tab 11, at 67-68.) Thus, AES has failed to substantiate its position that it should be relieved of the obligation to produce the aesc.com e-mail or be permitted to shift the cost to ALSTOM.

9

## IV.    LEGAL ARGUMENT

Under the Federal Rules of Civil Procedure, AES is required to undertake a rigorous effort to preserve, review, and produce electronic documents and other discoverable information. It is now well-recognized that electronic documents, including e-mail, are no less discoverable than paper documents. *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 317 (S.D.N.Y. 2003); *Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421, 428 (S.D.N.Y. 2002). In addition, this Court's Default Standard provides that "[a]fter receiving requests for document production, the parties shall search their documents, other than those identified as limited accessibility electronic documents, and produce responsive electronic documents in accordance with Fed. R. Civ. Proc. 26(b)(2)."

The Default Standard provides that "[e]lectronic documents of limited accessibility may include those created or used by electronic media no longer in use, maintained in redundant electronic storage media, or for which retrieval involves substantial cost." The Default Standard further instructs that

> Electronic searches of documents identified as of limited accessibility shall not be conducted until the initial electronic document search has been completed. Requests for information expected to be found in limited accessibility documents must be narrowly focused with some basis in fact supporting the request.

In addition, paragraph 9 of the Default Standard provides the following, in regards to the cost of producing e-mail:

> **Costs.** Generally, the costs of discovery shall be borne by each party. However, the court will apportion the costs of electronic discovery upon a showing of good cause.

The e-mail in question is indisputably relevant and material. The e-mail involves communications about several relevant issues, including the design and construction of the

10

equipment, emissions permitting and, most importantly, discussions of the steps that AES should have followed to prevent the corrosion about which it is complaining in this lawsuit.

To the extent that the e-mail in question truly is "of limited accessibility", ALSTOM has complied with the Court's Default Standard in requesting that e-mail. First, it has made a factual showing that there are relevant and material communications in those e-mails. Second, it has limited its request to a discrete time period and is willing to further limit that request to only twelve individuals. Third, it waited until AES fully completed its "initial search" which, because of the rolling production that AES insisted upon, did not conclude until January 30, 2006.

Conversely, AES has not sustained its burden of establishing good cause for either its failure of production or its attempt to shift the cost of production to ALSTOM. Counsel for AES has asserted in correspondence that the e-mail in question is on back-up tapes and that it would be both "time consuming and exceptionally expensive" to retrieve and produce that e-mail. (Tab 21.) When AES was requested to provide sworn testimony on those issues, however, the witness produced by AES could provide no testimony as to the steps taken by AES to save its e-mail to archive or back-up tapes or the cost of retrieving e-mail from archives or back-up tapes. Accordingly, AES has not, and cannot, sustain its burden to show that good cause exists to withhold production of the aesc.com e-mail or apportion the cost of producing it to ALSTOM.

## IV.   CONCLUSION

The "aesc.com" e-mail that AES has refused to produce is discoverable. AES has not satisfied its burden of showing that it should be allowed to withhold production of that e-mail or apportion some of the cost of producing it to ALSTOM. Accordingly, the Court should compel AES to produce that e-mail, in the format agree to by the parties (*see* Tabs 23 and 24), at its own cost and award ALSTOM the fees and costs incurred in filing this Motion.

ALSTOM POWER INC.

/s/ Daniel W. Sciapli
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, Delaware  19806
(302) 888-3222
dscialpi@wierlaw.com

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Telephone:  (410) 685-1120
Fax:  (410) 547-0699

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 22nd day of February, 2006, a copy of the foregoing Defendant's Motion to Compel Production of "AESC.COM" E-mail and Associated Electronic Documents and accompanying proposed Order was filed with the Court using CM/ECF, which will send copies of those documents to: John S. Spadaro, Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware  19805.  In addition, courtesy copies were served, via electronic mail, upon Daniel D. Williams, Esquire, Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C.  20005.

/s/ Daniel W. Sciapli
Daniel W. Scialpi (#4146)

1800044