# TAB
# 9

**From:**      Robert L Misenheimer <Robert.L.Misenheimer@d-fd.com>
**Sent:**      Thursday, February 24, 2000 6:12 PM
**To:**        William M Jarvis
**Cc:**        AES-PR Project Email File <AES-PR.Project.Email.File@d-fd.com>; Ana C
               Peterson <Ana.C.Peterson@d-fd.com>
**Subject:**   Info Needed for Bank's Engineer

I hope this is the last note on this subject, but I need the following as soon
as possible:

1) Need a write-up documenting EEC's discussion in our meeting in Windsor of the
corrosion problems in the two US plants and why EEC does not think we will have
these problems on AES.

2) Please ask EEC provide a draft corrosion monitoring plan that can be set up
to develop baseline data and track corrosion during the two year warranty
period.

3) Please ask EEC to provide a list of key operating parameters/guidelines to be
followed to prevent corrosion.

Thanks, Bob

JARV-EMAIL-003436

# TAB 10

**From:**     Thomas L. Wardell
**Sent:**     Thursday, March 2, 2000 12:42 PM
**To:**       Robert L Misenheimer <Robert.L.Misenheimer@d-fd.com>
**Cc:**       Bob Day Jr <Bob.Day.Jr@d-fd.com>; William M Jarvis; Bruce W. Wilhelm;
              Linda R. Jannelle
**Subject:**  RE: AES - PR - Info Needed for Bank's Engineer
**Attach:**   Corrosion.doc

---

Attached at the bottom of this message is the requested EEC discussion on
Corrosion.

(Embedded     "Robert L Misenheimer"
image moved   <Robert.L.Misenheimer@d-fd.com>
to file:     02/24/2000 06:12 PM
pic32078.pcx)

To:   William M Jarvis/USFSY/ABB@ABB_USFSY
cc:   "AES-PR Project Email File" <AES-PR.Project.Email.File@d-fd.com>, "Ana
C
      Peterson" <Ana.C.Peterson@d-fd.com>
Subject:  Info Needed for Bank's Engineer

I hope this is the last note on this subject, but I need the following as
soon
as possible:

1) Need a write-up documenting EEC's discussion in our meeting in Windsor of
the
corrosion problems in the two US plants and why EEC does not think we will
have
these problems on AES.

2) Please ask EEC provide a draft corrosion monitoring plan that can be set
up
to develop baseline data and track corrosion during the two year warranty
period.

3) Please ask EEC to provide a list of key operating parameters/guidelines to be
followed to prevent corrosion.

Thanks, Bob

- Corrosion.doc

# Discussion Points
## 2/11/2000 ABB-CE's Offices

In general, all semi-dry scrubbing systems (spray dryer as well as the fluid bed process) will experience limited forms of corrosion. The severity of the corrosion is mostly a function of how the plant is operated and maintained.

- Our first installation in the states, in Weldon North Carolina, was a very smooth startup and was commercial within two months of "first coal fire". The vessel experienced corrosion in the area of the water spray lances after about two years of operation. This area of the vessel has been replaced with 317L grade stainless steel. The operating staff undertook the work with EEC advising them on metallurgical issues. They clearly understand the need to implement and monitor a preventative maintenance program for the water spray lances. Much more attention has been placed on this type of a program since the repairs and there is no indication to date that a repeat episode is in progress.

- The second installation in the U.S., an 80 MW coal fired unit in Gillette Wyoming, was a very difficult startup due to an excessive number of startup/shutdowns unrelated to the CDS system. Corrosion was evident after 4 years of commercial operation. A small area at the base of the plates in the ESP first field was corroded as a result of manufacturing defects in vacuum relief valves on the ash bins beneath the ESP that allowed ambient air inleakage into the hoppers of the first field. The plates have been repaired and the valves were replaced. Wall thinning was evident in the CDS vessel. It was more pronounced in the area of the water spray lances. A metallurgical analysis of a section of the vessel indicated wetting of the walls with subsequent corrosion and erosion. The Owner contracted to have a coating (vinyl ester) applied during the next scheduled outage that was five months after initial discovery of the problem. The root cause was never determined. Operating logs of all instrument readings were extensive but spray lance maintenance records did not exist. The operating staff has since implemented a more thorough preventative maintenance program of the water spray lances. The vessel will be monitored during future outages to determine if the wall thinning is progressing.

- There are certain operating parameters that will have an influence on the risk of potential corrosion in a semi-dry scrubbing process. The single most important parameter is the "approach" temperature. This is the difference between the wet and dry bulb temperature of the flue gas exiting the scrubber. Operations "sets" the approach temperature based upon a historical determination of the flue gas wet bulb temperature. Readings are taken manually and should be repeated at least once a day to track and correlate this parameter with operating conditions. The approach temperature must be adjusted accordingly.

WARD-EMAIL-006707

- Interlocks in the unit's control system are provided to protect against improper operating conditions or conditions outside of the units design parameters. Some of these interlocked parameters are low scrubber outlet gas temperature, elevated approach temperature during soot blowing cycles within the boiler, elevated approach temperature for high concentrations of chlorides in the gas cooling water, low bed density of solids circulating within the vessel, and minimum flue gas flow rates.

- The design of the equipment can be modified to mitigate the impact of all of the above issues. Corrosion allowances can be (and are) provided in the design of the scrubber vessel. The current plan is to provide an additional 1/8 inch of steel in the walls of the vessel where it is most susceptible to wall wetting, i.e. in and around the water spray lances.

- Another critical design area is the insulation and lagging system. Hotspots on the lagging surfaces and around penetrations can lead to "cold face" corrosion on adjacent flue gas surfaces. Supports or braces that penetrate through the lagging will be connected to external stiffeners, instead of connecting directly to the vessel skin. Where this is not possible, thermal isolation pads will be used. Where applicable, the braces should be covered with insulation and lagging. In addition, we recommend that an infrared heat loss survey be performed, during operation, to verify the quality of the insulation and lagging system, and identify any high temperature abnormalities. The insulation and lagging in these areas should be repaired as soon as possible.

- EEC recommends that the wall thickness of the vessel be monitored prior to startup to develop baseline data, and annually to record the rate of corrosion. A handheld, battery powered ultrasonic tester should be used to measure the wall thickness from inside the vessel. These measurements should then be transferred to an elevation drawing. Four (4) ports will be installed in the CDS roof, around the perimeter, at 90° intervals for this purpose. A steel cable will be secured at the top and lowered through the each port. A small "skyclimber" platform can be assembled inside the vessel, and will travel upward via the cable. Three (3) readings should be taken at 5' intervals on each quadrant of the wall. If a deviation greater than 5 mils occur in the readings at each elevation, then additional readings should be taken to determine the true average thickness.

WARD-EMAIL-006708

# TAB
# 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.         *     C.A. NO.:  04-1282(JJF)
                              *
      Plaintiff               *
                              *
      Vs.                     *
                              *
ALSTOM POWER, INC.            *
                              *
      Defendant               *
*******************************

30(B)(6) DEPOSITION OF MR. MIGUEL HERNANDEZ

DATE       :    January 19, 2006

TIME:      :    3:00 P.M.

OFFICE     :    Ober, Kaler, Grimes & Shriver, P.S.C.
                120 East Baltimore Street
                Baltimore, Maryland 21202-1643

HELD AT    :    Axtmayer, P.S.C.
                250 Ponce de León Avenue
                Suite 404
                Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

    Ann Sagerson, Esq.

FOR DEFENDANT:

    Anthony Vittoria, Esq.
    Michael Schollaert, Esq.
    Liana I. Loyola, Esq.

NOTARY PUBLIC:

    Liana I. Loyola, Esq.



**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927

2

1   COURT REPORTER:

2       Mr. Matthew J. Clutteur Short

3   INTERPRETER:

4       Mr. Maurice Gilbert

5                    *  *  *  *  *

6                    PROCEEDINGS

7                                       (3:20 P.M.)

8   MS. LOYOLA:

9       "Buenas tardes.  Vamos a comenzar con la segunda

10  deposición en el día de hoy, 19 de enero de 2006.  Vamos

11  ahora a tomarles el juramento a ustedes.  Vamos a

12  hacerlo así porque es una nueva deposición.  Por favor,

13  levante su mano derecha y mencione para el récord su

14  nombre."

15  COURT REPORTER:

16      Matthew Clutteur.

17  MS. LOYOLA:

18      "¿Usted jura solemnemente transcribir correctamente

19  con precisión cada uno de los eventos que ocurra durante

20  la deposición que va a comenzar en estos momentos?"

21  COURT REPORTER:

22      "Lo juro".

23      (Whereupon,

24                 MATTHEW CLUTTEUR

25  was duly sworn as the official Court Reporter for these


**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

3

1    proceedings.)

2    MS. LOYOLA:

3        "Gracias.  Por favor, levante su mano derecha y

4    mencione para el récord su nombre."

5    THE INTERPRETER:

6        Maurice Gilbert.

7    MS. LOYOLA:

8        "¿Jura usted solemnemente transcribir, perdón,

9    traducir de manera precisa cada uno de los eventos que

10   ocurra en, que estaría frente a usted en el transcurso

11   de la deposición que comienza?"

12   THE INTERPRETER:

13       "Lo juro".

14       (Whereupon,

15                    MAURICE GILBERT

16   was duly sworn as the official Interpreter for these

17   proceedings.)

18   MS. LOYOLA:

19       "Gracias.  Al deponente, por favor, levante su mano

20   derecha y mencione para el récord su nombre."

21   THE DEPONENT:

22       Miguel Hernández.

23   MS. LOYOLA:

24       "¿Jura usted solemnemente contestar con corrección

25   y precisión cada pregunta que se le haga durante la

4

1    deposición que comienza?"

2    THE DEPONENT:

3        "Lo juro".

4        (Whereupon,

5                    MIGUEL HERNANDEZ

6    was called as a witness, and after having been duly

7    sworn, was examined and, through the Interpreter,

8    testified as follows:)

9    MS. LOYOLA:

10        "Muchas gracias".  You can go on.

11   MR. VITTORIA:

12        Good afternoon. My name is Anthony Vittoria.  I'm a

13   counsel, lawyer for Alstom Power, Inc.

14        I have with me Liana Loyola of this law firm; and

15   Michael Schollaert, who also represents Alstom Power,

16   Inc.

17                    DIRECT EXAMINATION

18   BY MR. VITTORIA:

19        Q    Could you please state your name?

20        A    Yes, my name is Miguel Hernández.

21        Q    Okay.  Miguel Hernández, Mr. Hernández, do you

22   speak English?

23        A    Not fluently.

24        Q    When you're at work do you use Spanish or

25   English?



39

1    that e-mail.

2        A    Mmhm?

3        Q    And that sentence says, "The issue is that we

4    do not have our own e-mail server on site, so everyone's

5    machine goes to the server at Indianapolis to retrieve

6    every e-mail message, calendar reminder, contact,

7    etcetera". Do you see that?

8        A    Yes.

9        Q    So, when was it that the AES Puerto Rico

10   servers started managing the AES Puerto Rico e-mail?

11   MS. SAGERSON:

12       Objection, lack of foundation.

13   THE DEPONENT:

14       A    Could you repeat?

15   BY MR. VITTORIA:

16       Q    Yes.  When is it that the AES Puerto Rico

17   servers started maintaining the AES Puerto Rico email?

18   MS. SAGERSON:

19       Same objection.

20   THE DEPONENT:

21       A    Never.

22   BY MR. VITTORIA:

23       Q    So all of the AES Puerto Rico e-mail is still

24   being managed by a server in Indianapolis?

25       A    Now it's Arlington, Virginia.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

40

1      Q    And prior it was Indianapolis?

2      A    Yes.

3      Q    And when was that changed?

4      A    Wow!

5      Q    I got that one.

6   THE INTERPRETER:

7      Everybody wants to be an interpreter.

8   THE DEPONENT:

9      A    I don't remember when it was that they changed

10   to Arlington.

11   BY MR. VITTORIA:

12      Q    Is it your recollection that it was after

13   August 18th, 2003?

14      A    Pardon?

15      Q    Is it your recollection that it was after

16   August 18th, 2003, the date of this e-mail in Exhibit

17   25?

18      A    I believe so.

19      Q    Was it in 2004?

20   MS. SAGERSON:

21      Objection to form.

22   THE DEPONENT:

23      A    I'm not sure.

24   BY MR. VITTORIA:

25      Q    So have the five servers as AES Puerto Rico



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

42

1      A    I think it was in September.  Maybe they

2  started configuration at the beginning of... I'm not

3  sure, I'm not sure... end of 2003, or beginning of...

4      Q    Two thousand four?

5      A    Two thousand four.

6      Q    Do you know how often, prior to the switch

7  from Indianapolis to Arlington, Indianapolis archived e-

8  mail information contained on its servers?

9  MS. SAGERSON:

10     Objection to form, and lack of foundation.

11  THE DEPONENT:

12     A    No.

13  MS. SAGERSON:

14     And he's here to testify about AES Puerto Rico's

15  electronic document procedures, not corporate's.

16  BY MR. VITTORIA:

17     Q    Do you know, prior to the switch from India-

18  napolis to Arlington, how often Indianapolis created

19  backup tapes of e-mail information on its servers?

20  MS. SAGERSON:

21     Objection, lack of foundation.

22  THE DEPONENT:

23     A    No.

24  BY MR. VITTORIA:

25     Q    Do you know how often Arlington now archives



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

43

1  information, e-mail information on its servers?

2  MS. SAGERSON:

3      By "archive," do you mean "backup"?

4  MR. VITTORIA:

5      (No audible response).

6  MS. SAGERSON:

7      Objection, lack of foundation.

8  THE DEPONENT:

9      A    No.

10  BY MR. VITTORIA:

11      Q    Do you know how often Arlington creates backup

12  tapes of e-mail information?

13  MS. SAGERSON:

14      Objection, lack of foundation.

15  THE DEPONENT:

16      A    No.

17  BY MR. VITTORIA:

18      Q    You began work with AES Puerto Rico in 2001?

19      A    July 9th, 2001.

20      Q    Very good.  At that time, did the AES Puerto

21  Rico employees have an AES Puerto Rico.com e-mail

22  address?

23      A    For messaging, for e-mail?

24      Q    Yes.

25      A    Aes.com; no.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

1    Puerto Rico employees currently have an aespr.com e-mail

2    address?

3        A    No.

4        Q    What is their e-mail address currently?

5        A    Aes.com.

6        Q    Okay.  My fault.  When was the switch from

7    aesc.com to aes.com?

8        A    I'm speculating, but I think that it was in

9    mid-2002.

10        Q    Do you know what has happened with the e-mails

11    that had the aesc.com address?

12        A    No.

13        Q    Do you know the location of the server that

14    managed the aesc.com e-mail?

15        A    I'm not sure if it was in Indiana.

16    MR. VITTORIA:

17        Can you dig out Exhibit 8?

18        Q    Mr. Hernández, I'd like you to take a look at

19    what's been marked as Exhibit 9, and let me know when

20    you've had a chance to review it.

21        A    The markings?  What is it?

22        Q    Just take a look at it.

23        A    Okay.

24        Q    Do you recognize the document?

25        A    Yes.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

67

1    BY MR. VITTORIA:

2        Q    Has there ever been an occasion where there

3    has been some kind of loss of a server or of hardware at

4    AES Puerto Rico that has resulted in the loss of AES

5    Puerto Rico e-mail messages?

6        A    No.

7        Q    Has there ever been a problem with a server,

8    or other hardware, that has resulted in a loss of non-e-

9    mail electronic documents at AES Puerto Rico?

10       A    One server crashed.

11       Q    And when was that?

12       A    That was end of 2004.

13       Q    And were some electronic documents lost as a

14   result of that crashed server?

15       A    No.

16       Q    Why were they not lost?

17       A    Because it's in the backup, thank God there

18   was a backup.

19       Q    Do you know what the cost would be to retrieve

20   archived e-mail messages, archived AES Puerto Rico e-

21   mail messages?

22   MS. SAGERSON:

23       Objection to form.

24   THE DEPONENT:

25       A    I have no idea.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

68

1   BY MR. VITTORIA:

2       Q    Do you know the cost that would be incurred to

3   retrieve AES Puerto Rico e-mail messages from backup

4   tapes?

5   MS. SAGERSON:

6       Objection to form.

7   THE DEPONENT:

8       A    No.   I have no idea.

9   MR. VITTORIA:

10      I'm seeing the light at the end of the tunnel.

11      Q    Mr. Hernández, are you familiar with the DCS

12  system at the plant?

13  THE INTERPRETER:

14      I'm sorry, for the Interpreter, "Are you

15  familiarized with the DSC..."?

16  MR. VITTORIA:

17      DCS.

18  THE INTERPRETER:

19      DCS.

20  BY MR. VITTORIA:

21      Q    ...system at the plant?

22      A    I don't know it, but I know the network.

23      Q    Can you explain the difference?

24      A    DCS, at least all instruments, software, net-

25  work, that's the infrastructure of the network.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

73

1    MS. SAGERSON:

2        Objection to form.

3    THE DEPONENT:

4        A    No.

5    BY MR. VITTORIA:

6        Q    Did AES Puerto Rico take any steps to ensure

7    that e-mail resident on the Arlington servers were not

8    deleted after September 29th, 2004?

9    MS. SAGERSON:

10        Objection to form.

11    THE DEPONENT:

12        A    That I understand?  No.

13    BY MR. VITTORIA:

14        Q    On or about September 29th of 2004, were any

15    AES Puerto Rico e-mails still resident on the Indiana-

16    polis servers?

17        A    Not very... I believe they were already in

18    Arlington.  In Arlington.

19        Q    But you're not sure?

20        A    I'm not sure.

21        Q    Were any steps taken by AES Puerto Rico to

22    ensure that AES Puerto Rico e-mails, resident on the

23    Indianapolis servers, were not deleted following

24    September 29th, 2004?

25

1   MS. SAGERSON:

2       Objection to form. Lack of foundation. He doesn't

3   even know if there were e-mails on the Indianapolis

4   system.

5   THE DEPONENT:

6       A    I'm not sure, no.

7   BY MR. VITTORIA:

8       Q    Are you aware of any other memorandum similar

9   to Exhibit 24 regarding the preservation of documents

10  for this lawsuit?

11      A    I know that there was one of April 15, in

12  April 15th, around there, of 2005.

13      Q    Are you aware of any prior to this one of

14  September 29th, 2004, Exhibit 24?

15  MS. SAGERSON:

16      Objection to form.

17  THE DEPONENT:

18      A    Before 29 September?

19  BY MR. VITTORIA:

20      Q    Of 2004.

21      A    No, I don't remember.

22      Q    Are you aware of any memorandum or documents

23  or e-mails regarding the preservation of documents for

24  any other case?

25