IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,               *

        Plaintiff,              *

     v.                            *        C.A. No. 04-1282-JJF

ALSTOM POWER INC.,               *

        Defendant.             *

*   *   *   *   *   *   *   *   *   *   *

**DEFENDANT'S SECOND MOTION TO COMPEL
PRODUCTION OF ELECTRONIC DOCUMENTS
OR, IN THE ALTERNATIVE, FOR SANCTIONS**

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19806
(302) 888-3222

Of Counsel:

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Telephone:   (410) 685-1120
Facsimile:    (410) 547-0699

Counsel for Defendant
ALSTOM Power Inc.

Date:  February 23, 2006

ALSTOM Power Inc. ("ALSTOM"), defendant, by its counsel, and pursuant to Fed. R.

Civ. P. 37(a)(2)(B), moves for an order compelling AES Puerto Rico, L.P. ("AES") to produce

all electronic documents in its possession, custody or control that are responsive to ALSTOM's

two Requests for Documents or, in the alternative, for an order ruling that AES has failed to

produce relevant and responsive electronic mail ("e-mail") and that the jury at the trial of this

case should be instructed that it should draw a negative inference as to the content of those e-

mail messages.

## I.    INTRODUCTION

Throughout the course of discovery in this case, ALSTOM has questioned whether AES

has made complete production of electronic documents and e-mail.  At various points in AES's

production, ALSTOM has demonstrated that AES has not produced discoverable e-mail that it

indisputably had or should have in its possession, custody, or control.  AES has dismissed those

concerns, asserting, instead, that it was making a "rolling" production – thereby implying that it

would eventually produce the missing e-mails.

AES's rolling production of electronic documents and e-mail continued until

February 17, 2006.  During that production, AES has produced a total of 71,206 documents.

Despite the seemingly large number of electronic documents produced by AES, ALSTOM has

determined that there are well over a hundred responsive and relevant e-mails exchanged by

ALSTOM and AES that are in ALSTOM's own e-mail collection and that AES should have in

its possession, custody or control, but has not produced.  For that reason, AES also

unquestionably has failed to produce hundreds, if not thousands, of other discoverable e-mail

messages to which ALSTOM was not privy, including internal communications,

communications with its consultants, and with the prime contractor for the design and

construction of the project at issue with whom ALSTOM was in contractual privity. AES's failure of production represents a serious breach of its discovery obligations under the Federal Rules of Civil Procedure and the policies of this Court.

## II.     FACTUAL BACKGROUND

This matter relates to the design, construction, and operation of a coal-fired power plant in Guayama, Puerto Rico (the "Plant"). AES is the owner of the Plant. D/FD Caribbean, S.E. ("D/FD") was the prime contractor responsible for the design and construction of the Plant. ALSTOM was a subcontractor to D/FD. Under its Purchase Order with D/FD (the "Purchase Order"), ALSTOM furnished and installed the boilers and related equipment for the Plant, including the pollution control equipment at issue in this case. Contending that it was assigned certain warranties made by ALSTOM to D/FD in the Purchase Order, AES filed this action against ALSTOM under those warranties.

AES's primary claim in this action is for alleged breach of the "Accelerated Corrosion Warranty" contained in the Purchase Order. The Accelerated Corrosion Warranty contains an express condition precedent. It provides that the "corrosion guaranty is conditioned upon operation and maintenance of the system in accordance with the Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors." (*See* Tab 1, Purchase Order, General Terms and Conditions, at §1.6.) One of ALSTOM's defenses in this case is that AES failed to operate and maintain the system in accordance with the Operation and Maintenance Manuals and therefore cannot satisfy this condition precedent.

AES contends that it discovered the corrosion complained of in this action in one of two units in mid-November, 2003. On November 24, 2003, AES sent a letter to ALSTOM

demanding that ALSTOM remedy the corrosion, citing the Accelerated Corrosion Warranty. (*See* Tab 2.)  AES has admitted that it had the assistance of counsel in drafting that letter.  (*See* Tab 3, 30(b)(6) Deposition of Al Dyer, at 55.)

AES performed remedial work on the corrosion in the winter of 2003.  (*See* Tab 2, at 79-80.)  AES contends that it discovered additional corrosion in the second unit at the Plant in early January, 2004.  (*Id.*, at 93-94.)  Subsequently, AES sent ALSTOM two more letters – dated January 21, 2004 and June 22, 2004 – demanding that ALSTOM remedy the corrosion.  (*See* Tabs 4 and 5.)

As authorized under the terms of the Accelerated Corrosion Warranty, ALSTOM requested information and documentation from AES in order to determine whether it had an obligation to perform remedial work under  the Warranty.  Because there are significant conditions precedent to ALSTOM's obligations under the Accelerated Corrosion Warranty, ALSTOM's responses raised the spectre that AES's claim under the Warranty would be disputed.  Despite the developing dispute regarding its claim, AES delayed in instructing its employees to preserve relevant documents and data until September 29, 2004 – almost a year after the corrosion was originally discovered.[1]  (*See* Tab 6.)  Furthermore, even when it was belatedly issued, AES's preservation instruction was provided to only a select handful of AES employees.  (*Id.*)

---

[1] Ironically, according to its own Privilege Logs, AES is withholding documents and data dating back as early as April 15, 2004 (but at least as early as July 8, 2004), citing the attorney-work product doctrine.  (*See* Tab 7, AES Privilege Log, at 7 and 17.)  It is axiomatic that the protections of the work-product doctrine do not apply unless the party asserting the doctrine prepared the documents in anticipation of litigation.  AES's assertion of the work product doctrine to prevent disclosure of documents and data prepared as early as April, 2004 is an admission that its preservation instruction should have been issued to all persons having relevant documents and data no later than April of 2004.

### III.     ELECTRONIC DISCOVERY BACKGROUND

On March 28, 2005, ALSTOM served its First Request for Documents, which sought the production of both hard-copy and electronic documents.[2]  (*See* Tab 8.)  Recognizing the effort that would be required by both parties to gather, prepare, and produce responsive documents and data, ALSTOM acceded to AES's suggestion that the parties agree to a "rolling production" of their respective electronic documents.

As discovery progressed, AES's "rolling" production consisted of the production of a miniscule number of electronic documents in late summer and then a deluge of electronic documents in the fall and winter of 2005.  In particular, AES produced a total of 544 electronic documents on August 22, 2005 and then did not produce another electronic document until November 9, 2005, when it produced an additional 2,430 electronic documents.  Between that date and December 21, 2005, AES produced a total of 60,074 additional electronic documents.[3]

During the course of discovery, ALSTOM expressed concerns regarding AES's electronic document production.  Specifically, ALSTOM questioned why relevant e-mails that had been exchanged by the parties in the regular course of business were being produced by ALSTOM but were not being produced by AES.  (*See, e.g.,* Tab 10, at 3.)     AES dismissed ALSTOM's concerns at the time, stating that the parties were engaged in a "rolling production" and that ALSTOM could expect to receive additional electronic documents from AES.  (*See* Tab 11.)

---

[2] ALSTOM served its Second Request for Production of Documents on October 25, 2005.  (*See* Tab 8.)

[3] Only the first of AES's electronic document productions – the production consisting of 544 electronic documents – was made prior to ALSTOM's first Motion to Compel Electronic Documents, which was filed on October 24, 2005.

Based on its review of AES's early production of electronic documents, ALSTOM raised a significant concern that AES had produced a very limited number of e-mail messages that had either been sent to or by employees of D/FD – AES's primary contact on the project.  (*See* Tab 10, at 2.)   When ALSTOM voiced this concern during a telephone conference regarding discovery issues with AES on December 20, 2005, AES responded by requesting that ALSTOM provide to AES those D/FD e-mails.  (*See* Tab 12, Schollaert Aff., at ¶ 3.)  When questioned why AES did not have that e-mail itself, in what is now a telling admission, AES responded that it was possible that some documents were "not retained in the ordinary course."  (*Id.*, at ¶ 5.)

On December 29, 2005, AES reported that it had completed its production of electronic documents.  (*See* Tab 13.)   At the same time, ALSTOM again raised concerns that AES's production of e-mail was incomplete.  (*See* Tab 14.)  This time, AES dismissed ALSTOM's concerns as a "sideshow" (*see* Tab 15) and asserted that its efforts to collect and produce e-mail had "fully conformed with the requirements of the Federal Rules."  (*See* Tab 16.)  Despite this assertion, AES later tacitly admitted that its production of e-mail had not been completed.  (*See* Tab 17.)  AES produced additional e-mail on January 20 and January 30, 2006.  (*See* Tabs 18 and 19.)

Despite multiple productions by AES, ALSTOM has determined that AES has failed to produce substantial discoverable e-mail.  (*See* Tab 20.)  In an effort to resolve the dispute regarding AES's incomplete production, ALSTOM raised the issue during a conference call on February 10, 2006.  In response, AES asserted that it had no knowledge of any missing e-mail and requested that ALSTOM provide some examples showing that AES's electronic production was incomplete.  (*See* 12, at ¶ 7.)  ALSTOM did so on February 15, 2006, identifying a number of AES e-mail messages that were in ALSTOM's collection but had not been produced by AES.

(*See* Tab 21.)  When confronted with this evidence, AES promised to produce still more electronic documents; AES did not, however, deny that it had failed to produce e-mails that had been produced by ALSTOM.  (*See* Tab 22.)

In testing whether AES's production of e-mail is complete, ALSTOM has compared the e-mail messages exchanged between the parties that are contained in its collection with the e-mails produced by AES.  That comparison has shown that there are still well over a hundred e-mail messages from the relevant time period that AES failed to produce.  This analysis necessarily is limited to a comparison of e-mail messages exchanged by employees of ALSTOM and AES, which is the only AES e-mail in ALSTOM's collection.  Coupled with AES's failure to produce e-mail exchanged with D/FD, its prime contractor, this analysis demonstrates that AES's production of discoverable e-mail is incomplete and that, in all likelihood, AES failed to preserve e-mail that was relevant to this dispute and should have been produced.  More importantly, the e-mail that AES has failed to produce includes hundreds, and probably thousands, of internal communications, and communications between AES and D/FD or other third parties to which ALSTOM was not privy.  Set forth below is a summary of ALSTOM's analysis.

## IV.    SPECIFIC DEFICIENCIES IN AES'S PRODUCTION

### A.    Analysis Of E-Mail Exchanged With Paul Stinson

ALSTOM has compared the e-mails that had been exchanged between its employees and Paul Stinson[4] during the relevant time period.  ALSTOM has in its collection a total of 90 e-mail messages that were either sent to or by Mr. Stinson.  While AES has produced a total of 156 e-

---

[4] Mr. Stinson is a trouble-shooter employed by AES's parent company, AES Corporation.  Mr. Stinson was sent to the Plant on several occasions to investigate different operating issues, including the corrosion issue about which AES complains.

mail messages that were exchanged between Mr. Stinson and an employee of ALSTOM, many of those e-mails are not relevant to the issues in this case. Thus, to obtain an accurate count of the relevant e-mail messages sent to or by Mr. Stinson that AES has produced, ALSTOM performed a "keyword" search of the Stinson e-mail messages produced by AES and the Stinson e-mail messages in ALSTOM's collection. A search using the keywords "CDS," "ESP," "scrubber," "precipitator," and "EEC,"[5] which would largely differentiate relevant from irrelevant e-mail, reveals that AES has produced only 54 "clearly" relevant e-mails that were either sent to or by Mr. Stinson and an ALSTOM employee. Conversely, ALSTOM has in its e-mail collection 78 Stinson e-mails that contain one or more of the keywords. In other words, ALSTOM has in its e-mail collection, and has produced to AES, 24 more clearly relevant Stinson e-mails than AES has produced to ALSTOM.

Importantly, many of the e-mails that were not produced by AES are of significant relevance to this case. In particular, AES failed to produce an e-mail dated September 30, 2003 from Karl Hognefelt, ALSTOM's in-house precipitator consultant, to Paul Stinson which attached a copy of Mr. Hognefelt's report relating his site visit to inspect the equipment at issue. (*See* Tab 23.) Other significant Stinson e-mails that AES failed to produce include extensive analysis of CDS/ESP issues performed by Paul Stinson. (*See, e.g.*, Tabs 24 and 25.)

**B.    Analysis Of E-Mail Exchanged With Ron McParland**

ALSTOM has also compared the e-mails that had been exchanged between its employees and Ron McParland[6] during the relevant time period. ALSTOM has in its collection a total of

---

[5] The pollution control equipment at issue is comprised primarily by the circulating dry scrubber (the "CDS or "scrubber") and the electrostatic precipitator (the "ESP" or "precipitator").

[6] Mr. McParland was an employee of AES and was involved during the design stage when the parties discussed steps to prevent the corrosion about which AES now complains.

301 e-mails that were either sent to or by Mr. McParland.  While AES has produced a total of 129 e-mails that had been sent to or by Mr. McParland, AES produced only 31 e-mails that contain one or more of the search terms described above.  ALSTOM produced a total of 83 clearly relevant McParland e-mails – 52 more than AES has produced.

Again, many of the McParland e-mails that AES failed to produce contain highly relevant and material communications.  For example, AES failed to produce an April 14, 2003 e-mail from EEC on which Mr. McParland was copied that addressed various issues relating to the pollution control equipment, including the corrosion warranty.  (*See* Tab 26.)  AES also failed to produce a May 26, 2003 e-mail from D/FD to Mr. McParland that specifically addressed the need for AES to operate the equipment pursuant to EEC's "instructions" and "operating parameters":

> In addition to this, we recommend that AES check the dew point daily in accordance with EEC instructions and insure that the CDS outlet temperature be maintained in accordance with the EEC operating parameters.

(*See* Tab 27.)

## C.    Analysis Of E-Mail Exchanged With Al Dyer

ALSTOM has compared the e-mails that had been exchanged between its employees and Al Dyer[7] during the relevant time period.  ALSTOM has in its collection a total of 148 e-mails that were either sent to or by Mr. Dyer.  While AES has produced a total of 462 e-mails that had been sent to or by Mr. Dyer, AES produced only 73 e-mails that contain one or more search terms from the relevant time period.  ALSTOM produced a total of 80 clearly relevant McParland e-mails – 7 more than AES has produced.

---

[7] Mr. Dyer is AES's President and Plant Manager.

While the number of missing Dyer e-mails about which ALSTOM has direct evidence is not great, they are of particular importance, especially considering that Mr. Dyer was the individual making a majority of the critical decisions during the relevant time period. For example, AES failed to produce two e-mails in an exchange between Mr. Dyer and ALSTOM's Project Manager, Bill Jarvis, relating to AES's claims against ALSTOM for the corrosion allegedly experienced in the equipment. (*See* Tabs 28 and 29.)

**D.**    **Analysis Of E-Mail Exchanged With D/FD**

ALSTOM has compared the e-mails that had been exchanged between AES, D/FD and ALSTOM during the relevant time period. ALSTOM has in its collection a total of approximately 540 e-mails that were exchanged between all three parties. AES has produced 101 such e-mails, only 19 of which contain one or more of the search terms. ALSTOM produced a total of 44 clearly relevant AES–D/FD–ALSTOM e-mails – 25 more than AES has produced.

Again, many of the D/FD e-mails that AES failed to produce relate to issues that are of critical importance to this case, including repairs to the pollution control equipment – repairs that ALSTOM believes helped solve the operational difficulties – and EPA emissions testing. (*See* Tabs 30 and 31.) Incredibly, the e-mail relating to EPA emissions testing was sent to five different AES employees – all of whose relevant e-mail AES has purportedly produced – but was still not produced by AES. (*See* Tab 30.)

**E.**    **Hard-Copy E-mails Not Produced Electronically**

As part of its hard-copy document production in this case, AES has produced copies of e-mails that had been printed onto paper. Many of those e-mails are highly relevant and material to this case. As further evidence that its electronic production is incomplete, however, AES has

9

failed to produce many of those same e-mails as part of its electronic document production. The most probable inference to be drawn is that AES failed to preserve the electronic e-mail between the time these e-mail messages were printed and the time that AES sought to retrieve them in discovery in this case. Some examples of those documents include: (1) and internal e-mail from former AES president Richard Trifonoff to several AES employees relating to the CDS water spray nozzles (*see* Tab 32)[8]; (2) an e-mail from AES employee Calvin Kotrla to a third-party relating to the delivery of the replacement collecting plates ordered by AES (*see* Tab 33)[9]; and (3) an internal e-mail from Calvin Kotrla relating to the payment for the replacement collecting plates and rigitrodes ordered by AES (*see* Tab 34).

## V.    ARGUMENT

Under the Federal Rules of Civil Procedure, AES is required to undertake a rigorous effort to preserve, review, and produce electronic documents and other discoverable information. It is now well-recognized that electronic documents, including e-mail, are no less discoverable than paper documents. *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 317 (S.D.N.Y. 2003); *Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421, 428 (S.D.N.Y. 2002). In addition, this Court's Default Standard provides that "[a]fter receiving requests for document production, the parties shall search their documents, other than those identified as limited accessibility electronic documents, and produce responsive electronic documents in accordance with Fed. R. Civ. Proc. 26(b)(2)."

---

[8] The e-mail attached at Tab 32 contains a string of five separate e-mails – three of which were sent to or by AES employees. None of the three e-mails sent to or by AES employees were produced in electronic format by AES, despite the fact that they relate to a highly relevant issue in this case.

[9] Again, none of the e-mails that are part of the string of e-mails in this exhibit were produced in electronic format by AES.

As set forth above, AES has failed to produce relevant and responsive electronic e-mail documents. Indeed, by looking at only five witnesses, ALSTOM has shown that, even at this late date in the discovery process, AES has failed to produce well over one hundred relevant and responsive e-mail messages that are, or should be, in its possession, custody, or control. AES's failure to produce those e-mail messages and its production of some e-mail messages in hard-copy form but not electronically, demonstrates that AES has also failed to collect and produce discoverable e-mail messages (and attachments) to which ALSTOM was not privy that were exchanged with D/FD, its prime contractor, and other third parties. Moreover, AES's delay for almost a year after the discovery of the corrosion in instructing only some of its employees to preserve electronic documents supports the conclusion that most or all of these missing e-mail messages no longer exist.

This is one of two motions that ALSTOM has been forced to file relating to AES's failure to produce relevant and responsive e-mails. It is now apparent that AES will not or cannot produce the e-mails in question – probably because they no longer exist. Accordingly, pursuant to Federal Rule 37, ALSTOM is entitled to an Order directing AES to produce the e-mail that has not been produced or, if the e-mail has not been properly preserved, an Order instructing the jury at the trial of this case that AES failed to preserve and produce relevant evidence and that the jury should draw a negative inference as to the content of the missing e-mail messages.

## VI.    CONCLUSION

For the reasons set forth above, ALSTOM respectfully requests that the Court issue an Order: (1) compelling AES to produce any and all responsive e-mail messages in its possession, custody, or control; or, in the alternative, (2) instructing the jury at the trial of this case that AES failed to preserve and produce relevant evidence and that the jury should draw a negative

inference as to the content of the missing e-mail messages; and (3) awarding ALSTOM its attorneys' fees and costs in prosecuting this motion.

ALSTOM POWER INC.


/s/ Daniel W. Sciapli
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19806
(302) 888-3222
dscialpi@wierlaw.com

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Telephone:    (410) 685-1120
Facsimile:    (410) 547-0699


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 23rd day of February 2006, copies of the foregoing Second Motion to Compel Production of Electronic Documents or, in the Alternative, for Sanctions was filed with the Court using CM/ECF, which will send copies of those documents to:  John S. Spadaro, Esquire, Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware  19805.  In addition, courtesy copies were served, via electronic mail, upon Daniel D. Williams, Esquire, Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C.  20005.


/s/ Daniel W. Scialpi
Daniel W. Scialpi


1800042