# TAB
# 1

# PART III - GENERAL TERMS

## 1.0  WARRANTIES

1.1.1 Contractor warranties Duke/Fluor Daniel Caribbean S.E. ("D/FDC") and Owner that the Work shall comply with the provisions of this Contract and all specifications and drawings referred to in this Contract, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Contractor. Contractor further warranties D/FDC and Owner that all materials, equipment and supplies furnished by Contractor for the Work shall be new and fit for their specified purposes as set forth in this Contract and be in full compliance with the requirements of this Contract. As described in this Agreement, if any defect in the Work in violation of the foregoing warranties arises within the period set forth below, Contractor shall upon receipt of prompt written notice from D/FDC or Owner of such defect promptly furnish, at no cost to D/FDC or Owner, design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties.

1.2 Contractor, at its expense, (including, without limitation, costs of removal, packing, transportation and reinstallation) shall remedy promptly any defective Work which exists during the applicable warranty period as set forth in this Article 1.0, and of which D/FDC gives written notice within a reasonable time after discovery of the defect or damage. Upon such notification by D/FDC, Contractor shall promptly commence and proceed to make all needed adjustments, repairs, additions, corrections, and replacements which arise out of or are necessitated by such defective Work or damage. Contractor shall conduct such warranty work on a overtime schedule basis if D/FDC determines such a schedule is necessary to avoid or minimize the effects of an outage or load reduction and D/FDC shall reimburse Contractor the premium differential for performing warranty work on an overtime basis. Contractor shall coordinate its warranty Work with D/FDC to minimize interference to D/FDC's and Owner's operations. D/FDC will permit reasonable access to as much of the Unit(s) as Contractor may reasonably require for performance of warranty Work, but any costs of uncovering Work shall be the responsibility of the Contractor. Contractor shall perform warranty Work so that such adjustments, repairs, additions, corrections, and replacements do not degrade the performance of, nor impair the use of the Equipment, Materials or other Work in question, other systems, or the Unit(s) as a whole to an extent that the Equipment, Materials, or other Work, systems or Unit(s) will not meet the requirements of this Contract in all respects, and Contractor shall repair or replace all other facilities to the extent they are destroyed or damaged as result of Contractor's performance of warranty Work.

1.2.1 The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance with the following exceptions:

    a.    The warranty period for the Boiler Hot Loop shall be twenty-four (24) months after Performance Acceptance;

    b.    The warranty period shall be extended for corrective Work as set forth below.

1.2.2 At the mutual agreement of Contractor and D/FDC, warranty Work provided hereunder may be deferred until the time of the Unit's next regularly scheduled maintenance outage, provided that such outage shall commence not later than six (6) months after D/FDC's notice to Contractor of the defective condition, and the warranty provisions hereunder shall apply notwithstanding that such outage occurs after the time the warranty would otherwise expire.

Contractor shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

1.3  The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Contractor's submittal to D/FDC of written Notice of Completion unless D/FDC, within ten (10) days thereafter, furnishes Contractor with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Contractor warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

1.3.1   In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, D/FDC shall so notify Contractor in writing prior to expiration of the Warranty Period, as applicable, and Contractor shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

1.3.2  A chronic failure ("Chronic Failure") shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, D/FDC and Contractor shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance.

1.4 In the event Contractor shall have been notified in writing of any defects in the Work in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, D/FDC and Owner shall have the right upon written notice to Contractor to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay D/FDC or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with back-up documentation supporting written claim.

1.5  In the event of an emergency when, in the reasonable judgment of D/FDC, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by D/FDC, or by a third party chosen by D/FDC, without giving prior notice to Contractor, and the reasonable cost of the remedial work shall be paid by Contractor but Contractor shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by D/FDC to Contractor as soon as practical.

1.6 The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to

materially affect in the next two (2) years (i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Contractor and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth in Article 1.3, applicable to this Article 1.6.

1.7 Contractor agrees that D/FDC may assign its rights under this warranty and other parts of this Contract to Owner and Owner's Lenders, and Contractor hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

1.8 Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feedstocks from the limits specified in the Contract are excluded from any warranty obligations of the Contractor.

1.9 Contractor's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

1.10 ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

## 2.0 INSPECTION, TESTING AND QUALITY CONTROL

2.1 Contractor shall inspect all materials, supplies and equipment which are to be incorporated in the Work. In addition, Contractor shall conduct a continuous program of construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to D/FDC for review and approval, and shall be in sufficient detail to delineate those items to be inspected and the manner in which they are to be inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

2.2 Contractor shall, during the course of performance of the Work hereunder, without additional compensation, make or cause to be made all tests required by this Contract. D/FDC may require additional inspections and tests for which Contractor shall be compensated for. Contractor shall furnish D/FDC with satisfactory documentation of the results of all inspections and tests. For those tests which are specifically listed in the Contract as "D/FDC Witness Tests", D/FDC shall be given not less than five (5) working days notice by Contractor in order that D/FDC and/or Owner may witness any such tests.

# TAB
# 2



**PUERTO RICO**

| CD | CA | CR | PCC | SCH |
|----|----|----|-----|-----|
| PE | | E | | ECR |
| GCR | | OTHER_____ | | |

PROJECT ADMINISTRATION
CONTRACT NO. _5697_

November 24, 2003

Mr. William Jarvis
Project Director
Alstom Power Inc.
2000 Day Hill Road
Windsor, Ct 06095

Subject: Warranty claim for ESP Collection Plate failures

Dear Mr. Jarvis:

As you are aware, AES Puerto Rico Unit 2 ESP has experienced an accelerated corrosion failure of numerous ESP collection plates, despite the facility having been operated in a manner consistent with the requirements set out in the Plant Operations Manual and the Environmental Elements O&M Manual. We believe that this accelerated corrosion is a defect covered by the warranties under Section 1.0 of Part III of the contract, dated February 14, 1998, and as such are providing this formal warranty claim notification.

AES Puerto Rico is currently performing stabilization work on the damaged ESP collection plates necessary to enable us to return the unit to service in early December as planned. This interim remedial work will mitigate the serious loss or damage that would otherwise result from waiting until Alstom is able to perform such work, while also providing Alstom time to develop and implement the necessary long-term corrective actions of procuring new collection plates of a more robust design consistent with its warranties and developing an installation plan. Following receipt of the new materials, AES Puerto Rico will allow Alstom reasonable access to the facility at the next scheduled outage as reasonably required for the implementation of these long-term corrective actions, including the installation of the new plates.

AES Puerto Rico is currently evaluating the need to inspect Unit 1 ESP in light of these developments, and will advise accordingly.

Please promptly confirm by return letter that Alstom will honor its warranty and arrange to perform the necessary long-term corrective actions, as well as to pay the reasonable costs incurred by AES Puerto Rico in performing the interim remedial work consistent with Alstom's warranty obligations under the Contract.

Sincerely,

Allan B. Dyer
Plant Manager
AES Puerto Rico. L.P.

W-005-01676

# TAB
# 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.          * C.A. NO.:  04-1282(JJF)
                              *
      Plaintiff               *
                              *
      Vs.                     *
                              *
ALSTOM POWER, INC.,           *
                              *
      Defendant               *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

THE 30(B)(6) DEPOSITION OF MR. ALLAN DYER
(CORPORATE DESIGNEE)

DATE      :   January 18, 2006

TIME:     :   9:30 A.M.

OFFICE    :   Ober, Kaler, Grimes & Shriver, P.S.C.
              120 East Baltimore Street
              Baltimore, Maryland 21202-1643

HELD AT   :   Axtmayer, P.S.C.
              250 Ponce de León Avenue
              Suite 404
              Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

      Daniel D. Williams, Esq.

FOR DEFENDANT:

      Anthony Vittoria, Esq.

NOTARY PUBLIC:

      Liana I. Loyola, Esq.

**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927



1    ranties under Section 1.0 of Part III of the contract,

2    dated February 14, 1998, and as such I'm providing this

3    formal warranty claim notification". Do you see that?

4         A    I do.

5         Q    To which contract are you referring in that

6    sentence?

7         A    I believe I was referring to Mr. Jarvis's

8    company that he represents, which is Alstom.  Or his

9    subcontractor Environmental Element. But this letter was

10   drafted with legal counsel more than two years ago.

11   MR. WILLIAMS:

12        And I'll advise you not to disclose any communica-

13   tions you had with your legal counsel concerning the

14   drafting of this letter.

15   BY MR. VITTORIA:

16        Q    Was the contract between AES and DFD dated

17   February 14th, 1998?

18   MR. WILLIAMS:

19        Objection to form.  And vague as to what you mean

20   by "the contract".

21   THE DEPONENT:

22        Can I ask you to restate the question?

23   BY MR. VITTORIA:

24        Q    Was the contract between AES Puerto Rico and

25   DFD for this project dated February 14th, 1998?



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

1    lunch.

2         (Whereupon, the deposition was recessed for lunch,

3    scheduled to resume the same day at the same place.)

4                                              (12:10 p.m.)

5                      AFTERNOON SESSION

6                                              (1:30 p.m.)

7    MR. VITTORIA:

8         Okay.  The time by my watch is 1:30.

9         Q    Mr. Dyer, there is... Can you tell me about

10   the stabilization program for which AES Puerto Rico is

11   seeking recovery?

12        A    Would you like me to refer to the table, or

13   just in general?

14        Q    In general tell me what it is.

15        A    Stabilization program, well, in November,

16   December, 2003, when the severe corrosion was discov-

17   ered, at that time we couldn't get Alstom interested in

18   it. And I think the severe corrosion clearly caught us

19   by surprise.  And we worked with a company that's listed

20   on that... Can I have that exhibit?

21        I want to make sure I'm saying their name right.

22   F.L. Smidth Airtech, who, to my understanding, are a

23   group of people that we had at that time, who were

24   former EEC guys, and had experience on refurbishing ESPs

25   throughout the industry, gave us the advice that they



1    could teach us how to stabilize the plates, with the

2    intent to, for the short term, allow the unit to run...

3    not necessarily as well, but allow us to operate.

4        Q    Did you have an understanding of what they

5    meant when they said "stabilization"?

6        A    If you're asking if I understood?

7        Q    Yes.

8        A    I believe I understood.  To the extent of the

9    stabilization, I didn't have a full appreciation of it,

10   at the time we discovered the corrosion.

11       Q    What is the nature of the work, as far as

12   stabilization is concerned?

13       A    Well, my understanding is you work in a very

14   difficult quarters, and you have to scaffold to cut out

15   the corroded areas, and patch them with plate material.

16       Q    Are the patches welded on?

17       A    I've never been inside to watch the work.

18   I've seen photographs of the work, so I'm not sure how

19   they attach the plates.

20       There's, there's more than one method of doing it,

21   to my understanding, because some plates are totally

22   corroded, some plates are cut off, and sometimes they

23   use stabilizing bars so that plates won't short out.

24   And if you short out, you lose the field, and you lose

25   the capacity of the precipitator.

1    I can't recall.

2    BY MR. VITTORIA:

3        Q    Can you describe the... I'm gonna refer you to

4    Exhibit No. 4, the supplemental answers to interrogato-

5    ries, page 3, stabilization program still...

6        A    Mmhm.

7        Q    ...can you describe the additional work,

8    during July, 2004, that is referred to in the second

9    line item in that chart?

10       A    I can only describe that it was additional

11   work during an outage in July to stabilize, and that, to

12   the best of my knowledge, we were invoiced $54,544.45

13   from a various number of vendors, through a varied

14   number of dates.

15       Q    Okay.  The same type of work that you

16   described earlier as being the stabilization program?

17       A    I would speculate that it's similar.

18       Q    How about additional work during the April,

19   2005 outage?  Was that similar work?

20       A    That would be my... I would speculate that,

21   yes.

22       Q    Now subsequent to November of 2003, acceler-

23   ated corrosion was found in the Unit 1 ESP, correct?

24       A    Please repeat?

25       Q    After November of 2003, accelerated corrosion



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

1   was found in the Unit 1 ESP.  That's right?

2        A    That's correct.

3        Q    And when was that?

4        A    I believe in January Unit 1 came down with a

5   FBHE tube failure, which was covered under the two-year

6   hot loop warranty.

7        And obviously, at that point in time, we were

8   concerned about Unit No. 1, after we had seen the severe

9   corrosion in Unit No. 2.

10       So during that forced outage in January, we went

11   immediately to inspect the ESP.

12       Q    Okay, and that's January of 2004?

13       A    Yes.

14       Q    Now there were...

15       A    I recollect that date because we were having a

16   late Christmas party.  In Puerto Rico we have Three

17   Kings Day, which is after Christmas, so we tend to have

18   our Christmas party, either at Christmas or after

19   January. That's why I know it was, I believe the second

20   week of January.

21       Q    Did it ruin the party?

22       A    Yeah.  I had to send all my guys to the plant.

23       Q    Is the work that is identified in the first

24   line item under stabilization program work for both Unit

25   1 and 2?



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

# TAB
# 4



January 21, 2004                                    AES/API-002-04


Mr. William Jarvis
Project Director
Alstom Power Inc.
2000 Day Hill Road
Windsor, Ct 06095

Subject: Warranty claim for ESP Collection Plate failures

Dear Mr. Jarvis:

As we have previously notified Alstom Power, Inc. ("Alstom") in our letter of November 28, 2003, AES Puerto Rico Unit 2 ESP has experienced an accelerated corrosion failure of numerous ESP collection plates, despite the system having been operated and maintained in a manner consistent with the requirements set out in the Plant Operations Manual and the Environmental Elements O&M Manual. This accelerated corrosion is a defect covered by the warranties under Article 1.0 of Part III of the Contract, dated February 14, 1998, between Alstom (as successor to Combustion Engineering, Inc.) and Duke/Fluor Daniel Caribbean S.E. ("D/FDC"), which warranty rights by their express terms run in favor of AES Puerto Rico, L.P. ("AES Puerto Rico") and which have also been assigned by D/FDC to AES Puerto Rico as permitted by Article 1.7 thereunder.

AES Puerto Rico is extremely disappointed with Alstom's failure to acknowledge and perform its warranty responsibilities to promptly furnish, at its own expense, the design, engineering, labor, equipment and materials necessary to correct such defect, and hereby reiterates its demand that Alstom promptly and fully perform its warranty obligations with respect to such defects.

Due to Alstom's failure to promptly and adequately correct such defects, AES Puerto Rico was required to perform stabilization work on the damaged ESP collection plates necessary to enable the unit to return to service in early December as planned.  Pursuant to the requirements of Article 1.4 of the Contract, AES Puerto Rico hereby demands that Alstom promptly reimburse it for the costs incurred by AES Puerto Rico in performing such interim remedial work, and attached hereto is an invoice documenting such costs incurred by AES Puerto Rico through the end of December 2003.

This interim remedial work not only mitigated to some extent the significant losses and damages caused by Alstom's failure to perform such work, but also provided Alstom additional time to develop and implement the actions necessary for the long-term correction of these defects -- which necessary actions include designing, engineering and/or procuring new collection plates of a more robust design that comply fully with Alstom's warranties and developing and implementing an installation plan for such new collection plates. Following its receipt of the new materials, AES Puerto Rico will allow

Carr. #3 Km. 142.0, Bo. Jobos • P.O. Box 1890, Guayama, Puerto Rico 00785 • Tel. (787) 866-8117 • Fax (787) 866-8139

AESPR 000276

AES2-04-01147

Alstom reasonable access to the facility at the next scheduled outage as reasonably required for the implementation of these long-term corrective actions, including the installation of the new plates.

AES Puerto Rico has also recently completed an inspection of Unit 1 which found that its ESP collection plates have also incurred accelerated corrosion damage. Based on these inspection results, AES Puerto Rico is hereby formally expanding its warranty claims to also include correction of the defective Unit 1 ESP collection plates and associated equipment.

While AES Puerto Rico appreciates Alstom's efforts associated with the root cause analysis of these defects, AES Puerto Rico cannot allow Alstom's refusal to promptly and fully perform its warranty responsibilities to continue. Alstom must immediately commence performing its contractual warranty responsibilities with respect to such defective work and develop and implement a long-term correction, rather than continuing to force AES Puerto Rico to perform short-term mitigation efforts at its own expense and then subsequently pursue Alstom for reimbursement of such costs. AES Puerto Rico is especially concerned that such continuing refusal by Alstom to commence performing its warranty obligations may cause the facility not only to suffer forced outages or shutdowns, but also for such outages or shutdowns to be extended while the necessary corrective design, engineering, procurement and installation plans are then developed and implemented -- work which Alstom should be performing currently. AES Puerto Rico will hold Alstom fully liable for any and all losses and damages that AES Puerto Rico may incur as a result of Alstom's failure to fully and promptly perform its warranty obligations.

Please confirm by return letter no later than January 31, 2004 that Alstom will honor its warranty and promptly perform the actions necessary for the long-term correction of these defective ESP collection plates and associated equipment, as well as to pay the reasonable costs incurred by AES Puerto Rico in performing the interim remedial work required as a result of Alstom's failure to promptly and adequately perform its warranty obligations under the Contract.

This letter is without waiver of any and all rights, claims and remedies of AES Puerto Rico, whether arising under contract, at law, in equity or otherwise, and by this letter AES Puerto Rico expressly reserves all of the same.

Sincerely,

Allan B. Dyer
Plant Manager
AES Puerto Rico. L.P.

Attachment

C: AES Project File

AESPR 000277

AES2-04-01148

# TAB 5



**PUERTO RICO**

June 22, 2004                                                    AES/API-005-04

Mr. William M. Jarvis
Project Manager
ALSTOM Power, Inc.
2000 Day Hill Road
Windsor, Connecticut 06095

Dear Mr. Jarvis:

This letter responds to your May 18, 2004 correspondence concerning AES Puerto Rico's ("AES-PR") outstanding warranty claims. AES-PR's response to each of the four issues is as follows:

1.    Electrostatic Precipitator Corrosion

Your letter does not specifically address whether ALSTOM will honor AES-PR's request for payment under the warranty for the costs to repair the electrostatic precipitators and to correct the root cause of the damage to the precipitators by installing a new Reverse Osmosis system to purify the PRASA water used by the plant. Please clarify ALSTOM's position on this issue.

As for ALSTOM's claim that it "continues to investigate this extremely rapid corrosion," and its request to review operating records as part of that investigation, we do not understand what the purpose of ALSTOM's continued investigation would be. Because ALSTOM was unable to rectify the problem, for reasons including those you explain in your May 18 letter, AES-PR was forced to devise a solution on its own to correct the defects causing premature corrosion. AES-PR is now well under way implementing that solution. If ALSTOM continues to believe that it needs to inspect the plant's operating records, please contact me to arrange a time to come to the plant for such an inspection.

2.    Refractory Work

AES-PR is pleased that ALSTOM has now agreed to pay JT Thorpe for the January 2004 refractory repair work it performed on Unit 1. This confirms that ALSTOM agrees to pay JT Thorpe the $ 92,493.23 owed for this work. Please inform me when Alstom has made this payment to JT Thorpe.

As for the November 2003 repair work, AES-PR disagrees that this work falls outside the 6-month time period described in Section 1.2 of the warranty.

The work for which AES-PR seeks reimbursement was to repair damage first discovered during the inspection of Unit 2 in November 2003, not March 2003. The work was performed within the month of discovery. Please advise whether ALSOTM continues to dispute this claim.

3.     FBHE Handcuffs

ALSTOM and AES-PR have failed to reach agreement with respect to this claim. AES-PR reserves its right to take all appropriate action to collect on it.

4.     Secondary Air Expansion Joints

ALSTOM is incorrect that this claim relates to damage caused by operator error or that it was resolved in a settlement between AES-PR and DFD. AES-PR has now determined that the root cause of the secondary air expansion joint failures is badly misaligned headers. It analyzed this failure without resort to a formal engineering study, thus AES-PR does not have the "analysis of the failures" ALSTOM requests in its letter. Because AES-PR was able to determine the root cause of the failures without an engineering study, the amount sought on this warranty claim can be reduced by $50,000. The total amount AES-PR now seeks for this claim is $ 235,111.

We understand that ALSTOM personnel continue to investigate the root cause of the failures. Please provide us with any analysis from ALSTOM's investigation.

Sincerely,

Allan B. Dyer

# TAB
# 6

| | |
|---|---|
| **From:** | Al Dyer [Al.Dyer@AES.com] |
| **Sent:** | Wednesday, September 29, 2004 1:52 PM |
| **To:** | Puerto Rico Leaders |
| **Cc:** | Ron McParland; Ernest Pagaduan; Maria Torres; Bill Vela; Paul Stinson; Nicolas Cubillos S.; Williams, Daniel; Brian Thompson; Gonzalo Pacanins; Hector Marquez; Lillian Alicea; Doug Tomlin; Gary Bates; Williams, Daniel |
| **Subject:** | Preservation of Documents for Alstom Boiler Lawsuit |

# *MEMORANDUM*

TO:        AES-PR People

FROM:    Al Dyer

DATE:    September 29th, 2004

RE:          Preservation of Documents for Alstom Boiler Lawsuit

As you may be aware, last week AES Puerto Rico, L.P. sued Alstom Power, Inc. in federal court in Delaware. The lawsuit seeks payment from Alstom with respect to warranty claims relating to electrostatic precipitator ("ESP") corrosion and for additional handcuffs on the fluidized bed heat exchangers ("FBHEs").

As part of this lawsuit, in the near future, our attorneys will be collecting documents relating to these two warranty claims. In the meantime, it is essential that all documents relating in any way to the electrostatic precipitator corrosion and the additional FBHE handcuffs be retained and not be destroyed. This includes both electronic documents such as e-mails, word processing files, spreadsheets and databases as well as paper documents including originals, drafts, handwritten notes and duplicates. These documents must not be discarded, destroyed, erased, purged, or deleted. All versions of every document must be retained, even if they are copies.

Types of documents that must be retained include all documents relating in any way to the following:
FBHE Handcuffs:

**REDACTED**

5/12/2005

AESPR 027503

AES2-12-00021

- Documents discussing any FBHE tube failures

- Documents describing efforts to correct the tube failures

- Documents analyzing the causes of any tube failures

- Documents describing the performance of the FBHE handcuffs, including but not limited to documents discussing broken handcuffs and movement of the handcuffs

- Documents showing the control set point for the fluidizing airflow on the FBHEs

- Documents concerning ash plugging in the fluidizing air header manifold

- Documents analyzing the handcuff configurations on the plant's FBHEs and on FBHEs in other plants

- Documents describing the repair, replacement, and addition of handcuffs in the FBHEs

- Documents relating in any way to the AES Puerto Rico's warranty claim concerning the FBHE handcuffs

ESP Corrosion:

- Documents describing corrosion to the ESP collecting plates, rigidtrodes, and other components of the ESPs

- Documents analyzing the causes of any such corrosion

- Documents analyzing the content of the flue gas entering the CDS and the ESP

- Documents reflecting the air temperature settings in the circulating dry scrubbers ("CDS"),

- Documents reflecting opacity measurements for the gas exiting the stack

- Documents analyzing the water quality of the water injected into the CDS

- Documents describing the decision to install, and the installation of, the reverse osmosis system to treat the PRASA water

- Documents relating to any communications with Alstom or Environmental Elements Corp. concerning the ESP corrosion, the operation of the CDS, replacement parts for the ESP, and the need to install the reverse osmosis system

- Documents relating in any way to AES Puerto Rico's warranty claim concerning the FBHE handcuffs

The lists above are illustrative, and documents relating to the FBHE and ESP warranty claims should be

5/12/2005

AESPR 027504

AES2-12-00022

retained even if not precisely within the listed categories. When in doubt, documents should be retained. Should you have any questions about the above, please do not hesitate to contact me directly about it.

*Al Dyer*
**AES Puerto Rico**
(787) 866 8117 x 233

CONFIDENTIALITY: This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium. Without Prejudice.

This communication is for use by the intended recipient and contains information that may be privileged, confidential or copyrighted under law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this e-Mail, in whole or in part, is strictly prohibited. Please notify the sender by return e-Mail and delete this e-Mail from your system. Unless explicitly and conspicuously stated in the subject matter of the above e-Mail, this e-Mail does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This e-Mail does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

This email has been scanned for all viruses by the MessageLabs service.

5/12/2005

# TAB
# 7

AES Puerto Rico, LP v. ALSTOM Power, Inc.
Plaintiff's Privilege Log

| Bates Begin | Bates End | Author(s) | Addressee(s) | Copied To | Date | Pages | Description | Privilege |
|---|---|---|---|---|---|---|---|---|
| AESPREPPRIV-002321 | AESPREPPRIV-002322 | John Toher | Csaba Little | | 8/11/2004 | 2 | E-mail Re: ESP report, comments prepared in anticipation of litigation | WP |
| AESPREPPRIV-002323 | AESPREPPRIV-002324 | John Toher | Csaba Little | | 8/11/2004 | 2 | E-mail Re: ESP report, comments prepared in anticipation of litigation | WP |
| AESPREPPRIV-002325 | AESPREPPRIV-002325 | John Toher | Csaba Little | | 8/10/2004 | 1 | E-mail Re: ESP report, comments prepared in anticipation of litigation | WP |
| AESPREPPRIV-002330 | AESPREPPRIV-002330 | John Toher | Csaba Little | | 7/26/2004 | 1 | E-mail Re: comments on ALSTOM report on ESP corrosion prepared in anticipation of litigation | WP |
| AESPREPPRIV-002331 | AESPREPPRIV-002335 | John Toher | Csaba Little | | 7/8/2004 | 5 | E-mail Re: ESP report, comments prepared in anticipation of litigation | WP |
| AESPREPPRIV-002343 | AESPREPPRIV-002344 | Al Dyer | William Jarvis | | 6/2/2004 | 2 | Draft letter for review with counsel Re: AES PRs outstanding warranty claims | A/C |

PRIVILEGE KEY:
A/C - Attorney-Client
WP - Work Product

AES Puerto Rico, LP v. ALSTOM Power, Inc.
Plaintiff's Privilege Log

| Bates Begin | Bates End | Author(s) | Addressee(s) | Copied To | Date | Pages | Description | Privilege |
|---|---|---|---|---|---|---|---|---|
| AESPREPRIV-005187 | AESPREPRIV-005187 | Bill Vela | Carlos Reyes, Al Dyer, Carlos Colon-Franceschi, Esq., Eli Matos, Esq. | Deborah Jennings, Esq. | 8/1/2003 | 1 | E-mail Re: EQB proposed agreement | A/C |
| AESPREPRIV-005188 | AESPREPRIV-005189 | Rebecca Cranna | Eric Lundberg, Al Dyer, Esq. | John Baecher, Esq. | 8/11/2003 | 2 | E-mail Re: EQB proposed agreement E-mail Re: Draft | A/C |
| AESPREPRIV-005245 | AESPREPRIV-005245 | Gloria Berges | Eric Lundberg | Hector Marquez, Al Dyer | 8/7/2003 | 1 | waiver request | A/C |
| AESPREPRIV-005336 | AESPREPRIV-005339 | Al Dyer | Felipe Ceron | | 8/3/2003 | 4 | Memo Re: Monthly report, legal issues redacted | A/C |
| AESPREPRIV-005340 | AESPREPRIV-005341 | Al Dyer | Felipe Ceron | | 8/7/2003 | 2 | Memo Re: Monthly report, legal issues redacted | A/C |
| AESPREPRIV-005725 | AESPREPRIV-005726 | Al Dyer | Felipe Ceron, Steve Walsh; Dave Sundstrom; Ruben Soroeta | | 6/23/2003 | 2 | E-mail Re: Corporate legal issues reflecting communication with counsel | A/C |
| AESPREPRIV-005933 | AESPREPRIV-005934 | Harry Bonilla | Csaba Little, Ernest Pagatdan | | 4/19/2004 | 2 | E-mail Re: Information for counsel Re: PBHE handcuffs | |
| AESPREPRIV-005942 | AESPREPRIV-005944 | Daniel Williams, Esq. | Al Dyer | | 4/15/2004 | 3 | E-mail Re: Litigation issues | A/C, WP |
| AESPREPRIV-005945 | AESPREPRIV-005945 | Daniel Williams, Esq. | Al Dyer, Harry Bonilla | | 4/14/2004 | 1 | E-mail Re: Litigation issues | A/C, WP |
| AESPREPRIV-006078 | AESPREPRIV-006079 | Harry Bonilla | Al Dyer, Daniel Williams, Esq., Csaba Little, Carlos Reyes | Dane Butswinkas, Esq., Hack Wiegmann, Esq., Maria Torres | 4/1/2004 | 2 | E-mail Re: Litigation issues | A/C |

PRIVILEGE KEY:
A/C - Attorney-Client
WP - Work Product

# TAB 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,                    *

　　　　Plaintiff,                        *
                                          *          04-1282-JJF
　　v.                                    *     C.A. No. 03-544-JJF
                                          *
ALSTOM POWER, INC.,                       *

　　　　Defendant,                        *

　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

## ALSTOM POWER, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS AND ENTRY UPON LAND FOR INSPECTION

TO:　　AES Puerto Rico, L.P.
　　　　c/o John S. Spadaro, Esquire
　　　　Murphy Spadaro & Landon
　　　　824 Market Street, Suite 700
　　　　Wilmington, DE 19801

　　　　Pursuant to Fed. R. Civ. P. 34, Defendant, ALSTOM Power, Inc. ("ALSTOM") hereby serves its First Request for Production of Documents and Things and Entry Upon Land for Inspection to Plaintiff, AES Puerto Rico, L.P. ("AES"). AES shall file a written response within 30 days of service of this Request.

## DEFINITIONS

　　1.　　"Document" shall mean any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including, but not limited to correspondence, messages, contracts, checks, memoranda or notes of telephone or other oral conversations, studies, surveys, charts, reports, minutes, notes, diaries, logs, schedules, cancelled checks, graphs, invoices, bills, computer reports, photographs, videotapes, releases, newspaper or magazine articles, books,

1

financial statements, ledgers, transcripts, affidavits, tapes, tape recordings, phonograph recordings, e-mails, electronic files, electronically stored data, whether originals, copies, or drafts, however produced or reproduced. If any of the data or information requested below is stored in such a way as to be retrieved by computer, then in respect to such data or information, the term "document" shall also include the physical medium in which such data or information is stored, or a copy thereof, together with a copy of the software which will enable the data or information to be retrieved and reviewed.

2. "Electronic data" means the original (or identical duplicate when the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic data includes, by way of example only, computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, operating systems, source code of all types, peripheral drivers, PIF files, batch files, ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists in an active file, deleted file or file fragment. Electronic data includes any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, removable media such as Zip disks, Jaz cartridges, Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, on or in any other vehicle for digital data storage and/or

2

transmittal. The term electronic data also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with each original and/or copy.

3. "Electronic media" means any magnetic or other storage media device used to record electronic data. Electronic media devices may include, but are not limited to, computer memories, hard disks, floppy disks, CD-ROM, removable media such as Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, or on or in any other vehicle for digital data storage and/or transmittal.

4. "Identify," when used in reference to electronic data, means to state the software and/or operating system under which the data was created, title and author, the type of data (example: word processing document, spreadsheet, database, application program, etc.), and all other means of identifying it with sufficient particularity to meet the requirements for its inclusion in a Request for Production pursuant to the Federal Rules of Civil Procedure, and its present or last known location or custodian. If any such electronic data was, or no longer is, in the possession or subject to your control, state what disposition was made of it and the reason for such disposition.

5. "Network" means any hardware and/or software combination that connects two or more computers together and which allows the computers to share and/or transfer data between them. For the purposes of this definition, the connection between or among the microcomputers need not be either physical or direct, i.e., wireless networks, and sharing and/or transferring data via indirect routes utilizing modems and phone company facilities. In addition, there need not be

3

a central file or data server nor a central network operating system in place, i.e., peer-to-peer networks and networks utilizing a mainframe host to facilitate data transfer.

6.  "Support" means any help or assistance provided to a user of a computer by another individual, either in an official job capacity or not. Such help or assistance may take the form of, but is not limited to, answering questions, in person or via mechanical means, direct intervention, training, software troubleshooting, hardware troubleshooting, programming, systems consulting, maintenance, repair and/or user forums. Providers of support may be employees, contractors and/or other third-party providers.

7.  The term "computer" shall be construed in its broadest possible sense and includes, but is not limited to, any means of storing or processing magnetic, graphic, photographic or other descriptive materials or any retrievable data or information including without limitation computers, word processors, personal computers, network terminals, hard-drives, computer network systems, mainframes, or other means of creating or storing information in magnetic form under the custody, possession or control of AES, its past and present officers, directors, partners, agents, predecessors, successors, affiliates, representatives, employees, attorneys, and any other person or entity employed by or acting on behalf of AES.

8.  "Person" means any natural person, corporation, partnership or other private organization or governmental or legal entity.

9.  "You" or "AES" or "Owner" refers to Plaintiff, AES Puerto Rico, L.P., a Delaware limited partnership, and any current or former officers, directors, employees, agents, contractors, representatives of or attorneys for AES or AES related entities.

4

10.  "D/FD" refers to Duke/Fluor Daniel Caribbean, S.E., a Puerto Rico partnership, and its constituent partner members, also named as parties in this action, and any officers, directors, employees, agents, representatives of or attorneys for D/FD.

11.  "ALSTOM" refers collectively to ALSTOM Power Inc. and ALSTOM Caribe, (f/k/a CE Caribe), and any officers, directors, employees, agents, contractors, representatives or attorneys of ALSTOM.

12.  "EEC" refers to Environmental Elements Corp., a Maryland corporation, and any officers, directors, employees, agents, contractors, representatives or attorneys on behalf of EEC.

13.  "Agreement" refers to the contract dated April 3, 1996, between AES, as Buyer, and D/FD, as Seller, in which D/FD agreed to engineer, design, and construct a 454-megawatt, co-generation, coal-fired plant in Guayama, Puerto Rico.

14.  "Project" means the 454-megawatt, co-generation, coal-fired facility, in its entirety, located in Guayama, Puerto Rico.

15.  "CDS" refers to the Circulating Dry Scrubber equipment provided by ALSTOM for the Project.

16.  "ESP" refers to the Electrostatic Precipitator equipment provided by ALSTOM for the Project and referred to in your Complaint.

17.  "FBHE Handcuffs" refers to the fluidized bed heat exchanger handcuff equipment provided by ALSTOM for the Project and referred to in your Complaint.

18.  "Plant Operating Data" means recorded measurements, in both written and electronic form, of the operating parameters of the Project from the time of "first fire" on coal.

19.  "Water Treatment Systems" refers to the plant equipment used to treat the water used in the CDS and ESP equipment.

5

20.    "Closed Cooling Water Cycle" refers to the

## REQUEST FOR DOCUMENTS – INSTRUCTIONS

1.    This request for production of documents is continuing in nature, so AES shall supplement its response to this request for production of documents in accordance with Rule 34 of the Federal Rules of Civil Procedure.

2.    This request includes the production of all non-identical copies of requested documents, including drafts and copies upon which notes or comments have been made.

3.    If any document responsive to this request is not produced due to a claim of privilege to a part or parts of the document (including a claim that all or a portion of the document constitutes work product), describe each such document and the factual basis for the claim of privilege. Documents shall be deemed to have been adequately listed and described for the purpose of this instruction when the following information has been provided:

    a.    The place, approximate date and manner of preparation of the document;

    b.    The basis on which the privilege is claimed;

    c.    The name of each person who participated in the preparation of the document;

    d.    The name and corporate position, if any, of each person other than attorneys representing you to whom the content of the document has been communicated in the past whether by copy, exhibition, reading or substantial summarization;

    e.    The nature of the document and a brief description of its subject matter; and

    f.    Each addressee, recipient or possessor of the document.

6

5.    To the extent that any request is objected to on grounds other than privilege, set forth the factual and legal basis for the objection. If you object in part to any request, produce all documents responsive to the remainder of that request.

6.    Documents required to be produced are not limited to "paper" documents, but also include electronic data and electronic media and all forms of documents listed in the documents definition above.

7.    Where the name or identity of a person or entity is requested, state the full name, address, title, employer, and business address (if applicable) of the person or entity.

8.    Where knowledge or information is requested, such request includes knowledge of your agents, representatives, and, unless privileged, your attorneys.

9.    In seeking information to respond to this document production request, you are required to examine all possible forms of storing textual, verbal or numerical information, and your examination may not be limited to paper or other forms of "hard copy" records. In searching for nonpaper sources of information, you are required to search all computer or other electronic or optical forms of information storing formats, including:

    a.    so-called floppy disks;

    b.    removable drive media, of all kinds;

    c.    hard drives used by individuals;

    d.    hard drives shared by multiple users;

    e.    storage media used by network systems;

    f.    storage media not maintained on-line, including but not limited to backup tapes or similar archival storage media, wherever and by whomever stored or retained;

g.   file servers;

h.   optical media, including "write-once-read-many" ("WORM") media or other

optical formats, including rewritable optical formats;

i.   portable computers, included but not limited to, "notebook" computers,

"laptop" computers, or other similar portable devices;

j.   palmtop, pocket size or similar portable information devices on which

information is stored in digital form;

k.   systems that preserve "voice mail" or similar messages in analog or digital

form; and

l.   all systems, whether included in (a)-(k) above, that preserve electronic mail

or similar messages in any form, including, but not limited to, systems on the

desktop of electronic mail users, systems on servers, and systems that are

"offline" methods of preservation of such messages, whether tape, optical or

otherwise.

10.   The documents and things requested shall be produced at the office of AES, or

such other location(s) as agreed to by the parties.

## REQUESTS FOR DOCUMENTS

**REQUEST 1:**  All documents, including indices, directories and catalogs, which

evidence, explain or set forth how AES identifies, organizes and maintains documents or files

relating to the Project, including, but not limited to, Plant Operating Data.

**REQUEST 2:**  All documents, written policies, procedures, guidelines, electronic data or

electronic media that refer, evidence or relate to file naming conventions and standards.

8

**REQUEST 3:** All documents, written policies, procedures, guidelines, electronic data or electronic media that refer, evidence or relate to diskette labeling standards.

**REQUEST 4:** All documents, written policies, procedures, guidelines, electronic data or electronic media that refer, evidence or relate to back up tape rotation schedules.

**REQUEST 5:** All documents, written policies, procedures, guidelines, electronic data or electronic media that refer, evidence or relate to electronic media retention/destruction schedules.

**REQUEST 6:** All documents, written policies, procedures, guidelines, electronic data or electronic media that refer, evidence or relate to corporate policies concerning employee use of company computers and data.

**REQUEST 7:** Exact copies (sometimes referred to as image copies, or evidentiary copies) of hard drives on desktop, laptop, notebook, palm top or personal digital assistant computers used by AES and/or its employees, agents or representatives in any way relating to the Project.

**REQUEST 8:** Exact copies (sometimes referred to as "diskcopies") of diskettes used by AES and/or its employees, agents or representatives in any way relating to the Project.

**REQUEST 9:** Organization charts in any form, written or otherwise, for AES and all of its respective partners, subsidiaries, divisions, and affiliates.

**REQUEST 10:** Any and all lists of AES employees who worked on the Project.

**REQUEST 11:** All documents evidencing, referring to or relating to any and all negotiations or discussions leading up to AES' Agreement with D/FD.

**REQUEST 12:** All documents which constitute the Agreement between AES and D/FD pertaining to the Project.

9

**REQUEST 13:**    All documents created or exchanged by AES, D/FD or EEC evidencing, referring to or relating to the application for the air permit submitted to the governmental agency or agencies having authority over the emissions from the Project.

**REQUEST 14:**    All documents which constitute, pertain or relate in any way to any engineering documents, plans, drawings or specifications for the Water Treatment System.

**REQUEST 15:**    All documents which constitute, pertain or relate in any way to any engineering documents, plans, drawings or specifications for the CDS and/or the ESP equipment.

**REQUEST 16:**    All documents which constitute, pertain or relate in any way to any engineering documents, plans, drawings or specifications for the FBHE Handcuff equipment.

**REQUEST 17:**    All documents which constitute, pertain or relate in any way to any engineering documents, plans, drawings or specifications for the Closed Cooling Water Cycle.

**REQUEST 18:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between AES and D/FD concerning or in connection with the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 19:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between AES and ALSTOM concerning or in connection with the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 20:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between AES and EEC concerning or in connection with the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 21:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between D/FD and EEC concerning or in connection with the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 22:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between AES and any subcontractor, sub-subcontractor, vendor, supplier, consultant or other person or entity (other than D/FD, ALSTOM and EEC) supplying any advice, consultation, labor, services, materials or other items in regard to the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 23:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between AES and D/FD concerning or in connection with the FBHE Handcuff equipment.

**REQUEST 24:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between AES and ALSTOM concerning or in connection with the FBHE Handcuff equipment.

**REQUEST 25:**    All documents evidencing, referring to or relating to any and all communications and transmissions (written or oral) between AES and any subcontractor, sub-subcontractor, vendor, supplier, consultant or other person or entity (other than D/FD and ALSTOM) supplying any advice, consultation, labor, services, materials or other items in regard to the FBHE Handcuff equipment.

**REQUEST 26:**    All documents which constitute, pertain or relate in any way to subcontracts, purchase orders, agreements or understandings for work performed or requested to be performed of any kind between AES and any subcontractor, independent contractor or material supplier (other than D/FD and ALSTOM) supplying any advice, consultation, labor, services, materials or other items in regard to the CDS and/or the ESP equipment, or the Water Treatment System.

11

**REQUEST 27:**    All documents which constitute, pertain or relate in any way to subcontracts, purchase orders, agreements or understandings for work performed or requested to be performed of any kind between AES and any subcontractor, independent contractor or material supplier (other than D/FD and ALSTOM) supplying any advice, consultation, labor, services, materials or other items in regard to the FBHE Handcuff equipment.

**REQUEST 28:**    All documents which pertain or relate in any way to sums paid by AES to any subcontractor, independent contractor or material supplier (other than D/FD and ALSTOM) supplying any advice, consultation, labor, services, materials or other items in regard to the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 29:**    All documents which pertain or relate in any way to sums paid by AES to any subcontractor, independent contractor or material supplier (other than D/FD and ALSTOM) supplying any advice, consultation, labor, services, materials or other items in regard to the FBHE Handcuff equipment.

**REQUEST 30:**    All documents which constitute, pertain or relate in any way to requests for information, or other requests for interpretation or clarification which AES or D/FD submitted to any person or entity relating to the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 31:**    All documents which constitute, pertain or relate in any way to requests for information, or other requests for interpretation or clarification which AES or D/FD submitted to any person or entity relating to the FBHE Handcuff equipment.

**REQUEST 32:**    All documents which constitute, pertain or relate in any way to diaries, daily logs, chronologies, calendars or other records of the progress of the design, procurement

12

and/or construction and installation of the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 33:**    All documents which constitute, pertain or relate in any way to diaries, daily logs, chronologies, calendars or other records of the progress of the design, procurement and/or construction and installation of the FBHE Handcuff equipment.

**REQUEST 34:**    All documents which constitute, pertain or relate in any way to reports or meetings relating to the Project, including, without limitation, job meeting minutes, coordination meeting minutes, progress reports, cost reports and daily reports, monthly and/or other periodic reports.

**REQUEST 35:**    All documents evidencing, referring to or relating to any and all damages purportedly suffered or sustained by AES as a result of any problems with or failures of the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 36:**    All documents evidencing, referring to or relating to any and all damages purportedly suffered or sustained by AES as a result of any problems with the FBHE Handcuff equipment.

**REQUEST 37:**    Any and all insurance policies concerning the Project.

**REQUEST 38:**    All documents referring to or relating to any damages claimed by AES against D/FD and/or any other subcontractor, sub-subcontractor, supplier, vendor or other person or entity furnishing any work, labor, services, materials, equipment or other items in connection with the CDS and/or the EPS equipment.

**REQUEST 39:**    All documents referring to or relating to any damages claimed by AES against D/FD and/or any other subcontractor, sub-subcontractor, supplier, vendor or other person

13

or entity furnishing any work, labor, services, materials, equipment or other items in connection with the FBHE Handcuff equipment.

REQUEST 40:    All documents which evidence, refer to or relate to AES' withholding backcharges from D/FD relating to the CDS and/or the EPS equipment, or the Water Treatment System.

REQUEST 41:    All documents which evidence, refer to or relate to AES' withholding backcharges from D/FD relating to the FBHE Handcuff equipment.

REQUEST 42:    All documents which evidence, refer to or relate to the assessment or threatened assessment and/or withholding by AES of any sums due D/FD under the Agreement relating to the CDS and/or the ESP equipment, or the Water Treatment System.

REQUEST 43:    All documents which evidence, refer to or relate to the assessment or threatened assessment and/or withholding by AES of any sums due D/FD under the Agreement relating to the FBHE Handcuff equipment.

REQUEST 44:    All documents which evidence, refer to or relate to performance guarantees under the Agreement relating to the CDS and/or the ESP equipment, or the Water Treatment System.

REQUEST 45:    All documents relating to any warranty obligations for the CDS and/or the ESP equipment, or the Water Treatment System.

REQUEST 46:    All documents relating to any warranty obligations for the FBHE Handcuff equipment.

REQUEST 47:    All documents which comprise, refer or relate in any way to AES' internal memoranda, correspondence or other form of internal communication regarding the CDS and/or the ESP equipment, or the Water Treatment System.

14

**REQUEST 48:**    All documents which comprise, refer or relate in any way to AES' internal memoranda, correspondence or other form of internal communication regarding the FBHE Handcuff equipment.

**REQUEST 49:**    All documents which constitute, pertain or relate in any way to photographs, videotapes, drawings or other graphic depictions of any aspect of the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 50:**    All documents which constitute, pertain or relate in any way to photographs, videotapes, drawings or other graphic depictions of any aspect of the FBHE Handcuff equipment.

**REQUEST 51:**    All documents which constitute, pertain or relate in any way to AES' operations manual for the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 52:**    All documents which constitute, pertain or relate in any way to AES' maintenance guidelines and records for the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 53:**    Any and all inspection reports, testing reports or other documents, data compilations or tangible things referring to or relating to the CDS and/or the ESP equipment, or the Water Treatment System.

**REQUEST 54:**    Any and all documents related to the operation or maintenance of the Closed Cooling Cycle.

**REQUEST 55:**    Any and all inspection reports, testing reports or other documents, data compilations or tangible things referring to or relating to the FBHE Handcuff equipment.

**REQUEST 56:**    All documents relating to the power plant's compliance or failure to comply with air emissions standards, including but not limited to any such standards imposed by the U.S. Environmental Protection Agency and any agency of the government of Puerto Rico.

**REQUEST 57:**    Any and all documents relating to the water spray lances/water injection nozzles within the CDS and ESP equipment, including, but not limited to, documents relating to the maintenance, testing or inspection of the lances/nozzles, the atomization of water by the lances/nozzles, and the water flow rate through the lances/nozzles.

**REQUEST 58:**    Any and all documents relating to the operating temperature within the CDS and ESP equipment, including, but not limited to, any documents relating to the CDS "outlet temperature" and the "flue gas approach temperature".

**REQUEST 59:**    Any and all documents relating to the Rigitrodes, the collector plates or the discharge electrodes within the CDS and ESP equipment.

**REQUEST 60:**    Any and all documents comprising, relating to or referring to the "Test and Monitoring Plan" prepared by EEC for the CDS and ESP equipment.

**REQUEST 61:**    Any and all documents relating to the vacuum/pressure relief valves on the ash bins of the CDS and ESP equipment, including, but not limited to, any and all documents relating to the maintenance or inspection of those valves.

**REQUEST 62:**    Any and all documents relating to the chloride content of the water used within the CDS and ESP equipment, including, but not limited to, any records of the daily testing of the water.

**REQUEST 63:**    Any and all documents related to any testing of the water used in the Closed Cooling Water Cycle.

16

**REQUEST 64:**   Any and all documents relating to the chloride content of the ash within the CDS and ESP equipment.

**REQUEST 65:**   Any and all documents relating to the recirculation of ESP ash into the plant's boilers, including, but not limited to, any and all documents relating to when flyash was injected into the boilers.

**REQUEST 66:**   Any and all documents relating to the operation of the sootblowers within the CDS and ESP equipment, including, but not limited to, any documents relating to any maintenance or inspection of those sootblowers.

**REQUEST 67:**   Any and all documents relating to the constituents or chemical/molecular make-up of the flue gas at the air heater outlet and at the stack during operation of the plant.

**REQUEST 68:**   Any and all documents relating to the in-leakage of outside air into the CDS and ESP equipment.

**REQUEST 69:**   All documents related to any physical or operational modifications AES made to the CDS and/or EPS equipment, the Water Treatment System, or the Closed Cooling Water Cycle.

**REQUEST 70:**   Documents sufficient to identify each and every partner of AES from January 1, 2002 to the present, and for each such partner, documents sufficient to identify the legal residence, principle place of business, and place of incorporation of the partner.

**REQUEST 71:**   All documents related to the design of the closed cooling water cycle.

**REQUEST 72:**   Any and all documents related to the source of the water use at the plant.

17

**REQUEST 73:**  Any and all documents related to the design and installation of a secondary reverse osmosis system on the Project.

**REQUEST 74:**  Any and all documents related to the Distributed Control System.

**REQUEST 75:**  Any and all documents relating to the Plant Operating Data.

**REQUEST 76:**  All documents which were viewed by or prepared by any person who may be called to testify as an expert witness at the trial of this case and all bibliographies, resumes or curricula vitae regarding any such expert witness who may be called to testify at the trial of this case.

## REQUESTS FOR INSPECTION

**REQUEST 1:**  Any components that were removed from the CDS and/or the ESP equipment, including, but not limited to, any collector plates that were removed.

**REQUEST 2:**  During the next scheduled shut-down of the plant, the CDS and ESP equipment currently installed at the Project.

ALSTOM POWER INC.

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222

John Anthony Wolf, Esquire
James E. Edwards, Esquire
Anthony F. Vittoria, Esquire
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:     (410) 547-0699

18

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this _18th_ day of ~~February~~ *March*, 2005, a copy of the

foregoing First Request For Production Of Documents And Things And Entry Upon Land For

Inspection was served, via first-class mail, postage prepaid, on:

John S. Spadaro, Esquire
Murphy Spadaro & Landon
~~824 Market Street, Suite 700~~   *Wrong Address*
Wilmington, Delaware 19801

Dane H. Butswinkas, Esquire
R. Hackney Wiegmann, Esquire
Mary Beth Long, Esquire
Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Attorneys for Plaintiff


_____
Richard R. Wier, Jr.

732667.v2

19