# TAB
# 20

OBER|KALER
A Professional Corporation

Ober, Kaler, Grimes & Shriver
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699
www.ober.com

James E. Edwards, Jr.
jeedwards@ober.com
410-347-7330

Offices In
Maryland
Washington, D.C.
Virginia

February 9, 2006

VIA FACSIMILE AND FIRST-CLASS MAIL

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005

Re:    AES Puerto Rico, LP v. ALSTOM Power Inc.
       Civil Action No. 04-1282-JJF

Dear Dan:

        This is in response to your message to me dated February 2, 2006, in which you attempted to "memorialize" agreements made during our telephone call regarding discovery issues on February 1.  Your message presents an incomplete summary of the call and, therefore, requires a response.  In addition, this letter will set forth ALSTOM's position with respect to several issues that were left open pending review of deposition transcripts and the like after the conference call.

        With regard to concerns raised by ALSTOM during the telephone conference, we have the following comments:

        •       In responding to ALSTOM's interrogatory regarding the identity and responsibilities of persons having knowledge of discoverable information, AES simply provided a list of names.  The interrogatory properly requires a description of each person's responsibilities and a summary of the discoverable information known to them.  As a compromise to resolve this dispute, as set forth in Mr. Vittoria's e-mail message, we indicated a willingness to look at your attempt to organize these individuals into subgroups based upon their responsibilities in connection with the subject matter of this case, which must be clearly identified.

        •       We discussed the depositions of AES's corporate designees with respect to its claim for damages and electronic and paper discovery.  ALSTOM objected to the untimely supplementation of AES's answer to ALSTOM's interrogatory relating to damages on the eve of a deposition, which had been scheduled for a considerable period of time.  ALSTOM also objected to AES's failure to produce all documents relating to its claim for damages prior to the deposition.  We agreed to review the transcript while you did the same and

OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
February 9, 2006
Page 2

determine whether the deposition should be continued. As set forth below, the deposition of AES's corporate designee with respect to its claim for damages should be continued. Similarly, ALSTOM objected to the inability of AES's corporate designee to answer questions and address subjects relating to electronic discovery that were clearly set forth in ALSTOM's Notice of Deposition. We have subsequently reviewed the transcript and the Notice of Deposition. As set forth below, the deposition should be continued as well.

- Given that he worked for Environmental Elements Corporation in connection with the design and supply of equipment at issue in this litigation and then provided non-litigation related consulting services to AES in connection with that same equipment, John Toher is a fact witness. In addition, you advised that AES engaged Mr. Toher last winter as a prospective expert witness who might develop opinions to be presented at trial. Prior to that engagement, materials exchanged between AES and Mr. Toher would not have been prepared in anticipation of litigation or for trial and would be discoverable. Thus, if AES asserts the privilege with regard to the exchange of materials with Mr. Toher prior to his engagement as a prospective trial expert, a privilege log should be produced at this time so that we can assess the basis for any claim of privilege. Depending upon whether Mr. Toher is identified by AES as an expert whose opinions may be presented at trial, in which case exchanges between Mr. Toher and AES will be discoverable, or is merely an individual engaged in anticipation of litigation or for trial who will not offer such expert opinions, in which case some of those exchanges may not be discoverable, we will ascertain whether a further privilege log is required. We are prepared to provide a privilege log relating to communications with Altran prior to its engagement as a prospective trial expert and request that AES do the same with Mr. Toher.

- In light of the discovery of communications among AES, D/FD Caribbean, ALSTOM, and EEC relating to the prevention of corrosion in the electrostatic precipitator dating back to February, 2000, and perhaps even earlier, we requested production of electronic documents, including electronic mail, for this period. In the past, AES has indicated that it would be difficult to retrieve certain electronic mail, some of which we now understand may be available only on back-up tapes. In addition, there is a second category of electronic mail exchanged during the construction of the Project that we believe has not been produced. This is based, in part, on our analysis of electronic mail messages produced by AES with hard-copy documents that are not contained in AES's electronic production of electronic mail. It is confirmed by AES's indication that it lacks many of the electronic mail communications with D/FD Caribbean that ALSTOM obtained during discovery in a lawsuit with D/FD. At least at one time, such electronic mail should have been on AES's servers. During the



Daniel D. Williams, Esquire
February 9, 2006
Page 3

conference call, we agreed to look at the disclosure you made to Mr. Regner regarding the cost of retrieving the former category of electronic mail. As to the latter category of electronic mail, we requested, but did not receive, an explanation of its status. As set forth below, production of the electronic mail in both categories (or an explanation of why it cannot be produced) is required.

• We also questioned the production of CEMS data in 15 minute intervals. At his deposition, Mr. Sostre testified that it would not be difficult to obtain this information in six minute intervals, the period of time that is germane based upon the specifications with regard to opacity. You agreed to determine what would be required in order to produce the CEMS data in six minute intervals. We are examining the documents produced recently in Puerto Rico to determine whether, in fact, those documents contain comprehensive CEMS data in six minute intervals. If the documents do not contain a complete record of the CEMS data in six minute intervals during the period of time that is relevant in this case, AES should produce that data in either electronic or paper form or facilitate ALSTOM's access to the data on an expedited basis.

• We discussed the scheduling of depositions. Bill Jarvis is not available the week of February 20. He is available in early March. Tim Maidenford is traveling to Europe and involved in critical commissioning meetings the last two weeks in February. He is available March 7 or 8. He is in Kentucky and suggests that we take the deposition at a hotel near the Cincinnati airport, which is fine with us. We requested a notice of deposition for the corporate designee's deposition, regarding the handcuffs issue which we received on February 7. We are identifying who should appear and hope to know the answer tomorrow or early next week. On February 6, we received notice of AES's intention to take the deposition of Tom Coleman. Mr. Coleman is still employed by ALSTOM. He is willing to travel from his project site in New Hampshire to Windsor, Connecticut for the deposition. He would be available for deposition late in the week of February 20 or the following week. ALSTOM requested the availability of Mr. Dyer, Doug Tomlin, and Ron McParland for depositions. ALSTOM also now requests that AES provide available dates for the deposition of Tracy Jarvis. If any of these individuals is no longer employed by AES, please provide last known contact information so that we can issue an appropriate subpoena. ALSTOM also will provide another notice of deposition for a corporate designee for AES early next week.

With regard to concerns raised by AES during the conference call, we have the following comments:

OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
February 9, 2006
Page 4

•    ALSTOM recently provided two CDs to AES containing responsive electronic mail for Tom Barber, as requested, and supplemental production for a number of other custodians previously produced. In earlier discussions, we had indicated a belief that the electronic mail being produced covered the period of time that was relevant to the case. Subsequently, we reviewed the electronic mail for all of the custodians to confirm that belief and requested that ALSTOM's IT personnel confirm whether additional electronic mail was available during the period in question. Based upon that undertaking, we determined that additional electronic mail should be produced, and it has been provided. You were going to review supplemental production of electronic mail for Karl Kognefelt, Linda Rothe, and Frank Gabrielli, if any, all of whom have been deposed.

•    ALSTOM agreed to provide a letter stipulating to the authenticity of a document authored by Frank Gabrielli that was produced subsequent to his deposition. We will review your letter dated January 24, 2006 in preparing that letter.

•    We agreed to confirm whether Mr. Gabrielli has any other discoverable documents in his possession. We have done so and can confirm that Mr. Gabrielli has no such documents.

•    ALSTOM is not still collecting documents from Ed Bulewich, Fred Campbell, and Steve Francis. ALSTOM is reviewing electronic mail for production for prospective witnesses identified recently by AES.

•    You inquired regarding the status of ALSTOM's privilege log relating to electronic documents. We indicated that it should be produced early next week. We forwarded the privilege log to you on February 8. We did not discuss AES's reservation of rights with regard to ALSTOM's assertion of the privilege over these documents as indicated in your parenthetical. No such waiver of the privilege has occurred. Indeed, both sides have produced documents and data to one another subsequent to December 31. Despite assurances that all of AES's documents and data had been produced as of December 31, this includes AES's recent document production in Puerto Rico, which contains numerous documents that should have been produced in AES's initial document production.

•    ALSTOM is following up to determine whether it can locate Control Room Logs for the period after September 21, 2002.

•    We are attempting to determine whether the so-called Maidenford Daily Commissioning Report is complete.

OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
February 9, 2006
Page 5

With regard to several open discovery issues, ALSTOM's position is as follows:

- The deposition of AES's corporate designee with respect to electronic discovery must be continued. There are numerous instances in which the witness, Mr. Hernandez, could not answer questions falling clearly within the scope of the categories for examination in the Notice of Deposition. Examples of these are found at pages 40 - 45 (regarding the shared servers), pages 59 - 62 (regarding the retrieval of electronic mail), pages 63 - 66 (regarding the retrieval of electronic mail), page 68 (regarding the cost to retrieve electronic mail from back-up tape), pages 73 - 75 (relating to the preservation of electronic mail), and pages 79 -80 (relating to the retrieval of electronic mail). One colloquy at pages 79 - 80 of the transcript is particularly telling.

> Q:   Are you aware of the steps that were taken to retrieve, collect, and produce those e-mails in this case?
>
> A:   No, I'm not aware.

Because this witness was largely unfamiliar with subjects relating to shared servers maintained in Indianapolis and then in Arlington and with the process of identifying, retrieving, and copying electronic mail for production to ALSTOM, including the cost to do so, none of which was done in Puerto Rico, AES should make a separate designee from the IT Group in Arlington available to address these issues.

- The deposition of AES's corporate designee with respect to damages also must be continued. We received AES's Supplemental to ALSTOM's Interrogatory No. 10, relating to damages, on the eve of the deposition and while Mr. Vittoria, who was to take the deposition, was traveling to Puerto Rico. The Supplemental Response to Interrogatory No. 10 broadly expands the components of AES's claim for damages and dramatically increased the amount claimed. Moreover, in mid-January, we learned that "a small number of boxes" would be available at the facility on January 16, two days before Mr. Dyer's deposition. Despite efforts to expedite the process, we obviously did not receive those documents until after the deposition had been taken. In fact, the production included 13 boxes. Further, based upon the index provided with those documents and our preliminary review of them, a significant number of those documents would have been reviewed in preparation for that deposition if they had been provided earlier. Because Mr. Vittoria already was in Puerto Rico,

OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
February 9, 2006
Page 6

he attempted to conduct the deposition based upon the Supplemental Answer to Interrogatory No. 10, which he did not receive until his arrival in Puerto Rico the day before the deposition. He also did so without the benefit of the documents that had not yet been produced. While we do not intend to simply re-take the deposition, it should be continued for the purpose of follow-up inquiry regarding components of the claim for damages set forth in the Supplemental Answer for the first time and documents produced subsequent to the deposition.

•       As set forth above, there are two categories of electronic mail that AES has failed to produce to ALSTOM. The first of these categories is the electronic mail that dates back to the earlier stages of the Project. Such e-mail apparently is stored on back-up tapes. Based upon the discovery of discussions among AES, D/FD Caribbean, ALSTOM, and EEC dating back to early 2000 relating to the pollution control equipment and the prevention of corrosion, these back-up tapes undoubtedly contain responsive electronic mail of material witnesses with knowledge of discoverable information. Your earlier communication with Jeff Regner of this office is vague and would not satisfy AES's burden to establish that retrieval of this relevant electronic mail would be overly burdensome. Moreover, the corporate designee with regard to electronic discovery issues was wholly unfamiliar with the prospective cost of this exercise. For that reason, AES should produce discoverable electronic mail on the back-up tapes in question.

Under the Default Standard For Discovery Of Electronic Documents issued by the United States District Court for the District of Delaware, as a general proposition, "the cost of discovery shall be borne by each party." The Default Standard provides that the court will only apportion the cost of electronic discovery "upon a showing of good cause." In order to minimize AES's costs of retrieval, ALSTOM can agree to limit the number of individuals whose electronic mail must be searched and arrive at an agreed set of search terms to be run over that electronic mail. Apart from that, AES is obligated to retrieve this electronic mail from the back-up tapes and make it available to ALSTOM.

Further, there are strong indications that AES has either failed to preserve or has not produced more recent electronic mail relating to the Project. Again, this is based upon the existence of hard copies of electronic mail messages to or from AES users that did not appear in AES's electronic production of electronic mail and AES's acknowledgement that it does not have all of the electronic mail exchanges with its EPC contractor, D/FD Caribbean. ALSTOM is entitled to an explanation of the circumstances surrounding the failure to preserve or produce this electronic mail, which should be afforded by its corporate designee for electronic discovery.

OBER | KALER
A Professional Corporation

Daniel D. Williams, Esquire
February 9, 2006
Page 7

We look forward to discussing these matters with you during our conference call on February 10.  If you have any questions in the interim, please call me.

Sincerely yours,

James E. Edwards, Jr.

JEEJr/bak

# TAB 21

# Fuhrman, Paula R.

| | |
|---|---|
| From: | Vittoria, Anthony |
| Sent: | Wednesday, February 15, 2006 7:53 PM |
| To: | 'Dan Williams (E-mail)' |
| Cc: | Edwards, James; Schollaert, Michael; Fuhrman, Paula R. |
| Subject: | AES v. ALSTOM -- E-mails |

Dan,

I remembered immediately upon sending you the e-mail below that it was ALSTOM that Bates numbered the most recent AES hard-copy document production. Accordingly, I have attached for your reference the document that is referred to in number of 1 of the first group below (AES-G-01-159-000728 through 000730).

Tony



Trifonoff E-mail

-----Original Message-----

| | |
|---|---|
| From: | Vittoria, Anthony |
| Sent: | Wednesday, February 15, 2006 7:41 PM |
| To: | Dan Williams (E-mail) |
| Cc: | Edwards, James; Schollaert, Michael; Fuhrman, Paula R. |
| Subject: | AES v. ALSTOM -- E-mails |

Dan,

As we have mentioned during our recent discovery telephone conferences, there are a large number of e-mails that AES undoubtedly has or should have that it has not produced electronically in this case. Those e-mails include ones that AES has produced in hard-copy format but failed to produce electronically, and those in ALSTOM's electronic document production that were not produced by AES. By way of example, those e-mails include:

Hard Copy E-mails Not Produced Electronically By AES

1. AES-G-0-159-000728 through 000730
2. AESPR 136464
3. AESPR 136470 through 136475
4. AESPR 136476

The third e-mail of this group is particularly material in that, in our view, it indicates that, despite AES's haste to order replacement collecting plates in the winter of 2003, AES realized by March of 2004 that it no longer needed those plates in the near term.

E-mails Produced Electronically By ALSTOM But Not Produced Electronically By AES

1. JARV-EMAIL-034734 through 034740
2. JARV-EMAIL-034731 through 034732
3. WARD-EMAIL-020732 through 020735
4. WARD-EMAIL-020707 through 020708
5. WARD-EMAIL-020675 through 020676
6. WARD-EMAIL-020673 through 020674

Several of these examples are highly relevant and material to this case. In particular, the first e-mail includes Karl Hognefelt's September, 2003 trip report. Several of the other examples contain extensive analysis of CDS/ESP issues by Paul Stinson.

During the course of AES's electronic document production, ALSTOM repeatedly voiced its concern that there were

'e-mails that AES had or should have that it had not yet produced. AES consistently dismissed those concerns by pointing out that it was making a "rolling" production -- thereby implying that AES would eventually produce the missing e-mails.

AES has now represented -- on more than one occasion -- that it has completed its electronic document production and that it has, with the exception of the "aesc.com" e-mail (which ALSTOM has addressed separately), produced all of the relevant, responsive electronic e-mail in its possession. As demonstrated by the examples above, however, AES has failed to produce numerous relevant and material e-mails that it has or should have. Importantly, the examples in the second group consists only of e-mails that were exchanged between the parties during the regular course of business and, therefore, the ones about which ALSTOM has knowledge. There could be hundreds if not thousands of relevant and material e-mails that AES has failed to produce -- such as internal e-mails or e-mails to third-parties on which ALSTOM was not copied -- about which ALSTOM neither has, nor could have, knowledge.

Accordingly, ALSTOM seeks confirmation from AES that, with the exception of the "aesc.com" e-mail, it has produced all of the responsive, relevant e-mail in its possession and that, therefore, some e-mails have been lost or destroyed.

If, on the other hand, AES now admits that it has not produced all of the responsive relevant e-mails in its possession, then ALSTOM requests an immediate response from AES as to the steps that it intends to take to ensure that all relevant and responsive electronic e-mail will be produced. If AES does not respond adequately to this request, and because we have consistently raised this issue during the course of AES's electronic document production, ALSTOM will have no choice but to seek the Court's assistance.

Thank you for your prompt attention to these matters. I look forward to your response.

Tony

**Anthony F. Vittoria**
410-347-7692
afvittoria@ober.com

O B E R | K A L E R
*Attorneys at Law*
www.ober.com
443-263-4192 -- Fax
120 East Baltimore Street
Baltimore, Maryland 21202

AES-G-01-159-000728

**Calvin Kotrla**

| | |
|---|---|
| From: | Richard Trifonoff |
| Sent: | Wed 4/9/2003 10:25 AM |
| To: | Gary Bates; Calvin Kotrla; Doug Tomlin; Ron McParland; Ernest Pagaduan; Elias Sostre |
| Cc: | |
| Subject: | RE: Spillback nozzles - Puerto Rico |
| Attachments: | |

To me, if they last a year and stop the wet ash risk, it's worth it.....

Richard " Trif" Trifonoff

Richard "Trif" Trifonoff
AES Puerto Rico

-----Original Message-----
From: Gary Bates
Sent: Wednesday, April 09, 2003 11:07 AM
To: Richard Trifonoff; Calvin Kotrla; Doug Tomlin; Ron McParland; Ernest Pagaduan; Elias Sostre
Subject: FW: Spillback nozzles - Puerto Rico

Got some prices on the Tungsten Carbide tips. They are awful proud of them. If we could get a years run out of them it might be worth doing. We currently get around 3 months out of the ones we use now. There won't be any savings, other than the fact that we would not be taking as many chances of having a nozzle go bad and causing wet ash problems.

Anyway, let me know what ya'll think and we will talk about it later.

Gary

P.S. 2 days

-----Original Message-----
From: JToher [mailto:ijmconsult@comcast.net]
Sent: Sunday, April 06, 2003 5:24 PM
To: Gary Bates
Subject: FW: Spillback nozzles - Puerto Rico

John Toher, dba IJM Consulting
Ph (443) 745-5763
Fax (410) 429-0921

-----Original Message-----
From: Terra Vincent [mailto:TerraVincent@lechlerusa.com]
Sent: Monday, March 10, 2003 9:07 AM
To: ijmconsult@comcast.net
Cc: Armin Möck (E-mail)
Subject: RE: Spillback nozzles - Puerto Rico

AES-G-01-359-000729

John,

To follow up with my original email attached below, here is the pricing for the tungsten carbide mouthpieces. This pricing would be valid after the first order for the replacement complete assemblies:

Tungsten carbide mouthpiece, to replace p/n 800.200.06.00020:
Qty (5-9): $1015.00 each
Qty (10-24): $822.40 each

This compares to the hardened stainless steel versions, qty (5-9) for $257.00 each and qty (10-24) for $218.50 each.

Let me know if you have any questions! I look forward to meeting you on 3/17 at 9:30 am. Is that still an acceptable time for you?

Sincerely,

Terra Vincent
Lechler, Inc.

> -----Original Message-----
> From:      Terra Vincent
> Sent: Monday, February 24, 2003 3:59 PM
> To:  'ijmconsult@comcast.net'
> Cc:  'Armin Möck (E-mail)'
> Subject:    Spillback nozzles - Puerto Rico
>
> John,
>
> We have been discussing your recent request for more wear-resistant
materials for the Spillback mouthpieces currently installed at AES
Puerto Rico with Armin Möck of Lechler GmbH.  We are pleased to offer
you a proposal based on the mouthpiece being made out of tungsten
carbide for superior wear resistance.  All of the other components
besides the gaskets (swirl disc, nut and center connector) will be made
out of hardened stainless steel.  The individual components will be
different than the original ones that you purchased in hardened
stainless steel (so they need to be replaced), but they will retrofit
onto your existing lances and will provide the same performance.
>
> Original lance part number:  800.200.06.20000
>
> Complete nozzle assembly includes:
> *    Tungsten carbide mouthpiece
> *    Hardened stainless steel swirl disc
> *    Hardened stainless steel center connector
> *    Hardened stainless steel nut (cap)
> *    Gaskets

AES-G-01-159-000730

>
> Qty 5-9 complete assemblies:  $2440.00 net each
> Qty 10-24 complete assemblies:  $1990.00 net each
>
> Delivery for initial order:  16 weeks after receipt of order
>
> Prices are firm for 60 days and FOB St. Charles, IL USA
> Terms:  1% 10, net 30
>
> If you have any questions about this proposal, please give me a call
at (800) 777-2926 x 6811.  We look forward to working with you again!
>
> Sincerely,
>
> Terra Vincent
> Environmental Division Manager
> Lechler, Inc.
>

This email has been scanned for all viruses by the MessageLabs service.

# TAB
# 22

LAW OFFICES

## WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

DANIEL D. WILLIAMS
(202) 434-5263
ddwilliams@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

February 17, 2006

**VIA E-MAIL AND FIRST CLASS MAIL**

Anthony F. Vittoria, Esquire
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, Maryland 21202-1643

Re:    **AES Puerto Rico, L.P. v. ALSTOM Power, Inc.**

Dear Tony:

I write in response to your email of Wednesday night regarding AES-PR's production of emails.

**First,** you begin by stating that AES-PR has not produced emails that it should have and that exist in ALSTOM's files. By way of example you listed ten emails. To make the record clear, of the ten emails you cite, you admit that, for four of them, the documents were produced, albeit in paper form. As for the remaining six documents, no AES-PR employee is included on any of them. The emails were between ALSTOM employees and Paul Stinson, a retired employee of The AES Corporation.

**Second**, AES-PR does not agree that any emails have been "lost or destroyed," as you speculate in your email. Similarly, your suggestion that there are possibly hundreds or thousands of responsive documents that have not been produced by AES-PR has no factual support. While ALSTOM has made these baseless accusations repeatedly, the deposition of our document custodians refute that claim. We have consistently asked you to explain the basis of this unsupported charge and provide examples of the "missing emails." Yet until your email two days

WILLIAMS & CONNOLLY LLP

Anthony F. Vittoria, Esquire
February 17, 2006
Page 2

ago, ALSTOM has been unwilling to do so despite our repeated requests. We now see that the claim simply has no merit.

      **Finally**, you have asked AES-PR to confirm the status of its electronic production. Today AES-PR is sending you a CD of additional electronic documents. At this time, we ask that ALSTOM tell us when it will finally produce: documents for Mr. Campbell, Mr. Francis, and Mr. Bulewich.

      Sincerely,

      Daniel D. Williams

# TAB
# 23

| **From:** | Karl Hognefelt |
|---|---|
| **Sent:** | Tuesday, September 30, 2003 5:01 PM |
| **To:** | William M Jarvis; Thomas Coleman; Paul.Stinson@aes.com |
| **Subject:** | PR Guayama Trip report092603 |
| **Attach:** | Puerto Rico 092603.doc |

Gentlemen
Please find attached My Notes from the trip to Guayama last week.
Let me know if you have any questions.
Best regards/Karl

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

JARV-EMAIL-034734

# ALSTOM

**Subject: Tuning of AES Puerto Rico CDS & ESP**     **Trip Date: 9/22/2003 – 9/26/2003**

**Author:   KARL HOGNEFELT**     **Report Date: 09/29/2003**

Circulation:

The purpose of my trip to AES Guayama, Puerto Rico was to support customer AES to evaluate the operation of the CDS and the ESP, to suggest change in operation to reduce the opacity spikes that occur at some operating conditions.
Previous to the trip current operating data had been studied to see if there were any trends of operating conditions that were related to the sudden opacity spikes. The evaluated data showed the Unit 1 operating at full load most the time and Unit 2 at full load and also at reduced load for some time. The data show stable opacity at full load but increased opacity for Unit 2 at change in load. It was noted that the opacity spikes are delayed 2-3 hrs in relation to load change. The time delay in this case could be related to the problem to keep the recirculated ash in balance at lower loads.

The following are my notes for each day on site:

**Monday 09/22/03**
Arrived on site in the after noon. Unit 1 boiler is off line for repair of tube leaks. Unit 2 is running at 240MW load.

**CDS data U2**
A newly installed instrument is used to measure the fluegas dew point temperature (Tdp= 120°F). This instrument is located at the outlet of the CDS. The operating temperature is chosen to be minimum 30° above the dew point in accordance with EEC recomendations. Current operating gas temperature leaving the CDS was 153°F. The pressure drop over the ash bed was 2.2" wg. The pressure drop is set and automatically controlled by opening and closing the valves for feeding ash from the first row of ESP hoppers. Unfortunately the control system does not control on any ash level in the hoppers and there is a risk that they run out of ash in the hoppers. Two hoppers were showing "Low-Low" level and there is a risk that this will result in back flow of gas into the ESP hopper. It is important that there is a minimum level of ash in each of the first row of hoppers to serve as an air lock and prevent that there will be a backflow of gas and ash from the air slide into the ESP.

**ESP Data U2**
The opacity was showing 1-2% and had sudden spikes of 12-15%. The 6 minutes average was at about 3% and no excursion of permit was reported.

| Field | Voltage (kV) | Current (mA) | Sparking |
|-------|--------------|--------------|----------|
| 2-1   | 60           | 200          | 2        |
| 2-2   | 60           | 200          | 0        |
| 2-3   | 60           | 350          | 0        |
| 2-4   | 60           | 410          | 0        |
| 2-5   | 52           | 500          | 0        |
| 2-6   | 70           | 1000         | 0        |
| 2-7   | 65           | 950          | 3        |
| 2-8   | 58           | 1080         | 0        |
| 2-9   | Off line     |              |          |
| 2-10  | 65           | 1050         | 0        |
| 2-11  | 55           | 350          | 0        |
| 2-12  | 58           | 1050         | 0        |

JARV-EMAIL-034735

It was noted that TR 2-9 was out of service because of a bad breaker that can only be repaired when the unit comes off line.

**Tuesday 09/23/03, morning**
Unit 2 load was still 240 MW.

**DCS data U2**
Bed pressure differential = 2.2" wg, Operating temperature = 154°F, Four nozzle lances in operation. Current procedures are to clean the nozzles twice a week. The nozzle tips are replaced for wear after approximately 3 months of operation.

**ESP data U2**
The opacity was more stable at 2-5% with a few spikes at 12%. The six minutes average was 4%. There were NO first row hopper levels at "Lo-Lo" level. There seem to be less opacity spikes when the first row of hoppers is kept at a higher level.

| Field | Voltage (kV) | Current (mA) | Sparking |
|-------|--------------|--------------|----------|
| 2-1 | 59 | 236 | 0 |
| 2-2 | 60 | 240 | 0 |
| 2-3 | 59 | 310 | 0 |
| 2-4 | 60 | 380 | 0 |
| 2-5 | 60 | 460 | 0 |
| 2-6 | 70 | 480 | 0 |
| 2-7 | 68 | 1050 | 0 |
| 2-8 | 67 | 1190 | 0 |
| 2-9 | Off line | | |
| 2-10 | 65 | 1180 | 0 |
| 2-11 | 69 | 480 | 0 |
| 2-12 | 63 | 1130 | 0 |

The data show NO sparking and it was questioned why the voltage is limited to 60kV in the five first fields.
Confirmed that rapping frequencies is set to high with double impacts for the three first mechanical fields and lower frequency for the 4th and 5th and very low for the outlet field.
The rotary feeders under the hoppers in the last two fields had been replaced with double dump valves, type Plattco Airlock Flap valve, size 12" x 18". Operating frequency for these valves were set to upper open =2seconds, upper close, lower open 6 seconds, lower close. This frequency was repeated every 30-40 second.

**Tuesday 09/23/03, Afternoon**
The after noon was spent on inspecting the internals of Unit 1 ESP.
Many of the insulator stabilizers located at the lower end of the DE frames were broken. In fields with broken stabilizers there is a risk that the tall and narrow fields will start to swing during operation. The stabilizers made of flat bar Teflon were replaced with similar material. It was recommended to use "virgin" Teflon that has the best electrical isolation at increased temperature. It was also pointed out that it is important to align the DE frames to be in the center of the collecting plates when changing the stabilizers.
There was major "snowballs" build-up on many of the spikes of the DE electrodes. The size was in some cases up to 5-6" in diameter. There were more built-up in the west side of the ESP and especially in the inlet fields. It was pointed out to the customer to clean off these build-up, as they will have a negative effect on the ESP performance.

JARV-EMAIL-034736

**Wednesday 09/24/03**
Load for U2 was = 240MW,
**CDS data**
Operating temperature = 153°F, Bed Pressure differential = 2.10"wg, SO2 out = 7ppm

**ESP data – U2**
The opacity was 1-2% with some small spikes up to 6%. NO first row hopper levels at "Lo-Lo" level. There seem to be less opacity spikes when the first row of hoppers is kept at a higher level.

| Field | Voltage (kV) | Current (mA) | Sparking |
|-------|-------------|-------------|----------|
| 2-1 | 59 | 180 | 0 |
| 2-2 | 60 | 160 | 0 |
| 2-3 | 60 | 270 | 0 |
| 2-4 | 60 | 380 | 0 |
| 2-5 | 60 | 480 | 0 |
| 2-6 | 69 | 1040 | 0 |
| 2-7 | 68 | 1080 | 0 |
| 2-8 | 67 | 1180 | 0 |
| 2-9 | Off line | | |
| 2-10 | 65 | 1190 | 0 |
| 2-11 | 69 | 490 | 0 |
| 2-12 | 63 | 1140 | 0 |

**Major points discussed in meeting with AES**
- Keep higher level in first row of ESP hoppers to avoid risk for gas and dust backflow into the ESP. If backflow occur it will result in opacity spikes and more dust in back-end fields. A min level of ash in the hopper will serve as an air lock and prevent backflow.
- ESP control settings limited in voltage for first five field with zero sparking. Recommend increased voltage for optimum performance.
- AES reported that major sparking had been reported resulting in reducing voltage in five first fields.
- AES had implemented procedure to dump ash from back end hoppers every 2 hours to get rid of the fine ash that is recirculated and migrates downstream.
- The overflow located in first row of hoppers was discussed. AES suspect that ash is over flowing even at low hopper levels. The overflow shute in the Unit 1 has dampers that can be manually closed to prevent overflow and increase ash level in hoppers. AES suggested trying out these dampers to see the effect of a raised hopper level when Unit 1 comes on line.
- The Hopper baffles installed in Unit 1 ESP first row of hoppers has a positive influence to the operation by reducing the incoming gas flow in the hoppers. These baffles will also reduce the risk for transfer of ash from firs hoppers over to back-end fields.
- AES confirmed that the water quality for the CDS can vary and has an influence on the operation. ALSTOM referenced that it is a known fact that high content of Chlorides can have a negative influence on ESP performance.
- The broken standoff insulators noted in U1- ESP will be replaced and the DE frames will be aligned at installation of new Teflon bars.
- The big "snowball" ash build-up noted in U1-ESP DE system will be removed to improve performance.

JARV-EMAIL-034737

- AES will analyze the operation under different conditions. Pressures gauges installed in different parts of the hoppers and air slides will be monitored to confirm changes in operation and determine best procedure for stable ash recirculation.
- AES will further investigate the procedure to dump the ash from back-end hoppers, how often and what influence this has on the opacity.

JARV-EMAIL-034738

**Thursday 09/25/03 Morning**
Load for U2 was = 255MW (Max)
**CDS data**

Operating temperature =154°F, Differential bed pressure = 2.5-3" wg,

**ESP data**
The opacity was low and stable at 2-3% at 9.00Am. Only some minor spikes.

| Field | Voltage (kV) | Current (mA) | Sparking |
|-------|--------------|--------------|----------|
| 2-1 | 59 | 200 | 60 |
| 2-2 | 60 | 290 | 46 |
| 2-3 | 59 | 340 | 48 |
| 2-4 | 59 | 470 | 21 |
| 2-5 | 59 | 580 | 8 |
| 2-6 | 69 | 1040 | 27 |
| 2-7 | 68 | 1070 | 0 |
| 2-8 | 68 | 1202 | 0 |
| 2-9 | Off line | | |
| 2-10 | 66 | 1205 | 0 |
| 2-11 | 69 | 450 | 0 |
| 2-12 | 64 | 1154 | 0 |

From the ESP data we can see a high spark rate on the front fields. The CDS water had been changes from filtered water used previous this week to the "raw" water NOT filtered. The water quality was changed around 7 am in the morning. After a couple of hours with good performance and low opacity the sparking increased and there were coming more of high opacity spikes.

The following data was taken at 2.15Pm

| Field | Voltage (kV) | Current (mA) | Sparking |
|-------|--------------|--------------|----------|
| 2-1 | 59 | 275 | 70 |
| 2-2 | 58 | 343 | 41 |
| 2-3 | 59 | 384 | 42 |
| 2-4 | 60 | 418 | 23 |
| 2-5 | 60 | 498 | 19 |
| 2-6 | 64 | 720 | 72 |
| 2-7 | 67 | 955 | 57 |
| 2-8 | 69 | 1122 | 30 |
| 2-9 | Off line | | |
| 2-10 | 27 | 300 | 80 |
| 2-11 | 69 | 435 | 23 |
| 2-12 | 67 | 1167 | 0 |

The sparking had increased over 5 hours of operation and had also resulted in major opacity spikes. Suddenly field 2-10 shortened and resulted in a major increased opacity.
It was recommended to run the rappers in this field continues for a time. Still it was not possible to restart the 2-10 TR and soon it was noted that one of the hoppers under this field had no vacuum at the poke holes. It probably had a high level even if the level indicator did not show this. Suggested increased frequency of operation of the double damp valves at these hoppers. With change of water quality and special operating procedures it still took 2-3 hours to come back to "lower" opacity levels.

JARV-EMAIL-034739

Water analyze of the "raw" water show high conductivity and a chloride content of 3,500ppm vs. 50ppm for the Filtered water used previous day. The CDS process require the dust to be recirculated and the same dust will be wetted with the high chloride content water for each recirculation with increased chloride content for each time.

A dust sample taken and analyzed show the chloride content was measured to 12,000 microgram/gram. This correspond to 1.2% chlorides in the dust. The result is that the ash get sticky and build up on the ESP internals and it is difficult to rapp off the plates. This result in higher sparking and the dust is drifting towards the back-end fields with much more dust collected here. The standard setting of the rapping is not enough to keep these field clean and it can cause TR's to shorten out.

**Unit 1 – CDS inspection**
U1 – CDS was visually inspected through an inspection door located below the ash injection point. There was only one minor area with ash deposits on the West wall, thickness 1-2". All other wall area of the CDS was almost plate clean. The top of the ventures had a thin dust layer on the plate between the seven ventures but there were no dust in the ventures.

**CONLUSIONS**
- It is very important to keep a higher level of ash in the first row of ESP hoppers to prevent back flow resulting in loosing the inventory in these hoppers and causing increased opacity spikes.
- The water quality is an important factor for the ESP performance. AES will make a complete water analyze of the NOT filtered water to see if there are other things than the high chloride levels that will influence the ESP operation. ALSTOM will get the result from the water analyze for further evaluation.
- AES will also take a dust sample from operation with NOT filtered water and send this sample to ALSTOM in Knoxville for an analyze.
- High chloride content can result in serious corrosion in the CDS and ESP.
- To improve the ESP performance it is recommended to mix filtered water and NOT filtered water to test the ESP operation with a lower chloride content.
- Chloride content should be monitored and the CDS outlet temeprature should be maintained in accordance with EEC operating instructions to prevent corrosion.
- If using high chloride water a test can be made by increasing the CDS operating temperature 5 & 10°F. This will make the ash much less sticky and will also reduce the risk for corrosion. The higher chloride content should still give a satisfactory SO2 removal efficiency.
- The ESP rapping frequency has to be increased for higher chloride content water, as the sticky dust is very difficult to rapp down.
- Ash built-up in the ESP like the "snow balls" should be removed at outage to get expected ESP performance.
- The ESP insulator stabilizors should be inspected at outage and repaired if needed to get expected ESP performance.

# TAB
# 24

| | |
|---|---|
| **From:** | Paul Stinson <Paul.Stinson@AES.com> |
| **Sent:** | Wednesday, October 1, 2003 11:24 AM |
| **To:** | Karl Hognefelt/USKNL01/Power/ALSTOM@GA; William M Jarvis/USWIN01/Power/ALSTOM@GA; Thomas Coleman/USWIN01/Power/non-ALSTOM@GA |
| **Subject:** | RE: PR Guayama Trip report092603 |

Karl, we now have delta pressure instrumentation on the airslides on unit 1 and they are being completed on unit 2.

I appears from these that we are seeing spikes from a baseline of 1 inch of water up to 5 inches of water, and that these spikes seem to correlate to opacity spikes.

I am suspicious that we may be overloading the airslides, with intermittent operation of the 430 rotary valves.

One thing that would help us is if we could obtain some information on the design of these slides. For example, what were the slides designed to accept for ash loading rates at each hopper location? What are the dimensions of the airslides internally at each location? (I don't have the drawings here, but perhaps I can get some one at the plant to provide these.)

Here is my thinking on this. The CDS pressure, at the point the airslides enter it, is about 5-7 inches of water higher than the ESP. Thus, if the airslides are not overloaded, and the pressure drip along the airslide is at most 1 inch of water, then, the pressure being "sealed" by the rotary valve is at most 6-8 inches of water. IN the event of overloading, then the pressure profile along the airslide will change. The section of airslide above the area of the overloading will rise by say 4 inches of water, due to the fluidizing air from the LP blowers. This pressure will certainly try to "clear" the overloading, but it also would create a higher pressure to cause blowback.

Let's say that the 430 rotary valve operation is causing the overloading. Since the airlocks are on the 440 and 450 hoppers, that means the only place for that extra pressure to go may be up the 430 hoppers. If this is correct, we should be able to correlate the spikes in delta pressure on the airslides with the operation of the 430 valves. We are trying to do that now.

If we do correlate, we may need to somehow smooth out the loading on the airslides. Longer term, we may need larger capacity sections under the 430's.

Let's see what the data reveals. Your comments are welcomed.

Can you help with the airslide capacity data?

JARV-EMAIL-034731

Paul Stinson

-----Original Message-----
From: karl.hognefelt@power.alstom.com
[mailto:karl.hognefelt@power.alstom.com]
Sent: Tuesday, September 30, 2003 4:01 PM
To: william.m.jarvis@power.alstom.com; thomas.coleman@power.alstom.com;
Paul Stinson
Subject: PR Guayama Trip report092603

Gentlemen
Please find attached My Notes from the trip to Guayama last week.
Let me know if you have any questions.
Best regards/Karl
(See attached file: Puerto Rico 092603.doc)

CONFIDENTIALITY : This e-mail and any attachments are confidential and
may be privileged. If you are not a named recipient, please notify the
sender immediately and do not disclose the contents to another person, use
it for any purpose or store or copy the information in any medium.

This email has been scanned for all viruses by the MessageLabs service.

This email has been scanned for all viruses by the MessageLabs service.

JARV-EMAIL-034732

# TAB
# 25

| From: | Paul Stinson <Paul.Stinson@AES.com> |
|---|---|
| Sent: | Thursday, October 9, 2003 8:51 AM |
| To: | Karl Hognefelt/USKNL01/Power/ALSTOM@GA |
| Cc: | Thomas L. Wardell/USWIN01/Power/ALSTOM@GA; William M Jarvis/USWIN01/Power/ALSTOM@GA |
| Subject: | RE: ESP CDS air slides |
| Attach: | Ash loadings.xls |

Here's the ash loadings I calculated from the measurements the control room operator made last night. Please see the attached spreadsheet.

The loading is about 9-12 tph for the 420s and about 2-3 tph for the 430s. Did not get any data for 440 and 450 valves. Presumably because it took too long to fill them.

With some degree of blinding of the membrane from ash contamination in the LP blower supply, we surely are struggling with the capacity of the 150 section of the airslide.

My proposal is to replace the section of airslide under the 420 and 430 valves with a larger section, perhaps a 200 or larger slide. I have contacted Claudius Peters about a proposal.

What is your input?

Can you ask the Alstom ESP experts what they would expect to happen if we are in fact overloading the 150 section of the slides? Would they expect there to be opacity implications?

I now have significant time looking at the delta pressure measurements. On every slide, if you shut down all valves except the 400s and 410s, the pressure drop becomes very steady and low, about 1 inch of water. All higher delta pressure and erratic pressure drop arises from operation of the 420 through 450 valves. The B slide on Unit 1 is capable of operating all valves simultaneously without too much problem. All other slides do not appear to be able to run all four valves (i.e., 420-450) without some opacity spiking.

The operator's main control on opacity is the starting and stopping of the 420-450 valves trying to avoid opacity spikes while keeping the high levels down in all hoppers.

We replaced all 430 valves on unit 1 with new valves on Monday. The jury is still out, but I do not note any real improvement in opacity.

I saw a real live blow back on unit 1 440C airlock valve. We found it because the delta pressure on that slide was spiking negative. The top flapper was stuck open. Interestingly, there was no opacity spike. Perhaps the hopper was empty.

WARD-EMAIL-020673

Paul

-----Original Message-----
From: karl.hognefelt@power.alstom.com [mailto:karl.hognefelt@power.alstom.com]
Sent: Wednesday, October 08, 2003 12:37 PM
To: Paul Stinson
Cc: thomas.l.wardell@power.alstom.com; william.m.jarvis@power.alstom.com
Subject: RE: ESP CDS air slides

Paul
Comments to your temperature measurement for the air slides at Unit 1 ESP.
In general the temperatures look very low.
Temperatures below dew point temp is not good for the process.
Temperatures below 120°F will increase risk for corrosion and make the
"high chloride" ash VERY sticky and difficult to fluidize.
Are the heaters for the fluid air working? The temperature on the fluid
air is supposed to be 170°F.
Are the inspection doors on the air slide leaking, so ambient air is
cooling down the ash?
Are all parts of the ash system insulated? I saw that some areas around
the double damp valves and some other sections were missing insulation
when I was on site. This insulation need to be re-installed to reduce
cooling of the ash.
Cooling down the ash will make it very sticky with high chloride content
and also increase the risk for clogging the fluid cloth.
Have you been able to check the fluid air flow to different sections of the
air slides?

Best regards/ Karl


CONFIDENTIALITY : This e-mail and any attachments are confidential and
may be privileged. If you are not a named recipient, please notify the
sender immediately and do not disclose the contents to another person, use
it for any purpose or store or copy the information in any medium.

This email has been scanned for all viruses by the MessageLabs service.

This email has
been scanned for all viruses by the MessageLabs service. - Ash loadings.xls

WARD-EMAIL-020674

# TAB
# 26

| | |
|---|---|
| **From:** | Titus, Joe <JTitus@eec1.com> |
| **Sent:** | Monday, April 14, 2003 5:20 PM |
| **To:** | John C. Packard/USWIN01/Power/ALSTOM@GA |
| **Cc:** | Linda P. Rothe/USWIN01/Power/ALSTOM@GA; Thomas L. Wardell/USWIN01/Power/ALSTOM@GA; William M Jarvis/USWIN01/Power/ALSTOM@GA; VanHooser, Bill <wbvanhooser@eec1.com>; Kimberl, Rob <rbkimberl@eec1.com>; 'ron.mcparland@aes.com' <ron.mcparland@aes.com>; 'larry_copeland% FluorCorp@d-fd.com' <larry_copeland%FluorCorp@d-fd.com> |
| **Subject:** | RE: AES-Puerto Rico |

John,

Based our recent discussions that you had with our President John Sams and I; I see an opportunity for Alstom and EEC to reach an acceptable conclusion to the AES-Puerto Rico project. It appears from the below email that there is confidence that reducing air leakage through the rotary valves will allow successful testing to be completed for the EPA.

Incorporating that belief with EEC's commitment to pay for the "fix", we would like to propose the following to bring final closure to this contract.

1. The EPA test will be performed with the rotary valves isolated and if particulate passes, Alstom will make final contract retention payment to EEC w/o LOC issuance. The contract will then be closed in the following manner under a settlement agreement signed by both parties in advance:
a. Both parties drop any and all claims, counter-claims, liquidated damages, backcharges, etc., past, present or future, and close the contract
b. EEC will agree to pay for a specific fix of the rotary valves as per AES or Alstom specifications, for a total cost not to exceed $100,000 USD.
c. EEC's mechanical warranty will be assigned to AES and run one-year from 11/9/02.
d. EEC's corrosion warranty is void due to lack of timely and/or adequate insulation and lagging.
e. Punchlist is considered closed. EEC will address items directly to AES.
2. Passing the EPA test and supporting the cost for the rotary valve "fix" would constitute 100% complete and Final Acceptance (the current contract is closed and completely satisfied).

John, we look forward to working with you to bring a positive closure to this project.

Sincerely,

Joe Titus - EEC

WARD-EMAIL-0,05442

-----Original Message-----
From: william.m.jarvis@power.alstom.com
[mailto:william.m.jarvis@power.alstom.com]
Sent: Friday, April 11, 2003 8:28 AM
To: VanHooser, Bill; Titus, Joe; Lockwood, Sherri; Kimberl, Rob
Cc: linda.p.rothe@power.alstom.com; thomas.l.wardell@power.alstom.com
Subject:

Bill,

This correspondence is further to my email of 4/9/03 to Rob Kimberl.

As discussed with you yesterday afternoon, the results from the PM testing
on Unit 2 on Tuesday 4/8/03 show that the PM emissions were approximately
1/2 the guaranteed value. The rotary air locks clearly have a significant
negative effect on the emissions.

Since the test was conducted with the rotary air locks isolated and since
this is not a normal operating condition, AES needs assurance that EEC will
correct the leakage through the air locks before they will allow the EPA
testing to proceed.

We once again request your urgent confirmation that EEC will rectify this,
and request that you provide your plan and  time schedule for implementing
the solution.

Regards,
Bill

CONFIDENTIALITY : This e-mail and any attachments are confidential and may
be privileged. If you are not a named recipient, please notify the sender
immediately and do not disclose the contents to another person, use it for
any purpose or store or copy the information in any medium.

WARD-EMAIL-005443

# TAB 27

| From: | Mike.Norris@d-fd.com |
|---|---|
| **Sent:** | Monday, May 26, 2003 11:16 AM |
| **To:** | ron.mcparland@aes.com |
| **Cc:** | Larry.Copeland@Fluor.com |
| **Bcc:** | William M Jarvis |
| **Subject:** | Response to AES-DFD-157 |

Ron, Per our discussion, the following is provided in response to the above referenced letter on ESP/CDS issues.

Alstom has addressed your concerns and with the results forwarded to you via previous e-mail on diagnostic testing results, it is antcipated that AES will notify the EPA for final PM testing on Unit 2. It would be desireable if we can schedule the test for Thursday, May 29 pending EPA availability.

Please let me know at your earliest convience of AES' decision to move forward with EPA notification or if you have any additional concerns.

Thanks,
Mike


As you know, Environmental Elements Co. has not diligently pursued solutions to the ESP performance deficiencies and further has notified that it will no longer honor their contractual obligations. This has complicated and delayed the resolution of the deficiencies, nevertheless ALSTOM remains committed to rectifying the open issues.

Diagnostic testing has indeed indicated that leakage through the ESP hopper rotary air lock valves has a negative effect on the performance of the ESP. In fact it was determined that when the valves in the last two rows of hoppers are isolated, the emissions are approximately 1/4 of the permitted value. Investigations by our engineers determined that the most significant portion of the leakage is the so called "displaced loss" which refers to the amount of air carried in the pockets of the rotors. It was concluded that the leakage through the valves can best be reduced by slowing down the rotor rotation speed.

As of this date, 4 rotors in air locks have been replaced in the last row of the ESP hoppers along with the installation of Variable Frequency Drives to the rotary valves to slow the rotation speed in the last two rows of hoppers. As the results of diagnostic testing performed last week indicate passing results, this confirms the results of the testing previously performed in April, wherein leakage through the rotary air locks was shown to adversely effect opacity.

These modifications will also be performed on Unit 1.

In addition to this, we recommend that AES check the dew point daily in accordance with EEC instructions and insure that the CDS outlet temperature be maintained in accordance with the EEC operating parameters.

We are currently upgrading the diverter valves on unit 1 to address the increased wear on these valves.

We agree that the CDS/ESP should  ramp from 50% to 100% load without exceeding the permitted opacity limits and that the system should operate in stable condition within these ranges, however we are not certain that this can be achieved without injection of ash at lower loads.

A procedure will be developed by Alstom working with your operations group to allow the sytem to work in automatic. This will be incorporated into the DCS by D/FD and all temporary logic associated with the rotary vales will be removed.

In response to item 7 in AES' letter, should AES desire we will install the baffles designed by EEC in Unit 2 ESP at the next available opportunity. These baffles are installed in Unit 1. We will take advantage of the outage on Unit 1 to further investigate the gas side conditions of the ESP in an effort to address the issues raised by AES.

Alstom's electrical consultant is currently on site to investigate the cause of the electrical failures on the TR controllers.

JARV-EMAIL-033792

# TAB
# 28

| From: | Al Dyer <Al.Dyer@AES.com> |
|---|---|
| Sent: | Monday, June 28, 2004 3:57 PM |
| To: | William M Jarvis/USWIN01/Power/ALSTOM@GA |
| Cc: | Ed Bulewich/USWIN01/Power/ALSTOM@GA; Williams, Daniel <DDWilliams@wc.com> |
| Subject: | RE: AES/PR: ESP Collector Plate Corrosion |

Bill,

I appreciate the update with respect to your supplier EEC, howeveras you are very much awarethe "ESP"equipmentwarranty is between AES and Alstom.

AsIpreviously agreedwith you,AES will proceed with our next steps as of the end of June in the eventAlstom fails toreimburse AES for its significant costs associated with ESPcorrosion.

Regards

Al Dyer

Al Dyer

Puerto Rico

(787) 866 8117 x 233

CONFIDENTIALITY: This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium. Without Prejudice.

-----Original Message-----
From: william.m.jarvis@power.alstom.com
[mailto:william.m.jarvis@power.alstom.com]
Sent: Monday, June 28, 2004 1:12 PM
To: Al Dyer
Cc: ed.bulewich@power.alstom.com
Subject: AES/PR: ESP Collector Plate Corrosion

Dear Al,

EEC has promised to send me a letter regarding the ESP Collector Plate

JARV-EMAIL-064862

Corrosion by the end of this week.  Once received, I will forward onto to

you.

Regards,

Bill

CONFIDENTIALITY : This e-mail and any attachments are confidential and may

be privileged. If you are not a named recipient, please notify the sender

immediately and do not disclose the contents to another person, use it for

any purpose or store or copy the information in any medium.

---

This email has been scanned for all viruses by the MessageLabs service.

---

This communication is for use by the intended recipient and contains
information that may be privileged, confidential or copyrighted under law.  If
you are not the intended recipient, you are hereby formally notified that any
use, copying or distribution of this e-Mail, in whole or in part, is strictly
prohibited. Please notify the sender by return e-Mail and delete this e-Mail
from your system.  Unless explicitly and conspicuously stated in the subject
matter of the above e-Mail, this e-Mail does not constitute a contract offer, a
contract amendment, or an acceptance of a contract offer.  This e-Mail does not
constitute consent to the use of sender's contact information for direct
marketing purposes or for transfers of data to third parties.

This email has been scanned for all viruses by the MessageLabs service.

JARV-EMAIL-064863