IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AES PUERTO RICO, L.P., <br><br> Plaintiff, <br> v. <br><br> ALSTOM POWER, INC., <br><br> Defendant. | Civ. No. 04-1282-JJF |

## PLAINTIFF AES PUERTO RICO, L.P.'S OPPOSITION TO ALSTOM'S MOTION TO COMPEL "AESC.COM" E-MAIL

Defendant ALSTOM Power Inc. ("ALSTOM") has filed an eleventh-hour motion to compel production of irrelevant electronic documents knowing full well that it simply is not possible to restore the backup tapes on which the documents reside in a timeframe such that they could be used in this lawsuit. Eleven months ago AES Puerto Rico, L.P. ("AES-PR") informed ALSTOM that it had a set of backup tapes of its e-mail from an obsolete computer system that it had stopped using in mid-2002. Because the e-mail was created in an obsolete file format, the cost to restore the backup tapes is extraordinary – $70,000 to $150,000 – and the restoration work would take approximately 10 to 14 weeks. AES-PR also informed ALSTOM that the backup tapes are highly unlikely to contain relevant evidence since the documents on the backup tapes pre-date any of the relevant facts in dispute in this litigation. Nonetheless, AES-PR offered to ALSTOM that, should ALSTOM wish to have the tapes restored, AES-PR would do so subject to appropriate cost shifting. ALSTOM declined that proposal and instead waited until just before the close of fact discovery – when it would be too late to make use of the materials – to file its motion to compel. ALSTOM's motion should be denied.

## BACKGROUND

### A. Overview of Action.

This dispute concerns a warranty claim for a component of the pollution control equipment at AES-PR's coal-fired power plant in Puerto Rico. ALSTOM was the principal subcontractor for the construction of the plant. It built the plant's equipment under a "turn-key" contract pursuant to which ALSTOM was responsible for delivering the equipment "up and running" to AES-PR after constructing it and engaging in a months-long commissioning process (in which ALSTOM was responsible for fine-tuning the equipment and training AES-PR in the equipment's use). AES-PR took control of the plant on November 29, 2002.

A year after AES-PR began operating the plant, in November 2003, AES-PR discovered massive corrosion in the pollution control equipment ALSTOM had supplied, and it submitted a claim under ALSTOM's corrosion warranty to repair the damage and arrest further corrosion. In response, ALSTOM sought to require its own subcontractor, Environmental Elements Corp. ("EEC"), to honor the claim in ALSTOM's place on the basis of a parallel warranty in ALSTOM's contract with EEC. EEC, however, rejected ALSTOM's demand. When ALSTOM then refused to pay AES-PR, AES-PR filed this lawsuit. ALSTOM responded to the lawsuit by abandoning its theory that EEC was responsible for the warranty claim and instead arguing that alleged operator error during the first year of operation of the plant voided ALSTOM's warranty obligations.

### B. ALSTOM's Document Requests.

ALSTOM's First Requests for Production of Documents contained no date-range limitation and requested that AES-PR search all "backup tapes or similar archival material." *See* Mot. Tab 1 at 7. AES-PR timely responded and objected to these requests on April 27, 2005. *See* Opp. Tab A. In its responses and objections, AES-PR objected "to each request to the extent

that it fails to limit the date range of its request. AES P.R. agrees to produce documents generated after November 28, 2002, the date AES P.R. began operating the plant." *Id.* at ¶ 6. With respect to backup tapes, AES-PR objected to searching such tapes because doing so would be "extremely costly," and "the burden" on AES-PR "outweighs all possible benefits to ALSTOM." *Id.* at ¶ 9.

### C.    ALSTOM's Demands To Restore Obsolete Backup Tapes.

When AES-PR submitted its objections to ALSTOM's document requests in April 2005, ALSTOM already knew of the existence of backup tapes of certain e-mails containing the "aesc.com" extension, which are from an obsolete e-mail system named "First Class" that was replaced with the Microsoft "Outlook" system four years ago. ALSTOM knew this because, in December 2004, it had subpoenaed electronic documents from AES-PR in unrelated litigation in which AES-PR was a non-party and, as part of AES-PR and ALSTOM's discussions about that subpoena, in April 2005, AES-PR wrote to ALSTOM to explain that the cost to restore the backup tapes was estimated to be "in the hundreds of thousands of dollars." *See* Opp. Tab B (Williams Decl. ¶ 2). With the benefit of that knowledge, in December 2005, some eight months after AES-PR objected to producing such documents in this litigation, ALSTOM's counsel asked AES-PR's counsel to restore the backup tapes, notwithstanding that they were created in 2001, well before the events at issue in this litigation. *Id.* ¶ 4. Counsel for AES-PR replied that the tapes were unlikely to contain responsive documents and that, in light of the extraordinary costs involved in restoring them, AES-PR would do so only if ALSTOM paid for the restoration. *Id.* ALSTOM declined to do so. *Id.*

ALSTOM waited over a month until January 24, 2006 to raise the issue again, this time taking the position that AES-PR had not adequately justified its claim that the costs to

3

restore the backup tapes are extraordinary. *Id.* ¶ 5. When the parties met and conferred concerning ALSTOM's demand that the backup tapes be restored at AES-PR's expense, counsel for AES-PR explained that "it would be difficult to retrieve" the information on the backup tapes and that he had previously given the specific cost information to ALSTOM's counsel when the issue arose in the unrelated suit. Mot. Tab 20 at 2-3. On February 9, 2006, ALSTOM's counsel wrote to counsel for AES-PR to say that ALSTOM wanted still more information about the cost and burden of restoring the backup tapes. Counsel for AES-PR responded promptly by letter dated February 15, 2006, explaining that restoration and retrieval of the documents on the backup tapes, for even half-a-dozen individuals, would take several months and cost from $75,000 to $200,000. *See* Mot. Tab 21.

The parties met and conferred about AES-PR's February 15, 2006 letter later that day. AES-PR's counsel explained that it was working with the industry leader in electronic discovery, Kroll-Ontrack, and that Kroll-Ontrack had advised that, in light of the obsolescence of the First Class e-mail system, there was no way to expedite the restoration and retrieval of the information from the backup tapes. *See* Opp. Tab B (Williams Decl. ¶ 8). When ALSTOM's counsel responded that he believed his technical consultant would testify that the process should not take so long, AES-PR's counsel said that if ALSTOM's vendor could restore the tapes more quickly, ALSTOM should tell AES-PR who its vendor was so that AES-PR could consider using it. *Id.*

ALSTOM never provided AES-PR with the identity of its vendor. Instead, it waited another week until February 22, 2006, on the eve of the fact discovery cut-off, and filed its motion to compel. Its motion contains no mention whatsoever of Kroll-Ontrack's estimate for

4

the time it will take to restore the backup tapes, nor does it contain a letter or affidavit from any vendor saying the tapes can be restored more quickly or more cheaply.

## ARGUMENT

### I. IT WOULD TAKE TWO TO THREE MONTHS TO PRODUCE THE DOCUMENTS ALSTOM DEMANDS.

Kroll-Ontrack, the world's leading data recovery company and the company with physical possession of the First Class backup tapes, estimates that it will take approximately 10 to 14 weeks to restore, retrieve, and produce the documents ALSTOM seeks. *See* Opp. Tab C (Mulienberg Aff. ¶¶ 2, 8f) (49 to 79 business days needed). As trial in this matter is scheduled for May 22, 2006, just over two months from now, it is not possible for these documents to be used in this litigation.

In his affidavit, Jon P. Muilenburg of Kroll-Ontrack explains that, on December 8, 2001, for unrelated litigation, Kroll-Ontrack created a number of backup tapes of the e-mail servers for The AES Corporation ("AES"). *Id.* ¶ 4. AES-PR's e-mails were stored on these servers. Kroll-Ontrack's affidavit explains that the first step in processing the documents on the backup tapes is to restore the data on them. That process alone will take 5 to 8 weeks. *Id.* ¶ 8a. This amount of time is required because it requires significant manual intervention to convert data from the antiquated First Class e-mail system into a modern format in which the information ALSTOM insists on receiving is accessible. *Id.* ¶ 8a-c, g. The total time to restore the backup tapes and make the electronic documents available for production is estimated to be approximately 10 to 14 weeks. *Id.* ¶ 8f. Kroll-Ontrack explains that "[e]xpedited processing is not available for this data set, due to the intense manual effort required." *Id.* ¶ 8g.

Because it will take 10 to 14 weeks to restore and produce the documents ALSTOM seeks, there is no way they can used in this litigation. This Court set March 10, 2006

as the fact-discovery cut-off date, March 24, 2006 as the deadline for case dispositive motions, May 4, 2006 for the pre-trial conference, and May 22, 2006 for trial. Accordingly, it simply will not be possible to produce the documents ALSTOM seeks in a timeframe that allows them to be used in this litigation.

That ALSTOM waited until just before the close of fact discovery to raise this issue suggests that ALSTOM is demanding that AES-PR go to the time and expense to produce these documents for a purpose other than discovery needed to litigate this case. ALSTOM knew about the existence of these backup tapes in April 2005, and AES-PR specifically objected to the production of them when it responded to ALSTOM's document requests that same month. *See* Opp. Tab B (Williams Decl. ¶ 2); Opp. Tab A at ¶¶ 6, 9. In December 2005, ALSTOM raised the issue, but then declined to agree to cost shifting to start the process of restoring the backup tapes. *See* Opp. Tab B (Williams Decl. ¶ 4). It waited another month to raise the issue again, and until February 22, 2006 to file its motion to compel. If the documents on these backup tapes truly were significant for this litigation, ALSTOM would have raised the issue at the Court-ordered discovery hearing in this matter on December 7, 2005. It did not do so. ALSTOM's eleventh-hour demand should be denied because even to begin the process of restoring thebackup tapes now would be a costly yet pointless exercise.[1]

---

[1] Claiming that deposition testimony on the burden to restore the backup tapes was inadequate, ALSTOM argues that AES-PR failed to provide it with sufficient proof concerning the feasibility and cost of doing so. *See* Mot. 8-9, 11. But ALSTOM neglects to mention that, prior to the deposition of AES-PR on this subject, counsel for AES-PR had explained to ALSTOM's counsel that AES-PR's e-mails reside on servers of the ultimate parent company of AES-PR, The AES Corporation. ALSTOM's motion also neglects to mention that, before ALSTOM filed its motion, the parties had already agreed that AES-PR would make a representative of The AES Corporation available for deposition on this very topic on March 3, 2006. In any event, the Affidavit attached at Tab C completely fulfills AES-PR's obligation to show the cost and infeasibility of ALSTOM's demands.

## II.  THE DOCUMENTS ALSTOM SEEKS ARE NOT RELEVANT TO ANY FACT IN DISPUTE.

Not only does ALSTOM request information that cannot be made available during the pendency of this action, but the information ALSTOM demands is not relevant to any disputed facts in this litigation.  While ALSTOM notes repeatedly that the "design, construction, and operation of the power plant that is at issue in this case spanned more than a decade," *e.g.* Mot. at 1, it acknowledges that its defense in this case relates to a much more narrow issue – that AES-PR allegedly "failed to operate and maintain the [equipment] in accordance with the Operation and Maintenance manuals" and specified operating criteria for the Plant, Mot. at 2. AES-PR took control of the facility on November 29, 2002, and first submitted its warranty claim almost a year later in November 2003.  As the First Class e-mail system was replaced in mid-2002, there is no logical reason why documents created on that system would be relevant to significant issues in dispute in this lawsuit, which turns on how AES-PR operated the plant from November 2002 forward.

In an attempt to convince the Court otherwise, ALSTOM highlights selected documents from 2000 and early 2001 that were created while the plant was being designed.  *See* Mot. at 3-6.  But this lawsuit does not involve the question whether AES-PR or anyone else appreciated a risk of corrosion of the pollution control equipment before the plant was operational.  That the parties appreciated the risk of corrosion is precisely why the contract on which AES-PR sues contains an extended two-year warranty "against the consequences of accelerated corrosion" even though the base warranty for the equipment extended for only one year.  *See* Mot. Tab 3 §§ 1.2.1; 1.6.  What the parties dispute here is whether, after AES-PR took control of the facility on November 29, 2002, AES-PR operated the equipment in a manner that somehow voided the warranty.  ALSTOM believes it can escape liability by arguing that AES-

PR should have disregarded the specific instructions of ALSTOM's own employees and sub-contractors during commissioning of the equipment and instead followed previously-issued written instructions (that ALSTOM witnesses have testified were obsolete). AES-PR argues that ALSTOM's interpretation of the contract is wrong and also absurd in that it would mean that AES-PR was required to operate the plant with procedures that all agree did not work. AES-PR further argues that it adhered to all relevant operating and maintenance requirements. Whichever party is correct on those questions, there can be no serious dispute that the relevant facts are the events that occurred *after* start-up of the equipment, because the key factual issue is whether AES-PR's operation of the facility somehow voided the warranty. Because ALSTOM first started the pollution-control equipment at the end of July 2002, and because ALSTOM did not turn the plant over to AES-PR for AES-PR to operate until November 29, 2002, the back-up tapes that are the subject of ALSTOM's motion to compel could not possibly contain documents relevant to the issues in dispute in this litigation.[2]

### III. ALSTOM WOULD BE RESPONSIBLE TO BEAR THE COST TO RESTORE THE BACKUP TAPES.

Even if it were possible for AES-PR to produce the electronic documents on the backup tapes during the pendency of this litigation, ALSTOM would bear responsibility to pay the extraordinary costs involved in making the documents it demands available. This Court's Default Standard for Discovery of Electronic Documents provides that "the court will apportion the costs of electronic discovery upon a showing of good cause." Default Standard ¶ 9. It

---

[2] ALSTOM inappropriately peppers its Motion To Compel with arguments as to the merits of the case, perhaps in an attempt to preview for the Court its forthcoming summary judgment arguments. AES-PR will address ALSTOM's merits arguments in detail at summary judgment, but notes here that it categorically disagrees with many of ALSTOM's unsubstantiated factual assertions in its Motion. *See, e.g.* Mot. at 3 (claiming wrongly that "none of [the operating instructions for the equipment] were adhered to by AES").

further provides that, for documents of "limited accessibility," which includes "electronic media no longer in use," inspection of such documents need not occur <u>at all</u> unless there is "some basis in fact supporting the request," and even then, the search must be "narrowly tailored." *Id.* ¶¶ 2, 4. Thus, even if the backup tapes were expected to contain significant information, this Court's Default Standard counsels against requiring inspection of them in light of the costs of doing so. Where, as here, they are not expected to contain important information, and the cost of searching the backup tapes is extraordinary, good cause exists to tax those costs to the party insisting that the obsolete backup tapes be restored.

    Kroll-Ontrack estimates that the cost to comply with ALSTOM's request is approximately $71,000 to $146,000. Opp. Tab C (Muilenburg Aff. ¶ 8f and Ex. A). When confronted with such extraordinary costs, cost shifting is appropriate. Indeed, in *Roe Entertainment, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421, 430-33 (S.D. N.Y. 2002), cited approvingly by ALSTOM in its motion, the Court awarded cost shifting for the cost to restore backup tapes and produce electronic documents when the costs were expected to range from $10,000 to $84,000 and material on the backup tapes, while relevant, was not "likely to be a gold mine" of important documents. *Accord, e.g.*, *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 570, 577 (N.D. Ill. 2004) (allocating 75% of estimated $249,000 cost to restore backup tapes and produce electronic documents to the party requesting the production). Not only does shifting the costs appropriately allocate the burden of extraordinary litigation expenses, but it ensures that the requesting party is seeking information it truly needs by requiring it to demonstrate with its own money that it believes the discovery is necessary. It is particularly telling here that ALSTOM refuses to pay anything at all for the restoration and retrieval of the documents on the "limited accessibility" media it has demanded be searched.

## CONCLUSION

The time for fact discovery has now passed. ALSTOM's attempt to prolong discovery after the Court's March 10, 2006 cut-off is an unacceptable delay tactic that this Court should not countenance, particularly when ALSTOM has been on notice of the cost to restore the electronic data it seeks for nearly a year and when the documents have little if any relevance to the facts in dispute in this litigation. AES-PR respectfully requests that ALSTOM's motion to compel be denied, and that AES-PR be awarded its costs and fees to oppose the motion.

                                      Respectfully submitted,

OF COUNSEL:
Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: March 10, 2006

/s/ John S. Spadaro
John S. Spadaro (Bar No. 3155)
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

Attorneys for AES Puerto Rico, L.P.

## CERTIFICATE OF SERVICE

On March 10, 2006, Plaintiff served Plaintiff AES Puerto Rico, L.P.'s Opposition to ALSTOM's Motion To Compel "aesc.com" E-Mail by hand delivery, on:

>Richard R. Weir, Esq.
>Daniel W. Scialpi, Esq.
>Two Mill Road, Suite 200
>Wilmington, Delaware 19806

and by e-mail and first class mail, postage prepaid, on:

>James E. Edwards, Esq.
>Anthony Vittoria, Esq.
>Ober, Kaler, Grimes & Shriver
>120 East Baltimore Street
>Baltimore, Maryland 21202-1643


/s/ John S. Spadaro