# TAB
# 1

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF DELAWARE

 3    ------------------------------------X

 4    AES PUERTO RICO, L.P.,

 5              Plaintiff            :    ORIGINAL

 6         v.                        :    Case No.:

 7    ALSTOM POWER, INC.,            :    04-1282-JJF

 8              Defendant            :

 9    ------------------------------------X

10

11            Deposition of LUIS CANEPARI

12              Washington, D.C.

13            Friday, March 3, 2006

14                 1:35 p.m.

15    Job No.:  1-74202

16    Pages 1 - 97

17    Reported by:  Lynn Schindler

18

19

20

21

22
```



**L.A.D.**
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

55

 1   objection, please?  Please read back his objection.

 2          MR. WILLIAMS:  I'd like you to clarify for

 3   the record what the question is here.

 4          (The objection was read by the court

 5   reporter.)

 6   BY MR. VITTORIA:

 7      Q    Do you know the steps that would need to be

 8   taken to retrieve the AES Puerto Rico AESC.com e-mail?

 9          MR. WILLIAMS:  Objection to form.

10      A    The steps required to restore any backup of

11   an obsolete system is to recreate the infrastructure

12   what was previously in place and restore the backup

13   media.

14   BY MR. VITTORIA:

15      Q    Do you know where Kroll is located?

16      A    I don't know.

17      Q    Does AES Corporation have the infrastructure

18   for the AESC.com e-mail?

19          MR. WILLIAMS:  Objection to form.

20      A    AES Corporation does not have that

21   infrastructure anymore.

22   BY MR. VITTORIA:

56

1     Q     So AES Corporation has no way other than

2   these steps that you just mentioned to retrieve

3   AESC.com e-mail?

4           MR. WILLIAMS:    Objection to form.

5   Mischaracterizes the testimony.

6     A     AES Corporation has no infrastructure to

7   recreate that obsolete e-mail system.

8   BY MR. VITTORIA:

9     Q     How long did AES Corporation use the

10  AESC.com e-mail system?

11    A     I don't know.  It was long before my time at

12  AES.

13    Q     Do you know what the costs would be to

14  retrieve AES Puerto Rico e-mail from the AESC.com

15  backup media?

16    A     I don't know.

17    Q     Do you know how long it would take?

18    A     I don't know.

19          MR. WILLIAMS:    I'll note for the record we

20  provided that information to counsel and will be

21  providing it directly from Kroll to counsel.

22  BY MR. VITTORIA:

# TAB
# 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER, INC., | * | |
| Defendant. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## AFFIDAVIT OF MOLLIE NICHOLS

PURSUANT TO the terms and provisions of 28 U.S.C. § 1746(2), the undersigned makes oath in due form of law as follows:

1.    I, MOLLIE NICHOLS, am over 18 years of age and am competent to testify as a witness. I am a Senior Vice President and Counsel at First Advantage of Chantilly, Virginia. First Advantage is a sophisticated multi-disciplinary firm specializing in electronic discovery consulting, electronic discovery processing, computer forensic investigation and data recovery.

2.    In my position at First Advantage, I advise attorneys on issues involving electronic evidence and spoliation. I have two decades of experience in civil and criminal litigation, as a litigator, a law professor, and an educator of judges and lawyers. I currently teach Digital Discovery and Evidence at William & Mary Law School in Williamsburg, Virginia.

3.    First Advantage has been retained as a computer forensic expert/consultant by ALSTOM Power Inc. in the above captioned litigation with AES Puerto Rico, L.P.

4.    I have reviewed the affidavit of Jon Muilenburg (the "Muilenburg Affidavit") in support of Plaintiff's Opposition to Motion to Compel Production of "AESC.COM" E-mail.

Furthermore, I am familiar with good practices necessary to preserve, index, maintain, and retrieve electronic data.

5.    In paragraph 4 of the Muilenburg Affidavit, Mr. Muilenburg explains the process by which Kroll Ontrack, the electronic discovery consultant for AES, took an electronic "snapshot" of "certain electronic data then located on AES' email and electronic file servers." In short, an electronic snapshot is essentially a method of preserving all of the data on a server at a given point in time. According to the Muilenburg Affidavit, Kroll Ontrack collected the data on the servers on back-up tapes in 2001. Muilenburg presents this information, not as someone with personal knowledge who was involved with the collection of the data, since he did not begin his employment with Kroll Ontrack until 2003, but as a representative of Kroll Ontrack who is relying on documentation kept by Kroll Ontrack concerning this collection.

6.    When an electronic discovery service provider is hired to collect and preserve data, many documents are generated, including a statement of work, an estimate of the cost, examination forms, and chain of custody forms. None of that documentation from 2001 was attached to Muilenburg's affidavit or provided to me at any other time. When a server is backed up on tape, it is normal practice to create a log documenting when and where the data was collected and onto what specific media to which it was saved during the data collection. The tape is then labeled to correspond with the log, creating the most efficient way to locate data when it is necessary to restore a specific file, especially when distinguishing between the restoration of a tape from an email server and a tape from a file server. Even if the exact data that exists on the server is not known, the tapes that are associated with each server should have been labeled to indicate which server's data the tape contains.

7.    If, in fact, Kroll Ontrack failed to organize the tapes as outlined above, it will be necessary to restore all of the back-up tapes. If a proper log existed, only the tapes containing First Class and Exchange/Outlook email would need to be restored.[1] Therefore, Kroll Ontrack's failure to keep an accurate log presents the largest obstacle to efficiently restoring the data at issue to a useable format thereby substantially increasing the time and cost to restore the data.

8.    Assuming that all 50 tapes[2] now need to be restored as a result of the failure to properly log or organize the back-up tapes in any meaningful way, and that the time estimates to restore each tape are correct (4-6 hours per tape), the Muelinburg Affidavit states that it would take 25-40 business days to restore the tapes. In order to account for the high number of days estimated to restore the tapes, the Muelinburg Affidavit had to presume that only one tape would be restored at a time, and tapes would only be restored 40 hours per week. In my experience, electronic discovery service providers can restore multiple tapes simultaneously, and can run the machines 24 hours a day, 7 days a week, if necessary.   Accordingly, the statement in the Muelinburg Affidavit that it would take 25-40 days to complete appears misleading and fails to account for the resources available to a large electronic discovery service provider, such as Kroll Ontrack.

---

[1] Muilenburg's affidavit states that Exchange email server data exists on the tapes collected in 2001, although Plaintiff's Opposition states that Microsoft Outlook did not replace First Class email until "four years ago," which would be 2002.

[2] It is unclear from Exhibit A of the Muelinburg Affidavit how many back-up tapes exist as it reflects "-" tapes but "25-50" images (usually reserved for the number of forensic images taken of computer hard drives). For purposes of this Affidavit, I have conservatively assumed the existence of 50 back-up tapes.

9.    Once the restoration takes place, processing the First Class email would require a conversion[3] to a compatible file format for filtering and review. When a company transitions to new software or hardware configurations, the legacy data may or may not be converted or imported into the new application. Email is normally migrated to the new system. If there was migration of data from First Class email to Outlook, a tool should exist to accomplish the conversion. If a readily available conversion tool does not exist[4], and the affiant's time estimates for manual conversion are accurate (60-108 hours), then most electronic service providers would complete the conversion much quicker than 12-24 business days estimated in paragraph 8.b of the Muelinburg Affidavit.

10.    Once the data is converted and filtered, search terms would be used to narrow the data set to be reviewed. Once the data set is reduced, the data could be converted to a TIFF format. Kroll Ontrack estimates that, based on "historical averages", 12 custodians would generate 360,000 to 840,000 pages. Based upon my experience, it is difficult to estimate the number of pages; further, historical averages are not an accurate means to quantify the number of pages for a specific job. With proper filtering, the quantity of pages could be dramatically less than estimated by Kroll Ontrack.

11.    Based upon the information provided in the Muelinburg Affidavit, it is apparent that much of time and cost referred to in the Muelinburg Affidavit is needed to correct problems associated with its own failure to collect, log, organize, maintain, and retrieve the electronic data it collected in 2001.

---

[3] Muilenburg states that First Class email is not a commonly used email system; however, with the resources that are available through Kroll Ontrack, the world's largest data recovery and electronic discovery company, I find it unusual that alternative means of preservation were not implemented in a system that could be difficult to restore.

[4] A native review could also be done, which would eliminate the need for conversion.

12.     Furthermore, it is apparent that the time and cost estimates provided by Kroll Ontrack are unnecessarily conservative and fail to account for the resources available to a large electronic discovery service provider.


I declare under penalty of perjury that the foregoing is true and correct. Executed on March 16, 2006.

Mollie C. Nichols
Senior Vice President and Counsel
First Advantage

# TAB
# 3

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 04-1282-JJF |
| | ) | |
| ALSTOM POWER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO ALSTOM
## POWER, INC.'S SECOND SET OF INTERROGATORIES

Plaintiff AES Puerto Rico L.P. ("AES-PR") objects and responds to Defendant ALSTOM Power, Inc.'s ("ALSTOM's") second set of interrogatories as follows:

### GENERAL OBJECTIONS

The following general objections are incorporated in, and serve as additions to, each of AES-PR's responses and objections to each of ALSTOM's specific interrogatories.

A.  AES-PR objects to ALSTOM's interrogatories to the extent that they call for information protected by the attorney-client privilege, the attorney work product doctrine, or other applicable statutory or common law privileges or immunities. To the extent that any interrogatory may be construed as seeking the disclosure of information subject to these privileges or immunities, AES-PR invokes the same.

B. AES-PR objects to ALSTOM's interrogatories to the extent that they seek confidential or proprietary information of third parties as to which AES-PR has entered into agreements to protect the confidentiality of such information.

C. AES-PR objects to Definition (A) to the extent that it purports to impose on AES-PR any obligations greater than those imposed by the Federal Rules of Civil Procedure and the rules and orders of the Court.

D. AES-PR objects to Definition (D) to the extent that it calls for information from contractors or agents of AES-PR that is not properly imputed to AES-PR. AES-PR further objects to the definition to the extent that it defines "AES" to include "AES related entities." AES-PR is answering solely on behalf of itself.

E. AES-PR objects to Definition (K)[1] as overbroad and unduly burdensome. AES-PR is providing in these responses information sufficient "to identify" persons and things as that term is reasonably understood. AES-PR further objects to the definition regarding identification of persons because it presupposes that each person to be identified could be compelled to be a witness in Court.

---

[1] ALSTOM's Second Set of Interrogatories contains two Definitions titled Definition (K). *Compare* p. 2 *with* p. 3. This Objection relates to the Definition (K) on page 3.

2

F.  AES-PR objects to Definition (L)[2] to the extent that its use of the term "writing" or "document" exceeds the definition set forth in the Fed. R. Civ. P. 34.

G.  These interrogatory responses and objections are not intended to be, and shall not be construed as, an agreement or concurrence by AES-PR with ALSTOM's characterization of any facts, circumstances, or legal obligations.

H.  AES-PR objects to ALSTOM's interrogatories to the extent they attempt to impose requirements beyond those set forth in Fed. R. Civ. P. 33 or the rules or orders of the Court.

I.  These interrogatory responses reflect AES-PR's present knowledge based on inquiry to date.  Discovery in this matter is ongoing, and AES-PR expressly reserves the right to rely upon any additional information located or obtained in the future.

## RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

The following responses and objections are made subject to and without waiver of any of the general objections set forth above.

### INTERROGATORY NO. 15

If you contend that D/FD, ALSTOM or EEC amended, modified, supplemented, superceded, changed or altered the EEC O&M Manual Volume 1, whether orally or in writing, state in detail the basis for your contention, including in your answer whether the amendment, modification, supplementation, supercession, change, alteration was oral or written, and by whom it was issued.

---

[2] ALSTOM's Second Set of Interrogatories contains two Definitions titled Definition (L).  *Compare* p. 2 *with* p. 3.  This Objection relates to the Definition (L) on page 3.

RESPONSE:   AES-PR objects to this interrogatory as premature, particularly because ALSTOM has not yet completed its document production with respect to the documents AES-PR requested on March 7, 2005.  AES-PR may supplement its response once ALSTOM completes its document production, depositions have been completed, and AES-PR completes its factual investigation in this matter.  Subject to and without waiver of the foregoing specific objection and its general objections, AES-PR responds as follows:

In September or October 2002, EEC and/or ALSTOM presented revised operating procedures to AES-PR in the "EEC Control Room Reference" book.  They periodically updated those procedures in September and/or October 2002.  Those revised procedures supplemented and superceded the August 2001 EEC O&M Manual.  The instructions in the final EEC Control Room Reference Book, dated October 22, 2002, direct the Plant operator to set the CDS outlet temperature to 152 degrees.

In addition, in the fall of 2002, Bill Vanhooser, EEC, orally directed AES-PR personnel to operate the CDS at an outlet temperature of approximately 150 to 152 degrees and not to allow the temperature to drop below 145 degrees.  Other EEC and/or ALSTOM personnel may have provided similar instructions as well.  AES-PR is currently unaware of the total number of times EEC and/or ALSTOM gave it this oral instruction.

In addition, ALSTOM and EEC modified the August 2001 EEC O&M Manual procedures by directing commissioning personnel to operate the CDS at an

4

outlet temperature in the 150 to 152 degree range in the period before AES-PR

began commercial operation of the Plant on or about November 28, 2002.

INTERROGATORY NO. 16

If you contend that you were ever instructed to operate either CDS at the Plant with an outlet flue gas temperature of below 152 degree Fahrenheit, identify who gave you the instruction, set forth the substance of the instruction that was given, when and on how many occasions the instruction was given, and state whether the instruction was given orally or in writing on each such occasion.

RESPONSE: AES-PR objects to this interrogatory as premature,

particularly because ALSTOM has not yet completed its document production with

respect to the documents AES-PR requested on March 7, 2005. AES-PR may

supplement its response once ALSTOM completes its document production,

depositions have been completed, and AES-PR completes its factual investigation in

this matter. Subject to and without waiver of the foregoing specific objection and its

general objections, AES-PR incorporates its response to Interrogatory No. 15 as if

fully set forth herein.

INTERROGATORY NO. 17

If you contend that ALSTOM waived, or is otherwise estopped from relying upon, the conditions precedent to the ESP Corrosion Warranty that the system be operated and maintained "in accordance with Contractor's Operation and Maintenance Manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacities", state in detail the basis for your contention, including in your answer whether the bases of the alleged waiver or estoppel were oral or written representations, and the identity of the person or persons who made those representations.

RESPONSE: AES-PR objects to this interrogatory as premature,

particularly because ALSTOM has not yet completed its document production with

respect to the documents AES-PR requested on March 7, 2005. AES-PR may

supplement its response once ALSTOM completes its document production, depositions have been completed, and AES-PR completes its factual investigation in this matter. AES-PR further objects to this interrogatory to the extent that it characterizes AES-PR's obligations under the warranty. AES-PR further objects to this interrogatory to the extent that it calls for legal conclusions. AES-PR treats ALSTOM's request to set forth the "basis" of AES-PR's contention as meaning to set forth the "factual basis."

Subject to and without waiver of the foregoing specific objections and its general objections, AES-PR incorporates its response to Interrogatory No. 15 as if fully set forth herein. In addition, AES-PR states:

From at least May 2001 through January 2004, ALSTOM knew that the Plant was designed to operate, and would be operated, with high-chloride water with a chloride content of up to 4300 mg/l. It supervised the operation of the Plant with high-chloride water during and after commissioning of the Plant.

The Plant could not operate pursuant to the requirements of its air permit with the CDS outlet temperature set to 172 degrees or above when using the high-chloride water for which it was designed to operate. ALSTOM knew and was aware of that fact, and that is why it and/or its subcontractor directed AES-PR to set the CDS outlet temperature to approximately 150 to 152 degrees.

When ALSTOM and/or its subcontractor instructed AES-PR to operate the CDS at an outlet temperature of approximately 150 to 152 degrees in October 2002, ALSTOM knew that doing so created a risk of accelerated corrosion. From

6

October 2002 until November 2003, ALSTOM knew that the Plant was operating at a CDS outlet temperature of approximately 150 to 152 degrees and that doing so created a risk of accelerated corrosion. ALSTOM never instructed AES-PR to raise the outlet temperature to 172 to 176 degrees as provided in the August 2001 EEC O&M Manual, and it did not instruct AES-PR to cease using high chloride water for the CDS spray water.

In October and November 2002, ALSTOM demonstrated the Plant's performance during commissioning with the CDS operating at an outlet temperature of approximately 150 degrees. On information and belief, it did so in order to maximize the likelihood that the Plant would be able to comply with its air permit. Had ALSTOM run the Plant at a higher CDS outlet temperature using high chloride water, the Plant would have exceeded the opacity limit, and possibly other limits, specified in the permit.

As early as July 27, 2002, ALSTOM was advised by its subcontractor EEC that the CDS spray nozzles were likely to malfunction. ALSTOM independently determined that the spray nozzles EEC had installed were inadequate and/or defective, and complained to EEC concerning this defect in its "punch-list" of open issues submitted to EEC. ALSTOM did not advise AES-PR that it had installed defective and deficient spray nozzles.

The spray nozzle cleaning procedure recommended by EEC caused the Plant to experience unacceptable opacity spikes during the cleaning procedure.

7

INTERROGATORY NO. 18

If you contend that any of the alterations, modifications or additions made to the original design of the ESP after its installation at the Plant made in an effort to control the particulate emissions from the Plant caused, contributed, exacerbated or accelerated the corrosion discovered in the ESP, state in detail the basis for your contention.

RESPONSE: AES-PR objects to this interrogatory as premature,

particularly because ALSTOM has not yet completed its document production with

respect to the documents AES-PR requested on March 7, 2005. AES-PR may

supplement its response once ALSTOM completes its document production,

depositions have been completed, and AES-PR completes its factual investigation

with respect to ALSTOM's and its subcontractors' alterations, modifications, or

additions to the original design of the ESP.

/s/ John S. Spadaro
John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: November 28, 2005          Attorneys for AES Puerto Rico, L.P.

8

## VERIFICATION

I, Allan B. Dyer, declare under penalty of perjury that:

    1.    I am President of AES Puerto Rico, L.P.

    2.    I have read the foregoing Responses of AES Puerto Rico L.P. to

ALSTOM Power Inc.'s Second Set of Interrogatories and, to the best of my

knowledge, information and belief, they are true and accurate.

_November 21, 2005_
Date

Allan B. Dyer

9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AES PUERTO RICO, L.P.,<br><br>    Plaintiff,<br><br>  v.<br><br>ALSTOM POWER, INC.<br><br>    Defendant. | )<br>)<br>)<br>)<br>)  Civ. No. 04-1282-JJF<br>)<br>)<br>)<br>)<br>) |

### NOTICE OF SERVICE

On November 28, 2005, Plaintiff served Plaintiff's Responses to

ALSTOM Power, Inc.'s Second Set of Interrogatories, along with a copy of this

Notice of Service, by first class mail, postage prepaid, on:

> Richard R. Weir, Esq.
> Daniel W. Scialpi, Esq.
> 1220 Market Street, Suite 600
> Wilmington, Delaware 19801
>
> Anthony F. Vittoria, Esq.
> James E. Edwards, Esq.
> Ober, Kaler, Grimes & Shriver
> 120 East Baltimore Street
> Baltimore, Maryland 21202-1643
>
>   Respectfully submitted.
>
>
>   /s/ John S. Spadaro
>   John S. Spadaro
>   Bar No. 3155
>   MURPHY SPADARO & LANDON
>   1011 Centre Road, Suite 210
>   Wilmington, DE 19805
>   Tel. (302) 472-8100
>   Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: November 28, 2005          Attorneys for AES Puerto Rico, L.P.

# TAB
# 4

## SIGNATURE DOCUMENT

## CONTRACT NO. W419-44-C0001

THIS CONTRACT IS entered into, effective as of **February 24, 1998** by and between Duke/Fluor Daniel Caribbean S.E. (hereinafter referred to as "Duke/Fluor Daniel Caribbean S.E." or "DFDC")

whose address is:          Duke/Fluor Daniel Caribbean S.E.
P.O. Box 1011
Charlotte, NC  28201-1011

and Combustion Engineering, Inc. (hereinafter referred to as "Contractor" or "ABBCE"),                                                LICENSE NUMBER    TBD
whose address is:

ABB Combustion Engineering Systems
Combustion Engineering, Inc.
P.O. Box 500
2000 Day Hill Road
Windsor, CT  06095-0500

In consideration of the agreements herein contained, the parties hereto contract and agree as follows:

### ARTICLE  1.0          CONTRACT DOCUMENTS

This Contract shall consist of this Signature Document and the following documents, and the exhibits, drawings, specifications and documents referred to therein, all of which by this reference are incorporated herein and made a part of this Contract:

        DEFINITION OF TERMS
        PART I    -    SCOPE OF WORK
        PART II   -    COMMERCIAL TERMS
        PART III  -    GENERAL TERMS

Said Contract sets forth the entire Contract and agreement between the parties pertaining to the Work and supersedes all inquiries, proposals, agreements, negotiations and commitments, whether written or oral, prior to the date of execution of this Contract, pertaining to said Work of this Contract.  The provisions of this Contract may be changed only by a writing executed by Duke/Fluor Daniel Caribbean S.E. and Contractor.  Trade custom and trade usage are superseded by this Contract and shall not be applicable in the interpretation of performance of this Contract.

### ARTICLE  2.0          PRECEDENCE

In cases of express conflict between PARTS of the Contract, specifications, drawings or exhibits, the order of precedence shall be as follows:

        -    Signature Document
        -    Definition of Terms
        -    PARTS I AND II
        -    PART III

In the event of an express conflict between the documents listed above, or between any other documents which are a part of the Contract, Contractor shall notify DFDC immediately and shall comply with DFDC's resolution of the conflict.

W-016-00305

ARTICLE   3.0          SCOPE OF WORK

Except as otherwise expressly provided elsewhere in this Contract, Contractor shall supply all services, things, and items of expense necessary to perform, and shall perform, the Work generally described as:

**Design, Manufacture, Supply, Delivery, Erection, and Startup Assistance of the Circulating Fluidized Bed Boilers, Circulating Dry Scrubber Flue Gas Desulfurization Systems, and Electrostatic Precipitators.**

said work being more particularly described in PART I - SCOPE OF WORK (herein referred to as "Work"), for and in connection with the

AES PUERTO RICO TOTAL ENERGY PROJECT

said Work to be performed on a site to be designated by Duke/Fluor Daniel Caribbean S.E. at or in the vicinity of **Guayama, Puerto Rico.**

Contractor acknowledges that Contractor's Work done under this Contract is part of Duke/Fluor Daniel Caribbean S.E's obligation to AES Puerto Rico L.P. (hereinafter referred to as "Owner") under the Engineering, Procurement and Construction Services Agreement between AES Puerto Rico L.P and Duke/Fluor Daniel Caribbean S.E. dated effective as of April 3, 1996 (the "EPC Contract"). Contractor hereby agrees to assume full responsibility for all its obligations under this Contract between ABBCE and DFDC.

ARTICLE   4.0          CONTRACT PRICE

Contractor's full compensation for full and complete performance by Contractor of all the Work and compliance with all terms and conditions of this Contract shall be as set forth in PART II - COMMERCIAL TERMS.

ARTICLE   5.0          CAPTIONS

Titles and captions used in this Contract are for convenience only and shall not be used in the interpretation of any of the provisions of this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Contract on the day and year below written, but effective as of the day and year first set forth above.

COMBUSTION ENGINEERING, INC.                    DUKE/FLUOR DANIEL CARIBBEAN S.E.

BY: _____                   BY: _____

TITLE: _____                   TITLE: _____PRESIDENT_____

DATE: ____2/24/98_____                    DATE: ____2/24/98_____

W-016-00306