IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P. | * | |
| Plaintiff | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC. | * | |
| Defendant | * | |

\*      \*      \*      \*      \*      \*      \*

**ALSTOM POWER INC.'S OPENING BRIEF IN SUPPORT**
**OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, Delaware 19806
(302) 888-3222

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax: (410) 547-0699

Counsel for Defendant
ALSTOM Power Inc.

Date: March 24, 2006

**TABLE OF CONTENTS**

**Page**

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................... 1

II.     SUMMARY OF ARGUMENT ...................................................................... 2

III.    STATEMENT OF PERTINENT FACTS ......................................................... 3

      A.      ALSTOM Contracted To Provide Boilers And Related Air-Pollution Control Equipment For The Plant.  That Air Pollution Equipment Was Subject To Accelerated Corrosion If Not Operated and Maintained Properly. ........................................................................... 3

            1.      How the air pollution equipment works.................................... 4
            2.      How improper operation and/or maintenance ("O&M") can result in accelerated corrosion. ............................................... 4

      B.      ALSTOM's Purchase Order Warranty Against Accelerated Corrosion Expressly Was Limited By, And Conditioned On, Compliance By AES With Specified O&M Practices And Procedures............................................................................... 5

            1.      The Warranty is for a period of no longer than four years and only applies to "accelerated corrosion" that manifests itself in the initial twenty-four (24) month period of operation and that materially affects the structural integrity of the equipment or the ability of the equipment mechanically to perform during the four year period........................................ 5
            2.      The Purchase Order expressly conditions ALSTOM's Warranty on AES' compliance with specified O&M requirements............................................................. 5
            3.      The Purchase Order excludes warranty coverage for corrosion caused, in whole or in part, by deviations in the fuel or feedstock......................................................... 6
            4.      The Purchase Order entitles ALSTOM, in the event of an AES Warranty claim, to information necessary to determine the validity of the claim. ........................................... 6
            5.      The Purchase Order expressly states that ALSTOM shall not be liable for incidental, special or consequential damages relating to or resulting from Warranty claims.......................... 6

      C.      ALSTOM's ESP Supplier, EEC, Expressly Warned AES, During The Plant's Design Phase, That Compliance With Specified O&M Practices Would Be Required To Ensure Against Accelerated Corrosion. ........................................................................... 7

D.    O&M Manuals Detailed The Practices That AES Was Required To Observe To Ensure Against Accelerated Corrosion (And To Obtain Coverage Under ALSTOM's Warranty). Those Manuals Further Required AES To Record And Maintain Certain Data. ......................................... 8

E.    After Approximately One Year Of Operation, AES Advised That The ESP Was Corroding. AES Unilaterally Ordered Replacement Collector Plates And Undertook An Immediate So-Called "Stabilization Program" – And Demanded That ALSTOM Pay For The Associated Cost. ....................................................................................... 12

F.    AES Then Unilaterally Installed An Additional Component To Lower Its Operating Costs – And Demanded That ALSTOM Also Pay For That. ..................................................................................................... 15

G.    AES' Consultant Concluded That AES' Operations And Maintenance Practices – Practices Inconsistent With Purchase Order Requirements – Were The Root Cause Of The Accelerated Corrosion. .................................. 17

H.    AES Nevertheless Filed This Breach Of Warranty Action To Collect Amounts That It Unilaterally Decided To Spend On New Collector Plates, Its "Stabilization Program" And Its New RO System. ............................. 18

I.    AES Subsequently Amended Its Claims In This Proceeding To Seek More Than An Additional $34 Million In Estimated Future Costs, Primarily Intended To Address Admitted New Problems Created By Its New RO System And To Enhance Its Pollution And Water Discharge Systems After Expiration Of The Warranty Period. ........................... 19

IV.    ARGUMENT ................................................................................................. 20

A.    The Purpose Of And Standard For Summary Judgment ...................................... 20

B.    AES Failed To Satisfy The Contractual Condition Precedent To ALSTOM's Warranty Obligations. ................................................................. 21

1.    AES failed to monitor and control properly the chloride content of the CDS water. ................................................................. 22
2.    AES failed to monitor and control the chloride content of the ash. ....................................................................................... 22
3.    AES failed to adjust properly the flue gas approach temperature. ............................................................................. 24
4.    AES failed to maintain properly the water nozzles. .............................. 25
5.    AES failed to increase the CDS outlet temperature during operation of the soot blowers. .......................................................... 26
6.    AES failed to record O&M data and other required information. ............................................................................ 27

C.    AES Utilized Feedstock That Voided ALSTOM's Warranty. ............................ 28

D.    Even Had AES Satisfied The Purchase Order Conditions Precedent And Had It Utilized Feedstock That Did Not Void ALSTOM's Warranty, Significant Elements Of Its Damage Claim Are Unrecoverable As A Matter Of Law...................................................29

   1.    The Court may limit and bar – on summary judgment – claimed damages that are without legal basis and that could not properly be presented to the trier of fact............................29

   2.    AES would not be entitled – under any circumstances – to recover an amount greater than the difference between the value of the goods as accepted and the value that they would have had if they had been as warranted, the measure of which is the direct cost of repair necessary to allow the equipment to perform for the duration of the warranty period. ...................................................................................30

   3.    AES may not, as a matter of law, recover claimed damages based on the cost of replacement collector plates that have not been, and will not be, installed during the four year warranty period. ..................................................................32

   4.    AES may not, as a matter of law, recover claimed damages based on consequential costs that are unrelated to repair and replacement of corroded collector plates. .............................33

   5.    AES may not, as a matter of law, recover claimed damages based on future improvements to the Plant water treatment system, including the brine crystallizer unit. .........................34

   6.    Even if all of AES' claimed damages had a proper legal basis – which they do not – the principle of disproportionality mandates that the Court limit damages to those that were foreseeable.................................................36

V.    CONCLUSION.............................................................................38

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................20

*First Nat'l Bank of Arizona v. City Serv. Co.*,
    391 U.S. 253 (1968)................................................................................20

*Lincoln Pulp & Paper Co. v. Dravo Corp.*,
    445 F.Supp. 507 (D.Me. 1977) .............................................................30

*Long Island Lighting Co. v. IMO Industries, Inc.*,
    No. 85 Civ. 6392 (RO), 1990 U.S. Dist. LEXIS 5351 (S.D. N.Y. 1990) ....................36, 37

*Weiss v. Nw. Broad. Inc.*,
    140 F. Supp 2d 336 (D.Del. 2001)........................................................21

### STATE CASES

*525 Main St. Corp. v. Eagle Roofing Co.*,
    168 A.2d 33 (N.J. 1961)....................................................................31, 32

*4000 Old Pali Rd. Partners v. Lone Star*,
    862 P.2d 282 (Haw. Ct. App. 1993) .....................................................27

*Allied Chem. Corp. v. Van Buren Sch. Dist. No. 42*,
    575 S.W.2d 145 (Ark. 1979)..................................................................31

*CitiSteel U.S.A., Inc. v. Gen. Elec. Co.*,
    No. Civ. A. 99-810-GMS, 2001 WL 65740 (D.Del. Jan. 9, 2001)....................................30

*Dierickx v. Vulcan Indus.*,
    158 N.W.2d 778 (Mich. Ct. App. 1968) ...............................................31

*Edwards v. Kent Rentals, Inc.*,
    C.A. No. 83C-0C10, 1989 Del. Super. LEXIS 373
    (Del. Super. Ct., Sept. 20, 1989)............................................................29

*Falcon Tankers, Inc. v. Litton Systems, Inc.*,
    355 A.2d 898 (Del. Super. Ct. 1976) ........................................29, 35, 36

*Hooton v. Kenneth B. Mumaw Plumbing & Heating Co.*,
    318 A.2d 514 (Md. 1974) .......................................................................32

*New England Power Co. v. Riley Stoker Corp.*,
    477 N.E.2d 1054 (Mass. App. Ct. 1985) ...............................................30

iv

*Oberly v. Howard Hughes Med. Institute,*
    472 A. 2d 336 (Del. Ch. 1984)......................................................................21

*Wood River Pipeline Co. v. Wilbros Eng'r. Serv. Co.,*
    738 P.2d 866 (Kan. 1987).........................................................................34

## STATUTES/RULES

Fed. Rule Civ. Proc. 56(c) ...........................................................................20

5 DEL. CODE ANN. tit. 6 § 2714(d)(2006)........................................................30

## MISCELLANEOUS

J. WHITE & R. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL
    CODE Sec. 10-2 (2d. ed 1980) ..........................................................30-31, 33-34

RESTATEMENT (SECOND) OF CONTRACTS § 348(2).......................................30

RESTATEMENT (SECOND) OF CONTRACTS § 351(3).......................................36

**I.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

On or about September 20, 2004, AES Puerto Rico, L.P. ("AES") filed a single-count Complaint against ALSTOM Power Inc. ("ALSTOM"), asserting two claims for breach of express warranty:  (i) the first sought recovery of approximately $5.9 million attributable to alleged accelerated corrosion of certain air pollution control equipment; and (ii) the second sought recovery of $118,414.68 related to the purchase and installation of supposedly additional heat exchanger components.  ALSTOM answered the Complaint, denying liability with respect to AES' two claims in their entirety.

On May 16, 2005, AES first responded to ALSTOM's Interrogatories.  In response to ALSTOM's Interrogatory No. 10, AES represented, under oath, that the damage element of its first breach of warranty claim was comprised of:  (i) the purchase and installation of water treatment equipment at an estimated cost of $8.6 million; (ii) the purchase and installation of replacement parts at an estimated cost of $5.4 million; and (iii) a so-called "Stabilization Program" implemented on an interim basis with regard to certain components at a cost of about $600,000.  Eight months later, on the eve of the damages deposition of its corporate designee and one week before mediation proceedings before Magistrate Judge Thynge, AES supplemented its Answer to Interrogatory No. 10 and radically altered the nature and amount of its claimed damages.  In that Supplemental Answer, AES contended that the damage element of its first breach of warranty claim now is comprised of:  (i) various forms of "water treatment" improvements at an estimated cost of more than $34 million; (ii) the estimated cost of purchase and installation of replacement parts at nearly $5 million; and (iii) $492,501.98 for the so-called "Stabilization Program."  That supplemental response thus increased the first element of AES' damage claim by some $34 million more than its original $5.9 million claim.

Pursuant to the Court's Scheduling Order, the parties were to submit discovery requests such that responses could be completed by March 10, 2006.  Two Motions to Compel currently are pending before the Court, by which ALSTOM is seeking orders directing AES to produce

relevant electronic mail that either has not been preserved or has not been produced. Also currently pending before the Court is ALSTOM's Motion for Sanctions based on AES' untimely production of documents ostensibly related to its claim for damages.

The parties are scheduled to appear before the Court for a Pre-Trial Conference on May 4, 2006. The trial of this case to a jury is scheduled to commence on May 22, 2006. This Motion for Partial Summary Judgment is timely filed.

## II.    SUMMARY OF ARGUMENT

As noted, AES' two claims in this action are predicated on alleged breach of express warranties. The claim for which it seeks recovery of approximately $40 million – and the claim at which this Motion for Summary Judgment is directed – concerns ALSTOM's express warranty against "accelerated corrosion" of certain air pollution control equipment. That claim fails – and ALSTOM is entitled to partial summary judgment – for each of the following reasons.

1.    The conclusion of its own consultants and documents obtained from its own files indisputably establish that AES failed to satisfy six separate contractual conditions precedent to ALSTOM's express warranty obligation: (i) AES did not monitor and control the content of corrosive water-borne chemicals introduced into the equipment; (ii) AES did not monitor and control the content of corrosive feedstock-borne chemicals introduced into the equipment; (iii) AES did not properly adjust operating temperatures according to the level of corrosive elements introduced into the equipment; (iv) AES did not properly maintain certain equipment components; (v) AES did not elevate required operating temperatures during certain maintenance procedures; and (vi) AES did not maintain mandated records. Because AES did not satisfy those contractual conditions precedent, no warranty obligation ever arose – as a matter of law.

2.    In addition, the purchase order includes an express disclaimer that warranties will not cover corrosion that results, in whole or in part, from use of fuel or feedstock that deviates from specified criteria. Indisputably, AES utilized feedstock that did not comply with purchase order specifications; testing by AES itself revealed that feedstock contained as much as five to

eleven times the contractually allowable percentage of a known corrosive agent. That, consequently, voided ALSTOM's warranty obligation.

      3.     Even had AES satisfied the purchase order conditions precedent and had it not utilized feedstock that voided the warranty, its claimed damages are, in significant respects, without legal basis and could not properly be presented to a trier of fact. Specifically, AES improperly seeks to recover claimed damages: (i) for steps taken to ensure that the equipment performs longer than the duration of the warranty period; (ii) based on consequential costs that specifically are barred by the purchase order; (iii) based on future improvements to be undertaken after expiration of the warranty period to correct "new problems" created by AES' unilateral remediation failures; and (v) that are shockingly disproportionate to the value of the underlying purchase order and, more particularly, the value of the corroded components.

## III.    STATEMENT OF PERTINENT FACTS

### A.    ALSTOM Contracted To Provide Boilers And Related Air-Pollution Control Equipment For The Plant. That Air Pollution Equipment Was Subject To Accelerated Corrosion If Not Operated and Maintained Properly.

This lawsuit arises from the construction of a 454-megawatt co-generation coal-fired power plant in Guayama, Puerto Rico (the "Plant"). AES is the owner of the Plant, and an entity known as Duke/Fluor Daniel Caribbean, S.E. ("D/FD") designed the Plant for AES and was the general contractor.[1]

      ALSTOM entered into two purchase orders with D/FD, and, under the one that is relevant to this action, agreed to furnish two circulating fluidized bed boilers ("Boilers") and related air pollution control equipment for the Plant, with the latter composed of a pair of circulating dry scrubbers ("CDS") and electrostatic precipitators ("ESP"). Given the nature of AES' specifications relating to that pollution control equipment, there was only one supplier that, as a practical matter, could provide that equipment, Environmental Elements Corporation

---

[1] Affidavit of William M. Jarvis (Exhibit 1 at ¶ 2; Appendix ("A") 001).

("EEC"). Consequently, based on that essentially sole source specification, ALSTOM entered into a purchase order with EEC, by which EEC agreed to furnish the pollution control equipment at an approximate cost of $14.6 million.[2]

### 1.    How the air pollution equipment works.

As coal or other feedstock (such as ash) is burned in the combustor portion of the Boilers, the smoke and ash from the combustion process (collectively, the "flue gas") rise out of the top of the combustor. As that flue gas passes through the other portions of the Boiler, much of the ash is separated and removed. After the flue gas leaves the Boiler, it enters the CDS, where sulfur dioxide is removed and the flue gas is cooled, utilizing nozzles that are intended to spray the flue gas with an atomized mist, or fog, of cooling water. From the CDS, the flue gas enters the ESP, where it passes through an electrical field that positively charges the particles of ash in the gas. Those positively charged ash particles are then attracted to thin, negatively charged steel ESP "collector plates," which are designed to capture some of the ash remaining in the flue gas before it reaches the smokestack.[3]

### 2.    How improper operation and/or maintenance ("O&M") can result in accelerated corrosion.

The ESP collector plates are, by the very nature of the environment in which they operate, subject to corrosion. However, they are particularly subject to accelerated corrosion if the system is not operated and maintained consistent with detailed parameters and according to specific guidelines. One of the potential causes of corrosion on ESP collector plates results from the formation and accumulation of corrosive acids on the plates. Corrosive acids will form if the temperature of the flue gas entering the ESP falls below a given level and significant amounts of moisture are present in the system.

Accordingly, in order to prevent corrosion, it is critical that: (i) the water droplets used to cool the flue gas evaporate so moisture does not enter the ESP; and (ii) the temperature within the

---

[2] *Id.* at ¶ 3; A001.
[3] *Id.* at ¶ 5; A002.

ESP remains sufficiently high so condensation does not occur on components inside the ESP, particularly the collector plates. If moisture enters the ESP or condensation occurs, then it is likely that corrosive substances (acids) will form and adhere to the moist surfaces inside the ESP, particularly the collector plates.

**B.    ALSTOM's Purchase Order Warranty Against Accelerated Corrosion Expressly Was Limited By, And Conditioned On, Compliance By AES With Specified O&M Practices And Procedures.**

**1.    The Warranty is for a period of no longer than four years and only applies to "accelerated corrosion" that manifests itself in the initial twenty-four (24) month period of operation and that materially affects the structural integrity of the equipment or the ability of the equipment mechanically to perform during the four year period.**

The Purchase Order between ALSTOM and D/FD included an express warranty against potential accelerated corrosion of the CDS and ESP equipment (the "Warranty"). The Warranty is for a total period of not longer than four (4) years and - because corrosion is to be expected – only applies to "accelerated corrosion" that manifests itself during the initial twenty-four (24) month period of operation and that will materially affect either structural integrity or mechanical performance during the four year period:

> The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, and interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years (i) the structural integrity of the Equipment [or] any portion thereof or (ii) [the] ability of the Equipment to mechanically perform.[4]

**2.    The Purchase Order expressly conditions ALSTOM's Warranty on AES' compliance with specified O&M requirements.**

The Warranty is not unqualified. Indeed, it expressly is conditioned – using the unequivocal word "conditioned" – on AES' compliance with specified O&M requirements:

---

[4] Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 1.6; A016-A017).

Contractor's corrosion guaranty is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and a typical system operation at baseload and specified capacity factors.[5]

3.    **The Purchase Order excludes warranty coverage for corrosion caused, in whole or in part, by deviations in the fuel or feedstock.**

The Purchase Order includes specific parameters concerning the acceptable composition of fuel and feedstock, including size, solubility, chemical composition and the like. Any deviation from those parameters voids ALSTOM's warranties, including the accelerated corrosion Warranty:

Consumable items, normal wear and tear… and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or in part by deviations in the fuel or feedstock from the limits specified in the Contract are excluded from any warranty obligations of the Contract.[6]

4.    **The Purchase Order entitles ALSTOM, in the event of an AES Warranty claim, to information necessary to determine the validity of the claim.**

The Purchase Order specifically entitles ALSTOM, in the event of an AES claim against the Warranty, to obtain "reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under [the] Warranty."[7] In addition, the Purchase Order requires that, in the event of accelerated corrosion, ALSTOM and AES must attempt to reach mutual agreement as to the extent of the corrosion and the "appropriate remedial actions."[8]

5.    **The Purchase Order expressly states that ALSTOM shall not be liable for incidental, special or consequential damages.**

The Purchase Order also contains an express disclaimer, providing that ALSTOM shall not be held liable for incidental, special or consequential damages of any kind:

---

[5] *Id.*
[6] *Id.* at Part III, ¶ 1.8; A017.
[7] *Id.* at Part III, ¶ 1.9; A017.
[8] *Id.* at Part III, ¶ 1.6; A017.

In no event shall D/FDC or Contractor be liable for incidental,
special or consequential damages of any kind, including, without
limitation, loss of revenue, loss of profits, loss of use of the
facility or damages associated therewith.***All releases, waivers
or limitations of liability specifically expressed in this Contract
apply notwithstanding the negligence, strict liability, fault, or
breach of warranty or contract of the party whose liability is so
released or limited.[9]

**C.      ALSTOM's ESP Supplier, EEC, Expressly Warned AES, During The
Plant's Design Phase, That Compliance With Specified O&M Practices
Would Be Required To Ensure Against Accelerated Corrosion.**

In January 2000 – well before ALSTOM had supplied the CDS and ESP units to the

Plant, and while they were still being designed – the engineer for AES' financier raised concerns

about equipment corrosion.[10]  In response, ALSTOM's supplier, EEC, stressed the importance of

operating and maintaining the equipment to minimize corrosion:

> The guaranties provided by EEC on the AES Puerto Rico Project
> are based on proper operation and maintenance procedures.
>
> ***
>
> Certainly, if [ALSTOM or D/FD] or their Consultant believe that
> good operation and maintenance procedures may not be
> consistently followed, then advanced levels of protection, such
> as suggested by [the financier's engineer], may be warranted.
> Advanced levels of corrosion protection will result in a cost
> increase.[11]

The fundamental importance of observing proper O&M procedures was subsequently

emphasized in a telephone conference call between representatives of D/FD, ALSTOM and EEC

(and memorialized by D/FD's e-mail summary):

> The CDS is a Semi-Dry Scrubbing Process which will use a
> nominal 30°F flue gas approach temperature.... CDS corrosion
> will occur if the interior walls get wet due to inleakage of cold
> air or if over humidification of the CDS due to excessive inlet
> spray water flow.
>
> The key to preventing and minimizing scrubber corrosion is to
> not allow the flue gas temp. to drop below the 30°F approach

---

[9] *Id.* at Part III, ¶ 52.0; A044-A045.
[10] *See* e-mail chain of January 11, 2000 to January 25, 2000 (Exhibit 3 at 3; A050).
[11] *Id.* at 4; A051.

temperature. Good plant operations and control will prevent this from occurring by carefully maintaining the approach temp. above preset limits....

***

As a means to outline measures to minimize and control corrosion in the CDS [ALSTOM and EEC] will develop procedures and instructions in the [Operations and Maintenance] manuals which plant operators will use to set up good operation procedures.[12]

The following month (February 2000), representatives of ALSTOM and EEC met with AES and D/FD personnel to discuss the CDS and ESP equipment and, among other things, potential corrosion. Meeting minutes reflect that, from the very outset, EEC reemphasized that precautions would be required for long-term success and minimization of corrosion.[13]  The minutes further establish that, as the meeting concluded, EEC again stressed that the "keys to good CDS operation" were:  (i) maintenance of the spray nozzles; and (ii) maintenance of minimum approach temperature.[14]  Thus, even as the Plant was still being designed, AES personnel were well aware of the fact that failure on their part to observe proper O&M procedures and practices would likely result in accelerated corrosion of the equipment.

> **D.** **O&M Manuals Detailed The Practices That AES Was Required To Observe To Ensure Against Accelerated Corrosion (And To Obtain Coverage Under ALSTOM's Warranty).  Those Manuals Further Required AES To Record And Maintain Certain Data.**

Approximately eight (8) months later, in late September 2000, EEC furnished D/FD with portions of what it described as a "Typical Operations & Maintenance Manual" for review. Those materials again emphasized the importance of performing necessary preventive maintenance of the CDS spray water nozzles, reminding D/FD that "the nozzle should be

---

[12] *Id.* at 2; A049.

[13] Minutes of February 10 and 11, 2000 CFB Boiler/CDS/ESP meeting (Exhibit 4 at 2; A054).

[14] *Id.* at 6; A058.

inspected daily, as a minimum, and ideally once per operating shift," and that the "results of these inspections must be recorded in the plant daily logs."[15]

Several months later – and shortly before submitting a final version of the Project-specific Operations & Maintenance Manuals ("O&M Manuals") – EEC also furnished, at D/FD's request, a "Maintenance and Monitoring Plan" that provided an "overview" of the O&M Manual requirements for minimizing corrosion.[16] The first sentence of that Plan reiterated EEC's continual advices that proper O&M would be essential because warranties expressly were conditional: "The guaranties provided by EEC are based on proper operation and maintenance procedures."[17] Immediately thereafter, the Plan set forth a "brief overview" of the maintenance and monitoring plan, noting that control of flue gas temperature and ash chloride content would be key to minimizing corrosion of the Equipment:

> During operation, close control of critical process parameters is necessary to minimize corrosion. For [sodium dioxide] control, the CDS scrubbing process will use a nominal 30°F flue *gas approach temperature* to adiabatic saturation. This is controlled by regulation of the water flow rate into the nozzles at the CDS. The key is to ensure that the flue gas temperature at the CDS outlet does not fall below preset limits.*** Initially, the wet bulb temperature of the flue gas is physically measured, and readings should be repeated daily to correlate this parameter with operating conditions. Once this relationship is determined, it should be checked on a regular basis by plant personnel.*** Operating logs of this data must be maintained by plant personnel.
>
> The second critical parameter is the *Chloride Contents* or maximum allowable concentration of $CaCl_2$ in the ash.*** This concentration is influenced by the spray water and coal chloride content. Plant personnel will measure water conductivity and correlate this to chloride content to establish the flue gas approach temperature. This measurement should be taken on a pre-established schedule. In the beginning this should be carried out on a weekly basis....*** These readings must be maintained in the plant operating logs.

---

[15] *See* attachment to May 15, 2001 e-mail (Exhibit 5 at 3; A061).
[16] *Id.*
[17] *Id.* at 2; A060.

The third critical process parameter is the operation of the *soot blowers*. Operation of the soot blowers can elevate the flue gas wet bulb temperature.

         \*\*\*

It is crucial that the recommended operating parameters of the flue gas cleaning system are followed. It is equally important that proper maintenance procedures are carried out by the plant personnel.[18]

Soon after providing that Maintenance and Monitoring Plan overview, EEC issued the Project-specific O&M Manuals.[19] Pursuant to the terms of the Purchase Order, they became – and are – "Contract Documents," and, thus, a part of the Purchase Order.[20]

Chapter 9 of the first volume of the O&M Manuals reiterated EEC's explicit warning to the operator, AES, concerning the link between proper O&M procedures and the risk of corrosion. It provided: "The following overview of the Maintenance and Monitoring Plan is geared specifically to minimize corrosion of surfaces that handle flue gas."[21] It further stated: "During operation, close control of critical process parameters is necessary to minimize corrosion."[22]

Consistent with EEC's repeated admonitions, the O&M Manuals gave very specific instructions with regard to regulating the temperature in the CDS so as to ensure proper evaporation of the cooling water and prevention of condensation, while still satisfying emissions removal requirements. According to the O&M Manuals – and consistent with the Maintenance and Monitoring Plan earlier provided – the operator, AES, was to measure regularly the "wet bulb temperature" (i.e., the dew point temperature or point of adiabatic saturation) and, as a starting point, was to operate the CDS in such a manner that the temperature of the flue gas would be

---

[18] *Id.* at 2-3; A060-A061 (emphasis in original).

[19] O&M Manual Excerpts (Exhibit 6; A063).

[20] Materials that ALSTOM was required to furnish and that are incorporated by reference under the terms of the Purchase Order are "Contract Documents." *See* Purchase Order Excerpts (Exhibit 2 at Art. 1.0; A004).

[21] O&M Manual Excerpts (Exhibit 6 at 9-2; A078).

[22] *Id.*

maintained at a minimum temperature of 30°F above the wet bulb temperature.[23]  That was to be accomplished by regulating the water flow rate of the CDS nozzles.  Accordingly, the O&M Manuals directed AES to "take wet bulb temperature measurements at the outlet of the CDS" for each shift during initial operations, and, thereafter, to do so regularly and to maintain records that such measurements had been taken.[24]

As also emphasized in the EEC Maintenance and Monitoring Plan, the O&M Manuals advised that the second critical parameter governing potential corrosion would be the chloride content of the ash in the CDS, which would be influenced by the chloride content of both the spray water and the fuel and feedstock being combusted in the boiler.[25]  Accordingly, the O&M Manuals directed AES to "[m]easure the chloride content on the ash and [to] measure cooling water conductivity to correlate to chloride content in the water and verify flue gas approach temperature, with those readings maintained in Plant Operating Logs"; initially, those measurements were to be taken on a weekly basis.[26]  If testing detected the presence of high chlorides in either the ash or the water (which could interfere with evaporation), the O&M Manuals required that AES operators adjust the CDS operating temperature.[27]

Again, as did the Maintenance and Monitoring Plan, the O&M Manuals stated that a third critical parameter in minimizing corrosion would be the operation of soot blowers in the Boiler, a process by which steam is used to clean ash from the Boiler, and which can elevate the flue gas wet bulb temperature.  According to the O&M Manuals, the operating temperature of the CDS must be "ramped up" during a soot blowing cycle.[28]  In order to ensure that the operators would elevate the CDS outlet temperature during soot blowing, EEC furnished a logic diagram pursuant to which the Plant's Distributed Control System could be programmed to elevate the temperature

---

[23] *Id.*
[24] *Id. at* 9-4; A080.
[25] *Id.* at 9-2; A078.
[26] *Id.* at 9-2 and 9-3; A078-A079.
[27] *Id.* at 4-2; A069.
[28] *Id.* at 9-3 ; A079.

automatically when soot blowing was occurring, and ALSTOM provided that logic diagram to D/FD.[29]

Finally, the O&M Manuals prescribed a rigorous process for maintaining the CDS spray nozzles in order to ensure that they uniformly emitted a fine, atomized mist.[30]

In late October 2002 – approximately a month before the Plant was turned over to AES – ALSTOM submitted the last in a series of limited "revised operating procedures" involving: (i) CDS water nozzle cleaning procedures; (ii) a CDS nozzle cleaning log revision; (iii) a CDS re-start procedure revision; and (iv) a CDS cold start-up procedure revision.[31]  Those revised procedures were consistent with, and did not purport to modify, the procedures for normal operation of the equipment as established by the O&M Manuals.

> **E.**     **After Approximately One Year Of Operation, AES Advised That One ESP Was Corroding.  AES Unilaterally Ordered Replacement Collector Plates And Undertook An Immediate So-Called "Stabilization Program" – And Demanded That ALSTOM Pay For The Associated Cost.**

On or about November 28, 2002, AES accepted the completed Plant from D/FD and warranty periods began to run.[32]

After approximately one year of operation by AES, AES personnel found corrosion in portions of one of the ESPs during an inspection.[33]  ALSTOM was advised and immediately mobilized a specialist to the Plant to inspect the corrosion and to initiate a root cause analysis.[34] The purpose of that root cause analysis was two-fold: (i) to ascertain the cause of the corrosion

---

[29] *See* transmittal of March 28, 2001 (Exhibit 7; A098).

[30] Exhibit 6 at 9-5 to 9-7 and 9-12 to 9-14; A081-A083 and A088-A-090.

[31] October 23, 2002 letter and attached revised operating procedures (Exhibit 8; A100).

[32] In its Complaint, AES alleges that Performance Acceptance was not accomplished until December 19, 2002.  For the purposes of this Motion, that difference is immaterial, and ALSTOM will assume that warranties did not begin running until that date, and that the pertinent warranty will extend to December 18, 2006.

[33] Affidavit of W. M. Jarvis (Exhibit 1 at ¶ 6; A002).

[34] *Id.*; *see also*  November 26, 2003 K. Hognefelt Trip Report (Exhibit 9 at 1; A113).

and, thus, to determine whether it was covered by ALSTOM's Warranty; and (ii) to develop appropriate remedial action to address the causal factors leading to the corrosion.[35]

ALSTOM's inspection revealed significant corrosion of certain collector plates in the ESP, primarily concentrated in the lower half of the ESP, suggesting that temperature stratification may have had some influence.[36]  In discussing his observations with Plant personnel, the ALSTOM specialist advised that the corrosion pattern indicated that it likely was related to operating temperature and that high chloride content in the CDS water would increase the risk for corrosion.[37]  AES Plant personnel acknowledged a high chloride content in the water and agreed to increase the unit's operating temperature, advising the ALSTOM specialist that they had just discovered that a diagram in the O&M Manual required an operating temperature of 175°F when AES used water with a high concentration of chloride for the CDS.[38]  The ALSTOM specialist obtained samples of the corroded collector plates for analysis in ALSTOM's home office, and concluded his report by offering the preliminary conclusion that the cause of the "corroded collecting plates is probably a combination of using high chloride contents water and operating at too low [a] temperature."[39]

While the root cause analysis was still underway – and in knowing disregard of the Purchase Order procedure calling for joint analysis and mutual agreement concerning the extent of corrosion and the appropriate remedy – AES decided to proceed unilaterally, as reflected by a November 24, 2003 e-mail (just days after the discovery of the corrosion) from its Plant Manager to other AES personnel:

> The Root Cause of the corrosion is still under investigation.  This effort is being led by Paul Stinson, and we are engaged with Alstom and their vendor EEC.  AES has submitted this as a warranty claim and *we are proceeding with the short-term and*

---

[35] Affidavit of W. M. Jarvis (Exhibit 1 at ¶ 6; A002).
[36] November 26, 2003 K. Hognefelt Trip Report (Exhibit 9 at 1; A113).
[37] *Id.* at 3; A115.
[38] *Id.* at 3-4; A115-A116.
[39] *Id.* at 4; A116.

> long-term measures regardless of the commercial (warranty) obligations.[40]

That same day, AES' Plant Manager submitted a formal warranty claim to ALSTOM, advising – again, with the root cause analysis having just begun and with AES not having undertaken a good faith effort to reach mutual agreement with ALSTOM on "appropriate remedial action" – that AES was "currently performing stabilization work on the damaged ESP collector plates" and that it expected that ALSTOM would "pay the reasonable costs incurred by AES Puerto Rico in performing the interim remedial work...."[41]  In addition, AES insisted that ALSTOM "develop and implement the necessary long-term corrective actions of procuring new collector plates of a more robust design...."[42]

Only days later, AES proceeded with its unilateral action, ordering upgraded replacement materials from EEC on November 26 and December 5, 2003, for delivery on an expedited basis, and thereafter invoicing ALSTOM for those materials.[43]

Less than two months later, while ALSTOM's root cause analysis was on-going, AES reported accelerated corrosion damage of the ESP collector plates in the other unit and formally expanded its warranty claims.[44]  By letter dated January 21, 2004, AES acknowledged ALSTOM's continuing "efforts associated with the root cause analysis" – a necessary precursor to a determination both of warranty coverage and appropriate remedial action – but nevertheless again insisted that ALSTOM must "honor its warranty and properly perform the actions necessary for the long-term correction of these defective ESP collector plates and associated equipment, as well as to pay the reasonable costs incurred by AES Puerto Rico in performing the interim remedial work...."[45]

---

[40] November 24, 2003 e-mail from A. Dyer to F. Cerone (Exhibit 10 at 1-2; A117-A118)(emphasis added).
[41] November 24, 2003 letter from A. Dyer to W. Jarvis (Exhibit 11; A120).
[42] *Id.*
[43] *See, e.g.,* May 18, 2004 letter from E. Bulewich (on behalf of W.M. Jarvis) to A. Dyer (Exhibit 12 at 1; A121);  AES internal December 2, 2003 e-mail (Exhibit 13; A124).
[44] *See* January 21, 2004 letter from A. Dyer to W. Jarvis (Exhibit 14 at 2; A126).
[45] *Id.*

F.    **AES Then Unilaterally Installed An Additional Component To Lower Its Operating Costs – And Demanded That ALSTOM Also Pay For That.**

Even as AES was reiterating its demand that ALSTOM "promptly perform the actions necessary for the long-term correction" of the corrosion and insisting that ALSTOM reimburse it for costs incurred to that point, AES was also unilaterally pursuing other remedies.  Indeed, as early as January 23, 2004, AES had been considering a proposal from a supplier to substitute a component of the Plant's existing water treatment system – a Reverse Osmosis ("RO") system – with two new RO units for the purpose of reducing the level of chlorides and other dissolved solids in the water spray utilized in the CDS upstream of the ESP.[46]  In their consideration of the possible addition of the new equipment to the Plant, AES personnel noted that the rate of ESP collector plate corrosion had been slowed by elevating the flue gas temperature at the CDS outlet – something already prescribed by the O&M Manuals – but that doing so affected sodium dioxide removal efficiency and increased the Plant's consumption of hydrated lime.[47]  The primary benefit of adding a new RO system, as recognized by AES personnel, was to lower operating costs; specifically, the addition of the new equipment would result in a savings to AES of $3 million annually based on decreased lime usage:

- **Benefits**

  - Decrease Lime usage of $250,000 per month.  Due to the need to run at higher temperatures to decrease the rate of corrosion, we are consuming an additional $250,000 of lime.
  - Another benefit is the deferment of replacing the corroded plates in the ESP.  Although there is significant corrosion to the ESP, if the corrosion is arrested we will be anticipate [sic] being able to run at least 3 more years before needing to replace the plates. The cost for replacement will be $6 million, assuming no impact to capacity payments due to the availability hit.  Due to the uncertainty of the length of time that this repair can be deferred, we have not included the time value benefit in our analysis above.[48]

---

[46] *See* January 23, 2004 internal AES e-mail (Exhibit 15; A127); *see also* February 11, 2004 AES internal Request for Capital Expenditure Approval (Exhibit 16; A128).

[47] February 11, 2004 AES internal Request for Capital Expenditure Approval (Exhibit 16 at 1; A128).

[48] *Id.* at 5; A132.

15

Aside from its consideration of the financial ramifications, AES also conducted what it described as "technical due diligence" of the proposed new RO system in concert with D/FD, the supplier of that equipment (GE-Betz) and various specialty consultants (but, notably, neither ALSTOM nor EEC). Among the technical issues considered were: (i) the effect on the Plant's operations and maintenance (resulting in a conclusion that filters included with the new system would "significantly decrease the present RO membrane fouling and result in fewer membrane replacements and chemical cleanings"); and (ii) environmental concerns (resulting in a conclusion that existing permits were sufficient for the new system configuration).[49]

Soon thereafter, AES expanded its warranty claim to include its new RO system. By letter of April 30, 2004, AES advised ALSTOM:

> AES-PR seeks immediate reimbursement for two sets of costs associated with correcting the defects in the CDS and ESP systems. First, AES-PR has expended $481,069 to stabilize the corroded plates in Units 1 and 2. In addition, AES-PR has begun purchasing replacement plates and rigidtrodes to replace the damaged components in both units' ESPs. AES-PR expects that the total cost for these materials will total approximately $2,814,868, and the cost for installation will be on the order of $1,000,000. Thus the total cost to repair all corrosion damage to the ESP is expected to be approximately $4,295,937. Second, the cost of the new Reverse Osmosis system, which is needed to prevent continued accelerated corrosion of the ESP plates, is expected to be on the order of $1.6 million. Accordingly, the total cost to repair the corrosion damage to the ESP system and to correct the defect causing the corrosion is $5,895,937.[50]

ALSTOM responded by noting that, since the first observation of corrosion in November 2003, it had been cooperating with AES personnel to understand the "corrosion phenomena," and that proper investigation of the corrosion required – as provided for by the terms of the Purchase Order – that ALSTOM be provided access to the Plant's operating records to verify, among other things, the validity of the claim.[51] ALSTOM further advised that, pending the provision of the

---

[49] *Id.* at 3-4; A130-A131.
[50] April 30, 2004 letter from A. Dyer to W. Jarvis (Exhibit 17 at 2; A135).
[51] May 18, 2004 letter from E. Bulewich (for W.M. Jarvis) to A. Dyer (Exhibit 12 at 1-2; A121-A122).

requested materials and completion of that investigation, it could not agree that AES' warranty claims were valid under the terms of the Purchase Order.[52]

> **G.    AES' Consultant Concluded That AES' Operations And Maintenance Practices -- Practices Inconsistent With Purchase Order Requirements -- Were The Root Cause Of The Accelerated Corrosion.**

In the meantime, AES had been – again, unilaterally – conducting its own analysis, having retained a former EEC employee to determine the root cause of the corrosion.[53]  As ALSTOM previously had suggested, AES' new consultant told it that a proper root cause analysis was absolutely essential to the development of appropriate remedial measures:

> This may take some time to find the root cause, *but if we fix the wrong thing it will take even longer to solve the problem once and for all.*[54]

Based upon his preliminary investigation, AES' consultant concluded that the root cause of the corrosion appeared to have been operation of the equipment in a high chloride environment and at CDS outlet flue gas temperatures that were lower than those required by the O&M Manuals:

> This means the CDS has been running with less than a 30 degree approach in the past.  We also now know the chlorides in the process have been very high in the past and the CDS was not running with an even higher than 30 degree approach to accommodate the presence of these chlorides.  The combined effect of high chlorides, low approach, and thin bed is the most likely "root cause" that I can suggest right now.[55]

That conclusion was consistent with AES' own earlier evaluation, as reflected in its internal January 25-31, 2004 Weekly Report:

> Our present hypothesis is that the high chlorides in the water along with the temperature entering into the ESP *being below the dew point* are leading to the noted corrosion in the ESP.[56]

---

[52] *Id.*
[53] *See* January 28, 2004 letter from J. Toher to P. Stinson (Exhibit 18; A138).
[54] *Id.* at 2; A139 (emphasis added).
[55] March 16, 2004 e-mail from J. Toher to C. Little (Exhibit 19; A140).
[56] AES January 25-31, 2004 internal Weekly Report (Exhibit 20 at 2-3; A142-A143)(emphasis added).

17

Following an October 2004 on-site inspection, AES' consultant reminded AES Plant personnel of the need to observe proper operating procedures and, particularly, the requirement to maintain sufficiently high temperatures to minimize corrosion:

> Over the course of the week, several discussions took place … regarding future operation of the CDS.   There is a general concern regarding **CDS operating temperature verses [sic] chlorides** in the process.
>
> ***
>
> However, there is a definite relationship between CDS operating temperature and the concentration of chlorides in the process. All of the chlorides entering the CDS, whether from the coal via the boiler or from the water, will react with the calcium in the lime and eventually exist as solid calcium chloride salts in the recirculating ash as well as the disposal ash.   This calcium chloride salt is difficult to dry and therefore we must raise the operating temperature of the CDS as the concentration of this salt increases either from the coal or the water chlorides.[57]

The consultant concluded that AES should operate the equipment as called for by the O&M Manuals – at a temperature equal to the flue gas wet bulb temperature plus 30°F when lower levels of chloride were present, and to increase the temperature as the chloride level increased.[58]

**H.     AES Nevertheless Filed This Breach Of Warranty Action To Collect Amounts That It Unilaterally Decided To Spend On New Collector Plates, Its "Stabilization Program" And Its New RO System.**

Notwithstanding its consultant's conclusions that the "root cause" of the corrosion was "the combined effect of high chlorides [and] low approach [temperature]" – in other words, AES' own operation of the equipment in a manner inconsistent with O&M Manual requirements – AES initiated this action against ALSTOM in September 2004, seeking to require ALSTOM to pay for AES' O&M failures and steps taken to reduce AES' operating costs.

In so doing, AES generally raised the same issues and damage claims set forth in its April 2004 warranty claims letter, resulting in a total claim of nearly $6 million for (i) costs of the so-

---

[57] October 10, 2004 letter from J. Toher to C. Kiss (Exhibit 21 at 2-3; A146-A147)(emphasis in original).
[58] *Id.* at 3; A147.

called "Stabilization Program," (ii) purchase and installation of replacement collector plates and (iii) cost of the new RO system.[59]

> **I.    AES Subsequently Amended Its Claims In This Proceeding To Seek More Than An Additional $34 Million In Estimated Future Costs, Primarily Intended To Address Admitted New Problems Created By Its New RO System And To Enhance Its Pollution And Water Discharge Systems After Expiration Of The Warranty Period.**

Eight months later, in mid-May 2005, AES answered ALSTOM's Interrogatory No. 10 – which requested information concerning any work performed or work provided for the CDS or ESP equipment – by stating that "it has made and/or expects to make" approximately $8.6 million in payments for improvements to the Plant's water treatment system ($1.8 million of which represented the cost of its new RO system and $6.85 million of which was the estimated cost of a unit described as a "crystallizer-brine concentrator"). AES further identified actual payments of $1,709,937.69 for replacement of collector plates, an estimated $3,709,937.71 for future replacement of collector plates, and $589,426.44 for the cost of its so-called "Stabilization Program."[60]

Six months later, AES advised the United States Environmental Protection Agency that it had expended $1.9 million to install the new RO system and that it intended "to install a new brine concentrator and a crystallizer" at a "projected cost ranging from $4.75 million to $10 million...."[61]

Then, in mid-January 2006 – some 16 months after the filing of this action, literally on the eve of the deposition of its witness on damages issues and one week before a court-ordered mediation before Magistrate Judge Thynge – AES submitted supplemental responses to ALSTOM's Interrogatory No. 10. Pursuant to that supplemental response, AES claimed that it

---

[59] *See* Complaint at ¶ 21.
[60] Excerpts of AES Response to ALSTOM Power Inc.'s Interrogatory No. 10 (Exhibit 22 at 8-10; A150-A152).
[61] November 17, 2005 letter from A. Dyer to C. O'Neill (Exhibit 23 at 4; A156).

had paid approximately $4.1 million for purported remediation, but that its future payments were expected to total about an additional $35.7 million.[62]

Approximately $22.4 million of those future claims were identified as "estimates" related to AES' purported plan to add a "brine crystallizer" unit to its water treatment system. As reflected in its internal "Project Justification," AES itself describes those improvements as necessitated by "new problems" created by its unilateral decision to add a new RO unit:

> In 2004 the system was reconfigured and new RO system was installed to provide additional treatment to the CDS water supply and resulting brine transferred to the Manufacturing Aggregate dust suppression system, ash conditioning and Pug Mill. This reconfiguration was marginally successful *and created new problems* since the storm water run-off carried the salts to the storm water ponds and Coal Pile Pond…. This cycle created an accumulation of solid/salts in the ponds increasing their concentrations, reducing the evaporation rates and forcing us to reduce the reuse of the ponds water…. As a result, the ponds water levels increased and now are at the maximum allowable points.[63]

## IV.    ARGUMENT

### A.    The Purpose Of And Standard For Summary Judgment.

As the Court is, of course, abundantly aware, Rule 56(c) requires that the Court grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.[64]  Indeed, the purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."[65] Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."[66]

---

[62] AES Supplemental Responses to ALSTOM Power Inc.'s Interrogatory No. 10 (Exhibit 24 at 2-3; A159-A160).

[63] AES Brine Crystallizer Project Justification (Exhibit 25 at 4; A166)(emphasis added).

[64] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

[65] *See* Advisory Committee Note to 1963 Amendment of Fed. Rule Civ. Proc. 56(e).

[66] *First Nat'l Bank of Arizona v. City Serv. Co.,* 391 U.S. 253, 289 (1968).

20

**B.    AES Failed To Satisfy The Contractual Condition Precedent To ALSTOM's Warranty Obligations.**

As noted, pursuant to the express terms of the Purchase Order, ALSTOM's "corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with [the] Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors."[67]

Under Delaware law – the law that controls the Purchase Order[68] - a condition precedent is "an act or event, other than the lapse of time, which, unless the condition is excused, must occur *before a duty to perform a promise in the agreement arises*."[69] Thus, unless AES operated and maintained the equipment in accordance with the O&M Manuals and other specified operating parameters and maintained records to document that compliance, ALSTOM's warranty obligations never arose.

AES had (and continues to have) the burden, under Delaware law, of asserting and establishing that all conditions precedent have been satisfied.[70] Notably, its Complaint in this matter does not even allege satisfaction of the conditions precedent.

AES' failure in that regard is not mere happenstance. The conclusions of its own consultant and documents obtained from AES' own files establish that AES failed to satisfy those conditions precedent and, as a matter of law, cannot meet its burden of proof.

The indisputable facts establish that AES failed to satisfy the condition of operating and maintaining in accordance with the O&M Manuals because: (i) it did not monitor and control the chloride content of the CDS water; (ii) it did not monitor and control the chloride content of the ash; (iii) it did not properly adjust the flue gas approach temperature according to the level of chlorides and moisture in the system;  (iv) it did not properly maintain the water nozzles in the

---

[67] Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 1.6; A017).
[68] *Id.* at Part III, ¶ 39.4; A039.
[69] *Weiss v. Nw. Broad. Inc.*, 140 F. Supp 2d 336, 343 (D.Del. 2001)(emphasis added).
[70] *See Oberly v. Howard Hughes Med. Institute*, 472 A. 2d 366, 386 (Del. Ch. 1984).

CDS; (v) it did not operate the equipment at required temperatures during soot blowing; and (vi) it did not maintain records of those required actions.

1.    **AES failed to monitor and control properly the chloride content of the CDS water.**

The specifications for the Plant expressly state that the maximum chloride content of the water to be used in the CDS is 4300 mg/liter.[71]  ALSTOM neither designed nor furnished the equipment used to convey water to the CDS or to monitor or control the chloride content of that water.  Rather, AES or its design/builder, D/FD, was responsible for the design and construction of those systems.[72]  Significantly, the O&M Manuals prepared by EEC and provided to AES expressly stated that the chloride content of the water was to be tested every day.[73]

Notwithstanding requests by ALSTOM, AES never provided documentation to establish that it monitored or controlled the level of chlorides in the CDS water.[74]  That failure is particularly notable given AES' contractual obligation to provide ALSTOM with the "operating records…and other information [ALSTOM] deem necessary to satisfy themselves of the validity of a claim under [the Purchase Order] warranty."[75]

AES failed to monitor and control properly the chloride content of the CDS water as required by the O&M Manuals.  Consequently, as a matter of law, AES cannot establish that it satisfied that condition precedent to ALSTOM's Warranty obligations.

2.    **AES failed to monitor and control the chloride content of the ash.**

The specifications also set limits on the chloride content of the ash in the CDS.[76]  Consequently, the O&M Manuals expressly stated that AES was to measure the chloride content

---

[71] *See* Circulating Dry Scrubber Specification Excerpts (Exhibit 26 at Attachment No. 6, p. 1 of 2; A175).
[72] *See* Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 55.0; A045); *see also* Circulating Dry Scrubber Specification Excerpts (Exhibit 26 at 5-6; A172-A173).
[73] O&M Manual Excerpts (Exhibit 6 at 9-5; A081).
[74] Affidavit of W. M. Jarvis (Exhibit 1 at ¶¶ 7-8; A002-A003).
[75] Purchase Order Excerpts, (Exhibit 2 at Part III, ¶ 1.9; A017).
[76] *See* Circulating Dry Scrubber Specification Excerpts (Exhibit 26 at Attachment No. 1, p. 1 of 2; A174).

of the ash in the CDS on a regular basis (and at least weekly until Plant operating characteristics

had been established).[77]

ALSTOM requested that AES provide it with documentation that would establish that

AES monitored the level of chlorides in the system as required by the O&M Manuals.[78] In fact,

AES' own Project documentation establishes that it did not do so.

In mid-September 2003 – after AES had been operating the Plant for more than nine

months and shortly before it discovered the corrosion of the ESP collector plates – an AES

employee circulated internally a copy of the EEC Maintenance and Monitoring Plan that had been

furnished during the design phase of the Plant, and which had provided a "brief overview of the

maintenance and monitoring plan geared specifically to minimizing corrosion...."[79]  (Indeed, it

had been that document that had highlighted for AES – at a very preliminary stage – the fact that

the "guarantees provided by EEC are based on proper operation and maintenance procedures."[80])

In circulating that document, the AES employee noted:

> During detailed design we requested EEC to summarize any
> activities necessary to ensure successful long-term operations of
> the CDS & ESP, attached is the summary.  I'm not sure who has
> already seen this, so if it is old news just ignore.  Some are
> related to preoperational and initial commissioning periods,
> however others are related to normal O&M.[81]

Significantly, that Plan – which certainly should have been "old news" to AES personnel

who had been operating the Plant for more than nine months, and supposedly pursuant to the

O&M Manual requirements – noted that key O&M practices required "close control of critical

operating parameters including...ash chloride content...."[82]

Upon receiving that e-mail and the attached, previously submitted corrosion

minimization plan, another AES employee – one who, perhaps ironically, was later charged with

---

[77] O&M Manual Excerpts (Exhibit 6 at 9-2 and 9-3; A078-A079).
[78] Affidavit of W.M. Jarvis (Exhibit 1 at ¶¶ 7-8; A002-A003).
[79] *See* September 12, 2003 e-mail from R. McParland to AES personnel (Exhibit 27 at 2; A177).
[80] *Id.*
[81] *Id.* at 1; A176.
[82] *Id.* at 4; A179.

conducting the ESP corrosion root cause analysis – inquired of his fellow employees: "I wonder if we have ever tested the [chloride] content of the ash?"[83]  In response, he was advised by another AES employee: "I have never tested the ash for chlorine in the past."[84]

It was only at that point – nearly 10 months after AES had begun operation of the equipment – that AES personnel began to make any effort to comply with the O&M requirement for monitoring the ash chloride content.  Indeed, an October 2003 internal AES e-mail stated that one of the "changes" to Plant operations had included "sampling the ash on CDS and ESP hoppers to determine the chloride content...."[85]

AES failed to monitor and control the chloride content of the ash as required by the O&M Manuals.  Consequently, as a matter of law, AES cannot establish that it satisfied that condition precedent to ALSTOM's Warranty obligations.

### 3.    AES failed to adjust properly the flue gas approach temperature.

From the early stages of design and construction of the Plant, AES knew that the control of the flue gas approach temperature would be imperative to minimize corrosion within the ESP.[86]  Indeed, EEC had advised AES more than four years prior to Plant turnover that there would be three different approach temperatures (depending on spray water chlorine content).[87]  Even more importantly, the O&M Manuals provided to AES contained not only express instructions as to the minimum operating procedures for a given level of chloride, but also contained equally express directions that the temperature was to be monitored each shift.[88]

Notwithstanding ALSTOM's request, AES did not provide operating logs or other information that document AES' compliance with that O&M Manual requirement.[89]  It is

---

[83] *See* September 15, 2003 e-mail from P. Stinson to AES employees (Exhibit 28; A180).
[84] *See* September 15, 2003 e-mail from D. Stone to AES employees (Exhibit 29 at 1; A181).
[85] *See* October 3, 2003 e-mail from E. Sostre to C. Reyes (Exhibit 30 at 1; A183).
[86] February 2000 Meeting Minutes (Exhibit 4 at 2; A054).
[87] *Id.* at 3; A055.
[88] O&M Manual Excerpts (Exhibit 6 at 4-2, 9-4 and 9-5; A069, A080 and  A081).
[89] Affidavit of W.M. Jarvis (Exhibit 1 at ¶ 7-8; A002-A003).

abundantly clear that AES did not adjust temperatures as required by the O&M Manuals, as reflected by its own consultant's conclusions:

> This means the CDS has been running with less than a 30 degree approach in the past. We also now know the chlorides in the process have been very high in the past and the CDS was not running with an even higher than 30 degree approach to accommodate the presence of these chlorides. The combined effect of high chlorides, low approach and thin bed is the most likely "root cause"....[90]

AES failed to adjust properly the flue gas approach temperature as required by the O&M Manuals. Consequently, as a matter of law, AES cannot establish that it satisfied that condition of ALSTOM's Warranty.

### 4.    AES failed to maintain properly the water nozzles.

As AES had been advised during the Plant's design phase, maintenance of the CDS spray nozzles was critical to minimize corrosion within the ESP.[91] Specifically, as noted by the O&M Manuals, the CDS spray nozzles must emit water in a very fine mist in order to limit the moisture content, and, thus, corrosiveness of the ash.[92] Accordingly, the O&M Manuals require that Plant operators periodically check and clean the spray nozzles to ensure that they do not become clogged, which would result in improper atomization.[93]

Notwithstanding its contractual obligation to do so, AES did not submit operating logs or other information to ALSTOM sufficient to verify its compliance with the O&M Manual requirements.[94] Significantly, AES' own records establish that the nozzles were not operating properly, and were performing more like a garden hose than a misting device.[95] AES' own consultant originally had observed that deficiency during an inspection prior to the discovery of

---

[90] March 16, 2004 e-mail from J. Toher to C. Little (Exhibit 19; A140).
[91] February 2000 Meeting Minutes (Exhibit 4 at 2 and 6; A054 and A058).
[92] O&M Manual Excerpts (Exhibit 6 at 9-12; A088).
[93] *Id.* at 9-5 through 9-7, and 9-12 through 9-14; A088-A090.
[94] Affidavit of W.M. Jarvis (Exhibit 1 at ¶¶ 7-8; A002-A003).
[95] January 30, 2004 e-mail from P. Stinson to AES personnel (Exhibit 31 at 2; A187).

the corrosion,[96] and he subsequently advised AES of his concern that AES was not properly recognizing or addressing that problem:

> I am a little concerned with your observations of the broom stick test.  I would say you should never get moist ash on the broomstick.  If you do, then this is indication of a drying problem.  My concern stems from the comment that moist ash on the broomstick is regarded as "normal."  This is definitely not normal and I suggest that this rudimentary test actually did suggest there was a drying problem that was confirmed when you tested the spray lance and found only half a spray pattern.[97]

As a result of AES' disregard of a problem with its maintenance of the nozzles, there was an overabundance of water injected, which, when combined with high chlorides and low flue gas temperature, led to the formation of corrosive acids.

AES failed to maintain properly the water nozzles as required by the O&M Manuals. Consequently, as a matter of law, AES cannot establish that it satisfied that condition to ALSTOM's Warranty obligations.

### 5.    AES failed to increase the CDS outlet temperature during operation of the soot blowers.

As noted, the O&M Manuals expressly stated that a "third critical process parameter" for the avoidance of corrosion concerned operation of the soot blowers.[98]  Specifically, because operation of the soot blowers can elevate the flue gas wet bulb temperature, AES was instructed that the CDS outlet temperature would need to be increased during the process;[99] ALSTOM provided control logic diagrams by which that action could be taken automatically.[100]

Notwithstanding ALSTOM's requests, AES never provided documentation that it complied with that requirement of the O&M Manuals.[101]  Indeed, examples of available operating information  demonstrates that it did not.[102]

---

[96] January 17, 2003 memorandum from J. Toher to R. McParland (Exhibit 32 at 2; A190).
[97] February 4, 2004 e-mail from J. Toher to AES personnel (Exhibit 31 at 1; A186).
[98] O&M Manual Excerpts (Exhibit 6 at 9-3; A079).
[99] *Id.*
[100] *See* transmittal of March 28, 2001 (Exhibit 7; A098).
[101] Affidavit of W.M. Jarvis (Exhibit 1 at ¶¶ 7-8; A002-A003).

AES failed to operate the equipment at proper temperatures during soot blowing as required by the O&M Manuals. Consequently, as a matter of law, AES cannot establish that it satisfied the conditions to ALSTOM's warranty obligations.

### 6.      AES failed to record O&M data and other required information.

The O&M Manuals repeatedly warned that EEC's guarantees (and, therefore, ALSTOM's Warranties) "are based on proper operation and maintenance procedures."[103] Because, pursuant to the Purchase Order, ALSTOM was to have "reasonable access to...operating records, the equipment and other information [ALSTOM] deemed necessary to satisfy themselves of the validity of a claim under [the] warranty,"[104] the O&M Manuals also repeatedly admonished AES personnel that operating data needed to be recorded and maintained. Among the items that the O&M Manuals specifically mandated documentation of were the daily physical measurements of the wet bulb temperature of the flue gas[105] and weekly measurements of the chloride concentration in the ash.[106]

Indisputably, AES plant personnel failed to provide such data to ALSTOM, notwithstanding its requests.[107] AES' internal records revealed they failed even to take the readings.[108]

ALSTOM bargained for the express right to operational records and other information necessary to verify AES' compliance with the conditions to ALSTOM's Warranty, and thus, . the validity of any accelerated corrosion claims. AES' failure to maintain proper records was, in and of itself, a material breach of the Purchase Order.[109] More significantly, however, AES' breach also constituted a failure to comply with requirements of the O&M Manuals – which provide that

---

[102] Control Room Log Book Excerpts (Exhibit 33 at 2-3; A193-A194).
[103] See, e.g, O&M Manual Excerpts (Exhibit 6 at 7-14 and 9-2; A076 and A078).
[104] Purchase Order Excerpts  (Exhibit 2 at Part III, ¶ 1.9; A017).
[105] See O&M Manual Excerpts (Exhibit 6 at 7-14 and 9-2; A076 and A078).
[106] Id. at 7-14 and 9-3; A076 and A079.
[107] Affidavit of W.M. Jarvis (Exhibit 1 at ¶¶ 7-8; A002 and A003).
[108] See September 15, 2003 electronic mail from D. Stone to AES employees (Exhibit 29 at 1; A181).
[109] See 4000 Old Pali Rd. Partners v. Lone Star, 862 P.2d 282 (Haw. Ct. App. 1993).

"operating logs of this data *must* be maintained by plant personnel" and "these readings *must* be maintained in the plant operating logs"[110] – and, consequently, a failure to satisfy the express condition of ALSTOM's accelerated corrosion Warranty.

AES failed to record and maintain data required by the O&M Manuals. Consequently, as a matter of law, AES cannot establish that it satisfied that condition to ALSTOM's Warranty obligations.

**C.    AES Utilized Feedstock That Voided ALSTOM's Warranty.**

The portion of the Purchase Order that included the specification for the CDS and EPS equipment included parameters for the coal (fuel) and ash (potential feedstock) that would be utilized for the Boiler in the Plant.[111]  As noted, the specification provided information to ALSTOM (and EEC) concerning the constituent nature of the anticipated fuel and feedstock, including its size, its hardness, and its chemical composition.[112]  Pursuant to that specification, ALSTOM was advised that equipment should be designed to operate with a coal and ash chlorine content of 0.03%, but with a potential actual range of 0 to 0.1% content.[113]  That was particularly notable inasmuch as the maximum allowable concentration of chloride in the ash was a "critical parameter" in controlling corrosion, as noted in the O&M Manuals.[114]

Significantly, as discussed above, AES neglected – in direct contravention of the O&M Manuals – to measure the chlorine content of the ash.[115]  When it finally did so some ten months into operations, it found that the chlorine contents in ash samples ranged from a low of 0.53% to a

[110] O&M Manual Excerpts (Exhibit 6 at 9-2 and 9-3; A078 and A079)(emphasis added).

[111] Ash generated by the combustion process became "feedstock" when AES "reinjected" ash into the Boiler combustors. Affidavit of W.M. Jarvis (Exhibit 1 at ¶ 4; A002).

[112] *See* Circulating Dry Scrubber Specification (Exhibit 26 at Attachment No. 1, p. 1 of 2; A174).

[113] *Id.*

[114] O&M Manual Excerpts (Exhibit 6 at 7-14 and 9-2; A076 and A078).

[115] *See, e.g.,* September 15, 2003 electronic mail from D. Stone to AES employees (Exhibit 29 at 1; A181); October 3, 2003 electronic mail from E. Sostre to C. Reyes (Exhibit 30; A183).

high of 1.1% – or anywhere from five to eleven times the amount specified in the Purchase Order specifications.[116]

AES' utilization of feedstock with chlorine percentages far in excess of limits contained in the specifications voided the Warranty, which expressly stated: "corrosion…caused in whole or in part by deviations in the fuel or feedstock from a limit specified in the Contract are excluded from any warranty obligations…."[117]

### D. Even Had AES Satisfied The Purchase Order Conditions Precedent And Had It Not Utilized Feedstock That Voided The Warranty, Significant Elements Of Its Damage Claim Are Unrecoverable As A Matter Of Law.

#### 1. The Court may limit and bar – on summary judgment – claimed damages that are without legal basis and that could not properly be presented to the trier of fact.

When claimed damages are not, as a matter of law, recoverable, summary judgment or other pretrial disposition is both appropriate and warranted.  Indeed, that principle is well-illustrated by decisions of this Court and Delaware state trial courts.

For example, in *Falcon Tankers, Inc. v. Litton Systems, Inc.,* the Superior Court of Delaware for New Castle County granted partial summary judgment to a supplier who asserted that, even assuming *arguendo* a breach of warranty, it could not be held liable for certain of the damages claimed.[118]  Similarly, in *Edwards v. Kent Rentals, Inc.*, the Superior Court of Delaware for Sussex County, in ruling on a motion for summary judgment, held that various items of claimed damage could not be sought or recovered "as a matter of law."[119]  Finally, in *CitiSteel U.S.A., Inc.  v. General Electric Company* (in the context of a Fed. R. Civ. P. 12 motion for judgment on the pleadings), this Court determined that, based on the language of the contract

---

[116] October 3, 2003 electronic mail from D. Stone to P. Stinson (Exhibit 34 at 1; A195); September 9, 2003 – October 3, 2003 analysis (Exhibit 35; A196).
[117] Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 1.8; A079).
[118] *Falcon Tankers, Inc. v. Litton Systems, Inc.*, 355 A.2d 898 (Del. Super. Ct. 1976).
[119] *Edwards v. Kent Rentals, Inc.*, C.A. No. 83C-0C10, 1989 Del. Super. LEXIS 373 (Del. Super. Ct. Sept. 20, 1989).

between the parties, the plaintiff was "barred as a matter of law" from recovering consequential

damages that it had claimed.[120]

Plainly, summary judgment is appropriate under such circumstances. As established

below, this is one of those circumstances.

> **2.  AES would not be entitled – under any circumstances – to recover an amount greater than the difference between the value of the goods as accepted and the value that they would have had if they had been as warranted, the measure of which is the direct cost of repair necessary to allow the equipment to perform for the duration of the warranty period.**

As a threshold matter, it is abundantly clear that the applicable contract – the Purchase

Order between D/FD Caribbean and ALSTOM for the provision of the CFB Boilers and related

equipment – is a contract for the sale of goods, and thus governed by the provisions of the

Uniform Commercial Code.[121]

Under Delaware's Uniform Commercial Code provisions, the breach of an express

warranty entitles a plaintiff to damages equal to "the difference at the time and place of

acceptance between the value of the goods accepted and the value they would have had if they

had been as warranted...."[122] Generally, the cost of repair is universally recognized as the

starting point for calculation of that difference in value,[123] as Professors White and Summers have

observed in their definitive treatise:

> A useful objective measure of the difference in value as is and as warranted is the cost of repair or replacement. Thus, if a buyer accepts a truck with a defective radiator, a good measure of the difference between the value of the truck as warranted and its value as delivered is the price of a new radiator less the value of the faulty one.[124]

---

[120] *CitiSteel U.S.A., Inc. v. Gen. Elec. Co.,* No. Civ. A. 99-810-GMS, 2001 WL 65740 (D.Del. Jan. 9, 2001).

[121] *See, e.g., New England Power Co. v. Riley Stoker Corp.,* 477 N.E.2d 1054, 1056 (Mass. App. Ct. 1985); *Lincoln Pulp & Paper Co. v. Dravo Corp.,* 445 F.Supp. 507 (D.Me. 1977).

[122] 6 DEL. CODE ANN. tit. 6, § 2714(d)(2006).

[123] *See* RESTATEMENT (SECOND) OF CONTRACTS § 348(2)(b).

[124] J. WHITE & R. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE § 10-2 at 377-78 (2d. ed 1980).

As also recognized by Professors White and Summers, however, problems arise when a buyer seeks the cost of repair or replacement that resulted in the buyer having obtained goods that have a greater value or longer life than that originally warranted – a situation that results in an enhancement by which the buyer receives a "windfall."[125]   In the construction industry, such enhancements are known as "betterment."   Subsequent enhancements or repairs that extend a component's original product warranty will constitute betterment, and thus, are not recoverable as damages in a breach of warranty action.

Illustrative of that principle are the facts and holding of *525 Main St. Corp. v. Eagle Roofing Co.*  In that case, a contract specified that the roofing system should be water-tight for a period of 10 years.[126]  When the system began leaking after the fifth year, the owner replaced it with another roof of the same quality and design as the original and subsequently sought to recover the cost of the new roof from the original roofing contractor.  The contractor argued that the owner already had obtained five years use from the old roof and would now have the benefit of a new 10-year roof, which would extend the expected roof life five years beyond the original warranty.  On appeal, the Supreme Court of New Jersey determined that the owner could recover only half the cost of the new roof, because any greater recovery would give the owner an enhanced roof durability benefit beyond its original warranted life expectation.[127]

Similarly, in *Hooton v. Kenneth B. Mumaw Plumbing and Heating Co.*, an appellate court concluded that the plaintiffs, in pursuing their breach of warranty claims with respect to a deficient heating and cooling system, were "only entitled to a system which will fulfill the warranty made by [defendant], and not one which may be designed to exceed that standard, nor

---

[125] *Id.* at 378.

[126] *525 Main St. Corp. v. Eagle Roofing Co.*, 168 A.2d 33 (N.J. 1961).

[127] *Id.*; *see also Dierickx v. Vulcan Indus.,* 158 N.W.2d 778 (Mich. Ct. App. 1968)(roof repairs extended roof life beyond warranty.); *Allied Chem. Corp. v. Van Buren Sch. Dist. No. 42,* 575 S.W.2d 445 (Ark. 1979)(repairs extended life beyond warranty duration).

one which results in unreasonable economic waste."[128]  In making that determination, the court

noted that the "measure of damages in breach of express warranty cases … is the amount of

money which will render that which is guaranteed to be as warranted."[129]  In this case, because

AES seeks to recover damages that relate to betterment efforts – including steps taken to extend

the useful life of warranted ESP collector plates beyond the four year term of ALSTOM's

Warranty – those damages are not recoverable as a matter of law.

> **3.    AES may not, as a matter of law, recover claimed damages based on the cost of replacement collector plates that have not been, and will not be, installed during the four year warranty period.**

Among the elements of damage claimed by AES is an "estimated" $1.4 million for

replacement collector plates and an additional $2 million "estimated" for labor to install the plates

some time in the future.[130]  Those plates have not been installed; indeed, they recently have been

added to AES' "inventory" for accounting purposes.[131]

Notably, there is no evidence of an intention by AES to install those replacement

components within the remaining duration of the four year warranty.  More significantly, there is

no evidence of a need to install those replacement plates because of corrosion reasonably

expected to materially affect (i) the structural integrity of the equipment or (ii) the ability of the

equipment to perform during the remaining months of the Warranty, which will expire no later

than December 18, 2006.[132]

Replacement of collector plates after expiration of the Warranty term would constitute,

for the purposes of AES' breach of warranty claim, a betterment.[133]  AES would be obtaining

---

[128] *Hooten v. Kenneth B. Mumaw Plumbing & Heating Co.*, 318 A.2d 514, 519 (Md. 1974)(citations omitted).
[129] *Id.* at 573, 214 A.2d at 518(quoting *Correlli Roofing Co. v. Nat'l Instrument Co.*, 214 A.2d 919, 921 (Md. 1965)).
[130] *See* AES Supplemental Answers to Interrogatory No. 10 (Exhibit 24 at 2; A159).
[131] August 29, 2005 internal AES e-mail claim (Exhibit 36; A202).
[132] *See* Footnote 32, *infra*.
[133] *See, e.g., Hooton*, 318 A.2d at 514; *525 Main St. Corp.*, 168 A.2d at 33.

from ALSTOM (or at ALSTOM's expense) equipment that would have a significantly longer useful life than that warranted. It may not properly do so.

AES may not recover the claimed damages relating to the purchase and installation of those replacement plates.

> **4.      AES may not, as a matter of law, recover claimed damages based on consequential costs that are unrelated to repair and replacement of corroded collector plates.**

AES also has claimed, as elements of its alleged damages, various "ongoing" and "estimated" costs involving additional amounts for operations and maintenance, "boiler water injection," "CDS clean water supplement" and "other water supply changes."[134]  Those claimed elements of damage are also not recoverable as a matter of law.

As established above, to the extent that the claimed amounts reflect costs that purportedly will be spent after expiration of the four year warranty, they constitute a betterment and cannot be recovered.

Even more significantly, all of those claimed costs are consequential.  Plainly, they are not costs directly related to the repair of corroded collector plates, or, for that matter, the claimed corrosion failure.  Professors White and Summers have explained, by the following example, the sometimes seemingly amorphous distinction between (i) direct repair or value differential damages that are recoverable under U.C.C. § 2-714(2) and (ii) consequential damages addressed by U.C.C. § 2-715(2):

> To illustrate:  in *Russo v. Hilltop Lincoln-Mercury, Inc.,* defective wiring caused a fire which destroyed the buyer's new automobile.  The court awarded the buyer the full purchase price of the automobile without identifying that portion of the price which represented recovery for consequential damages.  Only the difference between the automobile's warranted and actual value at the time of acceptance could be recovered as general damages under 2-714(2).  *The defective wiring system reduced the actual value of the automobile at the time of acceptance below the purchase price, but the defect did not render the auto worthless as of the acceptance date.*  A large part of the fire

---

[134] AES Supplemental Answers to Interrogatory No. 10 (Exhibit 24 at 2; A159).

damage was therefore consequential. Had the parties excluded consequentials by contract, the court would have had to identify the value differential component of the buyer's total loss.[135]

Equally illustrative is the case of *Wood River Pipeline Co. v. Wilbros Engineer Services Co.* That case involved rupture of an oil pipeline, with an owner claiming, *inter alia*, breach of warranty and seeking damages based on harm to real property at the site of the oil spill, the costs of replacing oil lost in the spill, the costs of repairing the pipeline, and the costs of recovering oil spilled.[136] The defendant contended that, under its contract, it "clearly [would be] liable for *actual* damages – *e.g.*, the cost of labor and materials to repair a ruptured pipeline – but it [was] excluded from liability to [the owner] for *consequential* damages."[137] The court agreed, granting partial summary judgment on the basis that the contract barred liability for all damages other than the direct costs of repair.[138]

As noted above, the Purchase Order contains a like provision. Because, by agreement, ALSTOM cannot be held liable for incidental, special or consequential damages resulting from a failure of the equipment or a breach of the Warranty,[139] the elements of damage claimed by AES that relate to anything other than the cost of labor and materials to repair or replace corroded plates during the warranty period are simply not recoverable as a matter of law.

>    5.    **AES may not, as a matter of law, recover claimed damages based on future improvements to the Plant water treatment system, including the brine crystallizer unit.**

AES' claim for the approximate $25 million that it estimates as the cost of its future Plant water treatment system improvements – including the brine crystallizer unit and the cost of operating those systems – are also not recoverable for many of the reasons cited above, as well as for one significant additional reason discussed below.

---

[135] J. WHITE & R. SUMMERS, *supra,* § 10-4 at 386-37 (emphasis added).
[136] *Wood River Pipeline Co. v. Wilbros Eng'r Serv. Co.*, 738 P.2d 866 (Kan. 1987).
[137] *Id.* (emphasis in original).
[138] *Id.*
[139] Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 52.0; A044-A045).

First, installation and operation of that new equipment indisputably will not occur during the remaining eight or nine month duration of the equipment's Warranty period, [140] and thus is not required to protect the equipment during the Warranty period against failure either of (i) structural integrity or (ii) ability to mechanically perform. To the extent that those future water treatment system improvements provide such protection thereafter – if, in fact, they do so at all – they would constitute betterment and the costs would not be recoverable.

Second, the costs clearly would be consequential inasmuch as they would have no direct relationship to the cost of labor and materials to repair a corroded plate (or any other warranted component for that matter).

Finally (and even if they were deemed otherwise recoverable), the claimed future costs are not recoverable because they purportedly are required – as AES itself describes them – to remediate problems created by AES' own unilateral installation of the new RO units. Indeed, in its internal Crystallizer Project Justification document, AES itself admitted that the reason for the new improvements was because AES' unilaterally-installed RO units "created new problems." [141]

In *Falcon Tankers*, discussed briefly above, the Superior Court of Delaware granted summary judgment to the defendant supplier, discharging it from any responsibility for costs incurred by plaintiff relating to the failure of plaintiff's own repair – in that instance, replacement joints obtained by the plaintiff that themselves had failed.[142] In reaching that conclusion, the court held:

> By the great weight of authority, consequential damages are only granted where the breach is a proximate cause of the losses and the damages were reasonably foreseeable at the time of contracting. It is also recognized by the weight of authority that the negligence of an intervening party is not foreseeable. While it is clearly foreseeable that [plaintiff] would need to replace defective parts by obtaining replacement joints, it was not

---

[140] *See* AES Supplemental Answers to Interrogatory No. 10 (Exhibit 24 at 2; A159).
[141] AES Brine Crystallizer Project Justification (Exhibit 25 at 4; A166).
[142] *Falcon Tankers, Inc.,* 355 A.2d at 898.

foreseeable that the replacement joints would themselves be defective.[143]

The court reached a similar result in *Long Island Lighting Co. v. IMO Industries, Inc.*[144] In that case, the court concluded that certain damages were not recoverable because "much of the expenses incurred by [plaintiff were] the result of poor judgment and mismanagement, which could not have been foreseen by [defendant]." In that regard, the court concluded, the plaintiff's "mismanagement and its own negligence negate any causation on the part of [defendant]."[145]

Much like *Falcon Tankers* and *Long Island Lighting*, the brine crystallizer and other proposed water treatment system improvements are required solely to address the "new problem" created by AES' own failed RO remedy, for which ALSTOM bears no responsibility and for which it cannot properly be held liable.

Those claimed damages are not recoverable as a matter of law.

> **6.    Even if all of AES' claimed damages had a proper legal basis – which they do not – the principle of disproportionality mandates that the Court limit damages to those that were foreseeable.**

A significant limitation on recovery of all contract damages is the principle of disproportionality: the avoidance, in the interest of justice, of damages disproportionate to the agreed contract price. That principle, as reflected in the Restatement of Contracts, focuses on the raw injustice of burdening one party with damages that otherwise might be recoverable, but that are excessive under the circumstances. Thus, pursuant to the Restatement, "a court may limit damages to foreseeable loss … if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation."[146]

The Comment to that Restatement section expands on the particular circumstances where justice requires such relief:

---

[143] *Id.* at 907 (citations omitted).
[144] *Long Island Lighting Co. v. IMO Industries, Inc.*, No. 85 Civ. 6392 (RO), 1990 U.S. Dist. LEXIS 5351 (S.D. N.Y. May 9, 1990).
[145] *Id.*
[146] *See* RESTATEMENT (SECOND) OF CONTRACTS §351(3).

> It is not always in the interest of justice to require the party in
> breach to pay damages for all of the foreseeable loss that he has
> caused. There are unusual instances in which it appears from the
> circumstances either that parties assumed that one of them would
> not bear the risk of a particular loss or that, although there was
> no such assumption, it would be unjust to put the risk on that
> party. One such circumstance is extreme disproportion between
> the loss and the price charged by the party whose liability for
> that loss is in question. The fact that the price is relatively small
> suggests that it was not intended to cover the risk of such
> liability.[147]

The *Long Island Lighting* case discussed above also touched upon the concept underlying

that doctrine, albeit without express citation to the Restatement. In ruling on a motion for

summary judgment – and in a context where, for the purposes of that motion, the contract's

consequential damage limitation was assumed to be inapplicable, the court nevertheless rejected

claimed damages far in excess of the price of the equipment because award of such damages

would be patently unfair and unreasonable:

> Taking a reasonable overview here, more than 10 years ago,
> [defendant] sold [plaintiff] three pieces of equipment for a little
> over $2 million, some part of which surely represented profit.
> Now [plaintiff] presents a "bill" of more than $245 million.
> Although it may have been foreseeable to [defendant] in 1974
> that [plaintiff] would reject the engines if it found them to be
> defective, and that [plaintiff] as a result would be forced to
> purchase alternative engines, and that the cost of replacement
> diesels might exceed the contract price since [defendant] knew
> the diesels would not be installed for some time, the events that
> actually did transpire could not under any stretch of the
> imagination have been foreseeable [at the time of contracting] in
> 1974.[148]

The same holds true of AES' damage claims here. The amounts claimed for the future

water treatment system improvements are so attenuated and expansive as to have been wholly

unforeseeable at the time of contracting. Clearly, no rational supplier of goods would (or could)

have contemplated that corrosion of ESP components having a value of less than $2 million (with

the entirety of the CDS/EPS subcontract cost at only $14 million) would lead to exposure to more

---

[147] *Id.* at Comment f.
[148] *Long Island Lighting Co,* 1990 U.S. Dist. LEXIS 5351 at * 12-13.

than $34 million in claims by the Owner for future improvements to its Plant water treatment system.   As a matter of justice and law, they must be deemed as not recoverable.

## V.     CONCLUSION

Accordingly, for each of the foregoing reasons, ALSTOM Power Inc. respectfully requests that the Court grant its Motion, entering partial summary judgment on its behalf, and awarding it its attorneys' fees and costs, and such other relief as the Court deems necessary, just, and proper.


Respectfully submitted,

ALSTOM POWER INC.


/s/ Daniel W. Scialpi
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19801
(302) 888-3222
dscialpi@wierlaw.com



James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:     (410) 547-0699