# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,            *

    Plaintiff                         *

v.                                *   C.A. No. 04-1282-JJF

ALSTOM POWER INC.,                *

    Defendant                         *

\*     \*     \*     \*     \*     \*     \*

### AFFIDAVIT OF WILLIAM M. JARVIS

1. I, William M. Jarvis, am greater than eighteen (18) years of age and am competent to testify.

2. I served as a Project Manager for ALSTOM Power Inc. ("ALSTOM") during construction of the 454-megawatt co-generation coal-fired power plant in Guayama, Puerto Rico (the "Plant"). AES Puerto Rico ("AESPR") is the owner of the Plant, and an entity known as Duke/Fluor Daniel Caribbean, S.E. ("D/FD") designed the Plant for AESPR and was the general contractor.

3. ALSTOM contracted to furnish and install in the Plant two circulating fluidized bed boilers ("Boilers") and related air-pollution control equipment, with the latter composed of a pair of circulating dry scrubbers ("CDS") and electrostatic precipitators ("ESP"). Given the nature of AESPR's specifications relating to that pollution control equipment, there was only one supplier that, as a practical matter, could provide the equipment, Environmental Elements Corporation ("EEC"). Consequently, based on that essentially sole source specification, ALSTOM entered into a purchase order with EEC, by which EEC agreed to furnish the pollution control equipment at an approximate cost of $14,600,000.

A 001

4. AESPR burned coal in the Boiler's combustors as fuel and also reinjected ash as feedstock.

5. As coal or other feedstock (such as ash) is burned in the combustor portion of the Boilers, the smoke and ash from the combustion process (collectively, the "flue gas") rise out of the top of the combustor. As that flue gas passes through the other portions of the Boiler, much of the ash is separated and removed. After the flue gas leaves the Boiler, it enters the CDS, where sulfur dioxide is removed and the flue gas is cooled, utilizing nozzles that are intended to spray the flue gas with an atomized mist, or fog, of cooling water. From the CDS, the flue gas enters the ESP, where it passes through an electrical field that positively charges the particles of ash in the gas. Those positively charged ash particles are then attracted to thin, negatively charged steel "collector plates" in the ESP, which are designed to capture most of the ash remaining in the flue gas before it reaches the smokestack.

6. On or about November 21, 2003 – after approximately one year of operation by AESPR – AESPR personnel found corrosion in portions of one ESP during an inspection. ALSTOM was advised and immediately mobilized a specialist to the Plant to inspect the corrosion and to initiate a root cause analysis. The purpose of that root cause analysis was two-fold: (i) to ascertain the cause of the corrosion and, thus, to determine whether it was covered by the corrosion warranty in ALSTOM's Purchase Order; and (ii) to develop appropriate remedial action to address the causal factors leading to the corrosion.

7. For the purposes of ALSTOM's root cause analysis and to satisfy ALSTOM as to the validity of AESPR's warranty claims, I requested operating records and other information from AESPR necessary to determine whether AESPR had: (i) monitored and controlled the chloride content of the water; (ii) monitored and controlled the chloride content of the ash; (iii) adjusted the flue gas approach temperature according to the level of chlorides and moisture

in the system; (iv) properly maintained the water nozzles in the CDS; (v) operated the equipment at required temperatures during soot blowing; and (vi) maintained mandated records.

8. AESPR never provided documentation — including operating records and other information — sufficient to verify that it had complied with the Operations & Maintenance Manual requirements, had satisfied the conditions to ALSTOM's warranty obligations, or that its warranty claims were valid under the terms of the Purchase Order.

I HEREBY AFFIRM, under the penalties of perjury, that the foregoing is true and correct based on my personal knowledge.

Dated: March 23, 2006

_____
William M. Jarvis

# Exhibit 2

SIGNATURE DOCUMENT

CONTRACT NO. W419-44-C0001

THIS CONTRACT IS entered into, effective as of February 24, 1998 by and between Duke/Fluor Daniel Caribbean S.E. (hereinafter referred to as "Duke/Fluor Daniel Caribbean S.E." or "DFDC")

whose address is:   Duke/Fluor Daniel Caribbean S.E.
P.O. Box 1011
Charlotte, NC 28201-1011

and Combustion Engineering, Inc. (hereinafter referred to as "Contractor" or "ABBCE"),

LICENSE NUMBER ___TBD___

whose address is:
ABB Combustion Engineering Systems
Combustion Engineering, Inc.
P.O. Box 500
2000 Day Hill Road
Windsor, CT 06095-0500

In consideration of the agreements herein contained, the parties hereto contract and agree as follows:

ARTICLE 1.0    CONTRACT DOCUMENTS

This Contract shall consist of this Signature Document and the following documents, and the exhibits, drawings, specifications and documents referred to therein, all of which by this reference are incorporated herein and made a part of this Contract:

DEFINITION OF TERMS
PART I  -  SCOPE OF WORK (Including 4 specs)
PART II  -  COMMERCIAL TERMS
PART III -  GENERAL TERMS

Said Contract sets forth the entire Contract and agreement between the parties pertaining to the Work and supersedes all inquiries, proposals, agreements, negotiations and commitments, whether written or oral, prior to the date of execution of this Contract, pertaining to said Work of this Contract. The provisions of this Contract may be changed only by a writing executed by Duke/Fluor Daniel Caribbean S.E. and Contractor. Trade custom and trade usage are superseded by this Contract and shall not be applicable in the interpretation of performance of this Contract.

ARTICLE 2.0    PRECEDENCE

In cases of express conflict between PARTS of the Contract, specifications, drawings or exhibits, the order of precedence shall be as follows:

- 1 Signature Document
- 2 Definition of Terms
- 3 PARTS I and II
- 4 PART III - General Terms

In the event of an express conflict between the documents listed above, or between any other documents which are a part of the Contract, Contractor shall notify DFDC immediately and shall comply with DFDC's resolution of the conflict.

A 004

ARTICLE 3.0              SCOPE OF WORK

Except as otherwise expressly provided elsewhere in this Contract, Contractor shall supply all services, things, and items of expense necessary to perform, and shall perform, the Work generally described as:

Design, Manufacture, Supply, Delivery, Erection, and Startup Assistance of the Circulating Fluidized Bed Boilers, Circulating Dry Scrubber Flue Gas Desulfurization Systems, and Electrostatic Precipitators.

said work being more particularly described in PART I - SCOPE OF WORK (herein referred to as "Work"), for and in connection with the

AES PUERTO RICO TOTAL ENERGY PROJECT

said Work to be performed on a site to be designated by Duke/Fluor Daniel Caribbean S.E. at or in the vicinity of Guayama, Puerto Rico.

Contractor acknowledges that Contractor's Work done under this Contract is part of Duke/Fluor Daniel Caribbean S.E.'s obligation to AES Puerto Rico L.P. (hereinafter referred to as "Owner") under the Engineering, Procurement and Construction Services Agreement between AES Puerto Rico L.P and Duke/Fluor Daniel Caribbean S.E. dated effective as of April 3, 1996 (the "EPC Contract"). Contractor hereby agrees to assume full responsibility for all its obligations under this Contract between ABBCE and DFDC.

ARTICLE 4.0              CONTRACT PRICE

Contractor's full compensation for full and complete performance by Contractor of all the Work and compliance with all terms and conditions of this Contract shall be as set forth in PART II - COMMERCIAL TERMS.

ARTICLE 5.0              CAPTIONS

Titles and captions used in this Contract are for convenience only and shall not be used in the interpretation of any of the provisions of this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Contract on the day and year below written, but effective as of the day and year first set forth above.

COMBUSTION ENGINEERING, INC.              DUKE/FLUOR DANIEL CARIBBEAN S.E.

BY: _____              BY: C.L. Roy Jr.

TITLE: _____              TITLE: PRESIDENT

DATE: 2/24/98                            DATE: 2/24/98

PART II
COMMERCIAL TERMS

1.0 CONTRACT PRICE, NTP, and NO SHOP

    1.1 Full compensation to Contractor for full and complete performance by Contractor of all the Work, compliance with all terms and conditions of this Contract, and for Contractor's payment of all obligations incurred in, or applicable to, performance of the Work shall be the total Lump Sum Contract Price of One Hundred Nineteen Million DOLLARS ($119,000,000). At the end of the project, Contractor will provide a reasonable and appropriate itemized breakdown of the Contract Price to Owner if requested. This breakdown will not be subject to audit.

    1.2 It is agreed and understood by Contractor and D/FDC that Contractor's and D/FDC's performance obligations, excluding Section 2.0 of Part II, shall commence immediately upon receipt of the Notice to Proceed (NTP) from D/FDC and that none of the performance obligations set forth in this contract shall become effective unless and until such notice is given and delivered to Contractor.

    1.3 Unless this agreement is otherwise terminated pursuant to the terms and conditions contained herein, for the term described in Section 2.2 of Part II of this Agreement, DFDC shall not entertain, solicit, or otherwise investigate or procure offers from any other parties with respect to the services described in Part I - Scope of Work.

2.0 PRICING BASIS

    2.1 The Contract Price set forth herein is firm for the duration of the Work and includes all Contractor's costs, expenses, overhead and profit for complete performance of the Work.

    2.2 The Contract Price set forth herein is firm and shall remain valid as long as a notice to proceed is issued on or prior to February 1, 1999.

3.0 PRICING FOR CHANGES

Adjustments to the Contract Price for any change, other than those expressly stated in Section 2.0 above, in the Scope of Work shall be in accordance with the provisions of the Article 16 entitled CHANGES and Article 19 entitled CLAIMS as set forth in PART III.

4.0 TAXES

    4.1 The Contract Price as set forth herein includes those taxes and fees set forth in the Article 43 entitled Taxes, Duties and Fees in PART III.

    4.2 DFDC is required to obtain correct taxpayer identification numbers from all noncorporate payees who receive payment for

A 006

services, rents, royalties or interest that would be subject to IRS Form 1099 reporting. Twenty percent back-up tax withholding will be imposed on all Form 1099 reportable payments made to Contractor if Contractor fails to provide a correct taxpayer identification number.

4.3 Contractor will be compensated for any increase in tax rates, license fees, and permit fees or any new taxes, licenses or permits imposed after the effective date of the Contract; provided however that this provision shall be limited to sales, use, and excise taxes assessed against the Work and to licenses and permits required specifically for the Work.

5.0 PAYMENT TERMS

DFDC agrees to make payment to Contractor by wire transfer based upon the Progress Payment Schedule (Attachment 13.B to this Part II) providing verification has been established that the milestone event(s) tied to that specific payment has been satisfactorily completed. Invoices will not be paid prior to completion of the stated milestone nor earlier than the listed invoice date. Contractor's performance of its obligations hereunder will not be considered complete until, without limitation, DFDC is in receipt, in proper form, of all engineering data requirements, drawings, parts and spare parts lists and instructions manuals. Payment Terms, including retainage requirements, shall be in accordance with the provisions of the Price and Payment Articles as set forth in PART III.

6.0 DETERMINATION OF UNITS

All units of Work performed for the Contract Price set forth in Article 1.0, and Pricing for Changes in Article 3.0 of this PART II shall be determined and documented in accordance with the provisions set forth in the Article entitled Documentation and Right of Audit set forth in PART III.

7.0 SPECIAL INVOICING INSTRUCTIONS

7.1 The cut-off date for Contractor's progress invoice shall be five (5) calendar days after the first day of the month covered by such invoice.

7.2 Contractor shall submit separate invoices in original form with three (3) copies complete with all supporting documentation to DFDC's Office Address shown in Section 12.0 of this Part II.

7.3 Contractor's invoices shall be on a progressive basis and clearly marked with this Contract Number.

A 007

7.4 Contractor's invoices shall be cross referenced to the Progress Payment Schedule.

7.5 DFDC shall not be obligated to pay for invoice items which are not in accordance with the Progress Payment Schedule. DFDC reserves the right to make provisional payment on an invoice in dispute, pending audit and reconciliation of the total charge.

    7.5.1 Only invoices stamped by DFDC, as received by the cut off date as defined in subsection 7.1 and accompanied by Contractor's partial (conditional) lien waivers (in substantially the form shown in Attachment 13.E and in addition to any other documentation or substantion required hereunder or as directed per Article 42.6 of Part III) will be paid by wire transfer within thirty (30) calendar days of the cutoff date. Each authorized and approved change to the Contract is to be invoiced separately in the manner provided in this Article.

    7.5.2 Contractor shall sign each invoice certifying that all Work covered by the invoice is complete and that the invoice is correct, authentic and the only one issued for the Work described therein.

7.6 Retainage shall be paid to Contractor in accordance with the terms set forth in Article 42.0 Invoicing and Payment of Part III of this Contract.

8.0 BACKCHARGES

A backcharge is a cost sustained by DFDC and chargeable to Contractor, which shall either be paid by Contractor or, at DFDC's option, deducted from amounts owed to Contractor. Without limitation and by way of example only, backcharges may result from:

8.1 Services performed by DFDC, at Contractor's request, for work which is within Contractor's Scope of Work under this Contract, or

8.2 Costs sustained by DFDC as a result of Contractor's non-compliance with the provisions of this Contract or Contractor's act or omission or negligence.

8.3 Upon identification by DFDC of an actual or anticipated backcharge, DFDC will issue Contractor with a written backcharge notice in accordance with Article 19 - Claims of Part III. This Notice shall describe the backcharge Work to be performed (if any), the schedule period for performance, the cost to be charged by DFDC to Contractor for the backcharge and other terms. The backcharge cost shall include:

    8.3.1 Labor: at actual cost plus 15% to cover payroll additives;

  8.3.2 Material: at actual supplier and freight invoice cost delivered to jobsite;

  8.3.3 Construction Equipment: at actual third party rental cost or at DFDC's equipment rental rates whichever may be applicable;

  8.3.4 10% shall be added to Paragraph's 8.3.1 through 8.3.3 above for indirect costs, overhead, supervision and administration.

  Thirty (30) calendar days after commencement of the Backcharge Work or on completion of the Backcharge Work, whichever occurs sooner, DFDC will invoice Contractor for the incurred Backcharge Cost.

9.0 CANCELLATION SCHEDULE

In the event this Contract is canceled in accordance with Article 18.0 - Termination at Duke/Fluor Daniel Caribbean S.E.'s Option of Part III, DFDC agrees to make compensation to Contractor and Contractor agrees to accept as full and complete payment to Contractor for all cancellation charges or claims of Contractor for such Termination, payment based on the Cancellation Schedule (Attachment 13.C to this Part II). Termination and Cancellation Terms shall be in accordance with the provisions of the Termination at Duke/Fluor Daniel Caribbean SE's Option - Article 18.0 as set forth in PART III.

10.0 LIQUIDATED DAMAGES

10.1 GENERAL

DFDC and Contractor agree that, at Release of this Contract, the milestones shown in the Contract Master Schedule (Attachment 13.D to this Part II) of this Contract will be assigned specific dates based on the agreed upon durations from Release. Contractor guarantees the dates that will be established based on the durations stated in the Contract Master Schedule of this Contract to be the firm date for completion by Contractor of all activities pertaining to each specific milestone.

Contractor shall meet the Performance Acceptance and Performance Guarantees set forth in this Section 10.0 on or before the dates specified. The parties agree that failure of Contractor to meet these dates and Performance Guarantees will do DFDC harm and that damages for failure to meet said guarantees are extremely impracticable or impossible to predict or calculate, and accordingly Contractor shall be liable for liquidated damages to DFDC for failure to achieve Performance Acceptance or Performance Guarantees as specified below, which liquidated damages Contractor will pay to DFDC. Contractor acknowledges and affirms that the amounts of liquidated damages set forth herein do not constitute a penalty, but rather are a fair estimate and assessment of damages which are uncertain and not readily ascertainable. The liquidated damages set forth in this Section 10.0 are the sole and exclusive remedies of DFDC for failure of Contractor to meet Performance Acceptance or Performance Guarantees. The parties agree that liquidated damages are in lieu of actual damages and

DFDC will not attempt to recover actual damages for Contractor's failure to achieve the guarantees stipulated in this Section 10. All liquidated damages specified herein are cumulative and no liquidated damages shall be deemed to supplement, replace, supersede or in any way reduce any other liquidated damages for which Contractor is responsible.

If liquidated damages for delay and/or performance are not assessed against DFDC by the Owner, and DFDC incurred no additional expense in mitigating the impact of Contractors failure to meet any performance and/or schedule guarantee, then DFDC shall waive liquidated damages for schedule and/or performance. Liquidated Damages for schedule and/or performance shall be waived if the cause of the delay or performance shortfall is beyond the scope of the Contractor's Work

## 10.2 LIQUIDATED DAMAGES FOR LATE DRAWINGS AND DATA SUBMITTAL

The Contractor recognizes that DFDC will suffer damages in the event of delay in schedules for submittal of Final drawings and data as specified in the DDMISR. Contractor shall submit drawings and data packages to arrive at DFDC on or before the specified dates. Documents submitted shall be in accordance with the requirements of this Contract. Documents that do not meet these requirements will be returned to the Contractor and will not be accepted until resubmitted and received in proper form and content by DFDC. The parties agree that the sum of $500.00 per calendar day is a reasonable and fair estimate of damages and loss which DFDC would suffer for each such calendar day that Contractor is late in submitting each drawing package or data package. It is therefore agreed that, in the event of such failure by Contractor, Contractor shall pay to DFDC the sum of $500.00 for each calendar day by which the actual date of each drawing package or data package is later than the said firm drawing package or data package submittal date.

## 10.3 LIQUIDATED DAMAGES FOR LATE PERFORMANCE ACCEPTANCE

10.3.1 Contractor guarantees that it will, with respect to its performance under this Agreement, perform all things necessary to enable DFDC to achieve Performance Acceptance on or before the Guaranteed Performance Acceptance Date, which is 29 months after the issuance of the Notice to Proceed (NTP) to Contractor, which Performance Acceptance shall be achieved hereunder if and only if:

A.  The Facility has operated as a whole for a period of at least 100 continuous hours and has successfully satisfied the criteria of the 100 hour Performance Test as described in Appendix D of the EPC (Attachment 13.G).

B.  All equipment and facilities necessary for the full, safe and reliable operation of the Facility have been properly constructed, installed, insulated and protected where required, and correctly adjusted, and all portions of the Contractor's Scope of Work can be used for their intended purposes in accordance with all applicable laws and applicable permits.

C. The Facility, and specifically Contractor's Work, is fully and properly interconnected and synchronized with the electrical system of the Utility by DFDC and all features and equipment of the Facility are capable of operating simultaneously in accordance with the applicable provisions of the Power Purchase Agreement and the detailed written operating procedures developed thereunder (to the extent such procedures are consistent with Prudent Utility Practices and impose requirements that were or should have been reasonably foreseen by Contractor under the circumstances) and all portions of the Facility can legally and safely be placed in commercial operation for their specified purpose.

D. Owner accepts the Notice of Performance Acceptance, or if Owner has not accepted the Notice of Performance Acceptance, it has not done so for reasons completely exclusive of Work provided by Contractor.

10.3.2 If Contractor fails to perform all things necessary in accordance with Contract Master Schedule (Attachment 13.D) to enable DFDC to achieve Performance Acceptance on or before the guaranteed Performance Acceptance Date, and provided that DFDC has to pay liquidated damages to the Owner for late completion of Performance Acceptance, then Contractor shall be liable to DFDC for liquidated damages as follows:

$$\text{Liquidated Damages} = \$300,000 \times a$$
where:

$a$ = Number of days, or partial days, for which Contractor has failed to perform all things necessary to enable DFDC to achieve Performance Acceptance on or before the Guaranteed Performance Acceptance Date.

10.4 LIQUIDATED DAMAGES FOR TECHNICAL PERFORMANCE

10.4.1 Contractor guarantees the performance of the equipment and other Work covered by this Contract to be in accordance with the guaranteed data as set forth in the following Confirmed Equipment Specifications (Attachments to Scope of Work - Part I), which Guarantees are sometimes referred to as "Performance Guarantees":

- Circulating Fluidized Bed Boiler Specification W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.00-0001, Revision 0;
- Circulating Dry Scrubber FGDS Specification W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.03-0001, Revision 0; and
- Electrostatic Precipitator Specification W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.03-0002, Revision 0.

10.4.2 Contractor's achievement of these Performance Guarantees will be demonstrated over a four (4) hour test period as set forth in Appendix D Performance Test Plan (Attachment 13.G) which will occur during the Performance Test. Contractor's achievement of these Performance Guarantees will be tested per the methods specified in the Performance Test Plan. (Attachment 13.G).

10.4.3 It is agreed that the actual damages and loss which DFDC would incur as a result of Contractor's default in its obligation to meet the

A 011

Performance Guarantees would be impractical and difficult to determine and that the sums listed below are a reasonable and fair estimate of the damages and loss which DFDC would suffer by Contractor's failure to meet the Performance Guarantees. It is, therefore, agreed that Contractor shall pay DFDC the following liquidated damages for any shortfalls in meeting the Performance Guarantees:

A. Auxiliary Power Consumption:
$2,733 for each full KW that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

B. Efficiency:
The amount shown below for each 0.1% of efficiency that the Facility is below the guarantee value for each of the following operational loads, as defined in the performance section of the technical specification.

| Operational Load | Efficiency Liquidated Damages |
|---|---|
| 100% | $207,000 per 0.1% of efficiency loss |
| 90% | $203,500 per 0.1% efficiency loss |
| 65% | $ 42,900 per 0.1% efficiency loss |
| 50% | $ 11,000 per 0.1% efficiency loss |

C. Economizer Inlet to Superheater Outlet Pressure Drop:
$13,500 for each full one psi of superheater or economizer pressure drop that the unit is in excess of the guarantee value, as defined in the performance section of the technical specification.

D. MCR Steam Flow:
$265,000 for each full 1000 lb./hr. of main steam flow that the unit is below the guarantee value, as defined in the performance section of the technical specification.

E. Boiler Steam Temperature:
$160,000 for each full 1 degree F of main steam or reheat steam temperature that the unit is below the guarantee value, as defined in the performance section of the technical specification.

F. Limestone: (Aragonite)
$590 per each full pound per hour of Limestone that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

G. Lime:
$6,565 per each full pound per hour of Lime that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

H. Urea:
1) $17,869 per each full pound per hour of Urea that the Facility is in excess of the 85% to 100% MCR guarantee value, as defined in the performance section of the technical specification.
2) $1,370 per each full pound per hour of Urea that the Facility is in excess of the Less than 85% MCR guarantee value, as

defined in the performance section of the technical specification.

## 10.5 PAYMENT OF LIQUIDATED DAMAGES

10.5.1  Contractor agrees that all sums payable by Contractor to DFDC as liquidated damages pursuant to this Section 10 shall be paid promptly to DFDC or, at DFDC's option, may be deducted by DFDC from the price to be paid to Contractor hereunder. The liquidated damages are agreed to be a reasonable estimate of actual damages, not a penalty.

10.5.2  The liquidated damages set forth in this Section 10.0 are the sole and exclusive remedies of DFDC for failure of Contractor to meet Performance Acceptance or Performance Guarantees, however, shall not constitute a waiver of any rights of DFDC to damages or other remedies of DFDC under other Sections of this Contract not related to Contractor's failure to meet Performance Acceptance and/or Performance Guarantees.

10.5.3  Contractor's liability for liquidated damages shall be limited in accordance with Article 52.0 of Part III of this Contract, provided, however, that liquidated damages shall not be deemed to be incidental, special or consequential damages.

## 10.6 REMEDIES

10.6.1  In the event the Performance Test results indicate lower than specified and/or guaranteed performance, Contractor will be given the opportunity, which is reasonably possible under the circumstances, to rectify the equipment and the unit will be retested.

10.6.2  In the event of any deficiencies in Contractor's equipment and design relative to the specifications and/or performance guarantees in the attached Technical Specification which are not covered by liquidated damages, Contractor will correct these deficiencies to conform to the performance guarantees as set out in the specification.

## 11.0 EARLY COMPLETION BONUS

If Performance Acceptance occurs before the Guaranteed Performance Acceptance Date, DFDC hereby agrees to pay Contractor an amount equal to $50,000/day for each day by which the occurrence of Performance Acceptance is earlier than the Guaranteed Performance Acceptance Date (the "Early Completion Bonus"); provided, however, that the aggregate amount of such bonus (if any) required hereunder shall not exceed $1,667,500. DFDC shall pay the Early Completion Bonus, if any, to Contractor within five (5) days of receipt of any funds from Owner for its early completion under the EPC Contract.

In the event ABBCE achieves its Performance Acceptance early, but early completion is not achieved by DFDC under the EPC Contract, then ABBCE shall waive its right to the Early Completion Bonus.

## 12.0 COMMUNICATIONS

Direct Communications To:

Duke/Fluor Daniel Caribbean S.E.
P.O. Box 1011
Charlotte, NC 28201-1011
ATTN: E. D. Terres, Jr.

Mail All Engineering Data To:

Duke/Fluor Daniel Caribbean S.E.
2300 Yorkmont Road
Charlotte, NC 28217
ATTN: R. F. Day Jr.
Project Number:
Project Name: AES Puerto Rico

Invoices and all supporting documents shall be transmitted in original and three (3) copies to:

Duke/Fluor Daniel Caribbean S.E.
P.O. Box 1011
Charlotte, NC 28201-1011
ATTN: ACCOUNTS PAYABLE - AES Puerto Rico Project

13.0  ATTACHMENTS

    A.    Deleted
    B.    Progress Payment Schedule
    C.    Cancellation Schedule
    D.    Contract Master Schedule
    E.    Partial Lien Waiver
    F.    Final Release Waiver
    G.    Performance Test Plan