IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,                    *

           Plaintiff,                    *

           v.                                 *          C.A. No. 04-1282-JJF

ALSTOM POWER INC.,                        *

           Defendant.                   *

   *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SANCTIONS</u>**


Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222


James E. Edwards
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:     (410) 547-0699

Counsel for Defendant
ALSTOM Power Inc.

Date: March 24, 2006

# TABLE OF CONTENTS

I.     STATEMENT OF NATURE AND STAGE OF PROCEEDINGS.................................. 1

II.    SUMMARY OF ARGUMENT ..................................................................... 1

III.   STATEMENT OF FACTS........................................................................... 1

IV.    ARGUMENT  ......................................................................................... 3

A.     In Violation Of This Court's Order, AES Has Repeatedly
       Obstructed The Discovery Process And Prejudiced ALSTOM's
       Defense Of This Case........................................................................... 3

       1.     The Court's December 16, 2006 Discovery Order ................................ 3

       2.     The First Corporate Designee's Deposition and AES's Late
              Production of Documents........................................................... 4

       3.     AES's Repeated Failure to Produce Relevant Documents Prior to
              Scheduled Depositions ............................................................. 5

       4.     AES's Supplementation of Answers to Interrogatories During a
              Deposition ............................................................................. 7

B.     AES's Latest Tactics Are Just A Continuation Of Its Improper Conduct
       During Discovery In This Case ............................................................... 8

       1.     AES's Delayed Electronic Document Production ................................ 8

       2.     AES's Counsel's Interposed Repeated, Meritless and Improper
              Objections During Depositions .................................................. 10

       3.     AES Improperly Coached Witnesses By Making Improper Speaking
              Objections............................................................................. 15

       4.     AES Improperly Coached Witnesses During Deposition Breaks ......... 17

       5.     AES Improperly Asserted The Protection Of The Work-Product
              Doctrine During Deposition ..................................................... 20

       6.     AES Has Given Improper Instruction "Not To Answer" Questions
              Despite The Lack Of Any Colorable Claim Of Privilege ................... 21

C.     Based On AES's Repeated Efforts To Obstruct The Discovery
Process, Strict Sanctions Are Warranted ............................................................. 23

V.     CONCLUSION ............................................................................................................ 25

## TABLE OF CITATIONS
### CASES

*Bonds v. District of Columbia,* ................................................................. 23
93 F.3d 801 (D.C. Cir. 1996)

*Donnelly v. Johns-Manville Sales Corp.,* ................................................. 23
677 F.2d 339 (3rd Cir. 1982)

*Hall v. Clifton Precision,* ........................................................... 10, 15, 17, 19
150 F.R.D. 525 (E.D. Pa. 1993)

*Plaisted v. Geisinger Medical Center,* ................................................. 12, 21
210 F.R.D. 527 (M.D. Pa. 2002)

*Residential Funding Corp. v. DeGeorge Financial Corp.,* ........................... 24
306 F.2d 99 (2nd Cir. 2002)

*Transportes Aereos De Angola v. Ronair, Inc.,* ...................................... 23
104 F.R.D. 482 (D. Del. 1985)

### RULES

Federal Rule of Civil Procedure 30 .......................... 4, 5, 7, 9, 12, 14, 15, 18, 19, 21, 23

Federal Rule of Civil Procedure 37(b)(2) ......................................... 23

Federal Rule of Civil Procedure 37(b)(2)(B) .................................... 24

Federal Rule of Civil Procedure 37 (b)(2)(C) .................................. 24

### COURT ORDERS

December 8, 2005 Discovery Conference Order ........................................ 3

December 16, 2006 Discovery Order .................................................. 3, 23

## I.    STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This civil action arises from the construction of a coal-fired power plant in Guayama, Puerto Rico (the "Plant").  AES Puerto Rico, L.P. ("AES"), the plaintiff, is the owner of the Plant.  ALSTOM Power Inc. ("ALSTOM"), the defendant, was a subcontractor responsible for the installation of two circulating fluidized bed ("CFB") boilers and the air pollution control equipment for the Plant.  AES's primary claim in this case relates to the alleged accelerated corrosion of one of the components of the pollution control equipment.

Under the Court's Scheduling Order, the parties were required to serve discovery requests on one another such that fact discovery would be completed by March 10, 2006.  The Court has scheduled the pre-trial conference for May 4, 2006, and trial to a jury is set to commence on May 22, 2006.

## II.    SUMMARY OF ARGUMENT

1.    AES's failure to comply with this Court's Discovery Order dated December 16, 2005, coupled with its contemptuous behavior throughout discovery, including, particularly, delaying the production of documents, the untimely supplementation of pleadings, and improper objections during depositions, has severely prejudiced ALSTOM's defense of this matter, and, under Rule 37 of the Federal Rules of Civil Procedure, justifies the imposition of sanctions.

## III.    STATEMENT OF FACTS

Throughout the course of this proceeding, AES has obstructed ALSTOM's discovery.  To further that improper strategy, AES has used a variety of tactics, including the late production of documents, the untimely supplementation of pleadings, and wholly improper objections and instructions to witnesses during depositions.  The reason for AES's strategy is clear.  AES's claim for breach of warranty is expressly conditioned on, among other things, the operation of

1

the equipment at issue in accordance with the procedures in the supplier's Operations and Maintenance Manuals ("O&M Manuals").  As the custodian of most of the relevant information, particularly the information which demonstrates that AES failed to operate the equipment as set forth in the O&M Manuals, complete production is not in AES's interest.

AES's latest tactics, however, run afoul of a discovery Order issued by this Court on December 16, 2005.  That Order had been submitted jointly by the parties following a hearing on three motions to compel discovery filed by ALSTOM at an earlier stage of the discovery process.  In that Order, among other things, the Court required the parties to produce all responsive documents to one another on or before December 30, 2005.

On two occasions since the entry of that Order, AES has produced documents relating to its claim for damages in a manner designed to preclude ALSTOM's review of those documents prior to the depositions of AES's corporate designees on liability and damages issues.  In the first such instance, on the eve of the first damages deposition of its corporate designee and one week before mediation proceedings before Magistrate Judge Thygne, AES supplemented its answer to Interrogatory No. 10 and radically altered the nature and amount of its claimed damages.  AES also produced voluminous documents relating to the claim for damages while ALSTOM's counsel was en route to Puerto Rico to take the deposition, thereby effectively precluded ALSTOM from undertaking a complete examination with respect to the claim or those documents.

ALSTOM objected to this tactic and AES agreed to make the corporate designee available for a second day of examination on March 9, 2006, the day before the end of fact discovery in the case.  AES, nonetheless, repeated the same tactic at the reconvened deposition – producing documents apparently generated weeks before the deposition to ALSTOM only after

2

the deposition in Puerto Rico had been adjourned.  Further, as explained in greater detail below, these discovery abuses are not isolated incidents.  Rather, they are the culmination of a pattern of improper discovery tactics that warrants the imposition of sanctions.

## IV.    ARGUMENT

**A.    In Violation Of This Court's Order, AES Has Repeatedly Obstructed The Discovery Process And Prejudiced ALSTOM's Defense Of This Case.**

### 1.    The Court's December 16, 2006 Discovery Order.

On December 7, 2005, the Court held a "discovery dispute" hearing in this case at which the Court heard argument on three separate Motions to Compel filed by ALSTOM based on AES's failure to fulfill its discovery obligations.  Those Motions included a Motion to Compel Electronic Documents and a Motion to Compel Hard Copy Documents.  At the conclusion of the hearing, the Court instructed the parties to meet and confer regarding the issues in dispute, attempt to reach a resolution, and report back to the Court.  (Tab 1, Order of December 8, 2005.)

Following the Court's direction, the parties met on several occasions during the next couple of weeks and crafted a resolution, which was subsequently submitted to the Court in the form of a proposed order.  With that proposed order, ALSTOM submitted a letter, drafted by both parties, further clarifying their agreement.  (Tab 2, December 15, 2005 letter to Court.)  On December 16, 2005, the Court entered the proposed order (the "Order").  (Tab 3, December 16 Order.)  Among other things, the Order provided:

> The parties shall make all responsive hard copy and electronic documents available for production to the requesting party by **DECEMBER 30, 2005**.

In addition, the letter submitted by the parties indicated that "the parties have discussed specific categories of documents to be produced during the agreed timeframe *and will work together to ensure that a full and convenient production occurs*."  (Tab 2, at 2, emphasis added.)

## 2.   The First Corporate Designee's Deposition and AES's Late Production of Documents.

On November 22, 2005, 2005, ALSTOM first served a Notice of Deposition under Rule 30(b)(6) on AES for the purpose of obtaining testimony regarding AES's claim for damages (the "damages deposition"). (Tab 4, Notice of 30(b)(6) Damages Deposition.) When AES refused to produce a deponent within the time set forth in the original notice, ALSTOM served an Amended Notice, which contained the same areas of examination but rescheduling the deposition for January 18, 2006, an agreed date, in San Juan, Puerto Rico.[1] (Tab 5, Amended Notice of Deposition.)

On January 13, 2006, AES informed ALSTOM that a "small number" of documents would be available for review at the Plant in Puerto Rico the day before the scheduled damages deposition. (Tab 6, Letter of January 13, 2006.) That "small number" of documents turned out to be 13 banker's boxes of documents, many of which were directly relevant to the damages deposition that was to take place the next day. Furthermore, all of these documents were in AES's possession before December 30, 2005, the date by which documents were to be produced under the Court's Order. Therefore, such documents could have, and should have, been produced by that time. (*See, e.g.*, Tab 7, crystallizer proposal dated September 30, 2005.)

On the same day the documents were to be made available, AES served a Supplemental Response to ALSTOM's Interrogatory No. 10, which requested that AES itemize its claim for damages. (Tab 9, AES's Supplemental Responses to Interrogatory No. 10.) In its Supplemental Response, AES radically altered its claim for damages, which increased from approximately $14 million, to over $40 million. (*Id.*) In doing so, AES sought to render the deposition of its

---

[1] Later, ALSTOM served a Second Amended Notice which changed only the location of the deposition. (Tab 8, Second Amended Notice of Deposition.)

corporate designee at the damages deposition scheduled to take place the next day as unproductive as possible.

Having already traveled to Puerto Rico, ALSTOM attempted to complete the deposition but also objected to AES's untimely production of documents and supplementation of its Answers to Interrogatories. Following discussion between the parties, AES agreed to reconvene the corporate designee's deposition on March 9, 2006, the day before the close of discovery. In addition, on February 17, 2006, ALSTOM served a notice under Rule 30(b)(6) to take the deposition of a second corporate designee for AES relating to liability issues on March 10, 2006, the last day of fact discovery. (Tab 10, Second Amended Notice of 30(b)(6) Deposition.)[2]

### 3.    AES's Repeated Failure to Produce Relevant Documents Prior to Scheduled Depositions.

On March 3, 2006, AES informed ALSTOM that additional documents would be made available for inspection by ALSTOM at AES's Plant in Puerto Rico on March 8, 2006, the day before the first of the two scheduled depositions were to occur. (Tab 13, e-mail dated March 3, 2006.) Despite repeated attempts, ALSTOM could not reach the contact person at the Plant on that day to obtain the documents prior to the deposition. (*See* Tab 14, e-mail dated March 8, 2006.) Ultimately, counsel for AES provided a copy of the documents but, failed to do so until after both depositions had been completed.

Once again, the documents belatedly produced by AES were critical to both the damages deposition and the liability deposition. Specifically, many of the documents related to cost estimates for a so-called "brine crystallizer" and other water treatment equipment at the Plant –

---

[2] The original Notice of Deposition was served on February 17, 2006. (Tab 11, Notice of Deposition.) ALSTOM later served an Amended Notice to reduce the areas of examination. (Tab 12, Amended Notice of Deposition.) The Second Amended Notice was served solely to change the date from March 9, 2006 to March 10, 2006 and the time from 9:00 a.m. to 10:00 a.m.

an element of damages for which AES is seeking over $34 million.  Furthermore, all of the documents belatedly produced by AES had been obtained no later than the end of February, 2006; many of them date back to December of 2005.  For example, one of the documents produced is a revised budget for the crystallizer system that indicates it was submitted to AES on December 29, 2005.  (Tab 15, revised proposal dated December 29, 2005.)  Another document produced was an e-mail dated February 24, 2006 relating to AES's claim for over $7 million in operations and maintenance costs for the crystallizer – a claim for which AES has produced precious little supporting documentation.  (Tab 16, e-mail dated February 24, 2006.)

    The documents belatedly produced by AES also were important to the liability deposition.  In its notice to take the deposition, ALSTOM expressly requested that AES produce a witness who could offer testimony relating to:

> The zero liquid discharge permit for the Project and/or operation of the Plant, including AES's assertion that a brine crystallizer is now necessary to comply with that permit . . .

(Tab 10, at 3.)  The bulk of the documentation produced by AES following the conclusion of the liability deposition related to AES's investigation into the means by which it could satisfy its zero liquid discharge requirements, including a "ZLD Trip Report" dated February 17, 2006.  (Tab 17, Trip Report.)  Another one of the documents that AES produced after the completion of the two depositions was a long PowerPoint presentation entitled "Brine Concentration – Crystallizer ZLD System Design" presented to AES by one of its bidders, which also related to the zero liquid discharge issue.  (Tab 18, PowerPoint presentation.)

### 4.    AES's Supplementation Of Answers to Interrogatories During a Deposition.

AES's untimely supplementation of its Answers to ALSTOM's Second Set of Interrogatories was equally prejudicial.  AES supplemented those answers *during* the 30(b)(6) liability deposition and did so by faxing the Supplemental Answers to ALSTOM's counsel's office in Baltimore to the attention of the attorney for ALSTOM who was taking the 30(b)(6) deposition in San Juan. (Tab 19, AES's Responses to ALSTOM's Third Set of Interrogatories and Supplemental Answers to Specific Interrogatories ("Supplemental Answers").)  To ensure that the Supplemental Answers could not be used at the deposition, AES did not deliver the Answers to the attention of any of the other attorneys that have been representing ALSTOM in this case.  Furthermore, AES's lawyer at the liability deposition remarked repeatedly in response to ALSTOM's use of AES's original answers at the deposition that those answers "had been supplemented," but never provided the Supplemental Answers to ALSTOM's attorney.  (Tab 20, 30(b)(6) Deposition of David Stone, at 296-297, 299.)[3]

Those Supplemental Answers specifically addressed several liability issues raised by AES in this case.  In particular, the Supplemental Answers contain additional allegations relating to AES's contention that ALSTOM modified the O&M Manuals for the pollution control equipment (Tab 19, Supplemental Answers, at 7), a subject that was expressly set forth in ALSTOM's notice to take the liability deposition.  (Tab 10, at 5-6.)  AES's failure to provide the Supplemental Answers to ALSTOM prior to or, at a minimum, during the liability deposition – a deposition which had been scheduled for almost a month – greatly prejudiced ALSTOM's examination.

---

[3]  ALSTOM has received the transcript of the Rule 30(b)(6) deposition at which Mr. Stone testified and has submitted the relevant portions of that transcript to the Court for its consideration.

Without more, AES's conduct with respect to the untimely delivery of documents and supplementation of answers to interrogatories – obviously intended to impede ALSTOM's discovery in the case – would warrant the imposition of sanctions. As set forth below, however, this conduct is by no means an isolated instance. Rather, it is the culmination of a pattern of discovery abuses designed to prevent discovery that will not be beneficial to AES's claims, conduct which should be considered in its totality in determining the nature and extent of the sanctions that should be imposed.

**B.     AES's Latest Tactics Are Just A Continuation Of Its Improper Conduct During Discovery In This Case.**

**1.     AES's Delayed Electronic Document Production.**

ALSTOM served its First Request for the Production of Documents and Things and Entry Upon Land for Inspection ("First Request"), which sought the production of both hard-copy and electronic documents, on March 18, 2005.[4] Recognizing the effort that would be required to gather, prepare, and produce the massive amount of responsive material, the parties agreed to a "rolling production" of their respective electronic documents. Because of various issues – including the negotiation of the format of the electronic document discovery, the exchange of hard-copy documentation, and the participation by the parties in a mediation before The Honorable Mary Pat Thynge – the parties did not make their initial exchanges of electronic documents until mid-August, 2005.

Despite the timing of the parties' agreement as to the format of the electronic document

---

[4]AES's obstructionist tactics were being practiced even at this early stage in the proceedings – despite the fact that the First Request was dated and served on March 18, 2005, AES asserted, without providing any proof, that it did not receive the First Request until March 28, 2005. In the spirit of cooperation, ALSTOM agreed to treat the First Request as having been served on March 28, 2005.

production, AES could have been using the time between March 28, 2005 and mid-August, 2005 to collect and review e-mail, but chose not to do so. By late October, AES had produced a total of only 544 electronic documents. Conversely, based on the parties' agreement to do a rolling production, ALSTOM produced 53,859 documents through October of 2005. Because AES had effectively produced no electronic documents, ALSTOM filed a Motion to Compel AES's production on October 24, 2005.

In the 28 days immediately after the filing of ALSTOM's Motion, AES produced an additional 14,003 electronic documents. Then, in December, 2005, AES disgorged another 49,203 electronic documents. Moreover, AES has produced another 21,391 electronic documents in January, February, and March, 2006.

The protracted nature of AES's production, coupled with the massive production at the back-end of the schedule, demonstrates conclusively that AES intentionally delayed its production so that ALSTOM's opportunity to review and analyze this data would be compromised. Indeed, Luis Canepari, one of the two individuals designated by AES to testify regarding electronic document production, testified that he did not even begin processing electronic mail until November, 2005, at the earliest:

> Q:    When did you start collecting e-mails for this litigation?
>
> A:    End of year, 2005.
>
> Q:    Do you know the month?
>
> A:    Probably November, December. I received the first one in November.

(*See* Tab 21, Luis Canepari 30(b)(6) Deposition, at 27.)

2.    **AES's Counsel's Interposed Repeated, Meritless and Improper Objections During Depositions.**

To date, ALSTOM has taken nine depositions.  During those depositions, counsel for AES has made literally thousands of objections, in violation of the spirit of the Federal Rules. *See Hall v. Clifton Precision*, 150 F.R.D. 525, 530 (E.D. Pa. 1992) ("'The making of an excessive number of objections may itself constitute sanctionable conduct'") (citations omitted). Indeed, in the deposition of Doug Tomlin, AES's counsel objected an astonishing 410 times.[5] (Tab 22, Tomlin Deposition.)  Those 410 objections addressed only 955 questions, which means that AES's counsel objected to 43% of the questions asked, including preliminary questions such as Mr. Tomlin's name and address.[6] (*Id.*)  In Tracy Jarvis' deposition, counsel for AES made the same objection – that Mr. Jarvis was testifying on his own behalf and not as a corporate designee – an incredible 24 times, sometimes to consecutive questions:

> Q:    (BY MR. VITTORIA)  Do you recall if AES Puerto Rico agreed to accept this waste water stream from Phillips?
>
> MR. TUXBURY:     Objection, compound.  And, again, Mr. Jarvis is here on his own behalf, not as a corporate designee.
>
> A:     I don't recall any agreement with Phillips to receive their treated waste water.
>
> Q:    (BY MR. VITTORIA)  At any point when you were an employee of AES Puerto Rico, did you – did AES Puerto Rico accept a waste water stream from Phillips?
>
> MR. TUXBURY:  Objection.  Mr. Jarvis is here as

---

[5] In contrast, ALSTOM objected a total of four times during AES's deposition of Rule 30(b)(6) designee Raymond Hickey.

[6] A complete copy of Doug Tomlin's deposition has been provided with the objections highlighted.  (Tab 22, Deposition of Doug Tomlin.)  The highlighted objections demonstrate, in vivid fashion, the completely disruptive nature of the hundreds of needless objections made by AES's counsel.

– on his own behalf, not as a corporate designee, to testify what he
knows.

A:    Not that I know of.

(Tab 23, Deposition of Tracy Jarvis, at 67-68.)

Furthermore, many of AES's objections are, on their face, completely devoid of merit.

For example, during the deposition of Elias Sostre, the Control Room Team Leader for AES,

counsel for AES objected to a question as to whether there were written reports of tests

performed because the question somehow "mischaracterized" the testimony:

Q:    To your knowledge, did anyone at AES or AES
Puerto Rico arrive at the conclusion that the temperature did not
affect opacity?

MR. WILLIAMS:
Objection, calls for speculation.

THE DEPONENT:
A:    Most of the tests, and the evidence that was
compiled, affirmed that whenever there was high chloride, and you
expected high temperature, the temperature in the opacity could
not be controlled.

BY MR. SCHOLLAERT:
Q:    Who performed these tests?

A:    Those tests that were made by Stinson or by myself.

Q:    Were there written reports?

MR. WILLIAMS:
Objection to the form of the question.  Mischaracterizes the
testimony.

(Tab 24, Deposition of Elias Sostre, at 180-81.)

During two separate depositions, counsel for AES objected to the use of certain exhibits

because those exhibits had hole punch marks in the left hand margin.  Counsel for AES even

went so far as to insinuate that counsel for ALSTOM was using "altered documents" during one

of those depositions:[7]

> Q:      I'm handing you what's been marked as Exhibit No.
> 14, and I ask you to take a look at it.

> MR. WILLIAMS:
>      Mr. Vittoria, would you identify for the record what's been
> redacted on this exhibit, the black marks in the lefthand margin?

> MR. VITTORIA:
>      Nothing's been redacted; those are hole punches.

> MR. WILLIAMS:
>      Not in the document that was produced though, right?

> MR. VITTORIA:
>      I don't know that sitting here.

> MR. WILLIAMS:
>      So you don't know if anything was underneath those holes?

> MR. VITTORIA:
>      I do not.  Now I'm not going to be deposed.  The exhibit is
> the exhibit.  And, again, Mr. Williams, if you have any questions,
> you can ask them; not of me, but of the Witness.

> MR. WILLIAMS:
>      And my only concern is if you're using altered documents.

(Tab 25, 30(b)(6) Deposition of Allan Dyer, at 155-156.)  A copy of the document in question

has been attached hereto at Tab 26.

In addition, many of AES's counsel's objections violate the instruction contained in

Federal Rule 30(d)(1) that objections are to be "concise."  *See Plaisted v. Geisinger Med. Center*,

210 F.R.D. 527, 534 (M.D. Pa. 2002) (objections "that go on for pages" and suggest an answer

are improper).  A prime example occurred during Mr. Sostre's deposition:

> Q.      Did you produce a copy of this manual that you
> have for purposes of this litigation?

---

[7] *See also* Tab 24, Sostre Deposition, at 48-49.

MR. WILLIAMS:

Objection to form.  Yesterday you took a corporate designee deposition about AES Puerto Rico's document production, and you heard about the robust process that AES Puerto Rico went through to produce documents.

Of course, you also learned that the process was coordinated with the document custodian and counsel.

MR. SCHOLLAERT:

Dan, I'd ask you to refrain from making speaking objections.

MR. WILLIAMS:

Well, I don't know how a person would know what "did you produce a copy of this" means.  I mean, he testified that he photocopied it.  Produced to whom?

If you're talking about production for litigation, I think we need to be clear about what we're talking about.

And if that's what you're talking about, I don't understand how a witness would possibly be able to answer that, outside of a document custodian.

(Tab 24, Sostre Deposition, at 44-45.)  Another example occurred during the damages deposition

at which AES's President, Allan Dyer, testified:

Q:    Okay, I hand you what has been marked as Exhibit 20, and I ask you to take a look at it.

A:    Okay.

Q:    Do you recognize this document?

MR. WILLIAMS:

Objection to form.  Mr. Dyer is not here to testify about his personal knowledge.  He is testifying about the specific issues in the notice of deposition, to the questions as AES Puerto Rico's knowledge

BY MR. VITTORIA:

Q:    Do you recognize the document, Mr. Dyer?

13

MR. WILLIAMS:

I . . . Do you have . . . Whose testimony are you asking for? . . . The company's on one of the 16 issues, or Mr. Dyer personally?

MR. VITTORIA:

I'm asking a question, do you recognize the document?

MR. WILLIAMS:

And I'm asking . . . First, the "you" is ambiguous. Second of all, this doesn't relate to any of the 16 issues on the deposition notice. I've been very patient today with you going beyond your deposition notice, but I think we've reached the point where it is just inappropriate. This has nothing to do with the RO system. The words "RO" don't appear on the document.

It has nothing to do with any rationale relating to the RO system.

And now you're asking Mr. Dyer about his personal testimony, about his personal information about a document, and that's not appropriate in a 30(b)(6) deposition, as you well know.

(Tab 25, Dyer 30(b)(6) Deposition, at 215-216.)

AES's counsel's repeated tactic of making lengthy objections to questions was designed to distract counsel, break up the flow of the deposition[8], and waste time during the depositions.

---

[8] AES's counsel often succeeds in its improper attempts to break up the flow of the deposition:

Q.      Does the wet bulb temperature change?

MR. WILLIAMS:

Objection, calls for speculation; lack of foundation. Asks for scientific conclusion. And Mr. Sostre is not here as an expert.

THE DEPONENT

A.      What was the question?

(Tab 24, Sostre Deposition, at 90)

3.    **AES Improperly Coached Witnesses By Making Improper Speaking Objections.**

Federal Rule 30(d)(1) also provides that counsel's objections should be made in "a non-suggestive manner."  Nevertheless, throughout the nine depositions taken by ALSTOM, AES's counsel has made objections that were not only suggestive, but were clearly designed to coach the witness as to how to respond to the pending question.  *See Hall*, 150 FRD at 531 ("It should go without saying that lawyers are strictly prohibited from making any comments, either on or off the record, which might suggest or limit a witness's answer to an unobjectionable question").  Indeed, AES's "coaching" has, at times, gotten so extreme that counsel's statements can only be characterized as testimony.[9]

For example, during the damages deposition, counsel for AES "testified" – incorrectly – as to when replacement parts arrived at the site:

> Q:    Okay, let's put it this way:  By March of 2004, did AES Puerto Rico still believe that it was important to have the plates delivered in a rush?
>
> MR. WILLIAMS:
>    Objection to form; they were there by then.  It's incoherent.
>
> MR. VITTORIA:
>    Dan, please don't testify.  Number one, that's factually incorrect.  But, number two, it's improper.
>
> MR. WILLIAMS:
>    Okay.  Objection to form.

(Tab 25, Dyer 30(b)(6) Deposition, at 120.)  Later, in that same deposition, counsel for AES made it clear that Mr. Dyer was not to testify that he knew the author of a particular document:

---

[9]  *See Hall*, 150 F.R.D. at 528, in which the Court, faced with deposition conduct similar to AES's conduct in this case, was forced to note what should have been obvious:  "It is the witness – not the lawyer – who is the witness."

Q:      . . . Mr. Dyer, I'm handing you what's been marked as Exhibit No. 16, and I'd ask you to take a look at it.

A:      Okay, I've had a quick review of it.

Q:      Do you recognize the document?

A:      I recognize something similar to this.  This is a capital request form that we have.  I don't see our company logo on it anywhere, so . . . But it looks like something that we would submit.

Q:      Do you know who was the author of this particular document, Exhibit No. 16?

MR. WILLIAMS:
Objection to form; he said he didn't know who created this, or what this document is.

(*Id.*, at 186-87.)

AES's counsel's propensity to testify continued throughout all of the depositions, including Tracy Jarvis' deposition, where counsel for ALSTOM was forced to resort to interrupting AES's counsel's monologue in an effort to prevent coaching of the witness:

Q:      Did AES Puerto Rico have to report to a governmental entity if it violated its zero liquid discharge permit?

A:      We did not have a discharge permit.  So there was no permit to violate.

        . . . .

Q:      So to your understanding, if AES Puerto Rico violated its zero liquid discharge status, it didn't report that to anybody[?]

MR. TUXBURY:  Objection.  That mischaracterizes the witness' testimony.  He said that AES Puerto Rico is not allowed to do any discharge, and that's why you don't have to report it.

MR. VITTORIA:      Object to counsel's testimony.

16

. . . .

> Q:      And it was your testimony that you began analyzing the CDS make-up water on or around the time of this e-mail.  Do you –
>
> MR. TUXBURY:  Objection.  That mischaracterizes the testimony.  The witness testified that prior to this time --
>
> MR. VITTORIA:      That's enough of an objection.
>
> MR. TUXBURY:      -- water analysis done.
>
> MR. VITTORIA:      Do not testify again.
>
> MR. TUXBURY:      I'm not.  I'm just trying to not let you –
>
> MR. VITTORIA:      You can say, "mischaracterizes the testimony."  Do not give him an answer.

(Tab 23, Jarvis Deposition, at 18-19, 80.)

### 4.    AES Improperly Coached Witnesses During Deposition Breaks.

Following the breaks in several of the depositions, AES's witnesses returned to give, either through a "clarification" or through AES's counsel's questions, testimony that was dramatically different than how the witnesses had testified prior to the break.  The obvious coaching of those witnesses is an especially egregious violation of the spirit of the Federal Rules.  *See Hall*, 150 F.R.D. at 529 (discussion between deponent and attorney during breaks are barred because "[a] clever lawyer or witness who finds that a deposition is going in an undesired or unanticipated direction could simply insist on a short recess to discuss" the deponent's testimony).

A prime example occurred during the deposition of Mr. Canepari, at which counsel for

AES requested a break soon after Mr. Canepari testified to a lack of knowledge relating to an e-mail system – the "First Class" e-mail system[10] – that AES had used in the past:

> Q:      . . . Do you know what the First Class e-mail system
>
> was?
>
> A:      No.  I believe it was an e-mail chain system.

(Tab 21, Canepari 30(b)(6) Deposition, at 59.)  Counsel for AES requested a break only five questions later.  Following that short break, which Mr. Canepari spent with counsel for AES, Mr. Canepari stated his desire to "clarify" his response to the question relating to the First Class e-mail system:

> MR. WILLIAMS:  Mr. Canepari has one answer he'd like to clarify.
>
> THE WITNESS:  I contacted the old e-mail administrator who was here when First Class was implemented.  He clarified that First Class is a stand-alone system, such as Lotus Notes, it doesn't need another interface.  So it's basically a stand-alone system.  And that we started rolling out Exchange, Outlook interface in 2001, and we phased it out for like a year until we finalized it.  Some could have access to both systems for a while.
>
> . . . .
>
> Q:      And you now have an understanding as to what First Class e-mail system is?
>
> MR. WILLIAMS:  Objection to form.  Lack of foundation.  Mischaracterizes the prior testimony.
>
> A:      Yes.
>
> BY MR. VITTORIA:
> Q:      What is that?
>
> A:      First Class is a stand-alone system for e-mail

---

[10]  The First Class e-mail system was the system that used the "aesc.com" e-mail about which ALSTOM has been forced to file its fourth motion to compel in this case.

communications.

> Q:      Is it synonymous with the AESC.com system?
>
> A:      Yes.  It has AESC at the end.

(*Id.*, at 58-59).

A similar dramatic change in testimony followed a break in the liability deposition at which David Stone, AES's Commercial Engineering Team Leader, testified.   During that deposition, ALSTOM questioned Mr. Stone about AES's practices regarding ash re-injection from the fly ash silos to the boiler during the summer of 2003.  This issue is critical because it is ALSTOM's belief that AES's practice of continuously re-injecting this ash without monitoring its chemical composition contributed to the corrosion that subsequently was discovered in the fall of 2003 and winter of 2004.  During examination by ALSTOM, Mr. Stone testified that AES began fly ash re-injection in the summer of 2003 and did so "continuously" for at least a couple of months.  (Tab 20, David Stone 30(b)(6) Deposition, at 269-272.)  Following the next break, counsel for AES asked Mr. Stone questions regarding ash re-injection.  This time, Mr. Stone testified that AES did not reinject fly ash on a "continuous" basis, as he had originally testified; rather, Mr. Stone radically changed his position and testified that AES had reinjected ash only on an "intermittent" basis during the relevant period.  (*Id*, at 365.)

AES's practice of reviewing testimony with its witnesses during breaks and then having them return to give different testimony is strictly prohibited.  *See Hall*, 150 F.R.D. at 531-532 ("Counsel and their witness-clients shall not engage in private, off-the-record conferences during breaks or recesses, except for the purpose of deciding whether to assert a privilege").

5. **AES Improperly Asserted The Protection Of The Work-Product Doctrine During Deposition.**

During the deposition of AES's President, Mr. Dyer, on March 9, 2006, ALSTOM showed the witness an e-mail message from AES's environmental consultant, ENSR, relating to AES's decision to install a reverse osmosis system following the discovery of the corrosion. (Tab 27, February 3, 2004 e-mail.)  The document in question had been produced by both AES and ENSR, and had previously been used, without objection, during the deposition of Tracy Jarvis, AES's former Water Treatment Team Leader.

Counsel for AES nonetheless immediately objected to the use of the document on attorney-work product grounds (although no attorney is listed or mentioned in the e-mail) and requested, pursuant to a "claw-back" agreement between the parties, that ALSTOM immediately return the document to AES.  When ALSTOM refused because the document did not appear, on its face, to be work product, and because any protection that may have existed for the document was waived by its previous use at Tracy Jarvis' deposition, counsel for AES instructed Mr. Dyer not to answer any questions about the document.  Because the deposition was occurring in San Juan, Puerto Rico and discovery was set to close the next day, ALSTOM was forced to contact the Court during the deposition to resolve the issue.  At a telephone hearing conducted during the deposition, Judge Gregory M. Sleet of this Court ruled that any protection that may have existed for the document had been waived and that AES's counsel could no longer instruct Mr. Dyer to answer questions about the document.  (Tab 28, Al Dyer Deposition, at 191-201.)[11]

AES's over-assertion of the claim of privilege in relation to ENSR's documents is not limited to the one document about which Judge Sleet rendered his ruling.  Rather, ENSR has, in

---

[11] ALSTOM has received the transcript of Mr. Dyer's deposition, and has submitted the entire portion of the deposition transcript dedicated to the impromptu hearing with the Court.

response to a subpoena served by ALSTOM, asserted the attorney work product protection for well over 10% of the documents responsive to that subpoena. ENSR's refusal to produce responsive documents has forced ALSTOM to file a motion to compel with the District Court for the District of Massachusetts. ENSR's response to that motion plainly shows that ENSR is merely acting at the direction of AES. (Tab 29, ENSR's Opposition to Motion to Compel, at 1.)

6.    **AES Has Given Improper Instruction "Not To Answer" Questions Despite The Lack Of Any Colorable Claim Of Privilege.**

On repeated occasions, AES has instructed witnesses not to answer questions even though there was no colorable claim of privilege, in violation of Federal Rule 30(d)(1). *See Plaisted*, 210 F.R.D. at 534 (ordering that instructions "not to answer" non-privileged questions are improper and justify the resumption of affected depositions). The following colloquy at the damages deposition, at which Al Dyer testified, is illustrative of this tactic:

> Q:    Are you aware that prior to the discovery of corrosion, Tracy Jarvis had contacted G.E. Betz about the chlorides in the water used for the CDS?
>
> MR. WILLIAMS:
>     Objection. The Witness is not here to testify based upon personal knowledge.
>
>     I will instruct you not to answer the question.
>
> MR. VITTORIA:
>     You're going to instruct him not to answer a question that's not privileged?
>
> MR. WILLIAMS:
>     About his personal awareness about something that's not one of the 16 topics listed in the notice.
>
> MR. VITTORIA:
>     You're instructing him not to answer[?]
>
> MR. WILLIAMS:
>     Which of the 16 topics are you specifically referring to, Mr.

Vittoria?

MR. VITTORIA:
        This is in relation to Subject No. 3, the need for the reverse osmosis system.

MR. WILLIAMS:
        The words "the need for the reverse osmosis system" are not present in Item No. 3, [as] you are aware.  Is there another number you think that "the need for the reverse osmosis system" shows up on the notice of topics?

MR. VITTORIA:
        Dan, I'm not going to argue about this.  Are you instructing your Witness not to answer that question?

MR. WILLIAMS:
        Did you not hear me?

MR. VITTORIA:
        A question that is not privileged?

MR. WILLIAMS:
        Where is "the need for the reverse osmosis system" identified in your notice of topics?

MR. VITTORIA:
        ["]The purported rationale for installing the reverse osmosis system,["] in No. 3.

MR. WILLIAMS:
        Well, he's prepared to testify about that.

MR. VITTORIA:
        And I'm asking him about that.  I am also entitled to investigate that issue, and I am doing so.  And you are instructing your client not to answer?

MR. WILLIAMS:
        About what he personally knows about a communication before discovery of any corrosion?  Yes.

(Tab 25, Dyer 30(b)(6) Deposition, at 198-199.)   Although AES tacitly admitted that the

question being asked did not tread upon privileged information, it nevertheless instructed the

witness not to answer, in direct violation of Rule 30(d)(1).

**C.      Based On AES's Repeated Efforts To Obstruct The Discovery Process, Strict Sanctions Are Warranted.**

Rule 37(b)(2) of the Federal Rules of Civil Procedure provides that "[i]f a party . . . fails to obey and order to permit or provide discovery . . . or if a party fails to obey an order entered under Rule 26(f)", the court may impose sanctions on that party.  The sanctions expressly provided by Rule 37(b)(2) include:

> (B)  An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

> (C)  An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party . . .

In determining whether to impose sanctions on a party, the Court is to examine all pertinent circumstances in the case, including whether there has been a history of proceeding in a dilatory manner.  *Transportes Aereos De Angola v. Ronair, Inc.*, 104 F.R.D. 482, 508 (D. Del. 1985) *citing Donnelly v. Johns-Manville Sales Corp.*, 677 F.2d 339, 342 (3rd Cir. 1982); *see also Bonds v. District of Columbia*, 93 F.3d 801, 811-812 (D.C. Cir. 1996).  The Court is free to exercise its discretion to impose a severe sanction, including dismissal, "when there is a clear record of delay or contumacious conduct by the plaintiff."  *Ronair*, 104 F.R.D. at 507 *citing Donnelly*, 677 F.2d at 342.

The timing of AES's dilatory tactics is another factor that can be considered by the Court.  The Second Circuit pointedly addressed this consideration when it stated that: "as a discovery deadline or trial date draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent

and to the Court." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.2d 99, 112 (2nd Cir. 2002). In *Residential Funding*, the Second Circuit held that, because trial was imminent and the plaintiff had repeatedly missed deadlines to produce the documents in question, the plaintiff "was under an obligation to be *as cooperative as possible*." *Id.* (emphasis in original). Indeed, the Second Circuit held in *Residential Funding* that the plaintiff's "purposeful sluggishness" in producing relevant and responsive e-mails was sufficiently culpable behavior to warrant an adverse instruction against the plaintiff. *Id.*, at 110.

The discovery Order issued by the Court on December 16, 2005 at the parties' request expressly provided that the parties are to produce all relevant and responsive documents by December 30, 2005. (Tab 3.) In addition, the letter submitted by the parties to the Court provided that the parties "will work together to ensure that a full and convenient production occurs." (Tab 2, at 2.) Both parties have supplemented their productions since December 30; however, AES's belated productions of documents relating to the radically altered components of its claim for damages – and particularly the increased claim for so-called boiler water reinjection, the procurement and operation of a brine crystallizer and "other water supply changes" for in excess of $31 million – has severely prejudiced ALSTOM's defense of these claims. Accordingly, pursuant to Rule 37(b)(2)(B), the Court should prohibit AES from presenting any evidence at trial relating to any enacted or proposed water system changes, other than the reverse osmosis system, but including the boiler water reinjection or the brine crystallizer. In addition, the Court should strike AES's Supplemental Answers to ALSTOM's Second Set of Interrogatories.

In the alternative, pursuant to Rule 37(b)(2)(C), the Court should: (i) reopen discovery for the purpose of resuming the damages deposition and the liability deposition in the United

States and direct AES to reimburse ALSTOM the costs and legal fees incurred in preparing for and continuing those depositions – one for the third time and one for the second; (ii) grant ALSTOM leave to supplement its expert reports and its motion for partial summary judgment, if necessary, based on the testimony at those depositions; (iii) award ALSTOM the attorney's fees and costs incurred in preparing this motion; and (iv) granting any further relief deemed appropriate by that Court.

### V.    CONCLUSION

AES's sharp practices and dilatory behavior have severely prejudiced ALSTOM in its defense of AES's claims.   AES's latest tactics – producing documents and supplementing discovery effectively after the close of discovery and after the conclusion of two corporate designee depositions – is in direct violation of the spirit and wording of the Court's Discovery Order.   Accordingly, the Court should sanction AES's improper tactics by ordering that it is barred from presenting any evidence relating to its claim for the cost of any enacted or proposed water system changes, other than the reverse osmosis system, but including boiler water reinjection or a brine-concentrator/crystallizer system, and that AES's supplemental answers to ALSTOM's Second Set of Interrogatories are stricken.

In the alternative, the Court should: (i) reopen discovery for the purpose of resuming the damages deposition and the liability deposition in the United States and direct AES to reimburse ALSTOM the costs and legal fees incurred in preparing for and continuing those depositions; (ii) grant ALSTOM leave to supplement its expert reports and its motion for partial summary judgment, if necessary, based on the testimony at those depositions; (iii) award ALSTOM the attorney's fees and costs incurred in preparing this motion; and (iv) granting any further relief deemed appropriate by that Court.

ALSTOM POWER INC.


/s/ Daniel W. Sciapli
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, Delaware  19806
(302) 888-3222

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland  21202-1643
(410) 685-1120
Fax:  (410) 547-0699


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 24th day of March, 2006, a copy of the foregoing Memorandum in Support of Defendant's Motion for Sanctions was filed with the Court using CM/ECF.  A copy of the Memorandum was hand-delivered to John S. Spadaro, Esquire, Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware 19805.  In addition, courtesy copies were served, via first-class mail, upon Daniel D. Williams, Esquire, Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C.  20005.


/s/ Daniel W. Sciapli
Daniel W. Scialpi (#4146)


1805372