# Tab 7

AES-G-08-251-021480



GE Infrastructure
Water & Process Technologies

**GE Ionics, Inc.**
**RCC® Thermal Products**
11113 NE 33rd Place
Bellevue, WA 98004, USA
Tel. 425.828.2400, Fax 425.828.0528

September 30th, 2005
GE RCC Proposal No. 05-3828

Via Email to GE Water: Rick Krichten
                        CC: Ericson Etienne

Subject:  Budget Proposal to Supply a MVR Brine Concentrator and Steam Crystallizer System
          For AES Puerto Rico Power Station

GE Infrastructure – Water & Process Technologies, RCC Thermal Products (GE RCC) is pleased to provide this budget proposal to supply a Mechanical Vapor Recompression (MVR) Brine Concentrator and Steam Crystallizer System for the AES Puerto Rico power plant based on our review of the revised plant water balance and RO reject chemistry information provided this week. This budget zero liquid discharge (ZLD) system is designed to concentrate 89 gpm at approximately 32,000 mg/l TDS.

It has been assumed that the wastewater stream must be taken to solids (salt cake), and high quality distillate (< 20 mg/l TDS) must be recovered. In the combined ZLD system, the wastewater stream would first be concentrated in Brine Concentrator, which is a seeded slurry, vertical tube, falling film, mechanical vapor recompression (MVR) evaporator. The high quality distillate recovered can be reused and the concentrated brine blowdown stream will be directed to a steam-driven, Forced Circulation Crystallizer. The Crystallizer will concentrate the brine to a solid sludge suitable for disposal in a landfill. A simplified process flow diagram and process description for the Brine Concentrator and Crystallizer system are attached.

The following is a suggested scope of work by RCC and others to establish a budget cost estimate. This Scope of Supply assumes RCC will design and supply equipment and others will perform construction and installation activities. RCC is very flexible on the Scope of Supply and can take on some of the Buyer's activities, if desired.

<u>RCC Scope</u>

RCC will provide equipment design and supply as follows:

- Perform process design and provide a Process Flow Diagram (PFD) including mass balance;
- Perform equipment design and provide a P&ID;
- Provide equipment list and equipment data sheets;
- Provide an electrical one line and wiring schematic diagrams;
- Provide general arrangement drawing;
- Provide foundation design criteria;
- Provide electrical/instrumentation interface data;

**A 025**

AES-G-08-251-021481

- Perform I&C design and PLC programming;

- Supply Brine Concentrator equipment as follows:

  - Feed tank
  - Feed pump/motor
  - Feed tank mixer/motor
  - Acid pumps/motors (2)
  - Feed / distillate heat exchanger
  - Deaerator vessel with packing
  - Evaporator vessel
  - Recirculation ducts with expansion joints
  - Vapor ducts with expansion joints
  - Distillate pump/motor
  - Distillate tank
  - Recirculation pump/motor
  - Vapor compressor/motor
  - Seed tank
  - Seed tank mixer/motor
  - Seed pump/motor
  - Control system - PLC type with computer operator interface
  - Field instrumentation and controls

- Supply crystallizer equipment as follows:

  - Crystallizer body and mist eliminator
  - Crystallizer Heater
  - Vapor condenser
  - Solids separation device (i.e., pressure filter or centrifuge)
  - Recirculation pump / motor
  - Feed pump / motor
  - Filtrate tank
  - Filtrate tank mixer
  - Filtrate pump / motor
  - Distillate tank
  - Distillate pump
  - Antifoam pumps / motors (3)
  - Caustic pumps / motors (2)
  - Control system - PLC type with CRT operator interface (common to BC)
  - Field instruments
  - Control valves

- Provide supervision of construction, initial startup, and training on a time and materials basis;
- Provide and supply 5 copies of the Operation and Maintenance Manuals.

GE Ionics Proprietary Information.
© Copyright 2005, GE Ionics, Inc. All Rights Reserved.

Scope of Supply by Others

The following scope of supply has been assumed to be "by others" in the development of the budgetary pricing contained in this proposal. If requested by the Buyer, RCC can also perform certain items specified below.

- Prepare site for system installation;
- Design and supply building, if required;
- Design and provide foundations, anchor bolts, and all concrete work and grouting;
- Design, supply, and install equipment, interconnecting piping, insulation, and heat tracing;
- Design, supply, and install electrical and control wiring and conduit;
- Handling, storage, and protection of Seller's equipment and components prior to installation;
- Design, supply and install support steel, access platforms, and ladders;
- Provide and install electrical power distribution equipment, including MCC, transformers and low voltage starters, and cable from electrical room to the motors;
- Provide area lighting, fire protection, building lighting and building HVAC as required;
- Provide electrical grounding system;
- Provide all electrical power, utility water, chemicals, instrument and utility air and other plant process required utilities;
- Provide operations personnel for checkout, initial startup/operation, and Acceptance Test;
- All other items specifically not described as part of RCC's scope of work.

Budget Pricing

The budget equipment only price for the ZLD system is $4.75 million. This includes the equipment only and does not include equipment skids. Current equipment delivery would be 11-14 months for to current materials availability issues. Power consumption is estimated at 400 kW at rated capacity with steam of 9000 lb/hr (at 30 psig) required for the crystallizer (alternately and MVR Crystallizer could be supplied requiring an additional 300 kW and only 1000 lb/hr of steam). The solids sludge discharge for would be 17 tons per day.

Please be aware that these estimates are based on the limited amount of information currently available. Scope changes and clients specifications may impact the estimated prices. Please let me know if you have any questions or comments or if we can provide any additional information. I can be reached by phone at (425) 629-1312 or by e-mail at david.ciszewski@ge.com. We look forward to continuing to work with you on this project.

Sincerely,
GE IONICS, INC.

Dave Ciszewski
Applications & Sales Manager
RCC Thermal Products

Page 3
GE Ionics Proprietary Information.
© Copyright 2005, GE Ionics, Inc. All Rights Reserved.

AES-G-08-251-021483

## Brine Concentrator/Crystallizer Description

Wastewater is fed to an agitated feed tank where the pH is adjusted to 5-6 using sulfuric acid to convert potentially scaling $HCO_3$ to $CO_2$. The feed is pumped through a plate heat exchanger and heated to near boiling by recovering the distillate's sensible heat. The hot feed then passes through a deaerator where carbon dioxide ($CO_2$) and other non-condensables are stripped before entering the evaporator.

The brine slurry from the sump is continuously recirculated to the top of the vertical heat-transfer tubes where it flows through an RCC patented distributor inserted into the top of each tube and falls as a thin film inside. A portion of the thin film is vaporized. Distributor inserts are proven to provide superior wetting inside the tubes and minimize scale formation. In a vapor compression thermodynamic cycle the vapor is compressed and introduced into the shell side of the vertical tube bundle. The temperature difference between the vapor and the brine film causes to vapor to release its heat of condensation to the falling brine and to condense on the outside of the tubes as distilled water. This distillate is collected at the bottom of the condenser and flows to the distillate tank through a pipe handling both liquid and steam. A small vent stream from the distillate tank maintains the evaporator vessel at a slightly positive pressure. The hot distillate is pumped through the heat exchanger where it gives up its sensible heat to the incoming feed. From this point, the distillate is available as make-up to the cooling tower and feed to the demineralizer system. A portion of the concentrated brine is continuously withdrawn from the sump for discharge to a crystallizer feed tank and is then transferred to a forced circulation crystallizer to reduce the waste to dry solids.

The concentrated brine from the Brine Concentrator is collected in the heated and agitated crystallizer feed tank and is transferred to the crystallizer recirculation line. The concentrated brine feed is mixed with the recirculating brine slurry and is pumped through a shell and tube heater. Steam is introduced into the heater shell. The brine is heated a few degrees (sensible heating) as it passes through the heat exchanger and when it re-enters the vapor body, it flashes - effectively converting the sensible heat to latent heat in the form of vapor. Boiling within the tubes is suppressed by the liquid elevation in the vapor body.

Crystals are continuously formed within the brine slurry held up in the vapor body vessel prior to entering the recirculation pump. Following the heating and flashing of the brine, water is removed in the form of vapor. The brine becomes supersaturated and the salts precipitate from solution. These crystals are continuously removed in a solids separator (pressure filter) and the mother liquor is returned to the crystallizer feed tank. The solids are automatically discharged from the system as a salt cake for disposal. Because of the high magnesium present in the wastewater, a liquid waste purge stream may be required. It is not possible to accurately determine the amount of purge flow required without a complete feed chemistry and performing laboratory testing.

## RCC Brine Concentrator Features

- Seed-Slurry Design Technology

The RCC Brine Concentrator is a calcium sulfate, calcium phosphate, calcium fluoride, and silica crystallizing evaporator, which utilizes a seed slurry technique to prevent scale formation on the heat-transfer surfaces. Whereas conventional wastewater brine evaporators or multi-stage flash

GE Ionics Proprietary Information.
© Copyright 2005, GE Ionics, Inc. All Rights Reserved.

A 028

AES-G-08-251-021484

systems are limited in concentration to the point where calcium sulfate and/or silica precipitate, the RCC Brine Concentrator can concentrate many times beyond the saturation limit of these constituents. Calcium carbonate, another common scale former, is eliminated by acidifying and converting the feed carbonate to carbon dioxide (a volatile gas) and stripping out the carbon dioxide and other non-condensables in a decarbonating and deaerating tower.

To avoid scale buildup in the evaporator, a slurry of calcium sulfate (seed) is continuously circulated over the wetted surfaces in the evaporator. Through control of RCC proprietary design parameters such as slurry concentration, seed characteristics, and system geometry, the evaporator can operate in this otherwise scale-forming environment. The thermochemical operation within the evaporator with regard to the scale prevention mechanism is depicted in the diagram below. As the water is evaporated from the brine film inside the tubes, the remaining brine film becomes super-saturated and calcium sulfate, calcium phosphate, calcium fluoride, silica, and other scaling compounds start to precipitate. The precipitating material promotes crystal growth in the slurry rather than new nucleation that would deposit on the heat-transfer surfaces; the silica and other scaling crystals attach themselves to the calcium sulfate crystals. This scale prevention mechanism, called preferential precipitation, has a proven capability to promote clean heat-transfer surfaces.

### RCC SEEDED-SLURRY SCALE PREVENTION MECHANISM



- High Distillate Quality

In many applications, it is very important that the process vapor (distillate) contain low levels of dissolved salts. Minimizing brine carryover also protects the vapor compressor from entrained brine droplets. The quality of the distillate is largely dependent on the effectiveness of the mist eliminator. RCC's design utilizes an annular arrangement of mesh-type mist eliminator to increase efficiency. To further ensure high distillate quality, RCC utilizes an automatic wash system that periodically cleans the mist eliminator pads by spraying distillate through a ring of nozzles located below the pads.

- Venting System for Non-Condensable Gases

Proper venting of the evaporator condenser is necessary to prevent loss of evaporative capacity due to blinding of the heat transfer surface with non-condensable gases. Venting is especially important for a vapor compression evaporator because reduced evaporative capacity can result in compressor surge. The total vent flow must be larger than the non-condensables from the tube bundle, but excess venting must be avoided because it increases the energy consumption and lowers product recovery.

- Brine Distribution

In the RCC Brine Concentrator, recirculating brine falls by gravity in a thin film on the inside of vertical tubes. This design results in high heat transfer coefficients at moderate pumping energy and high steam decontamination. To maintain a uniform film and completely wetted surface, RCC uses a unique, patented film distributor. One of these distributors is inserted at the top of each tube, with the proper tube flow being maintained by the match between distributor orifice area and recirculation flow rate. This system has consistently proven its capability to provide the uniform film distribution required to maintain completely wetted heat transfer surfaces, thus avoiding the scale formation, which can easily occur with poor distribution techniques. In addition, positive film formation such as provided by the RCC distributor avoids excessive droplet formation within the tubes, thus minimizing mist elimination problems and allowing production of a high quality distillate.

- System Cleaning

The RCC Brine Concentrator seeded slurry process eliminates the requirement for frequent system cleaning when the system is operated within design parameters and according to specified operating procedures. Should cleaning be required, the Brine Concentrator is designed to accomplish this task. All vessel surfaces in contact with concentrated brine are directly accessible for inspection and when necessary can be cleaned by either chemical or mechanical means. Of prime importance is the cleaning of the evaporator heat transfer surfaces. The Brine Concentrator design has the brine on the inside of the tubes that permits direct access to these surfaces from both ends. Chemical cleaning is accomplished by circulating a cleaning solution in the same manner that the brine is recirculated. In those occasional cases when a process or operator upset causes severe fouling, mechanical cleaning of these surfaces can be accomplished to return all heat transfer surfaces to a clean condition. Operators of RCC Brine Concentrator systems typically perform chemical cleaning of their systems once per year.

GE Ionics Proprietary Information.
© Copyright 2005, GE Ionics, Inc. All Rights Reserved.

A 030

# Tab 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,                    *

        Plaintiff,                        *

v.                                        *          C.A. No. 04-1282-JJF

ALSTOM POWER INC.,                        *

        Defendant.                        *

*    *    *    *    *    *    *    *    *    *    *

**SECOND AMENDED NOTICE OF**
**DEPOSITION OF CORPORATE DESIGNEE**
**(DAMAGES)**

ALSTOM Power, Inc., defendant, by undersigned counsel, and pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, hereby gives notice that it will take the deposition upon oral examination of AES Puerto Rico, L.P. before a notary public or other such person authorized to administer oaths beginning at 9:30 a.m. on Wednesday, January 18, 2006, and continuing until the deposition is completed, at the offices of AXTMAYER, PSC, American International Plaza, Suite 404, 250 Munoz Rivera Avenue (Hato Rey), San Juan 00918, Puerto Rico. The deposition shall be recorded by stenographic and/or sound means.

**DEFINITIONS**

For purposes of this Notice of Deposition, certain terms are defined below:

1.    "You" or "AES" or "Owner" refers to Plaintiff, AES Puerto Rico, L.P., a Delaware limited partnership, and any current or former officers, directors, employees, agents, contractors, representatives of or attorneys for AES or AES related entities.

2.    "ALSTOM" refers collectively to ALSTOM Power Inc. and ALSTOM Caribe (f/k/a CE Caribe), and any officers, directors, employees, agents, contractors, representatives, or attorneys of ALSTOM.

3.    "D/FD" refers to Duke/Fluor Daniel Caribbean, S.P., a Puerto Rico partnership, and its constituent partner members or partners, and any of its or their officers, directors, employees, agents, representatives of, or attorneys for D/FD.

4.    The "Project" means the engineering, design, construction, commissioning and operation of a coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

5.    The "EPC Contract" means the Agreement for Engineering, Procurement, and Construction Services  Between AES and Duke/Fluor Daniel Caribbean S.P. dated as of April 3, 1996 with respect to the Project.

6.    "CDS" refers to the Circulating Dry Scrubber equipment provided by ALSTOM for the Project.

7.    "ESP" refers to the Electrostatic Precipitator equipment provided by ALSTOM for the Project and referred to in your Complaint.

8.    "FBHE Handcuffs" refers to the fluidized bed heat exchanger handcuff equipment provided by ALSTOM for the Project and referred to in your Complaint.

## AREAS OF EXAMINATION

The Deponent shall designate such person or persons as are necessary to respond to the areas of examination set forth below.

1.    Any damages claimed by AES against D/FD or ALSTOM and/or any other subcontractor, sub-subcontractor, supplier, vendor, or other person or entity furnishing any work, labor, services, materials, equipment, or other items in connection with the CDS and/or the ESP.

2

2.    Any damages claimed by AES against D/FD or ALSTOM and/or any other subcontractor, sub-subcontractor, supplier, vendor, or other person or entity furnishing any work, labor, services, materials, equipment, or other items in connection with the FBHE Handcuffs.

3.    The "Reverse Osmosis System" referred to in AES's Responses to Interrogatory Numbers 9 and 10 of ALSTOM's First Set of Interrogatories, including the decision making process involved in deciding to install the System, the purported rationale for installing the reverse osmosis system, how that rationale relates to any of the breaches of warranty alleged in this case, and any costs incurred by AES in procuring the design and construction of the system.

4.    The "Crystallizer – brine concentrator" referred to in AES's Responses to Interrogatory Number 10 of ALSTOM's First Set of Interrogatories, including the decision making process involved in deciding to install the Crystallizer, the purported rationale for installing the "Crystallizer – brine concentrator," how that rationale relates to any of the breaches of warranty alleged in this case, the estimate for the "Crystallizer – brine concentrator" set forth in AES's Response, the basis for that estimate, and when AES intends to purchase and install the "Crystallizer – brine concentrator," if ever.

5.    The "Stabilization Program" referred to in AES's Responses to Interrogatory Numbers 9 and 10 of ALSTOM's First Set of Interrogatories, including the nature of the "Stabilization Program," the costs allegedly associated with the "Stabilization Program," and how the "Stabilization Program" relates to any of the breaches of warranty alleged in this case.

6.    The replacement collecting plates purchased for Unit 2, as referred to in AES's Response to Interrogatory No. 10 of ALSTOM's First Set of Interrogatories: including the composition of those plates; how the composition of those plates may differ from the composition of the original plates; how, when, and from whom the replacement collecting plates

3

A 033

were procured; the cost of these replacement collecting plates; any estimates that were sought or received by AES for other replacement plates; the decision making process involved in deciding to purchase the replacement plates and the rationale for the purchase of the replacement plates; how that rationale relates to any of the breaches of warranty alleged in this case; the current location of the plates; when AES intends to install the replacement plates, if ever; and the cost of installing the replacement collector plates.

7.    The "ESP Curtains Fabrication Rigitrodes Material & labor" referred to in AES's Response to Interrogatory No. 10 of ALSTOM's First Set of Interrogatories, including: including the composition of those curtains and rigitrodes; the costs of those curtains and rigitrodes; the decision making process involved in deciding to purchase the curtains and rigitrodes and the rationale for the purchase of the curtains and rigitrodes; how that rationale relates to any of the breaches of warranty alleged in this case; the current location of the curtains and rigitrodes; when AES intends to install the curtains and rigitrodes, if ever; and the cost of installing the curtains and rigitrodes.

8.    The other costs identified in AES's Response to Interrogatory No. 10 of ALSTOM's First Set of Interrogatories, including costs for the labor provided by PIC and Combustion Engineering, the services provided by Brand Scaffold, the freight provided by ICE, and the consulting services provided by Raymond, FL Smidth Airtech, the purported rationale for incurring the cost of the labor/services/freight/consulting, and how the identified labor/services/freight/consulting relates to any of the breaches of warranty alleged in this case.

9.    The "Replacement Collection Plates for Unit 1" referred to in AES's Response to Interrogatory Number 10 of ALSTOM's First Set of Interrogatories, including: the purported rationale for the "Replacement Collection Plates for Unit 1;" how that rationale relates to any of

4

A 034

the breaches of warranty alleged in this case; the estimate for the "Replacement Collection Plates for Unit 1" set forth in AES's Responses; the basis for that estimate; when AES intends to purchase and install the "Replacement Collection Plates for Unit 1," if ever; and the cost of installing those replacement collector plates.

10.     The "Labor to install all plates" " referred to in AES's Response to Interrogatory Number 10 of ALSTOM's First Set of Interrogatories, including: the rationale for incurring the cost of that labor; how that rationale relates to any of the breaches of warranty alleged in this case; how AES determined the estimate for the labor set forth in AES's Responses to ALSTOM's Interrogatories; the basis for that estimate; and when AES intends to perform that labor, if ever.

11.     The material and labor identified in AES's Response to Interrogatory No. 12 of ALSTOM's First Set of Interrogatories relating to the FBHE Handcuffs, including the rationale for incurring the cost of that material and labor and how that rationale relates to any of the breaches of warranty alleged in this case.

12.     The usage, including the amounts and associated costs, of limestone and hydrated lime at the Project both before and after the installation of the Reverse Osmosis System referred to in AES's Responses to Interrogatory Numbers 9 and 10 of ALSTOM's First Set of Interrogatories.

13.     Any operational cost savings AES has experienced after the completion of any of the work for which it is seeking damages in this matter.

14.     Any other damages claimed by AES that allegedly relate to the ESPs or the CDSs.

15.     Any other damages claimed by AES that allegedly relate to the FBHE Handcuffs.

16.    Any changes, modifications or alterations to any of the damages claims

previously asserted by AES against ALSTOM.


_____

James E. Edwards, Jr., Esquire
Anthony F. Vittoria, Esquire
Michael A. Schollaert, Esquire
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:    (410) 547-0699

Attorneys for ALSTOM Power Inc.

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222

6

A 036

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 5th day of January, 2006, a copy of the foregoing

Second Amended Notice of Deposition of Corporate Designee (Damages) was served, via

facsimile and first-class mail on:

John S. Spadaro, Esquire
Murphy Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, Delaware  19805

Dane H. Butswinkas, Esquire
R. Hackney Wiegmann, Esquire
Mary Beth Long, Esquire
Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005


_____
Anthony F. Vittoria

7

A 037

# Tab 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 04-1282-JJF |
| | ) | |
| ALSTOM POWER, INC. | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO ALSTOM
POWER, INC,'S INTERROGATORY NO. 10

Plaintiff AES Puerto Rico L.P. ("AES-PR") supplements its responses

to Defendant ALSTOM Power, Inc.'s (ALSTOM's) interrogatory 10 as follows:

GENERAL OBJECTIONS

The general objections set forth in AES-PR's Responses to ALSTOM's

First Set of Interrogatories are incorporated herein by reference and serve as

additions to AES PR's supplemental response to Interrogatory No. 10.

SUPPLEMENTAL RESPONSE TO INTERROGATORY No. 10

The following supplemental response is made subject to and without

waiver of any of the general objections incorporated by reference above.

INTERROGATORY NO. 10

For any work performed on or materials/equipment provided for the
CDS and/or ESP equipment, itemize the payments made by you to any vendor,
subcontractor and/or any other entity by date, amount, and reason for payment.

A 038

SUPPLEMENTAL RESPONSE

Subject to the general objections incorporated by reference above, and without waiver thereof, AES-PR states that it has made and/or expects to make the following payments:

Water Treatment

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|--------|------|--------|-------------------|
| Various (list provided as Attachment A to initial response to interrogatory) | 02-06-04 – 03-31-05 | $1,786,559.12 | Reverse Osmosis System Capital Cost |
| ChemTreat, Others | Ongoing | $877,154 | Operation and maintenance of reverse osmosis system (Based $100,000/yr and 10% discount rate) |
| Various | 2005/2006 | $50,000 (est.) | Boiler water injection project installation |
| Drummond | 24 months | $7,568,000 (est.) | O&M cost for injection of high-chloride water into the boiler |
| Various | 24 months | $220,752 (est.) | CDS clean water supplement |
| Various | 24 months | $1,314,000 (est.) | Other water supply changes |
| Various | To begin in 2006 | $512,000 (est.) | Crystallizer – engineering, permits, relocation |
| To be determined | 2006 | $7,000,000 (est.) | Crystallizer – procurement |
| To be determined | 2006/2007 | $7,000,000 (est.) | Crystallizer – Construction |
| To be determined | 2006 | $1,400,000 | Crystallizer – construction/procurement contingency (10%) |
| Various | Ongoing | $6,578,655 (est.) | Crystallizer – O&M costs (est. $750,000/yr, incl. 650kW/h and 10% discount rate) |
|  |  |  |  |
| Total |  | $34,307,120.12 |  |

2

A 039

Collection Plates

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| EEC | Various | $925,120.00 | Replacement collecting plates for Unit 2 |
| PIC | Various | $40,649.10 | Labor |
| ICE | Various | $240,409.74 | Freight |
| Raymond | Various | $2,942.49 | Consulting |
| FL Smidth Airtech | 12/31/2003 | $92,935.28 | Consulting/Inspection |
| EEC | Various | $219,250.00 | ESP rigitrodes |
| Various | | $1,400,000.00 (est.) | Replacement collection plates (incl. related parts, consulting, inspection, labor and shipping, w/o costs associated with storage) for Unit 1 |
| | | $2,000,000.00 (est.) | Labor to install all plates |
| Total | | $4,921,306.61 | |

Stabilization Program

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| Various | Various | $481,069.00 | Other costs related to initial stabilization of corroded plates |
| Various | Various | $54,544.45 | Additional work during July 2004 |
| Various | Various | $53,812.99 | Additional work during October 2004 outage |
| Various | Various | $3,075.54 | Additional work during April 2005 outage |
| TOTAL | | $592,501.98 | |

3

A 040

AES PR supplements this response by referring ALSTOM to the documents AES PR is producing in response to ALSTOM's first set of requests for production. See Fed. R. Civ. P. 33(d).

_____

_____/s/ John S. Spadaro_____
John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: January 17, 2006      Attorneys for AES Puerto Rico, L.P.

4

A 041

## VERIFICATION

I, Allan B. Dyer, declare under penalty of perjury that:

    1.     I am President of AES Puerto Rico, L.P.

    2.     I have read the foregoing supplemental response of AES Puerto Rico

L.P. to ALSTOM Power Inc.'s Interrogatory No. 10 and, to the best of my

knowledge, information and belief, they are true and accurate.

_January 17, 2005_
Date

Allan B. Dyer

5

A 042

# Tab 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,           *

       Plaintiff,          *

  v.                    *      C.A. No. 04-1282-JJF

ALSTOM POWER INC.,         *

       Defendant.       *

*    *    *    *    *    *    *    *    *    *    *

## SECOND AMENDED NOTICE OF DEPOSITION OF CORPORATE DESIGNEE

ALSTOM Power, Inc., defendant, by undersigned counsel, and pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, hereby gives notice that it will take the deposition upon oral examination of AES Puerto Rico, L.P. before a notary public or other such person authorized to administer oaths beginning at 10:00 a.m. on Friday, March 10, 2006, and continuing until the deposition is completed, at the offices of AXTMAYER, PSC, American International Plaza, Suite 404, 250 Munoz Rivera Avenue (Hato Rey), San Juan 00918, Puerto Rico or at such other location as the parties shall agree. The deposition shall be recorded by video and stenographic and/or sound means.

### DEFINITIONS

For purposes of this Notice of Deposition, certain terms are defined below:

1.    "You" or "AES" or "Owner" refers to Plaintiff, AES Puerto Rico, L.P., a Delaware limited partnership, and any current or former officers, directors, employees, agents, contractors, representatives of or attorneys for AES or AES related entities.

2.    "ALSTOM" refers collectively to ALSTOM Power Inc. and ALSTOM Caribe (f/k/a CE Caribe), and any of their officers, directors, employees, agents, contractors, representatives, or attorneys.

3.    "D/FD" refers to Duke/Fluor Daniel Caribbean, S.P., a Puerto Rico partnership, and its constituent partner members or partners, and any of its or their officers, directors, employees, agents, representatives of, or attorneys.

4.    "EEC" refers to Environmental Elements Corporation and any of its officers, directors, employees, agents, contractors, representatives, or attorneys.

5.    The "Project" means the engineering, design, and construction of a coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

6.    The "EPC Contract" means the Agreement for Engineering, Procurement, and Construction Services Between AES and Duke/Fluor Daniel Caribbean S.P. dated as of April 3, 1996 with respect to the Project.

7.    The "Purchase Order" means the contract between ALSTOM and D/FD pursuant to which ALSTOM agreed to furnish and erect boilers and related equipment on the Project.

8.    "CDS" refers to the Circulating Dry Scrubber equipment provided by ALSTOM for the Project.

9.    "ESP" refers to the Electrostatic Precipitator equipment provided by ALSTOM for the Project and referred to in your Complaint.

10.    "FBHE Handcuffs" refers to the fluidized bed heat exchanger handcuff equipment provided by ALSTOM for the Project and referred to in your Complaint.

11.    "Water Treatment Systems" refers to the plant equipment used to treat the water used in the CDS and ESP.

2

A 044

12.    "Plant" refers to the coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

### AREAS OF EXAMINATION

The Deponent shall designate such person or persons as are necessary to respond to the areas of examination set forth below.

1.    The zero liquid discharge permit for the Project and/or operation of the Plant, including AES's assertion that a brine crystallizer is now necessary to comply with that permit and that water injection into the boiler is necessary until the crystallizer is constructed, and any investigation or analysis of the extent to which the permit could be modified to permit some discharge of waste water.

2.    Environmental permitting issues for opacity and sulphur dioxide relating to the Project and/or the Plant, including, but not limited to, political and/or legal opposition to the Project and/or the Plant, any lawsuits filed to prevent issuance of operational permits for the Project and/or the Plant and any continued complaints and/or investigations regarding alleged environmental issues and the Plant's operations.

3.    Knowledge of AES regarding the risk of corrosion in the CDS or the ESP prior to November, 2003  and measures that could be taken to limit the risk of corrosion and how and from whom AES acquired such knowledge, including the subject matter of a Due Diligence Report by Black & Veatch relating to emissions and corrosion, discussions at a meeting with D/FD, ALSTOM, and EEC on February 10, 2000, and any discussions or analyses of these issues among individuals employed by AES and D/FD and other persons or entities, including, but not limited to, ALSTOM, EEC, and John Toher.

3

4.    Knowledge regarding the alleged accelerated corrosion experienced at the Plant, including the assertion in paragraph 19 of the Complaint that "[t]he accelerated corrosion far exceeds industry standards," and the assertion in paragraph 19 of your Complaint that the corrosion "has affected both the structural integrity of portions of the electrostatic precipitators and the ability of the electrostatic precipitators mechanically to perform."

5.    Knowledge regarding the assertion in paragraph 21 of the Complaint that AES "determined that it needed to make modifications, including installing a new water treatment system in order to eliminate from the gas entering the electrostatic precipitators the compounds responsible for the accelerated corrosion."

6.    AES's notification to ALSTOM of a claim for alleged accelerated corrosion under the Warranty in the Purchase Order that is the subject of this action and any and all efforts to agree upon appropriate remedial actions with ALSTOM to correct the alleged defects and/or deficiencies for which AES notified ALSTOM.

7.    Knowledge regarding AES's practices of measuring the chloride content of the CDS spray water or the fly ash at the Plant, including, but not limited to, how measurements were taken, when measurements were taken, how measurements were recorded, and the frequency of any such measurements.

8.    Knowledge regarding AES's practices of measuring the wet bulb temperature of the CDS, including, but not limited to, how measurements were taken, where measurements were taken, when measurements were taken, how measurements were recorded, and the frequency of any such measurements.

9.    Knowledge regarding AES's practices of replacing the CDS water nozzles or their constituent parts, including, but not limited to, what replacements were made, when such

4

replacements were made, how often such replacements were made, whether AES kept replacement and ordering records for the nozzles and the constituent parts, and the costs of replacing the nozzles and/or the constituent parts.

10.    Knowledge regarding AES's decision to modify the type of CDS spray nozzles used in the CDS, including, but not limited to, when such modification occurred, why the modification occurred, and the cost of the modification.

11.    Knowledge regarding AES's decision to install equipment to re-inject fly ash from the ash silos to the boiler, including how much (quantity) ash was re-injected into the boiler when the ash re-injection system was operating, when the ash re-injection system was operated, and AES's purpose in requiring the installation of the ash re-injection system.

12.    Knowledge regarding the consumption of cooling water in the CDS in gallons per minute in calendar year 2003.

13.    Knowledge regarding settings or adjustments to the CDS inlet temperature by AES during calendar year 2003.

14.    Knowledge regarding the extent to which, during the period between September, 2002 and February, 2004, AES complied with the procedures and requirements set forth in the Operations and Maintenance Manuals ("O&M Manuals") prepared by EEC with regard to the CDS and ESP, without regard to any modifications that AES now contends were made to such O&M Manuals, and any deviations by AES from such procedures and requirements.

15.    Knowledge regarding ALSTOM's and/or EEC's alleged modification of the O&M Manuals or the operation and maintenance procedures and/or parameters for the pollution control equipment at the Plant, including, but not limited to, what procedures were allegedly modified, how such modifications were made, by whom such modifications were made, to whom

5

such modifications were made, whether such modifications were oral or in writing, and when such modifications occurred.

16.    Knowledge regarding any and all efforts by AES to operate the CDS and ESP in accordance with the procedures set forth in the O&M Manuals after discovery of the corrosion in the ESP.

17.    Knowledge regarding attendance by AES's employees at the training program conducted by ECC and any subsequent dissemination of the training materials to AES's employees or re-broadcast of training using the training videotapes.

18.    Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "Plant could not operate pursuant to the requirement of its air permit with the CDS outlet temperature set to 172 degrees or above when using high-chloride water for which it was designed to operate."

19.    Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "spray nozzle cleaning procedure recommended by EEC caused the Plant to experience unacceptable opacity spikes during the cleaning procedure."

20.    Knowledge regarding the nature of additional handcuffs installed by AES on the fluidizing bed heat exchangers at the Plant and the locations on the fluidized bed heat exchangers where such handcuffs were installed.

6

_(signature)_

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:    (410) 547-0699

Attorneys for ALSTOM Power Inc.

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, Delaware 19801
(302) 888-3222

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 7th day of March, 2006, a copy of the foregoing

Second Amended Notice of Deposition of Corporate Designee was served, via electronic mail

and first-class mail, on:

John S. Spadaro, Esquire           Daniel D. Williams, Esquire
Murphy Spadaro & Landon            Williams & Connolly LLP
1011 Centre Road, Suite 210        725 Twelfth Street, N.W.
Wilmington, Delaware 19805         Washington, D.C. 20005

_(signature)_

Anthony F. Vittoria

7

A 049

# Tab 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant. | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## NOTICE OF DEPOSITION OF CORPORATE DESIGNEE

ALSTOM Power, Inc., defendant, by undersigned counsel, and pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, hereby gives notice that it will take the deposition upon oral examination of AES Puerto Rico, L.P. before a notary public or other such person authorized to administer oaths beginning at 9:00 a.m. on Thursday, March 9, 2006, and continuing until the deposition is completed, at the offices of AXTMAYER, PSC, American International Plaza, Suite 404, 250 Munoz Rivera Avenue (Hato Rey), San Juan 00918, Puerto Rico or at such other location as the parties shall agree. The deposition shall be recorded by stenographic and/or sound means.

## DEFINITIONS

For purposes of this Notice of Deposition, certain terms are defined below:

1.　　"You" or "AES" or "Owner" refers to Plaintiff, AES Puerto Rico, L.P., a Delaware limited partnership, and any current or former officers, directors, employees, agents, contractors, representatives of or attorneys for AES or AES related entities.

A 050

2.      "ALSTOM" refers collectively to ALSTOM Power Inc. and ALSTOM Caribe (f/k/a CE Caribe), and any of their officers, directors, employees, agents, contractors, representatives, or attorneys.

3.      "D/FD" refers to Duke/Fluor Daniel Caribbean, S.P., a Puerto Rico partnership, and its constituent partner members or partners, and any of its or their officers, directors, employees, agents, representatives of, or attorneys.

4.      "EEC" refers to Environmental Elements Corporation and any of its officers, directors, employees, agents, contractors, representatives, or attorneys.

5.      The "Project" means the engineering, design, and construction of a coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

6.      The "EPC Contract" means the Agreement for Engineering, Procurement, and Construction Services Between AES and Duke/Fluor Daniel Caribbean S.P. dated as of April 3, 1996 with respect to the Project.

7.      The "Purchase Order" means the contract between ALSTOM and D/FD pursuant to which ALSTOM agreed to furnish and erect boilers and related equipment on the Project.

8.      "CDS" refers to the Circulating Dry Scrubber equipment provided by ALSTOM for the Project.

9.      "ESP" refers to the Electrostatic Precipitator equipment provided by ALSTOM for the Project and referred to in your Complaint.

10.     "FBHE Handcuffs" refers to the fluidized bed heat exchanger handcuff equipment provided by ALSTOM for the Project and referred to in your Complaint.

11.     "Water Treatment Systems" refers to the plant equipment used to treat the water used in the CDS and ESP.

2

12.    "Plant" refers to the coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

## AREAS OF EXAMINATION

The Deponent shall designate such person or persons as are necessary to respond to the areas of examination set forth below.

1.    The zero liquid discharge permit for the Project and/or operation of the Plant, including AES's assertion that a brine crystallizer is now necessary to comply with that permit and that water injection into the boiler is necessary until the crystallizer is constructed, and any investigation or analysis of the extent to which the permit could be modified to permit some discharge of waste water.

2.    Environmental permitting issues for opacity and sulphur dioxide relating to the Project and/or the Plant, including, but not limited to, political and/or legal opposition to the Project and/or the Plant, any lawsuits filed to prevent issuance of operational permits for the Project and/or the Plant and any continued complaints and/or investigations regarding alleged environmental issues and the Plant's operations.

3.    Knowledge of AES regarding the risk of corrosion in the CDS or the ESP prior to November, 2003  and measures that could be taken to limit the risk of corrosion and how and from whom AES acquired such knowledge, including the subject matter of a Due Diligence Report by Black & Veatch relating to emissions and corrosion, discussions at a meeting with D/FD, ALSTOM, and EEC on February 10, 2000, and any discussions or analyses of these issues among individuals employed by AES and D/FD and other persons or entities, including, but not limited to, ALSTOM, EEC, and John Toher.

3

4.      Knowledge regarding the alleged accelerated corrosion experienced at the Plant, including the assertion in paragraph 19 of the Complaint that "[t]he accelerated corrosion far exceeds industry standards," and the assertion in paragraph 19 of your Complaint that the corrosion "has affected both the structural integrity of portions of the electrostatic precipitators and the ability of the electrostatic precipitators mechanically to perform."

5.      Knowledge regarding the assertion in paragraph 21 of the Complaint that AES "determined that it needed to make modifications, including installing a new water treatment system in order to eliminate from the gas entering the electrostatic precipitators the compounds responsible for the accelerated corrosion."

6.      AES's notification to ALSTOM of a claim for alleged accelerated corrosion under the Warranty in the Purchase Order that is the subject of this action and any and all efforts to agree upon appropriate remedial actions with ALSTOM to correct the alleged defects and/or deficiencies for which AES notified ALSTOM.

7.      Knowledge regarding AES's practices of measuring the chloride content of the CDS spray water or the fly ash at the Plant, including, but not limited to, how measurements were taken, when measurements were taken, how measurements were recorded, and the frequency of any such measurements.

8.      Knowledge regarding AES's practices of measuring the wet bulb temperature of the CDS, including, but not limited to, how measurements were taken, where measurements were taken, when measurements were taken, how measurements were recorded, the frequency of any such measurements, and AES's installation of equipment to monitor the wet bulb temperature of the CDS, including, but not limited to, when such equipment was installed, why the equipment was installed, and where measurements from the equipment are recorded.

4

9.    Knowledge regarding AES's practices of cleaning the CDS water nozzles, including, but not limited to, how the cleaning procedure was conducted, when the cleaning procedure was conducted, how often the cleanings occurred, whether such cleaning procedures were recorded, and the frequency of any such cleanings.

10.    Knowledge regarding AES's practices of replacing the CDS water nozzles or their constituent parts, including, but not limited to, what replacements were made, when such replacements were made, how often such replacements were made, whether AES kept replacement and ordering records for the nozzles and the constituent parts, and the costs of replacing the nozzles and/or the constituent parts.

11.    Knowledge regarding AES's decision to modify the type of CDS spray nozzles used in the CDS, including, but not limited to, when such modification occurred, why the modification occurred, and the cost of the modification.

12.    Knowledge regarding AES's decision to install equipment to re-inject fly ash from the ash silos to the boiler, including, but not limited to, when such equipment was installed, why the equipment was installed, how much (quantity) ash is re-injected into the boiler, when such ash is re-injected, and the purpose behind the installation of said equipment.

13.    Knowledge regarding the consumption of cooling water in the CDS in gallons per minute in calendar year 2003.

14.    Knowledge regarding settings or adjustments to the CDS inlet temperature by AES during calendar year 2003.

15.    Any and all efforts taken by AES to reduce the consumption of limestone and hydrated lime at the Plant during calendar years 2002 and 2003, including, but not limited to,

A 054

knowledge regarding the effect of operating parameters of the boilers and the CDS upon the levels of consumption.

16.    Any and all efforts, goals, or targets to operate at the Plant at opacity emission levels below those required under permits issued by the Environmental Protection Agency.

17.    Knowledge regarding AES's obligation to report violations of its emissions permits to the Environmental Protection Agency (the "EPA") or other governmental entities and the reports of violations actually made by AES to the EPA during calendar years 2002, 2003, 2004, and 2005, the substance of any reports, and AES policies and practices regarding its reporting requirements.

18.    Knowledge regarding the extent to which, during the period between September, 2002 and February, 2004, AES complied with the procedures and requirements set forth in the Operations and Maintenance Manuals ("O&M Manuals") prepared by EEC with regard to the CDS and ESP, without regard to any modifications that AES now contends were made to such O&M Manuals, and any deviations by AES from such procedures and requirements.

19.    Knowledge regarding ALSTOM's and/or EEC's alleged modification of the O&M Manuals or the operation and maintenance procedures and/or parameters for the pollution control equipment at the Plant, including, but not limited to, what procedures were allegedly modified, how such modifications were made, by whom such modifications were made, to whom such modifications were made, whether such modifications were oral or in writing, and when such modifications occurred.

20.    Knowledge regarding any and all efforts by AES to operate the CDS and ESP in accordance with the procedures set forth in the O&M Manuals after discovery of the corrosion in the ESP.

6

21.    Knowledge regarding attendance by AES's employees at the training program conducted by ECC and any subsequent dissemination of the training materials to AES's employees or re-broadcast of training using the training videotapes.

22.    Knowledge regarding the incorporation of logic in the Distributed Control System ("DCS") for adjustment of the operating temperature of the CDS during sootblowing cycles in the boilers at the Plant.

23.    Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "Plant could not operate pursuant to the requirement of its air permit with the CDS outlet temperature set to 172 degrees or above when using high-chloride water for which it was designed to operate."

24.    Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "spray nozzle cleaning procedure recommended by EEC caused the Plant to experience unacceptable opacity spikes during the cleaning procedure."

25.    Knowledge of the fluidized bed heat exchanger tube failures that occurred on September 16, 2003, January 9, 2004, and June 3, 2004, the assertion in paragraph 27 of the Complaint that "AES Puerto Rico determined that the cause of tube failures was too few handcuffs holding the sets of steam tubes together," including any analysis that allegedly resulted in that determination, the fluidizing velocities and fluidizing air flow set points for each fluidized bed heat exchanger, and the fluidizing bed heat exchanger handcuff arrangements for other AES Corporation power plants that were consulted for purposes of determining that additional handcuffs were necessary to operate under appropriate operating parameters without tube failures at the Plant.

7

26.    Knowledge regarding the nature of additional handcuffs installed by AES on the fluidizing bed heat exchangers at the Plant and the locations on the fluidized bed heat exchangers where such handcuffs were installed.

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:    (410) 547-0699

Attorneys for ALSTOM Power Inc.

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, Delaware 19801
(302) 888-3222

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 17th day of February 2006, a copy of the foregoing Notice of Deposition of Corporate Designee was served, via facsimile and first-class mail, on:

John S. Spadaro, Esquire
Murphy Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, Delaware  19805

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005

James E. Edwards, Jr.

8