# Tab 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## AMENDED NOTICE OF DEPOSITION OF CORPORATE DESIGNEE

ALSTOM Power, Inc., defendant, by undersigned counsel, and pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, hereby gives notice that it will take the deposition upon oral examination of AES Puerto Rico, L.P. before a notary public or other such person authorized to administer oaths beginning at 9:00 a.m. on Thursday, March 9, 2006, and continuing until the deposition is completed, at the offices of AXTMAYER, PSC, American International Plaza, Suite 404, 250 Munoz Rivera Avenue (Hato Rey), San Juan 00918, Puerto Rico or at such other location as the parties shall agree. The deposition shall be recorded by stenographic and/or sound means.

### DEFINITIONS

For purposes of this Notice of Deposition, certain terms are defined below:

1. "You" or "AES" or "Owner" refers to Plaintiff, AES Puerto Rico, L.P., a Delaware limited partnership, and any current or former officers, directors, employees, agents, contractors, representatives of or attorneys for AES or AES related entities.

2. "ALSTOM" refers collectively to ALSTOM Power Inc. and ALSTOM Caribe (f/k/a CE Caribe), and any of their officers, directors, employees, agents, contractors, representatives, or attorneys.

3. "D/FD" refers to Duke/Fluor Daniel Caribbean, S.P., a Puerto Rico partnership, and its constituent partner members or partners, and any of its or their officers, directors, employees, agents, representatives of, or attorneys.

4. "EEC" refers to Environmental Elements Corporation and any of its officers, directors, employees, agents, contractors, representatives, or attorneys.

5. The "Project" means the engineering, design, and construction of a coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

6. The "EPC Contract" means the Agreement for Engineering, Procurement, and Construction Services Between AES and Duke/Fluor Daniel Caribbean S.P. dated as of April 3, 1996 with respect to the Project.

7. The "Purchase Order" means the contract between ALSTOM and D/FD pursuant to which ALSTOM agreed to furnish and erect boilers and related equipment on the Project.

8. "CDS" refers to the Circulating Dry Scrubber equipment provided by ALSTOM for the Project.

9. "ESP" refers to the Electrostatic Precipitator equipment provided by ALSTOM for the Project and referred to in your Complaint.

10. "FBHE Handcuffs" refers to the fluidized bed heat exchanger handcuff equipment provided by ALSTOM for the Project and referred to in your Complaint.

11. "Water Treatment Systems" refers to the plant equipment used to treat the water used in the CDS and ESP.

12. "Plant" refers to the coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

## AREAS OF EXAMINATION

The Deponent shall designate such person or persons as are necessary to respond to the areas of examination set forth below.

1. The zero liquid discharge permit for the Project and/or operation of the Plant, including AES's assertion that a brine crystallizer is now necessary to comply with that permit and that water injection into the boiler is necessary until the crystallizer is constructed, and any investigation or analysis of the extent to which the permit could be modified to permit some discharge of waste water.

2. Environmental permitting issues for opacity and sulphur dioxide relating to the Project and/or the Plant, including, but not limited to, political and/or legal opposition to the Project and/or the Plant, any lawsuits filed to prevent issuance of operational permits for the Project and/or the Plant and any continued complaints and/or investigations regarding alleged environmental issues and the Plant's operations.

3. Knowledge of AES regarding the risk of corrosion in the CDS or the ESP prior to November, 2003 and measures that could be taken to limit the risk of corrosion and how and from whom AES acquired such knowledge, including the subject matter of a Due Diligence Report by Black & Veatch relating to emissions and corrosion, discussions at a meeting with D/FD, ALSTOM, and EEC on February 10, 2000, and any discussions or analyses of these issues among individuals employed by AES and D/FD and other persons or entities, including, but not limited to, ALSTOM, EEC, and John Toher.

4. Knowledge regarding the alleged accelerated corrosion experienced at the Plant, including the assertion in paragraph 19 of the Complaint that "[t]he accelerated corrosion far exceeds industry standards," and the assertion in paragraph 19 of your Complaint that the corrosion "has affected both the structural integrity of portions of the electrostatic precipitators and the ability of the electrostatic precipitators mechanically to perform."

5. Knowledge regarding the assertion in paragraph 21 of the Complaint that AES "determined that it needed to make modifications, including installing a new water treatment system in order to eliminate from the gas entering the electrostatic precipitators the compounds responsible for the accelerated corrosion."

6. AES's notification to ALSTOM of a claim for alleged accelerated corrosion under the Warranty in the Purchase Order that is the subject of this action and any and all efforts to agree upon appropriate remedial actions with ALSTOM to correct the alleged defects and/or deficiencies for which AES notified ALSTOM.

7. Knowledge regarding AES's practices of measuring the chloride content of the CDS spray water or the fly ash at the Plant, including, but not limited to, how measurements were taken, when measurements were taken, how measurements were recorded, and the frequency of any such measurements.

8. Knowledge regarding AES's practices of measuring the wet bulb temperature of the CDS, including, but not limited to, how measurements were taken, where measurements were taken, when measurements were taken, how measurements were recorded, and the frequency of any such measurements.

9. Knowledge regarding AES's practices of replacing the CDS water nozzles or their constituent parts, including, but not limited to, what replacements were made, when such

replacements were made, how often such replacements were made, whether AES kept replacement and ordering records for the nozzles and the constituent parts, and the costs of replacing the nozzles and/or the constituent parts.

10. Knowledge regarding AES's decision to modify the type of CDS spray nozzles used in the CDS, including, but not limited to, when such modification occurred, why the modification occurred, and the cost of the modification.

11. Knowledge regarding AES's decision to install equipment to re-inject fly ash from the ash silos to the boiler, including how much (quantity) ash was re-injected into the boiler when the ash re-injection system was operating, when the ash re-injection system was operated, and AES's purpose in requiring the installation of the ash re-injection system.

12. Knowledge regarding the consumption of cooling water in the CDS in gallons per minute in calendar year 2003.

13. Knowledge regarding settings or adjustments to the CDS inlet temperature by AES during calendar year 2003.

14. Knowledge regarding the extent to which, during the period between September, 2002 and February, 2004, AES complied with the procedures and requirements set forth in the Operations and Maintenance Manuals ("O&M Manuals") prepared by EEC with regard to the CDS and ESP, without regard to any modifications that AES now contends were made to such O&M Manuals, and any deviations by AES from such procedures and requirements.

15. Knowledge regarding ALSTOM's and/or EEC's alleged modification of the O&M Manuals or the operation and maintenance procedures and/or parameters for the pollution control equipment at the Plant, including, but not limited to, what procedures were allegedly modified, how such modifications were made, by whom such modifications were made, to whom

such modifications were made, whether such modifications were oral or in writing, and when such modifications occurred.

16.  Knowledge regarding any and all efforts by AES to operate the CDS and ESP in accordance with the procedures set forth in the O&M Manuals after discovery of the corrosion in the ESP.

17.  Knowledge regarding attendance by AES's employees at the training program conducted by ECC and any subsequent dissemination of the training materials to AES's employees or re-broadcast of training using the training videotapes.

18.  Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "Plant could not operate pursuant to the requirement of its air permit with the CDS outlet temperature set to 172 degrees or above when using high-chloride water for which it was designed to operate."

19.  Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "spray nozzle cleaning procedure recommended by EEC caused the Plant to experience unacceptable opacity spikes during the cleaning procedure."

20.  Knowledge regarding the nature of additional handcuffs installed by AES on the fluidizing bed heat exchangers at the Plant and the locations on the fluidized bed heat exchangers where such handcuffs were installed.

_____
James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:   (410) 547-0699

Attorneys for ALSTOM Power Inc.

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, Delaware 19801
(302) 888-3222

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 3rd day of March, 2006, a copy of the foregoing Amended Notice of Deposition of Corporate Designee was served, via facsimile and first-class mail, on:

| | |
|---|---|
| John S. Spadaro, Esquire | Daniel D. Williams, Esquire |
| Murphy Spadaro & Landon | Williams & Connolly LLP |
| 1011 Centre Road, Suite 210 | 725 Twelfth Street, N.W. |
| Wilmington, Delaware 19805 | Washington, D.C. 20005 |

_____
James E. Edwards, Jr.

# Tab 13

Vittoria, Anthony

| | |
|---|---|
| From: | Williams, Daniel [DDWilliams@wc.com] |
| Sent: | Friday, March 03, 2006 11:58 AM |
| To: | Vittoria, Anthony |
| Cc: | Sagerson, Ann; Tuxbury, James |
| Subject: | AES-PR v. ALSTOM |

```
> Tony, next Wednesday, AES-PR will have available for ALSTOM's
> inspection and copying at the facility in Guayama, Puerto Rico a small
> supplement to its document production relating to newly-created
> documents since its last paper document production.
>
> Also, because ALSTOM refuses to hold the 30(b)(6) deposition of AES-PR
> next week anywhere near Guayama, the witness(es) will not be available
> until 10:00 a.m.  As you know, during rush hour, the drive time from
> Guayama to San Juan is over 2 hours.  AES-PR's corporate designee(s)
> will, of course, be available for up to seven hours of questioning.
>
> As I have discussed with Jim Edwards, the 30(b)(6) deposition will
> proceed next Friday (over our objections) and the deposition of Mr.
> Dyer will proceed next Thursday.
>
> Best regards, Dan
>
> Daniel D. Williams
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C. 20005
> tel.  (202) 434-5263
> fax   (202) 434-5029
>
```

NOTICE:

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply or by telephone (call us collect at (202) 434-5000) and immediately delete this message and all its attachments.

1

A 065

# Tab 14

**Fuhrman, Paula R.**

---

**From:** Ramon Mellado Villarreal | ELECTRA [rmellado@electraonline.net]
**Sent:** Thursday, March 09, 2006 7:13 AM
**To:** Fuhrman, Paula R.
**Subject:** RE: Scanning of Documents at Power Plant in Guayama Puerto Rico

Don't worry about it; we are at your service.

Thanks for thinking of us.



# ELECTRA
**Information Management Solutions**

**Ramón Mellado Villarreal**
President

T.787.767.6362;   F.787.767.9552
4 Vieques St.; Hato Rey, PR 00917
http://www.electraonline.net

---

**From:** Fuhrman, Paula R. [mailto:prfuhrman@ober.com]
**Sent:** Wednesday, March 08, 2006 5:26 PM
**To:** rmellado@electraonline.net
**Subject:** RE: Scanning of Documents at Power Plant in Guayama Puerto Rico

Ramon:

   I just received a call regarding the documents I have asked you to pick up for us at the Power Plant. It appears that we will not need your services; our opponents in this matter have decided to copy the documents themselves, and just give them to us.

   I appreciate your help and your willingness to make several calls to help us and I'm sorry to put you to the trouble of all of this for nothing.

   Thank you for your help and I will certainly be calling you if we need assistance again.

Sincerely,
Paula Fuhrman
Paralegal

>        -----Original Message-----
>        **From:** Ramon Mellado Villarreal | ELECTRA [mailto:rmellado@electraonline.net]
>        **Sent:** Wednesday, March 08, 2006 4:12 PM
>        **To:** Fuhrman, Paula R.
>        **Subject:** RE: Scanning of Documents at Power Plant in Guayama Puerto Rico
>
>        As we spoke, it will a pleasure assisting you once more. Today I called Maria Torres at AES 3 times without success. I will try again tomorrow and keep you informed of our progress.
>
>        Cordially,



# ELECTRA
**Information Management Solutions**

**Ramón Mellado Villarreal**

3/21/2006

A 066

President

T.787.767.6362; F.787.767.9552
4 Vieques St.; Hato Rey, PR 00917
http://www.electraonline.net

**From:** Fuhrman, Paula R. [mailto:prfuhrman@ober.com]
**Sent:** Wednesday, March 08, 2006 12:28 PM
**To:** rmellado@electraonline.net
**Cc:** Vittoria, Anthony
**Subject:** Scanning of Documents at Power Plant in Guayama Puerto Rico

Ramon:

I am in need of your assistance again. I understand that you have scanned documents for us from the Power Plant in Guayama in the past. Our opponents, AES, tell us that there is a small amount of documentation that they will provide to us to copy.

Would you go to the Plant and pick up the documents and scan them for us? The contact person at the plant is Millie Porres, 787-866-8117 Extension 212.

Please either email me in response to this or call me directly at: 410-230-7019. Thank you very much for your assistance.

Paula Reva Fuhrman
Paralegal
410-230-7019
410-230-7219 Fax
prfuhrman@ober.com

# OBER|KALER

*Attorneys at Law*
www.ober.com
410-547-0699 – Fax
120 East Baltimore Street
Baltimore, Maryland 21202

3/21/2006

A 067

# Tab 15



December 29, 2005  *Revised DATE Not Correct*

Mr. Carlos Alequin
AES Puerto Rico
PO Box 1890
Guayama, PR 00785

Subject: Revised Budget for Zero Liquid Discharge (ZLD) Solutions

Mr. Alequin,

Aquatech has reviewed the data collected during my visit and based on several worst case operating scenarios and with out any improvement to the existing RO we have assumed that maximum RO reject will be approximately 90 gpm. Our design approach is based on a 100-gpm design.

We propose the following options;

### Option 1: 100 gpm Brine Concentrator and 20 gpm Forced Circulation Crystallizer

This plan provides a cost effective ZLD solution for your plant considering no change in the existing cooling tower blowdown softener/RO system. Wastewater (RO Reject plus other plant waste) will be directed first to the chemical conditioning (seeding) tank, then to a falling film Brine Concentrator (BC) for pre-concentration then on to a Forced Circulation flash evaporator and finally to the filter press for dewatering. The product is a solid salt cake that can be discharged off site. Due to your water chemistry this BC requires chemical seeding of Calcium Chloride for seeded slurry operation and improve the concentration efficiency. Presently we have considered the Crystallizer to be power driven however if low-pressure steam is available then the power consumption can be considerably reduced. In addition steam driven units are easier to operate and maintain.

This option offers turndown of 50-60% so if the existing RO system were to be upgraded then this system could still be used. It would not be the most energy efficient solution but it does provide you options should the RO have problems again.

### Option 2: 2 x 50 gpm Forced Circulation Crystallizer

This option provides redundancy and a very rugged solution, considering no change in the existing cooling tower blowdown softener/RO system. The Operating cost of this option is higher compared to Option-1 above if both 50 GPM units are operated continuously.

Water will be directed to a wastewater collection tank then treated in either one or both Forced Circulation Evaporators. Concentrated waste will then be directed to filter press for dewatering. The concentrated waste product is a solid salt cake that can be discharged off site. Chemistry is not as big of an issue for the FC and it is more flexible to shutdown and start up conditions. Presently we have considered the Crystallizer to be power driven however if low-pressure steam is available then the



2

Power consumption can be considerably reduced. In addition steam driven units are easier to operate and maintain

**Option 3**: 600 gpm Brine Concentrator and 20 gpm Forced Circulation Crystallizer

This ZLD option would eliminate the existing cooling tower blowdown softener/RO system including all associated operating costs. However Power requirement of this option is very high and the capital cost is also highest of all the options. In case you are considering this option seriously we will have to work out detailed economic payback evaluation.

Wastewater will be sent directly from the cooling tower and other waste sources to the chemical conditioning (seeding) tank, then to a falling film Brine Concentrator for pre-concentration then on to a Forced Circulation flash evaporator and finally to the filter press for dewatering. The concentrated waste product is a solid salt cake that can be discharged off site. Presently we have considered the Crystallizer to be power driven however if low-pressure steam is available then the power consumption can be considerably reduced. In addition steam driven units are easier to operate and maintain

**Option 4**: 320 gpm (2 x 160 GPM) Ultrafiltration System (to improve existing RO performance) and One 50 gpm Crystallizer.

Aquatech is currently awaiting additional data from the AES Puerto Rico site to determine a process improvement to the existing cooling tower blowdown RO system. However based on our preliminary evaluations and some previous experience of similar application we believe that the best solution for the entire ZLD design will be centered on a more reliable and functional RO system. Ultrafiltration (UF) should improve the pretreatment and accomplish the overall design RO recovery of 85% in two stages.

We propose to use the filtered water as feed to the UF system and the product will be the RO feed. The UF will deliver water with SDI of <1 and will substantially reduce the fouling on the RO membranes. The UF will have provision of Chemical enhanced back washing which will be performed automatically via the PLC aprox once every hour to keep the membranes clean and sterilized. The UF backwash water can be recycled back in to the Blowdown softening clarifier. We will further reconfirm our design approach after receipt of membrane autopsy report.

Reject from the existing RO and other miscellaneous waste (Total flow 50 GPM) will be directed to a wastewater collection tank then on to the Forced Circulation Evaporator. Concentrated waste will then be directed to a filter press for dewatering. The concentrated waste product is a solid salt cake that can be discharged off site. Chemistry is not as big of an issue for the FC and it is more flexible to shutdown and start up conditions. Presently we have considered the Crystallizer to be power driven however if low-pressure steam is available then the power consumption can be considerably reduced. In addition steam driven units are easier to operate and maintain.

Regards,


Patrick Randall

Aquatech International Corporation, One-Four Coins Drive, Canonsburg, PA 15317 USA, t) 724-746-5300
www.aquatech.com

A 069



3

## Summary of the options

| Option | Description | | Budget Price Exworks | Estimated Power | Notes |
|---|---|---|---|---|---|
| 1 | **100 GPM BC and 20 GPM FCC** | | | | |
| | 1 x 100 GPM BC | ($2.46 M) | $4.2 M | 410 kW | 175 ld/hr CaCl2, 11 lb/hr H2SO4 |
| | 1 x 20 GPM FCC | ($1.46 M) | | 190 kW | Low Pressure Steam can be used. |
| | 1 x 100% Belt Press | ($ 0.28 M) | | 30 kW | 250 lb/hr salt cake (liquid wt) |
| 2 | **50 GPM FCC** | | | | |
| | 2 x 50 GPM FCC | ($ 5.12 M) | $5.4 M | 2 x 600 kW | 11 lb/hr H2SO4 |
| | 1 x 100% Belt Press | ($ 0.28 M) | | 30 kW | 220 lb/hr salt cake (liquid wt) |
| 3 | **600 GPM BC and 20 GPM FCC** | | | | |
| | 1 x 600 GPM BC | ($ 6.92 M) | $8.6 M | 2400 kW | 55 lb/hr H2SO4 |
| | 1 x 20 GPM FCC | ($ 1.46 M) | | 240 kW | Low Pressure Steam can be used. |
| | 1 x 100% Belt Press | ($ 0.28 M) | | 30 kW | 270 lb/hr salt cake (liquid wt) |
| 4 | **UF for RO improvement and 50 gpm FCC** | | | | |
| | 2 x 300 GPM Ultrafilter (UF) | ($ 0.66 M) | $3.5 M | 20 kW | Coagulant, acid, caustic and hypo |
| | 1 x 50 GPM FCC | ($ 2.56 M) | | 600 kW | Low Pressure Steam can be used. |
| | 1 x 100% Belt Press | ($ 0.28 M) | | 30 kW | 220 lb/hr salt cake (liquid wt) |

The Budget Pricing above is only for Equipment supply. For economic payback evaluation installation costs also need to be considered. Based on our experience the Installation costs are aprox 80% cost of the equipment value.

# Tab 16

| | |
|---|---|
| From: | Etienne, Ericson L. (GE Infrastructure) [Ericson.Etienne@ge.com] |
| Sent: | Friday, February 24, 2006 10:03 AM |
| To: | Ramiro Rivera |
| Cc: | David Stone; Krichten, Richard (GE Infrastructure) |
| Subject: | Answers To ZLD Equipment Questions |

Ramiro:

Below in blue are answers to the question asked pertaining to the Brine Concentrator and Crystallizer equipment option.

If you should have any other questions, please do not hesitate to contact us.

regards,
Ericson

1- What is the O&M cost per year including chemicals of a 100 gpm BC and 20 gpm CRZ? Which chemicals are used and estimated amount? Installation costs?
Major O&M costs are for the power and steam. Power consumption is estimated at 400 kW at rated capacity with steam of 9000 lb/hr (at 30 psig) required for the crystallizer (alternately and MVR Crystallizer could be supplied requiring an additional 300 kW and only 1000 lb/hr of steam)) In addition, The system requires the following chemicals: 500 lb/day of 93% sulfuric acid, 5 lb/day of antifoam, and 10 lb/day of 50% caustic soda. Operating spares typically run 1-2% per year of the equipment costs. Additional O&M labor is approximately 12 hours/day. Installation costs are very site specific, but are typically 50-75% of the equipment costs.
2- What types of sludge press are available?
RCC has successfully used both solid bowl centrifuges and Oberlin pressure filters for these applications. Based on the estimated crystallizer sludge production of 17 tons/day, a pressure filter is less expensive.
3- Can the BC/CRZ units run on both steam and electricity, or is it just strictly electricity and strictly steam?
Normally, the units are designed to operate only on one energy source, but it is possible to design it to run on both. This would add about 10-25% to the capital costs.
4- What is the delivery time of a 100 gpm BC and 20 gpm CRZ?
Currently, due to a volatile materials market for titanium and high-grade stainless steels, equipment delivery is approximately 12-14 months.
5- What is the metallurgy of the BC/CRZ?
Heat exchanger tubes for both the BC & crystallizer would be titanium. Vessel brine wetted parts in the BC would be mostly AL6XN (6% Mo Stainless Steel) and Alloy 625 in the crystallizer. Brine pumps would be duplex stainless steel (CD4MCu). Vapor and distillate components would be 316 SS.


> Ericson Etienne
> GE Infrastructure
> Water & Process Technologies
> District Sales Executive
>
> T 787 290 1130
> F 787 290 2210
> C 787 607 5220
> Ericson.Etienne@ge.com
> www.gewater.com
>
147 El Tuque Industrial Park
Ponce, PR 00728

> This communication is for use by the intended recipient and contains information that may be privileged, confidential or copyrighted under law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this e-Mail, in whole or in part, is strictly prohibited. Please notify the sender by return e-

1

Mail and delete this e-Mail from your system. Unless explicitly and conspicuously stated in the subject matter of the above e-Mail, this e-Mail does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This e-Mail does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.
>

This email has been scanned for all viruses by the MessageLabs service.