Page 85

[1] Q Were those instructions that you described
[2] that EEC just changed, were they for the constant
[3] operation of the plant?
[4] MS. SAGERSON: Objection to form, vague and
[5] ambiguous.
[6] A Constant operation?
[7] Q Did the instructions tell AES to set the
[8] temperature at a given temperature and leave it there?
[9] MS. SAGERSON: Objection, vague and
[10] ambiguous.
[11] A I'm not sure. I can't remember.
[12] Q After Alstom and EEC left the site, who
[13] instructed the control room operators at what
[14] temperature to operate the CDS?
[15] MS. SAGERSON: Objection to form, lack of
[16] foundation.
[17] A This is just my opinion or speculation, but
[18] I think when Alstom and EEC left, we were still
[19] following the basic guidelines that they left for us
[20] to operate the CDS. I'm not sure. I can't remember.
[21] It goes back to that document that they left, but I
[22] can't remember.
[23] Q So by basic guidelines, you are referring
[24] to a single document?
[25] MS. SAGERSON: Objection, mischaracterizes

Page 86

[1] the witness's prior testimony.
[2] A I can't remember if it was a single
[3] document or what. I don't remember.
[4] Q Was AES, in subsequent operation of the
[5] plant, based solely upon a document provided by EEC
[6] that you're referring to?
[7] MS. SAGERSON: Objection to form, vague and
[8] ambiguous.
[9] A Repeat that, please.
[10] Q Was AES in its subsequent operation of the
[11] plant, after Alstom and EEC left, based upon this
[12] revised document that you have discussed?
[13] MS. SAGERSON: Same objection.
[14] A I can't remember. I don't recall.
[15] Q Whose job responsibility after Alstom and
[16] AES left was it to set the CDS outlet temperature?
[17] MS. SAGERSON: Objection, vague and
[18] ambiguous, lack of foundation.
[19] A Whose responsibility was it to change the
[20] CDS temperature?
[21] MS. SAGERSON: Same objection to the
[22] witness's repeat of the question.
[23] A The control room operator, under the
[24] direction after Alstom and EEC left, I don't
[25] remember. I made this statement before about

Page 87

[1] Gary Bates, he watched that very closely. So if he
[2] told him -- I'm not sure if he told the control room
[3] operator, hey we need to change the temperature to
[4] this, but I can't be 100 percent sure on that. I
[5] believe that may be what happened.
[6] Q But you were the control room team leader;
[7] is that correct?
[8] A That is correct.
[9] Q Shouldn't you have an understanding on who
[10] is telling the control room operators on what point to
[11] set the CDS outlet temperature?
[12] MS. SAGERSON: Objection, argumentative,
[13] vague and ambiguous.
[14] A I was trusting Gary and I know that he was
[15] taking care of that because I had additional
[16] responsibilities working with Prepa on the electrical
[17] side and different things like that. We had a mutual
[18] agreement that he was going to take care of certain
[19] parts of the plant for systems and I would take care
[20] of other things. I did not just also take part of
[21] things that was just in the control room. Like during
[22] a boiler outage, he would be worried about some parts
[23] of the boiler and I would try to take some of the
[24] pressure off of him. We had a mutual agreement of
[25] sharing responsibilities on different aspects.

Page 88

[1] Q It's your understanding that Gary Bates
[2] instructed the control room operators to set the CDS
[3] outlet temperature?
[4] MS. SAGERSON: Objection, mischaracterizes
[5] the witness's prior testimony.
[6] A I said I was not sure. I said it could
[7] have happened to Gary because I remember him talking
[8] about different topics but I don't remember, you know,
[9] the approach temperature and things like that. He
[10] would have instructed him. I don't know that for
[11] sure.
[12] Q Do you recall anyone taking the wet bulb
[13] temperature?
[14] A I do not recall anyone or I don't remember
[15] seeing anyone take it but I recall hearing Gary talk
[16] about the wet bulb and the 30-degree approach. I have
[17] never witnessed it, no.
[18] Q Is it your understanding that the CDS
[19] outlet temperature is set based upon the wet bulb
[20] temperature?
[21] MS. SAGERSON: Objection, vague and
[22] ambiguous.
[23] A Repeat that, please.
[24] Q Is it your understanding that the CDS
[25] outlet temperature is set based upon the wet bulb

Page 89

[1]  temperature?

[2]    MS. SAGERSON:  Same objection.

[3]    A    I can't recall that.

[4]    Q    Was it your understanding that the CDS

[5]  outlet temperature was supposed to be set 30 degrees

[6]  above the wet bulb temperature?

[7]    MS. SAGERSON:  Objection, vague and

[8]  ambiguous, lack of foundation.

[9]    A    Repeat that, please.

[10]    Q    Was it your understanding that the CDS

[11]  outlet temperature was supposed to be set 30 degrees

[12]  above the wet bulb temperature?

[13]    MS. SAGERSON:  Same objection.

[14]    A    I can't recall what the temperature was set

[15]  at.

[16]    Q    Can you describe what your understanding of

[17]  the approach temperature is?

[18]    MS. SAGERSON:  Objection, asked and

[19]  answered.

[20]    A    I commented I don't know what exactly it is

[21]  because I had enough trust or faith that Gary, he was

[22]  taking care of that.

[23]    Q    Was anyone else involved with Gary in

[24]  taking the wet bulb temperature?

[25]    A    There could have been but I don't know.

Page 90

[1]    Q    Do you know who the CDS -- strike that.

[2]    Do you know who the control room operators

[3]  were at this point?

[4]    MS. SAGERSON:  Objection to form.

[5]    MR. SCHOLLAERT:  Strike that, I will

[6]  rephrase.

[7]  BY MR. SCHOLLAERT:

[8]    Q    Do you know who the control room operators

[9]  were during your tenure as the control room team

[10]  leader?

[11]    MS. SAGERSON:  Objection to form.

[12]    A    I can recall some of them but I don't know

[13]  if I can recall all of them.

[14]    Q    Do you recall if any of them ever took the

[15]  wet bulb temperature?

[16]    MS. SAGERSON:  Objection, vague and

[17]  ambiguous.

[18]    A    I can't recall.

[19]    Q    Do you recall to whom Gary Bates would

[20]  instruct to set the CDS outlet temperature?

[21]    MS. SAGERSON:  Objection, asked and

[22]  answered.

[23]    A    Can you repeat that question.

[24]    Q    Do you recall to whom Gary Bates would

[25]  instruct to set the CDS outlet temperature?

Page 91

[1]    MS. SAGERSON:  Same objection.

[2]    A    I don't recall.

[3]    Q    When did Gary Bates leave the plant?

[4]    MS. SAGERSON:  Objection, lack of

[5]  foundation.

[6]    A    I can't recall what exactly, when he left.

[7]    Q    Did Gary leave AES Puerto Rico prior to

[8]  your departure?

[9]    A    He did.

[10]    Q    What was your position after Gary Bates

[11]  left AES Puerto Rico?

[12]    MS. SAGERSON:  Objection, vague and

[13]  ambiguous.

[14]    A    I think -- I'm not sure, I think it was

[15]  control room team leader.

[16]    Q    Who would instruct the control room

[17]  operators how the set the CDS outlet temperature after

[18]  Gary Bates left?

[19]    MS. SAGERSON:  Objection, vague and

[20]  ambiguous.

[21]    A    This is my opinion, it would probably be

[22]  the person that took Gary's position, but I'm not

[23]  sure.

[24]    Q    Who took Gary's position?

[25]    A    If I remember correctly, it was

Page 92

[1]  Elias Sostre.

[2]    Q    Was it your testimony that you relied upon

[3]  Gary Bates to set the CDS outlet temperature?

[4]    MS. SAGERSON:  Objection to form,

[5]  mischaracterizes the witness's prior testimony.

[6]    A    I'm not -- repeat that, please.

[7]    Q    You testified that you relied upon and

[8]  trusted Gary Bates to set the CDS outlet temperature;

[9]  is that correct?

[10]    A    I believe that is not correct.  I believe I

[11]  stated that I relied on Gary Bates to -- I relied on

[12]  him because he was taking care of that.  Whether he

[13]  was setting the set point or not, I do not know that.

[14]    Q    On whom did you rely after Gary Bates

[15]  left?

[16]    MS. SAGERSON:  Objection, vague and

[17]  ambiguous.

[18]    A    Repeat that, please.

[19]    Q    On whom did you rely after Gary Bates left?

[20]    MS. SAGERSON:  Objection, vague and

[21]  ambiguous, lack of foundation.

[22]    A    I replied I relied on Gary's replacement.

[23]    Q    Gary's replacement was Elias Sostre; is

[24]  that correct?

[25]    A    Correct.  I can't remember but this -- I'm

Page 93

[1] thinking, I'm not 100 percent sure, but before Gary
[2] left, I think Elias was working with Gary. I don't
[3] know that for a fact. I know Gary would make sure
[4] things were taken care of before he would leave. I
[5] know he would do that, in my mind. I'm not 100
[6] percent sure.
[7] Q Did you witness him instructing
[8] Elias Sostre on how to set the CDS outlet temperature?
[9] MS. SAGERSON: Objection to form.
[10] A I can't recall if I did.
[11] Q Did you have any discussion with
[12] Elias Sostre regarding the wet bulb temperature after
[13] the departure of Gary Bates?
[14] MS. SAGERSON: Objection to form.
[15] A Not to my knowledge. I don't recall.
[16] Q Did you have any discussions with
[17] Elias Sostre regarding the CDS outlet temperature
[18] after the departure of Gary Bates?
[19] MS. SAGERSON: Objection, vague and
[20] ambiguous.
[21] A I can't recall that.
[22] Can I get a glass of water, please.
[23] MR. SCHOLLAERT: Can we go off the record?
[24] THE VIDEOGRAPHER: We are off the record.
[25] The time is 12:12 p.m.

Page 94

[1] (Recess taken.)
[2] THE VIDEOGRAPHER: We are on the record.
[3] The time is 12:12 p.m.
[4] BY MR. SCHOLLAERT:
[5] Q Do you realize you are still under oath,
[6] Mr. Tomlin?
[7] A I do.
[8] Q Is it true that you never had a discussion
[9] regarding the delegation of the responsibilities to
[10] set the CDS outlet temperature upon the departure of
[11] Mr. Bates?
[12] MS. SAGERSON: Objection, vague and
[13] ambiguous.
[14] A I want you to repeat that, please.
[15] Q Isn't it true that you never had a
[16] discussion with Mr. Bates about the delegation of his
[17] responsibilities to set the CDS outlet temperature
[18] upon his departure from AES Puerto Rico?
[19] MS. SAGERSON: Objection, vague and
[20] ambiguous and mischaracterizes the witness's
[21] prior testimony.
[22] A I cannot recall that.
[23] Q Isn't it true that you never had a
[24] discussion with Mr. Sostre regarding the delegation of
[25] the responsibilities to set the CDS outlet temperature

Page 95

[1] upon his takeover of Mr. Bates' position?
[2] MS. SAGERSON: Objection, vague and
[3] ambiguous, mischaracterizes the witness's prior
[4] testimony.
[5] A I can't recall if there was a conversation.
[6] Q Who took over your position as control room
[7] team leader when you left AES Puerto Rico?
[8] MS. SAGERSON: Objection, mischaracterizes
[9] the witness's prior testimony.
[10] A Repeat that please.
[11] Wait. When I left AES Puerto Rico, I was
[12] not control room team leader.
[13] Q Okay. Who took over for control room team
[14] leader when you left the position?
[15] A Elias Sostre.
[16] Q Do you recall when that was?
[17] A I do not recall.
[18] Q To your knowledge, Mr. Sostre was never
[19] instructed on how to set the CDS outlet temperature;
[20] is that correct?
[21] MS. SAGERSON: Objection, mischaracterizes
[22] the witness's prior testimony.
[23] A Could you repeat that, please.
[24] Q To your knowledge, Mr. Sostre was never
[25] instructed on how to set the CDS outlet temperature;

Page 96

[1] is that correct?
[2] MS. SAGERSON: Same objection.
[3] A I don't know that to be true.
[4] Q To your knowledge, do you know if he was
[5] ever instructed on how to set the CDS outlet
[6] temperature?
[7] A I don't recall.
[8] Q Was it your responsibility to train
[9] Mr. Sostre to take over your position as control room
[10] lead operator?
[11] MS. SAGERSON: Objection, mischaracterizes
[12] the witness's prior testimony.
[13] A That question didn't make sense.
[14] Q Was it your responsibility to train
[15] Elias Sostre to take over your position as control
[16] room team leader?
[17] A Prior to leaving Puerto Rico, I wanted to
[18] spend time to have Elias go and do and understand the
[19] things that I was doing, this is just my speculation,
[20] of what he was doing in his area. But I asked Al Dyer
[21] to take this opportunity, because I was getting ready
[22] to leave, that way if Elias needed any help, the Prepa
[23] stuff or the things that I was doing, that I would
[24] still be there to help.
[25] Q So you trained Elias Sostre in regards to

AES Puerto Rico, L.P. v.
Alstom Power, Inc.

Doug Tomlin
February 28, 2006

---

Page 97

[1] the functions that you performed; is that correct?

[2] MS. SAGERSON: Objection, mischaracterizes
[3] the witness testimony.

[4] A  Repeat that, please.  I trained --

[5] Q  Elias Sostre to take over the functions
[6] that you performed; is that correct?

[7] MS. SAGERSON: Same objection, and now the
[8] question is vague and ambiguous.

[9] A  I can't recall what all -- I recall going
[10] through him with several different things, but I'm not
[11] sure what all it was.

[12] Q  Okay.  Do you recall training him on how to
[13] set the CDS outlet temperature?

[14] MS. SAGERSON: Objection.

[15] A  I don't recall.

[16] Q  You can't recall whether you trained
[17] Elias Sostre on how to set the CDS outlet
[18] temperature?

[19] MS. SAGERSON: Objection, asked and
[20] answered.

[21] A  I don't recall.

[22] MR. SCHOLLAERT: I think this will be a
[23] good point to take a lunch break.

[24] THE VIDEOGRAPHER: We are off the record.
[25] The time is 12:18 p.m.

---

Page 98

[1]                 - - -

[2] (Thereupon, at 12:18 o'clock p.m., a
[3] luncheon recess was taken to 1:06 o'clock p.m.)

[4]

[5] A-F-T-E-R-N-O-O-N  S-E-S-S-I-O-N

[6] THE VIDEOGRAPHER: We are back on the
[7] record.  The time is 106 p.m.

[8] BY MR. SCHOLLAERT:

[9] Q  Mr. Tomlin, you are aware that you're still
[10] under oath?

[11] A  Yes, I am.

[12] Q  Are you aware of any device that measures
[13] the wet bulb temperature?

[14] MS. SAGERSON: Objection to form.

[15] A  Repeat that.

[16] Q  I'll rephrase it as well.

[17] Are you aware of any device that measures
[18] the wet bulb temperature non-manually?

[19] MS. SAGERSON: Objection, vague and
[20] ambiguous.

[21] A  I do not recall any.

[22] MR. SCHOLLAERT: For the record, I am
[23] marking a document that begins AESPR-279705
[24] through AESPR-279707 as Deposition Exhibit No. 5
[25] and I'm handing it to the witness.

---

Page 99

[1] (Thereupon, Tomlin Deposition Exhibit No. 5
[2] was marked for identification.)

[3] Q  Can you look at the first page of this
[4] e-mail and let me know when you have finished.

[5] A  Okay.

[6] Q  Does this appear to be an e-mail from
[7] WeLi Yi to Gary Bates, cc'ing a number of recipients
[8] including yourself?

[9] A  It appears to be that.

[10] Q  And it's dated February 12th, 2003; is that
[11] correct?

[12] A  That is correct.

[13] Q  Do you recognize this document, Mr. Tomlin?

[14] A  I don't remember receiving this document.

[15] Q  Does this document refresh your
[16] recollection as to whether or not an instrument was
[17] installed on unit 2 to measure the wet bulb
[18] temperature?

[19] MS. SAGERSON: Objection, mischaracterizes
[20] the document.

[21] A  Could you repeat the question, please.

[22] Q  Does this refresh your recollection as to
[23] whether any equipment was installed in unit 2 that may
[24] be used to measure the wet bulb temperature?

[25] MS. SAGERSON: Same objection.

---

Page 100

[1] A  That does not refresh my memory.

[2] Q  Reading this first paragraph, does this
[3] indicate that such an instrument was installed?

[4] MS. SAGERSON: Objection, vague and
[5] ambiguous.

[6] A  Would you repeat that, please.

[7] Q  Reading this e-mail, Exhibit No. 5, does
[8] that refresh your recollection as to whether an
[9] instrument was installed on unit 2 to would be used to
[10] measure the wet bulb temperature?

[11] MS. SAGERSON: Objection, vague and
[12] ambiguous, mischaracterizes the document.

[13] A  I do remember discussions being, or
[14] discussions happening.  I can't remember who all and
[15] when, but I remember talking about getting some kind
[16] of transmitter, but I don't remember if it was ever
[17] purchased or installed.  I can't remember.

[18] Q  Okay.  Does the Dewcon humidity transmitter
[19] sound familiar?

[20] A  It may be, but I'm not 100 percent sure.

[21] Q  Do you recall whether the wet bulb
[22] temperature was eventually a value that could be
[23] gained from the CDS?

[24] MS. SAGERSON: Objection to form.

[25] A  I can't remember.

A 232

---

Page 101

[1] Q Do you remember ever using the -- strike
[2] that.
[3] Does it appear that an Excel spreadsheet
[4] was attached to this document? You can take a look at
[5] the second and third pages.
[6] MS. SAGERSON: Objection to form.
[7] A Would you repeat your question now.
[8] Q Did you ever use the Excel spreadsheet
[9] attached to this e-mail to calculate the dew-point
[10] temperature?
[11] MS. SAGERSON: Objection to form, vague and
[12] ambiguous.
[13] A I have never seen the spreadsheet.
[14] Q Are you familiar with the controls in the
[15] control room -- strike that.
[16] Are you familiar with the data available
[17] from the DCS?
[18] MS. SAGERSON: Objection, vague and
[19] ambiguous, lack of foundation.
[20] A I didn't understand the question.
[21] Q Do you recall whether the dew-point
[22] temperature for unit 2 was available in the DCS?
[23] A I do not recall.
[24] Q So you never utilized the dew-point
[25] temperature in the DCS?

Page 102

[1] MS. SAGERSON: Objection to form, lack of
[2] foundation, vague and ambiguous.
[3] A I can't say because I don't remember. I
[4] don't recall.
[5] Q But you do remember discussions regarding
[6] the installation of a dew-point measuring device?
[7] MS. SAGERSON: Objection, mischaracterizes
[8] the witness's prior testimony.
[9] A I remember talking about a device or an
[10] instrument, but I don't recall what it was.
[11] Q You don't know if one was installed;
[12] correct?
[13] A That is correct, I do not know.
[14] Q And if one was installed, you never used
[15] it; is that correct?
[16] MS. SAGERSON: Objection, mischaracterizes
[17] the witness's prior testimony.
[18] A I do not know if it was installed.
[19] Q Did you ever use such an instrument?
[20] MS. SAGERSON: Objection, mischaracterizes
[21] the witness's prior testimony, lack of
[22] foundation, vague and ambiguous.
[23] A I don't recall.
[24] Q Are you aware whether AES ever measured the
[25] chloride content of ash during your employment at AES

Page 103

[1] Puerto Rico?
[2] MS. SAGERSON: Objection to form, vague and
[3] ambiguous.
[4] A Not to my memory. I do not recall.
[5] Q Do you recall any discussions regarding the
[6] chloride content of fly ash during your employment at
[7] AES Puerto Rico?
[8] MS. SAGERSON: Objection, vague and
[9] ambiguous.
[10] A Not that I recall.
[11] Q Are you aware of any instructions to
[12] measure the chloride content of the fly ash during
[13] your employment at at AES Puerto Rico?
[14] MS. SAGERSON: Objection, vague and
[15] ambiguous.
[16] A Could you repeat that, please.
[17] Q Are you aware of any instructions to
[18] measure the chloride content of the fly ash when you
[19] were employed at AES Puerto Rico?
[20] A Not that I recall.
[21] Q Do you recall any discussions regarding
[22] measuring the chloride content of the fly ash while
[23] you were employed at AES Puerto Rico?
[24] MS. SAGERSON: Objection, vague and
[25] ambiguous.

Page 104

[1] A Not that I recall.
[2] MR. SCHOLLAERT: For the record, I am
[3] marking a document Bates labeled AESPR-172843 as
[4] Deposition Exhibit No. 6 and I handing a copy of
[5] it to the witness.
[6] (Thereupon, Tomlin Deposition Exhibit No. 6
[7] was marked for identification.)
[8] Q Mr. Tomlin, will you please look at that
[9] e-mail and let me know when you get finished.
[10] A Okay.
[11] Q Mr. Tomlin, does this appear to be an
[12] e-mail from Paul Stinson, dated September 15th, 2003
[13] to a number of recipients, amongst which you are
[14] included, labeled RE: ESP, CDS Corrosion Maintenance
[15] Plant.doc?
[16] A It appears to be an e-mail.
[17] Q Do you recognize this document,
[18] Mr. Tomlin?
[19] A I do not recognize it.
[20] Q I can draw your attention to the e-mail
[21] below the first e-mail in the string from
[22] Ron McParland to Paul Stinson in which you are a
[23] recipient, dated September 12 of 2003.
[24] Do you recognize that message?
[25] A I see that it reads that.

**A 233**

AES Puerto Rico, L.P. v.
Alstom Power, Inc.

Doug Tomlin<br>February 28, 2006

Page 105

[1]    Q    Do you recognize that e-mail?

[2]    A    I can't recall this e-mail.

[3]    Q    Do you remember that we discussed this
[4] e-mail as Exhibit No. 2 earlier? I will refer your
[5] attention to Exhibit No. 2.

[6]    A    I recognize that we looked at Exhibit
[7] No. 2, the first e-mail.

[8]    Q    If you can look at Exhibit No. 2 and turn
[9] to the second page, if you look at the last paragraph,
[10] it reads, "The second critical parameter is the
[11] chloride content or maximum allowable concentration of
[12] the CaCl2 and the ash. The range is 1.0 to 3.5
[13] percent, (3.5 percent maximum.)"

[14]         Do you see that, Mr. Tomlin?

[15]    A    I see that it reads that.

[16]    Q    Does that refresh your recollection on any
[17] discussions regarding measuring the chloride content
[18] of the fly ash during your employment at AES Puerto
[19] Rico?

[20]    A    It does not refresh.

[21]    Q    If you can turn your attention back to
[22] Exhibit No. 6. The first sentence in the text or the
[23] body of the e-mail says, "I wonder if we have ever
[24] tested the CaCl2 content of the ash."

[25]         Do you see that?

Page 106

[1]    A    I see that it reads that.

[2]    Q    Do you don't remember receiving that
[3] e-mail?

[4]    A    I do not remember receiving this e-mail.

[5]    Q    Just for the record, do you know what the
[6] chemical compound CACL2 is?

[7]    A    It refers to the chlorides, I am
[8] understanding by the document that we read before.

[9]    Q    After receiving this e-mail -- excuse me.
[10] Strike that.

[11]         MR. SCHOLLAERT: For the record, I am
[12] marking a document Bates labeled AESPR-242646 as
[13] Deposition Exhibit No. 7 and I am handing a copy
[14] to the witness.

[15]         (Thereupon, Tomlin Deposition Exhibit No. 7
[16] was marked for identification.)

[17]    Q    Mr. Tomlin, please take a look at that
[18] e-mail and let me know when you are finished.

[19]    A    Okay.

[20]    Q    Mr. Tomlin, do you know who David Stone is?

[21]    A    I know who David Stone is.

[22]    Q    Who is David Stone?

[23]    A    David Stone at the time, in Puerto Rico, he
[24] was the material handler and the coal handling team
[25] leader.

Page 107

[1]    Q    What are the responsibilities of a material
[2] handler and coal handling team leader?

[3]         MS. SAGERSON: Objection to form.

[4]    A    I believe his responsibilities were to get
[5] the coal and limestone to the plant so we could make
[6] electricity. I think his responsibility was also to
[7] do ash.

[8]    Q    What did he do with ash?

[9]    A    I'm not sure. I'm not sure.

[10]    Q    Does Exhibit No. 7 appear to be an e-mail
[11] from David Stone on September 15th, 2003 to a number
[12] of recipients, you included, subject RE: ESP, CDS
[13] Corrosion Maintenance Plan.doc?

[14]    A    It appears to be.

[15]    Q    Do you recall receiving this e-mail,
[16] Mr. Tomlin?

[17]    A    I can't receiving this.

[18]    Q    Can you look down to the first -- second
[19] paragraphs that begins, "I have never tested the ash
[20] for chlorine in the past. I have requested a
[21] laboratory to perform a test for the chlorine in the
[22] trace analysis in the fly/bed ash samples that were
[23] sent out last week. I will report the analysis upon
[24] receipt".

[25]    A    I see that it reads that.

Page 108

[1]    Q    But you don't recall receiving this e-mail?

[2]    A    I do not recall.

[3]    Q    Do you recall ever receiving a report
[4] referred to in the e-mail from Mr. Stone regarding
[5] chlorine in the fly ash samples?

[6]         MS. SAGERSON: Objection, mischaracterizes
[7] the document.

[8]    A    I do not recall.

[9]    Q    Do you recall ever sampling the fly ash?

[10]         MS. SAGERSON: Objection, vague and
[11] ambiguous.

[12]    A    I do not recall sampling the fly ash.

[13]    Q    Are you familiar with the process of
[14] re-injecting fly ash from the ESP hoppers back into
[15] the boilers at the EEC Puerto Rico plant?

[16]         MS. SAGERSON: Objection, vague and
[17] ambiguous.

[18]    A    Could you repeat that, please.

[19]    Q    Are you familiar with the process of
[20] re-injecting fly ash from the ESP hoppers and/or silos
[21] to the boilers?

[22]         MS. SAGERSON: Objection, vague and
[23] ambiguous.

[24]    A    I am vaguely familiar with the fly ash
[25] re-injection.

**A 234**