Tab 23

```
06-84210 mkh

        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE


AES PUERTO RICO, L.P.,    *
        Plaintiff,        *
                          *
VS.                       *    C.A. No.04-1282-JJF
                          *
ALSTOM POWER INC.,        *
        Defendant.        *
```

**COPY**

************************************************
            ORAL DEPOSITION OF
               TRACY JARVIS
              MARCH 2, 2006
************************************************

ORAL AND VIDEOTAPED DEPOSITION of TRACY JARVIS, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 2nd of March, 2006, from 9:22 a.m. to 3:57 p.m., before Mary Kay Hendricks, CSR in and for the State of Texas, reported by machine shorthand, at the offices of the Schwartzenburg Law Offices, 5300 Memorial, Suite 700, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A 258

```
 1  be used as CDS spray water fall within the scope of
 2  your responsibilities?
 3              MR. TUXBURY:  Objection, foundation.
 4      A.   It would have not been a direct
 5  responsibility for the water treatment.
 6      Q.   (BY MR. VITTORIA)  Who would have direct
 7  responsibility for that?
 8      A.   I'm not sure who that would have been.
 9      Q.   Did you have any duties or responsibilities
10  in relation to the zero liquid discharge status of
11  the plant?
12              MR. TUXBURY:  Objection, vague.
13      A.   The water treatment area had some of the
14  responsibilities as a zero discharge.
15      Q.   (BY MR. VITTORIA)  And what
16  responsibilities were those?
17      A.   We would monitor the various ponds
18  throughout the plant site.
19      Q.   Did AES Puerto Rico have to report to a
20  governmental entity if it violated its zero liquid
21  discharge permit?
22      A.   We did not have a discharge permit.  So
23  there was no permit to violate.
24      Q.   Can you explain that?
25      A.   Because it was a zero discharge facility,
```

Tracy Jarvis

Page 19
March 2, 2006

```
 1  there wasn't an NPDS permit at the plant.
 2      Q.   An MP --
 3      A.   N --
 4      Q.   N?
 5      A.   -- national discharge -- I'm not sure what
 6  the rest of it...
 7      Q.   Could you give me the initials again?
 8      A.   N -- national -- golly.  NPDES.  Sorry.
 9      Q.   That's okay.
10      A.   That's hard to get out.
11      Q.   So to your understanding, if AES Puerto
12  Rico violated its zero liquid discharge status, it
13  didn't report that to anybody.
14           MR. TUXBURY:  Objection.  That
15  mischaracterizes the witness' testimony.  He said
16  that AES Puerto Rico is not allowed to do any
17  discharge, and that's why you don't have to report
18  discharges.
19           MR. VITTORIA:  Object to counsel's
20  testimony.
21      Q.   (BY MR. VITTORIA)  You can answer the
22  question that's asked.
23      A.   We would have been required to contact an
24  agency if we were -- we had any unauthorized
25  discharge from our facility.
```

A 260

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

```
 1       A.   Phillips had a waste water treatment
 2  facility at their plant, and they had a discharge
 3  permit.  They approached us to use that stream as
 4  make-up to our cooling water system.
 5       Q.   This is different than the condensate
 6  returned from Phillips?
 7       A.   This is completely different from the
 8  condensate returned.
 9       Q.   Is there a reason why AES Puerto Rico would
10  need additional make-up from Phillips' waste water
11  stream?
12            MR. TUXBURY:  Objection.  Mr. Jarvis
13  is here testifying on his own behalf, not as a
14  corporate designee of AES Puerto Rico.
15       A.   I don't recall why they would have
16  approached us with this.
17       Q.   (BY MR. VITTORIA)  Do you recall if AES
18  Puerto Rico agreed to accept this waste water stream
19  from Phillips?
20            MR. TUXBURY:  Objection, compound.
21  And, again, Mr. Jarvis is here on his own behalf,
22  not as a corporate designee.
23       A.   I don't recall any agreement with Phillips
24  to receive their treated waste water.
25       Q.   (BY MR. VITTORIA)  At any point when you
```

A 261

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

Tracy Jarvis
Page 68
March 2, 2006

1  were an employee of AES Puerto Rico, did you -- did
2  AES Puerto Rico accept a waste water stream from
3  Phillips?
4              MR. TUXBURY:  Objection.  Mr. Jarvis
5  is here as -- on his own behalf, not as a corporate
6  designee, to testify what he knows.
7      A.   Not that I know of.
8      Q.   (BY MR. VITTORIA)  At some point in the
9  fall of 2003, the water treatment team started
10 measuring the chloride levels of the CDS spray
11 water, correct?
12     A.   In the fall of 2003, we began to look
13 closer at the CDS make-up water as part of a
14 troubleshooting scheme because of opacity problems
15 throughout the summer of 2003.
16     Q.   And when you say "look closer," is one of
17 the things you did is measure the chloride levels of
18 that water?
19     A.   We began testing the chloride levels,
20 conductivity, turbidity, pH, various other
21 parameters.  Before that we monitored everything
22 upstream that was being fed.
23     Q.   When you say "upstream," where upstream?
24     A.   That would have included the filtered
25 water -- as part of our daily operations, we would

A 262

713.524.4600
3401 LOUISIANA, SUITE 300
ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002
713.524.4951
1.800.767.9532

Tracy Jarvis

Page 80
March 2, 2006

1      A.    I remember the e-mail.

2      Q.    (BY MR. VITTORIA)  If you want to refer
3  back to Exhibit No. 7.

4      A.    All right.

5      Q.    And it was your testimony that you began
6  analyzing the CDS make-up water on or around the
7  time of this e-mail. Do you --

8      MR. TUXBURY:  Objection.  That
9  mischaracterizes the testimony.  The witness
10  testified that prior to this time --

11      MR. VITTORIA:  That's enough of an
12  objection.

13      MR. TUXBURY:  -- water analysis done.

14      MR. VITTORIA:  Do not testify again.

15      MR. TUXBURY:  I'm not.  I'm just
16  trying to not let you --

17      MR. VITTORIA:  You can say,
18  "mischaracterizing the testimony."  Do not give him
19  an answer.

20      Q.    (BY MR. VITTORIA)  Do you recall that
21  testimony?

22      A.    I recall saying that we began analyzing the
23  CDS water tank area this -- at this time. Previous
24  to that we monitored -- I think I stated that also,
25  that we monitored everything upstream so we had a

A 263

713.524.4600
3401 LOUISIANA, SUITE 300
ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002
713.524.4951
1.800.767.9532

```
 1   to -- because of the opacity issues that we were
 2   having.
 3       Q.   Do you remember anything else that you
 4   discussed with Richard during that telephone
 5   conversation?
 6            MR. TUXBURY:  Objection, vague, asked
 7   and answered.
 8       A.   Not anything more specific, just a general
 9   plant overview.
10       Q.   (BY MR. VITTORIA)  Mr. Jarvis, you're not
11   an employee of AES Puerto Rico right now, are you?
12       A.   Currently I work at AES Deepwater.
13       Q.   Did you meet with anybody to prepare for
14   your deposition here today?
15            MR. TUXBURY:  At this point I'm going
16   to direct the witness not to -- you can answer the
17   question to the extent that you will not disclose
18   any communications you had with counsel.
19       A.   I met with counsel.
20       Q.   (BY MR. VITTORIA)  And when did you meet?
21            MR. TUXBURY:  Again, you can answer
22   this question, but don't discuss anything that was
23   said between you and counsel.
24       A.   Tuesday and Wednesday.
25       Q.   (BY MR. VITTORIA)  How long did you meet on
```

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

Tracy Jarvis

Page 191
March 2, 2006

```
 1   Tuesday?
 2              MR. TUXBURY:  Again, the same
 3   instruction.
 4       A.     Half a day.
 5       Q.     (BY MR. VITTORIA)  Half a day on Tuesday?
 6       A.     Half a day on Tuesday.
 7       Q.     Half a day on Wednesday?
 8       A.     Half a day on Wednesday.
 9       Q.     Do you have a written retainer agreement
10   with Mr. Tuxbury?
11              MR. TUXBURY:  I'm going to instruct
12   the witness here to answer this question "yes" or
13   "no."
14       A.     No.
15       Q.     (BY MR. VITTORIA)  Do you have an
16   understanding that you will receive bills for his
17   services here today?
18              MR. TUXBURY:  I'm going to instruct
19   the witness not to answer this question.
20              MR. VITTORIA:  On what grounds?
21              MR. TUXBURY:  It -- it will violate
22   attorney/client privilege.
23              MR. VITTORIA:  Whether he has an
24   understanding as to whether or not he's going to get
25   bills?
```

A 265

713.524.4600
3401 LOUISIANA, SUITE 300
ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002
713.524.4951
1.800.767.9532

Tracy Jarvis

Page 192
March 2, 2006

```
 1              MR. TUXBURY:  Yes.
 2        Q.    (BY MR. VITTORIA)  Do you have a retainer
 3   agreement with any other lawyer at the Williams &
 4   Connolly law firm?
 5              MR. TUXBURY:  I'm going to permit the
 6   witness to answer the question "yes" or "no" if
 7   he -- if he knows.
 8        A.    No.
 9        Q.    (BY MR. VITTORIA)  Do you expect to receive
10   bills from any other Williams & Connolly law
11   firm (sic) for the services in relation to this
12   deposition?
13              MR. TUXBURY:  I'm going to instruct
14   the witness not to answer this question.
15              MR. VITTORIA:  On what grounds?
16              MR. TUXBURY:  Violate attorney/client
17   privilege.
18        Q.    (BY MR. VITTORIA)  Did you meet with any
19   other lawyers other than Mr. Tuxbury?
20              MR. TUXBURY:  You can answer this
21   question to the extent that you won't disclose the
22   communications you had with counsel.
23        A.    I met with a Dan, Daniel some time back.
24        Q.    (BY MR. VITTORIA)  Dan Williams?
25        A.    Dan Williams.
```

A 266

713.524.4600
3401 LOUISIANA, SUITE 300
ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002
713.524.4951
1.800.767.9532

Tracy Jarvis

Page 194
March 2, 2006

```
 1            MR. TUXBURY:  Yes.
 2       Q.   (BY MR. VITTORIA)  Did you and Mr. Tuxbury
 3  have any discussions relating to how you were to
 4  answer questions here today?
 5            MR. TUXBURY:  I'm going to instruct
 6  the witness not to answer this question on
 7  attorney/client privilege grounds.
 8       Q.   (BY MR. VITTORIA)  Did you and Mr. Tuxbury
 9  have any conversations relating to the testimony of
10  other witnesses in this matter?
11            MR. TUXBURY:  I'm going to instruct
12  the witness not to answer this question on
13  attorney/client privilege grounds.
14       Q.   (BY MR. VITTORIA)  Did you and Mr. Tuxbury
15  have any discussions relating to the theories of AES
16  in this lawsuit?
17            MR. TUXBURY:  I'm going to instruct
18  the witness not to answer this question on
19  attorney/client privilege grounds.
20       Q.   (BY MR. VITTORIA)  And did you have any
21  discussions with Mr. Tuxbury about Alstom's theories
22  in this lawsuit?
23            MR. TUXBURY:  I'm going to instruct
24  the witness not to answer this question on
25  attorney/client privilege grounds.
```

A 267

713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

713.524.4951
1.800.767.9532

# Tab 24

OFFICIAL TRANSCRIPT OF PROCEEDINGS

BEFORE THE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| IN THE MATTER OF | CASE NO. |
|---|---|
| AES PUERTO RICO, L.P. | C.A. NO.: 04-1282 (JJF) |
| Plaintiff | |
| Vs. | |
| ALSTOM POWER, INC. | |
| Defendant | |

DEPOSITION OF MR. ELIAS SOSTRE

**PLACE:** HATO REY, PUERTO RICO

**DATE:** JANUARY 20, 2006

*Crespo & Rodriguez, Inc.*
Tel. (787) 758-5930 / 763-8018
Fax (787) 767-8217
A-6 Yale Street, Santa Ana
Rio Piedras, Puerto Rico 00927

A 268

COPY

1  manual.

2  Q  And there's only one volume of this manual?

3  A  Just, it's just one manual.  One.

4  Q  Did you produce a copy of this manual that you
5  have for purposes of this litigation?
6  MR. WILLIAMS:

7  Objection to form.  Yesterday you took a corporate
8  designee deposition about AES Puerto Rico's document
9  production, and you heard about the robust process that
10 AES Puerto Rico went through to produce documents.

11 Of course, you also learned that the process was
12 coordinated with the document custodian and counsel.
13 MR. SCHOLLAERT:

14 Dan, I'd ask you to refrain from making speaking
15 objections.
16 MR. WILLIAMS:

17 Well, I don't know how a person would know what
18 "did you produce a copy of this" means. I mean, he
19 testified that he photocopied it. Produced to whom?

20 If you're talking about production for litigation,
21 I think we need to be clear about what we're talking
22 about.

23 And if that's what you're talking about, I don't
24 understand how a witness would possibly be able to
25 answer that, outside of a document custodian.

1   MR. SCHOLLAERT:
2       Dan, I would ask you again, please stop making
3   speaking objections.
4   BY MR. SCHOLLAERT:
5       Q   Was a copy of this manual, was the manual in
6   your possession photocopied for purposes of this
7   litigation?
8   MR. WILLIAMS:
9       Objection, calls for speculation.
10  THE DEPONENT:
11      A   It seems to me that I answered that question
12  previously when I said that previously, when we were in
13  training, I saw a coworker with a book, I made a copy,
14  and since then I keep it.
15  BY MR. SCHOLLAERT:
16      Q   Did María Torres ask you for a copy of this
17  manual?
18  MR. WILLIAMS:
19      Objection; form.
20  THE DEPONENT:
21      A   I understand that was one of the documents,
22  but I don't know.  I understand it was.
23  BY MR. SCHOLLAERT:
24      Q   Do you know if she personally photocopied the
25  manual in your possession?



```
 1   THE DEPONENT:
 2       A    No, I don't know.  I can't say precisely.
 3   (Whereupon, a document has been marked for identifica-
 4   tion as Exhibit 1 of the deposition).
 5   MR. WILLIAMS:
 6       There's no number on this document?
 7   MR. SCHOLLAERT:
 8       No.
 9   MR. WILLIAMS:
10       Do you want to stamp it?
11   MR. SCHOLLAERT:
12       I'm handing the Witness what has been marked as
13   Exhibit No. 1.
14   BY MR. SCHOLLAERT:
15       Q    Can you look over the document, and let me
16   know when you're finished?
17   MR. WILLIAMS:
18       I'll note for the record that this photocopy
19   appears to be cut off, and has marks on the lefthand
20   side that look like redactions.
21   MR. SCHOLLAERT:
22       I believe what Mr. Williams is referring to three-
23   hole punches on the left side of the document.
24       Counsel for Alstom proffers that these are hole
25   punches and not redactions.
```



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

A 271

MR. WILLIAMS:

    Does Counsel proffer there is no text under where the holes had been punched?

MR. SCHOLLAERT:

    I proffer that this is the duplication of a document produced by AES Puerto Rico...

MR. WILLIAMS:

    With the hole punches?

MR. SCHOLLAERT:

    I cannot confirm whether the hole punches were in its original production, or made by Alstom.

MR. WILLIAMS:

    So we don't know if there was text under the holes.

THE DEPONENT:

    A    What was the initial question you asked?

BY MR. SCHOLLAERT:

    Q    Just to let me know when you get finished looking over the document.

    A    Do you need me to look at it completely, or...

    Q    Have you seen this document before?

    A    It looks similar to the qualification book of the boiler room area.

    Q    Were you required to answer the questions in Exhibit No. 1?



1  memory is that it was around 118, 122, 23, in that
2  range. That's my best memory.
3      Q   Where did the information come from?
4      A   That information came from the team leader of
5  the area at that time.
6      Q   Who was that?
7      A   Gary Bates.
8      Q   Does the wet bulb temperature change?
9  MR. WILLIAMS:
10     Objection, calls for speculation; lack of founda-
11 tion. Asks for a scientific conclusion. And Mr. Sostre
12 is not here as an expert.
13 THE DEPONENT:
14     A   What was the question?
15 BY MR. SCHOLLAERT:
16     Q   Does the wet bulb temperature change?
17 MR. WILLIAMS:
18     Same objections.
19 THE DEPONENT:
20     A   Your question is, does it change? Or did it
21 change?
22 BY MR. SCHOLLAERT:
23     Q   Did it change?
24 MR. WILLIAMS:
25     Same objections.

```
 1        Q    Did anyone at AES arrive at that conclusion?
 2   MR. WILLIAMS:
 3        Objection.
 4   BY MR. SCHOLLAERT:
 5        Q    To your knowledge.
 6   MR. WILLIAMS:
 7        Objection, calls for speculation.
 8   MR. SCHOLLAERT:
 9        I'll restate the question.
10        Q    To your knowledge, did anyone at AES or AES
11   Puerto Rico arrive at the conclusion that the
12   temperature did not affect opacity?
13   MR. WILLIAMS:
14        Objection, calls for speculation.
15   THE DEPONENT:
16        A    Most of the tests, and the evidence that was
17   compiled, affirmed that whenever there was high
18   chloride, and you expected high temperature, the
19   temperature in the opacity could not be controlled.
20   BY MR. SCHOLLAERT:
21        Q    Who performed these tests?
22        A    Those were tests that were made by Stinson or
23   by myself.
24        Q    Were there written reports?
25
```



```
 1   MR. WILLIAMS:
 2        Objection to the form of the question.
 3   Mischaracterizes the testimony.
 4   THE DEPONENT:
 5        A    Very probably there were some written reports,
 6   and there could've been occasions when opacity could be
 7   controlled.  But most of the time opacity caused problem
 8   when there was a combination of high chloride and high
 9   temperature.
10   BY MR. SCHOLLAERT:
11        Q    Did the high temperature lead to opacity
12   exceedences under AES Puerto Rico's permit?
13        A    I couldn't say precisely, tell you exactly,
14   but my impression is, yes.
15   (Whereupon, a document has been marked for identifica-
16   tion as Exhibit 10 of the deposition).
17        Q    What data did you use to arrive at your
18   conclusion that temperature affected opacity?
19        A    The fact that most of the times that we tried
20   to increase the temperature, opacity went out of
21   control, and then we had to bring the temperature down
22   again.
23        Q    What do you mean by "out of control?"
24        A    That opacity, the average started to go up,
25   and the variations in opacity started to increase with
```



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

A 275