# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 04-1282-JJF |
| | ) | |
| ALSTOM POWER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPPOSITION OF PLAINTIFF AES PUERTO RICO, L.P.
## TO ALSTOM POWER, INC.'S MOTION FOR SANCTIONS

John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  April 7, 2006                    Attorneys for AES Puerto Rico, L.P.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................iii

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     AES-PR HAS NOT FAILED TO OBEY ANY COURT ORDER AND
      THUS RULE 37(b)(2) SANCTIONS ARE NOT APPROPRIATE..................................2

II.    SANCTIONS AGAINST AES-PR WOULD NOT BE JUST OR
      APPROPRIATE.............................................................................................................4

III.   ALSTOM'S MOTION IS NOTHING MORE THAN AN ATTEMPT
      TO DISTRACT AES-PR FROM RESPONDING TO ALSTOM'S
      MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO AVOID
      LIABILITY FOR THE FULL SCOPE OF DAMAGES AES-PR HAS
      INCURRED ....................................................................................................................8

          A.    ALSTOM's Motion for Sanctions Is Designed to Distract
               AES-PR from Responding to ALSTOM's Thirty-Eight
               Page Motion for Partial Summary Judgment and To Hinder
               AES-PR's Ability To Prepare for Trial ...............................................................8

          B.    ALSTOM's Motion Is Yet Another Attempt To Avoid
               Payment for the Full Scope of AES-PR's Damages.............................................8

IV.   ALSTOM'S CONTENTIONS ABOUT AES-PR'S CONDUCT IN
      DISCOVERY ARE WITHOUT MERIT.........................................................................9

          A.    AES-PR Timely Supplemented Its Document Production
               and Interrogatory Responses Before the First Corporate
               Designee's Deposition and Subsequently Agreed To Reconvene
               that Deposition ...................................................................................................9

          B.    AES-PR Made Documents Available Prior to Scheduled
               Depositions .......................................................................................................11

          C.    ALSTOM's Claim that It Was "Greatly Prejudiced" by the
               Timing of AES-PR's Supplemental Interrogatory Response
               Is Not Credible..................................................................................................12

          D.    AES-PR Conducted a Careful, Extensive Search for
               Electronic Documents and It Believes Its Electronic Document
               Production Is Complete......................................................................................14

E.      AES-PR's Deposition Objections Were Proper and Were Not Different In Kind from ALSTOM's Objections ...................................................16

F.      AES-PR Did Not Coach Witnesses During Breaks in Depositions ......................................................................................................20

G.      ALSTOM Is Not Entitled to Further Relief Over AES-PR's Assertion That a Litigation Consultant's E-Mail Is Work Product ...........................................................................................................23

H.      ALSTOM Needs No Further Relief With Respect to an Assertion Not to Answer a Question at a Deposition That Already Has Been Continued...........................................................................24

CONCLUSION ..................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997) ..............................................................................................................20

*Black Horse Lane Assoc., L.P. v. Dow Chemical Corporation*, 228 F.3d 275 (3d Cir. 2000)............................................................................................................2

*Coca-Cola Bottling Company of Shreveport, Inc. v. The Coca-Cola Company*, 110 F.R.D. 363 (D. Del. 1986) ..........................................................................................4

*Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993) ...........................................22

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).........................................................................................................4, 7

*McKinley Infuser, Inc. v. Zdeb*, 200 F.R.D. 648 (D. Colo. 2001)...................................22

*Starlight International Inc. v. Herlihy*, 186 F.R.D. 626 (D. Kan. 1999) ........................20

*In re Stratosphere Corp. Sec. Litigation*, 182 F.R.D. 614 (D. Nev. 1998)....................22

*Transportes Aereos de Angola v. Ronair, Inc.*, 104 F.R.D. 482 (D. Del. 1985).............2

*United States v. J.M. Taylor*, 166 F.R.D. 356 (M.D.N.C. 1996), *aff'd* 166 F.R.D. 367 (M.D.N.C. 1996) ....................................................................................23

### STATE CASES

*State of West Virginia ex rel. Means v. King*, 520 S.E.2d 875 (W. Va. 1999) ...............22

### FEDERAL STATUTES

Fed. R. Civ. P. 26(e)(2).......................................................................................................4, 9

Fed. R. Civ. P. 30(b)(6)................................................................................................Passim

Fed. R. Civ. P. 37(a)-(b) ..............................................................................................2, 3, 7

## INTRODUCTION

ALSTOM's 25-page Motion for Sanctions ("Motion"), filed two weeks after the close of fact discovery and complaining about alleged discovery abuses dating back to Fall 2005, is not brought to gain discovery needed for trial of this case or to correct an injustice caused by discovery not received. Not only is the relief ALSTOM demands legally unwarranted, and not only is ALSTOM's recitation of the facts incorrect and misleading, but the intent of this Motion only could be to distract AES-PR from its prosecution of this case, increase litigation costs, and delay resolution of this years-long dispute. Those are not proper purposes for a discovery motion.

This Court's default scheduling order calls for discovery motions to be no more than four pages in length and establishes an expedited procedure for their consideration. Moreover, at a December 7, 2005 discovery hearing in this matter, after hearing from the parties about a host of discovery disputes, the Court directed the parties to attempt to resolve them and then established an even simpler and more expedited procedure should they be unable to do so. The Court said that, if discovery disputes continued to arise, the parties should "[c]all chambers. We'll remember the name of the case. We will have you back . . . ." *See* D.I. 64 (Tr. at 66). Instead of doing so, ALSTOM waited until after the close of fact discovery and filed a 25-page brief with a 293-page appendix of exhibits. Had ALSTOM believed it was not receiving all the discovery it actually needed, it could have and would have promptly and succinctly brought the matter to the Court's attention. Its failure to do so evidences that ALSTOM's motion was filed not to redress some discovery wrong, but to attempt to gain a tactical advantage that will allow it to avoid the merits at trial – a trial that otherwise will result in ALSTOM paying substantial damages to compensate for the harm it has caused to AES-PR.

ALSTOM's motion should be denied for the following reasons:

**First**, Rule 37(b)(2) sanctions are inappropriate here because the Court has not issued an order compelling the discovery ALSTOM purportedly desires. Sanctions are warranted only if the party from which discovery is sought has failed to obey such an order, and AES-PR has not failed to obey any Court order here.

**Second**, ALSTOM's motion is nothing more than an attempt to distract AES-PR from responding to ALSTOM's Motion for Partial Summary Judgment and to avoid liability for the full scope of damages that AES-PR has incurred in attempting to remedy the accelerated corrosion in the pollution control equipment that ALSTOM supplied.

**Third**, ALSTOM's motion simply is without merit, and it seeks to hold AES-PR to a standard that ALSTOM itself does not come close to meeting.

## ARGUMENT

### I.    AES-PR HAS NOT FAILED TO OBEY ANY COURT ORDER, AND THUS RULE 37(b)(2) SANCTIONS ARE INAPPROPRIATE.

ALSTOM seeks relief under Fed. R. Civ. P. 37(b)(2), but that rule is not applicable here. Sanctions under Rule 37(b)(2) may be awarded only if the moving party first obtains an order to compel discovery that subsequently is disobeyed. *See Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 301-02 (3d Cir. 2000); *Transportes Aereos de Angola v. Ronair, Inc.*, 104 F.R.D. 482, 498 (D. Del. 1985) (holding that moving to compel under Rule 37(a) is "the only recourse available to a party seeking discovery through depositions, interrogatories, requests for production where there has been a response to the discovery request, but the response is inadequate or inappropriate" and noting that only after an order compelling discovery has been disobeyed may the "second step of the two-step . . . be invoked under Rule 37(b)"). Thus, a party seeking sanctions under Rule 37(b)(2) <u>must</u> <u>first</u>

- 2 -

receive an order compelling the discovery it seeks under Rule 37(a). *Id.* Because ALSTOM has

not received such an order, there is no occasion even to consider its sanctions motion here.

Indeed, the only relevant discovery order from this Court that ALSTOM cites is

the December 16, 2005 Discovery Dispute Resolution Plan ("Discovery Order"), *see* D.I. 62, 65,

that was the agreed-upon resolution to discovery issues proposed by both parties and that applies

equally to both parties. The Discovery Order followed a December 7, 2005 discovery hearing on

<u>both</u> <u>parties</u>' motions to compel. After that hearing, the Court <u>denied</u> all of the pending motions

with leave to renew. (D.I. 60). There simply is no order granting any ALSTOM motion to

compel.

With regard to the agreed Discovery Order, AES-PR has complied with its

obligations. To the extent ALSTOM alleges that AES-PR has violated the Discovery Order by

making supplemental document productions of newly discovered or created documents after

December 30, 2005 (which would be a misreading of the Discovery Order), ALSTOM would

have committed the same violation. Indeed, ALSTOM produced over 25% of its electronic

documents after December 30, 2005, including thousands of documents for witnesses who had

been deposed <u>prior</u> to the document productions. *See* Williams Decl. ¶ 7 (attached at Tab

A). Consistent with this motion, in which ALSTOM asks for a different standard to be applied

to AES-PR than to itself, ALSTOM even produced over 9000 electronic documents after it filed

its February 23, 2006 motion to compel AES-PR to produce additional electronic documents.

*See* Tab B.

Moreover, unlike AES-PR, ALSTOM has ignored other discovery deadlines set

by Court Order and the Federal Rules of Civil Procedure. For example, even though this Court's

December 16, 2005 Order required the parties to exchange privilege logs by December 30, 2005,

ALSTOM waited until February 8, 2006 to produce its electronic-document privilege log. *See* Tab C. When AES-PR served <u>one</u> interrogatory on ALSTOM on December 23, 2005, ALSTOM waited until February 7, 2006, two weeks past the due date, to respond, and then supplemented the response on the last day of fact discovery. *See* Tab A (Williams Decl. ¶ 2). ALSTOM is trying to hold AES-PR to a standard that it has not come close to achieving itself.

## II.    SANCTIONS AGAINST AES-PR WOULD NOT BE JUST OR APPROPRIATE.

Even if AES-PR had violated some Court order – which it has not – sanctions would be inappropriate here. Although district courts generally have discretion whether to impose sanctions for violation of a court order and, if so, what sanctions to impose, *Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Company*, 110 F.R.D. 363, 367 (D. Del. 1986), courts are limited by two standards – first, the sanction must be "just," and second the sanction "must be 'specifically related to the particular 'claim' which was at issue in the order to provide discovery.'" *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982). Neither standard is met in this case.

First, the imposition of sanctions would not be "just" because AES-PR has made reasonable, good-faith efforts to comply with the Court's Discovery Order and the Federal Rules of Civil Procedure. Supplementing interrogatory responses and document productions in good faith surely does not rise to the level of sanctionable conduct – indeed, the Federal Rules of Civil Procedure require it. *See* Fed. R. Civ. P. 26(e)(2).[1]

---

[1]  ALSTOM's brief grossly misstates the record with regard to the production of documents after December 30, 2005. AES-PR believed it had completed its production of documents by December 29, 2005. *See* Tab D. Nevertheless, in January 2006, <u>both</u> parties agreed to exchange lists of individuals whose emails each believed the other had not searched, <u>both</u> parties agreed to make supplemental document productions with respect to those individuals, and AES-PR also agreed to make available paper print-outs of plant operating data it already had made available electronically (but which ALSTOM never has undertaken to inspect and copy). *See* Tab E. ALSTOM gave AES-PR a list of 18 individuals and AES-PR gave ALSTOM a list of 10

Notwithstanding ALSTOM's accusations and suggestions to the contrary, AES-PR continually has strived to work with ALSTOM to resolve discovery disputes. Indeed, counsel for ALSTOM wholly ignores the numerous instances in which AES-PR has worked cooperatively and in good faith with ALSTOM in order to avoid disputes:

- ALSTOM sought to take the deposition of Ron McParland, a former AES-PR employee who was then living in Vietnam. At ALSTOM's request, counsel for AES-PR contacted Mr. McParland in Vietnam to determine if he would be returning to the U.S. before the close of fact discovery on March 10. When AES-PR learned that Mr. McParland would not return to the U.S. until after the close of fact discovery at the end of March, AES-PR agreed to permit ALSTOM to take Mr. McParland's deposition out of time. That deposition was held on March 31, 2006 – three weeks after the close of fact discovery and seven days after ALSTOM filed this Motion for Sanctions.

- The internal components of the plant's pollution control equipment can be inspected only when each unit is off line. ALSTOM had the opportunity to inspect Unit 2 in Spring 2005 but declined to do so; it inspected the internal components of Unit 1 and the rest of the facility in October 2005. When it requested to inspect the internal components of Unit 2 after the close of fact discovery during a shut down of the unit at the end of March, AES-PR consented even though ALSTOM already had been afforded an opportunity to inspect these internal components during the time authorized for fact discovery in Spring 2005.

- AES-PR voluntarily agreed to reopen the deposition of the Rule 30(b)(6) witness on damages issues after ALSTOM complained that AES-PR's supplemental interrogatory response was provided shortly before for the deposition. It agreed to do so even though ALSTOM's notice of deposition had specifically requested that the witness testify at the deposition as to "[a]ny changes, modification or alterations to any of the damages claims previously asserted by AES against ALSTOM," meaning that ALSTOM already had contemplated questioning at the deposition about recent changes to the damages estimates.

- AES-PR agreed to reopen the Rule 30(b)(6) deposition on electronic document production issues because ALSTOM complained that the witness AES-PR supplied could not answer questions about events that took place at the offices of AES-PR's ultimate

---

individuals. AES-PR produced documents for 15 of the individuals identified by ALSTOM, although it explained that it did not believe the documents for most of those individuals actually were relevant, and ALSTOM produced documents for three of the individuals on AES-PR's list. The vast majority – over 75% – of the electronic documents that AES-PR produced after December 30, 2005 were based on this agreement. Tab A (Williams Decl. ¶ 3).

corporate parent, The AES Corporation ("AES"). In addition, AES-PR worked with AES to make an AES employee available for the reopened deposition.

- During the first week of January 2006, both parties compiled and exchanged lists of persons from whom they believed the other side should have collected electronic documents. ALSTOM requested that AES-PR produce documents for 18 individuals. Despite the fact that AES-PR did not agree that all of those individuals would have responsive documents, AES-PR agreed to and did produce documents for 15 of those 18 individuals; ALSTOM on the other hand agreed to produce documents for only three of the ten individuals from whom AES-PR sought documents. Remarkably, ALSTOM now uses this production against AES-PR because those documents – by necessity because of the parties' agreement – were produced after December 30, 2005.

ALSTOM's *ad hominem* attacks throughout discovery have made the process significantly more difficult than necessary. AES-PR's counsel repeatedly has asked that ALSTOM's counsel work civilly and cooperatively to resolve discovery disputes, only to be accosted with accusations of bad faith. ALSTOM's motion continues this practice and is peppered with conclusory allegations and factual inaccuracies about AES-PR's conduct during the discovery period. *See, e.g.*, Mot. 8 n.4 (labeling as an "obstructionist tactic" AES-PR's notice to ALSTOM that it had not received a copy of ALSTOM's First Set of Requests for Production).

Moreover, ALSTOM has engaged in the very conduct that it claims warrants sanctions against AES-PR, including making supplemental productions after December 30, 2005, producing additional documents for witnesses after the witness testified, amending interrogatory responses on the last day of fact discovery, making speaking objections in depositions, and so on. AES-PR does not suggest that ALSTOM did so for nefarious purposes. For example, in the course of litigating a large, complicated case such as this one, documents are both generated and discovered after depositions take place, and parties act properly, not in bad faith, when they then produce them. AES-PR objects to ALSTOM's suggestion that its conduct

- 6 -

is anything other than good faith discovery efforts to supplement discovery as supplemental documents and facts become known.

The second standard the Supreme Court articulated as constraining a court's decision whether to impose sanctions highlights why it is inappropriate to file a motion for sanctions prior to having a motion to compel granted. The sanction must be "specifically geared to the specific claim which was at issue in the order to provide discovery." *Ins. Corp. of Ir.*, 456 U.S. at 707. There is no specific order to provide discovery here, so the relief ALSTOM seeks is not "specifically geared to the specific claim which was at issue in the order to provide discovery."[2] Accordingly, ALSTOM's motion fails as a matter of law.

---

[2] ALSTOM's primary request for sanctions seeks the extraordinary relief of barring AES-PR from presenting any evidence relating to its claim for the cost of any water system changes, other than the reverse osmosis system. The costs of the proposed water treatment system comprise the majority of AES-PR's damages. For obvious reasons, ALSTOM is seeking to avoid liability for these damages. In the alternative, ALSTOM requests that the Court reopen discovery for the purposes of resuming the Rule 30(b)(6) damages and liability depositions in the United States and to impose on AES-PR the costs associated with resuming those depositions and in preparing its Motion. ALSTOM's alternative form of relief further highlights why this post-fact-discovery motion is inappropriate. The Federal Rules require a party seeking to reopen a deposition first to "meet and confer" with opposing counsel. *See* Fed. R. Civ. P. 37(a)(2)(B). ALSTOM never asked AES-PR to reopen these depositions – instead ALSTOM has made an end-run around its meet-and-confer obligation by styling this motion as a motion for sanctions rather than a motion to compel.

III.    **ALSTOM'S MOTION IS NOTHING MORE THAN AN ATTEMPT TO DISTRACT AES-PR FROM RESPONDING TO ALSTOM'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO AVOID LIABILITY FOR THE FULL SCOPE OF DAMAGES AES-PR HAS INCURRED.**

A.    **ALSTOM's Motion for Sanctions Is Designed to Distract AES-PR from Responding to ALSTOM's Thirty-Eight Page Motion for Partial Summary Judgment and To Hinder AES-PR's Ability To Prepare for Trial.**

This motion is ALSTOM's latest attempt to distract AES-PR from responding to ALSTOM's motion for partial summary judgment and preparing this case for trial.

It is no coincidence that ALSTOM filed its twenty-five page sanctions motion on the exact same day it filed its thirty-eight page motion for partial summary judgment. Even prior to ALSTOM filing these motions, AES-PR asked ALSTOM to consent to a short extension for AES-PR's response to ALSTOM's forthcoming summary judgment motion since AES-PR also would be conducting expert depositions in the same two-week timeframe. *See* Tab A (Williams Decl. ¶ 6). ALSTOM refused to consent to an extension to the Local Rules' two-week deadline for responses to motions. *Id.* Instead, ALSTOM filed this twenty-five page motion for sanctions, which AES-PR now has to respond to in the same two weeks it is responding to the motion for partial summary judgment and conducting expert depositions.

B.    **ALSTOM's Motion Is Yet Another Attempt To Avoid Payment for the Full Scope of AES-PR's Damages.**

ALSTOM is desperate to avoid payment for the substantial damages related to AES-PR's water treatment system (other than the reverse osmosis system). ALSTOM has advanced in its partial summary judgment motion three separate reasons why it should not be exposed to those damages . Because those arguments are factually and legally meritless, ALSTOM now attempts to attack the problem from a different angle – that is, in the form of a motion for sanctions barring the introduction of "any evidence relating to [AES-PR's] claim for

the cost of any enacted or proposed water system changes, other than the reverse osmosis system. . . ." Mot. 25.  Indeed, ALSTOM's primary request for relief is to bar this evidence despite the fact that ALSTOM's Motion complains about everything from electronic discovery generally to objections at depositions to improper claims of privilege.  ALSTOM's efforts to manufacture discovery disputes in an attempt to avoid confronting the case on the merits should not be countenanced.

## IV.    ALSTOM'S CONTENTIONS ABOUT AES-PR'S CONDUCT IN DISCOVERY ARE WITHOUT MERIT.

### A.    AES-PR Timely Supplemented Its Document Production and Interrogatory Responses Before the First Corporate Designee's Deposition and Subsequently Agreed To Reconvene that Deposition.

In both its Statement of Facts and in Sections IV.A.2 and IV.A.3 of its Motion, ALSTOM asserts that AES-PR belatedly produced documents relating to its claim for damages in a manner designed to preclude ALSTOM's review of those documents prior to the depositions of AES-PR's corporate designees on liability and damages issues.  Here again, many of ALSTOM's factual assertions are simply wrong.  First, because AES-PR has not yet purchased or installed some of the components of the new water treatment system necessitated by the severe corrosion, AES-PR still is receiving quotes and other information from prospective vendors.  Thus, new documents that post-date the December 30, 2005 production deadline are being created and produced.  While ALSTOM's motion suggests that there is something sinister about the timing of these productions, that suggestion is wholly without support.  AES-PR's supplemental productions reflect its efforts seasonably to update its discovery responses.  *See* Fed. R. Civ. P. 26(e)(2) (requiring "seasonabl[e]" supplementation of discovery responses).

Second, while AES-PR did supplement its answer to Interrogatory No. 10 the day before the 30(b)(6) damages deposition, AES-PR was not acting in bad faith in doing so.  Rather,

AES-PR, in preparing its corporate designee witness on damages, as it was required to do under Rule 30(b)(6), concluded that the damages figures had changed since its initial response to Interrogatory No. 10 and that a supplemental response was in order. *See* Tab A (Williams Decl. ¶ 5). AES-PR worked diligently to provide that supplemental response to counsel for ALSTOM prior to the deposition. *Id.*

Third, ALSTOM simply is wrong that AES-PR produced "voluminous documents relating to its claim for damages" while ALSTOM's counsel was en route to Puerto Rico. *See* Mot. 2. (Later, ALSTOM amends its rhetoric to say that "many" of the documents were related to damages, *see* Mot. 4.) AES-PR made the documents available to ALSTOM two days before the deposition, not one day, *see* Tab F, and the vast majority of the documents that AES-PR produced had nothing whatsoever to do with AES-PR's damages claims. The majority were simply print-outs of computer operating data as well as other binders of plant operating data. *See* Tab A (Williams Decl. ¶ 4).[3]

Moreover, this is a moot point. When ALSTOM objected to the timing of AES-PR's supplemental interrogatory response and the production of documents, rather than debate the issue – and AES-PR maintains its conduct was proper – AES-PR agreed to make the corporate designee available for continued examination. That deposition was continued on March 9, 2006. Thus, there is no prejudice. ALSTOM received the relief it requested and is not entitled to additional relief now.

_____

[3]  Significantly, despite ALSTOM's claim that "voluminous documents" produced in January related to damages, ALSTOM used only three documents from that production in the reconvened damages deposition held in March. Of those three documents, two of them were from outside sources and were received by AES-PR on December 29, 2005 – one day before productions were supposed to be complete. Producing documents two weeks after they are received hardly reflects an intentional strategy to obstruct the discovery process.

**B.    AES-PR Made Documents Available Prior to Scheduled Depositions.**

ALSTOM blames AES-PR for failing to make documents available before the first of two scheduled depositions in March.  The truth is, ALSTOM simply failed to plan ahead and then blamed its delinquent conduct on AES-PR.  As ALSTOM acknowledges, AES-PR gave ALSTOM notice on March 3 that a small number of additional documents would be available for inspection and copying at AES's Puerto Rico Plant on March 8, 2006.  *See* Mot. at 5.  According to ALSTOM's own exhibits, counsel for ALSTOM apparently did not attempt to contact their Puerto Rico copy service until 12:30 in the afternoon on March 8th.  *See* ALSTOM Mot. Tab 14.  According to the copy service, they were unable to get in touch with AES-PR's contact person that afternoon, but there is no indication that they had tried previously.  When the copy service had not arrived to pick up the documents by the close of business, AES-PR offered to copy the documents itself and have its counsel deliver them by hand to ALSTOM's counsel in Puerto Rico on Friday, March 10 (the first possible opportunity for counsel to do so).  *See* Tab A (Williams Decl. ¶ 8).  AES-PR's counsel received the documents on the night of March 9 and delivered them to ALSTOM's counsel on March 10.  *See id.*  The fault belongs to ALSTOM, not AES-PR, for waiting until the afternoon of March 8 to retrieve the documents, and then deciding to have them delivered on March 10.  Moreover, there were a grand total of 16 documents in that production and the majority of the documents <u>were not even created</u> until February 2006.  There was absolutely no intentional delay with respect to production of those documents.[4]

---

[4] In Section IV.A.2, ALSTOM makes the following statement: "Furthermore, all of the documents belatedly produced by AES had been obtained <u>no later than the end of February 2006</u>; . . . ." (emphasis added).  The documents were produced <u>at the beginning of March</u>.  That hardly is a belated production.  ALSTOM also includes an example of a document AES-PR allegedly had in its possession before December 30, 2005, *see* ALSTOM Mot. Tab 15.  But the document itself indicates that the date of the document is not correct; it says "Date Not Correct."

What is most remarkable about ALSTOM's position is that it argues for a standard ALSTOM itself utterly has failed to meet. Indeed, ALSTOM produced over 45,000 documents – more than 25 percent of all the electronic documents ALSTOM produced in this litigation – over a month after the December 30, 2005 deadline. *See* Tab A (Williams Decl. ¶ 7). Thousands of those documents named or were from the files of three witnesses that AES-PR already had deposed. *See* Tab G. Moreover, ALSTOM waited until after the deposition of ALSTOM engineer Frank Gabrielli to produce a highly significant document that AES-PR specifically requested in the month prior to the deposition, but which ALSTOM's counsel claimed did not exist. *See* Tab H. When the witness contradicted his counsel and testified at his deposition that the document did indeed exist and was on his computer, counsel for ALSTOM refused to permit him to retrieve it during the deposition but instead produced it the next day. *See id.*

ALSTOM also amended its interrogatory responses on March 10, 2006, the last day of fact discovery, and it amended its Request for Admission responses on March 13, 2006, three days after the close of discovery and a day before a deposition focused on them.

### C.     ALSTOM's Claim that It Was "Greatly Prejudiced" by the Timing of AES-PR's Supplemental Interrogatory Response Is Not Credible.

ALSTOM served AES-PR with a Third Set of Interrogatories on February 8, 2006. AES-PR's response was due on March 10, 2006. AES-PR served its responses on that date and, at the same time, supplemented its responses to various interrogatories from ALSTOM's Second Set of Interrogatory Requests. The Supplemental Interrogatory responses primarily supplemented responses to contention interrogatories that AES-PR expressly had reserved the right to supplement based on information learned through the discovery process. It made sense, therefore, that AES-PR would supplement those responses at the close of fact

discovery. It must have made sense to ALSTOM as well, because ALSTOM did the very same thing. *See* Tab I.

ALSTOM's claim that it was "greatly prejudiced" at the 30(b)(6) deposition it scheduled for the last day of fact discovery, March 10, 2006, because of the timing of AES-PR's supplemental interrogatory response is not credible. Only one of the supplemental responses was even relevant to the topics listed in the 30(b)(6) notice. During the deposition, counsel for AES-PR alerted counsel for ALSTOM that that particular interrogatory had been supplemented when ALSTOM's counsel first inquired about the interrogatory. *See* ALSTOM Mot. Tab 20 at 297:2-3. Counsel for AES-PR even asked counsel for ALSTOM if he had a copy of the supplemental response, to which ALSTOM's counsel replied, "I'm not sure if I do or don't. I don't have it here." *See* ALSTOM Mot. Tab 20 at 297:5-6. ALSTOM's counsel could have requested that counsel for AES-PR provide a copy or he could have called his office to have it faxed to him. Instead, he decided it was unnecessary and continued the deposition without it – over AES-PR's objection that he was using the wrong version of the document. Any suggestion by ALSTOM that its counsel could not have either requested the document at the deposition or had it faxed to him during the deposition defies common sense.

Moreover, ALSTOM articulates no particular prejudice it suffered by the timing of AES-PR's interrogatory response, other than simply to assert that it was prejudiced. *See* Mot. 7 ("AES's failure to provide the Supplemental Answers . . . greatly prejudiced ALSTOM's examination."). The entirety of AES-PR's supplemental response is reproduced below:

> In November 2002, EEC and/or ALSTOM presented additional revised operating procedures to AES-PR, including but not limited to procedures titled "CDS Cold Start-up" dated November 14, 2002. Those revised procedures supplemented and superseded the August 2001 EEC O&M Manual.

- 13 -

> In addition, ALSTOM and EEC modified the August 2001 EEC O&M
> Manual procedures when their commissioning personnel demonstrated how to
> operate and maintain the pollution control equipment between July 2002 and July
> 2003 in a manner different from that set forth in the August 2001 O&M Manual.

*See* Tab J. The original response indicated revised operating procedures were issued periodically

in September and October 2002. Thus, this supplemental response simply indicated that revised

procedures were issued up until November 14, 2002, rather than the end of October 2002 – and

further elaborated on what AES-PR's deponents had explained – that AES-PR's personnel had

been trained by ALSTOM and EEC personnel as to how to run the equipment. ALSTOM was

not prejudiced in any way when it learned that the final revisions were made in mid-November

2002 rather than October 2002. Moreover, ALSTOM was well aware of the November 14, 2002

document modifying the August 2001 preliminary Operation and Maintenance Manual and AES-

PR's position with regard to that document, as it had been used in several depositions prior to

this one. It simply is not credible for ALSTOM to assert that if it had had AES-PR's short

supplemental response earlier, the course of its examination would have been different. AES-PR

suspects the examination would not have changed one iota, which is why ALSTOM's counsel

did not pause to obtain the amended response.

### D.    AES-PR Conducted a Careful, Extensive Search for Electronic Documents and It Believes Its Electronic Document Production Is Complete.

Remarkably, ALSTOM once again complains to this Court about AES-PR's production

of electronic documents. This is the <u>third</u> time that ALSTOM has filed a motion concerning this

same subject.[5] Indeed, as of the writing of this response, there is an ALSTOM motion to compel

---

[5] ALSTOM filed its first Motion to Compel the Production of Electronic Documents on October 24, 2005, and the Court denied that motion with leave to renew on December 8, 2005. *See* D.I. 60. ALSTOM filed its Second Motion to Compel the Production of Electronic Documents on February 23, 2006.

addressing this topic fully briefed and pending before this Court.  Because AES-PR does not wish to burden this Court by addressing an issue that already has been briefed, AES-PR directs the Court to AES-PR's Opposition To ALSTOM's Second Motion to Compel, D.I. 81.  To appreciate the irony of ALSTOM's current complaints, however, it is helpful to have an understanding of a few historical points.

First, AES-PR is criticized for doing too little, and then criticized for doing too much.  ALSTOM states that by October 2005, ALSTOM had produced 53,859 electronic documents while AES-PR had produced only 544.  What ALSTOM fails to mention is that it appears as though the 53,859 documents had been collected for a previous lawsuit involving an entirely different party that largely were irrelevant to this lawsuit.  In fact, that production by ALSTOM put an enormous burden on AES-PR because counsel had to sift through thousands of irrelevant documents.  Now, ALSTOM switches gears and criticizes AES-PR for producing large volumes of electronic documents in November and December, even though the productions were within the discovery deadlines for this case.  *See* Mot. 9 (accusing AES-PR of "disgorging" documents in November and December 2005).[6]  Finally, ALSTOM points out that AES-PR made additional electronic productions in early 2006.[7]  So did ALSTOM.  Indeed, over 25% of

_____

[6] Once again, ALSTOM misleads this Court in quoting a portion of Luis Canapari's deposition testimony.  Mr. Canapari is an employee of AES-PR's ultimate parent company, The AES Corporation ("AES").  AES-PR employees began collecting responsive emails long before November 2005.  AES-PR asked that AES assist with that process in November 2005 by collecting emails from the central server as a backstop to the efforts at AES-PR, the employees of which had access to the very same e-mails.  Mr. Canapari was testifying about events that took place at the AES corporate office in Arlington, Va., not events that took place at the plant in Puerto Rico.

[7] Here again, ALSTOM makes vitriolic and unfounded accusations.  ALSTOM states, "[t]he protracted nature of AES's production, coupled with the massive production at the back-end of the schedule, demonstrates conclusively that AES intentionally delayed its production so that ALSTOM's opportunity to review and analyze this data would be compromised."  Mot. 9 (emphasis added).

ALSTOM's electronic documents were produced to AES-PR in February 2006. *See* Tab A (Williams Decl. ¶ 7). Thousands of those documents were from witnesses that AES-PR already had deposed. *Id.*

**E.     AES-PR's Deposition Objections Were Proper and Were Not Different In Kind from ALSTOM's Objections.**

Some of the most powerful evidence that ALSTOM's motion is utterly devoid of merit are the pages it wastes complaining about the conduct of AES-PR's counsel during depositions. In addition to being unfounded, most of the complaints are hypocritical.

ALSTOM selectively quotes thirteen of AES-PR's counsel's objections from literally thousands of pages of deposition transcripts in an effort to make AES-PR's conduct appear wrongful when in fact it was not. *See* Mot. 10-17. All of the objections were made in good faith. None evidences obstruction of discovery. ALSTOM's sweeping generalizations based on these thirteen objections are unfounded. Ultimately, if these questions are asked at trial, the Court will have to rule on them, but there is no reason to do so now.

In addition, in a number of important respects, ALSTOM flatly misstates the factual record. For example, ALSTOM tells this Court that counsel for AES-PR made excessive objections during Doug Tomlin's deposition, even objecting to "preliminary questions such as Mr. Tomlin's name and address," *see* Mot. 10. Counsel did no such thing:

Q.     Can you just state your name briefly for the record?
A.     Doug Tomlin.

*        *        *

Q.     Where do you currently live?
A.     Chippewa.
Q.     Where is Chippewa?
A.     It is actually Beaver Falls, Pennsylvania.
Q.     Beaver Falls, Pennsylvania. How long have you been there?
A.     Going on two years.

*See* ALSTOM Mot. Tab 22 (Tomlin Tr. at 4-5). Indeed, counsel for AES-PR did not make her first objection for twelve more questions, and that objection was perfectly appropriate.[8]

In addition to complaining about the number of objections,[9] ALSTOM's motion complains about the type of objections. *See, e.g.*, Mot. 10 (contending that counsel for AES-PR objected on the grounds that the deponent was not a corporate designee) *and* Mot. 12-14 (complaining that "many" of counsels' objections were not "concise"). ALSTOM's characterizations are unfounded. And AES-PR could similarly critique ALSTOM's objections at the depositions of its witnesses:

> Q.     And during that period, were they taking instructions and direction from Alstom and EEC as to how to operate the equipment?
>
> MR. VITTORIA: Objection to the form of the question, objection, mischaracterizes evidence, and assumes evidence not in, in the record.
>
> A.     Yes.
>
>                    *     *     *
>
> Q.     And during the hundred hour reliability test, were they following written instructions that had been provided to them from EEC and Alstom?
>
> MR. VITTORIA: Objection to form of the question, it's compound and the objection lacks, phew, assumes facts not in evidence and mischaracterizes the testimony.

*See* Tab K (Vanhooser Tr. at 39-40).

---

[8] ALSTOM's Motion contains similar factual misstatements throughout. In the interest of brevity, AES-PR has brought only a portion of them to the Court's attention.

[9] ALSTOM selectively complains that counsel for AES-PR objected to 43% of the questions in the deposition of Doug Tomlin. What ALSTOM fails to inform the Court is that, in that very same deposition, counsel for ALSTOM objected to 73% of AES-PR's counsel's questions. Again, ALSTOM is wasting both parties' time and resources by focusing on such matters rather than the merits of this case.

Q.     Second issue you presented to EEC in this letter is operation coverage post one hundred hour reliability test.  Right?

A.     Yes.

Q.     Can you read that issue into the record?

MR. VITTORIA:  I'm going to object to continuing reading into the record.  We had Linda Miss Rothe read two sentences from the first item and then no questions were asked about it.  And the document says what it says.  This isn't a procedure in which documents can be read into the record.  The document is what it is.  But you can continue.

*See* Tab L (L. Rothe Tr. at 122-23).

\*          \*          \*

Q.     On the October 2002 leak, about how expensive was it to do those repairs with the materials and labor and everything combined?

A.     I have no idea.

Q.     Do you have a ball park?

MR. EDWARDS:  If you have some basis for answering, absolutely you should answer.  There's a line somewhere, and I don't think any of us can exactly cross it between having a basis and just making a guess, but you need to have some sort of basis.

THE WITNESS:  Based on what I have seen recently and what it costs to do some of these repairs, I would guess probably in the quarter to half million range.

*See* Tab M (Hickey Tr. at 40-41).

ALSTOM complains that AES-PR improperly coached witnesses by making speaking objections.  AES-PR did not coach witnesses.  ALSTOM's counsel, on the other hand, made repeated speaking objections that could have influenced the witnesses' testimony:

Q.     Why do they describe it as back sifting ash building up?  Is that the type of ash that would cause back sifting?

A.     No.  It's ash that has back sifted, building up in the plenum.

- 18 -

Q.  Okay.

MR. EDWARDS:  Again, just to be clear, he hasn't identified who the author of this document is or if he even knows who the author of this document is.

THE WITNESS:  I think you're misreading this a little bit.

*See* Tab M (Hickey Tr. at 45-46).

\*        \*        \*

Q:   What is the role of general manager?

A:   He was either -- I don't know.  He was the -- well, he runs the whole organization.  That may have been -- what's the date, January 28, '04.  Let  me think back.

MR. EDWARDS:  I'm going to tell you that you shouldn't think about this, but it's maybe not something to be tearing over for too long, and I caution you about just guessing.

THE WITNESS:  I don't know what his role was at that time for sure.  I don't remember.

*See* Tab M (Hickey Tr. at 115-16).

Q.  Mr. Jarvis was describing the chloride samples of coal.  Correct?

MR. VITTORIA:  Objection.  We're talking about ash here Dan we're not talking about coal.

MR. WILLIAMS:  Okay I ask counsel to stop testifying.

MR. VITTORIA:  I ask you to stop mischaracterizing what is in the document.

Q.  Can you answer the question, please.  Do you want it read back?

\*  \*  \*

Q.  Your report describe[s] it [a]s amount of chlorine in the coal.  Is that correct?

MR. VITTORIA:  Objection.  It does not.

- 19 -

*See* Tab N (Gabrielli Tr. at 84-85).  AES-PR is not moving to re-open these depositions or for other sanctions, but it objects to ALSTOM insisting on a standard that it has not met itself.

## F.     AES-PR DID NOT COACH WITNESSES DURING BREAKS IN DEPOSITIONS.

ALSTOM submits absolutely no evidence that AES-PR "coached" witnesses during breaks in depositions.  The two instances that ALSTOM cites in its Motion involved 30(b)(6) depositions, one of which concerned electronic document discovery.  ALSTOM cites this deposition as a "prime example."  *See* Mot. 17.  But the Motion itself makes clear the basis for the testimony that was supplemented.  On a break, the witness, from the Information Technology group at AES-PR's ultimate parent corporation, AES, contacted a coworker, the e-mail administrator at AES, to obtain clarification regarding the nature of a particular e-mail system.  *Id.*  He did so precisely because, as a Rule 30(b)(6) corporate designee, he had a duty to obtain the information about the agreed-upon topics and to testify about them.  *See Starlight Int'l Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D. Kan. 1999) ("If the designated persons do not possess personal knowledge of the matters set out in the deposition notice, the [entity] is obligated to prepare the designees so that they may give knowledgeable and binding answers for the [organization]." (quotation marks omitted)); *Bank of New York v. Meridien BIAO Bank Tanz. Ltd.*, 171 F.R.D. 135, 150 (S.D.N.Y. 1997) (30(b)(6) deposition "not designed to be a memory contest" (quotation marks omitted)).  The conduct ALSTOM cites is hardly coaching by counsel for AES-PR – the witness testified that the information came – not from counsel – but from a co-worker.

ALSTOM's second example is simply misleading.  ALSTOM claims that Mr. Stone, the AES-PR 30(b)(6) witness on various liability issues, testified that AES-PR re-injected

flyash "'continuously'" for a least a couple of months and that, "[f]ollowing the next break,"[10]

and in response to redirect questions from AES-PR's counsel, Mr. Stone "radically changed" his

position and testified that ash was reinjected only on an "'intermittent'" basis. *See* Mot. 19. But

ALSTOM's argument rests on a selective and misleading quotation of the initial testimony. Mr.

Stone's first response to ALSTOM's question regarding fly-ash reinjection was as follows: "I

believe we operate all our systems, at different times, maybe not continuously. . . ." *See*

ALSTOM Mot. Tab 20 (Tr. at 269). In response to a follow-up question by ALSTOM's counsel,

Mr. Stone testified that it was his understanding that AES-PR began reinjecting flyash "on a

more continuous basis during the summer of 2003." *See* ALSTOM Mot. Tab 20 (Tr. at 270).

Mr. Stone <u>never</u> testified that the flyash reinjection system operated "continuously," although

counsel mischaracterized it that way in his questions. On redirect, counsel for AES-PR

attempted to clear up what he believed was an unclear record created by ALSTOM's counsel's

mischaracterizations of Mr. Stone's prior testimony in his questions. Mr. Stone testified on

redirect that, in preparation for his deposition as AES-PR's designee, he had discussed with one

of the personnel responsible for plant operations, Elias Sostre, the frequency of flyash

reinjection. After a series of questions regarding fly-ash reinjection, counsel for AES-PR asked

Mr. Stone "And do you recall specifically what [Mr. Sostre] told you about how frequently the

fly ash re-injection system was run in the summer months of 2003?" *See* Tab O (Stone Tr. at

---

[10] ALSTOM's motion attempts to make every action by AES-PR appear intentional and insidious. The "next break" was the last break of the day. When the deposition continued, counsel for ALSTOM indicated (as per ALSTOM's usual *modis operandi*) that the witness had insufficient information about several of the topics, but that at that time he had no further questions. *See* Tab O [Stone Tr. at 349]. Counsel for AES-PR sought to "clear[] up [ALSTOM's counsel's] concerns" by asking redirect questions and permitting ALSTOM's counsel another opportunity to elicit all testimony about any subject on which the corporate designee was to be prepared to testify. *Id.* (Tr. at 350).

365).  Mr. Stone responded, "he indicated that it was more, it was an intermittent reinjection

system."  *See id.*

   ALSTOM's motion argues that any discussion with a deposition witness – on

breaks – about the substance of the deposition is categorically improper.  Mot. 17-19.  ALSTOM

cites no case in <u>this</u> jurisdiction for that proposition because there is none.  The case on which it

does rely is *Hall v. Clifton Precision*, 150 F.R.D. 525, 529 (E.D. Pa. 1993) ("conferences

between witness and lawyer are prohibited both during the deposition and during recesses"); but

*Hall* has been sharply criticized in other jurisdictions.  *See, e.g.*, *In re Stratosphere Corp. Sec.

Litig.*, 182 F.R.D. 614, 620 (D. Nev. 1998) ("the *Hall* decision goes too far and its strict

adherence could violate the right to counsel"); *accord State of W. Va. ex rel. Means v. King*, 520

S.E.2d 875 (W. Va. 1999) (same applying identical state rules).  Many cases recognize that

nothing "precludes counsel from speaking to his or her client/witness during . . . recesses of

depositions."  *Stratosphere*, 182 F.R.D. at 621; *accord McKinley Infuser, Inc. v. Zdeb*, 200

F.R.D. 648, 650 (D. Colo. 2001) ("the truth finding function is adequately protected if deponents

are prohibited from conferring with their counsel while a question is pending; other

consultations, during periodic deposition breaks . . . ordinarily are appropriate").

   There is nothing improper about counsel for a 30(b)(6) witness (or any witness for

that matter) refreshing the witness' recollection <u>on the record</u>.  And with respect to conversations

during breaks, the case on which ALSTOM relies, *Hall*, explains that the rationale for the rule it

establishes is that "[t]he underlying purpose of a deposition is to find out what a witness saw,

heard, or did -- what the witness thinks."  *Hall*, 150 F.R.D. at 528.  In contrast, in a Rule 30(b)(6)

deposition, "[t]he testimony . . . represents the knowledge of the corporation, not of the

individual deponent. . . .  Thus, the duty to present and prepare a Rule 30(b)(6) designee goes

beyond matters personally known to that designee or to matters in which that designee was personally involved." *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (citations omitted), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996). Thus the *Hall* rule, rejected by many courts, is particularly inappropriate for Rule 30(b)(6) deponents who have a duty to investigate the subjects of the deposition.

> **G.     ALSTOM Is Not Entitled to Further Relief Over AES-PR's Assertion That a Litigation Consultant's E-Mail Is Work Product.**

Purely for atmospheric effect, ALSTOM recites a complaint about an assertion of privilege at a deposition for which ALSTOM already has received relief from this Court. *See* Mot. 20-21. During a deposition of AES-PR President Allan Dyer on March 9, 2006, AES-PR's counsel contended that a document introduced had been produced inadvertently and was privileged. The basis for the assertion was that the document concerned the work of a consulting firm, ENSR, that had been hired by AES-PR's outside litigation counsel for environmental matters to assist with an environmental dispute. *See* Opp. to Motion to Compel ENSR Documents (attached at Tab P). ALSTOM disagreed that the document was privileged, argued the privilege had been waived, and arranged for a telephonic hearing before Judge Sleet to resolve the issue. Judge Sleet did not address whether the document was attorney work product, but concluded that, because the document had been used in a previous deposition, any claim of work product protection had been waived. *See* Docket Minute Entry (Mar. 9, 2006) ("DECISION: Discussion regarding the parties' disputed issue on the assertion privilege of the work production doctrine. The Court ruled that the claim of work product privilege has been waived."). ALSTOM's counsel then questioned the witness concerning the document.

The foregoing reflects two facts. First, ALSTOM already has received any and all relief to which it is entitled with respect to this issue – it was permitted to question Mr. Dyer

- 23 -

concerning this document. Second, ALSTOM's counsel knows the proper method to resolve urgent discovery disputes – when it actually wanted discovery, it had no trouble contacting the Court and arranging for a hearing on the matter. Indeed, during the December 7, 2005 discovery hearing in this action, the Court instructed the parties to use just that procedure. *See* D.I. 64 (Transcript at 66) ("Call chambers. We'll remember the name of the case. We will have you back . . . ."). That ALSTOM chose not to do so with respect to the issues that form the basis for this Motion, and that it decided instead to save the issues and move for sanctions, suggests that ALSTOM's motion is not actually seeking to remedy any allegedly missing discovery.

> **H.    ALSTOM Needs No Further Relief With Respect to an Assertion Not to Answer a Question at a Deposition That Already Has Been Continued.**

ALSTOM's Motion contains a lengthy excerpt from a Rule 30(b)(6) deposition on damages issues in which AES-PR's counsel instructed the 30(b)(6) witness not to answer a question not within the scope of the topics listed in ALSTOM's notice. *See* Mot. 21-22. Whichever side is correct with respect to the instruction or the breadth of the deposition notice, and AES-PR maintains that the question clearly was outside the scope, there can be no serious dispute that ALSTOM already received all relief to which it possibly could be entitled with respect to this issue. ALSTOM's motion omits mention of the fact that this deposition took place on January 18, 2006, and that AES-PR voluntarily agreed to continue this deposition on March 9, 2006. *See* Mot. 21-22. On March 9, ALSTOM both continued the deposition of the Rule 30(b)(6) designee <u>and</u> deposed the witness, AES-PR President Allan Dyer, in his personal capacity. Accordingly, ALSTOM had ample opportunity either to ask the question of Mr. Dyer in his personal capacity on March 9 or to seek relief before the Rule 30(b)(6) deposition was continued and then, if permitted, to ask the question during the course of the continued

deposition. Accordingly, there is absolutely no reason for ALSTOM to be raise the issue with the Court at this late date.

## <u>CONCLUSION</u>

AES-PR respectfully requests that ALSTOM's motion for sanctions be denied, and that AES-PR be awarded its costs and fees in opposing the motion.

Respectfully submitted,

OF COUNSEL:
Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: April 7, 2006

/s/ John S. Spadaro
John S. Spadaro (Bar No. 3155)
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

Attorneys for AES Puerto Rico, L.P.

## CERTIFICATE OF SERVICE

On April 7, 2006, Plaintiff served Plaintiff AES Puerto Rico, L.P.'s Opposition to

ALSTOM Power Inc.'s Motion for Sanctions by hand delivery on:

> Richard R. Weir, Esq.
> Daniel W. Scialpi, Esq.
> Two Mill Road
> Suite 200
> Wilmington, Delaware 19806

And by e-mail and first class mail, postage prepaid, on:

> James E. Edwards, Esq.
> Anthony Vittoria, Esq.
> Ober, Kaler, Grimes & Shriver
> 120 East Baltimore Street
> Baltimore, Maryland 21202-1643

/s/ John S. Spadaro