## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AES PUERTO RICO, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| v. | )   Civ. No. 04-1282-JJF |
| | ) |
| ALSTOM POWER, INC., | ) |
| | ) |
| Defendant. | ) |

## OPPOSITION OF PLAINTIFF AES PUERTO RICO, L.P. TO
## ALSTOM POWER INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: April 7, 2006                    Attorneys for AES Puerto Rico, L.P.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................iv

NATURE AND STAGE OF THE PROCEEDING.............................................................1

SUMMARY OF ARGUMENT ......................................................................................2

STATEMENT OF FACTS ...........................................................................................3

    A.    The Power Plant and Its Pollution Control Equipment...................................3

    B.    The Contracts ...........................................................................................4

    C.    Concerns About Corrosion in 2000 .............................................................6

    D.    The August 2001 Initial Operations and Maintenance Manual ....................6

    E.    Difficulties During Commissioning of the Equipment ..................................7

    F.    ALSTOM Secretly Accepts Corrosion Risk in an Attempt To Make the Flawed Pollution Control Equipment Comply with the Plant's Air Permit................................................................................................9

    G.    Severe Corrosion Is Discovered.................................................................11

    H.    ALSTOM Declines To Honor Its Warranty and Passes Blame To EEC......................................................................................................11

    I.    AES-PR Is Forced To Devise a Solution to the Accelerated Corrosion on Its Own..............................................................................13

    J.    AES-PR Acted Prudently and Reasonably in Stabilizing the Equipment, Securing Replacement Collection Plates, and Developing a Method To Prevent Future Corrosion.....................................14

ARGUMENT ..........................................................................................................16

I.    NO CONDITION PRECEDENT PRECLUDES RECOVERY UNDER THE WARRANTY..............................................................................................17

    A.    The Warranty Does Not Establish Conditions Precedent .............................18

        1.    The Contract Language Does Not Make Compliance With EEC's August 2001 O&M Manual a Condition Precedent..........................................................................................19

2.    ALSTOM's Conduct in 2003-04 Confirms that Compliance with EEC's August 2001 Manual Is Not a Condition Precedent ........................................................................22

B.    There Are Factual Disputes as to Each of ALSTOM's Specific "Condition Precedent" Theories ........................................................23

C.    ALSTOM Is Equitably Estopped from Relying on Any Alleged Conditions Precedent and Has Waived Any Such Right ................28

II.    THE FEEDSTOCK UTILIZED BY AES-PR DID NOT VOID THE WARRANTY .........................................................................30

III.    ALSTOM IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY ELEMENT OF AES-PR'S DAMAGES CLAIMS ........................31

A.    The Applicable Measure of Damages Is as Set Forth in the Contract ........................................................................31

B.    ESP Collecting Plates that Last More Than Four Years Are Not a "Betterment" ........................................................32

1.    ALSTOM Confuses the Warranty Discovery and Claim Period with the Substance of Its Warranty ........................................32

2.    ALSTOM Contracted to Supply ESP Collecting Plates Built to Last at Least 25 Years ........................................33

3.    It Is Irrelevant that the Replacement ESP Collecting Plates Have Not Yet Been Installed ........................................34

C.    AES-PR Is Not Seeking to Recover Consequential Damages ........................34

1.    Whether Damages Are Consequential Damages Typically Is a Fact Question for the Jury To Decide ........................34

2.    Consequential Damages Are Damages Caused as a Consequence of the Equipment Failure ........................................35

3.    The Water Supply Changes Are Not Consequential Damages ........................................................................36

4.    The Brine Crystallizer Is a Necessary Component of AES-PR's Lowest-Cost Solution to the Corrosion Problem ........................................................................37

      D.     ALSTOM's Proportionality Argument Ignores the Plain
              Language of the Contract...............................................................38

CONCLUSION......................................................................................40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................16

*Bechtel v. Robinson*, 886 F.2d 644 (3d Cir. 1989).........................................................28

*Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79 (3d Cir. 2001) ................21

*Bristol Sav. Bank v. Silver*, 208 B.R. 100 (D. Conn. 1996).............................................22

*Brooks v. Monroe System for Bus.*, 873 F.2d 202 (8th Cir. 1989).....................................23

*Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107 (7th Cir. 1992) ....................................23

*Castle v. Cohen*, 840 F.2d 173 (3d Cir. 1988) ............................................................18

*Chatlos System, Inc. v. National Cash Register Corp.*, 670 F.2d 1304 (3d Cir. 1982) ................36

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 696 F. Supp. 57 (D. Del. 1988) .................................................................32

*Green County v. Quinlan*, 211 U.S. 582 (1909) .........................................................17, 18, 19, 22

*Hurt v. New York Life Insurance Co.*, 53 F.2d 453 (10th Cir. 1931)....................................19

*I.R.V. Merchandising Corp. v. Jay Ward Productions, Inc.*, 856 F. Supp. 168 (S.D.N.Y. 1994) ...............................................................18

*James E. Brady & Co. v. Eno*, 992 F.2d 864 (8th Cir. 1993) .........................................18

*Landtect Corp. v. State Mutual Life Assurance Co.*, 605 F.2d 75 (3d Cir. 1979) .....................17

*Long Island Lighting Co. v. IMO Industries, Inc*, 1990 U.S. Dist. LEXIS 5351 (S.D.N.Y. May 9, 1990)..............................................................39

*Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442 (S.D.N.Y. 1986) .............................................................34

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................23

*Newport Associates Development Co. v. Travelers Indemnity Co.*, 162 F.3d 789 (3d Cir. 1998) ...............................................................17

*In re Northwestern Corp.*, 313 B.R. 595 (Bankr. D. Del. 2004) .......................................21

*Pig Importation Co. v. Middle States Holding Co.*, 943 F. Supp. 392 (D. Del. 1996) .................32

*Roneker v. Kenworth Truck Co.*, 944 F. Supp. 179 (W.D.N.Y. 1996) ...........................35

*Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358 (3d Cir. 1987) .......................17

*United States ex. rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877 (S.D. Ohio 1999) ......................34

*Valhal Corp. v. Sullivan Associates, Inc.*, 44 F.3d 195 (3d Cir. 1995) ..........................17

*Weiss v. Nw. Broad., Inc.*, 140 F. Supp. 2d 336 (D. Del. 2001) ...............................19, 20

## STATE CASES

*Aeroglobal Capital Management v. Cirrus Industrial, Inc.*, 871 A.2d 428 (Del. 2005) ..............28

*Burke County Public Schs. Board of Education v. Juno Construction Corp.*, 306 S.E.2d 557 (N.C. Ct. App. 1983) .................................................................................31, 33

*Elsky v. Hearst Corp.*, 232 A.D.2d 310 (N.Y. App. Div. 1996) .....................................21

*Falcon Tankers, Inc. v. Litton Systems Inc.*, 355 A.2d 898 (Del. Super. Ct. 1976) ......................38

*Gilbert v. El Paso Co.*, 575 A.2d 1131 (Del. 1990) .......................................19

*Haft v. Haft*, 671 A.2d 413 (Del. Ch. 1995) ..........................................22

*Nassau Gallery, Inc. v. Nationwide Mutual Fire Insurance Co.*, 2003 W. 21223843 (Del. Super. Ct. Apr. 17, 2003) ...........................................................................21

*Pennington v. Rhodes*, 929 S.W.2d 169 (Ark. Ct. App. 1996) .................................31, 33

*Pepsi-Cola Bottling Co. v. Pepsico*, 297 A.2d 28 (Del. 1972) .................................28

*Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364 (N.J. 1992) ..............................39

*Stolz Realty Co. v. Paul*, 1995 WL 654152 (Del. Super. Sep. 20, 1995) ....................................18

*Wilson v. America Insurance Co.*, 209 A.2d, 902 (Del. 1965) .......................................28

*Wolf v. Globe Liquor Co.*, 103 A.2d 774 (Del. 1954) ..........................................28

*Wood River Pipeline Co. v. Wilbros Energy & Services Co.*, 738 P.2d 866 (Kan. 1987) .............36

*Worthy Brothers Pipeline Corp. v. Acierno*, 1996 WL 527347 (Del. Super. Ct. July 26, 1996), aff'd, 693 A.2d 1066 (Del. 1997)................................................................20

## FEDERAL RULES

Fed. R. Civ. P. 56(c) ....................................................................................6, 7, 16, 24, 25

## STATE STATUTES

Del. Code Ann. tit. 6, § 2-714.......................................................................................32

Del. Code Ann. tit. 6, § 2-715.......................................................................................35

Del. Code Ann. tit. 6 § 2-719.........................................................................................32

## MISCELLANEOUS

13 Samuel Williston & Richard A. Lord, <u>A Treatise on the Law of Contracts</u> (4th ed. 2004)..........................................................................................................22

Restatement (Second) of Contracts (1981)...............................................................19, 39

17A Am. Jur. 2d Contracts (2004).............................................................................18, 21

## NATURE AND STAGE OF THE PROCEEDING

This dispute concerns two warranty claims that AES Puerto Rico, L.P. ("AES-PR") submitted to ALSTOM Power, Inc. ("ALSTOM").  ALSTOM seeks partial summary judgment with respect to one of those claims, concerning the corrosion warranty for the plant's pollution control equipment.

The plant, which began commercial operation on November 28, 2002, was delivered months behind schedule and its pollution control equipment suffered significant performance problems from initial operation.  In November 2003, during a routine shut-down of the plant for maintenance, AES-PR discovered severe accelerated corrosion in the pollution control equipment.  The corrosion was so serious that it created "a potential to shut down the plant at which time it would revert to the banks" that provided the construction financing. B.263-66, 285.  AES-PR urgently needed to make repairs and arrest further accelerated corrosion of the equipment, and it submitted a claim under its warranty to ALSTOM.

ALSTOM's warranty specifically covers accelerated corrosion, so AES-PR requested that ALSTOM replace the corroded components and eliminate the source of the corrosion.  ALSTOM first responded to AES-PR's warranty claim by attempting to deflect responsibility to its own subcontractor for the equipment, Environmental Elements Corporation ("EEC").  When EEC refused to pay, ALSTOM then denied responsibility and asserted that the accelerated corrosion was caused by AES-PR's operator error.  ALSTOM's efforts to shift responsibility from itself – either to its subcontractor or its customer – are meritless.

AES-PR filed this action in September 2004, and ALSTOM answered the complaint on November 5, 2004 by denying liability.  The parties now have completed fact discovery and exchanged expert disclosures.  Trial is scheduled to begin May 22, 2006.

## SUMMARY OF ARGUMENT

This case is not appropriate for summary judgment. All of the critical facts are hotly contested by the parties. Contrary to ALSTOM's assertions: the procedures that ALSTOM claims governed AES-PR's operation of the pollution control equipment, in fact, did not; the accelerated corrosion of the equipment was caused not by AES-PR's operation of the equipment, but by ALSTOM's deficient design; AES-PR operated the equipment as directed by ALSTOM; AES-PR used appropriate feedstock to fuel the plant; and the remedy AES-PR developed to prevent future corrosion – with no help from ALSTOM, because ALSTOM had abandoned the warranty – was entirely reasonable and appropriate.

The irony here is that AES-PR's description of the facts is substantially similar to ALSTOM's before ALSTOM was sued. Shortly after suit was filed, however, ALSTOM invented a new series of excuses not to honor its warranty – including its conditions precedent and feedstock theories. It is ALSTOM's new excuses that create the multitude of factual disputes, both with AES-PR's position and with ALSTOM's pre-litigation position.

ALSTOM's legal arguments do not provide a basis for summary judgment either. ALSTOM's legal argument on liability is that its corrosion warranty is void because AES-PR followed instructions of ALSTOM's commissioning personnel rather than a preliminary version of a subcontractor's Operations and Maintenance ("O&M") manual that never was updated and that contained instructions that did not work. Not surprisingly, neither the contract nor the law required AES-PR to follow those obsolete and faulty instructions. Moreover, compliance with the preliminary O&M manual is not a condition precedent to enforcement of the corrosion warranty, both because the language of the contract does not establish conditions precedent and the preliminary O&M manual is not incorporated into the contract. And, even if the manual's

instructions were conditions precedent, ALSTOM is equitably estopped from relying on them because it directed AES-PR to operate the equipment contrary to those instructions.

ALSTOM's arguments regarding damages are equally meritless. First, ALSTOM makes the absurd – and textually wrong – argument that, although ALSTOM was required to supply equipment that would last for 25 years, equipment that fails during the warranty period need only be patched so that it will not completely stop functioning during the first four years of operation. Second, ALSTOM labels as "consequential damages" the cost of re-engineering the plant's equipment to prevent continued accelerated corrosion, even though the law and the factual record are to the contrary. Third, ALSTOM's proportionality argument ignores the plain language of the contract and understates the contract price by $105 million.

## STATEMENT OF FACTS

**A.     The Power Plant and Its Pollution Control Equipment.**

This lawsuit concerns a power plant designed to be "one of the cleanest coal power plants in the world." B.428 (Stone Dep. 23:22-23). The plant, a 454-megawatt coal-fired power plant in Guayama, Puerto Rico, includes two units, each of which contains specially-designed pollution control equipment. The equipment includes a circulating dry scrubber ("CDS"), which removes sulfur dioxide from the flue gas (smoke from the burning of coal). As part of the CDS process, a fine water mist is sprayed into the device, which lowers the temperature of the flue gas. The CDS is followed by an electrostatic precipitator ("ESP"), which contains a series of metal plates that, through the use of electrical charges, remove fly ash (particulates in the flue gas) before the cleaned flue gas exits the plant's smoke stack.

Among the pollution limits with which the plant must comply is a limit on "opacity" – a measure of the visibility of the flue gas exiting the plant. The better the

performance of the ESP in removing fly ash from the flue gas, the lower the opacity. As

explained in detail below, the operating temperature of the CDS affects the ability of the ESP to

control opacity. *See, e.g.*, B.402, 405 (Sostre Dep. 163:3-7, 212:12-16). The plant's permits also

prohibit the facility from discharging water – it is a "zero discharge" plant and must reuse or

evaporate all waste water produced by the plant's operations. B.429 (Stone Dep. 24:8). As part

of its eco-friendly design, the plant was to use high-chloride water from a nearby sewage

treatment facility as the water source for, among other components, the CDS spray water.

B.229-30 (T. Jarvis Dep. 29:12-30:12); B.530, 537; A.175.

**B.      The Contracts.**

        In April 1996, AES-PR entered into a contract with Duke/Fluor Daniel Caribbean,

S.E. ("D/FD") for construction of the power plant. *See* A.1. On February 24, 1998, D/FD

subcontracted with ALSTOM[1] to supply and erect the boilers and related equipment, including

the CDS and ESP (the "Contract").[2] The Contract Price is $119 million. B.41 (§ 1.1).[3]

        The Contract incorporates by reference a Design Specification for the ESP, B.8

(§ 2.1.1.3). The Specification states in relevant part:

> The ESP is required to operate for a minimum of twenty-five (25) years
> with minimum downtime for periodic inspections and maintenance, and at
> good reliability levels in comparison to other similar units in electric
> utility service.

---

[1] The Contract lists "Combustion Engineering" as a party. Combustion Engineering is now part
of ALSTOM. *See* B.302 (Rothe Dep. 20:7-9).

[2] In a misleading attempt to minimize its responsibility, ALSTOM refers to this Contract as a
"Purchase Order." *E.g.* Mot. 3-6. But the document itself is labeled "CONTRACT," B.1, and it
is not on a short, standard form purchase order. Moreover, it is more than an order for the
purchase of equipment. *E.g.* B.7 ("Work" include "all design, manuals, training, drawings,
documentation, manufacture, supply, delivery, erection, startup, including supervision.").

[3] ALSTOM's appendix includes excerpts from a version of the Contract, but it omits key
portions. AES-PR's Appendix contains all relevant excerpts from the Contract at B.1-81.

B.508, 536.[4]  Thus, the Contract required ALSTOM to design, manufacture, and deliver ESPs

that had a minimum useful life of 25 years.

The Contract contains a warranty for the units' ESPs against the effects of

excessive corrosion.  It provides:

> The Contractor shall warrant for a period of twenty-four (24) months from
> performance acceptance the . . . precipitators[5] . . . against the
> consequences of accelerated corrosion outside of the industry standards
> for power-generated facilities with dry scrubbing systems to the extent that
> the corrosion has materially affected or is reasonably expected to
> materially affect in the next two (2) years (i) the structural integrity of the
> Equipment [or] any portion thereof or (ii) th[e] ability of the Equipment to
> mechanically perform.  Contractor's corrosion guarantee is conditioned
> upon operation and maintenance of the system in accordance with
> Contractor's Operation and Maintenance manuals, Owner's specified
> operating parameters, and typical system operation at baseload and
> specified capacity factors.

B.50-51 (§ 1.6).  This language sets forth a 24-month period for submitting warranty claims and

explains that the warranty covers only accelerated corrosion that is so severe that it is likely to

cause structural or mechanical failure of the equipment within two years.

The contract permits D/FD to "assign its rights under this warranty . . . to [AES-

PR]," B.51 (§ 1.7).  ALSTOM does not dispute for purposes of its Motion that D/FD did so on

October 31, 2003.  See D.I. 1 (Compl. ¶ 12).  The Contract forbids ALSTOM from assigning its

obligations under the warranty absent AES-PR's consent, B.72 (§ 38), which never happened.

---

[4]  Thus, it simply is not true, as ALSTOM claims, that the ESP components are "by the very
nature of the environment in which they operate, subject to corrosion" and therefore expected not
to last more than four years.  Mot. 4; accord Mot. 5 (claiming warranty limited to 4 years
"because corrosion is to be expected").  Both the Design Specification incorporated by reference
into the Contract and the deposition testimony are the opposite.  See, e.g., B.432 (Stone Dep.
167:21-22) (equipment "was designed for a 25-year design life").

[5]  "Precipitator" is another term for the ESP.

On March 30, 1999, ALSTOM issued a $14.5 million "Purchase Order" to EEC for EEC to "design, manufacture, and supply" – but not construct – the plant's ESPs and related pollution-control equipment. *See* B.325, 304. Construction was left to ALSTOM. ALSTOM's Purchase Order to EEC contains an accelerated corrosion warranty similar to the accelerated corrosion warranty in ALSTOM's Contract with D/FD. *See* B.335, 304.

## C.     Concerns About Corrosion in 2000.

ALSTOM's Statement of Pertinent Facts discusses minutes of meetings in January and February 2000 regarding concerns about corrosion. *E.g.* Mot. 7-8. The notes of those meetings reflect preliminary thoughts during the project design phase – not final operating or maintenance procedures – and ALSTOM makes no argument that the meeting discussions were incorporated into the Contract. Moreover, the factual record shows that these meetings concerned a type of corrosion not at issue in this case. AES-PR's witnesses testified that these discussions concerned corrosion of the CDS vessel, an entirely different potential problem. *See* B.431 (Stone Dep. p. 135:6-13); McParland Dep. (transcript forthcoming).

## D.     The August 2001 Initial Operations and Maintenance Manual.

In August 2001, EEC, ALSTOM's subcontractor, issued a preliminary Operations and Maintenance ("O&M") Manual. ALSTOM's Statement of Pertinent Facts, without any citation or factual support, refers to this manual as the "final version" of the O&M Manual. Mot. 9 & 10 n.19.[6] AES-PR disputes that the Manual it cites is the "final version." ALSTOM Commissioning Engineer Thomas Coleman testified at deposition that "[w]hen the equipment actually gets in operation, the [] procedures [from the pre-commissioning versions of the O&M

---

[6]   ALSTOM's brief, at footnote 19, cites an excerpt from the Manual, but it submits no affidavit or deposition testimony stating that the excerpt is from a <u>final</u> Manual. *See* Fed. R. Civ. P. 56(c) (Court to consider "the pleadings, depositions, answers to interrogatories, and admissions of file, together with [any] affidavits"). Indeed, the factual record is exactly to the contrary.

manuals] need to be changed . . . ."  B.176 (Dep. 119:22-24); *accord* B.178 (Dep. 121:1)

(operating procedures "get[] superseded" during commissioning).  Likewise, ALSTOM Project

Manager William Jarvis testified that, even as late as October 8, 2002, he "expect[ed] . . . that

EEC would be issuing revised operating procedures."  B.244 (Dep. 46:12-15).  Indeed, EEC

issued at least <u>nine</u> such revisions.  B.242 (Jarvis Dep. 42:16-21); B.388, 316 ("9 <u>formal</u>

revisions to the operating procedures" (emphasis added)).  ALSTOM expected AES-PR to

follow the revised procedures.  B.243 (Jarvis Dep. 45:3-6).  Mr. Jarvis, ALSTOM's highest

ranking official on this project, admits that he never asked EEC to update the August 2001

preliminary version of its O&M manual to incorporate these revised procedures.  *Id.* (45:11-14).

**E.      Difficulties During Commissioning of the Equipment.**

        Before turning over the power plant to AES-PR, ALSTOM was required to

provide "technical field support and consultation services during performance testing, initial

operation of all equipment furnished, and training of Owner's operating and maintenance

personnel."  *See* B.8 (§ 1.2).  Its services included assistance during "start-up of the plant to

correct any deficiencies."  B.9 (§ 3.1.1.3); *see also* B.24-26.  The process of starting up and

adjusting the equipment is known as "commissioning."

        During commissioning, ALSTOM (and EEC on its behalf) instructed AES-PR's

operators, who were then operating the plant's controls, in the equipment's proper operation.

B.245-46 (W. Jarvis Dep. 49:17-50:8) (plant operating parameters set by EEC during this

period); B.444 (Tomlin Dep. 46:11-20); B.169-70 (Coleman Dep. 16:20-17:18).  Commissioning

of any plant inevitably involves operating procedure modifications.  *See* B.176-77 (Coleman

Dep. 119:22-120:7) ("When the equipment actually gets in operation, these procedures need to

be changed given conditions. . . .  I mean, equipment, you design something to operate or you

have expectation of things to operate at a certain place. But when you start up and you operate, that may change.").

      As explained above, during commissioning, which continued through November 28, 2002, ALSTOM, through EEC, issued at least nine formal sets of revised operating procedures. The modifications required during commissioning were significantly more extensive than normal or anticipated. ALSTOM complained to EEC that "[t]his commissioning process had equated more to R&D than actual commissioning." B.367, 307. In stark contrast to its litigation position now that the August 2001 manual is a final document, at the time ALSTOM complained that EEC was "revis[ing] the operation procedures continuously up until the last day [EEC was] on site" in November 2002. B.378, 310-11.

      During commissioning, ALSTOM and EEC demonstrated by their actions that EEC's August 2001 O&M Manual did not contain the operative instructions. For example, EEC, on ALSTOM's behalf, adopted each of the following practices during commissioning that was contrary to EEC's August 2001 preliminary O&M Manual:

- The August 2001 Manual contains a maintenance recommendation that the "wet bulb" temperature be measured, daily or each shift, at "the outlet of the CDS," A.79-80. EEC's chief commissioning engineer testified that between August and November 2002, however, EEC checked the wet bulb only "a half dozen, maybe ten times," and that he instructed AES-PR to check it at a different location – the CDS inlet. B.451 (Dep. 110:10-11); 460 (Dep. 229:5-7).

- ALSTOM emphasizes that the August 2001 Manual calls for checking CDS water chloride levels daily. Mot. 22; but see A.78-79 (inconsistent provision recommending that levels are to be checked weekly). ALSTOM's commissioning staff, however, did not check water chloride levels daily or weekly – Mr. Jarvis testified he was aware of only one test during the five months of commissioning, and EEC's Van Hooser was aware of no tests at all. B.253 (W. Jarvis Dep. 81:3-6); B.457 (Van Hooser Dep. 210:19-20).

- The August 2001 O&M Manual included an instruction to run at a CDS outlet temperature of 176 degrees with "Maximum Chloride" water and 156 degrees with "Low Chloride" water, A.69. During commissioning, EEC issued revised

procedures directing AES-PR to operate at an outlet temperature of 155 degrees regardless of the water chloride content. B.446 (Van Hooser Dep. 72:10-19). EEC then issued revised instructions to set the temperature to "the higher of 152 degrees or 30 degree approach to saturation," which is below even the "Low Chloride" level specified in the August 2001 O&M manual. B.463, 456.

Other of ALSTOM's and EEC's commissioning procedures similarly diverged from the practices in EEC's August 2001 preliminary O&M manual.

**F.     ALSTOM Secretly Accepts Corrosion Risk in an Attempt To Make the Flawed Pollution Control Equipment Comply with the Plant's Air Permit.**

For more than a year before the accelerated corrosion in AES-PR's pollution control equipment was discovered, ALSTOM carefully documented that its subcontractor EEC had supplied "defective" equipment that could not produce emissions levels that complied with AES-PR's air emission permits. B.387, 314. Using the high chloride water called for by the plant's design, the ESP could not sufficiently control opacity when running at the high temperature specified in the August 2001 O&M Manual. *See* B.405 (Sostre Dep. 212:13-16) ("AES was instructed [during commissioning] to operate with a temperature of 152 degrees . . . due [to] that you couldn't control the opacity at a higher temperature."); B. 401 (Sostre Dep. 114:7-9); B.414 (Stinson Dep. 175:14-20).

To enable the pollution control equipment to comply with the air permits notwithstanding the defects, ALSTOM, through EEC, instructed AES-PR to lower the CDS outlet temperature from 176 degrees to the higher of 152 degrees or 30 degree approach to saturation, regardless of chloride content of the water. *See* B.463, 452-53; *accord* B.283, 254, 312 (CDS equipment operating "some 15 degrees Fahrenheit below the design value"). ALSTOM did so notwithstanding that operation at the higher temperature with high chloride water was designed to prevent corrosion. ALSTOM's change to the procedure was made in an attempt to control opacity because running at a lower outlet temperature helps lower the level of

- 9 -

particulates leaving the plant's smoke stack.  B.458-59 (Van Hooser Dep. 211:19-212:9); B.212, 198 ("It seems that the ESP have difficult [time] to keep up when the ash load is increased and till the water spray has reduced the temperature down to 150F that is the normal gas temperature with CDS in service."); B.531, 237-38 (operating the equipment with "outlet temperature lower than design [enabled the equipment] to satisfy [the] opacity permit" governing air emissions)[7]; accord B.174 (Coleman Dep. 85:4-7) (as of March 2003, ALSTOM commissioning engineer believed lowering outlet temperature "may help").

ALSTOM's own documents reflect that it knew that lowering the CDS outlet temperature created a corrosion risk to the ESPs.  Beginning in Fall 2002, ALSTOM, in private communications not shared with AES-PR, documented that risk.  For example, ALSTOM's in-house pollution control expert wrote in a private memo to others at ALSTOM that "For long term there is a risk for corrosion by operating the CDS at 150ºF."  B.219, 204.  In December 2002, before any corrosion had been discovered, EEC sent ALSTOM a notice that EEC's corrosion warranty in the Purchase Order was "void" based on alleged construction errors by ALSTOM.  B.250 (W. Jarvis Dep. 66:1-4).  ALSTOM responded to EEC:

> EEC's tactic is a blatantly obvious attempt to position themselves to avoid the known consequences of the high potential for corrosion due to operation of the CDS at lower than design outlet temperature.  In accordance with the parameters established by EEC, the CDS continues to operate with an outlet temperature some 15 degrees Fahrenheit below the design value.  EEC advised during the design phase that control of this temperature was critical to corrosion prevention.

B.386, 310-11.

---

[7]  During his deposition, Mr. Jarvis said he "[did]n't recall this document," but he admitted that the document lists him as its author and that it came from the hard drive of his computer.  B.237-38 (W. Jarvis 30(b)(6) Dep. 17:18-18:16).

ALSTOM and EEC accepted the known corrosion risk because they had no other choice – the equipment could not comply with the environmental permits when operated with high-chloride water at higher temperatures. Faced with defective equipment that could not satisfy the plant's air permits, ALSTOM modified the operating procedures by lowering the CDS outlet temperature. With respect to corrosion, ALSTOM simply hoped for the best.

**G.      Severe Corrosion Is Discovered.**

During a routine maintenance outage at one of the plant's two units in November 2003, AES-PR discovered "extensive, severe, accelerated corrosion" in the ESP. *See* D.I. 1 (Compl. ¶ 18); B.82 (Dyer Decl. ¶ 2). When it opened the second unit's ESP in January 2004, it discovered "similar" accelerated corrosion. *Id.* The damage found in the November 2003 outage "was the worst case of corrosion [ALSTOM ESP expert Karl Hognefelt] had seen in his 25+ year career." B.285, 263. Thus, the specific harm ALSTOM had anticipated – that running at a lower-than-design CDS outlet temperature would lead to corrosion – in fact had come to pass.

ALSTOM now posits several new possible theories as to the cause of the corrosion. AES-PR disputes each and every one of them. AES-PR's expert has concluded that the cause of the corrosion was the exact risk that ALSTOM recognized at the time it was attempting to control opacity – running with high chloride water at too low a CDS outlet temperature. B.92-94. Indeed, as ALSTOM now admits, its in-house expert, Mr. Hognefelt, reached that same conclusion: corrosion "likely was related to operating temperature and . . . high chloride content in the CDS water would increase the risk for corrosion." Mot. 13.

**H.      ALSTOM Declines To Honor Its Warranty and Passes Blame to EEC.**

Immediately after discovery of the accelerated corrosion in November 2003, ALSTOM agreed that repair of the equipment was covered by warranty, but it insisted that the

- 11 -

claim should be paid by its subcontractor, EEC, based on the substantially identical corrosion warranty in the contract between ALSTOM and EEC.  B.284, 258-59; B.395, 322; B.82 (Dyer Decl. ¶ 3).  ALSTOM's Mr. Jarvis admitted at deposition that he (incorrectly) views the corrosion warranty as EEC's responsibility because ALSTOM "immediate[ly] pass[ed] through" its obligations under the Contract to EEC.  B.248, 260 (W. Jarvis Dep. 64:8-23, 152:12-15). *But see* B.72 (Contract § 38.0) (forbidding ALSTOM to assign its obligations absent consent).  AES-PR therefore disputes ALSTOM's factual assertion that it assigned an ALSTOM engineer "to determine whether [the corrosion] was covered by ALSTOM's Warranty."  *See* Mot. 13. Although Mr. Jarvis's affidavit states otherwise, *see* A.2 (¶ 6), his deposition is consistent with his contemporaneous explanation of ALSTOM's rationale for denying the warranty claim:

> ALSTOM diligently followed the terms under our contract with DFD and accordingly passed the contract warranty terms onto EEC . . . .  As such, any warranty claim, to the extent it is a valid claim, under the contract warranty terms, is the responsibility of Environmental Elements Corp.

B.294, 274 (W. Jarvis Dep. 221:7-12); *accord* B.82 (Dyer Decl. ¶ 3).  Thus, at most, Mr. Jarvis's affidavit creates a factual dispute as to whether ALSTOM independently was investigating the validity of AES-PR's warranty claim prior to commencement of this lawsuit.

Consistent with ALSTOM's view that it had passed through the warranty to EEC, on July 30, 2004 ALSTOM forwarded to AES-PR a report on the warranty claim from a consultant for EEC's insurance company, Liberty Mutual.  *See* B.297, 277.  The two-page report denied ALSTOM's warranty claim on the theory that "the boiler operation has in the past been operated outside of the parameters which constitute the warranty on corrosion . . . during testing and early operation" of the plant.  B.298.  Although ALSTOM informed AES-PR of the consultant's conclusion, internally it disputed those results.  B.276 (W. Jarvis Dep. 250:7-12) ("ALSTOM has reviewed [the] report dated July 2, 2004 and finds that it does not provide an

adequate basis for the rejection of the ESP corrosion warranty claim."); B.210 (Hognefelt Dep. 269:18-19) ("I don't agree with what he's saying here.").

I.    **AES-PR Is Forced To Devise a Solution to the Accelerated Corrosion on Its Own.**

ALSTOM has asserted as fact that it spent all of 2004 evaluating AES-PR's warranty claim. It does so to buttress its legal argument that AES-PR was prohibited from devising a remedy to the corrosion problem without the consent of ALSTOM on the appropriate remedy. *See* Mot. 13-15 (AES-PR proceeded "unilaterally"). AES-PR disputes those factual assertions. ALSTOM's position in November 2003 was <u>not</u> that it was considering AES-PR's claim or that there was a dispute about the appropriate remedy. ALSTOM was willing to seek reimbursement from EEC for AES-PR, but it viewed the warranty as EEC's responsibility. And it did not take any action at all to remedy the problem. B.435 (Stone Dep. 192:7-9) ("Alstom just passed along their obligations to their subcontractor, that wasn't replying with any solutions,"); B.436-37 (Stone Dep. 196:25-97:2). Moreover, the Contract's warranty provides that, if ALSTOM "shall fail to promptly and adequately correct such defects, . . . Owner shall have the right . . . to correct or to have such defects corrected for the account of" ALSTOM. B.50 (Contract § 1.4). With no assistance from ALSTOM, AES-PR was forced to take immediate action to devise its own solution to the accelerated corrosion – corrosion that was so extreme that it had the "potential to shut down the plant." B.285, 263; B.83 (Dyer Decl. ¶ 5).

Notwithstanding ALSTOM's refusal to honor its warranty obligation, AES-PR continued to request ALSTOM's technical advice on the corrosion problem. But by March 2004, some four months after the accelerated corrosion was discovered, ALSTOM still had not offered a solution. After AES-PR complained to ALSTOM, ALSTOM replied by e-mail:

> We can understand AES' concern and frustration with this equipment. . . .
> [ALSTOM] lack[s] specific experience with the [equipment] supplied by
> EEC and/or the AES/PR water cycle design.

*See* B.287, 267.  ALSTOM sent its first corrosion analysis to AES-PR on July 2, 2004, over

seven months after the corrosion was discovered, and ALSTOM claimed even after that analysis

to be continuing to investigate.  *See* B.278-79 (W. Jarvis Dep.  282:25-283:4).

**J.      AES-PR Acted Prudently and Reasonably in Stabilizing the Equipment, Securing
         Replacement Collection Plates, and Developing a Method To Prevent Future
         Corrosion.**

ALSTOM repeatedly highlights that AES-PR's damages today are higher than

estimated upon discovery of the corrosion.  The increased costs reflect that AES-PR, abandoned

by the supplier of its pollution control equipment, was forced to develop on its own a method to

prevent future corrosion.  *See* B.438 (Stone Dep. 201:18-22) ("ALSTOM was unable to provide

any solutions to our corrosion problem, basically non-existent to providing solutions . . . .

[S]ince we couldn't get any input from ALSTOM, and we had a plant to run," AES-PR

developed its own solution).  In the process of resolving the problem ALSTOM abandoned,

AES-PR first tried the lowest cost solutions and only when they proved insufficient did it

undertake more costly remedies.  AES-PR's damages claims are as follows:

1.      <u>Stabilization and replacement of the precipitator plates</u>.  The accelerated corrosion

of the ESP collecting plates was so severe that the structural integrity of the equipment was

compromised.  Therefore, immediately after discovery of the corrosion, AES-PR incurred costs

to stabilize the remaining plates.  B.182-83, 185 (Dyer Jan. 18 Dep. 79:15-80:3, 99:6-10).  This

stabilization was intended to "allow [the plant] to run" for a "short term" until the corroded

collecting plates could be replaced.  B.183 (Dyer Jan. 18 Dep. 80:2); *accord* B.185 (Dyer Jan. 18

- 14 -

Dep. 99-100:17-18) ("the stabilization was never intended to restore the integrity of the precipitator"). That and additional stabilization work cost approximately $593,000. B.467.

AES-PR has purchased replacement ESP collecting plates and related equipment for Unit 2 and anticipates the need to do so for Unit 1. The total actual and estimated cost for purchase and installation of the plates is from $4.9 million to $6.7 million. B.467; B.147.

In January 2004, AES-PR determined that the root cause of the corrosion was the decision by ALSTOM and EEC to run the pollution control equipment at too low a CDS outlet temperature with high chloride water. AES-PR discovered that, by removing chlorides from the CDS spray water, the pollution control equipment could comply with its air permit even when running at higher temperatures. B.414 (Stinson Dep. 175:4-20). Accordingly, it made temporary and then permanent changes to its water system to purify its water.

AES-PR's emergency changes to its water supplies greatly slowed the rate of further corrosion to its damaged ESP plates. That, and subsequent modifications to its water treatment system discussed below, have slowed the accelerated corrosion sufficiently that AES-PR now estimates it can delay installation of replacement ESP plates for up to three more years. B.187-89 (Dyer Jan. 18 Dep. 154:2-6, 162:25-163:4).

2.    Modifications to remove chlorides from the water. The permanent modification to the water treatment system to reduce the chlorides in the CDS spray water, and thereby stop the corrosion, is installation of a "reverse osmosis" system. B.543. This new water treatment system has prevented further corrosion. B.433 (Stone Dep. 182:9-11). The procurement cost for the system was $1.8 million, and the net present value of the operating costs is $877,000. B.466.

A by-product of the reverse osmosis system is brine (water with high concentrations of chlorides and other impurities) that, because the plant is a zero-discharge

facility, cannot be disposed of as waste water. B.83 (Dyer Decl. ¶ 6). Immediately after installation of the new reverse osmosis system, the plant attempted to evaporate the water in this brine on-site as a method to minimize costs, knowing at the time that it might be necessary to install a brine crystallizer later. B.83 (Dyer Decl. ¶ 6); B.232-33 (T. Jarvis Dep. 120:20-121:5). Because it could not successfully evaporate all of the brine water, AES-PR was forced to take the next step – contracting to purchase a crystallizer to turn the brine into solid salt for disposal (and adopting an interim method to dispose of the brine during crystallizer construction). *See* B.147; B. 544; B.83-84 (Dyer Decl. ¶¶ 7-8). That solution costs approximately $31.6 million. B.466.

      ALSTOM's Statement of Pertinent Facts contends that these efforts are needed to remediate problems with AES-PR's reverse osmosis system, Mot. 19-20. AES-PR disputes ALSTOM's assertion. The reverse osmosis system was only installed in the first place to purify the water to prevent the accelerated corrosion. Moreover, the factual record shows that AES-PR first attempted a lower cost solution, the reverse osmosis system without a crystallizer (although it had "doubts" as to whether that would work); it decided to install the crystallizer only after determining that the lower cost approach prevented the plant from complying with its zero-liquid-discharge obligation. B.194 (Dyer Mar. 9 Dep. 118:4); B.83-84 (Dyer Decl. ¶¶ 6-9). AES-PR's expert has reported that the crystallizer is a necessary component of the least-cost solution to prevent further ESP corrosion. *See* B.147; *accord* B.544; B. 84 (Dyer Decl ¶ 9).

## <u>ARGUMENT</u>

      Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must review all of the evidence and

construe all inferences in the light most favorable to the non-moving party. *Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 200 (3d Cir. 1995).

In a breach of contract case, summary judgment is warranted only where "the contract is unambiguous." *Newport Assocs. Dev. Co. v. Travelers Indem. Co.,* 162 F.3d 789, 791 (3d Cir. 1998). If the nonmoving party presents a reasonable alternative reading of the contract, then there is a question of fact for trial as to the meaning of the contract. *See Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir. 1987); *Landtect Corp. v. State Mut. Life Assurance Co.,* 605 F.2d 75, 80 (3d Cir. 1979).

## I. NO CONDITION PRECEDENT PRECLUDES RECOVERY UNDER THE WARRANTY.

In a creative attempt to avoid having to prove that any alleged operator error actually <u>caused</u> the corrosion to the ESPs, ALSTOM tries to convert a normal contract term using the words "conditioned upon," B.51 (§ 1.6), into legal "conditions precedent." The significance of ALSTOM's attempt to qualify this language as a "condition precedent" is that, if AES-PR fails to satisfy a legal "condition precedent," then essentially there is no warranty for AES-PR to enforce, regardless of whether its failure to satisfy the condition precedent had any connection to the accelerated corrosion at issue.

The United States Supreme Court has explained that examination of a contract in its entirety usually "makes it [] manifest that which is called a condition is really but a covenant or agreement, to be performed independently of the counter obligation." *Green County v. Quinlan,* 211 U.S. 582, 594 (1909). That is the case here. The only reasonable interpretation of the Contract is that the "conditioned upon" language establishes legal "covenants" or "obligations" of AES-PR, not "conditions precedent." Therefore, ALSTOM is not excused from honoring its warranty unless it can prove that AES-PR's purported failure to satisfy its covenant

- 17 -

or obligation actually <u>caused</u> the accelerated corrosion. And ALSTOM does not attempt to argue that the undisputed facts show that AES-PR's actions <u>caused</u> the accelerated corrosion here. In addition, factual disputes preclude summary judgment as to the six specific "conditions precedent" alleged by ALSTOM.

Moreover, even if ALSTOM were correct that the warranty includes conditions precedent (which it does not), it is estopped from asserting the conditions precedent. ALSTOM itself directed AES-PR to diverge from the instructions in the August 2001 preliminary EEC O&M manual. Having done so – particularly while knowing that doing so created a risk of corrosion – ALSTOM cannot then penalize AES-PR for following its directions.

### A.     The Warranty Does Not Establish Conditions Precedent.

Under the law of Delaware, as elsewhere, conditions precedent are disfavored. *See, e.g.*, 17A Am. Jur. 2d Contracts § 460 ("Conditions precedent are not favored and the courts will not construe stipulations to be such unless required to do so by plain, unambiguous language."); *I.R.V. Merchandising Corp. v. Jay Ward Productions, Inc.*, 856 F. Supp. 168, 174 (S.D.N.Y. 1994) ("Where a contract term is ambiguous, New York law disfavors construing the term as creating a condition precedent."); *Stolz Realty Co. v. Paul*, 1995 WL 654152, at *9 (Del. Super. Sep. 20, 1995). Courts are not to construe provisions as conditions precedent unless the parties' intent is crystal clear. *See Castle v. Cohen*, 840 F.2d 173, 176 (3d Cir. 1988); *see also James E. Brady & Co. v. Eno*, 992 F.2d 864, 869 (8th Cir. 1993). Notwithstanding this authority, ALSTOM insists that the Contract contains conditions precedent based solely on the two-word phrase "conditioned upon" in the warranty. *See* Mot. 21. The United States Supreme Court in *Green County* ruled that a virtually identical phrase, "upon the condition that," did <u>not</u> create a condition precedent based on a full reading of the Contract. 211 U.S. at 584.

- 18 -

1.    The Contract Language Does Not Make Compliance
       With EEC's August 2001 O&M Manual a Condition Precedent.

Examining the entire Contract "makes it manifest that" there is no condition

precedent here and that ALSTOM's interpretation is implausible. *Green County*, 211 U.S. at

594. "[A] condition precedent is an act or event, other than a lapse of time, which, unless the

condition is excused, must occur before a duty to perform a promise in the agreement arises."

*Weiss v. Nw. Broad., Inc.*, 140 F. Supp. 2d 336, 343 (D. Del. 2001); *see also Gilbert v. El Paso*

*Co.*, 575 A.2d 1131, 1142 (Del. 1990) ("offeror may condition the performance contemplated in

his offer upon the occurrence or non-occurrence of specific events"); Restatement (Second) of

Contracts § 224 (1981) (a "condition is an event"). Thus, to be a condition precedent, the

language in the Contract must make ALSTOM's duties under the contract contingent upon the

occurrence of a specific act or event. *Gilbert*, 575 A.2d 1142 (emphasis added). *See also Hurt v.*

*New York Life Ins. Co.*, 53 F.2d 453, 454 (10th Cir. 1931).

There are multiple reasons why the Contract language stating that the warranty is

"conditioned upon operation and maintenance of the system in accordance with Contractor's

Operation and Maintenance manuals," B.51 (§ 1.6), does not establish a legal condition

precedent requiring compliance with EEC's August 2001 O&M Manual, any one of which is

dispositive.

First, the manual to which ALSTOM contends AES-PR was required to adhere as

a condition precedent to enforcement of the warranty, in fact, is not incorporated by reference

into the Contract. The Contract refers to "Contractor's" O&M Manuals. *See* B.50-51(§ 1.6). It

then defines "Contractor" as "Combustion Engineering, Inc.," which now is part of ALSTOM.

B.302 (Rothe Dep. 20: 7-9). That definition of "Contractor" does not include EEC. Thus, the

EEC O&M Manual is not even a "Contractor's Operation and Maintenance manual[]"

- 19 -

incorporated into the contract. *See* B.51. At a minimum, there is a factual dispute whether the EEC Manual fits the definition of a "Contractor's" manual.[8]

Second, the August 2001 version of the EEC Manual is not final. *See, e.g.*, B.243 (W. Jarvis Dep. 45:11-14) (conceding EEC Manual not updated "to include the revised procedures"); *see* Statement of Facts § D (listing additional evidence). EEC subsequently revised the instructions in the manual both in writing, *see, e.g.*, B.463 (instruction for outlet temperature), and in its practices during commissioning, *see* Statement of Facts § D. ALSTOM itself complained bitterly to EEC about the initial configuration of the pollution control equipment and reported to EEC that "Start-up and normal operating procedures for the CDS and ESP have been modified countless times without attaining consistent reliable operation." B.371, 308. The Contract does not require AES-PR to follow non-final manuals. At a minimum, there is a factual dispute as to whether the Manual is final. *See* Statement of Facts §§ D-F.

Third, EEC's August 2001 manual contains an extensive set of literally thousands of specific operating and maintenance parameters with complex and intricate variables, *e.g.* B.247 (W. Jarvis Dep. 54:14-19) (specifications for setting outlet temperature "complex"), not a specific and finite act or event that is required to establish a condition precedent. The requirement that AES-PR comply with each and every one of the thousands of instructions is not the sort of <u>clear</u> and <u>specific</u> act or event, such as payment of money, *Worthy Bros. Pipeline Corp. v. Acierno*, 1996 WL 527347, at *1 (Del. Super. Ct. July 26, 1996), aff'd, 693 A.2d 1066 (Del. 1997), or execution of a contract, *Weiss*, 140 F. Supp. 2d 344, that is required in order to establish a condition precedent. To interpret the Contract as ALSTOM suggests would be

---

[8]  In its motion, ALSTOM alters the language of the warranty to remove reference to "<u>Contractor's</u>" manuals. *See* Mot. 21 ("corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with [the] Operation and Maintenance manuals . . . ."

commercially unreasonable because, by establishing such myriad, complex conditions precedent, it would allow ALSTOM to argue in virtually every case that ALSTOM should be excused from its warranty obligations as a result of some technical noncompliance with an operating instruction, even if that noncompliance had no connection whatsoever to the damage at issue. The law does not require such an absurd result. *See, e.g.*, *In re Northwestern Corp.*, 313 B.R. 595, 601 (Bankr. D. Del. 2004) ("absurd result disfavored"); *see also Elsky v. Hearst Corp.*, 232 A.D.2d 310, 311 (N.Y. App. Div. 1996) (declining to read contract to contain "commercially unreasonable restriction"); *Nassau Gallery, Inc. v. Nationwide Mut. Fire Ins. Co.*, 2003 WL 21223843, at *3 (Del. Super. Ct. Apr. 17, 2003); *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.* 247 F.3d 79, 96 (3d Cir. 2001); 17A Am. Jur. 2d *Contracts* § 456 (2004) (same).

Fourth, virtually all of the operating procedures and record-keeping requirements ALSTOM contends AES-PR violated are found in Chapter 9 of the EEC August 2001 Manual. Chapter 9 provides, however, that the owner may customize the procedures based on its operating experience:

> It is the responsibility of plant personnel to review this material and incorporate the requirements in their already existing maintenance schedules. The customer may decide to alter or customize the maintenance as determined through operating experience.

A.78 (emphasis added). The factual record shows that AES-PR did alter and customize the specific recommended maintenance requirements on which ALSTOM relies – indeed the changes primarily were those recommended by ALSTOM and EEC personnel in 2002 during commissioning of the facility. *See* Statement of Facts §§ E-F. AES-PR's modifications to the procedures, the record reflects, were reasonable. *See* B.89 (AES-PR expert reports "[o]verall, AES exercised appropriate judgment in interpreting and implementing EEC's directives consistent with industry practice"). Because the maintenance instructions in Chapter 9 authorize

AES-PR "to alter or customize the requirements" as it sees fit – they cannot possibly be conditions precedent that must be fulfilled before ALSTOM's contractual obligations arise. *See, e.g.*, *Bristol Sav. Bank v. Silver*, 208 B.R. 100, 105 (D. Conn. 1996) (contract term not requiring "any particular act by anyone" not a condition precedent).

Fifth, the EEC O&M manual was not even in existence until <u>three</u> <u>years</u> <u>after</u> the Contract was formed in 1998. *See* A.64 (Manual dated August 2001). Thus, the parties could not have agreed to condition the warranty on any <u>specific</u> acts or events when those acts or events had not yet even been defined.

Because the warranty here did not contemporaneously set out specific acts or events on which ALSTOM's obligations were conditioned, there exist only mutual promises. *See Bristol Sav. Bank*, 208 B.R. at 105 (no condition precedent because the contract did not make the party "liable . . . after any particular act by anyone"); 13 Samuel Williston & Richard A. Lord, <u>A Treatise on the Law of Contracts</u> § 38:5 (4th ed. 2004) ("A promise is a manifestation of an intention to act or refrain from acting in a specified way."); *see also Green County*, 211 U.S. at 594. Accordingly, because the language in the Contract does not establish conditions precedent, ALSTOM cannot disclaim its warranty without showing that the alleged operator error caused the accelerated corrosion. Of course, ALSTOM is unable to do that on an undisputed record.

2.    ALSTOM's Conduct in 2003-04 Confirms that Compliance with
      <u>EEC's August 2001 Manual Is Not a Condition Precedent.</u>

Delaware applies the objective theory of contract, which considers the "objective acts (words, acts and context)" the best evidence of the parties' intent. *See Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995). ALSTOM's conduct immediately after learning of the accelerated corrosion proves it did not believe the warranty contains any conditions precedent. After learning of the accelerated corrosion, ALSTOM <u>never</u> mentioned to AES-PR the existence

of any "conditions precedent" and <u>never</u> inquired whether AES-PR had fulfilled any such

"conditions precedent." *See* B.82 (Dyer Decl. ¶ 3).  The first suggestion that the Contract

contains a "condition precedent" was made by ALSTOM's litigation counsel at a December 7,

2005 hearing in this matter. *See* D.I. 64 (Hearing Tr. at 32) ("This is important because the

warranty that AES is prosecuting this case under has . . . a condition precedent.").[9]

      If ALSTOM truly believed that the accelerated corrosion warranty contained

conditions precedent, upon learning of the accelerated corrosion, it immediately would have

sought to confirm whether they had been fulfilled.  It did not. *See* B.82 (Dyer Decl. ¶ 3)

("During this timeframe, Mr. Jarvis never told me that ALSTOM was investigating whether

AES-PR's warranty claim was valid."); Statement of Facts § H, *supra*.  Instead, ALSTOM told

EEC that "we consider this a warranty item for EEC and as such hereby give notice." *See* B.392,

318.  ALSTOM even invoiced EEC for over $1.5 million under the substantially identical

corrosion warranty that EEC provided to ALSTOM, which warranty contains the same

"conditioned upon" language. *See* B.335, 304.  Ironically, shortly after issuing the invoice,

ALSTOM accused EEC of "fail[ing] to honor its [corrosion] warranty" by refusing to pay for

AES-PR's replacement ESP plates. *See* B.395, 322.

**B.**    **There Are Factual Disputes as to Each of ALSTOM's Specific "Condition Precedent" Theories.**

      Although ALSTOM bears the burden to establish that no material issue of fact is

in dispute, *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10

---

[9]  Even ALSTOM's Answer is silent on AES-PR's alleged failure to meet specific conditions precedent  Federal Rule of Civil Procedure 9(c) requires that the "denial of performance or occurrence [of a condition precedent] shall be made specifically and with particularity," but ALSTOM did not do so.  ALSTOM's pleading failure both confirms that it only recently came to view the provisions of the August 2001 manual as conditions precedent and provides an independent ground to deny ALSTOM's motion. *See Brooks v. Monroe Sys. for Bus.*, 873 F.2d 202, 205 (8th Cir. 1989); *Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107 (7th Cir. 1992).

(1986), it supports its motion with only one conclusory affidavit, no deposition excerpts, and no properly authenticated documents. *See* Fed. R. Civ. P. 56(c). That failure of evidence alone provides grounds to hold that ALSTOM has not met its burden. And as is explained above, there are factual disputes as to whether the August 2001 EEC manual gives rise to any conditions precedent and whether the maintenance and record-keeping requirements set forth in Chapter 9 of that manual – which are the provisions on which ALSTOM principally relies – are mandatory or merely <u>recommended</u> maintenance requirements that can be customized as the owner sees fit. In addition to those dispositive factual disputes, there are specific factual disputes precluding summary judgment with respect to each of the six alleged failures that ALSTOM advances.

1.      <u>Water chloride content</u>. ALSTOM asserts – literally without record citation – that "AES failed to monitor and control properly the chloride content of the CDS water as required by the O&M manuals." Mot. 22. But while ALSTOM offers no factual support for that assertion, the record reflects the opposite – AES-PR's expert studied the available documents and concluded that "there is no evidence that would indicate that [the] design maximum [chloride level] was exceeded." B.104 (Lunt Rpt. 17). And ALSTOM's own ESP expert, pre-litigation, reached the same conclusion. *See* B.223, 207 (Water "chloride content is around 2500-3000 ppm. The data I saw vary but seem to be in this range most of the time.").

2.      <u>Ash chloride content</u>. With respect to measuring ash chloride content, ALSTOM simply misstates what the EEC Manual says, or at a minimum there is a factual dispute on this point. AES-PR's witnesses have testified that the Manual language ALSTOM cites, *see* Mot. 22-23 & n.77 (citing A.78-79), means that chloride levels of the CDS <u>water</u> are to be checked, and the fly ash chloride level is to be computed mathematically based on this measurement. B.411 (Stinson Dep. 108:5-11); *accord* B.408 (Stinson Dep. 92:6-9) (checking

chloride level of ash daily is unnecessary). Indeed, the plain language of the passage provides that "the plant will measure water conductivity," and that this measurement will be "correlate[d]" to ash chloride. A.78. Moreover, to the extent ALSTOM is suggesting that the chloride ash levels were elevated, AES-PR's expert has determined that that is wrong. B.102 (design maximum ash chloride levels "were never close to being realized over the first year of commercial operation"). There are no undisputed facts to support ALSTOM's argument.

> 3. <u>Flue Gas Approach Temperature.</u> ALSTOM argues that AES-PR failed to

set the CDS outlet temperature, also known as the "flue gas approach temperature," according to EEC's August 2001 manual. That argument is astounding in light of the overwhelming record evidence that the instructions in the August 2001 manual were superseded during commissioning. *See* Statement of Facts § F. This is one of the <u>most</u> hotly disputed issues in this litigation, and the documentary evidence strongly supports AES-PR's version of the events. *See id.* The record reflects that AES-PR did indeed comply with the final instructions ALSTOM provided with respect to flue gas approach temperature. *See* B.441 (Stone Dep. 326:15-18) ("Until the discovery of the corrosion, AES was operating on a 30 degree approach temperature per the operating instruction set forth by EEC in the operating instructions"); B.403 (Sostre Dep. 172:8-9) ("I haven't seen any evidence that we operated at less than 30 degrees."). This factual dispute precludes summary judgment for ALSTOM.[10]

---

[10] Although cryptic, ALSTOM may be arguing, based on an e-mail containing a preliminary conclusion by an AES-PR consultant, that AES-PR did not follow the revised instructions it received during commissioning. *See* Mot. 24 & n.90. ALSTOM does not include any affidavit or deposition testimony to explain what the document is that it attaches to its motion. But in any event, that point, too, at most is a subject of factual dispute – AES-PR's expert has reviewed the operating data (which the author of the e-mail appears not to have done prior to writing the e-mail) and concluded that, prior to the discovery of the accelerated corrosion, AES-PR had set the CDS outlet temperatures "in conformance with EEC's commissioning instructions." B.96.

4.    The CDS Spray Water Nozzles.  ALSTOM argues that AES-PR "failed to maintain properly the water nozzles as required by the O&M Manuals," and accordingly that the warranty is void.  That factual contention is disputed.  *See* B.101 (expert Lunt summarizing cleaning records and concluding that the nozzles in fact were checked and cleaned frequently).  And while ALSTOM argues that improper maintenance led to "an overabundance of water injected, which . . . led to the formation of corrosive acids," Mot. 26, for that assertion it cites literally nothing.  The record evidence shows that, in fact, the corrosion was not caused by "improper spray pattern from the water nozzles on the CDS."  B.159 (report of expert); B.415-16 (Stinson Dep. 195:24-196:10) (AES-PR consultant Stinson investigated this issue and ultimately concluded that there was no "carryover of water from the CDS into the ESP because of incomplete drying of the CDS spray water").[11]

5.    Soot Blower Operation.  ALSTOM argues that the warranty is void based on an alleged failure to adjust the CDS outlet temperature during soot blowing, but the factual record demonstrates that one of the operational changes ALSTOM made during commissioning was to not implement this procedure.  *See* B.400 (Sostre Dep. 105:4-21); B.99 (expert report).  ALSTOM's motion claims that ALSTOM provided computer logic to make this adjustment automatically, Mot. 26 & n. 100, but the document it cites for that claim, an ALSTOM letter not sent to AES-PR, does not say any such thing, and there is no accompanying affidavit or deposition testimony explaining what the document is.  In any event, that letter, at most, creates a factual dispute with the sworn statement of AES-PR's plant operating staff.  *See* B.400 (Sostre

---

[11]    ALSTOM does include one citation to a document for its claim that the nozzles were performing "more like a garden hose than a misting device," Mot. 25 & n.95, but the page of the document it cites, A.187, does not contain that or any similar statement.  And the fact that there exist a few documents referring to poorly performing spray nozzles shows, not that the nozzles were not maintained, but that AES-PR was inspecting them and repairing problems as they arose.  *See* B.418 (Stinson Dep. 201:1-5) (plant changing components every three months).

Dep. 105:4-21). And the factual record shows that there is no need to increase the CDS outlet temperature during soot blowing, and that this procedure did not cause any corrosion. B.99.

      6.    <u>Access to Plant Operating and Maintenance Records.</u>  ALSTOM argues throughout its motion that AES-PR failed to provide ALSTOM with access to operating data as mandated by the Contract. But the factual record is directly to the contrary.

      Part III § 1.9 of the Contract provides:

> Contractor's representatives shall have reasonable access to test and operating records, . . . to satisfy themselves of the validity of a claim under this warranty.

B.51. Prior to AES-PR filing suit, ALSTOM was <u>not</u> assessing "the validity of a claim under this warranty" – ALSTOM took the position that the warranty was EEC's responsibility and that ALSTOM would provide only technical assistance. *See* Statement of Facts §§ H, I. And when ALSTOM requested access to plant operating records, AES-PR responded that the documents were available for ALSTOM's review at its convenience. B.290, 292, 268-71; B. 83 (Dyer Decl. ¶ 4). ALSTOM never followed up to review the documents. *Id.* AES-PR's offer, however, fully satisfied its contractual obligation to provide "reasonable access to [the] . . . operating records." While ALSTOM's Motion argues that "[i]ndisputably, AES plant personnel failed to provide [plant operating] data to ALSTOM," *see* Mot. 27, ALSTOM's own witnesses testified to the contrary. *See* B.261 (W. Jarvis Dep. 154:10-11, 14-16) ("There was some data sent but I don't know exactly what was in all that data. . . . I mean there was interfacing dialogue between Mr. Hognefelt and Mr. Stinson from AES as well as others.");[12] *accord* A.116 (report from ALSTOM engineer summarizing water quality data received from AES-PR).

---

[12]    Aware of this deposition testimony, Mr. Jarvis' affidavit, A.1-3, is cleverly drafted <u>not</u> to say specifically that the operating data was not supplied to ALSTOM, but to say only that "AES never provided documentation . . . <u>sufficient to verify</u> that it had complied with the Operations &

C.    **ALSTOM Is Equitably Estopped from Relying on Any Alleged Conditions Precedent and Has Waived Any Such Right.**

ALSTOM would have the Court believe that the last word on how to run the pollution control equipment was EEC's issuance of the August 2001 preliminary O&M Manual. As explained in Statement of Facts §§ E-F, that is false – and, in any event, certainly disputed. For five months, from July 2002 to November 2002, ALSTOM provided continuous on-site commissioning services that included oral and written instructions and demonstrations teaching AES-PR how to operate and maintain the equipment. *See* Statement of Facts § E, *supra*.

Under Delaware law, the doctrine of equitable estoppel applies when "a party by [its] conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to [that party's] detriment." *Bechtel v. Robinson*, 886 F.2d 644, 650 (3d Cir. 1989) (quoting *Wilson v. Am. Ins. Co.*, 209 A.2d, 902, 903-04 (Del. 1965)). A party "whose conduct has brought the situation about [is] estopped from asserting his legal rights against the party so misled." *Wolf v. Globe Liquor Co.*, 103 A.2d 774, 776 (Del. 1954); *see also Bechtel*, 886 F.2d at 650. ALSTOM also has waived any insistence on compliance with the August 2001 preliminary manual. *See, e.g., Pepsi-Cola Bottling Co. v. Pepsico*, 297 A.2d 28, 33 (Del. 1972) (notwithstanding contract term that contract modifications are to be in writing, parties may waive contract requirements "by their conduct"); *Aeroglobal Capital Mgmt. v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005) (reversing summary judgment because waiver issue of fact).

Here, even if ALSTOM were correct that adherence to all of the voluminous operating procedures in the August 2001 preliminary EEC O&M manual were a condition precedent to enforcement of ALSTOM's warranty (and we explain above that it was not),

---

Maintenance Manual requirements." A.3 (¶ 8) (emphasis added). The affidavit does not set forth specifically what portions of what manual or what missing data he is referring to, or why the records AES-PR supplied were insufficient.

ALSTOM would be estopped from exploiting AES-PR's deviations from those procedures, and has waived the right to insist on compliance with them, because, during commissioning, ALSTOM and its subcontractor EEC trained AES-PR to operate the equipment in a manner substantially different from that set forth in that manual. *See* Statement of Facts §§ E, F; *see, e.g.*, B.398 (Sostre Dep. 95:5-7) ("AES Puerto Rico continues doing the practices that ALSTOM and EEC did during commissioning").

It would be particularly unjust to require AES-PR to have followed the August 2001 manual when, in fact, following that document with respect to CDS outlet temperature resulted in violation of AES-PR's air emission permits. *See* Statement of Facts § F; *see, e.g.*, B.402 (Sostre Dep. 163:5-7) ("At the high temperature, high chloride, you couldn't operate the CDS."). At a minimum, there is a factual dispute as to whether ALSTOM's commissioning instructions caused AES-PR to deviate from the manual's instructions.

Another example is provided by the manual's instructions to monitor water chlorides. ALSTOM and EEC did not check these levels during commissioning. *See* Statement of Facts § E. While ALSTOM attempts to disclaim all responsibility for the water system to excuse its own failure to check it, Project Manager Jarvis conceded that ALSTOM never attempted to take water samples from the parts of the equipment that indisputably were included in ALSTOM's area of responsibility. *See* B.255-57 (W. Jarvis Dep. 92:2-94:1); *see also* B.477, 536 (CDS Design Specification § 4.1.4) ("Scope shall also include . . . flue gas cooling water system."). Thus, at a minimum there is a factual dispute whether ALSTOM is estopped from and has waived its right to blame AES-PR for operating the plant differently than it did.[13]

---

[13]  Although, by design, the CDS outlet temperature would have been adjusted depending on water chloride level, ALSTOM did not check the chloride levels because, during commissioning, it determined that the equipment must run with a very low outlet temperature under all

## II.    THE FEEDSTOCK UTILIZED BY AES-PR DID NOT VOID THE WARRANTY.

ALSTOM argues that the "feedstock" used by AES-PR did not comply with specifications.  Relying on Part III, Section 1.8 of the Contract, which states that "corrosion . . . caused in whole or in part by deviations in the fuel or feedstock from a limit specified in the Contract are excluded from any warranty obligations," B.51, ALSTOM contends that the warranty is void.  Specifically, it claims that, when AES-PR re-injected fly ash (which ALSTOM calls "ash") from the ESPs into the boiler, the fly ash became "feedstock" that failed to comply with design specifications.  *See* Mot. 28-29.  That argument is flawed in two critical respects.

First, Contract § 1.8 releases ALSTOM from its warranty obligations only for corrosion "<u>caused</u> . . . by deviations in the fuel or feedstock."  B.51 (emphasis added).  ALSTOM's motion does not even allege, much less show, that the accelerated corrosion here was <u>caused</u> by any such deviation, *see* Mot. 28-29, and for good reason:  ALSTOM knows that such an assertion is disputed.  AES-PR's expert has produced a report demonstrating that re-injection of fly ash "was <u>not</u> the cause of the corrosion in the ESPs."  *See* B.94 (§ 6.1.2) (emphasis added); *accord* B.413 (Stinson Dep. 113:21-24) ("it does not change the content of chloride in the ash").  Thus, ALSTOM is not entitled to summary judgment on this theory.

Second, ALSTOM's assertion that the design specifications require that fly ash re-injected into the boiler have a chloride content between 0 and 0.1% also is, at best, in dispute.  At his deposition, AES-PR consultant Paul Stinson, who was responsible for investigating the cause of the corrosion, testified that the Specification on which ALSTOM relies, found at A.174, refers only to "the ash from the coal, . . . <u>not</u> the ash from the ESP."  *See* B.409 (Stinson Dep. 103:16-21) (emphasis added); B.424 (Specification).  While ALSTOM argues to the contrary

----

circumstances  to comply with its air emission permit.  *See* Statement of Facts § F.  This factual dispute is central to the estoppel question and precludes entry of summary judgment.

that the Specification relates to "the anticipated fuel and feedstock," Mot. 28, it cites no

deposition or affidavit testimony to support that claim. Accordingly, there is no evidence before

the Court supporting ALSTOM's view.[14]

## III.    ALSTOM IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY ELEMENT OF AES-PR'S DAMAGES CLAIMS.

ALSTOM argues in the alternative that this Court should award it partial

summary judgment on various components of AES-PR's damages claims, but ALSTOM does

not cite one single fact not in dispute in support of its arguments.

### A.    The Applicable Measure of Damages Is as Set Forth in the Contract.

ALSTOM's motion correctly explains that "the 'measure of damages in breach of

express warranty cases . . . is the amount of money which will render that which is guaranteed to

be as warranted.'" Mot. 32 (internal citation omitted); *accord Burke County Pub. Schs. Bd. of

Educ. v. Juno Constr. Corp.*, 306 S.E.2d 557, 560 (N.C. Ct. App. 1983) ("The correct measure of

damage in construction contract cases is the cost of repairing the structure to make it conform to

contract specifications."); *Pennington v. Rhodes*, 929 S.W.2d 169, 173 (Ark. Ct. App. 1996).

Section 1.1.1 of the Contract's warranty provisions requires ALSTOM to "promptly furnish . . .

design and engineering, labor, equipment and materials necessary to correct such defect and

cause the Work to comply fully with" the project's design Specifications. *See* B.49 (Contract §

1.1.1) (emphasis added). In response to a warranty claim, ALSTOM must make "all needed

adjustments, repairs, additions, corrections, and replacements which arise out of or are

necessitated by such defective work or damage." B.49 (§ 1.2) (emphases added). If, as

---

[14]    Moreover, contrary to ALSTOM's assertion, fly ash is not "feedstock." *See* Merriam Webster Online Dictionary, www.m-w.com (visited Apr. 3, 2006) ("feedstock" is "raw material supplied to a machine or processing plant"). Re-injected fly ash from the ESP is not a "raw material."

happened here, ALSTOM "shall fail to promptly and adequately correct such defects," then AES-PR has "the right upon written notice to [ALSTOM] to correct or to have such defects corrected for the account of [ALSTOM]." B.50 (§ 1.4).

ALSTOM alternatively contends that, based on the Uniform Commercial Code ("U.C.C."), the measure of damages should be "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." *See* Mot. 30 (quoting Del. Code Ann. tit. 6, § 2-714(d)). But because the Delaware U.C.C. permits parties to "provide for remedies in addition to or in substitution for those provided in this Article," *see* Del. Code Ann. tit. 6 § 2-719(1)(a) (2006), even if the U.C.C. did apply to this Contract,[15] the scope of the remedies provided by the Contract governs the measure of damages in this case, not this alternative measure. *See Pig Imp. Co. v. Middle States Holding Co.*, 943 F. Supp. 392, 400 (D. Del. 1996).[16]

**B.**    **ESP Collecting Plates that Last More Than Four Years Are Not a "Betterment."**

        1.    ALSTOM Confuses the Warranty Discovery and <u>Claim Period with the Substance of Its Warranty</u>.

ALSTOM misconstrues the meaning of the Contract and argues that AES-PR is asking for replacement ESP collector plates that will last beyond the contracted-for "four year" warranty period (which it invents by adding together the two year period for submitting warranty claims and the two-year period in the description of the corrosion that could cause total failure). *See* Mot. 5. The Contract's warranty provision applies to claims <u>submitted</u> "for a period of

---

[15] The U.C.C. applies only to transactions for goods. *See Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 696 F. Supp. 57, 84 (D. Del. 1988). The Contract here is for much more. *See* B.2 (Article 3.0).

[16] Furthermore, as a threshold matter, ALSTOM has not established any facts – must less facts not in dispute -- that establish the value of the plant as accepted. *See* Mot. 30-32.

twenty-four (24) months," B.50 (§ 1.6) (emphasis added) – there is no question that condition was satisfied here.  Moreover, it covers only accelerated corrosion that is so severe that it is likely to cause structural or mechanical failure of the equipment within two years.  *Id.* (corrosion "reasonably expected to materially affect in the next two (2) years" the structural integrity or performance of the equipment).  This contractual language goes to the <u>severity</u> of corrosion covered by the warranty, not the capability of the equipment ALSTOM has warranted.  ALSTOM reads the language defining how severe corrosion must be to be "accelerated" to mean that, once such catastrophic corrosion is discovered, ALSTOM need only make the minimum repairs necessary so that the equipment can limp along without structural or mechanical failure for up to four years.  That is not what the provision says.  Once corrosion is discovered that is so severe that it is expected to cause structural or mechanical failure within two years, ALSTOM has warranted to repair the equipment to comply with the Contract Specifications.  *See Burke County*, 306 S.E.2d at 560 (damages are costs "to make [equipment] conform to contract specifications"); *Pennington*, 929 S.W.2d at 173.

> 2.     ALSTOM Contracted To Supply ESP Collecting Plates
> <u>Built To Last at Least 25 Years</u>.

Upon determining within the warranty's two-year discovery period that accelerated corrosion is expected to materially affect the equipment's integrity or performance – which ALSTOM in its Motion does not dispute – ALSTOM then is obligated to "promptly furnish . . . design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties."  B.49 (§ 1.1.1).  One of the "foregoing warranties" set forth in § 1.1.1 states that "the Work shall comply with . . . all specifications and drawings referred to in this Contract."  *Id.*  The relevant Specification requires the ESP "to operate for a minimum of twenty-five (25) years."  B.508 (§ 6.2.2), 536; *see*

Statement of Facts § B; B.432 (Stone Dep. 167:20-23) (equipment "was designed for a 25-year design life"). Thus, ALSTOM's warranty promises that, if accelerated corrosion is discovered within two years, ALSTOM will repair it so that it can function as designed – to last 25 years without catastrophic failure due to corrosion. ALSTOM's alternative four-year warranty theory, at most, creates a factual dispute as to the construction of the Contract.

<blockquote>3.    It Is Irrelevant that the Replacement ESP Collecting Plates<br>Have Not Yet Been Installed.</blockquote>

ALSTOM argues that, because the replacement plates purchased by AES-PR will not be installed within four years of the plant's initial operation, they are not covered by warranty. As explained above, the warranty is for equipment capable of functioning for 25 years, not four. The factual record demonstrates that the temporary repairs AES-PR implemented will not allow the equipment to operate for anywhere close to 25 years. *See* Statement of Facts § J(1). Accordingly, ALSTOM's Motion is incorrect when it says "there is no evidence of a need to install those replacement plates." Mot. 32. There is a factual dispute on that precise question.

**C.    AES-PR Is Not Seeking To Recover Consequential Damages.**

<blockquote>1.    Whether Damages Are Consequential Damages<br>Typically Is a Fact Question for the Jury To Decide.</blockquote>

ALSTOM argues that various components of AES-PR's damages claim "are . . . not recoverable as a matter of law" because they are consequential damages. Mot. 33. But ALSTOM neglects to mention that, in general, whether damages are classified as "direct" or "consequential" is a factual question to be left to the jury. *See, e.g.*, *United States ex. rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 895 (S.D. Ohio 1999) ("question of fact to be decided at trial whether the . . . damages . . . are consequential, direct, or incidental in nature"); *Long Island*

*Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442, 1459 & n.30 (S.D.N.Y. 1986) ("We reserve for trial the question of whether the plaintiff's claimed damages should be characterized as direct, incidental, or consequential."); *Roneker v. Kenworth Truck Co.*, 944 F. Supp. 179, 186 (W.D.N.Y. 1996) ("'the precise demarcation between direct and consequential damages is a question of fact'"). This factual question precludes entry of summary judgment.

> 2.  **Consequential Damages Are Damages Caused as a**
>        <u>Consequence of the Equipment Failure.</u>

Under the Contract, the parties are not liable for "incidental, special or consequential damages." *See* B.78 (§ 52.0). The Contract provides examples of such damages – "loss of revenue, loss of profit, loss of use of the facility, or damages associated therewith." *See id.* Consequential damages are defined in the Delaware U.C.C. as:

> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>
> (b) injury to person or property proximately resulting from any breach of warranty.

*See* Del. Code Ann. tit. 6, § 2-715(2).

AES-PR does not seek consequential damages in this lawsuit. Its damages are neither lost revenues or other consequences of being unable to sell electricity because of the corrosion damage, which are addressed by § 2-715(2)(a), nor are they injuries to plant personnel or equipment caused by corroded sections of the ESP collecting plates becoming loose or unstable, which are addressed by § 2-715(2)(b). Rather, AES-PR seeks only the costs to correct the defect in the equipment, including restoring the plates and making modifications to prevent further corrosion. It makes no difference that the modifications made to conform the equipment to the original Specification differ from the initial design – if they are necessary for the equipment to comply with the Specification, payment for the modifications is an appropriate

remedy. *See Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 670 F.2d 1304, 1305-07 (3d Cir. 1982) (after remanding warranty claim to district court with direction to exclude "consequential damages," affirming damages awarded for cost to supply a different system because initial system did not comply with specified capabilities).

ALSTOM places great weight on *Wood River Pipeline Co. v. Wilbros Energy & Services Co.*, 738 P.2d 866 (Kan. 1987), Mot. 34, but that case actually supports AES-PR's position. In *Wood*, plaintiff sought to recover on a warranty of an oil pipeline after the pipeline had burst. There, the court prohibited recovery for "damages to real property at the site of the oil spill, the costs of replacing oil lost in the spill . . . and the costs of recovering oil spilled" because the contract prohibited an award of consequential damages. *Id.* at 868. In this case, AES-PR is <u>not</u> seeking to recover damages similar to those disallowed in *Wood*, such as any damage to its property when corroded pieces of the ESP collection plates broke free, or lost profits for the time the plant was off-line to make repairs. It is precisely the type of damages <u>permitted</u> in *Wood* – "the cost of repair[]," that AES-PR seeks in this lawsuit. *Id.* at 868.

### 3. The Water Supply Changes Are Not Consequential Damages.

ALSTOM claims that AES-PR's changes to its water treatment apparatus to arrest future corrosion "[p]lainly . . . are not costs directly related to . . . the claimed corrosion failure." Mot. 33. That factual assertion is disputed. As explained in detail in Statement of Facts § J(2), the changes for which AES-PR seeks reimbursement are indeed needed to remove the corrosive inputs to its pollution control system and at the same time allow the plant to comply with its environmental permits. *See, e.g.*, B.83-84 (Dyer Decl. ¶¶ 5-9) ("installation of the new reverse osmosis system and brine crystallizer is the most cost effective means to stop further accelerated corrosion of the ESPs"); B.146 (McDonald expert report) (AES-PR's water treatment

modification "addresses the cause . . . of the [corrosion] problem at its source"); B.433 (Stone

Dep. 182:9-11) ("The new water system minimized the amounts of chlorides that went into the

CDS . . . to eliminate the accelerated corrosion."). The modifications to AES-PR's water

treatment system are the lowest-cost engineering solution to make the pollution control

equipment function as warranted without accelerated corrosion. *See* B.147 (expert report).

Because these costs relate directly to the cure adopted to assure that the ESP plates do not

continue to experience accelerated corrosion, they are not consequential damages.

    4.    The Brine Crystallizer Is a Necessary Component of AES-PR's Lowest-
        Cost Solution to the Corrosion Problem.

      ALSTOM's contention that the brine crystallizer is a consequential damage or

betterment is a disputed fact as well. As explained above, the crystallizer, a component of the

water treatment changes, is a necessary part of the solution to stop continued corrosion.

ALSTOM argues that the crystallizer is unnecessary because it is meant to address "new

problems" at the Plant. *See* Mot. 35. That claim is wrong, and at the very least is disputed.

      As is detailed in Statement of Facts § J(2), AES-PR knew when it installed the

secondary reverse osmosis system that it also might need a brine crystallizer, but it decided to

delay purchasing the crystallizer to see if it would be possible to dispose of the brine produced

by the new reverse osmosis system without a crystallizer. *See* B.83 (Dyer Decl. ¶ 6); B.232-33

(T. Jarvis Dep. 120:20-121:5). When alternative disposal proved impracticable, AES-PR

determined that it did indeed need to install the crystallizer. *See* Statement of Facts § J(2). Thus,

while ALSTOM contends in its Motion that the purpose of the crystallizer is "to remediate

problems created by AES' own unilateral installation of the new [reverse osmosis] units," and

would blame AES-PR for attempting a lower cost solution before installing the crystallizer, its

factual assertion is directly contradicted by record evidence that the crystallizer is needed to

arrest the corrosion while complying with environmental permits. *See* Statement of Facts § J(2); *see, e.g.* B.83 (Dyer Decl. ¶¶ 6-7).

ALSTOM reliance on *Falcon Tankers, Inc. v. Litton Systems Inc.,* 355 A.2d 898 (Del. Super. Ct. 1976), is unavailing. *See* Mot. 35-36. In *Falcon Tankers,* the party's repairs were unsuccessful because it used defective replacement parts, and the court ruled that defendant would not be liable for those defective parts. 355 A.2d at 907. But in this case, the secondary reverse osmosis system has enabled the Plant to be able to satisfy its air emission permits and not experience additional corrosion. *See supra.* And the crystallizer is necessary because the reverse osmosis system alone was insufficient to remedy ALSTOM's flawed pollution control equipment and allow the Plant to comply with its zero-liquid-discharge obligations for water discharges. There is absolutely no evidence of "'poor judgment and mismanagement,'" as ALSTOM suggests in its Motion with without record support. Mot. 36. In fact, the record is to the contrary. *See* B.140-47; B.83-84 (Dyer Decl. ¶¶ 5-9).

**D.    ALSTOM's Proportionality Argument Ignores the Plain Language of the Contract.**

After receiving over $119 million under the Contract for a complete boiler and pollution control system that ALSTOM promised would operate for 25 years and comply with air emission environmental permits, ALSTOM now claims that notions of "disproportionality" dictate that it should be excused from its warranty obligations. *See* Mot. 36-38. In making that argument, ALSTOM assiduously avoids even mentioning the Contract price, the fact that the Contract itself specifies the amount of damages that are recoverable, and the severity of the damage that ALSTOM's deficient equipment caused. It also ignores the case law providing that the proportionality doctrine generally applies to contracts "that do not arise in a commercial setting," where there is "an informality of dealing, including the absence of a detailed written

contract," and there is an "extreme disproportion." *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364, 381 (N.J. 1992) (quoting Restatement (Second) Contracts § 351).

ALSTOM cites *Long Island Lighting Co. v. IMO Industries, Inc,* 1990 U.S. Dist. LEXIS 5351 (S.D.N.Y. May 9, 1990), a case in which a court disallowed damages that amounted to over <u>120 times</u> the contract price. *See* Mot. at 37. But ALSTOM fails to inform the Court that the value of the Contract awarded to ALSTOM in this case was $119 million, *see* B.41 (§ 1.1), not the $14 million figure ALSTOM recites, *see* Mot. 37.[17] And even if the Contract price <u>were</u> $14 million, the claimed damages are nowhere near 120 times that figure, as was the case in *Long Island Lighting.* Far from being disproportionate, AES-PR's damages amount to only about one-third of the Contract price. *See* Statement of Facts § B.

ALSTOM's argument also is easily dismissed because the Contract itself specifies the cap on damages for a warranty claim. It provides:

> In no event shall Contractor's liability for any matter relating to the Contract, including . . . warranties, . . . exceed either individually or in the aggregate an amount equal to the Contract Price.

B.78 (§ 52.0). The Contract Price, of course, is $119 million. *See* B.41 (§ 1.1). Having agreed to this cap, ALSTOM cannot now complain that the damages AES-PR seeks are disproportionate.

Finally, ALSTOM pretends that all that is at stake here for AES-PR is $2 million in ESP collecting plates. Mot. 37. But the effect of the failure of those plates, as ALSTOM's own witnesses reported, could be catastrophic – without the ability to stop further accelerated

---

[17]   At the Court's December 7, 2005 discovery hearing, when ALSTOM was trying to impress the Court with the magnitude of this dispute, it told the Court that "[t]his is a $450,000,000 case." D.I. 64 (Hearing Tr. at 42:14). In fact, the Contract is worth $119 million, B.41, not $14 million as ALSTOM now claims, and AES-PR's damages claim is for approximately $40 million.

ESP plate corrosion, AES-PR faced the prospect of having to shut down its entire power plant,

"at which time [the plant] would revert to the banks" that supplied financing for the facility.  *See*

B.285, 263.  The "interests of justice," Mot. 36, would not be served by permitting ALSTOM to

avoid honoring its warranty to make the plant's pollution control equipment operate as promised.

## CONCLUSION

For the foregoing reasons, Plaintiff AES-PR requests that Defendant ALSTOM's

Motion for Partial Summary Judgment be denied.


Respectfully submitted,


OF COUNSEL:
Dane H. Butswinkas                          /s/ John S. Spadaro
R. Hackney Wiegmann                         John S. Spadaro (Bar No. 3155)
Daniel D. Williams                          MURPHY SPADARO & LANDON
WILLIAMS & CONNOLLY LLP                      1011 Centre Road, Suite 210
725 Twelfth Street, N.W.                    Wilmington, DE 19805
Washington, D.C. 20005                      Tel. (302) 472-8100
Tel. (202) 434-5000                         Fax (302) 472-8135
Fax (202) 434-5029

Dated:  April 7, 2006                       Attorneys for AES Puerto Rico, L.P.


- 40 -

## <u>CERTIFICATE OF SERVICE</u>

On April 7, 2006, Plaintiff served Opposition of Plaintiff AES Puerto Rico, L.P.

to ALSTOM Power Inc.'s Motion for Partial Summary Judgment by electronic filing and first

class mail, postage prepaid, on:

> Richard R. Weir, Esq.
> Daniel W. Scialpi, Esq.
> Two Mill Road
> Suite 200
> Wilmington, Delaware 19806

and by e-mail and first class mail, postage prepaid, on:

> James E. Edwards, Esq.
> Anthony Vittoria, Esq.
> Ober, Kaler, Grimes & Shriver
> 120 East Baltimore Street
> Baltimore, Maryland 21202-1643

<u>/s/ John S. Spadaro</u>