**Thomas Coleman**

Page 1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF DELAWARE

3

4       --------------------------------------X

5    AES PUERTO RICO, LP

6

7    VS            Civ. No. 04-1282-JJF

8

9    ALSTOM POWER, INS.

10      --------------------------------------X

11

12

13            Deposition of Thomas Coleman taken in

14    accordance with the Federal Rule of Civil

15    Procedure at the Law Offices of Coudery Ecker &

16    Murphy, 760 Main Street Hartford, Connecticut,

17    Before Holly Murphy, a Licensed Shorthand

18    Reporter and Notary Public, in and for the State

19    of Connecticut at 9:38 AM on February 23, 2006.

20

21

22

23                              ORIGINAL

24

25   Job No. 172990                    B.168

**Thomas Coleman**

Page 16

1      Q.      Were you actually working in the

2   control room with the operators?

3      A.      At times, yes.

4      Q.      When did you begin that part of your

5   duties?

6      A.      Once the mechanical commissioning was

7   complete and the units were ready for start up

8   commissioning and operation, I went.

9      Q.      Do you recall when that was?

10     A.      No.  I don't recall the exact date.

11     Q.      Was it around June 13, 2002?

12     A.      Sometime around then, yes.  Like I

13   said, I don't know the exact date.

14     Q.      I believe you just said, "commissioning

15   phase and start up phase," something along those

16   lines?

17     A.      Yes.

18     Q.      Can you tell me what the commissioning

19   phase of a project is such as AES Puerto Rico?

20     A.      The commissioning phase is you go

21   through and you do all your functional checks,

22   your safety checks, make sure the equipment is

23   properly placed and ready for service.

24          Start up an operation is the physical

25   point at which the equipment becomes operational

B.169

**Thomas Coleman**

Page 17

1  and you see how the systems interact with one

2  another.

3      Q.    So does the commissioning phase occur

4  before the start up phase?

5      A.    Yes.

6      Q.    Do you recall when this commissioning

7  phase at AES Puerto Rico was completed?

8          MR. EDWARDS:  For a particular piece of

9  equipment or everything?

10          MS. SAGERSON:  How about for the

11  boiler?

12      A.    The commissioning is a big umbrella.

13  It does capture start up and operations because

14  there are some systems that you cannot commission

15  until the boiler is operational or start up.

16          So the term commissioning isn't just one

17  phase.  It envelopes the whole commissioning,

18  start up and operations phase in my opinion.

19      Q.    The air pollution control equipment

20  which by my definition consists of at least the

21  ESP and the CDS.

22          Was that commissioned prior to the start

23  up phase?

24      A.    Portions of it, yes.

25      Q.    Which portions?

**B.170**

**Thomas Coleman**

Page 82

1    Q.    Can you describe for me some of the

2   items that you were working on?

3    A.    Again, it was parts, valves, for

4   example, equipment that had broken or AES had

5   used spare parts that were covered under

6   warranty, that kind of stuff.

7    Q.    Were you spending any time in the

8   control room at this point?

9    A.    Very little other than just to get some

10  printouts of the graphics on the DCS.

11   Q.    How often were you interfacing with AES

12  personnel at that point?

13   A.    Almost on a daily basis in some form or

14  another.

15   Q.    Were your primary contacts at AES still

16  Doug Tomlin and Gary baits?

17   A.    Yes, they were.

18         (Whereupon, Plaintiff's Exhibit No. 14

19  was marked for identification.)

20  BY MS. SAGERSON:

21   Q.    I'm handing you what has been marked as

22  Exhibit 14.  Take a moment and look over that

23  document, please.

24   A.    Okay.

25   Q.    Do you see this exhibit contains two

B.171

**Thomas Coleman**

Page 83

1    e-mails.  The bottom e-mail being an e-mail from

2    yourself to Mr. Jarvis and the top e-mail being

3    Mr. Jarvis' response to you?

4        A.    Yes.

5        Q.    Your e-mail to Mr. Jarvis is dated

6    March 30, 2003.

7            Do you see that?

8        A.    Yes, I do.

9        Q.    The subject is PM testing.

10           Do you see that?

11       A.    Yes.

12       Q.    The bottom paragraph says, you indicate

13   in the bottom paragraph that AES installed a dew

14   point monitor.

15           Do you see that?

16       A.    Yes, I do.

17       Q.    Do you recall when AES installed the

18   dew point monitor?

19       A.    It must have been around this time.

20       Q.    March 2003 time frame?

21       A.    Yes.  That maybe came out of their

22   meetings with their consultants.  I don't know.

23       Q.    You indicate that the wet bulb

24   temperature appears to have dropped 5 degrees

25   from 123 degrees to 118 degrees.

B.172

**Thomas Coleman**

Page 84

1          Do you see that?

2      A.    Yes, I do.

3      Q.    You say:  The ESP is not doing any

4   better from what I have seen as well.  However,

5   the dew point monitor that AES installed on the

6   unit 2 CDS outlet has dropped 5 degrees from 123

7   to 118 so there may be room to lower the

8   temperature setpoint which may help in opacity

9   but may cause build-up on the rigitrodes and

10  problems later.

11         Does that refresh your recollection that

12  lowering the CDS outlet temperature did have a

13  positive impact on opacity?

14     A.    No.  It really doesn't have an effect

15  on the opacity.

16     Q.    What is your basis for that statement?

17     A.    I don't know.

18     Q.    What is your basis for the statement

19  that you just made?  Not the statement in the

20  e-mail.

21     A.    There may have been some misperceptions

22  on my part.

23     Q.    Would it surprise you that Mr. Van

24  Hooser, the project manager from EEC testified

25  that lowering the outlet temperature did have a

B.173

**Thomas Coleman**

Page 85

1    positive effect on opacity?

2            MR. EDWARDS:  Objection.

3        A.    It does surprise me.

4        Q.    What do you think you meant by lowering

5    the temperature setpoint may help in opacity?

6        A.    I guess at the time I felt it might

7    have helped.

8        Q.    At the time you wrote the e-mail?

9        A.    Yes.

10       Q.    What was your concern with regard to

11   build-up on the rigitrodes?

12       A.    After the event in early January where

13   ADS plugged up the CDS, there was severe

14   build-up, what we call snowballs on the

15   rigitrodes leaving even, I mean, through out the

16   precipitator.

17       Q.    How did lowering the CDS temperature

18   setpoint, how would that cause build-up on the

19   rigitrodes?

20       A.    It would attach.  It was that moist

21   that it would attach to the rigitrodes which is a

22   direct result of misoperation of the unit.

23       Q.    I'm a little confused.  Your e-mail

24   indicates that the wet bulb temperature has

25   decreased from 123 to 118 degrees?

                                        B.174

Thomas Coleman

Page 118

1    chlorine was unit two.  Unit one was coming back

2    up from an outage and it was off line when this

3    chlorination happened.

4         Q.    So the chlorination, the over

5    chlorination did not effect unit one at all?

6         A.    No.  From what I recall, no.

7         Q.    How quickly did the over chlorination

8    dissipate from the make up pond if you know?

9         A.    I do not.  I don't know the length of

10   time specifically.

11        Q.    Was it days do you know?

12        A.    I would imagine it would be probably

13   days given the amount that they had over

14   chlorinated.

15        Q.    Is there more than one ESP?

16        A.    There are two.  Unit one has an ESP and

17   unit two has an ESP.

18        Q.    Is there more than one CDS?

19        A.    Not per unit.  There's one CDS per

20   unit.

21        Q.    So there's actually two CDS's at the

22   plant?

23        A.    Yes.

24              (Whereupon, Plaintiff's Exhibit No. 22

25   was marked for identification.)

B.175

**Thomas Coleman**

Page 119

1    BY MS. SAGERSON:

2        Q.    I'm handing you what has been marked as

3    Exhibit 22.  I would ask if you recognize this as

4    an EEC procedures -- strike that.

5            I would ask if you recognize this as an

6    EEC document related to the CDS cold start up?

7        A.    Yes, I do.

8        Q.    Do you see that it's dated November 14,

9    2002?

10       A.    Yes, I do.

11       Q.    Do you recall reviewing this document

12   on or around the November 2002 time fame?

13       A.    Yes, I do.

14       Q.    What was the purpose of your review of

15   this document?

16       A.    This was the modification to the

17   original start up procedure.

18       Q.    To the original EEC operations manual?

19           MR. EDWARDS:  Objection.  Calls for

20   legal conclusion.  You can answer.

21       A.    As with any piece of equipment there is

22   a start up procedure guideline given.  When the

23   equipment actually gets in operation, these

24   procedures need to be changedgiven conditions.

25           It's not specific to EEC supplied

B.176

**Thomas Coleman**

Page 120

1   equipment or our supplied equipment or a DFD

2   supplied equipment.

3         It's the nature.  I mean, equipment, you

4   design something to operate or you have

5   expectation of things to operate at a certain

6   place.  But when you start up and you operate,

7   that may change.

8         Q.    Change is based on the experience;

9   correct?

10        A.    Yes.

11        Q.    So EEC, ALSTOM, DFD may provide

12   operations manuals prior to the start up phase

13   but through experience and fine tuning of the

14   equipment, many of those procedures will change;

15   is that correct?

16             MR. EDWARDS:  Objection.  You can

17   answer.

18        A.    Not totally change.  Very minimal

19   changes.  It's something that you basically owe

20   the customer is, you know, anything that would

21   change equipment wise or operation wise or

22   enhancements, you owe them information on that

23   piece of equipment.

24        Q.    So that they understand how to run the

25   equipment?

B.177

**Thomas Coleman**

1    A.    Yes.    Everything gets superceded.

2   Transmittals get made.

3    Q.    Are you saying that for example, when

4   EEC provides a revised version of the steps for

5   the CDS start up, this is the version that the

6   AES operators should follow?

7        MR. EDWARDS:  Objection.  Legal

8   conclusion.  You can answer.

9    A.    Yes.  It should be used as the

10  guideline for placing this in operation.

11   Q.    Do you see on the second page of this

12  document under CDS start up, the second to the

13  last bullet point says:  As soon as CDS outlet

14  gas temp has fallen to 165 degrees Farenheit, put

15  temp control value in auto with setpoint equaling

16  the higher of 152 degrees or 30 degree approach

17  to saturation.

18        Do you see that?

19   A.    Yes, I do.

20   Q.    Is that consistent with your

21  recollection that EEC had instructed AES to

22  operate the CDS outlet gas temperature at the

23  higher of 152 or 30 degree approach to

24  saturation?

25        MR. EDWARDS:  Objection.  Foundation.

B.178

**Thomas Coleman**

Page 155

1          C E R T I F I C A T E

2

3          I hereby certify that I am a Notary

4    Public, in and for the State of Connecticut, duly

5    commissioned and qualified to administer oaths.

6          I further certify that the foregoing

7    deposition was taken by me stenographically in

8    the presence of counsel and reduced to

9    typewriting under my direction, and the foregoing

10   is a true and accurate transcript of the

11   testimony.

12          I further certify that I am neither of

13   counsel nor attorney to either of the parties to

14   said suit, nor am I an employee of either party

15   to said suit, not of either counsel in said suit,

16   nor am I interested in the outcome of said cause.

17          Witness my hand as Notary Public this

18   23rd day of February, 2006.

19

20   *Holly M. Murphy*

21   Holly M. Murphy

22        NOTARY PUBLIC in and for the

23        State of Connecticut.

24        00177

25

B.179

## OFFICIAL TRANSCRIPT OF PROCEEDINGS

### BEFORE THE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

IN THE MATTER OF                                                   CASE NO.

    AES PUERTO RICO, L.P.       * C.A. NO.:  04-1282(JJF)
                             *
        Plaintiff              *
                             *
        Vs.                 *
                             *
    ALSTOM POWER, INC.,        *
                             *
        Defendant           *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

THE 30(B)(6) DEPOSITION OF MR. ALLAN DYER
(CORPORATE DESIGNEE)

---

**PLACE:**  Hato Rey, Puerto Rico

**DATE:**  January 18, 2006

*Crespo & Rodríguez, Inc.*
Tel. (787) 758-5930 / 763-8018
Fax (787) 767-8217
A-6 Yale Street, Santa Ana
Rio Piedras, Puerto Rico 00927

**B.180**

1    Q    Do you have an understanding as to why AES

2    Puerto Rico has not made a claim against Environmental

3    Elements or EEC?

4    MR. WILLIAMS:

5        I will instruct you not to disclose communications

6    with counsel in your answer.

7    THE DEPONENT:

8        Okay.  Obviously before we made these decisions, we

9    received advice from counsel.

10   BY MR. VITTORIA:

11       Q    Has AES Puerto Rico made a claim against any

12   other entity, other than Alstom, related to the

13   accelerated corrosion?

14       A    To the best of my knowledge, we have not.

15   MR. WILLIAMS:

16       Mr. Vittoria, when do you want to break for lunch?

17   We've been going for about an hour now.

18   MR. VITTORIA:

19       It's fine.  If you want to go now...?

20   MR. WILLIAMS:

21       Off record.

22                        OFF THE RECORD

23   MR. VITTORIA:

24       On the record.  Let the record reflect that it's

25   12:10 by my clock at this time, and we will break for



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

B.181

1  lunch.

2      (Whereupon, the deposition was recessed for lunch,

3  scheduled to resume the same day at the same place.)

4                                        (12:10 p.m.)

5                    AFTERNOON SESSION

6                                        (1:30 p.m.)

7  MR. VITTORIA:

8      Okay.  The time by my watch is 1:30.

9      Q    Mr. Dyer, there is... Can you tell me about

10  the stabilization program for which AES Puerto Rico is

11  seeking recovery?

12      A    Would you like me to refer to the table, or

13  just in general?

14      Q    In general tell me what it is.

15      A    Stabilization program, well, in November,

16  December, 2003, when the severe corrosion was discov-

17  ered, at that time we couldn't get Alstom interested in

18  it. And I think the severe corrosion clearly caught us

19  by surprise.  And we worked with a company that's listed

20  on that... Can I have that exhibit?

21      I want to make sure I'm saying their name right.

22  F.L. Smidth Airtech, who, to my understanding, are a

23  group of people that we had at that time, who were

24  former EEC guys, and had experience on refurbishing ESPs

25  throughout the industry, gave us the advice that they

1    could teach us how to stabilize the plates, with the

2    intent to, for the short term, allow the unit to run...

3    not necessarily as well, but allow us to operate.

4        Q    Did you have an understanding of what they

5    meant when they said "stabilization"?

6        A    If you're asking if I understood?

7        Q    Yes.

8        A    I believe I understood.  To the extent of the

9    stabilization, I didn't have a full appreciation of it,

10   at the time we discovered the corrosion.

11       Q    What is the nature of the work, as far as

12   stabilization is concerned?

13       A    Well, my understanding is you work in a very

14   difficult quarters, and you have to scaffold to cut out

15   the corroded areas, and patch them with plate material.

16       Q    Are the patches welded on?

17       A    I've never been inside to watch the work.

18   I've seen photographs of the work, so I'm not sure how

19   they attach the plates.

20       There's, there's more than one method of doing it,

21   to my understanding, because some plates are totally

22   corroded, some plates are cut off, and sometimes they

23   use stabilizing bars so that plates won't short out.

24   And if you short out, you lose the field, and you lose

25   the capacity of the precipitator.

1    counsel, I'll instruct you not to answer.

2    THE DEPONENT:

3        A    That will have to be considered.

4    BY MR. VITTORIA:

5        Q    So, as of January 18, 2006, AES Puerto Rico

6    has not yet decided whether it will attempt to recover

7    its own people costs, and own equipment costs, from

8    Alstom in this litigation?

9        A    That decision, as of the date of this document

10    Exhibit 4, which was signed by me on the 17th of 2005,

11    pardon me, 2006, as of that date, we had not determined

12    whether or not to put that. But I would inform that

13    clearly AES has enormous effort in there.

14        Q    Has anybody attempted to put a dollar figure

15    on that enormous effort?

16        A    Not to my knowledge.  I know I haven't.

17        Q    Explain to me how the stabilization program

18    relates to the corrosion that was discovered in the ESP?

19        A    Okay.  Please understand I'm not a... there

20    are technical people that could explain that better than

21    I can, and I think I touched on it in some of my other

22    answers, but as the ESP was corroding, plates were

23    falling off, causing the fields to short.  Okay?  And

24    when a field causes an electrical short, it shuts down

25    the entire field.  Okay?  Also, the plates have the

99

1    ability to fall in the hoppers and block our ability to

2    remove the ash material.

3         When you start losing plates, and losing surfaces,

4    and losing fields, you have tremendous trouble

5    maintaining your opacity.

6         The stabilization program was a program, to my

7    understanding, to stabilize those plates, even though

8    they're severely damaged, in some cases, less damaged in

9    other cases, to give them the integrity that they lost

10   due to the severe corrosion.

11        Q    Okay.  To your understanding, has the stabi-

12   lization work been successful in solving the problems

13   caused by the accelerated corrosion?

14   MR. WILLIAMS:

15        Objection to form; vague, unclear.

16   THE DEPONENT:

17        Well, the, the stabilization was never intended to

18   restore the integrity of the precipitator.  The stabi-

19   lization was, you know, never, in our opinion, a long-

20   term remedy.

21        And it clearly doesn't cure the corrosion, because

22   the corrosion isn't, you know, a result of that mate-

23   rial.

24   BY MR. VITTORIA:

25        Q    Has the stabilization work remedied the issue

1    relating to the field shorting out because of the

2    corrosion?

3         A    It's improved it.  It hasn't eliminated it.

4         Q    And since the stabilization, have any more

5    pieces of plate fallen down into the hoppers?

6         A    All the time.

7         Q    Are these pieces of plates in which stabiliz-

8    ation work has been performed?

9         A    Yes, I would believe so, yeah.

10        Q    Is it also plates on which no work has been

11   performed?

12        A    I mean, the geometry of the internals of that

13   piece of equipment are much more sophisticated than, you

14   know, and go beyond my capabilities, and the damage.

15        Q    Okay, let's turn collection plates, which is

16   the first chart on page 3 of Exhibit No. 4.

17        A    The same document?

18        Q    Yes.

19        A    Okay.

20        Q    Now, line item 1, do you see...

21        A    Mmhm?

22        Q    ...for the first two, under "Reason of Payment

23   Replacement Collecting Plates for Unit 2," can you

24   describe that for me?

25        A    These are the plates that we bought shortly



1   BY MR. VITTORIA:

2       Q    The current estimate is that they would be

3   replaced in three years?

4       A    I answered that. My opinion is that we will be

5   doing it in the next three years, but I'm only one part

6   of that decision-making process.

7       Q    Do you know of anyone else within AES who

8   believes that they will need to be replaced sooner than

9   that?

10  MR. WILLIAMS:

11      Objection to form.

12  THE DEPONENT:

13      I believe we have people that think they should

14  have been installed yesterday.

15  BY MR. VITTORIA:

16      Q    And who are those people?

17      A    Huh?

18      Q    Who are those people?

19      A    Some of our mechanical people, or technicians,

20  the ones that struggle with high opacity, the ones that

21  struggle with the stabilization.

22      Q    Do you know of any names, sitting here today?

23      A    Sure.  A lot of our control room staff,

24  probably believe it.  A lot of our maintenance staff.

25      Q    Do you know of a specific individual?

162

1     BY MR. VITTORIA:

2          Q     Is that the P.O. for the Unit 2 replacement
3     collecting plates?

4          A     Mmhm.

5          Q     Is that a yes?

6          A     That's yes.

7          Q     Any other documents that were used to
8     establish the $1.4 million estimate for the Unit 1
9     collecting plates?

10         A     I would assume the shipping documents.  But,
11    again, I could be... I'm speculating.

12         Q     Any other documents?

13         A     Well, when we went through the process of
14    eliminating the money we spent on storage, those docu-
15    ments would've been included.  So we could exclude them.

16         Q     Any other documents that you can think of that
17    were used to establish...

18         A     I'm sure there would be.  Many people have
19    personal scratch papers, but not that I know of.

20         Q     Do you have any personal scratch papers where
21    you were doing the arithmetic to come up with that $1.4
22    million estimate?

23         A     Not that I know of, because when I was re-
24    viewing these numbers, I was doing them with my counsel.

25         Q     When does AES Puerto Rico expect to purchase

1  the replacement collection plates for Unit 1?

2      A    In the next two, three years, assuming that

3  the precipitators can continue to run in the band-aid

4  mode that we're running in.

5      Q    And when do you expect to install the re-

6  placement collector plates for Unit 1?

7      A    I thought you just asked me that.

8      Q    I asked you when you were expecting to

9  purchase them.

10      A    Oh, when do I expect to purchase them versus

11  installing?

12      Q    Yes.

13      A    I think we would take the position, what we

14  know today, we would link the purchasing very close to

15  the installation date. But we believe that we have got

16  to refurbish that ESP.

17      Q    What do you mean "what you know today"?

18      A    Pardon me?

19      Q    You said, "knowing what we know today, we

20  would line..."

21      A    Well, I know I have a severely-corroded pre-

22  cipitator that's in a band-aid mode.  It's not gonna get

23  better.

24      Q    Would you link the purchase and installation

25  of the Unit 1 replacement plates, because of your ex-

1  perience with the purchase of the Unit 2 replacement
2  plates...
3  MR. WILLIAMS:
4      Objection to form; ambiguous.
5  THE DEPONENT:
6      I have to ask you to repeat.
7  BY MR. VITTORIA:
8      Q    You testified that you would link closely the
9  purchase and installation of the Unit 1 replacement
10 collector plates, correct?
11     A    Mmhm.
12     Q    Is that a yes?
13     A    Yes.
14     Q    Okay.  And you said that was based on what you
15 know now.
16 MR. WILLIAMS:
17     Objection to form ... I'm sorry, go ahead, I'll
18 object at the end.
19 BY MR. VITTORIA:
20     Q    And that's not an exact repeat of what you
21 said, but that's what you indicated.  And I'm trying to
22 figure out exactly what you meant by that.
23     A    Well, let me clarify for you.
24     Q    Okay.
25     A    In November, 2003, when we found the severe

1  corrosion of the collector plates, we believed that

2  within a year that unit would have to shut down; it

3  would not be able to operate in any kind of mode; band-

4  aid mode, or whatever.

5  Because we were advised that this was, they could

6  only give us one year, at that time. So we worked very

7  quickly, in 2003, to get those plates.  Okay?

8  In 2004, it became real clear to us that the root

9  cause of the corrosion was due to a design failure of

10  the collector plates not being able to handle the water

11  balance.

12  So we made efforts to change the water balance,

13  because we believed that's the lowest remedy, lowest

14  cost remedy.

15  Q    What do you mean "the water balance"?

16  A    AES Puerto Rico is a zero-discharge facility.

17  We bring anywhere from four to six million gallons of

18  water a day into our plant.

19  We are not allowed and we're the only plant in

20  Puerto Rico, that is not allowed to discharge any water;

21  we can't discharge it to the sewer, and we can't dis-

22  charge it to the ocean; and we can't discharge it to any

23  of the canals.

24  Q    Okay.

25  A    AES Puerto Rico, the CDS was a method of

268

1       CERTIFICATE OF COURT REPORTER

2

3          I, MATTHEW J. CLUTTEUR SHORT, Court Reporter, and

4       member of Crespo Rodríguez, Inc.:

5          DO HEREBY CERTIFY:  That the foregoing transcript

6       is a full, true and correct record of the testimony

7       given which was taken down by me, and thereafter reduced

8       to the typewritten form.

9          I FURTHER CERTIFY:  That I am not in any way

10      involved or interested in the outcome of said action.

11         WITNESS my hand this 24 of January, 2006 in San

12      Juan, Puerto Rico.

13

14

15      _____

16      MATTHEW J. CLUTTEUR SHORT

17      Court Reporter

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, LP     *    C.A. NO.: 04-1282(JJF)
                        *
     Plaintiff         *
                        *
     Vs.               *
                        *
ALSTOM POWER, INC.      *
                        *
     Defendant         *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF MR. ALLAN DYER

DATE      :    March 9, 2006

TIME:     :    9:30 A.M.

OFFICE    :    Ober, Kaler, Grimes & Shriver, P.S.C.
                120 East Baltimore Street
                Baltimore, Maryland 21202-1643

HELD AT   :    Axtmayer, P.S.C.
                250 Ponce de León Avenue
                Suite 404
                Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

   Daniel D. Williams, Esq.

FOR DEFENDANT:

   Anthony Vittoria, Esq.

NOTARY PUBLIC:

   Liana I. Loyola, Esq.

COURT REPORTER:                **B.193**

   Mr. Matthew J. Clutteur Short

**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927



1    essentially, correct?

2    MR. WILLIAMS:

3        Objection to form.

4    THE DEPONENT:

5        May I ask you to repeat the question, please?

6    BY MR. VITTORIA:

7        Q    Sure.  AES Puerto Rico has concluded the

8    design that Betz made for the secondary RO system

9    essentially doesn't work.  Correct?

10    MR. WILLIAMS:

11        Objection to form.

12    THE DEPONENT:

13        I tend to think that AES Puerto Rico, as an entity,

14    has had doubts to the performance of the reverse osmosis

15.   supplied by G.E. Betz.

16    BY MR. VITTORIA:

17        Q    What is your personal feeling?

18        A    My personal feeling?

19        Q    Yes.

20        A    My personal feeling is G.E. Betz did demons-

21    trate that they could operate and build, as they

22    designed to, and therefore I paid them for it.

23        Q    Do you believe that the design that they have

24    actually instituted at AES Puerto Rico has fulfilled the

25    representations that they made, prior to the execution

1    of the purchase order?

2    MR. WILLIAMS:

3        Objection to form.  Vague, and lack of foundation.

4    THE DEPONENT:

5        I can testify that some of our technical personnel

6    don't feel that it's 100 percent up to spec.

7    BY MR. VITTORIA:

8        Q    In addition to the secondary reverse osmosis

9    system, you understand that AES Puerto Rico has made a

10   claim for a brine concentrator and a crystallizer in

11   this case.  Correct?

12       A    That's... I understand that.

13       Q    And why is it that, to your understanding, AES

14   Puerto Rico needs that brine concentrator and

15   crystallizer?

16       A    From my perspective, it's very simple.  The

17   CDS, which was the piece of equipment to achieve zero

18   discharge, due to the corrosion in the ESP, was unable

19   to achieve zero discharge.

20       So in order to avoid the severe corrosion, and to

21   operate what's in our permits, I feel that we have to

22   install a brine concentrator and crystallizer.

23       Q    And what is the purpose of that equipment?

24       A    The brine concentrator and crystallizer?

25       Q    Yes.

**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

B.195

1                    CERTIFICATE OF COURT REPORTER

2

3          I, MATTHEW J. CLUTTEUR SHORT, Court Reporter, and

4     member of Crespo Rodríguez, Inc.:

5          DO HEREBY CERTIFY:  That the foregoing transcript

6     is a full, true and correct record of the testimony

7     given which was taken down by me, and thereafter reduced

8     to the typewritten form.

9          I FURTHER CERTIFY:  That I am not in any way

10    involved or interested in the outcome of said action.

11         WITNESS my hand this 24th of March, 2006 in San

12    Juan, Puerto Rico.

13

14

15                    MATTHEW J. CLUTTEUR SHORT

16                         Court Reporter

17

18

19

20

21

22

23

24

25

**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

VIDEO DEPOSITION OF KARL HOGNEFELT
January 10, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,        :

            Plaintiff,        :
vs.                               Civ. No. 04-1282-JJF
                              :

ALSTOM POWER, INC.,

                              :

            Defendant.


APPEARANCES:

                FOR THE PLAINTIFF:
                Daniel D. Williams, Esq.
                Ann N. Sagerson, Esq.
                Williams & Connolly LLP
                725 Twelfth Street, N.W.
                Washington, D.C. 20005

                FOR THE DEFENDANT:

                James E. Edwards, Jr., Esq.
                Ober Kaler
                120 E. Baltimore Street
                Baltimore, Maryland, 21202-1643


Also Present: Matt Poplin, Videographer

                                        B.197

Karl Hogenefelt

Page 125

1                      document was marked Exhibit

2                      No. 9.)

3 BY MR. WILLIAMS:

4          Q.    Okay.  You can put that exhibit aside.

5 I'm going to hand you what is been marked as exhibit

6 nine.  Can you please identify this document, for the

7 record?

8          A.    Yes, this is, I think, the trip report

9 from my trip down there in October, yes, 2002.

10         Q.    And it's dated October 15, 2002,

11 correct?

12         A.    Yes, that's correct.

13         Q.    Lists you as the author?

14         A.    Yes.

15         Q.    Did you write this?

16         A.    Yes, I did.

17         Q.    The last page has some handwriting on

18 it.  Do you see that?

19         A.    Yes.

20         Q.    Is that last page part of your report?

21         A.    Not really.  It's just the internal

22 charge number to use for this project.

23         Q.    Just so we're clear for the record,

24 the rest of the document is your actual report?

25         A.    Yes.

B.198

**Karl Hogenefelt**

Page 126

1      Q.    And the last page is just an internal

2 charge document?

3      A.    Yes.

4      Q.    Okay.  And this accurately reflects

5 that you were at the plant from October 12, 2005 to

6 October 5th -- I'm sorry -- it accurately reflects

7 that you were at the plant from October 12th, 2002,

8 to October 15th, 2002, correct?

9      A.    That's correct, yes.

10      Q.    In the first paragraph of the report

11 you identify the people that you met on-site,

12 correct?

13      A.    Yes.

14      Q.    You list Gary Mattice, which is

15 M-a-t-t-i-c-e.  Do you see that?

16      A.    Yes, I'm not sure about the spelling.

17 Maybe that's not correct, but --

18      Q.    Who is Mr. Mattice?

19      A.    I guess it says commissioner manager.

20      Q.    What does that mean?  What does he do?

21      A.    He is the one that manage the start up

22 of the equipment from Alstom.

23      Q.    And you list two other gentlemen from

24 Alstom, correct?

25      A.    Yes.

B.199

Page 127

1         Q.     And three gentlemen from EEC?

2         A.     Yeah.

3         Q.     You don't list any from AES Puerto

4 Rico company, correct?

5         A.     No, I didn't have any meetings with

6 AES.  I met some people from AES, but I didn't sit

7 down and have any meetings with AES people.

8         Q.     Is that because at this time period in

9 October 2002 EEC and Alstom were responsible for

10 running the equipment because it had not yet been

11 delivered to AES Puerto Rico?

12                     MR. EDWARDS: Objection.

13                     THE WITNESS: I mean I was

14               called down by Bill Jarvis and Alstom

15               had their office on site, and that's

16               where I had the meetings with the

17               Alstom people and the EEC people.

18 BY MR. WILLIAMS:

19         Q.     And it's correct that you met with

20 those people because Alstom and EEC were responsible

21 for the equipment at this point, AES Puerto Rico

22 hadn't taken control of the facility yet correct?

23         A.     No.

24                     MR. EDWARDS: Objection.

25                     THE WITNESS: That's my

B.200

**Karl Hogenefelt**

Page 128

1                     understanding, yes.

2 BY MR. WILLIAMS:

3           Q.    On the paragraph under that you see it

4 says, the following are notes made for each day on

5 site, Saturday, October 12th, 2002?

6           A.    Yes, I see that.

7           Q.    Can you read the third sentence that

8 starts with the start of the CDS?  I'm sorry, it's

9 the fourth sentence.

10          A.    The start of the CDS caused a major

11 opacity spike 70 to 80 percent for 30 or 40 minutes.

12 It seems that -- should I continue?

13          Q.    Please.

14          A.    It seems that the ESP had difficulty

15 keep up with the ash load is -- when the ash load is

16 increased and till the water spray had reduced the

17 temperature down to 150 that is the normal gas

18 temperature with the CDS in service.

19          Q.    Okay.  And then we discussed before

20 that the legal limit for opacity is 20 percent,

21 correct?

22          A.    Yes.

23          Q.    Can you turn to page four, please.  Do

24 you see the middle paragraph that starts with start

25 up problems?                              B.201

**Karl Hogenefelt**

Page 129

1        A.    Yes.

2             Q.    And I'll read it.  Start up problems

3  with the CDS with high opacity levels 50 to 70

4  percent have been noticed.  The CDS start up

5  procedure includes start of ash feeding and then

6  start of spraying of water to get the gas temperature

7  down to 150 degrees Fahrenheit.  The ESP cannot

8  collect the high concentration without lowering the

9  gas temperature.  The longer it takes to get down to

10  normal operating temperature the bigger the opacity

11  spike.  Did I read that correctly?

12        A.    Yes.

13             Q.    So by the time of your trip to the

14  plant in Puerto Rico in October of 2002, the

15  procedure for running the CDS was to bring the outlet

16  temperature down to 150 degrees as quickly as

17  possible, is that correct?

18        A.    That's correct.  I mean 150 degree was

19  something that they had set as the operating

20  temperature, and that's what they were aiming for.

21             Q.    When you say they, are you referring

22  to EEC commissioning personnel?

23        A.    Whoever were operating I mean.

24             Q.    Would that be EEC and Alstom

25  commissioning personnel on site?

B.202

**Karl Hogenefelt**

Page 130

1          A.     I guess so.  I don't remember exactly

2 who it was that had the -- were managing the

3 operations at that time.

4          Q.     **Mr. VanHooser was one of those people**

5 **on site managing the operations?**

6          A.     No, not really.  I mean this is people

7 in the control room, and I think it was people from

8 Dupler Daniel (phonetic) also at that time.

9          Q.     **It's not your testimony that the**

10 **people in the control room decided on their own,**

11 **right?**

12          A.     No, I mean it's not, but I said I

13 don't know.  I didn't give them any instructions on

14 operating at a certain temperature.  This was I

15 mentioned 150 because that was something that I was

16 told that they had -- were aiming for.

17          Q.     **You were told that was the procedure**

18 **that had been established by that point, right?**

19          A.     That was a temperature that they

20 reported that they were operating, trying to, when

21 they were operating.

22          Q.     **Well, you actually wrote the CDS start**

23 **procedure includes start of ash feeding and then**

24 **spraying of water to get the gas down to 150 degrees**

25 **Fahrenheit?**

B.203

**Karl Hogenefelt**

Page 140

1 BY MR. WILLIAMS:

2        Q.    Okay.  I'm going to show you what's

3 been marked as exhibit 10.  Can you please identify

4 it, for the record.

5        A.    Yes, this was a summary I wrote.

6        Q.    This is a memorandum you wrote on

7 October 16th, 2002?

8        A.    Yes.

9        Q.    And you sent it to Mr. Jarvis,

10 Mr. Lillestolen, who is your boss, is that correct?

11       A.    Lillestolen, yes.

12       Q.    And who is Peter Maurin, and I

13 apologize if I asked you that before?

14       A.    Peter Maurin, as I said before, that

15 he was the manager of precontract where Tom Pearson

16 worked that was also involved in supporting this

17 project.

18       Q.    Do you recall sending this to anybody

19 else?

20       A.    I copied three other persons there.

21       Q.    Who are the people you copied?

22       A.    Jim Yann he is President of the

23 Knoxville, and my --

24       Q.    Just do one at a time.  That's the

25 Alstom office here in Knoxville?

                                              B.204