**William Jarvis**

Page 45

1          MR. EDWARDS:  Same objection.

2          THE WITNESS:  I'm not aware.

3      Q.   (By Mr. Williams)  Did Alstom expect that

4  AES would follow the revised start-up procedures

5  issued by EEC during the fall of 2002?

6      A.   Yes.

7      Q.   And it never advised AES that following the

8  revised start-up procedures would void any of the

9  warranties for the equipment?

10      A.   Did not.

11      Q.   Did Alstom ever request that EEC update its

12  August 2001 O and M manual to include the revised

13  procedures EEC was issuing?

14      A.   Did not.

15      Q.   But Alstom did expect that in the fall of

16  2002 EEC would issue revised operating procedures,

17  correct?

18          MR. EDWARDS:  Objection.  Foundation.

19  You can answer.

20          THE WITNESS:  Can you restate the

21  question, please?

22          MR. WILLIAMS:  Let's do it this way.

23  I'll withdraw the question.  You can put that exhibit

24  aside.

25          (Exhibit No. 7, offered and marked.)

B.243

**William Jarvis**

Page 46

1          Q.    (By Mr. Williams) I'm going to hand you

2    what's been marked as Exhibit No. 7.

3                Exhibit 7 is a letter from you to Mr.

4    VanHooser dated October 8, 2002, correct?

5          A.    That's correct.

6          Q.    And do you see you gave Mr. VanHooser a list

7    of open issues?

8          A.    Yes.

9          Q.    And issue 3 is update and issue revised

10   operating procedures, correct?

11         A.    Yes.

12         Q.    So Alstom did expect as of October 8, 2002

13   that EEC would be issuing revised operating

14   procedures?

15         A.    Yes.

16                MR. WILLIAMS:  Okay.  You can put that

17   exhibit aside.  Why don't we take a short break now.

18   Off record.

19                THE VIDEOGRAPHER:  Going off the record

20   at 10:31 a.m.

21                (A recess was taken.)

22                THE VIDEOGRAPHER:  Back on the record

23   at 10:38 a.m.

24                (Exhibit No. 8, offered and marked.)

25         Q.    (By Mr. Williams) Mr. Jarvis, I'm handing

B.244

**William Jarvis**

Page 49

1      A.    Yes.

2      Q.    And then you ask him to plan to have EEC's

3   commissioning team in place -- I'm sorry, to place the

4   CDS into service and to support the CDS operation on

5   24-hour coverage.

6      A.    Yes.

7      Q.    What was EEC's commissioning team's role in

8   the August through November 2002 time frame?

9      A.    Well, they were there to advise and assist

10   the operators in putting this equipment in service and

11   operating it.  During this particular period of time I

12   believe this refers to when the testing was going to

13   occur.

14            So I'll have to look at this quickly

15   here.  This looks like it was before the testing went

16   in.

17      Q.    And in the August, September 2002 time

18   frame, who was making the decisions as to how the CDS

19   should be operated?

20            MR. EDWARDS:  Objection.  Foundation.

21   You can answer.

22            THE WITNESS:  The -- again the guidance

23   was being provided by EEC but it was the operators who

24   operated the equipment that worked for AES that were

25   performing the operations of the equipment.

B.245

**William Jarvis**

Page 50

1       Q.    (By Mr. Williams)   So the operators working

2    for AES were making the decisions as to what bed

3    density to maintain?

4       A.    No.   Those global kind of issues I would say

5    EEC was dictating those.

6       Q.    EEC was also dictating what CDS outlet

7    temperature to run at, correct?

8       A.    Yes.

9       Q.    Okay.   Let's look at Mr. VanHooser's reply

10   to your E-mail which is on the top of the page and

11   dated August 27, 2002.   Are you there?

12      A.    Yes, okay.

13      Q.    Do you see that his third sentence says,

14   also attached is a discussion of the possible

15   modifications to the operation of the rotary airlocks

16   to address the opacity spikes?

17      A.    Yes.

18      Q.    And does this refresh your recollection that

19   there were modifications to the operating procedures

20   being made to address opacity spikes?

21      A.    I recall this, yes.   This is what I referred

22   to earlier about the ash was being carried downstream

23   in the precipitator and it had to be flushed back in

24   so that it was operational changes that were

25   techniques that were used to try and get that ash back

B.246

**William Jarvis**

Page 54

1      A.    Frankly I don't know what this says.

2    Finding the correct operating temperature.

3      Q.    Well, is it your understanding generally

4    that as of mid September 2002 EEC had not yet found

5    the correct CDS outlet temperature for the CDS?

6                MR. EDWARDS:  Objection.  You can

7    answer.

8                THE WITNESS:  No, I don't believe

9    that's the case.

10     Q.    (By Mr. Williams)  So you think they had

11   found the correct CDS outlet temperature by this date?

12               MR. EDWARDS:  Same objection.  You can

13   answer.

14               THE WITNESS:  There is a complex set of

15   factors that go into the operating temperature; one

16   being the quantity of chlorides in the ash, one being

17   quantity of chlorides in the spray water that have to

18   all go in to determining what that outlet temperature

19   is.

20     Q.    (By Mr. Williams)  Are you aware that as of

21   this date EEC was experimenting with various outlet

22   temperatures to see what the effect would be on

23   opacity?

24     A.    No.

25     Q.    But it looks like Ms. Rothe was aware of

B.247

Page 64

1          A.    Yes.

2          Q.    And that legally binding contract between

3     EEC and Alstom contains a corrosion warranty for the

4     pollution control equipment?

5                    MR. EDWARDS:  Objection.  Legal

6     conclusion but you can certainly answer.

7                    THE WITNESS:  In that the specification

8     was immediate pass through to EEC, yes.

9          Q.    (By Mr. Williams)  What are you referring to

10    when you refer to the specification?

11         A.    The Duke Fluor/Daniel specification that we

12    looked at earlier today for the precipitator and CDS

13    was tailored to the Environmental Elements equipment.

14                    They were selected -- Environmental

15    Elements was selected.  When we came into the project,

16    they were already the supplier of the equipment and

17    the specification was tailored to their design.

18                    So we passed it.  Essentially that had

19    already been agreed to between DFD and Environmental

20    Elements.  We were hired to execute the contract and

21    we passed it on to those exact specifications from

22    Duke Fluor/Daniel for the CDS and ESP were passed on

23    to EEC.

24         Q.    So you saw yourself as the middleman between

25    EEC and DFD?

B.248

**William Jarvis**

Page 65

1      A.    Yes.

2      Q.    Are you aware whether the purchase order

3   that Alstom entered into with EEC contains an explicit

4   two-year corrosion warranty for the pollution control

5   equipment?

6                MR. EDWARDS:  Objection.  Legal

7   conclusion but you can answer.

8                THE WITNESS:  My only knowledge of that

9   is that it is in the specification.  I'm not fully

10   cognizant whether it's called out specifically

11   separately or not.

12      Q.    (By Mr. Williams)  In the purchase order?

13      A.    In the purchase order.  I will turn that

14   off.  I thought I had it turned off.

15      Q.    That's fine.

16      A.    I'm sorry.

17      Q.    But you are aware that EEC gave Alstom a

18   corrosion warranty for the equipment?

19      A.    Yes.

20      Q.    And you're also aware that at some point at

21   the end of 2002 EEC notified Alstom that the warranty

22   was void?

23      A.    Yes, I'm aware they took that position.  We

24   disagreed with that position but --

25      Q.    And Alstom took -- I'm sorry, strike that.

B.249

**William Jarvis**

Page 66

1    EEC took the position the warranty was void as a

2    result of the failure of Alstom to properly insulate

3    and lag the precipitator?

4         A.    Yes.

5         Q.    So Alstom was the one that actually

6    constructed the precipitator?

7         A.    Yes, that's correct.

8         Q.    And it was supplied by EEC?

9         A.    Yes.

10        Q.    Are insulation and lagging the same thing?

11        A.    Insulation is a thermal blanket.  Lagging is

12   a metal cover that protects the thermal blanket from

13   -- it's a hard surface that just prevents puncture and

14   so on of the thermal blanket.

15        Q.    And this thermal blanket goes around the ESP

16   equipment?

17        A.    And the CDS equipment, yes.

18        Q.    And Alstom was responsible for insulating

19   and lagging the pollution control equipment?

20        A.    Yes.

21        Q.    Did Alstom fail to do so before the

22   equipment was operational?

23        A.    We insulated all the equipment before it was

24   commissioned.  We did not have all of the lagging

25   installed.

B.250

Page 67

1      Q.   And do you believe that the failure to have

2   all the lagging installed caused corrosion of the

3   electrostatic precipitator plates?

4      A.   I do not.

5             MR. EDWARDS:  Objection.

6             THE WITNESS:  I do not.

7      Q.   (By Mr. Williams)  Why do you think EEC took

8   that position?

9             MR. EDWARDS:  Objection.  Assumes facts

10  not in evidence.  Lack of foundation.  You can answer.

11            THE WITNESS:  I can only speculate why

12  they took the position is they were trying to get out

13  of the project.  They wanted to close this and be done

14  with it and get away from it.

15     Q.   (By Mr. Williams)  Do you think they

16  perceived some risk of corrosion and they wanted to

17  avoid it before any corrosion was discovered?

18     A.   I don't know.

19            MR. EDWARDS:  Objection.

20     Q.   (By Mr. Williams)  It's possible --

21     A.   We do know that going in there after this

22  letter nullifying -- trying to nullify the warranty,

23  we know we've gone in there since then after that

24  period of time and there was no corrosion in the

25  precipitator or the CDS.

B.251

Page 80

1    supply to supply that piping?

2        A.    Yes.

3        Q.    During commissioning did EEC ask you to

4    determine what the CDS spray water chloride levels

5    was?

6                    MR. EDWARDS:  By you you mean Mr.

7    Jarvis?

8                    MR. WILLIAMS:  I do, yeah, thank you.

9                    THE WITNESS:  There were many attempts

10    to try and find out what that information was.  And

11    our commissioning folks would go back to Duke

12    Fluor/Daniel and try and get the information.

13                    It was not forthcoming from them.  I'm

14    sure there was discussions with AES to get the

15    information.  No one could seem to come up with the

16    information to say what those levels of chlorides were

17    in the water.

18        Q.    (By Mr. Williams)  Do you remember

19    specifically personally being asked by Mr. VanHooser?

20        A.    Yes, I do.

21        Q.    And what did you do with Mr. VanHooser's

22    request?

23        A.    I spoke with Charlie Lyda (phonetic) from

24    Duke Fluor/Daniel and said it's imperative that we get

25    this information.

B.252

**William Jarvis**

Page 81

1            And he ultimately either discussed it

2    with Tracy Jarvis of AES or sent them a letter, I

3    don't know which, but ultimately Tracy Jarvis gave us

4    one sheet of paper showing what the CDS spray water

5    was and represented that that's a normal condition of

6    operation.

7          Q.    Did EEC rely on that sheet of paper when it

8    set the CDS outlet temperature?

9                MR. EDWARDS:   Objection.   Foundation.

10   You can answer.

11               MR. WILLIAMS:   During commissioning?

12               THE WITNESS:   We provided it to Mr.

13   VanHooser.   So I would presume that yes, he took that

14   into consideration.

15         Q.    (By Mr. Williams)   But you don't know

16   specifically what he took into consideration?

17         A.    I do not know .

18         Q.    Do you know if EE -- strike that.   Do you

19   know if during commissioning, EEC instructed AES

20   Puerto Rico to operate the CDS with an outlet

21   temperature below the levels in the material balance

22   charts that EEC had supplied?

23               MR. EDWARDS:   Objection, foundation.

24               THE WITNESS:   I do not know

25   specifically that.

B.253

**William Jarvis**

Page 82

1      Q.    (By Mr. Williams) Do you know where Mr.

2   Pearson got the information that he set forth in his

3   January 7th E-mail?

4      A.    I do not know.

5      Q.    And by Mr. Pearson's E-mail I'm referring to

6   Exhibit No. 16.

7      A.    I understand, yes.

8      Q.    I should have made that clear in my

9   question.

10     A.    Okay.

11              (Exhibit No. 17, offered and marked.)

12     Q.    (By Mr. Williams) Mr. Jarvis, you've been

13   handed what's been marked Exhibit No. 17.

14              Exhibit 17 is an E-mail from you to

15   several people at Alstom dated January 9, 2003; is

16   that correct?

17     A.    Yes.

18     Q.    And it concerns EEC's comments to Alstom's

19   punch list, correct?

20     A.    Yes.

21     Q.    And you provide Ms. Rothe with your comments

22   on EEC's response, correct?

23     A.    Well, mine or a compilation of -- I think I

24   was at the job site at this period of time or

25   formulating these, if not specifically at this period

B.254

**William Jarvis**

1    about those issues.

2         Q.   Have you seen the CDS spray water tank

3    yourself?

4         A.   I'm sure I have.

5         Q.   Is it possible to draw water from the CDS

6    spray water tank?

7         A.   To draw water from it?

8         Q.   If I took a cup and held it under the CDS

9    spray water tank, is there somewhere where I could

10   take a water sample?

11        A.   I do not know.

12        Q.   If one wanted to take a water sample from

13   the CDS spray water tank, what would be involved in

14   doing so?

15              MR. EDWARDS:  Objection.  Asked and

16   answered.

17              THE WITNESS:  Specifically from the

18   tank?

19              MR. WILLIAMS:  Yes.

20              THE WITNESS:  I do not know.

21        Q.   (By Mr. Williams)  How about from the lines

22   running from the tank into the CDS?

23        A.   Perhaps.

24        Q.   Now, you know that those lines connect to

25   CDS spray nozzles ultimately, correct?

B.255

**William Jarvis**

Page 93

1      A.    Yes.

2      Q.    And those CDS spray nozzles disconnect from

3    the line, correct?

4      A.    Say again please.

5      Q.    Well, the CDS spray nozzles have a mechanism

6    whereby they can be disconnected from the water line,

7    correct?

8      A.    Yes.

9      Q.    So it certainly would be possible to take a

10    water sample at the end of the line connecting the CDS

11    spray water tank to the CDS?

12      A.    Oh, I think that might be a little

13    dangerous.

14      Q.    Because the water is under high pressure?

15      A.    Yes.

16      Q.    But the pressure is controlled by a valve,

17    right?

18      A.    Yeah.  There is a valve that controls that

19    water pressure to all the nozzles.

20      Q.    And the valve can be shut off?

21      A.    It could.  If the equipment was out of

22    service, it could, yes.

23      Q.    To your knowledge did -- strike that.  To

24    your knowledge did Alstom ever take a water sample of

25    the CDS spray water for testing in 2002 or 2003?

B.256

**William Jarvis**

Page 94

1       A.    Not that I recollect.

2       Q.    In all your years of experience, have you

3    ever had water tested for chloride content?

4       A.    Can't say as I have.  Really not

5    specifically, no.

6       Q.    Did Alstom ever investigate the cost of

7    getting a water chloride test done?

8       A.    On AES Puerto Rico?

9       Q.    Ever, to your knowledge?

10       A.    I don't know.

11            MR. EDWARDS:  You're trying to speak

12    for the whole company now.

13            MR. WILLIAMS:  To his knowledge.  I

14    limited it to his knowledge.

15       Q.    (By Mr. Williams)  Do you know if Alstom

16    ever investigated the cost of taking a chloride water

17    sample?

18       A.    Not to my knowledge.

19       Q.    Do you have any rough estimate of how much

20    it would cost?

21       A.    I don't know.

22       Q.    You can put that exhibit aside.

23                    (Exhibit No. 18, offered and marked.)

24       Q.    (By Mr. Williams)  I'm going to hand you

25    what's been marked as Exhibit No. 18.

B.257

**William Jarvis**

Page 148

1    while the unit was still shutdown in November 2003?

2         A.    Yes.

3         Q.    Did you personally enter the ESP and see the

4    corroded materials?

5         A.    Just very -- on the peripheral end of it

6    yes, I did.

7         Q.    Mr. Hognefelt did a thorough inspection?

8         A.    Yes, he did.

9                     (Exhibit No. 25, offered and marked.)

10        Q.    (By Mr. Williams)  I'm going to hand you

11   what's been marked Exhibit 25.

12                    Exhibit 25 is an E-mail from you to Ms.

13   Rothe with a CC to Thomas Kehoe dated November 20,

14   2003?

15        A.    Yes.

16        Q.    Did I pronounce his name correctly?

17        A.    Kehoe.

18        Q.    Kehoe.

19        A.    Yes.

20        Q.    Who is Mr. Kehoe?

21        A.    Alstom's internal attorney.

22                    MR. WILLIAMS:   Counsel, is Alstom

23   claiming privilege on this document?

24                    MR. EDWARDS:  No.

25                    MR. WILLIAMS:   Okay.

B.258

**William Jarvis**

Page 149

1    Q.    (By Mr. Williams)  Do you see that you asked

2    Ms. Rothe to send a letter to EEC, Liberty Mutual

3    advising that corrosion was found and notifying EEC

4    and Liberty Mutual that you would hold them

5    responsible for the repairs under the corrosion

6    warranty?

7    A.    Yes.

8    Q.    And then you go on to ask Ms. Rothe to

9    request that EEC and Liberty Mutual immediately advise

10    the availability of replacement collector panels.

11              Do you see that?

12    A.    Yes, um-hm.

13    Q.    And Ms. Rothe did so, right?

14    A.    I assume so.  She's usually pretty good at

15    following through and taking care of things.

16    Q.    Do you recall whether EEC and Liberty Mutual

17    responded to the request to advise on the availability

18    of replacement collector materials?

19    A.    To my recollection they did not respond to

20    us.

21    Q.    You can put Exhibit 25 to the side.

22              (Exhibit No. 26, offered and marked.)

23    Q.    (By Mr. Williams)  I'm going to hand you

24    what's been marked Exhibit No. 26.

25              Do you see Exhibit 26 is an E-mail from

B.259

**William Jarvis**

Page 152

1    Q.    You discussed the corrosion with Mr. Dyer?

2    A.    Yes.

3    Q.    What do you recall about those discussions?

4    A.    Very, very little recollection of those

5    conversations.

6    Q.    Is there anything that you do recall

7    specifically?

8    A.    I know he said that he looked to us as being

9    a warranty claim and we talked about well, we'll begin

10   the investigation, it's a potential claim, we'll look

11   into it.

12          I explained to him that Liberty Mutual is

13   responsible for this warranty, it's a pass through as

14   we consider it to EEC. We were -- we said we would

15   pursue the warranty claim.

16          And I also believe at that same time that

17   we asked for documentation so that we could begin to

18   look into the warranty claim.

19   Q.    You actually offered to assist AES Puerto

20   Rico -- well, strike that.

21          You actually offered to assist in getting

22   EEC to honor its warranty obligations, correct?

23   A.    We may have said that, yes. I'm sure we

24   were looking into it as warranty -- potential warranty

25   claim and we would pursue it through.

B.260

**William Jarvis**

Page 154

1       A.    Go ahead.

2       Q.    Okay.   You asked about the chloride content

3    of the water?

4       A.    And the temperature of the CDS outlet

5    temperature, water flows, various other aspects of the

6    operating parameters around the CDS.

7       Q.    And are you aware that AES Puerto Rico sent

8    water quality data to Mr. Hognefelt and his team

9    during this time frame?

10      A.    There was some data sent but I don't know

11   exactly what was in all that data.   I know that was

12   going on for quite a long period of time after the

13   corrosion.

14             I mean there was interfacing dialogue

15   between Mr. Hognefelt and Mr. Stinson from AES as well

16   as others at the power plant.

17      Q.    People at the power plant were sending data

18   concerning what's known as TR spark rates and power

19   measurements?

20      A.    Yes, exactly.   That was some of the data

21   that was being sent for sure.   To my recollection we

22   never got the data that would allow us to look into

23   and prove up that the corrosion was related to the EEC

24   responsibilities.

25      Q.    What data specifically do you recall not

B.261

**William Jarvis**

Page 162

1    characterized it, and I think I spoke with Al on this,

2    characterized it as much less but nevertheless

3    corrosion.

4        Q.    (By Mr. Williams)  Did Alstom then send

5    anyone to site to inspect the corrosion?

6        A.    I don't recall the specifics around that,

7    whether it was a short-term outage, long-term outage.

8    And I don't recall if we came to the site for that

9    particular event.  It's possible we did.

10       Q.    Corrosion can only be inspected when a unit

11   is shutdown; is that right?

12       A.    That's correct.  Corrosion of this

13   particular nature, yes, that's correct.

14       Q.    You can't enter the unit when it's

15   operating?

16       A.    That's correct.

17       Q.    And sitting here today you don't recall

18   whether anyone from Alstom inspected the unit 1 ESP

19   when it was shutdown in January of 2004?

20       A.    I don't recollect.

21               MR. WILLIAMS:  Let's take a short break

22   now.

23               THE VIDEOGRAPHER:  Going off the record

24   at 2:02 p.m.

25               (A recess was taken.)

B.262

**William Jarvis**

Page 163

1          (Exhibit No. 28, offered and marked.)

2          THE VIDEOGRAPHER:  Back on the record

3    at 2:10 p.m.

4          Q.   (By Mr. Williams)  Mr. Jarvis, I'm going to

5    hand you what's been marked Exhibit No. 28.

6          Exhibit 28 is an E-mail from yourself to

7    a Bruce Buchholz dated January 20, 2004.

8          Do you see that?

9          A.   Yes.

10         Q.   And there is a CC to Ray Hickey and Donna

11   Anderson and Chris Tapper.

12         A.   Yes.

13         Q.   Who is Mr. Buchholz?

14         A.   Mr. Buchholz was the head of our group at

15   that time in Windsor.

16         Q.   And you reported directly to Ray Hickey at

17   this time?

18         A.   That's correct.

19         Q.   Mr. Hickey report to Mr. Buchholz?

20         A.   That's correct.

21         Q.   Who is Donna Anderson?

22         A.   At the time I believe -- I believe she was

23   the controller at that time I think.

24         Q.   How about Chris Tapper?

25         A.   Which is why I'm struggling with that

B.263

**William Jarvis**

Page 164

1    question because he was -- he may have been the -- he

2    may have been the controller.

3        Q.    Were you asked to prepare a summary of the

4    ESP corrosion that was discovered at the AES Puerto

5    Rico facility?

6        A.    Yes.

7        Q.    Who asked you to do that?

8        A.    I would assume Mr. Buchholz.

9        Q.    What was the purpose of you preparing this

10   summary, if you know?

11       A.    I would expect because it was a known issue

12   and, you know, it was something that could impact the

13   AES.  So he probably wanted to know.

14             I mean he wanted to know what was going

15   on in the business so probably asked me to summarize

16   it for him.

17       Q.    Could you please read the E-mail.  I know

18   it's a page and a half.  Read it to yourself.

19       A.    Okay.  Okay.

20       Q.    Is there anything in your January 20, 2004

21   summary that's inaccurate?

22             MR. EDWARDS:  Objection to the form.

23   You can answer.

24             THE WITNESS:  Given what I knew at the

25   time?

B.264

**William Jarvis**

Page 165

1              MR. WILLIAMS:  Yes.

2              THE WITNESS:  I wouldn't say -- it's

3    probably pretty accurate.

4         Q.   (By Mr. Williams)  Given what you know now

5    is there anything you currently believe is inaccurate

6    from your January 20, 2004 summary?

7              MR. EDWARDS:  Objection.  You can

8    answer.

9              THE WITNESS:  Well, I don't know.

10   Specifically maybe not.

11        Q.   (By Mr. Williams)  Do you see in the second

12   paragraph, the second sentence says that Mr. Hognefelt

13   felt that the unit 2 ESP corrosion was the worst case

14   of corrosion he had seen in his 25 plus year career?

15        A.   I see that, yes.

16        Q.   Did he tell you that directly?

17        A.   Yes.

18        Q.   In going down three paragraphs you see it

19   says that AES views this as extremely serious as it

20   has a potential to shut down the plant?

21        A.   Yes.

22        Q.   Do you share AES -- strike that.  Did you

23   share AES's assessment?

24        A.   This assessment that it --

25        Q.   Did you share AES's assessment that the

B.265

**William Jarvis**

Page 166

1    corrosion problem was so serious that it had the

2    possible to shut down the plant?

3                    MR. EDWARDS:  Objection.  You can

4    answer.

5                    THE WITNESS:  We know that what was

6    occurring there was -- when it was corroding, the

7    plates were falling over and falling against other

8    adjacent electrodes and shorting it out.

9                    So, yes, as it corroded it shorted out

10   the electrostatic precipitator and had to shut things

11   down and go in and fix it, so, yes, to that degree.

12        Q.    (By Mr. Williams)  Do you see that the

13   E-mail continues with you writing that AES is

14   currently pursuing means to eliminate the RO blow down

15   stream from the CDS makeup?

16        A.    Um-hm.

17        Q.    And then you say they are considering

18   applying for emergency relief to their zero discharge

19   permit.

20        A.    Yes.

21        Q.    So what you're saying there that AES was

22   considering modifications to its water systems so that

23   AES could send clean water to the CDS system but that

24   doing so wouldn't permit AES to be able to dispose of

25   all of its water through the CDS mechanism?

B.266

Page 188

1     (Exhibit No. 38, offered and marked.)

2      Q.   (By Mr. Williams)  I'm going to hand you

3   what's been marked Exhibit No. 38.

4           Exhibit 38 is an E-mail from you to Mr.

5   Dyer dated March 10, 2004.

6      A.   Um-hm.

7      Q.   With a CC to Mr. Lieberherr; is that

8   correct?

9      A.   Yes.

10     Q.   This E-mail follows up on the conference

11   call that you just discussed with Mr. Dyer, right?

12     A.   Yes.

13     Q.   In the first full paragraph you explain that

14   you share AES's concern and frustration about the

15   pollution control equipment as Alstom has struggled to

16   resolve the problems with no support or cooperation

17   from the supplier, Environmental Elements Corp; is

18   that right?

19     A.   That's correct.

20     Q.   And that's a true statement, right?

21     A.   Yes.

22     Q.   And at the bottom of the next paragraph you

23   write that since Alstom is a direct competitor to

24   Lurgi, Lurgi has been unwilling to provide support to

25   Alstom.  This has hampered our progress, right?

B.267

**William Jarvis**

Page 194

1            Do you see that?

2     A.   Yes.

3     Q.   And by this he's referring to the three

4 outstanding warranty issues, right?

5     A.   Um-hm.

6     Q.   Yes?

7     A.   Yes.

8     Q.   What did you do in response to Mr. Dyer's

9 request to begin the contract dispute resolutions with

10 respect to the two issues you didn't resolve the next

11 day?

12     A.   I don't recall.

13     Q.   And to be clear one of the issues you didn't

14 resolve related to the ESP corrosion?

15     A.   Yes.

16     Q.   You can put that --

17     A.   At this time frame we were still trying to

18 find out really what caused the corrosion and we

19 didn't know.

20           (Exhibit No. 41, offered and marked.)

21     Q.  (By Mr. Williams)  I'm going to hand you

22 what's been marked Exhibit No. 44.

23         I'm handing you what's been marked

24 Exhibit 41.

25         Exhibit 41 is a letter from you to Mr.

B.268

**William Jarvis**

Page 195

1      Dyer dated May 18, 2004, correct?

2          A.   Yes.

3          Q.   And the letter discusses four warranty

4      items; is that right?

5          A.   That's correct.

6          Q.   It's in response to an April 30, 2004 letter

7      from AES Puerto Rico to you concerning those warranty

8      items?

9          A.   That's correct.

10         Q.   You see issue 1 is electrostatic

11     precipitator corrosion?

12         A.   Yes.

13         Q.   Can you read to yourself the paragraph under

14     section 1 that starts as you note?

15         A.   Yes.

16         Q.   You informed Mr. Dyer that Alstom has

17     struggled to understand the corrosion problem because

18     of difficulties with EEC and Lurgi; is that right?

19         A.   That's correct.

20         Q.   And then in the next paragraph you say that

21     Alstom continues to investigate the problem, right?

22         A.   Can you repeat that, please?

23         Q.   Yes.  Sorry.  In the next paragraph you say

24     that Alstom continues to investigate the problem?

25         A.   Investigate the extremely rapid corrosion

B.269

William Jarvis

Page 196

1    phenomena, yes.

2         Q.    And then Alstom requests access to operating

3    records; is that right?

4         A.    Yes.

5         Q.    Okay.  You can set Exhibit 41 aside.

6                     (Exhibit No. 42, offered and marked.)

7         Q.    (By Mr. Williams)  I'm going to hand you

8    what's been marked as Exhibit 42.

9         A.    Yes.

10        Q.    Exhibit 42 is a letter in which Mr. Dyer

11   responds to your May 18, 2004 letter, correct?

12        A.    Correct.

13        Q.    Do you see his letter has four sections

14   concerning the four outstanding warranty claims?

15        A.    Yes.

16        Q.    And the first one relates to the

17   electrostatic precipitator corrosion.

18        A.    Yes.

19        Q.    And at the end of the second paragraph of

20   that section he writes, if Alstom continues to believe

21   that it needs to inspect the plant's operating

22   records, please contact me to arrange a time to come

23   to the plant for such an inspection.

24                     Do you see that?

25        A.    Yes.

B.270

**William Jarvis**

Page 197

1     Q.   Did you contact Mr. Dyer to arrange a time

2   to come to the plant to inspect the plant operating

3   records?

4     A.   I don't recall.

5     Q.   You can set that exhibit aside.  Now, we

6   talked previously very briefly about reinjecting fly

7   ash from the ESP into the boiler.

8            Do you remember that?

9     A.   I do.

10     Q.   And I believe we talked about the fact that

11   the fly ash contains chloride salt.

12            Do you remember that?

13     A.   Yes.

14     Q.   When fly ash is reinjected into the boiler

15   from the ESP, is it your understanding that it then

16   creates hydrochloric acid in the boiler?

17     A.   Yes, I believe so.  There is a complex

18   chemical reaction that goes on there and one of the

19   constituents is hydrochloric acid when it reaches a

20   humid state.

21     Q.   And then the hydrochloric acid exits the

22   boiler, right?

23     A.   Yes.  We're a little beyond my expertise

24   level here.

25            MR. EDWARDS:   I'll object on foundation

B.271

**William Jarvis**

Page 219

1      Q.   That would be a fair assessment?

2      A.   Yes.

3      Q.   Then you say you need to respond to AES and

4  you need Liberty's input?

5      A.   Yes.

6      Q.   We'll put that exhibit aside.

7               (Exhibit No. 46, offered and marked.)

8      Q.   (By Mr. Williams)  I'll hand you what's been

9  marked as Exhibit 46.

10          Exhibit 46 is an E-Mail from you to Mr.

11  Dyer dated June 29, 2004, correct?

12     A.   Yes.

13     Q.   Did you need Liberty Mutual -- I'm sorry,

14  did you need Liberty Mutual's input before sending

15  this E-mail to AES?

16           MR. EDWARDS:  Objection to the extent

17  that calls for a legal conclusion.  You can answer.

18           MR. WILLIAMS:  Actually let's strike

19  that question.

20     Q.   (By Mr. Williams)  Can you turn to the

21  second page of the document.

22         Do you see on the bottom of the second

23  page there is an E-mail from you to Mr. Dyer dated

24  June 28th?

25     A.   Yes.

B.272

**William Jarvis**

Page 220

1      Q.   2004?

2      A.   Yes.

3      Q.   And in the E-mail you say that EEC has

4   promised to send you a letter regarding ESP collector

5   plate corrosion by the end of this week.

6      A.   Yes.

7      Q.   And who at EEC promised that letter to you?

8      A.   Wow.  I can -- I am -- this is speculation

9   but I suspect it was not EEC that I was -- when I

10  referred to it, it was probably somebody from Liberty

11  Mutual being Frank Hucks I think is probably the case.

12     Q.   Do you recall insisting that Liberty Mutual

13  take a position as to what it was going to do with AES

14  Puerto Rico's warranty claim?

15     A.   Yes.

16     Q.   And you were having trouble getting that

17  response from Liberty Mutual?

18     A.   Yes, that's correct.

19     Q.   You then do see above that E-mail Mr. Dyer

20  sent you an E-mail on June 28, 2004?

21     A.   Yes.

22     Q.   And Mr. Dyer wrote to you that he

23  appreciated your update; however, as you are very much

24  aware the ESP equipment warranty is between AES and

25  Alstom.

B.273

**William Jarvis**

Page 221

1          Do you see that?

2      A.   Yes, I do.

3      Q.   And then the E-mail that's on the top of the

4  first page of Exhibit 46 is your response to Mr. Dyer;

5  is that right?

6      A.   Yes.

7      Q.   Do you see in the second paragraph of your

8  response to Mr. Dyer you write that Alstom diligently

9  followed the terms under our contract with DFD and

10  accordingly passed the contract warranty terms on to

11  EEC?

12      A.   Yes.

13      Q.   Then you write as such any warranty claim to

14  the extent it is a valid claim under the contract

15  warranty terms is the responsibility of Environmental

16  Elements Corp.

17      A.   Yes.

18      Q.   And that was Alstom's view as of June 29,

19  2004?

20      A.   Yes.

21      Q.   And indeed Alstom was working hard to get

22  EEC to honor the warranty obligation as of this date,

23  correct?

24      A.   Yes.

25          MR. EDWARDS:  Objection to the extent

B.274

**William Jarvis**

Page 222

1    it calls for a legal conclusion.

2         Q.    (By Mr. Williams)   I'm going to ask you to

3    get out Exhibit 29.

4              Exhibit 29 as we discussed before is a

5    letter from you to Mr. Dyer dated June 2, 2004,

6    correct?  I'm sorry, dated July 2, 2004, correct?

7         A.    Correct.

8         Q.    And I believe you testified before that the

9    letter summarizes Alstom's -- strike that.

10             I believe what you testified before is

11   that the letter summarizes what Alstom knows about the

12   corrosion issue as of this date; is that accurate?

13        A.    Yes.

14        Q.    And was that the purpose of this letter?

15        A.    Yes.

16        Q.    Who drafted this letter?

17        A.    Well, I suspect I put it together again with

18   compilations from various inputs within other

19   entities.

20        Q.    When you say inputs from other entities, are

21   you referring to other parts of Alstom?

22        A.    Yes.

23        Q.    Do you see you say in summary this is what

24   we know about -- I'm sorry, do you say in summary this

25   is what we know to date about the corrosion issue on

B.275

**William Jarvis**

Page 250

1   letter to go to Mr. Beers of TASC; is that right?

2       A.   Yes.

3       Q.   So were you proposing that Ms. Rothe send

4   TASC a response to its July 2, 2004 letter with the

5   information you're supplying in this E-mail?

6       A.   Yes.

7       Q.   And you proposed that Alstom tell TASC that

8   Alstom has reviewed TASC's report dated July 2, 2004

9   and finds that it does not provide an adequate basis

10  for rejection of the ESP corrosion warranty claim,

11  right?

12      A.   Yes.

13      Q.   Then you list a series of nine items for

14  which you solicit information from TASC, correct?

15      A.   Yes.

16      Q.   And those nine items all relate to

17  deficiencies that you had identified in the technical

18  information from the TASC July 2, 2004 report; is that

19  accurate?

20      A.   Well, it seems like we're asking for the

21  basis of what they -- how they formed their conclusion

22  and for additional information on how their conclusion

23  pans out.

24      Q.   And you believed TASC didn't have an

25  adequate basis for its conclusion when you drafted

B.276

**William Jarvis**

1     Q.   Other than receiving this letter?

2     A.   Other than this note here, I do not know.

3     Q.   You think it might be inaccurate?

4          MR. EDWARDS:  Objection.  Calls for

5     speculation.  He's already said he doesn't know what

6     this refers to.

7          THE WITNESS:  I do not know what it

8     means.  I don't know.

9     Q.   (By Mr. Williams)  Okay.  You can set

10    Exhibit 54 to the side.  Let's go off record for a

11    short break.

12         THE VIDEOGRAPHER:  Going off the record

13    at 5:37 p.m.

14              (A recess was taken.)

15         THE VIDEOGRAPHER:  Back on the record

16    at 5:42 p.m.

17              (Plaintiff's Exhibit No. 55, offered

18              and marked.)

19    Q.   (By Mr. Williams)  Mr. Jarvis, I've just

20    handed you what's been marked Exhibit No. 55.

21         Exhibit 55 is a July 30, 2004 letter from

22    you to Al Dyer of AES Puerto Rico; is that correct?

23    A.   Yes.

24    Q.   And you attached to your July 30, 2004

25    letter a copy of the July 2, 2004 report from TASC

B.277

William Jarvis

Page 282

1    Consulting; is that right?

2          A.    Yes.

3          Q.    And you request additional data from AES

4    Puerto Rico that had been requested by TASC Consulting

5    in its July 2, 2004 letter; is that right?

6          A.    Yes.

7          Q.    You see your last sentence says, we can

8    discuss the best means to obtain this data during our

9    meetings next week?

10         A.    Yes.

11         Q.    Did you meet with Mr. Dyer the following

12   week after sending this letter?

13         A.    I don't recall.

14         Q.    Do you remember if you met with Mr. Dyer in

15   August of 2004?

16         A.    It's likely I did but specifically I don't

17   recall.

18         Q.    So specifically you don't recall what

19   happened at any meeting you had with him in August

20   2004?

21         A.    At the moment I do not remember.

22         Q.    I'm sorry?

23         A.    I'm sorry, I do not remember at this moment.

24         Q.    Okay.    You can put Exhibit 55 to the side.

25   Even after sending Mr. Dyer your July 2, 2004 letter

B.278

**William Jarvis**

Page 283

1    concerning Alstom's analysis of the corrosion problem,

2    Alstom continued to investigate the causes of the

3    corrosion; is that right?

4        A.   Yes.

5        Q.   And as late as September 2004 Alstom still

6    didn't have a definitive analysis as to what was

7    causing the problems with the EEC supplied

8    precipitator equipment; is that right?

9                    MR. EDWARDS:  Objection.

10                   THE WITNESS:  Well, the July 2nd letter

11   pinned what we believe is the cause of the corrosion.

12   The six or seven items, I don't recall exactly now.

13       Q.   (By Mr. Williams)  But investigations as to

14   the cause of the corrosion were continuing as of

15   September 2004; is that right?

16                   MR. EDWARDS:  Objection.  Asked and

17   answered.

18                   MR. WILLIAMS:  Yeah, strike that

19   question.

20                   (Exhibit No. 56, offered and marked.)

21       Q.   (By Mr. Williams)  I'm going to hand you

22   what's been marked as Exhibit No. 56.

23       A.   Okay.

24       Q.   Can you identify what this document is?

25       A.   This looks to be a report that was given in

B.279

Page 296

```
 1              C E R T I F I C A T E

 2        I hereby certify that I am a Notary Public, in

 3   and for the state of Connecticut, duly commissioned

 4   and qualified to administer oaths.

 5        I further certify that the deponent named in

 6   the foregoing deposition was by me duly sworn, and

 7   thereupon testified as appeared in the foregoing

 8   deposition; that said deposition was taken by me

 9   stenographically in the presence of counsel and

10   reduced to typewriting under my direction, and the

11   foregoing is a true and accurate transcript of the

12   testimony.

13        I further certify that I am neither of counsel

14   nor attorney to either of the parties to said suit,

15   nor am I an employee of either party to said suit, nor

16   of either counsel in said suit, nor am I interested in

17   the outcome of said cause.

18        Witness my hand and seal as Notary Public this

19   20th day of March, 2006.

20

21

22

                        Barbara L. Murphy, LSR
23                      Notary Public

24

     My Commission Expires:

25   June 30, 2007
```

                                                   **B.280**

---