

**William M Jarvis**
(Phone: +1-860-285-9059)
01/09/2003 11:46 AM

To: Linda P. Rothe/USWIN01/Power/ALSTOM@GA, Gary
Mattice/USFSY/AAP-TEMP, TigerTColeman@aol.com, Ron
Gratton/USFSY/AAP-TEMP
cc: Thomas J. Kehoe/USWIN01/Power/ALSTOM@GA, Pamela
Moynagh/USWIN01/Power/ALSTOM@GA, Thomas L.
Wardell/USWIN01/Power/ALSTOM@GA, John C.
Packard/USWIN01/Power/ALSTOM@GA, Linda S.
Chen/USWIN01/Power/ALSTOM@GA, Gary
Mattice/USFSY/AAP-TEMP@GA

Subject: Re: AES-PR EEC Nonconformances

Linda,

Below are my comments to EEC's letter. This will need some further input from Gary Mattice, Tom
Coleman, and Ron Gratton before it can go out.

1) EEC continues to attribute the opacity problem to "issues outside of EEC scope" yet EEC has failed to
identify and/or provide a viable basis for so called external influences on the ESP operation. Until such
time that EEC can provide concrete evidence to support this allegation, we consider that the cause of the
opacity excursions originates from the much more plausible occurrence of gas bypassing the ESP
collecting plates. As such this is clearly within EEC's scope of responsibility.

It is fact that sufficient ash can not be removed from the system as designed by EEC through the overflow
in the first row of ESP hoppers. There is no other means to remove ash from the ESP except up the
stack. Ash therefore accumulates in the ESP and must be evacuated from the system by manually
diverting ash from the back hoppers to the ash bins. This method of operation was developed by
ALSTOM commissioning staff to enable the system to function, however, this is not in accordance with the
design and requires constant operator intervention.

By EEC's own admission (J.Titus to L. Rothe 11/08/02), the excessive emissions that are causing the
opacity spikes result from dust traveling along the bottom of the ESP; ash is also picked up out of the
collection hoppers by the gas and migrates downstream to the back hoppers. EEC further states that
rapping the collector plates exacerbates the problem. This conclusion was based on observations made
by EEC while the ESP was in operation. EEC advises that baffles will prevent this "rolling" of the ash from
occurring and implies that this will resolve the opacity spikes.

The 3D Gas Flow Model Study performed by EEC as part of the base scope of supply further supports
this. The results of this testing show that some of the highest gas velocities occur at the inlet to the ESP
just above the hoppers. This would be conducive to the conditions cited by Mr. Titus.

Earlier EEC advised (J. Titus to L. Rothe 11/6/02) that although they have concluded that gas baffles in
the ESP will resolve the opacity excursions, they believe the cause is related to unknown ash or gas
characteristics. In a telephone conversation with EEC on 11/1/02, EEC indicated that they strongly
suspected that the opacity was due to high concentrations of extremely fine ash particles (10 -12 microns)
in the rear ESP fields. They assert that these particles are hard to collect in an ESP. Analysis has since
shown this not to be the case; particle size is fairly constant throughout the ESP and in the range of 30
microns. These are well within the norms for ESP operation.

In conclusion the resolution of this emissions issue is solely EEC's responsibility. Due to the gravity of the
impact of these opacity excursions on AES, and EEC's refusal to act on resolution, ALSTOM has
proceeded to implement the baffles in accordance with EEC's advisement. ALSTOM will recover incurred
costs from EEC in accordance with the contract terms.

2) The position taken by EEC is categorically incorrect. The CDS/ESP has required the constant
attention of ALSTOM commissioning staff to keep the system operating within the air permit. EEC revised
the operation procedures continuously up until the last day they were on site. As a result of these
continuos changes, operations staff had difficulty becoming familiar with the operations of the equipment

**B.281**



supplied by EEC . {Gary Mattice can add his thoughts this as he was closer to the situation.}

3) EEC must provide a detailed execution plan and their erection supervisor must be on site to coordinate/supervise the corrective work to bring the ID Inlet duct into compliance with the specification.

4) The rotary feeders provided as a bypass system by EEC, and now utilized as the main feed, can not meet the required feed rates. As supplied, the valve delivers more than the guaranteed lime flow and can not be reduced below this rate. EEC must first demonstrate that the existing rotary valve can control to the required feed rate prior to modifying the primary feeder.

5) EEC requests that the hydrated lime tanks be at low-low level to rectify this non-conformance. Logistics will not permit the lime feed to operate in this mode. The plant can not remain in compliance with the air permit without hydrated lime feed. As such this work will have to be performed during a plant outage and will therefore will require that EEC work around the clock to complete. Again EEC must submit a detailed execution plan and their erection supervisor must be on site to coordinate/supervise the work.

6) We are perplexed as to why EEC did not field adjust the manual control valves while they were on site and observed the valves full open. That EEC would wait until the issue is raised as a requirement for acceptance is indicative of the poor quality of EEC support. In addition EEC has supplied ball valves which in our experience are not suitable for regulating flow. ALSTOM will attempt to "balance" the system and considers this item open until such time that it is proven that the blowers are adequate.

7) We agree with EEC that the repair procedure for the rotary valves was inadequate. These emergency repairs were required to enable the plant to continue to operate. However the shafts on other valves have continued to fail. We believe there is a design deficiency in the valves. EEC has never fulfilled their promise to send the representative from the valve supplier to investigate the problems. As such ALSTOM and AES have proceeded to implement a program to rectify this deficiency.  ALSTOM will recover incurred costs from EEC in accordance with the contract terms. This item will remain open until such time that the failures have ceased.

8) Need input from T. Coleman, G. Mattice, Ron Gratton.

9) T. Coleman will pursue details with AES electrical engineer and advise by email.

10) See 9.

11) EEC is correct that one nozzle was identified as defective during the early stages of commissioning however EEC has yet to supply a replacement nozzle. Since then additional defects have been uncovered. ALSTOM will forward the nozzles to EEC for replacement.

12) Need input from T. Coleman.

13) ?? N/A

14)  EEC to provide an execution plan for revising the handrail to comply with contract requirements.

15) ALSTOM (T. Coleman please transmit with a letter) will forward only the internals from the quick disconnect fittings as the balance of the fittings are required to operate the facility. Along with this ALSTOM will forward a water sample to EEC. In the interim EEC is required to provide guidance on the safety of operating without the internals installed.

16) T. Coleman: Except of the Valvcon actuator these seem to be a duplication.  If not please define here for convenience of those not on Power Solve.

EEC to provide a time schedule for replacement of the Valvcon Actuator.

**B.282**

API 0672597

17) T. Coleman to provide details on the heater failure.

18) T. Coleman to provide details.

19) The CDS/ESP operated for less than 6 months and 500 hours (Gary can you verify this number) under conditions where only a very limited amount of insulation was not completed. This is not a basis for EEC's total rejection of their corrosion guarantee and is not accepted by ALSTOM.

EEC's tactic is a blatantly obvious attempt to position themselves to avoid the known consequences of the high potential for corrosion due to operation of the CDS at lower than design outlet temperature. In accordance with the parameters established by EEC, the CDS continues to operate with an outlet temperature some 15 degrees Fahrenheit below the design value. EEC advised during the design phase that control of this temperature was critical to corrosion prevention.

Base measurements of the casing metal thickness are not required as previously stated by EEC. Thickness readings will be taken during the scheduled outage in June. This data will be compared to the design and manufacturing tolerances to determine the amount of loss due to corrosion.

By copy to Gary, Tom, and Ron (if you are out there) please provide your comments and forward to Linda and me via email. We need to repond to EEC in a timely manner so your quick attention to this will be appreciated. Thanks, Bill

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not open any attachments hereto, disclose the contents of this e-mail or the attachments if any thereto, to another person, use it for any purpose or store or copy the information in any medium.

B.283

| From: | William M Jarvis |
|---|---|
| Sent: | Thursday, November 20, 2003 12:43 PM |
| To: | Linda P. Rothe |
| Cc: | Thomas J. Kehoe |
| Subject: | AESPR: ESP Collector Plate Wastage |

Linda,

Under separate e-mail I just forwarded some photos of the wastage found today on the unit 2 ESP collector plates. Please send a letter to EEC & LM advising the conditions we have found and notifying that we hold them responsible for the repairs under their corrosion warranty. Neither the full extent of the problem nor the cost to rectify have been determined.

Request that EEC and LM immediately advise the availability of replacement collector panels.

Thanks,
Bill

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

**B.284**



| From: | William M Jarvis |
|---|---|
| Sent: | Tuesday, January 20, 2004 9:38 AM |
| To: | Bruce D. Buchholz |
| Cc: | Ray Hickey; Donna D. Anderson; Chris TAPPER |
| Subject: | AES/PR: EEC ESP Corrosion - Revised |

Karl Hognefelt is from ECS Knoxville. Sorry for any confusion.

Summary

Inspections on Unit 2 ESP during the outage in November '02 revealed extensive corrosion on the ESP collector plates. Approximately 20% of the plates were corroded. AES hired FSL (mainly ex-EEC em employees) to perform remedial work to return the unit to service. At this time AES also notified AP that they considered this a warranty issue. We passed the notification on to EEC's performance bond co. (Liberty Mutual). AES also ordered replacement collector plates (upgraded material to corten) from FSL.

I asked Karl Hognefelt from ECS Knoxville to inpspect Unit 2 to review the problem. He felt this was the worst case of corrosion he had seen in his 25+ year career. It was strongly suspected that the corrosion resulted from the chlorides in the Circulating Dry Scrubber makeup water. The chlorides originate from the RO brine water which was the specified design source for the makeup water.

Karl has continued to work with AES to set a test protocol to determine "safe" operating levels of chlorides. He has studied regular direct input from AES and is consulting with numerous experts within ALSTOM on the issue.

In the meantime, Unit 1 was forced off line last week due to a tube leak in the ISH FBHE. Inspections of Unit 1 shows that the same corrosion conditions exist albeit to a lesser extent.

AES views this as extremely serious as it is a potential to shut down the plant at which time it would revert to the banks.

AES is currently pursuing means to eliminate the RO blowdown stream from the CDS makeup. They are considering applying for emergency relief to the "zero discharge" permit. Injecting in the boiler (not a good idea). Installing a water treatment facility to treat the chlorides ($5MM - $10MM).

We continue to evaluate within ALSTOM and investigate alternative operating procedures. ECS has expertise in this matter.

I believe that AES is looking to ALSTOM to take a more active role in restoring the ESP and/or installing the water treatment facility.

Background

EEC came with the project when DFD awarded. EEC equipment is specified in the permit.

**B.285**

**EXHIBIT**

ω Jarvis 28
2/4/05

JARV-EMAIL-073911

**JARV_EMAIL-073911**

The use of RO brine was part of the design.

There is specified limits in the spec.

EEC provided the operating instructions at site. We now believe that these did not address the Chloride levels.

We have since found that chlorides have a big effect on the ESP performance.

We have a 24 month corrosion warranty which was passed on from EEC.

EEC has been non-repsonsive to AES issues for well over a year.

We have a $14MM performance bond with Liberty Mutual.

Before the week is out I will write a letter to AES summarizing what we know and what we are doing.

WMJ

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

**B.286**

| From: | William M Jarvis |
|---|---|
| Sent: | Wednesday, March 10, 2004 12:06 PM |
| To: | Al Dyer <Al.Dyer@AES.com> |
| Bcc: | Werner Lieberherr, Chris TAPPER |
| Subject: | AES/PR: Contact Info |

Dear Al,

Following up on our telephone conversation yesterday, here is the contact information for Werner Lieberherr:

Email: Werner Lieberherr/USWIN01/Power/ALSTOM@GA
Telephone: 860-285-4000

Also, I want to thank you for your candor regarding AES corporate perception that ALSTOM's performance on the backend equipment has been poor. We can understand AES' concern and frustration with this equipment. We share the same feelings with this equipment as we have struggled to resolve problems with no support or cooperation from the supplier, Environmental Elements Corp. I want to assure you however that ALSTOM is committed to resolution of this most recent development of corrosion in the ESP with the same determination that we have demonstrated in resolution of the numerous other performance issues that occurred with this air pollution control equipment.

To elaborate on our conversation yesterday, when AES designated EEC as the supplier of the flue gas desulfurization (FGD) equipment prior to application for the air permits, EEC had a technology license agreement with Lurgi GmbH for their Circulating Dry Scrubber (CDS) process. EEC supplied the CDS/ESP equipment under this Lurgi license, however, as we recently discovered, EEC allowed the license to expire during the execution of the AES/PR project. Consequently, Lurgi ceased to support EEC in the CDS/ESP technology. This explains why EEC did not support the commissioning. EEC does not posses the technical expertise on the CDS/ESP system, appears to have exited this business, and in fact has abandoned the AES/PR project. It has, therefore, been impossible to obtain any input from EEC. Moreover, since ALSTOM is a direct competitor to Lurgi in the FGD market, Lugi has been unwilling to provide support to ALSTOM. This has hampered our progress.

Although expertise on dry FGD technology resides within ALSTOM, we lack specific experience with the Lurgi process supplied by EEC and/or the AES/PR water cycle design. Nevertheless, drawing on a number of internal recourses including our own Environmental group and our Power Plant Lab, ALSTOM has continued to investigate and work with AES to understand and seek resolution to the numerous issues with the CDS/ESP. To date, ALSTOM has spent in excess of $3,000,000 to correct deficiencies with EEC equipment for which we have not been reimbursed.

We appreciate AES's continued cooperation in providing operating data and reports to further our understanding of the CDS/ESP issues. ALSTOM continues to investigate the corrosion phenomena and we are confident that with continued collaboration with AES this serious issue can be resolved. I will forward reports of our analysis and an updated summary of progress next week.

**B.287**



JARV-EMAIL-074062

I understand that AES is investigating alternatives for air pollution control technology on other potential projects. If you feel it would be beneficial I could arrange for a presentation of ALSTOM's technology. Please let me know if we can help.

Regards,
Bill

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

**B.288**

# ALSTOM



**Power Environment**

Utility Boiler Business

May 18, 2004

AES Puerto Rico
Carr. # 3 Km 142.0
Bo. Jobos
P.O. Box 1890
Guayama, Puerto Rico 00785

Attention:    Mr. Allan B. Dyer

Reference: AES Letter dated April 30, 2004 (AES/API-004-04)

Dear Mr. Dyer,

ALSTOM is in receipt of your referenced letter regarding AES' claims for warranty and acknowledges that we had two or three conversations regarding some of these claims during the early part of this year.  ALSTOM does not agree that these are valid claims under the terms of the DFD contract.

Using the number convention established in your letter, ALSTOM responds as follows:

1.  Electrostatic Precipitator Corrosion

AES letter of November 28, 2003 notified ALSTOM that extensive corrosion had been identified on Unit 2 ESP collection plates during the outage from November 8, 2003 through December 1, 2003.  AES ordered replacement materials from Environmental Elements Corp on November 26 and December 5, 2003 for which AES invoiced ALSTOM.

On January 12, 2004 AES notified ALSTOM that corrosion had also occurred in Unit 1 ESP albeit not as severe as Unit 2.  Since the first observations in November 2003, ALSTOM has collaborated with AES personnel to understand the corrosion phenomena.

As you note, our investigations have been somewhat hampered by lack of support from the equipment supplier, Environmental Elements Corp. (EEC).  AES designated EEC as the supplier of the flue gas desulfurization (FGD) equipment prior to application for the air permits.  At that time EEC had a technology license agreement with Lurgi GmbH for their Circulating Dry Scrubber (CDS) process and therefore supplied the CDS/ESP equipment in accordance with this Lurgi license.  As we recently discovered, EEC allowed the license to expire during the execution of the AES/PR project.  Consequently, Lurgi ceased to support EEC in the CDS/ESP technology.  EEC did not posses the technical expertise on the CDS/ESP system, appears to have exited this business, and in fact has abandoned the AES/PR project.  It has therefore been impossible to obtain any input from EEC.  Moreover,

2000 Day Hill Road
Windsor, CT 06095
Tel: 860-285-5082
Fax: 860-285-4645

**B.289**

since ALSTOM is a competitor to Lurgi in the FGD market, Lurgi has been unwilling to provide support to ALSTOM.

ALSTOM continues to investigate this extremely rapid corrosion phenomenon. To further our investigation ALSTOM requires access to the operating records. Please advise when these records can be made available for our review.

2.    Refractory Work

Repairs to the FBHE refractory were first performed by ALSTOM in March of 2003. At AES request, only temporary repairs were performed. Under the terms of our contract with DFD, ALSTOM was to be provided access to perform the required repairs within 6 months. Access was not provided within the contractual time span, which thereby relieved ALSTOM of responsibility for the repairs. We suggest that you pursue this cost with DFD.

AES advised on January 13, 2004 of the need to repair the Unit 1 coal feed chute refractory and that AES had mobilized JT Thorpe to perform the repairs. In subsequent discussions with Mr. Ron McParland, I advised him that this work would be covered under warranty. We have received no further correspondence on this subject.

We understand that AES has not paid JT Thorpe for the feed chute work. We will contact JT Thorpe to arrange payment for the coal chute repairs.

3.    FBHE Handcuffs

ALSTOM maintains that the additional handcuffs added by AES are indeed an enhancement.

The control set point for the fluidizing airflow on Unit 1 FBHE was higher than the Unit 2 control set point. This increased airflow on Unit 1 resulted in forces on the heat transfer surfaces that were higher than the forces in Unit 2. These higher forces in turn caused the tube leaks. ALSTOM accepted responsibility for this and implemented the repairs.

Unit 2, with lower fluidizing airflow, has operated successfully over the same time period without failures.

ALSTOM rejects this warranty claim.

4.    Secondary Air Expansion Joints

Failures that first occurred on these expansion joints were attributed to overheating when the airflow control dampers upstream of these expansion joints were found to operating improperly. These are not ALSTOM's responsibility but they are the responsibility of the operator. In addition, we understand that this warranty claim was resolved in the settlement between AES and DFD.

AES advised of further failures in March of 2003. Kindly provide your analysis of the failures for our review.

With reference to the May 17, 2004 email from Mr. Pagaduan please keep us appraised of the schedule.

B.290

ALSTOM reserves all rights regarding AES's claims.

Sincerely,

*Ed Bulewich*

Ed Bulewich for:
  W. M. Jarvis
  Project Manager

cc:    E. Bulewich, Jr.

**B.291**



**PUERTO RICO**



EXHIBIT

June 22, 2004                                          AES/API-005-04

Mr. William M. Jarvis
Project Manager
ALSTOM Power, Inc.
2000 Day Hill Road
Windsor, Connecticut 06095

Dear Mr. Jarvis:

　　　　This letter responds to your May 18, 2004 correspondence concerning AES Puerto Rico's ("AES-PR") outstanding warranty claims. AES-PR's response to each of the four issues is as follows:

　　1.　　Electrostatic Precipitator Corrosion

　　　　Your letter does not specifically address whether ALSTOM will honor AES-PR's request for payment under the warranty for the costs to repair the electrostatic precipitators and to correct the root cause of the damage to the precipitators by installing a new Reverse Osmosis system to purify the PRASA water used by the plant. Please clarify ALSTOM's position on this issue.

　　　　As for ALSTOM's claim that it "continues to investigate this extremely rapid corrosion," and its request to review operating records as part of that investigation, we do not understand what the purpose of ALSTOM's continued investigation would be. Because ALSTOM was unable to rectify the problem, for reasons including those you explain in your May 18 letter, AES-PR was forced to devise a solution on its own to correct the defects causing premature corrosion. AES-PR is now well under way implementing that solution. If ALSTOM continues to believe that it needs to inspect the plant's operating records, please contact me to arrange a time to come to the plant for such an inspection.

　　2.　　Refractory Work

　　　　AES-PR is pleased that ALSTOM has now agreed to pay JT Thorpe for the January 2004 refractory repair work it performed on Unit 1. This confirms that ALSTOM agrees to pay JT Thorpe the $ 92,493.23 owed for this work. Please inform me when Alstom has made this payment to JT Thorpe.

　　　　As for the November 2003 repair work, AES-PR disagrees that this work falls outside the 6-month time period described in Section 1.2 of the warranty.

**B.292**

The work for which AES-PR seeks reimbursement was to repair damage first discovered during the inspection of Unit 2 in November 2003, not March 2003. The work was performed within the month of discovery. Please advise whether ALSOTM continues to dispute this claim.

    3.    <u>FBHE Handcuffs</u>

ALSTOM and AES-PR have failed to reach agreement with respect to this claim. AES-PR reserves its right to take all appropriate action to collect on it.

    4.    <u>Secondary Air Expansion Joints</u>

ALSTOM is incorrect that this claim relates to damage caused by operator error or that it was resolved in a settlement between AES-PR and DFD. AES-PR has now determined that the root cause of the secondary air expansion joint failures is badly misaligned headers. It analyzed this failure without resort to a formal engineering study, thus AES-PR does not have the "analysis of the failures" ALSTOM requests in its letter. Because AES-PR was able to determine the root cause of the failures without an engineering study, the amount sought on this warranty claim can be reduced by $50,000. The total amount AES-PR now seeks for this claim is $ 235,111.

We understand that ALSTOM personnel continue to investigate the root cause of the failures. Please provide us with any analysis from ALSTOM's investigation.

Sincerely,

Allan B. Dyer

**B.293**

From:       William M Jarvis
Sent:       Tuesday, June 29, 2004 1:28 PM
To:         Al Dyer <AJ Dyer@AES.com>
Cc:         Williams, Daniel <DDWilliams@wc.com>; Ed Bulewich
Bcc:        Wolf, John <jawolf@ober.com>; John Schwartzenburg
Subject:    RE: AES/PR: ESP Collector Plate Corrosion

---

Al,

As you know, ALSTOM provided the CDS/ESP from the supplier nominated by AES,
Environmental Elements Corp., and in strict accordance with the DFD
Specifications for this equipment.

ALSTOM diligently followed the terms under our contract with DFD and
accordingly passed the contract warranty terms onto EEC through our P.O.
507301O.  As such, any warranty claim, to the extent it is a valid claim under
the contract warranty terms, is the responsibility of Environmental Elements
Corp.

ALSTOM has notified EEC and its surety, Liberty Mutual, of this potential
warranty claim by AES.  Liberty Mutual has requested, and ALSTOM has provided,
samples of the corroded collection plates.  Liberty Mutual is conducting its
own investigation into the ESP corrosion and advised that they would provide
their findings in a report by the end of this week.  As I advised, we will
forward this to AES.

We note that on November 26, 2003 and December 5, 2003 AES ordered upgraded
materials from EEC apparently as replacement material for the damaged
Rigitrodes and collection plates.  We also note that EEC is apparently
profiting from a problem that may ultimately be its responsibility to remedy,
however, we once again wish to insure you that we will continue to help AES
find the root cause and evaluate potential solutions to this corrosion.

Regards,
Bill



Al Dyer <AJ.Dyer@AES.com>

06/28/2004 03:57 PM

To: William M Jarvis/USWIN01/Power/ALSTOM@GA
cc: Ed Bulewich/USWIN01/Power/ALSTOM@GA, "Williams, Daniel" <DDWilliams@wc.com>
Subject: RE: AES/PR: ESP Collector Plate Corrosion

**B.294**



JARV-EMAIL-073356

JARV_EMAIL-073356

Bill,

I appreciate the update with respect to your supplier EEC, howeveras you are very much awarethe "ESP" equipmentwarranty is between AES and Alstom.

AsIpreviously agreedwith you, AES will proceed with our next steps as of the end of June in the eventAlstom fails toreimburse AES for its significant costsassociated with ESPcorrosion.

Regards

Al Dyer

Al Dyer

Puerto Rico

(787) 866 8117 x 233


CONFIDENTIALITY: This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium. Without Prejudice.


-----Original Message-----
From: william.m.jarvis@power.alstom.com
[mailto:william.m.jarvis@power.alstom.com]
Sent: Monday, June 28, 2004 1:12 PM
To: Al Dyer
Cc: ed.bulewich@power.alstom.com
Subject: AES/PR: ESP Collector Plate Corrosion

Dear Al,

EEC has promised to send me a letter regarding the ESP Collector Plate

Corrosion by the end of this week. Once received, I will forward onto to

you.

Regards,

Bill

**B.295**

JARV-EMAIL-073357

**JARV_EMAIL-073357**

CONFIDENTIALITY : This e-mail and any attachments are confidential and may

be privileged. If you are not a named recipient, please notify the sender

immediately and do not disclose the contents to another person, use it for

any purpose or store or copy the information in any medium.

_____

This email has been scanned for all viruses by the MessageLabs service.

_____

This communication is for use by the intended recipient and contains
information that may be privileged, confidential or copyrighted under law. If
you are not the intended recipient, you are hereby formally notified that any
use, copying or distribution of this e-Mail, in whole or in part, is strictly
prohibited. Please notify the sender by return e-Mail and delete this e-Mail
from your system. Unless explicitly and conspicuously stated in the subject
matter of the above e-Mail, this e-Mail does not constitute a contract offer, a
contract amendment, or an acceptance of a contract offer. This e-Mail does not
constitute consent to the use of sender's contact information for direct
marketing purposes or for transfers of data to third parties

This email has been scanned for all viruses by the MessageLabs service.

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be
privileged. If you are not a named recipient, please notify the sender
immediately and do not disclose the contents to another person, use it for any
purpose or store or copy the information in any medium.

**B.296**

JARV-EMAIL-073358

**JARV_EMAIL-073358**

RECEIVED

# ALSTOM

| Power Environment
| Utility Boiler Business

July 30, 2004

AES Puerto Rico
Carr. # 3 Km 142.0
Bo. Jobos
Guayama 00785, PR

Attention:     Mr. Allan B. Dyer

Ref:    Electrostatic Precipitator Corrosion
        Operating Logs

Dear Mr. Dyer,

Further to our July 2, 2004 letter to AES regarding ALSTOM's analysis of the Electrostatic Precipitator
Corrosion, we are transmitting the attached letter from TASC Consulting Services acting on behalf of
Liberty Mutual Insurance Company. As you may recall Liberty Mutual issued the Payment and
Performance Bond for Environmental Elements Co. This Bond covers the corrosion guarantee provided
by EEC in accordance with the D/FD Specifications.

ALSTOM has asked TASC for additional details and clarification of their analysis, which TASC has not
yet provided. We will provide this to AES upon receipt. In the meantime TASC has advised that certain
operating data is required to further evaluate the warranty claim.

Specifically the following data is required:

1)      O2 values at the Air Heater Outlet and the Stack.
2)      Flue Gas Temperature at the CDS outlet.
3)      Wet Bulb Temperature of the flue gas at the CDS outlet.
4)      CaCl2 content of the ash.
5)      Conductivity and Cl content of the CDS cooling water.
6)      Sootblower operating records.
7)      Testing and Maintenance records for the CDS cooling water nozzles.

We request you provide the data required. We can discuss the best means to obtain this data during our
meetings next week.

Sincerely,

W. M. Jarvis

**B.297**

WMJ/brr
Attachment

cc:     E. Bulewich
o:\pb\projops\projmgmt\bill\AES – Op Logs

2000 Day Hill Road
Windsor, CT 06095
Tel: 860-285-5082
Fax: 860-285-4645



EXHIBIT
W.JHEON 55
3/14/05



## TASC Consulting Services, L.L.C.

New York Office: 224 West 35ᵗʰ Street, Suite 610 • New York, NY 10001 • (212) 244-9588 • FAX (212) 244-9514
Philadelphia Office: 6 East Hinckley Avenue, Suite 203 • Ridley Park, PA 19078 • (610) 521-5060 • FAX (610) 521-5338
Baltimore Office: (410) 683-8375 • FAX (410) 683-8381

July 2, 2004

Linda P. Rothe
Project Procurement Manager
ALSTOM Power, Inc.
2000 Day Hill Road
Windsor, CT 06095

| RE: | | |
|---|---|---|
| | Principal: | **Environmental Elements Corp.** |
| | Obligee: | **ALSTOM Power, Inc.** |
| | Project: | **Supply of Circulating Dry Scrubber Air Pollution Control System** |
| | Surety: | **Liberty Mutual Insurance Company ("LMIC")** |
| | Bond No.: | **17004980** |
| | Subject: | **Analysis of Precipitator, Curtain Corrosion Warranty claim** |

Dear Ms. Rothe:

In response to ALSTOMs' claim regarding the precipitator collector plates, I have investigated the possible causes for the corrosion and decay of the materials. On behalf of LMIC, I must decline the claim due to improper operation of the boiler preceding the CDS and Precipitator. Please review the following information supporting this decision.

In an interview with EEC personnel (Joe Titus, Bill Vanhooser), and AES consultant (John Toher), it has been determined that the boiler operation has in the past been operated outside of the parameters which constitute the warranty on corrosion. It is believed that "ACID MIST" was allowed to coat the collector plates and resulted in the massive corrosion exhibited in the photographs provided by ALSTOM. The design of this system allows for the burning of coal which results in sulfur dioxide ("SO2") as a by product of the combustion. SO2 when combined with water or "MIST" will then become sulfuric acid or "ACID MIST". There are several ways in which the system is capable of producing the ACID MIST which all are the responsibility of the operator to prevent from occurring. We believe that during testing and early operation of the boiler and CDS the ACID MIST was developed and allowed to coat the collector plates which resulted in the accelerated corrosion.

The system allows for the removal of the SO2 in the boiler and CDS. When quantities are not removed and are allowed to enter the precipitator they will normally pass through and out the stack not harming any equipment. However, the chlorides in the water being used from the treatment plant down the street are contributing and acerbating the ACID MIST condition. Chlorides are difficult to dry out of the air in the CDS where the

**B.298**

water mist is injected to give the exhaust gas added conductivity. When the water doesn't dry out in the exhaust gas it combines with the SO2 and coats the precipitator curtains and allows for sulfuric acid to decay the material. This condition must be controlled and prevented to maintain the corrosion warranty. It was obvious to the technical experts that this condition has not been controlled and caused the accelerated corrosion and decay of the materials in the precipitator collecting plate curtains. At this point in time and until further information is provided to prove otherwise, LMIC must decline any payment for the curtain wall replacement collector plates.

Sincerely;

Dreu Beers

**Linda Rothe**

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4

5    AES PUERTO RICO, L.P., )

6         Plaintiff,        )

7    VS.                    )   No. 04-1282-JJF

8    ALSTOM POWER, INC.,    )

9         Defendant.        )

10

11

12

13

14

15

16        VIDEOTAPED DEPOSITION OF LINDA ROTHE, a witness

17    called on behalf of the Plaintiff, pursuant to the Federal

18    Rules of Civil Procedure, before Esmeralda Guzman, a

19    Certified Shorthand Reporter and Notary Public in and for

20    the State of Connecticut, taken at Alstom Power, Inc., 2000

21    Day Hill Road, Windsor, Connecticut, taken on Friday,

22    January 13, 2006, commencing at 9:41 a.m.

                                        **B.300**

23

24    Job No. 172540                    ORIGINAL

**Linda Rothe**

Page 19

 1    that this is it.

 2        Q.  Do you recognize the first two pages as the

 3    signature document for the contract for the supply of the

 4    boiler between Alstom and DFD?

 5        A.  I do not.

 6        Q.  Can you turn to the page that's marked ALDEC

 7    05-01589.  The top of the page it says Part 3, General

 8    Terms.  Do you see that?

 9        A.  I do.

10        Q.  Can you flip through this and see if this is the

11    excerpt of the contract that you referred to before?

12        A.  I don't know.

13        Q.  Can you turn to the second page of the document.

14        A.  Of this document?

15        Q.  Yes.

16        A.  Okay.  Yes.

17        Q.  Do you see there are two signature blocks?

18        A.  I do.

19        Q.  Do you see one says Combustion Engineering?

20        A.  Yes, it does.

21        Q.  Is Combustion -- I'm sorry, strike that.  Is

22    Combustion Engineering the same as Alstom?

23                    MR. VITTORIA:  Objection.

24                    THE WITNESS:  Combustion Engineering

B.301

**Linda Rothe**

Page 20

1        is -- Alstom is today inclusive of the

2        Combustion Engineering that did business at

3        that time.

4    Q.   (By Mr. Williams)   Okay.   You can put this exhibit

5  aside.   Your counsel may want to keep this.

6        MR. VITTORIA:   Thanks.

7    Q.   (By Mr. Williams)   So Combustion Engineering is

8  now part of Alstom.   Right?

9    A.   Yes.

10    Q.   And are you aware that DFD issued technical

11  specifications for the CDS that Alstom agreed to supply to

12  DFD?

13    A.   Yes.

14    Q.   Have you seen those technical specifications

15  before?

16    A.   I'm sure I have seen them before, yes.

17    Q.   Just explain for the record what a technical

18  specification is.

19    A.   A technical specification is something that

20  describes the scope to be provided and the requirements of

21  the equipment.

22    Q.   It's a detailed document that itemizes the

23  specifics of what the equipment needs to do?

24        MR. VITTORIA:   Objection.   Objection

B.302

**Linda Rothe**

Page 21

1            to the form of the question.

2                  THE WITNESS:  It's a technical

3            document that describes what the equipment

4            is supposed to be provided to.

5      Q.  (By Mr. Williams)  When you say supposed to be

6   provided to, what do you mean?

7      A.  Equipment must be provided that meets what's

8   described in the technical specification.

9      Q.  So the equipment supplied has to meet the design

10  requirements that are specified in this case by DFD?

11                 MR. VITTORIA:  Objection.

12                 THE WITNESS:  Yes.

13                 (Exhibit 2, Technical Specification,

14            marked for identification.)

15     Q.  (By Mr. Williams)  Miss Rothe, I'm going to show

16  you what's been marked Exhibit 2.  Take a minute to look at

17  it and see if Exhibit 2 is the technical specification for

18  the CDS that Alstom agreed to supply for the AES Puerto

19  Rico facility.

20     A.  I refer to it by number in the purchase order.

21     Q.  Why don't we get out the purchase order.  We'll

22  see if that helps you.

23     A.  That would be nice.

24                 (Exhibit 3, Purchase Order, marked

B.303

Page 22

1             for identification.)

2        Q.  (By Mr. Williams)  I'm handing you what's been

3   marked as Exhibit Number 3.  Please identify that document

4   for the record.

5        A.  The original purchase order for the engineering of

6   the equipment to EEC.

7        Q.  So the purchase order that's Exhibit 3 is Alstom's

8   subcontract with EEC for the supply of the ESP and the CDS

9   for the Puerto Rico facility?

10                  MR. VITTORIA:  Objection.

11                  THE WITNESS:  Could you repeat the

12             question, please?

13        Q.  (By Mr. Williams)  The purchase order that's

14   Exhibit 3 is the subcontract between Alstom and EEC for the

15   supply of the CDS and the ESP for the Puerto Rico facility?

16                  MR. VITTORIA:  Objection.

17                  THE WITNESS:  It is the contract

18             between ourselves and Environmental to

19             provide the equipment to the specifications

20             that are called out on it.

21        Q.  (By Mr. Williams)  And Environmental referring to

22   Environmental Elements Corporation?

23        A.  Yes.

24        Q.  Now, I believe you said before that Exhibit 3

B.304

Linda Rothe

Page 63

```
1           later something else happened that inspired

2           me to assert abandonment.  I'm not sure.

3                (Exhibit 9, 9/19/02 E-mail, marked

4           for identification.)

5      Q.  (By Mr. Williams)  Miss Rothe, I'm going to hand

6   you what's been marked Exhibit Number 9.  This is an e-mail

7   from you to Mr. VanHooser of EEC with a CC to Mr. Jarvis,

8   Mr. Kimberl of EEC, and others.  Correct?

9      A.  Yes.

10     Q.  It's dated September 19, 2002.  Correct?

11     A.  Yes.

12     Q.  And this is an e-mail you sent.  Right?

13     A.  It appears to be an e-mail I sent.

14     Q.  And your e-mail is a reply to an e-mail from

15  Mr. VanHooser which is down on the second page of the

16  exhibit?

17               MR. VITTORIA:  I'm sorry, could you

18          repeat that question, please.

19               (The previous question was read

20          back.)

21     Q.  (By Mr. Williams)  Is that right?

22     A.  It appears to be, yes.

23     Q.  Mr. VanHooser attached a letter to his e-mail.

24  Right?
```

B.305

Page 64

1      A.   He did.

2      Q.   And the letter is found in the last two pages of

3   Exhibit 9.   Right?

4      A.   There is a letter.

5           MR. VITTORIA:   I want to note for the

6           record that the bates numbers are not

7           consecutive between the e-mail and the

8           letter that's attached.   The e-mail is 3470

9           to 3471.   The letter that's attached is

10          3413 to 3414.

11          MR. WILLIAMS:   I'll ask you to object

12          when you want to object, but not make

13          statements for the record in the middle of

14          the deposition.

15          MR. VITTORIA:   You can ask it.

16     Q.   (By Mr. Williams)  And so the record is clear,

17   Mr. VanHooser works for EEC.   Right?   Or did at the time?

18     A.   Yes.

19     Q.   Can you turn to the first page of the exhibit,

20   please.   Can you read the first paragraph of your message

21   dated September 19, 2002 to Mr. VanHooser?

22     A.   Are you looking...

23     Q.   I'm sorry, I'm looking at the first page of the

24   exhibit.

B.306

**Linda Rothe**

Page 65

1       A.   Okay, first page.

2       Q.   And I'm asking you to read the first paragraph of

3   your September 19, 2002 e-mail to Mr. VanHooser.

4       A.   "We have read your letter of earlier this date and

5   are astounded at the position taken by EEC on the subject

6   of CDS, ESP commissioning.  This commissioning process has

7   equated to more R&D than actual commissioning."

8       Q.   And when you say we are astounded, you're

9   referring to Alstom's position.  Right?

10      A.   Correct.

11      Q.   Then the next paragraph, the second sentence says,

12   "It was evident that EEC did not have the technical savvy

13   with this first time installation on a CFB boiler."

14   Correct?

15      A.   It's what I say.

16      Q.   What do you mean by first time installation on a

17   CFB boiler?

18      A.   I'm told -- I was told it was their first time

19   installing this equipment on a CFB.

20      Q.   So you were told it was EEC's first time?

21      A.   I was told that by my technical people.

22      Q.   Here at Alstom?

23      A.   Probably.

24      Q.   Next paragraph says, "Further, EEC experienced

B.307

**Linda Rothe**

Page 121

1            THE WITNESS:  No.  I don't recall

2        verbatim all of the items.

3    Q.  (By Mr. Williams)  Right.

4    A.  Certainly the ones that are beyond my technical

5    expertise, which is basically nothing.  So yeah, you know,

6    I can't say anything other than I know I gave them a punch

7    list and I know the format was generally this and I know

8    their responses came in generally that way.

9    Q.  You can put that document aside.  I'm sorry, can

10   you take the document back out.  Exhibit Number 21.  Did

11   you maintain a copy of EEC's responses to Alstom's punch

12   list in your files?

13   A.  I believe so.

14   Q.  As part of your normal job duties, that would be

15   something you would do?

16   A.  Part of them, yes.

17            (Exhibit 22, 12/20/02 Letter, marked

18        for identification.)

19   Q.  (By Mr. Williams)  Okay, that's fine.  I'm going

20   to hand you what's been marked Exhibit 22.  You can flip

21   through it if you'd like.  My first question is whether you

22   recognize this as a letter from you to Environmental

23   Elements Corp. dated December 20, 2002 on behalf of Alstom.

24   A.  Yes.

B.308

**Linda Rothe**

Page 122

1    Q.  Your letter lists nineteen issues.  Correct?

2    A.  Correct.

3            MR. VITTORIA:  Objection.

4    Q.  (By Mr. Williams)  Under the heading CDS, ESP

5    outstanding items.  Correct?

6    A.  Yes.

7    Q.  Are these punch list items?

8    A.  They appear to be.

9    Q.  Let's go to issue number one.  And can you read

10   into the record the first sentence of the opacity spike

11   issue that you presented to EEC in this letter?

12   A.  "Startup and normal operating procedures for the

13   CDS and ESP have been modified countless times without

14   attaining consistent reliable operation."

15   Q.  And read the next sentence.

16   A.  "Stack opacity spikes exceeding the maximum

17   permissible levels continue."

18   Q.  The second issue that you present to EEC in this

19   letter is operation coverage post one hundred hour

20   reliability test.  Right?

21   A.  Yes.

22   Q.  Can you read that issue into the record?

23           MR. VITTORIA:  I'm going to object to

24      the continuing reading into the record.  We

B.309

Linda Rothe

Page 136

1      Q.  (By Mr. Williams)  Let's go to issue nineteen on

2   the list.  The corrosion guarantee.

3      A.  I see it.

4      Q.  Can you tell looking at the issue and the

5   conclusion whether the conclusion is something Alstom

6   agrees with?

7                  MR. VITTORIA:  Objection.

8                  THE WITNESS:  No.

9      Q.  (By Mr. Williams)  No, it's not something Alstom

10  agrees with or you can't tell?

11     A.  You can't tell.

12     Q.  I can't tell.  I'm asking you if you can tell.

13  You can't tell?

14     A.  No, it is not something Alstom agrees with.  I

15  know Alstom's position on the warranty.

16.    Q.  So Alstom's position was not that Alstom and EEC

17  agreed to disagree?

18     A.  Right.  Alstom's position was clearly stated and

19  has not been backed off from.

20                  (Exhibit 27, 4/7/03 E-mail, marked

21           for identification.)

22     Q.  (By Mr. Williams)  I'm going to show you what's

23  been marked Exhibit 27.  Exhibit 27 is an e-mail from you

24  to Mr. VanHooser of EEC dated April 7, 2003.  Correct?

B.310

**Linda Rothe**

Page 137

1      A.   April 7, 2003, yes.

2      Q.   And your e-mail attaches a punch list of items.

3   Correct?

4      A.   Correct.

5      Q.   And the punch list is Alstom's punch list of

6   outstanding items for EEC.  Correct?

7      A.   This is Alstom's punch list of items for EEC, yes.

8      Q.   Do you see that issue one relates to opacity

9   spikes?

10     A.   I do.

11     Q.   Do you see the third paragraph from the bottom

12  that starts "in conclusion"?

13     A.   Yes.

14     Q.   And do you see that Alstom concluded in this punch

15  list, "Due to the gravity of the impact of these opacity

16  excursions on AES and EEC's refusal to act on resolution,

17  Alstom has proceeded to implement the baffles in accordance

18  with EEC's advisement.  Alstom will recover incurred costs

19  from EEC in accordance with the contract terms."  Did I

20  read that accurately?

21     A.   Yes.

22     Q.   Do you know what the baffles are that Alstom's

23  referring to in this punch list?

24          MR. VITTORIA:  Objection.

B.311

**Linda Rothe**

Page 141

1    Q. And issue nineteen relates to EEC's repudiation of

2    its corrosion warranty.  Correct?

3              MR. VITTORIA:  Objection.

4              THE WITNESS:  It's the -- item

5              nineteen is the corrosion guarantee issue

6              and EEC's position, conclusion, and Alstom

7              responses are there.

8    Q. (By Mr. Williams)  So what's under Alstom response

9    is Alstom's position with respect to the corrosion

10   warranty.  Correct?

11             MR. VITTORIA:  Objection.

12             THE WITNESS:  It appears to be.

13   Q. (By Mr. Williams)  And in the second paragraph of

14   Alstom's response, Alstom states that, "EEC's tactic is a

15   blatantly obvious attempt to position themselves to avoid

16   the known consequences of the high potential for corrosion

17   due to operation of the CDS at lower than design outlet

18   temperature.  In accordance with the parameters established

19   by EEC, the CDS continues to operate with an outlet

20   temperature some fifteen degrees Fahrenheit below the

21   design value.  EEC advised during the design phase that

22   control of this temperature was critical to corrosion

23   prevention."  Did I read that accurately?

24   A. It appears that you did.

B.312