



**Linda P. Rothe**
(Phone: +001 860-285-9713)

04/07/2003 12:35 PM

To: wbvanhooser@eec1.com
cc: jtitus@eec1.com, Thomas L. Wardell/USWIN01/Power/ALSTOM@GA,
Thomas Coleman/USWIN01/Power/non-ALSTOM@GA, William M
Jarvis/USWIN01/Power/ALSTOM@GA
Subject: P.O. 50730 IO Punchlist Update

Bill,

Attached find the updated statused Punchlist of items. Please review and provide the requested inputs by April 11th..

CDS punchlist.ZIF
"CDS punchlist.doc"

Thank You,

Linda

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

**B.376**



API 0676262

# CDS / ESP Outstanding Items

## 1.    Opacity Spikes.

1) EEC has attempted to attribute the opacity problem to "issues outside of EEC scope" yet EEC has failed to identify and/or provide a viable basis for so called external influences on the ESP operation. Until such time that EEC can provide concrete evidence to support this allegation, we consider that the cause of the opacity excursions stems from the much more plausible and observed occurrence of gas bypassing the ESP collecting plates. As such this is clearly within EEC's scope of responsibility.

It is fact that sufficient ash can not be removed from the system, as designed by EEC, through the overflow in the first row of ESP hoppers. There is no other means to remove ash from the ESP except up the stack as opacity. Ash therefore accumulates in the ESP ash collection hoppers and must be evacuated from the system by manually diverting ash from the back ESP hoppers to the ash disposal bins. This method of operation was developed by ALSTOM commissioning staff to enable the CDS/ESP system to function however, this is not in accordance with the design and requires constant operator intervention. Additionally we believe that this contributes to excessive consumption of hydrated lime.

By EEC's own admission (J.Titus to L. Rothe 11/08/02), the excessive emissions that are causing the opacity spikes result from dust traveling along the bottom of the ESP; ash is also picked up out of the collection hoppers by the gas and migrates downstream to the back hoppers. EEC further states that rapping the collector plates exacerbates the problem. This conclusion was based on observations made by EEC while the ESP was in operation. EEC advises that baffles will prevent this "rolling" of the ash from occurring and implies that this will resolve the opacity spikes.

The 3D Gas Flow Model Study performed by EEC as part of the base scope of supply further supports this concept. The results of this testing show that some of the highest gas velocities occur at the inlet to the ESP just above the hoppers. This would be conducive to the conditions cited by Mr. Titus. Presumably the gas baffles will correct the effects of this high velocity component of the gas stream.

Earlier EEC advised (J. Titus to L. Rothe 11/6/02) that although they have concluded that gas baffles in the ESP will resolve the opacity excursions, they believe the cause is related to unknown ash or gas characteristics. In a telephone conversation with EEC on 11/1/02, EEC indicated that they strongly suspected that the opacity was due to high concentrations of extremely fine ash particles (10 -12 microns) in the rear ESP fields. They assert that these particles are hard to collect in an ESP. Analysis has since shown this not to be the case; particle size is fairly constant throughout the ESP and in the range of 30 microns. These are well within the norms for ESP operation.

In conclusion the resolution of this emissions issue is entirely EEC's responsibility. Due to the gravity of the impact of these opacity excursions on AES, and EEC's refusal to act on resolution, ALSTOM has proceeded to implement the baffles in accordance with EEC's advisement. ALSTOM will recover incurred costs from EEC in accordance with the contract terms.

Additionally, recently reported correlation of rotary valve leakage to opacity spiking again illustrates this problem clearly within EEC's scope of supply.

You are reminded that AES/DFD have denied acceptance of these units for failure to meet emissions and will seek liquidated damages for which Alstom will hold EEC responsible.

## 2.    Operation Coverage Post 100 Hour Reliability Test

API 0676263

B.377

**EEC's Position:**

*The process was successfully operated by the plant personnel with little or no time dedicated to it throughout the 100-hour test, when procedures provided by EEC were followed. Further, Alstom's claim is broad and non-specific. In November these people you now request were at the plant and they were not needed, other than to confirm that operators were following procedure.*

Alstom response: The position taken by EEC is categorically incorrect. The CDS/ESP has required the constant attention of ALSTOM commissioning staff to keep the system operating within the air permit. EEC revised the operation procedures continuously up until the last day they were on site. As a result of these continuous changes, operations staff had difficulty becoming familiar with the operations of the equipment supplied by EEC .

There was never a time when this equipment was not tended to on a continuous basis much more so than any other equipment in the plant. And while someone may not have had to be in front of the EEC equipment control screen(s) 100% of the time, ALSTOM control room representative spent a large portion of their attention on the EEC equipment. As a matter of fact, the EEC equipment was the primary concern of Alstom in regards to maintaining operator interaction to attempt to meet emissions performance.

Again due to EEC's inaction, ALSTOM has been forced to maintain staff on site to insure that the equipment operates without opacity issues. ALSTOM will recover costs incurred under the terms of the contract.

3.    ID Fan Inlet Duct Design Deficiency.

The duct design and construction of the ID Inlet duct does not meet the specifications. EEC to advise how this will be corrected and a time schedule to complete the work.

**EEC's Position:    Agreed**

*Conclusion: EEC will subcontract this work to Talboa Tank of Ponce, PR. Work can begin on 1/31/03 and will require two weeks for completion (one week per unit). This work can be accomplished while the units are operating.*

Alstom response: We require a status regarding completion during this past outage. The entire scope of work associated with rectifying this nonconformance, including scaffolding and insulation removal/reinstallation is the responsibility of EEC.

4.    Hydrated Lime Storage and Feed System – Gravimetric & Bypass Volumetric Feeder

To date the Hydrated lime feed system has not been successfully commissioned. The manufacturer's representative was on site for several weeks in attempts to commission the system. This system could not be commissioned due to design, equipment selection, and configuration problems. The feed system needs to be

redesigned to accomplish reliable accurately metered feed rate control. This requires Mechanical, Electrical and Controls modification.
The intermediate weigh bin vent line repeatedly plugs. This is a generic problem as it exists on both units. Alstom does not agree that
the EEC suggested modifications provide for the element of control and measurement required by the contract. EEC is to provide a
plan and time schedule for implementation that will allow the weigh belt feeder to function as intended.

*EEC's Position:     The contract did not specify weighed metering systems. A single rotary valve feed is sufficient. In fact,*
*Section 8.3 of the CDS Specification is very explicit in regard to the element of control and measurement: "Reagent system shall*
*include...rotary vane feeders, volumetric feeders,..." and does not mention loss in weight feeders at all. EEC*
*will replace the weigh belt system and provide a rotary valve. In effect, EEC will have supplied a redundant feed system*
*(at their cost) when the contract only specified one feed system.*

*Conclusion: EEC is proceeding with time schedule to complete the work we have specified. We believe this work could be completed by Talboa Tank during the last week of January '03, simultaneous with the repair work on the Lime Silos. API to notify EEC if this is acceptable, and EEC will confirm the schedule and proceed with coordinate this work through Talboa Tank.*

Alstom response: We require a status regarding completion during this past outage.

Further notes: The hydrated lime rotary feeders provided as a bypass system by EEC, and now utilized as the main feed, can not meet the required feed rates. As supplied, the valve delivers more than the guaranteed lime flow and can not be reduced below this feed rate. EEC proposes to substitute an identical rotary valve for the weigh belt feeder that does not function. In addition, there are frequent interruptions in flow. EEC must implement a solution to enable the hydrated lime flow to be adequately controlled without interruptions.

## 5.    Unit 1 Hydrated Lime Storage Silo Damage
The walls of the silo buckled inwards in the area of the sidewall supports. The tank design is deficient. EEC advised that Talboa Tank had been subcontracted to complete this repair. EEC has taken no action. EEC to provide a time schedule for correcting this design deficiency.

*EEC's Position:     EEC has taken action and agrees that this must be fixed.*

*Conclusion: EEC has subcontracted this work to Talboa Tank of Ponce, PR. Work can begin on 1/24/03 and will require seven (7) days total for completion of both units. Both silos must be near empty (low-low level) before the silos can be repaired.*

**B.379**

API 0676265

Alstom response: We require a status regarding completion during this past outage.

Further notes:  EEC had requested that the hydrated lime tanks be at low-low level to rectify this non-conformance. Logistics will not permit the lime feed to operate in this mode. The plant can not remain in compliance with the air permit without hydrated lime feed. As such this work will have to be performed during a plant outage and will therefore will require that EEC work around the clock to complete.

### 6.    Medium Air Pressure Blower Capacity

The medium pressure blowers cannot maintain design outlet pressure when supplying fluidization air for its design consumers i.e. Hydrated Lime Storage Silo and Weigh Bin, Ash Disposal Silos and First Row ESP Ash Hoppers.
The blower capacity needs to be increased to suite the requirements of the consumers.

*EEC's Position:    The blower performance meets system air requirements with suitable margin. The manual flow control valves, that are used to achieve the specified air regulation to each system, require field adjustment (see applicable Process Flow Diagram). EEC observed these valves were all "full open". Alstom agreed to review the requirements of the PFD and balance the flow as necessary.*

*Conclusion: EEC considers this item closed, until further notice.*

Alstom Response: We are perplexed as to why EEC did not field adjust the manual control valves on his system while they were on site and observed the valves in the full open position. This was never even discussed with our commissioning staff. That EEC would wait until the issue is raised as a requirement for acceptance is indicative of the poor quality of EEC support. In addition EEC has supplied ball valves which in our experience are not suitable for regulating flow. ALSTOM will attempt to "balance" the system and considers this item open until such time that it is proven that the blowers are adequate.

### 7.    ESP Hopper Outlet Rotary Valve Failures

Rotary valves continue to bind up causing severe mechanical damage to the rotor shaft and drive.  This is not due to construction debris.
Replacement vanes are required to replace the damaged vanes.
Root cause needs to be identified and corrected.  Replacement sprockets for the rotary valves have broken. EEC needs to replace these.

*EEC's Position:    EEC's position remains unchanged in that we do not believe there is a design deficiency with the valves. We believe the procedure used to repair the rotor shafts is unsound and incorrect and this is the cause of some of the recent mechanical damage. However, as a courtesy we shipped two replacement vane assemblies (on 12/5/02) via UPS to the AES warehouse for their use. In addition EEC has already provided eight (8) replacement sprockets for the rotary valves. Of these*

● *replacement sprockets four (4) were defective and have been replaced by EEC. EEC is not aware of any additional failures.*

*Conclusion:    EEC considers this item closed, until further notice.*

Alstom response:  We agree with EEC that the repair procedure for the rotary valves was in some cases inadequate. These emergency repairs were required to enable the plant to continue to operate. However the shafts on other valves have continued to fail. We believe there is a design deficiency in the valves. EEC has never fulfilled their promise to send the representative from the valve supplier to investigate the problems.  As such ALSTOM and AES have proceeded to implement a program to rectify the deficiencies with these valves.   ALSTOM will recover incurred costs from EEC in accordance with the contract terms. This item will remain open until such time that the corrective measures have been completed and the failures have ceased.  EEC must supply one (1) additional rotary valve under warranty to replenish AES stock.

Alstom response: We require status of replacement valve.

### 8.  Silo Level Monitoring Probe Replacement

The current level probes used on the Hydrated Lime Silo, Ash Disposal Bins and the ESP ash hoppers have proven to be very unreliable.
These probes fail indicating product with no product present, and also fail the opposite way, indicating no presence of product when product is present.
Reliable level probes are required.

● *EEC's Position:    EEC supplied level probes per the specification, and per the specified conditions. EEC has supplied replacement probes for those that failed under warranty. Our records indicate only three have failed since startup.*

*Conclusion: EEC considers this item closed, until further notice.*

Alstom requires status of warranty replacements.   There had been one additional failure of these level probes. EEC was to provide a replacement under warranty.

### 9.    ESP Transformer / Rectifier Contactor Failure - Design

As per Alstom TIR # 1146, the contactors used in the TR set controllers have failed prematurely and the remaining ones show signs of immanent failure.
One of the failed contactors was inspected and it was found that the securing method for the stationary contacts was poorly designed and leads to poor electrical contact and resultant overheating.  Replacement contactors suitable for the application are required.
T/R ADP3200 controllers — They have ZERO reliability, there have been approx. 12 failures during S/U and commercial operation. These continue to fail. EEC needs to replace with more reliable controllers.

*EEC's Position:    EEC presented new evidence from Rich Hoch (EEC I&C Engineer), and Alstom agreed to review this information with their on-site engineer (Ron Gratton)*
● *and advise outcome.  To date we have received no feedback from Alstom.  We can only repeat the observations of Rich Hoch , which are:*

**B.381**

API 0676267

*Regarding the ADP3200 controllers, EEC notified Alstom & DFD on or about 10/22/02 that ambient temperature in the MCC room was too high for the controllers. Some of the failures have been caused by excessive heat.  EEC was advised that this would be corrected. To date, nothing has changed. These failures are not covered under the Warranty.*

*Conclusion: EEC considers this item closed, until further notice.*

Alstom response: The Transformer Rectifier controllers have experienced excessive equipment failures. Following is a brief recollection of the failed equipment:

    a) At least twelve ADP3200 controllers.
    b) At least five 400A contactors.
    c) Two 400A fuses
    d) One SCR assembly
    e) Two 400A circuit breakers.
    f) Several front panel display units (EEC commissioning should have a definite count).

Above contactor assembly, was in his opinion a random failure, due to a manufacturing defect. The contactor data sheet was reviewed and indicates they were used properly for the application. As far as the other ones showing signs of premature failure, there was no valid evidence to confirm this suspicion. The only way to be certain is to disassemble one of the contactors, which, to our knowledge, has not occurred.

EEC maintains that the cause of the failures is excessive ambient temperature in the MCC room and that as such the numerous failures are not covered under warranty. ALSTOM disagrees with this attempt to deflect responsibility for the poor reliability of the T/R controls, as the facts do not support this claim.

The T/R control cubicles are forced ambient-air cooled with temperature sensor (TSA on EEC DWG No.D805) set to alarm at 60C (or 50C as it is not clear on the drawings). No alarms are recorded in the data base. The Technical Manual for ADP3200 controller lists the operating limit temperature limit as 85C. Additionally we refer you to Bob Muller's memo to Tom Wardell dated 11/03/99 as follows: "The T/R controllers do not need A/C as long as they are in a ventilated enclosure that can maintain an ambient temperature of @110 deg F (44C) or less."

The T/R controllers (TWIN-PAC Controller) have experienced abnormally high numbers of equipment failures. Presently this equipment is unreliable for continuous operation. EEC must carefully evaluate the situation and replace the existing T/R controllers with reliable equipment.

(Also see item 10 which is related to these failures.)

## 10.    TR Set High Current cable terminations
One of the TR Set Controllers electrical isolators failed, and it was found that the root cause is most likely the poor termination arrangement of the cabling.
The cabling used is a multi strand trailing type cable used for its flexibility – using screw type terminals for the termination of this type of cable is unsuitable - compression terminal lugs are required for this type of cable.
This was discussed with EEC's Mr. Rich Hoch, and he agreed that these terminations should be redone with the appropriate termination lugs.

**B.382**

**EEC's Position:**    The above conclusion was made prior to careful inspection of the breaker. The failure of the breaker was actually caused by a mis-adjustment of the remote handle/cable assembly that did not allow the breaker to open completely when turned off. Disassembly and inspection showed the failure to be internal and not at the terminations. Review of this application with the manufacturer indicates that the breakers used were provided with the proper termination lugs.

Conclusion: EEC considers this item closed.

Alstom response:  Photographs of Unit 1 show that all but 2 of the 12 circuit breakers have discoloration due to overheating. One of the 2 that do not show signs of overheating is the one that AES repaired, using a crimped lug. Infrared temperature readings on the breakers indicate temperatures in excess of 300 deg F. If this problem is not due to the terminations as asserted by EEC, then this would indicate an internal breaker problem. EEC must determine the root cause of this overheating and replace the breakers

It is true that the circuit breaker, mentioned in the EEC reply, failed because of a problem with the operating mechanism however the root cause of this is undetermined. There currently is another circuit breaker presently out of service (unit#1) which exhibits the same problem believe got stuck during normal operation and operator could not turned it off and broke the operating plastic piece. We believe it is a result of overheating. We have not examined the circuit breaker as the unit is on line.

## 11.    CDS Water Injection Nozzle Tip Fouling

Nozzle tips or mouthpieces reliability – AES has used 2 spares 1 during S/U and one recently. These were manufactured out of tolerance. EEC is aware of this but has not taken action. After last weeks events of the unit 2 CDS plugging, AES borrowed 6 from the unit in Wyoming that has an EEC CDS. EEC needs to supply replacement nozzle tips.

**EEC's Position:**    EEC has no prior knowledge regarding nozzle quality problems. We were aware of only one failure since S/U. Failed nozzles should be returned to EEC, and these will be forwarded to the manufacturer for analysis. If this inspection indicates nozzles were manufactured out of tolerance, then they will be replaced under warranty.

Conclusion: Alstom to return failed nozzles to EEC.

Alstom response:  EEC is correct that one nozzle was identified as defective during the early stages of commissioning however EEC has yet to supply a replacement nozzle. Since then additional defects have been uncovered. ALSTOM will forward the nozzles to EEC for replacement. We require status of EEC replacements.

## 12.    CDS Water Injection Pressure Gauge Replacement

The pressure gauges on the CDS Water Injection system have failed as a result of overpressure and pulsation.

● Replacement pressure gauges with suitable overpressure and pulsation protection are required for this system.

*EEC's Position:     The range of the gauges is two times the operating pressure for both the supply and return service, which is per the manufacturer's instructions. Pulsation may be caused by improper sequence in valving a nozzle in or out. The Manufacturer supplies small throttling devices known as Pulsation Dampeners for this purpose. Please advise if you would like us to pursue this enhancement.*

*Conclusion: EEC considers this item closed.*

Alstom response:   Under normal operating conditions these gages operate with continuous pulsation and see frequent pressure spikes when the pumps are started. EEC advises that pulsation dampers will prevent this from occurring. Knowing these conditions EEC should have provided these under their contract. EEC is once again requested to procure replacement gages and the required pulsation dampers.

### 13)    N/A

### 14.    Handrail
The Hand Rails at the stair landings do not conform to OSHA requirements.  These are installed according to the drawings provided by EEC.  EEC to provide a plan and a ● time schedule for replacing the handrail.  This is a safety issue for which EEC is liable.

*EEC's Position:     EEC will review OSHA requirements and erection drawings.  If railing does not comply with regulations or if shop fabricated railings were incorrect, EEC will repair this work.*

*Conclusion: EEC will advise on time schedule.*

Alstom response: We require a status regarding completion during this past outage.

### 15.    *Nozzle Quick Disconnects*
*All 10 of quick disconnects have failed due to corrosion.  The water supply side have the internals removed because of the amount of corrosion that had occurred has made them inoperable.  This is a safety concern to AES.  EEC needs to replace with corrosion resistant couplings.*

*EEC's Position:     The disconnects are plated steel and should not corrode in the presence of the specified cooling water supply.  Please return failed disconnects to EEC for inspection.*

*Conclusion: Alstom to return failed disconnects to EEC for inspection and recommendation.*

Alstom response:   Require status from EEC. On 1/13/03 ALSTOM forwarded only the internals from the ● quick disconnect fittings as the balance of the fittings are required to operate the facility.  Along with this ALSTOM forwarded a water sample to EEC. EEC maintains that the fittings should not corrode if

**B.384**

the specified water quality is maintained. EEC is to provide evidence that the water in not in accordance with the specified conditions otherwise replacement couplings are required to be supplied under warranty. In the interim EEC is required to provide guidance on the safety of operating without the internals installed.

**16.    Open TIRs**
*There are some parts that were provided by AES from their warehouse. EEC needs to replace (TIRs are still open). There are also several parts needed now to repair 3 T/Rs, as identified under separate cover.*

*EEC's Position:    EEC is aware of only the following Open TIR's:*
   *1146 – T/R Contactors (See Item #9 above for comments)*
   *1149 – Valvcon Electric Actuator*
   *1153 – TR Controller (See Item #9 above for comments)*
*Conclusion: EEC will provide replacement spare parts for the Valvcon Electric Actuator on the Penthouse Heater/Blower system*

Alstom response:  EEC to advise time schedule and delivery information for the Valvcon actuators. ALSTOM will install and backcharge EEC for labor.

**17.    Heating Elements:**
*The heating elements on the Medium pressure blowers are defective. EEC to replace.*

*EEC's Position:    Alstom needs to provide more detail as to the cause of the failure or return the failed heater elements for analysis, to determine if this should be covered by warranty.*

*Conclusion: Alstom to advise of failure details or return heater elements to EEC for analysis.*

Alstom response:  Due to failure on EEC's part to react in a timely fashion, heating elements were replaced and costs will be presented to EEC as a backcharge.

**18.    Latest rev of controls and logic-**
*Also need to review this with AES and make some modifications to prevent another CDS pluggage occurrence.*

*EEC's Position:    EEC is not aware of the referenced pluggage. Alstom/AES to provide more details and observations. Alstom/AES to provide EEC written request for changes in control logic and EEC will review and make recommendations.*

*Conclusion: After receipt of the requested details, EEC will review and make recommendations.*

**B.385**

API 0676271

Alstom response:   AES will compile a list of changes desired and obtain and submit a copy of the latest logic for EECs review.

### 19.    Corrosion Guarantee
*EEC's position has been reviewed and rejected.*

**EEC's Position:**    *Already stated and communicated.*

*Conclusion: We agree to disagree at this time.  However, EEC will not respond to any issue regarding corrosion.*

Alstom response:   The CDS operation began after B. VanHooser arrived on site on August 12, 2002. The CDS on each unit has operated for approximately 1000 hours.  Installation conditions were complete in all but a very limited area.  This is well documented and there is no basis for EEC's total rejection of their corrosion guarantee and this position is not accepted by ALSTOM.

EEC's tactic is a blatantly obvious attempt to position themselves to avoid the known consequences of the high potential for corrosion due to operation
of the CDS at lower than design outlet temperature.  In accordance with the parameters established by EEC, the CDS continues to operate with an outlet temperature some 15 degrees Fahrenheit below the design value.  EEC advised during the design phase that control of this temperature was critical to corrosion prevention.

Base measurements of the casing metal thickness are not required as previously stated by EEC. Thickness readings will be taken during the next available outage.  This data will be compared to the design and manufacturing tolerances to determine the amount of loss due to corrosion.

These significant issues with EEC equipment must be resolved before "Final Acceptance" is granted.

# ALSTOM

Power

April 17, 2003

Environmental Elements Corp.
3700 Koppers St.
PO Box 1318
Baltimore MD
21203
   Attn: Mr. Joe Titus

Reference: AES Puerto Rico Project
           ALSTOM PO No. 50730 IO (the "Contract")
           ALSTOM letters (via e-mail) dated March 27, 2003, April 4, 2003, and April 11, 2003
           EEC letters (via e-mail) dated April 14, 2003 and April 17, 2003

Dear Mr. Titus:

Further to our previous notifications to Environmental Elements Corp. ("EEC"), your equipment is defective, has failed to meet its performance guarantees, fails to conform to your warranties, and is in fact causing a delay in acceptance of the entire plant.

Your letter dated April 14 requests that ALSTOM Power Inc. ("ALSTOM") waive its rights in regards to several matters, many unrelated to the current issue, before EEC will honor its obligations under the Contract. It proposes conditions which are wholly unacceptable to ALSTOM, and which are rejected.

Please consider this letter to be notice to EEC that ALSTOM considers EEC to be in breach of its warranty, its performance guarantees, and the Contract.

Without limitation to any other right or remedy, ALSTOM will proceed to correct the deficiencies in EEC's equipment. All costs resulting from or related to EEC's failure will be charged to EEC, in accordance with the Contract.

Linda P. Rothe
Project Procurement Manager
ALSTOM Power Inc.

B.387

ALSTOM Power Inc.
2000 Day Hill Road
Windsor, CT 06095
Tel: (860) 285-9166



EXHIBIT
Rothe 30
1-13-06

# ALST◯M

Power

May 29, 2003
LM07

B.L.Y.

MAY 30 2003

SURETY LAW DEPT.

Ms. Nina M. Durante, Senior Surety Counsel
Liberty Bond Services
450 Plymouth Road, Suite 400
Plymouth Meeting, PA   19462-164

Reference:   AES Puerto Rico Project
             ALSTOM PO No. 50730 IO (the "Contract")
             EEC letter dated May 16, 2003

Dear Ms Durante,

We refer to EEC's May 16,2003 letter written in response to our letter No LM03 dated May 9, 2003 to
Liberty Mutual and must point out that based on EEC's comments contained therein, it is clearly evident
that EEC is not properly and/or adequately informed of the actual conditions underlying the issues with
their equipment.

First and foremost the system provided by EEC has failed to meet the PM Emission Guarantees.  EEC
fails to recognize and continues to neglect the seriousness of this failure to meet Performance Guarantees.
This has resulted in significant financial impact to ALSTOM for which we seek payment of full damages
under the terms of the contract and applicable law.  Due to EEC's continual avoidance, denial of
responsibility, and abandonment of the work, ALSTOM has been forced to rectify EEC's multitude of
deficiencies in order to mitigate our damages.

Using the numbering convention established in AES' April 23, 2003 letter and referenced in EEC's May
16, 2003 letter, we clarify EEC's misconceptions and/or lack of understanding as follows:

1) It is gratifying to see that EEC acknowledges the requirement that the system must operate in
automatic mode.  ALSTOM has made no modifications to the last revision of EEC operating procedures.
If this is incorrect, EEC must advise which of the 9 formal revisions to the operating procedures should be
followed.  EEC would then be required to demonstrate that the system can indeed operate for sustained
periods in this mode while meeting all of the permitted emission values. AES advises that the system
currently requires constant manual intervention by the operators.

We know of no operation instability in the CFB boilers.

2) In accordance with EEC's final published operating procedures, the diverter valves are to be operated
as required to eliminate high levels in the hoppers and/or opacity spikes.  The diverter valves are indeed
operated in this mode, however both of the conditions precedent for operating these valves occur
frequently.  A review of the voluminous correspondence on this issue will show that EEC is aware of the
underlying problems necessitating this frequent operation.  That is, ash is not removed from the
CDS/ESP system through the overflow pipes in the hoppers below the first collection field in the ESP as
designed but migrates to downstream ash hoppers.  Consequently ash accumulates in the downstream

ALSTOM Power Inc.
2000 Day Hill Road
Windsor, CT 06095


**EXHIBIT**
32
Rothe
1-13-06

L-009145

**B.388**

hoppers where the only means to eliminate the ash is through the diverter valves or through the stack as opacity violations. The frequency of operation of these diverter valves is increasingly proportional to increased operating load. This is a long standing problem which EEC has failed to address. (Please refer to item 5 below for additional information.)

As EEC notes the valves are not designed for this frequency of use. Due to EEC's failure to act to resolve the underlying causes of the problem, ALSTOM is currently addressing the excessive wear on these valves. All costs incurred are to EEC's account for which we will look to Liberty Mutual for reimbursement of these backcharges.

3) EEC has failed to grasp the point of AES's letter. The point raised in EEC's letter is not in contention as it has not been tested. The fact is, the CDS/ESP can not be ramped from 50% to 100% load without exceeding emissions even with all TR's in service. We believe that this is due to ash which has fallen out of the gas stream and accumulated on horizontal surfaces during low load operation being re-entrained in the gas stream as load is increased.

ALSTOM continues to investigate this and advises that all costs associated with the investigation and rectification of this deficiency are to EEC's account for which we will look to Liberty Mutual for reimbursement of these backcharges.

4) Once again we know of no instability in the CFB boiler operation. The issue referred to by AES is the inability of the bed ash inventory to be maintained in the CDS at 50% load. At 50% load the CDS bed is depleted in a matter of hours. This prevents operation of the CDS at 50% load. In accordance with the specification the CDS must be capable of operating between 50% and 100% load.

ALSTOM is currently investigating and evaluating the cost of various means to address this deficiency. All costs associated with this investigation and rectification are to EEC's account for which we will look to Liberty Mutual for reimbursement of these backcharges.

5) This is related to item 4 above in that ash inventory can not be maintained in the CDS/ESP. Please also refer to item 2 above. We agree with EEC's statement that the ash should not have to be continually eliminated through the diverter valves; this is confirmation that the system supplied by EEC can not function as designed.

ALSTOM continues to investigate the root cause of this inventory control issue and strongly suspects that this is related to air flow distribution at the inlet to the ESP. Recent testing has shown that the design provided by EEC does not meet the Performance Guarantee criteria for air flow distribution. Extremely high velocity exists in several areas downstream of the ESP flow distribution devices. We believe this to be fundamental to many of the performance deficiencies with EEC supplied equipment.

ALSTOM believes that additional flow correction devices may be needed to eliminate high velocity at the inlet of the ESP. In order to gain a better understanding of the parameters influencing this poor distribution of gas, ALSTOM intends to re-perform the model study originally performed by EEC under the contract. All costs associated with this model study, investigation and subsequent modification of the gas flow distribution devices are to EEC's account for which we will look to Liberty Mutual for reimbursement of these backcharges.

ALSTOM Power Inc.
2000 Day Hill Road
Windsor, CT 06095

L-009146

B.389

6) In accordance with the numerous logic design changes provided by EEC's Mr. VanHooser, extensive programming modifications were implemented in the Distributed Control System. Many of these were made obsolete with subsequent revisions to the EEC operating procedures. AES has requested that the DCS be reprogrammed to eliminate this extraneous logic. The cost of the DCS programming engineer to revise the logic will be to EEC's account for which we will look to Liberty Mutual for reimbursement of these backcharges.

7) Please note that it was in fact EEC who designed gas baffles to address the distribution problems in the ESP. EEC assured that these baffles would correct the ESP performance deficiencies. ALSTOM installed these baffles in Unit 1 ESP on EEC's behalf and has previously invoiced EEC for the material and labor cost associated with this modification. Since operation on Unit 1 showed no improvement in ESP performance, the baffles were not installed on unit 2. AES requests that the final configuration of gas baffles and/or flow correction devices be installed in both units.

As noted in item 5 above, ALSTOM will continue to pursue modifications to the gas flow distribution required to meet EEC's Performance Guarantees. Any modifications required to the flow distribution devices within the ESP are to the account of EEC for which we will look to Liberty Mutual for reimbursement of these backcharges.

8) We can understand that EEC is not familiar with the notation of the ESP electrical equipment problems used by AES, however EEC is fully aware of the problems. This AES punchlist notation refers to the numerous failures of the TR controllers and circuit breakers, as well as the overheated insulation on the cabinet wiring, and the resulting internal fires in the equipment supplied by EEC. This equipment continues to fail.

Due to EEC's failure to respond to these long outstanding problems, ALSTOM has hired a consultant to investigate and resolve these issues. All costs associated with this investigation and rectification are to EEC's account for which we will look to Liberty Mutual for reimbursement of these backcharges.

The above does not encompass the full extent of the deficiencies with EEC supplied equipment. Additional outstanding issues are listed below which are wholly to EEC's account for which we will look to Liberty Mutual for reimbursement of backcharges:

1) ID Inlet Duct fails to meet specified structural design criteria.

2) Hydrated lime tank and supporting steel structure has deformed due to inadequate structural design.

3) Hydrated Lime Feed System damaged as a result of deflection in item No. 2.

4) Hydrated Lime Feed System design deficiencies prevent operation of the system.

5) Platforms, Stairs, and Handrail design does not meet OSHA requirements.

6) ESP Hopper Rotary Air Lock Valves have excessive leakage resulting in violation of emission permit.

7) Rapper Control System is not properly functioning.

8) Backcharges for correction of EEC non-conformances during erection and commissioning.

ALSTOM Power Inc.
2000 Day Hill Road
Windsor, CT 06095

9) Replacement parts that EEC refused to supply under warranty.

We are extremely disappointed by EEC's continued apathy towards these non-conformances and furthermore are astounded by EEC's arrogant opinion regarding their performance to date. We believe that your independent investigation will confirm that EEC has failed to act in good faith and in a manner consistent with the contract requirements to resolve issues with the equipment in their scope of supply.

As the consequences of delay in meeting Performance Guarantees are substantial, and there are significant backcharges associated with the corrective actions required to resolve the aforementioned deficiencies, we urge Liberty Mutual to become familiar with the issues. Please advise if you require any further details.

ALSTOM is making every effort to mitigate the cost, however we welcome any suggestions Liberty Mutual may offer on means to further mitigate the loss.

Sincerely,

Linda P. Rothe
Project Procurement Manager

cc: Environmental Elements Corp.
    3700 Koppers St.
    PO Box 1318
    Baltimore  MD   21203
    Attn: John L. Sams

    William Jarvis
    Thomas Liggett

JAN 14 2004 13:10 FR LIBERTY BOND SVC    6108284684 TO 12122449514    P.02/03

# ALSTOM

| Power

January 13, 2004
LM 18a

RECEIVED
JAN 14 2004
SURETY LAW DEPT

Liberty Mutual Insurance Company
Liberty Bond Services
Interchange Corporate Center
450 Plymouth Road, Suite 400
Plymouth Meeting, PA  19462

Attn: Mr. Frank Hucks,
      Senior Surety Counsel

Subject:   Accelerated Corrosion Warranty Claim
           AES Puerto Rico Project

Reference: Performance and Payment Bond No. 17-002-963 ("Bond")
           ALSTOM Purchase Order 50730 IO
           AES Puerto Rico Letter, A. Dyer to W. Jarvis dated November 24, 2003

Dear Frank:

AES performed an inspection on Unit 1 ESP on Sunday January 10, 2004.  Corrosion is evident in this unit however it appears to be less that was discovered in Unit 2 in November.  Please note that we consider this a warranty item for EEC and as such hereby give notice

This report is based on a preliminary inspection that was done in the ESP  12/11 by AES. The majority of the damage is located at the west side of the ESP.   What follows is from the report:

" West side

First Mechanical field – the leading edge (Electrical field 1) couldn't be inspected very well but we saw that at least two of the panels were corroded and loose. In the trailing edge (Electrical field 2) we found very little corrosion, especially at the bottom of the plates and in some of the edges. There is no major damage in this field.

Second mechanical field – in the leading edge of this field, which is the electrical field 3, we were unable to inspect it due to the baffle that is installed in front of it. In the trailing edge (Electrical field 4) the damage exists mostly on the stabilizing edges of the last panel and concentrated at the creased area of the stabilizer. This is section with the most damage. The damage seems to be as high as 30 feet and towards the center of the ESP. one big chunk of panel was found laying in the walkway.

Third mechanical field – the leading edge (Electrical field 5) has the same damage characteristics as the Electrical field 4, however not as extensive and most damage are occurring at the center of the ESP. On the trailing edge (Electrical field 6) the damage is concentrated towards the center of the ESP; most of the damage is at the stabilizing edges of the last two panels on each of the collecting plates. *Damage is at a lesser degree than the preceding compartments.*

B.392



L1-001751

Fourth mechanical field – The leading edge (Electrical field 7) has the same characteristics of last field trailing edge (Electrical field 6). On the trailing edge (Electrical field 8) there is no obvious damage in this section. The panels were solid to touch.

Fifth mechanical field – the leading edge (Electrical field 9) has a baffle installed in front of it. However, from what we could see, there is no damage in this section and in the remaining fields of the ESP in the west side.

**East side**

First mechanical field – this complete section looks in very stable condition as far as we are able to see. Panels look and feel sturdy. There are no signs of corrosion.

Second mechanical field – In the leading edge (Electrical field 3) has a baffle installed in front of it, but base on what we could see there is no damage in this section. The trailing edge (Electrical field 4) looks in good condition, but there are some signs of panels decreasing in thickness. The deterioration is concentrated towards the center of the ESP.

Third Mechanical field – This entire mechanical field (Electrical fields 5 and 6) present the same characteristics than the previous mechanical field.

Fourth Mechanical field – There were no major findings in this entire field (Electrical fields 7 and 8). The plates look strong and there are no signs of corrosion. The fields look very good from this point and back."

You are encouraged to inspect the ESP while it is down over the next week. Let me know of your intentions to do so.

Sincerely,

Linda P. Rothe
Project Procurement Manager
ALSTOM Power Inc.

W.Jarvis
T. Kehoe

**B.393**

ALSTOM Power Inc.
2000 Day Hill Road
Windsor, CT 06095
Tel: (860) 285-9713
Fax: (860) 285-4645

**L1-001752**

# ALSTOM

## Power Environment

Utility Boiler Business

### I N V O I C E

| | |
|---|---|
| EEC | |
| 3700 Kopper Street | |
| P.O. Box 1318 | |
| Baltimore, MD 21203 | |
| | |
| Attn:   Mr. Bill Van Hooser | |

| | |
|---|---|
| Date: | January 29, 2004 |
| Invoice No.: | CS-04-301 |
| Your Ref. No.: | P.O. 50730IO |
| Due Date: | Upon Receipt |
| Our Ref. No.: | 65005697 |
| Page 1 of 1 | |

| DESCRIPTION | | | AMOUNT |
|---|---|---|---|
| **AES Puerto Rico Project** | | | |
| **PCC** | **DESCRIPTION** | | |
| 205 | AES Invoice - API-001 Precipitator Curtains | Consulting Services - Unit 2 | 92,935.28 |
| | | ESP Curtains Fabrications | 219,250.00 |
| | | Precip Curtains Labor | 140,777.21 |
| | | Nov. 2003 Outage | 26,403.89 |
| | | Scaffold Services | 21,450.00 |
| | | Sum | 500,816.38 |
| | | | |
| 205 | Material | Collecting Plates | 925,120.00 |
| | | | |
| | | Material Total | 925,120.00 |
| | | | |
| | | Total Labor & Material | 1,425,936.38 |
| | **INDIRECT OVERHEAD COST (PER SECTION 18 OF PURCHASE ORDER)** | 10% | 142,593.64 |

| | | |
|---|---|---|
| **TOTAL AMOUNT DUE THIS INVOICE UPON RECEIPT** | US $ | 1,568,530.02 |
| Interest @ 4% per month will be assessed | | |

Please Note: There are outstanding invoices which we have not received.
Those invoices will be billed as soon as we receive them.



ALSTOM Power Inc.
Power Boilers

Katila R. T. Quow
Senior Financial Analyst

| Payment shall be required via wire transfer to the following account: | |
|---|---|
| Bank: | Bank One |
| Accountee: | ALSTOM Power Inc. |
| Account No.: | 57-54720 |
| ABA Number: | 071000013 |
| Notes: | Please reference our invoice no. |

EXHIBIT
37
Rothe
1-13-06

**B.394**

L-011054

2000 Day Hill Road
Windsor, CT 06095
Tel: 860-285-5082
Fax: 860-285-4645

# ALSTOM



Power Environment
Utility Boiler Business

March 11, 2004

Invoice Number : CS-04-301
Invoice Date : 01/29/2004
Amount : $1,568,530.02

This invoice is for warranty claims submitted by AES for replacement of ESP
internal components that have failed due to corrosion.  This work is covered
under EEC's 2 years corrosion warranty.  ALSTOM has not paid AES for this claim.

This material was purchased by AES from EEC.  EEC designed and manufactured
these components.  ALSTOM finds it ironic that EEC has apparently profited from
its failure to honor its warranty, but this is an issue between Liberty Mutual and
its principal EEC.

Per our previous correspondence we believe that Liberty Mutual has an obligation
to assume these warranty obligations and feel that Liberty Mutual should provide
this warranty directly to AES.

ALSTOM Power Inc.
2000 Day Hill Road
Windsor, CT 06095-0500
Tel: (860) 688-1911
Fax: (860) 285-9512

**B.395**


EXHIBIT
38
Rothe
1-13-06

**L-010648**

# ALSTOM

## Power Environment

Utility Boiler Business

### INVOICE

EEC
3700 Kopper Street
P.O. Box 1318
Baltimore, MD 21203

Attn:   Mr. Bill Van Hooser

| | |
|---|---|
| Date: | January 29, 2004 |
| Invoice No.: | CS-04-301 |
| Your Ref. No.: | P.O. 507301O |
| Due Date: | Upon Receipt |
| Our Ref. No.: | 65005697 |
| Page 1 of 1 | |

| DESCRIPTION | | | AMOUNT |
|---|---|---|---|
| **AES Puerto Rico Project** | | | |
| **PCC** | **DESCRIPTION** | | |
| 205 | AES Invoice - APJ-001 Precipitator Curtains | Consulting Services - Unit 2 | 92,935.28 |
| | | ESP Curtains Fabrications | 219,250.00 |
| | | Precip Curtains Labor | 140,777.21 |
| | | Nov. 2003 Outage | 26,403.89 |
| | | Scaffold Services | 21,450.00 |
| | | Sum | 500,816.38 |
| 205 | | Material    Collecting Plates | 925,120.00 |
| | | Material Total | 925,120.00 |
| | | Total Labor & Material | 1,425,936.38 |
| INDIRECT OVERHEAD COST (PER SECTION 10 OF PURCHASE ORDER) | | 10% | 142,593.64 |
| TOTAL AMOUNT DUE THIS INVOICE UPON RECEIPT | | | US $ 1,568,530.02 |
| Interest @ 4% per month will be assessed | | | |

Please Note: There are outstanding invoices which we have not received.
Those invoices will be billed as soon as we receive them.

ALSTOM Power Inc.
Power Boilers

Kisha R. T. Quow
Senior Financial Analyst

| Payment shall be required via wire transfer to the following account: | |
|---|---|
| Bank: | Bank One |
| Accountee: | ALSTOM Power Inc. |
| Account No.: | 57-54720 |
| ABA Number: | 071000013 |
| Notes: | Please reference our invoice no. |

**B.396**

**L-010649**

2000 Day Hill Road
Windsor, CT 06095
Tel: 860-285-5082

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.         \*   C.A. NO.:  04-1282(JJF)
                                 \*
     Plaintiff             \*
                                 \*
     Vs.                    \*
                                 \*
ALSTOM POWER, INC.           \*
                                 \*
     Defendant             \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF MR. ELIAS SOSTRE

DATE      :    January 20, 2006

TIME:    :    9:30 A.M.

OFFICE   :    Ober, Kaler, Grimes & Shriver, P.S.C.
                120 East Baltimore Street
                Baltimore, Maryland 21202-1643

HELD AT  :    Axtmayer, P.S.C.
                250 Ponce de León Avenue
                Suite 404
                Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

    Daniel D. Williams, Esq.
    James L. Tuxbury, Esq.

FOR DEFENDANT:

    Anthony Vittoria, Esq.
    Michael A. Schollaert, Esq.

NOTARY PUBLIC:

    Liana I. Loyola, Esq.

**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927


1    BY MR. SCHOLLAERT:

2         Q    Is it AES Puerto Rico's current practice to

3    increase the CDS outlet temperature when soot blowing

4    occurs?

5         A    AES Puerto Rico continues doing the practices

6    that Alstom and EEC did during commissioning, when we

7    went to commercial operation.

8         Q    Did Alstom... Strike that. Am I characterizing

9    your testimony correctly if you're saying... strike that

10   again. Is it true that AES Puerto Rico does not increase

11   the CDS outlet temperature when it initiates soot

12   blowing in the control room?

13   MR. WILLIAMS:

14        Objection, asked and answered.

15   THE DEPONENT:

16        A    AES Puerto Rico continues making the same

17   practices that EEC and Alstom did for commissioning when

18   we went to commercial operation.

19   BY MR. SCHOLLAERT:

20        Q    With regards to putting aside EEC's and

21   Alstom's practices, does AES Puerto Rico adjust the CDS

22   outlet temperature when soot blowing occurs?

23   MR. WILLIAMS:

24        Objection asked and answered; hypothetical.

25



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

B.398

98

1    MR. SCHOLLAERT:

2        I went off the record, Dan.

3                        OFF THE RECORD

4    MR. SCHOLLAERT:

5        We're taking a lunch break at 12:00 p.m. Can we go

6    off the record?

7        (Whereupon, the deposition in the above-entitled

8    matter was recessed until 1:00 p.m. of the same day at

9    the same place.)

10                                        (12:00 p.m.)

11                   AFTERNOON SESSION

12                                        (1:05 p.m.)

13   MR. SCHOLLAERT:

14       We're back on the record. It is 1:05 p.m.

15       Q    Mr. Sostre, the equipment that measures the

16   wet bulb temperature that automatically communicates it

17   to the DCS is installed on what unit?

18   MR. WILLIAMS:

19       Objection to the form.

20   THE DEPONENT:

21       A    It was installed on Unit 2.

22   BY MR. SCHOLLAERT:

23       Q    On Unit 2?  Is there any equipment installed

24   on Unit 1 to measure the wet bulb temperature?

25



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

B.399

1   THE DEPONENT:

2      A   Can you repeat the question?

3   BY MR. SCHOLLAERT:

4      Q   What practices did Alstom maintain with

5   regards to the CDS outlet temperature when soot blowing

6   was initiated in the control room?

7      A   According to what I remember, when soot

8   blowing occurred, the temperature of the CDS was never

9   increased.

10      Q   So AES did not increase the temperature of the

11   CDS outlet temperature when soot blowing occurred?

12   MR. WILLIAMS:

13      Objection to form.  And objection to the extent

14   that it calls for a legal conclusion about who was

15   running the plant.  And asked and answered, if it

16   doesn't call for a legal conclusion.

17   BY MR. SCHOLLAERT:

18      Q   Please answer the question.

19      A   During... When we went to commercial opera-

20   tion, AES maintained the same practices that Alstom had

21   during commissioning.

22      Q   You just testified that Alstom did not adjust

23   the temperature.  Is that correct?

24   MR. WILLIAMS:

25      Objection, asked and answered.

1  depending on the chloride content of the CDS spray

2  water?

3        A    When the wet bulb temperatures give an

4  indication that's higher, the CDS temperature is 125,

5  130°, that was more than 30°.

6        Q    Does AES increase the CDS outlet temperature

7  depending on the chloride content of the CDS spray

8  water?

9  MR. WILLIAMS:

10       Objection, asked and answered.

11 THE DEPONENT:

12       A    When the temperatures were taken, that they

13 gave higher temperatures, the temperature was already

14 more than 30° approach.

15 BY MR. SCHOLLAERT:

16       Q    If the chloride content of the spray water is

17 higher, do you have to operate at higher than a 30°

18 approach temperature?

19 MR. WILLIAMS:

20       Objection to the request for expert testimony,

21 about what has to be done.

22 THE DEPONENT:

23       A    You're supposed to increase the temperature.

24 BY MR. SCHOLLAERT:

25       Q    Did AES increase the temperature?

**B.400A**



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

1  MR. WILLIAMS:

2      Objection, lack of temporal scope.

3  THE DEPONENT:

4      A    At the time that the temperatures came up

5  higher, the approach was already more than 30°, the

6  temperature was higher.

7      Additionally, AES Puerto Rico was instructed to

8  operate it at 152°, and whenever you tried to increase

9  the temperature, the opacity was out of control.

10 MR. SCHOLLAERT:

11     I'm handing the Witness what has been marked as

12 Exhibit No. 3.

13 MR. WILLIAMS:

14     "Gracias."

15 BY MR. SCHOLLAERT:

16     Q    Can you turn to the second page of the

17 document, Mr. Sostre?

18 MR. SCHOLLAERT:

19     Oh, we're gonna go off the record so the Video-

20 grapher can change the videotape.  I think you were

21 supposed to say that into the record in Spanish.

22 We'll go off the record.

23 THE VIDEOGRAPHER:

24     "Son las..." "1:31". 1:31.  I'm gonna change the

25 tape.

162

1  BY MR. SCHOLLAERT:

2      Q    What were the others?

3      A    The rapper sequence was also worked on.

4  (Pause.)  Other things were done that right now don't

5  come to mind.

6      Q    Why did AES raise the temperature for the CDS

7  outlet temperature?

8      A    The exit temperature for the CDS was raised

9  because, as a measure to avoid corrosion.

10     Q    Why?

11  MR. WILLIAMS:

12     Objection, asked and answered.

13  THE DEPONENT:

14     A    Because, due to that it was thought that that

15  could be one of the reasons for the corrosion.

16  BY MR. SCHOLLAERT:

17     Q    Who thought that it could be one of the

18  reasons for the corrosion?

19     A    I don't remember specifically who.

20     Q    Was it your thought?

21     A    I don't remember.

22     Q    What temperature did you raise the CDS outlet

23  temperature to?

24  MR. WILLIAMS:

25     Objection, form.  Objection, assumes facts not in



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

**B.401A**

1    evidence.

2    THE DEPONENT:

3        A    We tried to increase the temperature to 170

4    degrees, and during the process we had a lot of pro-

5    blems, because the opacity was out of control.  At the

6    high temperature, high chloride, you couldn't operate

7    the cds.

8    BY MR. SCHOLLAERT:

9        Q    Did you have opacity exceedences as a result

10   of raising the temperature?

11   MR. WILLIAMS:

12       Objection, calls for a legal conclusion.

13   THE DEPONENT:

14       A    I don't remember exactly.  But it seems to me

15   that there was, but I don't remember exactly.

16   MR. SCHOLLAERT:

17       I did not write the exhibit number down, Dan, can

18   you identify?

19   MR. WILLIAMS:

20       Exhibit No. 6.

21   BY MR. SCHOLLAERT:

22       Q    Can you turn to page 135523?  The first line

23   at the top, is that your handwriting?

24       A    It looks like my handwriting, it looks like

25   it.

1       Q    Okay.  Did AES always operate at a 30°

2  approach temperature in the CDS?

3  MR. WILLIAMS:

4       Objection, unless you're questioning him about his

5  personal knowledge.

6  THE DEPONENT:

7       A    According to the temperature measures that

8  were taken, I haven't seen any evidence that we operated

9  at less than 30°.  That's the only thing I can say.

10  BY MR. SCHOLLAERT:

11       Q    Okay. Did AES install... Do you know what a

12  corrosion coupon is?

13       A    I have knowledge of what a corrosion coupon

14  is.

15       Q    Can you explain to me what it is?

16       A    The idea that I have of a corrosion coupon is,

17  it's a part of a specific metal, it could be different

18  types of metal that's installed within an equipment,

19  with the purpose that after a period of time when it's

20  within that equipment, you can remove it, and analyze

21  that metal piece to see if there's any  to determine the

22  composition, and determine to see if there's any loss by

23  corrosion, or any kind of erosion in the equipment.

24       Q    Did AES Puerto Rico install corrosion coupons

25  in the ESP's plant?

1    MR. WILLIAMS:

2        Objection, to the extent you're calling for his

3    testimony as a corporate designee.  It's inappropriate.

4    He can only testify to his personal factual knowledge.

5    THE DEPONENT:

6        A    I'm not sure if they spoke about installing

7    them at a given moment, but I'm not sure if they were

8    installed.

9    BY MR. SCHOLLAERT:

10       Q    You do not know if corrosion coupons were

11   installed?

12       A    I couldn't say precisely.

13       Q    Is AES Puerto Rico required to report

14   exceedences of its environmental permits?

15   MR. WILLIAMS:

16       Objection to the extent that you're calling for his

17   testimony as a corporate representative.  He's here as

18   an individual.

19   THE DEPONENT:

20       A    Could you repeat the question again?

21   MR. SCHOLLAERT:

22       And I'll ask you again to let the Translator finish

23   translating my question before you object.

24       The Witness is having difficulties understanding

25   when you're talking, and the Translator is talking in

212

1  ature, low chloride, 156; outlet chloride, maximum

2  chloride 176."

3  BY MR. SCHOLLAERT:

4      Q    Does Exhibit No. 2, page EEC06011 instruct the

5  operator to increase the outlet temperature when higher

6  chlorides are present?

7  MR. WILLIAMS:

8      Objection to the, objection to the characterization

9  of the document as an instruction that was given to some

10  operator.

11  THE DEPONENT:

12      A    Well, in reference to this document, I see

13  what it says here, but AES was instructed to operate

14  with a temperature of 152 degrees.  Those are the ins-

15  tructions that we were given, due that you couldn't

16  control the opacity at a higher temperature.

17  BY MR. SCHOLLAERT:

18      Q    What are the instructions on page EEC06011

19  tell you to do?

20  MR. WILLIAMS:

21      Objection to Counsel's characterization that these

22  are some instructions.

23  THE DEPONENT:

24      A    It says "Outlet temperature, low chloride,

25  156; outlet temperature, maximum chloride, 176". But we

253

CERTIFICATE OF COURT REPORTER

I, MATTHEW J. CLUTTEUR SHORT, Court Reporter, and member of Crespo Rodríguez, Inc.:

DO HEREBY CERTIFY: That the foregoing transcript is a full, true and correct record of the testimony given which was taken down by me, and thereafter reduced to the typewritten form.

I FURTHER CERTIFY: That I am not in any way involved or interested in the outcome of said action.

WITNESS my hand this 27th day of January, 2006 in San Juan, Puerto Rico.

_____

MATTHEW J. CLUTTEUR SHORT

Court Reporter

1

1     Volume:    I

2     Pages:     1-269

3     Exhibits: 1-65

4     IN THE UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF DELAWARE

6

7                              C.A. No. 04-1282-JJF

8

9     - - - - - - - - - - - - - - - - - - - - x

10    AES PUERTO RICO, L.P.,

11              Plaintiff

12    vs.

13    ALSTOM POWER, INC.,

14              Defendant

15    - - - - - - - - - - - - - - - - - - - - x

16

17         VIDEOTAPED DEPOSITION OF PAUL STINSON

18         Thursday, February 9, 2006 - 9:32 a.m.

19              Holland & Knight LLP

20              10 St. James Avenue

21              Boston, Massachusetts

22              - - - - - - - - - - -

23

24    Reporter:  Maureen J. Manzi, CSR