Paul Stinson                                        02/09/2006

92

1    mischaracterizes Mr. Stinson's testimony.

2        Q.   Let me rephrase it.   Why do you believe that

3    checking the chloride content of the ash on a daily

4    or shift basis would be ridiculous?

5            MR. WILLIAMS:   Same objection.

6        A.   The chloride content of the ash is a direct

7    result of a material balance.   Therefore, it's not

8    necessary to know what the chloride content of the

9    ash is.   It's only necessary to know what the

10   quality of the water going into the CDS is.   It

11   would be very expensive, very time-consuming, and

12   the time delay between taking the sample and getting

13   the results would make the results meaningless.   No

14   one would suggest such a thing.

15       Q.   You would agree with me though that starting

16   in September AES Puerto Rico started testing the

17   chloride content of the ash on a regular basis,

18   wouldn't you?

19           MR. WILLIAMS:   Objection to form.   Are

20   we talking about 2003?

21           MR. VITTORIA:   2003.

22           MR. WILLIAMS:   Can you repeat the

23   question, please?

24       Q.   Read it back, please.

Paul Stinson

02/09/2006

103

1      A.   I see that.

2      Q.   And below that six lines it says Chlorine,

3   the design is .03 with a range of 0-.1.  Do you see

4   that?

5      A.   I see that.

6      Q.   You would agree with me that the chloride

7   content of the ash as reported in Exhibit No. 21

8   greatly exceed the limits contained in Exhibit No.

9   22, wouldn't it?

10         MR. WILLIAMS:  Objection, vague.

11     A.   That would not be a correct -- that would

12  not be a correct conclusion.

13     Q.   How is it not correct?

14     A.   These apply to two different things.

15     Q.   Could you explain that for me?

16     A.   Yes.  This is -- this is a specification I

17  believe -- I didn't write the specification.  But

18  this is a specification for the coal and the ash

19  from the coal.  Okay.  Those are specified as

20  received.  And so this is the ash as received not

21  the ash from the ESP.

22     Q.   You don't get ash until you burn the coal,

23  correct?

24     A.   The ash is in the coal when it arrives.

Paul Stinson

02/09/2006

107

1  There's no question pending.

2      Q.  **Please.  How am I incorrectly reading the**

3  **document?**

4          MR. WILLIAMS:  Do you want him to look

5  at the document?

6          MR. VITTORIA:  Sure.

7          MR. WILLIAMS:  Do you want him to look

8  at a particular part of the document or review the

9  whole thing?

10          MR. VITTORIA:  His testimony is that I'm

11  incorrectly reading the document and I'm asking him

12  how I'm doing so.

13          MR. WILLIAMS:  Why don't you take a look

14  at the whole document and answer the question.

15      A.  Would you turn to page 9-2.

16      Q.  **I'm there.**

17      A.  This is one that we looked at and you made

18  me read the first sentence.  The second -- the

19  second sentence states that the concentration of the

20  chloride in the ash is influenced by the spray water

21  in the coal chloride content.  You see that there?

22      Q.  **Yes, I do.**

23      A.  Okay.  The coal chloride content is

24  well-known and is measured regularly by the plant.

Paul Stinson                                    02/09/2006

108

1   It's extremely low.  That's the ash that's in the

2   coal coming into the plant.  Now, therefore, the

3   other factor that we don't know so well or don't

4   know as definitely is what is the quality of the

5   spray water.  And, therefore, the third sentence

6   states that the "plant personnel will measure water

7   conductivity and correlate this to chloride

8   content."  So what is reasonable and correct is what

9   that third sentence says.  But that sentence does

10  not say I would add to measure the chloride content

11  of the ash, just to correlate.

12      Q.  I appreciate your explanation.  And if I

13  could have you to turn to 9-5 of that document.

14      A.  Yes, I've turned to that page.

15      Q.  And the second bullet point above the

16  heading Daily For First 3 Months.  Do you deny that

17  it says "Measure the chloride content on the ash and

18  measure cooling water conductivity"?

19      A.  I don't deny that that's what's written

20  there.

21      Q.  Okay.

22          MR. WILLIAMS:  I'll object.  That's an

23  incomplete statement and move to strike.

24      Q.  And you would agree with me, wouldn't you,

Paul Stinson                                         02/09/2006

112

1      A.  All of the ash that enters the CDS is

2   sprayed with the water that when it contains

3   chlorides, it contains chlorides.

4      Q.  **Having passed through the CDS on two**

5   **occasions had been sprayed with water that contains**

6   **chlorides on two occasions, wouldn't that ash have**

7   **an elevated chloride level?**

8           MR. WILLIAMS:  Objection to form.

9      A.  No, that ash would not have an elevated

10  chloride level.

11     Q.  **Can you explain why not?**

12     A.  Yes, I can explain why not.

13     Q.  **Please do.**

14     A.  The chlorides that enter the system enter

15  the system with the water in the CDS and they leave

16  the system with the fly ash.  Do you follow me so

17  far?

18     Q.  **I do.**

19           MR. WILLIAMS:  Mr. Stinson --

20           THE WITNESS:  I'm sorry.  I'm sorry.

21           MR. WILLIAMS:  -- you cannot ask

22  counsel questions, but go ahead.

23     A.  I'm sorry for the asking question.

24  Therefore, the chloride enters at a constant rate

Paul Stinson                                                02/09/2006

113

1   with the water, and the amount of chlorides entering

2   with the water is not affected by whether or not

3   there's fly ash reinjection going on.  So let me

4   repeat myself.  The amount of water being sprayed in

5   the CDS is not affected by the amount of ash

6   entering the CDS nor the -- whether you're doing fly

7   ash reinjection.  The chlorides all leave the

8   system, if you will, with the net production of ash,

9   and the net production of ash is not changed by

10  whether or not the fly ash is being recycled.  The

11  same amount of ash is being produced net on the

12  plant whether the fly ash is being recycled or not.

13  So we have the same amount of chlorides going into

14  the CDS whether the fly ash is being recycled or not

15  and we have the same amount of ash leaving the

16  system into the fly ash storage area regardless of

17  whether or not the fly ash is being recycled.  The

18  chloride content of the ash is simply obtained by

19  dividing the flow rate of chlorides into the CDS by

20  the flow rate of the net ash generated.  And that's

21  determined by material balance.  And, therefore,

22  because neither of those are affected by whether fly

23  ash recycling is going on, it does not change the

24  content of chloride in the ash.

Paul Stinson                                                    02/09/2006

175

1              MR. WILLIAMS:   Objection to form.

2       A.   Yes, I do have some understanding.

3       **Q.   And what's that understanding?**

4       A.   There were -- there was a very important

5    fact about this whole time what was going on that

6    turned out to be extremely important in the

7    understanding of what happened.  And that is, at the

8    time when we raised the temperature upon discovery

9    of the corrosion in the ESP, we happened to be

10   operating on very low chloride water or essentially

11   almost no chloride water because the water treating

12   facility that produces the high chloride water was

13   shut down for maintenance.

14              So at the time we raised the

15   temperature, we were running very clean water.  And

16   what was happening was, subsequently when the

17   chlorided water came back in, the guys were having

18   great difficulty at making opacity at the high

19   temperatures, so they lowered the temperatures and I

20   was trying to get them to raise them back up.  And

21   Al was indicating some agreement to try.  But

22   ultimately we learned that you can't operate at

23   those high temperatures with the chloride in the

24   water, at least not without great difficulty.

Paul Stinson                                              02/09/2006

195

1      A.   Okay.

2      Q.   **This is an e-mail from you to WeiLi Yu and**

3   **Puerto Rico Leaders dated January 23, 2004, correct?**

4      A.   That's what it says.

5      Q.   **And the subject is RE: Additional T/C for**

6   **ESP.  Do you see that?**

7      A.   I do see that.

8      Q.   **Do you recall sending this e-mail?**

9      A.   I do recall sending this e-mail.

10     Q.   **Did you do so in the course of your duties**

11  **at AES Puerto Rico?**

12          MR. WILLIAMS:  Objection to form.  He

13  testified he's not an employee of AES Puerto Rico.

14     Q.   **Did you do this as part of your duties as an**

15  **employee of AES Corporation?**

16     A.   I was an employee of AES Corporation at the

17  time I wrote this e-mail.

18     Q.   **If you look at the numbered paragraph 2) in**

19  **that e-mail it says, "Perhaps some of the water that**

20  **is sprayed into the CDS continues to evaporate after**

21  **it gets passed the CDS outlet T/Cs and cools the gas**

22  **further."  Do you see that?**

23     A.   I do see that.

24     Q.   **Now, you believed that there is a possible**

196

1   carryover of water from the CDS into the ESP because

2   of incomplete drying of the CDS spray water,

3   correct?

4        A.   I'm sorry.  You'll have to repeat the

5   question.

6               (Question read back.)

7        A.   No, because I understand now that once we

8   raised the ESP -- the CDS temperature to around one

9   hundred -- the high 160s, we were no longer having a

10  water problem in there.  But I didn't know that at

11  the time I wrote this.  I didn't know we had

12  arrested this corrosion problem at the time.  It

13  would be fair to say that, you know, I was concerned

14  at the time perhaps.

15       Q.   And your concern at the time was that there

16  was a carryover of DCS spray water into the ESP

17  because of incomplete drying, correct?

18               MR. WILLIAMS:  Objection, vague.

19       A.   We were -- the subject of this is about

20  things we were doing to determine if complete drying

21  was occurring.

22       Q.   And you were investigating whether

23  incomplete drying could be caused by poor

24  atomization of the CDS spray water by the CDS spray

Paul Stinson                                                      02/09/2006

200

1      A.  I think I have some recollection of this

2  e-mail.

3      Q.  The first paragraph has a heading called

4  Nozzles, correct?

5      A.  That is correct.

6      Q.  And under that paragraph little a) it

7  states, "I received the nozzle that Dave Stone sent

8  to me and we talked about them this morning.  I

9  think we need to get more scientific about these for

10  a while."  Do you see that?

11      A.  I see that.

12      Q.  And then the remainder of that paragraph you

13  discuss tracking hours of use for each nozzle; is

14  that correct?

15      A.  Yes.  I am talking about tracking the hours

16  of use for each nozzle.

17      Q.  And you also discuss checking the spray

18  pattern for the nozzles?

19      A.  Yes, that's mentioned.

20      Q.  And you also discussed the fact that there

21  may be a decision as to the maximum hours that a

22  nozzle can be in service before they're changed out,

23  correct?

24          MR. WILLIAMS:  Objection to form.

Paul Stinson                                        02/09/2006

201

1    A.   Yes, that probably is a bit misstated in

2    that apparently there already was a standard for

3    that which was three months, and I think I meant to

4    say there may be a lesser standard than three months

5    decided.

6    **Q.   So at this time you had a concern both about**

7    **the general maintenance of the nozzles but also the**

8    **long-term wear and tear of the nozzles, correct?**

9         MR. WILLIAMS:  Objection to form.

10   A.   My concern was that the plant do everything

11   possible to assist with the drying of the ash

12   because we were un -- because of the severity of the

13   corrosion and because we couldn't be sure that we

14   could get enough temperature in the CDS.  So by

15   looking at the nozzles was one factor that even

16   though it's relatively a minor factor, it might

17   help.  So we were looking at it and trying to get

18   much more scientific.

19   **Q.   And you were looking at both the daily**

20   **maintenance of the nozzles as well as the long-term**

21   **wear and tear of the nozzles, correct?**

22        MR. WILLIAMS:  Objection to form.

23   A.   Well, I was looking at the entire aspect of

24   maintenance of the nozzles, whether it could be done

Paul Stinson                                                    02/09/2006

269

1    COMMONWEALTH OF MASSACHUSETTS

2    MIDDLESEX, ss.

3           I, Maureen J. Manzi, Certified Shorthand

4    Reporter and Notary Public, CSR #135093, duly

5    commissioned and qualified in and for the

6    Commonwealth of Massachusetts, do hereby certify

7    that there came before me on the 9th day of

8    February, 2006 the person hereinbefore named, who

9    was by me duly sworn to testify to the truth and

10   nothing but the truth of their knowledge touching

11   and concerning the matters in controversy in this

12   cause; that they were thereupon examined upon their

13   oath, and their examination reduced to typewriting

14   under my direction and that the deposition is a true

15   record of the testimony given by the deponent.

16          In Witness Whereof, I have hereunto set my

17   hand and affixed my seal this 16th day of February,

18   2006.

19                               CERTIFIED TRANSCRIPT
                                  LEGALINK BOSTON

20

21          _Maureen J. Manzi_

22          Notary Public

23          My Commission Expires:

24          January 17, 2008

DUKE/FLUOR DANIEL
CARIBBEAN, S.E.

Specification No.:  W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.03-0001
Revision:  2
May 10, 2001
Page:  1 of  27

CARIBBEAN ARCHITECTS & ENGINEERS (CAE)

FLUOR DANIEL CARIBBEAN, INC. (FDCI)

DUKE/FLUOR DANIEL CARIBBEAN (DFDC)

DUKE/FLUOR DANIEL INTERNATIONAL (DFDI)

DUKE/FLUOR DANIEL INTERNATIONAL SERVICES (DFDIS)

AES PUERTO RICO,  L. PARTNERSHIP (AES-PR)

AES-PR TOTAL ENERGY PROJECT

GUAYAMA, PUERTO RICO

EXHIBIT NO. 22
M.J. MANZI
2/9/06

**CIRCULATING DRY SCRUBBER
FLUE GAS CLEANING SYSTEM**

SCOPE OF SUPPLY AND TECHNICAL REQUIREMENTS
MATERIALS, EQUIPMENT, FACILITIES, AND DOCUMENTS

Revision 0 - Conformance Specification - February 17,1997

**REVISION LOG**



| 1 | February 4, 1998 | 6 | |
| 2 | May 10, 2001 | 7 | |
| 3 | | 8 | |
| 4 | | 9 | |
| 5 | | 10 | |


DEFENDANT'S EXHIBIT

Specification
Circulating Dry Scrubber

**B.420**

W-017-00684

**DUKE/FLUOR DANIEL
CARIBBEAN, S.E.**

Specification No.: W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.03-0001
Revision: 2
May 10, 2001
Page: 2 of 27

**DUKE/FLUOR DANIEL
VERIFICATION OF SPECIFICATION**

Owner: _____ AES Puerto Rico, L.P. (AES-PR) _____

Title of Specification: _____ AES Puerto Rico Total Energy Project _____

_____ Circulating Dry Scrubber Flue Gas Cleaning System _____

Specification Number: _____ W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.03-0001 _____

Revision: _____ 02 _____

In accordance with established procedures, the quality of this specification has been assured. Signatures certify that the above specification was originated, checked, and approved as noted below:

| | | Signature | Date |
|---|---|---|---|
| Prepared By: | | *Robert F Day Jr* | Date: 5/11/01 |
| Checked By: | | *J. M. Jensen* | Date: 5-11-01 |
| Inspected By: | Mechanical | | Date: 5-14-01 |
| | Electrical | | Date: 5-15-01 |
| | Civil | *Michael B. Welch* | Date: 5-15-01 |
| | Layout | *John R. Mulcahy* | Date: 5-15-01 |
| Approved By: | Eng. Mgr. | | Date: 5/15/01 |

**B.421**

Specification
Circulating Dry Scrubber



# DUKE/FLUOR DANIEL CARIBBEAN, S.E.

Specification No.: W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.03-0001
Revision: 2
May 10, 2001
Page: 3 of 27

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| 1.0 | COVER SHEET | 1 |
| 2.0 | VERIFICATION SHEET | 2 |
| 3.0 | TABLE OF CONTENTS | 3 |
| 4.0 | GENERAL | 5 |
| 4.1 | SCOPE | 5 |
| 4.2 | INSTALLATION SITE | 5 |
| 4.3 | DEFINITIONS | 5 |
| 4.4 | CODES AND STANDARDS | 6 |
| 5.0 | ATTACHMENTS | 8 |
| 6.0 | INSTALLATION AND OPERATING CONDITIONS | 8 |
| 6.1 | INSTALLATION DESIGN CRITERIA | 8 |
| 6.2 | OPERATING CONDITIONS | 10 |
| 6.3 | PERFORMANCE GUARANTEES | 11 |
| 7.0 | EQUIPMENT AND SERVICES TO BE FURNISHED | 11 |
| 7.1 | EQUIPMENT TO BE FURNISHED BY SELLER | 11 |
| 7.2 | TERMINAL POINTS | 12 |
| 8.0 | DESIGN REQUIREMENTS | 12 |
| 8.1 | GENERAL | 12 |
| 8.2 | ABSORBER/REACTOR VESSEL | 14 |
| 8.3 | REAGENT STORAGE SYSTEM | 15 |
| 8.4 | ASH RECIRCULATION SYSTEM | 16 |
| 8.5 | FLUE GAS COOLING WATER SYSTEM | 17 |
| 8.6 | COOLING WATER TANK | 17 |
| 8.7 | PUMPS | 18 |
| 8.8 | DUCTS | 19 |
| 8.9 | INSULATION AND LAGGING | 19 |
| 8.10 | STRUCTURAL STEEL | 20 |
| 8.11 | LADDERS, PLATFORMS AND STAIRS | 20 |
| 8.12 | EXPANSION JOINTS | 21 |
| 8.13 | INSTRUMENTATION AND CONTROLS | 21 |

**B.422**

Specification
Circulating Dry Scrubber



**DUKE/FLUOR DANIEL CARIBBEAN, S.E.**

Specification No.: W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.03-0001
Revision: 2
May 10, 2001
Page: 4 of 27

## TABLE OF CONTENTS (Cont'd)

| | | |
|---|---|---|
| 9.0 | SPECIAL REQUIREMENTS | 22 |
| | | 22 |
| | 9.1 PRE-AWARD MEETING | 22 |
| | 9.2 PACKAGING AND SHIPPING | 22 |
| | 9.3 MISCELLANEOUS REQUIREMENTS | 22 |
| | 9.4 NOISE | 22 |
| | 9.5 MATERIAL ORIGIN OF MANUFACTURE | |
| | | 23 |
| 10.0 | QUALITY ASSURANCE | |
| | | 23 |
| 11.0 | DELIVERY | |
| | | 23 |
| 12.0 | DRAWINGS | |
| | | 23 |
| | 12.1 GENERAL | 24 |
| | 12.2 SPECIFIC | |
| | | 25 |
| 13.0 | INSTRUCTION MANUALS | |
| | | 25 |
| 14.0 | TESTS AND INSPECTIONS | |
| | | 26 |
| 15.0 | SPARE PARTS | |
| | | 26 |
| 16.0 | INFORMATION TO BE FURNISHED | |
| | | 26 |
| | 16.1 PRIOR TO AWARD OF ORDER | 26 |
| | 16.2 AFTER AWARD OF ORDER | |
| | | 26 |
| 17.0 | DISCREPANCIES AND INTERPRETATION | |
| | | 27 |
| 18.0 | CONFORMANCE WITH SPECIFICATIONS | |
| | | 27 |
| 19.0 | CONSTRUCTION SERVICES | |
| | | 27 |
| 20.0 | TECHNICAL DIRECTION | |
| | | 27 |
| 21.0 | SUBMISSION OF PROPOSALS AND PRICES | |



# DUKE/FLUOR DANIEL CARIBBEAN, S.E.

Specification No.: W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.03-0001
Attachment No.: 1
Page: 1 of 2

### Coal and Ash Analysis
### 02/04/98

| | Design (Performance) | Range | |
|---|---|---|---|
| **Proximate Analysis - Wet, %** | | | |
| Moisture | 11.3 | 6.0 | 13.0 |
| Volatile Matter | 33.0 | 30.0 | 38.0 |
| Fixed Carbon | 46.9 | 43.0 | 61.0 |
| Ash | 8.8 | 5.0 | 10.0 |
| Sulfur | 0.76 | 0 | 1.0 |
| Chlorine | 0.03 | 0 | 0.1 |
| | | | |
| **Ultimate Analysis, %** | | | |
| Carbon | 65.4 | | |
| Hydrogen | 4.50 | | |
| Nitrogen | 1.28 | | |
| Sulfur | 0.76 | | |
| Ash | 8.8 | | |
| Oxygen | 7.93 | | |
| Chlorine | 0.03 | | |
| Total Moisture | 11.3 | | |
| | | | |
| Nitrogen Limit (lbm/$10^6$ Btu) | | < 1.18 | |
| Oxygen to Nitrogen Ratio | | < 6.3 | |
| | | | |
| Higher Heating Value (HHV), as received, Btu/lbm | 11,600 | 11,000 | 13,000 |
| Hardgrove Grindability Index (HGI) | 50 | 43 | 65 |
| Size  - Before Crushing | 50 mm | 3 x 0 in. | 3 x 0 in. |
|     - After Crushing | Per Seller | Per Seller | Per Seller |




Specification
Circulating Dry Scrubber

**B.424**

# DUKE/FLUOR DANIEL
## CARIBBEAN, S.E.

Specification No.: W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.03-0001
Attachment No.: 1
Page: 2 of 2

| Ash Fusion Temperatures, °F | Red. | Ox. | Reducing Basis | |
|---|---|---|---|---|
| Initial Deformation, ID | 2,230 | 2,340 | 2,100 | NA |
| Softening, ST (H-W) | 2,340 | 2,470 | 2,200 | NA |
| Hemispherical, HT (H-1/2W) | 2,560 | 2,560 | 2,430 | NA |
| Fluid, FT (Flat) | 2,560 | 2,650 | 2,430 | NA |

| Ash Analysis, % | Design (Performance) | Range | |
|---|---|---|---|
| $P_2O_5$ | 0.17 | < 0.3 | |
| $SiO_2$ | 61.40 | 45.0 | 70.0 |
| $Al_2O_3$ | 18.90 | 20.0 | 35.0 |
| $Fe_2O_3$ | 8.46 | 3.0 | 15.0 |
| $TiO_2$ | 0.92 | 0.9 | 4.0 |
| CaO | 3.00 | 0.5 | 4.0 |
| MgO | 1.70 | < 3.3 | |
| $Na_2O$ | 0.50 | 0.3 | 0.9 |
| $K_2O$ | 1.90 | 0.9 | 3.0 |
| $SO_3$ | 2.40 | < 5.0 | |
| Undetermined | 0.65 | | |

| Sulfur Forms | |
|---|---|
| | 0.65 |
| Pyritic | Later |
| Sulfate | Later |
| Organic | Later |




Specification
Circulating Dry Scrubber

**B.425**

W-017-00712

# DUKE/FLUOR DANIEL CARIBBEAN, S.E.

Specification No.: W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.03-0001
Attachment No.: 6
Page: 1 of 1

## WATER ANALYSES FOR FGD MAKEUP
### 04/18/96

The following are analyses for makeup water to the FGD system. All makeup water used for flue gas cooling for the FGD system shall be RO Brine water. The RO brine, as listed below, is cooling tower blowdown that has been treated in a sidestream softener and passed through an RO unit.

|  | RO Brine (mg/l, max.) |
| --- | --- |
| Calcium, as $CaCO_3$ | 550 |
| Magnesium, as $CaCO_3$ | 100 |
| Sodium, as Na | 8,000 |
| Iron, as Fe | 0.4 |
| P Alkalinity, as $CaCO_3$ | 0 |
| M Alkalinity, as $CaCO_3$ | 60 |
| Chlorides, as Cl | 4,300 |
| Sulfate, as $SO_4$ | 11,000 |
| Phosphate, as $PO_4$ | 1 |
| Silica, as $SiO_2$ | 30 |
| pH | 5 - 7 |
| TDS | 25,000 |





Specification
Circulating Dry Scrubber

**B.426**

W-017-00740

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, LP   *   C.A. NO.: 04-1282(JJF)
        *
   Plaintiff     *
        *
    Vs.      *
        *
ALSTOM POWER, INC.    *
        *
   Defendant    *
*******************************

DEPOSITION OF MR. DAVID STONE
30(b)(6)

DATE    :   March 10, 2006

TIME:    :   9:30 A.M.

OFFICE   :   Ober, Kaler, Grims & Shriver, P.S.C.
        120 East Baltimore Street
        Baltimore, Maryland 21202-1643

HELD AT   :   Axtmayer, P.S.C.
        250 Ponce de León Avenue
        Suite 404
        Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

  Daniel D. Williams, Esq.

FOR DEFENDANT:

  Anthony Vittoria, Esq.

NOTARY PUBLIC:

  Liana I. Loyola, Esq.

**B.427**

**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927



1    THE DEPONENT:

2        We have not initiated the process of any new

3    permits associated with the facility.

4    BY MR. VITTORIA:

5        Q    My question was, in regard to its zero liquid

6    discharge status, AES has not made any attempts to alter

7    or modify that status, correct?

8    MR. WILLIAMS:

9        Objection, asked and answered; ambiguous.

10    THE DEPONENT:

11        We have not applied for any new permits that would

12    allow discharge at the facility.

13    BY MR. VITTORIA:

14        Q    And why not?

15        A    It's the belief at AES that type of permit

16    would be impossible for this facility.

17        Q    And why is that?

18        A    During the development of this power plant, in

19    the early 1990s there was severe opposition to the power

20    plant on the environmental focus, or on the environ-

21    mental side, and this project, and our environmental

22    impact, was to have one of the cleanest coal power

23    plants in the world, and to be, to not have any dis-

24    charges from the plant facility.

25        And even with that, it took eight years to develop

**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

**B.428**

1    the plant, through numerous rigorous court cases, all

2    the way up to the Supreme Court, that finally decided,

3    the Supreme Court of Puerto Rico, that finally allowed

4    us to build the power plant.

5        So, and it took eight years, with no liquid dis-

6    charge. And I just don't see it possible that it could

7    ever be possible, in the future, since it took us eight

8    years without, with it being a zero discharge facility.

9        Q    AES has applied for modifications to its air

10   permit, correct?

11   MR. WILLIAMS:

12       Objection to form. Outside the scope. You can

13   answer based on your personal knowledge, if you know.

14   THE DEPONENT:

15       There were... Which air permit?

16   BY MR. VITTORIA:

17       Q    The one that controls the emissions from the

18   plant.

19   MR. WILLIAMS:

20       Objection to form. Vague, ambiguous, outside the

21   scope. You can answer based on your personal knowledge,

22   if you know.

23   THE DEPONENT:

24       Yeah, we have more than one air permit, but...

25

1    BY MR. VITTORIA:

2        Q    If you would turn back to the first page.  Do

3    you see that the e-mail is addressed to him as well?

4        A    The document would indicate that it was sent

5    to a V. Singh, which I would assume was Vigai Singh.

6        Q    Do you know who Gary Petrie is?

7        A    I do, I do know a Gary Petrie.

8        Q    Was he an employee of AES Puerto Rico?

9        A    Gary was not an employee of AES Puerto Rico.

10       Q    How about Dale Hoxie?

11       A    Dale Hoxie was not an employee of AES Puerto

12   Rico.

13       Q    And you attended this meeting?

14   MR. WILLIAMS:

15       Objection to characterization of the document.

16   THE DEPONENT:

17       In reviewing the deposition, I attended a meeting;

18   I don't remember if that was the exact time. The docu-

19   ment would indicate that I was there.

20   BY MR. VITTORIA:

21       Q    And you at the time were an employee of AES

22   Puerto Rico.  Correct?

23   MR. WILLIAMS:

24       Objection.  Asked and answered.

25

1      THE DEPONENT:

2          I had been an employee of AES for about two weeks

3      at the time of this meeting.  If the meeting was

4      February 10th, and we're assuming that.

5      BY MR. VITTORIA:

6          Q    And at this meeting, AES, DFD, Alstom and EEC

7      discussed specific measures designed to prevent corro-

8      sion of both the CDS and the ESP, correct?

9          A    I don't recall the specifics, other than the

10     CDS discussion.  I was new with the company, but what I

11     do recall from the meeting was discussions about the

12     CDS, and the, the CDS vessel is what I remember from the

13     meeting, specifically.

14         Q    Do you remember that one of the things that

15     was stressed at the meeting to prevent corrosion was

16     maintenance of the spray nozzles?

17     MR. WILLIAMS:

18         Objection, lack of foundation.  Vague as to what

19     corrosion we're talking about.

20     THE DEPONENT:

21         No, I don't recall specific discussions on the CDS

22     nozzles.

23     BY MR. VITTORIA:

24         Q    Okay.  If you could turn to the page that's

25     marked 385 on the bottom right hand corner, Jarv e-mail-

1    Q    Okay.  If you could turn to page five, Para-

2    graph 19, at the bottom of that page...? Do you see the

3    second sentence starts, "The accelerated corrosion far

4    exceeds industry standards..." carrying over to the next

5    page?

6    A    I do see the sentence.

7    Q    AES has never hired an industry specialist to

8    determine that fact, correct?

9    MR. WILLIAMS:

10       Objection to form.

11   THE DEPONENT:

12       Well, how would you define "industry specialist"?

13   BY MR. VITTORIA:

14       Q    Somebody who is an expert in industry

15   standards as alleged in the complaint.

16   MR. WILLIAMS:

17       Objection to form.  Objection to characterization

18   of the document.

19   THE DEPONENT:

20       I mean, the accelerated corrosion far exceeds

21   industry standards, it was designed for a 25-year design

22   life, and it's corroded after a little over a year and a

23   half of operations.

24       I don't think you need to be an expert to see that

25   it's, you know, corroded and, you know, falling apart.

1     water, the water was not longer put into the CDS, and it

2     had to be treated in another method.

3          Q     And so the water treatment system that was

4     installed by AES eliminated from the CDS water compounds

5     that caused corrosion.   Correct?

6     MR. WILLIAMS:

7          Objection to form.

8     THE DEPONENT:

9          The new water system minimized the amounts of

10    chlorides that went into the CDS were to eliminate the

11    accelerated corrosion.

12    BY MR. VITTORIA:

13         Q     But the new water system was not removing

14    particles from the gas, was it?

15    MR. WILLIAMS:

16         Objection, argumentative.   Misstates the document.

17    THE DEPONENT:

18         The new water system removed the water that intro-

19    duced the chlorides into the gas.

20    BY MR. VITTORIA:

21         Q     Let's turn to the next subject.   If you'll

22    look back at Exhibit 2... Exhibit 1, excuse me. The next

23    subject is on page 4, Paragraph 5. It states... I'm

24    sorry, it would be No. 6. It's also on page 4. "AES's

25    notification to Alstom of a claim for alleged

1    that that discussion took place.

2    BY MR. VITTORIA:

3        Q    Do you know if AES Puerto Rico ever sought

4    Alstom's input to the stabilization program that was

5    begun after the discovery of the corrosion in the Unit 1

6    ESP?

7        A    I don't recall a specific communication

8    between AES and Alstom on Unit 1.

9        Q    And AES Puerto Rico ordered replacement

10   collection plates in early December of 2003, correct?

11       A    AES ordered some collection plates some

12   time... I don't know the exact date, after the corrosion

13   was discovered.

14       Q    AES never sought Alstom's input into the

15   ordering of those collection plates, correct?

16       A    I don't know whether we specifically addressed

17   the collecting plate purchase with Alstom.

18       Q    And AES never obtained Alstom's agreement to

19   the purchase of those replacement plates, correct?

20       A    I don't think we've, AES has received an

21   agreement for any, any plans to resolve the issue, other

22   than, you know, we just, there was no response on solu-

23   tions to the corrosion problem, whether it was buying

24   collecting plates, or repairs, or...

25       Q    Did AES seek to mediate any of those issues

1    with Alstom, prior, at any time?

2    MR. WILLIAMS:

3        Objection to form.  Vague and ambiguous.

4    THE DEPONENT:

5        AES, during the time of this, was waiting for

6    solutions to be presented from Alstom, and it seems like

7    the... Alstom just passed along their obligations to

8    their subcontractor, that wasn't replying with any

9    solutions.

10        And so, therefore, AES wasn't receiving any solu-

11   tions from Alstom or its subcontractor to resolve the

12   issues related to corrosion.

13   BY MR. VITTORIA:

14       Q    And so AES never submitted to mediation the

15   issue of the stabilization work that it was performing

16   at the plant.  Correct?

17   MR. WILLIAMS:

18       Objection to form.  Assumes facts not in evidence.

19   Lack of foundation.

20   THE DEPONENT:

21       I don't think there is any dispute.  They didn't

22   present any options.

23   BY MR. VITTORIA:

24       Q    My question is, did AES ever submit to

25   mediation the issue of the stabilization work performed

1    Q    Okay.  It would contain, towards the bottom, a

2    2.0 inspection testing and quality...

3    A    Okay.

4    Q    And if you go to the top of the page, there is

5    a paragraph, a partial paragraph, and I want to refer

6    your attention to the second-to-last sentence of that

7    paragraph.  And it reads, "In the event that the parties

8    are unable to reach a mutual agreement, either as to the

9    extent of corrosion, or the appropriate remedy, the

10   issue shall be referred to a mutually-agreeable third

11   party mediator."  Do you see that?

12   A    This document between Duke/Fluor Daniel and

13   ABB Combustion Engineering would indicate that sentence

14   that in the event the parties are unable to reach a

15   mutual agreement, either as to the extent of corrosion,

16   or the appropriate remedy, the issue shall be referred

17   to a mutually-agreeable third party mediator.

18   Q    Okay.  Now, with that language in mind, did

19   AES Puerto Rico ever refer the stabilization work to a

20   mutually-agreeable third party mediator?

21   MR. WILLIAMS:

22       Objection to form.  Misstates the factual record.

23   Lack of foundation.

24   THE DEPONENT:

25       Alstom didn't provide any solutions that would

1  require mediation.  There were no disputes.  They didn't

2  provide any resolution to the corrosion issue.

3  BY MR. VITTORIA:

4      Q    So your answer is, no, AES did not refer the

5  stabilization work to a mutually-agreeable thirty part

6  mediator.

7  MR. WILLIAMS:

8      Objection, misstates the Witness's testimony.

9  THE DEPONENT:

10     AES had no dispute to mediate, I guess.

11 BY MR. VITTORIA:

12     Q    So the answer is, no, AES did not refer the

13 stabilization work to a mutually-agreeable third part

14 mediator.

15 MR. WILLIAMS:

16     Objection, asked and answered.  Badgering the

17 Witness.

18 THE DEPONENT:

19     AES had not disputes that required a mediator.

20 There was no alternatives provided by Alstom to mediate.

21 BY MR. VITTORIA:

22     Q    Did AES Puerto Rico refer the purchase of the

23 replacement collector plates to a mutually-agreeable

24 third party mediator?

25

1  BY MR. VITTORIA:

2       Q     And so AES did not refer it to a mutually-

3  agreeable third party mediator, correct?

4  MR. WILLIAMS:

5       Objection to form.   Vague and ambiguous.

6  THE DEPONENT:

7       AES purchased the RO system to attempt at minimiz-

8  ing the effects of the water problem.

9  BY MR. VITTORIA:

10      Q     Without first having submitted the issue to a

11  mutually-agreeable third party mediator.   Correct?

12  MR. WILLIAMS:

13      Objection to form.   Asked and answered several

14  times at this deposition, and the prior 30(b)(6) depo-

15  sition of the same company. Move to strike this entire

16  line of questioning.

17  THE DEPONENT:

18      Alstom was unable to provide any solutions to our

19  corrosion problem, basically non-existent to providing

20  solutions, and AES tried to solve the problem them-

21  selves, since we couldn't get any input from Alstom, and

22  we had a plant to run, and try to stop the corrosion.

23  BY MR. VITTORIA:

24      Q     Do you understand that if AES had submitted

25  these issues to a mutually-agreeable third party

202

1    mediator, that mediator may have instructed Alstom to

2    perform the activities that AES decided were appro-

3    priate?

4    MR. WILLIAMS:

5        Objection to form. Lack of foundation. Hypothe-

6    tical.

7    THE DEPONENT:

8        I believe AES...

9    MR. WILLIAMS:

10       And outside the scope of this deposition.

11   THE DEPONENT:

12       I believe AES continually asked Alstom to provide

13   recommendations, and none were provided.

14   BY MR. VITTORIA:

15       Q    My question was different. Do you realize that

16   if AES had submitted these issues to a mutually-

17   agreeable third party mediator, that mediator may have

18   instructed Alstom to perform the activities that AES was

19   proposing?

20   MR. WILLIAMS:

21       Objection to form. Outside the scope of the depo-

22   sition. Hypothetical. Vague and ambiguous.

23   THE DEPONENT:

24       I think there was a warranty claim made, and there

25   was no dispute relative to... there was just no plan

1    MR. WILLIAMS:

2        Objection, mischaracterizes his testimony.  It sets

3    up a false choice.

4    THE DEPONENT:

5        No, AES Puerto Rico operated the facility under the

6    direction of Alstom, Duke/Fluor Daniel, and all sub-

7    contractors, including Alstom and EEC.  They were in

8    control of the facility, and we were just operating

9    under their direction and their startup procedures.

10   BY MR. VITTORIA:

11       Q    And were those directions and startup pro-

12   cedures provided orally?

13       A    It's my understanding that there were, there

14   is a continuous interaction in a startup where there is

15   employees directing the activities of the AES employees

16   who were working under their direction, there is con-

17   tinuous oral instructions. Some instructions are docu-

18   mented, others are oral, as we're operating under their

19   direction.

20       Q    And at the commercial operation, AES was

21   operating under its own direction, correct?

22       A    AES operated the facility after commercial

23   operation by itself, following the procedures esta-

24   blished during the commissioning of the facility, by the

25   subcontractors.

1    MR. WILLIAMS:

2          Objection to form.  Ambiguous.

3    THE DEPONENT:

4          I think it led... the 30 degree approach tempe-

5    rature led to, I believe, 152, 150 or 152. Based on a 30

6    degree approach, the wet bulb is typically in the low

7    120 range.

8    BY MR. VITTORIA:

9          Q    And so prior to the discovery of corrosion,

10   AES Puerto Rico was following the alleged directions to

11   run the 30 degrees above approach, correct?

12   MR. WILLIAMS:

13         Objection to form.

14   THE DEPONENT:

15         Until the discovery of corrosion, AES was operating

16   on a 30 degree approach temperature per the operating

17   instructions set forth by EEC in the operating instruc-

18   tions.

19   BY MR. VITTORIA:

20         Q    Which means, I'm sorry, which means that AES

21   never attempted to run the CDS at any degree above 167

22   degrees prior to the discovery of the corrosion.

23   Correct?

24   MR. WILLIAMS:

25         Objection to form.  Mischaracterizes the Witness's

