1    CERTIFICATE OF COURT REPORTER

2

3    I, MATTHEW J. CLUTTEUR SHORT, Court Reporter, and

4    member of Crespo Rodriguez, Inc.:

5    DO HEREBY CERTIFY:  That the foregoing transcript

6    is a full, true and correct record of the testimony

7    given which was taken down by me, and thereafter reduced

8    to the typewritten form.

9    I FURTHER CERTIFY:  That I am not in any way

10    involved or interested in the outcome of said action.

11    WITNESS my hand this 24th of March,

12    2006 in San Juan, Puerto Rico.

13

14

15

16    MATTHEW J. CLUTTEUR SHORT

17    Court Reporter

18

19

20

21

22

23

24

25

**B.442**

**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3                        - - -

4    AES PUERTO RICO, L.P.,           )
                                      )
5              Plaintiff,             )
                                      ) Civil Action
6         vs.                         ) CA NO.
                                      ) 04-1282-JJF
7                                     )
     ALSTOM POWER, INC.,              )
8                                     )
               Defendant.             )
9
                                  - - -

10

                 Deposition of DOUG TOMLIN
11
               Tuesday, February 28, 2006
12
                        - - -
13
              The deposition of DOUG TOMLIN, called as a
14   witness by the Defendant, pursuant to notice and the
     Federal Rules of Civil Procedure pertaining to the
15   taking of depositions, taken before me, the
     undersigned, Jessica L. Tapia, a Notary Public in and
16   for the Commonwealth of Pennsylvania, at the offices
     of Blumling & Gusky, Koppers Building, 436 Seventh
17   Avenue, Suite 600, Pittsburgh, Pennsylvania  15219,
     commencing at 9:34 o'clock a.m., the day and date
18   above set forth.

19                        - - -

20          COMPUTER-AIDED TRANSCRIPTION BY
              MORSE, GANTVERG & HODGE, INC.
21             PITTSBURGH, PENNSYLVANIA
                    412-281-0189
22
                        - - -
23

24

25

                                          **B.443**

1    A    I don't recall.

2    Q    You stated that Bill VanHooser instructed

3 you to set the CDS outlet temperature at various

4 temperatures; is that correct?

5    A    That is correct.

6    Q    And you said that he instructed you, to

7 make the system work; is that correct?

8         MS. SAGERSON:  Objection, mischaracterizes

9         the witness's prior testimony.

10   A    I don't understand your question.

11   Q    Why did Bill VanHooser instruct you to

12 operate the CDS outlet temperature at various

13 temperatures?

14        MS. SAGERSON:  Objection to form, vague and

15        ambiguous.

16   A    Why would he tell us?  He was the vendor or

17 he was responsibile for commissioning it and teaching

18 AES how to operate it --

19   Q    How did he -- sorry.

20   A    -- in my mind.

21   Q    Did he ever instruct you why he was

22 changing the CDS outlet temperature?

23        MS. SAGERSON:  Objection, vague and

24        ambiguous.

25   A    Not to my knowledge.

**B.444**

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3    AES PUERTO RICO, L.P.      *

4          Plaintiff           *

5      v.                      *     CIV. NO. 04-1282-JJF

6    ALSTOM POWER, INC.         *

7          Defendant            *     Pages 1 - 248

8                        - - - - - - - - - - -

9

10

11

12        Videotaped deposition of William B. VanHooser

13                      Baltimore, Maryland

14                  Tuesday, February 7, 2006

15

16                              ORIGINAL

17

18

19                              **B.445**

20    Job No. 172632

21    Reported by:  Kathleen R. Turk, RPR-RMR

**William B. VanHooser**

Page 72

1    valve to twenty-five percent.  When the CDS flue

2    gas outlet temperature reaches 200 degrees

3    Fahrenheit, put valve in automatic mode with a set

4    point of 180 degrees Fahrenheit.  What -- once

5    temperature reaches 180, lower set point to 160.

6    When the temperature is stable at 160, lower

7    controller set point to 155.

8              Do you see that?

9        A    Yes, I do.

10       Q    So by September 2nd, 2002, EEC is

11   recommending that the CDS outlet temperature be

12   set at 155 degrees Fahrenheit?

13             MR. VITTORIA:  Objection;

14   mischaracterizes the document.

15       A    At this point, we were recommending that

16   in the absence of, of any information that was

17   supposed to have been measured and taken by AES

18   personnel to support what we need to set the

19   temperature at.

20             I mean, in particular, our procedures

21   require daily, daily monitoring of the wet bulb

B.446

**William B. VanHooser**

Page 73

1    temperature and the -- a number of parameters --

2    chloride content -- in order to tell you where you

3    need to set the wet bulb temperature.

4        Q    So the temperature was set at 155 without

5    taking a corresponding wet bulb temperature

6    measurement?

7                MR. VITTORIA:   Objection.

8        A    No.

9        Q    No, it was not set without taking a

10   corresponding wet bulb temperature measurement?

11       A    It was -- it was --

12               MR. VITTORIA:   Objection to the form

13   of the question.

14       A    It was set at 155 as a result of, of our

15   own measurement of the wet bulb temperature.

16           It was the only information that we had

17   to go on at the time, and we were being instructed

18   to start the unit up by AES personnel, it's the

19   only information that we had to go on even though

20   we had requested additional support and other

21   parameters being measured.  That's why we set it

B.447

1    at 155.

2        Q    What other parameters had you asked to be

3    measured?

4        A    The chloride content in the water and in

5    the ash.

6        Q    And you were aware as of July 7th --

7    excuse me -- July 9th, 2002, that the design

8    specification called for a maximum level of

9    chloride content in the water of 4,300 parts per

10   million, correct?

11                    MR. VITTORIA:   Objection.

12       A    I was aware that that was what was in the

13   specifications.

14       Q    And you indicated in your fax to

15   Mr. Foley in Exhibit No. 5 on July 9th, 2002, that

16   if you didn't have the chloride content of the

17   water, you would set the CDS outlet temperature at

18   the most conservative point, 176 degrees

19   Fahrenheit, correct?

20                    MR. VITTORIA:   Objection.

21                    First, if she refers to a document,

B.448

Page 75

```
 1    I would pull it out and look at it.

 2                    And, secondly, I object to it

 3    mischaracterizes the testimony of the document.

 4    A    I think that was No. --

 5    Q    Exhibit 5.

 6    A    -- 5, I believe.

 7                    MR. VITTORIA:  Madam Court Reporter,

 8    could you read the question back, please?

 9                    (Question was read by the Reporter.)

10                    MR. VITTORIA:  Okay.  I'm objecting.

11                    It mischaracterizes the testimony

12    and mischaracterizes the document.

13    A    What the document indicates is there are

14    two parameters that have to be measured -- one is

15    the chloride content, and the other is the wet

16    bulb temperature -- and without either of these,

17    the document indicates that the temperature should

18    be set at 176.

19    Q    (By Ms. Sagerson) But with the wet bulb

20    temperature measurement alone, you felt it

21    appropriate to set the CDS outlet temperature at a
```

B.449

**William B. VanHooser**

Page 109

1    establishing a bed, whether it's done immediately

2    after the shutdown or some time, you know, passes.

3        Q    Okay.  If you turn to the next page of

4    the exhibit, and if you look at the bottom two

5    bullet points on that page, it says, as soon as

6    CDS outlet gas temp has fallen to 200 degrees

7    Fahrenheit, put temp control valve in auto with SP

8    equaling 170 degrees Fahrenheit.

9            Do you see that?

10       A    Yes, I do.

11       Q    Is SP set point?

12       A    Yes, it is.

13       Q    The next bullet reads, as soon as CDS

14   outlet gas temp has fallen to 170 degrees

15   Fahrenheit, lower temp control valve set point to

16   160 degrees Fahrenheit.  When the set point is

17   reached, continue lowering the temperature to 152

18   in a maximum increment 5 degrees Fahrenheit.

19           Do you see that?

20       A    I see it.

21       Q    Did EEC take a corresponding wet bulb

B.450

**William B. VanHooser**

1    temperature in lowering the temp to 152 degrees as

2    of October the 3rd, 2002?

3              MR. VITTORIA:   Objection.

4    A    I don't remember when the previous last

5    wet bulb temperature was taken.

6              I know that when it was taken, it was

7    taken by EEC personnel.  We were the only ones

8    taking them.  And we had taken, like I say, you

9    know, during the process of my time on-site, we

10   probably -- I took them a half a dozen, maybe ten

11   times -- and from our experience, we had taken the

12   wet bulb temperature, and we were making

13   adjustments to the outlet temperature on the basis

14   only of these measurements that were taken by us.

15   Q    In other words, you did not know the

16   chloride content of the water at this point?

17             MR. VITTORIA:   Objection.

18   A    I had no knowledge of what the chloride

19   content was of the water or the ash or the coal.

20   Q    Did you ask E -- did you ask Alstom to

21   get a measurement of the chloride content of the

B.451

**William B. VanHooser**

Page 127

1    as written is an instruction to allow the operator

2    to, to adjust the bed differential pressure

3    according to boiler, boiler load, and why it was

4    marked out, I'm not sure.

5            I, I don't -- I can't answer why that was

6    marked out.

7        Q    Okay.

8                        (Thereupon, VanHooser

9                        Deposition Exhibit No. 17

10                       was marked.)

11       Q    (By Ms. Sagerson) You've been handed what

12   is marked Exhibit No. 17.

13           Do you recognize this document?

14       A    Yes.

15           MR. VITTORIA:  For the record, the

16   document doesn't have any Bates numbers.  It has

17   no indication where it came from.

18       Q    And do you recognize this as a revised

19   version of Exhibits No. 16, 15, 14, and 13?

20       A    It appears -- although, the heading at

21   the top is different, this is a CDS Cold Start --

B.452

Page 128

1    it doesn't mention anything about low load or what

2    the load is, so it's unclear as to how it actually

3    got to be Rev. 9.  I'm not sure.

4        Q    And do you see that it's dated

5    November 14th, 2002?

6        A    Yes.

7        Q    If you turn to the second page and look

8    at the sixth bullet point, it says, open all ESP

9    dosing valves (Row 400) and bring CDS bed dp to

10   1.25 to 1.5 inches.

11           Do you see that?

12       A    Yes, I do.

13       Q    And then skipping the next sentence and

14   going down to the next bullet point, it says, put

15   dosing valves (400 A-D) in auto.  This will allow

16   set point tracking to control CDS dp automatically

17   based on boiler load.

18           Do you see that?

19       A    Yes, I do.

20       Q    And do you recognize, then, that the

21   revision in the -- the handwritten revision in the

B.453

**William B. VanHooser**

1    October 28th, 2002, exhibit that we just looked at

2    was accepted and included in this November 14th,

3    2002, document?

4                    MR. VITTORIA:   Objection; assumes

5    facts not in evidence, calls for speculation,

6    mischaracterizes both the documents.

7        A    I mean, that would, that would appear to

8    be the case, but it -- I can't say for sure

9    because it is -- it, it -- it's talking about -- I

10   mean, it's not labeled as a low load condition.

11                   I'm not sure how significant that is one

12   way or the other, but --

13       Q    Well, I have no idea.

14                   You believed that the 1.25 to 1.5-inch

15   CDS bed differential pressure was sufficient for

16   safe operation of the CDS, right?

17                   MR. VITTORIA:   Objection.

18       A    Looking at these documents, my only

19   conclusion is at that time that was the best

20   information that we had to go on.

21       Q    Am I correct that the higher the bed dp,

B.454

**William B. VanHooser**

Page 130

1    the more ash exists in the CDS?

2              MR. VITTORIA:  Objection.

3      A    Yes, usually.

4      Q    And does more ash in the CDS generally

5    correlate to more ash entering the ESP?

6              MR. VITTORIA:  Objection.

7      A    It very likely could.

8      Q    And if more ash enters the ESP, does that

9    generally correlate to more ash exiting the ESP

10   through the smokestack?

11             MR. VITTORIA:  Objection; calls for

12   speculation.

13     A    Not necessarily.

14     Q    Would a decrease in the bed differential

15   pressure help to control opacity?

16             MR. VITTORIA:  Objection.

17     A    From the standpoint of if there were no

18   ash in there, there would certainly be a

19   likelihood that the opacity would be lower, but --

20   I mean, our experience, you know, would indicate

21   that, that, you know, the bed dp's that we're

B.455

Page 131

1    talking about here should have no significant

2    impact on the opacity.

3       Q    And do you see the second-to-the-last

4    bullet point?  It says, as soon as CDS outlet gas

5    temp has fallen to 165 degrees Fahrenheit, put

6    temp control valve in auto with a set point

7    equaling the higher of 152 degrees Fahrenheit or

8    30-degree approach to saturation.

9           Do you see that?

10             MR. VITTORIA:   Objection.

11      A    I see that.

12      Q    This document is, again, dated

13   November 14th, 2002.

14          Do you recall that we looked at an

15   exhibit earlier that indicated that you left the

16   AES Puerto Rico site per instructions from EEC on

17   or about 11/14/2002?

18             MR. VITTORIA:   Objection to

19   counsel's testimony, objection to the form of the

20   question.

21      A    I -- I do remember talking about that

B.456

**William B. VanHooser**

Page 210

1    to set the temperature other than the wet bulb

2    temperatures, which we were taking manually

3    ourselves.

4           So on the basis of the information that,

5    that we were able to generate ourselves, we were

6    regulating the temperature --

7    Q    And on --

8    A    -- 30-degree approach.

9    Q    And on the basis of the information that

10   you were able to obtain yourself, the normal

11   operating temperature decreased from 176 degrees

12   to roughly 150 to 155 degrees, correct?

13          MR. VITTORIA:  Objection;

14   mischaracterizes the testimony, lack of

15   foundation.

16   A    Yeah, you have to remember that this is

17   referring to a condition that we expected to exist

18   with high chlorides, okay?

19          We never had any information to tell us

20   what the chlorides were.  The only information

21   that we had, again, was on the basis of the wet

B.457

**William B. VanHooser**

Page 211

1    bulb temperature, which we made ourselves, and we

2    were adjusting the temperature according to that

3    because we had -- now, you have to understand,

4    when we would -- we would make these, these

5    adjustments, we would say we're making it on the

6    basis of the wet bulb temperature only, we don't

7    have anything that -- you know, the chlorides

8    could be at a high level and we need to crank the

9    temperature up, and then they would say, well,

10   what impact will that likely have.  We said it

11   could likely raise the opacity.  They're like,

12   well, then, do you have any, any information to

13   tell you that you need to keep the temperature,

14   you know, at, at higher elevations.  And I said,

15   no, because we don't have the chloride levels.

16   Then, well, keep it at the level we're at right

17   now because that will keep us in compliance with

18   opacity.

19       Q    So if you had raised the CDS outlet

20   temperature to 176 degrees Fahrenheit, you would

21   have been out of compliance with capacity -- I

B.458

**William B. VanHooser**

Page 212

1    mean, opacity?

2             MR. VITTORIA:   Objection.

3        A    It was my experience that the opacity

4    had -- was being influenced by the amount of water

5    that we were spraying in there, and if we raised

6    the temperature, the opacity would go up.

7        Q    So E -- so AES Puerto Rico could not stay

8    in compliance with its opacity permit operating at

9    176 degrees Fahrenheit; is that right?

10            MR. VITTORIA:   Objection;

11   mischaracterizes the testimony, lack of

12   foundation.

13       A    We made -- as I -- as, as, as we've been

14   talking about here, we made modifications to the

15   way the ash was being diverted, removed, turning

16   the rotary air locks on and off, and, and these

17   were temporary procedures that were put into place

18   that did keep us in compliance.

19            So -- so to say that we weren't able to

20   stay in compliance, I mean, I don't think that's a

21   correct characterization.

B.459

**William B. VanHooser**

Page 229

1          You testified earlier that you actually

2    took the wet bulb temperature at the AES Puerto

3    Rico plant?

4          A    Correct.

5          Q    And where was the location at which you

6    took that temperature?

7          A    At the inlet to the CDS.

8          Q    Is there any reason in regards to the

9    op -- operation of the CDS that you would take the

10   wet bulb at the outlet of the ESP to the ID fan?

11         A    No, you really wouldn't want to take it

12   there.

13         Q    And why is that?

14         A    Because the, the moisture content is

15   different there, and you would get a different

16   reading that wouldn't truly refect -- reflect what

17   the wet bulb temperature is inside the CDS.

18         Q    Okay.  Did you ever instruct somebody

19   that it was acceptable to take the wet bulb

20   temperature at the ESP outlet in regards to the

21   operation of the CDS?

B.460

**Esquire Deposition Services**

**William B. VanHooser**

Page 246

```
1                CERTIFICATE OF NOTARY PUBLIC

2          I, Kathleen R. Turk, the officer before whom the

3      foregoing deposition was taken, do hereby certify that

4      the witness whose testimony appears in the foregoing

5      deposition was duly sworn by me; that the testimony of

6      said witness was taken by me in stenotype and thereafter

7      reduced to typewriting under my direction; that said

8      deposition is a true record of the testimony given by

9      said witness; that I am neither counsel for, related to,

10     nor employed by any of the parties to the action in

11     which this deposition was taken; and, further, that I am

12     not a relative or employee of any attorney or counsel

13     employed by the parties hereto, nor financially or

14     otherwise interested in the outcome of the action.

15

16                        Kathleen R. Turk

17                        Kathleen R. Turk

18                        Notary Public in and for the

19                        State of Maryland

20     My Commission Expires:

21     March 1, 2007.
```

**B.461**

**EEC**

ENVIRONMENTAL ELEMENTS CORPORATION

11/14/02

## CDS COLD START-UP

# PRELIMINARY STEPS TO CDS START-UP

- Ash levels in the 1st field (400 Row) ESP hoppers should ideally be at hi-hi level, but ash levels that indicate no alarms are acceptable also. There should be no Low-Low Alarms
- Shortly after the ID Fan is put into service, start hydrated lime feed system in Manual with an Output of 100% to lime feeder
- ESP airlocks A, B, C, & D in rows 410 through 450 should be in Manual and ON as soon as lime feeder has started running.
- ESP Dosing Valves 400 A, B, C, & D should be in Auto and closed.
- Clean all water nozzles and valve in four (4) nozzles.
- ESP rappers should be operating in Program #5
- Water pump set-up:
  - Operating pump in Manual / Stand-by pump in Auto
  - Temp Control Valve (TV-106) in Manual w/ 50% Output
  - By-pass Valve in Auto and open
  - Supply Isolation Flow Valve (FV-201) in Auto and closed
  - Return Isolation Flow Valve (FV-210) in Auto and closed
- Stack observer should be in position to get visual indication of stack opacity
- Measure wet bulb temperature at 100-125 MW load.
- Approximately one (1) hour prior to startup, divert ash from all hoppers in rows 430, 440 and 450. Steps are as follows:
  - Close ALL airlocks in rows 410 and 420

**B.462**



EXHIBIT

Van Hooser # 17

RAJ 2/7/06

**EEC**

ENVIRONMENTAL ELEMENTS CORPORATION

11/14/02

- Open ALL diverter valves
- Start ALL airlocks in rows 430, 440 and 450 and allow to run for a minimum of one (1) hour
- ESP airlocks A, B, C, & D in rows 430, 440 and 450 should be in Manual and OFF as soon as coal firing begins.

## CDS START-UP

- Flue gas flow rate at CDS inlet should be $\geq$ 400,000 ACFM
- As soon as Flue Gas temperature at the CDS inlet reaches 220°F, the CDS should be put into service as quickly as possible.
- Close ALL airlocks in rows 430, 440 and 450.
- Close ALL diverter valves
- Confirm that lime feeder is operating in Manual with 100% output
- Open All ESP Dosing Valves (Row 400) and bring CDS bed dP to 1.25-1.50". Recommended output to accomplish this is as follows:
  A-D = 25-35%
- Put Dosing Valves (400 A-D) in Auto. This will allow SetPoint Tracking to control CDS dP automatically based on boiler load
- Start Water pump as soon as CDS bed dp reaches 1.0"
- As soon as water pump starts, put Water Control Valve in manual with an output of 20-30%.
- As soon as CDS outlet gas temp has fallen to 165°F, put Temp Control Valve in Auto w/ SP = the higher of 152°F or 30°F approach to saturation
- _**DO NOT ALLOW CDS OUTLET FLUE GAS TEMPERATURE TO FALL BELOW 145°F**_

B.463

**EEC**

ENVIRONMENTAL ELEMENTS CORPORATION

11/14/02

- **Return the operating water pump to Auto. Return the hydrated lime feed system to Auto with a setpoint of 0.01 lb/MBtu.**

- **Return Airlocks A, B, C and D in rows 430 through 450 to service, individually (one at a time).  If the magnitude or frequency of opacity spikes become objectionable, then turn the airlocks in these rows off.  Airlocks should not be run continuously until they can do so without violating opacity limits.  If high level alarms come in, ash can be momentarily diverted until it is possible to run the airlocks continuously.**

- **As soon as the CDS bed differential pressure and CDS outlet flue gas temperature have stabilized, it will be necessary to clean all operating water nozzles within 8 hours.  <u>This must not be delayed.</u>**

**B.464**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 04-1282-JJF |
| | ) | |
| ALSTOM POWER, INC. | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S SUPPLEMENTAL RESPONSES TO ALSTOM POWER, INC.'S INTERROGATORY NO. 10

Plaintiff AES Puerto Rico L.P. ("AES-PR") supplements its responses to Defendant ALSTOM Power, Inc.'s (ALSTOM's) interrogatory 10 as follows:

### GENERAL OBJECTIONS

The general objections set forth in AES-PR's Responses to ALSTOM's First Set of Interrogatories are incorporated herein by reference and serve as additions to AES PR's supplemental response to Interrogatory No. 10.

### SUPPLEMENTAL RESPONSE TO INTERROGATORY No. 10

The following supplemental response is made subject to and without waiver of any of the general objections incorporated by reference above.

### INTERROGATORY NO. 10

For any work performed on or materials/equipment provided for the CDS and/or ESP equipment, itemize the payments made by you to any vendor, subcontractor and/or any other entity by date, amount, and reason for payment.

**B.465**

## SUPPLEMENTAL RESPONSE

Subject to the general objections incorporated by reference above, and without waiver thereof, AES-PR states that it has made and/or expects to make the following payments:

Water Treatment

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| Various (list provided as Attachment A to initial response to interrogatory) | 02-06-04 – 03-31-05 | $1,786,559.12 | Reverse Osmosis System Capital Cost |
| ChemTreat, Others | Ongoing | $877,154 | Operation and maintenance of reverse osmosis system (Based $100,000/yr and 10% discount rate) |
| Various | 2005/2006 | $50,000 (est.) | Boiler water injection project installation |
| Drummond | 24 months | $7,568,000 (est.) | O&M cost for injection of high-chloride water into the boiler |
| Various | 24 months | $220,752 (est.) | CDS clean water supplement |
| Various | 24 months | $1,314,000 (est.) | Other water supply changes |
| Various | To begin in 2006 | $512,000 (est.) | Crystallizer – engineering, permits, relocation |
| To be determined | 2006 | $7,000,000 (est.) | Crystallizer – procurement |
| To be determined | 2006/2007 | $7,000,000 (est.) | Crystallizer – Construction |
| To be determined | 2006 | $1,400,000 | Crystallizer – construction/procurement contingency (10%) |
| Various | Ongoing | $6,578,655 (est.) | Crystallizer – O&M costs (est. $750,000/yr, incl. 650kW/h and 10% discount rate) |
| Total | | $34,307,120.12 | |

B.466

Collection Plates

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| EEC | Various | $925,120.00 | Replacement collecting plates for Unit 2 |
| PIC | Various | $40,649.10 | Labor |
| ICE | Various | $240,409.74 | Freight |
| Raymond | Various | $2,942.49 | Consulting |
| FL Smidth Airtech | 12/31/2003 | $92,935.28 | Consulting/Inspection |
| EEC | Various | $219,250.00 | ESP rigitrodes |
| Various | | $1,400,000.00 (est.) | Replacement collection plates (incl. related parts, consulting, inspection, labor and shipping, w/o costs associated with storage) for Unit 1 |
| | | $2,000,000.00 (est.) | Labor to install all plates |
| Total | | $4,921,306.61 | |

Stabilization Program

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| Various | Various | $481,069.00 | Other costs related to initial stabilization of corroded plates |
| Various | Various | $54,544.45 | Additional work during July 2004 |
| Various | Various | $53,812.99 | Additional work during October 2004 outage |
| Various | Various | $3,075.54 | Additional work during April 2005 outage |
| TOTAL | | $592,501.98 | |

**B.467**

AES PR supplements this response by referring ALSTOM to the documents AES PR is producing in response to ALSTOM's first set of requests for production. See Fed. R. Civ. P. 33(d).


_____/s/ John S. Spadaro_____

John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135


OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: January 17, 2006        Attorneys for AES Puerto Rico, L.P.

4

B.468

## VERIFICATION

I, Allan B. Dyer, declare under penalty of perjury that:

1.    I am President of AES Puerto Rico, L.P.

2.    I have read the foregoing supplemental response of AES Puerto Rico

L.P. to ALSTOM Power Inc.'s Interrogatory No. 10 and, to the best of my

knowledge, information and belief, they are true and accurate.

January 17, 2006
Date

Allan B. Dyer

5

**B.469**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
                                    )
AES PUERTO RICO, L.P.,              )
                                    )
              Plaintiff,            )
                                    )      C.A. No. 04-1282-JJF
      v.                            )
                                    )
ALSTOM POWER, INC.,                 )
                                    )
              Defendant.            )
                                    )
```

**EXHIBIT**

ALSTOM 2
3/14/06

### PLAINTIFF AES PUERTO RICO, L.P.'S
### FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, and in accordance with the definitions and instructions set forth below, plaintiff AES Puerto Rico, L.P. requests that ALSTOM Power, Inc. respond to the following requests for admission on or before March 9, 2006:

### DEFINITIONS

Unless a contrary meaning appears in the text, the following Definitions shall apply herein:

1.    "AES-PR" means AES Puerto Rico, L.P.

2.    "ALSTOM," "Defendant," "you," and "your" refer to ALSTOM Power, Inc., Combustion Engineering Systems, Combustion Engineering, Inc., any predecessor or successor corporations of these corporations, any officers or employees of these corporations, and any agents, representatives, or attorneys, and anyone else who acts or purports to act on behalf of these corporations.

3.    The term "Plant" means AES-PR's power plant located in Guayama,

**B.470**

Puerto Rico.

4.    "Document" is given the meaning used in Rule 34(a) of the Federal Rules of Civil Procedure, and shall include, but not be limited to, originals, drafts and non-identical copies of all writings (whether handwritten, typed, printed or otherwise made); drawings; graphs; charts; records; electronically-created, electronically-stored and/or electronically-transmitted data or information (including electronic mail and messages, computer databases, computer hard drives and computer discs); audio or video recordings, including tape recordings; and any other compilations of data from which information can be obtained and/or translated.

5.    "All" and "any" shall both be construed as "any and all."

6.    The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

1.    These requests for admission are to be answered by you with reference to all information which is or may be available to you, or any agents or attorneys acting on your behalf, and not merely information within your personal knowledge.

2.    If you object to these requests for admission or fail to answer them on the grounds that either the attorney-client privilege or the work-product doctrine, or both, or any other claim of privilege, applies, then you are requested to state with particularity the nature of the claim of privilege.

3.    If in answering these requests for admission you encounter any ambiguity in construing them or any definition or instruction relevant to these

B.471

requests for admission, set forth the matter deemed ambiguous and the construction selected or used in answering the request for admission.

4.    If you object to these requests for admission or portion thereof, please describe in detail the factual basis for your objection and furnish a response to all portions of it to which you have no objection.

## REQUESTS FOR ADMISSION

1.    The document attached at Tab A is an authentic copy of the design specification for the circulating dry scrubber that ALSTOM contracted to supply and install at the Plant.

2.    The document attached at Tab B is an authentic copy of the design specification for the electrostatic precipitator that ALSTOM contracted to supply and install at the Plant.

3.    The document attached at Tab C is an authentic copy of a document from ALSTOM's files listing the assumed inlet conditions and performance guarantees for the flue gas cleaning system ALSTOM contracted to supply and install at the Plant.

4.    The document attached at Tab D is an authentic copy of an excerpt from a Request for Quotation ALSTOM issued for the supply of refractory at the Plant. It is a "record of regularly conducted activity" as that term is used in Federal Rule of Evidence 803(6).[1]

---

[1]  Please note that the document attached at Tab D was among the documents ALSTOM permitted counsel for AES-PR to inspect at ALSTOM's offices in Windsor, Connecticut. It did not contain a Bates number or other identifying number.

5.    The document attached at Tab E is an authentic copy of an excerpt from the Design and Operation Manual ALSTOM issued for the circulating fluidized bed steam generator ALSTOM supplied for the Plant.

6.    The document attached at Tab F is an authentic copy of a letter sent by ALSTOM's counsel relating to ALSTOM's claim for payment under a bond issued by Liberty Mutual concerning equipment and services Environmental Elements Corporation contracted to provide to ALSTOM.

7.    The document attached at Tab G is an authentic copy of a document created by William Jarvis on or about June 24, 2003 describing non-conformances with the CDS/ESP equipment installed at the Plant. It is a "record of regularly conducted activity" as that term is used in Federal Rule of Evidence 803(6).[2]

8.    In February or March 2005, ALSTOM issued a Statement of outstanding invoices to Environmental Elements Corporation reflecting that Environmental Elements Corporation owes ALSTOM payment for several invoices including invoice CS-04-301, which is an invoice in the amount of $1,651,164.72 for electrostatic precipitator collecting plates for the Plant.

---

[2]  Please note that the document attached at Tab G was produced by Ober, Kaler as a Microsoft Excel file on December 30, 2005. It did not contain a Bates number or other identifying number.

B.473

OF COUNSEL:
Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

/s/ John S. Spadaro
John S. Spadaro, Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

Dated:  February 7, 2006          Attorneys for AES Puerto Rico, L.P.

**B.474**