# DUKE/FLUOR DANIEL CARIBBEAN, S.E.



4.   A total of fifteen (15) copies of approved operating and maintenance manuals shall be submitted to the *Engineer at the address given in Paragraph 12.1.6 of this specification* in accordance with the SDR Form.

## 14.0   TESTS AND INSPECTIONS

1.   The Seller shall make all tests necessary to ensure that material, equipment and workmanship are of the required degree specified herein and shall fully comply with the laws and regulations of the Commonwealth of Puerto Rico (including National Board registration requirements). Note that although Puerto Rico is not a code territory, all Seller supplied equipment shall be designed, fabricated, tested and stamped in accordance with codes and standards referenced in Section 4.4 of this specification.

2.   Motors shall be tested as specified in Section 8.1, 8.2, 8.3, or 8.15, Motor Requirements, of the General Project Requirements (GPR), as applicable to the rated horsepower of the motor.

3.   A copy of all required tests and inspections, as applicable to a field erected ESP Package, shall be submitted to the Engineer at the address given in Paragraph 12.1.6 of this specification for approval before the equipment is shipped.

4.   Owner and/or Engineer shall have full access to the equipment during the process of fabrication and testing. Seller shall notify Mike Copeland at (704) 426-2873 at least five (5) working days prior to functional tests to allow for witness at Owner/Engineer discretion.

5.   The control system(s) shall be subjected to a complete functional test prior to shipment. Field controls and instruments may be simulated as necessary to accomplish testing. These tests shall be witnessed by the Engineer. The test procedure(s) shall be submitted to the Engineer for review and approval prior to testing.

6.   The test procedures, acceptance criteria, and test reports shall be supplied by the Seller for all tests performed.

7.   The Engineer/Owner shall:

   a.   Have full access to the equipment during the process of its manufacture and shop testing.

   b.   Be notified when manufacturing and testing schedule is arranged.

   c.   Be informed during manufacture of any major problems or rework that may affect delivery of the equipment as scheduled.

## 15.0   SPARE PARTS

1.   Seller shall furnish Erection and Commissioning Spare Parts and submit spare parts lists in accordance with the requirements of Section 4.1, Spare Parts, of the General Project Requirements (GPR).

2.   All parts and consumables, with the exception of fuel, reagents, and utilities, required during startup and initial operation, and performance testing shall be supplied by the Seller.



Specification
*ESP*

AESPR 021872

AESPR-021872

DUKE /FLUOR DANIEL
CARIBBEAN, S.E.

Specification No.: W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.03-0002
Revision: 2
May 10, 2001
Page: 29 of 29

## 16.0    INFORMATION TO BE FURNISHED BY BIDDER

### 16.1    WITH PROPOSAL

Not Applicable for Conformed Specification.

### 16.2    AFTER AWARD OF ORDER

1.  Within one (1) week after award of order, Seller is to provide written confirmation of drawing submittal schedule and manufacturing schedule.

2.  Seller shall submit drawings and information listed in Section 12.2 in accordance with the drawing submittal schedule.

3.  Seller shall submit a 3.5" HD computer disk with general arrangement drawings and P&IDs if available on Intergraph Microstation version 4.0 format or Autocad. Calma System in IGES format is also acceptable.

## 17.0    DISCREPANCIES AND INTERPRETATION

Should Seller find discrepancies in, or omissions from, the drawings or specifications or be in doubt as to their meaning, the Seller shall notify the Buyer by letter, who will then issue a written interpretation.

## 18.0    CONFORMANCE WITH SPECIFICATIONS

The Bidder must submit with the proposal a list of all major and minor exceptions to these specifications and obtain written approval from the Engineer of such exceptions prior to award of order. If there are no exceptions, it must be so stated in writing. It is particularly emphasized that any unapproved nonconformity with the specification must be changed to complete conformity at the Seller's expense, and this expense will include the cost of all labor and materials and other related expenses by the Owner, Engineer, or Seller.

## 19.0    CONSTRUCTION SERVICES

Erection shall be in accordance with the requirements of Section 3.0 of the Part I - Scope of Work document included in the purchasing documents.

## 20.0    TECHNICAL DIRECTION

Commissioning and training services shall be in accordance with the requirements of Section 3.0 of the Part I - Scope of Work document included in the purchasing documents.

## 21.0    SUBMISSION OF PROPOSALS AND PRICES

Not Applicable for Conformed Specification.



Specification
ESP

AESPR 021873

AESPR-021873

## ABB ALSTOM
### POWER

# Tab D

# REQUEST FOR QUOTATION

# NO. 65005697-R

# REFRACTORY SUPPLY
## and
# INSTALLATION
### for

## CIRCULATING FLUIDIZED BED STEAM GENERATORS

## AND ANCILLARY EQUIPMENT

## AES – PUERTO RICO TOTAL ENERGY PROJECT

## GUAYAMA, PUERTO RICO

## APRIL 14, 2000

API 0674386

B.528

# CIRCULATING FLUIDIZED BED STEAM GENERATORS AND ANCILLARY EQUIPMENT

### 2 X 250 MW CFB's

### AES – PUERTO RICO TOTAL ENERGY PROJECT

### GUAYAMA, PUERTO RICO

## TABLE OF CONTENTS

| SECTION | DESCRIPTION |
|---------|-------------|
| 1 | REQUEST FOR QUOTATION |
| 2 | INSTRUCTIONS TO BIDDERS |
| 3 | SPECIAL CONDITIONS |
| 4 | GENERAL TERMS & CONDITIONS |
| 5 | QUOTATION FORM |
| 6 | CONSTRUCTION REQUIREMENTS |

API 0674387

B.529

AES PUERTO RICO TOTAL ENERGY PROJECT
GUAYAMA, PUERTO RICO

QUOTATION 65005697-R
2 X 250 MW CFB's

## PROJECT DESCRIPTION

AES-PR Is constructing and will be operating a cogeneration plant that will fire coal and produce electricity at an approximate net capacity of 413 megawatts with up to a maximum of 454.3 megawatts. The plant will consist of two CFB boilers with Circulating Dry Scrubbers/Precipitators, two turbine generators and related plant equipment. The electricity will be sold to the Puerto Rico Electric Power Authority (PREPA) and the steam to Philips Puerto Rico Core. Financing will be provided by commercial institutions.

The plant will be located on the South coast of Puerto Rico, about a 75minute drive from San Juan, in the Jobos neighborhood of the Municipality of Guayama. The site for the project is an industrial lot of approximately 85 acres adjacent to a petrochemical complex (Phillips PR Core). The nearest major seaport is Ponce, about 38 miles to the west along a modern divided highway.

The facility is designed for a zero discharge of water used in the process and/or runoff water from the fuel storage area. Treated effluent from the regional sewage treatment plant in Guayama will be used in the plant for cooling tower make up and cooling the flue gas in the Circulating Dry Scrubber (CDS) thus eliminating most of the water that is currently being discharged into the sea by this treatment facility. This also eliminates the need to use seawater and reduces the dependency on local fresh water sources. The ash from the plant will be processed into useful secondary products (road aggregate, etc.) and/or transported off the island.

The plant also incorporates, for the first time ever, the use of a scrubber for the clean up of the flue gases from a CFB boiler. The combination of these technologies and progressive environmental strategies will make this plant one of the cleanest coal burning plants in the world. This concept of low environmental impact is very important to AES and also is critical to the permitting process involved in developing the project. This will be the first coal-fired generating project on the island of Puerto Rico and there has been significant opposition to the use of coal by local environmentalists. Any issues or changes that would threaten continued approval by the environmental authorities would not be accepted by AES.

Project Description

API 0674388

B.530

# Tab G

## ENVIRONMENTAL ELEMENTS
## NON CONFORMANCES

| A. | OPERATIONAL PERFORMANCE ISSUES | | | |
|---|---|---|---|---|
| 1 | PM Emissions Guarantee not met. Air permit not granted by EPA | See items No. B.1 and B.2; Correct and retest. (Trygon) | C | 6/20/2003 |
| 2 | Must divert ash to eliminate opacity spikes. | See item No. B.2: Correct and test | | |
| 3 | Can not maintain CDS bed at 50% load. | See item No. B.2: Additional air flow? | | |
| 4 | Exceed permitted opacity on load ramps between 50% and 100% load | Inspect ESP for ash accumuation at low gas flow. | | |
| 5 | Hydrated Lime Feed erratic. | See items No. B.4, B.5 and B.6. Correct and test | | |
| 6 | CDS/ESP requires constant operator intervention. | See item B.2; | | |
| 7 | CDS outlet temperature lower than design to satisfy opacity permit. | | | |

| B. | MECHANICAL ISSUES | | | |
|---|---|---|---|---|
| 1 | ESP Ash Hopper Rotary Air Lock Valves leak. | Add VFC and reduce pocket size. | C | 6/12/2003 |
| 2 | ESP Gas flow distribution does not meet spec. | Add hopper baffles and modify inlet nozzle curtains. Re-run scale model study. | | |
| 3 | Air slide diverter valves excessive wear. | Add UHMW Plastic. Correct item A.2: | | In progress |
| 4 | Structural deformation of Hydrated Lime Storage Tank and Support steel. | EEC reapir on Unit 2 did not work. Perform structural analysis prepare design and implement on unit 1 during outage. Unit 2 later. | | In progess |
| 5 | Hydrated Lime feed system damaged as a result of deflection in item B.4 | Repair tank and structure, replace damaged parts. | | |
| 6 | Hydrated Lime feed system can not control flow | Rotary valve too big; Eliminate fluidizng air; add vibrators; Not good design practice to have 2 feeders in series; Calibrate feeders; undo logic changes to control system | | In progress |
| 7 | Hydrated Lime Bin Vent filter undersized | Investigate options with manufacturer. | | |
| 8 | ID Fan Inlet Duct structural design not per spec. | EEC designed additional supports. EEC started work; sub-contractor work below minimum standards. Hire contractor to complete work | | In progress |
| 9 | Platforms, stairs, and handrails not per OSHA. | EEC provided parts. Hire contractor to correct. | | |

B.531

ENVIRONMENTAL ELEMENTS
NON CONFORMANCES



# ENVIRONMENTAL ELEMENTS
## NON CONFORMANCES

| C. | ELECTRICAL ISSUES | | | | |
|---|---|---|---|---|---|
| 1 | T/R Controller failures. Breakers, contactors, wiring, and SC 2000 continue to fail. | Hire consultant, perform thermal imaging. | | | |
| 2 | I/O Plexers continue to fail due to condensation in cabinet. | Add space heaters to cabinets and EEC to replace I/O's under warranty. | | | |
| 3 | Terminal Blocks not rated for 600 volts. | Purchase and install. | | | |

| D. | WARRANTY PARTS REPLACEMENT | | | | |
|---|---|---|---|---|---|
| 1 | See parts list. | | | | |

B.533

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant, | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ALSTOM POWER INC.'S AMENDED RESPONSE TO AES PUERTO RICO, L.P.'S FIRST SET OF REQUESTS FOR ADMISSION

ALSTOM Power Inc. ("ALSTOM"), defendant, by its attorneys, and pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby amends its response to the First Set of Requests for Admission (the "Requests") served by AES Puerto Rico, L.P. ("AES"), plaintiff.

### PRELIMINARY STATEMENT

A.    These responses are made solely for the purpose of this action. Each response is subject to all appropriate objections (including, but not limited to, objections as to confidentiality, relevancy, propriety and admissibility) that may require the exclusion from evidence of any statement contained in this Response. All such objections and grounds are reserved and may be interposed at the time of trial.

B.    Except for explicit facts that may be admitted in this Response, no admissions by ALSTOM of any nature whatsoever are implied or should be inferred. The fact that ALSTOM has responded to any Request in AES's Requests for Admission should not be taken as an admission or acceptance of the existence of any facts set forth or assumed by any such Request.

**B.534**

## PRELIMINARY OBJECTIONS--APPLICABLE TO ALL REQUESTS

1.      ALSTOM objects to Definition 2 in the Requests to the extent that it calls for a response based on information possessed by persons or entities whose knowledge is not properly imputed to ALSTOM.    ALSTOM's responses to these Requests are based solely on its knowledge.

2.      ALSTOM's responses are based on its knowledge and a reasonable investigation of the subject matter of the Requests as of date of this Response.

3.      ALSTOM will supplement its responses to the Requests only insofar as required by the applicable Federal Rules of Civil Procedure and the Rules of this Court.

4.      Subject to the foregoing, and any objections made to specific Requests, ALSTOM responds to these Requests without waiver and with preservation of:

    a.      The right to object to the use of any responses, or the subject matter thereof, on any ground in any proceedings in any action (including any trials);

    b.      The right to object on any ground at any time to a demand or request for a further response to this discovery request or to any other interrogatories, document requests, or other discovery proceedings involving or relating to the subject matter of the discovery requests herein responded to; and,

    c.      The right at any time to revise, correct, add to, supplement, or clarify any of the individual Requests.

5.      Each of the objections and limitations set forth above is applicable to each of the numbered requests set out below, and these objections and limitations are hereby incorporated by reference in each response to the Requests.

**B.535**

## RESPONSE TO REQUESTS FOR ADMISSION

**Request for Admission No. 1:**  The document attached as Tab A is an authentic copy of the design specification for the circulating dry scrubber that ALSTOM contracted to supply and install at the Plant.

**Response to Request for Admission No. 1:**  ALSTOM objects to the use of the term "design specification," which is not a defined term in the Request or in ALSTOM's Purchase Order with Duke/Fluor Daniel Caribbean, S.E. ("D/FD") under which ALSTOM furnished equipment for the Plant.  Without waiving its objection, ALSTOM admits that the document attached as Tab A to the Requests is an authentic copy of the Specification for the Circulating Dry Scrubber Flue Gas Cleaning System that ALSTOM contracted to supply to D/FD under Contract No. W419-44-C0001 between D/FD and ALSTOM's predecessor, Combustion Engineering, Inc., and states that other documents incorporated by reference in the document attached as Tab A also constitute a part of the Specification.

**Request for Admission No. 2:**  The document attached as Tab B is an authentic copy of the design specification for the electrostatic precipitator that ALSTOM contracted to supply and install at the Plant.

**Response to Request for Admission No. 2:**  ALSTOM objects to the use of the term "design specification," which is not a defined term in the Request or in ALSTOM's Purchase Order with D/FD under which ALSTOM furnished equipment for the Plant.  Without waiving its objection, ALSTOM admits that the document attached as Tab B to the Requests is an authentic copy of the Specification for the Electrostatic Precipitator (ESP) Flue Gas Cleaning System that ALSTOM contracted to supply to D/FD under Contract No. W419-44-C0001 between D/FD and ALSTOM's predecessor, Combustion Engineering, Inc., and states that other documents incorporated by reference in the document attached as Tab B also constitute a part of the Specification.

**B.536**

**Request for Admission No. 3:**  The document attached as Tab C is an authentic copy of a document from ALSTOM's files listing the assumed inlet conditions and performance guarantees for the flue gas cleaning system ALSTOM contracted to supply and install at the Plant.

**Response to Request for Admission No. 3:**  ALSTOM objects to Request No. 3.  The document attached as Tab C, on its face, purports to be a document that is three pages in length; however, only two of the three pages are included in Tab C.  Without waiving its objection, ALSTOM admits that the document attached as Tab C to the Requests is an authentic copy of a portion of a document in ALSTOM's files that is entitled "Flue Gas Cleaning System Performance Selection For AES Puerto Rico."  ALSTOM denies the remainder of Request No. 3.

**Request for Admission No. 4:**  The document attached as Tab D is an authentic copy of an excerpt from a Request for Quotation ALSTOM issued for the supply of the refractory at the Plant.  It is a "record of a regularly conducted activity" as that term is used in Federal Rule of Evidence 803(6).

**Response to Request for Admission No. 4:**  ALSTOM objects to Request No. 4 to the extent that it seeks an admission with respect to a document, which, on its face, appears to relate to Refractory Supply and Installation, a scope of work at the Plant that is not relevant to the subject matter of this action.  Without waiving its objection, ALSTOM admits that the document attached as Tab D to the Requests is an authentic copy of a portion of a document entitled "Request For Quotation No. 65005697-R:  Refractory Supply and Installation."  ALSTOM admits that the document from which Tab D is excerpted is a record of a regularly conducted business activity.

**Request for Admission No. 5:**  The document attached as Tab E is an authentic copy of an excerpt from the Design and Operation Manual ALSTOM issued for the circulating fluidized bed steam generator ALSTOM supplied for the Plant.

**B.537**

4

**Response to Request for Admission No. 5:**  ALSTOM objects to Request No. 5 to the extent that it seeks an admission with respect to the authenticity of what purports to be an excerpt from one volume of a much larger, multi-volume Design and Operation Manual. Without waiving its objection, ALSTOM admits that, in connection with this Plant, it prepared a multi-volume Circulating Fluidized Bed Steam Generator Instruction Manual, a Date of Issue for that manual was September, 2001, and the pages attached as Tab E are authentic copies of a part of that manual.

**Request for Admission No. 6:**  The document attached as Tab 6 is an authentic copy of a letter sent by ALSTOM's counsel relating to ALSTOM's claim for payment under a bond issued by Liberty Mutual concerning the equipment and services Environmental Elements Corporation contracted to provide ALSTOM.

**Response to Request for Admission No. 6:**  ALSTOM admits that the document attached as Tab F to the Request is an authentic copy of a letter sent by Ober|Kaler, ALSTOM's counsel, and that the letter relates to a claim by ALSTOM under a bond issued by Liberty Mutual Insurance Company on behalf of Environmental Elements Corporation ("EEC") concerning equipment and services that is the subject of a Purchase Order between ALSTOM and EEC.

**Request for Admission No. 7:**  The document attached as Tab G is an authentic copy of a document created by William Jarvis on or about June 24, 2003 describing non-conformances with the CDS/ESP equipment installed at the Plant. It is a "record of a regularly conducted activity" as that term is used in Federal Rule of Evidence 803(6).

**Response to Request for Admission No. 7:**  After making reasonable inquiry, the information known or readily obtainable by ALSTOM is insufficient to enable it to admit or deny Request No. 7.

**Request for Admission No. 8:**  In February or March 2005, ALSTOM issued a Statement of outstanding invoices to Environmental Elements Corporation reflecting that Environmental Elements Corporation owes ALSTOM payment for several invoices including invoice CS-04-301, which is an invoice in the amount of $1,651,164.72 for electrostatic precipitator collecting plates for the Plant.

**B.538**

**Response to Request for Admission No. 8:**  ALSTOM objects to Request No. 8.  The term "issued" is vague and is not defined in the Requests.  Without waiving its objection, ALSTOM denies that, in February or March, 2005, it sent to Environmental Elements Corporation ("EEC") a statement of outstanding invoices reflecting that EEC owed ALSTOM payment for a number of invoices as described in this Request.

DATED:  March 13, 2006                    ALSTOM POWER INC.

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, DE 19806
(302) 888-3222

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:      (410) 547-0699

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 13th day of March, 2006, a copy of ALSTOM Power Inc.'s Amended Response to AES Puerto Rico, L.P.'s First Set of Requests for Admission was served, via hand delivery, on John S. Spadaro, Esquire, Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware 19805, and, by facsimile and first-class mail, on Daniel D. Williams, Esquire, Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C. 20005.

Michael A. Schollaert

**B.539**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 04-1282-JJF |
| | ) | |
| ALSTOM POWER, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AES PUERTO RICO, L.P.'S RESPONSES TO ALSTOM POWER, INC.'S THIRD SET OF INTERROGATORIES AND SUPPLEMENTAL RESPONSES TO SPECIFIED INTERROGATORIES

Plaintiff AES Puerto Rico L.P. ("AES-PR") objects and responds to Defendant ALSTOM Power, Inc.'s ("ALSTOM's") third set of interrogatories and supplements its response to specified interrogatories as follows:

### GENERAL OBJECTIONS

The following general objections are incorporated in, and serve as additions to, each of AES-PR's responses and objections to each of ALSTOM's specific interrogatories.

A. AES-PR objects to ALSTOM's interrogatories to the extent that they call for information protected by the attorney-client privilege, the attorney work product doctrine, or other applicable statutory or common law privileges or immunities. To the extent that any interrogatory may be construed as seeking the disclosure of information subject to these privileges or immunities, AES-PR invokes the same.

B.540

B.  AES-PR objects to ALSTOM's interrogatories to the extent that they seek confidential or proprietary information of third parties as to which AES-PR has entered into agreements to protect the confidentiality of such information.

C.  AES-PR objects to Definition (A) to the extent that it purports to impose on AES-PR any obligations greater than those imposed by the Federal Rules of Civil Procedure and the rules and orders of the Court.

D.  AES-PR objects to Definition (D) to the extent that it calls for information from contractors or agents of AES-PR that is not properly imputed to AES-PR.  AES-PR further objects to the definition to the extent that it defines "AES" to include "AES related entities."  AES-PR is answering solely on behalf of itself.

E.  AES-PR objects to Definition (I) to the extent that it attempts to characterize the document Bates-stamped EEC-05970 through EEC-06331.

F.  AES-PR objects to Definition (K)[1] as overbroad and unduly burdensome.  AES-PR is providing in these responses information sufficient "to identify" persons and things as that term is reasonably understood.  AES-PR further objects to the definition regarding identification of persons because it presupposes that each person to be identified could be compelled to be a witness in Court.

---

[1] ALSTOM's Second Set of Interrogatories contains two Definitions titled Definition (K).  *Compare* p. 2 *with* p. 3.  This Objection relates to the Definition (K) on page 3.

2

F.  AES-PR objects to Definition (L)[2] to the extent that its use of the term "writing" or "document" exceeds the definition set forth in the Fed. R. Civ. P. 34.

G.  These interrogatory responses and objections are not intended to be, and shall not be construed as, an agreement or concurrence by AES-PR with ALSTOM's characterization of any facts, circumstances, or legal obligations.

H.  AES-PR objects to ALSTOM's interrogatories to the extent they attempt to impose requirements beyond those set forth in Fed. R. Civ. P. 33 or the rules or orders of the Court.

I.  These interrogatory responses reflect AES-PR's present knowledge based on reasonable inquiries to date.  Consistent with Instruction (A), AES-PR expressly reserves the right to supplement its interrogatory responses in the future.

---

[2] ALSTOM's Second Set of Interrogatories contains two Definitions titled Definition (L).  *Compare* p. 2 *with* p. 3.  This Objection relates to the Definition (L) on page 3.

3

**B.542**

## RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

The following responses and objections are made subject to and without waiver of any of the general objections set forth above.

INTERROGATORY NO. 19

If you contend that the installation of the secondary reverse osmosis system at the Plant identified in AES's Supplemental Response to ALSTOM Power Inc.'s Interrogatory No. 10 was a direct, proximate, and foreseeable result of ALSTOM's alleged breach of the ESP Corrosion Warranty, state in detail the basis for your contention, and identify all documents that refer or relate to and all persons with knowledge of the subject matter of your answer to this Interrogatory.

RESPONSE:  AES-PR objects to this interrogatory on the ground that it calls for a legal conclusion and its requests for identification are overbroad and unduly burdensome.  Subject to the foregoing general and specific objections, AES-PR states that the installation of the secondary reverse osmosis system was an immediate and necessary step to arrest the severe accelerated corrosion described in the Complaint in this action.  The pollution control equipment supplied by ALSTOM, by design, was to operate without accelerated corrosion and in compliance with the Plant's environmental permits when using high-chloride water. The equipment ALSTOM supplied, however, could not do so.  Accordingly, the secondary reverse osmosis system was installed so that low-chloride water could be used in the CDS, which allowed the pollution control equipment to operate in compliance with the Plant's environmental permits and without causing accelerated corrosion.  AES-PR has identified the persons with knowledge of this subject matter in its multiple responses to Interrogatory No. 2, as well as in depositions in this matter, and AES-PR incorporates those responses and that testimony as if fully set

4

B.543

forth herein.  AES-PR supplements this response by referring ALSTOM to the

documents AES-PR is producing in response to ALSTOM's requests for production

of documents.  See Fed. R. Civ. P. 33(d).

INTERROGATORY NO. 20

If you contend that the proposed installation of the brine crystallizer at
the Plant identified in AES's Supplemental Response to ALSTOM Power Inc.'s
Interrogatory No. 10 is a direct, proximate, and foreseeable result of ALSTOM's
alleged breach of the ESP Corrosion Warranty, state in detail the basis for your
contention, and identify all documents that refer or relate to and all persons with
knowledge of the subject matter of your answer to this Interrogatory.

RESPONSE:  AES-PR objects to this interrogatory on the ground that

it calls for a legal conclusion and its requests for identification are overbroad and

unduly burdensome.  Subject to the foregoing general and specific objections, AES-

PR states that AES-PR's plant was designed to be a zero-liquid-discharge facility.

The brine crystallizer to be installed at the Plant is necessary for the Plant to

operate without accelerated corrosion of its ESPs and at the same time comply with

its zero-liquid-discharge environmental permit.  The pollution control equipment

supplied by ALSTOM, by design, was to operate without accelerated corrosion and

at the same time consume specified quantities of high-chloride water.  The

equipment ALSTOM supplied, however, could not do so.  Because the CDS

equipment cannot consume high chloride water without causing accelerated

corrosion in the ESPs, the Plant must install the brine crystallizer as an alternative

mechanism to dispose of the high chloride water without causing accelerated

corrosion in the ESPs.  AES-PR has identified the persons with knowledge of this

subject matter in its multiple responses to Interrogatory No. 2, as well as in

depositions in this matter, and AES-PR incorporates those responses and that

testimony as if fully set forth herein.  AES-PR supplements this response by

referring ALSTOM to the documents AES-PR is producing in response to

ALSTOM's requests for production of documents.  See Fed. R. Civ. P. 33(d).

## SUPPLEMENTAL RESPONSES TO SPECIFIC INTERROGATORIES

INTERROGATORY NO. 14

Set forth in detail and itemize each element of damage which you
contend you are entitled to recover in this action, describing in detail how you
computed each element of damage and the provision(s) in the Purchase Order
pursuant to which you contend that you are entitled to recover such damages, and
identify all documents which refer or relate to and all persons with knowledge of the
subject matter of your answer to this Interrogatory.

SUPPLEMENTAL RESPONSE:   AES-PR supplements its response to

Interrogatory No. 14 by adding to it the following:

AES-PR supplements this response by referring ALSTOM to the expert

reports of Jack R. McDonald, Ph.D. and Stuart A. Rosenberg, CPA, CVA

that AES-PR served on ALSTOM on February 27, 2006.

INTERROGATORY NO. 15

If you contend that D/FD, ALSTOM or EEC amended, modified,
supplemented, superceded, changed or altered the EEC O&M Manual Volume 1,
whether orally or in writing, state in detail the basis for your contention, including
in your answer whether the amendment, modification, supplementation,
supercession, change, alteration was oral or written, and by whom it was issued.

SUPPLEMENTAL RESPONSE:   AES-PR supplements its response to

Interrogatory No. 15 by adding to it the following:

B.545

In November 2002, EEC and/or ALSTOM presented additional revised operating procedures to AES-PR, including but not limited to procedures titled "CDS Cold Start-up" dated November 14, 2002.  Those revised procedures supplemented and superceded the August 2001 EEC O&M Manual.

In addition, ALSTOM and EEC modified the August 2001 EEC O&M Manual procedures when their commissioning personnel demonstrated how to operate and maintain the pollution control equipment between July 2002 and July 2003 in a manner different from that set forth in the August 2001 O&M manual.

## INTERROGATORY NO. 16

If you contend that you were ever instructed to operate either CDS at the Plant with an outlet flue gas temperature of below 152 degrees Fahrenheit, identify who gave you the instruction, set forth the substance of the instruction that was given, when and on how many occasions the instruction was given, and state whether the instruction was given orally or in writing on each such occasion.

SUPPLEMENTAL RESPONSE:  AES-PR supplements its response to Interrogatory No. 16 by adding to it the following:

At least the following five EEC and ALSTOM commissioning personnel instructed AES-PR personnel, verbally or in writing, to operate on occassion the CDS with an outlet temperature of below 152 degrees:  Tim Maidenford, Tom Coleman, Joe Ortega, Bill Van Hooser, and Dave Edsall.  Others may have done so as well.

## INTERROGATORY NO. 17

If you contend that ALSTOM waived, or is otherwise estopped from relying upon, the conditions precedent to the ESP Corrosion Warranty that the system be operated and maintained "in accordance with Contractor's Operation and Maintenance Manuals, Owner's specified operating parameters, and typical system

7

B.546

operation at baseload and specified capacities", state in detail the basis for your contention, including in your answer whether the bases of the alleged waiver or estoppel were oral or written representations, and the identity of the person or persons who made those representations.

   <u>SUPPLEMENTAL RESPONSE</u>:  AES-PR supplements its response to Interrogatory No. 17 by adding to it the following:

   EEC and ALSTOM's commissioning personnel demonstrated how to operate and maintain the pollution control equipment between July 2002 and July 2003 in a manner different from that set forth in the August 2001 O&M manual.

<br>

            <u>/s/ John S. Spadaro</u>
            John S. Spadaro
            Bar No. 3155
            MURPHY SPADARO & LANDON
            1011 Centre Road, Suite 210
            Wilmington, DE 19805
            Tel. (302) 472-8100
            Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  March 10, 2006       Attorneys for AES Puerto Rico, L.P.

B.547

## VERIFICATION

I, Allan B. Dyer, declare under penalty of perjury that:

1.  I am President of AES Puerto Rico, L.P.

2.  I have read the foregoing AES Puerto Rico, L.P.'s Responses to

ALSTOM Power, Inc.'s Third Set of Interrogatories and Supplemental Responses to

Specified Interrogatories and, to the best of my knowledge, information and belief,

they are true and accurate.

03/08/06
Date

Allan B. Dyer

9

B.548