parameters, and typical system operation at baseload and specified capacity factors, *all of which are an express condition of . . . ALSTOM's corrosion warranty under the Purchase Order . . . .*"[47] Even if, for some inexplicable reason, AES somehow had failed to comprehend ALSTOM's clear statements in Paragraphs 13, 15 and 19, it cannot possibly have overlooked the specificity of ALSTOM's Twenty-First Affirmative Defense: "*AES's claims are barred by its failure to satisfy and comply with requirements and conditions contained in the warranties . . . .*"[48]

This is but one -- albeit, a particularly vivid one -- example of the lengths to which AES has gone in its effort to create purported "critical facts" that are "hotly contested" by the parties. The "facts" upon which AES relies are not facts at all -- and they surely are not the sort of genuine issues of material fact that must be established to avoid entry of summary judgment.

### 4. AES has made no showing that it satisfied specified conditions.

ALSTOM has pointed to the absence of evidence sufficient to establish that AES had satisfied the conditions that called for: (i) monitoring and controlling the chloride content of the ash and (ii) maintaining mandated records of required operating and maintenance actions.[49] In opposition, AES has failed to show material facts that present a triable issue.

As the O&M Manuals repeatedly emphasize, monitoring and controlling the chloride content of the ash was a "critical parameter in the control of corrosion."[50] Thus, the Manuals directed AES to "[m]easure the chloride content [of] the ash and measure cooling water conductivity to correlate to chloride content in the water . . . ."[51] AES has provided no evidence that it monitored and controlled the chloride content of the ash by "[m]easur[ing] the chloride content [of] the ash"; rather, it contends that there is "a factual dispute" because an AES witness believes that the O&M Manual language "means [only] that chloride levels of the CDS <u>water</u> are

---

[47] *Id.* at ¶ 19 (emphasis added).
[48] *Id.* at 12-13 (emphasis added).
[49] Open. Br. at 22-24, 27-28.
[50] *See* O&M Manual Excerpts (Exhibit 6 at 9-2; A078).
[51] *Id.* at 9-5; A081.

to be checked . . . ."[52]  The interpretation offered by that AES witness, however, is wholly inconsistent with the plain language of the Manual: "Measure the chloride content [of] the ash *and* measure cooling water conductivity to correlate the chloride content in the water . . . ."[53] Plainly, both must be measured.  AES cannot create "a factual dispute" based on an AES witness' erroneous contention that the plain language of the Manual does not say what it says and mean what it says, particularly given the fact that AES' own Plant records reflect its belated recognition of the requirement that it measure the chloride content of the ash.[54]

AES also has failed to meet its burden of producing evidence necessary to present a triable issue as to its satisfaction of the condition that it record and maintain specified O&M data. As ALSTOM has pointed out, an activity such as the measurement of water conductivity and its correlation to chloride content was to be undertaken on at least a weekly basis, and the Manual expressly directed that those "readings *must* be maintained in the plant operating logs."[55]  AES has provided no evidence to demonstrate compliance; indeed, its opposition brief response to ALSTOM's showing that "AES failed to record O&M data and other required information" does not even suggest that AES complied.  Instead, AES only stated that it provided "access to Plant Operating and Maintenance records".  That is not what the O&M Manuals plainly require.[56]

AES has made no showing that would establish that it satisfied the O&M requirements -- and thus, conditions precedent -- relating to (i) the monitoring and controlling of the chloride content of the ash and (ii) recordation and maintenance of O&M data and other required information.  ALSTOM is entitled, as a matter of law, to summary judgment with regard to AES'

---

[52] Opp. Br. at 24 (emphasis in original).
[53] O&M Manual Excerpts (Exhibit 6 at 9-5; A081) (emphasis added).
[54] *See* September 15, 2003 e-mail from AES' P. Stinson to AES employees (Exhibit 28; A180) ("I wonder if we have ever tested the [chloride] content of the ash?").
[55] O&M Manual Excerpts (Exhibit 6 at 7-14 and 9-3; A076 and A079) (emphasis added).
[56] *Compare* Open. Br. at 27-28 with Opp. Br. at 27.  Clearly, the Purchase Order *also* required AES to provide ALSTOM with access to Plant operating and maintenance records. *See* Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 1.9; A017).  That obligation, however, is distinct from AES' obligation -- the satisfaction of which is a condition precedent to ALSTOM's corrosion warranty obligation -- to record and maintain designated O&M data.  Indisputably, AES did not record and maintain required data.

failure to satisfy those conditions.

>    5.  **AES has admitted that it did not satisfy other conditions, but has tried to excuse its admitted non-satisfaction of those conditions.**

AES has admitted its non-satisfaction of conditions relating to (i) monitoring and controlling of chloride content of the CDS water, (ii) adjustment of the flue gas approach temperature according to the level of chlorides and moisture in the system and (iii) operation of the equipment at required temperatures during soot blowing. However, as excuses for its admitted failures, AES has argued that (i) "available documents" have led its expert to conclude "there is no evidence that would indicate that [the] design maximum [chloride level of the CDS water] was exceeded,"[57] (ii) oral direction and revised instructions received from EEC and/or ALSTOM field personnel "superceded" the provisions of the O&M Manuals,[58] and (iii) and that ALSTOM did not itself increase temperatures for soot blowing during commissioning.[59]

The fact that AES' expert may have concluded that "available documents" do not provide evidence that chloride levels have been exceeded does not mean that AES monitored and controlled the chloride content of the CDS water as required by the O&M Manuals; indeed, AES' carefully chosen (and exceedingly vague) reference to "available documents" underscores the undeniable fact that AES did not record and maintain all required O&M data. Clearly, AES has made no showing that, as required by the O&M Manuals, it "measure[d] water conductivity and correlate[d] this to chloride content" or that it complied with the requirement that those "readings must be maintained in the plant operating logs."[60]

In addition, any alleged oral direction or revised instructions received from field personnel neither "superceded" the provisions of the O&M Manuals nor excuse, pursuant to the doctrine of equitable estoppel, AES' noncompliance with O&M requirements. They did not

---

[57] Opp. Br. at 24.
[58] *Id.* at 25.
[59] *Id.* at 26.
[60] Indeed, AES' own expert has acknowledged that AES did not do so for the initial nine month period of operation. *See* Report of R. Lunt at 17; B.104.

"supercede" the Manuals because the Manuals are "Contract Documents" and, as noted, can only be modified by a writing signed by D/FD and ALSTOM.[61] The Manuals are not "superceded" by operation of equitable estoppel because, as this Court has noted, a party cannot claim that it lacked knowledge of the true facts, and thus invoke equitable estoppel, based on statements that purportedly contradicted the terms of the parties' written agreement.[62] AES, like the plaintiff in *Benitec*, "cannot now be allowed to claim detrimental reliance when it had knowledge of the terms of the contract from the contract itself."[63]

The same is true with respect to AES' ill-defined claims of "waiver", which it invokes based on ALSTOM field personnel's alleged failure to test water for chloride content and adjust temperatures during soot blowing. The cases cited by AES itself establish that waiver "is the voluntary and intentional relinquishment of a known right", that "the standards for proving waiver under Delaware law are 'quite exacting,'" and that the facts must be "unequivocal".[64] AES' allegation that certain ALSTOM and/or EEC field personnel did not themselves comply with the O&M Manual requirements (even if assumed to be true) does not provide evidence of waiver by ALSTOM -- the corporate entity -- of its bargained-for conditions precedent, particularly when the Contract expressly provides that the parties' bargain can be modified only by written, signed amendment.[65]

AES has admitted its non-satisfaction of the identified conditions. Its excuses for non-satisfaction are unavailing as a matter of law. ALSTOM is entitled to summary judgment.

---

[61] *See* Purchase Order Excerpts (Exhibit 2 at Art. 1.0; A004).

[62] *Benitec Austl. Ltd. v. Promega Corp.*, C.A. No. 04-889 JJF, 2005 U.S. Dist. LEXIS 3545, at *15 (D. Del. Mar. 8, 2005).

[63] *Id.* at *16.

[64] *Aeroglobal Capital Mgmt, LLC. v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005).

[65] Purchase Order Excerpts (Exhibit 2 at Art. 1.0; A004) ("The provisions of this Contract may be changed only by a writing executing by" D/FD and ALSTOM.); *see also* Exhibit 2 at Part III, ¶ 50.0; A044 ("Either party's failure to insist on performance of any term, condition or instruction, or to exercise any right or privilege in this Contract, or their waiver of any breach, shall not thereafter waive any such term, condition, instruction, and/or right or privilege.").

C. **Significant Elements Of AES' Damage Claim Are Unrecoverable As A Matter Of Law.**

The vast preponderance of damages claimed by AES are costs that purportedly will be incurred in the future, after expiration of the warranty period, and that are intended, in AES' own words, "to prevent future corrosion."[66] AES may not, however, recover costs that represent a "betterment", and that are intended to address the consequences of accelerated corrosion after expiration of the warranty period, including costs relating to future replacement of the collector plates and purported future improvements to its water treatment system.

1. **AES purposely has confused various of the Purchase Order warranties; ALSTOM's warranty against "accelerated corrosion" is for a maximum of 48 months.**

The Article in the Purchase Order setting forth the warranties contains three different warranties, with clearly defined terms, durations and remedies for each.[67] ALSTOM provided a 12 month warranty, pursuant to Paragraphs 1.1.1 and 1.2, against defects;[68] that warranty period was to be extended, for an additional twelve months, with respect to corrective work undertaken with respect to any such defects.[69] ALSTOM also provided a separate, longer (24 month) warranty, under Paragraph 1.2.1, against defects in components described as the "Boiler Hot Loop,"[70] but expressly limited that warranty such that it would not be extended for corrective work beyond the initial 24 month period.[71]

Neither of those two warranties is at issue in this case. Rather, what this case concerns, as AES' opposition brief recognizes, is "the corrosion warranty for the plant's pollution control equipment" under Paragraph 1.6, which "specifically covers accelerated corrosion."[72] That warranty -- with its own terms, duration and remedies -- expressly governs claims relating to any

---

[66] *See, e.g.,* Opp. Br. at 14.
[67] *See* Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 1.0-1.10; A015-A017).
[68] *Id.* at ¶¶ 1.1.1-1.2; A015.
[69] *Id.* at ¶ 1.3; A016.
[70] *Id.* at 1.2.1; A015.
[71] *Id.* at ¶ 1.3.2; A016.
[72] Opp. Br. at 1.

occurrence of alleged accelerated corrosion.[73] Pursuant to that Paragraph 1.6 warranty, ALSTOM provided specific, 24 month warranty protection (also referred to as a "guarantee") against "accelerated corrosion" of the CDS and ESP.[74] However, the total temporal coverage of that warranty was even longer than 24 months because it applied to "the consequences of accelerated corrosion . . . to the extent that the corrosion . . . is reasonably expected to materially affect in the next two (2) years [following the initial 24 months] (i) the structural integrity of the Equipment [or] any portion thereof or (ii) [the] ability of the Equipment to mechanically perform."[75] Notably -- and consistent with its longer temporal duration -- that warranty expressly stated that there would "be no re-warranty or extended warranty obligation".[76] Thus, ALSTOM guaranteed against accelerated corrosion that materially affected either structural integrity or mechanical performance during the initial 48 month period of operation. However, it did not, for example, guarantee against accelerated corrosion: (a) that manifested itself or materially affected either structural integrity or mechanical performance anytime after 48 months; (b) that manifested itself during the initial month of operation, but which was not reasonably expected to affect structural integrity or mechanical performance during the following 47 month period; or (c) that manifested itself in the initial 12 months, but that would not affect structural integrity or mechanical performance until sometime after the following 36 months.

AES has attempted to extend ALSTOM's maximum 48 month guarantee as provided for by Paragraph 1.6 to a guarantee against accelerated corrosion for a 25 year term by reference to an entirely separate and inapplicable warranty. Specifically, by relying on the warranty in Paragraphs 1.1.1 and 1.2 (the distinct 12 month warranty), AES has attempted to import that warranty's terms, an alleged 25 year operating life specification and the remedies of that separate warranty and then to graft them onto the distinct Paragraph 1.6 accelerated corrosion warranty

---

[73] Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 1.6; A016-A017).
[74] *Id.*
[75] *Id.*
[76] *Id.*

(on which AES predicates its liability claim). However, the terms, durations and remedies for one warranty cannot properly be engrafted onto another -- thus creating a new, non-contractual warranty. Moreover, AES' effort in that regard runs afoul of protections afforded ALSTOM under the Purchase Order's limitation of liability clause, which expressly states that "[w]here a remedy is specified in the Contract for an occurrence, such remedy shall be *an exclusive remedy for such occurrence*."[77] Here, the "exclusive remedy" for occurrences of alleged accelerated corrosion is that set forth in Paragraph 1.6. Thus, AES's effort to engraft additional alleged warranty durations and remedies purportedly provided for by Paragraphs 1.1.1 and 1.2 onto the separate and distinct warranty provided for by Paragraph 1.6 is improper.

In addition, the fact that, pursuant to the product specifications, the ESP was to have a 25 year operational life does not mean that various components of that equipment would not require repair or replacement during that 25 year period or that ALSTOM would be obligated, under warranty, to undertake repair or replacement at its cost for 25 years. Indeed, such an interpretation would render surplus, irrelevant and nugatory the specific, expressly exclusive and more limited 12, 24 and 48 month periods that expressly pertain to various components.[78] Given the express warranties for a limited duration -- including the maximum 48 month guarantee against accelerated corrosion -- it is clear that there was no intent to guarantee against breakage -- or accelerated corrosion -- for a 25 year period. Indeed, that is the only reasonable interpretation, especially given the fact that the Purchase Order expressly provides that, "[w]here a remedy is specified in the Contract for an occurrence" -- such as accelerated corrosion -- that "remedy shall be an exclusive remedy for such occurrence."[79] Plainly, that is the intent of the Purchase Order

---

[77] *Id.* at Part III, ¶ 52.0; A044 (emphasis added).

[78] AES' incorrect interpretation as applied to a commonplace warranty, for example, an automobile warranty, is instructive in that regard. Even in a consumer protection situation, a specific, limited 12 month warranty is not intended to provide protection for the balance of an automobile's useful life or for any period other than that specified by the warranty, even though it is understood that moving parts may break (or rust/corrosion may occur) after warranties expire and during the automobile's useful life. *Jackson v. Krieger Ford, Inc.*, No. 88AP-1031, 1989 Ohio App. LEXIS 1201 * 15 (Ohio Ct. App. Mar. 28, 1989).

[79] Purchase Order Excerpts (Exhibit 2 at Part III, ¶ 52.0; A044).

with respect to the applicable warranty and remedies for occurrences of alleged accelerated corrosion.

Quite simply, ALSTOM did not guarantee that the ESP equipment would not experience accelerated corrosion or require repair during the entirety of its specified 25 year operable life. Rather, ALSTOM only guaranteed against accelerated corrosion that affected structural integrity or ability to perform mechanically during a maximum period of 48 months.

> **2. AES may not recover costs that constitute "betterment" and that are intended to address corrosion after expiration of the warranty period, including for future improvements to its water treatment system.**

As established by the cases cited in ALSTOM's opening brief, any repairs undertaken to extend accelerated corrosion protection beyond the maximum 48 month warranty duration constitute "betterment", the costs of which are not recoverable as damages in a breach of warranty action.[80] Accordingly, the fact that AES has not yet installed the replacement collector plates is not, as it contends, "irrelevant".[81] Indeed, AES' admission that it "now estimates it can delay installation of replacement ESP plates for up to three more years"[82] is highly relevant to its damage claim. By AES' own admission, those replacement plates will not be installed at any time during the warranty period, and thus, indisputably, cannot constitute an "appropriate remedy" necessary to ensure that accelerated corrosion does not materially affect either the structural integrity or ability of the equipment to perform during the maximum 48 month period of protection.

The same is true with respect to AES' purported plans to undertake future improvements to the Plant water treatment system (which is outside of ALSTOM's scope, and for which D/FD, as the design/builder, is responsible to AES). Again, AES has described its efforts as "a method to prevent future corrosion", and -- again, indisputably -- the improvements are not required to

---

[80] Open Br. at 30-32.
[81] Opp. Br. at 34.
[82] *Id.* at 15.

address accelerated corrosion that reasonably is expected to materially affect the structural integrity or ability of the equipment to perform during the warranted period. Rather, as AES now has conceded, the modifications are intended to provide additional corrosion-resistance beyond the expiration of the warranty period. Moreover, as ALSTOM also has shown, AES' claim for the approximate $25 million that it estimates as the cost of those future improvements represents, at best, unrecoverable consequential damages, or otherwise must be viewed as unrecoverable damages relating to the need to remediate water disposal problems created by AES' own unilateral repair efforts.[83] If they are viewed as the former, ALSTOM is entitled to summary judgment because consequential damages are not recoverable under the terms of the Purchase Order.[84] Although AES -- citing inapplicable, out-of-state caselaw -- has tried to suggest that any determination as to whether damages are direct or consequential must be made by a jury,[85] it appears completely to have overlooked (or, at the least, has tried to avoid) the Delaware cases, including one from this Court, that plainly stand for the proposition that the Court may limit and bar, on summary judgment, claimed damages that are, like those sought by AES, without legal basis and that could not properly be presented to the trier of fact.[86]

ALSTOM is also entitled to summary judgment with respect to those claimed costs because, as was the case in *Falcon Tankers, Inc. v. Litton Systems, Inc.*, the purported future costs relate to the failure of AES' own repair.[87] It is not, as AES contends, ALSTOM asserting that the improvements are necessary to address "new problems" created by AES' repair efforts -- that is the conclusion that AES itself reached as reflected in its own contemporaneous documentation: "This reconfiguration was marginally successful *and created new problems* since the storm water

---

[83] Open. Br. at 34-36.
[84] *Id.* at 33-34.
[85] Opp. Br. at 34-35.
[86] *See* Open. Br. at 29-30.
[87] *Falcon Tankers, Inc. v. Litton Systems, Inc.*, 355 A.2d 898 (Del. Super. Ct. 1976).

run-off carried the salts to the storm water ponds and Coal Pile Pond . . . ."[88] Thus, just as the *Falcon Tankers* court held that a defendant in a breach of warranty action could not be held liable for costs consequent to the plaintiff's repair efforts, so, too, ALSTOM cannot be held liable for the "new problem" created by AES' own RO remedy.

>   3.  **AES' claimed costs -- particularly those that relate to purported future efforts to prevent "further corrosion" -- indisputably are grossly disproportionate to the value of the corroded components.**

Finally, AES argues that principles of proportionality should not apply because the Purchase Order contains a provision limiting ALSTOM's outermost exposure to $119 million, which was the Contract Price for all of the components that it furnished pursuant to the Purchase Order. Thus, AES apparently believes that any determination with respect to proportionality should be the same irrespective of whether all $119 million worth of components catastrophically failed or a single component suffered from alleged accelerated corrosion.

Like many of its other arguments, AES' contention defies common sense. The total cost of all of the CDS and ESP equipment and components was only, as AES acknowledges, approximately $14.5 million, and the value of replacement collector plates (even considering installation costs) is only about $2 million.[89] AES nevertheless believes it somehow reasonable and proportionate for ALSTOM -- which did nothing more than furnish and install an air pollution control system that AES had specified essentially on a sole source basis -- to be liable for more than $40 million in purported repair costs relating solely to corrosion of the ESP collector plates. Clearly, as ALSTOM has shown, the amounts claimed are so attenuated and expansive as to have been wholly unforeseeable at the time of contracting, and, thus, as a matter of justice and law, they must be rejected.[90]

---

[88] AES Brine Crystallizer Project Justification (Exhibit 25 at 4; A166) (emphasis added).
[89] *See* Opp. Br. 6, 39.
[90] Open. Br. at 36-38.

Respectfully submitted,
ALSTOM POWER INC.

_____
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19801
(302) 888-3222
dscialpi@wierlaw.com


James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:     (410) 547-0699

1810192.1