IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.              *

      Plaintiff              *

      v.              *    C.A. No. 04-1282-JJF

ALSTOM POWER INC.              *

      Defendant              *

\*      \*      \*      \*      \*      \*      \*

**APPENDIX TO ALSTOM POWER INC.'S REPLY BRIEF IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST FOR HEARING**

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, Delaware   19806
(302) 888-3222


James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:     (410) 547-0699

Counsel for Defendant
ALSTOM Power Inc.

Date:  April 14, 2006

**TABLE OF CONTENTS**
**APPENDIX TO ALSTOM POWER INC.'S REPLY BRIEF IN**
**SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND REQUEST FOR HEARING**

| Tab Number | Description | Appendix Page Numbers |
|---|---|---|
| 37 | Supplemental Affidavit of William M. Jarvis | C 001 to C 002 |
| 38 | **Cases Cited in Alstom Power Inc.'s Opening Brief in Support of Motion for Partial Summary Judgment** | |
| | *CitiSteel U.S.A., Inc. v. Gen. Elec. Co.,* No. Civ. A. 99-810-GMS, 2001 WL 65740 (D.Del. Jan. 9, 2001) | C 003 to C 004 |
| | *Edwards v. Kent Rentals, Inc.,* C.A. No. 83C-OC10, 1989 Del. Super. LEXIS 373 (Del. Super. Ct. Sept. 20, 1989) | C 005 to C 013 |
| | *Long Island Lighting Co. v. IMO Industries, Inc.,* No. 85 Civ. 6392 (RO), 1990 U.S. Dist. LEXIS 5351 (S.D.N.Y. May 8, 1990) | C 014 to C 020 |
| 39 | **Cases Cited in Alstom Power Inc.'s Reply Brief in Support of Motion for Partial Summary Judgment** | |
| | *Benitec Austl. Ltd. v. Promega Corp.,* C.A. No. 04-889 JJF, 2005 U.S. Dist. LEXIS 3545 (D. Del. Mar. 8, 2005) | C 021 to C 026 |
| | *Jackson v. Krieger Ford, Inc.,* No. 88AP-1031, 1989 Ohio App. LEXIS 1201 (Ohio Ct. App. Mar. 28, 1989) | C 027 to C 031 |

# Exhibit 37

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,                    *

      Plaintiff                        *

      v.                               *       C.A. No. 04-1282-JJF

ALSTOM POWER INC.,                        *

      Defendant                        *

## SUPPLEMENTAL AFFIDAVIT OF WILLIAM M. JARVIS

    1.    I, William M. Jarvis, am greater than eighteen (18) years of age and am competent to testify.

    2.    I served as a Project Manager for ALSTOM Power Inc. ("ALSTOM") during construction of the 454-megawatt co-generation coal-fired power plant in Guayama, Puerto Rico (the "Plant"). AES Puerto Rico ("AES") is the owner of the Plant, and an entity known as Duke/Fluor Daniel Caribbean, S.E. ("D/FD") designed the Plant for AES and was the general contractor.

    3.    ALSTOM's Purchase Order with D/FD required it to furnish and install certain air pollution control equipment and to provide Operations & Maintenance Manuals for that equipment. ALSTOM subcontracted with Environmental Elements Corporation ("EEC") to furnish that air pollution control equipment and the accompanying manuals.

    4.    EEC prepared O&M Manuals for the air pollution control equipment (the "O&M Manuals") and furnished those O&M Manuals to ALSTOM. The O&M Manuals, which bear a date of August 2001, reflect on their face that they were prepared for AES and D/FD for use with the Plant.

    5.    ALSTOM submitted the EEC-prepared O&M Manuals to D/FD as the final (and only) version of "Contractor's O&M Manuals" for the air pollution control equipment, and they were accepted by D/FD as such. Although EEC thereafter prepared various additional writings relating to start-up and shut-down of the equipment, diverting ash from hoppers into ash bins, and cleaning the nozzles in one

part of the equipment, those materials were never incorporated into the O&M Manuals nor were the

O&M Manuals ever formally modified or revised.

I HEREBY AFFIRM, under the penalties of perjury, that the foregoing is true and correct based

on my personal knowledge.


Dated:  April 13, 2006                                                          _____
                                                                                            William M. Jarvis

C 002

# Exhibit 38

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 65740 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
**CITISTEEL** USA, INC., Plaintiffs,
v.
**GENERAL ELECTRIC** COMPANY, Defendant.
**No. CIV. A. 99-810-GMS.**

Jan. 9, 2001.

Daniel V. Folt, Cozen & O'Connor, Wilmington, DE. Of Counsel: Paul R. Bartolacci, Georgia A. Stanaitis, Cozen & O'Connor, Philadelphia, PA, for Plaintiff. Donald E. Reid, Morris, Nicholas, Arsht & Tunnell, Wilmington, DE. Of Counsel: Alfred W. Putnam, Jr., Mary Catherine Roper, Drinker Biddle & Reath LLP, Philadelphia, PA, for Defendants.

MEMORANDUM AND ORDER

SLEET, District J.
**\*1** This case involves a contract dispute between CitiSteel USA, Inc. ("CitiSteel") and General Electric Company ("GE"). In 1997, GE repaired and upgraded an industrial transformer for CitiSteel. In February of 1998, only a few months after the repair and upgrade, the transformer failed. GE accepted responsibility for the failure and repaired the transformer in keeping with its warranty. In November of 1999, CitiSteel filed this action seeking to recover consequential damages that it alleges resulted from the failure of the GE transformer. GE claims that by the terms of its warranty, CitiSteel is only entitled to repair and replacement of defective parts, and that it cannot recover consequential damages. CitiSteel counters that GE's warranty does not apply because it was not part of the agreement between the parties. GE has filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

In the briefing on the motion, the parties have raised two main issues: 1) whether judgment on the pleadings is appropriate in this matter, and 2) whether the GE warranty is a part of the contract between the parties. The court will address these issues in turn.

Whether a motion for judgment on the pleadings is appropriate?

Rule 12(c) provides that once the pleadings are closed, a party may move for judgment on the pleadings, and the court may rule on such motion, 1) as long as the motion has been presented "within such time as not to delay the trial," and 2) so long as the court does not consider "matters outside the pleadings" (if the court does not exclude such matters, "the motion shall be treated as one for summary judgment") that may have been presented for its consideration. Fed.R.Civ.P. 12(c). GE's Rule 12(c) motion satisfies both prongs of this test. This is so because the court need only consider the pleadings and the contract at issue, the CitiSteel purchase order ("the contract"). See Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993) (holding that a court may consider documents integral to the complaint without converting a motion to dismiss into a summary judgment motion). CitiSteel argues that the 12(c) motion should be converted into one for summary judgment because extrinsic evidence pertaining to the contract negotiations between the parties must be considered in order to resolve this dispute. The court is not persuaded by this argument. The court need only consider the contract itself to decide if GE's warranty applies. Extrinsic evidence regarding the contract negotiations is not relevant to that consideration. See E.I. DuPont Nemours and Co. v. Admiral Ins. Co ., 711 A.2d 45, 57 (Del.Super.Ct.1995) ("The Court may not consider extrinsic evidence in an effort to construe an unambiguous contract.").

Whether the GE warranty is part of the CitiSteel purchase order?

After considering the facts in a light most favorable to the plaintiff, as the court must, Institute for Scientific Info., Inc. v. Gordon and Breach, Sci. Publishers, Inc., 931 F.2d 1002, 1004 (3d Cir.1991), it seems clear that the contract plainly incorporates the GE Warranty in its entirety. Under the headings "Warranty offering," CitiSteel expressly discussed the duration of the warranty (which is not at issue), and clearly incorporated the GE warranty by reference with the language: "Also included for general warranty information is GE ISS form 4887[sic] (CS) (1/89)." GE form 487(CS) (1/89), entitled "Conditions of Sale for Services" had been

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 65740 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

provided to CitiSteel by GE during negotiations. Considering the following sequence of events as plaintiff describes them, CitiSteel appears to have had an opportunity to examine GE's warranty before incorporating it into the contract. First, CitiSteel concedes that it was aware that GE intended for its warranty to "apply to these repairs." Plaintiff's brief at 5. Second, CitiSteel was furnished with a copy of GE's warranty provisions. *Id.* Third, *CitiSteel* drafted the purchase order and explicitly incorporated the GE warranty by reference after learning that GE intended for the warranty to apply. *Id.* Finally, by its own terms, the contract incorporates GE's warranty. In Section 1 of the agreement entitled "Instructions to Seller" regarding supplemental terms, the contract states that: "*Any supplemental conditions of purchase referenced on the face of this order and attached hereto are hereby incorporated into and made part of this order.*" (emphasis added).

**\*2** CitiSteel makes two arguments against the validity of the GE warranty: 1) that the GE warranty is either not incorporated at all because it was not specifically negotiated, or 2) in the alternative, it was only incorporated in part. Both of these arguments are unpersuasive. As to its first argument, CitiSteel has offered no evidence to support its claim that it was denied the opportunity to negotiate. For example, if CitiSteel had offered evidence that GE concealed the warranty terms, made misrepresentations, or modified the agreement after it was drafted by them, then there would be a genuine issue for the trier of fact to decide. There is no such evidence in the record before the court. And, while it might seem that the court has put CitiSteel in a bit of a "chicken and egg" dilemma, this is not so because the plain language of the contract makes it clear that CitiSteel did incorporate the entire GE warranty into the contract. *See E.I. DuPont Nemours and Co. v. Admiral Ins. Co., 711 A.2d at 56* (holding that interpreting the language of a contractual provision is a question of law for the court to decide).

Thus, after considering the pleadings and the CitiSteel contract, it is clear that the court need only consider the contract language and that, based upon that language, CitiSteel should be barred as a matter of law from recovering consequential damages.

For these reasons, IT IS HEREBY ORDERED that:

1. General Electric's Motion For Judgment On The Pleadings Pursuant To FED. R. CIV. P. 12(c) (D.I.13)) is GRANTED.

D.Del.,2001.
CitiSteel USA, Inc. v. General Elec. Co.
Not Reported in F.Supp.2d, 2001 WL 65740 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1989 DE. SUPER. LEXIS 373

**MARGARET H. EDWARDS, Plaintiffs v. KENT RENTALS, INC. and
LIBERTY HOMES, INC., Defendants**

**Civil Action No. 83C-OC10**

**Superior Court of Delaware, Sussex**

*1989 Del. Super. LEXIS 373*

**Dated Submitted: May 5, 1989
September 20, 1989, Decided**

**PRIOR HISTORY:** [*1]

Motion for Summary Judgment.

**DISPOSITION:**

Granted in Part, Denied in Part

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved for
summary judgment on plaintiff's claim for breach of con-
tract and breach of express warranties resulting from the
purchase of a mobile home.

**OVERVIEW:** Plaintiff brought suit against defendants
for breach of contract and express warranties seeking the
full purchase price minus the trade-in value of a mobile
home. Defendants moved for summary judgment, which
was denied, by the court. The court held that defendants
were not entitled to summary judgment on plaintiff's
claim for revocation of her acceptance because there was
a genuine issue of material fact as to the reasonableness
of time between discovering the grounds for revocation
and plaintiff's actual revocation. The court also held the
fact that plaintiff trading-in her mobile home did not
preclude her from pursuing her revocation claim. Defen-
dants motion for summary judgment on plaintiff's claim
for breach of express warranty was also denied because
defendants failed to produce evidence showing plaintiff
did not suffer any damages. The court further held plain-
tiff could seek incidental and consequential damages
under *Del. Code Ann. tit. 6, § 2-715.*

**OUTCOME:** The superior court denied defendants' mo-
tion for summary judgment because there was a genuine
issue of material fact as fact as to the reasonableness of

time between discovering the grounds for revocation and
plaintiffs actual revocation and because defendants failed
to show plaintiff did not suffer any damages.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary
Judgment Standard*
[HN1] On a Motion for Summary Judgment, the court
must draw all reasonable inferences and view the evi-
dence in favor of the non-moving party. The moving
party has the burden of showing no material issue of fact
exists, and it is entitled to judgment as a matter of law. If
there exists a reasonable indication a material fact is in
dispute or if it is desirable to inquire more thoroughly
into the facts in order to clarify the application of the law
to the facts, the court will not grant summary judgment.

*Commercial Law (UCC) > Sales (Article 2)*
[HN2] When a mixed contract is presented, it is neces-
sary for a court to review the factual circumstances sur-
rounding the negotiation, formation, and contemplated
performance of the contract to determine whether the
contract is predominantly or primarily a contract for the
sale of goods. If so, the provisions of *U.C.C. § 2-201 et
seq.* apply.

*Commercial Law (UCC) > Sales (Article 2) > Breach,
Repudiation & Excuse*
[HN3] See *Del. Code Ann. tit. 6, § 2-608.*

1989 Del. Super. LEXIS 373, *

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN4] The reasonableness of the time between discovering the ground for revocation of acceptance and actually before revoking acceptance depends on the facts of each case.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN5] When a plaintiff revokes her acceptance of goods, she obtains a security interest in the goods for the purchase price, and is able to hold it or resell it as an aggrieved seller pursuant to *Del. Code Ann. tit. 6, § § 2-706* and *2-711(3)*.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN6] Although a plaintiff does not give notice of the resale, that omission is not fatal; it means plaintiff merely loses the right to use the resale price as an absolute measure of damage, but she still can recover damages based on market price. *Del. Code Ann. tit. 6, § 2-706.*

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN7] In determining market price, the trier of fact may refer to an arm's length bargain between a willing buyer and a willing seller, neither being under a compulsion to buy or sell.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
*Commercial Law (UCC) > Sales (Article 2) > Obligation & Construction*
[HN8] The scope and existence of a usage of trade are to be proved as facts. *Del. Code Ann. tit. 6, § 1-205(2).*

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
*Commercial Law (UCC) > Sales (Article 2) > Obligation & Construction*
[HN9] See *Del. Code Ann. tit. 6, § 2-316(2).*

*Commercial Law (UCC) > Sales (Article 2) > Obligation & Construction*

*Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment*
[HN10] Whether a disclaimer is conspicuous is a matter for the Court to decide. *Del. Code Ann. tit. 6, § 1-201(10).*

*Commercial Law (UCC) > Sales (Article 2) > Obligation & Construction*
*Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment*
[HN11] Where there is a mixed contract the implied warranties arise and pass at the time of the sale.

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN12] The breach of the express warranty entitles plaintiff to damages for the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. *Del. Code Ann. tit. 6, § 2-714(2).*

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN13] A plaintiff is entitled to incidental and consequential damages if she succeeds on her revocation of acceptance and/or breach of warranty claims.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN14] See *Del. Code Ann. tit. 6, § 2-715.*

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN15] Consequential damages are granted where the breach is the proximate cause of the loss and the damages are reasonably foreseeable.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN16] Unless it can be ruled on as a matter of law, the question whether the buyer's consequential damages were foreseeable by the seller is one of fact to be determined by the trier of fact.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN17] Punitive damages may be sustainable for a willful or malicious breach of contract.

*Commercial Law (UCC) > Sales (Article 2) > Obligation & Construction*
*Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment*
[HN18] Although a manufacturer or seller does not have to extend a warranty, if it extends a "written warranty," it must comply with the Magnuson-Moss Warranty Act, *15 U.S.C.S. § 2301.*

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN19] Pursuant U.S.C.S. § 2310(d), a consumer may bring a claim against a supplier, warrantor or service contractor who fails to comply with an obligation under the chapter or under written warranties, implied warranties or service contracts.

*Contracts Law > Formation*
[HN20] See U.S.C.S. § 2301(8).

*Commercial Law (UCC) > Sales (Article 2)*
[HN21] See *15 U.S.C.S. § 2301*(6).

**COUNSEL:**

William Schab, Esquire, Schab & Barnett, Georgetown, Delaware, Attorney for Plaintiff.

James T. Vaughn, Jr., Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware, Attorney for Defendant Kent Rentals, Inc.

John A. Sergovic, Jr., P.A., Georgetown, Delaware, Attorney for Defendant Liberty Homes, Inc.

**JUDGES:**

Before William Swain Lee, Judge

**OPINIONBY:**

LEE

**OPINION:**

MEMORANDUM OPINION

WILLIAM SWAIN LEE, J.

This is an action where plaintiff, Margaret H. Edwards, after revoking acceptance of a mobile home, seeks return of its purchase price minus its trade-in value; alleges breach of warranty; seeks punitive damages; and claims entitlement to a return of the purchase price, costs and attorney's fees pursuant to *15 U.S.C.S. § § 2304* and 2310 ("the Magnuson-Moss Warranty Act"

or "Act"). Presently be fore the Court is the motion of Kent Rentals, Inc. ("KRI") for summary judgment.

FACTS

Sexagenarian Margaret Edwards decided, after her husband died, to sell her family home and purchase a mobile home. She visited the lot of KRI, which traded as Henlopen Homes, in Lewes, Delaware, and which also has its main office in Dover, Delaware. She liked the three-bedroom [*2] 1980 Oakbrook Liberator model which Liberty Homes, Inc. ("Liberty") manufactured. KRI regularly sold mobile homes Liberty manufactured, and it serviced for Liberty the manufacturer's warranties on the sold homes.

Mrs. Edwards assumed the mobile home was a 1981 model, but she and the salesman, or dealer, never discussed the model's year. The dealer told her the mobile home was new, that it would deliver and properly set up the home, that warranties would cover any problems, and that KRI would correct any problems.

Mrs. Edwards relied upon KRI's representations and entered into a Purchase Agreement dated July 22, 1981 ("Purchase Agreement"). That Purchase Agreement contained the following terms and conditions. A "x" was marked in the box beside which was the word "NEW", while the box beside the word "USED" remained empty. The unit price was $ 15,000. The Optional Equipment price was $ 650. Under the heading "Optional Equipment, Labor and Accessories" was the sentence: "Deliver, level, and block." Mrs. Edwards testified at her deposition that the Optional Equipment price included $ 500 for the skirting and $ 150 for a pair of steps. She further testified that the installation charge [*3] for placing the mobile home on the lot was a part of the deal. The total price included the above-noted figures as well as a two percent Department of Motor Vehicles' fee, a title fee and an insurance premium, for a total price of $ 16,176.

In darker print, underlined, and below Mrs. Edwards' signature while also above the acknowledgement of receipt where Mrs. Edwards additionally signed, was the following statement:

"Purchasers certify that the matter printed on the back hereof has been read and agreed to as a part of this agreement. the same as though it were printed above the signatures; . . . ."

On the back of this Purchase Agreement are "ADDITIONAL TERMS AND CONDITIONS." In paragraph 8, there is the following language:

"WARRANTIES: THE DEALER SHALL GIVE OVER TO THE BUYER COPIES OF ANY AND ALL WRITTEN WARRANTIES COVERING THE WITHIN

DESCRIBED UNIT, OR ANY APPLIANCE OR COMPONENT THEREIN, WHICH HAVE BEEN PROVIDED BY THE MANUFACTURER OF THE UNIT OR APPLIANCE OR COMPONENT, RESPECTIVELY. IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW THE DEALER MAKES NO WARRANTIES WHATSOEVER REGARDING THE UNIT OR ANY APPLIANCE OR COMPONENT CONTAINED THEREIN. [*4]

THE DEALER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES. INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE."

The letters are in dark print, and paragraph 8 is the only one on the back page wherein all the letters in the paragraph are capitalized. Additionally, the disclaimer statements are underlined.

On the same date as she signed the Purchase Agreement, Mrs. Edwards signed and received from KRI a standard invoice which stated thereon that the year of the mobile home was 1980, and that Mrs. Edwards paid the full $ 16,176 purchase price in cash.

Martin E. Moffitt, president of KRI, testified in his affidavit of November 23, 1987 that KRI's "responsibility is limited to its set up work, in setting up mobile homes which it sells" and that "[s]ingle wides need not be on footers. . . . the vast majority of single wides (probably over 95%) in this state are not on concrete footers."

Shortly after she bought her home, plaintiff received from the manufacturer two pamphlets. One is entitled, "Home Owner's Manual" and the other, "Set Up Instruction Manual for Single Wide Homes".

In the Home Owner's Manual, the manufacturer sets forth its limited warranty. Thereafter [*5] is contained the following information regarding warranty repair:

"If you have a problem with your home which you think might be covered by the above warranty, you should first contact the dealer from whom you purchased your home. Depending on the nature of the problem, the dealer may make the necessary repairs or adjustments, or he may contact the manufacturer for assistance. If for some reason you cannot contact the dealer, you may contact us directly . . . ." (Emphasis added.)

Under "Set Up Procedures", on page 3 of the Home Owner's Manual is the following information:

"Procedures for properly setting up your home, and anchoring it to the ground, are contained in a separate pamphlet accompanying this manual. It is very important

that your home is set un and anchored according to the proper procedure. because failure to do so may cause damage to your home which would not be covered by the manufacturer's warranty." (Emphasis in original).

In the "Set Up Instruction Manual for Single Wide

Homes", there appear the following warnings and information:

"IT IS EXTREMELY IMPORTANT TO PROPERLY SET, BLOCK AND LEVEL YOUR HOME

It is best to have your home prepared for occupancy by a knowledgeable [*6] and experienced home set up firm. Such people should have the expertise to properly set up and block your home so that it is level and remains so. If your home is not properly set up and blocked on appropriate foundations, it may undergo unnatural structural strains, which could result in:

(1) buckling and/or loosening of walls, partitions, siding, ceilings, doors, floors, linoleum, carpeting, insulation, wiring, sinks, tubs, toilets, weather stripping and miscellaneous fixed original fixtures of the home.

(2) leaking windows, doors, roof, ceiling, walls, floor, seams and junctures in general.

(3) improper closing, binding and sagging of windows, cabinets and inside and outside doors.

(4) malfunctioning of plumbing, water outlets, lighting fixtures, electrical, heating and air conditioning systems.

Unless you are very qualified and capable, it may well be worth the extra expense of not doing it yourself."

The manual explains the importance of footings to give the home proper and lasting stability. It also contains a "Roof Load Zone Map" showing Delaware to be in the south, and explains the way to construct proper footings, which should be concrete, for a home located in the south. [*7] The manual further explains how to level the home after the footings are properly dry. Contrary to Mr. Moffitt's affidavit, wherein he stated concrete footings are not required, the manufacturer of the home of which KRI was the dealer requires poured concrete footers.

KRI set up the mobile home about six days after the sale. Over a month later, it put the skirting around. Mrs. Edwards did not move into the home until October 26, 1981 because she could not find movers available until then.

In late August, 1981, after the mobile home was set up and before she moved in, Mrs. Edwards noticed leaks in the kitchen and bedroom. She called Mr. Moffitt at

KRI for repairs, and KRI did not come to repair them until November, 1981. Thereafter, whenever it rained, Mrs. Edwards had water running down the windows and in the seams in the living room, kitchen and bedrooms. KRI told her to wait until spring, when it would repair the whole roof. In spring, KRI put putty on the roof but did not paint the stains on the inside. The mobile home continued to leak.

Mrs. Edwards' door would not shut; she had to tie a rope around it to shut it. KRI attempted to fix this but failed. The exterior siding and walls [*8] inside bowed out so that the sides looked pregnant; the water froze in the winter down the sides of the home and when it melted in the spring, the water came up under the floor. KRI did not repair that. The wall came down in the hallway. There was a hole in the siding which was never repaired. The windows did not fit securely in the frame and could not be shut. KRI made approximately twelve service calls from August 4, 1981 through August 17, 1982.

In the summer of 1982, Mr. Moffitt and Charles H. Aughinbaugh of Liberty came to inspect Mrs. Edwards' mobile home. They said the mobile home needed to be leveled. In September of 1982, Mr. Moffitt and Mr. Aughinbaugh returned and met with Mrs. Edwards and her attorney. Plaintiff later was told that she was to blame for any problems that existed.

Mrs. Edwards retained Dennett Liebrand, a gentleman who has had approximately 13 years of experience in mobile home design and repair, to look at her trailer. He testified at his deposition that the home had not been properly set up. He saw that the metal frame in several places was not touching the cement block piers, and he attributed this to the fact that, while a small part of the home was [*9] sitting on piers which were sitting on a concrete platform, the majority of the home was not sitting on such piers; that there were no cement footings under it; and that the part of the home which was not on the concrete pad was twisting or dropping.

Mr. Liebrand testified that the mobile home's defects had two possible causes: the first, least likely, cause was that the frame of the home was bent. This could have resulted from the home sitting on the dealer's lot at an angle or from being bent while the home was being transported either to the dealer initially or to Mrs. Edwards' lot. The second, most probable, cause was the fact that the home had not been properly set up when placed on the lot.

In a letter dated February 2, 1983, Mrs. Edwards, through her attorney, notified Liberty and KRI that she had revoked acceptance of the mobile home. She instructed defendants to remove the mobile home from the lot. However, defendants never removed the home.

Mrs. Edwards then filed this lawsuit alleging breach of contract and breach of warranties and seeking the full purchase price minus the trade-in amount and consequential and incidental damages. In May, 1984, she traded in the mobile home [*10] for a double wide mobile home. When she traded in the mobile home, she explained to the buyer the history of the mobile home. She haggled with the dealer over the price and received $ 5,995 for it. Another mobile home dealer previously had offered her $ 2,000. Upon purchasing the new mobile home, she incurred the following expenses:

$ 1,500 - Foundation for new home

$ 500 - Footers for new home

$ 30 - Remove skirting from old home

$ 200 - Storing furniture while awaiting new home

$ 75 - Moving furniture

$ 922 - Apartment for two weeks while awaiting new home

$ 35 - Cable T.V. hookup to new home

$ 26 - Telephone hookup to new home

$ 22 - Placement permit for new home

$ 63 - Kennel for pet while awaiting new home

$ 100 - Removing furniture from storage

$ 529.99 - Electrical connection fees for new home

$ 204 - Title and transfer charges for new home

$ 52 - DMV fees for new home

$ 17 - Sussex Trust charge for copies of cancelled checks

$ 350 - Washer for new home [one purchased with old home could not be removed]

In his affidavit, Mr. Moffitt maintained important differences in setting up single and double wide homes exist; double wides require concrete footers while single wides do [*11] not.

DISCUSSION

Defendant KRI has moved for summary judgment. It argues that the facts do not support a claim for punitive damages; that KRI did not make any written, expressed warranty and the implied warranties of merchantability and fitness for a particular purpose are disclaimed, and accordingly, claims for breaches of warranty are precluded; that the Magnuson-Moss Warranty Act does not apply to KRI, and therefore, plaintiff is not entitled to a refund of the purchase price, costs and attorney's fees pursuant to the Act; and that there is no evidence that any

alleged failure of KRI to properly set up the mobile home has caused the plaintiff to suffer harm or damage and what plaintiff enumerates as damages are not proximately related to any faulty "setup" and are not within the scope of foreseeable damages. n1

n1 Plaintiff argues in her answering brief that summary judgment could be granted in her favor; however, she has not made a motion therefore, and until she does, the Court will not rule on such a motion. Thus, this opinion addresses only defendant's Motion for Summary Judgment. Additionally, plaintiff argues in her answering brief that the facts support claims of negligence as well as prohibited trade practices pursuant to 6 Del. C. Chapter 25. However, these claims are not a part of the complaint, and accordingly, the Court will not consider this portion of plaintiff's argument. If plaintiff wishes to make these claims a part of her complaint, then she will have to seek leave to amend. Super. Ct. Civ. R. 15.

[*12] [HN1]

On a Motion for Summary Judgment, the Court must draw all reasonable inferences and view the evidence in favor of the non-moving party. *Sweetman v. Strescon Industries, Del. Super., 389 A.2d 1319 (1978).* The moving party has the burden of showing no material issue of fact exists, and it is entitled to judgment as a matter of law. *Moore v. Sizemore, Del. Supr., 405 A.2d 679 (1979).* If there exists a reasonable indication a material fact is in dispute or if it is desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the facts, the Court will not grant summary judgment. *Ebersole v. Lowengrub, Del. Supr., 180 A.2d 467 (1962).*

This transaction involved the sale of goods (the mobile home) and services rendered in setting up the mobile home. As the Delaware Supreme Court explained in *Neilson Bus. Equip. Ctr. v. Monteleone, Del. Supr., 524 A.2d 1172, 1174 (1987):*

[HN2] "When a mixed contract is presented, it is necessary for a court to review the factual circumstances surrounding the negotiation, formation and contemplated performance of the contract to determine whether [*13] the contract is predominantly or primarily a contract for the sale of goods. If so, the provisions of Article Two of the Uniform Commercial Code apply. *Glover School and Office Equip. Co., Inc. v. Dave Hall, Inc., Del. Super., 372 A.2d 221, 223 (1977)."*

In this case, as in *Neilson Bus. Equip. Ctr. v. Monteleone, supra,* the facts establish the installation of the

home was ancillary to the contract for the sale of the mobile home, and therefore, the installation portion is not to be treated as standing separately from the sale of the mobile home. See *Glover School & Office Equip. Co., Inc. v. Dave Hall, Inc., supra at 223* (percentage of installation portion to total contract may determine the applicability of the Uniform Commercial Code). Thus, the Uniform Commercial Code applies.

The Court now will decide what claims plaintiff has made, her potential remedies therefore, and whether KRI is entitled to summary judgment on those claims and/or damages for those claims.

Revocation of acceptance.

First, plaintiff has stated a claim for revocation of acceptance pursuant to [HN3] *6 Del. C. § 2-608,* which provides:

"(1) The buyer [*14] may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-comformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity, if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

The facts viewed most favorably in Mrs. Edward's favor for purposes of this summary judgment motion establish the problems with the mobile home substantially impaired its value to her. The facts also establish Mrs. Edwards notified the defendants of her revocation of acceptance.

[HN4] The reasonableness of the time between discovering the ground for revocation [*15] of acceptance and actually before revoking acceptance depends on the facts of each case. Ed Fine Oldsmobile, *Inc. v. Knisley, Del. Super., 319 A.2d 33, 37 (1974).* The record is devoid of information on when plaintiff understood defendants would not repair her home and the amount of elapsed time from that point until the February 2, 1982 letter revoking acceptance. The necessity of examining

these facts more thoroughly to determine the applicability of the law to the circumstances precludes a motion for summary judgment on this claim for revocation of acceptance. *Ebersole v. Lowengrub, supra.*

That Mrs. Edwards remained in her home until she sold it does not preclude her from maintaining her claim for revocation of acceptance. *Lawrence v. Modern Mobile Homes, Inc., Mo. Ct. App., 562 S.W.2d 729 (1978); Jorgensen v. Pressnall, Or. Supr., 545 P.2d 1382 (1976).*

Furthermore, the fact plaintiff traded in her mobile home does not preclude her from pursuing this revocation of acceptance claim. [HN5] When plaintiff revoked her acceptance, she obtained a security interest in the mobile home for the purchase price, [*16] and was able to hold it or resell it as an aggrieved seller pursuant to *6 Del. C. § 2-706. 6 Del. C. § 2-711(3).* [HN6] Although plaintiff did not give notice to KRI of the resale, that omission is not fatal; it means plaintiff merely loses the right to use the resale price as an absolute measure of damage, but she still can recover damages based on market price. *6 Del. C. § 2-706,* Comment 3.

[HN7] In determining market price, the trier of fact may refer to an arm's length bargain between a willing buyer and a willing seller, neither being under a compulsion to buy or sell. *Potts v. Offutt, Ind. Ct. App., 481 N.E.2d 429, 434 n.1 (1985).* It may consider also the condition of that particular mobile home. See *Burgess v. Curly Olney's, Inc., Neb. Supr., 251 N.W.2d 888, 891 (1977).* Plaintiff will have to show the $ 5,995 was the market price of her mobile home at the time she sold it. Plaintiff and Dennett Liebrand testified in their depositions that the mobile home was in poor condition. Plaintiff also testified that she and the dealer haggled over the price before they reached the $ 5,995 amount, and that another dealer had offered her only $ 2,000 [*17] for the mobile home. Defendant has produced no evidence on the market price of the mobile home at the time of the resale. In viewing the facts in a light most favorable to plaintiff for purposes of this motion, this Court finds the evidence establishes the market price for the mobile home at resale was $ 5,995.

Thus, Mrs. Edwards has a claim for revocation of acceptance, and for purposes of the summary judgment motion, she has proffered evidence supporting her entitlement to the difference between the purchase price and resale price of the mobile home. Accordingly, defendant's argument that plaintiff has failed to establish entitlement to the damages she is seeking in her complaint fails, and the Court denies this portion of defendant's summary judgment motion.

Breach of warranty.

Plaintiff further has stated claims for breach of warranty. KRI expressly agreed to set up the mobile home. Because the Purchase Agreement is ambiguous as to how this undertaking is to be performed, the Court looks to parole evidence. *6 Del. C. § 2-202.* This parole evidence may consist of the oral warranty it was to be done properly and to the usage of trade. Id. [HN8] The scope and existence of a [*18] usage of trade are to be proved as facts. *6 Del. C. § 1-205(2).* The parties dispute what the usage of trade for setting up a mobile home is, and therefore, it remains a question for the trier of fact as to whether the setup was proper. If the trier of fact should find the proper setup procedure is that contained in the manufacturer's instructions, then KRI will be liable for a breach of an oral express warranty to install the home properly.

In paragraph 8, the Purchase Agreement states the dealer makes no warranties. Even if that phrase could be found to constitute a disclaimer of warranty to install the home properly, such a disclaimer is inconsistent with the express warranty, and therefore, inoperative. *6 Del. C. § 2-316(1); Jensen v. Seigel Mobile Homes Group, Idaho Supr., 668 P.2d 65, 72 (1983).*

However, KRI did disclaim the implied warranties of merchantability and fitness for a particular purpose. According to [HN9] *6 Del. C. § 2-316(2):*

". . . [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty [*19] of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'"

[HN10] Whether the disclaimer is conspicuous is a matter for this Court to decide. *6 Del. C. § 1-201(10); Lecates v. Hertrich Pontiac Buick Co., Del. Super., 515 A.2d 163, 166 n.4 (1986).* The language on the front page calling attention to the terms and conditions on the back is noticeable and conspicuous, and the disclaimer language on the back is written so that a reasonable person against whom it is to operate ought to have noticed it, and it mentions merchantability. *Rudy's Glass Const. Co. v. E. F. Johnson Co., Fla. Dist. Ct. App., 404 So.2d 1087 (1981); Wagaman v. Don Warner Chevrolet-Buick, Inc., Pa. D.&C.3d, 31 UCC Rep. Serv. 1604 (1981).*

Plaintiff argues the implied warranties did not arise until KRI installed the mobile home. However, [HN11] where there is a mixed contract as here, the implied warranties arise and pass at the time of the sale. *Neilson Bus. Equip. Ctr. v. Monteleone, supra.* [*20] Conse-

quently, KRI's disclaimer of the implied warranties is valid.

[HN12] The breach of the express warranty entitles plaintiff to damages for "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *6 Del. C. § 2-714(2); Neilson Bus. Equip. Ctr. v. Monteleone, supra at 1176.* Plaintiff has not yet shown the value of the goods at the time of acceptance. However, plaintiff has shown that she has a claim for a breach of express warranty and that she is entitled to damages therefore. Plaintiff also alleges she suffered damages. Defendant, who has the burden of proving no disputed facts exist, has not produced any evidence establishing that plaintiff did not suffer any damages. Thus, KRI has not met its burden of proof on summary judgment here and is not entitled to summary judgment on the issue of whether plaintiff suffered damages as a result of the breach of warranty.

Incidental and consequential damages.

[HN13] Plaintiff is entitled to incidental and consequential damages if she succeeds on her [*21] revocation of acceptance and/or breach of warranty claims. In [HN14] *6 Del. C. § 2-715*, it is provided:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty."

[HN15] Consequential damages are granted where the breach is the proximate cause of the loss and the damages were reasonably foreseeable. *Falcon Tankers. Inc. v. Litton Systems, Inc., Del. Super., 355 A.2d 898 (1976).*

The Court finds, as a matter of law, that the following items of damages are not reasonable expenses for incidental damages nor reasonably foreseeable [*22] as consequential damages: kennel for pet while awaiting new home and Sussex Trust charge for copies of can-

celled checks. *Falcon Bankers, Inc. v. Litton Systems, Inc., supra.* (The Court decided certain damages were not consequential damages as a matter of law.) The Court further finds that the trier of fact should determine whether the remaining items are reasonable expenses for incidental damages or whether they are reasonably foreseeable as consequential damages: foundation for new home; footers for new home; removing skirting from old home; storing furniture while awaiting new home; moving furniture; apartment for two weeks while awaiting new home; cable tv. hook-up to new home; telephone hook-up to new home; placement permit for new home; removing furniture from storage; electrical connection fees for new home; title and transfer charges for new home; DMV fees for new home; and washer for new home. *Sun Maid Raisin Growers v. Victor Packing, Cal. App. 5 Dist., 194 Cal. Rptr. 612, 614 (1983)* [HN16] ("[U]nless it can be ruled on as a matter of law, the question whether the buyer's consequential damages were foreseeable by the seller is one of fact to be determined [*23] by the trier of fact.")

Punitive damages.

Plaintiff seeks punitive damages, arguing she assumed she was receiving a 1981 model when in fact she received a 1980 model. [HN17] Punitives may be sustainable for a wilful or malicious breach of contract. *Jardel Co., Inc. v. Hughes, Del. Supr., 523 A.2d 518, 529 (1987); Casson v. Nationwide Ins. Co., Del. Super., 455 A.2d 361, 368 (1982).* However, the facts here fail to show any element of ill-will, hatred or intent to cause injury to Mrs. Edwards which would support a finding of malicious conduct. Accordingly, the Court grants summary judgment in defendant KRI's favor on the punitive damages issue.

Claims for violation of the Magnuson-Moss Warranty Act. The final issue involves the applicability of the

Magnuson-Moss Warranty Act. This Act was enacted to protect purchasers of consumer products n2 from deceptive warranty practices. *Skelton v. General Motors Corp., 660 F.2d 311, 313-14 (7th Cir. 1981),* cert. denied, *456 U.S. 974 (1982).* [HN18] Although a manufacturer or seller does not have to extend a warranty, if it extends a "written warranty," it must comply with [*24] the Act. Id.

n2 The parties did not discuss whether a mobile home is a consumer product, and therefore, subject to the applicability of the Act. This Court finds a mobile home is a consumer product. *Najran Co. v. Fleetwood Entrprises, 659 F. Supp. 1081, 1099 (S.D. Ga. 1986); Guerdon Industries,*

*Inc. v. Gentry, Miss. Supr., 531 So.2d 1202 (1988).*

In this case, KRI agreed to deliver, level and block the home. It also orally agreed to service the manufacturer's written warranty, and in fact, undertook such services. [HN19] Pursuant to IS U.S.C.S. § 2310(d), a consumer may bring a claim against a supplier, warrantor or service contractor who fails to comply with an obligation under the chapter or under written warranties, implied warranties or service contracts.

A service contract is defined as follows in [HN20] U.S.C.S. § 2301(8):

"The term 'service contract' means a contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product."

The agreement to deliver, level and block the mobile home does not fall within the definition of "service contracts." [*25] Furthermore, even if the agreement to deliver, level and block property were in writing, it would not be a "written warranty" n3 covered by the Act. *Skelton v. General Motors Corp., supra.*

n3 In [HN21] *15 U.S.C.A. § 2301(6)*, it is provided:

"(6) The term 'written warranty means -

(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,

which written affirmation, promise, or undertaking becomes part of the basis of the bargain

between a supplier and a buyer for purposes other than resale of such product.

KRI never undertook its servicing of the warranty in writing; therefore, it is not liable on the [*26] ground of breaching a service contract. Finally, although KRI was a "supplier," it did not make any written representations along with its oral representations in connection with the offer of sale of the mobile home. *16 C.F.R. 700.4*; cf, *G.M.A.C. v. Jankowitz, N.J. Super. A.D., 523 A.2d 695 (1987); Ventura v. Ford Motor Corp., N.J. Super. A.D., 433 A.2d 801 (1981); Freeman v. Hubco Leasing, Inc., Ga. Supr., 324 S.E. 2d 462 (1985).* In *G.M.A.C. v. Jankowitz, supra,* a car manufacturer required the car dealer to make the warranty repairs, and that was a factor in the Court's decision holding the car dealer adopted the warranty and thereby was subject to the Act. In *Ventura v. Ford Motor Corp, supra,* The dealer's written undertaking to promptly perform all terms and conditions of the owner service policy made the Act applicable. In Freeman v. Hubco Leasing. Inc., there existed an agreement between the car manufacturer and dealer whereby the dealer agreed to provide warranty service to buyers of the cars. The manufacturer's warranty to buyers provided the dealers would correct defects [*27] in materials or workmanship, and states the manufacturers and dealers intended to provide the buyers with the full benefit of these warranties. The Court held this was a written warranty under *15 U.S.C.A. § 2301(6)(B).*

In this case, there is no evidence an agreement existed between KRI and Liberty requiring KRI to service Liberty's warranty. Furthermore, the manufacturer's warranty, which Mrs. Edwards received after the sale, does not require the dealer to service the warranty; it merely says the dealer may service the warranty. Finally, no written statements exists whereby KRI agreed to service the warranty or it indicated it intended to provide Mrs. Edwards with the benefits of the manufacturer's warranty. Thus, the Act does not apply to KRI, and plaintiff is not entitled to seek attorney's fees, costs and return of the purchase price under *15 U.S.C. § § 2304* and 2310.

In conclusion, plaintiff may proceed to trial on her claims based on revocation of acceptance and breach of express warranty where she may seek damages, including incidental and consequential damages. However, she may not seek punitive damages, nor may she seek a refund of the purchase price, attorney's fees [*28] and costs pursuant to the Magnuson-Moss Warranty Act.

IT IS SO ORDERED.

LEXSEE 1990 U.S. DIST. LEXIS 5351

**LONG ISLAND LIGHTING CO., Plaintiff, v. IMO INDUSTRIES, INC., Defendant**

**No. 85 Civ. 6892 (RO)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1990 U.S. Dist. LEXIS 5351*

**May 3, 1990, Decided; May 8, 1990, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff utility company filed an action for damages against defendant supplier under a contract for the supply of three standby generators. All but one of the company's claims was dismissed. The final claim was based on an alleged breach of a contractual warranty to repair or replace. The supplier moved for summary judgment on the warranty claim. The company cross-moved on the supplier's affirmative waiver defense and lack of notice argument.

**OVERVIEW:** A finding by a state public service commission constituted collateral estoppel that the company had notice of potential defects in the supplier's generators but never asked the supplier to replace them. Although the company's claim for recovery was therefore limited to the an alleged breach of the repair or replace warranty, it sought $ 245 million, which was mostly attributable to the company's purchase of alternative power sources and a "cost of money" claim. The court held that (1) most, if not all, of the company's damages were not recoverable from the supplier; (2) the company did satisfy the notice requirement of N.Y. U.C.C. Law § 2-607(3)(a) (1964); (3) the recovery options of the company were limited by its contract with the supplier and did not include special, incidental or consequential damages or interest and did include a duty to mitigate damages; (4) the alternative power costs were not recoverable because they represented "cover," which the company was precluded from recovering; and (5) most of the company's expenses were the result of poor judgment and mismanagement that could not have been foreseen by the supplier.

**OUTCOME:** The court dismissed all of the company's claim for damages other than the amount attributable to the cost of repair.

**LexisNexis(R) Headnotes**

*Commercial Law (UCC) > Sales (Article 2) > Breach, Repudiation & Excuse*
[HN1] N.Y. U.C.C. Law § 2-607(3)(a) (1964) provides that a buyer who has accepted goods has to within a reasonable time after he discovers any breach notify the seller of breach or be barred from any remedy. The type of notice required to preserve a buyer's rights is not burdensome. It has to merely be sufficient to let the seller know that the transaction is still troublesome and has to be watched.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN2] The Uniform Commercial Code limits the recovery options of a buyer who accepts and keeps defective goods. Whereas a buyer who rejects or revokes acceptance of nonconforming goods may seek damages for "cover," N.Y.U.C.C. Law §§ 2-711, 2-712 (1964), a buyer who retains defective goods may only recover as damages the loss resulting in the ordinary course of events from the seller's breach, N.Y.U.C.C. Law § 2-714 (1964), which is usually

computed by reference to the cost of repair. In addition, a buyer who retains defective goods may seek incidental and consequential damages.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN3] The Uniform Commercial Code allows parties to limit or preclude consequential damages unless the limitation or exclusion is unconscionable. N.Y.U.C.C. Law § 2-719(3). A defendant may be estopped from asserting a contractual limitation of consequential damages if a defendant has acted in bad faith.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN4] Incidental damages include, among other things, any commercially reasonable charges, expenses, or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach. N.Y.U.C.C. Law § 2-715(1) (1964).

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
[HN5] Consequential damages are losses resulting from general or particular requirements of which a defendant at the time of contracting has reason to know and that can not reasonably be prevented by cover or otherwise, N.Y.U.C.C. Law § 2-715(2) (1964).

*Contracts Law > Remedies > Avoidable Consequences*
[HN6] A party may only recover those expenses incurred in a "reasonable" effort to avoid loss.

*Commercial Law (UCC) > Sales (Article 2) > Remedies*
*Contracts Law > Remedies > Foreseeable Damages*
[HN7] A party to a contract may recover financing costs as incidental damages, apart from prejudgment interest allowable under New York law. Generally, trial courts award such relief where the injured party can point to costs associated with a particular loan that is "commercially reasonable and foreseeable" under the circumstances.

**COUNSEL:** [*1]

Attorney for Plaintiffs: Hunton & Williams, New York, New York, Of Counsel: Douglas W. Davis, Robert M. Rolfe, Franklin H. Stone, Cheryl G. Ragsdale, Michael L. Unti.

Attorneys for Defendant: Weil, Gotshal & Manges, New York, New York, Of Counsel: James W. Quinn, Mindy J. Spector, Rosenman & Colin, New York, New York, Of Counsel: Robert E. Smith, David Ross.

**OPINIONBY:**

OWEN

**OPINION:**

OPINION AND ORDER

RICHARD OWEN, UNITED STATES DISTRICT JUDGE

This action for damages by plaintiff Long Island Lighting Co. ("LILCO") against defendant Imo Industries, Inc., arises out of a contract under which, for some $ 2.1 million, Imo supplied three stand-by generators of electricity for use at LILCO's Shoreham Nuclear Power Station. n1 As a result of three prior rulings by the Honorable Gerard N. Goettel, familiarity with which is assumed, all but one of LILCO's claims have been dismissed. n2 The final claim for recovery is predicated upon Imo's alleged breach of a contractual warranty to repair or replace the equipment. n3 Imo now moves for summary judgment on the warranty claim, and Lilco cross-moves for partial summary judgment on Imo's affirmative waiver defense and lack of notice argument.

n1 As an historical note, Shoreham never received its license and never became operational because LILCO ultimately was unable to come up with a suitable emergency evacuation plan for the Long Island area. LILCO recently entered into an agreement to transfer Shoreham to New York State in exchange for substantial guaranteed future rate increases and tax benefits. The numerous power sources discussed herein are not part of that agreement and, therefore, will be retained by LILCO.

[*2]

n2 *Long Island Lighting Co. v. Imo Delaval, Inc., 668 F. Supp. 237 (S.D.N.Y. 1987); Long Island Lighting Co. v. Transamerica Delaval, Inc., 648 F. Supp. 988 (S.D.N.Y. 1986); Long Island Lighting Co. v. Transamerica Delaval, Inc., 646 F. Supp. 1442 (S.D.N.Y. 1986).* Imo formerly was known as Transamerica Deleval, Inc..

n3 The warranty reads:

"In the event the equipment fails to achieve the warranted performance in place, then, to the extent that the deficiency or failure to achieve warranted performance is attributable to equipment supplied by [Imo], [Imo] shall make such adjustments or modifications to enable the equipment to achieve warranted performance. The costs of these adjustments and modifications shall be for [Imo's] account. Alter such adjustments or modifications, should the equipment fail to achieve warranted performance, an equitable adjustment shall be made, which may without limitation include an adjustment in the purchase order price."

The parties agree that the warranty can be characterized as one to "repair or replace."

Pursuant to a 1974 contract, the said engines were delivered to LILCO in 1976, as an independent on-site power source at Shoreham [*3]  to insure the safe shutdown of the reactor in emergencies. They were installed five years later, in 1981, the parties having known that they would not be installed immediately upon delivery.

As Judge Goettel noted, some time in the 1970s, but at the very least prior to 1983, LILCO became aware of defects in the engines. n4 In particular, in 1981, LILCO's agent, Stone & Webster Engineering Corp., became aware through a job at another nuclear power plant that Imo's newer engines contained 13" x 12" crankshafts whereas the crankshafts in LILCO's engines were 13" x 11". Although Stone & Webster was aware that this difference in size could have an effect on the crankshafts' capacity for torsional stress, it never undertook independent tests of the crankshafts' capacity, and it never asked Imo to replace the Shoreham crankshafts with the larger ones it knew Imo was providing to other plants. n5

n4 Judge Goettel gave collateral estoppel effect to a finding by the New York State Public Service Commission (PSC) that LILCO had notice of potential defects in the diesels' design in mid-1977. Based upon the PSC's findings, Judge Goettel reasonably concluded that after mid-1977, "LILCO was no longer justified in relying on [Imo's] alleged concealment of the diesel defects or misrepresentations as to their adequacy." *646 F. Supp. at 1452.* I find no reason to reconsider Judge Goettel's decisions or conclusions in this case. See *Zdanok v. Glidden Co., 327 F.2d 944 (2d Cir.), cert. denied, 377 U.S. 934 (1964).*

[*4]

n5 LILCO previously attempted to amend its pleadings to assert claims against Stone & Webster for breach of contract, negligent performance of services, and indemnity and contribution. Judge Goettel dismissed those claims based on a limitation of liability in the parties' contract. *668 F. Supp. 237 (S.D.N.Y. 1987).* In that proceeding, LILCO asserted, among other things, that "Stone & Webster received inaccurate information from [Imo] regarding the diesel generators it was supplying for Shoreham, but that Stone & Webster failed properly to evaluate that information."

As the events would have it, in August, 1983, the crankshafts in one of the engines did break during preoperational testing, whereupon cracks also were found in the other engines' crankshafts. A consultant retained by LILCO to investigate the cause of the defect determined that the 13" x 11" crankshafts were undersized. Imo sent LILCO replacement

crankshafts which were larger, and it helped install them. n6 By December, 1983, the engines were reassembled and ready for testing. In 1985, the Atomic Safety & Licensing Board found them suitable for use.

> n6 LILCO notes, and Imo does not dispute, that Imo's repair work at this juncture was not done under warranty -- that is, LILCO paid for the supplies and workmanship. On several occasions prior to the crankshaft failure, Imo had notified LILCO that it deemed all contractual warranties to have expired, and it offered LILCO the opportunity to purchase extended warranties. LILCO declined that offer, maintaining its belief that all warranties still were in effect. The parties have chosen not to raise, and I therefore do not address, the issue of whether the warranty was in effect. In addition, the parties have chosen not to address at this point whether the warranty actually was breached.

[*5]

In September of 1983 -- one month after the crankshaft failure, and after Imo had delivered two replacements to Shoreham -- LILCO ordered three Colt diesel engines at a cost of $ 13 million. Although LILCO had no immediate or imminent need for the Colts, which were to be delivered in the spring of 1984, it ordered them as an "insurance policy" in the event that Imo's engines ultimately proved unsatisfactory. LILCO represents that the Nuclear Regulatory Commission (NRC) had announced an industry-wide hiatus in licensing any plant with Imo engines; given that, and the two years it takes to order diesel engines, LILCO felt it could not afford to delay.

Notwithstanding LILCO's distrust of Imo's workmanship, LILCO never decided or planned to replace the Imo engines with the Colts, and it never exercised the cancellation clause contained in the Colt contract. Moreover, although LILCO chose the Colts in part because they could fit into the structure in which the Imos were housed, since the Imo engines were repaired when the Colts arrived, LILCO built a $ 100 million storage house for the Colt engines. The Colt engines were never connected to LILCO's emergency power system, and they were  [*6]  never qualified for use by the NRC. Overall, LILCO assesses the cost of the Colts at $ 126 million, n7 which it seeks to recover from Imo.

> n7 All damages amounts are rounded off to the nearest whole number.

Limited now to recovery based on Imo's alleged breach of the repair or replace warranty, LILCO nonetheless still seeks all of the damages it sought in this action before Judge Goettel dismissed its claims of fraudulent concealment, failure to warn, and breach of warranty against defects. In all, LILCO seeks to recover $ 245 million, most of which is attributable to LILCO's purchase of alternative power sources, including $ 126 million for the purchase and housing of the Colt engines, $ 2 million to refurbish a gas turbine, and $ 2 million to purchase four used EMD diesel engines.

In addition, LILCO seeks certain "increased costs," including approximately $ 2 million in increased licensing costs, $ 2 million for costs associated with activities undertaken by a group of Imo diesel owners, n8 and $ 3 million for additional testing and maintenance. Finally, LILCO asserts a $ 107 million "cost of money" claim. n9

> n8 In order to convince the NRC about the reliability of Imo engines, nuclear plant owners of Imo generators formed a group in November, 1983, and they presented a plan for a Design Review & Quality Revalidation (DRQR) program. The NRC stated in January 1984 that it would not license any plants relying on Imo engines until it approved the DRQR results.

[*7]

> n9 LILCO represents that the figures relating to the cost of money, and the costs of maintenance and testing are subject to revision, the former because of the settlement agreement with New York State, and the latter because of the continuing passage of time.

The parties dispute the amount it cost to repair the crankshafts. LILCO estimates that it cost $ 25 million to repair the crankshafts, and it adds a $ 24 million cost of money claim to that amount. n10 Imo claims that the cost of repair was $ 6.7 million.

n10 Lilco has paid Imo $ 7,045,515 for "support services, materials and labor" connected with the engines' repair. In addition, Lilco states that it paid over $ 21,000,000 to purchase materials and pay other contractors and engineers to repair the engines.

Bearing those facts in mind, common sense, as much as the governing legal principles, leads me to conclude that most, if not all, of LILCO's so-called "damages" in fact are not recoverable from Imo. LILCO's decision to pursue the two paths of repair and replace simultaneously was imprudent, and basic contract principles establish that a purchaser of goods such as Lilco cannot "have its cake and eat it, too."

As a preliminary [*8] matter, I find no merit to Imo's contention that all claims relating to the warranty are barred since LILCO allegedly failed to comply with the notice requirements of N.Y.U.C.C. § 2-607(3)(a) (McKinney 1964). Section 2-607(3)(a) [HN1] provides that a buyer who has accepted goods "must within a reasonable time after he discovers . . . any breach notify the seller of breach or be barred from any remedy." The type of notice required to preserve a buyer's rights is not burdensome. See *Computer Strategies, Inc. v. Commodore Business Mach., Inc., 105 A.D.2d 167, 483 N.Y.S.2d 716* (2d Dep't 1984). It must "'merely be sufficient to let the seller know that the transaction is still troublesome and must be watched.'" Loris Stavrinidis. Ltd. v. Graphic Equipment World Wide, No. 79 Civ. 5001 (S.D.N.Y. Aug. 31, 1981) (citation omitted). See also Texpor Traders, Inc. v. Trust Co. Bank, No. 87 Civ. 9224 (BN) (S.D.N.Y. Sept. 12, 1989); *Horizons. Inc. v. Avco Corp., 551 F. Supp. 771 (D.S.D. 1982),* aff'd in part & rev'd in part, *714 F.2d 862 (8th Cir. 1983).* That minimal burden surely is satisfied by this record.

The evidence reflects that LILCO notified Imo of the crankshaft failure immediately [*9] after it occurred. Furthermore, on December 2, 1983, LILCO's General Counsel sent Imo's attorney a letter regarding the crankshaft failure, as well as other "occurrences attributable to defectively designed or fabricated diesel generator components." The letter informed Imo that "LILCO believes the defects in the diesel generator sets . . . constitute a breach of the contract . . ., including but not limited to a breach of warranties contained in and arising out of that contract. This letter is solely for the purpose of providing notice of the breach." Accordingly, whether Imo previously had repudiated the warranty obligations is irrelevant, since I find Imo's contention that it lacked notice disingenuous under any view of the facts.

Turning to the issue of LILCO's recoverable damages for Imo's alleged breach, n11 [HN2] the Uniform Commercial Code limits the recovery options of a buyer who accepts and keeps defective goods. Whereas a buyer who rejects or revokes acceptance of nonconforming goods may seek damages for "cover," N.Y.U.C.C. § § 2-711 and 2-712 (McKinney 1964), a buyer who retains defective goods may only recover as damages the loss resulting in the ordinary course of events [*10] from the seller's breach, N.Y.U.C.C. § 2-714 (McKinuey 1964), which is usually computed by reference to the cost of repair. E.g., *Horizons, Inc. v. Avco Corp., 551 F. Supp. 771 (D.S.D. 1982),* aff'd, *714 F.2d 862 (8th Cir. 1983).* In addition, a buyer who retains defective goods may seek incidental and consequential damages.

n11 To the extent that it is relevant, I find LILCO's claim against Imo unaffected by Section VII.E.3 of LILCO's contract with Stone & Webster, which provides:
Neither Stone & Webster nor vendors, contractors or subcontractors shall be liable to Lilco, either individually or jointly and irrespective of whether caused by negligence, for loss of anticipated profits, interest, loss by reason of shutdown or nonoperation of the Project or other facilities, increased expenses of operation of the Project or other facilities, or special or consequential loss or damage, arising from any cause whatsoever.

Judge Goettel held that this provision barred LILCO from recovering from Stone & Webster "all economic damages alleged in the amended complaint." *668 F. Supp. at 243-44.* However, Imo does not demonstrate as a matter of law a basis to avail itself of the damage limitations therein. The contract does not readily apply to Imo since Imo contracted directly with LILCO, and was not a vendor, contractor or subcontractor of Stone & Webster. Moreover, there is no extrinsic evidence that Imo was intended to be a third-party beneficiary of the clause. See *Key Int'l Mfg. v. Morse/Diesel Inc., 142 A.D.2d 448, 536 N.Y.S.2d 26* (2d Dep't 1988); *Port Chester Elec. Const. Co. v. Atlas, 40 N.Y.2d 652, 357 N.E.2d 983, 389 N.Y.S.2d 327 (1976).*

[*11]

Addressing LILCO's alternative power costs, since LILCO is unable to characterize these costs as cover because it never rejected Imo's engines, n12 LILCO naturally attempts to characterize them as incidental or consequential damages, n13 or as justified under a legal obligation to mitigate damages caused by another's breach. However, I conclude that the alternative power costs are not recoverable since they more properly represent cover, which LILCO is precluded from recovering.

n12 LILCO acknowledges that it accepted the engines and never revoked that acceptance. Accordingly, LILCO concedes that it is barred from recovering its alternative power costs as "cover." Nonetheless, LILCO admitted in discovery that "some of its damages are in the nature of 'cover.'"

n13 The parties' contract provides that "under no circumstances shall [Imo] be liable for special or consequential damages." [HN3] The Uniform Commercial Code allows parties to limit or preclude consequential damages "unless the limitation or exclusion is unconscionable." N.Y.U.C.C. § 2-719(3). As Judge Goettel noted, "[a] defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith." *646 F. Supp. at 1458* (citations omitted). However, "[t]he question of [Imo's] alleged bad faith raises a factual issue that cannot be resolved on the instant motion and is, therefore, reserved for trial of the plaintiffs warranty claim." *646 F. Supp. at 1459* (footnote omitted). Therefore, it is assumed for purposes of this opinion that the consequential damages limitation is inapplicable.

[*12]

[HN4] Incidental damages include, among other things, "any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." N.Y.U.C.C. § 2-715(1) (McKinney 1964). LILCO "has cited no authority, and this Court has found none, which indicates a buyer who has accepted goods may recover the cost of cover as an incidental expense," *Horizons. Inc. v. Avco Corp., 551 F. Supp. 771, 781 (D.S.D. 1982),* aff'd, *714 F.2d 862 (8th Cir. 1983).* See also *Intern. Adhesive Coating v. Bolton Emerson Intern., 851 F.2d 540, 546-47 (1st Cir. 1988).*

The same result is true for consequential damages. [HN5] Consequential damages are losses resulting from "general or particular requirements of which [Imo] at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise," N.Y.U.C.C. § 2-715(2) (McKinney 1964). Taking a reasonable overview here, more than ten years ago, Imo sold LILCO three pieces of equipment for a little over $ 2 million, some part of which surely represented profit. Now LILCO presents a "bill" of more than $ 245 million. Although it may have been [*13] foreseeable to Imo in 1974 that LILCO would reject the engines if it found them to be defective, and that LILCO as a result would be forced to purchase alternative engines, and that the cost of replacement diesels might exceed the contract price since Imo knew the diesels would not be installed for some time, the events that actually did transpire could not under any stretch of the imagination have been foreseeable in 1974.

As found by the PSC, much of the expenses incurred by LILCO are the result of poor judgment and mismanagement, which could not have been foreseen by Imo. n14 In particular, LILCO's failure to cancel the Colt contract and its decision to construct a $ 100 million building to house the Colts was unreasonable and, as such, unforeseeable behavior. LILCO's mismanagement and its own negligence negate any causation on the part of Imo. See *General Inst. Corp. v. Pennsylvania Pressed Met., Inc., 366 F. Supp. 139 (M.D. Pa. 1973),* aff'd without opinion, *506 F.2d 1051 (3d Cir. 1974).*

n14 Judge Goettel noted: "[T]he PSC imposed 'penalties' on LILCO not merely because the diesels were defective or malfunctioned, but because LILCO was negligent in supervising and managing the construction of Shoreham and, thus, imprudently incurred exorbitant additional costs." *668 F. Supp. at 241.*

[*14]

Moreover, I conclude that LILCO cannot justify its alternative power costs pursuant to a legal duty to mitigate damages. [HN6] A party may only recover those expenses incurred in a "reasonable" effort to avoid loss. E.g., *Spang Industries. Inc., v. Aetna Casualty & Surety Co., 512 F.2d 365, 371 n.7 (2d Cir. 1975).* The steps LILCO took were unreasonable. Imo has more than satisfied its burden of proof in this regard, see *Ellerman Lines. Ltd. v. The President Harding, 288 F.2d 288 (2d Cir. 1961),* and my conclusion is amply supported by the PSC's findings. Therefore, I conclude that LILCO's alternative power costs are not recoverable as either incidental or consequential damages.

Turning to LILCO's "increased costs," I conclude that only the additional testing and maintenance costs are arguably damages as a result of and incident to Imo's breach of a warranty to repair or replace. As Imo correctly states, the rest of the costs LILCO seeks to recover do not flow from Imo's alleged breach of warranty, particularly since the crankshafts were repaired and replaced within a short time. LILCO's allegation that Imo fraudulently concealed the fact that the engines were defective is irrelevant [*15] for purposes of LILCO's remaining cause of action, as any such claim is barred. *Long Island Lighting Co. v. Transamerica Delaval, Inc., 646 F. Supp. 1442 (S.D.N.Y. 1986).*

Finally, LILCO asserts a "cost of money" claim of over $ 100 million based on a utility accounting concept known as "Allowance for Funds Used During Construction" (AFUDC). n15 AFUDC "is defined as including both a debt component, that is, ordinary interest paid on borrowed funds, and an equity component, that is, the imputed cost to the utility of the diversion of its own capital to the construction project." *Greenapple v. Detroit Edison Co., 618 F.2d 198, 200 (2d Cir. 1980), aff'g 468 F. Supp. 702, 706 (S.D.N.Y. 1979).*

n15 LILCO's AFUDC rate is calculated in accordance with the Uniform System of Accounts promulgated by the Federal Energy Regulatory Commission under section 301 of the Federal Power Act, *16 U.S.C. § 825* (1985). The formula takes into account the following information: 1) weighted average cost of long-term debt; 2) current cost of short-term debt used for construction; 3) weighted average of preferred stock dividends; 4) latest adjudicated allowed return on common equity by a regulatory body setting the majority of the company's rates. 18 C.F.R. Part 101 § 3(17) (1988).

[*16]

[HN7] A party to a contract may recover financing costs as incidental damages, apart from prejudgment interest allowable under New York State law. See. e.g., *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co., 697 F.2d 481 (2d Cir. 1983); Intermeat, Inc. v. American Poultry, Inc., 575 F.2d 1017 (2d Cir. 1978)*. Generally, courts award such relief where the injured party can point to costs associated with a particular loan that was "commercially reasonable and foreseeable" under the circumstances. See *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co., 697 F.2d at 484*. But cf., See Washington Public Power Supply Sys. v. General Electric Co., No. 85 Civ. 098 (E.D. Wash. Nov. 8, 1989); *Havens Steel Co. v. Randolph Engineering Co., 613 F. Supp. 514 (D.C.Mo. 1985), aff'd, 813 F.2d 186 (8th Cir. 1987)*.

Therefore, an award of interest would be appropriate if LILCO had rightfully and properly rejected the diesels as non-conforming goods, and had secured a loan in order to purchase replacement diesels from Colt. However, LILCO is unable to point to a particular loan necessitated by Imo's conduct, see *Ernst Steel Corp. v. Horn Const. Div., 104 A.D.2d 55, 481 N.Y.S.2d 833 (4th [*17] Dep't 1984), modified on other grounds, 109 A.D.2d 1104, 486 N.Y.S. 1022 (4th Dep't 1985)*, and, in any event, LILCO "has not met its burden of proof that its claim for financing costs was attributable to [Imo's] breach," *481 N.Y.S.2d at 839*. n16 It is accordingly unnecessary to decide whether the method LILCO used to compute its financing costs was accurate or reasonable.

n16 Indeed, LILCO's own arguments before the PSC support this conclusion. LILCO testified before the PSC that all of the AFUDC charges on Shoreham would have accrued even if the diesels had not failed.

Accordingly, LILCO's claim is dismissed as to all categories of damages other than the amount attributable to the cost of repairing the engines, which amount may, upon appropriate showing, include the cost of maintenance or of testing the diesels in the course of or subsequent to their repair.

So ordered.

Dated: May 3, 1990 New York, New York

# Exhibit 39

LEXSEE 2005 US DIST LEXIS 3545

**BENITEC AUSTRALIA LTD., Plaintiff, v. PROMEGA CORPORATION, Defendant, v. COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION, Third Party Defendant.**

**Civil Action No. 04-889 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 3545**

**March 8, 2005, Decided**

**DISPOSITION:** Defendant's motion for preliminary injunction denied.

**COUNSEL:** [*1] John W. Shaw, Esquire and Kevin Baird, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware. Of Counsel: John P. Corrado, Esquire, Barry E. Bretschneider, Esquire, Charles C. Carson, Esquire, of MORRISON & FOERSTER LLP, McLean, Virginia, for Plaintiff.

Michael F. Bonkowski, Esquire, and Kimberly L. Gattuso, Esquire, of SAUL EWING, Wilmington, Delaware. Of Counsel: Grant C. Killoran, Esquire and Mary C. Turke, Esquire of MICHAEL BEST & FRIEDRICH LLP, Milwaukee, Wisconsin, for Defendant.

John W. Shaw, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, for Third Party Defendant.

**JUDGES:** FARNAN, District Judge.

**OPINIONBY:** Joseph J. Farnan Jr.

**OPINION:**

**OPINION**

March 8, 2005
Wilmington, Delaware

**FARNAN, District Judge**

Presently before the Court is the Motion For A Preliminary Injunction (D.I. 26) filed by Defendant Promega Corporation ("Promega"). For the reasons set forth below, the Court will deny the Motion For A Preliminary Injunction (D.I. 26).

**BACKGROUND**

**I. Procedural History**

Benitec is an Australian corporation that develops therapeutics to treat serious diseases using DNA-directed RNA interference [*2] ("ddRNAi"). Promega is a Wisconsin corporation that develops and markets biotechnology research products. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (a) (2).

On July 22, 2004, Plaintiff Benitec Australia, Ltd. ("Benitec") brought this declaratory action against Promega Corporation ("Promega") alleging that Promega has improperly withheld certain sums from payments due to Benitec under a license agreement and that, as a result, Promega's license has been converted to a non-exclusive license. Benitec further alleges that any sublicenses granted by Promega have been transferred to Benitec as of May 1, 2004, along with the right to receive all future sublease income from the sublicenses.

On August 25, 2004, Promega served its Answer, Affirmative Defenses, Counterclaims (D.I. 6) and Third Party Complaint (D.I. 4). On September 17, 2004, Benitec and Third Party Defendant Ambion, Inc. ("Ambion") each filed Answers (D.I. 10, 13) and moved for judgment on the pleadings (D.I. 11, 14). Those motions are fully briefed and awaiting decision by the Court.

On November 10, 2004, Promega brought this Motion for a Preliminary Injunction (D.I. 26) [*3] to preserve its rights as an exclusive licensee during the pendency of this lawsuit.

**II. The License Agreements**

On March 31, 2003, Benitec and Promega executed a "Benitec/Promega License Agreement for RNAi Technology" ("the Benitec license"). The license gave Promega the exclusive worldwide right to commercially

C 021

develop, sell, and distribute ddRNAi products for use in research, and the exclusive right to grant sublicenses. Key provisions of the Benitec license state that Promega had to pay an upfront license fee of $ 350,000, a $ 50,000 UK patent fee, and a $ 100,000 European patent fee. Further, assuming that the license was still exclusive, Promega had to pay an annual minimum royalty of $ 50,000 no later than April 30th of each year. If Promega failed to timely pay the annual minimum royalty, the license would convert to non-exclusive status and Promega would lose its right to sublicense products. Upon conversion to a non-exclusive license, Promega would be required to assign all existing product sublicenses to Benitec and immediately pay all outstanding minimum royalty payments. (D.I. 32, App. A at PP 4.00, 4.01, 5.00, 5.01, and 7.00.) The Benitec license also provided [*4] that Promega would be liable for all taxes arising out of license payments other than "taxes imposed on Benitec's net income." (Id. at P 7.04.) Further, the Benitec license allowed Promega and Benitec to jointly grant commercial research licenses. (Id. at P 7.03.)

On or about March 31, 2003, Promega paid Benitec the $ 350,000 initial license fee. At some subsequent date, Promega satisfied the $ 50,000 UK patent issuance fee obligation.

On December 8, 2003, Benitec, Promega, and Commonwealth Scientific and Industrial Research Organization ("Commonwealth") executed a license ("the License"), which superseded the Benitec license. The provisions discussed above remained the same, except that § 4.00 of the license, which previously required payment of three license fees (initial $ 350,000, UK $ 50,000 and European $ 100,000) was changed to require only the $ 100,000 European patent issuance fee.

On May 26, 2004, P 7.00 of the license was amended to define the effective date of the license was March 31, 2004 ("the Amendment").

**III. The Tax Payments**

At the time that Promega paid Benitec the $ 350,000 initial license fee, it also made a 10% U.S. income tax payment of $ [*5] 35,000 on Benitec's behalf pursuant to a U.S.-Australia tax treaty. Promega alleges that it did so because Benitec at that time had no U.S. place of business. Promega further alleges that under the License, Benitec was liable for its own income taxes, and, therefore, owed Promega $ 35,000. Benitec contends that Promega was responsible for making the U.S. income tax payment pursuant to the terms of the contract. On April 28, 2004, as its annual royalty payment, Promega paid Benitec $ 9,719, which included a setoff of $ 2,500 in

taxes related to this royalty n1 and a setoff of the $ 35,000 prior tax payment plus 10% interest.

> n1 The treaty tax rate for withholding between the United States and Australia was 5% effective July 1, 2003.

On July 22, 2004, Benitec sent Promega a letter alleging that Promega's rights under the Benitec/Commonwealth license had become non-exclusive as of May 1, 2004. Benitec cited Promega's alleged failure to pay the annual minimum royalty due on April 30, 2004, as the reason for the conversion. [*6] Benitec filed this lawsuit against Promega shortly thereafter.

The primary issue in this lawsuit is whether Benitec rightly declared that the license had converted to non-exclusive status because Promega failed to make the minimum annual royalty payment for the 2004 fiscal year.

In support of the instant Motion, Promega contends that while this lawsuit for declaratory judgment as to Promega's status as a licensee is pending, Benitec is issuing product sublicenses and unilaterally granted a commercial research license in violation of Promega's exclusive product licensing rights.

**DISCUSSION**

In determining whether to grant a motion for a preliminary injunction, courts are to consider (1) whether the movant has shown a reasonable probability of success on the merits, (2) whether the movant will be irreparably injured by denial of the relief, (3) whether granting preliminary relief will result in even greater harm to the nonmoving party, and (4) whether granting the preliminary relief will be in the public interest. Allegheny Energy, Inc. v. DOE, Inc., 171 F.3d 153 (3d Cir. 1999).

**I. Likelihood of Success on the Merits**

First, the party seeking a preliminary [*7] injunction must demonstrate a likelihood of success on the merits.

Promega contends that it has shown a likelihood of success on the merits. Promega first argues that it will prevail on its breach of contract counterclaim because the May 26, 2004, Amendment to the license confirms that Benitec was liable for the treaty taxes. Specifically, Promega contends that because the May 26, 2004, Amendment to P 7.00 of the License applies only to the minimum royalty payments, it follows that, on May 1, 2004, Promega could not have become a non-exclusive licensee with no obligation for future minimum royalty

Case 1:04-cv-01282-JJF    Document 115    Filed 04/14/2006    Page 28 of 36

Page 3

2005 U.S. Dist. LEXIS 3545, *

payments. Thus, Promega asserts that Benitec's willingness to amend the License after Promega withheld the taxes from the April 2004 royalty payment proves that Benitec considered the taxes withheld "taxes imposed on . . . net income" as set forth in P 7.04. In response, Benitec contends that the purpose of the Amendment was to correct a clerical error.

Promega further contends that evidence of communications between Benitec and Promega executives confirms that Benitec was liable for the treaty taxes. Specifically, Promega contends that John McKinley, Benitec's CEO, told Richard Schiffreen, [*8] Promega's Director of Technology and Development, that Promega was not liable for Benitec's taxes. As evidence of Mr. McKinley's statement, Promega offers Dr. Schiffreen's contemporaneous notes of the conversation and an email from Mr. McKinley to Dr. Schiffreen dated June 22, 2003. Promega contends that, subsequent to the executives' conversation, Promega wired $ 47,500 to Benitec in satisfaction of the $ 50,000 UK patent issuance fee less $ 2,500 in income taxes that Promega had paid on Benitec's behalf. Promega alleges that Benitec accepted Promega's wire transfer of $ 47,500 without objection.

Promega also argues that even if Benitec did comply with the terms of the agreement in converting the License to non-exclusive status, Benitec's behavior leading up to and following the alleged automatic conversion constitutes a breach of the implied duties of good faith, fair dealing, and cooperation. Alternatively, Promega contends that Benitec's actions establish an accord and satisfaction. Finally, Promega contends that Benitec is equitably estopped from declaring Promega's license to be non-exclusive.

In response, Benitec contends that Promega's declarations and exhibits demonstrate [*9] an absence of evidentiary support for Promega's allegations. Further, Benitec contends that the four corners of the license contain clear and unambiguous contract language. In support of its position that the tax deductions in question were based on Benitec's gross income, Benitec offers the language of relevant tax statutes, treasury regulations, and treaties. Benitec further contends that is has not breached its duties of good faith and fair dealing, and that there was no accord and satisfaction.

After reviewing the contentions of the parties, the relevant facts, and the applicable law, the Court concludes that Promega has not shown a likelihood of success on the merits.

A. Breach of Contract Claim

The Court finds that Promega has not shown a likelihood of success on the merits of its breach of contract claim. Section 7.04 of the License states that Promega as licensee shall pay and indemnify Benitec as licensor all taxes based on payments under the License other than those imposed or based on Benitec's net income. Section 7.04 goes on to state that all amounts payable by Promega shall be paid without deduction or withholding of any present or future tax, and that Benitec [*10] shall receive amounts equal to the amounts it would have received had not such deductions or withholding been required. Benitec contends that the $ 35,000 and $ 2,500 tax treaty payments that Promega withheld from its annual royalty payment were based on gross income, not net income, and, therefore, under P 7.04 of the license, those payments were not attributable to Benitec. In support of its position, Benitec offers Treasury Regulation § 1.881-2(a)(2), Treasury Regulation § 1.1441-3 (a) and U.S.-Australian Tax Treaty Article 12. Promega concedes that the income taxes at issue are technically levied on gross income, but asserts that gross income in this context is the same as net income because no deductions are allowable. Promega cites 26 C.F.R. § 1.881-2(a) (3) in support of this assertion.

The Court finds that the contract language is clear and unambiguous that Promega cannot withhold sums for tax payments unless based on Benitec's net income. At this point in the proceedings, the Court finds that Promega has not brought forth convincing evidence that the taxes in question were based on Benitec's [*11] net income. Thus, the Court finds that Section 7.04 is a "gross-up" provision that increases the amount of a royalty to compensate the licensor for the taxes withheld. The Court does not doubt that executives of Promega and Benitec discussed Promega's ability to recoup these payments at some point in the future. However, Promega's unilateral action in withholding the amount of the taxes from its minimum royalty payment appears to have had the effect of breaching the License.

Thus, the Court concludes that Promega has not shown a likelihood of success on the merits with regard to its breach of contract claim.

B. Breach of Implied Warranty of Good Faith and Fair Dealing

Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward each other with respect to their contract. Katz v. Oak Indus. Inc., 508 A.2d 873, 880 (Del. Ch. 1986) (citing Restatement (Second) of Contracts, § 205 (1981)). A party must "act reasonably to fulfill the intent of the parties to the agreement." Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., 832 A.2d 116, 128 (Del. Ch. 2003) [*12] (quoting Kelly v. McKesson HBOC, Inc., 2002 Del. Super. LEXIS 39, 2002 WL 88939 at * 10 (Del. Super. Jan. 17, 2002)).

C 023

Delaware courts have used the following test when assessing whether the implied covenant has been breached: "is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith--had they thought to negotiate with respect to that matter." Katz, 508 A.2d at 880 (citing Martin v. Star Publ'g Co., 50 Del. 181, 11 Terry 181, 126 A.2d 238 (Del. Supr. 1956); Danby v. Osteopathic Hosp. Ass'n., 34 Del. Ch. 172, 101 A.2d 308 (Del. Ch. 1953) aff'd 34 Del. Ch. 427, 104 A.2d 903 (Del. Supr. 1954); Broad v. Rockwell Int'l Corp., 642 F.2d 929, 957 (5th Cir. 1981)). However, "the implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912, 921 (Del. Ch. 1999) (citing Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co., 708 A.2d 989, 990 (Del. Supr. 1998)). [*13]

Promega contends that even if Benitec's construction of the License is correct, Benitec's silence and subsequent assertion that the License converted to non-exclusive status is a breach of the implied covenant of good faith and fair dealing. The Court finds that Promega is attempting to inject a new obligation into the contract, the obligation to warn the other party if any of its intended actions will breach the contract. The Court finds that the conditions for breach are expressly stated in the contract, and that the parties would not necessarily have agreed to the additional duty to warn that Promega requests.

Thus, the Court concludes that Promega has not shown a likelihood of success on the merits of its breach of implied warranty of good faith and fair dealing claim.

C. Accord and Satisfaction

The required elements for an accord and satisfaction in Delaware are that (1) a bona fide dispute among the parties as to the amount of the debt must honestly exist, (2) the debtor tendered an amount to the creditor in honest belief that such would constitute satisfaction of the debt, and (3) the creditor accepts such payment. See Acierno v. Worthy Bros. Pipeline Corp., 693 A.2d 1066, 1068-69 (Del. 1997); [*14] CitiSteel USA, Inc. v. Connell Ltd. P'ship, 758 A.2d 928 (Del. 2000). An accord and satisfaction may not result from part payment of a liquidated claim in the absence of additional consideration. AMJUR ACCORD § § 7,28; See, e.g., Trader v. Wilson, 2002 Del. Super. LEXIS 92, 2002 WL 499888, *3-4 (Del. Super.). A liquidated claim is one which can be determined with exactness from the agreement between the parties, by an arithmetical process, or by the application of definite rules of law. State, for Use of Warner Co. v. Mass. Bonding & Ins. Co., 40 Del. 274, 1 Terry 274, 9 A.2d 77, 80 (Del. Super. 1939); AMJUR ACCORD § 7.

The Court finds that the $ 50,000 annual royalty payment owed by Promega was liquidated because it can be "determined with exactness from the agreement between the parties." AMJUR ACCORD § 7. Sections 5.00 and 7.00 of the License expressly stipulate that Promega must pay a minimum annual royalty of $ 50,000 no later than April 30th of each year. Thus, the Court concludes that the amount of Promega's payment was liquidated and that Promega's partial payment of it cannot, therefore, constitute an accord and satisfaction.

D. Equitable Estoppel

Under Delaware law, the [*15] doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." Waggoner v. Laster, 581 A.2d 1127, 1136 (Del. 1990). The party claiming estoppel must show that (1) he lacked the knowledge of the true facts or he lacked the means to obtain the truth; (2) he relied on the conduct of the party against whom the estoppel is claimed; and (3) he suffered a prejudicial change of position as a result of his reliance. Id. at 1136. The party seeking estoppel must be able to prove these elements by clear and convincing evidence. Reeder v. Sanford School, Inc., 397 A.2d 139 (Del. Super. 1979).

To support its claim of equitable estoppel, Promega relies on oral statements that allegedly modified the terms of the written agreement between the parties. Delaware courts generally reject attempts to invoke equitable estoppel based on such oral statements. See, e.g., Keene Corp. v. Hoofe, 267 A.2d 618 (Del. Ch. 1970). In Keene, the defendant agreed in writing to accept stock options subject to restrictions [*16] providing for repurchase by his employer if his employment terminated before defendant was employed five years. The court in Keene held that, even though the defendant allegedly relied to his detriment on inducements to negotiate the terms of his employment, he did not act with reasonable diligence in discovering the restrictions and when employment was terminated in less than one year, the employer was not estopped from its asserting right to repurchase the stock.

Thus, the Court concludes that Promega cannot now be allowed to claim detrimental reliance when it had knowledge of the terms of the contract from the contract itself.

II. Irreparable harm

The Court must next consider whether Plaintiffs will suffer irreparable harm if the injunctive relief is not granted.

Promega contends that Benitec's sublicensing activities will cause harm to Promega's position in the RNAi market and that Promega will suffer the costs of lost opportunity. Promega further contends that its damages are complex and that any judgment may be uncollectible from Benitec. Promega argues that it is entitled to a presumption of irreparable harm because the right to exclude is at issue in this [*17] lawsuit.

In response, Benitec contends that Promega cannot show irreparable harm because Promega has delayed in seeking preliminary relief and because Promega's alleged harms are purely speculative and Promega has provided no objective evidence or expert opinion on market conditions.

Although a delay in seeking relief may constitute grounds for barring preliminary relief, in the instant case, the Court does not agree that Promega has delayed in filing for a preliminary injunction. Promega filed for preliminary injunctive relief shortly after it became apparent that Benitec was negotiating directly with potential sublicensees. However, where, as here, interests involving money damages are at stake, preliminary injunctive relief is not usually appropriate. See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801-02 (3d Cir. 1989) (harm was not deemed irreparable even though nature of the action involved lose of majority of business revenue). The Court finds that Promega has not shown that the non-economic injuries it alleges, such as of control of reputation, loss of trade and loss of goodwill, are reasonably imminent or otherwise non-speculative. [*18]

For these reasons, the Court concludes that Promega has not made a sufficient showing of irreparable harm to allow the Court to find that this factor weighs in favor of granting a preliminary injunction in this lawsuit.

### III. Balance of Hardships

Next, the Court must balance the harm that will occur to Plaintiffs if the injunction is denied with the harm Defendants will incur if the injunction is granted. Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir. 1995).

Promega contends that the balance of hardships favors it because enjoining Benitec's sublicensing activity will not harm Benitec. Rather, Benitec would be in the same position it was in before the breach. In support of this argument, Promega points to the $ 350,000 initial license fee it paid to Benitec. In response, Benitec contends that the balance of harms favors Benitec because the new sublicenses represent a source of revenue for it.

The Court finds that granting the Motion for Preliminary Injunction will cause Benitec only minimal hardship because doing so will leave Benitec in the same position it was shortly before the injunction was granted, i.e., not granting sublicenses and in receipt [*19] of the $ 350,000 initial license fee. Further, the Court finds that allowing Benitec to continue its sublicensing efforts in the ddRNAi market may cause Promega to lose revenue, market share and good will in the marketplace that it may find difficult to recover should it prevail on the merits in this action. For these reasons, the Court concludes that the balance of hardships tips in Promega's favor.

### IV. Public interest

Finally, the Court must assess the impact of an injunction in Promega's favor on public interest concerns.

Promega contends that an injunction in these circumstances will not harm the public because Benitec was a party to an exclusive licensing agreement and received a hefty licensing fee. Promega further contends that, in the absence of injunctive relief, those seeking to license the ddRNAi technology will be confused as to whether to deal with Benitec or Promega and may decide to delay licensing or withdraw from the market entirely. Benitec responds that an injunction would end all sublicensing and would deprive the public of access to Benitec's technology.

While this is a private contractual dispute that has no substantial public impact, the Court finds [*20] that the public interest weighs in favor of enforcing a contract that has been shown to be valid at this preliminary juncture. For this reason, the Court concludes that granting a preliminary injunction in the instant case will not have a favorable impact on the public interest.

### CONCLUSION

In sum, the Court concludes that Promega's failure to demonstrate likelihood of success on the merits and irreparable harm, and the impact on the public interest weigh against issuing a preliminary injunction. Thus, the Court concludes that a preliminary injunction should not issue. Accordingly, the Court will deny Defendant Promega's Motion For A Preliminary Injunction (D.I. 26).

An appropriate Order will be entered.

### ORDER

At Wilmington, this 8 day of March 2005, for the reasons discussed in the Opinion issued this date;

IT IS HEREBY ORDERED that the Motion For Preliminary Injunction (D.I. 26) filed by Defendant Promega Corporation is **DENIED.**

C 025

2005 U.S. Dist. LEXIS 3545, *

Joseph J Farnan Jr                                    UNITED STATES DISTRICT JUDGE

LEXSEE 1989 OHIO APP. LEXIS 1201

**Bernie L. Jackson, Plaintiff-Appellant, v. Krieger Ford, Inc. et al., Defendants-Appellees**

**No. 88AP-1030**

**Court of Appeals of Ohio, Tenth Appellate District, Franklin County**

**1989 Ohio App. LEXIS 1201**

**March 28, 1989, Decided**

**PRIOR HISTORY:**

[*1]

APPEAL from the Franklin County Court of Common Pleas.

**DISPOSITION:**

Judgment affirmed in part and reversed in part; case remanded.

**COUNSEL:**

MR. CHARLES W. HESS, for appellant.

PORTER, WRIGHT, MORRIS & ARTHUR, MR. KENNETH BLUMENTHAL and MR. RANDALL W. KNUTTI, for appellees.

**JUDGES:**

McCORMAC, J., BOWMAN and YOUNG, JJ., concur.

**OPINIONBY:**

McCORMAC

**OPINION:**

OPINION

McCORMAC, P.J.

Plaintiff-appellant, Bernie L. Jackson, appeals from a judgment of the Franklin County Court of Common Pleas awarding summary judgment to defendants-appellees, Krieger Ford, Inc., and Ford Motor Company, on all issues.

Appellant filed suit against Krieger Ford, Inc., Ford Motor Company, and Ford Motor Credit Company, on August 5, 1987. Appellant's complaint sounded in four areas: fraud, breach of warranty, violation of Ohio's Consumer Sales Practices Act, and violation of the Magnuson-Moss Act. On August 3, 1988, appellees, appellees moved for summary judgment supported by the deposition of appellant. Appellant filed a memo contra supported by the same deposition as well as the affidavit of appellant. The trial court granted summary judgment in favor of Krieger Ford, Inc., and Ford Motor Company by decision rendered the 26th day of September, 1988. Through inadvertence, [*2] the trial court failed to include defendant Ford Motor Credit Company in its journal entry. This was later rectified by the trial court signing a journal entry dismissing Ford Motor Credit Company on February 3, 1989.

Appellant appeals the trial court's ruling and raises the following assignments of error:

"1. The trial court erred as a matter of law when it granted appellees summary judgment to appellant's allegations under Ohio's Consumer Sales Practices Act as there are genuine issues of material fact as to whether the Act had been violated by appellees.

"2. The trial court erred as a matter of law when it granted appellees summary judgment as to appellant's claims of violations of Ohio's Consumer Sales Practices Act because reasonable minds can come to more than one conclusion as to whether appellees have violated the Act.

"3. The trial court erred as a matter of law when it granted appellees summary judgment as to appellant's

1989 Ohio App. LEXIS 1201, *

claims of fraud as there are genuine issues of material fact as to whether appellees committed fraud.

"4. The trial court erred as a matter of law when it granted appellees summary judgment as to appellant's claims of fraud because reasonable minds [*3] can come to more than one conclusion as to whether appellees committed fraud.

"5. The trial court erred as a matter of law when it granted appellees summary judgment to as to appellant's claims that the written limited warranty failed its essential purpose as there are genuine issues as to material fact as to whether the warranty failed its essential purpose.

"6. The trial court erred as a matter of law when it granted appellees summary judgment as to appellant's express warranty claims as there are genuine issues as to material fact regarding whether certain express warranties were made to appellant, and not contained in the written limited warranty, and which survive any written disclaimers.

"7. The trial court erred as a matter of law when it granted appellees summary judgment as to appellant's warranty claims, both written and oral, because reasonable minds can come to more than one conclusion as to whether these warranties were breached by appellees.

"8. The trial court erred as a matter of law when it granted appellees summary judgment as to appellant's claims under Ohio's Consumer Sales Practices Act, common law fraud and breach of warranty because the trial court [*4] failed to view the evidence most strongly in favor of appellant as required by Rule 56 of the Ohio Rules of Civil Procedure."

This appeal arises from the purchase of a 1985 Ford Tempo from appellee Krieger by appellant Jackson in March 1985. At all times pertinent to this action, appellant has been employed by Kuehnert Homes, an institution for mentally retarded children and adults, as a residential supervisor. A requirement of his position is the transportation of residents to and from schools and workshops. During the entire course of this transaction, appellant has represented that he used the Tempo almost exclusively for this purpose.

Throughout the life of the car, appellant has experiences several mechanical problems of varying degree. Most of appellant's complaints during the warranty period were minor and, generally, were successfully repaired by appellees. Once the vehicle's warranty period had ended, the car's problems became more extensive, culminating in approximately $ 700 in repairs to the front suspension of appellant's vehicle. While there was con-

flicting evidence as to the timing of these problems, generally it appears that the vehicle's major problems first arose [*5] at approximately thirty-seven thousand miles.

By his first and second assignments of error, appellant complains that the trial court erred by granting appellees' motion for summary judgment, because there are genuine issues of material fact which could lead to more than one conclusion regarding a violation of Ohio's Consumer Sales Practices Act by appellees. Pursuant to Civ. R. 56(C), summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The evidence must be viewed most strongly in favor of the nonmoving party and, if reasonable minds could reach more than one conclusion, summary judgment is an improper remedy. As such, all issues raised on appeal will be viewed in light of this standard.

Appellant argues that a factual issue arises as to whether his purchase of the automobile in question was a "consumer transaction." Appellant's theory is that to be a business transaction the vehicle must be physically modified in some way so as to remove its consumer function. Continuing, he argues that a traveling salesman using an unmodified car would be a consume. However, appellant cites no authority [*6] for this proposition.

R.C. 1345.01 states, in pertinent part:

"(A) 'Consumer transaction' means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things. * * *

" * * *

"(D) 'Consumer' means a person who engages in a consumer transaction with a supplier.

As we read the above-cited statute, the primary focus should be placed on the parties to the transaction and not the good itself.

Ohio's Consumer Sales Practices Act, R.C. 1345.01 et seq., became effective July 14, 1972, yet very little case law has evolved addressed to the issue of defining "consumer transaction." Tomes v. George P. Ballas (Sept. 30, 1986), Lucas App. No. L-85-359, unreported, is one of the few decisions discussing consumer transaction at length. Tomes involved a situation where the appellee purchased a van intending to use it for business, but, shortly after taking possession, he put the van to an exclusively personal use. In holding that the sale was not

a consumer transaction, the court concluded that [*7] the time for determining the existence of a consumer transaction should be at the point a binding agreement is entered into and that "objective manifestations of the parties, as set forth by the totality of the circumstances" determine the limits of a consumer transaction.

Applying the Tomes' rule to the case at bar leads to the conclusion that the sale in question was not a consumer transaction. At the time of sale, appellant informed appellees of his occupation and the use to which his automobile would be put. Appellant represented that the Tempo would be used primarily in conjunction with his occupation. As such, viewing the objective manifestations of the appellant at the time of purchase leads to the conclusion that the vehicle was purchased principally for a business use.

A second line of reasoning which leads to the same conclusion is offered by the Uniform Commercial Code. The code, for the purpose of classifying transactions in order to file security agreements, uses language identical to Ohio's Consumer Sales Practices Act to define consumer transaction. The official comments to 9-109(1), R.C. 1309.07, includes the following:

"The classes of goods are mutually exclusive; [*8] the same property cannot at the same time and as to the same person be both equipment and inventory, for example. In borderline cases--a physician's car or a farmer's utility vehicle which might be either consumer goods or equipment--the principal use to which the property is put should be considered as determinative.

The case at bar represents another borderline example. In cases of dual use, it becomes more difficult to determine at the time a binding agreement is entered what the principal use will be. In these cases, a court must be able to view the transaction in its entirety, including the period between purchase and complaint.

Case law interpreting 9-109(1) have produced several tests; the best reasoned and most workable of these is the "principal use test." In re McClain (C.A. 10, Okla. 1971), 447 F.2d 241, certiorari denied 405 U.S. 918, see 77 ALR 3rd 1225. The McClain decision concluded that a court may consider extrinsic facts concerning the actual uses to which the vehicle was put to determine its primary purpose.

The analysis cannot necessarily be reduced to a simple mathematical formula. For example, extrinsic factors could include: total time used for business [*9] versus total time used for personal activities, evidence of compensation for business use either from an employer or by way of deduction, as well as relative mileage. The point is that, consistent with Tomes, a court must be permitted to view the "totality of the circumstances surrounding the

transaction." Tomes, supra. In transactions where the objective manifestations of the parties are unclear at the time of the agreement, the principal use to which the goods are subsequently used may be considered.

Additional support for classifying appellant as a nonconsumer comes from other jurisdictions which have enacted similar legislation. Kansas, having also adopted a statute based entirely upon the Uniform Consumer Sales Practices Act, defines consumer in KSA 50-624 as follows:

"(b) 'Consumer' means an individual who seeks or acquires property or services for personal, family, household, business or agricultural purposes." [Emphasis added.]

The state of Texas has also included business transactions within the protection of its consumer statute. Title 2, Subchapter E, Section 17.45 of Vernon's Texas Code Annotated, defines consumer to include " * * * a business consumer that [*10] has assets of $ 25,000,000 or more * * *." The point is that other states whose legislatures reviewed the uniform act chose to include business consumers within their law's ambit, while Ohio did not, suggesting that the Ohio General Assembly intended a more limited scope of consumer transactions.

Application of the above-cited standards leads to the conclusion that appellant is not a consumer as defined by R.C. 1345.01. By his own admission, appellant's intended and subsequent use of the vehicle was almost exclusively for business. In his deposition testimony, appellant stated that, at the time of his major mechanical breakdowns, he was using his vehicle almost ninety percent of the time for business. Furthermore, the evidence indicates that, for a considerable portion of the time that appellant owned the vehicle, he resided at his place of employment, implying that he did not put miles on his car for the nonbusiness use of travel to and from work. At every possible occasion throughout appellant's ownership of the car, he reiterated to appellees that the car was necessary for his occupation.

Applying both the Tomes' "objective manifestations" standard and the principal use test, [*11] we conclude that reasonable minds could come to but one conclusion, that the sale in question does not qualify as a consumer transaction. Having failed to meet the threshold inquiry, appellant cannot avail himself of the protection offered by Ohio's Consumer Sales Practices Act.

Appellant's first and second assignments of error are overruled.

Appellant's third and fourth assignments of error contend that there exists a genuine issue of material fact regarding his claims of fraud, thereby precluding sum-

1989 Ohio App. LEXIS 1201, *

mary judgment by the trial court. In support, appellant contends appellees defrauded him on three separate occasions; by replacing an axle unnecessarily, by claiming to have a front strut which was allegedly not replaced, and by overstating the price for a brake job.

In order to prevail on a theory of fraud at trial, appellant must establish: (1) a false representation made by appellees; (2) appellees' knowledge of the falsity; (3) intent to mislead on the part of appellees; (4) reliance by claimant; and (5) injury as a result of the claimant's reliance. Manning v. Len Immke Buick (1971), 28 Ohio App. 2d 203, at 205, citing Crabbe v. Freeman (1959), 81 Ohio Law Abs. 65. However, [*12] since appellees sought summary judgment, appellees had the burden to negate the fraud alleged in the complaint.

As to the brake job, appellant's argument is not persuasive. Appellant argues that, because the cost of a brake job is materially higher at Krieger than some place else, appellees are therefore guilty of fraud. Even is we were convinced by this argument, appellant did not replace his brakes at Krieger, and thus, he can show no damages. Viewing the evidence, reasonable minds could only come to the conclusion that appellant has failed to satisfy all essential elements of fraud regarding the quote for repairing the brakes.

Appellees' alleged replaced of the front strut and the axle represents a different situation. Appellant did offer evidence tending to show that the axle was needlessly replaced. While automobile repairs are not an exact science and a dealer may, in good faith, replace a part and later find that it was not the source of the problem, the problem for summary judgment is that appellees presented insufficient evidence to negate appellant's allegation of fraud. Krieger offered no evidence of why it believed that the axle should be replaced.

Appellant averred that [*13] subsequent to appellees' representation that the front strut had been replaced, a second mechanic informed him that the strut appeared to be original equipment. While this evidence could be classified as hearsay under Evid. R. 802, appellees offered no objections to its admission. An objection not taken will be deemed waived and will not be considered on appeal. White v. Richmond (1847), 16 Ohio 5; Gates v. Dills (1967), 13 Ohio App. 2d 163. Moreover, there was no sworn testimony by appellees that the strut had been replaced; thus, in any event, Krieger failed to satisfy its burden on summary judgment.

Appellant's third and fourth assignments of error are sustained to the extent that they deal with the appropriateness of summary judgment on the issue of Krieger's alleged fraud concerning the front strut and axle repairs.

In his fifth assignment of error, appellant contends that the trial court erred as a matter of law by granting appellees summary judgment on appellant's claim that the written warranty failed of its essential purpose. Appellant argues that a warranty can fail of its essential purpose if its duration is too short.

The issue presented is whether appellant has [*14] successfully limited appellant's remedy for breach as provided by R.C. 1302.93. (UCC 2-719.) The general rule as stated in R.C. 1302.93(A)(1) is that:

"(1) [T]he agreement may provide for remedies in addition to or in substitution for those provided in sections 1302.01 to 1302.98 inclusive, * * *."

This rule is subject to limitations outlined in the sections of that statute that follow. Those are that the limitation must expressly state it is exclusive or it will be regarded as optional, the limited remedy must not fail of its essential purpose, and (from official comment number one) that the remedy must not be unconscionable. Appellant, herein, takes issue with the second limitation by arguing that his car broke down so shortly after the warranty had expired that the remedy must have failed of its essential purpose.

In support of his proposition, appellant cites Goddard v. General Motors Corp. (1979), 60 Ohio St. 2d 41, for the proposition that, if a car is so defective that the remedy of replace and repair is no remedy, then the limited warranty must be put aside, availing the purchaser of other code remedies. The case at bar is factually at odds with the cited case, in that [*15] Goddard involved an automobile which developed a problem shortly after purchase which could not be corrected by the seller. Appellant herein developed only minor problems, which were basically repaired to his satisfaction during the warranty period; his extensive problems did not arise until well after the warranty had expired.

Interpretation of R.C. 1302.93 mandates a look at the purpose of a limited warranty, not the duration. Ford's twelve-month, twelve thousand-mile warranty was designed to assure that the car be free of defects for a limited time and mileage; the warranty was not designed to provide protection for the balance of the car's useful life or for any other period than specified by the warranty. Ford offered an extended warranty at a modest additional cost for those purchasers who wanted additional protection. The record does not support a finding that the car was designed to fail immediately after the warranty expired. Cars have moving parts and, eventually, after use, some parts may break.

Appellant's fifth assignment of error is overruled.

By his sixth and seventh assignments of error, appellant contends that the trial court erred in granting summary judgment [*16] to appellees on the issue of express warranties, contending that there are material issues of fact allowing differing conclusions. Appellant argues that statements made to him by Krieger's agents were affirmations of fact and, as such, rose to the level of express warranties.

The general rule that affirmative statements may become express warranties is stated in R.C. 1302.26(A)(1), which reads:

"(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

For a proper analysis, this provision must be read in light of R.C. 1302.26(B), which states:

"(B) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

In 1952, under an analogous General Code Section 8392, the Court of Appeals for Summit County recognized that the [*17] conflict inherent in the above-cited statute was one of degree. Schwartz v. Gross (1952), 93 Ohio App. 445. As the Schwartz court noted in the first and second paragraphs of the syllabus, "[a] positive statement of the quality of goods is an express warranty * * *," however, "[i]t is a seller's privilege to 'puff' his goods * * *." In order to determine which classification a statement fits, one must look at the actual statements made in light of the totality of the circumstances in which they were made.

Specifically, appellant points to statements made to him that the "performed fine" and was "good on gas." The terms "fine" and "good" are merely an expression of opinion. Had the salesman stated that the car got 18.2

miles per gallon, or that its performance could be judged by its acceleration from zero to sixty in four seconds, then a warranty would conceivable have arisen. The specificity of the statements are important.

Also important is the context in which the statement was made. The salesman's statements were made during preliminary negotiations at which time "puffing" usually reaches its apex and concerned general statements about which there is usually puffing. Thus, [*18] the trial court properly concluded that the salesman's statements, that the car "performed fine" and that it was "good on gas," were value judgments based upon the opinions of a sales person and that those statements could not reasonably be construed to be express warranties.

Appellant's sixth and seventh assignments of error are overruled.

Appellant's eighth assignment of error is a summary of his first seven assignments of error; in that assignment, appellant argues that the trial court failed to construe the evidence in a light most favorable to him as the nonmoving party below. Throughout this opinion, we have reviewed and discussed each alleged error on the bases of all elements contained in Civ. R. 56(C), rendering a discussion of this assignment of error superfluous.

Appellant's eighth assignment of error is overruled.

Appellant's first, second, fifth, sixth, seventh, and eighth assignments of error are overruled. Appellant's third and fourth assignments of error are sustained to the extent that they deal with the appropriateness of summary judgment on the issue of Krieger's alleged fraud concerning the front strut and axle replacements. The summary judgments granted Ford Motor [*19] Company and Ford Motor Credit Company are affirmed, as the only basis for reversal does not involve these parties. The summary judgment granted Krieger Ford, Inc., is partly affirmed and partly reversed. The case is remanded to the trial court for further procedure in relation to the claim of fraud in replacing the front strut and front axle.

McCORMAC, J., BOWMAN and YOUNG, JJ., concur.