IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

**REPLY TO PLAINTIFF'S OPPOSITION TO ALSTOM POWER INC.'S
<u>MOTION FOR SANCTIONS AND REQUEST FOR HEARING</u>**

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:     (410) 547-0699

Counsel for Defendant
ALSTOM Power Inc.

Date: April 14, 2006

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................................................... 1

II. ARGUMENT .......................................................................................................... 2

    A.    AES' Failure To Provide The Air Permit Compliance Documents Further Entitles ALSTOM To Sanctions Against AES ........................................ 2

        1.    Factual Background Pertinent To This Motion .......................................... 2
        2.    Legal Background ....................................................................................... 3
        3.    AES' Claims ................................................................................................ 4
        4.    ALSTOM repeatedly requested that AES produce documents relating to AES' compliance with its PSD Permit ................................... 5
        5.    ALSTOM recently obtained many of the documents in question, not from AES, but directly from the EPA ...................................... 8
        6.    AES chose not to produce the documents in question because those documents seriously undermine its case ............................................ 9
        7.    AES should be barred from presenting a claim at trial for the costs relating to actual or proposed changes to its wastewater disposal systems because of its failure to produce the highly relevant and probative air permit compliance documents ......................... 11

    B.    Sanctions Are Appropriate Because Of AES' Failure To Abide By The Court's Discovery Order. ..................................................................................... 12

    C.    Sanctions Are Appropriate Here Because Of The Calculated Nature Of AES' Cumulative Discovery Violations ............................................................ 13

    D.    ALSTOM Has Been Greatly Prejudiced By The Totality Of AES' Conduct In This Case .......................................................................................... 14

III. CONCLUSION ...................................................................................................... 16

IV. REQUEST FOR HEARING ................................................................................... 17

## TABLE OF CITATIONS

### CASES

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) .................................................................................................... 16

### RULES

Local Rule 7.1.2 ................................................................................................................. 1

Local Rule 7.1.4 ............................................................................................................... 18

Federal Rules of Civil Procedure 37(b)(2) ....................................................................... 13

### COURT ORDERS

December 16, 2005 Discovery Order ................................................................................. 1

ALSTOM Power Inc. ("ALSTOM"), defendant, by its counsel, and, pursuant to the Federal Rules of Civil Procedure and Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local Rules"), submits this Reply to Plaintiff's Opposition to ALSTOM's Motion for Sanctions and Request for Hearing.

## I.   INTRODUCTION

ALSTOM filed its Motion for Sanctions to address AES' tactical pattern of repeated noncompliance with this Court's Discovery Order dated December 16, 2005 (the "Discovery Order"). Following submission of that motion, ALSTOM has now obtained additional conclusive evidence of AES' willful noncompliance with this Court's Discovery Order and the dictates of the Federal Rules of Civil Procedure.

Specifically, on April 3, 2006, ALSTOM obtained documentation from the United States Environmental Protection Agency ("EPA") in response to a request by ALSTOM under the Freedom of Information Act ("FOIA"), which sought production of documents relating directly to AES' compliance with the air emissions permit issued to AES by the EPA. AES has expressly admitted in this matter that those documents are relevant -- contending, as part of its case, that the air pollution equipment in question "could not operate pursuant to the requirements of its air permit" while running at a high temperature and using high chloride water. Despite the undeniable relevance of those documents and despite ALSTOM's specific, formal requests to AES for their production and subsequent Motion to Compel Production, AES has failed to produce those documents to ALSTOM.

Review of the EPA documents reveals why AES has chosen not to produce them: the documents contradict AES' primary contention that the alleged damages were caused by the equipment supplied by ALSTOM, and not by its own improper operations of that equipment. Moreover, the documents reveal that AES was providing the Federal Government reasons for air

1

permit violations that are inconsistent with the reasons that AES now proffers in support of its position in this litigation.

AES' failure to produce the highly relevant and probative air permit compliance documents (documents which it is required to maintain under the air permit) underscores the significance of AES' repeated untimely production of documents and supplementation of discovery, all of which ALSTOM described in the Motion for Sanctions, and justifies the imposition of sanctions against AES. Accordingly, ALSTOM respectfully submits that the Court should order, in the manner described below, that AES be barred from submitting any evidence at trial relating to actual or proposed changes to its wastewater treatment system at the Plant.

## II.    ARGUMENT

**A.    AES' Failure To Provide The Air Permit Compliance Documents Further Entitles ALSTOM To Sanctions Against AES.**

### 1.    Factual Background Pertinent To This Motion

The pollution control equipment at issue is comprised of two different components – the circulating dry scrubber ("CDS") and the electrostatic precipitator ("ESP"). The smoke, or "flue gas," from the combustion in the Plant's boilers enters into the CDS, first, where it is mixed with hydrated lime, which binds with, and eliminates, sulfur compounds that remain in the flue gas. In addition, a very fine mist of water is sprayed into the gas to cool it in order to facilitate the lime/sulfur reaction. In order to minimize the risk of the sort of corrosion complained of in this case, the Operations and Maintenance ("O&M") Manuals for this equipment provide clearly that the temperature of the flue gas in the CDS must be maintained at a temperature that is high enough to evaporate this spray water and prevent condensation when the flue gas departs the CDS and enters the ESP.

When the flue gas enters the ESP, it passes by electrodes that emit positively charged ions causing the ash particles in the flue gas to be attracted to negatively charged "collecting plates." Those collecting plates are periodically "rapped" by a rapping system – essentially a

series of pistons at the top of the plates – to shake off the ash particles that have accumulated on the plates. Those ash particles fall to the bottom of the ESP, where a series of rotary valves open periodically to allow the ash to be collected into hoppers, which are located below the ESP, rather than be discharged out the stack as pollutants.

As part of its design, AES and Duke/Flour Daniel Caribbean, L.P. ("D/FD"), its engineer-procure-construct ("EPC") contractor, designed the system such that the water used in the CDS to cool the gas is wastewater obtained directly from a treatment facility operated by the Puerto Rico Aqueduct and Sanitation Authority ("PRASA"). As wastewater, it is very high in total dissolved solids and chlorides.

It was well known by all of the parties that an elevated level of chlorides in the CDS spray water would hinder the evaporation of the spray water in the CDS, resulting in an increased risk of corrosion. It was also well known that, in order to counteract that increased risk of corrosion, it is necessary to increase the CDS operating temperature when there are high levels of chlorides in the spray water to ensure complete evaporation and prevent condensation in the ESP. Accordingly, the O&M Manuals supplied by ALSTOM expressly provide that AES, as the operator of the equipment, is to raise the CDS operating temperature if the CDS spray water has an elevated level of chlorides. (*See* Tab 30, O&M Manual, at 4-2.)

    **2.**    **Legal Background**

AES has asserted a claim under the Accelerated Corrosion Warranty applicable to the pollution control equipment. That Warranty provides that ALSTOM's liability is expressly conditioned upon, among other things, AES' "operation and maintenance of the system in accordance with the Contractor's Operation and Maintenance manuals . . . " (*See* Tab 31, Purchase Order, General Terms and Conditions, at §1.6.) ALSTOM has contended throughout this case that AES cannot satisfy this condition precedent and, thus, cannot recover under the Accelerated Corrosion Warranty because, among other things, it operated the CDS at low

3

temperatures despite using water with high chloride levels, in direct violation of the O&M Manuals.

AES' attempts to avoid the consequences of its failure to operate and maintain the equipment as prescribed in the O&M Manuals by asserting that the pollution control equipment was defective and that it was impossible to operate it as specified in the O&M Manuals. Specifically, AES contends that it was impossible to run the CDS at the higher temperatures required to minimize the risk of accelerated corrosion because high temperatures caused high opacity -- visible flue gas as it exits the Plant's smoke-stack.

Opacity is one of the "emissions" that are governed by the air permit issued to AES by the EPA.[1] (*See* Tab 32, Second Revision to the Final PSD Permit (the "PSD Permit"), at EPA-0010.) For purposes of the dispute in this case, it is significant that the PSD Permit required AES to report, on a quarterly basis, each and every excess emission (including opacity), provide a reason for the excess emission and explain the steps that AES was taking to resolve the issue. (*Id.*, at EPA-0020-0021.) The permit also required AES to retain its records for a minimum of ten (10) years. (*Id.*, at EPA-0021.) Thus, the content of these quarterly reports bears directly on AES' contentions regarding the existence of opacity exceedences and the reasons for those exceedences. AES, nonetheless, has persistently failed to produce those eminently discoverable and highly probative documents to ALSTOM in discovery.

3.     **AES' Claims.**

Because it claims that the Plant could not meet the opacity requirements in the PSD Permit when running at the high temperature necessary to accommodate high chloride water and minimize the risk of accelerated corrosion, AES contends that its only choice was to eliminate the high chloride water. (Tab 33, AES' Answers to ALSTOM's Third Set of Interrogatories, at 4.) Thus, according to AES, it installed a secondary reverse osmosis ("RO") system to remove the

---

[1] The permit with the EPA is actually called the Prevention of Significant Deterioration of Air Quality, or "PSD", permit.

4

chlorides from the water going to the CDS. (*Id.*) AES also contends that the installation of the secondary RO system created the need to change other aspects of the Plant's wastewater treatment systems at some time in the future, all at a purported cost of more than $34 million, which it now contends is ALSTOM's responsibility. (*Id.*, at 5.) AES' claims to recover these costs thus rest entirely on its assertion that it could not operate the CDS at higher temperatures required to minimize the risk of accelerated corrosion without causing high opacity and violating its PSD Permit. Therefore, the documents that AES prepared and submitted to the EPA regarding omissions compliance are directly relevant to AES' claim.

### 4.     ALSTOM repeatedly requested that AES produce documents relating to AES' compliance with its PSD Permit.

Understanding that documents relating to AES' environmental permits were highly relevant to this case, ALSTOM requested, in its First Request for Production of Documents served in March, 2005, that AES produce the following regarding air permitting :

> **Request 13**: All documents created or exchanged by AES, D/FD or EEC evidencing, referring to or relating to the application for the air permit submitted to the governmental agency or agencies having authority over the emissions from the Project.

(*See* Tab 34, ALSTOM's First Request for Production of Documents and Things and Entry Upon Land for Inspection ("First Request"), at 10.) ALSTOM also requested the following (expressly referencing EPA compliance) in the First Request:

> **Request 56:** All documents relating to the power plant's compliance or failure to comply with air emissions standards, including but not limited to any such standards imposed by the U.S. Environmental Protection Agency and any agency of the government of Puerto Rico.

(*Id.*, at 16.)

AES first produced hard-copy documents to ALSTOM on May 25, 2005. Noticeably absent from that production were any documents exchanged with the EPA relating to the PSD

5

Permit. ALSTOM raised this issue with AES and requested that AES immediately produce any and all documents relating to the permit. (*See* Tab 35, letter dated August 15, 2005, at 5.)

AES belatedly responded to ALSTOM's letter and failed to address the issue regarding the EPA documents. (*See* Tab 36, letter dated September 6, 2005.) As a result, ALSTOM requested production of the documents a second time. (*See* Tab 37, letter dated September 16, 2005.)

On September 27, 2005, AES informed ALSTOM that it had "recently located a small quantity of additional documents that it will be producing shortly. These documents relate to the Plaint's air permits and the 'Test and Monitoring Plan.'" (*See* Tab 38, letter dated September 27, 2005.) When those documents still had not been produced a month later, ALSTOM again renewed its request that they be produced. (*See* Tab 39, letter dated October 25, 2005.)

AES served its Answers to ALSTOM's Second Set of Interrogatories on November 28, 2005 (Tab 40 AES' Answers to ALSTOM's Second Set of Interrogatories, at 9), asserting, for the first time, that the equipment provided by ALSTOM could not operate according to the O&M Manuals and allow AES to remain in compliance with the Plant's air permits. (*Id.*, at 6.) By making this assertion, AES squarely put the air permits, and the ability of the equipment to comply with those permits, at issue in this case.

Despite this fact, AES continued to withhold production of documents relating to its compliance with the PSD Permit. As a result, ALSTOM filed a Motion to Compel on December 5, 2005. (*See* Tab 41, Motion to Compel Production of Documents.) In that Motion, ALSTOM expressly requested that the Court compel AES to "produce to ALSTOM all of the documents that [AES] is legally required to submit to the EPA." (*Id.*, at 11.)

At the conclusion of the Court's Discovery Dispute Hearing on December 7, 2005, the Court instructed the parties to attempt to come to an agreed resolution of the discovery disputes that had arisen. Following the Court's direction, the parties met on several occasions and ultimately prepared and jointly submitted a proposed order to reflect what was understood by

6

ALSTOM at the time to be a resolution of open discovery issues.  On December 16, 2005, the Court entered the proposed order (the "Discovery Order") relating directly to ALSTOM's two previously-filed motions to compel, including expressly the requests for permit compliance and EPA-related documents.  (Tab 42, Discovery Order.)  Among other things, the Discovery Order provides:

> The parties shall make all responsive hard copy and electronic documents available for production to the requesting party by **DECEMBER 30, 2005**.

(*Id*.)  In what appeared to be an attempt to comply with the Discovery Order, AES made two separate productions of hard-copy documents during the month of December, 2005.  Nonetheless, AES' production still did not include any of the reports to the EPA relating to its compliance with the PSD Permit.

A week later, AES represented to ALSTOM that it continued "to believe that it has produced all relevant EPA information that it possesses," but would review its files and "re-confirm" that it had produced all of the responsive hard-copy documents that "can be located." (*See* Tab 43, letter dated January 5, 2006.)  Despite its promise to search its files, AES failed to produce any hard-copy documents relating to its compliance with the PSD Permit.

In fact, based on AES' own index of the contents of its files, AES knew that its files contained records submitted to the EPA.  (*See* Tab 44, AES Environmental Records Index.)  Thus, upon receipt of ALSTOM's First Request, AES was required to, and easily should have been able to, identify its reports to the EPA and make them available to ALSTOM for inspection and copying.  That AES elected not to produce these documents despite repeated requests by ALSTOM beginning in March, 2005 is compelling evidence of the magnitude of AES' obstruction of discovery.

7

> **5. ALSTOM recently obtained many of the documents in question, not from AES, but directly from the EPA.**

On August 16, 2005, ALSTOM issued a Freedom of Information Act ("FOIA") request to the EPA, requesting that the EPA produce the following:

> 1. All documents All documents exchanged between AES Puerto Rico, LP ("AES-PR"), or any individual or entity acting on its behalf, and EPA Region II comprising or relating to AES-PR's application for a Prevention of Significant Deterioration of Air Quality ("PSD") permit for the AES-PRCP or EPA Region II's issuance of the PSD permit for AES-PRCP.
>
> 2. All documents evidencing, relating or referring to the AES-PRCP's compliance or failure to comply with the PSD permit or any other air emission standard.

(*See* Tab 45, FOIA request dated August 16, 2005.)

ALSTOM has now received (on April 3, 2006, after the close of discovery) documents responsive to its FOIA request from the EPA's San Juan, Puerto Rico office. Among the documents produced by the EPA, but not by AES, are a number of categories of documents that are highly relevant and probative. Moreover, all of the documents that ALSTOM received for the first time from the EPA had either been supplied to the EPA by AES or provided to AES by the EPA. Specifically, the EPA produced documentation relating to AES' requests for modification of the PSD Permit, reports by AES regarding the calibration of equipment, and reports regarding emissions from the Plant submitted by AES. Importantly, the documents produced by the EPA also included Continuous Emissions Monitoring System ("CEMS") Reports, which set forth the Plant's actual emissions' deviations from its PSD Permit levels, and what AES reported contemporaneously as the cause for such deviations.

AES' PSD Permit requires that AES maintain the documents in question for a minimum of ten (10) years. (*See* Tab 32, at EPA-0021.) Despite this mandate, AES did not produce those documents to ALSTOM in response to ALSTOM's discovery request in March, 2005 or at any time thereafter.

8

### 6. AES chose not to produce the documents in question because those documents seriously undermine its case.

ALSTOM's examination of the documents obtained from the EPA shows why AES chose not to produce them: AES sought to prevent discovery of these documents because they contradict allegations made by AES that are at the very core of its case. Specifically, the EPA documents contradict AES' assertion that operating the CDS at the higher temperatures required to minimize the risk of accelerated corrosion causes opacity emission deviations, the linchpin of AES' attempt to recover from ALSTOM the cost of installing the secondary RO system and other modifications to its wastewater treatment systems.

Evidence unearthed in discovery reveals that, in the fall of 2003, AES reported to its corporate parent that it had solved the opacity problem at its Plant by making mechanical adjustments to the rapping system. (*See* Tab 46, e-mail dated November 12, 2003; *see also* Tab 47, Memo dated November 3, 2003.) In point of fact, the O&M Manuals provided by ALSTOM specifically state that making adjustments to the rapping sequence is a potential solution to high opacity. (*See* Tab 30, at 10-9.) AES, however, is now attempting to disavow the conclusion reached in the fall of 2003 that its opacity problems had been solved and, instead, asserts that there were continuing opacity problems when it operated the CDS at the higher temperatures required to minimize the risk of corrosion. The reason for AES' after-the-fact attempt to change its story is clear: if it had solved the opacity problem by altering the rapping sequence, that would establish that there is no relationship between opacity and higher operating temperatures, which is the premise for AES' attempt to recover from ALSTOM the cost of modifications to its wastewater treatment systems.

In fact, the CEMS Reports that are among the documents AES refused to produce confirm AES' contemporaneous conclusion that it had solved the opacity problem in the Fall of 2003. For example, the CEMS Report for the Fourth Quarter of 2003, which spans the time between October 1, 2003 and December 31, 2003, shows that AES had only 70 opacity violations

9

– 25 of which occurred during a two and one-half hour period on a single day. (*See* Tab 48, Fourth Quarter 2003 CEMS Report, at EPA 0348 and 362.) Those 70 violations in the Fourth Quarter of 2003 represented a drop of 85% in comparison with the opacity violations that AES had reported in the Third Quarter of 2003. (*See* Tab 49, Third Quarter 2003 CEMS Report, at EPA 0197 and 0211.)

AES was able to cut opacity violations even further in the next quarter: the Plant had only 33 opacity violations in all of the First Quarter of 2004. (*See* Tab 50, First Quarter 2004 CEMS Report, at EPA 0609 and 0620.) Accordingly, the CEMS Reports that AES failed to produce indicate that AES did gain control of the opacity problem and that it did so by making mechanical adjustments to the rapping system that are wholly unrelated to CDS operating temperature. These facts seriously undermine AES' contention that there is a correlation between opacity and higher CDS operating temperature and contradict AES' assertion that it is required to implement the purportedly high-dollar changes to its wastewater treatment system in order to remove chlorides from the water so that it could operate the CDS at lower temperatures and keep opacity within the limits specified in the PSD Permit.

The CEMS Reports also show that AES was contemporaneously providing reasons for the opacity violations to the EPA that are different than those now being given in an effort to bolster its position in this case. While AES now contends that most, if not all, of the opacity violations were caused by high operating temperature, its CEMS Reports indicate that AES was providing the EPA a variety of reasons for each specific opacity violation, including problems with the rapping system, problems with the hoppers, problems with the electrodes ("T/R sets"), and problems with the rotary valves - none of which are related to operating temperature. (*See, e.g.,* Tab 49, at EPA 0224 through 0228.) Indeed, in the CEMS Reports, AES never reported that a particular opacity violation was caused by low operating temperature or high chloride content spray water, as it now contends.

10

Finally, the CEMS Reports also undermine AES' assertion that it could not operate the equipment within the requirements of its air permit at high temperature with high chloride water. AES discovered the corrosion in the Unit 2 ESP in late November, 2003. Following the discovery of that corrosion, AES raised the CDS operating temperature almost immediately to the temperatures at which it should have been operated according to the O&M Manuals, (*See* Tab 51, e-mail dated November 24, 2003.) while continuing to use, at least on a periodic basis, water with high chloride content. (*See* Tab 52, Unit 1 CDS Make-up Water Chart.) Nonetheless, AES had a total of only 70 opacity violations during that time period of operation at higher temperatures – 25 of which occurred in that aberrant two and one-half hour period. In contrast, AES had a total of 459 opacity violations in the Third Quarter of 2003 when it routinely operated the CDS at an improperly low temperature.

7. **AES should be barred from presenting a claim at trial for the costs relating to actual or proposed changes to its wastewater treatment systems because of its failure to produce the highly relevant and probative air permit compliance documents.**

AES' air permit requires that AES retain the reports related to emissions that had been submitted to the EPA for ten years. Indeed, AES' own internal index of the records it maintains establishes that AES possessed the documents in question and easily could have produced them in response to ALSTOM's discovery request. Furthermore, ALSTOM specifically and repeatedly requested the documents – first in a formal document request and then in follow-up requests. ALSTOM was thereafter constrained to file a Motion to Compel, which, among other things, prompted the Court to direct the parties to attempt to resolve discovery disputes, a process that resulted in the entry of the Discovery Order. Nevertheless, to this day, AES has defiantly withheld production of the air permit compliance documents that it supplied to and received from the EPA in the face of the Discovery Order and ALSTOM's repeated, specific requests.

Based on the supposed premise that the CDS cannot operate at the higher temperatures required to reduce the risk of corrosion and still control emissions, AES has made a claim for

11

over $34 million for costs purportedly required to modify wastewater disposal systems so that it can eliminate chlorides and operate the CDS at a lower temperature. Despite repeated requests, however, AES has failed to produce obviously relevant and important documents that would allow ALSTOM to test that assertion. Accordingly, the Court should enter an Order directing that AES shall not be permitted to present any evidence at trial relating to the changes to its wastewater disposal systems for which it is seeking the recovery of damages in this case.

**B.     Sanctions Are Appropriate Because Of AES' Failure To Abide By The Court's Discovery Order.**

In its Opposition, AES asserts that sanctions cannot be imposed in this case because ALSTOM has not yet obtained an order to compel the discovery at issue. Under Federal Rule 37(b)(2), however, the Court has discretion to impose sanctions against a party if that party "fails to obey an order to provide or permit discovery." That is precisely the gravamen of ALSTOM's request for the imposition of sanctions here.

As noted, this Court's Discovery Order arose from ALSTOM's two motions to compel, which expressly sought to compel production of, among other things, permit compliance and EPA documents. That Discovery Order expressly instructed the parties to "make all responsive hard copy and electronic documents available for production to the requesting party by **DECEMBER 30, 2005**." (*See* Tab 42.) As set forth in this Reply and in ALSTOM's opening Memorandum in Support of its Motion for Sanctions, AES has failed to comply with the Court's Order, both in regard to the documents relating to its damages and, as now discovered, in regard to the production of its air permit compliance documents that were submitted to and received from the EPA. Because the Discovery Order is undeniably an order "to provide or permit discovery" and because AES has failed to obey that Order by providing discovery, the Court can, and should, exercise its discretion and impose sanctions.

C.  **Sanctions Are Appropriate Here Because Of The Calculated Nature Of AES' Cumulative Discovery Violations.**

In its Opposition, AES asserts that sanctions are not appropriate because it has made a good faith effort to comply with its discovery obligations. Now that AES' most recent failure of production has come to light – the EPA documents – it is even more clear that AES' assertion of good faith is neither credible nor sufficient to avoid the imposition of sanctions.

First, AES' opposition ignores the stunning similarity between the events that occurred around the time of the first set of corporate designee depositions and the events that occurred around the time of the second set of corporate designee depositions. Indeed, if anything, AES' withholding production of relevant documents and supplementary interrogatory answers until after the completion of the second deposition of AES' corporate designee was even more egregious than its belated production of documents and supplemental answers that occurred the day before the first deposition.

Second, AES' Opposition ignores the manner in which it actually produced the last set of documents to ALSTOM. While AES concedes that it produced the last set of relevant documents to ALSTOM on March 10, 2006, it attempts to evade responsibility for the deliberate decision to withhold production of those documents until after the conclusion of the deposition of its corporate designee that occurred on that day. In other words, AES' counsel had the documents in its possession at that deposition for at least eight hours – from the start of the deposition at 10:00 a.m. until the conclusion of the deposition after 6:00 p.m. – without producing them or even mentioning them to ALSTOM's counsel. It is clear that AES held on to the documents throughout the day to ensure that ALSTOM could not make use of them at the deposition. Such tactics should not be tolerated.

Third, AES fails to address the manner in which it supplemented its Answers to Interrogatories. While AES has served almost every other pleading in this case on at least two of ALSTOM's counsel, it faxed its final Supplemental Answers to Interrogatories to the attention of

13

only one lawyer in the offices of ALSTOM's counsel in Baltimore – the same lawyer that was busy taking the corporate designee deposition in San Juan, Puerto Rico. Again, it is clear that AES purposefully served its Supplemental Answers in a manner that was calculated to ensure that ALSTOM's counsel was unable to review and ask questions about them at the deposition.

Finally, the content of the materials finally obtained by ALSTOM from the EPA pursuant to FOIA demonstrates that AES' behavior in withholding production of those materials goes far beyond what AES might plausibly attempt to portray as aggressive discovery practices. Rather, the material from the EPA conclusively shows that AES has withheld directly relevant and damaging evidence that plainly is in its files. Similarly, as stated in the opening brief, this is not an isolated incident. AES has still failed to produce relevant responsive hard copy and electronic documents – including the e-mails that are the subject of two other Motions filed by ALSTOM – all in the face of the Discovery Order and ALSTOM's repeated requests.

AES' history of dilatory and obstructionist behavior during the discovery in this case, which includes its demonstrable failure to turn over evidence in the form of the air permit compliance and EPA documents, establishes that AES has not been acting in good faith. Based on AES' manifest lack of good faith during discovery, the imposition of sanctions against AES is fully justified. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

D. **ALSTOM Has Been Greatly Prejudiced By The Totality Of AES' Conduct In This Case.**

In its Opposition, AES claims that ALSTOM could not have been prejudiced by its late supplementation of its answers to interrogatories. In making that claim, however, AES ignores the fact that none of its witnesses to date has been able to identify the specific documents that AES claims modified the O&M Manuals supplied by ALSTOM. It was for that very reason that ALSTOM included in its corporate designee deposition notice the following as an "Area of Examination":

14

> 15. Knowledge regarding ALSTOM's and/or EEC's alleged modification of the O&M Manuals or the operation and maintenance procedures and/or parameters for the pollution control equipment at the Plant, including, but not limited to, what procedures were allegedly modified, how such modifications were made, by whom such modifications were made, to whom such modifications were made, whether such modifications were oral or in writing, and when such modifications occurred.

(*See* Tab 53, Second Amended Notice of Corporate Designee, at 5-6.). Thus, ALSTOM directed specific questions to AES' corporate designee in an effort to discover the identity of the specific documents that AES contends are modifications to the O&M Manuals. (*See* Tab 54, 30(b)(6) deposition of David Stone, at 299-301.) By belatedly asserting in its Supplemental Answers to Interrogatories, which it served in Baltimore during the deposition conducted in San Juan, Puerto Rico, that there were more and different documents that "modified" the O&M Manuals, AES prevented ALSTOM from learning the exact identity of those documents and inquiring about them at the deposition. Accordingly, AES' contention that ALSTOM was not prejudiced by AES' late supplementation is simply wrong.

More to the point, however, is the fact that ALSTOM has been greatly prejudiced by the cumulative effect of AES' conduct in this case. AES has utterly and inexplicably failed to produce relevant and probative documents that it submitted to the EPA[2]; AES has failed to fulfill its promise of a rolling electronic document production, instead dumping almost all of its e-mail on ALSTOM at the end of the discovery period; AES has failed to produce relevant and responsive documentation in a timely fashion, not once, but twice; AES has failed to make timely supplementation of critical interrogatory answers – again, not once, but twice; and AES has made

---

[2] But for the happenstance of the recent production of these documents by the EPA in response to ALSTOM's FOIA request, it is likely that AES would have succeeded in preventing these documents from seeing the light of day prior to trial.

15

thousands of objections at depositions with the sole purpose of obstructing ALSTOM's examinations.[3]

AES' pattern of obstruction, including the failure to produce the recently discovered EPA air permit compliance documents, has indisputably been undertaken to prejudice ALSTOM in its attempts to discover information and discern evidence with which it can support its defenses. In particular, ALSTOM has been prevented from using the documents at the ten fact depositions in this case. ALSTOM's experts were also denied the use of those documents and other information in the formation of their opinions and the preparation of required expert witness disclosures. AES's delays or outright refusal in producing documents also interfered with the schedule for the depositions of AES' expert witnesses, which AES is now attempting to block. AES's pervasive obstruction of discovery thus has severely prejudiced both ALSTOM's attempts to obtain the discovery to which it is entitled under the Federal Rules and its preparation for trial.

### III.   CONCLUSION

AES' failure to produce the highly relevant and probative air permit compliance documents, its continued failure to produce electronic evidence and hard copies of documents, and other sharp practices and dilatory behavior outlined in ALSTOM's Memorandum in Support of its Motion for Sanctions, all in defiance of this Court's Discovery Order and ALSTOM's repeated requests, manifestly have prejudiced ALSTOM in its defense of AES's claims. AES's tactics are in direct violation of the Federal Rules and the Court's Discovery Order. Accordingly, the Court should sanction AES's improper tactics and: (i) order that AES is barred from presenting any evidence relating to its claim for the cost of any enacted or proposed changes to water treatment systems at the Plant; (ii) strike AES's supplemental answers to ALSTOM's Second Set of Interrogatories; (iii) award ALSTOM the attorneys' fees and costs incurred in

---

[3] AES' effort in its Opposition to equate the very limited number of proper objections made by ALSTOM at depositions with the numerous improper objections made by AES, as detailed in ALSTOM's opening Memorandum, fails as an attempt to deflect attention from its own blatant misconduct.

16

preparing this motion; and (iv) granting any further relief deemed appropriate by that Court.[4]

## IV.    REQUEST FOR HEARING

Pursuant to Local Rule 7.1.4, ALSTOM respectfully requests oral argument on its Motion for Sanctions.

ALSTOM POWER INC.

/s/ Daniel W. Sciapli
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, Delaware  19806
(302) 888-3222


James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland  21202-1643
(410) 685-1120
Fax:  (410) 547-0699

---

[4] In the alternative, the Court should: (i) reopen discovery for the purpose of resuming the all of the relevant depositions in the United States and direct AES to reimburse ALSTOM the costs and legal fees incurred in preparing for and continuing those depositions; (ii) grant ALSTOM leave to supplement its expert reports and its motion for partial summary judgment, if necessary, based on the testimony at those depositions; (iii) award ALSTOM the attorneys' fees and costs incurred in preparing this motion; and (iv) granting any further relief deemed appropriate by that Court.

17