# Tab 40

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AES PUERTO RICO, L.P., | ) |
| Plaintiff, | ) |
| v. | ) Civ. No. 04-1282-JJF |
| ALSTOM POWER, INC., | ) |
| Defendant. | ) |

## PLAINTIFF'S RESPONSES TO ALSTOM
## POWER, INC.'S SECOND SET OF INTERROGATORIES

Plaintiff AES Puerto Rico L.P. ("AES-PR") objects and responds to

Defendant ALSTOM Power, Inc.'s ("ALSTOM's") second set of interrogatories as

follows:

### GENERAL OBJECTIONS

The following general objections are incorporated in, and serve as

additions to, each of AES-PR's responses and objections to each of ALSTOM's

specific interrogatories.

A. AES-PR objects to ALSTOM's interrogatories to the extent that

they call for information protected by the attorney-client privilege, the attorney

work product doctrine, or other applicable statutory or common law privileges or

immunities. To the extent that any interrogatory may be construed as seeking the

disclosure of information subject to these privileges or immunities, AES-PR invokes

the same.

B. AES-PR objects to ALSTOM's interrogatories to the extent that they seek confidential or proprietary information of third parties as to which AES-PR has entered into agreements to protect the confidentiality of such information.

C. AES-PR objects to Definition (A) to the extent that it purports to impose on AES-PR any obligations greater than those imposed by the Federal Rules of Civil Procedure and the rules and orders of the Court.

D. AES-PR objects to Definition (D) to the extent that it calls for information from contractors or agents of AES-PR that is not properly imputed to AES-PR. AES-PR further objects to the definition to the extent that it defines "AES" to include "AES related entities." AES-PR is answering solely on behalf of itself.

E. AES-PR objects to Definition (K)[1] as overbroad and unduly burdensome. AES-PR is providing in these responses information sufficient "to identify" persons and things as that term is reasonably understood. AES-PR further objects to the definition regarding identification of persons because it presupposes that each person to be identified could be compelled to be a witness in Court.

---

[1] ALSTOM's Second Set of Interrogatories contains two Definitions titled Definition (K). *Compare* p. 2 *with* p. 3. This Objection relates to the Definition (K) on page 3.

2

C 102

F. AES-PR objects to Definition (L)[2] to the extent that its use of the term "writing" or "document" exceeds the definition set forth in the Fed. R. Civ. P. 34.

G. These interrogatory responses and objections are not intended to be, and shall not be construed as, an agreement or concurrence by AES-PR with ALSTOM's characterization of any facts, circumstances, or legal obligations.

H. AES-PR objects to ALSTOM's interrogatories to the extent they attempt to impose requirements beyond those set forth in Fed. R. Civ. P. 33 or the rules or orders of the Court.

I. These interrogatory responses reflect AES-PR's present knowledge based on inquiry to date. Discovery in this matter is ongoing, and AES-PR expressly reserves the right to rely upon any additional information located or obtained in the future.

### RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

The following responses and objections are made subject to and without waiver of any of the general objections set forth above.

### INTERROGATORY NO. 15

If you contend that D/FD, ALSTOM or EEC amended, modified, supplemented, superceded, changed or altered the EEC O&M Manual Volume 1, whether orally or in writing, state in detail the basis for your contention, including in your answer whether the amendment, modification, supplementation, supercession, change, alteration was oral or written, and by whom it was issued.

---

[2] ALSTOM's Second Set of Interrogatories contains two Definitions titled Definition (L). *Compare* p. 2 *with* p. 3. This Objection relates to the Definition (L) on page 3.

3

RESPONSE:  AES-PR objects to this interrogatory as premature, particularly because ALSTOM has not yet completed its document production with respect to the documents AES-PR requested on March 7, 2005. AES-PR may supplement its response once ALSTOM completes its document production, depositions have been completed, and AES-PR completes its factual investigation in this matter.  Subject to and without waiver of the foregoing specific objection and its general objections, AES-PR responds as follows:

In September or October 2002, EEC and/or ALSTOM presented revised operating procedures to AES-PR in the "EEC Control Room Reference" book.  They periodically updated those procedures in September and/or October 2002.  Those revised procedures supplemented and superceded the August 2001 EEC O&M Manual.  The instructions in the final EEC Control Room Reference Book, dated October 22, 2002, direct the Plant operator to set the CDS outlet temperature to 152 degrees.

In addition, in the fall of 2002, Bill Vanhooser, EEC, orally directed AES-PR personnel to operate the CDS at an outlet temperature of approximately 150 to 152 degrees and not to allow the temperature to drop below 145 degrees.  Other EEC and/or ALSTOM personnel may have provided similar instructions as well.  AES-PR is currently unaware of the total number of times EEC and/or ALSTOM gave it this oral instruction.

In addition, ALSTOM and EEC modified the August 2001 EEC O&M Manual procedures by directing commissioning personnel to operate the CDS at an

4

outlet temperature in the 150 to 152 degree range in the period before AES-PR

began commercial operation of the Plant on or about November 28, 2002.

## INTERROGATORY NO. 16

If you contend that you were ever instructed to operate either CDS at the Plant with an outlet flue gas temperature of below 152 degree Fahrenheit, identify who gave you the instruction, set forth the substance of the instruction that was given, when and on how many occasions the instruction was given, and state whether the instruction was given orally or in writing on each such occasion.

RESPONSE: AES-PR objects to this interrogatory as premature,

particularly because ALSTOM has not yet completed its document production with

respect to the documents AES-PR requested on March 7, 2005. AES-PR may

supplement its response once ALSTOM completes its document production,

depositions have been completed, and AES-PR completes its factual investigation in

this matter. Subject to and without waiver of the foregoing specific objection and its

general objections, AES-PR incorporates its response to Interrogatory No. 15 as if

fully set forth herein.

## INTERROGATORY NO. 17

If you contend that ALSTOM waived, or is otherwise estopped from relying upon, the conditions precedent to the ESP Corrosion Warranty that the system be operated and maintained "in accordance with Contractor's Operation and Maintenance Manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacities", state in detail the basis for your contention, including in your answer whether the bases of the alleged waiver or estoppel were oral or written representations, and the identity of the person or persons who made those representations.

RESPONSE: AES-PR objects to this interrogatory as premature,

particularly because ALSTOM has not yet completed its document production with

respect to the documents AES-PR requested on March 7, 2005. AES-PR may

5

supplement its response once ALSTOM completes its document production, depositions have been completed, and AES-PR completes its factual investigation in this matter. AES-PR further objects to this interrogatory to the extent that it characterizes AES-PR's obligations under the warranty. AES-PR further objects to this interrogatory to the extent that it calls for legal conclusions. AES-PR treats ALSTOM's request to set forth the "basis" of AES-PR's contention as meaning to set forth the "factual basis."

Subject to and without waiver of the foregoing specific objections and its general objections, AES-PR incorporates its response to Interrogatory No. 15 as if fully set forth herein. In addition, AES-PR states:

From at least May 2001 through January 2004, ALSTOM knew that the Plant was designed to operate, and would be operated, with high-chloride water with a chloride content of up to 4300 mg/l. It supervised the operation of the Plant with high-chloride water during and after commissioning of the Plant.

The Plant could not operate pursuant to the requirements of its air permit with the CDS outlet temperature set to 172 degrees or above when using the high-chloride water for which it was designed to operate. ALSTOM knew and was aware of that fact, and that is why it and/or its subcontractor directed AES-PR to set the CDS outlet temperature to approximately 150 to 152 degrees.

When ALSTOM and/or its subcontractor instructed AES-PR to operate the CDS at an outlet temperature of approximately 150 to 152 degrees in October 2002, ALSTOM knew that doing so created a risk of accelerated corrosion. From

6

October 2002 until November 2003, ALSTOM knew that the Plant was operating at a CDS outlet temperature of approximately 150 to 152 degrees and that doing so created a risk of accelerated corrosion. ALSTOM never instructed AES-PR to raise the outlet temperature to 172 to 176 degrees as provided in the August 2001 EEC O&M Manual, and it did not instruct AES-PR to cease using high chloride water for the CDS spray water.

In October and November 2002, ALSTOM demonstrated the Plant's performance during commissioning with the CDS operating at an outlet temperature of approximately 150 degrees. On information and belief, it did so in order to maximize the likelihood that the Plant would be able to comply with its air permit. Had ALSTOM run the Plant at a higher CDS outlet temperature using high chloride water, the Plant would have exceeded the opacity limit, and possibly other limits, specified in the permit.

As early as July 27, 2002, ALSTOM was advised by its subcontractor EEC that the CDS spray nozzles were likely to malfunction. ALSTOM independently determined that the spray nozzles EEC had installed were inadequate and/or defective, and complained to EEC concerning this defect in its "punch-list" of open issues submitted to EEC. ALSTOM did not advise AES-PR that it had installed defective and deficient spray nozzles.

The spray nozzle cleaning procedure recommended by EEC caused the Plant to experience unacceptable opacity spikes during the cleaning procedure.

7

INTERROGATORY NO. 18

If you contend that any of the alterations, modifications or additions made to the original design of the ESP after its installation at the Plant made in an effort to control the particulate emissions from the Plant caused, contributed, exacerbated or accelerated the corrosion discovered in the ESP, state in detail the basis for your contention.

RESPONSE: AES-PR objects to this interrogatory as premature,

particularly because ALSTOM has not yet completed its document production with

respect to the documents AES-PR requested on March 7, 2005. AES-PR may

supplement its response once ALSTOM completes its document production,

depositions have been completed, and AES-PR completes its factual investigation

with respect to ALSTOM's and its subcontractors' alterations, modifications, or

additions to the original design of the ESP.

/s/ John S. Spadaro
John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  November 28, 2005        Attorneys for AES Puerto Rico, L.P.

C 108

## VERIFICATION

I, Allan B. Dyer, declare under penalty of perjury that:

     1.    I am President of AES Puerto Rico, L.P.

     2.    I have read the foregoing Responses of AES Puerto Rico L.P. to

ALSTOM Power Inc.'s Second Set of Interrogatories and, to the best of my

knowledge, information and belief, they are true and accurate.

November 21, 2005
Date

Allan B. Dyer

9

C 109

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|                              |   |                      |
|------------------------------|---|----------------------|
| AES PUERTO RICO, L.P.,       | ) |                      |
|                              | ) |                      |
|    Plaintiff, | ) |                      |
|    v.         | ) | Civ. No. 04-1282-JJF |
|                              | ) |                      |
| ALSTOM POWER, INC.           | ) |                      |
|                              | ) |                      |
|    Defendant. | ) |                      |

## NOTICE OF SERVICE

On November 28, 2005, Plaintiff served Plaintiff's Responses to

ALSTOM Power, Inc.'s Second Set of Interrogatories, along with a copy of this

Notice of Service, by first class mail, postage prepaid, on:

> Richard R. Weir, Esq.
> Daniel W. Scialpi, Esq.
> 1220 Market Street, Suite 600
> Wilmington, Delaware 19801
>
> Anthony F. Vittoria, Esq.
> James E. Edwards, Esq.
> Ober, Kaler, Grimes & Shriver
> 120 East Baltimore Street
> Baltimore, Maryland 21202-1643

> Respectfully submitted,

> /s/ John S. Spadaro
> John S. Spadaro
> Bar No. 3155
> MURPHY SPADARO & LANDON
> 1011 Centre Road, Suite 210
> Wilmington, DE 19805
> Tel. (302) 472-8100
> Fax (302) 472-8135

C 110

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: November 28, 2005          Attorneys for AES Puerto Rico, L.P.

2

C 111

# Tab 41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,                          *

      Plaintiff,                              *

v.                                              *          C.A. No. 04-1282-JJF

ALSTOM POWER INC.,                              *

      Defendant.                             *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DEFENDANT'S MOTION TO COMPEL
## PRODUCTION OF DOCUMENTS

 

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222

Of Counsel:

James E. Edwards, Jr., Esquire
Anthony F. Vittoria, Esquire
Michael A. Schollaert, Esquire
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:    (410) 547-0699

Counsel for Defendant
ALSTOM Power Inc.

Date: December 5, 2005

ALSTOM Power Inc. ("ALSTOM"), the defendant, pursuant to Federal Rule of Civil Procedure 37(a)(2), files this Motion to Compel Production of Documents.

## I.    INTRODUCTION

Plaintiff, AES Puerto Rico, L.P. ("AES"), has gone to great lengths to filter and restrict the documentation that it is willing to produce to ALSTOM. Indeed, AES elected to produce documents responsive to ALSTOM's First Request for Production of Documents ("First Request"), not as those documents were kept in the usual course of business, but, ostensibly, organized and labeled to correspond with the categories in ALSTOM's First Request. This method of production is highly unusual for a case pertaining to a complex construction project that spanned more than a decade. Indeed, AES has subsequently produced several additional boxes of documents without labels corresponding to categories in ALSTOM's requests. Presumably, AES produced those documents as they were kept in the usual course of business. The mixture of the two acceptable forms of production, however, has resulted in significant failure of production by AES, in violation of the Federal Rules of Civil Procedure.

AES's failure to produce entire categories of documents or all of the responsive documents within a category, more so than the manner of its production, is the subject of this motion. Throughout the course of its production, AES has failed to express to ALSTOM the criteria it used to determine whether it would produce a certain documents. It is clear, however, that AES was not using the criteria set forth in the Federal Rules – that the document must only be reasonably calculated to lead to the discovery of admissible evidence – because it has refused or failed to produce several categories of documents that are highly relevant and certainly reasonably calculated to lead to the discovery of admissible evidence.

When it has ascertained that AES's production is incomplete, ALSTOM repeatedly has attempted to obtain full discovery, only to be met by the response that AES has produced "some documents" responsive to the requests. ALSTOM, however, is not seeking a partial production of documents responsive to its requests, nor does such a production satisfy AES's obligation under the Federal Rules. Where, as here, AES has failed to provide all of the documents responsive to ALSTOM's request, it is appropriate for the Court to intervene and direct that a complete production of responsive documents be made.

## II.    BACKGROUND

This matter relates to the design and construction of a coal-fired power plant in Guayama, Puerto Rico (the "Project" or the "Plant"), which is owned by AES. ALSTOM was a subcontractor to the prime contractor on the Project, an entity known as D/FD Caribbean, S.E. ("D/FD"). Among other things, ALSTOM furnished and installed two boilers and the "back-end" pollution control equipment for the Project.

Although there are two components of the Plant that are at issue in this case, by far the larger portion of the dispute relates to the alleged accelerated corrosion of steel ash collector plates located in the pollution control equipment[1] provided by ALSTOM and for which ALSTOM provided a corrosion warranty. Importantly, the operation and maintenance of the Plant within detailed parameters and according to specific guidelines is a condition precedent to ALSTOM's liability on the corrosion warranty because the collector plates are subject to excessive corrosion if the Plant is not operated properly.

---

[1] ALSTOM provided both a circulating dry scrubber ("CDS") and an electrostatic precipitator (ESP) to remove pollutants from the flue gas. Although the corrosion occurred on collector plates within the ESP, corrosion in the units is directly related to operation and maintenance of both the CDS and the ESP.

2

In November of 2003, approximately one year after AES accepted control of the Plant, AES discovered that several of the collector plates in the Unit 2 ESP had suffered extensive corrosion.[2]  In January of 2004, AES also discovered accelerated corrosion in the Unit 1 ESP.[3] Immediately upon discovering the corrosion, and before it had conducted any investigation, AES ordered replacement collector plates from Environmental Elements Corporation ("EEC"), ALSTOM's subcontractor and the manufacturer of the ESPs.  AES subsequently submitted a claim, pursuant to the corrosion warranty, for, among other things, the cost of buying and installing those plates, stabilizing the existing plates, and for equipment it alleged was necessary to arrest the corrosion.

## III.   ARGUMENT

### A.   The Discovery At Issue.

On or about March 18, 2005, ALSTOM served AES with its First Request, a copy of which is attached hereto as Tab 1.  (*See* Tab 1, First Request.)  AES served its Objections and Responses to that Request on or about April 27, 2005.  (*See* Tab 2, Objections and Responses to First Request.)   Then, on May 25, 2005, AES produced approximately eleven banker's boxes of documents in response to ALSTOM's First Request.  AES has subsequently produced three additional boxes of documents of hard copy documents and four separate productions of electronic documents.   After ALSTOM conducted an in-house, substantive review of the

---

[2] This corrosion of Unit 2 occurred between the spring/summer of 2003 – which is after AES took control of the Plant – and November of 2003, as there were no signs of corrosion when work was performed on the ESPs in April and July of 2003.

[3] The corrosion in Unit 1 occurred between September of 2003, when the unit was last inspected, and January of 2004.

3

C 115

documents, it was readily apparent that AES failed to produced numerous documents that are responsive to ALSTOM's First Request and relevant to the claims in this action.[4]

ALSTOM has identified the following categories of documents, specifically requested by ALSTOM, which AES has failed or refused to produce:

### I.   Documents Relating to the Operation and Maintenance of the Equipment

As stated earlier, the corrosion warranty provided by ALSTOM was conditioned upon the proper operation and maintenance of the pollution control equipment. Specifically, the warranty for accelerated corrosion provides: "Seller's corrosion guarantee is condition upon operation and maintenance of the system in accordance with Seller's Operation and Maintenance manuals." (*See* Tab 4, attaching the relevant portion of ALSTOM – D/FD Subcontract.) In order to defend AES's claims, therefore, ALSTOM sought production of documents regarding AES's operation and maintenance of the pollution control equipment in the First Request. As stated in more detail below, AES has largely failed to produce the requested documents, and, where it has done so, the documents produced are incomplete. Accordingly, ALSTOM requests that the Court compel AES to make a complete production of the categories of documents set forth below.

---

[4] In the interest of expediting the production of the documents, ALSTOM served a Second Request for Production of Documents ("Second Request") on or about October 25, 2005. Utilizing photographs and documents currently in its possession, ALSTOM requested specific documents known to be AES's possession but which AES inexplicably failed to produce in response to ALSTOM's First Request. Although ALSTOM maintains, and can concretely demonstrate, that these items were responsive to its First Request, ALSTOM chose to issue the Second Request in order to clarify any potential dispute involving documents responsive to ALSTOM's requests. Indeed, after a recent request by ALSTOM to review the documents responsive to the Second Request, AES stated that the Second Request is "either in whole or in part duplicative of the [First Request] . . . [t]herefore, AES-PR already has produced the overwhelming bulk of its hard copy documents that are responsive to ALSTOM's Second Set of Request." (*See* Tab 3, Ltr. from D. Williams dated Dec. 1, 2005.) Moreover, AES denied ALSTOM's request to review the documents before the December 7, 2005 discovery dispute hearing. (*Id.*) Regardless, ALSTOM seeks to compel production of only those documents responsive to its First Request.

C 116

### a.    CDS Temperature Data

The Operation and Maintenance Manuals (the "O&M Manuals") require the operator (hereinafter referred to as AES) to closely control the CDS temperature to prevent accelerated corrosion. In doing so, AES was required to measure the "flue gas" and "wet bulb temperature" of the CDS. Moreover, the O&M Manuals state that the CDS outlet temperature should be "trended by the plant DCS,[5]" and "[o]perating logs of this data must be maintained by plant personnel." (*See* Tab 5, O&M Manual, Vol. 1, at Sec. 9.0.)    Request 58 of ALSTOM's First Request sought production of: "[a]ny and all documents relating to the operating temperature within the CDS and ESP equipment, including, but not limited to, any documents relating to the CDS 'outlet temperature' and the 'flue gas approach temperature.'" (*See* Tab 1, First Request, Request 58.) Despite this seeming simple, yet critical, request, AES's responsive production was incomplete.

Rather than providing complete production, AES has produced a limited amount of documents, including a CD labeled "CDS Temp," and other anecdotal references, all of which contain the requested information, but only for limited date ranges. Because AES was required to routinely measure and record this data, a production of limited date ranges is incomplete. In order to ascertain whether the Plant was operated correctly, ALSTOM must receive this information for the entire period in which AES and/or D/FD operated the equipment. Thus, the Court should direct AES to produce documents containing the required data in an unaltered form without AES's manipulation or reformatting of the data.

---

[5] DCS stands for Distributed Control System and is standard operating equipment for modern power plants. The DCS system allows operators to manage and control the entire power plant with complete integration of all components of the plant, including the backend pollution control equipment. The DCS system provides real-time data regarding plant status, performance information, and operation.

5

### b.    Water Chloride Measurement

Chloride is known to cause or accelerate corrosion in the ESP. Indeed, the Plant specifications contained a limit to the chloride content of the water in the CDS. Moreover, the O&M Manuals require the CDS to be operated at higher temperatures when higher amounts of chlorides are present in the water. Specifically, the O&M Manuals require AES to "measure water conductivity and correlate this to chloride content to establish flue gas approach temperature . . . [t]he readings must be maintained in plant operating logs." (*See* Tab 5, O&M Manual, Vol. 1, at Sec. 9.0.) In order to obtain Plant operating logs containing this data, ALSTOM requested all document related to the chloride content of the water used within the CDS and ESP, including records of water testing. (*See* Tab 1, First Request, Request 62.) In its document production, AES produced a log book entitled "CDS Makeup Water Samples." The log book, however, only contained measurements of the chloride content of the water from September 11, 2003 to May 8, 2004. During ALSTOM's inspection of the Plant, it observed additional water sample log books that AES failed to produce.[6] (*See* Tab 7, Photograph of Unit #1 Water Samples Log Book.) Therefore, the Court should direct AES to fulfill its discovery obligations by producing all of the documents responsive to ALSTOM's Request 62 of the First Request.

### c.    Ash Chloride Measurement

The O&M Manuals further state that the chloride content of the ash is the "second critical parameter" in the operation of the pollution control equipment to prevent accelerated corrosion.

---

[6] Interestingly, AES was unable to locate any additional documents reflecting chloride testing of the CDS spray water. In a letter dated September 27, 2005, AES stated that despite "good faith efforts to locate all such hard-copy documents in AES-PR's possession, we have not yet located any." (*See* Tab 6, Ltr. from D. Williams dated Sept. 27, 2005, at ¶ 10.) ALSTOM, however, was able to locate additional responsive documents during an approximately thirty minute inspection of the Plant's control room.

C 118

AES was also required to measure and record data relating to the chloride content of the CDS and ESP ash. (*See* Tab 5, O&M Manual, Vol. 1, at Sec. 9.0.) Thus, in Request 64 in its First Request, ALSTOM requested that AES produce "[a]ny and all documents relating to the chloride content of the ash within the CDS and ESP equipment." (*See* Tab 1, First Request, Request 64.) ALSTOM subsequently noted AES's failure to provide these documents in a letter dated September 16, 2005. (*See* Tab 8, Ltr. from A. Vittoria dated Sept. 16, 2005.) In response to that letter, AES stated that it had produced responsive documents, including, "[b]y way of example, AES-PR made available to ALSTOM [sic] a multi-page document entitled "Ash Study Chloride Content." (*See* Tab 6, Ltr. from D. Williams dated Sept. 27, 2005, at ¶ 6.)

The production of some of the documents that are responsive to ALSTOM's Request 64 is not sufficient. While AES produced some documentation related to the chloride content of the ash, including the "Ash Study Chloride Content,"[7] ALSTOM is entitled to all of the documents related to AES's measurement of the chloride content of the ash as required by the O&M Manuals. AES has failed to produce documentation regarding routine, or regular, measurements of the chloride content of the ash despite the O&M Manuals' requirement that such measurements be taken. Accordingly, the Court should compel AES to produce these documents.

### d.    CDS Water Nozzle Maintenance and Cleaning Records

The O&M Manuals further provide for routine maintenance of the CDS water nozzles. (*See* Tab 5, O&M Manual, Vol. 1, at Sec. 9.1.) Request 57 of ALSTOM's First Request states:

> Any and all documents relating to the water spray lances/water injection nozzles within the CDS and ESP equipment, including, but not limited to, documents relating to the maintenance, testing

---

[7] Upon further examination of the Ash Study Chloride Content, the study centers upon ash samples taken on three discrete days – September 29 and 30, 2003 and October 3, 2003.

7

> or inspection of the lances/nozzles, the atomization of water by the
> lances/nozzles, and the water flow rate through the lances/nozzles.

(*See* Tab 1, First Request, Request 57.) In response to this request, AES has produced a "CDS Nozzle Cleaning Log: Unit 1 / Unit 2," which provides this information for a limited period of time. Thus, AES's production is incomplete. Specifically, the log for Unit 1 spans the period from January 2, 2003 to November 3, 2004, while the Unit 2 log spans the period from January 2, 2004 to November 2, 2004. AES has failed to explain why it produced the nozzle cleaning log book only for the narrow date ranges listed above. Moreover, ALSTOM observed additional CDS nozzle cleaning logs in the control room of the Plant during a recent site inspection. (*See* Tab 8, Photograph of Unit #2 CDS Nozzle Cleaning Log.) Because AES has failed to produced these documents and failed to explain their absence, this Court should compel AES to produce the requested documents.

### e.    Distributed Control System Data

In several circumstances, the O&M Manuals state that data related to CDS temperature and other operating parameters should be "trended by the plant DCS." (*See* Tab 5, O&M Manual, Vol. 1, at Sec. 9.0.) The DCS data, therefore, plays a critical role in assuring compliance with the operation and maintenance requirements. Request 74 of ALSTOM's First Request seeks, "[a]ny and all documents related to the Distributed Control System." (*See* Tab 1, First Request, Request 74.) In response, AES refused to produce any documents related to this request. Specifically, AES stated, "AES-PR objects to this request on the grounds that it is overly broad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." (*See* Tab 2, Responses and Objections to First Request.)

As set forth above, a prerequisite for AES's claims for breach of warranty is its ability to establish that it operated the Plant correctly. Thus, the data relating to plant operations that is

8

recorded in the DCS is indisputably relevant and discoverable. Relying solely upon a boilerplate objection, and without an explanation, AES has failed to produce documents related to the DCS. Accordingly, the Court should compel AES to produce the DCS data properly requested by ALSTOM in its First Request.

### 2. Videotapes

In Request 49 of its First Request, ALSTOM specifically requested all "videotapes... of any aspect of the CDS and/or the ESP equipment, or the Water Treatment System." (*See* Tab 1, First Request, Request 49.) In AES's response to this request, it states, after objecting to the requests on multiple grounds, that it "will produce any non-privileged, responsive documents relating to the corrosion damage to the ESP equipment." (*See* Tab 2, Responses and Objections to First Request.) AES's limitation of its production to documents "relating to the corrosion damage to the ESP equipment," is an improper attempt to avoid its discovery obligations.

Moreover, AES failed to produce a single videotape in any of its productions to ALSTOM. During the course of ALSTOM's site visit to the Plant, ALSTOM observed the existence and possession of multiple videotapes responsive to Request 49 that AES inexplicably failed to produce. Specifically, ALSTOM observed the following videotapes located in the Plant control room: "CDS Scrubber And Electrostatic Precipitator," "CDS Scrubber – An Introduction of Precipitator & Components," "Base Theory of Operation," "Precipitator & Components: An Introduction of Start Up & Shut Down of APCS and Components." (*See* Tab 9, Photograph of Videotapes.) Because these videotapes undeniably exist (and others may as well) and because AES failed to produced them as requested, the Court should compel AES to produce all videotapes responsive to ALSTOM's requests.

9

C 121

### 3. Calibration Records

AES has failed to produce any documents relating to the maintenance or calibration of the measuring instruments, including thermocouples and other temperature reading devices, for either the ESP or the CDS. (*See* Tab 5, O&M Manual, Vol. 1, at Secs. 9.0, 9.1.) It is undeniable that the Plant has instruments to measure many of the critical operating parameters of the ESP and CDS equipment. In Request 52 of its First Request, ALSTOM requested, "[a]ll documents which constitute, pertain or relate in any way to AES' maintenance guidelines and records for the CDS and/or the ESP equipment." (*See* Tab 1, First Request, Request 52.)    To date, AES has refused or failed to produce any documentation relating to maintenance or calibration of the measuring instruments.

Specifically, ALSTOM seeks records related to the CDS inlet and outlet temperature thermocouples or other measuring device(s), the CDS wet bulb measuring device(s), CDS dry bulb measuring device(s), CDS dew point measuring device(s), CDS acid dew point measuring device(s), ESP measuring device(s), and stack measuring device(s). Without documentation that it properly calibrated these instruments, AES would be unable to satisfy its burden of establishing that it accurately operated the Plant within the design parameters. Accordingly, the Court should compel AES to produce any and all documents responsive to Request 52.

### 4. Air Permit Compliance and Violation Records

Under the terms of the permit and applicable environmental laws, AES is required to communicate with and submit data to the United States Environmental Protection Agency (the "EPA"), including reporting all emissions violations. In Request 56 of ALSTOM's First Request, ALSTOM specifically requested "[a]ll documents relating to the power plant's compliance or failure to comply with air emissions standards, including but not limited to any

10

such standards imposed by the U.S. Environmental Protection Agency and any agency of the government of Puerto Rico." (*See* Tab 1, First Request, Request 56.) Although AES has produced some records regarding air emissions and the EPA, AES's production is incomplete. Accordingly, the Court should require that AES produce to ALSTOM all of the documents that it is legally required to submit to the EPA.

### 5.    Requests for Which AES Produced No Documents

As stated earlier, AES produced its documents by organizing and labeling them to correspond with ALSTOM's First Request. Despite stating its intent to produce "non-privileged, responsive documents," AES utterly failed to produce any documents responsive to Request Nos. 2, 3, 4, 5, 6, 9, 20, 45, 67, 68, and 70, nor has it explained their absence. ALSTOM is entitled to production of the documents set forth in the categories described above, all of which are discoverable in this action under the Federal Rules.

### B.    Legal Authority.

The categories of information set forth above are relevant to the present lawsuit filed by AES. Under Federal Rule of Civil Procedure 26(b)(1), ALSTOM is entitled to "obtain discovery regarding any matter, not privileged, which is relevant to the claim or defense of any party." Courts construe this standard very liberally in favor of the party seeking discovery. *Marshall v. Elec. Hose & Rubber, Co.*, 68 F.R.D. 287, 295 (D. Del. 1975). Moreover, the discovery requested by ALSTOM should be permitted "unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." *La Chemise Lacoste v. Alligator Co., Inc.*, 60 F.R.D. 164, 171 (D. Del. 1973). AES has not sufficiently explained its failure to produce the requested documents; it simply has not produced them.

11

It is well recognized that the party resisting production bears the burden of establishing a

lack of relevancy or undue burden.[8] *St. Paul Reinsurance Co., Ltd. v. Commerical Fin. Corp.*,

198 F.R.D. 508, 511-12 (N.D. Iowa 2000); *Oleson v. Kmart Corp.*, 175 F.R.D. 560, 565 (D. Kan.

1997) (stating that the party resisting production must set forth specific facts, through affidavit or

otherwise, to substantiate its objection). In this case, AES has not set forth any specific facts in

support of its efforts to resist discovery. Instead, AES has simply failed to produce numerous

documents responsive to ALSTOM's request and necessary for full and fair resolution of this

litigation.

## IV.    CONCLUSION

For the reasons set forth above, ALSTOM Power Inc. respectfully requests that this Court

enter an Order directing AES to produce any and all documents responsive to Request Nos. 2, 3,

4, 5, 6, 9, 20, 45, 49, 52, 57, 58, 62, 64, 67, 68, 70, and 74 of ALSTOM's First Request for

Production of Documents.

ALSTOM POWER INC.

/s/ Daniel W. Scialpi
Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222
dscialpi@wierlaw.com

---

[8] Under Federal Rule 26(b)(1), to withhold production of discoverable and non-privileged information, AES must establish that "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." FED. R. CIV. PROC. 26(b)(1).

C 124

James E. Edwards, Jr., Esquire
Anthony F. Vittoria, Esquire
Michael A. Schollaert, Esquire
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax:    (410) 547-0699

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 5th day of December 2005, a copy of the foregoing

Defendant's Motion to Compel Production of Documents, Rule 7.1.1 Statement and Proposed

Order was filed with the Court using CM/ECF, which will send a copy to:  John S. Spadaro,

Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware 19805.  In

addition, a courtesy copy was served via electronic mail upon Daniel D. Williams, Esquire,

Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C.  20005

/s/ Daniel W. Scialpi
Daniel W. Scialpi

774192

C 125