# Tab 50



CAPS
C.O.

April 29, 2004

**Chief, Air Compliance Branch**
U.S. EPA, Region 2
290 Broadway – 21st Floor
New York, NY 10007-1866

**Subject: AES Puerto Rico Cogeneration Plant (AES-PR), Guayama, PR – 1st Quarter 2004 CEMS Report**

Enclosed is a copy of AES Puerto Rico's CEMS Quarterly Report for 1st Quarter 2004. This is being submitted in accordance with the requirements of the facility's PSD Permit, 40 CFR Part 60.49a and Appendix F to part 60.

Certification Statement: Based on information and belief formed after reasonable inquiry, the statements and information in this document are true accurate and complete.

If you have any questions I can be reached at (787) 866-8117 ext.239.

Sincerely,

William G. Vela

cc: Region 2 CEM Coordinator
Director, CEPD, US EPA
Director, Air Permit Program

U.S. ENV. PROT. AGENCY
2004 MAY -4 PM 3:29
CEPD-DIRECTOR OFFICE

C 168

Carr. #3 Km. 142.0. Bo. Jobos • P.O. Box 1890, Guayama, Puerto Rico 00785 • Tel. (787) 866-8117 • Fax (787) 866-8139



AES
Puerto Rico

# First Quarter 2004

# Continuous Emissions Monitoring System Report

PO Box 1890, Guayama PR 00785 * Tel: 787-866-8117 * Fax: 787-866-8139

# Table of Contents

| Tab | Section Description |
| --- | --- |
| 1 | Monitoring System Performance and Excess Emission Summary - Unit 1 |
| 2 | Monitoring System Performance and Excess Emission Summary - Unit 2 |
| 3 | Excess Emissions Report – Unit 1 |
| 4 | Excess Emissions Report – Unit 2 |
| 5 | Daily Emissions Report – Unit 1 |
| 6 | Daily Emissions Report – Unit 2 |
| 7 | Availability Report - Unit 1 |
| 8 | Availability Report – Unit 2 |
| 9 | Calibration Gas Audit (CGA) Results - Unit 1 |
| 10 | Calibration Gas Audit (CGA) Results - Unit 2 |

# Monitoring System Performance and Excess Emission Summary

## Unit 1

================================================================================

Monitor Downtime Report
AES Puerto Rico
Unit #1
OPACITY

================================================================================

Report for 01/01/2004 to 03/31/2004
Today's Date: 04/16/2004

================================================================================

1. Monitor Availability

| Reasons for Missing or Unacceptable Data | Downtime (minutes) | % Downtime to Operating Time |
|---|---|---|
| a. Monitor Malfunctions | 0 | 0.00 |
| b. Non-Monitor Equipment Malfunctions | 0 | 0.00 |
| c. Quality Assurance | 42 | 0.04 |
| d. Other Known Causes | 18 | 0.02 |
| e. Unknown Causes | 0 | 0.00 |
| Total CMS Downtime | 60 | 0.05 |

| | |
|---|---|
| Total Online Operating Time in Minutes | 118458 |
| [Total CMS Downtime] x 100 / [Total source operating time]. (%) | 0.05 |

B. Excess Emissions Summary

| | |
|---|---|
| 1. Number of 6 Minute Averages | 19743 |
| 2. Number of 6 Minute Averages in Excess of Limit | 27 |

| 3. Reasons for Excess Emissions Based on 6 Minute Rolling Average | Duration (Minutes) | % E.E. Time To Operating Time |
|---|---|---|
| I. Startup / Shutdown | 108 | 0.09 |
| II. Control Equipment Malfunction | 0 | 0.00 |
| III. Process Malfunction | 0 | 0.00 |
| IV. Unknown Causes | 0 | 0.00 |
| V. Other Known Causes | 54 | 0.05 |
| TOTAL | 162 | |

| | |
|---|---|
| Total Monitored Facility Operating Minutes | 118398 |
| Total duration of excess emissions x 100 / [Total source operating time]. (%) | 0.14 |

C 172

# Monitoring System Performance and Excess Emission Summary

## Unit 2

Monitor Downtime Report
AES Puerto Rico
Unit #2
OPACITY

Report for 01/01/2004 to 03/31/2004
Today's Date: 04/16/2004

1. Monitor Availability

| Reasons for Missing or Unacceptable Data | Downtime (minutes) | % Downtime to Operating Time |
|---|---|---|
| a. Monitor Malfunctions | 0 | 0.00 |
| b. Non-Monitor Equipment Malfunctions | 0 | 0.00 |
| c. Quality Assurance | 30 | 0.02 |
| d. Other Known Causes | 12 | 0.01 |
| e. Unknown Causes | 0 | 0.00 |
| Total CMS Downtime | 42 | 0.03 |

Total Online Operating Time in Minutes 131040
[Total CMS Downtime] x 100 / [Total source operating time]. (%) 0.03

B. Excess Emissions Summary

1. Number of 6 Minute Averages 21840
2. Number of 6 Minute Averages in Excess of Limit 6

| 3. Reasons for Excess Emissions Based on 6 Minute Rolling Average | Duration (Minutes) | % E.E. Time To Operating Time |
|---|---|---|
| I. Startup / Shutdown | 0 | 0.00 |
| II. Control Equipment Malfunction | 0 | 0.00 |
| III. Process Malfunction | 0 | 0.00 |
| IV. Unknown Causes | 0 | 0.00 |
| V. Other Known Causes | 36 | 0.03 |
| TOTAL | 36 | |

Total Monitored Facility Operating Minutes 130998
Total duration of excess emissions x 100 / [Total source operating time]. (%) 0.03

# Tab 51

**From:** Paul Stinson
**Sent:** Monday, November 24, 2003 5:42 PM
**To:** Puerto Rico Leaders
**Subject:** Instrumentation for the Unit 2 ESP

Now that we know we have a serious corrosion problem, we are taking some steps to mitigate. For example we will run higher CDS outlet temperatures and we are doing some repairs and stabilization of the collecting plates.

I want to propose some additional instrumentation that will help us diagnose our efforts.

I would like for some removable corrosion coupons to be installed in the ESP at locations recommended by our contractor, FL Schmidt. I want also to have at least two thermocouples to be installed in the ESP, one high up, at least 10 feet from a sidewall, and one down low, at least ten feet from a sidewall. They should be able to be read with a handheld voltmeter.

I want Hassan to review and approve each installation for high voltage safety. We need to be sure that none of the devices can come into proximity of high voltage source, nor can they be pushed in farther or moved such that they contact any source of high voltage.

The thermocouples are needed to measure temperature stratification in the box from bottom to top. The coupons will allow us to evaluate the corrosion rates we are seeing.

The thermocouples should be installed in the plane between the 420 and 430 hoppers.

Paul Stinson

# Tab 52



Unit 1 CDS Make-up Water Quality
Chloride, ppm
4000
3500
3000
2500
2000
1500
1000
500
0
10/6/2003
10/26/2003
11/15/2003
12/5/2003
12/25/2003
1/14/2004
2/3/2004
2/23/2004
Date of Sample

AESPR-120902

C 176

# Tab 53

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P., *

Plaintiff, *

v. * C.A. No. 04-1282-JJF

ALSTOM POWER INC., *

Defendant. *

* * * * * * * * * * *

**SECOND AMENDED NOTICE OF DEPOSITION OF CORPORATE DESIGNEE**

ALSTOM Power, Inc., defendant, by undersigned counsel, and pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, hereby gives notice that it will take the deposition upon oral examination of AES Puerto Rico, L.P. before a notary public or other such person authorized to administer oaths beginning at 10:00 a.m. on Friday, March 10, 2006, and continuing until the deposition is completed, at the offices of AXTMAYER, PSC, American International Plaza, Suite 404, 250 Munoz Rivera Avenue (Hato Rey), San Juan 00918, Puerto Rico or at such other location as the parties shall agree. The deposition shall be recorded by video and stenographic and/or sound means.

**DEFINITIONS**

For purposes of this Notice of Deposition, certain terms are defined below:

1. "You" or "AES" or "Owner" refers to Plaintiff, AES Puerto Rico, L.P., a Delaware limited partnership, and any current or former officers, directors, employees, agents, contractors, representatives of or attorneys for AES or AES related entities.

2. "ALSTOM" refers collectively to ALSTOM Power Inc. and ALSTOM Caribe (f/k/a CE Caribe), and any of their officers, directors, employees, agents, contractors, representatives, or attorneys.

3. "D/FD" refers to Duke/Fluor Daniel Caribbean, S.P., a Puerto Rico partnership, and its constituent partner members or partners, and any of its or their officers, directors, employees, agents, representatives of, or attorneys.

4. "EEC" refers to Environmental Elements Corporation and any of its officers, directors, employees, agents, contractors, representatives, or attorneys.

5. The "Project" means the engineering, design, and construction of a coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

6. The "EPC Contract" means the Agreement for Engineering, Procurement, and Construction Services Between AES and Duke/Fluor Daniel Caribbean S.P. dated as of April 3, 1996 with respect to the Project.

7. The "Purchase Order" means the contract between ALSTOM and D/FD pursuant to which ALSTOM agreed to furnish and erect boilers and related equipment on the Project.

8. "CDS" refers to the Circulating Dry Scrubber equipment provided by ALSTOM for the Project.

9. "ESP" refers to the Electrostatic Precipitator equipment provided by ALSTOM for the Project and referred to in your Complaint.

10. "FBHE Handcuffs" refers to the fluidized bed heat exchanger handcuff equipment provided by ALSTOM for the Project and referred to in your Complaint.

11. "Water Treatment Systems" refers to the plant equipment used to treat the water used in the CDS and ESP.

12. "Plant" refers to the coal-generated power plant for AES Puerto Rico, L.P. in Guayama, Puerto Rico.

**AREAS OF EXAMINATION**

The Deponent shall designate such person or persons as are necessary to respond to the areas of examination set forth below.

1. The zero liquid discharge permit for the Project and/or operation of the Plant, including AES's assertion that a brine crystallizer is now necessary to comply with that permit and that water injection into the boiler is necessary until the crystallizer is constructed, and any investigation or analysis of the extent to which the permit could be modified to permit some discharge of waste water.

2. Environmental permitting issues for opacity and sulphur dioxide relating to the Project and/or the Plant, including, but not limited to, political and/or legal opposition to the Project and/or the Plant, any lawsuits filed to prevent issuance of operational permits for the Project and/or the Plant and any continued complaints and/or investigations regarding alleged environmental issues and the Plant's operations.

3. Knowledge of AES regarding the risk of corrosion in the CDS or the ESP prior to November, 2003 and measures that could be taken to limit the risk of corrosion and how and from whom AES acquired such knowledge, including the subject matter of a Due Diligence Report by Black & Veatch relating to emissions and corrosion, discussions at a meeting with D/FD, ALSTOM, and EEC on February 10, 2000, and any discussions or analyses of these issues among individuals employed by AES and D/FD and other persons or entities, including, but not limited to, ALSTOM, EEC, and John Toher.

4. Knowledge regarding the alleged accelerated corrosion experienced at the Plant, including the assertion in paragraph 19 of the Complaint that "[t]he accelerated corrosion far exceeds industry standards," and the assertion in paragraph 19 of your Complaint that the corrosion "has affected both the structural integrity of portions of the electrostatic precipitators and the ability of the electrostatic precipitators mechanically to perform."

5. Knowledge regarding the assertion in paragraph 21 of the Complaint that AES "determined that it needed to make modifications, including installing a new water treatment system in order to eliminate from the gas entering the electrostatic precipitators the compounds responsible for the accelerated corrosion."

6. AES's notification to ALSTOM of a claim for alleged accelerated corrosion under the Warranty in the Purchase Order that is the subject of this action and any and all efforts to agree upon appropriate remedial actions with ALSTOM to correct the alleged defects and/or deficiencies for which AES notified ALSTOM.

7. Knowledge regarding AES's practices of measuring the chloride content of the CDS spray water or the fly ash at the Plant, including, but not limited to, how measurements were taken, when measurements were taken, how measurements were recorded, and the frequency of any such measurements.

8. Knowledge regarding AES's practices of measuring the wet bulb temperature of the CDS, including, but not limited to, how measurements were taken, where measurements were taken, when measurements were taken, how measurements were recorded, and the frequency of any such measurements.

9. Knowledge regarding AES's practices of replacing the CDS water nozzles or their constituent parts, including, but not limited to, what replacements were made, when such

replacements were made, how often such replacements were made, whether AES kept replacement and ordering records for the nozzles and the constituent parts, and the costs of replacing the nozzles and/or the constituent parts.

10. Knowledge regarding AES's decision to modify the type of CDS spray nozzles used in the CDS, including, but not limited to, when such modification occurred, why the modification occurred, and the cost of the modification.

11. Knowledge regarding AES's decision to install equipment to re-inject fly ash from the ash silos to the boiler, including how much (quantity) ash was re-injected into the boiler when the ash re-injection system was operating, when the ash re-injection system was operated, and AES's purpose in requiring the installation of the ash re-injection system.

12. Knowledge regarding the consumption of cooling water in the CDS in gallons per minute in calendar year 2003.

13. Knowledge regarding settings or adjustments to the CDS inlet temperature by AES during calendar year 2003.

14. Knowledge regarding the extent to which, during the period between September, 2002 and February, 2004, AES complied with the procedures and requirements set forth in the Operations and Maintenance Manuals ("O&M Manuals") prepared by EEC with regard to the CDS and ESP, without regard to any modifications that AES now contends were made to such O&M Manuals, and any deviations by AES from such procedures and requirements.

15. Knowledge regarding ALSTOM's and/or EEC's alleged modification of the O&M Manuals or the operation and maintenance procedures and/or parameters for the pollution control equipment at the Plant, including, but not limited to, what procedures were allegedly modified, how such modifications were made, by whom such modifications were made, to whom

such modifications were made, whether such modifications were oral or in writing, and when such modifications occurred.

16. Knowledge regarding any and all efforts by AES to operate the CDS and ESP in accordance with the procedures set forth in the O&M Manuals after discovery of the corrosion in the ESP.

17. Knowledge regarding attendance by AES's employees at the training program conducted by ECC and any subsequent dissemination of the training materials to AES's employees or re-broadcast of training using the training videotapes.

18. Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "Plant could not operate pursuant to the requirement of its air permit with the CDS outlet temperature set to 172 degrees or above when using high-chloride water for which it was designed to operate."

19. Knowledge regarding the assertion in AES's Response to Interrogatory No. 17 to ALSTOM's Second Set of Interrogatories that the "spray nozzle cleaning procedure recommended by EEC caused the Plant to experience unacceptable opacity spikes during the cleaning procedure."

20. Knowledge regarding the nature of additional handcuffs installed by AES on the fluidizing bed heat exchangers at the Plant and the locations on the fluidized bed heat exchangers where such handcuffs were installed.

James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax: (410) 547-0699

Attorneys for ALSTOM Power Inc.

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
Two Mill Road, Suite 200
Wilmington, Delaware 19801
(302) 888-3222

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 7th day of March, 2006, a copy of the foregoing Second Amended Notice of Deposition of Corporate Designee was served, via electronic mail and first-class mail, on:

John S. Spadaro, Esquire
Murphy Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, Delaware 19805

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Anthony F. Vittoria

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant. | * | |

* * * * * * * * * * *

**NOTICE OF DEPOSITION**

Defendant ALSTOM Power, Inc., by undersigned counsel and pursuant to Rule 30 of the Federal Rules of Civil Procedure, hereby gives notice that it will take the deposition upon oral examination of Al Dyer before a notary public or other such person authorized to administer oaths beginning at 9:30 a.m. on Thursday, March 9, 2006, and continuing until the deposition is completed, at the offices of AXTMAYER, PSC, American International Plaza, Suite 404, 250 Munoz Rivera Avenue (Hato Rey), San Juan 00918, Puerto Rico, or at such other location as the parties shall agree. The deposition shall be recorded by video and stenographic and/or sound means.

ALSTOM POWER INC.

James E. Edwards, Esquire
Anthony F. Vittoria, Esquire
Michael A. Schollaert, Esquire
OBER, KALER, GRIMES & SHRIVER, P.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone: (410) 685-1120
Fax: (410) 547-0699

Richard R. Wier, Jr. (#716)
Daniel W. Scialpi (#4146)
RICHARD R. WIER, JR., P.A.
1220 Market St., Suite 600
Wilmington, DE 19801
(302) 888-3222

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 7th day of March, 2006, a copy of the foregoing Notice of Deposition was served via electronic mail and first-class mail on:

John S. Spadaro, Esquire
Murphy Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, Delaware 19805

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Anthony F. Vittoria

# Tab 54

**OFFICIAL TRANSCRIPT OF PROCEEDINGS**

**BEFORE THE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---

**IN THE MATTER OF** **CASE NO.**

| | | |
|---|---|---|
| AES PUERTO RICO, LP | * | C.A. NO.: 04-1282(JJF) |
| | * | |
| Plaintiff | * | |
| | * | |
| Vs. | * | |
| | * | |
| ALSTOM POWER, INC. | * | |
| | * | |
| Defendant | * | |

******************************

DEPOSITION OF MR. DAVID STONE
30(b)(6)

---

**PLACE:** Hato Rey, Puerto Rico

**DATE:** March 10th, 2006

*Crespo & Rodríguez, Inc.*
Tel. (787) 758-5930 / 763-8018
Fax (787) 767-8217
A-6 Yale Street, Santa Ana
Rio Piedras, Puerto Rico 00927

                    IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, LP * C.A. NO.: 04-1282(JJF)
*
Plaintiff *
*
Vs. *
*
ALSTOM POWER, INC. *
*
Defendant *
******************************

DEPOSITION OF MR. DAVID STONE
30(b)(6)

DATE : March 10, 2006

TIME: : 9:30 A.M.

OFFICE : Ober, Kaler, Grims & Shriver, P.S.C.
120 East Baltimore Street
Baltimore, Maryland 21202-1643

HELD AT : Axtmayer, P.S.C.
250 Ponce de León Avenue
Suite 404
Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

Daniel D. Williams, Esq.

FOR DEFENDANT:

Anthony Vittoria, Esq.

NOTARY PUBLIC:

Liana I. Loyola, Esq.

CRESPO & RODRIGUEZ, INC.
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Rio Piedras, Puerto Rico 00927

C 187


paragraph on page number four.

A Okay. Can I read the question of the...

Q Sure.

A Okay.

Q The second paragraph on page number four says, "In September or October, 2002, EEC and/or Alstom presented revised operating procedures to AES-PR, in the 'EEC Control Room Reference' book. They periodically updated those procedures in September and/or October, 2002. Those revised procedures supplemented and superseded the August, 2001 EEC O&M Manual.

The instructions in the final EEC Control Room Reference Book, dated October 22, 2002, direct the plant operator to set the CDS outlet temperature to 152 degrees." Did I read that correctly?

A I believe you read the paragraph that began "In September or October, 2002..." in its entirety.

(Whereupon, a document has been marked for identification as Exhibit 38 of the deposition.)

MR. WILLIAMS:

And once again we'll note for the record this paragraph has been supplemented.

BY MR. VITTORIA:

Q I'm handing you what's been marked as Exhibit 38, and I would ask you, is what has been marked as



Exhibit 38, the EEC Control Room Reference Book, that is referred to the in the second paragraph that I just read, Exhibit 37?

A The title of the document does say "Control Room Reference EEC."

Q Is that the document to which is being referred in this interrogatory answer?

MR. WILLIAMS:

Objection, asked and answered.

THE DEPONENT:

It appears to be the Control Room Reference EEC, I don't know, book, or pamphlet, or directives.

BY MR. VITTORIA:

Q Is there another book that is being referred to in the second paragraph on page four, the one that's referred to as the "EEC Control Room Reference"?

MR. WILLIAMS:

Objection to form.

THE DEPONENT:

I don't know of any other books.

BY MR. VITTORIA:

Q If you'll turn to the page that's marked "AES2-0401076," please.

A Okay.

Q Are you on that page?

A Yes, I'm on AESPR000207.

Q Okay.

A I guess that's the same one.

Q It is. Do you see the date at the top, it says, the typed date is 10/22/02?

A There is a handwritten R.E.C. 10-22-02, and below there's a typed 10-22-02.

Q Is that the instruction, in the final EEC Control Room Reference Book dated October 22, 2002, that is referred to in the second paragraph on page four?

MR. WILLIAMS:

Objection, calls for speculation.

THE DEPONENT:

I'm not sure if this was... I'm not sure if this was the final... I don't have any... this page would indicate it's a CDS Restart Procedure as of the date 10-22-02.

BY MR. VITTORIA:

Q Did you speak with anyone, other than counsel, relating to the substance of this interrogatory answer on page four?

A No, I've not spoken to anyone relative to this document with others during preparation.

Q Do you know who would know what document is being referred to in that answer to the interrogatory?