**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____

AES PUERTO RICO, L.P.,                    )
                                          )
                                          )
                    Plaintiff,            )
          v.                              )     Civ. No. 04-1282-JJF
                                          )
ALSTOM POWER, INC.,                       )
                                          )
                    Defendant.            )
_____)

**<u>PROPOSED PRETRIAL ORDER</u>**

John S. Spadaro (# 3155)                  Richard R. Wier, Jr. (#716)
MURPHY SPADARO & LANDON                   Daniel W. Scialpi (#4146)
1011 Centre Road, Suite 210               RICHARD R. WIER, JR., P.A.
Wilmington, DE 19805                      Two Mill Road, Suite 200
Tel (302) 472-8100                        Wilmington, DE 19806
Fax (302) 472-8135                        Tel (302) 888-3222

Dane H. Butswinkas                        John Anthony Wolf
R. Hackney Wiegmann                       James E. Edwards, Jr.
Daniel D. Williams                        Anthony F. Vittoria
Ann N. Sagerson                           Michael A. Schollaert
James L. Tuxbury                          OBER, KALER, GRIMES & SHRIVER
WILLIAMS & CONNOLLY LLP                   A Professional Corporation
725 Twelfth Street, N.W.                  120 East Baltimore Street
Washington, D.C. 20005                    Baltimore, MD 21202-1643
Tel. (202) 434-5000                       Tel: (410) 685-1120
Fax (202) 434-5029                        Fax: (410) 547-0699

Attorneys for AES Puerto Rico, L.P.       Attorneys for ALSTOM Power Inc.

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ......................................................................................1

     A.     AES-PR's Statement ...........................................................................1

     B.     ALSTOM's Statement .........................................................................1

II.     BASIS FOR JURISDICTION ...................................................................................2

III.     ADMITTED FACTS REQUIRING NO PROOF......................................................2

IV.     ISSUES OF FACT REMAINING TO BE LITIGATED ..........................................4

     A.     AES-PR's List of Issues of Fact To Be Litigated .................................4

     B.     ALSTOM's List of Issues of Fact To Be Litigated ...............................6

V.     ISSUES OF LAW REMAINING TO BE LITIGATED............................................10

     A.     AES-PR's List of Issues of Law To Be Litigated..................................10

     B.     ALSTOM's List of Issues of Law To Be Litigated ...............................12

VI.     LIST OF EXHIBITS..................................................................................................19

     A.     AES-PR's List of Exhibits ....................................................................19

     B.     ALSTOM's List of Exhibits ..................................................................34

VII.     LIST OF WITNESSES .............................................................................................61

     A.     AES-PR's List of Witnesses ..................................................................61

     B.     ALSTOM's List of Witnesses ...............................................................64

VIII.     AES-PR'S BRIEF STATEMENT OF PROOF .......................................................66

IX.     ALSTOM'S BRIEF STATEMENT OF PROOF .....................................................73

X.     SETTLEMENT NEGOTIATIONS ..........................................................................102

XI.    OTHER MATTERS THAT THE PARTIES DEEM APPROPRIATE.................................102

    A.    AES-PR's List of Other Matters ...............................................................102

    B.    ALSTOM's List of Other Matters ............................................................102

XII.    CONCLUSION.............................................................................................................105

Pursuant to D. Del Rule 16.4, Plaintiff AES Puerto Rico, L.P. ("AES-PR") and Defendant ALSTOM Power Inc. ("ALSTOM") submit this proposed pretrial order.

## I. NATURE OF THE ACTION

### A. AES-PR's Statement

This is a breach of warranty case concerning equipment that Defendant ALSTOM contracted to design, supply and commission during construction of Plaintiff AES Puerto Rico's 454 megawatt coal-fired power plant in Guayama, Puerto Rico. The equipment at issue includes pollution control equipment and boiler tube stabilization components. ALSTOM expressly warranted that this equipment would comply with the parties' contract and be free from material defects. AES Puerto Rico contends that ALSTOM breached the Contract because the equipment was defective and ALSTOM failed to fulfill its duty under the Contract to correct the defects and to cause the equipment to comply with the Contract. ALSTOM has denied AES Puerto Rico's claims and contends that any damage to the equipment was caused by AES Puerto Rico's misuse of the equipment.

### B. ALSTOM's Statement

On September 20, 2004, AES Puerto Rico, L.P. ("AES-PR") filed a single-count Complaint against ALSTOM Power Inc. ("ALSTOM"), asserting two claims for breach of express warranty: (i) the first sought recovery of damages allegedly attributable to accelerated corrosion of air pollution control equipment supplied by ALSTOM; and (ii) the second sought recovery of damages allegedly related to the purchase and installation of additional boiler tube stabilization components. ALSTOM answered the Complaint, denying liability with respect to AES-PR's two claims in their entirety. There is no counterclaim. Neither the Complaint nor the Answer have been Amended.

## II.  BASIS FOR JURISDICTION

Federal jurisdiction is based upon diversity of citizenship.  28 U.S.C.

§ 1332(a)(2).  AES-PR is a limited partnership the partners of which are citizens of foreign

states.  ALSTOM is a citizen of Delaware and Connecticut.  The amount in controversy exceeds

$75,000.

## III.  ADMITTED FACTS REQUIRING NO PROOF

1.      Plaintiff AES-PR is a limited partnership formed pursuant to the laws of Delaware.

2.      AES-PR is the owner of a 454-megawatt co-generation coal-fired power plant in

Guayama, Puerto Rico.

3.      Defendant ALSTOM is a corporation organized and existing under the laws of Delaware

with its principal place of business in the State of Connecticut.

4.      ALSTOM is the successor to a company formerly known as Combustion Engineering,

Inc.

5.      AES-PR entered into a contract with Duke/Fluor Daniel Caribbean S.E. ("D/FD") for the

engineering, design and construction of the power plant in April, 1996.

6.      ALSTOM, through its predecessor company, Combustion Engineering, Inc., entered into

a contract with D/FD, dated February 24, 1998 (the "Contract") whereby ALSTOM, among

other things, was to furnish, erect, and provide start-up assistance with respect to Circulating

Fluidized Bed Boilers and related equipment, including air-pollution control equipment.  Exhibit

No. D-004 is a genuine and admissible copy of ALSTOM's Contract with D/FD.

7.      The original Contract Price under the Contract between D/FD and ALSTOM referenced

in Item No. 6 above was $119 million.

8.      The air pollution control equipment includes, among other things, two circulating dry scrubbers ("CDS") and two electrostatic precipitators ("ESP").

9.      ALSTOM entered into a Purchase Order with Environmental Elements Corporation ("EEC") (the "EEC Purchase Order"), dated March 30, 1999, pursuant to which EEC agreed to supply to ALSTOM the pollution control equipment for the Plant.  Pursuant to Change Order No. 1 to the EEC Purchase Order, the contract price was $14,527,570.

10.      The EEC Purchase Order contained a corrosion warranty at Paragraph 5, page 6.

11.      On February 10 - 11, 2000, during the pre-construction phase of the Project, representatives of AES-PR, D/FD, ALSTOM, and EEC attended a meeting in Windsor, Connecticut (the "2000 Windsor meeting").

12.      AES-PR began commercial operation of the plant on November 28, 2002.

13.      In  November, 2003, AES-PR, during a shutdown of the plant's Unit 2, discovered that certain internal components of the ESP on Unit 2 had corroded and AES-PR provided notice to ALSTOM of the corrosion.

14.      In  January, 2004, AES-PR, during a shutdown of the plant's Unit 1, discovered that certain internal components of the ESP on Unit 1 had corroded and AES-PR provided notice to ALSTOM of the corrosion.

## IV.  ISSUES OF FACT REMAINING TO BE LITIGATED

**A.**    **AES-PR's List of Issues of Fact To Be Litigated.**

1.    Whether Part III, Section 1.0 of the Contract between D/FD and ALSTOM (the Contract") included various express warranties (collectively, the "Warranty").

2.    Whether, on or about October 31, 2003, D/FD assigned its rights under the Warranty to AES-PR.

3.    Whether the Contract included an express warranty against the consequences of accelerated corrosion of the CDS and ESP equipment (the "Corrosion Warranty").

4.    Whether the Contract included an express warranty related to the "Boiler Hot Loop" (the "Boiler Hot Loop" Warranty).

5.    Whether the corrosion discovered in the ESPs of Units 1 and 2 is accelerated corrosion.

6.    Whether the corrosion affected the structural integrity of the Equipment (or any portion thereof) or the ability of the Equipment mechanically to perform.

7.    Whether the August 2001 Operation and Maintenance ("O&M") Manual was modified by written and oral instructions provided by ALSTOM and/or EEC during the start-up and commissioning phase of the project.

8.    Whether the EEC August 2001 O&M manual is one of the "Contractors Operations and Maintenance manuals" referred to in Section 1.6 of the Contract.

9.    Whether ALSTOM determined during commissioning and start-up of the project that the air pollution control equipment or any portion thereof was defective.

10.    Whether ALSTOM and/or EEC operated the plant prior to performance acceptance in accordance with the EEC August 2001 O&M manual.

11.    Whether ALSTOM and/or EEC knew in 2002 that operating the CDS with a CDS outlet temperature between 150 and 155 degrees Fahrenheit created an increased risk of corrosion in the ESP.

12.    Whether ALSTOM modified the operating instructions of the air pollution control equipment during commissioning and start-up to permit the equipment to comply with certain air permits, but in a manner that created a risk of accelerated corrosion.

13.    Whether ALSTOM and/or EEC instructed AES-PR to operate the CDS at the higher of 30 degree approach to adiabatic saturation or 152 F during normal operations.

14.    Whether AES-PR generally operated the CDS with an outlet temperature at 30 degrees above approach to adiabatic saturation.

15.    Whether AES-PR reasonably relied on ALSTOM's and/or EEC's modified operating and maintenance procedures.

16.    Whether AES-PR appropriately operated and maintained the fluidized bed heat exchanger and air pollution control equipment.

17.    Whether the operating temperature of the CDS affects the ability of the ESP to control opacity.

18.    Whether the tube failures experienced on September 16, 2003, January 9, 2004 and June 3, 2004 were the result of a design defect in the FHBE handcuff configuration.

19.    Whether, in January 2004, AES-PR gave ALSTOM notice of its warranty claim for ALSTOM's design deficiency in the internal clamp configuration of the fluidized bed heat exchanger tube bundles, commonly referred to as the FBHE "handcuffs."

20.    Whether the additional handcuffs installed by AES-PR are an "enhancement" not necessary for the proper functioning of the fluidized bed heat exchangers.

21.     Whether ALSTOM declined to repair the equipment and render the equipment as warranted.

22.     Whether the scope of ALSTOM's Warranty covers AES-PR's claims.

23.     Whether it is standard in the industry to follow the direction of an equipment manufacturer's field personnel during commissioning.

24.     Whether AES-PR can recover damages associated with the stabilization program.

25.     Whether AES-PR can recover damages associated with the replacement collector plates.

26.     Whether AES-PR can recover damages for modifications to the water treatment system.

27.     Whether AES-PR can recover damages for installation of a second set of FBHE handcuffs.

28.     Whether AES-PR is entitled to the amount of damages it claims.


**B.     ALSTOM's List of Issues of Fact To Be Litigated.**

1.     Has AES satisfied its burden of proving that, prior to November 28, 2004, there was accelerated corrosion of the CDS collector plates that materially affected or is reasonably expected to affect materially by November 28, 2006 (i) the structural integrity of the ESP or any portion thereof or (ii) the ability of the ESP to mechanically perform?

2.     Has AES-PR satisfied its burden of proving that it satisfied all conditions precedent to its claim, including operating and maintaining the pollution control equipment in accordance with the O&M Manuals prepared by EEC and submitted by ALSTOM to D/FD, in accordance with specified  operating parameters, and in accordance with typical systems operation at baseload and specified capacity factors?

6

3.      Has AES-PR satisfied its burden of proving that it satisfied the contractual conditions precedent to ALSTOM's warranty obligations under the accelerated corrosion warranty in Section 1.6 of the General Terms and Conditions of ALSTOM's Contract with D/FD?

4.      Has AES-PR satisfied its burden of proving that it monitored and controlled properly the chloride content of the CDS spray water as required in the O&M Manuals?

5.      Has AES-PR satisfied its burden of proving that it maintained records regarding the chloride content of the CDS spray water as required in the O&M Manuals?

6.      Has AES-PR satisfied its burden of proving that it monitored and controlled the chloride content of the ash in the CDS as required in the O&M Manuals?

7.      Has AES-PR satisfied its burden of proving that it maintained records regarding the chloride content of the ash in the CDS as required in the O&M Manuals?

8.      Has AES-PR satisfied its burden of proving that it properly adjusted the CDS outlet temperature based upon the chloride content of the CDS spray water or the ash in the CDS as required in the O&M Manuals?

9.      Has AES-PR satisfied its burden of proving that it maintained records establishing that it adjusted the CDS outlet temperature based upon the chloride content of the CDS spray water and the ash in the CDS as required in the O&M Manuals?

10.     Has AES-PR satisfied its burden of proving that it performed maintenance of the CDS spray nozzles and that it properly maintained records establishing that it performed maintenance of the CDS spray nozzles as required in the O&M Manuals?

11.     Has AES-PR satisfied its burden of proving that it increased the CDS outlet temperature during the operation of soot blowers in the CFB Boilers as required in the O&M Manuals?

12.     Has AES-PR satisfied its burden of proving that it maintained records indicating that it increased the CDS outlet temperature during the operation of the soot blowers in the CFB Boilers as required in the O&M Manuals?

13.     Has AES-PR satisfied its burden of proving that it recorded and maintained other maintenance and operating data that was required to be maintained pursuant to the O&M Manuals?

14.     Has AES-PR satisfied its burden of proving that it is excused from its non-performance of conditions precedent to its claim under the accelerated corrosion warranty based upon ALSTOM's conduct under the doctrines of estoppel and waiver?

15.     Has AES-PR satisfied its burden of proving that the O&M Manuals were amended in accordance with the terms of the Contract?

16.     Has AES-PR satisfied its burden of proving that it monitored corrosion based upon a mapping program mutually agreed to with ALSTOM?

17.     Has AES-PR satisfied its burden of proving that, in good faith, it attempted to reach an agreement with ALSTOM as to the extent of corrosion or the appropriate remedy?

18.     Has AES-PR satisfied its burden of proving that it used best faith efforts to mutually agree upon with ALSTOM appropriate remedial actions with respect to the corrosion of the ESP collector plates?

19.     Has AES-PR satisfied its burden of proving that, in the absence of a mutual agreement with ALSTOM as to the extent of corrosion or the appropriate remedy, that it referred, or attempted to refer, the dispute to a mutually agreeable third-party mediator?

20.    Has AES-PR satisfied its burden of proving that the corrosion of the CDS collector plates was not caused, in whole or in part, by deviations in the fuel or feedstock from the limits specified in the Contract between ALSTOM and D/FD?

21.    Has AES-PR satisfied its burden of proving that it gave ALSTOM reasonable access to test and operating records, the equipment, and other information ALSTOM deemed necessary to satisfy itself of the validity of AES-PR's claim under the accelerated corrosion warranty?

22.    Has AES-PR satisfied its burden of proving that the damages sought in this action constitute appropriate remedial actions that are required in order to address the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems such that the corrosion will not materially affect or is not reasonably expected to materially affect the structural integrity of the ESP's or any portion thereof or the ability of the ESP to mechanically perform during the period ending November 28, 2006?

23.    Is AES-PR barred from recovering the cost of improvements to the Plant, including the cost of injecting wastewater into the CFB Boilers, the cost of operating the Reverse Osmosis system, and for the cost of procuring, installing, and operating a brine concentrator and crystallizer unit beyond the four-year period of ALSTOM's accelerated corrosion warranty?

24.    Has AES-PR satisfied its burden of proving that ALSTOM's alleged breaches of warranty were a substantial factor in causing any of AES-PR's claimed damages?

25.    Has AES-PR satisfied its burden of proving the measure of its damages, and each component thereof, to a reasonable certainty?

26.    Has AES-PR satisfied its burden of proving that the FBHE handcuffs installed by ALSTOM do not comply with the provisions of ALSTOM's Contract with D/FD or that they are not free from defects in materials and workmanship and in full compliance with any design or

engineering furnished by ALSTOM, or that they were not, at the time of installation, new and fit

for their specified purpose as set forth in ALSTOM's Contract with D/FD and in full compliance

with the requirements of that Contract?

27.    Has AES-PR satisfied its burden of proving that it furnished prompt written notice to

ALSTOM, or that D/FD did so on its behalf, regarding claimed defects in the FBHE handcuffs?

28.    Has AES-PR satisfied its burden of proving that the installation of a second set of

handcuffs in all six FBHEs was required in order to cause ALSTOM's Work to comply with

warranties given by ALSTOM with regard to those materials?

29.    Has AES-PR satisfied its burden of proving that ALSTOM breached warranties with

regard to the installation of "handcuffs" on the tubes of the Fluidized Bed Heat Exchangers?

30.    Has AES-PR satisfied its burden of proving the measure of its damages for alleged

breach of warranty with regard to the FBHE handcuffs to a reasonable certainty?


## V.  ISSUES OF LAW REMAINING TO BE LITIGATED

### A.    AES-PR's List of Issues of Law To Be Litigated.

1.    Whether, absent AES-PR's consent, ALSTOM is permitted to assign its obligations

under the Contract to Environmental Elements Corporation ("EEC") and blame EEC for the

failure of the pollution control equipment to perform as promised.

    Authority:  *Klauder & Nunno Enters., Inc. v. Hereford Assoc., Inc.*, 723 F. Supp. 336,

346 (E.D. Pa. 1989).

2.    Whether ALSTOM is equitably estopped from claiming that the warranty is void on the

basis of alleged operator error.

Authority:  *Bechtel v. Robinson*, 886 F.2d 644, 650 (3d Cir. 1989); *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903-04 (Del. 1965); *Wolf v. Globe Liquor Co.*, 103 A.2d 774, 776 (Del. 1954).

3.      Whether ALSTOM has waived any claim that the warranty is void on the basis of alleged operator error.

Authority:  *Aeroglobal Capital Mgmt. v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005); *Pepsi-Cola Bottling Co. v. Pepsico*, 297 A.2d 28, 33 (Del. 1972).

4.      Whether the Contract contains any conditions precedent.

Authority:  *Green County v. Quinlan*, 211 U.S. 582, 594 (1909); *Castle v. Cohen*, 840 F.2d 173, 176 (3d Cir. 1988); *James E. Brady & Co. v. Eno*, 992 F.2d 864, 869 (8th Cir. 1993); *Hurt v. New York Life Ins. Co.*, 53 F.2d 453, 454 (10th Cir. 1931); *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1142 (Del. 1990); *Weiss v. Nw. Broad., Inc.*, 140 F. Supp. 2d 336, 343 (D. Del. 2001); *I.R.V. Merchandising Corp. v. Jay Ward Productions, Inc.*, 856 F. Supp. 168, 174 (S.D.N.Y. 1994); *Bristol Sav. Bank v. Silver*, 208 B.R. 100, 105 (D. Conn. 1996); *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1142 (Del. 1990); *Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995); *Stolz Realty Co. v. Paul*, 1995 WL 654152, at *9 (Del. Super. Sept. 20, 1995); 17A Am. Jur. 2d Contracts § 460

5.      Whether ALSTOM is required to render the equipment capable of operating as warranted and guaranteed or whether ALSTOM need only make temporary repairs to last through the warranty claim period.

Authority:  *Burke County Pub. Schs. Bd. of Educ. v. Juno Constr. Corp.*, 306 S.E.2d 557, 560 (N.C. Ct. App. 1983); *Pig Imp. Co. v. Middle States Holding Co.*, 943 F. Supp. 392, 400 (D. Del. 1996); *Pennington v. Rhodes*, 929 S.W.2d 169, 173 (Ark. Ct. App. 1996).

6.      Whether any of the damages AES-PR claims are consequential damages, and whether

that question is one of law or fact.

Authority:  *Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 670 F.2d 1304, 1305-07 (3d

Cir. 1982); *United States ex. rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 895 (S.D. Ohio 1999);

*Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442, 1459 & n.30

(S.D.N.Y. 1986); *Roneker v. Kenworth Truck Co.*, 944 F. Supp. 179, 186 (W.D.N.Y. 1996);

*Wood River Pipeline Co. v. Wilbros Energy & Services Co.*, 738 P.2d 866 (Kan. 1987); Del.

Code Ann. tit. 6, § 2-715(2).

7.      Whether AES-PR's damages are to be limited as disproportionate.

Authority:  *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364, 381 (N.J.

1992); *Long Island Lighting Co. v. IMO Industries, Inc*, 1990 U.S. Dist. LEXIS 5351 (S.D.N.Y.

May 9, 1990); Restatement (Second) Contracts § 351.


**B.      ALSTOM's List of Issues of Law To Be Litigated.**

1.      Based on Section 52 of the General Terms and Conditions of ALSTOM's Contract with

D/FD, is the accelerated corrosion warranty in Section 1.6 of the General Terms and Conditions

of ALSTOM's Contract the exclusive remedy for AES-PR's claim for corrosion of the ESP

collector plates?

Authority: *True North Comm. Inc. v. Publicis, S.A.*, 711 A.2d 34 (Del. Ch. 1997)

2.      Based on Section 52 of the General Terms and Conditions of ALSTOM's Contract with

D/FD, is AES-PR barred from recovering incidental, special, or consequential damages of any

kind in this action?

Authority: *Wood River Pipeline Co. v. Wilbros Eng'r Serv. Co.*, 738 P.2d 866 (Kan.

1987); *CitiSteel U.S.A., Inc.  v. Gen. Elec. Co.,* No. Civ. A. 99-810-GMS, 2001 WL 65740 (D. Del. Jan. 9, 2001).

3.    Has AES-PR, as a matter of law, failed to meet its burden of proving that it satisfied the contractual conditions precedent to ALSTOM's warranty obligations under the accelerated corrosion warranty in Section 1.6 of the General Terms and Conditions of ALSTOM's Contract with D/FD?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986); *4000 Old Pali Rd. Partners v. Lone Star*, 862 P.2d 282 (Haw. Ct. App. 1993).

4.    Has AES-PR, as a matter of law, failed to meet its burden of proving that it monitored and controlled properly the chloride content of the CDS spray water as required in the O&M Manuals?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986).

5.    Has AES-PR, as a matter of law, failed to meet its burden of proving that it maintained records regarding the chloride content of the CDS spray water as required in the O&M Manuals?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986); *4000 Old Pali Rd. Partners v. Lone Star*, 862 P.2d 282 (Haw. Ct. App. 1993).

6.      Has AES-PR, as a matter of law, failed to meet its burden of proving that it monitored and controlled the chloride content of the ash in the CDS as required in the O&M Manuals?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986).

7.      Has AES-PR, as a matter of law, failed to meet its burden of proving that it maintained records regarding the chloride content of the ash in the CDS as required in the O&M Manuals?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986); *4000 Old Pali Rd. Partners v. Lone Star*, 862 P.2d 282 (Haw. Ct. App. 1993).

8.      Has AES-PR, as a matter of law, failed to meet its burden of proving that it properly adjusted the CDS outlet temperature based upon the chloride content of the CDS spray water or the ash in the CDS as required in the O&M Manuals?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986).

9.      Has AES-PR, as a matter of law, failed to meet its burden of proving that it maintained records establishing that it adjusted the CDS outlet temperature based upon the chloride content of the CDS spray water and the ash in the CDS as required in the O&M Manuals?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*,

646 F.Supp. 433 (D. Del. 1986); *4000 Old Pali Rd. Partners v. Lone Star*, 862 P.2d 282 (Haw. Ct. App. 1993).

10.     Has AES-PR, as a matter of law, failed to meet its burden of proving that it properly maintained records establishing that it performed maintenance of the CDS spray nozzles as required in the O&M Manuals?

        Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986); *4000 Old Pali Rd. Partners v. Lone Star*, 862 P.2d 282 (Haw. Ct. App. 1993).

11.     Has AES-PR, as a matter of law, failed to meet its burden of proving that it increased the CDS outlet temperature during the operation of soot blowers in the CFB Boilers as required in the O&M Manuals?

        Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986).

12.     Has AES-PR, as a matter of law, failed to meet its burden of proving that it maintained records indicating that it increased the CDS outlet temperature during the operation of the soot blowers in the CFB Boilers as required in the O&M Manuals?

        Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986); *4000 Old Pali Rd. Partners v. Lone Star*, 862 P.2d 282 (Haw. Ct. App. 1993).

13.     Has AES-PR, as a matter of law, failed to meet its burden of proving that it recorded and maintained other maintenance and operating data that was required to be maintained pursuant to the O&M Manuals?

Authority: *Weiss v. Nw. Broad. Inc.,* 140 F. Supp 2d 336, 343 (D. Del. 2001); *Oberly v. Howard Hughes Med. Institute,* 472 A. 2d 366, 386 (Del. Ch. 1984); *Marker v. United States*, 646 F.Supp. 433 (D. Del. 1986); *4000 Old Pali Rd. Partners v. Lone Star*, 862 P.2d 282 (Haw. Ct. App. 1993).

14.     Has AES-PR, as a matter of law, failed to meet its burden of proving that it is excused from its non-performance of conditions precedent to its claim under the accelerated corrosion warranty based upon ALSTOM's conduct under the doctrines of estoppel and waiver?

Authority: *Benitec Austl. Ltd. v. Promega Corp.*, C.A. No. 04-889 JJF, 2005 U.S. Dist. LEXIS 3545 (D. Del. Mar. 8, 2005); *Wilson v. American Ins. Co.,* 209 A.2d 902 (Del. 1965); *Collins v. Sussex Trust Co.*, C.A. No. 88C-JN-21, 1989 Del. Super. LEXIS 274 (June 15, 1989); *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus.*, 871 A.2d 428 (Del. 2005).

15.     Has AES-PR, as a matter of law, failed to meet its burden of proving that the O&M Manuals were amended in accordance with the terms of the Contract?

Authority: *Dececchis v. Evers*; 174 A.2d 463 (1961); *Continental Ins. Co. v. Rutledge & Co.*,  750 A.2d 1219 (Del. Ch. 2000).

16.     Is AES-PR, as a matter of law, not entitled to recover under the accelerated corrosion warranty for the cost of replacement collector plates that will not be installed during the four-year period of ALSTOM's accelerated corrosion warranty?

Authority: *Hooten v. Kenneth B. Mumaw Plumbing & Heating Co.*, 318 A.2d 514, 519 (Md. 1974); *525 Main St. Corp. v. Eagle Roofing Co.,* 168 A.2d 33 (N.J. 1961); *Kennedy v.*

16

*Acura*, C.A. No. 01-4063, 2002 R.I. Super. LEXIS 121 (R.I. August 8, 2002); *Abraham v.*

*Volkswagen of America*; 795 F.2d 238 (2nd Cir. 1985).

17.     Is AES-PR, as a matter of law, not entitled to recover under the accelerated corrosion

warranty the costs of injecting water into the CFB Boilers, operating the Reverse Osmosis

system, and installing and operating a brine concentrator and crystallizer unit that will not occur

during the four-year period of ALSTOM's accelerated corrosion warranty?

        Authority *: Hooten v. Kenneth B. Mumaw Plumbing & Heating Co.*, 318 A.2d 514, 519

(Md. 1974); *525 Main St. Corp. v. Eagle Roofing Co.,* 168 A.2d 33 (N.J. 1961); *Kennedy v.*

*Acura*, C.A. No. 01-4063, 2002 R.I. Super. LEXIS 121 (R.I. August 8, 2002); *Abraham v.*

*Volkswagen of America*; 795 F.2d 238 (2nd Cir. 1985).

18.     Is AES-PR, as a matter of law, not entitled to recover under the accelerated corrosion

warranty the components of its claimed damages for costs that will be incurred after the four-

year period of ALSTOM's accelerated corrosion warranty?

        Authority *: Hooten v. Kenneth B. Mumaw Plumbing & Heating Co.*, 318 A.2d 514, 519

(Md. 1974); *525 Main St. Corp. v. Eagle Roofing Co.,* 168 A.2d 33 (N.J. 1961); *Kennedy v.*

*Acura*, C.A. No. 01-4063, 2002 R.I. Super. LEXIS 121 (R.I. August 8, 2002); *Abraham v.*

*Volkswagen of America*; 795 F.2d 238 (2nd Cir. 1985).

19.     Is AES-PR, as a matter of law, barred from recovering claimed consequential damages

allegedly related to the repair and replacement of corroded ESP collector plates under the terms

of ALSTOM's Contract with  D/FD that exclude recovery of incidental, special, or consequential

damages?

Authority: *Wood River Pipeline Co. v. Wilbros Eng'r Serv. Co.*, 738 P.2d 866 (Kan.1987); *CitiSteel U.S.A., Inc.  v. Gen. Elec. Co.,* No. Civ. A. 99-810-GMS, 2001 WL 65740 (D. Del. Jan. 9, 2001).

20.     Is AES-PR, as a matter of law, barred from recovering the costs of purchasing, installing, and operating the Reverse Osmosis system, injecting wastewater into the CFB Boilers, and purchasing, installing, and operating a brine concentrator and crystallizer unit under the terms of ALSTOM's Contract with D/FD that exclude recovery of incidental, special, or consequential damages?

Authority: *Wood River Pipeline Co. v. Wilbros Eng'r Serv. Co.*, 738 P.2d 866 (Kan.1987); *CitiSteel U.S.A., Inc.  v. Gen. Elec. Co.,* No. Civ. A. 99-810-GMS, 2001 WL 65740 (D. Del. Jan. 9, 2001).

21.     Is AES-PR, as a matter of law, not entitled to recover under the accelerated corrosion warranty claimed damages based upon future improvements to the Plant's water treatment system, including injection of water into the boiler, operating the Reverse Osmosis system, and the purchase, installation, and operation of a brine concentrator and crystallizer unit after the four-year period of ALSTOM's accelerated corrosion warranty?

Authority: *Hooten v. Kenneth B. Mumaw Plumbing & Heating Co.,* 318 A.2d 514 (Md. 1974); *525 Main St. Corp. v. Eagle Roofing Co.,* 168 A.2d 33 (N.J. 1961).

22.     Is AES-PR, as a matter of law, barred from recovering claimed damages for improvements to the Plant's water treatment system, including injection of water into the boiler, operating the Reverse Osmosis system, and the purchase, installation, and operation of a brine concentrator and crystallizer unit under the doctrine of disproportionality?

Authority: *Long Island Lighting Co. v. IMO Industries, Inc.,* No. 85 Civ. 6392 (RO), 1990 U.S.

Dist. LEXIS 5351 (S.D. N.Y. May 9, 1990).

## VI.  LIST OF EXHIBITS

### A.    AES-PR's List of Exhibits.

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-1 | ALDEC05-01491-1621 | 02/24/1998 | Contract No. W419-44-C0001 | 401/402, 901 | FRE 106, 901 |
| P-2 | WILH-EMAIL-009831-32 | 06/02/1997 | Tanca email attaching other email | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-3 | WILH-EMAIL-003952-53 | 06/23/1997 | Tanca email attaching other emails | 401/402, 801, 801, 803, 804 | FRE 401/402, 801/802 |
| P-4 | JT-00656-58 | 10/10/1997 | Winchester letter to Toher | 401/402; 801, 803 | FRE 401/402, 801/802, 901, 1003(2) |
| P-5 | API 0673619-60 | 03/30/1999 | Purchase Order to EEC | 401/402, 1003 | FRE 106, 1003(2) |
| P-6 | API 0673369-71 | 12/29/1999 | Flue Gas Cleaning System Performance Selection | 401/402; 801, 803 | FRE 106, 401/402, 403, 801/802 |
| P-7 | API 0674386-89 | 04/14/2000 | Excerpt from ABB Alstom Power Request for Quotation, No. 65005697-R | 401/402; 801, 803 | FRE 106, 401/402, 801/802 |
| P-8 | | 05/10/2001 | Specification for Circulating Dry Scrubber Flue Gas Cleaning System | 401/402; 1003 | FRE 106, 1003(2) |
| P-9 | AESPR 021845-73 | 05/10/2001 | Specification for Electrostatic Precipitator (ESP) Flue Gas Cleaning System | 401/402; 1003 | FRE 106, 1003(2) |

19

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-10 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 1 | 401/402, 1003 | FRE 1003(2) |
| P-11 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 2 | | No objection |
| P-12 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 3 | | No objection |
| P-13 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 4 | | No objection |
| P-14 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 5 | | No objection |
| P-15 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 6 | | No objection |
| P-16 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 7 | | No objection |
| P-17 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 8 | | No objection |
| P-18 | | 08/2001 | August 2001 EEC Operation and Maintenance Manual – Volume 9 | | No objection |
| P-19 | ALDEC05-00705 ALDEC05-00710 ALDEC05-00712-13 | 09/2001 | Excerpt from Alstom's Design and Operation Manual Volume 2, Circulating Fluidized Bed Steam Generator Instruction Manual | 401/402, 801, 803 | FRE 106, 401/402, 801/802 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-20 | EEC-04107-11 | 07/09/2002 | Fax from VanHooser to Foley with attachment | 401/402, 801, 803 | FRE 401/402, 801/802, 901 |
| P-21 | AL1-04943-53 | 07/29/2002 | Hognefelt Trip Report to AES-PR | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-22 | ROTH-EMAIL-006948 | 08/13/2002 | Rothe email | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-23 | ALDEC05-02058 | 08/16/2002 | AES Puerto Rico Daily Commissioning Report (8/16/02 – 8/17/02) | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-24 | MAID-EMAIL-016595-96 | 08/17/2002 | AES Puerto Rico Daily Commissioning Report (8/17/02 – 8/17/02) | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-25 | ALDEC05-02060 | 09/06/2002 | AES Puerto Rico Daily Commissioning Report (9/6/02 – 9/7/02) | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-26 | WVH00304 | 09/08/2002 | Troubleshooting CDS Problems | 401/402, 801, 804, 901, 1003 | FRE 401/402, 801/802, 901, 1003(2) |
| P-27 | API 0675827-28 L1-003413-14 | 09/19/2002 | Rothe email attaching other email, with attached VanHooser letter to Jarvis (9/19/02) | 401/402, 801, 803, 901, 1003 | FRE 401/402, 801/802, 901, 1003(2) |
| P-28 | MAID-EMAIL-009205-09 | 09/23/2002 | Campbell email attaching other email, with attachments | 401/402, 801, 803 | FRE 106, 401/402, 801/802 |
| P-29 | API 0675805-08 | 10/02/2002 | Rothe email attaching other email, with attachment | 401/402, 801, 803, 901, 1003 | FRE 401/402, 801/802, 901, 1003(2) |
| P-30 | JARV-EMAIL-016323-25 | 10/02/2002 | Rothe email attaching other emails | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-31 | JARV-EMAIL-005928-31 | 10/07/2002 | Jarvis email attaching other emails | 401/402, 801, 803 | FRE 401/402, 801/802 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-32 | | 10/08/2002 | Jarvis letter to VanHooser | 401/402, 801, 803, 901 | FRE 106, 401/402, 801/802, 901, FRCP 37(c)(1) |
| P-33 | ROTH-EMAIL-006750 | 10/09/2002 | Rothe email | 401/402, 801, 803 | FRE 106, 401/402, 801/802 |
| P-34 | API 0675769-70 | 10/09/2002 | Rothe email | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-35 | API 0675766 | 10/10/2002 | Jarvis email | 401/402, 801, 901, 1003 | FRE 106, 401/402, 801/802, 901, 1003(2) |
| P-36 | AES-WC-10-1373 | 10/13/2002 | API, DFD and AES Agreement re: Requirements for Performance Acceptance | 401/402, 801, 803, 1003 | FRE 401/402, 801/802, 901, 1003(2) |
| P-37 | AL1-05902-07 | 10/15/2002 | Hognefelt Trip Report to AES-PR for 10/12/02 – 10/15/02 | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-38 | AL1-04941 | 10/16/2002 | Hognefelt Summary of Trip Report to AES-PR | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-39 | W-018-00433-45 A100-12 | 10/23/2002 | Campbell letter to Lyda with attachments | 401/402, 801, 803 | FRE 801/802 |
| P-40 | API 0675745 | 11/05/2002 | Rothe letter to Titus | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-41 | WVH00841 | 11/07/2002 | VanHooser handwritten notes | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-42 | CAMP-EMAIL-011007 | 11/14/2002 | VanHooser email with attachment [CDS Cold Start-Up] | 401/402, 801, 803, 1003 | FRE 106, 401/402, 801/802, 1003(2) |
| P-43 | API 0675653 | 11/14/2002 | Rothe email attaching other email | 401/402, 801, 803 | FRE 401/402, 801/802 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-44 | API 0675735-40 | 11/19/2002 | VanHooser email with attachment | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-45 | API 0675691-93 | 12/11/2002 | Titus letter to Rothe, attaching EEC Corrosion Warranty Nullification | 401/402, 801, 803, 1003 | FRE 401/402, 801/802, 1003(2) |
| P-46 | JARV-EMAIL-004668 | 12/18/2002 | Coleman email | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-47 | API 0675672-74 | 12/19/2002 | VanHooser email attaching other email | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-48 | API 0675661-65 | 12/20/2002 | Rothe letter to Kimberl | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-49 | WARD-EMAIL-002408 | 01/08/2003 | AES Puerto Rico Daily Commissioning Report (1/4/03 – 1/8/03) | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-50 | HUGH-EMAIL-001730-31 | 01/08/2003 | Coleman email attaching other email | 401/402, 801, 803 | FRE 106, 401/402, 801/802 |
| P-51 | API 0672596-98 | 01/09/2003 | Jarvis email | 401/402, 801, 803 | FRE 106, 801/802 |
| P-52 | AESPR-235457-58 | 01/15/2003 | Bates email | 401/402, 801, 803 | FRE 106, 801/802 |
| P-53 | AL1-04923-24 | 01/30/2003 | Wardell email attaching other emails | 401/402, 801, 803 | FRE 106, 401/402, 801/802 |
| P-54 | AL1-05287-88 | 02/07/2003 | Jarvis email | 401/402, 801, 803 | FRE 401/402, 801/802, 901, 1003(2) |
| P-55 | L1-003507-08 | 02/14/2003 | Rothe letter to Titus | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-56 | AL1-04896-906 | 02/20/2003 | Hognefelt memo to Francis and Bradburn | 401/402, 801, 803 | FRE 106, 401/402, 403, 801/802 |
| P-57 | COLE-EMAIL-001414-15 | 03/31/2003 | Jarvis email attaching other email | 401/402, 801, 803 | FRE 801/802 |
| P-58 | API 0676262-72 | 04/07/2003 | Rothe email with attachment | 401/402, 801, 803 | FRE 801/802 |

23

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-59 | API 0676250-51 | 04/16/2003 | Rothe email | 401/402, 801, 803 | FRE 106, 401/402, 801/802 |
| P-60 | API 0676254 | 04/17/2003 | Rothe letter to Titus | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-61 | L-009145-48 | 05/29/2003 | Rothe letter to Durante | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-62 | API 0672660-62 | 06/10/2003 | Wardell email attaching other email | 401/402, 801, 803, 901, 1003 | FRE 401/402, 801/802, 901, 1003(2) |
| P-63 | AL1-07103-04 | 09/18/2003 | Project Change Control | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-64 | | 09/25/2003 | Stinson memo to Sostre | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-65 | | 09/26/2003 | Stinson Progress Report 2 | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901, 1003(2) |
| P-66 | AESPR-149608-09 | 09/27/2003 | Dyer email attaching other email | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-67 | AL1-05788-92 | 09/29/2003 | Hognefelt Trip Report to AES-PR for 9/22/03 – 9/26/03 | | (no objection) |
| P-68 | AESPR 022333-34 | 10/03/2003 | Purchase Order No. 03-1367 | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-69 | EEC-27332-46 | 10/09/2003 | Performance Test Plan | 401/402, 801, 803, 901 | FRE 106, 401/402, 801/802, 901 |
| P-70 | AESPR-233998-99 | 10/09/2003 | Sostre email | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-71 | AESPR-233993-97 | 10/13/2003 | Sostre email with attachments | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-72 | | 10/31/2003 | Excerpt from Release and Settlement Agreement | 401/402, 403 | FRE 106 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-73 | AESPR 022335 | 10/31/2003 | Copy of AES Puerto Rico, LP check payable to United Titanium Inc. | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-74 | JANN-EMAIL-037371 | 11/20/2003 | Jarvis email | 401/402, 801, 803 | FRE 801/802 |
| P-75 | LPI-00815 | 11/21/2003 | Rothe email | 401/402, 801, 803 | FRE 401/402, 403, 411, 801/802, 1003(2) |
| P-76 | L1-001761 | 11/24/2003 | Dyer letter to Jarvis | 401/402, 803, 1003 | FRE 403, 411, 1003(2) |
| P-77 | | 11/26/2003 | Hognefelt Trip Report to AES-PR for 11/22/03 – 11/25/03 | | (no objection) |
| P-78 | AESPR 022481-85 | 11/26/2003 | Purchase Order No. 03-1842 | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-79 | AESPR-176410-11 | 12/05/2003 | Purchase Order No. 03-1915 | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-80 | L1-001760 | 12/11/2003 | Rothe letter to Hucks | 401/402, 411, 801, 803 | FRE 106, 401/402, 403, 411, 801/802 |
| P-81 | AESPR 022354-56 | 12/15/2003 | Invoice to AES Puerto Rico LP | 401/402, 801, 803, 901, 1003 | FRE 801/802, 901, 1003(2) |
| P-82 | AESPR 022358-60 | 12/15/2003 | Invoice to AES Puerto Rico LP | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-83 | AESPR 022341 | 12/19/2003 | Copy of AES Puerto Rico LP check payable to United Titanium Inc. | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-84 | AESPR 022351-53 | 12/23/2003 | Invoice to AES Puerto Rico LP | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-85 | AESPR 007184-85 | 01/02/2004 | Stinson email | 401/402, 801, 901 | FRE 801/802, 901 |
| P-86 | AESPR-172040-61 | 01/09/2004 | Sostre email with attachments | 401/402, 801, 803, 901 | FRE 801/802, 901 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-87 | AESPR-120711 | 01/11/2004 | Sostre email | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-88 | L1-001751-52 | 01/13/2004 | Rothe letter to Hucks | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-89 | AL1-05722-23 | 01/13/2004 | Hognefelt email attaching other email | 401/402, 801, 803 | FRE 801/802 |
| P-90 | JARV-EMAIL-064720-22 | 01/15/2004 | Wilhelm email attaching other emails | 401/402, 801, 803 | FRE 801/802 |
| P-91 | ALDEC05-00008-09 | 01/15/2004 | Fishburn email | 401/402, 801, 803 | FRE 801/802 |
| P-92 | WILH-EMAIL-004938-40 | 01/16/2004 | Dyer email attaching other email | | (no objection) |
| P-93 | AESPR-119145 | 01/16/2004 | Jarvis email | | (no objection) |
| P-94 | AESPR 000331-33 | 01/16/2004 | Dyer letter to Jarvis with attachment | 401/402, 801, 803 | FRE 801/802 |
| P-95 | JARV-EMAIL-065149-50 | 01/20/2004 | Buchholz email | 401/402, 411, 801, 803, 804 | FRE 401/402, 403, 411, 801/802 |
| P-96 | JARV-EMAIL-073911-12 | 01/20/2004 | Jarvis email | 401/402, 411, 801, 803, 804 | FRE 401/402, 403, 411, 801/802 |
| P-97 | L-011055-58 | 01/21/2004 | Dyer letter to Jarvis | 401/402, 801 | FRE 801/802 |
| P-98 | LIND-EMAIL-000711-12 | 01/27/2004 | Lindau email attaching other emails | 401/402, 801, 803, 804 | FRE 801/802 |
| P-99 | COST-EMAIL-005350-51 | 01/27/2004 | Fishburn email | 401/402, 801, 803 | FRE 801/802 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-100 | L-011053 | 01/29/2004 | Rothe letter to Hucks | 401/402, 411, 801, 803, 901, 1003 | FRE 106, 401/402, 403, 411, 801/802, 901, 1003(2) |
| P-101 | L-011054 | 01/29/2004 | Invoice to EEC | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-102 | AESPR 022470-76 | 01/30/2004 | Copy of AES Puerto Rico LP check payable to F.L. Smidth Airtech, Inc. with supporting documentation | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-103 | AESPR 027160-61 | 02/01/2004 | Summary for Billing | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-104 | PANO-EMAIL-004472 | 02/03/2004 | Jarvis email | 401/402, 801, 803 | FRE 801/802 |
| P-105 | AESPR 027207-08 | 02/02/2004 | Summary for Billing | 401/402, 801, 803, 901, 1003, | FRE 106, 801/802, 901, 1003(2) |
| P-106 | AL1-05628-31 | 02/10/2004 | Dyer email attaching other emails | 401/402, 801, 803, 1003 | FRE 801/802, 1003(2) |
| P-107 | AL1-05620-22 | 02/19/2004 | Hognefelt memo to Bringfors | 401/402, 801, 803 | FRE 801/802 |
| P-108 | LP1-00529-32 | 02/27/2004 | Rothe letter to Beers | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-109 | ALDEC05-01144-45 | 03/01/2004 | Rothe email attaching other emails | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-110 | JARV-EMAIL-065003-04 | 03/08/2004 | Dyer email | 401/402, 801, 803 | FRE 801/802 |
| P-111 | HOGN-EMAIL-000624-26 | 03/08/2004 | Hognefelt email attaching other emails | 401/402, 801, 803 | FRE 801/802 |

27

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-112 | GABR-EMAIL-000885 | 03/08/2004 | Gabrielli email | 401/402, 801, 803 | FRE 106, 401/402, 801/803 |
| P-113 | JARV-EMAIL-074062-63 | 03/10/2004 | Jarvis email | 401/402, 801, 803 | FRE 801/802 |
| P-114 | L-010648-49 | 03/11/2004 | Alstom cover letter with attached Invoice Number CS-04-301 dated 01/29/04 | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-115 | LP1-00646-48 | 03/12/2004 | Rothe letter to Beers with attachment | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-116 | WARD-EMAIL-030456-57 | 03/29/2004 | Jarvis email attaching other emails | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-117 | AESPR 000272-75 | 04/30/2004 | Dyer letter to Jarvis | 401/402, 801, 803 | FRE 801/802 |
| P-118 | AESPR 022454 | 05/14/2004 | Copy of AES Puerto Rico LP check payable to ICE | 401/402, 801, 803 | FRE 801/802, 901 |
| P-119 | | 05/18/2004 | Jarvis letter to Dyer | 401/402, 801, 803 | FRE 801/802 |
| P-120 | AESPR 022441 | 06/18/2004 | Copy of AES Puerto Rico LP check payable to ICE | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-121 | | 06/22/2004 | Dyer letter to Jarvis | 401/402, 801, 803 | FRE 401/402, 801/802 |
| P-122 | ROTH-EMAIL-010317 | 06/28/2004 | Jarvis email | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-123 | AESPR 022393 | 07/15/2004 | Copy of AES Puerto Rico, LP check payable to ICE | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-124 | WILH-EMAIL-004919-20 | 07/28/2004 | Wilhelm email attaching other email | 401/402, 801, 803 | FRE 801/802 |
| P-125 | AESPR 022417 | 07/30/2004 | Copy of AES Puerto Rico LP check payable to ICE | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-126 | ALTRAN 000137-38 | 08/27/2004 | VanHooser letter to McKrell | 401/402, 411, 801, 803, 901 | FRE 401/402, 403, 411, 801/802, 901 |
| P-127 | AESPR 022382-88 | 09/02/2004 | Copy of AES Puerto Rico, LP check payable to ICE with supporting documentation | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-128 | | 09/13/2004 | Gabrielli email attaching other email | 401/402, 411, 801, 803 | FRE 106, 403, 411, 801/802 |
| P-129 | A-DB-00119-27 | 10/28/2004 | Joint Defense Agreement | 401/402, 411, 801, 803, 804 | FRE 401/402, 403, 411, 801/802 |
| P-130 | AL1-02282 | 02/25/2005 | Alstom statement | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-131 | AESPR-208210-20 | 08/10/2005 | Etienne letter to Dyer with attachment | 401/402, 801, 901 | FRE 801/802, 901 |
| P-132 | | 11/17/2005 | Dyer letter to O'Neill | | (no objection) |
| P-133 | | | Site Layout Plan | | (no objection) |
| P-134 | | | Photograph | | (no objection) |
| P-135 | AESPR 432964-79 | 04/11/2006 | Heins letter to Rivera with attachment | 401/402, 801, 803, 901, FRCP 26(e)(2) | FRE 401/402, 801/802, 901, FRCP37(c)(1) |
| P-136 | AESPR 432981 | 04/12/2006 | Etienne letter to Rivera | 401/402, 801, 803, 901, FRCP 26(e)(2) | FRE 401/402, 801/802, 901, FRCP37(c)(1) |
| P-137 | AESPR 432980 | 04/13/2006 | Randall letter to Rivera | 401/402, 801, 803, 901, FRCP 26(e)(2) | FRE 401/402, 801/802, 901, FRCP37(c)(1) |

29

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-138 | AESPR 432982-88 | 04/17/2006 | Randall letter to Rivera with attachment | 401/402, 801, 803, 901, FRCP 26(e)(2) | FRE 401/402, 801/802, 901, FRCP37(c)(1) |
| P-139 | AESPR 432939-63 | 04/19/2006 | Randall letter to Alequin with attachment | 401/402, 801, 803, 901, FRCP 26(e)(2) | FRE 401/402, 801/802, 901, FRCP37(c)(1) |
| P-140 | | Undated | Drawing of equipment | 401/402, 801, 901 | FRE 401/402, 801/802, 901 |
| P-141 | AESPR-137005-34 | Undated | AES-Puerto Rico slide presentation [ESP Corrosion] | 401/402, 801 901 | FRE 801/802, 901 |
| P-142 | AESPR-194940-47 | Undated | AES-Puerto Rico slide presentation [Water treatment] | 401/402, 801 901 | FRE 801/802, 901 |
| P-143 | | Undated | Spreadsheet listing EEC Non-Conformances | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-144 | | Undated | Alstom web page "About us" | 401/402, 801, 803, 901 | FRE 401/402, 801/802, 901 |
| P-145 | | Undated | Alstom web page presentation [The Full-Service Provider in Power Generation] | 401/402, 803, 901 | FRE 401/402, 801/802, 901 |
| P-146 | | Undated | Summary of Modification Work | 401/402, 801, 803, 901 | FRE 801/802, 901 |
| P-147 | WVH00182 | Undated | Handwritten drawing | 401/402, 801, 901 | FRE 801/802, 901 |
| P-148 | | Undated | Handwritten drawing | 401/402, 801, 901 | FRE 106, 401/402, 801/802, 901, 1003(2) |
| P-149 | | | Piece of corroded collector plate | 401/402, 901 | FRE 901 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-150 | | | Piece of corroded collector plate | 401/402, 901 | FRE 901 |
| P-151 | | | Piece of corroded collector plate | 401/402, 901 | FRE 901 |
| P-152 | | | FBHE handcuff | 401/402, 901 | FRE 901 |
| P-153 | | | Photograph | | (no objection) |
| P-154 | | | Purchase Spreadsheet | 401/402, 801, 803, 901, 1003 | FRE 106, 401/402, 801/802, 901, 1003(2) |
| P-155 | AESPR 432690-92 | 04/03/2003 | Emissions Report Unit 1 Q1 2003 | 401/402, 801, 803, 901, 1003 | FRE 106, 801/802, 901, 1003(2) |
| P-156 | AESPR 432704-06 | 04/03/2003 | Emissions Report Unit 2 Q1 2003 | 401/402, 801, 803, 901, 1003 | FRE 106, 801/802, 901, 1003(2) |
| P-157 | AESPR 432609-10 | 07/29/2003 | Emissions Report Unit 1 Q2 2003 | 401/402, 801, 803, 901, 1003 | FRE 106, 801/802, 901, 1003(2) |
| P-158 | AESPR 432621-22 | 07/29/2003 | Emissions Report Unit 2 Q2 2003 | 401/402, 801, 803, 901, 1003 | FRE 106, 401/402, 801/802, 901 |
| P-159 | AESPR 432459-61 | 10/08/2003 | Emissions Report Unit 1 Q3 2003 | 401/402, 901 | FRE 106, 901 |
| P-160 | AESPR 432473-75 | 10/08/2003 | Emissions Report Unit 2 Q3 2003 | 401/402, 901 | FRE 106, 901 |
| P-161 | | | Photograph | | (no objection) |
| P-162 | | | Photograph | | (no objection) |
| P-163 | | | Photograph | 401/402, 901 | FRE 901 |
| P-164 | | | Photograph | | (no objection) |
| P-165 | | | Photograph | | (no objection) |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-166 | | | Photograph | 401/402, 901 | FRE 901 |
| P-167 | | | Photograph | 401/402, 901 | FRE 901 |
| P-168 | | | Photograph | 401/402, 901 | FRE 901 |
| P-169 | | | Photograph | 401/402, 901 | FRE 901 |
| P-170 | | | Photograph | 401/402, 901 | FRE 901 |
| P-171 | | | Photograph | 401/402, 901 | FRE 901 |
| P-172 | | | Photograph | 401/402, 901 | FRE 901 |
| P-173 | | | Photograph | 401/402, 901 | FRE 901 |
| P-174 | | | Photograph | 401/402, 901 | FRE 901 |
| P-175 | | | Photograph | | (no objection) |
| P-176 | | | Photograph | 401/402, 901 | FRE 901 |
| P-177 | | | Photograph | 401/402, 901 | FRE 901 |
| P-178 | | | Photograph | | (no objection) |
| P-179 | | | Drawing of Equipment | 401/402, 801, 901 | FRE 401/402, 801/802, 901 |
| P-180 | AL1-05778-79 | 01/09/2004 | Sostre email | 401/402, 801, 803, 1003 | FRE 106, 801/802, 901, 1003(2) |
| P-181 | ROTH-EMAIL-036791 | 11/21/2003 | Rothe email | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-182 | ALDEC05-01147 | 11/21/2003 | Rothe email | 401/402, 411, 801, 803, 1003 | FRE 401/402, 403, 411, 801/802, 1003(2) |
| P-183 | ALDEC05-00977-81 | 12/20/2002 | Rothe letter to Kimberl | 401/402, 801, 803 | FRE 401/402, 801/802 |

| Exhibit No. | Bates No. | Date | Document | Basis for Admission | Basis for ALSTOM's objection |
|---|---|---|---|---|---|
| P-184 | L1-003470-71 L1-003413-14 | 09/19/2002 | Rothe email attaching other email, with attached VanHooser letter to Jarvis (9/19/02) | 401/402, 801, 803, 901, 1003 | FRE 401/402, 801/802, 901, 1003(2) |
| P-185 | AL1-05449-51 | 12/29/1999 | Flue Gas Cleaning System Performance Selection | 401/402, 801, 803 | FRE 401/402, 403, 801/802 |
| P-186 | AESPR 000276-77 AES2-04-01147-48 | 01/21/2004 | Dyer letter to Jarvis | 401/402, 801, 803 | FRE 801/802 |
| P-187 | WARD-EMAIL-027135 | 02/03/2004 | Jarvis email | 401/402, 801, 803 | FRE 801/802 |
| P-188 | JARV-EMAIL-077626-27 | 03/01/2004 | Rothe email attaching other emails | 401/402, 411, 801, 803 | FRE 401/402, 403, 411, 801/802 |
| P-189 | | 10/12/2005 | Subpoena to Altran Corporation | 401/402, 801, 901 | FRE 401/402, 801/802, 901 |
| P-190 | | 11/22/2005 | Vittoria letter to Williams | 401/402, 801 | FRE 401/402, 801/802 |
| P-191 | | 04/25/2006 | Vittoria email with attachments | 401/402, 801 | FRE 401/402, 801/802 |
| P-192 | | | Capital Project Report | 401/402, 801, 803, 901 | FRE 106, 801/802, 901 |

**B.     ALSTOM's List of Exhibits.**

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-001 | 4/3/1996 | EPC Contract between AES and D/FD | 401 801(c) 801(d)(2) 803(6) 807 901 | Relevance; prejudice; incomplete |
| D-002 | 5/6/1997 | Newspaper Article "Environmentalists speak out against EPA" | 401 801(c) 901 | Hearsay |
| D-003 | 6/19/1997 | Letter re: Comments from Scientific and Technical Services Inc. | 401 801(c) 901 | Hearsay; foundation |
| D-004 | 2/24/1998 | Contract No. W419-44-C0001 Between D/FD and ABB Combustion Engineering; Signature Document; Scope of Work; Commercial Terms; General Terms; Specifications | | |
| D-005 | 8/20/1998 | Letter re:  Request for Denial of AES-Puerto Rico Prevention of Significant Deterioration (PSD) Air Permit | 401 801(c) 901 | Hearsay; prejudice; foundation |
| D-006 | 3/30/1999 | Purchase Order for Precipitator, Dry Scrubber | 401 801(c) 803(6) 901 | Authenticity; multiple documents; hearsay |

---

[1]  As used in this column, "relevance" refers to Federal Rules of Evidence 401 and 402; "prejudice" refers to Federal Rule of Evidence 403; "hearsay" refers to Federal Rule of Evidence 801, 802 and 805; "authenticity" refers to Federal Rule of Evidence 901; "foundation" refers to Federal Rules of Evidence 602 and 901; "multiple documents" refers to Federal Rules of Evidence 401, 402, 403, 1001, 1002, and 1003; "incomplete" refers to Federal Rules of Evidence 106, 401, 402, and 403; "inadmissible demonstrative" refers to Federal Rules of Evidence 401, 402, 403, and 901; "opinion" refers to Federal Rule of Evidence 701; and "best evidence" refers to Federal Rule of Evidence 101, 1002, 1003, 1006.  AES-PR does not concede that ALSTOM's descriptions of the documents on this list are accurate.  Objection to "hearsay" includes hearsay within hearsay.  Objection to "prejudice" includes all grounds specified in Federal Rule of Evidence 403.

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-007 | 12/14/1999 | Black & Veatch's Preliminary Draft Due Diligence Report for Goldman, Sachs & Co. | 401 801(c) 803(6) 807 901 | Hearsay |
| D-008 | 1/11/2000 | E-Mail re: Bank's Engineer's Report | 401 801(c) 803(6) 807 901 | Hearsay |
| D-009 | 1/25/2000 | E-Mail re: ABBCE & EEC CDS, Vessel Corrosion re: Bank's Engineer's Report | 401 801(c) 803(6) 807 901 | Hearsay; foundation |
| D-010 | 1/25/2000 | Handwritten notes of CE-D/FD Conf. Call | 401 803(6) 807 901 | Hearsay; incomplete |
| D-011 | 2/8/2000 | E-mail re:  AES-PR - ABBCE/DFD/AES 2/10 & 11 Mtg Agenda | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-012 | 2/21/2000 | E-mail re: Corrosion Reference List/EEC Correspondence #420584-E046 | 401 801(c) 803(6) 807 901 | Foundation; hearsay |
| D-013 | 2/21/2000 | E-mail re:  AES - PR - EEC Corrosion Reference List | 401 801(c) 803(6) 807 901 | Foundation; hearsay |
| D-014 | 2/23/2000 | E-mail re: AES-PR-Corrosion Experience List/EEC | 401 801(c) 803(6) 807 901 | Foundation; hearsay |
| D-015 | 2/24/2000 | E-mail re: RE: Info Needed for Bank's Engineer | | |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-016 | 2/28/2000 | E-mail Re: AES/PR: ABBCE/DFD/AES/EEC/S&W Record of Meeting 2/10 & 11/00 | 401 801(c) 801(d)(2) 803(6) 807 901 | Foundation; hearsay |
| D-017 | 3/2/2000 | E-mail re: RE: AES - PR - Info Needed for Bank's Engineer | 401 801(c) 803(6) 807 901 | Foundation; hearsay |
| D-018 | 3/14/2000 | E-mail re: AES/PR: ABBCE/DFD/AES CFB Boiler, CDS Meeting Minutes 2/10&11 2000 | 401 801(c) 801(d)(2) 803(6) 807 901 | Foundation; hearsay |
| D-019 | 5/3/2000 | Letter No. AES-DFD-010 re: AES Puerto Rico Project Additional Scope Item 3 Water Supply System | 401 801(c) 801(d)(2) 803(6) 807 901 | Relevance; prejudice |
| D-020 | 5/10/2000 | Black & Veatch Due Diligence Report | 401 801(c) 803(6) 807 901 | Hearsay |
| D-021 | 5/30/2000 | Letter No. 3674-0-CR-9-00515 re: Change Order C-063 Modify Demin. Treatment Based Upon Revised Treated Water Analysis | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay; relevance; prejudice |
| D-022 | 2/20/2001 | E-mail re: ALSTOM Training Program | | |
| D-023 | 3/28/2001 | Letter of Transmittal No.: 00648 re: Analog Logic | 401 801(c) 803(6) 807 901 | Multiple documents |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-024 | 4/19/2001 | Supplier Transmittal No. 196 | 401 801(c) 801(d)(2) 803(6) 807 901 | Authenticity |
| D-025 | 5/15/2001 | E-mail re:  AES - PR - EEC CDS Maintenance and Monitoring Plan | 401 801(c) 803(6) 807 901 | Hearsay |
| D-026 | 5/31/2001 | Letter No. 3674-0-CR-9-05081 re: CFB Boiler & CDS Equipment Performance Related Information and Limits of Control | | |
| D-027 | 8/1/2001 | Operation and Maintenance Manual; Volume 1 | 401 801(c) 803(6) 807 901 | Incomplete; multiple documents |
| D-028 | 9/1/2001 | Air Pollution Control System (Desulphurization & Particulate Control) Training Manual; with handwritten "G. Bates" | 401 801(c) 801(d)(2) 803(6) 807 901 | Multiple documents; second document contains hearsay |
| D-029 | 9/1/2001 | Air Pollution Control System (Desulphurization  Particulate Control) Training Manual; with handwritten "Elias M. Sostre" | 401 801(c) 801(d)(2) 803(6) 807 901 | Incomplete |
| D-030 | 9/24/2001 | Supplier Transmittal #276 | 401 801(c) 801(d)(2) 803(6) 807 901 | Not previously produced |
| D-031 | 10/2/2001 | E-mail re: AES-PR-EEC Functional Checks | 401 803(6) 807 901 | Hearsay |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-032 | 10/25/2001 | Letter re:  AES Training Video Tapes | 401<br>801(c)<br>801(d)(2)<br>803(6)<br>807<br>901 | Not previously produced; multiple documents, second document – relevance, hearsay |
| D-033 | 10/31/2001 | Letter re: API Training Program Video Tape Transmittal | | |
| D-034 | 6/18/2002 | Letter re:  Current Operating Makeup Water System - Off-Site Influent Water Quality | 401<br>801(c)<br>801(d)(2)<br>803(6)<br>807<br>901 | Hearsay; foundation; multiple documents |
| D-035 | 7/26/2002 | Letter re: AES Concurrence with DFD Approach to Air Emissions Compliance | | |
| D-036 | 7/29/2002 | Letter re:  PRASA Water Source | 401<br>801(c)<br>801(d)(2)<br>803(6)<br>807<br>901 | Hearsay; relevance; prejudice; foundation |
| D-037 | 1/13/2003 | Copy of handwritten notes | 401<br>801(d)(2)<br>803(6)<br>807<br>901 | Hearsay, foundation; authenticity |
| D-038 | 1/17/2003 | E-mail re:  Trip Report | 401<br>801(c)<br>801(d)(2)<br>803(6)<br>807<br>901 | Hearsay |
| D-039 | 2/12/2003 | E-mail re:  Dewcon humidity transmitter at #2 CDS outlet | | |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-040 | 2/18/2003 | AES Puerto Rico Purchase Orders | 401 801(c) 801(d)(2) 803(6) 807 901 | Multiple documents; authenticity |
| D-041 | 3/4/2003 | E-mail re: Shift Report | | |
| D-042 | 3/4/2003 | Kohl Report | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Hearsay; foundation |
| D-043 | 3/12/2003 | E-mail re: Shift report | | |
| D-044 | 3/22/2003 | E-mail re: Shift Report | | |
| D-045 | 4/10/2003 | GE Betz Technical Report | 401 801(d)(2) 803(6) 807 901 | Hearsay; incomplete |
| D-046 | 5/15/2003 | E-mail re:  AES/PR:  Particualte Matter Testing | 401 801(c) 803(6) 803(7) 807 901 | Hearsay |
| D-047 | 5/24/2003 | Report re: Unit 1 & 2 | 401 801(d)(2) 803(6) 807 901 | Authenticity; incomplete; foundation |
| D-048 | 5/25/2003 | E-mail re: Nightly Report 05/24/03 | 401 801(d)(2) 803(6) 807 901 | Foundation; hearsay |
| D-049 | 6/9/2003 | Complaint Re:  AES Puerto Rico, L.P. v. D/FD, et al., Civil No. 03-544 (U.S.D.C. Del.), | 401 801(c) 801(d)(2) 807 901 | Relevance; prejudice |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-050 | 6/18/2003 | Letter 3674-0-CR-9-05968 re:  Unit 2 Emissions Testing Results | | |
| D-051 | 7/10/2003 | E-mail re: Unit Nightly Report 07/09/03 | | |
| D-052 | 7/11/2003 | Amended Complaint Re:  AES Puerto Rico, L.P. v. D/FD, et al., Civil No. 03-0544-JJF (U.S.D.C. Del.) | 401 801(c) 801(d)(2) 807 901 | Relevance; prejudice |
| D-053 | 8/8/2003 | E-mail re: FW: AES/PR: Unit 1 CDS Low Load Operation Test | 401 801(d)(2) 803(6) 807 901 | E-mails in string contain hearsay |
| D-054 | 8/10/2003 | E-mail Re: RE: YTD Reports on Safety / Environmental / FO's | | |
| D-055 | 8/15/2003 | E-mail re: EOS Report, Days, 08/15/03 | | |
| D-056 | 8/29/2003 | Kohl Report | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay; foundation |
| D-057 | 8/30/2003 | E-mail re: Controlling Opacity | | |
| D-058 | 9/4/2003 | E-mail re: Controlling Opacity | 401 801(d)(2) 803(6) 807 901 | Hearsay |
| D-059 | 9/6/2003 | E-mail re:  FW:  AES-PR trip report | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay; foundation |
| D-060 | 9/8/2003 | Letter re: Notification of Reportable Deviations of Stack Emissions Above Permit Limits | | |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-061 | 9/10/2003 | Site Visit Daily Report | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Hearsay |
| D-062 | 9/12/2003 | E-mail re: ESP, CDS Corrosion Maintenance Plan.doc | | |
| D-063 | 9/15/2003 | E-mail re: RE: ESP, CDS Corrosion Maintenance Plan.doc | | |
| D-064 | 9/15/2003 | E-mail re: RE: ESP, CDS Corrosion Maintenance Plan.doc | | |
| D-065 | 9/21/2003 | E-mail re: FW: Night Shift Outage Report | 401 801(d)(2) 803(6) 807 901 | Foundation |
| D-066 | 9/21/2003 | E-mail re: Change in Plant Leadership | | |
| D-067 | 9/26/2003 | Progress Report 2 by P. Stinson | | |
| D-068 | 9/27/2003 | E-mail re: Thoughts on Opacity | | |
| D-069 | 9/27/2003 | E-mail re: Newer Opacity Op Guidelines | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-070 | 10/1/2003 | Report for the Month of October | | |
| D-071 | 10/1/2003 | E-mail re: PR Guayama Trip Report 092603 | | |
| D-072 | 10/2/2003 | E-mail re: CDS water | | |
| D-073 | 10/3/2003 | E-mail re: FW: Opacity | | |
| D-074 | 10/3/2003 | E-mail Re:  Chlorine in Precip Ash | | |
| D-075 | 10/10/2003 | Plaintiff's First Set of Document Requests to Defendants Re:  AES Puerto Rico, L.P. v. D/FD, et al., Civil No. 03-0544-JJF (Delaware) | 401 801(c) 801(d)(2) 807 901 | Relevance; prejudice |
| D-076 | 10/15/2003 | E-mail re: Opacity Report | | |
| D-077 | 10/16/2003 | E-mail re: Ash Sample ANALYZE | | |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-078 | 10/23/2003 | E-mail re: FW: AES/PR ESP Performance - Rapper Program | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay; multiple documents; foundation |
| D-079 | 10/31/2003 | Release and Settlement Agreement | 401 801(c) 801(d)(2) 807 901 | Prejudice |
| D-080 | 11/3/2003 | Memo re: Resolution of Opacity Problem | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-081 | 11/8/2003 | E-mail re: Monthly Report | | |
| D-082 | 11/12/2003 | E-mail re: Progress Update 09/02/03-11/10/03 | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-083 | 11/24/2003 | E-mail re: ESP Corrosion at AES-PR | 401 801(c) 801(d)(2) 803(6) 807 901 | Incomplete |
| D-084 | 11/24/2003 | E-mail re: RE: ESP Corrosion at AES-PR | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-085 | 11/24/2003 | E-mail re: Instrumentation for the Unit 2 ESP | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-086 | 11/26/2003 | E-mail re:  AES-PR ESP Corr report | | |
| D-087 | 12/2/2003 | E-mail re: RE: Some thoughts about collecting plate problem | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-088 | 12/8/2003 | E-mail re: Ash drains | | |
| D-089 | 12/16/2003 | E-mail re: Opacity vs. CDS outlet temp | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-090 | 12/17/2003 | E-mail re: RE: Opacity vs. CDS outlet temp | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay in email string |
| D-091 | 1/6/2004 | E-mail re: RE: AES Puerto Rico | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay |
| D-092 | 1/11/2004 | E-mail re: FW: U1 force outage | 401 801(d)(2) 803(6) 807 901 | Hearsay |
| D-093 | 1/16/2004 | E-mail re: RE: Precip Hopper Ash Moisture Content | | |
| D-094 | 1/17/2004 | E-mail re: RE: RO Waste Water Injection | | |
| D-095 | 1/19/2004 | E-mail re: FW: Evaporator/Crystallizer | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay in attachment |
| D-096 | 1/19/2004 | E-mail re: Ash drains | | |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-097 | 1/21/2004 | E-mail re: AES/PR: Unit 1 FBHE Air Flow Setpoints | | |
| D-098 | 1/25/2004 | Weekly report from 1/25/04 through 1/31/04 | 401 801(d)(2) 803(6) 807 901 | Foundation |
| D-099 | 1/27/2004 | E-mail re: Re: RO Project Proposal - Rough Draft | | |
| D-100 | 1/28/2004 | E-mail re: Report on Opacity | 401 801(d)(2) 803(6) 807 901 | Hearsay; foundation |
| D-101 | 1/30/2004 | E-mail re:  FW:  Missing attachment | 401 801(c) 801(d)(2) 803(6) 807 901 | Foundation |
| D-102 | 2/3/2004 | E-mail re: CDS Nozzles | 401 801(c) 801(d)(2) 803(6) 807 901 | E-mail string contains hearsay and lacks foundation |
| D-103 | 2/3/2004 | E-mail re: Waste Water Disposal Permitting | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay; foundation |
| D-104 | 2/3/2004 | E-mail re:  FW:  Waste Water Disposal Permitting | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay; foundation |
| D-105 | 2/4/2004 | E-mail re:  Unit 1 Chloride vs Opacity vs CDS temp | 401 801(c) 801(d)(2) 803(6) 803(7) | Multiple documents; authenticity; foundation |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| | | | 807 901 | |
| D-106 | 2/4/2004 | E-mail re: RE: Missing Attachment | | |
| D-107 | 2/5/2004 | E-mail re: FW: Your PO's 03-1842 & 03-1915 | | |
| D-108 | 2/6/2004 | E-mail re: RE: My Next Visit | | |
| D-109 | 2/8/2004 | E-mail and Request for Capital Expenditure Approval and Printout of Concordance file metadata | | |
| D-110 | 2/10/2004 | E-mail re: RE: Report on Opacity | | |
| D-111 | 2/12/2004 | E-mail re: update | | |
| D-112 | 2/12/2004 | E-mail re: RE: Results of CDS survey | | |
| D-113 | 2/15/2004 | E-mail re: RV: NEW Water Treatment Investment at AES-PR (Urgent) | 401 801(c) 801(d)(2) 803(6) 807 901 | Prejudice |
| D-114 | 2/17/2004 | E-mail re: AES PR ISH Trip Report | | |
| D-115 | 3/3/2004 | E-mail re: RE: ro specs | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay; not previously produced; foundation |
| D-116 | 3/5/2004 | E-mail re: Shipping Information Collecting Plates | | |
| D-117 | 3/5/2004 | ESP Collectors Corrosion Report | 401 803(6) 807 901 | Hearsay; foundation; authenticity |
| D-118 | 3/12/2004 | E-mail re: Reoccuring Duties | | |
| D-119 | 3/16/2004 | E-mail re: March 09 Trip Report | 401 801(c) 801(d)(2) 803(6) 807 901 | Hearsay in email string |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-120 | 3/18/2004 | E-mail re: RE: ESP Opacity | 401 801(d)(2) 803(6) 807 901 | Multiple documents; authentication (second document); hearsay within email string |
| D-121 | 3/22/2004 | E-mail re: RE: ALSTOM in El Salvador | 401 801(c) 801(d)(2) 803(6) 807 901 | Relevance; prejudice; hearsay within email string |
| D-122 | 3/24/2004 | E-mail re: Reoccurring duties | | |
| D-123 | 3/29/2004 | Letter re: Warranty Claim for FBHE Tube Failures | | |
| D-124 | 4/23/2004 | E-mail re:  Wet Bulb Temperature | | |
| D-125 | 5/6/2004 | E-mail re: RE: reoccurring duties again | | |
| D-126 | 5/18/2004 | Letter re: AES Letter dated April 30, 2004 | 401 803(6) 807 901 | Hearsay |
| D-127 | 7/2/2004 | Letter to Dyer re: ALSTOM's findings from the investigations into the ESP corrosion | 401 803(6) 807 901 | Hearsay |
| D-128 | 9/20/2004 | AES' Complaint In C.A. #04-1282 | 401 801(d)(2) 901 | Relevance |
| D-129 | 9/29/2004 | E-mail re:  Preservation of Documents for ALSTOM Boiler Lawsuit | 401 801(c) 801(d)(2) 803(6) 807 901 | Relevance; prejudice |
| D-130 | 11/4/2004 | Tracy Jarvis Daily Planner Excerpt | 401 801(c) 801(d)(2) 803(6) 807 901 | Authenticity; foundation |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-131 | 11/5/2004 | Answer to Complaint In C.A. #04-1282 | 401 803(6) 807 901 | Hearsay; relevance |
| D-132 | 3/18/2005 | First Request for Production of Documents and Things and Entry Upon Land for Inspection and Responses and Objections; in C.A. #04-1282 | 401 801(d)(2) 803(6) 807 901 Local Rule 16.4(d)(6) | Hearsay; multiple documents |
| D-133 | 4/5/2005 | E-mail re: FW: Budget Proposal | | |
| D-134 | 4/6/2005 | E-mail re: CDS water sample | | |
| D-135 | 4/12/2005 | First Set of Interrogatories, Responses and Supplemental Responses, and Supplemental Response to Interrogatory #10; in C.A. #04-1282 | 401 801(d)(2) 803(6) 807 901 Local Rule 16.4(d)(6) | Multiple documents; relevance; incomplete to the extent it purports to be final |
| D-136 | 7/23/2005 | Project Justification: Brine Concentrator / Crystallizer | | |
| D-137 | 8/29/2005 | E-mail re: RE: ESP Collecting Plates | | |
| D-138 | 9/9/2005 | E-mail re: Monthly Report of ABD | 401 801(d)(2) 803(6) 807 901 | Prejudice |
| D-139 | 10/25/2005 | ALSTOM's Second Request for Production of Documents, Responses and Objections;  in C.A. #04-1282 | 401 801(d)(2) 803(6) 807 901 Local Rule 16.4(d)(6) | Hearsay; multiple documents; relevance |
| D-140 | 10/26/2005 | ALSTOM's Second Set of Interrogatories and Responses and Supplemental Responses;  in C.A. #04-1282 | 401 801(d)(2) 803(6) 807 901 Local Rule 16.4(d)(6) | Multiple documents |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-141 | 10/26/2005 | ALSTOM's First Set of Requests for Admissions and Responses;  in C.A. #04-1282 | 401<br>801(d)(2)<br>803(6)<br>807<br>901<br>Local Rule 16.4(d)(6) | Multiple documents; incomplete to the extent it purports to be final |
| D-142 | 11/17/2005 | Letter Re:  Coal Pile Runoff Pond - Overflow Events | | |
| D-143 | 2/8/2006 | ALSTOM's Second Set of Requests for Admission and Responses;  in C.A. #04-1282 | 401<br>801(d)(2)<br>803(6)<br>807<br>901<br>Local Rule 16.4(d)(6) | Multiple documents; relevance; prejudice |
| D-144 | 2/8/2006 | ALSTOM's Third Set of Interrogatories and Responses;  in C.A. #04-1282 | 401<br>801(d)(2)<br>803(6)<br>807<br>901<br>Local Rule 16.4(d)(6) | Multiple documents |
| D-145 | | 2003 Excess Emissions Report | 401<br>801(c)<br>801(d)(2)<br>803(6)<br>807<br>901 | Multiple documents |
| D-146 | | 2004 Excess Emissions Report | 401<br>801(c)<br>801(d)(2)<br>803(6)<br>807<br>901 | Multiple documents; authenticity |
| D-147 | | AES Puerto Rico Facilities Personnel Qualifications As per Article 8.5 | 401<br>801(d)(2)<br>803(6)<br>807<br>901 | Foundation |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-148 | | Technical Improvements with Concordance Metadata | 401 801(d)(2) 803(6) 901 | Multiple documents; authenticity; foundation |
| D-149 | | CDS Nozzle Cleaning Log - Unit 1 and 2 | | |
| D-150 | | Environmental Permits Agreements (Operation) | 401 801(c) 803(6) 803(7) 803(8) 807 901 | Multiple documents; authenticity [Spanish] |
| D-151 | | CDS Makeup Water Samples | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Incomplete; multiple documents |
| D-152 | | CEMS Report Fourth Quarter 2002 | | |
| D-153 | | CEMS Report First Quarter 2003 | | |
| D-154 | | CEMS Report Second Quarter 2003 | | |
| D-155 | | CEMS Report Third Quarter 2003 | | |
| D-156 | | CEMS Report Fourth Quarter 2003 | | |
| D-157 | | CEMS Report First Quarter 2004 | | |
| D-158 | | CEMS Report Fourth Quarter 2004 | | |
| D-159 | | ALSTOM Commissioning Log from 9/22/02 to 11/27/02 | 401 803(6) 807 901 | Hearsay; best evidence |
| D-160 | | Diagram: Site Layout Plan | | |
| D-161 | | Photo: Aerial View of Site | | |
| D-162 | | Photo: Top of Precipitator (Construction Phase) | | |
| D-163 | | Photo: Top of Precipitator (Post Construction) | | |
| D-164 | | Photo: Rapper and T/R Mechanisms on Top of Precipitator | | |
| D-165 | | Photo: CDS/Precipitator Connection | | |
| D-166 | | Photo: Precipitator Hoppers | | |
| D-167 | | Photo: Plant Control Room | | |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-168 | | Photo: Lance Entrance to CDS with Water Piping | 401 901 | Authenticity; relevance |
| D-169 | | Photo: Lance Entrance to CDS with Water Piping | 401 901 | Authenticity; relevance |
| D-170 | | Photo: Close-up of Lance Entrance to CDS | 401 901 | Authenticity; relevance |
| D-171 | | Photo: Close-up of Lance Entrance to CDS | 401 901 | Authenticity; relevance |
| D-172 | | Photo: CDS Lance | 401 901 | Authenticity |
| D-173 | | Photo: CDS Lance and Nozzle with ash | 401 901 | Authenticity; relevance; prejudice |
| D-174 | | Photo: CDS Lance and Nozzle with ash | 401 901 | Authenticity; relevance; prejudice |
| D-175 | | Photo: CDS Lance and Nozzle with ash | 401 901 | Authenticity; relevance; prejudice |
| D-176 | | Photo: CDS Lance and Nozzle with ash | 401 901 | Authenticity; relevance; prejudice |
| D-177 | | Photo: CDS Lance Nozzle with ash | 401 901 | Authenticity; relevance; prejudice |
| D-178 | | Photo: CDS Lance and Nozzle with ash | 401 901 | Authenticity; relevance; prejudice |
| D-179 | | Photo: CDS Lance and Nozzle after cleaning | 401 901 | Authenticity; relevance; prejudice |
| D-180 | | Photo: Internal view of CDS Nozzle Tip | 401 901 | Authenticity; relevance; prejudice |
| D-181 | | Photo: CDS Lance and Swirl Disc | 401 901 | Authenticity; relevance; prejudice |
| D-182 | | Photo: CDS Swirl Disc | 401 901 | Authenticity; relevance; prejudice |
| D-183 | | Photo: CDS Nozzle Tip and Swirl Disc | 401 901 | Authenticity; relevance; prejudice |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-184 | | Photo:  Replacement Collector Plates in Yard | | |
| D-185 | | Photo:  Replacement Collector Plates in Yard | | |
| D-186 | | Photo:  Replacement Collector Plates in Yard | | |
| D-187 | | Photo:  Replacement Rigitrodes in Warehouse | | |
| D-188 | | Photo:  Ash Pile | | |
| D-189 | | Photo:  Coal Pile Run-off Pond | | |
| D-190 | | Photo:  Manufactured Aggregate | 401 901 | Relevance; authenticity |
| D-191 | | Photo:  Rigitrode Ash, Tiff Image and Concordance Metadata | 401 901 | Multiple documents; authenticity; best evidence |
| D-192 | | Daily Log of Elias Sostre | | |
| D-193 | 10/14/2003 | E-mail re:  Opacity Report | | |
| D-194 | 10/15/2003 | Memo re: Specialty Chemicals | 401 801(c) 901 | Hearsay |
| D-195 | 10/17/2003 | Email re: Opacity Report | | |
| D-196 | 10/20/2003 | Email re: Opacity Report | | |
| D-197 | 11/14/2003 | Email re: Opacity Experience | 401 801(d)(2) 803(6) 901 | Foundation; hearsay |
| D-198 (on CD) | | Unit 1 Log Book (4/18/02 to 11/17/02) | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-199 (on CD) | | Unit 1 Log Book (11/17/02 to 5/24/03) | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-200 (on CD) | | Unit 2 Log Book (11/27/01 to 8/26/02) | 401 801(c) | Authenticity; best evidence |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| | | | 801(d)(2) 803(6) 803(7) 807 901 | |
| D-201 (on CD) | | Unit 2 Log Book (8/27/02 to 4/4/03) | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-202 (on CD) | | Control Room Log Book - Unit 1 - Period: June 25, 2003 to August 18, 2004 | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-203 (on CD) | | Control Room Log Book – Unit 1 – Period:  Aug. 19-Nov. 23, 2004 | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-204 (on CD) | | Control Room Log Book – Unit 1 – Period: April 4, 2003 to July 27, 2004 | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-205 (on CD) | | Control Room Log Book – Unit 2 – Period: August 6 – November 23, 2004 | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-206 (on CD) | | ALSTOM Commissioning Reports dated 9/22/02 to 11/27/02 | 401 803(6) 807 | Authenticity; best evidence; hearsay |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| | | | 901 | |
| D-207 (on CD) | | Daily Opacity Report Unit 1 Sept. 2002 / Dec. 2003 | 401 801(d)(2) 803(6) 807 901 | Authenticity; best evidence |
| D-208 (on CD) | | Daily Opacity Report Unit 2 Sept. 2002 / Dec. 2003 | 401 801(d)(2) 803(6) 807 901 | Authenticity; best evidence |
| D-209 (on CD) | | Daily Opacity Report Unit 1 January – July 2004 | 401 801(d)(2) 803(6) 807 901 | Authenticity; best evidence |
| D-210 (on CD) | | Daily Opacity Report Unit 2 January – July 2004 | 401 801(d)(2) 803(6) 807 901 | Authenticity; best evidence |
| D-211 (on CD) | | Daily Opacity Report Unit 1 & 2 August – December 2004 | 401 801(d)(2) 803(6) 807 901 | Authenticity; best evidence |
| D-212 (on CD) | | Daily Opacity Report Unit 1 & 2 January – December 2005 | 401 801(d)(2) 803(6) 807 901 | Authenticity; best evidence |
| D-213 (on CD) | | Operation & Maintenance Manual, Vol. 1 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-214 (on CD) | | Operation & Maintenance Manual, Vol. 2 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-215 (on CD) | | Operation & Maintenance Manual, Vol. 3 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-216 (on CD) | | Operation & Maintenance Manual, Vol. 4 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-217 (on CD) | | Operation & Maintenance Manual, Vol. 5 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-218 (on CD) | | Operation & Maintenance Manual, Vol. 5A | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-219 (on CD) | | Operation & Maintenance Manual, Vol. 6 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-220 (on CD) | | Operation & Maintenance Manual, Vol. 6A | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-221 (on CD) | | Operation & Maintenance Manual, Vol. 7 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |

54

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-222 (on CD) | | Operation & Maintenance Manual, Vol. 8 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-223 (on CD) | | Operation & Maintenance Manual, Vol. 8A | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-224 (on CD) | | Operation & Maintenance Manual, Vol. 9 | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D-225 (on CD) | | Operation & Maintenance Manual, Vol. 9A | 401 801(c) 803(6) 803(7) 807 901 | Authenticity; best evidence |
| D- 226 (physical Exhibit) | | ESP Collector Plate | 401 901 | Authenticity; relevance; reserve the right to object further after opportunity to inspect |
| D- 227 (physical Exhibit) | | Rigitrode | 401 901 | Authenticity; relevance; reserve the right to object further after opportunity to inspect |
| D-228 (Diagram) | | The Air Pollution Control System: General Arrangement | 401 901 1006 | Inadmissible demonstrative |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-229 (Diagram) | | Circulating Dry Scrubber | 401 901 1006 | Inadmissible demonstrative |
| D-230 (Diagram) | | Circulating Dry Scrubber | 401 901 1006 | Inadmissible demonstrative |
| D-231 (Diagram) | | Nozzles and Testing Ports | 401 901 1006 | Inadmissible demonstrative; foundation |
| D-232 (Diagram) | | Nozzle Location | 401 901 1006 | Inadmissible demonstrative |
| D-233 (Diagram) | | Nozzle Performing Properly | 401 901 1006 | Inadmissible demonstrative; hearsay; foundation; opinion |
| D-234 (Diagram) | | Nozzle Slightly Worn | 401 901 1006 | Inadmissible demonstrative; hearsay; foundation; opinion |
| D-235 (Diagram) | | Nozzle With Heavy Streaking | 401 901 1006 | Inadmissible demonstrative; hearsay; foundation; opinion |
| D-236 (Diagram) | | Nozzle With Solid Stream | 401 901 1006 | Inadmissible demonstrative; hearsay; foundation; opinion |
| D-237 (Diagram) | | Inlet Baffles and Knockout Curtain | 401 901 1006 | Inadmissible demonstrative; foundation |
| D-238 (Diagram) | | Inlet Baffle | 401 901 1006 | Inadmissible demonstrative; foundation |
| D-239 (Diagram) | | Electrostatic Precipitator: Collector Plates | 401 901 1006 | Inadmissible demonstrative |
| D-240 (Diagram) | | Electrostatic Precipitator: Rappers, Rigitrodes, Collector Plates and | 401 901 | Inadmissible demonstrative |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| | | Hoppers | 1006 | |
| D-241 (Diagram) | | Electrostatic Precipitator: Rigitrodes | 401 901 1006 | Inadmissible demonstrative |
| D-242 (Diagram) | | The Air Pollution Control System | 401 901 1006 | Inadmissible demonstrative |
| D-243 (Diagram) | | Rigitrodes and Collector Plates Remove Particles | 401 901 1006 | Inadmissible demonstrative; foundation; opinion |
| D-244 (Graph) | | Graph:  Summary: AES-PR's Reported Reasons for Opacity Exceedances – September 2003 to September 2004 – Unit 1 | 401 901 1006 | Inadmissible demonstrative; authenticity; best evidence; reserve the right to object further after opportunity to review documents |
| D-245 (Graph) | | Graph:  Summary: AES-PR's Reported Reasons for Opacity Exceedances – September 2003 to September 2004 – Unit 2 | 401 901 1006 | Inadmissible demonstrative; authenticity; best evidence; reserve the right to object further after opportunity to review documents |
| D-246 | 3/25/2003 | Letter re:  Ongoing Investigation and Adjustments Aimed at Completion of Emission Performance Testing During the Shakedown Period | | |
| D-247 | 9/12/2003 | E-mail re: Progress Report | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Hearsay |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-248 | 10/3/2003 | E-mail re: Opacity Report | | |
| D-249 | 10/13/2003 | E-mail re: Strategy to Prepare Ourselves for Regulatory Changes | 401 801(c) 801(d)(2) 803(6) 901 | Relevance; prejudice |
| D-250 | 11/17/2003 | E-mail re: Exceedances – Please Respond! | | |
| D-251 | 11/19/2003 | E-mail re: EOS Report, Days, 19 Nov 2003 | | |
| D-252 | 11/24/2003 | E-mail re: ESP Hopper Heaters | | |
| D-253 | 11/25/2003 | E-mail re: Collecting plates and Rigitrode Quotation | 401 801(c) 803(6) 901 | Hearsay |
| D-254 | 12/2/2003 | E-mail re:  FW: Collecting plates | | |
| D-255 | 12/3/2003 | E-mail re: FLS Scope of Work Summary | 401 801(d)(2) 803(6) 901 | Contains hearsay; incomplete |
| D-256 | 12/22/2003 | E-mail re: Flue Gas Sampling for Trouble Shooting | 401 801(d)(2) 803(6) 901 | Foundation; authenticity |
| D-257 | 12/26/2003 | E-mail re: Opacity Report | | |
| D-258 | 12/20/2003 | E-mail re: Report on Opacity | | |
| D-259 | 1/8/2004 | E-mail re: Report on Opacity | | |
| D-260 | 1/19/2004 | E-mail re: Report on Opacity | | |
| D-261 | 1/21/2004 | E-mail re: Various Thoughts on ESP Corrosion | 401 801(c) 801(d)(2) 803(6) 803(7) 807 901 | Hearsay |
| D-262 | 1/29/2004 | E-mail re: Report on Opacity | | |
| D-263 | 1/30/2004 | E-mail re: Report on Opacity | | |
| D-264 | 2/6/2004 | E-mail re: Material Handling Report | 401 801(d)(2) 803(6) 901 | Foundation |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-265 | 2/5/2004 | E-mail re: Draft Environmental Assessment for the Waste Water System | | |
| D-266 | 2/18/2004 | E-mail re: FW: John's Approval | | |
| D-267 | 6/6/2004 | E-mail re: Boiler Qualification Book | | |
| D-268 | 7/26/2004 | Letter re: Q2 2004 Progress Report | 401 803(6) 807 901 | Foundation; hearsay; prejudice |
| D-269 | 1/13/2005 | E-mail re: FW: Night Shift Report, 01/12/2005 | | |
| D-270 | 10/4/2005 | E-mail re: Environmental Monthly Report | 401 801(c) 801(d)(2) 803(6) 901 | Hearsay |
| D-271 | 10/10/2005 | Memo re: September 2005 Monthly Report | 401 801(d)(2) 803(6) 901 | Prejudice |
| D-272 | 11/3/2005 | Letter re: Report of Unit 1 Outage Between October 23-29, 2005 | 401 801(c) 801(d)(2) 803(6) 901 | Hearsay |
| D-273 (Video Tape) | | CDS Scrubber & Electrostatic Precipitator (Tape 1) | 401 801(c) 803(6) 807 901 | Authenticity; reserve right to object further after opportunity to review videotapes. |
| D-274 (Video Tape) | | AES PR – CDS Scrubber & Introduction of Precipitator & Components (Tape 2) | 401 801(c) 803(6) 807 901 | Authenticity; reserve right to object further after opportunity to review videotapes. |

| Exhibit Number | Date | Description | Basis for Admission | Basis for AES-PR Objections[1] |
|---|---|---|---|---|
| D-275 (Video Tape) | | Precipitator & Components & Introduction of Startup & Shutdown of APCS & Components (Tape 3) | 401 801(c) 803(6) 807 901 | Authenticity; reserve right to object further after opportunity to review videotapes. |
| D-276 (Video Tape) | | AES PR – End of Startup & Shutdown of APCS & Components (Tape 4) | 401 801(c) 803(6) 807 901 | Authenticity; reserve right to object further after opportunity to review videotapes. |

## VII.  LIST OF WITNESSES

**A.**    **AES-PR's List of Witnesses.**

| | Witness | Type of Testimony | Specialties of Experts (if expert witness) |
|---|---|---|---|
| 1. | Carlos Alequin<br>AES Puerto Rico, LP<br>Road #3 KM 142 P.O. Box 1890<br>Guayama, PR 00785 | In person | |
| 2. | Gary Bates<br>AES Shady Point<br>P.O. Box 1740<br>Panama, OK 74951 | In person | |
| 3. | John T. Baecher, Esq.<br>Chadbourne & Parke LLP<br>30 Rockefeller Plaza<br>New York, NY 10112 | In person | |
| 4. | Thomas Coleman<br>420 E Centre St.<br>Mahanoy City, PA 17948 | In person and/or by deposition | |
| 5. | Allan Dyer<br>AES Puerto Rico, LP<br>Road #3 KM 142 P.O. Box 1890<br>Guayama, PR 00785 | In person | |
| 6. | Stewart Ferguson<br>1925 Piper Way<br>Keswick, VA | In person | |
| 7. | Frank Gabrielli<br>ALSTOM Power Inc.<br>2000 Day Hill Rd.<br>Windsor, CT 06095 | In person and/or by deposition | |
| 8. | Raymond Hickey<br>ALSTOM Power Inc.<br>2000 Day Hill Rd.<br>Windsor, CT 06095 | In person and/or by deposition | |

| 9. | Karl Hognefelt<br>ALSTOM Power Environment<br>1409 Centerpoint Blvd<br>Knoxville, TN 37932 | In person and/or by deposition | |
| 10. | William Jarvis<br>ALSTOM Power, Inc.<br>2000 Day Hill Rd.<br>Windsor, CT 06095 | In person and/or by deposition | |
| 11. | Richard Lunt<br>SAIC, FOCIS Division<br>7 Wells Avenue<br>Newton, MA 02459 | In person | Air pollution control technology; chemical engineering; corrosion; power plant operations |
| 12. | Timothy Maidenford<br>125 Main St.<br>Joliett, PA 17981 | In person and/or by deposition | |
| 13. | Jack McDonald<br>3405 Hunters Ridge Rd.<br>Columbia, TN 38401 | In person | Air pollution control technology |
| 14. | Ronald McParland<br>The AES Corporation<br>4300 Wilson Boulevard<br>Arlington, VA 22203 | In person | |
| 15. | Gamaliel Rivera<br>AES Puerto Rico, LP<br>Road #3 KM 142 P.O. Box 1890<br>Guayama, PR 00785 | In person | |
| 16. | Stuart A. Rosenberg<br>Aronson and Company<br>700 King Farm Blvd., Suite 300<br>Rockville, MD 20850 | In person | Accounting |
| 17. | Linda Rothe<br>ALSTOM Power, Inc.<br>2000 Day Hill Rd.<br>Windsor, CT 06095 | In person and/or by deposition | |

| | | | |
|---|---|---|---|
| 18. | Willy Santiago<br>AES Puerto Rico, LP<br>Road #3 KM 142 P.O. Box 1890<br>Guayama, PR 00785 | In person | |
| 19. | Elias Sostre<br>AES Puerto Rico, LP<br>Road #3 KM 142 P.O. Box 1890<br>Guayama, PR 00785 | In person | |
| 20. | Paul Stinson<br>P.O. Box 1106<br>50 Rocky Winds Road<br>Moultonboro, NH 03254 | In person | Power plant operations and troubleshooting |
| 21. | David Stone<br>AES Puerto Rico, LP<br>Road #3 KM 142 P.O. Box 1890<br>Guayama, PR 00785 | In person | Engineering |
| 22. | John Toher<br>IJM Consulting<br>5401 Weywood Drive<br>Reisterstown, MD 21136 | In person | Air pollution control technology; power plant operations; commissioning of air pollution control technology |
| 23. | William Van Hooser<br>1939 Frederick Rd.<br>Catonsville, MD 21228 | In person and/or by deposition | |
| 24. | Bruce Wilhelm<br>ALSTOM Power, Inc.<br>2000 Day Hill Rd.<br>Windsor, CT 06095 | In person | |

**B.**    **ALSTOM's List of Witnesses.**

ALSTOM may call the following witnesses to testify at the trial of this action.

- William M. Jarvis, 2000 Day Hill Road, Windsor, Connecticut 06095

- Karl Hognefelt, 1409 Centerpoint Boulevard, Knoxville, Tennessee 37932

- Linda Rothe, 2000 Day Hill Road, Windsor, Connecticut 06095

- Tim Maidenford, 2000 Day Hill Road, Windsor, Connecticut 06095

- Tom Coleman, 2000 Day Hill Road, Windsor, Connecticut 06095

- Ray Hickey, 2000 Day Hill Road, Windsor, Connecticut 06095

- Frank Gabrielli, 2000 Day Hill Road, Windsor, Connecticut 06095

- Bruce W. Wilhelm, 2000 Day Hill Road, Windsor, Connecticut 06095

- Paul Panos, 2000 Day Hill Road, Windsor, Connecticut 06095

- Jim Hipson, 2000 Day Hill Road, Windsor, Connecticut 06095

- Thomas L. Wardell, 2000 Day Hill Road, Windsor, Connecticut 06095

- Robert E. Kohl, 4851 Ellicott Woods Lane, Ellicott City, Maryland 21043

- William Van Hooser, 1939 Frederick Road, Catonsville, Maryland 21228

- Kim R. Monroe, Environmental Sales Group, Inc., 6220 S. Orange Blossom Trail, Suite 152, Orlando, Florida 32809

- Allan B. Dyer, President, AES Puerto Rico, L.P., P.O. Box 1890, Guayama, Puerto Rico 00784

- John G. Toher, 5401 Weywood Drive, Reisterstown, Maryland 21136

- **Expert Witnesses**

- Marlin Anderson, Ph.D. (Specialty:  Design, Installation, Operation and Maintenance of Power Plant Pollution Control Equipment; Power Plant Emissions Control), APCO Services, Inc., 818 E. 21st Street, Hopkinsville, Kentucky 42240

- Ronald Ballinger, Ph.D. (Specialty:  Corrosion; Operation and Maintenance of Power Plant Equipment), ALTRAN Corporation, 451 D Street, Boston, Massachusetts 02210

- Otakar Jonas, Ph.D. (Specialty:  Power Plant Operations; Power Plant Water Balance and Disposal; Corrosion), 1113 Faun Road, Wilmington, Delaware 19803

- Joseph Mair, CPA, Nihill & Riedley, P.C., Suite 800, 150 S. Independence Mall West, Philadelphia, Pennsylvania 19106 (Specialty:  Construction Accounting)

- Ray Hickey, 2000 Day Hill Road, Windsor, Connecticut 06095 (Specialty:  Design of Power Plant Equipment; Failure Analysis)

- Karl Hognefelt, 1409 Centerpoint Boulevard, Knoxville, Tennessee 37932 (Specialty: Corrosion; Design, Installation, Operation and Maintenance of Power Plant Pollution Control Equipment; Power Plant Emissions)

- **<u>By Videotape Deposition As Adverse  Witnesses:</u>**

- Allan B. Dyer

- Elias Sostre

- Gary Bates

- AES-PR Corporate Designees (3)

- Paul Stinson

- Doug Tomlin

- Tracy Jarvis

- Ron McParland

## VIII.  AES-PR'S BRIEF STATEMENT OF PROOF

**I.      Breach of Contract**

AES-PR will prove by a preponderance of the evidence that ALSTOM breached its contract with AES-PR, including as follows:

**A.      Existence of a Contract**

The existence of a contract between ALSTOM and Duke/Flour Daniel ("D/FD") for the supply and erection of the power plants' boilers and air pollution control equipment is not in dispute (the "Contract").  Part III, Section 1.0 of the Contract provides a set of express warranties for the boiler and related equipment including the air pollution control equipment (the "Warranty").  D/FD assigned its warranty rights for prospective claims to AES-PR.

**B.      Breach**

AES-PR will establish that ALSTOM breached the Contract with AES-PR because the equipment ALSTOM supplied was not "as warranted" and ALSTOM refused to make the necessary adjustments, repairs, additions, corrections and replacements to render the equipment as warranted.  To the extent necessary, AES-PR will establish the following:

1.  ALSTOM supplied warranties in Section 1.0 of the Contract against accelerated corrosion of, *inter alia*, the electrostatic precipitators ("ESPs") and defects related to the Boiler Hot Loop including the internal clamp configuration of the fluidized bed heat exchanger tube bundles, commonly referred to as the FBHE "handcuffs."

2.  AES-PR complied with any and all obligations it may have had under the applicable warranties.

3.  AES-PR provided timely notice of its warranty claims.

66

4.   The pollution control equipment supplied by ALSTOM was defective for several reasons including that it could not be operated with the design-specified high-chloride water at a high enough temperature to prevent corrosion and at the same time cause the plant to comply with its environmental air permits and because various components of the equipment required excessive operator intervention to operate and maintain and experienced excessive wear and degradation.

5.   AES-PR notified ALSTOM of its corrosion warranty claim within two years of performance acceptance.

6.   AES-PR notified ALSTOM of its handcuff warranty claim within two years of performance acceptance.

7.   The ESP collector plates suffered "accelerated corrosion," and that the corrosion affected the structural integrity of the equipment and/or the ability of the equipment mechanically to perform.

8.   The accelerated corrosion was caused by the faulty design of the equipment and operation of the equipment according to ALSTOM's instructions with high-chloride water at a temperature of approximately 30 degrees above adiabatic saturation.  It was not caused by any alleged inadequate operation and maintenance practices of AES-PR.  It was not caused by any alleged deviations in the chloride content of "feedstock" used by the plant.

9.   AES-PR complied with any obligations it may have had to discuss potential solutions with ALSTOM and/or ALSTOM waived any right it may have had by repudiating the warranty or should be equitably estopped from asserting such an alleged right.

10.  AES-PR complied with any obligations it may have had to mediate with ALSTOM and/or ALSTOM waived its right to mediation by repudiating the warranty and/or should be equitably estopped from asserting such an alleged right.

## II.    Damages

AES-PR will establish that ALSTOM's breach of contract/warranty caused AES-PR's damages totaling approximately $43.7 million including as follows:

1.  AES-PR intends to show damages in the amount of approximately $0.5 million for costs associated with AES-PR's "stabilization program."  AES-PR had to expend significant sums of money stabilizing the ESP equipment following the discovery of the severe, accelerated corrosion in order to prevent an imminent plant shut down.

2.  AES-PR intends to show damages in the amount of approximately $4.9 million associated with costs AES-PR has or will incur to replace the corroded collecting plates.

3.  AES-PR intends to show damages in the amount of approximately $38.2 million that it has incurred or will incur to make modifications to the plant's water treatment system to eliminate the causes of accelerated corrosion and permit the equipment to operate as warranted.  This amount includes approximately $2.7 million for a new reverse osmosis system, including the costs to operate that system; $9.2 million for interim measures to control chloride and dispose of high chloride water while installing a brine concentrator/crystallizer; and $26.3 million to procure, install, construct and operate a brine concentrator/crystallizer.  In this regard, AES-PR intends to show that in order for the air pollution control equipment to operate as designed, without experiencing accelerated corrosion, AES-PR must eliminate the high level of chlorides in the CDS spray water that the plant was designed to use.  AES-PR has explored and adopted a reasonably priced method to do so.

68

4.  AES-PR intends to show damages in the amount of approximately $126 thousand for costs associated with purchasing and installing a second row of "handcuffs" on the fluidized bed heat exchanges to correct a design defect.

5.  AES-PR intends to show, to the extent necessary, that the damages it seeks are not consequential damages.

## III.    Purported Conditions Precedent

As outlined in AES-PR's Opposition to ALSTOM's Motion for Partial Summary Judgement, the Contract "makes it manifest that" there is no condition precedent in the Contract.

To the extent necessary, however, AES-PR will establish:

A.  That the August 2001 EEC Operation and Maintenance ("O&M") manuals were not the final operating instructions for the purposes of any condition precedents.

B.  That the terms in these manuals do not set forth conditions precedents.

C.  That ALSTOM waived any alleged condition precedent by:

1) Instructing AES-PR orally and in writing to operate the equipment in a manner that differed from the 2001 O&M manual;

2)  Engaging in conduct during commissioning and start-up that was wholly inconsistent with any alleged condition precedent; and

3)  failing to enforce the alleged right to have AES-PR operate and maintain the equipment according to the August 2001 O&M manual.

D.  That AES-PR complied with any conditions precedents.

**IV.    Affirmative Defenses**

ALSTOM bears the burden of proving any affirmative defense that it raises by a preponderance of the evidence.  AES-PR does not bear any burden with respect to ALSTOM's affirmative defenses.

**A.    No Assumption of the Risk.**

ALSTOM appears to raise the affirmative defense of assumption of the risk. Assumption of the risk is a tort defense, not a contract defense, and has no bearing on this case. Moreover, AES-PR does not bear any burden with respect to this defense and does not believe it is applicable to this case.  However, to the extent necessary, AES-PR will show:

1) that it operated and maintained the equipment in a reasonable manner that was consistent with the instructions of ALSTOM and its subcontractor EEC;

2) that it was not made aware that there was an increased risk of accelerated corrosion by following the instructions of ALSTOM and EEC.

**B.    No Misuse of Equipment**

AES-PR does not bear any burden with respect to this defense.  However, to the extent necessary, AES-PR will show:

1) that it operated and maintained the equipment in a reasonable manner that was consistent with the instructions of ALSTOM and its subcontractor EEC;

2)  that the accelerated corrosion in the equipment was not proximately caused by any alleged deviations from the applicable operation and maintenance instructions.

## V.    Equitable Estoppel

ALSTOM should be equitably estopped from relying on any alleged conditions precedent or affirmative defenses because it instructed AES-PR to operate the equipment in a manner that differed in certain respects from the August 2001 EEC O&M manual that it now claims AES-PR should have followed.  AES-PR intends to establish by clear and convincing evidence that:

A.  There was a contractual relationship between AES-PR and ALSTOM;

B.  ALSTOM and/or its subcontractor EEC instructed AES-PR orally, in writing and by its conduct during commissioning to operate certain aspects of the air pollution control equipment in a manner that differed in certain respects from the August 2001 EEC O&M manual and that AES-PR followed those instructions to its detriment;

C.  AES-PR's reliance on ALSTOM and EEC's instructions during the commissioning and start-up phases of the project was reasonable.

## VI.    Waiver

ALSTOM should be barred from relying on any alleged conditions precedents and/or raising its affirmative defense because it waived any legal right it may have had to assert that AES-PR should have acted in accordance with the August 2001 EEC O&M manual:

AES-PR intends to establish, to the extent necessary, that:

A.  ALSTOM voluntarily relinquished and/or abandoned any right it may have had to assert that the Contract contained a condition precedent that required AES-PR to follow the August 2001 EEC O&M manual;

B.  ALSTOM voluntarily relinquished and/or abandoned any right it may have had to enforce the terms of the August 2001 EEC O&M manual;

C.  ALSTOM intentionally waived its rights by instructing AES-PR orally, in writing and through its conduct, in a manner that differed in certain respects from EEC's August 2001 O&M manual.

## IX.  ALSTOM'S BRIEF STATEMENT OF PROOF

### A.      Summary of Defendant's Proof

AES-PR cannot recover in warranty from ALSTOM on its primary claim because it failed properly to operate and maintain the subject pollution control equipment and because it failed to comply with warranty requirements.  AES-PR cannot recover its claimed damages because such damages are for work far in excess of the applicable warranty requirements, constituting betterments, because the high dollar components of such damages are for future improvements in wastewater disposal at the Plant related to equipment that ALSTOM neither designed or supplied, and because such damages are consequential and thus barred by the applicable Contract.

AES-PR is part of a family of long-standing sophisticated companies that derive revenues from the development, ownership, and operation of power-generating plants and sale of power worldwide.  Together with its engineering, procurement, and construction prime contractor, Duke/Fluor Daniel Caribbean, S.E. ("D/FD"), AES-PR orchestrated the design and construction of the 454 megawatt power generating plant located in Guayama, Puerto Rico (the "Plant").  As the prime contractor, D/FD was solely responsible for the design of the Plant, including all of the Plant's water systems.  In that capacity, D/FD was solely responsible for specifying the sources of water to be used in all of the equipment at the Plant and how that water would be treated. D/FD also was solely responsible for designing the systems required for the proper disposal of wastewater generated by the Plant's operations so as to satisfy any obligations that AES-PR may have as a zero liquid discharge facility under its permits.

AES-PR and D/FD collaborated in the selection of the pollution control equipment to be installed at the Plant and prepared design specifications for that equipment, all prior to

ALSTOM's involvement in the project. Based on the requirements of the pollution control equipment specified in the design specifications, the only commercially reasonable supplier of that equipment was Environmental Elements Corporation ("EEC").

ALSTOM entered into two contracts with D/FD under which ALSTOM agreed to furnish and install two turbines, two CFB Boilers, and related pollution control equipment, the latter supplied to ALSTOM by EEC pursuant to a separate purchase order. Under its contract for the supply and installation of the boilers and the pollution control equipment, ALSTOM gave a two-year warranty against the consequences of accelerated corrosion of certain components of the equipment, including the pollution control equipment furnished by EEC, but only to the extent that the consequences of such corrosion materially affected or were reasonably expected to materially affect in the next two years the structural integrity of the equipment or its ability to mechanically perform. That warranty was expressly conditioned on, among other things, the operation and maintenance of the equipment in accordance with the terms of EEC's O&M Manuals. Further, should there be a proper claim for accelerated corrosion, the warranty provides that ALSTOM is responsible for "appropriate  remedial actions" that are sufficient to address the consequences of accelerated corrosion occurring in the period of 24 months after performance acceptance – here November 28, 2002 – but again only to the extent that such corrosion has materially affected or is reasonably expected to materially affect structural integrity or the ability of the equipment to mechanically perform for an additional two years.

Under Section 52 of the General Terms and Conditions of ALSTOM's Purchase Order with D/FD, where a remedy is specified in the Contract for an occurrence, "such remedy shall be an exclusive remedy for such occurrence."  Where, as here, AES-PR is complaining that ALSTOM is responsible for "accelerated corrosion" of the CDS collector plates, the accelerated

corrosion remedy in Section 1.6 of the General Terms and Conditions of the Contract, and not other warranties in the Contract, is AES-PR's "exclusive remedy."

AES-PR knew of the risk of corrosion in the ESP. It repeatedly had received instructions from EEC that ultimately were incorporated in its O&M Manuals advising that proper operation and maintenance of the equipment was required in order to minimize the risk of corrosion, and, thus, also was an express condition of the accelerated corrosion warranty. In a shortsighted attempt to reduce its operating costs and maximize the short-term profitability of the Plant, however, AES-PR now admits that it failed to follow the specified operations and maintenance procedures for the pollution control equipment. In doing so, AES-PR increased the risk of corrosion.

Despite its own admitted failures to follow the operations and maintenance procedures, AES-PR immediately attempted to blame ALSTOM when it discovered corrosion in one of the components of the pollution control equipment rather than accept responsibility for its own shortcomings. Without attempting an investigation of the cause of the corrosion, AES-PR asserted a claim against ALSTOM under the accelerated corrosion warranty in ALSTOM's Contract with D/FD. Moreover, AES-PR rushed to implement remedial measures in an effort to address the corrosion, recognizing, internally, that it was doing so without regard to any applicable warranty rights, all in violation of the terms of the accelerated corrosion warranty.

Under the Contract, AES-PR's failure to follow the procedures in the O&M Manuals voided ALSTOM's obligations under the accelerated corrosion warranty. As its excuse for its failure to follow the O&M Manuals, AES-PR now contends that the procedures in the O&M Manuals were modified by several page shut-down and start-up procedures prepared in the field by an employee of EEC, ALSTOM's supplier, and by statements purportedly made in the field

by EEC's employees. Such shut-down and start-up procedures, however, did not apply to normal operation and maintenance of the equipment. Moreover, no sophisticated power owner such as AES-PR could reasonably believe that documents prepared in the field by ALSTOM's supplier, without more, could alter the terms of the carefully-constructed, nine-volume O&M Manuals, which were a part of ALSTOM's Contract with D/FD.

Even after learning from its consultant and its own internal analysis that the most likely root cause of the corrosion was its own failure to operate and maintain the equipment as prescribed in the O&M Manuals, AES-PR continued to blame ALSTOM for its own failings. When its own remedial measures apparently exacerbated other wastewater disposal problems at the Plant, AES-PR failed to accept responsibility for its mistakes and for those of its design/builder, D/FD, in failing to design a system that was sufficient to dispose of wastewater at the facility. Instead, once again, AES-PR attempted to blame ALSTOM in order to force it to pay, not only for remedial measures necessary to repair the corrosion under ALSTOM's warranty, but also for the cost to cure wastewater disposal deficiencies that were solely the result of choices made by AES-PR and its design/build prime contractor, D/FD. Such matters were outside of ALSTOM's scope of work on this Project and wholly unforeseeable by ALSTOM when it contracted with D/FD.

AES-PR improperly seeks to recover claimed damages: (i) for betterments to the water systems at the Plant that ALSTOM neither designed or supplied under its Contract with D/FD; (ii) for equipment by which AES-PR is seeking to extend performance beyond the duration of ALSTOM's four-year accelerated corrosion warranty; (iii) based on future improvements to be undertaken after expiration of the warranty period to correct "new problems" created by AES-PR's unilateral remediation failures; and (iv) for enhancements to the Plant at costs that are

disproportionate to the value of the pollution control equipment that is subject to the accelerated corrosion warranty.    In addition, AES-PR is seeking to recover damages constituting consequential costs that are barred under Section 52 of the General  Terms and Conditions of ALSTOM's Contract with D/FD, which explicitly provides that ALSTOM shall, in no event, "be liable for incidental, special or consequential damages of any kind."

      **B.**     **Detailed Summary of Defendant's Proof**

          **1.  The Air Pollution Equipment Was Subject To Accelerated Corrosion If Not Operated and Maintained Properly.**

As coal or other feedstock (such as ash) is burned in the combustor portion of the Boilers, the smoke and ash from the combustion process (collectively, the "flue gas") rise out of the top of the combustor.  As that flue gas passes through the other portions of the Boiler, much of the ash is separated and removed.  After the flue gas leaves the Boiler, it enters the Circulating Dry Scrubber ("CDS"), where sulfur dioxide is removed and the flue gas is cooled, utilizing nozzles that are intended to spray the flue gas with an atomized mist, or fog, of cooling water.  From the CDS, the flue gas enters the Electrostatic Precipitator ("ESP"), where it passes through an electrical field that positively charges the particles of ash in the gas.  Those positively charged ash particles are then attracted to thin, negatively charged steel ESP "collector plates," which are designed to capture some of the ash remaining in the flue gas before it reaches the smokestack.

The ESP collector plates are, by the very nature of the environment in which they operate, subject to corrosion.  However, they are particularly subject to accelerated corrosion if the system is not operated and maintained consistent with detailed parameters and according to specific guidelines.  One of the potential causes of corrosion on ESP collector plates results from the formation and accumulation of corrosive acids that requires the presence of  moisture.  Such corrosive acids will form if the temperature of the flue gas entering the ESP falls below a given

77

level such that the moisture from the CDS spray water is not completely evaporated and carries over into the ESP or condensation occurs while the flue gas is passing through the ESP.

Accordingly, in order to prevent corrosion, it is critical that: (i) the water droplets used to cool the flue gas evaporate fully so moisture does not enter the ESP; and (ii) the temperature within the ESP remains sufficiently high so condensation does not occur on components inside the ESP, particularly the collector plates. If moisture enters the ESP or condensation occurs, it is likely that corrosive substances (acids) will form and adhere to the moist surfaces inside the ESP, particularly the collector plates.

> **2. ALSTOM's Purchase Order Warranty Against Accelerated Corrosion Expressly Was Limited By, And Conditioned On, Compliance By AES-PR With Specified O&M Practices And Procedures.**

The Contract between ALSTOM and D/FD included an express warranty against potential accelerated corrosion of the CDS and ESP equipment (the "Warranty"). The Warranty is for a total period of not longer than four (4) years and - because corrosion is to be expected – only applies to "accelerated corrosion" that manifests itself during the initial twenty-four (24) month period of operation and that will materially affect either structural integrity or mechanical performance during the four-year period:

> The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, and interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years (i) the structural integrity of the Equipment [or] any portion thereof or (ii) [the] ability of the Equipment to mechanically perform.

The Warranty is expressly conditioned – using the unequivocal word "conditioned" – on AES-PR's compliance with specified O&M requirements:

> Contractor's corrosion guaranty is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and a typical system operation at baseload and specified capacity factors.

The Contract includes specific parameters concerning the acceptable composition of fuel and feedstock, including size, solubility, chemical composition and the like. Any deviation from those parameters voids ALSTOM's warranties, including the accelerated corrosion Warranty:

> Consumable items, normal wear and tear… and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or in part by deviations in the fuel or feedstock from the limits specified in the Contract are excluded from any warranty obligations of the Contract.

The Contract specifically entitles ALSTOM, in the event of an AES-PR claim against the Warranty, to obtain "reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under [the] Warranty." The Contract further requires that, in the event of a claim under the accelerated corrosion warranty, ALSTOM and AES-PR must attempt to reach mutual agreement as to the extent of the corrosion and the "appropriate remedial actions."

### 3. ALSTOM's ESP Supplier, EEC, Expressly Warned AES-PR, During The Plant's Design Phase, That Compliance With Specified O&M Practices Would Be Required To Ensure Against Accelerated Corrosion.

In January 2000 – well before ALSTOM had supplied the CDS and ESP units to the Plant, and while they were still being designed – the engineering consultant for AES-PR's lender raised concerns about equipment corrosion. In response, ALSTOM's supplier, EEC, stressed the importance of operating and maintaining the equipment to minimize the risk of corrosion. The fundamental importance of observing proper O&M procedures was subsequently emphasized in

a telephone conference call between representatives of D/FD, ALSTOM and EEC (and memorialized by D/FD's e-mail summary).

The following month (February 2000), representatives of ALSTOM and EEC met with AES-PR and D/FD personnel to discuss the CDS and ESP equipment and, among other things, potential corrosion. Meeting minutes reflect that, from the very outset, EEC reemphasized that precautions would be required for long-term success and minimization of corrosion. The minutes further establish that, as the meeting concluded, EEC again stressed that the "keys to good CDS operation" were: (i) maintenance of the spray nozzles; and (ii) maintenance of minimum approach temperature. Thus, even as the Plant was still being designed, AES-PR personnel were well aware of the fact that failure on their part to observe proper O&M procedures and practices would likely result in accelerated corrosion of the equipment.

> **4. O&M Manuals Detailed The Practices That AES-PR Was Required To Observe To Ensure Against Accelerated Corrosion (And To Obtain Coverage Under ALSTOM's Warranty). Those Manuals Further Required AES-PR To Record And Maintain Certain Data.**

Approximately eight (8) months later, in late September 2000, EEC furnished D/FD with portions of what it described as a "Typical Operations & Maintenance Manual" for review. Several months later – and shortly before submitting a final version of the Project-specific Operations & Maintenance Manuals ("O&M Manuals") – EEC also furnished, at D/FD's request, a "Maintenance and Monitoring Plan" that provided an "overview" of the O&M Manual requirements for minimizing corrosion. The first sentence of that Plan reiterated EEC's continual advices that proper O&M would be essential because warranties expressly were conditional: "The guaranties provided by EEC are based on proper operation and maintenance procedures." The Plan set forth a "brief overview" of the maintenance and monitoring plan, noting that control of flue gas temperature at the CDS outlet, the chloride content of the ash in

the CDS, and the operating temperature of the CDS during soot blowing in the CFB Boilers would be key to minimizing corrosion of the Equipment.

Soon after providing that Maintenance and Monitoring Plan overview, EEC issued the Project-specific O&M Manuals. Pursuant to the terms of the Purchase Order, they became – and are – "Contract Documents," and, thus, a part of the Purchase Order.

Chapter 9 of the first volume of the O&M Manuals reiterated EEC's explicit warning to the operator, AES-PR, concerning the link between proper O&M procedures and the risk of corrosion. It provided: "The following overview of the Maintenance and Monitoring Plan is geared specifically to minimize corrosion of surfaces that handle flue gas." It further stated: "During operation, close control of critical process parameters is necessary to minimize corrosion."

Consistent with EEC's repeated admonitions, the O&M Manuals gave very specific instructions with regard to regulating the temperature in the CDS so as to ensure proper evaporation of the cooling water and prevention of condensation, while still satisfying emissions removal requirements. According to the O&M Manuals – and consistent with the Maintenance and Monitoring Plan earlier provided – the operator, AES-PR, was to measure regularly the "wet bulb temperature" (i.e., the dew point temperature or point of adiabatic saturation) and, as a starting point, was to operate the CDS in such a manner that the temperature of the flue gas would be maintained at a minimum temperature of 30ºF above the wet bulb temperature. That was to be accomplished by regulating the water flow rate of the CDS nozzles. Accordingly, the O&M Manuals directed AES-PR to "take wet bulb temperature measurements at the outlet of the CDS" for each shift during initial operations, and, thereafter, to do so regularly and to maintain records that such measurements had been taken.

The O&M Manuals advised that the second critical parameter governing potential corrosion would be the chloride content of the ash in the CDS, which would be influenced by the chloride content of both the spray water and the fuel and feedstock being combusted in the boiler.  Accordingly, the O&M Manuals directed AES-PR to "[m]easure the chloride content on the ash and [to] measure cooling water conductivity to correlate to chloride content in the water and verify flue gas approach temperature, with those readings maintained in Plant Operating Logs"; initially, those measurements were to be taken on a weekly basis.  If testing detected the presence of high chlorides in either the ash or the water (which could interfere with evaporation), the O&M Manuals required that AES-PR operators adjust the CDS operating temperature.

The O&M Manuals stated that a third critical parameter in minimizing corrosion would be the operation of soot blowers in the Boiler, a process by which steam is used to clean ash from the Boiler, and which can elevate the flue gas wet bulb temperature.  According to the O&M Manuals, the operating temperature of the CDS must be "ramped up" during a soot blowing cycle.  In order to ensure that the operators would elevate the CDS outlet temperature during soot blowing, EEC furnished a logic diagram pursuant to which the Plant's Distributed Control System could be programmed to elevate the temperature automatically when soot blowing was occurring, and ALSTOM provided that logic diagram to D/FD.

The O&M Manuals prescribed a rigorous process for maintaining the CDS spray nozzles in order to ensure that they uniformly emitted a fine, atomized mist.

In late October 2002 – approximately a month before the Plant was turned over to AES-PR – ALSTOM submitted the last in a series of limited "revised operating procedures" involving: (i) CDS water nozzle cleaning procedures; (ii) a CDS nozzle cleaning log revision; (iii) a CDS re-start procedure revision; and (iv) a CDS cold start-up procedure revision.  Those

revised procedures were consistent with, and did not purport to modify, the procedures for normal operation of the equipment as established by the O&M Manuals.

When all of the equipment that comprises the Plant has been installed, there is a process under which the equipment is started and operated, problems are identified and corrected, and the equipment is tuned in order to optimize its performance. This process is commonly referred to as "commissioning."

Initial efforts to start up the pollution control equipment began in July, 2002; however, it was not until August, 2002 that the equipment was started and operated for sufficient periods of time such that commissioning activities could be undertaken. From that point forward, there were periods of time when the boilers in each of the two units either were out of service or operating at less than full load as those boilers were being commissioned. Similarly, there were periods of time during the commissioning process when the pollution control equipment was not operating because one or more boilers were not operating or because work was being performed on that equipment. This up-and-down operation of the equipment and other testing of the equipment under conditions that differ from typical operation is commonplace during commissioning.

Well in advance of commissioning, at the request of AES-PR, EEC conducted training for the employees of AES-PR who would be operating the Plant's pollution control equipment. EEC videotaped the training and provided copies of the videotapes to AES-PR. Insofar as it related to the operational and maintenance procedures required to minimize the risk of corrosion in the ESP, the content of the training mirrored the instructions to the operators in the O&M Manuals.

During the course of commissioning, AES-PR's employees operated the pollution control equipment. For much of the commissioning process, EEC had two employees on site to provide training, advice, and assistance to those operators and troubleshoot any problems that arose during the operation of the pollution control equipment. Among other things, EEC's representatives on site instructed AES-PR's employees regarding the proper method for inspecting and cleaning the spray nozzles in the CDS, the proper method for checking the wet bulb temperature at the CDS, and the proper method for adjusting the CDS outlet temperature, all in accordance with the terms of the O&M Manuals.

For their part, employees of AES-PR were unwilling to participate in training exercises, did not follow instructions, and were unwilling to operate the pollution control equipment as set forth in the O&M Manuals. When the employees of EEC repeatedly directed AES-PR's employees to consult the O&M Manuals for more detailed instructions regarding the operation and maintenance of the equipment, AES-PR's employees refused to do so. Instead, AES-PR's employees either ignored required procedures or sought to identify short cuts in lieu of consulting and following the detailed instructions contained in the O&M Manuals.

The Contract Documents specify limits regarding the amount of particulate matter that can be emitted from the Plant's stack following treatment of the flue gas by the pollution control equipment after it exits the boilers. Such particulate emissions are referred to as "opacity." The Contract Documents specify that opacity may not exceed 20 percent on a six minute rolling average except that, for one six minute period each hour, it may be as high as 27 percent. Opacity is measured by a device in the Plant's stack that was neither furnished nor installed by ALSTOM or EEC. There were a number of instances during commissioning when the equipment used to measure opacity was demonstrably inaccurate.

84

During commissioning, there were a number of instances in which opacity, as measured by the device in the stack, was said to be in excess of the limit set forth in the Contract Documents. As is typically the case during commissioning, EEC, the supplier of the equipment, attempted to identify potential causes of what were reported to be emissions exceedences. Among other things, EEC performed work on hoppers in which the ash is collected in the ESP and recommended changes to the rapping sequence, the process by which hammers tap on collector plates in the ESP to remove trapped particulate matter. Despite these efforts, the results of tests performed in November, 2006 indicated that the pollution control equipment did not satisfy all of the emissions requirements in the Contract Documents.

On November 28, 2002, AES-PR accepted the completed Plant from D/FD and commenced commercial operation of the facility. Subsequently, ALSTOM decided to perform its own analysis of the pollution control equipment, with assistance from its Environmental Control Systems Group in Knoxville, Tennessee, in an effort to improve the performance of the pollution control equipment. Following a series of tests and analyses, ALSTOM implemented further improvements to the equipment, including repairs to rotary valves in the hoppers into which ash is collected in the ESP and the installation of a second set of baffles.

ALSTOM completed repairs to the rotary valves and installed the second set of baffles in Unit 1 during the period between May 29 and June 27, 2003. In conjunction with those repairs, ALSTOM reiterated in a message to D/FD that AES must continue to ensure that the CDS outlet temperature is maintained as prescribed by EEC. On or about June 18, 2003, the pollution control equipment was tested and satisfied all applicable emissions requirements. Even after the pollution control equipment had satisfied emissions standards, however, ALSTOM continued to work with AES-PR in an effort to improve its performance. As a result of those efforts, further

adjustments were made to the rapping sequence for the plates in the fourth quarter of 2003, which further improved the performance of the equipment. Indeed, based on the final adjustments to the rapping sequence, an AES-PR employee wrote in November, 2003 that the opacity problems had been solved.

In September, 2003, Karl Hognefelt, an employee from ALSTOM's Environmental Control Systems Group in Knoxville, Tennessee, was on site. During that site visit, Unit 1 was shut down, and Mr. Hognefelt took the opportunity to inspect the ESP and observed no evidence that the ESP collector plates had corroded.

In March, 2003, ALSTOM personnel conducted tests inside the ESP Unit 2. At that time, William VanHooser from EEC also was on site. During that testing, there was no evidence of corrosion of the ESP collector plates for Unit 2.

### 5. After Approximately One Year Of Operation, AES-PR Advised That One ESP Was Corroding.

In November, 2003, after approximately one year of operation by AES-PR, AES-PR personnel found corrosion in the ESP collector plates in Unit 2. ALSTOM was advised and immediately mobilized a specialist to the Plant to inspect the corrosion and to initiate a root cause analysis. The purpose of that root cause analysis was two-fold: (i) to ascertain the cause of the corrosion and, thus, to determine whether it was covered by ALSTOM's Warranty; and (ii) to develop appropriate remedial action to address the causal factors leading to the corrosion.

ALSTOM's inspection revealed significant corrosion of certain collector plates in the ESP, primarily concentrated in the lower half of the ESP, suggesting that temperature stratification may have had some influence. An ALSTOM specialist advised that the corrosion pattern indicated that it likely was related to operating temperature and that high chloride content in the CDS water would increase the risk for corrosion. AES-PR Plant personnel acknowledged

a high chloride content in the water and agreed to increase the unit's operating temperature, advising the ALSTOM specialist that they had just discovered a diagram in the O&M Manual that required an operating temperature of 175ºF when AES-PR used water with a high concentration of chloride for the CDS. The ALSTOM specialist obtained samples of the corroded collector plates for analysis in ALSTOM's home office, and concluded his report by offering the preliminary conclusion that the cause of the "corroded collecting plates is probably a combination of using high chloride contents water and operating at too low [a] temperature."

While the root cause analysis was still underway, AES-PR decided to proceed unilaterally, as reflected by a November 24, 2003 e-mail (just days after the discovery of the corrosion) from its Plant Manager to other AES-PR personnel. AES-PR immediately proceeded with its unilateral action, ordering upgraded replacement ESP collector plates for Unit 2 from EEC on November 26 and December 5, 2003, for delivery on an expedited basis, and thereafter invoicing ALSTOM for those materials.

Less than two months later, while ALSTOM's root cause analysis was on-going, AES-PR reported accelerated corrosion damage of the ESP collector plates in the other unit and formally expanded its warranty claims.

### 6. AES-PR Then Unilaterally Installed An Additional Component To Lower Its Operating Costs – And Demanded That ALSTOM Also Pay For That.

Even as AES-PR was reiterating its demand that ALSTOM reimburse it for costs incurred to that point, AES-PR was also unilaterally pursuing other remedies. Indeed, as early as January 23, 2004, AES-PR had been considering a proposal from a supplier to substitute a component of the Plant's existing water treatment system – a Reverse Osmosis ("RO") system – with two new RO units for the purpose of reducing the level of chlorides and other dissolved solids in the water spray utilized in the CDS upstream of the ESP. The primary benefit of adding

a new RO system, as recognized by AES-PR personnel, was to lower operating costs; specifically, the addition of the new equipment would result in a savings to AES-PR of $3 million annually based on decreased lime usage.

Aside from its consideration of the financial ramifications, AES-PR also conducted what it described as "technical due diligence" of the proposed new RO system in concert with D/FD, the supplier of that equipment (GE-Betz) and various specialty consultants (but, notably, neither ALSTOM nor EEC). Among the technical issues considered were: (i) the effect on the Plant's operations and maintenance (resulting in a conclusion that filters included with the new system would "significantly decrease the present RO membrane fouling and result in fewer membrane replacements and chemical cleanings"); and (ii) environmental concerns (resulting in a conclusion that existing permits were sufficient for the new system configuration).

Soon thereafter, on April 30, 2004, AES-PR expanded its warranty claim to include its new RO system. ALSTOM responded by noting that, since the first observation of corrosion in November 2003, it had been cooperating with AES-PR personnel to understand the "corrosion phenomena," and that proper investigation of the corrosion required – as provided for by the terms of the Purchase Order – that ALSTOM be provided access to the Plant's operating records to verify, among other things, the validity of the claim. ALSTOM further advised that, pending the provision of the requested materials and completion of that investigation, it could not agree that AES-PR's warranty claims were valid under the terms of the Purchase Order.

### 7. AES-PR's Consultant Concluded That AES-PR's Operations And Maintenance Practices – Practices Inconsistent With Purchase Order Requirements – Were The Root Cause Of The Accelerated Corrosion.

During January, 2004, AES-PR had been conducting unilaterally its own analysis, having retained a former EEC employee to determine the root cause of the corrosion. AES-PR's

consultant told it that a proper root cause analysis was absolutely essential to determine what caused the corrosion and to develop appropriate remedial measures:

> This may take some time to find the root cause, *but if we fix the wrong thing it will take even longer to solve the problem once and for all.*

Based upon his investigation, AES-PR's consultant concluded that the root cause of the corrosion appeared to have been operation of the equipment in a high chloride environment and at CDS outlet flue gas temperatures that were lower than those required by the O&M Manuals. That conclusion was consistent with AES-PR's own earlier evaluation, as reflected in its internal January 25-31, 2004 Weekly Report.

Following an October, 2004 on-site inspection, AES-PR's consultant reminded AES-PR Plant personnel of the need to observe proper operating procedures and, particularly, the requirement to maintain sufficiently high temperatures to minimize corrosion. AES-PR's consultant concluded that AES-PR should operate the equipment as called for by the O&M Manuals – at a temperature equal to the flue gas wet bulb temperature plus 30ºF when lower levels of chloride were present, and to increase the temperature as the chloride level increased.

### 8. AES-PR Failed To Satisfy The Contractual Condition Precedent To ALSTOM's Warranty Obligations.

AES-PR failed to satisfy the condition of operating and maintaining in accordance with the O&M Manuals because: (i) it did not monitor and control the chloride content of the CDS water; (ii) it did not monitor and control the chloride content of the ash; (iii) it did not properly adjust the flue gas approach temperature according to the level of chlorides and moisture in the system; (iv) it did not properly maintain the water nozzles in the CDS; (v) it did not operate the equipment at required temperatures during soot blowing; and (vi) it did not maintain records of those required actions.

### a.   AES-PR failed to monitor and control properly the chloride content of the CDS water.

The specifications for the Plant expressly state that the maximum chloride content of the water to be used in the CDS is 4300 mg/liter.  ALSTOM neither designed nor furnished the equipment used to convey water to the CDS or to monitor or control the chloride content of that water.  Rather, AES-PR or its design/builder, D/FD, was responsible for the design and construction of those systems.  The O&M Manuals prepared by EEC and provided to AES-PR expressly stated that the chloride content of the water was to be tested every day.

Despite requests by ALSTOM, AES-PR never provided documentation to establish that it monitored or controlled the level of chlorides in the CDS water.  AES-PR's own project documentation establishes that, until September, 2003, AES-PR did not monitor and control properly the chloride content of the CDS water as required by the O&M Manuals.

### b.   AES-PR failed to monitor and control the chloride content of the ash.

The specifications for the pollution control equipment also set limits on the chloride content of the ash in the CDS.  The O&M Manuals expressly stated that AES-PR was to measure the chloride content of the ash in the CDS on a regular basis (and at least weekly until Plant operating characteristics had been established).

ALSTOM requested that AES-PR provide it with documentation that would establish that AES-PR monitored the level of chlorides in the system as required by the O&M Manuals.  AES-PR's own Project documentation establishes that it did not do so.

In mid-September 2003 – after AES-PR had been operating the Plant for more than nine months and shortly before it discovered the corrosion of the ESP collector plates – an AES-PR employee circulated internally a copy of the EEC Maintenance and Monitoring Plan that had

been furnished during the design phase of the Plant, and which had provided a "brief overview of the maintenance and monitoring plan geared specifically to minimizing corrosion.…"  Upon receiving that e-mail and the attached, previously submitted corrosion minimization plan, another AES-PR employee (charged with conducting the ESP corrosion root cause analysis) stated: "I wonder if we have ever tested the [chloride] content of the ash?"  In response, he was advised by another AES-PR employee: "I have never tested the ash for chlorine in the past."  It was only at that point – nearly 10 months after AES-PR had begun operation of the equipment – that AES-PR personnel first began to make any effort to comply with the O&M requirement for monitoring the ash chloride content.  AES-PR failed to monitor and control the chloride content of the ash as required by the O&M Manuals.

### c. AES-PR failed to adjust properly the flue gas temperature at the CDS Outlet.

From the early stages of design and construction of the Plant, AES-PR knew that the control of the flue gas temperature at the CDS outlet would be imperative to minimize corrosion within the ESP.  EEC had advised AES-PR more than four years prior to Plant turnover that there would be three different outlet temperatures (depending on spray water chlorine content).  The O&M Manuals provided to AES-PR contained not only express instructions as to the minimum operating procedures for a given level of chloride, but also contained equally express directions that the temperature was to be monitored each shift.

Despite ALSTOM's request, AES-PR never provided operating logs or other information that document AES-PR's compliance with that O&M Manual requirement.  To the contrary, one of AES-PR's own consultants concluded that AES-PR did not adjust the flue gas temperature at the CDS outlet as required by the O&M Manuals.

**d. AES-PR failed to maintain properly the spray water nozzles and keep proper records of those activities.**

AES-PR was advised during the Plant's design phase that maintenance of the CDS spray nozzles was critical to minimize corrosion within the ESP.  As noted by the O&M Manuals, the CDS spray nozzles must emit water in a very fine mist in order to limit the moisture content, and, thus, corrosiveness of the ash.  The O&M Manuals require that Plant operators periodically check and clean the spray nozzles to ensure that they do not become clogged, which would result in improper atomization.

Despite its contractual obligation to do so, AES-PR did not submit operating logs or other information to ALSTOM verifying its compliance with the O&M Manual requirements.  During the period between November 28, 2002 and January 2, 2003, AES-PR did not maintain any records documenting the cleaning of the spray nozzles for either of the CDS units.  Thereafter, AES-PR kept periodic, but not daily, nozzle cleaning records for unit 1 for the period between January 2, 2003 and November 3, 2004.  For Unit 2, AES-PR only kept nozzle cleaning records for the period between January 2, 2004 and November 2, 2004.

AES-PR's own records also establish that the nozzles were not operating properly and were performing more like a garden hose than a misting device.  AES-PR's consultant originally observed that deficiency during an inspection prior to the discovery of the corrosion and subsequently advised AES-PR of his concern that AES-PR was not properly recognizing or addressing that problem.  As a result of AES-PR's disregard of a problem with its maintenance of the nozzles, there was an overabundance of water injected into the CDS.

**e.  AES-PR failed to increase the CDS outlet temperature during operation of the soot blowers.**

The O&M Manuals expressly stated that a third critical process parameter for the avoidance of corrosion involved operation of the soot blowers.  Because operation of the soot blowers can elevate the flue gas wet bulb temperature, AES-PR was instructed that the CDS outlet temperature would need to be increased during the process; ALSTOM provided control logic diagrams by which that action could be taken automatically.

Despite ALSTOM's requests, AES-PR never provided documentation that it complied with that requirement of the O&M Manuals.  Available operating information demonstrates that AES-PR did not.

**f.  AES-PR failed to record O&M data and other required information.**

The O&M Manuals warned that EEC's guarantees (and, therefore, ALSTOM's Warranties) "are based on proper operation and maintenance procedures."  ALSTOM, pursuant to the Contract, also was to have "reasonable access to…operating records, the equipment and other information [ALSTOM] deemed necessary to satisfy themselves of the validity of a claim under [the] warranty."   In addition, the O&M Manuals repeatedly admonished AES-PR personnel that operating data needed to be recorded and maintained.  Among the items that the O&M Manuals specifically mandated documentation of were the daily physical measurements of the wet bulb temperature of the flue gas and weekly measurements of the chloride concentration in the ash.

AES-PR plant personnel failed to provide such data to ALSTOM, notwithstanding its requests.  AES-PR's internal records revealed that it failed even to take the readings.

AES-PR's failure to maintain proper records is a material breach of the Purchase Order.  AES-PR's breach also constituted a failure to comply with requirements of the O&M Manuals –

which provide that "operating logs of this data *must* be maintained by plant personnel" and "these readings *must* be maintained in the plant operating logs." Consequently, AES-PR has failed to satisfy the express condition of ALSTOM's accelerated corrosion Warranty.

### 9. AES-PR Utilized Feedstock That Voided ALSTOM's Warranty.

The portion of the Purchase Order that included the specification for the CDS and EPS equipment included parameters for the coal (fuel) and ash (potential feedstock) that would be utilized for the Boiler in the Plant. The specification provided information to ALSTOM (and EEC) concerning the constituent nature of the anticipated fuel and feedstock, including its size, its hardness, and its chemical composition. Pursuant to that specification, ALSTOM was advised that equipment should be designed to operate with a coal and ash chlorine content of 0.03%, but with a potential actual range of 0 to 0.1% content. The maximum allowable concentration of chloride in the ash was a "critical parameter" in controlling corrosion, as noted in the O&M Manuals.

Until September, 2003, AES-PR neglected to measure the chlorine content of the ash. When it finally did so some ten months into operations, it found that the chlorine contents in ash samples ranged from a low of 0.53% to a high of 1.1% – or anywhere from five to eleven times the amount specified in the Purchase Order specifications.

### 10. AES-PR Is Solely Responsible For The Corrosion Of The Collector Plates In The ESP.

The corrosion of the ESP collector plates was the result of a corrosive environment in the ESP consisting of a wet solution containing sulfuric and hydrochloric acid. The cause of the wet acid environment was AES-PR's operation of the CDS at temperatures below those required under the O&M Manuals and moisture carryover into the ESP from the CDS. The corrosion occurred after March, 2003 for Unit 2 and after September, 2003 for Unit 1.

AES-PR's project documentation establishes that its attempts to measure the wet bulb temperature in the CDS were performed too infrequently and the measurements often were taken at locations other than those that would accurately describe the wet bulb temperature at the inlet to the ESP, the location where the measurements should have been taken. Taking wet bulb temperatures at a location that is either earlier in the system than the CDS outlet or at the downstream side of the ESP would bias the wet bulb temperatures toward lower levels. Setting the CDS outlet temperature based on those artificially low readings would result in a lower operating temperature than that required in the O&M Manuals to prevent moisture and minimize the risk of corrosion.

As the chloride content of the CDS spray water and the ash in the system increase, the O&M Manuals direct AES-PR to increase the CDS outlet temperature. AES-PR failed to measure the chloride content of the CDS spray water and the ash in the system and make appropriate adjustments to the CDS outlet temperature, as required in the O&M Manuals. AES-PR also did not automatically or manually increase the CDS outlet temperature during soot blowing operations in the CFB Boiler, as required in the O&M Manuals. Because soot blowing produces increased moisture that is sufficient to increase the wet bulb temperature by as much as 2ºF, AES-PR should have followed the procedures specified in the O&M Manuals.

AES-PR failed properly to maintain the CDS spray nozzles and to record and preserve records of those activities. AES-PR's personnel also did not understand how to interpret the test performed to determine whether the CDS spray nozzles were performing properly. The failure to correctly interpret the results of this test resulted in a failure to detect and correct problems with poorly performing nozzles as a part of the regular maintenance program set forth in the O&M Manuals, all of which increased the likelihood of moisture carryover into the ESP.

As a result of these failures to follow the requirements of the O&M Manuals, AES-PR created a significantly greater risk of corrosion. It routinely operated the CDS at an outlet temperature below that required in the O&M Manuals and did not ensure that the CDS spray nozzles operated properly, thus increasing the likelihood of condensation and moisture carryover into the ESP.

Beginning in July, 2003, the CDS inlet temperature increased and then went beyond 280ºF, the operating parameter reflected in the O&M Manuals. The increase in the CDS inlet temperature would have required a greater volume of water in order to lower the flue gas temperature to the CDS outlet temperature chosen by AES-PR. Plant records show that the flow of the CDS spray water increased in a manner that corresponds to the increase in the CDS inlet temperature. The resulting increase in moisture in the flue gas increased the wet bulb temperature even as the CDS outlet temperature remained constant at approximately 150ºF. As a result, after July, 2003, and only several months before it discovered the corrosion, AES-PR was operating the CDS at temperatures well below those required under the O&M Manuals. In so doing, AES-PR exposed the components of the ESP to even greater risk of corrosion.

In an effort to excuse its failure to follow the O&M Manuals and blame ALSTOM for the corrosion in the ESP, AES-PR contends that revised shut-down and start-up procedures for the CDS provided by EEC and verbal instructions purportedly given by EEC modified the requirements of the O&M Manuals. AES-PR apparently contends that it relied on the "start-up procedures" during normal operations of the air pollution control equipment. As an experienced and sophisticated owner and operator of a power generating facility, AES-PR could not reasonably view the shut-down and start-up procedures or verbal instructions supposedly given in the field by ALSTOM's supplier as modifications to the carefully-constructed, nine-volume

O&M Manuals.  Doing so would be a violation of industry standards and is no excuse for AES-PR's failure to follow the O&M Manuals.

When AES-PR first discovered the corrosion in Unit No. 2, it unilaterally made the decision to order up-graded collector plates and then to install a secondary RO system to remove most of the chlorides from the spray water in the CDS.  AES-PR's purported justification for this hurried decision apparently is that the CDS could not be operated in accordance with the O&M Manuals with water containing moderate to high chlorides.    AES-PR's own project documentation refutes this assertion.

The pollution control equipment was capable of performing as designed and as required in order to meet the emission limits set forth in the Specifications at the temperatures specified in the O&M Manuals to minimize the risk of corrosion when chlorides were present in the water and/or the ash.  The corrosion that occurred was the result of AES-PR's improper operation and maintenance of the equipment, not any design deficiency in the equipment.

### 11. Even Had AES-PR Satisfied The Purchase Order Conditions Precedent And Had It Not Utilized Feedstock That Voided The Warranty, Significant Elements Of Its Damage Claim Are Unrecoverable.

#### a. AES-PR may not recover claimed damages based on the cost of replacement collector plates that have not been, and will not be, installed during the four year warranty period.

Among the elements of damage claimed by AES-PR is an "estimated" $1.4 million for replacement collector plates and an additional $2 million "estimated" for labor to install the plates some time in the future.  Those plates have not been installed; instead, they recently have been added to AES-PR's "inventory" for accounting purposes.

AES-PR does not intend to install those replacement components within the remaining duration of the four year warranty.  There is no need to install those replacement plates because

of corrosion reasonably expected to materially affect (i) the structural integrity of the equipment or (ii) the ability of the equipment to perform during the remaining months of the Warranty, which will expire no later than December 18, 2006.

Replacement of collector plates after expiration of the Warranty term would constitute, for the purposes of AES-PR's breach of warranty claim, a betterment.  AES-PR would be obtaining from ALSTOM (or at ALSTOM's expense) equipment that would have a significantly longer life than that warranted.

Were ALSTOM found liable, AES-PR may not recover the claimed damages relating to the purchase and installation of those replacement plates.  Instead, its remedy would be limited to the cost of work already performed to stabilize the ESP collector plates, which are still in operation today, not an upgrade to the Plant or a stockpiling of upgraded components for possible use some time in the future beyond the warranty period.

**b.  AES-PR may not recover claimed damages based on consequential costs that are unrelated to repair and replacement of corroded collector plates.**

AES-PR also has claimed, as elements of its alleged damages, various "ongoing" and "estimated" costs involving additional amounts for operations and maintenance, "boiler water injection," "CDS clean water supplement" and "other water supply changes."  Those claimed elements of damage are also not recoverable as a matter of law.

As established above, to the extent that the claimed amounts reflect costs that purportedly will be spent after expiration of the four year warranty, they constitute a betterment and cannot be recovered.

In addition, all of those claimed costs are consequential.  They are not costs directly related to the repair of corroded collector plates, or, for that matter, the claimed corrosion failure.

The Purchase Order contains a provision excluding recovery of incidental, special, or consequential damages. Because, by agreement, ALSTOM cannot be held liable for incidental, special or consequential damages resulting from a failure of the equipment or a breach of the Warranty, the elements of damage claimed by AES-PR that relate to anything other than the cost of labor and materials to repair or replace corroded plates during the warranty period are simply not recoverable.

        **c. AES-PR may not recover claimed damages based on future improvements to the Plant water treatment system, including wastewater injection into the boilers and the brine concentrator and crystallizer unit.**

AES-PR's claim for the approximately $25 million that it estimates as the cost of its future Plant water treatment system improvements – including wastewater injection into the CFB Boilers and the brine concentrator and crystallizer unit and the cost of operating those systems – are also not recoverable for many of the reasons cited above, as well as for one significant additional reason discussed below.

Installation and operation of that new equipment will not occur during the remaining eight or nine month duration of the equipment's Warranty period, and thus is not required to protect the equipment during the Warranty period against failure either of (i) structural integrity or (ii) ability to mechanically perform. To the extent that those future water treatment system improvements provide such protection thereafter – if, in fact, they do so at all – they would constitute betterment and the costs would not be recoverable. Even if they are ultimately installed by AES-PR, such water treatment system improvements are intended to address wastewater disposal problems that are the responsibility of D/FD, the designer of the Plant's water systems, and not ALSTOM.

In addition, the claimed future costs are not recoverable because, according to AES-PR's own project documentation, they purportedly are required to remediate problems created by AES-PR's own unilateral installation of the new RO units.  In its internal Crystallizer Project Justification document, AES-PR itself admitted that the reason for the new improvements was because AES-PR's unilaterally-installed RO units "created new problems."

The brine crystallizer and other proposed water treatment system improvements are required solely to address other wastewater disposal issues for which ALSTOM is not responsible and the "new problem" created by AES-PR's own failed RO remedy, for which ALSTOM bears no responsibility and for which it cannot properly be held liable.  The costs also would be consequential inasmuch as they would have no direct relationship to the cost of labor and materials to repair a corroded plate or any other warranted component.  Again, were ALSTOM to be found liable, AES-PR's remedy would be limited to the cost of repairs that already have been made.

### 12. AES-PR Cannot Establish That ALSTOM Breached Warranties Related To The "Handcuffs" Installed On The Tubes Of The Fluidized Bed Heat Exchangers.

During the period between October, 2002 and January, 2004, there were several failures of tubes in the Fluidized Bed Heat Exchangers ("FBHE") at the Plant.  In each case, ALSTOM repaired the damage caused by the FBHE tube failure at no cost to AES-PR.  Subsequently, AES-PR asserted a claim against ALSTOM for breach of warranty, contending that a second row of clamps, known as FBHE handcuffs, was required in order to secure the tubes and prevent further FBHE tube failures.  ALSTOM properly denied AES-PR's claim for breach of warranty.

On projects constructed before the Plant as issue here in which ALSTOM installed CFB Boilers with FBHE's that are similar to those at AES-PR, ALSTOM used a single row of

handcuffs to secure the tubes in the FBHE's.  ALSTOM has not experienced significant

problems with tube failures on those prior installations.  Furthermore, on subsequent projects on

which ALSTOM did install CFB Boilers with FBHE's similar to those at the Plant at issue here,

ALSTOM installed a second row of FBHE handcuffs.  Nevertheless, on one of those projects,

ALSTOM still experienced a significant number of FBHE tube failures.  Failure analysis

performed since the FBHE tube failures on that project has shown that the failures were caused

by micro-fractures in curved portions of the tubes.  These micro-fractures were the result of a

failure by the particular supplier to anneal the material in the curved portion of the tube; the

micro-fractures and resulting failures were unrelated to the number of handcuffs installed on the

FBHE tubes.  Therefore, the single row of FBHE handcuffs installed by ALSTOM on the project

at issue here is sufficient and ALSTOM has not breached any applicable warranty under its

Contract with D/FD with regard to the FBHE handcuffs.

## X.  SETTLEMENT NEGOTIATIONS

The parties have communicated on multiple occasions in a good faith effort to explore the resolution of the controversy by settlement but have not been able to do so.

## XI.  OTHER MATTERS THAT THE PARTIES DEEM APPROPRIATE

**A.**    **AES-PR's List of Other Matters**.

1.    AES-PR respectfully requests that the Court advise as to when motions in limine are to be submitted.

2.    AES-PR respectfully requests that the Court set a deadline for submission of deposition designations and counter-designations.

**B**.    **ALSTOM's List of Other Matters.**

In addition to the relief requested in its Answer to the Complaint, ALSTOM has filed a Motion for Partial Summary Judgment and discovery motions that are currently pending before the Court.

In its Motion for Partial Summary Judgment, ALSTOM is seeking judgment in its favor, as a matter of law:

1.    On AES-PR's claim for accelerated corrosion of the ESP collector plates; or

2.    Our unrecoverable damages claimed for replacement collector plates, "other water supply changes," the brine concentrator and crystallizer unit, and all operational and maintenance costs for this equipment.

The Court has recently issued rulings on two discovery motions.  The remaining discovery motions and the relief requested in each is summarized as follows:

1.  ALSTOM's Motion to Compel Discovery Requests:

    a.  An Order compelling AES-PR to produce for deposition the individuals identified in its Affirmative Disclosures as specially employed to provide expert testimony in this case and the individuals identified in its Affirmative Disclosures who are either employed by or affiliated with AES-PR.

2.  ALSTOM's Motion for Sanctions requests:

    a.  A ruling barring the admission of any evidence relating to any aspect of AES-PR's claim for damages relating to the Plant's water systems, including the Reverse Osmosis system, the brine concentrator and crystallizer unit, "other water system changes," and all operations and maintenance costs;

    b.  That AES-PR's Supplemental Answers to Interrogatories be stricken; and

    b.  ALSTOM's costs and attorneys' fees in bringing the motion; or

    c.  The right to reconvene all depositions in the United States at AES-PR's expense (including the cost to prepare the depositions), the right to supplement expert reports, the right to supplement the Motion for Partial Summary Judgment, and costs and attorneys' fees.

ALSTOM also respectfully requests, as additional pre-trial relief, the Court to order that:

1.  AES-PR shall not introduce as evidence at trial any documents not produced to ALSTOM prior to the close of discovery on March 10, 2006;

2.      AES-PR shall not elicit testimony, whether from a fact or expert witness, based upon documents produced by AES-PR after the close of discovery on March 10, 2006;

3.      AES-PR shall not introduce evidence in support of its claimed damages about which it failed to produce to ALSTOM documentation prior to the close of discovery on March 10, 2006 or in support of elements of its claimed damages that it has failed to document and quantify with reasonable specificity;

4.      AES-PR shall not introduce evidence of any modification or rescission of the Contract Documents except as by written evidence signed by both parties.

5.      AES-PR shall not introduce evidence in support of its equitable estoppel defense based on oral statements that purportedly contradicted the terms of the written Contract Documents.

6.      AES-PR shall not introduce evidence that the terms, durations or relief applicable to warranty claims properly asserted under Sections 1.1.1 and 1.2 of ALSTOM's warranty also apply to any accelerated corrosion warranty claim properly asserted only under Section 1.6 of ALSTOM's warranty.

7.      AES-PR shall not introduce evidence intended to suggest or insinuate that the terms of the Contract Documents, including the terms of ALSTOM's warranty and the conditions precedent to ALSTOM's obligations, are ambiguous.

8.      AES-PR shall not introduce evidence in support of damage claims that are speculative in nature.

## XII.  CONCLUSION

This order shall control the subsequent course of this action unless modified by

the Court to prevent manifest injustice.


_____/s/_____          _____/s/_____
John S. Spadaro (# 3155)                    Richard R. Wier, Jr. (#716)
MURPHY SPADARO & LANDON                      Daniel W. Scialpi (#4146)
1011 Centre Road, Suite 210                 RICHARD R. WIER, JR., P.A.
Wilmington, DE 19805                         Two Mill Road, Suite 200
Tel (302) 472-8100                           Wilmington, DE 19806
Fax (302) 472-8135                           Tel (302) 888-3222

Dane H. Butswinkas                           John Anthony Wolf
R. Hackney Wiegmann                          James E. Edwards, Jr.
Daniel D. Williams                           Anthony F. Vittoria
Ann N. Sagerson                              Michael A. Schollaert
James L. Tuxbury                             OBER, KALER, GRIMES & SHRIVER
WILLIAMS & CONNOLLY LLP                       A Professional Corporation
725 Twelfth Street, N.W.                     120 East Baltimore Street
Washington, D.C. 20005                       Baltimore, MD 21202-1643
Tel. (202) 434-5000                          Tel: (410) 685-1120
Fax (202) 434-5029                           Fax: (410) 547-0699

Attorneys for AES Puerto Rico, L.P.          Attorneys for ALSTOM Power Inc.



SO ORDERED this _____ day of May, 2006



_____
United States District Judge

105