IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,           :
                                 :
        Plaintiff,               :
                                 :
    v.                           :    Civil Action No. 04-1282-JJF
                                 :
ALSTOM POWER, INC.,              :
                                 :
        Defendant.               :

John S. Spadaro, Esquire of MURPHY SPADARO & LANDON, Wilmington, Delaware.
Of Counsel: Dane H. Butswinkas, Esquire, Daniel D. Williams, Esquire, R. Hackney Weigmann, Esquire, Jeb Boatman, Esquire, James L. Tuxbury, Esquire, and Ann Sagerson, Esquire of WILLIAMS & CONNOLLY LLP, Washington, D.C.
Attorneys for Plaintiff.

Richard R. Weir, Jr., Esquire and Daniel W. Scialpi, Esquire of THE LAW OFFICES OF RICHARD R. WEIR, JR., P.A., Wilmington, Delaware.
Of Counsel: Stuart M. Kreindler, Esquire, Jeffrey A. Regner, Esquire, John Anthony Wolf, Esquire, James E. Edwards, Esquire, Anthony F. Vittoria, Esquire, and Michael A. Schollaert, Esquire of OBER KALER GRIMES & SHRIVER, Baltimore, Maryland.
Attorneys for Defendant.

**OPINION**

April 28, 2006
Wilmington, Delaware

**Farnan,** District Judge.

Pending before the Court is ALSTOM Power Inc.'s Motion For Partial Summary Judgment (D.I. 91). For the reasons discussed, the Motion will be denied.

## I.   FACTUAL BACKGROUND

The claims in this case result from the construction of a 454-megawatt coal-fired power plant built in Guayama, Puerto Rico. In April 1996, AES Puerto Rico, L.P. ("AES") entered into a contract with Duke/Fluor Daniel Carribean, S.E. ("Duke") for construction of the plant. Duke subcontracted with ALSTOM Power Inc. ("ALSTOM"), which agreed to furnish and construct two boilers and related pollution-control equipment for the power plant. ALSTOM entered into an agreement with Environmental Elements Corporation ("EEC") to construct the pollution-control equipment. Upon completion of the project, Duke assigned its rights under its contract with ALSTOM to AES.

The Court understands that the pollution-control equipment operates as follows. As coal or feedstock is burned in the boilers, the smoke and ash ("flue gas") rises out of the top of the combustor. While moving through the boiler, much of the ash is removed. After the flue gas leaves the boiler, it enters the circulating dry scrubbers ("CDS"), which remove sulfur dioxide and cool the flue gas by spraying the gas with an atomized mist

1

of water.[1]  The flue gas then enters the electrostatic precipitators ("ESP"), which consist of an electric field that positively charges the particles of ash in the flue gas.  The positively-charged particles are attracted to the ESP "collector plates," which capture some of the remaining ash before it reaches the smokestack.  (D.I. 91 at 4; D.I. 109 at 3).

    A.    <u>Contentions Of AES</u>

Following construction of the power plant, ALSTOM was required to provide technical support and consultation services to AES in the starting up and initial adjustment of the equipment, referred to as "commissioning."  During commissioning, ALSTOM and EEC deviated, and instructed AES to deviate, from the Operation and Maintenance Manuals ("Operation Manuals") and modified a number of the operating procedures.

In November 2003, AES discovered that sections of the ESP collector plates in one of the boilers had disintegrated and other sections had come loose.  Similar corrosion was discovered in the other boiler unit in January 2004.  After each discovery, AES immediately informed ALSTOM.  Initially, ALSTOM agreed that the equipment was covered under the accelerated corrosion warranty in the parties' contract, but insisted that EEC was responsible for paying the claim.  Later, ALSTOM contended that

---

[1]This water is obtained from a nearby sewage waste treatment facility.  The water contains a certain amount of chloride.

AES' strict compliance with the August 2001 Operation Manual procedures, which had been modified several times, was a condition precedent to ALSTOM's accelerated corrosion liability.

Due to ALSTOM's inaction, AES undertook to solve the problem on its own, which AES contends is permitted under the contract. Immediately after discovering the corrosion, AES stabilized the remaining collector plates until it could purchase new plates. AES also installed a reverse osmosis system, which slowed the rate of corrosion. In order to comply with environmental standards, AES also had to contract to purchase a brine crystallizer to turn the brine, a byproduct of the reverse osmosis system, into salt for disposal.

    B.   <u>Contentions Of ALSTOM</u>

As early as January 2000, EEC stated that the guarantees against corrosion were conditioned upon the use of proper operation and maintenance procedures. In February 2000, ALSTOM and EEC met with Duke and AES personnel to discuss corrosion and the precautions that AES would have to take to prevent it. The drafts of the Operation Manuals also discussed the importance of performing maintenance procedures.

In November 2003, ALSTOM received notification that AES had found corrosion in one of the boilers. ALSTOM immediately sent a specialist to analyze the cause of the corrosion. ALSTOM's specialist discovered significant corrosion of the ESP collector

plates and determined that it was most likely related to low operating temperatures and high chloride content in violation of the Operation Manuals. The specialist took samples of the corroded material for analysis.

Only days after the analysis had begun, AES unilaterally began remedying the corrosion by ordering replacement collector plates. AES also took unilateral action by installing the reverse osmosis system. Such action was taken by AES despite the fact that the contract required mutual agreement as to remedy. On April 30, 2004, AES sent ALSTOM a letter requesting reimbursement for the reverse osmosis system. ALSTOM responded that it was still investigating the cause of the problem and that until it received all pertinent records, it would not be able to complete that investigation.

II. **PARTIES CONTENTIONS**

ALSTOM contends that any warranty liability for corrosion was subject to a condition precedent in the contract, which provides that the "corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals." ALSTOM contends that AES failed to comply with the Operation Manuals, and as a result, ALSTOM's duty to perform under the warranty never arose.

AES contends that there is no condition precedent in the contract, and therefore, the "conditioned upon" language must be

read as establishing legal covenants or obligations. AES further contends that even if there is a condition precedent, ALSTOM is estopped from asserting it because ALSTOM instructed AES to deviate from the standards set forth in the Operation Manuals.

### III. LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).

### IV. DISCUSSION

    A.    <u>Whether The Contract Contains A Condition Precedent To ALSTOM's Liability Under The Corrosion Guarantee Such That The Court Should Grant ALSTOM Summary Judgment</u>

A condition precedent is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform

5

Case 1:04-cv-01282-JJF   Document 128   Filed 04/28/2006   Page 7 of 11

something promised arises." Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp., 2003 Del. Ch. LEXIS 58, at *18 n.30 (Del. Ch. May 21, 2003).[2] Conditions precedent "are not favored in contract interpretation because of their tendency to work a forfeiture." Stolz Realty Co. v. Paul, 1995 WL 654152, at *9 (Del. Super. Sep. 20, 1995) (citing 17A Am. Jur. 2d Contracts § 471 (1991)). However, if the language of a contract is plain and unambiguous, a court should construe the contract according to its terms. 17 Am. Jur. 2d Contracts § 460 (2006).

ALSTOM contends that AES' compliance with the Operation Manuals was a condition precedent to ALSTOM's duty to perform under the warranty, and thus, its duty never arose because AES did not comply. The pertinent provision of the contract provides:

> The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the... precipitators... against the consequences of accelerated corrosion outside of the industry standards

---

[2] Both parties agree that Delaware state law applies. (D.I. 91 at 21; D.I. 109 at 18). Third Circuit jurisprudence on this topic is effectively summarized in Castle v. Cohen, 840 F.2d 173 (3d Cir. 1988). Judge Hutchinson wrote:

> A condition is defined as an act or event which must occur before a duty of performance under an existing contract becomes absolute. Under Pennsylvania law, a condition precedent must be expressed in clear language or it will be construed as a promise. Since the failure to comply with a condition precedent works a forfeiture, such conditions are disfavored.

Castle, 840 F.3d at 177 (citations omitted).

6

> for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years (i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with the Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors.

(D.I. 92 at A016).

The Court concludes that the provision in the contract is a condition precedent to ALSTOM's duties under the contract. The contract provides that ALSTOM's liability for corrosion is "conditioned upon operation and maintenance of the system in accordance with the Contractor's Operation and Maintenance manuals." (D.I. 92 at A016). The Court concludes that this language is unambiguous and makes clear that ALSTOM is liable only if AES operates the equipment in the manner provided in the manuals. 13 Williston on Contracts § 38:16 (phrases conditioning performance "usually connote an intent for a condition rather than a promise").

While the Court has concluded that the contract contains a condition precedent, the Court also concludes, after reviewing the evidence in the light most favorable to AES, that summary judgment is inappropriate due to disputed issues of material

7

fact.[3]  First, there is a genuine issue of material fact as to whether Plaintiff complied with the procedures.  Much of ALSTOM's "proof" that AES failed to maintain the equipment in accordance with the manuals consists of ALSTOM's claim that AES failed to provide documentation of maintenance procedures.  (D.I. 91 at 22-27).  Second, there is a genuine issue of material fact as to whether the manuals, which provide that the "customer may decide to alter or customize the maintenance," permitted AES to alter the specifications to meet its needs.  (D.I. 92 at A078).  Finally, there is a genuine issue of material fact as to whether ALSTOM is estopped from asserting the condition precedent due to the deviations from the provisions of these manuals during commissioning.  Accordingly, the Court will deny ALSTOM's Motion For Partial Summary Judgment as it pertains to the accelerated corrosion warranty.

> B. <ins>Whether AES Utilized Feedstock In Violation Of Specifications Such That The Court Should Grant ALSTOM Summary Judgment</ins>

ALSTOM contends that it should also be granted summary judgment because AES used feedstock that voided ALSTOM's warranty.  In pertinent part, the contract between the parties provides:

> Consumable items, normal wear and tear... and erosion, corrosion or chemical attack to any portion of the

---

[3]The disputes of material fact are not limited to those listed by the Court.

>     boiler system <u>caused</u> in whole or part by deviations in
>     the fuel or feedstocks from the limits specified in the
>     Contract are excluded from any warranty obligations.

(D.I. 111 at B051) (emphasis added).

ALSTOM contends that AES was to operate the equipment with a coal and ash chloride content of 0.03% and within a range of 0 to 0.1% content. ALSTOM has proffered evidence that when AES measured the chloride content of the ash, the samples ranged from 0.53% to 1.1% chloride content. (D.I. 92 at A195). ALSTOM offers no facts, however, to show that these deviations caused the corrosion, and AES has adduced expert testimony to establish that such deviations did not cause the corrosion. Accordingly, the Court will deny ALSTOM's Motion For Partial Summary Judgment as it pertains to ALSTOM's contention that deviations in the feedstock caused the corrosion.

    C.    <u>Whether Certain Elements Of AES' Damages Claim Are Unrecoverable As A Matter Of Law</u>

ALSTOM contends that certain portions of Article 2 of the Delaware Uniform Commercial Code ("UCC") limit AES' ability to recover under the contract. The UCC applies to "transactions in goods." 6 <u>Del. Code Ann.</u> § 2-102. Where a contract concerns more than the sale of goods, the UCC still applies if the contract is primarily for the sale of goods. <u>Glover School and Office Equipment Co. v. Dave Hall, Inc.</u>, 372 A.2d 221, 223 (Del. Super. 1977). Such a determination depends heavily on the terms of and facts surrounding the individual contract. <u>Coca-Cola</u>

Bottling Co. v. Coca-Cola Co., 696 F. Supp. 57, 84 (D. Del. 1988).

The Court concludes that the contract at issue is not primarily for the sale of goods. The contract provides that ALSTOM will furnish and construct two boilers and pollution-control equipment, and thus, the service portion of the contract is "much more than 'merely incidental or collateral to the sale of goods.'" Coca-Cola, 696 F. Supp. at 84-85 (quoting Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 743 (2d Cir. 1979)). Accordingly, the Court concludes that the UCC does not apply.[4]

As to ALSTOM's other arguments, the Court concludes that there are numerous genuine issues of material fact as to which warranties apply and as to what constitutes consequential damages, and therefore, summary judgment is inappropriate. Accordingly, the Court will deny ALSTOM's Motion For Partial Summary Judgment as it relates to certain elements of AES' damages claims.

**V.    CONCLUSION**

For the reasons discussed, Alstom Power Inc.'s Motion For Partial Summary Judgment (D.I. 91) will be denied.

An appropriate Order will be entered.

---

[4] The Court notes that, even if the contract were primarily for goods, the parties can agree to remedies other than those provided by the UCC. 6 Del. Code. Ann. § 2-719(1)(a).