**OFFICIAL TRANSCRIPT OF PROCEEDINGS**

**BEFORE THE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

**IN THE MATTER OF**                                   **CASE NO.**

AES PUERTO RICO, L.P.          \* C.A. NO.:  04-1282(JJF)
                               \*
        Plaintiff              \*
                               \*
        Vs.                    \*
                               \*
ALSTOM POWER, INC.,            \*
                               \*
        Defendant              \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE 30(B)(6) DEPOSITION OF MR. ALLAN DYER
(CORPORATE DESIGNEE)

---

**PLACE:**  Hato Rey, Puerto Rico

**DATE:**  January 18, 2006

*Crespo & Rodríguez, Inc.*

Tel. (787) 758-5930 / 763-8018
Fax (787) 767-8217
A-6 Yale Street, Santa Ana
Rio Piedras, Puerto Rico 00927

**A 001**

```
 1    the 16 topics for which an AES Puerto Rico corporate

 2    designee was asked to testify today.

 3         I've given you wide latitude to ask questions of

 4    the operations equipment, but this really is now beyond

 5    the pale.

 6         But I will allow this one additional question.

 7    Go ahead and answered, if you can, Mr. Dyer.

 8    THE DEPONENT:

 9         Can I ask you to repeat the question one more time?

10    BY MR. VITTORIA:

11         Q    That's okay, I think it's a fair objection.

12    Let's turn to the last line item, not the total, in

13    collection plates.  "Labor To Install All Plates."  Do

14    you see that line item?

15         A    Yes.

16         Q    Okay, and it's a $2 million estimate.  Do you

17    see that?

18         A    Yes, sir.

19         Q    Please explain how AES Puerto Rico came up

20    with the $2 million estimate.

21         A    I believe that is just an oral estimate.  It's

22    not, we do not have any official quote on that.

23         Q    When you say "code" what does that mean?

24         A    Official quote.

25         Q    Oh, quote.  Thank you.  Do you know who came
```

1    up with that estimate?

2        A    I believe our, our people, being our mecha-

3    nical people and our engineers.  And this is an estimate

4    that we came up with shortly after we discovered the

5    corrosion.

6        It is very possible, in my opinion, that that

7    number, from what I've learned, could be much higher.

8        Q    Do you know if there are any work papers

9    relating to that estimate?

10   MR. WILLIAMS:

11       I'll instruct you to exclude any work papers that

12   may have been prepared for counsel.

13   THE DEPONENT:

14       Not that I know of, sir.

15   BY MR. VITTORIA:

16       Q    And you say you have not gotten any quotes

17   from any bidders, or anything related to that estimate?

18       A    We have had, in my opinion, my belief is we

19   have had some general discussions with our technical

20   people who may have had discussions with, you know,

21   vendors.

22       Q    Sitting here today, do you know the identity

23   of a vendor with whom your technical people may have

24   spoke, relating to this labor estimate?

25       A    It is quite possible that we talked to F.L.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

**OFFICIAL TRANSCRIPT OF PROCEEDINGS**

**BEFORE THE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---

**IN THE MATTER OF**                                    **CASE NO.**

AES PUERTO RICO, LP          *    C.A. NO.: 04-1282(JJF)
                             *
        Plaintiff            *
                             *
        Vs.                  *
                             *
ALSTOM POWER, INC.           *
                             *
        Defendant            *
*******************************

DEPOSITION OF MR. ALAN DYER
30(b)(6)

---

**PLACE:**    Hato Rey, Puerto Rico

**DATE:**     March 9th, 2006

*Crespo & Rodríguez, Inc.*

Tel. (787) 758-5930 / 763-8018
Fax (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927

A 004

1  Aquatech's December, 2005 options.

2      The Aquatech... I believe may be making their price

3  assumptions assuming the crystallizer to be power-driven

4  by low-pressure steam. I'm not sure if the others are

5  under that same assumption.

6      The one proposal that you have in front of me uses

7  80 percent as an assumption for installation costs.  And

8  I'm not sure if any of these include shipping costs as

9  well. Whether, as of January 17th, 2006, our procurement

10 may have included that.

11 BY MR. VITTORIA:

12     Q    Okay.  Does AES Puerto Rico have any proposals

13 that indicates the procurement of a crystallizer system

14 that would be $7 million?

15     A    We, right now believe that it could be a large

16 range.

17     Q    And what is that range?

18     A    It could go as high, as high as anywhere from,

19 it can go as high as maybe $14 to $16. I can't sit here

20 today and tell you how competitive Aquatech and GE will

21 be on their bidding. And I think it's very clear that we

22 wrote it as an estimate.

23     Q    When you say $14 to $16, you're including

24 construction, correct?

25     A    I would be including construction.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

28

1    for crystallizer construction?

2         A    I believe that using 80 percent was a consi-

3    deration.

4         Q    But that consideration was rejected?

5         A    I don't know if it was rejected or not. I tend

6    to think that 80 percent of $8.6 is pretty close to $7

7    million.  I'm not saying we used Option No. 3 and 80

8    percent.

9         Q    Okay, well, let's just look at the interroga-

10   tory answer. You have a $7 million estimate for the

11   procurement. But then you also have $7 million for the

12   construction, correct?

13        A    Mmhm.

14        Q    If you had used an 80 percent factor, you

15   would agree with me, wouldn't you, that the construction

16   figure should be 20 percent less than the procurement

17   figure, correct?

18        A    If we used 80 percent for construction. My

19   testimony was the 80 percent was considered.

20        Q    Okay.

21        A    It doesn't mean it was used.

22        Q    Right.  My question is, did you reject that

23   assumption that it would be 80 percent to install the

24   equipment?

25        A    It's...



1   MR. WILLIAMS:

2       Objection, asked and answered.

3   THE DEPONENT:

4       It's entirely possible that it was used, or

5   rejected. Again, I just want to state for the record,

6   these are estimates, and our intent is to make claims

7   with more accurate numbers; they could go up, they could

8   go down.

9   BY MR. VITTORIA:

10       Q   Do you have an understanding as to when AES

11   Puerto Rico will make those claims?

12       A   I believe within the next couple months we

13   will go out with an RFP and ask, within 30 days, to get

14   proposals.

15       Q   Is there any documentation that you're aware

16   of that indicates from what AES Puerto Rico obtained

17   that $7 million estimate for the crystallizer

18   construction?

19       A   There very well may be, I'm...

20   MR. WILLIAMS:

21       Counsel, were you saying something?

22   MR. VITTORIA:

23       I was asking the Court Reporter if he'd heard me,

24   because I didn't have my microphone on.

25

1    MR. WILLIAMS:

2         Go ahead, Mr. Dyer.

3    THE DEPONENT:

4         Can I ask you to repeat, please?

5    BY MR. VITTORIA:

6         Q    Sure.  Are you aware of any documentation upon

7    which AES Puerto Rico based its $7 million for

8    crystallizer construction?

9         A    I am certain we didn't pull these numbers off

10   the top of our head.

11        Q    Are you aware of any documentation that would

12   reflect those numbers?

13        A    You've presented me documentation that would

14   reflect these numbers.

15        Q    I'm referring specifically to the crystallizer

16   construction.

17        A    The crystallizer construction, I think, part

18   of the documentation is what you've put before me. Is

19   that all the documentation? I could not testify to that.

20        Q    And you would agree with me that the only

21   information in these proposals, relating to installation

22   or construction, is page three of Exhibit G, that says,

23   "Installation costs are approximately 80 percent cost of

24   the equipment value," wouldn't you?

25



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

33

1    brine concentrator and a crystallizer, correct?

2        A    I believe that's what Option B is.

3        Q    Okay.  And if you'll look at the bottom, it is

4    estimated total dollars per year, and that includes ca-

5    pital expenditures, operating expenditures, maintenance

6    and chemicals of $540,000 per year?

7                   (Deponent reviews document)

8        A    I see that.

9        Q    And that would include the cost of the equip-

10   ment amortized over the life of the equipment, correct?

11   MR. WILLIAMS:

12       Objection to form.  Misstates the document.

13                  (Deponent reviews document)

14   THE DEPONENT:

15       Can I ask you to repeat your question?

16   BY MR. VITTORIA:

17       Q    Sure.  That $540,000 figure would include the

18   cost of the equipment amortized over the life of the

19   equipment, correct?

20       A    I... this economic comparison is not clear to

21   me as to what the assumptions were.

22       Q    Are you aware of any other documentation that

23   is in AES Puerto Rico that would reflect the $750,000

24   O&M costs estimated in the answers to interrogatories?

25

34

```
 1    MR. WILLIAMS:

 2         Objection to form.

 3    THE DEPONENT:

 4         The $750,000 a year, it's clearly stated here as an

 5    estimate.

 6    BY MR. VITTORIA:

 7         Q    And are you aware of any documentation upon

 8    which AES Puerto Rico bases that estimate?

 9         A    I can't recall any documentation.

10    MR. WILLIAMS:

11         It is now 7 after 9:00.  We've been going eight

12    hours.  We need to end the deposition.  Plus it started

13    a half an hour late, because Counsel couldn't find

14    someone to swear in the Witness, and Counsel took a long

15    lunch. And now I may be tolerant if you are wrapping up.

16    But otherwise, we'll need to end.

17    MR. VITTORIA:

18         Okay, well, I object to the characterization of

19    what occurred today, but I am wrapping up, and if you'll

20    give me a minute, we might be done.

21                       (Short pause taken)

22    BY MR. VITTORIA:

23         Q    Are you aware of any other proposals to solve

24    the zero liquid discharge issue that have been obtained

25    by AES Puerto Rico?
```



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

A 010

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

### DISCOVERY DISPUTE RESOLUTION PLAN

WHEREAS, the Court held a discovery conference on December 7, 2005, and, by an Order dated December 8, 2005, the Court issued a ruling on pending discovery motions and directed AES Puerto Rico, L.P. ("AES-PR") and ALSTOM Power Inc. ("ALSTOM"), the parties, to submit a discovery dispute resolution plan by December 20, 2005; and

WHEREAS, at the Court's direction, the parties met and conferred to resolve areas of dispute;

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.    **Inadvertent Disclosure**: In order to facilitate the timely exchange of discovery, the parties will exchange documents with the understanding that inadvertent production or disclosure of documents protected by the attorney-client privilege or work product doctrine shall not constitute a waiver of such privilege or protection. Any such inadvertently produced documents shall be returned to the party producing them, and any applicable privilege and protection shall be maintained.

A 011

2.    **Expert Discovery:**

The parties shall make disclosures with regard to expert witnesses under Rule 26(a)(2) on the following schedule:

      (i)     Plaintiff's Affirmative Disclosures:  **February 27, 2006**

      (ii)    Defendant's Answering Disclosures:  **March 20, 2006**

      (iii)   Plaintiff's Rebuttal Disclosures:  **April 3, 2006**

Within three weeks of the submission of the Affirmative Disclosures, if any, Defendant is entitled to depose each expert who submitted an Affirmative Disclosure. Likewise, within three weeks of the submission of the Answering Disclosures, if any, Plaintiff is entitled to depose each expert who submitted an Answering Disclosure. Following the submission of the Rebuttal Disclosures, if any, Defendant is entitled to take the deposition of each expert who has filed a Rebuttal Disclosure – as to the Rebuttal Disclosure, solely – even if the expert's deposition had previously been taken in regard to an Affirmative Disclosure.

Such depositions shall be in addition to those authorized under Section I of the Court's Rule 16 Scheduling Order entered on October 7, 2005.

3.    **Document Production:** The parties shall make all responsive hard copy and electronic documents available for production to the requesting party by **December 30, 2005.** In the interim, the parties shall, on an interim basis, make available for review any documents that are assembled, reviewed, and ready for production prior to December 30, 2005.

A 012

4.    **Privilege Log**: Each party shall produce its privilege log with regard to hard copy and electronic document production to the opposing party on or before **December 30, 2005.**

5.    **Answers to Interrogatories**: Pursuant to the agreement between ALSTOM and AES-PR, ALSTOM shall limit its interrogatory in the manner in which it agreed with AES-PR and AES-PR shall supplement its Answer to ALSTOM's revised Interrogatory No. 2.

6.    **Hearing**: The hearing currently scheduled for December 20, 2005 at 10:00 a.m. is canceled.

December 16, 2005

_____

United States District Judge

**A 013**

Karl Hogenefelt

VIDEO DEPOSITION OF KARL HOGNEFELT
January 10, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,          :

          Plaintiff,            :

vs.                                 Civ. No. 04-1282-JJF

                                :

ALSTOM POWER, INC.,

                                :

          Defendant.

APPEARANCES:

                    FOR THE PLAINTIFF:
                    Daniel D. Williams, Esq.
                    Ann N. Sagerson, Esq.
                    Williams & Connolly LLP
                    725 Twelfth Street, N.W.
                    Washington, D.C. 20005

                    FOR THE DEFENDANT:

                    James E. Edwards, Jr., Esq.
                    Ober Kaler
                    120 E. Baltimore Street
                    Baltimore, Maryland, 21202-1643

Also Present:  Matt Poplin, Videographer

Karl Hogenefelt

Page 276

1 AES?

2          Q.      So is it your recollection that it was

3 either in late 2004 or early 2005?

4          A.      Something like that, yes.

5          Q.      Have you ever reviewed a report about

6 the corrosion at the AES Puerto Rico facility from a

7 company called Altran Corporation?

8          A.      Altran?  No, I don't think so.

9          Q.      In your report I'm talking about, I'll

10 just ask you to see if this refreshes your

11 recollection.  The report I'm talking about was

12 created by Altran at the request of EEC or ECC's

13 insurance company, which is Liberty Mutual.

14                 Does that refresh your recollection

15 about seeing a report from Altran around September

16 2004?

17         A.      No, I don't remember that.

18         Q.      We have looked at materials through

19 February 2004.  Do you recall anything that you did

20 concerning this project after February 2004?

21         A.      No, I mean I have not had anything I

22 mean to -- the only -- yeah, I saw one magazine

23 article about the plant, because I recognize Puerto

24 Rico and then you read it, and I don't know if it was

25 in Power magazine where the customer expressed their

AO88 (Rev. 1/94) Subpoena in a Civil Case

### Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ Delaware _____

AES Puerto Rico, L.P.

V.

ALSTOM Power, Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  04-1282-JJF

TO:  Mr. William Van Hooser
     1939 Frederick Road
     Catonsville, MD 21228

☑  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| United States District Court for the District of Delaware<br>844 North King Street<br>Wilmington, DE 19801 | 4B |
| | DATE AND TIME<br>10/16/06 at 10:00 a.m. –<br>10/20/06 at 5:00 p.m. |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☐  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Daniel D. Williams*    Attorney for Plaintiff | 8/30/06 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Daniel D. Williams, Esq., Williams & Connolly LLP
725 12th Street, N.W., Washington, D.C. 20005    (202) 434-5000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number

**A 016**

AO88  (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | | |
|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |

| | | |
|---|---|---|
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

    (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena.  The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

    (2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

    (B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.  If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.  Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

    (3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

        (i)   fails to allow reasonable time for compliance,
        (ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

        (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
        (iv)  subjects a person to undue burden.

    (B) If a subpoena

        (i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or
        (ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
        (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

    (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

    (2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

SIGNATURE DOCUMENT

CONTRACT NO. W419-44-C0001

THIS CONTRACT IS entered into, effective as of February 26, 1998 by and between Duke/Fluor Daniel Caribbean S.E. (hereinafter referred to as "Duke/Fluor Daniel Caribbean S.E." or "DFDC")

whose address is:     Duke/Fluor Daniel Caribbean S.E.
                      P.O. Box 1011
                      Charlotte, NC 28201-1011

and Combustion Engineering, Inc. (hereinafter referred to as "Contractor" or "ABCE"),            LICENSE NUMBER    TBD
whose address is:

                      ABB Combustion Engineering Systems
                      Combustion Engineering, Inc.
                      P.O. Box 500
                      2000 Day Hill Road
                      Windsor, CT  06095-0500

In consideration of the agreements herein contained, the parties hereto contract and agree as follows:

ARTICLE  1.0          CONTRACT DOCUMENTS

This Contract shall consist of this Signature Document and the following documents, and the exhibits, drawings, specifications and documents referred to therein, all of which by this reference are incorporated herein and made a part of this Contract:

          DEFINITION OF TERMS
          PART I   -   SCOPE OF WORK  (Including # specs)
          PART II  -   COMMERCIAL TERMS
          PART III -   GENERAL TERMS

Said Contract sets forth the entire Contract and agreement between the parties pertaining to the Work and supersedes all inquiries, proposals, agreements, negotiations and commitments, whether written or oral, prior to the date of execution of this Contract, pertaining to said Work of this Contract. The provisions of this Contract may be changed only by a writing executed by Duke/Fluor Daniel Caribbean S.E. and Contractor. Trade custom and trade usage are superseded by this Contract and shall not be applicable in the interpretation of performance of this Contract.

ARTICLE  2.0          PRECEDENCE

In cases of express conflict between PARTS of the Contract, specifications, drawings or exhibits, the order of precedence shall be as follows:

          -  1 Signature Document
          -  2 Definition of Terms
          -  3 PARTS I AND II
          -  4 PART III -General terms

In the event of an express conflict between the documents listed above, or between any other documents which are a part of the Contract, Contractor shall notify DFDC immediately and shall comply with DFDC's resolution of the conflict.

A 018

ARTICLE  3.0          SCOPE OF WORK

Except as otherwise expressly provided elsewhere in this Contract, Contractor shall supply all services, things, and items of expense necessary to perform, and shall perform, the Work generally described as:

Design, Manufacture, Supply, Delivery, Erection, and Startup Assistance of the Circulating Fluidized Bed Boilers, Circulating Dry Scrubber Flue Gas Desulfurization Systems, and Electrostatic Precipitators.

said work being more particularly described in PART I - SCOPE OF WORK (herein referred to as "Work"), for and in connection with the

AES PUERTO RICO TOTAL ENERGY PROJECT

said Work to be performed on a site to be designated by Duke/Fluor Daniel Caribbean S.E. at or in the vicinity of Guayama, Puerto Rico.

Contractor acknowledges that Contractor's Work done under this Contract is part of Duke/Fluor Daniel Caribbean S.E's obligation to AES Puerto Rico L.P. (hereinafter referred to as "Owner") under the Engineering, Procurement and Construction Services Agreement between AES Puerto Rico L.P and Duke/Fluor Daniel Caribbean S.E. dated effective as of April 3, 1996 (the "EPC Contract").  Contractor hereby agrees to assume full responsibility for all its obligations under this Contract between ABBCE and DFDC.

ARTICLE  4.0          CONTRACT PRICE

Contractor's full compensation for full and complete performance by Contractor of all the Work and compliance with all terms and conditions of this Contract shall be as set forth in PART II - COMMERCIAL TERMS.

ARTICLE  5.0          CAPTIONS

Titles and captions used in this Contract are for convenience only and shall not be used in the interpretation of any of the provisions of this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Contract on the day and year below written, but effective as of the day and year first set forth above.

COMBUSTION ENGINEERING, INC.                    DUKE/FLUOR DANIEL CARIBBEAN S.E.

BY: _____                     BY: _____

TITLE: _____                      TITLE: PRESIDENT

DATE: 2/24/98                                    DATE: 2/24/98

A 019

## PART II
## COMMERCIAL TERMS

1.0  CONTRACT PRICE, NTP, and NO SHOP

1.1  Full compensation to Contractor for full and complete performance by Contractor of all the Work, compliance with all terms and conditions of this Contract, and for Contractor's payment of all obligations incurred in, or applicable to, performance of the Work shall be the total Lump Sum Contract Price of <u>One Hundred Nineteen Million DOLLARS ($119,000,000)</u>. At the end of the project, Contractor will provide a reasonable and appropriate itemized breakdown of the Contract Price to Owner if requested. This breakdown will not be subject to audit.

1.2  It is agreed and understood by Contractor and D/FDC that Contractor's and D/FDC's performance obligations, excluding Section 2.0 of Part II, shall commence immediately upon receipt of the Notice to Proceed (NTP) from D/FDC and that none of the performance obligations set forth in this contract shall become effective unless and until such notice is given and delivered to Contractor.

1.3  Unless this agreement is otherwise terminated pursuant to the terms and conditions contained herein, for the term described in Section 2.2 of Part II of this Agreement, DFDC shall not entertain, solicit, or otherwise investigate or procure offers from any other parties with respect to the services described in Part I - Scope of Work.

2.0  PRICING BASIS

2.1  The Contract Price set forth herein is firm for the duration of the Work and includes all Contractor's costs, expenses, overhead and profit for complete performance of the Work.

2.2  The Contract Price set forth herein is firm and shall remain valid as long as a notice to proceed is issued on or prior to February 1,1999.

3.0  PRICING FOR CHANGES

Adjustments to the Contract Price for any change, other than those expressly stated in Section 2.0 above, in the Scope of Work shall be in accordance with the provisions of the Article 16 entitled CHANGES and Article 19 entitled CLAIMS as set forth in PART III.

4.0  TAXES

4.1  The Contract Price as set forth herein includes those taxes and fees set forth in the Article 43 entitled <u>Taxes, Duties and Fees</u> in PART III.

4.2  DFDC is required to obtain correct taxpayer identification numbers from all noncorporate payees who receive payment for

services, rents, royalties or interest that would be subject to IRS Form 1099 reporting. Twenty percent back-up tax withholding will be imposed on all Form 1099 reportable payments made to Contractor if Contractor fails to provide a correct taxpayer identification number.

4.3    Contractor will be compensated for any increase in tax rates, license fees, and permit fees or any new taxes, licenses or permits imposed after the effective date of the Contract; provided however that this provision shall be limited to sales, use, and excise taxes assessed against the Work and to licenses and permits required specifically for the Work.

5.0    PAYMENT TERMS

DFDC agrees to make payment to Contractor by wire transfer based upon the Progress Payment Schedule (Attachment 13.B to this Part II) providing verification has been established that the milestone event(s) tied to that specific payment has been satisfactorily completed. Invoices will not be paid prior to completion of the stated milestone nor earlier than the listed invoice date. Contractor's performance of its obligations hereunder will not be considered complete until, without limitation, DFDC is in receipt, in proper form, of all engineering data requirements, drawings, parts and spare parts lists and instructions manuals. Payment Terms, including retainage requirements, shall be in accordance with the provisions of the Price and Payment Articles as set forth in PART III.

6.0    DETERMINATION OF UNITS

All units of Work performed for the Contract Price set forth in Article 1.0, and Pricing for Changes in Article 3.0 of this PART II shall be determined and documented in accordance with the provisions set forth in the Article entitled Documentation and Right of Audit set forth in PART III.

7.0    SPECIAL INVOICING INSTRUCTIONS

7.1    The cut-off date for Contractor's progress invoice shall be five (5) calendar days after the first day of the month covered by such invoice.

7.2    Contractor shall submit separate invoices in original form with three (3) copies complete with all supporting documentation to DFDC's Office Address shown in Section 12.0 of this Part II.

7.3    Contractor's invoices shall be on a progressive basis and clearly marked with this Contract Number.

A 021

7.4   Contractor's invoices shall be cross referenced to the Progress Payment Schedule.

7.5   DFDC shall not be obligated to pay for invoice items which are not in accordance with the Progress Payment Schedule. DFDC reserves the right to make provisional payment on an invoice in dispute, pending audit and reconciliation of the total charge.

7.5.1   Only invoices stamped by DFDC, as received by the cut off date as defined in subsection 7.1 and accompanied by Contractor's partial (conditional) lien waivers (in substantially the form shown in Attachment 13.E and in addition to any other documentation or substantiation required hereunder or as directed per Article 42.6 of Part III) will be paid by wire transfer within thirty (30) calendar days of the cutoff date.   Each authorized and approved change to the Contract is to be invoiced separately in the manner provided in this Article.

7.5.2   Contractor shall sign each invoice certifying that all Work covered by the invoice is complete and that the invoice is correct, authentic and the only one issued for the Work described therein.

7.6   Retainage shall be paid to Contractor in accordance with the terms set forth in Article 42.0 Invoicing and Payment of Part III of this Contract.

8.0   <u>BACKCHARGES</u>

A backcharge is a cost sustained by DFDC and chargeable to Contractor, which shall either be paid by Contractor or, at DFDC's option, deducted from amounts owed to Contractor.   Without limitation and by way of example only, backcharges may result from:

8.1   Services performed by DFDC, at Contractor's request, for work which is within Contractor's Scope of Work under this Contract, or

8.2   Costs sustained by DFDC as a result of Contractor's non-compliance with the provisions of this Contract or Contractor's act or omission or negligence.

8.3   Upon identification by DFDC of an actual or anticipated backcharge, DFDC will issue Contractor with a written backcharge notice in accordance with Article 19 - Claims of Part III.   This Notice shall describe the backcharge Work to be performed (if any), the schedule period for performance, the cost to be charged by DFDC to Contractor for the backcharge and other terms.   The backcharge cost shall include:

8.3.1   Labor:   at actual cost plus 15% to cover payroll additives;

8.3.2  Material:    at actual supplier and freight invoice cost delivered to jobsite;

8.3.3  Construction Equipment:   at actual third party rental cost or at DFDC's equipment rental rates whichever may be applicable;

8.3.4  10% shall be added to Paragraph's 8.3.1 through 8.3.3 above for indirect costs, overhead, supervision and administration.

Thirty (30) calendar days after commencement of the Backcharge Work or on completion of the Backcharge Work, whichever occurs sooner, DFDC will invoice Contractor for the incurred Backcharge Cost.

9.0    CANCELLATION SCHEDULE

    In the event this Contract is canceled in accordance with Article 18.0 - Termination at Duke/Fluor Daniel Caribbean S.E.'s Option of Part III, DFDC agrees to make compensation to Contractor and Contractor agrees to accept as full and complete payment to Contractor for all cancellation charges or claims of Contractor for such Termination, payment based on the Cancellation Schedule   (Attachment 13.C to this Part II).   Termination and Cancellation Terms shall be in accordance with the provisions of the Termination at Duke/Fluor Daniel Caribbean SE's Option - Article 18.0 as set forth in PART III.

10.0   LIQUIDATED DAMAGES

10.1   GENERAL

DFDC and Contractor agree that, at Release of this Contract, the milestones shown in the Contract Master Schedule (Attachment 13.D to this Part II) of this Contract will be assigned specific dates based on the agreed upon durations from Release.   Contractor guarantees the dates that will be established based on the durations stated in the Contract Master Schedule of this Contract to be the firm date for completion by Contractor of all activities pertaining to each specific milestone.

Contractor shall meet the Performance Acceptance and Performance Guarantees set forth in this Section 10.0 on or before the dates specified.   The parties agree that failure of Contractor to meet these dates and Performance Guarantees will do DFDC harm and that damages for failure to meet said guarantees are extremely impracticable or impossible to predict or calculate, and accordingly Contractor shall be liable for liquidated damages to DFDC for failure to achieve Performance Acceptance or Performance Guarantees as specified below, which liquidated damages Contractor will pay to DFDC.   Contractor acknowledges and affirms that the amounts of liquidated damages set forth herein do not constitute a penalty, but rather are a fair estimate and assessment of damages which are uncertain and not readily ascertainable.   The liquidated damages set forth in this Section 10.0 are the sole and exclusive remedies of DFDC for failure of Contractor to meet Performance Acceptance or Performance Guarantees. The parties agree that liquidated damages are in lieu of actual damages and

DFDC will not attempt to recover actual damages for Contractor's failure to achieve the guarantees stipulated in this Section 10. All liquidated damages specified herein are cumulative and no liquidated damages shall be deemed to supplement, replace, supersede or in any way reduce any other liquidated damages for which Contractor is responsible.

If liquidated damages for delay and/or performance are not assessed against DFDC by the Owner, and DFDC incurred no additional expense in mitigating the impact of Contractors failure to meet any performance and/or schedule guarantee, then DFDC shall waive liquidated damages for schedule and/or performance. Liquidated Damages for schedule and/or performance shall be waived if the cause of the delay or performance shortfall is beyond the scope of the Contractor's Work

10.2    LIQUIDATED DAMAGES FOR LATE DRAWINGS AND DATA SUBMITTAL

The Contractor recognizes that DFDC will suffer damages in the event of delay in schedules for submittal of Final drawings and data as specified in the DDMISR. Contractor shall submit drawings and data packages to arrive at DFDC on or before the specified dates. Documents submitted shall be in accordance with the requirements of this Contract. Documents that do not meet these requirements will be returned to the Contractor and will not be accepted until resubmitted and received in proper form and content by DFDC. The parties agree that the sum of $500.00 per calendar day is a reasonable and fair estimate of damages and loss which DFDC would suffer for each such calendar day that Contractor is late in submitting each drawing package or data package. It is therefore agreed that, in the event of such failure by Contractor, Contractor shall pay to DFDC the sum of $500.00 for each calendar day by which the actual date of each drawing package or data package is later than the said firm drawing package or data package submittal date.

10.3    LIQUIDATED DAMAGES FOR LATE PERFORMANCE ACCEPTANCE

10.3.1 Contractor guarantees that it will, with respect to its performance under this Agreement, perform all things necessary to enable DFDC to achieve Performance Acceptance on or before the Guaranteed Performance Acceptance Date, which is 29 months after the issuance of the Notice to Proceed (NTP) to Contractor, which Performance Acceptance shall be achieved hereunder if and only if:

A.    The Facility has operated as a whole for a period of at least 100 continuous hours and has successfully satisfied the criteria of the 100 hour Performance Test as described in Appendix D of the EPC (Attachment 13.G).

B.    All equipment and facilities necessary for the full, safe and reliable operation of the Facility have been properly constructed, installed, insulated and protected where required, and correctly adjusted, and all portions of the Contractor's Scope of Work can be used for their intended purposes in accordance with all applicable laws and applicable permits.

C.    The Facility, and specifically Contractor's Work, is fully and properly interconnected and synchronized with the electrical system of the Utility by DFDC and all features and equipment of the Facility are capable of operating simultaneously in accordance with the applicable provisions of the Power Purchase Agreement and the detailed written operating procedures developed thereunder (to the extent such procedures are consistent with Prudent Utility Practices and impose requirements that were or should have been reasonably foreseen by Contractor under the circumstances) and all portions of the Facility can legally and safely be placed in commercial operation for their specified purpose.

D.    Owner accepts the Notice of Performance Acceptance, or if Owner has not accepted the Notice of Performance Acceptance, it has not done so for reasons completely exclusive of Work provided by Contractor.

10.3.2  If Contractor fails to perform all things necessary in accordance with Contract Master Schedule (Attachment 13.D) to enable DFDC to achieve Performance Acceptance on or before the guaranteed Performance Acceptance Date, and provided that DFDC has to pay liquidated damages to the Owner for late completion of Performance Acceptance, then Contractor shall be liable to DFDC for liquidated damages as follows:

$$\text{Liquidated Damages} = \$300,000 \times a$$
$$\text{where:}$$

a = Number of days, or partial days, for which Contractor has failed to perform all things necessary to enable DFDC to achieve Performance Acceptance on or before the Guaranteed Performance Acceptance Date.

## 10.4    LIQUIDATED DAMAGES FOR TECHNICAL PERFORMANCE

10.4.1  Contractor guarantees the performance of the equipment and other Work covered by this Contract to be in accordance with the guaranteed data as set forth in the following Confirmed Equipment Specifications (Attachments to Scope of Work - Part I), which Guarantees are sometimes referred to as "Performance Guarantees":

- Circulating Fluidized Bed Boiler Specification W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.00-0001, Revision 0;
- Circulating Dry Scrubber FGDS Specification W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.03-0001, Revision 0; and
- Electrostatic Precipitator Specification W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.03-0002, Revision 0.

10.4.2  Contractor's achievement of these Performance Guarantees will be demonstrated over a four (4) hour test period as set forth in Appendix D Performance Test Plan (Attachment 13.G) which will occur during the Performance Test. Contractor's achievement of these Performance Guarantees will be tested per the methods specified in the Performance Test Plan. (Attachment 13.G).

10.4.3  It is agreed that the actual damages and loss which DFDC would incur as a result of Contractor's default in its obligation to meet the

A 025

Performance Guarantees would be impractical and difficult to determine and that the sums listed below are a reasonable and fair estimate of the damages and loss which DFDC would suffer by Contractor's failure to meet the Performance Guarantees. It is, therefore, agreed that Contractor shall pay DFDC the following liquidated damages for any shortfalls in meeting the Performance Guarantees:

A.  Auxiliary Power Consumption:
    $2,733 for each full KW that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

B.  Efficiency:
    The amount shown below for each 0.1% of efficiency that the Facility is below the guarantee value for each of the following operational loads, as defined in the performance section of the technical specification.

| Operational Load | Efficiency Liquidated Damages |
|---|---|
| 100% | $207,000 per 0.1% of efficiency loss |
| 90% | $203,500 per 0.1% efficiency loss |
| 65% | $ 42,900 per 0.1% efficiency loss |
| 50% | $ 11,000 per 0.1% efficiency loss |

C.  Economizer Inlet to Superheater Outlet Pressure Drop:
    $13,500 for each full one psi of superheater or economizer pressure drop that the unit is in excess of the guarantee value, as defined in the performance section of the technical specification.

D.  MCR Steam Flow:
    $265,000 for each full 1000 lb./hr. of main steam flow that the unit is below the guarantee value, as defined in the performance section of the technical specification.

E.  Boiler Steam Temperature:
    $160,000 for each full 1 degree F of main steam or reheat steam temperature that the unit is below the guarantee value, as defined in the performance section of the technical specification.

F.  Limestone: (Aragonite)
    $590 per each full pound per hour of Limestone that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

G.  Lime:
    $6,565 per each full pound per hour of Lime that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

H.  Urea:
    1)  $17,869 per each full pound per hour of Urea that the Facility is in excess of the 85% to 100% MCR guarantee value, as defined in the performance section of the technical specification.
    2)  $1,370 per each full pound per hour of Urea that the Facility is in excess of the Less than 85% MCR guarantee value, as

A 026

defined in the performance section of the technical specification.

## 10.5  PAYMENT OF LIQUIDATED DAMAGES

10.5.1  Contractor agrees that all sums payable by Contractor to DFDC as liquidated damages pursuant to this Section 10 shall be paid promptly to DFDC or, at DFDC's option, may be deducted by DFDC from the price to be paid to Contractor hereunder.  The liquidated damages are agreed to be a reasonable estimate of actual damages, not a penalty.

10.5.2  The liquidated damages set forth in this Section 10.0 are the sole and exclusive remedies of DFDC for failure of Contractor to meet Performance Acceptance or Performance Guarantees, however, shall not constitute a waiver of any rights of DFDC to damages or other remedies of DFDC under other Sections of this Contract not related to Contractor's failure to meet Performance Acceptance and/or Performance Guarantees.

10.5.3  Contractor's liability for liquidated damages shall be limited in accordance with Article 57.0 of Part III of this Contract, provided, however, that liquidated damages shall not be deemed to be incidental, special or consequential damages.

## 10.6  REMEDIES

10.6.1  In the event the Performance Test results indicate lower than specified and/or guaranteed performance, Contractor will be given the opportunity, which is reasonably possible under the circumstances, to rectify the equipment and the unit will be retested.

10.6.2  In the event of any deficiencies in Contractor's equipment and design relative to the specifications and/or performance guarantees in the attached Technical Specification which are not covered by liquidated damages, Contractor will correct these deficiencies to conform to the performance guarantees as set out in the specification.

## 11.0  EARLY COMPLETION BONUS

If Performance Acceptance occurs before the Guaranteed Performance Acceptance Date, DFDC hereby agrees to pay Contractor an amount equal to $50,000/day for each day by which the occurrence of Performance Acceptance is earlier than the Guaranteed Performance Acceptance Date (the "Early Completion Bonus"); provided, however, that the aggregate amount of such bonus (if any) required hereunder shall not exceed $1,667,500.  DFDC shall pay the Early Completion Bonus, if any, to Contractor within five (5) days of receipt of any funds from Owner for its early completion under the EPC Contract.

In the event ABBCE achieves its Performance Acceptance early, but early completion is not achieved by DFDC under the EPC Contract, then ABBCE shall waive its right to the Early Completion Bonus.

## 12.0  COMMUNICATIONS

Direct Communications To:

A 027

Duke/Fluor Daniel Caribbean S.E.
P.O. Box 1011
Charlotte. NC 28201-1011
ATTN: E. D. Terres, Jr.

Mail All Engineering Data To:

Duke/Fluor Daniel Caribbean S.E.
2300 Yorkmont Road
Charlotte, NC 28217
ATTN: R. F. Day Jr.
Project Number:
Project Name: AES Puerto Rico

Invoices and all supporting documents shall be transmitted in original and three (3) copies to:

Duke/Fluor Daniel Caribbean S.E.
P.O. Box 1011
Charlotte, NC' 28201-1011
ATTN:  ACCOUNTS PAYABLE - AES Puerto Rico Project

13.0  ATTACHMENTS

A.     Deleted
B.     Progress Payment Schedule
C.     Cancellation Schedule
D.     Contract Master Schedule
E.     Partial Lien Waiver
F.     Final Release Waiver
G.     Performance Test Plan

A 028

## PART III - GENERAL TERMS

### 1.0  WARRANTIES

1.1.1 Contractor warranties Duke/Fluor Daniel Caribbean S.E. ("D/FDC") and Owner that the Work shall comply with the provisions of this Contract and all specifications and drawings referred to in this Contract, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Contractor. Contractor further warranties D/FDC and Owner that all materials, equipment and supplies furnished by Contractor for the Work shall be new and fit for their specified purposes as set forth in this Contract and be in full compliance with the requirements of this Contract.  As described in this Agreement, if any defect in the Work in violation of the foregoing warranties arises within the period set forth below, Contractor shall upon receipt of prompt written notice from D/FDC or Owner of such defect promptly furnish, at no cost to D/FDC or Owner, design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties.

1.2 Contractor, at its expense, (including, without limitation, costs of removal, packing, transportation and reinstallation) shall remedy promptly any defective Work which exists during the applicable warranty period as set forth in this Article 1.0, and of which D/FDC gives written notice within a reasonable time after discovery of the defect or damage.  Upon such notification by D/FDC, Contractor shall promptly commence and proceed to make all needed adjustments, repairs, additions, corrections, and replacements which arise out of or are necessitated by such defective Work or damage. Contractor shall conduct such warranty work on a overtime schedule basis if D/FDC determines such a schedule is necessary to avoid or minimize the effects of an outage or load reduction and D/FDC shall reimburse Contractor the premium differential for performing warranty work on an overtime basis.  Contractor shall coordinate its warranty Work with D/FDC to minimize interference to D/FDC's and Owner's operations.  D/FDC will permit reasonable access to as much of the Unit(s) as Contractor may reasonably require for performance of warranty Work, but any costs of uncovering Work shall be the responsibility of the Contractor. Contractor shall perform warranty Work so that such adjustments, repairs, additions, corrections, and replacements do not degrade the performance of, nor impair the use of the Equipment, Materials or other Work in question, other systems, or the Unit(s) as a whole to an extent that the Equipment, Materials, or other Work, systems or Unit(s) will not meet the requirements of this Contract in all respects, and Contractor shall repair or replace all other facilities to the extent they are destroyed or damaged as result of Contractor's performance of warranty Work.

1.2.1 The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance with the following exceptions:

    a.    The warranty period for the Boiler Hot Loop shall be twenty-four (24) months after Performance Acceptance;

    b.    The warranty period shall be extended for corrective Work as set forth below.

1.2.2 At the mutual agreement of Contractor and D/FDC, warranty Work provided hereunder may be deferred until the time of the Unit's next regularly scheduled maintenance outage, provided that such outage shall commence not later than six (6) months after D/FDC's notice to Contractor of the defective condition; and the warranty provisions hereunder shall apply notwithstanding that such outage occurs after the time the warranty would otherwise expire.

A 029

Contractor shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

1.3 The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Contractor's submittal to D/FDC of written Notice of Completion unless D/FDC, within ten (10) days thereafter, furnishes Contractor with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Contractor warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

1.3.1 In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, D/FDC shall so notify Contractor in writing prior to expiration of the Warranty Period, as applicable, and Contractor shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

1.3.2 A chronic failure ("Chronic Failure") shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, D/FDC and Contractor shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance.

1.4 In the event Contractor shall have been notified in writing of any defects in the Work in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, D/FDC and Owner shall have the right upon written notice to Contractor to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay D/FDC or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with back-up documentation supporting written claim.

1.5 In the event of an emergency when, in the reasonable judgment of D/FDC, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by D/FDC, or by a third party chosen by D/FDC, without giving prior notice to Contractor, and the reasonable cost of the remedial work shall be paid by Contractor but Contractor shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by D/FDC to Contractor as soon as practical.

1.6 The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to

A 030

materially affect in the next two (2) years (i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Contractor and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth in Article 1.3, applicable to this Article 1.6.

1.7  Contractor agrees that D/FDC may assign its rights under this warranty and other parts of this Contract to Owner and Owner's Lenders, and Contractor hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

1.8  Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feedstocks from the limits specified in the Contract are excluded from any warranty obligations of the Contractor.

*Warranty Exclusion*

1.9  Contractor's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

1.10  ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

## 2.0 INSPECTION, TESTING AND QUALITY CONTROL

2.1  Contractor shall inspect all materials, supplies and equipment which are to be incorporated in the Work. In addition, Contractor shall conduct a continuous program of construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to D/FDC for review and approval, and shall be in sufficient detail to delineate those items to be inspected and the manner in which they are to be inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

2.2  Contractor shall, during the course of performance of the Work hereunder, without additional compensation, make or cause to be made all tests required by this Contract. D/FDC may require additional inspections and tests for which Contractor shall be compensated for. Contractor shall furnish D/FDC with satisfactory documentation of the results of all inspections and tests. For those tests which are specifically listed in the Contract as "D/FDC Witness Tests", D/FDC shall be given not less than five (5) working days notice by Contractor in order that D/FDC and/or Owner may witness any such tests.

A 031

2.3  D/FDC and Owner and their representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Work and all material, supplies and equipment for the Work at the jobsite and at Contractor's and its suppliers' or subcontractors' shops for conformance with the Contract.  Contractor shall provide, or cause to be provided access and sufficient and safe facilities for such inspections.  Neither the failure to make such inspection nor to discover defective workmanship, materials or equipment, nor approval of or payment to Contractor for such Work, materials or equipment shall prejudice the rights of D/FDC or Owner.

2.4  If Contractor covers any portion of the Work prior to any inspection or test provided for in the specifications, inspection schedule, or as previously requested in writing by D/FDC, the cost of uncovering and covering the work to allow for such inspection or test shall be borne by the Contractor.  Reexamination of any Work may be ordered by D/FDC.  In the event of such reexamination, if any material, equipment or any part of the Work is determined by D/FDC to be defective, Contractor shall not be reimbursed for uncovering, repair or corrective and restoration costs.  If such Work is found to be in accordance with the Contract requirements upon such reexamination, D/FDC shall pay Contractor the cost of uncovering and restoration.

2.5  Rejection by D/FDC of any or all parts of defective Work for failure to conform with this Contract shall be final and binding unless Contractor demonstrates that such rejection is inappropriate.  Such rejected Work shall be promptly corrected or replaced by Contractor at Contractor's expense.  If Contractor fails to commence and diligently continue correction or replacement of such rejected Work promptly after receipt of written notice from D/FDC to correct or replace the rejected Work, D/FDC may at its option remove and replace the rejected Work, and Contractor shall promptly reimburse D/FDC for the reasonable costs of such removal and replacement of defective Work.

2.6  D/FDC and Owner shall use reasonable efforts to perform inspection activities so as to not interfere with Contractor's schedule or work progress.

2.7  Contractor shall furnish D/FDC with samples of any materials required for testing purposes which D/FDC may require.

2.8  D/FDC may appoint inspectors to ascertain that the Work is accomplished in accordance with the Contract.  Whether in the field or in Contractor's shop, or shops of its subcontractors, suppliers or manufacturers, the inspectors, upon reasonable notice to Contractor, shall have full access to the Work during normal working hours, and shall be given full cooperation.  The inspectors shall have the authority to reject any defective Work, Equipment, or Material.  The inspectors shall have no authority to permit any deviation from the Contract except as authorized in writing by D/FDC.  Duke Fluor Daniel will provide Contractor the names of the authorized inspectors.

3.0  CONDITIONS AND RISKS OF WORK

3.1  Contractor acknowledges that prior to the execution of this Contract, Contractor (a) has made a complete and careful examination of the Facility Site and the surrounding areas, the Contract Document and the drawings and specifications and other information set forth for the Work, (b) has made a complete and careful examination to determine the difficulties and hazards incident to the performance of the Work hereunder, including without limitation (i) the location of the Project, (ii) the general condition of the Facility Site and the surrounding areas excluding any

A 032

latent subsurface conditions not disclosed to Contractor, (iii) the proximity of the Project to adjacent facilities and structures, (iv) the conditions of the roads, waterways and railroads in the vicinity of the Facility Site, including the conditions affecting shipping and transportation, access, disposal, handling and storage of materials, (v) the labor conditions in the region of the Facility Site, (vi) Applicable Laws and Permits, (vii) the local weather conditions based upon previous weather data, and (viii) all other matters that might reasonably affect Contractor's performance hereunder of the construction of the Work, and (c) has determined to Contractor's satisfaction the nature and extent of such difficulties and hazards. Contractor takes no responsibility and shall have no liability for pre-existing site conditions not reasonably apparent, including, but not limited to, subsurface conditions, structural integrity of existing steel and structures, and buried or concealed conditions.

3.2 Contractor accepts the risk for its mistake or error relating to all matters within the scope of Section 3.1 hereof and acknowledges and agrees that no increase or adjustment in the Contract Price, the Contract Master Schedule (including all milestones), the Payment Schedule, and the Performance Guarantees will be authorized by D/FDC as result of any such mistake or error but Contractor shall not be responsible for the mistakes or errors of D/FDC, Owner or any of their agents, vendors or contractors of any tier (other than Contractor) relating to all matters within the scope of Article 3.1 hereof.

## 4.0 APPROVED FOR CONSTRUCTION DRAWINGS AND SPECIFICATIONS

4.1 The Work shall be performed using only drawings and specifications marked "Approved for Construction" or equivalent by D/FDC. Such approval shall not relieve Contractor of any obligations under this Contract, nor constitute Duke/Flour Daniel's assumption of responsibility for the accuracy or adequacy of any of Contractor's information or Work incorporated in such documents.

4.2 To the extent possible, Contractor shall perform all Work outside of the areas marked "HOLD" on "Approved for Construction" specifications and drawings to maintain the schedule of Work, but shall not perform any Work in the areas or sections marked "HOLD" on "Approved for Construction" specifications and drawings until revised "Approved for Construction" specifications and drawings are received with the "HOLD" markings deleted.

4.3 If Contractor's schedule will be delayed by "HOLD" markings on specifications and drawings, Contractor shall report such delay to D/FDC in writing not less than ten (10) working days of receipt of such specification and drawings.

4.4 Contractor shall maintain at the work site a complete and current set of "Approved for Construction" drawings and specifications.

## 5.0 INTENT OF SPECIFICATIONS AND DRAWINGS

5.1 The specifications and drawings may not be complete in every detail. Contractor shall comply with their manifest intent and general purpose, taken as a whole, and shall not knowingly make use of any errors or omissions therein to the detriment of the Work. Upon becoming knowledgeable of any conflict, error, omission or discrepancy appear in the drawings, specifications, instructions, in work done by others, or in site conditions, Contractor or D/FDC shall notify the other in writing at once, and D/FDC will issue written instructions to be followed. If Contractor proceeds with any of the Work in question prior to receiving such instructions, then required corrections shall be at Contractor's expense.

A 033

5.2 Contractor shall not deviate from the specifications and drawings without prior written approval from D/FDC. Anything shown in the specifications referred to in this Contract or thereafter furnished by D/FDC and not shown in the drawings referred to in this Contract or thereafter furnished by D/FDC, or shown in such drawings and not shown in such specifications, shall be of like effect as if shown or mentioned in both and shall not be considered to be a conflict.

5.3 Materials shall not be substituted for those specified, nor shall "or equal" items be furnished pursuant to the specifications without D/FDC's prior written approval.

## 6.0 SAFETY

6.1 Contractor shall take necessary safety and other precautions to protect property and persons from damage, injury or illness arising out of the performance of the Work. Contractor shall comply strictly with local, municipal, provincial, state and national laws, orders, and regulations which are applicable to Contractor or to the Work, including without limitation the Occupational Safety and Health Act of 1970 (84 U.S. Statutes 1590), as amended and any state plans approved thereunder, and regulations thereunder, to the extent applicable, and Contractor warrants the materials, equipment and facilities, whether temporary or permanent, furnished by Contractor in connection with the performance of the Work shall comply therewith. At all times while any of Contractor's employees, agents or subcontractors are in Contractor's work area, Contractor shall be responsible for providing them with a safe place of employment, and Contractor shall inspect its work area. To the extent and as provided for in Article 29, Contractor shall indemnify and save harmless D/FDC and Owner, and their officers, employees and agents, from and against any and all claims, loss or liability in any manner arising out of Contractor's failure to comply with this Article.

6.2 Accidents, injuries and illnesses requiring medical attention other that first aid, damage to property of D/FDC, Owner and Contractor, and fires shall be orally reported to D/FDC at the time of the incident. Written reports, satisfactory in form and content to D/FDC, shall be submitted by Contractor promptly after each accident.

6.3 Contractor shall maintain in form and content approved by D/FDC, jobsite accident, injury and illness statistics which shall be available for inspection by, and submitted to, D/FDC upon its written request.

6.4 Contractor shall perform the Work in a manner to minimize marring and scarring of the landscape, and silting of streams. Trash shall not be deposited in streams or waterways, and action shall be taken to eliminate the migration of trash on the Jobsite to these areas. Herbicides and other chemicals and their containers shall not be deposited in or near streams, waterways, fields or pastures. Contractor warrants that it shall comply with all environmental protection permits and licenses, whether obtained by D/FDC or Owner or itself and provided that for D/FDC or Owner obtained permits or licenses that a copy has been provided to Contractor; all environmental laws, rules, regulations and electric utility industry standards and practices applicable to the Work.

A 034

## 7.0 CLEANUP

7.1 Contractor shall use its reasonable efforts to keep its work area in a neat, clean and safe condition and remove from the Owner's premises and the vicinity thereof and properly dispose of all debris and rubbish caused by Contractor's operations. Upon completion of the Work, Contractor shall promptly return unused materials furnished by D/FDC and remove from Owner's premises all of Contractor's equipment, material, scaffolding and like items, leaving Owner's premises and the vicinity clean, safe and ready for use.

7.2 In the event Contractor shall fail to maintain its work area as described above and in a manner satisfactory to D/FDC, and Contractor has failed to effect such cleanup or removal promptly after receipt of written notice to do so, D/FDC shall have the right without further notice to Contractor to perform such cleanup and remove such items on behalf of, and at the expense of Contractor. D/FDC may store items removed at a place of its choosing on behalf of Contractor and at Contractor's risk and expense. D/FDC shall promptly notify Contractor of such place of storage. Contractor shall promptly reimburse D/FDC for the costs of such cleanup, removal and storage.

7.3 On or before completion of the Work, Contractor shall remove, transport and dispose of any Hazardous Material transported onto the Facility Site by Contractor or any of its subcontractors, or created, used or handled as part of Contractor's or any of its subcontractor's construction activities at the Facility Site. All cleanup and disposal shall be conducted in accordance with all Applicable Laws and Applicable Permits. Contractor shall notify D/FDC immediately upon the discovery of the presence of any Hazardous Material on, or the release of Hazardous Material on or from, the Facility Site.

## 8.0 SUBCONTRACTORS AND PURCHASE ORDERS

8.1 Contractor shall not subcontract performance of any work that will be performed at the jobsite and which has a value of $100,000 or greater without first notifying D/FDC of the intended subcontracting and obtaining D/FDC's Notice of Non-Objection in writing of the subcontracting and the subcontractor. Issuing of the Notice of Non-Objection shall not be unreasonably withheld. If requested by D/FDC, Contractors shall furnish D/FDC a copy of the subcontract (with price deleted if the subcontracted work is part of fixed price Work of Contractor under this Contract). Contractor agrees to include applicable Articles from this Contract in subcontracts but shall maintain responsibility for administration of such subcontracts.

8.2 Contractor guarantees that its subcontractors will comply fully with the terms of this Contract applicable to the portion of the Work performed by them. If any portion of the Work which has been subcontracted by Contractor is not prosecuted in accordance with this Contract then upon written notification from D/FDC, Contractor shall take corrective action to assure that the subcontractor's work is brought into compliance with the Contract. If after thirty (30) days of Contractor receiving written notice of such non-conformance, subcontractor has failed to reasonably bring the Work into compliance with the Contract to the reasonable satisfaction of D/FDC, then on written request of D/FDC the subcontractor shall be replaced at no additional cost to D/FDC and shall not be employed again on the Work.

8.3 D/FDC shall have the right from time to time to attend progress review meetings that Contractor holds with its subcontractors.

A 035

8.4 Contractor shall only purchase materials and equipment from suppliers listed in attachment 14 of the technical specifications.

## 9.0 TERMINATION FOR DEFAULT

9.1 In the event that Contractor shall default in the performance of any material obligation to be performed by Contractor under this Contract and shall fail to commence corrective action within five (5) working days following written notice thereof from D/FDC and shall thereafter fail to diligently pursue such corrective action, D/FDC may, without prejudice to any other rights or remedies D/FDC may have, hold in abeyance payments to Contractor for Work not in compliance with the Contract and/or terminate Contractor's right to continue performance of this Contract by written notice to Contractor specifying the date of termination. In the event of such termination, D/FDC may take possession of the Work at the jobsite and any or all materials and plant equipment (whether delivered to the jobsite or on order therefor by Contractor), Contractor's tools and construction equipment at jobsite and finish the Work by whatever method D/FDC may deem expedient.

9.2 In the event of termination by D/FDC under Section 9.1, Contractor shall, upon request by D/FDC, promptly advise it of all outstanding subcontractors, rental agreements and purchase orders which Contractor has with others pertaining to performance of the Work and furnish D/FDC with complete copies thereof. Upon request by D/FDC, Contractor shall assign to D/FDC or Owner, Contractor's title to materials and plant equipment for the Work and those subcontracts, rental agreements and purchase orders designated by D/FDC. Upon such assignment Contractor shall have no responsibility for work performed under such assigned items after assignment.

9.3 In the event of termination by D/FDC under Section 9.1, Contractor shall not be entitled to receive any further payment until the Work is completed. Upon completion and final acceptance of the Work, D/FDC will determine the total cost incurred in completing the Work including, without limitation, additional overhead, reasonable legal and other costs incurred by D/FDC to effect such termination and to complete the Work. If the total costs noted above exceed the balance of the Contract price unpaid at the time of the termination, Contractor shall, promptly after receipt of an invoice, pay to D/FDC the amount of such excess which shall be the reasonable actual cost. D/FDC shall have the right to recover from Contractor and is authorized to set-off against and deduct from any excess payable to Contractor any other damages as allowed for under this Contract and suffered by D/FDC or Owner due to said default or event giving rise to the termination or due to other defaults of Contractor in complying with the terms of this Contract. A waiver by D/FDC of one default by Contractor shall not be considered to be a waiver of any subsequent default by Contractor, nor be deemed to amend or modify the terms of this contract.

9.4 Upon commencement of a case by or against Contractor under applicable bankruptcy law, or any general assignment by Contractor for the benefit of its creditors, or the appointment of a receiver to take charge of Contractor's assets, and provided the same renders Contractor unable to perform its obligations, D/FDC may treat Contractor as in default under Section 9.1 and may exercise any of the remedies of this Article.

**A 036**

9.5 Contractor shall be considered in default from complying with the express obligations of this Contract whenever by reason of strikes, picketing or disputes of any nature between Contractor, and directed solely at Contractor, and any individual, group or organization at the Jobsite, Contractor persistently, repeatedly, or for any period of twenty (20) consecutive working days, should be unable to supply enough properly skilled workers or proper materials or equipment to execute the Work at the Jobsite.

## 10.0 STOP WORK ORDERS

Upon failure of Contractor or its subcontractor(s) to comply with any of the material requirements of this Contract, D/FDC shall have the authority upon written notice to Contractor to stop any Work of Contractor or its subcontractors affected by such failure until such failure is remedied or to terminate this Contract in accordance with Article 9.0. No part of the time lost due to any such stop orders shall be made the subject of a claim for extension of time or for increased costs or damages by Contractor, unless Contractor demonstrates that the stop work order was inappropriate.

## 11.0 SCHEDULING, REPORTING AND COORDINATION

11.1 Contractor shall schedule and coordinate the details of the Work being performed to meet the schedule requirements set forth in this Contract. Within thirty (30) calendar days after the signing of this Contract, Contractor shall submit to D/FDC for approval, a summary schedule showing the sequence in which Contractor proposes to perform the Work, the start and completion dates of all separable portions of the Work, materials procurement and delivery plans and any other information specified by D/FDC. Contractor agrees to adhere to the schedule approved by D/FDC and attend and participate in scheduled progress and coordination meetings called by D/FDC.

11.2 During the performance of Work, Contractor shall submit to D/FDC monthly progress reports on the actual progress and updated schedules as may be required by this Contract or requested by D/FDC. In the event Contractor's performance of the Work is not in compliance with the schedule established for such performance, D/FDC may, in writing, require the Contractor to submit its plan for schedule recovery or exercise any other remedies under this Contract. Contractor shall thereupon take such steps as may be necessary to improve its progress without additional cost to D/FDC.

11.3 Contractor recognizes that D/FDC, Owner, other contractors and subcontractors may be working concurrently at the Jobsite. Contractor agrees to cooperate with D/FDC, Owner and other contractors so that the project as a whole will progress with a minimum of delays. D/FDC reserves the right to reasonably require Contractor to schedule the order of performance of its Work in such manner as not to interfere with the performance of others.

11.4 Contractor shall reasonably cooperate with the engineering, construction and other efforts to accommodate the interface requirements of all other contractors and use all reasonable efforts to accommodate the interface requirements of the Utility, the Steam Host(s), the Fuel Supplier(s), all Federal, commonwealth, state and local agencies, all utilities serving the Project and all fuel oil and water suppliers.

11.5 Contractor shall develop a construction plan for, and oversee the construction of the Work in accordance with the terms and provisions of this Contract. Contractor shall inspect or cause to

A 037

be inspected all materials and equipment to be incorporated into the Work and shall reject those items determined not to be in compliance with the requirements of this Contract. Contractor shall also oversee the manner of incorporation of the materials and equipment into the Work and the workmanship with which such materials and equipment are incorporated and otherwise coordinate the construction of the Work. Contractor shall require all of its subcontractors to perform any subcontracts such that the work is in compliance with this Contract and, in performing the duties incident to such responsibility, Contractor shall issue to its subcontractors such directives and impose such restrictions as may be required in the construction of the Work to obtain compliance by subcontractors with the relevant terms of this Contract. Contractor shall review and be fully responsible for all construction services of the Work, including without limitation, all construction services provided by its subcontractors. Contractor shall establish and track the Work management controls systems and provide construction management services pertaining to the Work.

## 12.0 OVERTIME

Unless expressly stated elsewhere in this Contract, Work at the jobsite shall be compatible with D/FDC's Construction starting and quitting times, or other times approved by D/FDC. Scheduled overtime work by Contractor must be approved in advance and in writing by D/FDC and such approval for overtime work shall not be unreasonably withheld by DFDC. Contractor shall notify D/FDC in advance of any incidental spot overtime which Contractor elects to work due to such operations as concrete placement, non-disruptable work activities and emergencies to protect life and/or property. Overtime work, whether scheduled or incidental, shall be to Contractor's account unless the compensation therefor is specifically authorized in writing by D/FDC. In the event D/FDC approves compensation of Contractor's overtime in advance, such compensation as separately authorized shall be limited to the actual cost to Contractor of the premium portion only of all applicable wages, craft fringe benefits, and payroll burdens imposed by any governmental authority and measured by the compensation payable to employees. To establish the amount of payment, Contractor shall submit supporting documents satisfactory in form and content to D/FDC for its verification and approval.

## 13.0 DELAYS

13.1 In the event Contractor or D/FDC is delayed in performing any of their respective obligations in the Contract (other than the payment of money) and such delay is caused by a Force Majeure Event defined as; acts of God, war, riots, civil insurrection, acts of the public enemy, accidents, acts of civil or military authority, sabotage, epidemics, revolution, injunction, terrorism, quarantine, strikes and labor disputes (except as excluded below), fires, floods, landslides, tidal wave, hurricane, lightning, explosion or earthquakes, or other similar events, beyond the reasonable control of the party delayed, such delay shall be excused and the period of such delay shall be added to the time for performance as required. Force Majeure Events do not include strikes, work stoppages and labor disputes or unrest of any kind involving employees of Contractor or any of its subcontractors employed on the Facility Site (provided, however, that if such events are beyond the control of the Contractor or any of its subcontractors and are not caused by the actions or failure to act of Contractor or any of its subcontractors, such events shall be Force Majeure Events), late delivery of materials or equipment (except to the extent caused by a Force Majeure Event), and economic hardship. In the event any such delay due to the foregoing causes or events occurs or is anticipated, the party delayed or anticipating delay shall promptly notify the other party in writing of such delay or expected delay and the cause and estimated duration of such delay. In the event of a delay due to the foregoing causes or events,

A 038

whether such delay is excused or not, the party delayed shall, at no cost to the other party, exercise reasonable diligence to shorten and avoid the delay and shall keep the other party advised as to the continuance of the delay and steps taken to shorten or terminate the delay. Contractor shall not in any event be entitled to additional or extra compensation by reason of Contractor having been delayed in performance of its obligations due to the foregoing causes or events whether such delay was excused or not. Contractor or D/FDC shall, within five (5) working days of becoming knowledgeable of the commencement of any such delay, give to the other written notice thereof and of the anticipated results thereof. Within two (2) working days of the termination of any such delay, Contractor or D/FDC shall file a written notice with the other specifying the actual duration of the delay. If the delay was beyond the control and without the fault or negligence of   Contractor or DFDC, as the case may be,  and not foreseeable at the effective date of this Contract, Contractor or DFDC shall be entitled to an equitable extension of the time of performance of this Contract, **provided that the extension of time is of no greater scope and of no longer duration than is reasonably required by the delay.** Contractor shall not be entitled to, and hereby expressly waives recovery of, and damages suffered by reason of the delays contemplated by this Section 13.0 and extension of time shall constitute Contractor's sole remedy for such delays.

13.2  The time of completion of any and all Work items scheduled in the Contract shall not be extended because of non-extraordinary weather conditions or other natural non-extraordinary phenomena including, but not limited to normal rain, high temperature, wet grounds, and high winds.

13.3  The inability of Contractor to obtain permits or licenses required for the progress of its Work shall not be considered a reason for force majeure claim.

## 14.0 POSSESSION PRIOR TO COMPLETION

D/FDC and/or Owner shall have the right to move into Contractor's working and storage areas and the right to take possession of or use any completed or partially completed part of Contractor's Work as D/FDC or Owner deem necessary for their operations. In the event D/FDC or Owner desire to exercise the foregoing right, D/FDC will so notify Contractor in writing. Such possession or use shall not constitute acceptance of Contractor's Work, and D/FDC and/or Owner shall assume full responsibility for loss, damage or injury associated with such possession or use and such possession or use shall not interfere with Contractor's Work.

## 15.0 NOTICE OF PROJECT COMPLETION

15.1  When Contractor deems the Work to have achieved Project Completion, including satisfactory completion of such inspections, tests and documentation as are specified in this Contract, Contractor shall, within ten (10) working days thereafter, give a written notice of Project Completion of the Work to D/FDC, specifying the Work completed and the date it was completed. Within ten (10) calendar days after receipt of said notice of Project Completion, D/FDC may inspect the Work and shall either reject the notice of Project Completion and specify defective or uncompleted portions of the Work, or shall give the Contractor a written notice of acceptance of the Work and Project Completion either for the purpose of final payment only, or for the purposes of final payment and final acceptance. The Notice of Project Completion shall be dated as of the date that Contractor provided DFDC with the notice which proved to be acceptable.

A 039

15.2  In the event D/FDC rejects the notice of Project Completion and specifies defective or uncompleted portions of the Work, Contractor shall within five (5) working days, provide for D/FDC's review and approval, a schedule detailing when all defects will be corrected and/or the work will be completed and shall proceed to remedy such defective and uncompleted portions of the Work.  Thereafter, Contractor shall again give D/FDC a written notice of Project Completion of the Work, specifying a new date for the completion of the Work based upon the date such defective or uncompleted portions of the Work were corrected.  The foregoing procedure shall apply again and successively thereafter until D/FDC has given Contractor written notice of Project Completion for purposes of final payment and final acceptance.

15.3  If D/FDC to is unable to perform such inspection and notification within ten (10) days as stipulated in 15.1 above, the parties agree to mutually work together to complete such inspection as promptly as is reasonably possible.

## 16.0  CHANGES

16.1  The Scope of Work shall be subject to change by additions, deletions or revisions thereto by D/FDC.  Contractor will be notified of such changes by receipt of additional and/or revised drawings, specifications, exhibits or written orders.

16.2  Contractor shall submit to D/FDC within (20) twenty working days after receipt of notice of a change, a takeoff with supporting calculations and firm lump sum pricing for the change together with any adjustments in the schedule guarantees or other Contract requirements required for the performance of Work as changed.  The pricing shall be itemized to show the cost for labor (by trades and work classification), material and equipment and shall cover all work involved in the change, whether such work was deleted, added or modified.  Amounts related to subcontracts shall be identified as individual line items.  In addition, if the proposal includes a time extension (or adjustment of any other Contract requirement), a justification therefor shall also be furnished.

16.3  Contractor shall not perform changes in the Work in accordance with Sections 16.1 and 16.2 until D/FDC has approved in writing the pricing for the change and any adjustment in the schedule guarantees, or other Contract requirements for performance of the Work, except as set forth in Section 16.4.  Upon receiving such written approval from D/FDC, Contractor shall perform the change in accordance with this Contract.

16.4  Notwithstanding Section 16.3 D/FDC may expressly authorize Contractor in writing to perform the change prior to such approval by D/FDC.  Contractor shall not suspend performance of this Contract during the review and negotiation of any change, except as may be directed by D/FDC pursuant to Article 17.0, SUSPENSION OF WORK.  If Duke/Flour Daniel has authorized Contractor in writing to perform work prior to the issuance of a change order, Contractor shall then commence such work on a time and material basis.  If D/FDC and Contractor are unable to agree on a firm lump sum price then Contractor shall be compensated on a time and material basis.  The pricing for time and material shall be as follows:

I)      Craft labor and Engineering Costs: Labor rates shall include all payroll additives such as payroll taxes, insurance, vacation allowance, subsistence, etc.

II)     Construction Equipment Cost including rental equipment

III)    Material

IV)     Subcontractor Services

A 040

V)       Transportation and Delivery Cost

Items I, III and IV above shall be marked-up as follows to cover overheads, management and profit:

Item I) Thirty five percent (35%)
Item III) Twenty Percent (20%)
Item IV) Ten Percent (10%).

16.5 Contractor shall not comply with oral changes in the Work. If Contractor believes that any oral notice or instruction received from D/FDC will involve a change in the cost, time to perform or integrity of the work, it shall require that the notice or instruction be given in writing and shall comply with the provisions of Sections 16.2, 16.3 and 16.4. Any costs incurred by Contractor to perform oral changes shall be for Contractor's account, and Contractor waives any and all rights to claim from D/FDC or Owner for such costs or additional time to perform the Work as a result of compliance by Contractor with such oral changes.

16.6 D/FDC may request minor changes in the Work, consistent with the overall general scope of this Contract, to accommodate unanticipated changes which do not affect schedule or Contract Price. If Contractor believes that any such order entitles it to an adjustment to the Contract Price or schedule or both, it shall provide a written statement of such to D/FDC. Prior to beginning the portion of Work affected by the order, Contractor will prepare a Change Order as described in this Article.

16.7 Contractor is not entitled to claim for damages for anticipated profits on any portion of the Work that may be deleted and which was not performed.

## 17.0 SUSPENSION OF WORK

17.1 D/FDC may at any time, and from time to time, by written or telegraphic notice to Contractor suspend further performance of all or any portion of the Work by Contractor. Said notice of suspension shall specify the date of suspension and the estimated duration of the suspension. Upon receiving any such notice of suspension, Contractor shall promptly suspend further performance of the Work to the extent specified, and during the period of such suspension shall properly care for and protect all Work in progress and materials, supplies, and equipment Contractor has on hand for performance of the Work. Upon the request of D/FDC, Contractor shall promptly deliver to D/FDC unpriced copies of outstanding purchase orders and subcontractors of Contractor for materials, equipment and service for the Work, and shall take such action relative to such purchase orders and subcontracts as may be directed by D/FDC. Contractor shall use its best efforts to utilize its material, labor and equipment in such a manner as to mitigate costs associated with suspension. D/FDC may at any time withdraw the suspension of performance of the Work as to all or part of the suspended Work by written or telegraphic notice to Contractor specifying the effective date and scope of withdrawal, and Contractor shall resume diligent performance of the Work for which the suspension is withdrawn on the specified effective date of withdrawal.

17.2 If Contractor believes that any such suspension or withdrawal of suspension justifies modification of the Contract price or time of completion, Contractor shall comply with the provisions of the procedure set forth in Article 16.0, CHANGES. Contractor shall not be entitled to any prospective profits because of such suspension or withdrawals of suspension.

A 041

## 18.0 TERMINATION AT DUKE/FLUOR DANIEL CARIBBEAN S.E.'S OPTION

**18.1** D/FDC shall have the right at any time, with or without cause, to terminate further performance of all or part of the Work by written or telegraphic notice to Contractor specifying the date of termination. On the date of such termination stated in said notice, Contractor shall discontinue performance of the Work and shall preserve and protect tools, construction equipment and facilities on jobsite, materials and plant equipment purchased for or committed to the Work (whether delivered to the Jobsite or on order), Work in progress and completed Work (whether at jobsite or other locations) pending D/FDC's instructions and, if requested by it, shall turn over the same to D/FDC, or Owner, including title to said materials and plant equipment, provided the Contractor has been paid in full for such material and equipment or dispose of same in accordance with D/FDC's instructions.

**18.2** Upon receipt of said notice, Contractor shall advise D/FDC of its outstanding orders and subcontracts pertaining to performance of the terminated work and, upon request, furnish D/FDC with complete copies. Contractor shall place no further orders or subcontracts for materials, equipment, services, or facilities, except as may be necessary for completion of such portion of the Work as is not terminated; Contractor shall promptly make every reasonable effort to procure cancellation, upon terms satisfactory to D/FDC, of all orders and subcontracts to the extent they relate to the performance of Work terminated; or, as directed by D/FDC, shall assign to it or Owner such of its subcontracts and orders as are designated by D/FDC, or shall take such other action relative to such subcontracts or orders as may be directed by D/FDC.

**18.3** If Contractor has reasonably performed all obligations under this Contract up to the date of termination, Contractor shall recover from D/FDC an amount based upon the Cancellation Schedule (Attachment 13.C of Part II) which amount shall constitute complete and full settlement for such termination. In no event shall total payment to Contractor exceed the Contract Price.

**18.4** The provisions of this Contract, which by their nature survive final acceptance of the Work, shall remain in full force and effect after such termination.

## 19.0 CLAIMS

**19.1** Contractor shall give D/FDC written notice within five (5) working days after becoming aware of any event which Contractor believes may give rise to a claim by Contractor for an increase in the Contract Price or in the scheduled time for performance. Within ten (10) working days after becoming aware of such event, Contractor shall supply D/FDC with a statement supporting Contractor's claim, which statement shall include Contractor's detailed estimate of the change in Contract Price and scheduled time occasioned thereby. Contractor shall substantiate its claim with payroll documents, paid invoices, receipts, records of performance and other documents satisfactory to D/FDC and subject to its verification. D/FDC shall give Contractor written notice within five (5) working days upon determining that an action or inaction of Contractor which will result in a claim from D/FDC and D/FDC will submit a detailed claim to Contractor within ten (10) working days for review. Both parties hereby waive any claim or potential claim to the other party which was not reported in accordance with the provisions of this Article. The parties shall negotiate in good faith to reach an agreement, but in no case, except with D/FDC's prior written consent, shall any work be halted pending such agreement, whether or not the claim can be resolved to Contractor's satisfaction, and Contractor shall be bound by the terms and conditions of this Contract to prosecute the Work without delay to its successful completion. D/FDC shall not be bound to any adjustments in the Contract Price or scheduled time for Contractor's claim unless expressly agreed to by D/FDC in writing or otherwise required

pursuant to arbitration or court award. No claim hereunder by Contractor shall be allowed if asserted after final payment under this Contract. Contractor's and D/FDC's remedies are limited to those expressly set forth in this Contract.

19.2  Claims identified by the parties will be considered for resolution by the D/FDC Site Manager and the Contractor Construction Site Manager. Claims which remain unresolved for one (1) month after receipt of substantiating information by D/FDC may, at the discretion of either D/FDC or Contractor, be submitted to the D/FDC Project Director and the Contractor Project Manager for resolution. Should a claim remain unresolved for an additional one (1) month, either party may submit the claim to the D/FDC Vice President - Projects and the Contractor Director of Projects for resolution. This mutually agreed upon process for resolution of potential claims will not affect the rights and obligations, that are provided under the Contract for either party.

## 20.0 PROTECTION OF MATERIALS, EQUIPMENT AND WORK

20.1  Contractor shall at all times and at no additional cost to D/FDC, preserve and protect material and equipment used by Contractor in the execution of the Work from damage or loss due to weather, fire, theft, unexplained disappearance or other similar casualty.

20.2  Contractor shall at all times and at no additional cost to D/FDC, protect from damage due to Contractor's operations, equipment and materials (whether stored or installed), paving, structures and any and all other items on jobsite belonging to Owner, D/FDC or others.

20.3  The liability, if any, of D/FDC or Owner for any damage to the Work, or to materials, tools and equipment of Contractor or their subcontractors, shall be limited to the deductible of the Builder's All Risk Policy or Tools and Equipment Insurance as applicable. Otherwise, Contractor assumes responsibility.

## 21.0 CONTRACTOR'S CONSTRUCTION EQUIPMENT

Construction equipment obtained or furnished by Contractor which is to be used by Contractor on the jobsite shall be in good operating condition, safe, fit for the uses for which intended, and suitable for the safe, legal and efficient performance of the Work. Such equipment shall be subject to inspection from time to time by D/FDC. Any such equipment of Contractor which is rejected by Duke/Flour Daniel as not conforming with the foregoing shall be promptly brought into compliance without additional cost to D/FDC and without delaying the schedule for performance of the Work by Contractor.

## 22.0 CONTRACTOR'S SHIPMENTS

22.1  Contractor shall be responsible for arranging all shipments of Contractor supplied materials and equipment to the site of the Work and shall consign such shipments to itself as consignee at the project shipping address, freight fully prepaid. Contractor shall be responsible for making demurrage agreements and settlement with carriers for its shipments.

22.2  Contractor shall advise Duke/Flour Daniel in advance of all major shipments of Contractor's materials and equipment and shall coordinate with D/FDC the arrival, unloading and release of carriers' equipment. Contractor shall promptly unload its shipments and promptly release carrier's equipment.

A 043

22.3  In the event Contractor may be unable to promptly unload its shipment, Contractor shall notify D/FDC of such inability not less than ten (10) working days in advance of arrival. D/FDC, at its option, may unload or make arrangements for others to unload such shipments for the account and risk of Contractor. Contractor will promptly pay D/FDC for such costs of unloading.

## 23.0 CONTROL OF D/FDC FURNISHED MATERIALS

23.1  Materials and equipment furnished by D/FDC for the Work, if any, shall be received by Contractor in the presence of Duke/Flour Daniel's authorized representative and quantities thereof, shall be checked jointly by Contractor and D/FDC. The delivery and acceptance of all such materials and equipment shall be recorded in writing, and Contractor shall evidence receipt and acceptance of such materials and equipment by signing forms satisfactory to D/FDC.

23.2  Contractor shall carefully note any visible damage to D/FDC furnished materials and equipment prior to Contractor's acceptance of delivery. After Contractor has accepted delivery of such materials and equipment, Contractor shall assume full responsibility for any loss of or damage to such materials and equipment. Contractor shall notify D/FDC of any materials and equipment supplied to Contractor by D/FDC which are surplus and shall cooperate with D/FDC and Owner in the disposition of such surplus as directed by D/FDC.

23.3  Contractor shall notify D/FDC of any lack of, or requirement for, materials and equipment required under this Contract to be supplied by D/FDC in sufficient time for D/FDC to furnish said materials or equipment in advance of Contractor's need. In the event of misfit of D/FDC furnished materials or equipment, Contractor shall promptly notify D/FDC of such misfit. Contractor shall take all reasonable steps to avoid standby time due to such misfit or lack of D/FDC furnished materials or equipment and to continue progress of other portions of Work pending correction of such misfit and/or the furnishing of materials or equipment.

## 24.0 CARE, CUSTODY, CONTROL AND TITLE TO MATERIALS AND EQUIPMENT

24.1  Good and clear title to all materials and equipment furnished by Contractor under this Contract for the Work shall, except as expressly provided otherwise, elsewhere in the Contract, pass to Owner upon payment in full by D/FDC or incorporation into the permanent plant. Contractor shall ensure that vendors and suppliers from whom Contractor obtains materials and equipment do not retain, encumber or reserve title to or any interest in such items to the extent that D/FDC has paid Contractor for such items.

24.2  Notwithstanding the provisions of Section 24.1, the care, custody and control of Contractor's work incorporated into the permanent plant shall remain with Contractor until operation has been accepted by successful achievement of all the required testing standards and shall thereupon pass to D/FDC unless D/FDC or Owner notify Contractor in writing that such care, custody, and control is assumed by D/FDC or Owner at an earlier date.

## 25.0 CONTRACTOR'S PERSONNEL

25.1  Contractor shall provide an adequate number of qualified and competent supervisory staff, craft persons and other personnel to perform the Work. At all times during the course of the Work, Contractor shall provide at the jobsite a qualified, competent and responsible supervisor who shall be satisfactory to D/FDC. The supervisor shall have authority to represent Contractor

A 044

and directions given to him and accepted by him shall be binding on Contractor. Upon D/FDC's written request, Contractor shall give the supervisor, in writing, complete authority to act on behalf of, and to bind Contractor in all matters pertaining to the Work and this Contract. Contractor shall furnish D/FDC a copy of the authorization. Contractor shall not transfer or remove any of its supervisory or key personnel from performance of Work without the prior written notice to D/FDC.

25.2  Any employee of Contractor deemed by D/FDC or Owner, in their sole judgment, to be objectionable shall be removed from the jobsite immediately upon D/FDC's request that shall be in writing and which shall state the reason(s) for such request, and shall be promptly replaced by Contractor at no extra expense to D/FDC.

25.3  If requested by D/FDC, Contractor shall furnish it with the names and addresses of Contractor's subcontractors.

25.4  Subject to Applicable Laws, Contractor agrees that (a) in seeking personnel to perform the Work in Puerto Rico, Contractor and its subcontractors shall give first preference to individuals who (i) have been residents of Puerto Rico for a continuous period of at least one (1) year immediately prior to starting work on the Facility, (ii) at some time prior to starting work on the Facility, but not necessarily including the period of time immediately prior to starting work on the Facility, were residents of Puerto Rico for a period of at least five (5) consecutive years and have relocated to Puerto Rico in order to perform work on the Facility, or (iii) were born in Puerto Rico or have at least one parent who was born in Puerto Rico and in the opinion of the Utility have sufficient connection with Puerto Rico to be entitled to the preference established in this sentence; and (b) without limitation of the foregoing, not less that 30% of the total personnel hours expended in performance of the Work in Puerto Rico prior to the Commercial operation Date shall be performed by individuals who meet the conditions of (i), (ii) or (iii) in clause (a) above. Without limitation of the foregoing, subject to Applicable Laws, not less than 30% of the Work to be performed in Puerto Rico prior to the Commercial Operation Date and measured by person-hours on an annual basis, shall be performed by business concerns which are owned and controlled by one or more individuals who meet at least one of the three criteria described in clause (a) of the preceding sentence. For purposes of the preceding sentence, owned and controlled means a business (x) which is at least 51% owned by one or more of such individuals (e.g., in the case of a corporate form of organization, such individuals must hold at least 51% of all voting stock of the corporation; in the case of a special partnership, such individuals must hold at least 51% of the beneficial interests in the partnership), and (y) whose management and daily business operations are controlled by one or more of such individuals (who need not be owners of the business). Subject to Applicable Laws, Contractor also agrees to use its best efforts to maximize the hiring of Guayama area residents for the performance of construction labor and to maximize the use of subcontractors that are owned and controlled by Guayama area residents.

25.5  Contractor shall notify D/FDC within 120 days of the date of this Contract as to whether Contractor intends to use any union personnel in connection with the Work at the Facility Site. If any union personnel are used in connection with the Work at the Facility Site, Contractor shall procure one or more project labor agreements (containing "no strike clauses" reasonably satisfactory to D/FDC) covering all union personnel employed in connection with the Work not later than 15 days prior to the first scheduled closing of construction financing for the Facility (provided Contractor has at least 60 days notice of such scheduled closing), and shall keep such agreements in effect at all times while such personnel are so employed. Contractor shall be responsible for all labor relations matters relating to the Work and shall at all times use its best

A 045

efforts to maintain harmony among the any union personnel employed (if any) and other personnel employed in connection with the Work. Contractor shall at all times use its best efforts and judgment as an experienced Contractor to adopt and implement policies and practices designed to avoid work stoppages, slowdowns, disputes and strikes.

## 26.0 LABOR HARMONY

Contractor agrees that all labor employed by it, its agents, and/or Subcontractor's for Work on the jobsite shall be in harmony with and be compatible with all other labor used by D/FDC or other Contractors. Whenever Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of the Work, Contractor shall immediately give notice thereof including all relevant information to D/FDC.

## 27.0 EMPLOYMENT CERTIFICATIONS AND PRACTICES

27.1 Contractor certifies that it has a policy ensuring equal employment opportunity without regard to race, color, national origin, sex, age, religion or handicap, that it maintains no employee facilities segregated on the basis of race, color, religion or national origin and that it is not debarred or suspended from being awarded Federal or Federally assisted contracts.

## 28.0 WORK RULES

Contractor agrees to use its reasonable efforts to comply with D/FDC and Owner's rules governing the conduct of Contractor and Contractor's employees, agents and subcontractors at and about the jobsite. Contractor agrees that it shall ensure that its supervisory personnel, employees, agents and subcontractors at the jobsite comply strictly with such rules. D/FDC and Owner reserve the right to, from time to time, revise any such rules, and Contractor shall comply fully with such rules as revised in accordance with the foregoing provisions.

## 29.0 INDEMNITY

Contractor agrees to defend, indemnify and hold harmless D/FDC and Owner, the Owner's lenders, the Utility, the PREPA, and the Steam Host, the affiliated companies of each, and all of their directors, officers, employees, agents and representatives, from and against:

29.1 Any claim, demand, cause of action, liability, loss or expense arising by reason of Contractor's actual failure (or if asserted, to defend until proven not liable) to comply with any applicable law, ordinance, regulation, rule or order applicable to Contractor under this Contract, or with this Contract. This Section 29.1 includes, but is not limited to, fines or penalties by government authorities and claims arising from Contractor's actual or asserted failure to pay taxes for which Contractor is liable to pay hereunder.

29.2 Any claim, demand, cause of action, liability, loss or expense arising from actual violation or infringement of rights (or, if asserted, to defend until proven not liable) in any applicable patent, copyright, proprietary information, trade secret or other property right caused or alleged to be caused by the use of goods, materials, equipment, methods, processes, designs or information, including construction methods, construction equipment and temporary construction facilities, furnished by Contractor or its subcontractors in performance of the Work. Should any goods or services provided by Contractor become the subject of a claim of infringement of a patent, copyright or other property right, Contractor shall, at Contractor's option, either procure for

A 046

D/FDC and Owner the right to continue using such goods or services, replace same with equivalent, non-infringing goods or services, or modify the goods or services so that the use thereof becomes non-infringing, provided that any such modification or replacement is of equal quality and provides equal performance to the infringing goods or services. Contractor's obligations under this paragraph shall not apply to any goods, equipment processes, methods, designs or information to the extent that it was subsequently altered, modified or changed by D/FDC/Owner or used or operated by D/FDC/Owner in a manner in intended by this Contract.

29.3 Any claim, demand, cause of action, liability, loss or expense arising from injury to or death of third persons (including employees of D/FDC, Owner, Contractor and Contractor's subcontractors) or from damage to or loss of tangible property (but exclusive of property damage to the extent covered by the proceeds of the Builders All Risk Insurance or other insurance provided by D/FDC and/or Owner) caused by any negligent acts or omissions of Contractor or its subcontractors; provided, however, that Contractor's indemnification obligation for damage to the Facility shall not extend beyond the Performance Acceptance Date or during the Warranty Period, if the Contractor and/or its subcontractors is/are on the site to perform Warranty Work. Contractor's defense and indemnity obligations hereunder include claims and damages arising from non-delegable duties of D/FDC or Owner or arising from use by Contractor of construction equipment, tools, scaffolding or facilities furnished to Contractor by D/FDC or Owner.

29.4 Any claim, demand, cause of action, liability, loss or expense for actual or alleged contamination, pollution, or public or private nuisance, to the extent arising out of any acts or omissions of Contractor, or its subcontractors.

29.5 In the event of joint or concurrent negligence on the part of the D/FDC or any other indemnified party, the liability, and any associated indemnity obligations shall be reduced by the negligence attributable to such indemnified party. Contractor's defense and indemnity obligations shall include the duty to reimburse any reasonable attorneys' fees and expenses incurred by D/FDC or Owner for legal action to enforce Contractor's indemnity obligations, but only to the extent D/FDC or Owner is successful in such actions.

29.6 In the event that the indemnity provisions in this Contract are contrary to the law governing this Contract, then the indemnity obligations applicable hereunder shall be construed to have the same economic effect on the parties.

29.7 With respect to claims against D/FDC or Owner by employees of Contractor or its subcontractors, the indemnity obligations created under this Article 29.0 shall not be limited by the fact of, amount, or type of benefits or compensation payable by or for Contractor, its subcontractors or suppliers under any workers' compensation, disability benefits, or other employee benefits acts or regulations, and Contractor waives, against D/FDC or Owner, any limitation of liability arising from workers' compensation or such other acts of regulations.

29.8 If there is a dispute between the parties regarding Contractor's obligations hereunder, D/FDC shall be entitled to retain from payments otherwise due Contractor such amounts as shall reasonably be considered necessary to satisfy any claims, suits or liens for damages that fall within Contractor's indemnity obligations under this Article 29.0, until such claims suits or liens have been settled and satisfactory evidence to that effect has been furnished to D/FDC.

29.9 Contractor acknowledges specific payment of $10.00 incorporated into the Contract Price as legal consideration for Contractor's indemnity obligations as may be provided in this Contract.

29.10 <u>Notice and Defense</u>: Promptly after receipt by D/FDC of any claim or notice of the commencement of any action, proceeding or investigation as to which the indemnity provided for this Article applies. such indemnified party shall notify Contractor in writing of such fact. Contractor shall assume on behalf of the indemnified party the defense thereof with counsel of the indemnified party's choice or which shall be reasonably acceptable to D/FDC; provided that such indemnified party shall have the right to be represented by independent counsel of its own selection and at its own expense. D/FDC and Owner shall provide reasonable support and assistance to the Contractor in connection with the defense of any claim to which the indemnity herein shall apply.

## 30.0 INSURANCE

30.1 Before any Work is performed under this Contract, Contractor shall, as its sole cost, obtain and maintain in force the following insurance coverages:

30.1.1 Worker's Compensation Insurance, including occupational illness or disease coverage, or other similar social insurance in accordance with the laws of the nation, state, commonwealth, territory or province exercising jurisdiction over the employee and Employer's Liability Insurance with a limit of $1,000,000 per occurrence and in the aggregate.

30.1.2 Comprehensive or Commercial General Liability Insurance, including Contractual Liability, Products and Completed Operations Liability (with the Completed Operations coverage to remain in effect for two (2) years following Performance Acceptance), Explosion, Collapse, and Underground Hazards, Personal Injury Liability (with the standard contractual and employee exclusions eliminated), Elevators and Escalators, Employers Liability, and Broad Form Property Damage Liability coverages with a combined single limit of $1,000,000 per occurrence and in the aggregate. Such insurance shall protect against losses arising out of explosion, collapse or underground hazards. The Policy shall name D/FDC, its affiliates, Owner's Lenders and Owner as additional insureds with respect to liability or losses based upon or arising out of Contractor's Work under this Agreement. Contractor shall evidence that such coverage has been extended to the aforesaid additional insureds through provision of either a specific endorsement to its policy or through a Certificate of Insurance issued by its insurance broker on behalf of its insurance company that states that the additional insureds are additional insureds as required herein.

30.1.3 Automobile Liability Insurance covering use of all owned, non-owned and hired automobiles with a combined single limit of $1,000,000 per occurrence and in the aggregate for bodily injury and property damage liability. This policy shall be endorsed to name D/FDC, its affiliates and Owner and Owner's Lenders as additional insureds with respect to liability based upon or arising out of the activities of Contractor pursuant to this Contract.

30.1.4 Tools and Equipment Insurance covering physical damage to or loss of all major tools and equipment, office furniture and equipment, and vehicles for which Contractor is responsible throughout the course of the Work.

30.1.5 "Umbrella" or Excess Liability Insurance, over the Comprehensive or Commercial General Liability, Automobile Liability and Employer's Liability, with a coverage limit of $14,000,000.

30.2 The foregoing insurance coverages shall be primary and non-contributing with respect to any other insurance or self insurance which may be maintained by D/FDC, Owner, Owner's Lenders, the Electric Utility and Steam Host to which Owner will be furnishing electricity and steam, and the Puerto Rico Aqueduct and Sewer Authority. Contractor's Comprehensive General Liability and Automobile Liability Insurance policies shall contain a Cross Liability and Severability of interest clause. Contractor shall obtain from each of its insurers a waiver of subrogation in favor of D/FDC, its affiliates, Owner, Owner's Lenders, the Electric Utility and Steam Host to which Owner will be furnishing electricity and steam, and the Puerto Rico Aqueduct and Sewer Authority with respect to losses arising out of or in connection with the Work. Contractor shall cause its insurance underwriters to issue Certificates of Insurance satisfactory in form to D/FDC (ACCORD form or equivalent) evidencing that the coverages, coverage extensions, policy endorsements and waivers of subrogation required under this Contract are maintained in force and that not less than 30 days written notice will be given to D/FDC, Owner and Owner's Lenders prior to any material modification or cancellation of the policies.

30.3 Builder's Risk Insurance covering loss or damages to materials and equipment at the Jobsite that are and/or will be incorporated into the completed Facility shall be provided by D/FDC or Owner. Contractor and its subcontractors shall be additional named insured on the Builders Risk Insurance Policy and such policy shall provide a waiver of subrogation in favor of Contractor. Contractor shall be responsible for the payment of the applicable deductible (**but in no event shall said deductible exceed $25,000 per occurrence**) and other uninsured amounts for each loss or damage to such materials or equipment which are in the care, custody and control of Contractor.

30.4 Changes in Contractor's insurance costs or escalations in premiums related to insurance programs and limits agreed to herein shall not be the basis for any increase in the price of the Work unless such change is due to changes in the Work. However, the additional cost for any other insurance required to be put into place by D/FDC or Owner shall be borne by D/FDC or Owner.

30.5 All insurance coverage provided by the Contractor shall be on an occurrence basis unless such coverage is not commercially available, in which event the parties shall agree upon replacement coverage on a claims made basis which provides, to the fullest extent possible, the same coverage as would be provided on an occurrence basis.

**31.0 BONDS**

Deleted

**32.0 CONTRACTUAL RELATIONSHIP**

Contractor represents that it is fully experienced and properly qualified to perform the class of Work provided for herein, and that it is properly equipped, organized and financed to perform such Work. Contractor agrees that it is and at the time of performance of the Work, it will be properly licensed and qualified to do business in all governmental jurisdictions in which it is required for the Work. Upon written request by D/FDC, Contractor shall furnish to it such evidence as D/FDC may require relating to the Contractor's ability to fully perform this Contract. Nothing contained in this Contract or any subcontract awarded by Contractor shall create any contractual relationship between any subcontractor and D/FDC or Owner. Contractor agrees that

A 049

Contractor is an independent contractor and an employer subject to all applicable unemployment compensation, occupational safety and health, or similar statues so as to relieve D/FDC of any responsibility or liability for treating Contractor's employees as employees of D/FDC for the purpose of their safety or of keeping records, making reports or paying of any payroll taxes or contribution; and Contractor agrees to indemnify and hold D/FDC harmless and reimburse it for any expense or liability incurred under said statutes in connection with employees of Contractor, including a sum equal to any unemployment benefits paid to those who were Contractor's employees, where such benefit payments are charged to D/FDC under any merit plan or to D/FDC's reserve account pursuant to any statute. The Contractor further agrees, as regards the items set forth below and for Work under this Contract, that it will keep and have available all necessary records and make all payments, reports, collections and deductions and otherwise do any and all things so as to fully comply with all federal, state and local laws, ordinances and regulations as they affect performance of the Contract, so as to fully relieve and protect D/FDC and Owner from any and all responsibility or liability therefore or in regard thereto: (1) the production, purchase and sale, furnishing and delivering, pricing, and use or consumption of materials, supplies and equipment; (2) the hire, tenure or conditions of employment of employees and their hours of work and rates of the payment of the work, and (3) the keeping of records, making of reports, and the payment, collection and/or deduction of federal, state, commonwealth and local taxes, contributions, pension funds, welfare funds, or similar assessments.

## 33.0 PERMITS AND LICENSES

33.1 Contractor shall only be responsible for obtaining those permits which are required in order for Contractor to perform its scope of Work. D/FDC and or Owner shall obtain all other permits such as Building Permit, Air Permit, Operating Permit, etc.

33.2 Contractor shall be responsible for obtaining, at the time needed, all construction licenses and other permits, and governmental inspections required, as of the date of this Contract, by public authorities for performing the Work and which are not otherwise specified to be obtained by D/FDC or Owner.

33.3 The Work shall meet all applicable requirements of local, state, and Federal public authorities regulating the environment and local, state and Federal public authorities regulating building or construction specifications or design as necessary for the completed Units to qualify for necessary construction, building and operating permits and other licenses and environmental regulatory approvals provided that D/FDC or Owner has advised Contractor of any such requirements. The applicable regulatory requirements which are the basis for such obligation of Contractor are those effective on the date of this Contract. Contractor shall promptly notify D/FDC of any changes made in these requirements after date of this Contract which may impact the Work, and shall provide written recommendations concerning actions to be taken to comply with the revised or new regulations.

## 34.0 INDEPENDENT CONTRACTOR

Nothing in this Contract shall be deemed to represent that Contractor, or any of Contractor's employees or agents, are the agents, representatives or employees of D/FDC or Owner. Contractor shall be an independent contractor and shall have responsibility for and control over the details and means for performing the Work, provided that Contractor is in compliance with

the terms of this Contract. Anything in this Contract which may appear to give D/FDC the right to direct Contractor as to the details of the performance of the Work or to exercise a measure of control over Contractor, shall mean that Contractor shall follow the desires of D/FDC only as to the intended results of the Work.

## 35.0 CONFIDENTIAL INFORMATION

Drawings, specifications, and other information, which is marked as confidential and obtained by Contractor from D/FDC or Owner in connection with the Work shall be held in confidence by Contractor and shall not be used by Contractor for any purpose other that for the performance of Work or as authorized in writing by D/FDC. All such documents furnished by D/FDC or Owner to Contractor shall remain their property. Drawings, specifications and other information which is provided to D/FDC and which is marked as confidential shall be treated as confidential and proprietary and remain the property of Contractor. D/FDC and/or Owner shall have the right to disclose this information to third parties, subject to appropriate and reasonable restrictions of confidentiality, to the extent necessary to construct, maintain and operate the equipment but shall not use this information for the expansion or substantial duplication of the Work.

## 36.0 PUBLICITY

36.1 Contractor shall not make news releases pertaining to the Work or this Contract without first obtaining the written approval of D/FDC.

36.2 The Jobsite shall be maintained free from any and all advertising and Contractor's and its subcontractors', suppliers', and manufacturers' signboards of every kind, except those specifically approved in writing by D/FDC. Contractor and its subcontractors, suppliers, and manufacturers shall place no temporary sign (except as required for safety or by law) on any part of the premises of Owner without the written permission of D/FDC.

36.3 Publications and advertisements concerning the Project shall not be made by or on behalf of Contractor, or its subcontractors, suppliers, manufacturers or agents, unless prior written authorization therefor is obtained from D/FDC.

36.4 Cameras or picture taking, except for purposes of reporting the progress of construction or problem areas which may occur during construction, shall not be allowed on or of the Jobsite or on or of any of Owner's property or facilities, except with written permission of D/FDC.

## 37.0 OWNERSHIP AND USE OF DRAWINGS

37.1 Engineering and related data, calculations, plans, maps, drawings, computer programs and specifications furnished by D/FDC or Owner in connection with the Work (referred to in this Article 37.0 as "D/FDC's Documents") shall remain D/FDC's or Owner's property. Contractor agrees not to use or release to others any such D/FDC's Documents for purposes other than the Work performed hereunder unless prior written consent to the contrary is given by D/FDC. Contractor shall give D/FDC receipts for D/FDC's documents furnished by D/FDC or Owner and shall be responsible for their safekeeping and return to D/FDC or Owner upon request, upon termination or completion of this Contract, or upon termination or completion of the Work to which such D/FDC's documents apply.

A 051

37.2 Contractor shall release D/FDC and Owner from all liability which may arise as a result of the use of D/FDC's Documents, whether by Contractor or third parties to whom Contractor discloses said documents and information, for purposes other than the Work and Units provided under this Contract as set forth above. This Article 37.2 shall apply mutatis mutandi to D/FDC and Owner.

37.3 Any drawings, data or information supplied by Contractor hereunder shall remain the sole and exclusive property of Contractor but may be used by D/FDC and Owner solely for the purpose of evaluation, facilitating and/or completing construction, maintenance, operation and/or repair of the subject Facility and not for any other unrelated purpose.

## 38.0 ASSIGNMENTS

Contractor shall not assign this Contact wholly or in part, voluntarily, by operation of law, or otherwise without first obtaining the written consent of D/FDC. Any assignment of the Contract in violation of the foregoing shall be at the option of D/FDC, void. Subject to the foregoing, the provisions of this Contract shall extend to the benefit of and be binding upon the successors and assigns of the parties hereto. D/FDC reserves the right at its sole option to assign this Contract to Owner, Owner's designated agent, Owner's Lenders, or to D/FDC's affiliates. In the event that Contractor needs to split the Contract to include work in Puerto Rico, Contractor reserves the right to add Combustion Engineering Caribe, Inc. to this Contract.

## 39.0 LAWS AND REGULATIONS

39.1 Both parties shall comply strictly with local, municipal, state, federal and governmental laws, orders, codes and regulations applicable to their operations as they relate to this Contract.

39.2 Contractor shall not, under any circumstances apply to or enter into negotiations with any governmental authority or agency for acceptance of variations from or revisions to safety or health, or air, water or noise pollution laws or regulations relating to this Contract or to the performance thereof, without D/FDC and Owner's prior written approval.

39.3 Neither party shall, under any circumstances, cause or permit their operations as they relate to this Contract, the discharge, emissions or release of any hazardous substance and/or waste, pollutant, contaminant or other substance in violation of any applicable laws, rules or regulations which are now or hereafter promulgated by any governmental authorities having jurisdiction over the Work. Contractor shall comply with all legal regulatory requirements applicable to the Work performed under this Contract and shall be responsible for compliance with all hazardous waste, health and safety, notice, training, and environmental protection laws, rules, regulations and requirements, including, but not limited to, the Resource Conservation and Recovery Act. "Hazardous Waste" includes all substances which are or may be identified as such in 40 C.F.R Part 261 or other applicable laws or regulations. Contractor shall submit material safety data sheets, OSHA Form 20, as required. As an inducement to award of this Contract, Contractor warrants full compliance and that it will adhere to all applicable project hazardous waste procedures and if necessary, obtain or arrange for at its expense all identification numbers, permits, applications and other things required in connection with the activities under this Contract. Contractor agrees that it will not store any hazardous wastes at the jobsite for periods in excess of ninety (90) days or in violation of the applicable site storage limitations imposed by law, the Owner or D/FDC, whichever shall be more restrictive. Contractor further agrees that it

A 052

will not permit any accumulation in excess of the small quantity generator exclusion of 40 C.F.R. Part 261 or other applicable law, as amended. Contractor agrees to take, at its expense all actions necessary to protect third parties, including without limitation, employees and agents of Owner and D/FDC from any exposure to, or hazards of, hazardous and/or toxic wastes or substances generated or utilized in Contractor's operations. Contractor agrees to report to the appropriate governmental agencies all discharges, releases and spills of hazardous substances and/or wastes required to be reported by law and to immediately notify Owner and D/FDC of same.

39.4  This Contract shall be subject to the law and jurisdiction of the State of Delaware, unless expressly designated otherwise within this Contract.

39.5  To the extent, if any, that (a) any changes in Applicable Laws, including their interpretation, or Applicable Permits occur after the date of this Agreement or (b) any Applicable Permits obtained after the date hereof (or any Applicable Permits obtained by Owner on or prior to the date hereof but not disclosed to Contractor), contain terms that Contractor did not and should not have reasonably foreseen as of the date hereof, such changes or unforeseen terms shall be treated as a Scope Change under Section 16 hereof; provided, however, that Contractor shall not be required to comply with any such changes and terms which are impossible to comply with as a practical matter; and provided further, that this Section 39.5 shall not apply to any change in Applicable Permits resulting directly or indirectly from the acts or omissions of Contractor or any Subcontractor that are wrongful or otherwise not in compliance with Contractor's obligations hereunder.

39.6  Contractor shall observe and comply with all aspects of all ordinances, laws, requirements, codes, rules and regulations of all bodies of government and governmental agencies having jurisdiction over any aspect of the Work. If Contractor observes that this Contract is at variance therewith, it shall give D/FDC prompt written notice thereof. Should Contractor become aware of any violations of any laws, ordinances, requirements, codes, rules or regulations, it shall promptly notify D/FDC in writing. Contractor shall give due and adequate notice to D/FDC of all properties of third parties which may be affected by Contractor's Work. If Contractor, or its employees, agents, subcontractors, suppliers or manufacturers of any tier, violates any laws, ordinances, requirements, codes, rules or regulations, Contractor shall defend, indemnify and hold D/FDC and Owner, and their agents, harmless against any fines and penalties incurred by itself or by D/FDC, Owner, their agents, or their other contractors if resulting therefrom. Claims, loss or damages indemnification shall be in accordance with Article 29.0 of Part III of this Contract.

39.7  Contractor shall perform its Work in accordance with applicable laws, rules, regulations, and orders, including but not limited to, those under Federal Occupational Safety and Health Act (Public Law 91-956), relating to the safety of Contractor's employees and shall require each subcontractor to have an appropriate safety program covering the subcontractors employees. Contractor shall defend, indemnify and hold harmless D/FDC and Owner and their agents from and against any fines and penalties resulting from Contractor's or its subcontractor's violation of any such laws, rules, regulations, or orders. Claims, loss or damages indemnification shall be per Article 29.0 of Part III of this Contract.

39.8  Contractor shall comply with the requirements of all Federal and state Worker's Compensation, Unemployment, Wage and Hour, and Social Security Regulations pertaining to the Work involved in this Contract and other special state and municipal licenses and permits required for the Work. It shall file the necessary reports and pay the required taxes thereunder.

A 053

39.9  It shall be the obligation of the Contractor to inform itself of the requirements of the law.

39.10  The Work shall be designed and constructed in compliance with editions of the codes and standards listed in the erection specification Part I Scope of Work which are in effect as of the date of this Contract.  Subsequent changes in standards and codes shall be referred to D/FDC for resolution as to whether a Change Order shall be made to the Work consistent with this Contract.

39.11  Applicable codes and standards referenced in this Contract establish minimum requirements for the Work.  If this Contract is silent concerning applicable codes and standards, the applicable codes and standards shall control; however, applicable codes and standards referenced in this Contract shall be superseded by more stringent requirements of this Contract when and where such requirements occur.  Any other Contractor deviation from the applicable codes and standards referenced in this Contract shall not be permitted except with D/FDC's written approval.

### 40.0 COMMUNICATIONS

40.1  Written communications from Contractor shall be marked with D/FDC's contract number and addresses as set forth in this Contract.

40.2  Unless expressly authorized by D/FDC, in writing, Contractor shall not contact Owner regarding this Contract.

### 41.0 EMERGENCY MEDICAL SERVICES

D/FDC or Owner may furnish emergency medical treatment or related services to Contractor's employees in the case of job connected illness or injury occurring at the jobsite.  In the event that such services are available, all such treatment or services, if any, are furnished on a Good Samaritan basis and not as a contractual obligation.  In consideration of any such treatment or services, Contractor acknowledges, except for gross negligence or willful misconduct, that it assumes full and complete responsibility and liability for all injuries and damages to any of its employees arising out of or allegedly attributable in any way thereto.  Nothing herein contained shall be constructed as imposing any duty upon D/FDC or Owner to provide facilities necessary to furnish emergency medical treatment or related services to Contractor's employees or to make such facilities and/or services available to Contractor's employees.

### 42.0 INVOICING AND PAYMENT

42.1  The Contract Price shall be payable per the milestones (dates) and of the amounts established in (Attachment 13.B of Part II) this Contract.  Invoices shall be paid per the terms of this Contract provided verification has been established that the milestone(s) events tied to that specific payment have been satisfactorily completed.

42.2  Contractor shall submit separate invoices to D/FDC in accordance with Section 7.0, Part II of this Contract.

42.3  Payment shall not be construed to be an acceptance of Work.  D/FDC shall pay the final retainage invoice to Contractor in accordance with the following:

A 054

a)   Within five (5) days after the determination, in accordance with the terms of this an acceptable Letter of Credit to DFDC in the amount of $1,000,000;

b)   Within thirty (30) days after Project Completion, all remaining retainage less the $1,000,000 Letter of Credit shall be paid to Contractor;

c)   Within eighteen (18) months after the occurrence of Performance Acceptance, and provided that Project Completion has occurred, DFDC shall extinguish the Letter of Credit requirement.

**42.4** Additional Work Invoices shall be submitted as separate invoices, to cover additional Work authorized by D/FDC and completed by Contractor, but not added to this Contract by a formal change at the time of invoicing.

**42.5** Contractor shall prepare all invoices in a form satisfactory to and approved by D/FDC. In the event an invoice is submitted, in accordance with Contract terms, for Work accomplished on a reimbursable or unit price/unit rate basis, it shall be accompanied by documentation supporting each element of measurement and/or cost. Any invoice submitted, which fails to comply with the terms of this Contract, including the requirements of form and documentation, may be returned to Contractor. Any costs associated with the resubmission of a proper invoice shall be to Contractor's account.

**42.6** With each milestone payment invoice, Contractor shall furnish partial lien waivers (in substantially the form shown as Attachment 13.E to Part II of this Contract) which partial lien waiver will waive Contractor's lien rights for all work performed through the cutoff date of such invoice. D/FDC may withhold payment of invoices until Contractor furnishes such partial lien waivers. Such partial lien waiver may be conditioned upon receipt of the associated payment. In addition, Contractor shall provide, if requested by the Owner prior to disbursement of funds to D/FDC required to make such scheduled Contractor payment, copies of such partial lien waivers from subcontractors and suppliers with subcontracts or purchase orders with a contract price or purchase order price of $100,000 or more as are necessary to support Contractor's invoice.

## 43.0 TAXES, DUTIES AND FEES

Contract Price does not include any sales tax or duties. Sales tax and duties of any nature shall be the responsibility of D/FDC and/or Owner. Contract shall be inclusive of, all payroll taxes, income taxes, fees and other assessments of whatever nature imposed by governmental authorities and applicable to the performance of the Work and this Contract, provided that such taxes, fees and other assessments were the law and in effect as of the date of this Contract.

Contractor shall administer and pay all sales, use, gross receipts, municipal license, municipal excise, and other similar taxes, fees, duties and contributions imposed upon Contractor by any taxing authority upon the sale, purchase or use of materials, supplies, equipment, services or labor to be incorporated in the Work, as well as taxes on or measured by Contractor's income or gross receipts or taxes measured by wages earned by employees of Contractor or any of its Subcontractors (the "Taxes"), and shall furnish to the appropriate taxing authorities all required information and reports in connection with such Taxes and promptly furnish copies of all such information and reports to D/FDC; provided, that D/FDC shall be responsible, and shall reimburse Contractor outside the Contract Price and without retainage following receipt of appropriate supporting documentation, for all Taxes, other than taxes on or measured by

\ 055

Contractor's net income or taxes measured by wages earned by employees of Contractor or any Subcontractor, paid by Contractor. Contractor shall use reasonable efforts to efficiently manage its provision of the Work hereunder so as to minimize the incurrence of Taxes that are reimbursable by D/FDC hereunder. In addition, DFDC shall, to the extent reasonably possible, obtain or take advantage of tax exemptions, rebates and credits available with respect to the Contract for the benefit of D/FDC and Contractor and (to the extent that applies to Contractor's Work)such tax exemptions, rebates and credits shall be passed along to the Contractor. If and to the extent that the work required of Contractor pursuant to the preceding sentence materially exceeds what Contractor otherwise should have reasonably expected with respect to such matters, D/FDC shall reimburse Contractor outside of the Contract Price and without retainage for all costs reasonably incurred by Contractor in performing such extraordinary work; provided, however, that prior to having performed such extraordinary work Contractor shall have notified D/FDC of the likely costs thereof and D/FDC thereafter shall have directed Contractor to proceed with such work. All subcontracts and purchase orders shall be written exclusive of any sales or use tax, or, if not so written, shall include the amount of such tax as a separate line item on the face of such subcontracts and purchase orders along with adequate support documentation. Contractor will use its reasonable prudence and diligence in the administration of Taxes, and Contractor shall confirm with D/FDC in advance any discretionary action, election or omission permitted in connection with the Taxes.

## 44.0 DOCUMENTATION AND RIGHT OF AUDIT

44.1 Where Contractor's Invoice includes compensation for Work performed at a unit price, Contractor shall submit its determination of units of Work performed, determined in accordance with the provisions of this Contract, and substantiated by documents satisfactory in form an content to D/FDC. Upon verification by D/FDC of said documents, D/FDC will advise Contractor in writing of either acceptance of Contractor's determination of units or of D/FDC's determination of such units. If Contractor believes that D/FDC has incorrectly determined the units of Work performed, Contractor shall comply with the provisions of Article 19.0, CLAIMS.

44.2 Where Contractor's Invoice includes compensation for Work performed for a reimbursable Contract Price, all costs, expenses and other amounts so invoiced shall be substantiated and supported by equipment time slips, paid invoices, time sheets, receipts and other documents satisfactory to and verified by D/FDC.

44.3 Contractor shall maintain for a period of two (2) years after final payment under this Contract, all records and accounts pertaining to Work performed by Contractor under this Contract for a unit price, a reimbursable price, or otherwise authorized in writing by D/FDC for performance on a reimbursable basis. D/FDC and/or Owner shall have the right to have an independent auditor audit, copy and inspect said records and accounts at all reasonable times during the course of such Work and for the above two (2) year period for the purpose of verifying units furnished and/or costs incurred, as applicable.

## 45.0 LIENS

45.1 Contractor shall at all times promptly pay for all services, materials, equipment and labor used or furnished by Contractor in the performance of the Work under this Contract and provided that D/FDC has promptly paid Contractor for Work satisfactorily completed, shall at its expense keep Owner's premises and all property belonging to D/FDC and Owner, or to either of them, free and clear of any and all liens arising out of services, labor, equipment or materials furnished by

A 056

Contractor or its employees, materialmen or subcontractors in the performance of the Work. If Contractor fails to release and discharge any such claim of lien against Owner's premises or the property of D/FDC and Owner, or of either of them, arising out of performance of the Work within twenty (20) working days after receipt of written notice from D/FDC to remove such claim of lien, D/FDC may, at its option, discharge or release the claim of lien or otherwise deal with the lien claimant, and Contractor shall pay D/FDC any and all costs and expenses of D/FDC in so doing, including reasonable attorneys' fees incurred by D/FDC.

45.2 Should any lien or other encumbrance be placed against the Work or property of Owner or D/FDC due to any activity or Work of Contractor's subcontractors suppliers or manufacturers at any tier, Contractor shall immediately provide a bond consistent with the law to cover the lien.

45.3 Until bond is in place covering the lien obligation , D/FDC's obligation to make payments for the amount of the lien to Contractor shall be suspended. During the period of suspension of payments due to the failure of Contractor to place an adequate bond, no interest shall accrue to Contractor's account

45.4 Contractor and D/FDC shall notify each other of any liens of which they become aware.

## 46.0 RIGHT TO OFFSET

D/FDC, without waiver or limitation of any rights or remedies of D/FDC or Owner, shall be entitled from time to time to deduct from any amounts due or owing by D/FDC to Contractor in connection with this Contract, any and all amounts owned by Contractor to D/FDC or Owner is connection with this Contract.

## 47.0 FINAL PAYMENT CERTIFICATION AND RELEASE

D/FDC shall not be obligated to make final payment to Contractor until Contractor has delivered to D/FDC a final release waiver (in substantially the form shown as Attachment 13.F to Part II of this Contract) satisfactory to D/FDC that Contractor has fully performed under this Contract and that all claims of Contractor for the Work are satisfied upon the making of such final payment, that no property of Owner or property used in connection with the Work is subject to any unsatisfied lien of claim as a result of the performance of the Work, that all rights of lien against Owner's property in connection with the Work are released (including without limitation, if D/FDC requests, releases of lien satisfactory in form to D/FDC executed by all persons who by reason of furnishing material, labor or other services to Contractor for the Work or potential lienors against Owner's property), and that Contractor has paid in full all outstanding obligations against the Work.

In addition to the partial lien waivers required under Article 42.6 above, Contractor shall deliver to D/FDC a copy of a final release waiver form for each subcontractor and supplier with subcontracts or purchase orders with a contract price or purchase order price of $100,000 or more prior to the final payment per Article 42.3 above.

## 48.0 ARBITRATION/LITIGATION

48.1 In the event that D/FDC is required to arbitrate a dispute with a third party, which dispute arises out of or is directly related to this contract, Contractor agrees to join in such arbitration

A 057

proceeding as D/FDC may direct and shall submit to such jurisdiction and be finally bound by the judgment rendered in accordance with the arbitration rules as may be established therein.

48.2  If D/FDC is involved in litigation with a third party, which litigation includes issues which relate to Contractor, Contractor hereby agrees, if requested by D/FDC, to provide reasonable technical assistance during such litigation.

## 49.0  VALIDITY OF PROVISIONS

In the event any section, or any part or portion of any section of this Contract shall be held to be invalid, void or otherwise unenforceable, such holding shall not affect the remaining part or portions of that section, or any other section hereof.

## 50.0  WAIVER

Either party's failure to insist on performance of any term, condition, or instruction, or to exercise any right or privilege included in this Contract, or their waiver of any breach, shall not thereafter waive any such term, condition, instruction, and/or any right or privilege.

## 51.0  GRATUITIES

51.1  Contractor, its employees, agents or representatives shall not offer or give to an officer, official or employee of D/FDC or Owner gifts, entertainment, payments, loans or other gratuities to influence the award of a contract or obtain favorable treatment under a contract.

51.2  Violation of this Article may be deemed by D/FDC to be a material breach of this Contract and any other contract with D/FDC and subject all contracts with Contractor to Termination for Default, as well as any other remedies at law or in equity.

## 52.0  LIMITATION OF LIABILITY

In no event shall Contractor's liability for any matter relating to this Contract, including, without limitation, warranties, breach of contract, tort [including negligence] and lawsuits, but excluding any patent indemnity or third party liability under Article 29 of this Part III, exceed either individually or in the aggregate an amount equal to the Contract Price. In no event shall D/FDC or Contractor be liable for incidental, special or consequential damages of any kind, including, without limitation, loss of revenue, loss of profits, loss of use of the facility or damages associated therewith. The foregoing notwithstanding, in no event shall Contractor's liability for Liquidated Damages exceed, in the aggregate, an amount equal to thirty percent (30%) of the Contract Price. Where a remedy is specified in the Contract for an occurrence, such remedy shall be an exclusive remedy for such occurrence; where no remedy is specified in the Contract for an occurrence, the remedy at law shall apply subject to the provision of this Article 52. Furthermore, it is specifically understood and agreed that the payment of any liquidated damages provided for in the Contract shall constitute Contractor's sole obligation and D/FDC's and/or Owner's sole and exclusive remedies for Contractor's failure to meet the Contract schedule and/or Performance Guarantees. All releases, waivers or limitations of liability specifically expressed in this Contract apply equally to Contractor's subcontractors, suppliers and vendors of any tier. All releases, waivers or limitations of liability specifically expressed in this Contract apply

A 058

notwithstanding the negligence, strict liability, fault, or breach of warranty or contract of the party whose liability is so released or limited.

## 53.0 CONTRACTOR'S WORK AREA

All Contractor's work areas on the jobsite will be assigned by D/FDC and/or Owner, which areas shall be reasonably satisfactory to the Contractor and which shall have reasonably free and unhindered access thereto by the Contractor. Contractor shall confine its operations to the areas so assigned.

## 54.0 FUEL AND LIMESTONE

D/FDC and/or Owner shall provide at its cost the fuels and limestone specified in the technical specifications of this Contract which are to be delivered to the project in a reasonable and specified quantity in order to enable Contractor to perform start-up performance testing and operation of the project in accordance with the terms of this Contract, provided that Contractor shall have given D/FDC and/or Owner at least 30 days' prior written notice of the need for such fuels.

## 55.0 UTILITIES

D/FDC and/or Owner shall furnish all utilities, including electricity, water, sewage and waste disposal services, chemicals and consumables, which are required for construction, start-up, performance testing and operation of the Facility (or any portion thereof). D/FDC and/or Owner shall pay for all electricity consumed during start-up through Final Completion.

## 56.0 HAZARDOUS MATERIAL INDEMNITY

D/FDC shall defend, indemnify and save harmless the Contractor, its affiliates, subcontractors, consultants, agents and employees, from and against all claims, lawsuits, damages, losses, and expenses (including, but not limited to, reasonable attorneys' fees, court and arbitration costs) arising out of or resulting from the presence, discharge, escape or release of any hazardous or toxic waste or substance, other than as a result of the acts or omissions of Contractor, its subcontractors, agents, consultants or employees.

Contractor shall defend, indemnify and save harmless D/FDC, its affiliates, subcontractors, consultants, agents and employees, from and against all claims, lawsuits, damages, losses, and expenses (including, but not limited to, reasonable attorneys' fees, court and arbitration costs) arising out of or resulting from the presence, discharge, escape or release of any hazardous or toxic waste or substance, other than as a result of the acts or omissions of D/FDC, its subcontractors, agents, consultants or employees.

## 57.0 ADJOINING UTILITIES

Contractor shall do all things reasonably necessary or expedient to protect any and all parallel, converging and intersecting electric lines and poles, telephone lines and poles, highways, waterways, railroads, sewer lines, natural gas pipelines, drainage ditches, culverts and any and all property of others from damage as a result of its performance of the Work hereunder. To the extent that any such property is damaged or destroyed in the course of the performance of the

A 059

Work hereunder, Contractor shall at its own expense rebuild, restore or replace such damaged or destroyed property as Owner in its reasonable discretion may direct be so rebuilt, restored or replaced (subject to the limitations of Article 30.7), unless such property damage is the result of subsurface conditions which were not and should not have been reasonably foreseen by Contractor, exercising the standard or care required hereunder, prior to the occurrence of such damage or destruction. Notwithstanding the foregoing sentence, Contractor shall not be required by this Article 59.0 to rebuild, restore or replace such damaged or destroyed property if and to the extent that any contract entered into between Contractor and the Person whose property was damaged or destroyed by Contractor specifically provides that Contractor is not liable for such damage or destruction.

## 58.0 SUBORDINATED DEBT FINANCING

Contractor shall arrange for one or more of its affiliates to commit to provide subordinated debt financing for the Facility in an aggregate principal amount of $3,850,000 (the "Subordinated Debt Commitment Amount"), by causing such affiliates as lenders on or before the later of (a) the closing of initial construction financing for the Facility and (b) the 30th day following the date on which Contractor receives notice of such scheduled closing to execute and deliver an agreement in substantially the form as Appendix J of the EPC Contract, setting forth the rights and obligations of the Owner as borrower and such affiliate(s) as lenders with respect to the Subordinated Debt Commitment Amount (the Subordinated Debt Agreement") ,provided, however this obligation is subject to be reviewed and approved by ABBCE, and if such review and approval is not provided within six (6) weeks from the date of this Contract or such longer period as DFDC and Contractor may mutually agree, then this Contract is subject to termination or renegotiation at the sole discretion of DFDC; and provided further that , if DFDC or its affiliate(s) are not required to provide a subordinated debt commitment to the Owner under and pursuant to the EPC Contract by the later of the events delineated under subclauses (a) and (b) above, then this Article 58.0 and any Subordinated Debt Agreement shall be null and void, of no further force and effect, and fully and finally terminated without any surviving obligation..

## 60.0 HARBOR RIGHTS

Contractor acknowledges that D/FDC or Owner shall not be under any obligation to provide Contractor with rights of access to and use of Las Mareas Harbor in connection with Contractor's performance of the Work hereunder. Contractor further acknowledges that the Owner has negotiated with Phillips Puerto Rico Core, Inc. ("Phillips") a harbor coordination agreement that provides Phillips with certain rights to coordinate access to and use of Las Mareas Harbor by Owner and its Contractors, and provides Phillips with certain priorities with respect to such access and use. Contractor agrees that if it seeks to use Las Mareas Harbor then (i) such use shall be subject to, and Contractor shall comply with, the terms of the harbor agreement, and (ii) any costs imposed on Owner under the harbor coordination agreement or otherwise as a result of such use shall be for Contractor's account. D/FDC and Contractor shall use all reasonable efforts to agree on the coordination and cooperation of Harbor Usage during the period beginning five (5) months after the NTP and ending twenty-one (21) months after the NTP.

## 61.0 RESULTANT PHYSICAL DAMAGE

Contractor, through and up to the end of the Warranty Period, shall also be responsible for all resultant physical damages which are suffered or incurred by D/FDC as a result of Contractor's

A 060

failure to (a) comply with Contractor's warranties, or (b) fully and properly perform all of its obligations under or otherwise fully comply with this Contract.

## 62.0 GUARANTY

Contractor and D/FDC agree that guarantees may be necessary and required from corporate entities reasonably acceptable to each party to secure performance of each party's obligations described in this contract. Therefore, if either party requests financial guarantees for the obligations described herein, such requested party shall provide a guarantee in form and substance satisfactory to the requesting party within 30 days of such request. If either party fails to provide such guarantee, either party may terminate this contract and neither party shall have any further obligation or liability the other.

A 061

LEXSEE 871 A.2D 428

**AEROGLOBAL CAPITAL MANAGEMENT, LLC., Plaintiff Below, Appellant, v. CIRRUS INDUSTRIES, INC., CIRRUS HOLDING COMPANY LIMITED, and CRESCENT CAPITAL INVESTMENTS, INC., Defendants Below, Appellees.**

No. 101/266, 2004

SUPREME COURT OF DELAWARE

*871 A.2d 428; 2005 Del. LEXIS 133*

**January 12, 2005, Submitted
March 23, 2005, Decided**

**PRIOR HISTORY:** [**1] Court Below: Superior Court of the State of Delaware, in and for New Castle County. C.A. No. 01C-08-089. *Cirrus Holding Co. v. Cirrus Indus., 794 A.2d 1191, 2001 Del. Ch. LEXIS 92 (Del. Ch., 2001)*
*Aeroglobal Capital Mgmt., LLC v. Cirrus Indus., 2004 Del. Super. LEXIS 36 (Del. Super. Ct., Jan. 29, 2004)*
*Aeroglobal Capital Mgmt., L.L.C. v. First Islamic Inv. Bank, E.C., 2004 Del. Super. LEXIS 423 (Del. Super. Ct., May 25, 2004)*

**DISPOSITION:** AFFIRMED IN PART and REVERSED IN PART AND REMANDED.

**COUNSEL:** Rick S. Miller, Esquire, of Ferry, Joseph & Pearce, P.A., Wilmington, Delaware, Timothy C. Russell (argued) and Michael C. Wagner, Esquires, of Spector, Gadon & Rosen, Philadelphia, Pennsylvania; for Appellant.

Jessica Zeldin, Esquire, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Peter W. Carter, Esquire, (argued) of Dorsey & Whitney, LLP, Minneapolis, MN, John P. Brumbaugh (argued) and Michael R. Smith, Esquires, of King & Spalding, Atlanta, GA; for Appellees.

**JUDGES:** Before HOLLAND, BERGER and RIDGELY, Justices.

**OPINION BY:** RIDGELY

**OPINION:** [*431] RIDGELY, Justice:

This case arises out of competing efforts of AeroGlobal Capital Management, LLC ("AeroGlobal") and First Islamic Investment Bank, E.C. ("FIIB"),

through its agents Cirrus Holding Company Limited ("CHCL") and Crescent Capital Investments, Inc. ("Crescent"), to make substantial investments in Cirrus Industries, Inc. ("Cirrus"). [**2] AeroGlobal is the plaintiff below-appellant and cross appellee. Cirrus, CHCL and Crescent are the defendants below-appellees. FIIB is the defendant below-appellee and cross appellant.

In this opinion, we will begin by addressing FIIB's cross appeal contesting the Superior Court's jurisdiction over it. On cross appeal, FIIB argues that the Superior Court erred, as a matter of law, by denying its motion to dismiss for lack of personal jurisdiction because its activities did not bring it within the ambit of the Delaware Long Arm Statute. n1 FIIB also argues that the exercise of jurisdiction over it violates the *Due Process Clause of the Fourteenth Amendment of the United States Constitution.* We conclude that the Superior Court correctly applied Delaware's Long Arm Statute and we find no violation of the *Due Process Clause.* Accordingly, we affirm the Superior Court's decision denying FIIB's motion to dismiss for lack of personal jurisdiction.

n1 *DEL. CODE ANN. tit. 10, § 3104 (c)* (2005).

We next will address AeroGlobal's [**3] appeal of the Superior Court's grant of summary judgment in favor of the defendants. The complaint sought compensatory and punitive damages and alleged that defendants were liable for breach of contract of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual obligations and civil conspiracy. We conclude that the Superior Court erred, as a matter of law, in granting the defendants' motion for summary judgment because a genuine issue of material fact exists as to whether the defendants waived certain