contractual rights which were the basis for the grant of summary judgement. Accordingly, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

### A. The Parties

Cirrus is a privately held Delaware corporation headquartered in Duluth, Minnesota. The company is one of the world's largest manufactures of single-engine piston general aviation aircrafts. Cirrus was founded in 1984 by two brothers, Alan and Dale Klapmeier. Cirrus's Board consisted of ten members: Alan Klapmeier (President, CEO and Chairman of the Board), Dale Klapmeier (Chief [**4] Operating Officer), Larry Klapmeier (father of Alan and Dale Klapmeier), Marwan Atalla, James Brown, [*432] Dr. Dennis Elbert, Alice Hitchcock, Bill Midon, James Taylor, and William Woods.

CHCL is a Cayman Islands company formed for the express purpose of facilitating an investment in Cirrus by FIIB, an international investment bank based in Bahrain. FIIB has been represented throughout this transaction by Crescent, an United States subsidiary of FIIB that serves as an advisor to FIIB on certain private equity investments located in the United States.

AeroGlobal is a Delaware limited liability company created to facilitate an investment in Cirrus. The members of AeroGlobal are Graig Millard, GH Ventures LLC ("GH Ventures") and Boundary Waters Holding LLC ("Boundary Waters"). GH Ventures is a New York-based boutique merchant banking firm, whose principals are Christopher Moe and Ralph Isham. Boundary Waters is a vehicle through which Keith Fitzgerald does business with AeroGlobal.

### B. Cirrus's Financial Condition

Although Cirrus was a leader in its industry, n2 the company was experiencing cash flow difficulties. Cirrus's financial problems arose from its inability to meet the demand [**5] for its aircraft and to cover expenses, much of which are attributed to the significant cost of manufacturing FAA Type certified aircraft. Because of the capital-intensive nature of the industry, Cirrus was constantly engaged in fund raising activities. From approximately 1997 through 2001, Cirrus engaged several placement agents to raise capital and introduce Cirrus to potential investors. Much of Cirrus's early fund raising activities, however, proved unsuccessful. In the early parts of 2001, Cirrus continued experiencing financial difficulties and had already suffered a multi-million dollar loss for that year.

n2 Cirrus's leadership position is evidenced by the fact that its two aircraft offerings, the SR20 and SR22, are two of only three U.S. produced single-engine piston aircraft in their class to receive a Federal Aviation Authority ("FAA") Type Certificate in the last fifteen years, and are the only new U.S. produced aircraft in their class to receive a FAA Production Certificate in the last twenty-five years.

[**6]

### C. The Cirrus-Crescent Relationship

Early in 2001, Cirrus came to the attention of John Dyslin, a Crescent representative. Dyslin, interested in making an investment in Cirrus, visited Cirrus's corporate headquarters. After visiting Cirrus's operations, Dyslin concluded that Cirrus was a potential investment opportunity for FIIB. As a result, in March 2001, Dyslin began negotiating with Alan Klapmeier for a potential investment in Cirrus.

Cirrus, however, continued its search for capital notwithstanding its negotiations with Crescent. On April 19, 2001, Fitzgerald, a member of AeroGlobal via his membership in Boundary Waters, approached Millard about AeroGlobal possibly investing in Cirrus. Millard, in turn, extended a bridge loan to Cirrus on April 20, 2001, in the amount of $ 500,000, convertible into common stock. Millard also expressed an interest in making a larger investment in Cirrus.

### D. Crescent's Letter of Intent

On April 24, 2001, Cirrus and CHCL, on behalf of Crescent, executed a non-binding letter of intent (the "CHCL LOI") memorializing the negotiations between the two companies. CHCL agreed to invest $ 77.5 million in cash into Cirrus in exchange [**7] for 61% of Cirrus's outstanding shares on a fully diluted basis (i.e., $ 68.9 million directly to Cirrus for 54.2% of the outstanding shares and $ 8.6 million to Cirrus's shareholders for an additional 6.8%). If the [*433] parties did not reach an agreement by May 21, 2001, the CHCL LOI was terminable by either party. The CHCL LOI also contained both confidentiality provisions and prohibitions against Cirrus engaging in the solicitation, discussion or negotiation of competing proposals.

### E. AeroGlobal's Interest in Cirrus

On the following two days, AeroGlobal continued to pursue its interest in Cirrus. On April 25, 2001, Cirrus's Chief Financial Officer, Peter McDermott, spoke over the telephone with Fitzgerald about the terms of the CHCL LOI. Fitzgerald later received a copy of the CHCL LOI from Hitchcock, a Cirrus Board member and

A 063

close friend of Fitzgerald. On April 26, 2001, both Millard and Fitzgerald visited Cirrus's headquarters and spoke with Cirrus Board members. During their visit, Millard and Fitzgerald also discussed the CHCL LOI with Cirrus's outside counsel, Jeff Henson. Shortly after visiting Cirrus's headquarters, AeroGlobal started a more aggressive campaign to [**8] structure a deal with Cirrus.

At the same time Cirrus was entertaining a possible investment by AeroGlobal, Crescent was moving forward with due diligence. During this period of time, Crescent extended a $ 4 million loan to Cirrus to satisfy its needs for operating capital, as well as sending a team of consultants to Cirrus to help with Cirrus's production efficiency problems.

**F. Crescent and Cirrus's Negotiations of the Stock Purchase Agreement**

Negotiations between Crescent and Cirrus proceeded throughout May 2001 on the stock purchase agreement (the "CHCL SPA"). At some point during these negotiations, the terms of the CHCL LOI were restructured so that CHCL would invest $ 77.5 million in cash into Cirrus in exchange for 61% of Cirrus's outstanding common stock on a fully converted and diluted basis. n3 Cirrus would then declare a $ 15 million dividend, payable to common stockholders except CHCL, making the effective purchase price $ 3.72 per share ($ 2.79 per share for cash contribution plus a per share dividend of $ 0.93).

n3 This restructuring resulted from the fact that certain Cirrus shareholders, who initially expressed interest in selling their shares, were no longer willing to do so.

[**9]

**G. AeroGlobal's Continued Efforts to Invest in Cirrus**

Throughout May 2001, AeroGlobal continued to pursue a possible deal with Cirrus. On May 16, 2001, AeroGlobal faxed a proposal to Alan Klapmeier, indicating that it would invest up to $ 45 million for shares of Cirrus common stock at a price of $ 4.25 per share in a non-change of control transaction.

Alan Klapmeier, in turn, informed Dyslin about AeroGlobal's recent proposal and provided him a copy of it. Dyslin and Crescent expressed concern that Cirrus was not honoring the confidentiality/no-shop provisions of the CHCL LOI, but the record indicates that they both did little to enforce those terms. Alan Klapmeier also

expressed his concerns to Dyslin and other Crescent representatives that unless the AeroGlobal proposal was explored, Cirrus's Board might not unanimously approve the deal with Crescent, and Cirrus's shareholder might not approve the Crescent deal. However, both parties agreed that once the CHCL SPA was executed, Cirrus would have the opportunity to investigate further the AeroGlobal proposal.

**H. Execution of the CHCL SPA and Side Letter**

The Cirrus Board met to consider the terms of the CHCL [**10] SPA on June 6, 2001 and June 7, 2001. On June 7, 2001, the Cirrus Board approved the transaction, [*434] and CHCL SPA was executed notwithstanding AeroGlobal's proposed investment. The CHCL SPA encompassed the terms of the restructured CHCL LOI. The CHCL SPA also required the Cirrus Board to perform certain tasks: (1) cause a special meeting of the shareholders to convene on or before June 26, 2001; (2) recommend approval of the Crescent transaction to the shareholders; (3) prepare proxy materials soliciting approval of the Crescent transaction; and (4) provide the required notice of the meeting to the shareholders.

The CHCL SPA included a "no-shop" and "no-talk" provision. The "no-shop" and "no-talk" provision contained in Section 7.3.1 required that neither Cirrus nor any party working on behalf of Cirrus shall:

(a) solicit, initiate or encourage the submission of any Acquisition Proposal [which is broadly defined in the CHCL SPA] or (b) initiate or participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or take any other action to encourage or facilitate any inquiries or the making of any proposal that constitutes, [**11] or could be expected to lead to, any Acquisition Proposal.

Section 7.3.1 goes on to provide for a narrowly tailored exception to the "no-talk" provision found in subsection (b) quoted above. It reads as follows:

Notwithstanding anything to the contrary contained in this Section 7.3 or in any other provision of this Agreement, the Cirrus Board, in response to a Superior Proposal (as defined in Section 7.3.2) which did not result from a breach of this Section 7.3.1, at any time prior to the date ten (10) days after the date hereof (the "Open Window"), may (x) participate in

discussions or negotiations with or furnish information to any Person (other than a Cirrus Related Person) (a "Potential Acquiror") which makes a Superior Proposal that is submitted to Cirrus by such Potential Acquiror after the date hereof and (y) approve or recommend such Superior Proposal to the Cirrus Stockholders if, prior to any such action, the Cirrus Board determines in good faith, after consultation with Cirrus' outside financial and legal advisors, that to do otherwise would violate the fiduciary duties of the Cirrus Board and not be in the best interests of the Cirrus Stockholders.

Under [**12] section 7.3.2, the term "Superior Proposal" is defined as "any bona fide Acquisition Proposal which is reasonably likely to result in terms and consideration which are, viewed in the aggregate, more favorable to Cirrus and the Cirrus shareholders than [Crescent's proposal], considering all relevant factors...." Under Section 7.3.1, Cirrus also was to notify Crescent if it received any Acquisition Proposal (or any inquiry which could lead to one) and of any Board meeting to consider an Acquisition Proposal.

To address Cirrus's need to explore AeroGlobal's proposal, the parties also entered into a Side Letter on June 7, 2001. The Side Letter provided that Cirrus and its Board were entitled "to communicate with [AeroGlobal] regarding its proposal dated May 16, 2001 ... through June 14, 2001 without such communication being deemed to be a violation of Section 7.3 of the [CHCL SPA]." The Cirrus parties, however, uniformly believed that there was a ten-day Open Window for them to explore the AeroGlobal proposal. It was their understanding that the Open Window would run through June 17, 2001.

**I. Cirrus and AeroGlobal's Negotiations**

During the Open Window period, Cirrus [**13] began to negotiate with AeroGlobal regarding [*435] its proposed investment. On June 14, 2001, Aeroglobal submitted a written proposal to Cirrus. The draft proposal was essentially the same as the final transaction ultimately entered into by Aeroglobal and Cirrus. The draft proposal called for a two-stage investment by AeroGlobal. First, AeroGlobal was to provide an immediate bridge loan to Cirrus in the amount of $ 15 million, for which warrants convertible to stock would be issued to Aeroglobal at a price no lower than $ 4.25 per share and no higher than $ 6.00 per share. Second, upon negotiations and approval of a definite stock purchase agree-

ment, AeroGlobal would provide an additional $ 30 million, and Cirrus would arrange to convert into equity $ 10 million in outstanding debt. This transaction would not involve a change of control, as AeroGlobal would only acquire a 38% interest in the Cirrus equity.

On June 14, 2001 at 11:59 p.m., the time when the Side Letter was scheduled to expire, AeroGlobal and Cirrus had not yet reached an agreement after a heated breakdown in negotiations. Aeroglobal and Cirrus nonetheless resumed negotiations on June 15, 2001 and executed the AeroGlobal Letter [**14] of Intent (the "AeroGlobal LOI"), which was forwarded to the Cirrus Board. Alan Klapmeier wrote to Dyslin to give notice that Cirrus had received an Acquisition Proposal and that the Cirrus Board would meet to consider it on the following day. After "sleeping on" the AeroGlobal LOI for a night, the Cirrus Board, on June 17, 2001, determined that the AeroGlobal proposal was a "Superior Proposal" within the meaning of the CHCL SPA. Thereafter, the Cirrus Board passed three resolutions: (1) the AeroGlobal LOI was conditionally approved; (2) the CHCL SPA was terminated; and (3) the Cirrus Board withdrew its recommendation to the shareholders that the transaction with Crescent should be accepted.

Before implementing these decisions, the Cirrus Board sent Alan Klapmeier to ask Dyslin for a one-day extension of the Open Window to allow them to engage in further negotiations with Crescent over their deal. After Cirrus received word that the Open Window would not be extended, Alan Klapmeier executed the deal with AeroGlobal. Upon receiving the first $ 12 million (of the $ 15 million bridge loan ) from AeroGlobal, Cirrus notified Crescent that it was terminating the CHCL SPA pursuant to Section [**15] 11.1.7. n4 Cirrus then wired Crescent $ 4 million of that amount to repay a loan that Crescent had extended. It also purported to tender payment of the $ 5 million termination fee required under the CHCL SPA. Crescent accepted the $ 4 million loan repayment but refused to accept the $ 5 million termination fee.

n4 Section 11.1.7 of the CHCL SPA provides for termination of the CHCL SPA by Cirrus provided that Cirrus tenders payment to CHCL for terminating the agreement if Cirrus consummates an Alternative Transaction.

**J. Crescent's Court of Chancery Action**

On June 27, 2001, in response to the Cirrus Board approving the Aeroglobal LOI and terminating the

CHCL SPA. CHCL filed a verified complaint in the Court of Chancery seeking, among other things, injunctive relief. CHCL then filed a motion for a preliminary injunction seeking to enjoin Cirrus and AeroGlobal from taking further steps to complete the AeroGlobal LOI, including the mailing of proxy materials and holding a special meeting of the shareholders. [**16] CHCL also filed a motion for a temporary restraining order, which was eventually withdrawn.

**K. The Parties' Conduct in the Interim of the Court of Chancery Action**

By the time the Court of Chancery action was filed, AeroGlobal had provided [*436] Cirrus with $ 12 million of the $ 15 million bridge financing. Aeroglobal decided to defer the remaining $ 3 million bridge loan payment until after the uncertainties caused by the Court of Chancery action had been resolved.

In the early parts of July 2001, AeroGlobal also proposed an amendment of the AeroGlobal LOI to Cirrus, in which AeroGlobal's second stage investment of $ 30 million would be deferred until after the Court of Chancery issued a decision in favor of Cirrus and expiration of the time to appeal any such decision. The proposal would also allow AeroGlobal to place the remaining $ 3 million of the bridge loan into an escrow account, pending resolution of the lawsuit in the Court of Chancery. Cirrus rejected both proposals. However, on July 10, 2001, Cirrus agreed to and did amend the AeroGlobal LOI for the sole purpose of including an extension of the closing deadline for the $ 30 million investment from August 2, 2001 to [**17] August 10, 2001.

At the same time it was having difficulties with the AeroGlobal loans, Cirrus began to consider other financing options. Nevertheless, Alan Klapmeier explicitly acknowledged that despite AeroGlobal's deferral of the remaining $ 3 million bridge loan payment, the exclusive negotiations provision contained in the AeroGlobal LOI remained in full force and prohibited Cirrus from discussing other financing options. On July 13, 2001, CHCL offered to dismiss the Chancery Court litigation against Cirrus in exchange for payment of $ 10 million. Cirrus rejected the offer but did begin to discuss the possibility of reviving the initial CHCL SPA.

**L. The Court of Chancery's Decision**

On July 19, 2001, the Court of Chancery denied CHCL's motion for injunctive relief. Of particular significance in this appeal is a statement in the Court of Chancery's opinion that "the $ 3 million shortfall is due entirely to the pendency of this [preliminary injunction] motion and a resultant understanding between Cirrus and

AeroGlobal that the completion of the funding [of the bridge loan] should be delayed pending its outcome." n5

n5 *Cirrus Holding Company Ltd. v. Cirrus Indus., Inc.,* 794 A.2d 1191, 1203 n.18 (Del. Ch. 2001).

[**18]

**M. Cirrus and Crescent's New Stock Purchase Agreement**

Shortly after the Court of Chancery's decision, on July 30, 2001, the Cirrus Board voted unanimously to withdraw approval of the AeroGlobal LOI and instead approved a second stock purchase agreement with Crescent (the "Second CHCL SPA"). This agreement provided for an immediate infusion of $ 15 million in cash. That action was formally passed by the Cirrus Board on August 7, 2001.

**N. AeroGlobal's Superior Court Action**

On August 9, 2001, one day before the AeroGlobal LOI was to expire, AeroGlobal filed the instant action in the Superior Court against the defendants asserting four causes of action, including breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual obligations and civil conspiracy. Aeroglobal subsequently filed a related action in the Superior Court, making substantially the same allegations against FIIB as it had made against the defendants in the instant action. n6 Upon the close of discovery, the defendants moved for summary judgment.

n6 *See AeroGlobal Capital Management, LLC v. First Islamic Investment Bank, E.C.,* 2004 Del. Super. LEXIS 423, C.A. No. 01C-11-127 (Del. Super.).

[**19]

[*437] At oral argument on the motion for summary judgment, counsel for AeroGlobal informed the Superior Court that AeroGlobal had received advance information concerning the Cirrus Board adopting the Second CHCL SPA prior to the Cirrus Board terminating the Aeroglobal LOI AeroGlobal's counsel suggests that this information was the basis for the institution of the instant action. In any event, Cirrus did not formally notify AeroGlobal that it was terminating the AeroGlobal LOI until August 13, 2001, the same day on which Cirrus received payment of the $ 15 million cash infusion from Crescent under the Second CHCL SPA. At that

point, Cirrus repaid the $ 12 million obtained from the bridge loan, along with interest on the principal and attorneys' fees, to AeroGlobal.

The Superior Court granted summary judgement in favor of the defendants after it concluded that Cirrus did not breach its contractual obligations or its duty of good faith and fair dealing. Instead, the Superior Court found that it was AeroGlobal that failed to fulfill its contractual obligations by not immediately funding the entire $ 15 million bridge loan. The Superior Court also held, in the alternative, that the same result [**20] was required because AeroGlobal repudiated its deal with Cirrus prior to the consummation of the deal. The Superior Court further held that there was no predicate for AeroGlobal's tortious interference and civil conspiracy claims. It reasoned that the claims of tortious interference with contractual relations n7 and civil conspiracy n8 require the existence of a contractual and/or business relationship which was terminated or interrupted by wrongful conduct by one of the parties involved or a third party acting either separately or in concert. Because the Superior Court found no wrongdoing on the part of the defendants, it determined that there was no valid claim for tortious interference or civil conspiracy against the defendants.

n7 The elements of tortious interference under Delaware law are well established. "There must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." See Aspen Advisors LLC v. UA Theatre Co., 861 A.2d 1251, 1265-66 (Del. 2002) (quoting Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987)).

[**21]

n8 The elements for civil conspiracy under Delaware law are: (1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage. See Nicolet, Inc. v. Nutt, 525 A.2d 146, 149 (Del. 1987).

## II. Personal Jurisdiction over FIIB

From the outset of the Superior Court action, FIIB has contested whether it was subject to personal jurisdiction in Delaware. The Superior Court denied FIIB's motion to dismiss for lack of personal jurisdiction, finding that FIIB had availed itself to the laws of this State and

was therefore subject to being sued in Delaware. FIIB has cross-appealed this ruling. It maintains that neither the Delaware Long Arm Statute nor the Due Process Clause of the Fourteenth Amendment support the exercise of personal jurisdiction in this case.

We review a trial court's denial of a motion to dismiss for lack of personal jurisdiction under a de novo standard of review. n9 A plaintiff bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defendant. [**22] n10 [*438] In determining whether a plaintiff satisfies this burden, Delaware courts will apply a two-prong analysis to the issue of personal jurisdiction over a nonresident. n11 The court must first consider whether Delaware's Long Arm Statute is applicable, and next evaluate whether subjecting the nonresident to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment (the so-called "minimum contacts" requirement). n12

n9 Alston v. Hudson, Jones, Jaywork, Williams and Liguori, 748 A.2d 406, 2000 Del. LEXIS 120, at *2.

n10 Jacobson v. Ronsdorf, 2005 Del. Ch. LEXIS 2, *9-*10.

n11 LaNuova D & B, Sp A v. Bowe Co., Inc., 513 A.2d 764, 769 (Del. 1986).

n12 Id. (citing Waters v. Deutz Corp., 479 A.2d 273 (Del. 1984)).

### A. Applicability of Delaware's Long Arm Statute

In finding that FIIB was subject to personal jurisdiction in this State, the Superior Court relied on 10 Del. C. § 3104(c)(1). This [**23] subsection provides:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State ... n13

The Superior Court reasoned that FIIB transacted business in Delaware when, through its agents, CHCL and Crescent, it entered into the two separate stock purchase agreements with Cirrus. These acts ultimately re-

sulted in Cirrus accepting the Second CHCL SPA and terminating the AeroGlobal LOI, which is this basis of the entire lawsuit.

> n13 DEL. CODE ANN. tit. 10, § 3104(c)(1) (2005) (emphasis added).

The facts relevant to establish the Superior Court's jurisdiction over FHB are clear. There is no dispute that CHCL and Crescent were agents of FHB. Crescent, FHB's Delaware subsidiary, existed for the sole purpose of securing attractive investment opportunities [**24] in the United States on behalf of FHB. CHCL was formed for the express purpose of facilitating an investment by FHB in Cirrus. FHB, through its agents, entered into a stock purchase agreement with Cirrus, a privately held Delaware corporation, to purchase a substantial amount of Cirrus's capital stock. The offers made by Crescent to purchase Cirrus's capital stock, the last of which led to the instant action, were made on behalf of FHB and involved FHB funds. n14 Furthermore, the parties expressly agreed that Delaware law governed their agreement. n15 FHB, through its agents, was also required to approve and adopt and then cause Cirrus to adopt new bylaws n16 and a certificate of incorporation n17 pursuant to Delaware law.

> n14 A letter from Crescent to Cirrus's Board, dated June 20, 2001, establishes that the offers made by Crescent were on behalf of FHB and with FHB's explicit authorization and direction.

> n15 Section 13.8 of the Second CHCL SPA states that "this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without reference to Delaware choice of law rules." [**25]

> n16 Section 3.2 of the Second CHCL SPA states that CHCL "shall approve and adopt, and shall cause Cirrus to, adopt, the bylaws in the form attached hereto as Exhibit 3.2 (the 'Post-transaction Cirrus Bylaws'), which shall be the bylaws of Cirrus until thereafter changed or amended."

> n17 Section 3.1 of the Second CHCL SPA states:

> [CHCL] shall approve and adopt, and cause Cirrus to, file with the Secretary of State of the State of Delaware, the certificate of incorporation in the form attached hereto as Exhibit 3.1 (the "Post-Transaction Cirrus Certificate of Incorporation"), which shall be the certificate of incorporation until thereafter amended in accordance with *Delaware General Corporation Law.*

[*439] FHB argues that these facts are insufficient to constitute transacting business in Delaware. FHB relies on *Greenly v. Davis,* n18 for the position that its mere negotiations to purchase stock in Cirrus through its agents did not amount to a transaction of business in Delaware, especially where the negotiation and consummation of the transaction did not take place [**26] in Delaware. In *Greenly,* this Court found that the trial court correctly concluded that a Pennsylvania resident who allegedly breached a contract to sell a Delaware corporation was not subject to *in personam* jurisdiction in this State. n19 The plaintiff in *Greenly* was interested in purchasing two companies from the defendants who contracted for the sale. n20 In *Greenly,* the defendants were not Delaware residents. n21 The *Greenly* defendants owned a Pennsylvania corporation and a Delaware corporation. n22 Neither defendant had ever transacted business in Delaware related to the focus of the dispute in the lawsuit. n23 The trial court granted a motion to dismiss based upon factual affidavits which established that the parties negotiated the agreement in Pennsylvania with no actual contact relating to the transaction of sale in Delaware except "a part of the negotiations included a proposed sale of stock of a Delaware corporation which does transact business in Delaware." n24 In affirming the trial court's decision, this Court held that the negotiation of a contract for sale of stock by Pennsylvania residents did not amount to a transaction of business in Delaware, [**27] even though part of the negotiations included a proposed sale of a Delaware corporation that transacts business in Delaware. n25

> n18 486 A.2d 669 (Del. 1984).

> n19 Id. at 671.

> n20 Id.

871 A.2d 428, *; 2005 Del. LEXIS 133, **

n21 *Id. at 670.*

n22 *Greenly, 486 A.2d at 670.*

n23 *Id.*

n24 *Id. at 671.*

n25 *Id.*

We acknowledge that the ownership of a Delaware subsidiary does not, without more, amount to the transaction of business under Delaware's Long Arm Statute. n26 However, as is the case here, the ownership of a Delaware subsidiary may constitute the transaction of business under Delaware's Long Arm Statute where the underlying cause of action arises from the creation and operation of the Delaware subsidiary. n27 This is the case [*440] where the foreign corporation created and operated the Delaware subsidiary in a manner that would avail itself of the benefits and protections of the laws of the State of Delaware. In the present case, [**28] FIIB created Crescent, its Delaware subsidiary, for the express purpose of facilitating private equity investments in the United States, including Delaware. The acquisition of Cirrus, for example, was the type of transaction contemplated by FIIB when it created and operated Cirrus under the benefits and protections of Delaware law. The totality of the circumstances in this case show that FIIB transacted business in this State within the meaning of Delaware's Long Arm Statute.

n26 *See Venoco, Inc. v. Marquez, 2003 U.S. Dist. LEXIS 7593, at *8 (D. Del.)* (citing *In re DaimlerChrysler AG Sec. Litig., 197 F. Supp. 2d 86, 98 (D. Del. 2002)*; *Shaffer v. Heitner, 433 U.S. 186, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977)*; *Hana Ranch, Inc. v. Lent, 424 A.2d 28, 31 (Del. Ch. 1980)*).

n27 *Cf. Papendick v. Bosch, 410 A.2d 148, 152 (Del. 1979), cert. denied, 446 U.S. 909, 64 L. Ed. 2d 262, 100 S. Ct. 1837 (1980)* (concluding that stock ownership of a Delaware subsidiary is not by itself a sufficient contact to predicate personal jurisdiction but the formation and operation of a Delaware subsidiary may provide sufficient "minimum contacts" where the cause of action arises from the creation and operation of the Delaware subsidiary); *Sternberg v. O'Neil, 550 A.2d 1105, 1107 (Del. 1988)* (holding that a foreign corporation's (qualified to do business in Delaware) ownership of a Delaware subsidiary whose alleged mismanagement was the subject of a double derivative suit constituted a "minimum contact" with Delaware sufficient to satisfy the *Due Process Clause* and enable Delaware courts to exercise specific personal jurisdiction over the foreign corporation).

[**29]

Moreover, *Greenly* is distinguishable from the present case before this Court. Here, as compared to *Greenly*, the parties purposely chose Delaware law to govern the stock purchase agreement and the sale of Cirrus's stock to CHCL was more than a mere possibility. The parties in this case expressly intended that CHCL would purchase a substantial amount of Cirrus's capital stock upon the happening of stated events. This is in contrast to *Greenly* where there was only a mere possibility of a stock sale. While evidence of physical presence may be helpful in determining a party's intent to transact business and to show the actual transaction of business in this State, we hold that such evidence is not the *sine qua non* for jurisdiction under Delaware's Long Arm Statute. n28 In this case, the totality of the circumstances show that FIIB engaged in sufficient conduct to constitute transacting business in this State within the meaning of Delaware's Long Arm Statute.

n28 *NRG Barriers, Inc. v. Jelin, 1996 Del. Ch. LEXIS 81* (distinguishing the *Greenly* case and criticizing the defendants' use of an analytical approach based upon facts denoting physical presence for determining whether the transaction of business occurred in Delaware).

[**30]

## B. The Minimum Contacts Requirement

We next address whether the imposition of *in personam* jurisdiction in this case under Delaware's Long Arm Statute violates the *Due Process Clause of the Fourteenth Amendment*. The focus of this inquiry is whether FIIB engaged in sufficient "minimum contacts" with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice. n29 In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should "reasonably anticipate" being required to defend itself in Delaware's courts. n30 Due process issues arising from the imposition of *in personam* jurisdiction in-

volves a purely legal determination. Accordingly, our review on appeal is *de novo*. n31

> n29 *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945).

> n30 *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).

> n31 *Hercules, Inc. v. Leu Trust & Banking, Ltd.*, 611 A.2d 476, 480-81 (Del. 1992) (citing *Chao v. State*, 604 A.2d 1351, 1360 n.7 (Del. 1992); *Gannett Co., Inc. v. State*, 571 A.2d 735, 739 (Del. 1989)).

**[**31]**

We find the teachings from this Court's opinion in *Papendick* instructive. The *Papendick* case was an *in rem* action involving the attachment of a parent-foreign corporation's stock interest in a wholly owned **[*441]** Delaware subsidiary. n32 In *Papendick*, the litigation involved an alleged breach of contract. n33 The parent-foreign corporation had formed a Delaware subsidiary for the purpose of executing the contract which was allegedly breached. n34 This Court concluded that the foreign corporation, which had formed a Delaware subsidiary for the purpose of implementing a contract, had implicitly consented to the jurisdiction of Delaware's courts in an action brought against both the foreign corporation and its Delaware subsidiary for allegedly breaching the contract at issue. n35 In doing so, this Court followed the mandate of the United States Supreme court in *Shaffer*, n36 which instructed courts to focus upon the relationship between the defendant, the forum and the litigation when addressing the minimum contacts requirement. n37

> n32 *Papendick*, 410 A.2d at 149.

> n33 *Id.* at 148.

**[**32]**

> n34 *Id.* at 149-50.

> n35 *Id.* at 152.

> n36 *Shaffer*, 433 U.S. at 204.

> n37 *Papendick*, 410 A.2d at 152.

A later decision by this Court explaining *Papendick* provided that "the decision of the foreign-parent corporation to maintain a direct and continuing connection between Delaware and itself, as the owner of a Delaware subsidiary, was found to be a 'minimum contact' of paramount importance in the specific jurisdictional analysis of *Papendick*..." n38 We find particularly relevant the following language in *Papendick*:

> We do not believe that the *International Shoe* "minimum contact" due process standards were intended to deprive Delaware courts of jurisdiction by permitting an alien corporation to come into this State to create a Delaware corporate subsidiary for the purpose of implementing a contract under the protection of and pursuant to powers granted by the laws of Delaware, and then be heard to say, in a suit arising from the very contract which the subsidiary was created to implement, that **[**33]** the only contact between it and Delaware is the "mere" ownership of stock of the subsidiary.

> The latter point is most significant in applying *International Shoe* standards. There is a controlling distinction, for present purposes, between the ownership of shares of stock acquired by purchase or grant as in *Shaffer*, on the one hand, and ownership arising from the purposeful utilization of the benefits and protections of the Delaware Corporation Law in activities related to the underlying cause of action, on the other hand. [Here, the appellee] purposefully availed itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action. Therein lies the "minimum contact" sufficient to sustain the jurisdiction of Delaware's courts over [the appellee]. n39

> n38 *See Sternberg*, 550 A.2d at 1120 (explaining this Court's decision in *Papendick*).

> n39 *Papendick*, 410 A.2d at 152.

The United [**34] States Supreme Court has provided further guidance for determination of whether the defendant has established "minimum contacts" in the forum State which would support the exercise of *in personam* jurisdiction. n40 In *Burger King Corp.*, the United States Supreme Court held that "the constitutional touchstone remains whether the defendant [*442] purposefully established 'minimum contacts' in the forum State." n41 This Court has recognized that "the minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created continuing obligations between himself (itself) and the forum." n42 In *Burger King Corp.*, the United States Supreme Court further explained:

> Where the defendant "deliberately" has engaged in significant activities within a State, ... or has created "continuing obligations" between himself and residents of the forum, ... [the defendant] manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation [**35] in that forum as well. n43

n40 *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).

n41 *Id. at 474* (citing *International Shoe Co.*, 326 U.S. at 316).

n42 *Sternberg*, 550 A.2d at 1120.

n43 *Burger King Corp.*, 471 U.S. at 475-76.

In this case, the totality of the circumstances show that FIIB had sufficient ties to this State to satisfy the minimum contacts requirement. FIIB, through its agents, executed two stock purchase agreements with a privately held Delaware corporation. It negotiated the stock purchase agreements through Crescent, its Delaware subsidiary which advises it on various private equity investments located in the United States. The stock purchase agreement also calls for Delaware law to govern disputes arising from it. It is reasonable to infer that FIIB benefitted from Delaware law by operating Crescent for

commercial gain, including the benefits afforded by equity investments [**36] secured by Crescent.

Having found that FIIB purposefully established minimum contacts with this State, these contacts must be considered in light of other factors to determine whether the imposition of personal jurisdiction would comport with fair play and substantial justice principles. n44 However, the United States Supreme Court has noted that "the *Due Process Clause* may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." n45 When a corporate defendant who has purposefully directed its activities at the forum State seeks to defeat jurisdiction, it "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." n46

n44 *Sternberg*, 550 A.2d at 1122 (citing *Burger King Corp.*, 471 U.S. at 477).

n45 *Burger King Corp.*, 471 U.S. at 474.

n46 *Sternberg*, 550 A.2d at 1122 (quoting *Burger King Corp.*, 471 U.S. at 477).

[**37]

FIIB has not presented any compelling evidence suggesting that the exercise of personal jurisdiction in the present case would be unreasonable. FIIB has simply argued that its purchase of a Delaware corporation cannot be a sufficient contact with the State to satisfy the *Due Process Clause*. We have previously rejected this argument because the facts here involve more than that single circumstance. Furthermore, Delaware has a legitimate interest in resolving AeroGlobal's claims. FIIB used the benefits and protections of Delaware law to maintain its corporate subsidiary. As a result, Delaware has a legitimate interest in holding accountable those [*443] responsible for operating a Delaware subsidiary corporation in such a fashion. n47 Under the totality of the circumstances in this case, the Superior Court correctly concluded that the motion to dismiss for lack of personal jurisdiction should be denied.

n47 *Id. at 1124.*

### III. The Superior Court's Grant of Summary Judgment

We now turn to AeroGlobal's direct [**38] appeal. AeroGlobal first argues that the Superior Court erred in

871 A.2d 428, *; 2005 Del. LEXIS 133, **

granting summary judgment because a genuine issue of material fact existed as to whether: (1) Cirrus waived strict compliance for immediate payment of the entire $15 million bridge loan upon execution of the AeroGlobal LOI; (2) Cirrus was estopped by its conduct in the Court of Chancery action from asserting in this case that it did not waive its aforementioned contractual right; and (3) AeroGlobal materially breached the AeroGlobal LOI thereby rendering Cirrus' termination thereof unjustified. AeroGlobal further contends that the Superior Court erred in determining that it repudiated the AeroGlobal LOI. AeroGlobal finally challenges the Superior Court's dismissal of its claim asserting a breach of the implied covenant of good faith and fair dealing.

We discuss only the waiver issue raised by AeroGlobal because it is dispositive of the appeal. In doing so, we conclude that the Superior Court erred, as a matter of law, by granting summary judgment in favor of the defendants because there was a triable issue of fact as to whether Cirrus waived compliance with the contract terms for the immediate payment of the entire [**39] $15 million bridge loan upon execution of the AeroGlobal LOI. We therefore reverse the Superior Court's grant of summary judgment as to AeroGlobal's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. We further hold that the Superior Court prematurely determined that the defendants had not wrongfully interfered with or terminated the AeroGlobal LOI. We therefore reverse the Superior Court's grant of summary judgment as to AeroGlobal's tortious interference and civil conspiracy claims.

**A. Standard of Review on Summary Judgment on a Waiver Claim**

The purpose of Superior Court Civil Rule 56 is to provide a method by which issues of law involved in a litigation may be speedily brought before a trial court and disposed of without unnecessary delay. n48 "The disposition of litigation by motion for summary judgment should, when possible, be encouraged for it should result in a prompt, expeditious and economical ending of lawsuits." n49

n48 *State ex rel. Mitchell v. Wolcott*, 46 Del. 362, 7 Terry 362, 83 A.2d 759, 760 (Del. 1951).

N49 *Davis v. University of Delaware*, 240 A.2d 583, 584 (Del. 1968).

[**40]

Although summary judgment is encouraged when possible, there is no absolute right to summary judgment. n50 Summary judgment should be granted only if "there

is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." n51 A trial court's decision on a motion for summary judgment is subject to a *de novo* standard of review on appeal. n52

n50 *Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969).

n51 DEL. SUPER. CT. CIV. R. 56(c).

n52 *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (citing *Stroud v. Grace*, 606 A.2d 75, 81 (Del. 1992)).

[*444] In evaluating the summary judgment record, a trial court shall not weigh the evidence or resolve conflicts presented by pretrial discovery. n53 The trial court shall examine the factual record and make reasonable inferences therefrom in the light most favorable to the nonmoving party to determine if there is any dispute of material fact. n54 "The trier of fact may weigh [**41] the evidence and resolve disputes only after hearing all the evidence, including live witness testimony." n55 Thus, if from the evidence produced there is a reasonable indication that a material fact is in dispute or if it appears desirable to inquire more thoroughly into the facts in order to clarify application of the law, summary judgment is not appropriate. n56 "This is an axiom of the judicial process and applies unless the parties have stipulated that the paper record shall constitute the trial record." n57 We consider it an exercise of "good judicial administration [for a trial court] to withhold decision ... until [the record] presents a more solid basis of findings based on litigation or on a comprehensive statement of agreed facts." n58

n53 *Id.* (citing *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1149-50 (Del. 2002)).

n54 *Motorola, Inc. v. Amkor Tech., Inc.*, 849 A.2d 931, 935 (Del. 2004) (citing *Rhudy v. BottleCaps, Inc.*, 830 A.2d 402, 405 (Del. 2003)).

n55 *Telxon Corp.*, 802 A.2d at 262 (citing *Cerberus*, 794 A.2d at 1150).

[**42]

871 A.2d 428, *; 2005 Del. LEXIS 133, **

n56 *Ebersole v. Lowengrub, 54 Del. 463, 180 A.2d 467, 470, 4 Storey 463 (Del. 1962), modified, 58 Del. 266, 208 A.2d 495, 8 Storey 266 (Del. 1965); Myers v. Nicholson, 56 Del. 140, 192 A.2d 448, 451, 6 Storey 140 (Del. 1963).*

n57 *See Cerberus, 794 A.2d at 1149. See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (providing that trial courts should act "with caution" when granting summary judgment).*

n58 *Kennedy v. Silas Mason Co., 334 U.S. 249, 257, 92 L. Ed. 1347, 68 S. Ct. 1031 (1948).*

## B. Criteria for Waiver of Contractual Requirements or Conditions

It is well settled in Delaware that contractual requirements or conditions may be waived. n59 However, the standards for proving waiver under Delaware law are "quite exacting." n60 "Waiver is the voluntary and intentional relinquishment of a known right." n61 It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights. n62 The facts relied upon to prove waiver must be unequivocal. n63 [**43]

n59 *Pepsi-Cola Bottling Co. v. Pepsico, Inc., 297 A.2d 28, 33 (Del. 1972).*

n60 *American Family Mortgage Corp. v. Acierno, 1994 Del. LEXIS 105, at *13.*

n61 *Realty Growth Investors v. Council of Unit Owners, 453 A.2d 450, 456 (Del. 1982)* (citing *28 AM.JUR.2d, Estoppel and Waiver, § 158 (1966); George v. Frank A. Robino, Inc., 334 A.2d 223, 224 (Del. 1975)).*

n62 *Id.* (citing *Klein v. American Luggage Works, Inc., 52 Del. 406, 158 A.2d 814, 818, 2 Storey 406 (Del. 1960); Moore v. Travelers Indemnity Ins. Co., 408 A.2d 298, 301 (Del. 1979)).*

n63 *Id.* (citing *28 AM.JUR.2d, Estoppel and Waiver, § 163 (1966)).*

Based on these fundamental principles, we reiterate the three elements which must be satisfied before a conclusion of waiver may be reached. A contractual requirement or condition may be waived where (1) there is a requirement or condition to be waived, (2) the waiving party must know of the [**44] requirement or condition, and (3) the waiving party must intend to waive that requirement or condition. n64 [*445] Although we have held that this standard is "quite exacting," we nonetheless find that summary judgment was inappropriate in the present case as to AeroGlobal's claim of waiver.

n64 *Pepsi-Cola Bottling Co., 297 A.2d at 33.*

## C. Waiver of the "Timing Requirement" for the Immediate Payment of the Entire AeroGlobal Bridge Loan

At the heart of AeroGlobal's case is its claim that the defendants breached Section 4.d of the AeroGlobal LOI (the "Exclusive Negotiations Provision") by negotiating the Cirrus-Crescent stock acquisition while at the same time Cirrus purported to honor the AeroGlobal LOI. n65 Cirrus responded that it was not required to comply with the Exclusive Negotiations Provision because AeroGlobal breached Section 1.a of the AeroGlobal LOI (the "Timing Requirement") by failing to immediately pay the full $ 15 million bridge loan. n66 In essence, Cirrus is claiming that [**45] the Timing Requirement was an exception to the applicability of the Exclusive Negotiations Provision. The Superior Court agreed, and granted summary judgment in favor of the defendants. It held that the Exclusive Negotiations Provision was not binding on the parties because AeroGlobal failed to fulfill its obligations under the AeroGlobal LOI by withholding the remaining $ 3 million installment on the bridge loan. The Superior Court concluded that Cirrus was therefore free to negotiate for the needed financing with any party it deemed appropriate.

n65 Section 4.d of the AeroGlobal LOI states:

As long as [AeroGlobal] meets its obligations under the terms of this [LOI], Cirrus, for itself and its officers, directors, shareholders and employees, agrees not to enter into any agreements or hold any discussions, directly or indirectly through any affiliate, with any

other person or firm concerning the sale or other disposition of its stock or assets or any material investment until the later of the Investment Date and the expiration or termination of the Definitive Agreements (the "Expiration Date"). For purposes of the first sentence of this Section 4d, except as relates to Section 1a, [AeroGlobal] shall not be deemed to have failed to have met its obligations under this [LOI] until fifteen (15) days after Cirrus shall have given notice to [AeroGlobal] of each alleged failure to meet such obligations, specifying such alleged failure in reasonable detail to allow [AeroGlobal] to cure it, if such alleged failure remains uncured after the 15 day period.

[**46]

n66 Section 1.a of the AeroGlobal LOI provides that "upon signing [the AeroGlobal LOI], [AeroGlobal] irrevocably commits to provide Cirrus a bridge loan [of] $ 15,000,000 and [AeroGlobal] will immediately advance to Cirrus $ 15,000,000."

Intention forms the foundation of the doctrine of waiver, and an intention to waive must appear clear from the record evidence before summary judgment is granted on this issue. n67 The dispute in this case centers on whether Cirrus intended to waive the Timing Requirement. The question of Cirrus's intent in the instant case depends on a consideration of the facts surrounding Cirrus and AeroGlobal's dealings after CHCL initiated the Court of Chancery action.

n67 George, 334 A.2d at 224.

The record shows that Cirrus accepted the $ 12 million portion of the bridge loan for its benefit without demanding payment of the remaining $ 3 million. Cirrus promptly used that [**47] amount to repay a $ 4 million loan that Crescent had extended. Cirrus also attempted to use this amount to pay the $ 5 million break up fee under the CHCL SPA, but this payment was refused by Crescent. Cirrus used the remaining funds as working capital.

In deciding CHCL's action seeking injunctive relief, the Court of Chancery found that AeroGlobal's deferral of the [*446] remaining $ 3 million bridge loan payment was "due entirely to the pendency of this [preliminary injunction] motion and a resultant understanding between Cirrus and AeroGlobal that the completion of the funding [of the bridge loan] should be delayed pending its outcome." n68 The Court of Chancery made this finding on a record similar to what was before the Superior Court in this case.

n68 Cirrus Holdings Company Ltd., 794 A.2d at 1203 n.18.

The record also shows that Alan Klapmeier explicitly acknowledged that the agreement with AeroGlobal remained in full force and effect. When Cirrus began to consider other financing options [**48] after AeroGlobal deferred payment of the remaining $ 3 million of the bridge loan, Alan Klapmeier told the Cirrus board that the Exclusive Negotiations Provision remained in effect and prohibited such conduct regardless of AeroGlobal's deferral.

We conclude that it was for the trier of fact to decide whether Cirrus's conduct under the circumstances of this case evidenced an intentional, conscious and voluntary abandonment of its claim or right. n69 Where the inference or ultimate fact to be established concerns intent or other subjective reaction, summary judgment is ordinarily inappropriate. n70 On the record before us we hold that a waiver was a permissible inference that could reasonably be drawn from the evidence. It was error to grant summary judgment in the face of this material dispute of fact.

n69 George, 334 A.2d at 224 (citing Nathan Miller, Inc. v. Northern Ins. Co. of New York, 42 Del. 523, 3 Terry 523, 39 A.2d 23 (Del. 1944)).

n70 Id. (citing 6 JAMES WM. MOORE ET. AL., MOORE'S FEDERAL PRACTICE § 56.17 (2nd ed.); Continental Oil Co. v. Pauley Petroleum, Inc., 251 A.2d 824 (Del. 1969)).

[**49]

IV. Conclusion

Accordingly, we affirm the judgment of the Superior Court denying FIIB's motion to dismiss for lack of personal jurisdiction. We reverse the judgment of the Superior Court granting summary judgment to the defendants

871 A.2d 428, *; 2005 Del. LEXIS 133, **

and remand this matter for further proceedings consistent    with this opinion.

1 of 1 DOCUMENT

**BENITEC AUSTRALIA LTD., Plaintiff, v. PROMEGA CORPORATION, Defendant, v. COMMONWEALTH SCIENTIFIC AND INDUSTRIAL RESEARCH ORGANISATION, Third Party Defendant.**

**Civil Action No. 04-889 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 3545*

**March 8, 2005, Decided**

**DISPOSITION:** Defendant's motion for preliminary injunction denied.

**COUNSEL:** [*1] John W. Shaw, Esquire and Kevin Baird, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware. Of Counsel: John P. Corrado, Esquire, Barry E. Bretschneider, Esquire, Charles C. Carson, Esquire, of MORRISON & FOERSTER LLP, McLean, Virginia, for Plaintiff.

Michael F. Bonkowski, Esquire, and Kimberly L. Gattuso, Esquire, of SAUL EWING, Wilmington, Delaware. Of Counsel: Grant C. Killoran, Esquire and Mary C. Turke, Esquire of MICHAEL BEST & FRIEDRICH LLP, Milwaukee, Wisconsin, for Defendant.

John W. Shaw, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, for Third Party Defendant.

**JUDGES:** FARNAN, District Judge.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

**OPINION**

March 8, 2005
Wilmington, Delaware

**FARNAN, District Judge**

Presently before the Court is the Motion For A Preliminary Injunction (D.I. 26) filed by Defendant Promega Corporation ("Promega"). For the reasons set forth below, the Court will deny the Motion For A Preliminary Injunction (D.I. 26).

**BACKGROUND**

**I. Procedural History**

Benitec is an Australian corporation that develops therapeutics to treat serious diseases using DNA-directed RNA interference [*2] ("ddRNAi"). Promega is a Wisconsin corporation that develops and markets biotechnology research products. The Court has subject matter jurisdiction pursuant to *28 U.S.C. § 1332 (a) (2).*

On July 22, 2004, Plaintiff Benitec Australia, Ltd. ("Benitec") brought this declaratory action against Promega Corporation ("Promega") alleging that Promega has improperly withheld certain sums from payments due to Benitec under a license agreement and that, as a result, Promega's license has been converted to a non-exclusive license. Benitec further alleges that any sublicenses granted by Promega have been transferred to Benitec as of May 1, 2004, along with the right to receive all future sublease income from the sublicenses.

On August 25, 2004, Promega served its Answer, Affirmative Defenses, Counterclaims (D.I. 6) and Third Party Complaint (D.I. 4). On September 17, 2004, Benitec and Third Party Defendant Ambion, Inc. ("Ambion") each filed Answers (D.I. 10, 13) and moved for judgment on the pleadings (D.I. 11, 14). Those motions are fully briefed and awaiting decision by the Court.

On November 10, 2004, Promega brought this Motion for a Preliminary Injunction (D.I. 26) [*3] to preserve its rights as an exclusive licensee during the pendency of this lawsuit.

**II. The License Agreements**

On March 31, 2003, Benitec and Promega executed a "Benitec/Promega License Agreement for RNAi Technology" ("the Benitec license"). The license gave Promega the exclusive worldwide right to commercially

2005 U.S. Dist. LEXIS 3545, *

develop, sell, and distribute ddRNAi products for use in research, and the exclusive right to grant sublicenses. Key provisions of the Benitec license state that Promega had to pay an upfront license fee of $ 350,000, a $ 50,000 UK patent fee, and a $ 100,000 European patent fee. Further, assuming that the license was still exclusive, Promega had to pay an annual minimum royalty of $ 50,000 no later than April 30th of each year. If Promega failed to timely pay the annual minimum royalty, the license would convert to non-exclusive status and Promega would lose its right to sublicense products. Upon conversion to a non-exclusive license, Promega would be required to assign all existing product sublicenses to Benitec and immediately pay all outstanding minimum royalty payments. (D.I. 32, App. A at PP 4.00, 4.01, 5.00, 5.01, and 7.00.) The Benitec license also provided [*4] that Promega would be liable for all taxes arising out of license payments other than "taxes imposed on Benitec's net income." (Id. at P 7.04.) Further, the Benitec license allowed Promega and Benitec to jointly grant commercial research licenses. (Id. at P 7.03.)

On or about March 31, 2003, Promega paid Benitec the $ 350,000 initial license fee. At some subsequent date, Promega satisfied the $ 50,000 UK patent issuance fee obligation.

On December 8, 2003, Benitec, Promega, and Commonwealth Scientific and Industrial Research Organization ("Commonwealth") executed a license ("the License"), which superseded the Benitec license. The provisions discussed above remained the same, except that § 4.00 of the license, which previously required payment of three license fees (initial $ 350,000, UK $ 50,000 and European $ 100,000) was changed to require only the $ 100,000 European patent issuance fee.

On May 26, 2004, P 7.00 of the license was amended to define the effective date of the license was March 31, 2004 ("the Amendment").

### III. The Tax Payments

At the time that Promega paid Benitec the $ 350,000 initial license fee, it also made a 10% U.S. income tax payment of $ [*5] 35,000 on Benitec's behalf pursuant to a U.S.-Australia tax treaty. Promega alleges that it did so because Benitec at that time had no U.S. place of business. Promega further alleges that under the License, Benitec was liable for its own income taxes, and, therefore, owed Promega $ 35,000. Benitec contends that Promega was responsible for making the U.S. income tax payment pursuant to the terms of the contract. On April 28, 2004, as its annual royalty payment, Promega paid Benitec $ 9,719, which included a setoff of $ 2,500 in

taxes related to this royalty n1 and a setoff of the $ 35,000 prior tax payment plus 10% interest.

n1 The treaty tax rate for withholding between the United States and Australia was 5% effective July 1, 2003.

On July 22, 2004, Benitec sent Promega a letter alleging that Promega's rights under the Benitec/Commonwealth license had become non-exclusive as of May 1, 2004. Benitec cited Promega's alleged failure to pay the annual minimum royalty due on April 30, 2004, as the reason for the conversion. [*6] Benitec filed this lawsuit against Promega shortly thereafter.

The primary issue in this lawsuit is whether Benitec rightly declared that the license had converted to non-exclusive status because Promega failed to make the minimum annual royalty payment for the 2004 fiscal year.

In support of the instant Motion, Promega contends that while this lawsuit for declaratory judgment as to Promega's status as a licensee is pending, Benitec is issuing product sublicenses and unilaterally granted a commercial research license in violation of Promega's exclusive product licensing rights.

### DISCUSSION

In determining whether to grant a motion for a preliminary injunction, courts are to consider (1) whether the movant has shown a reasonable probability of success on the merits, (2) whether the movant will be irreparably injured by denial of the relief, (3) whether granting preliminary relief will result in even greater harm to the nonmoving party, and (4) whether granting the preliminary relief will be in the public interest. *Allegheny Energy, Inc. v. DOE, Inc.*, 171 F.3d 153 (3d Cir. 1999).

### I. Likelihood of Success on the Merits

First, the party seeking a preliminary [*7] injunction must demonstrate a likelihood of success on the merits.

Promega contends that it has shown a likelihood of success on the merits. Promega first argues that it will prevail on its breach of contract counterclaim because the May 26, 2004, Amendment to the license confirms that Benitec was liable for the treaty taxes. Specifically, Promega contends that because the May 26, 2004, Amendment to P 7.00 of the License applies only to the minimum royalty payments, it follows that, on May 1, 2004, Promega could not have become a non-exclusive licensee with no obligation for future minimum royalty

2005 U.S. Dist. LEXIS 3545, *

payments. Thus, Promega asserts that Benitec's willingness to amend the License after Promega withheld the taxes from the April 2004 royalty payment proves that Benitec considered the taxes withheld "taxes imposed on . . . net income" as set forth in P 7.04. In response, Benitec contends that the purpose of the Amendment was to correct a clerical error.

Promega further contends that evidence of communications between Benitec and Promega executives confirms that Benitec was liable for the treaty taxes. Specifically, Promega contends that John McKinley, Benitec's CEO, told Richard Schiffreen, [*8] Promega's Director of Technology and Development, that Promega was not liable for Benitec's taxes. As evidence of Mr. McKinley's statement, Promega offers Dr. Schiffreen's contemporaneous notes of the conversation and an email from Mr. McKinley to Dr. Schiffreen dated June 22, 2003. Promega contends that, subsequent to the executives' conversation, Promega wired $ 47,500 to Benitec in satisfaction of the $ 50,000 UK patent issuance fee less $ 2,500 in income taxes that Promega had paid on Benitec's behalf. Promega alleges that Benitec accepted Promega's wire transfer of $ 47,500 without objection.

Promega also argues that even if Benitec did comply with the terms of the agreement in converting the License to non-exclusive status, Benitec's behavior leading up to and following the alleged automatic conversion constitutes a breach of the implied duties of good faith, fair dealing, and cooperation. Alternatively, Promega contends that Benitec's actions establish an accord and satisfaction. Finally, Promega contends that Benitec is equitably estopped from declaring Promega's license to be non-exclusive.

In response, Benitec contends that Promega's declarations and exhibits demonstrate [*9] an absence of evidentiary support for Promega's allegations. Further, Benitec contends that the four corners of the license contain clear and unambiguous contract language. In support of its position that the tax deductions in question were based on Benitec's gross income, Benitec offers the language of relevant tax statutes, treasury regulations, and treaties. Benitec further contends that is has not breached its duties of good faith and fair dealing, and that there was no accord and satisfaction.

After reviewing the contentions of the parties, the relevant facts, and the applicable law, the Court concludes that Promega has not shown a likelihood of success on the merits.

A. Breach of Contract Claim

The Court finds that Promega has not shown a likelihood of success on the merits of its breach of contract claim. Section 7.04 of the License states that Promega as

licensee shall pay and indemnify Benitec as licensor all taxes based on payments under the License other than those imposed or based on Benitec's net income. Section 7.04 goes on to state that all amounts payable by Promega shall be paid without deduction or withholding of any present or future tax, and that Benitec [*10] shall receive amounts equal to the amounts it would have received had not such deductions or withholding been required. Benitec contends that the $ 35,000 and $ 2,500 tax treaty payments that Promega withheld from its annual royalty payment were based on gross income, not net income, and, therefore, under P 7.04 of the license, those payments were not attributable to Benitec. In support of its position, Benitec offers Treasury Regulation § 1.881-2(a)(2), Treasury Regulation § 1.1441-3 (a) and U.S.-Australian Tax Treaty Article 12. Promega concedes that the income taxes at issue are technically levied on gross income, but asserts that gross income in this context is the same as net income because no deductions are allowable. Promega cites 26 C.F.R. § 1.881-2(a) (3) in support of this assertion.

The Court finds that the contract language is clear and unambiguous that Promega cannot withhold sums for tax payments unless based on Benitec's net income. At this point in the proceedings, the Court finds that Promega has not brought forth convincing evidence that the taxes in question were based on Benitec's [*11] net income. Thus, the Court finds that Section 7.04 is a "gross-up" provision that increases the amount of a royalty to compensate the licensor for the taxes withheld. The Court does not doubt that executives of Promega and Benitec discussed Promega's ability to recoup these payments at some point in the future. However, Promega's unilateral action in withholding the amount of the taxes from its minimum royalty payment appears to have had the effect of breaching the License.

Thus, the Court concludes that Promega has not shown a likelihood of success on the merits with regard to its breach of contract claim.

B. Breach of Implied Warranty of Good Faith and Fair Dealing

Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward each other with respect to their contract. Katz v. Oak Indus. Inc., 508 A.2d 873, 880 (Del. Ch. 1986) (citing Restatement (Second) of Contracts, § 205 (1981)). A party must "act reasonably to fulfill the intent of the parties to the agreement." Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., 832 A.2d 116, 128 (Del. Ch. 2003) [*12] (quoting Kelly v. McKesson HBOC, Inc., 2002 Del. Super. LEXIS 39, 2002 WL 88939 at * 10 (Del. Super. Jan. 17, 2002)).

Delaware courts have used the following test when assessing whether the implied covenant has been breached: "is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith--had they thought to negotiate with respect to that matter." *Katz, 508 A.2d at 880* (citing *Martin v. Star Publ'g Co., 50 Del. 181, 11 Terry 181, 126 A.2d 238 (Del. Supr. 1956); Danby v. Osteopathic Hosp. Ass'n., 34 Del. Ch. 172, 101 A.2d 308 (Del. Ch. 1953)* aff'd *34 Del. Ch. 427, 104 A.2d 903 (Del. Supr. 1954); Broad v. Rockwell Int'l Corp., 642 F.2d 929, 957 (5th Cir. 1981)).* However, "the implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." *Chamison v. HealthTrust, Inc.--Hospital Co., 735 A.2d 912, 921 (Del. Ch. 1999)* (citing *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co., 708 A.2d 989, 990 (Del. Supr. 1998)).* **[*13]**

Promega contends that even if Benitec's construction of the License is correct, Benitec's silence and subsequent assertion that the License converted to non-exclusive status is a breach of the implied covenant of good faith and fair dealing. The Court finds that Promega is attempting to inject a new obligation into the contract, the obligation to warn the other party if any of its intended actions will breach the contract. The Court finds that the conditions for breach are expressly stated in the contract, and that the parties would not necessarily have agreed to the additional duty to warn that Promega requests.

Thus, the Court concludes that Promega has not shown a likelihood of success on the merits of its breach of implied warranty of good faith and fair dealing claim.

### C. Accord and Satisfaction

The required elements for an accord and satisfaction in Delaware are that (1) a bona fide dispute among the parties as to the amount of the debt must honestly exist, (2) the debtor tendered an amount to the creditor in honest belief that such would constitute satisfaction of the debt, and (3) the creditor accepts such payment. See *Acierno v. Worthy Bros. Pipeline Corp., 693 A.2d 1066, 1068-69 (Del. 1997);* **[*14]** *CitiSteel USA, Inc. v. Connell Ltd. P'ship, 758 A.2d 928 (Del. 2000).* An accord and satisfaction may not result from part payment of a liquidated claim in the absence of additional consideration. AMJUR ACCORD § § 7,28; See, e.g., *Trader v. Wilson, 2002 Del. Super. LEXIS 92, 2002 WL 499888, *3-4 (Del. Super.).* A liquidated claim is one which can be determined with exactness from the agreement between the parties, by an arithmetical process, or by the application of definite rules of law. *State, for Use of Warner Co. v. Mass. Bonding & Ins. Co., 40 Del. 274, 1 Terry 274, 9 A.2d 77, 80 (Del. Super. 1939);* AMJUR ACCORD § 7.

The Court finds that the $ 50,000 annual royalty payment owed by Promega was liquidated because it can be "determined with exactness from the agreement between the parties." AMJUR ACCORD § 7. Sections 5.00 and 7.00 of the License expressly stipulate that Promega must pay a minimum annual royalty of $ 50,000 no later than April 30th of each year. Thus, the Court concludes that the amount of Promega's payment was liquidated and that Promega's partial payment of it cannot, therefore, constitute an accord and satisfaction.

### D. Equitable Estoppel

Under Delaware law, the **[*15]** doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." *Waggoner v. Laster, 581 A.2d 1127, 1136 (Del. 1990).* The party claiming estoppel must show that (1) he lacked the knowledge of the true facts or he lacked the means to obtain the truth; (2) he relied on the conduct of the party against whom the estoppel is claimed; and (3) he suffered a prejudicial change of position as a result of his reliance. *Id. at 1136.* The party seeking estoppel must be able to prove these elements by clear and convincing evidence. *Reeder v. Sanford School, Inc., 397 A.2d 139 (Del. Super. 1979).*

To support its claim of equitable estoppel, Promega relies on oral statements that allegedly modified the terms of the written agreement between the parties. Delaware courts generally reject attempts to invoke equitable estoppel based on such oral statements. See, e.g., *Keene Corp. v. Hoofe, 267 A.2d 618 (Del. Ch. 1970).* In Keene, the defendant agreed in writing to accept stock options subject to restrictions **[*16]** providing for repurchase by his employer if his employment terminated before defendant was employed five years. The court in Keene held that, even though the defendant allegedly relied to his detriment on inducements to negotiate the terms of his employment, he did not act with reasonable diligence in discovering the restrictions and when employment was terminated in less than one year, the employer was not estopped from its asserting right to repurchase the stock.

Thus, the Court concludes that Promega cannot now be allowed to claim detrimental reliance when it had knowledge of the terms of the contract from the contract itself.

## II. Irreparable harm

2005 U.S. Dist. LEXIS 3545, *

The Court must next consider whether Plaintiffs will suffer irreparable harm if the injunctive relief is not granted.

Promega contends that Benitec's sublicensing activities will cause harm to Promega's position in the RNAi market and that Promega will suffer the costs of lost opportunity. Promega further contends that its damages are complex and that any judgment may be uncollectible from Benitec. Promega argues that it is entitled to a presumption of irreparable harm because the right to exclude is at issue in this [*17] lawsuit.

In response, Benitec contends that Promega cannot show irreparable harm because Promega has delayed in seeking preliminary relief and because Promega's alleged harms are purely speculative and Promega has provided no objective evidence or expert opinion on market conditions.

Although a delay in seeking relief may constitute grounds for barring preliminary relief, in the instant case, the Court does not agree that Promega has delayed in filing for a preliminary injunction. Promega filed for preliminary injunctive relief shortly after it became apparent that Benitec was negotiating directly with potential sublicensees. However, where, as here, interests involving money damages are at stake, preliminary injunctive relief is not usually appropriate. See *Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801-02 (3d Cir. 1989)* (harm was not deemed irreparable even though nature of the action involved loss of majority of business revenue). The Court finds that Promega has not shown that the non-economic injuries it alleges, such as of control of reputation, loss of trade and loss of goodwill, are reasonably imminent or otherwise nonspeculative. [*18]

For these reasons, the Court concludes that Promega has not made a sufficient showing of irreparable harm to allow the Court to find that this factor weighs in favor of granting a preliminary injunction in this lawsuit.

### III. Balance of Hardships

Next, the Court must balance the harm that will occur to Plaintiffs if the injunction is denied with the harm Defendants will incur if the injunction is granted. *Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir. 1995).*

Promega contends that the balance of hardships favors it because enjoining Benitec's sublicensing activity will not harm Benitec. Rather, Benitec would be in the same position it was in before the breach. In support of this argument, Promega points to the $ 350,000 initial license fee it paid to Benitec. In response, Benitec contends that the balance of harms favors Benitec because the new sublicenses represent a source of revenue for it.

The Court finds that granting the Motion for Preliminary Injunction will cause Benitec only minimal hardship because doing so will leave Benitec in the same position it was shortly before the injunction was granted, i.e., not granting sublicenses and in receipt [*19] of the $ 350,000 initial license fee. Further, the Court finds that allowing Benitec to continue its sublicensing efforts in the ddRNAi market may cause Promega to lose revenue, market share and good will in the marketplace that it may find difficult to recover should it prevail on the merits in this action. For these reasons, the Court concludes that the balance of hardships tips in Promega's favor.

### IV. Public interest

Finally, the Court must assess the impact of an injunction in Promega's favor on public interest concerns.

Promega contends that an injunction in these circumstances will not harm the public because Benitec was a party to an exclusive licensing agreement and received a hefty licensing fee. Promega further contends that, in the absence of injunctive relief, those seeking to license the ddRNAi technology will be confused as to whether to deal with Benitec or Promega and may decide to delay licensing or withdraw from the market entirely. Benitec responds that an injunction would end all sublicensing and would deprive the public of access to Benitec's technology.

While this is a private contractual dispute that has no substantial public impact, the Court finds [*20] that the public interest weighs in favor of enforcing a contract that has been shown to be valid at this preliminary juncture. For this reason, the Court concludes that granting a preliminary injunction in the instant case will not have a favorable impact on the public interest.

### CONCLUSION

In sum, the Court concludes that Promega's failure to demonstrate likelihood of success on the merits and irreparable harm, and the impact on the public interest weigh against issuing a preliminary injunction. Thus, the Court concludes that a preliminary injunction should not issue. Accordingly, the Court will deny Defendant Promega's Motion For A Preliminary Injunction (D.I. 26).

An appropriate Order will be entered.

### ORDER

At Wilmington, this 8 day of March 2005, for the reasons discussed in the Opinion issued this date;

IT IS HEREBY ORDERED that the Motion For Preliminary Injunction (D.I. 26) filed by Defendant Promega Corporation is **DENIED**.

2005 U.S. Dist. LEXIS 3545, *

Joseph J Farnan Jr                                    UNITED STATES DISTRICT JUDGE

A 081

LEXSEE 922 F.2D 184

**LAL R. BHAYA, and RICHARD CARNER, and WILLIAM J. HAESSLER, and
HENRY A. PARZICK, and EARLE WILLIAMS, Appellants v. WESTINGHOUSE
ELECTRIC CORPORATION, Appellee**

**No. 89-2063**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*922 F.2d 184; 1990 U.S. App. LEXIS 22315; 54 Fair Empl. Prac. Cas. (BNA)
1078; 55 Empl. Prac. Dec. (CCH) P40,462; 31 Fed. R. Evid. Serv. (Callaghan) 1379*

**October 11, 1990, Argued
December 28, 1990, Filed**

**PRIOR HISTORY:** [**1] On Appeal from the United States District Court for the Eastern District of Pennsylvania; D.C. Civil No. 84-5381.

**DISPOSITION:**

Affirmed.

**COUNSEL:**

Alan P. Epstein, Esq., Argued, Jablon, Epstein & Wolff, Philadelphia, Pennsylvania, Attorneys for Appellants.

Dona S. Kahn, Esq., Argued, Anderson, Kill, Olick & Oshinsky, P.C., Philadelphia, Pennsylvania, Attorneys for Appellee.

**JUDGES:**

Mansmann, Cowen and Alito, Circuit Judges. Mansmann, Circuit Judge, dissenting.

**OPINION BY:**

ALITO

**OPINION:**

[*185] OPINION OF THE COURT

ALITO, Circuit Judge

This is an appeal from a final judgment following a jury verdict in favor of Westinghouse Electric Corporation ("Westinghouse") in a suit by five former Westinghouse engineers under the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621 et seq.* The plaintiffs contend that the district court erred in granting Westinghouse's motion for a new trial, in excluding cer-

tain evidence at the second trial, and in refusing to give a supplemental jury instruction at the second trial. We will affirm.

I.

The background of this case is set out in some detail in this court's prior opinion, *Bhaya v. Westinghouse Electric Corp., 832 F.2d 258 (3d Cir. 1987)*, which reversed the district court's entry of judgment notwithstanding the verdict following the first [**2] trial, and in the opinion of the district court granting a new trial on remand. *Bhaya v. Westinghouse Electric Corp., 709 F. Supp. 600 (E.D. Pa. 1989)*. n1 Accordingly, a brief summary will suffice for present purposes.

n1 *See also Bhaya v. Westinghouse Corp., 624 F. Supp. 921 (E.D. Pa. 1985)* (addressing damages and attorney's fees following the first trial).

The five plaintiffs held the position of "negotiation engineer" before Westinghouse eliminated that entire job progression in 1982. The plaintiffs claimed that Westinghouse eliminated their job progression, rather than making layoffs based on seniority from a pool consisting of the negotiation engineers and engineers in two other closely related job progressions (the "availability assurance engineers" and the "applications engineers"), because the negotiation [*186] engineers were older. After the first trial in 1985, the jury returned a verdict for the plaintiffs. Westinghouse then moved for a judgment notwithstanding the verdict, because of the asserted insufficiency [**3] of the evidence. In the alternative, Westinghouse sought a new trial because of alleged trial errors. The district court granted judgment notwithstand-

A 082

Page 2

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

ing the verdict and thus did not address the claimed trial errors that formed the basis for the new trial motion.

On appeal, this court reversed, holding that the evidence, when viewed in the light most favorable to the plaintiffs, was sufficient to support a judgment in their favor. *832 F.2d at 262.* We therefore vacated the judgment notwithstanding the verdict but noted that the district court on remand could consider Westinghouse's as yet undecided motion for a new trial. *Id. at 263.*

On remand, the district court granted a new trial both on liability and damages. At the second trial, the jury found that Westinghouse was not liable, and the plaintiffs have appealed.

II.

A. We will first address the district court's decision to grant a new trial on liability. The district court's decision was based on the admission, over objection, of testimony by one of the plaintiffs, Henry Parzick, concerning out-of-court statements supposedly made at a Westinghouse management meeting. On direct examination, Parzick stated that his immediate supervisor, [**4] Thomas Kinlin, had related a discussion about the termination of the negotiation engineers that had occurred at the meeting in Kinlin's presence. n2 Asked what Kinlin had told him, Parzick testified as follows:

> Somebody in that meeting brought up the point that they might be violating . . . the labor laws of their contract.

When plaintiffs' counsel asked Parzick to state "exactly what Mr. Kinlin said, to the best of [his] recollection," Parzick testified:

> A statement was made that maybe we shouldn't be eliminating this group. Maybe we're doing something illegal or against the contract, and Mr. Nick Kulokoski, who was the personnel manager of the division, said, let's give it a try. What do we have to lose?

Thus, Parzick related out-of-court statements made by three individuals: Kinlin, who allegedly recounted the discussion at the management meeting; an unidentified attendee at the meeting, who allegedly brought up the point that "they might be violating . . . the labor laws of

their contract" and said that "maybe [they] were doing something illegal or against the contract"; and Kulokoski, the division personnel manager, who allegedly responded, "Let's give it a try. What [**5] do we have to lose?"

> n2 Kinlin testified that he did not attend any management meeting at which the termination of the negotiation engineers was discussed, and he stated that he had no recollection of the conversation with Parzick.

In granting a new trial on liability, the district court focused on the statements of the unidentified attendee. The court concluded that the statements were not hearsay because they were offered, not for the truth of the matter asserted, but to show the meaning of Kulokowski's response ("Let's give it a try. What do we have to lose?"), which would have otherwise been meaningless. *709 F. Supp. at 602-03.* While holding that admission of these out-of-court statements was not barred on hearsay grounds, the district court concluded that the unidentified declarant's statements were probably irrelevant (and thus inadmissible under *Fed. R. Evid. 402*) and that, even if relevant, they should have been excluded under *Fed. R. Evid. 403. 709 F. Supp. at 603-04.* The court explained that while the unidentified [**6] attendee reportedly said that the layoffs might be "illegal," he never stated that they might violate the ADEA. The court observed that the unidentified attendee's comments might just as well have concerned the possible violation of the collective bargaining agreement or labor laws but that these possible violations were immaterial in an age discrimination case. *Id.* Thus the [*187] court concluded that the unidentified declarant's statements should have been excluded or, in the alternative, accompanied by a cautionary instruction. *Id.* Applying the new trial standard set out in *McQueeny v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985),* the district court held that the erroneous admission of this testimony necessitated a new trial because it was "quite possible" that Westinghouse's "substantial rights" had been affected. *709 F. Supp. at 604.*

B. When the granting or denial of a new trial is contested on appeal, substantial deference must generally be given to the decision of the trial judge, "who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart" (*Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216, 91 L. Ed. 849, 67 S. Ct. 752 (1947)).* [**7] In *Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 66 L. Ed. 2d 193, 101 S. Ct. 188 (1980),* where a new trial was granted based in part on erroneous evidentiary rulings, the Supreme Court stated that "the authority to grant a new trial

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

. . . is confided almost entirely to the exercise of discretion on the part of the trial court." *See also Waldorf v. Shuta, 896 F.2d 723, 737 (3d Cir. 1990); Honeywell v. American Standards Testing Bureau, 851 F.2d 652, 655 (3d Cir. 1988), cert. denied, 488 U.S. 1010, 109 S. Ct. 795, 102 L. Ed. 2d 787 (1989); Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 921-22 (3d Cir. 1986); Silverii v. Kramer, 314 F.2d 407, 413 (3d Cir. 1963)* ("It is well settled that the granting or refusing of a new trial is a matter resting in the sound discretion of the trial judge and his action thereon is not reviewable upon appeal, save in the most exceptional cases").

Particular deference is appropriate in the present case because the decision to grant a new trial rested on an evidentiary ruling that was itself entrusted to the trial court's discretion. Indeed, a trial judge's decision to admit or exclude evidence under *Fed. R. Evid. 403* may not be reversed unless it is "arbitrary and irrational." [**8] n3 *United States v. De Peri, 778 F.2d 963, 973-74 (3d Cir. 1985), cert. denied, 475 U.S. 1110, 89 L. Ed. 2d 916, 106 S. Ct. 1518 and cert. denied, 476 U.S. 1159, 106 S. Ct. 2277, 90 L. Ed. 2d 720 (1986); United States v. Friedland, 660 F.2d 919, 929 (3d Cir. 1981), cert. denied, 456 U.S. 989, 73 L. Ed. 2d 1283, 102 S. Ct. 2268 (1982); United States v. Long, 574 F.2d 761, 767 (3d Cir.)* ("If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal"), *cert. denied, 439 U.S. 985, 99 S. Ct. 577, 58 L. Ed. 2d 657 (1978).*

n3 The district court did not rule that the out-of-court statement was irrelevant but only that it "probably was irrelevant" *(709 F. Supp. at 603).* We note, however, that the trial court's ruling on relevancy would have been reviewable only for an abuse of discretion. *Pfeiffer v. Marion Center Area School District, 917 F.2d 779,* Slip. op. at 5 (3d Cir. 1990).

Applying these deferential standards of review, we sustain the trial judge's decision to grant a new trial in this case. The trial court's conclusion that the testimony at issue should have been [**9] excluded under *Fed. R. Evid. 403* was unquestionably neither arbitrary nor irrational but reflected an appropriate assessment and weighing of the prescribed considerations. Relevant evidence may be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jurors." Here, the trial judge had solid grounds for concluding that the out-of-court statements at issue had little if any relevance or probative value and that they created a sub-

stantial danger of "unfair prejudice," "confusion of the issues," and "misleading the jurors."

The out-of-court statements had little if any relevance or probative value because they lacked any appreciable link to age discrimination or the ADEA. According to Parzick's testimony, the unidentified attendee specifically mentioned that terminating the negotiation engineers might violate "the labor laws of their contract" or "the contract." The most natural interpretation of this testimony is that it referred [*188] to a possible breach of the collective bargaining agreement. But in an age discrimination case, evidence that management was willing to risk a violation of its [**10] collective bargaining agreement would be relevant only if that fact made it "more probable . . . than it would be without the evidence" that management was also willing to risk a violation of the ADEA. *Fed. R. Evid. 401.* In our judgment, any connection between a willingness to risk a breach of the collective bargaining agreement and a willingness to risk a violation of age discrimination laws is remote at best. n4

n4 The dissent contends (dissenting typescript 5) that evidence of Westinghouse's willingness to risk a break of its collective bargaining agreement was relevant to rebut Westinghouse's defense that the collective bargaining agreement prohibited the company from spreading the reduction-in-force across the three engineering job progressions. Plaintiffs, however, never advanced this theory of relevancy. A trial judge's assessment of relevancy cannot be reversed on appeal based upon an entirely new theory not apparent on the face of the evidence. *See Campbell v. Nordco Products, 629 F.2d 1258, 1264 (7th Cir. 1980);* J. Weinstein & M. Berger, *Weinstein's Evidence* 401[08] at 401-57 to 401-58 (1990) ("Except in a case where the evidence sought to be introduced is relevant on its face, the court may without error sustain an objection to its introduction if the attorney fails to explain its significance.") (footnotes omitted); 1 J. Wigmore, *Evidence* § 17 at 782 (Tillers rev. 1983).

[**11]

Even if the phrase "labor laws of the contract" is interpreted to embrace the entire body of employment law -- an arguable although less plausible interpretation -- the statement in question would still lack appreciable probative value, as does the unidentified attendee's additional statement that the termination might be "illegal" in some unspecified way. Because these broad and vague statements might have referred to countless forms of illegal

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

conduct, the statements in themselves carry little probative weight in proving that management considered the age of the negotiation engineers in deciding to eliminate their jobs. Of course, the probative value of these statements would have been greatly enhanced if they had been uttered during a discussion relating in some way to the ages of the engineers affected by management's decision. But plaintiffs offered no such proof. Without some link to age, these broad and vague references had little probative weight in proving an ADEA case.

By contrast, the out-of court statements created a great danger of "unfair prejudice" (*Fed. R. Evid. 403*), which has been defined as an "undue tendency to suggest decision on an improper basis." Advisory Committee [**12] Note on Rule 403. Evidence that a party committed wrongs other than those at issue in a case often creates a danger of "unfair prejudice" because such evidence may influence a jury to return a verdict based on a desire to punish for the other wrongs. n5 *See* 10 *Moore's Federal Practice* § 403.10[1] at IV-75 & n.9 (1990); E. Cleary (ed.), *McCormick on Evidence* § 185 at 545 (1984); C. Wright & A. Miller, *Federal Practice and Procedure* § 5215 at 281. Here, the testimony indicating that Westinghouse management was willing to engage in conduct that might violate the "labor laws of the contract" or might be "illegal" in some unspecified way created just such a danger. As the trial judge aptly put it, "the jury probably was left with the impression that [Westinghouse's] managers were a lawless bunch." *709 F. Supp. at 600.* The jury might well have been influenced to return a verdict against Westinghouse simply because the jury disapproved of management's generally lawless attitude as portrayed by Parzick's testimony. Thus the testimony at issue here presented a textbook example of unfair prejudice.

n5 Although evidence that Westinghouse management was willing to risk a violation of the collective bargaining agreement or "labor laws" does not appear to fall directly within *Fed. R. Evid. 404(b)*, this evidence is closely akin to evidence falling within this rule. Evidence falling within Rule 404(b) must be carefully analyzed under Rule 403. *See Fed. R. Evid. 404(b)* advisory committee's note.

[**13]

For similar reasons, this testimony also created a great danger of "confusion of the issues." While the jury should have considered only whether Westinghouse had committed age discrimination, the testimony in question invited the jurors to ponder [*189] whether Westinghouse had violated "the labor laws of the contract" or whether it had committed other unspecified illegalities. By tending to divert the focus of the jury's attention in this way, the testimony injected a confusing factor into the case.

Finally, the testimony at issue created a substantial danger of "misleading the jury." The statement that termination of the negotiation engineers might violate the "labor laws of the contract" or might be "illegal" did not necessarily relate in any way to age discrimination; indeed, as previously observed, it seems more likely that these references pertained exclusively to the possibility of breaching the collective bargaining agreement. Yet the admission of these vague and suggestive statements in an age discrimination case had a natural tendency to mislead. This danger is well illustrated by the following passage from the closing argument of plaintiff's counsel. Plaintiffs' counsel told the [**14] jury *(709 F. Supp. at 603 n.2)* (emphasis added):

> Henry Parzick said *unequivocally* that he was told that Westinghouse knew that what they did was wrong, that Kulokoski said . . . might not this be *discrimination*, might not this be *a violation of state and federal statutes*? And Kulokoski, according to Hank Parzick, said . . . yes, let's take our chances.

In fact, the out-of-court statements recounted by Parzick contained no mention of "discrimination" or the "violation of state and federal statutes." But admission of those statements in an age discrimination case tended to mislead by suggesting -- without foundation -- precisely what plaintiffs' counsel inaccurately claimed in his summation. In sum, the district court had ample grounds for concluding that the out-of-court statements in question should have been excluded under Rule 403.

Having identified this incorrect evidentiary ruling, the trial judge was required under *McQueeny v. Wilmington Trust Co., 779 F.2d at 928,* to grant a new trial unless it was "highly probable" that the error did not affect any "substantial rights". No such conclusion was possible in the present case. Indeed, plaintiffs implicitly concede [**15] the importance of the out-of-court statements by arguing in this appeal that the exclusion of the same testimony at the second trial caused them "substantial prejudice" (Appellants' Br. 37) and thus constituted reversible error. *See Fed. R. Civ. P. 61* (judgment may not be set aside based on exclusion of evidence unless necessary to ensure "substantial justice"). Accordingly, it is

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

apparent that the granting of a new trial on liability was justified.

III.

Plaintiffs' remaining arguments clearly lack merit. The district court correctly held that a new trial should be granted on the issue of damages; n6 and in any event, the granting of a new trial on damages was inconsequential, since the district court properly granted a new trial on liability, the jury at the second trial found for Westinghouse on that issue, and plaintiffs have not asserted any sound basis for reversing the judgment entered following that verdict.

> n6 As previously noted, plaintiffs claimed that Westinghouse, instead of terminating all the negotiation engineers, should have spread out necessary layoffs among the members of a larger pool that included the availability assurance and applications engineers. In part for the purpose of showing that any damages should be limited, Westinghouse sought to introduce evidence that some availability assurance engineers had been laid off shortly after plaintiffs, but the district court sustained plaintiffs' objections. In ruling on Westinghouse's new trial motion, however, the district court recognized that this evidence was relevant on the issue of damages because it tended to show that plaintiffs might have been properly laid off a short time later even if plaintiffs' suggestion about spreading out the layoffs had been followed *(709 F. Supp. at 605).*
>
> On appeal, plaintiffs assert that some younger engineers were never laid off. The thrust of plaintiffs' argument appears to be that evidence of the layoffs of some availability assurance engineers was not relevant because that evidence did not conclusively show that plaintiffs would have been laid off at that time. This argument is fallacious, however, because evidence need not be conclusive in order to be relevant. *See Fed. R. Evid. 401.*

**[\*\*16]**

Plaintiffs contest the exclusion at the second trial of the out-of-court statements **[\*190]** just discussed in relation to the first trial. However, the trial judge's decision to exclude those statements at the second trial n7 must be upheld for the same reasons already explained. n8

> n7 Contrary to plaintiffs' contention on appeal, it is apparent that the court at the second trial adhered to its earlier ruling that the out-of-court statements should be excluded under Rule 403. Counsel for Westinghouse argued this point at length, and the court sustained their objection.
>
> During argument, the district court appeared to question whether Kinlin's out-of-court statement was inadmissible on another ground, i.e., lack of sufficient proof of the preliminary facts (see *Fed. R. Evid. 104)* necessary for introduction of that statement as an admission under *Fed. R. Evid. 801(d)(2) (D).* Because we conclude that the district court's exclusion of this evidence under Rule 403 was proper, we need not address this alternative ground for exclusion.

> n8 At the second trial, plaintiffs attempted to tie the out-of-court statements to the subject of age. Parzick testified that after he was notified of his termination, he and Kinlin talked about "the differences in ages." Specifically Parzick testified:
>
> > I told Mr. Kinlin, I said: "How can they do that to us old-timers? How can they really get rid of us old-timers?" And he said: "Hank, I really don't know . . ."
>
> This additional testimony does not fundamentally alter the balance under Rule 403 or demonstrate that the district court's ruling was arbitrary or irrational. This new testimony indicates that Parzick raised the topic of age by referring to the negotiation engineers as "old timers." Arguably it indicates that Kinlin discussed the topic of age in his alleged conversation with Parzick. But this new testimony provides no evidence that age was discussed at the management meeting. Without such a link, the statements at that meeting still have little if any probative value.

**[\*\*17]**

We also reject plaintiffs' contention that the district court erred by refusing to admit as part of their rebuttal case an excerpt from the testimony given at the first trial by one of Westinghouse's witnesses, Charles A. Turnbull. Rebuttal evidence must generally tend to refute the defendant's proof, and a trial judge's decision regarding the scope of rebuttal may not be reversed unless there

Page 6

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

has been a clear abuse of discretion. *See Spesco, Inc. v. General Electric Co., 719 F.2d 233, 239-40 (7th Cir. 1983); Martin v. Weaver, 666 F.2d 1013 (6th Cir. 1981); cert. denied, 456 U.S. 962, 72 L. Ed. 2d 485, 102 S. Ct. 2038 (1982); Hickok v. G.D. Searle & Co., 496 F.2d 444 (10th Cir. 1974);* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* 611 [1] at 611-30 8 n.45 (1990); 6 J. Wigmore, *Evidence* § 1873 (Chadbourn Rev. 1976). The trial court properly exercised that discretion in the present case because the excerpt from Turnbull's prior testimony merely stated in slightly different language what another defense witness said at the second trial.

As this court explained in its prior opinion, the plaintiffs contended that Westinghouse, [**18] instead of terminating all of the negotiations engineers, could have spread out seniority-based layoffs among the availability assurance and applications engineers as well. *832 F.2d at 261.* To support this theory, the plaintiffs presented testimony that they were qualified to perform the work of the engineers in the other job progressions and that "the tasks could have been transferred without a change in plaintiffs' job description." *Id.*

As part of its effort to refute this theory at the first trial, Westinghouse called Turnbull, who "testified that the job tasks could not have been transferred without engaging in collective bargaining unless assumption of those tasks would have required no revision of the plaintiffs' job description." *832 F.2d at 261.* At the second trial, Westinghouse called Robert McBurney, who held the position of Corporate Human Resource Director and who gave essentially the same testimony as Turnbull had at the first trial regarding the transfer of job tasks from the availability assurance engineers and the applications engineers to the negotiations engineers. Although McBurney's direct and cross-examination on this point were extensive, the similarity of [**19] his testimony to Turnbull's is illustrated by the following question and answer on direct examination:

> Q. Can you transfer some duties that don't change the job description without bargaining?
> A. If the duties are already covered in the job description and they are exactly [*191] the same kind of functions already performed.

Since McBurney's testimony was substantially the same as Turnbull's, the district court properly exercised its discretion in excluding the transcript of Turnbull's testimony. n9

n9 Before excluding the Turnbull transcript excerpt on the ground that it was essentially the same as McBurney's testimony, the district court stated that plaintiffs had not given notice of their intention to offer Turnbull's prior testimony, as required by Rule 21 of the Rules of the United States District Court for the Eastern District of Pennsylvania. Because we hold that Turnbull's prior testimony was properly excluded on another ground, we need not address the effect of Local Rule 21.

Finally, we hold that the district [**20] court did not err in refusing to give a third supplemental jury instruction on circumstantial evidence. When the trial judge initially instructed the jury, he included a full and accurate instruction on circumstantial evidence. After deliberating for some time, the jury reported that it could not agree and requested a clarification of the difference between types of evidence. In response, the judge again provided an accurate explanation of direct and circumstantial evidence. Plaintiffs' counsel did not object to this instruction but asked the court to make clear that the plaintiffs could sustain their burden of proof by circumstantial evidence, and the court did so. Following this clarification, one of the jurors asked whether age discrimination could be proven simply by showing that an employer had laid off older, qualified workers while retaining younger workers or whether there must be "an intention on the part of the company to discriminate." The court responded there must be proof that age was a determining factor in the employer's decision.

Plaintiffs' counsel objected that the court's answer "made it sound as if the employer had to make an affirmative statement and/or take [**21] affirmative action as demonstrated by 'direct evidence.'" The trial judge ruled, however, that he had already explained that an employer's intention could be inferred from circumstantial proof.

A trial judge's instructions to a jury must be "considered as a whole, to determine whether they are misleading or inadequate." *Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989).* Unless a trial judge misstates the law, the judge's rulings on points for charge may be reversed only if the judge committed an abuse of discretion. *Id.* In this case, the district court's instructions on direct and circumstantial evidence and on age discrimination were correct, and the court soundly exercised its discretion in refusing to give additional supplemental instructions covering the same matters that had already been explained fully and accurately. Having given correct and complete initial instructions, detailed supple-

Page 7

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

mental instructions, an additional clarification requested by plaintiffs' counsel, and an accurate response to a juror's question, the district court was not required to do any more.

The judgment of the district court will therefore be affirmed.

**DISSENT BY:**

MANSMANN

**DISSENT:**

MANSMANN, Circuit Judge, **[**22]** dissenting.

I respectfully dissent because I believe that the district court committed legal error in two respects: (1) in overturning the first jury's verdict in favor of the plaintiffs and in granting a new trial on the erroneous basis that the testimony of Henry Parzick was irrelevant and prejudicial and in excluding Parzick's testimony at the second trial; and (2) in the second trial, by responding to the jury's questions by language that was incomplete, confusing and misleading with respect to the plaintiffs' burden of proof in circumstantial cases of employment discrimination. I would reinstate the first jury's liability verdict for the plaintiffs and remand for a new trial on damages.

I.

We have repeatedly emphasized that direct evidence in the form of a "smoking gun" is not required to prove discrimination. *See Lockhart v. Westinghouse Credit* **[*192]** *Corp., 879 F.2d 43, 48 (3d Cir. 1989)* ("there is usually no 'smoking gun' evidence of intentional discrimination"); *Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 895 (3d Cir.)(in banc), cert. dismissed, 483 U.S. 1052, 97 L. Ed. 2d 815, 108 S. Ct. 26 (1987)* ("because the plaintiff may meet in alternate ways his burden to show that age was a determinative **[**23]** factor in his discharge, the plaintiff is entitled to show that the employer's explanation was pretextual by proffering evidence which is circumstantial or indirect as well as that which shows directly discriminatory animus"); *Maxfield v. Sinclair Int'l, 766 F.2d 788, 791 (3d Cir. 1985), cert. denied, 474 U.S. 1057, 88 L. Ed. 2d 773, 106 S. Ct. 796 (1986)* (employer statements to the employee that s/he is being fired because of age will often be difficult to obtain); *Dillon v. Coles, 746 F.2d 998, 1003 (3d Cir. 1984)* (in employment discrimination cases direct evidence of the employer's motivation is unavailable or difficult to acquire).

The allocation of burdens of proof and persuasion provided in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and *Texas Dep't of Community Affairs v. Burdine, 450 U.S.*

*248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*, make clear that not only is "smoking gun" evidence not required, but a specially tailored burden-shifting mechanism is available to a plaintiff who cannot produce direct evidence. *See Gavalik v. Continental Can Co., 812 F.2d 834, 853 (3d Cir.), cert. denied, 484 U.S. 979, 98 L. Ed. 2d 492, 108 S. Ct. 495 (1987)* (proof of discrimination under ERISA employs *Burdine* burden-shifting mechanism where direct **[**24]** "smoking gun" evidence is unavailable).

I would hold the excluded testimony of Henry Parzick to be both highly relevant and admissible as an admission of a party opponent. The record as a whole provides the context in which the statement is relevant and lays a proper foundation for a party opponent admission under *Federal Rule of Evidence 801 (d)(2)(D)*. A more complete review of the evidence produced at the first trial n1 makes this clear.

> n1 Because I would hold that the district court erred in granting a new trial on this issue, I would not have the court reach the question of whether the district court properly excluded this testimony at the second trial. Obviously, I would hold it error for the district court to have subsequently excluded this testimony at the second trial.

II.

Although the panel majority accurately summarizes the parties' contentions, additional facts are necessary to explain the relevance of the excluded testimony. While admitting that declining sales had necessitated the reduction-in-force, Westinghouse **[**25]** contended that it was precluded from transferring the plaintiffs to different job progressions by the collective bargaining agreement. Throughout the trial, Westinghouse asserted that it sought conscientiously to conform to the terms of the collective bargaining agreement in terminating the plaintiffs.

At the same time, Westinghouse manager James Borden testified that in deciding to eliminate the negotiation engineers' job progression, Westinghouse managers Borden and McIntyre had not considered plaintiffs' ages, pensions or salaries, however, Borden admitted he had recognized "years of service" as an "emotional issue". Borden testified that Westinghouse staff met weekly over a period of several months to consider reduction-in-force options. According to Borden, executive meetings were also held where Nick Kulokoski, manager of personnel relations, provided guidance on labor laws, the collective bargaining agreement, and compliance with discrimina-

Page 8

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

tion laws. Despite these numerous meetings, Westinghouse failed to document its assertions that its decision to eliminate negotiation engineers was based solely on economic necessity and that factors such as age, pension, or salary had not been assessed. [**26]

Plaintiff Henry Parzick testified that on November 3, 1982, he and other negotiation engineers were called to a meeting with James Borden and their supervisor Thomas Kinlin at which they were informed of their termination. Parzick testified, "one point of interest after the meeting, I did speak to [*193] Mr. Kinlin. We just chatted, and he informed me that at [an executive management] meeting he attended . . . a discussion was held regarding our termination." Parzick then related, over objection, the statements of the unnamed manager and Nick Kulokoski. Parzick also testified that only "management level or above" personnel attended executive meetings. Contrary to the majority's characterization of Kinlin's testimony, in answer to plaintiffs' counsel, Kinlin testified equivocally concerning this conversation, stating that he could have had a "confrontation with Kinlin, . . . but that he could not remember it", however, Kinlin believed "Hank" (Henry Parzick) and did not believe he was lying when he testified. Given the verdict for the plaintiffs, it is highly probable that the jury believed Parzick rather than Kinlin.

III.

Keeping in mind that "smoking guns" are rarely available to the plaintiffs [**27] in employment discrimination cases, the evidence proffered at the first trial was clearly sufficient to establish the relevance of Parzick's testimony. Borden established that staff and management held weekly meetings to discuss layoffs. While he asserted that the plaintiffs' ages were not considered, he conceded recognition of the emotional impact of the plaintiffs' long years of service when deciding to terminate the plaintiffs.

Borden also established that Nick Kulokoski, who allegedly stated "Let's give it a try. What do we have to lose?", advised management regarding compliance with the collective bargaining agreement and discrimination laws. Further, a compartmentalized differentiation between Westinghouse's alleged disregard of the collective bargaining agreement and age discrimination laws ignores the fact that age and seniority often are related and that pensions accrue according to both age and the collective bargaining agreement.

It was certainly for the jury to assess the credibility of Westinghouse's assertion that it never considered the financial implications of terminating groups of employees, specifically, relative savings in salary and pensions, which are tightly [**28] linked with age and seniority. Finally, even if one agrees with the majority that Par-

zick's testimony was not relevant to the plaintiffs' affirmative claim of age discrimination, it was undeniably relevant to challenge Westinghouse's defense that it could not have spread the reduction-in-force across the three engineering job progressions because the terms of the collective bargaining agreement precluded it from doing so. Because the plaintiffs could have met their burden by proving that Westinghouse's alleged business reasons were pretextual, Parzick's testimony was improperly excluded as irrelevant.

With respect to the district court's ruling that Parzick's testimony was unfairly prejudicial under *Federal Rule of Evidence 403*, I do not disagree with the panel majority's use of the abuse of discretion standard of review, but rather with the application of this standard to these facts. To be excluded under Rule 403, evidence must be *unfairly* prejudicial; mere prejudice cannot suffice because "virtually all evidence is prejudicial or it isn't material." *Carter v. Hewitt*, 617 F.2d 961, 972 n.14 *(3d Cir. 1980)*. Quoting Weinstein, we have stated that evidence is unfairly prejudicial [**29] if it

> "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish," or otherwise "may cause a jury to base its decision on something other than the established propositions in the case."

*Carter, 617 F.2d at 972.*

The declarant's statement mentioned "violating . . . the labor laws of their contract" or "doing something illegal or against the contract." Even if the illegality referred to age discrimination and not the collective bargaining agreement, the district court found the statement substantially prejudicial because the jury may have viewed Westinghouse managers as a "lawless bunch."

But Westinghouse itself proffered the defense that it never considered plaintiffs' ages and at all times conformed to the terms and restrictions of the collective bargaining agreement. So it was certainly [*194] material to Westinghouse's defense that it at all times tried to conform to the collective bargaining agreement. Given that Westinghouse repeatedly emphasized such efforts to conform to the collective bargaining agreement, the plaintiffs' one bit of evidence that Westinghouse may not have so scrupulously concerned itself with the collective bargaining agreement cannot be said [**30] to violate the *Carter* standard.

Logically relevant and not unfairly prejudicial, Parzick's testimony was admissible as a party opponent ad-

Page 9

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

mission under *Federal Rule of Evidence 801 (d)(2)(D)*. A statement qualifies as such an admission when

> [it] is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

This rule requires that the declarant be both authorized and acting within the scope of employment, when making an admission on behalf of the defendant. *See Carden v. Westinghouse Electric Corp., 850 F.2d 996, 1002 n.6 (3d Cir. 1988)*. Both statements, "maybe we're doing something illegal or against the contract" and "let's give it a try . . . what do we have to lose?", were made by high level executives authorized to speak on behalf of Westinghouse. Both statements were made during a meeting limited to Westinghouse executives which concerned reduction-in-force options. *See Cline v. Roadway Exp., Inc., 689 F.2d 481, 488 (4th Cir. 1982)* (admitting evidence by employees of statements made by "managers, some specifically identified," at managers [**31] meetings indicating some evidence of age discrimination). *Cf. Carden, 850 F.2d at 1002* (supervisor's statement that "they wanted a younger person" failed to identify "they" as foundation for admission); *Cedeck v. Hamiltonian Federal Sav. and Loan Ass'n, 551 F.2d 1136, 1138 (8th Cir. 1977)* (no admission because declarant unknown).

Moreover, one can infer from their presence at a meeting concerning the impending reduction-in-force that both the unnamed manager and Nick Kulokoski acted within the scope of their employment. For example, Nick Kulokoski, the personnel manager responsible for counsel on legal issues, acted within the scope of his employment when he evidenced Westinghouse's attitude: "Let's give it a try. What do we have to lose?" Westinghouse also cannot "compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman". *Lockhart, 879 F.2d at 54* (rejecting limited view that a manager not associated with plaintiff's division could not make admission for company).

Where the employer is a corporate entity, we have recognized that a manager's comments may not be avoided if later disadvantageous to its litigation posture. [**32] *Id.* ("when a major company executive speaks, "everybody listens" in the corporate hierarchy . . ."). *Contra Staheli v. University of Mississippi, 854 F.2d 121, 127 (5th Cir. 1988)* (professor uninvolved in tenure decision could not make admission for school concerning

denial of tenure); *Hill v. Spiegel, Inc., 708 F.2d 233, 237 (6th Cir. 1983)* (admission made by managers uninvolved in decision to discharge plaintiff made outside the scope of their agency). These facts suffice to lay the foundation that these managers acted within the scope of their employment.

Both the unnamed declarant's and Nick Kulokoski's statements constituted party-opponent admissions. n2 The admissibility of a Rule 801(d)(2)(D) admission does not depend on the plaintiff's ability to name a corporate officer making a damaging admission on behalf of the corporation; rather, identification which establishes the requisite foundation suffices. *See Dudding v. Thorpe, 47 F.R.D. 565, 571 (W.D. Pa. 1969)*. The name of the unnamed declarant, given the fact that he commented upon the legality of the termination decision, is unnecessary because the characteristics attributable [*195] to the declarant based on the context [**33] of the statement satisfy the requirements for a party opponent admission. *Id.* (authorized statement of an unnamed nurse who observed the alleged tort in the recovery room admissible against the hospital).

> n2 Kinlin's declaration to Parzick also satisfies Rule 801(d)(2)(D)'s foundation requirements because Kinlin's statement to Parzick coincided with the meeting at which Parzick was terminated.

Corporations do not proclaim boldly their intent to discriminate and rarely embrace discriminatory statements made by their managers. Yet these people are the ones who act for the corporation and because corporate entities can speak only through employees, managers' articulations may be the only ones evidencing corporate discriminatory intent. If corporate parties are not immune from making Rule 801(d)(2)(D) admissions, then managers' statements made in the scope of their employment must be given the effect of an admission.

IV.

To reverse for a confusing or misleading jury instruction, we "must [**34] be left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations". *United States v. Traitz, 871 F.2d 368, 383 (3d Cir.), cert. denied, 493 U.S. 821, 107 L. Ed. 2d 44, 110 S. Ct. 78 (1989)*. I am left with such a doubt given the circumstances of the supplemental instruction received by the jury within ten minutes of its defense verdict.

The initial charge instructed the jury on the burden of proof as well as direct and circumstantial evidence. After retiring to deliberate at 12:40 p.m., the jury re-

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

turned with questions at 4:20 p.m. n3 The court correctly reinstructed on the difference between direct and circumstantial evidence, whereupon the jury was dismissed briefly. After the jury reentered at 4:33 p.m., the court gave the following charge:

[In answer to the first question:] No. If it was pure happenstance, if there was no design at all, no reason why these men's names should come out and they were older, if it was pure happenstance as I say and not by any design, no, Westinghouse would not be liable.

But if you analyze it, from the very definition that I gave you, it means that that must have been a part of the intention of Westinghouse, because I said [**35] to you that age must be a "determining factor." That means, of necessity, that the employer must have determined that, because you can't have a "determination" in a vacuum. It has to be somebody's determination to make it a "determining factor."

So, therefore, it must be one of the things that influenced Westinghouse. In fact, the thing, one of the things that determined Westinghouse to do the, to act in the way it did.
[In answer to the second question:] No. Because the plaintiff has the burden of proof as I mentioned to you, and if the plaintiff hasn't proven why they did this, then the plaintiff has not sustained the burden of proof.

Plaintiffs' counsel then asked the court to reiterate that the plaintiffs could meet their burden of proof with circumstantial evidence. The court complied. n4

n3 As read into the record by the district court, these questions were:

1. "We are split on our verdict. However, there may be a change of opinion if Westinghouse is still guilty if they [sic.] discriminated by chance rather than by design".
2. "If a juror says that he does not know why Westinghouse made the

decision to layoff employees the way they [sic.] did, should he vote to convict [sic.]?"
3. "What is evidence? Please define the word evidence."

[**36]

n4 The district court charged: "Circumstantial evidence is just as good as direct evidence, provided it leads you to, to a conclusion 'by a preponderance of the evidence.' In other words, it leads you to balance the scales; balances the scales or unbalances them. . . . You can't speculate; no, of course."

At this point, another juror asked an additional question "having to do with the actual definition of age discrimination": "If . . . Westinghouse laid off older workers and retained younger ones, and if they were all fully qualified, [etc.], is that . . . in and of itself age discrimination?" In response, the court stated: "If the age . . . was "a determining factor" in making that decision, that would be age discrimination." The juror responded: "but . . . if it was not [*196] known, it was decided by the individual making this consideration that it was not known why the decision or how the decision was made, why the decision was made to do "this versus this," the mere fact of laying off the older workers and retaining the younger workers, is that age discrimination? You are saying that that is not, [**37] by itself. There has to be an intention on the part of the company . . . to discriminate on the basis of age." The court: "The employer must consider age to be a determining factor in reaching it's [sic.] decision." Plaintiffs' counsel obtained an exception, articulating his concern that the jury "ha[s] left here with a feeling that they need [to] find direct evidence of the employer's intention, . . . and I would ask . . . that that question . . . be answered . . . to include that they can find "intention" and they can find "intentional action" both through direct and circumstantial evidence."

In my view, this last question evidences at least one juror's continuing confusion over the relationship between types of evidence and the burden of proof. Because the jury returned a defense verdict within ten minutes of retiring after this last question, I am left with a "substantial and ineradicable doubt" as to whether the instructions allayed the jury's evident confusion concerning the type of evidence required to meet the plaintiffs' burden of proof. Although the district court repeatedly defined circumstantial evidence, I believe that at least one juror was confused as to whether direct evidence

922 F.2d 184, *; 1990 U.S. App. LEXIS 22315, **;
54 Fair Empl. Prac. Cas. (BNA) 1078; 55 Empl. Prac. Dec. (CCH) P40,462

[**38] was needed to show Westinghouse's discriminatory intent and therefore that the jury may have rendered a defense verdict even though it concluded that Westinghouse's explanation was pretextual.

Based on the foregoing I would summarize my departure from the majority as follows. At the first trial, although I agree with the panel majority that Westinghouse should have had the opportunity to show mitigation of damages, I would reinstate the verdict reached as to liability because I believe the statements made by Westinghouse managers were admissions relevant to age discrimination.

With respect to the second trial, I would reverse because the district court precluded the highly relevant admissible testimony of Henry Parzick and because I am convinced that the charge confused and misled the jury such that the jury believed that the plaintiffs had to prove discriminatory intent by direct evidence.

**A 092**

Westlaw.

617 F.2d 961                                                                      Page 1
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

C

United States Court of Appeals,Third Circuit.
Reginald CARTER, Appellant,
v.
Lowell D. HEWITT, Superintendent; John Fulek,
C.O.; Duane D. Pyles, C.O.; and Gilbert Levi, C.O.,
Appellees.
No. 79-1423.

Argued Jan. 7, 1980.
Decided Feb. 27, 1980.

State prison inmate brought civil rights action based on allegation that he was severely beaten by three prison guards in the course of a routine search of his cell. The United States District Court for the Middle District of Pennsylvania, R. Dixon Herman, J., adopted recommendations of the magistrate and entered judgment for defendants. The inmate appealed, and the Court of Appeals, Garth, Circuit Judge, held that: (1) the admission in evidence of a letter written by the inmate, which amounted to direct evidence of the existence of a plan to file false brutality complaints, did not violate the Federal Rules of Evidence; (2) the admissibility of the letter was not governed by the rule relating to evidence of other crimes, wrongs or acts; (3) the claim that there was insufficient similarity between the complaint filed by plaintiff and the complaint solicited in the letter did not provide a basis for excluding the letter; (4) the use of the letter for impeachment on cross-examination did not offend the rule which generally prohibits the use of extrinsic evidence of specific instances of the conduct of a witness for the purpose of attacking or supporting the witness' credibility; (5) the letter was not unfairly prejudicial; and (6) plaintiff's failure to call the recipient of the letter as a witness to explain the meaning of the letter could not be charged to the court.

Affirmed.

Gibbons, Circuit Judge, dissented and filed opinion.

West Headnotes

**[1] Federal Courts 170B ☞628**

170B Federal Courts
    170BVIII Courts of Appeals

170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
    170BVIII(D)2 Objections and Exceptions
        170Bk627 Evidence and Witnesses
            170Bk628 k. Admission or Exclusion of Evidence. Most Cited Cases
Procedural deficiency arising from fact that plaintiff did not present his objections to admission of evidence to the magistrate or to the district court did not preclude consideration of the objections on appeal where plaintiff, a prison inmate, appeared pro se before the magistrate and the district court.

**[2] Civil Rights 78 ☞1412**

78 Civil Rights
    78III Federal Remedies in General
        78k1408 Admissibility of Evidence
            78k1412 k. Criminal Law Enforcement; Prisons. Most Cited Cases
            (Formerly 78k241, 78k13.13(2))
Where letter, written by prison inmate, which generally described how to file a complaint charging prison guard brutality, bore on the essential factual issue of civil rights suit, that is, whether plaintiff inmate was beaten by prison guards, and where a fact finder could reasonably interpret the letter as reflecting a plan on the inmate's part to promote the filing of false complaints and could further infer that the inmate's own complaint about being beaten had been filed pursuant to that plan, the letter was relevant and admissible unless its admission was otherwise restricted. Fed.Rules Evid. Rule 402, 28 U.S.C.A.

**[3] Evidence 157 ☞138**

157 Evidence
    157IV Admissibility in General
        157IV(C) Similar Facts and Transactions
            157k138 k. Part of Series Showing System or Habit. Most Cited Cases
Where letter which prison inmate sent to a fellow inmate constituted direct and not merely inferential evidence of the existence of a plan to file false brutality complaints, the admission of the letter in evidence, in civil rights action initiated by the inmate, did not implicate the rule of evidence which governs attempts to prove the existence of a plan through evidence of a series of acts that conform to the plan. Fed.Rules Evid. Rule 404(b), 28 U.S.C.A.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

**[4] Courts 106 ⟶96(7)**

106 Courts
    106I Establishment, Organization, and Procedure
       106I(G) Rules of Decision
         106k88 Previous Decisions as Controlling
or as Precedents
           106k96 Decisions of United States
Courts as Authority in Other United States Courts
             106k96(7) k. Particular Questions or
Subject Matter. Most Cited Cases
Cases decided before the Federal Rules of Evidence
were issued could be regarded as authority for
interpreting the rule relating to the admissibility of
evidence of other crimes, wrongs or acts. Fed.Rules
Evid. Rule 404(b), 28 U.S.C.A.

**[5] Criminal Law 110 ⟶369.15**

110 Criminal Law
    110XVII Evidence
       110XVII(F) Other Offenses
         110k369 Other Offenses as Evidence of
Offense Charged in General
           110k369.15 k. Evidence of Other
Offenses to Prove Identity. Most Cited Cases
When the issue is the identity of the perpetrator of a
crime, it is perfectly proper and, indeed, necessary to
exclude other act evidence unless the evidence bears
such a high degree of similarity to the act charged as
to mark it as the handiwork of the accused.
Fed.Rules Evid. Rule 404(b), 28 U.S.C.A.

**[6] Evidence 157 ⟶357**

157 Evidence
    157X Documentary Evidence
       157X(C) Private Writings and Publications
         157k357 k. Letters, Telegrams, and Other
Correspondence. Most Cited Cases
Contention of civil rights plaintiff, a prison inmate,
that there was insufficient similarity between the
prison brutality complaint that he filed and
complaints that he allegedly solicited in a letter to a
fellow inmate provided no basis for refusing to admit
the letter in evidence where plaintiff conceded that he
both wrote the letter and filed a complaint alleging
that he was beaten by prison guards and where the
letter constituted direct evidence of a plan to file false
prison brutality complaints. Fed.Rules Evid. Rule
404(b), 28 U.S.C.A.

**[7] Witnesses 410 ⟶352**

410 Witnesses
    410IV Credibility and Impeachment
       410IV(B) Character and Conduct of Witness
         410k352 k. Competency of Impeaching
Evidence in General. Most Cited Cases
The principal concern of the rule which governs
admission of specific instances of conduct to attack
or support the credibility of a witness is to prohibit
impeachment through extrinsic evidence of the
witness' bad acts when this evidence is to be
introduced by calling other witnesses to testify.
Fed.Rules Evid. Rule 608(b), 28 U.S.C.A.

**[8] Witnesses 410 ⟶352**

410 Witnesses
    410IV Credibility and Impeachment
       410IV(B) Character and Conduct of Witness
         410k352 k. Competency of Impeaching
Evidence in General. Most Cited Cases
When extrinsic evidence concerning specific
instances of the conduct of a witness is obtained from
and through examination of the very witness whose
credibility is under attack, the core concerns of the
rule relating to use of specific instances of conduct to
attack the credibility of a witness are not implicated.
Fed.Rules Evid. Rule 608(b), 28 U.S.C.A.

**[9] Witnesses 410 ⟶352**

410 Witnesses
    410IV Credibility and Impeachment
       410IV(B) Character and Conduct of Witness
         410k352 k. Competency of Impeaching
Evidence in General. Most Cited Cases
The purpose of the rule which generally prohibits
introduction of extrinsic evidence of specific
instances of a witness' conduct for the purpose of
attacking or supporting the witness' credibility is to
avoid minitrials on wholly collateral matters which
tend to distract and confuse the jury. Fed.Rules Evid.
Rule 608(b), 28 U.S.C.A.

**[10] Witnesses 410 ⟶352**

410 Witnesses
    410IV Credibility and Impeachment
       410IV(B) Character and Conduct of Witness
         410k352 k. Competency of Impeaching
Evidence in General. Most Cited Cases
The general ban on the introduction of extrinsic
evidence of specific instances of conduct of a witness
for the purpose of attacking or supporting the witness'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

credibility should be relaxed when the witness sought to be impeached admits the impeaching act. Fed.Rules Evid. Rule 608(b), 28 U.S.C.A.

**[11] Witnesses 410 🔑 331.5**

410 Witnesses
    410IV Credibility and Impeachment
        410IV(A) In General
            410k331.5 k. Competency of Impeaching
Evidence in General. Most Cited Cases
            (Formerly 410k3311/2)
Use of letter written by civil rights plaintiff, a prison inmate, for impeachment purposes on cross-examination did not offend the rule which generally prohibits use of extrinsic evidence of specific instances of a witness' conduct for the purpose of attacking the witness' credibility where plaintiff did not deny having written the letter and where the credibility of plaintiff was the critical issue. Fed.Rules Evid. Rule 608(b), 28 U.S.C.A.

**[12] Evidence 157 🔑 99**

157 Evidence
    157IV Admissibility in General
        157IV(A) Facts in Issue and Relevant to Issues
            157k99 k. Relevancy in General. Most Cited Cases
The rule which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion does not offer protection against evidence that is prejudicial in the sense of being detrimental to a party's case; rather, the rule protects against evidence that is unfairly prejudicial. Fed.Rules Evid. Rule 403, 28 U.S.C.A.

**[13] Evidence 157 🔑 99**

157 Evidence
    157IV Admissibility in General
        157IV(A) Facts in Issue and Relevant to Issues
            157k99 k. Relevancy in General. Most Cited Cases
Evidence is "unfairly prejudicial," for purpose of the rule which permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, only if the evidence has an undue tendency to suggest decision on an improper basis or if the evidence appeals to the jury's sympathies, arouses its sense of horror or otherwise might cause the jury to base its decision on something other than the legal propositions relevant

to the case. Fed.Rules Evid. Rule 403, 28 U.S.C.A.

**[14] Civil Rights 78 🔑 1412**

78 Civil Rights
    78III Federal Remedies in General
        78k1408 Admissibility of Evidence
            78k1412 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
            (Formerly 78k241, 78k13.13(2))
Letter written by civil rights plaintiff, a prison inmate, while undoubtedly prejudicial to his case in that it resulted in the district court ruling against him, presented no danger of unfair prejudice where the letter was offered by defendants to suggest that plaintiff was not in fact beaten by prison guards as he claimed and that plaintiff was lying when he testified to the contrary and where plaintiff's credibility was the central issue at the trial. Fed.Rules Evid. Rule 403, 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[15] Civil Rights 78 🔑 1424**

78 Civil Rights
    78III Federal Remedies in General
        78k1424 k. Trial in General. Most Cited Cases
            (Formerly 78k243.1, 78k243, 78k13.14)
Failure of civil rights plaintiff, a prison inmate, to call the recipient of a certain letter to explain the meaning of the letter could not be charged to the district court where it was only before there had been a ruling on the relevance and admissibility of the letter that the inmate asked to call the recipient as a witness and where, after the magistrate ruled the letter relevant and admissible, the inmate did not renew his request to call the recipient of the letter.

**\*963** Sally A. Lied (argued), Deputy Atty. Gen., Edward G. Biester, Jr., Atty. Gen., Dept. of Justice, Harrisburg, Pa., for appellees.
James D. Crawford (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.

Before GIBBONS, ROSENN and GARTH, Circuit Judges.

OPINION OF THE COURT
GARTH, Circuit Judge:
We are called upon to determine whether a letter written by the plaintiff Reginald Carter, a prison inmate, violated the Federal Rules of Evidence when it was read and admitted into evidence at the trial of a s. 1983 action brought by Carter against prison

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
(Cite as: 617 F.2d 961)

authorities. We determine that it did not, and therefore affirm the judgment of the district court in favor of the defendants.

I.

Reginald Carter is an inmate at the Pennsylvania State Correctional Institution at Huntingdon. He claims that he was severely beaten in the course of a routine "shakedown," or search, of his cell on September 22, 1977 by three prison guards, defendants John Fuiek, Duane Pyles, and Gilbert Levi. On the date of the incident, Carter was housed in Huntingdon's maximum security block as a result of his role in an escape attempt a week earlier in which a guard was seriously injured. Carter brought suit against the three guards and against Lowell Hewitt, superintendent of the prison, under 42 U.S.C. s 1983.

The defendants moved to dismiss the complaint, or, in the alternative, for summary judgment. Supporting affidavits were filed with their motion. The action was referred to a U.S. Magistrate under *964 28 U.S.C. s 636 (1976). The Magistrate directed Carter to file responsive affidavits, but Carter claimed that he was unable to do so due to the restrictions he was subject to as a maximum security prisoner. Faced with this circumstance, the Magistrate scheduled an evidentiary hearing at the prison, at which time Carter's factual contentions were fully tried.

At the hearing, conducted without a jury on July 24, 1978, Carter presented three witnesses and also testified himself. The three witnesses were inmates housed in cells adjacent to or near Carter's at the time of the alleged beating. They all testified that Fuiek, Pyles, and Levi, the three defendant guards, came to Carter's cell shortly after 2:00 in the afternoon of September 22, 1977, ordered him out of the cell, and proceeded to beat him with batons, flashlights, fists, and feet. They all testified that they could not actually see the beating, due to the restricted visibility from their cells, but that they could hear the blows being landed. Two testified that they never noticed any bruises on Carter as a result of the beating; one testified that he noticed some swelling of Carter's face.

Carter testified to the beating in greater detail. He stated that he was hit on the head three or four times with a flashlight and hit 30-35 times with a baton. He also claimed he was kneed in the face, causing his mouth to bleed. He testified, however, that the only

visible signs of the beating as early as a day or two later were a swollen lip and some bruises on the back of his neck; all other injuries, he claimed, were covered by his clothes.

The defense called as witnesses the three defendant guards. They testified that they went to Carter's cell on the day in question for a routine shakedown. Fuiek entered the cell, ordered Carter out, and commenced the search. When Carter left the cell, he grabbed Officer Levi's baton and a struggle ensued. Pyles tried to pull Carter off Levi. Fuiek heard the commotion, left the cell, and demanded that Carter release the baton with the words, "turn it loose or I'll run this (flashlight) through your face." Carter then released the baton, and Fuiek completed his search. All three guards claimed that Carter had not been hit by anyone in any way.

The defense also put in the testimony of prison infirmary supervisor Morgan, that Carter would have shown more extensive injuries if he had been beaten as badly as he claimed, or in the manner that he described.

The incident giving rise to this appeal occurred during Carter's cross-examination. Carter was shown a letter written by one "Abdullah" to a fellow inmate at Huntingdon. Carter admitted that he had written the letter, and also admitted that he had denied writing this same letter when he had been questioned as to its authorship in an earlier prison disciplinary proceeding. Defense counsel asked Carter to read the letter. Carter objected on the grounds of relevance, claiming that the letter had been written six months after the alleged beating. The Magistrate then ordered Carter to read the letter but expressly reserved ruling on whether the letter was admissible. Complying with the Magistrate's direction, Carter read the letter aloud. The letter, which was undated, generally described to its unidentified recipient how to file a complaint charging prison guard brutality.[FN1] In *965 its most significant portion, the letter reads:

> FN1. In its entirety, the letter states:
> Dig My Brother!
> Here's some carbon paper to make copies of the complaint you should hook up.
> Make the complaint out like so:
> So & so guards came to my cell on or about (date) and threatened me saying, (whole rap with maybe a little yeast). Say that you said nothing for fear of your life and thereafter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

you've been suffering from acute tension and headaches.

Put in appeal, via request slip to Deputy Supt. of Operations Kelly if it was claimed you had a weapon. Say in your request that you had no weapon & that such shank junk was fabricated. Say that you were jacked up by guards & brought to hole and handled very bad by guards. Make complaint of how guards mishandled you.

This is a set up my brother compile complaints to be used for bullshit courts, possibly news media, and a radio program in Pittsburg (sic) & W.D.A.S. down Philly.

We want to establish a pattern of barbaric brutal harrassment (sic) and turn it on these chumps to the max. Write a letter to this dude and explain your problem briefly . . . and ask this dude to come visit you for a rap to aid you in legal affairs:

Charles Vierbach
741 Washington St.
Huntingdon, PA.

Make two or three copies (carbon) of your complaint, legal letters (sealed up in envelope) and request slips! Make sure I get a copy of all your stuff!

Abdullah

This is a set up my brother compile complaints to be use for bullshit courts, possibly news media, and a radio program in Pittsburg (sic) & W.D.A.S. down Philly.

We want to establish a pattern of barbaric brutal harrassment (sic) and turn it on these chumps to the max.

Defense counsel suggested that this letter was a direction to file a false brutality complaint. Carter claimed that he was only encouraging the filing of a legitimate complaint.

Shortly after the hearing, the Magistrate submitted proposed findings of fact and conclusions of law to the district court. Resolving the matter that had been expressly reserved, the Magistrate admitted the letter in evidence as reflecting on Carter's credibility and demonstrating a modus operandi on Carter's part of filing false brutality complaints. Relying in part on the letter, the Magistrate recommended that the district court find that no beating had occurred and that judgment be entered in favor of the defendant guards. As to Superintendent Hewitt, the Magistrate recommended that his motion for summary judgment

be granted since Carter had neither alleged nor proved that Hewitt had directed or encouraged the beating in any way. The district court adopted the Magistrate's recommendations [FN2] and entered judgment for the defendants.[FN3]

> FN2. 28 U.S.C. s 636(b)(1) (1976) provides in pertinent part:
> Within ten days after being served with a copy (of the magistrate's report), any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.
> Carter, who appeared pro se before the Magistrate and district court, filed no objections to the Magistrate's report within the specified time period; he claims that he was misled about the need to do so. As a result, the district court conducted no de novo factual determinations and simply adopted the Magistrate's recommendations. After the district court's opinion was issued, Carter did file objections to the Magistrate's report. The district court then issued a one page memorandum opinion construing Carter's objections as a motion to reconsider the district court's earlier opinion, and denying it on the ground that all the issues raised in Carter's objections had been considered previously.
> We need not consider whether the district court's disposition satisfies the de novo review requirement of s 636(b)(1), for two reasons. First, Carter does not raise this issue on this appeal (Carter on appeal is represented by counsel); and, second, the sole issue which is raised here, admissibility of the letter, presents a question of law as to which our own review is plenary. Thus, we pursue this matter no further.

> FN3. The district court's opinion concluded: "The motions for summary judgment of the Defendants will be granted and the actions dismissed." If this remark is taken as an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

Page 6

indication that the Magistrate and district court had dealt with this action as a matter for summary judgment, and had granted judgment to the defendants on the ground that Carter had not raised a "genuine issue as to any material fact," F.R.Civ.P. 56, our appropriate course would be to reverse and remand for trial on the merits, since Carter plainly has raised a material dispute of fact. The district court's reference to summary judgment, however, does not reflect what actually occurred. Once Carter informed the Magistrate that he could not obtain affidavits to meet those filed by the defendants, the Magistrate dispensed with the summary judgment proceeding and scheduled a full evidentiary hearing. In his order setting a date for the hearing, the Magistrate wrote:

It is apparent that a material fact in this case is at issue, that is, whether the Plaintiff was wrongfully beaten as a result of the actions and inactions of the Defendants on September 22, 1977. As a result, an evidentiary hearing must be held before the undersigned so that he can render proposed findings of facts and conclusions of law to the Court.

All the parties' factual contentions were tried at that hearing; the Magistrate's report makes clear that he was then regarding the case as a matter for final determination on the merits. None of the parties·here contend that the hearing was anything less than that. In these circumstances, then, we regard the proceedings below as constituting a final determination after trial, and not a summary judgment disposition. This same view was expressed by the Court of Appeals for the Eighth Circuit in considering a case which reached it in a similar procedural posture. Nielsen v. Western Electric Co., 603 F.2d 741, 743 (8th Cir. 1979).

**\*966** [1] Carter now appeals, challenging admission of the letter on three grounds. First, he claims that the letter constitutes character evidence rendered inadmissible by F.R.Evid. 404. Second, he claims that the letter is extrinsic evidence used to prove bad acts to impeach his credibility, and is therefore inadmissible under F.R.Evid. 608(b). Finally, he contends that, even if otherwise admissible, the letter should have been excluded under F.R.Evid. 403 because "its probative value is substantially outweighed by the danger of unfair prejudice." [FN4]

FN4. Carter presented none of these three objections to the Magistrate or to the district court; rather, his objection apparently was solely in terms of relevance (on the ground that the letter was written six months after the alleged beating). Under such circumstances, we generally decline to consider the claims on appeal. This is especially so with regard to the claim based on F.R.Evid. 403; under our recent decision in United States v. Long, 574 F.2d 761 (3d Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978), a party must specifically request the trial court to determine whether probative value is "substantially outweighed by the danger of unfair prejudice," before the court is required to invoke the rule. Id. at 766. As we noted earlier, however, Carter appeared pro se before the Magistrate and district court. Recognizing his pro se status, see, e. g., Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972) (per curiam), and consider Carter's claims on the merits here.

The defendants meet none of these contentions in their brief. Rather, in what we must regard as a questionable litigation strategy, they do not argue that the letter is admissible; they argue, instead, that even if admission of the letter constituted error, the error was harmless. If the letter was inadmissible, as Carter contends, we would find it difficult to hold that its admission was harmless. Both the Magistrate and the district court expressly relied, and relied heavily, on the letter in their opinions. Since, however, on our own analysis, we cannot agree with Carter that the letter was inadmissible, we do not reach the defendants' claim that any such error was harmless.

We consider, and reject, each of the three grounds of inadmissibility raised by Carter, in turn.

II.

*A. The Rule 404 Claim*

[2] We believe, quite simply, that the letter is admissible, substantive evidence because it bears on the central factual issue in the case whether Carter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 098

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
(Cite as: 617 F.2d 961)

was beaten by prison guards on September 22, 1977. The standard of relevance established by the Federal Rules of Evidence is not high: evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to determination of the action more probable or less probable than it would be without the evidence." F.R.Evid. 401 (emphasis added). A factfinder could reasonably interpret this letter as reflecting a plan on Carter's part to promote the filing of false complaints. A factfinder could further draw the inference that Carter's own complaint about being beaten on September 22, 1977 had been filed pursuant to that plan. Thus, the letter is relevant: it has some tendency to make Carter's assertion that he was beaten less likely to be true than it would be without the evidence. Since the letter is relevant, it is also admissible, unless its admission is otherwise restricted. F.R.Evid. 402.

[3] Carter claims, however, that F.R.Evid. 404(b) constitutes a restriction on admissibility. This rule provides:
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is *967 not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Carter claims that before evidence of his act, solicitation of a false complaint, may be admitted under this rule to prove a plan of filing false complaints, there must be much greater similarity between the action solicited in his letter (the filing of a false complaint) and the action taken by Carter (the filing of a complaint charging the defendants with beating Carter on September 22, 1977). We cannot agree; his contention misconstrues both the nature of the evidence introduced and the rule itself.

Federal Rule of Evidence 404(b), in this context, governs attempts to prove the existence of a plan through evidence of a series of acts that conform to the plan. Thus, the rule would be implicated here if the defendants, merely by showing that Carter had filed false brutality complaints on several other occasions, thereby sought to prove that Carter had conceived and implemented a plan of filing such false complaints. This letter does not, however, serve that purpose. Rather, Carter's letter constitutes direct evidence of the existence of a plan, in its statement that "(t)his is a set up my brother . . . . We want to

establish a pattern of barbaric brutal harrassment (sic) and turn it on these chumps to the max."

The difference is critical, and may be demonstrated by a simple example. Assume Carter's letter had stated, instead of its actual content, that "I think we can put these prison guards on the defensive by establishing a pattern of prison guard harassment. I intend doing so by encouraging prisoners to file numerous false complaints against the guards. Pursuant to this plan, I filed a false complaint of a beating by three guards on September 22, 1977." It could not be claimed that rule 404 would require such evidence to be in the form of proof of a series of discrete false complaints, and that in the absence of such proof the letter was inadmissible. And if we add to this hypothetical letter a request to the recipient to file a false complaint himself, it could not be claimed that rule 404 would demand great similarity between the complaint solicited and the complaint filed earlier by the author, before the letter could be admitted into evidence. The reason is clear. In the typical case of proof of a plan under the rule, the trier of fact is asked to infer the existence of the plan merely from proof of a series of similar acts. In such a case, the effectiveness of the proof of a plan depends wholly on the similarity of the acts shown.

By contrast, however, in the hypothetical letter described above and in Carter's actual letter, there is direct evidence of the existence of the plan; the letters are strong evidence of a plan even if there is no proof of any complaint filed by the author other than the one at issue in the case, and even if the recipient of the letter is not asked to file a false complaint. Since, these letters prove the plans directly and not inferentially, they fall outside the scope of rule 404: the letters are not evidence of other acts used as indirect proof of a plan, but direct evidence of the existence of the plan itself.[FN5] When there is direct evidence of a plan, admissibility does not depend on proof of a series of highly similar acts. Therefore, Carter's letter must be deemed admissible. *968 If the hypothetical letters described above are admissible, as surely they are, then so is Carter's; the differences among them go only to probative weight, not admissibility. While some inferences, no doubt, must be drawn from Carter's letter to reach the conclusion that he had a plan of filing false complaints and encouraging others to do so, and that the complaint about the incident of September 22, 1977 was part of this plan, these inferences only render the letter less probative, not less admissible. See United States v. Ravich, 421 F.2d 1196, 1204 n.10 (2d Cir.) (Friendly, J.), cert. denied, 400 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970).

FN5. We do not suggest in our analysis here that the proviso in the second sentence of F.R.Evid. 404(b) would preclude admission of the letter into evidence if Carter had denied writing it. Carter's letter was admissible to prove his plan as long as there was adequate, independent evidence of his authorship. Because Carter has conceded writing the letter, we do not discuss at length the admissibility of the letter if Carter had not made this concession. We observe, however, that, with a proper foundation, the proviso of the second sentence of rule 404(b) might very well support the admission of the letter into evidence if Carter, instead of admitting his authorship, had denied it.

Carter's admission of his authorship plays a different and more important role when the letter is offered as impeachment, rather than substantive, evidence. See part II(B) and note 11 infra.

[4][5][6] Even assuming, however, that rule 404 governs the admissibility of the letter, and that Carter's letter falls within rather than without, the scope of the rule, Carter misconstrues the rule's similarity requirement. In those cases demanding striking similarities between the act in question and the acts sought to be proved as evidence of a pattern, the issue is the identity of the perpetrator of the act (generally crime) in question. The typical context is that defendant Jones is charged with crime X, and the prosecution offers evidence of crimes Y and Z, which Jones concedes committing. The prosecution then asks the trier of fact to infer that since crime X is so peculiarly similar to crimes Y and Z, it must have been Jones who committed crime X. See, e. g., United States v. Goodwin, 492 F.2d 1141, 1154 (5th Cir. 1974); Drew v. United States, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (D.C.Cir.1964).[FN6] When the issue is identity, it is perfectly proper and, indeed, necessary, to exclude other act evidence unless "it bears such a high degree of similarity as to mark it as the handiwork of the accused." United States v. Goodwin, 492 F.2d at 1154. But identity is not an issue in this case; Carter concedes that he both wrote the letter and filed the complaint about the September 22, 1977 beating. The issue is rather what light the letter sheds on Carter's brutality complaint. There is no fear, as in the identity cases, that the factfinder may draw an erroneous conclusion as to the identity

of the person who committed a crime or performed an act. There is no need, then, for the "striking similarity" required in the identity cases, and little reason to hesitate to place this evidence before the trier of fact to draw all appropriate inferences.[FN7] The limitation of the "striking similarity" requirement to cases in which identity is the issue is well made in United States v. Myers, 550 F.2d 1036 (5th Cir. 1977). The court there stated:

FN6. These two cases, cited by Carter in support of his position, were decided before the Federal Rules of Evidence were issued. Rule 404, however, is in essence a codification of the common law approach, S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 129 (2d ed. 1977), and these pre-rule cases may be regarded as authority for interpreting the rule.

FN7. In addition to the distinction represented by the presence of the identity issue in the typical rule 404(b) cases, those cases also tend to be criminal prosecutions. Thus, the "striking similarity" required there serves the accused's due process right to a fair trial. In a civil suit such as Carter's, of course, due process considerations are much less weighty.

The government asserts that the evidence of the Pennsylvania bank robbery was admissible to prove that Myers committed the Florida bank robbery because it exhibits his characteristic modus operandi. This is a proper purpose. The probity of evidence of other crimes when introduced for this purpose depends upon both the uniqueness of the modus operandi and the degree of similarity between the charged crime and the uncharged crime. Of course, it is not necessary that the charged crime and the other crimes be identical in every detail. But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person. The more unique each of the common features is, the smaller the number that is required for the probative value of the evidence to be significant. But a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, **\*969** may be of significant probative value when considered together. . . .

A much greater degree of similarity between the charged crime and the uncharged crime is required

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. We have consistently held that for evidence of other crimes to be admissible the inference of identity flowing from it must be extremely strong.

Id. at 1045 (footnotes and citations omitted). See United States v. Powell, 587 F.2d 443, 448 (9th Cir. 1978).

We reject, then, Carter's contention that there was insufficient similarity between the complaint that he solicited in the letter and the complaint that he filed, to allow admission of the letter under rule 404. We hold that the letter was properly admissible as substantive evidence.

### B. The Rule 608(b) Claim

The Magistrate and the district court found the letter admissible in part because it bore on Carter's credibility in testifying that he had suffered a beating at the hands of the defendants. Carter claims this use of the letter violates the limitations on impeachment set forth in F.R.Evid. 608(b). We disagree.

[7] Rule 608(b) provides:
(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The principal concern of the rule is to prohibit impeachment of a witness through extrinsic evidence of his bad acts when this evidence is to be introduced by calling other witnesses to testify. Thus, Weinstein and Berger describe the extrinsic evidence ban as follows:
Courts often summarize the no extrinsic evidence rule by stating that "the examiner must take his (the witness's) answer." This phrase is descriptive of federal practice in the sense that the cross-examiner cannot call other witnesses to prove the misconduct

after the witness' denial; it is misleading insofar as it suggests that the cross-examiner cannot continue pressing for an admission a procedure specifically authorized by the second sentence of Rule 608(b).

3 J. Weinstein & M. Berger, Weinstein's Evidence P 608(05), at 608-22 (1978) (footnote omitted).

Similarly, McCormick writes: [FN8]

> FN8. McCormick's statement does not describe rule 608(b) but rather current practice at common law. This portion of the rule, however, simply codifies the common law practice in those jurisdictions that permit bad act impeachment. See S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 312 (2d ed. 1977); 3 J. Weinstein & M. Berger, Weinstein's Evidence P 608(05), at 608-21 (1978). Thus, McCormick's description of the rule at common law may be used as an aid in interpreting rule 608(b).

In jurisdictions which permit character-impeachment by proof of misconduct for which no conviction has been had, an important curb is the accepted rule that proof is limited to what can be brought out on cross-examination. Thus, if the witness stands his ground and denies the alleged misconduct, the examiner must "take his answer," not that he may not further cross-examine to extract an admission, but in the sense that he may not call other witnesses to prove the discrediting acts.
E. Cleary, McCormick on Evidence s 42, at 84 (2d ed. 1972) (footnotes omitted).

[8] Thus, the great majority of the decisions finding violations of rule 608(b) do so when the extrinsic evidence that is challenged*970 is obtained from a witness other than the one whose credibility is under attack. When, however, the extrinsic evidence is obtained from and through examination of the very witness whose credibility is under attack, as is the case here, we must recognize that the rule's core concerns are not implicated. There is, however, an even more significant reason for finding no violation of the extrinsic evidence rule here: Carter did not deny having written the letter; rather, he conceded his authorship but claimed that the letter was not an effort to encourage the filing of false complaints.

Carter's adoption of the letter, and thus his admission of the act used to impeach him, distinguishes this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
(Cite as: 617 F.2d 961)

case from every case where the witness, whose credibility is under attack, has denied the evidence which had been obtained from or through him, thus leading to a holding that the extrinsic evidence rule has been violated. In those cases, the witness has denied, rather than admitted, the acts used to impeach him. The impeachment process thus would have required the examiner to produce additional evidence to refute the witness's denial of the acts charged. Such a process makes apparent the basis for the rule against extrinsic evidence: if refutation of the witness's denial were permitted through extrinsic evidence, these collateral matters would assume a prominence at trial out of proportion to their significance. In such cases, then, extrinsic evidence may not be used to refute the denial, even if this evidence might be obtained from the very witness sought to be impeached. But, as we have observed, Carter's case does not present such a situation.

The impeaching letter with which Carter was confronted was not met by a denial of his authorship. Carter's admission that he wrote the letter distinguishes this case from all cases relied on by him. Carter relies especially heavily on United States v. Herzberg, 558 F.2d 1219 (5th Cir.), cert. denied, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). In Herzberg, two defendants were convicted of using the mails in a scheme to defraud. On cross-examination, the prosecutor asked one of the defendants, Barnes, if any fraud litigation had arisen out of a business relationship he had had with a Mrs. Vosack. In response to Barnes's denial, the prosecutor showed Barnes the opinion of the Arizona Supreme Court in a suit brought by Mrs. Vosack against him and others, and asked him to read aloud the last sentence of the opinion. This sentence revealed that the court was affirming a decision below that Barnes had defrauded Vosack. The court held that this line of questioning violated the extrinsic evidence ban of rule 608(b). 558 F.2d at 1222-23.

Thus, the Herzberg court found rule 608(b) violated only when the evidence was introduced after Barnes denied his bad act. Every other case in which the extrinsic evidence ban has been found violated by evidence brought forth during cross-examination of the witness under attack likewise fits this pattern. In each case, the extrinsic evidence was employed after a denial by the witness under attack of the specific instances of conduct. See, e.g., United States v. Turquitt, 557 F.2d 464 (5th Cir. 1977); United States v. Dinitz, 538 F.2d 1214 (5th Cir. 1976), cert. denied, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977); Carlsen v. Javurek, 526 F.2d 202 (8th Cir.

1975).[FN9]

FN9. In Turquitt, the defendant was asked on cross-examination by the prosecution whether he had ever signed a lease under the alias of Eddie Von Blitzen. The defendant denied ever having done so. Over objection, the prosecutor introduced into evidence a rental application form and lease for the defendant's apartment, both of which bore the signature Eddie Von Blitzen. The Court of Appeals reversed on this ground. 557 F.2d at 466-68.
In Carlsen, the plaintiff brought suit against a doctor, and others, claiming that the doctor's malpractice was the cause of the death of the plaintiff's wife. On cross-examination, the plaintiff testified that his relationship with his wife had been very good. The defendants' counsel then introduced the record of the plaintiff's conviction for assault and battery of his wife. The Court of Appeals ruled that admission of this record of conviction ran afoul of rule 608(b). 526 F.2d at 210.
In Dinitz, the defense sought to impeach a government witness through introduction of his prior inconsistent testimony at an unrelated trial. The court's opinion does not explicitly state that the witness denied that he had offered certain testimony at the earlier trial, see 538 F.2d at 1224, but such a denial may be assumed; if he had not testified differently at the second trial and denied his conflicting testimony at the earlier trial, there would be no need to attempt impeachment through use of the earlier testimony.
In both Dinitz and Carlsen, the trials were conducted prior to the effective date of the Federal Rules of Evidence. However, the courts indicate, implicitly in Dinitz and explicitly in Carlsen, that their results would be the same under the Federal Rules. See Dinitz, 538 F.2d at 1224; Carlsen, 526 F.2d at 210.

*971 The sole case analogous to this one, i. e., in which the challenged witness did not clearly deny the alleged instances of conduct, found no violation of rule 608(b) when documentary proof of those instances was introduced during questioning of the witness. In United States v. Senak, 527 F.2d 129 (7th Cir. 1975), cert. denied, 425 U.S. 907, 96 S.Ct. 1500,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

47 L.Ed.2d 758 (1976),[FN10] an attorney was charged with unlawfully soliciting payment from clients whom he had been assigned to represent in his position of public defender. On cross-examination, the prosecution asked Senak whether he had reported a certain fee on his income tax return. He responded that, if his return did not disclose the fee, then it was solely through neglect rather than intentional wrongdoing. The prosecution then introduced into evidence Senak's IRS records, which revealed that the fee had not been reported.

> FN10. In Senak, the trial was conducted prior to the effective date of the Federal Rules of Evidence. The court made clear, however, that its result would be the same under the rules. See 527 F.2d at 145.

Senak claimed that this cross-examination violated rule 608(b), but his contention was rejected. While the court's reasoning is not perfectly clear, it concludes that the introduction of the records did not constitute proof of specific instances of conduct through extrinsic evidence, but merely inquiry into such conduct on cross-examination, which is permitted by the rule. See 527 F.2d at 145. Thus, no violation of rule 608(b) was found even though the IRS records were utilized and admitted as extrinsic evidence.

[9] The distinction noted here between our case and those cases in which the extrinsic evidence ban was found to be violated by evidence brought forth during cross-examination of the witness under attack that Carter admitted the conduct charged while all other witnesses denied it provides a sound basis for allowing admission of Carter's letter. The purpose of rule 608(b)'s extrinsic evidence ban, as noted, is "to avoid minitrials on wholly collateral matters which tend to distract and confuse the jury." United States v. Simmons, 444 F.Supp. 500, 507 (E.D.Pa.1978). Wigmore similarly describes the rationale behind the common law ban on extrinsic evidence: to prevent confusion of issues through proliferation of testimony on minor matters; and to prevent unfair surprise arising from false allegations of improper conduct. 3A Wigmore on Evidence s 979, at 826-27 (Chadbourn rev. ed. 1970). These reasons for barring extrinsic evidence lose their force when the witness whose credibility is challenged concedes the alleged acts. No issues are confused or time wasted through a trial of a collateral matter: no trial is needed since the matter is conceded. The trial judge may exercise control over the degree to which the conceded

matters are explored through his power to bar irrelevant or cumulative evidence. F.R.Evid. 402, 403. Nor is there any danger of unfair surprise through false charges of bad conduct. If the witness concedes the matter, we may be confident that the charges were not false.

[10][11] Thus, there is no need in such a case to invoke rule 608(b) ' s ban on extrinsic evidence, particularly where, as here, credibility is the critical issue. [FN11] We conclude, *972 then, that the use of Carter's letter for impeachment purposes on cross-examination, and its admission, did not offend rule 608(b). [FN12]

> FN11. The dissent implies that there is some inconsistency between our disposition of the rule 608(b) claim here and the disposition of the 608(b) claim in United States v. Herman, 589 F.2d 1191 (3d Cir. 1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979). See dissenting op., at 977 ("The discussion of Fed.R.Evid. 608 is particularly disturbing . . . ."). Even the most cursory review of Herman, however, demonstrates that there is no cause for disturbance.
> We hold here that the extrinsic evidence ban should be relaxed when the witness sought to be impeached admits the impeaching act. In Herman, we held that the extrinsic evidence ban must be enforced where the witness sought to be impeached had not admitted the impeaching act. See 589 F.2d at 1195-96. Accordingly, there is complete harmony between our holding in Herman and our holding here.

> FN12. Of course, even if we found that the use of the letter as impeachment evidence ran afoul of rule 608(b), we would grant Carter no relief; the letter remains admissible substantively, as described above in part II(A) of this opinion.

### C. The Rule 403 Claim

Carter finally contends that the letter should have been excluded under F.R.Evid. 403. Again, we are constrained to disagree.

Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
(Cite as: 617 F.2d 961)

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[12][13] This rule cannot help Carter. It does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case. Rather, the rule only protects against evidence that is unfairly prejudicial. Evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, F.R.Evid. 403. It is unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish," or otherwise "may cause a jury to base its decision on something other than the established propositions in the case." [FN13] 1 J. Weinstein & M. Berger, Weinstein's Evidence P 403(03), at 403-15 to 403-17 (1978). A classic example of unfair prejudice is a jury's conclusion, after hearing a recitation of a defendant's prior criminal record, that, since the defendant committed so many other crimes, he must have committed this one too. This is an improper basis of decision, and the law accordingly prohibits introduction of prior convictions to demonstrate a propensity to commit crime. F.R.Evid. 404.[FN14]

FN13. This case was tried to a Magistrate without a jury. Nonjury trials present a much smaller danger of unfair prejudice than jury trials. In light of our analysis above, however, we need not, and do not, rely on the absence of a jury in rejecting Carter's claim under rule 403.

FN14. The distinction between prejudicial evidence and unfairly prejudicial evidence was drawn with care in Dollar v. Long Manufacturing Co., 561 F.2d 613 (5th Cir. 1977), cert. denied, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). The court there stated:
In this case, the plaintiff sought to use the warning letter for impeachment purposes. While we are aware that Rule 403 authorizes the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, we do not think this situation called for its application. In the face of Saunders' testimony as to his present opinion of the safety of the backhoe

when attached to a rollbar-equipped tractor, we do not think unfair prejudice to the defendant would have resulted from his having been confronted by his own letter warning of exposure to death by such use. Of course, "unfair prejudice" as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be "unfair." Id. at 618 (emphasis in original). The court reversed the district court's decision to exclude the letter and remanded the case.

[14] Carter's letter, while undoubtedly prejudicial to his case in that it resulted in the district court ruling against him, presents no danger of unfair prejudice. The letter was offered by the defendants to suggest that no beating occurred on September 22, 1977 and that Carter was lying when he testified to the contrary. This, of course, was the central issue at trial. In a case such as the one here where the witnesses on each side take diametrically opposed**973 positions, the factfinder's task is to determine which witnesses are more credible. If the Magistrate, after hearing the letter read, drew the inference that Carter was lying, it cannot be claimed that this was an improper basis of decision. It was, rather, a use of properly admitted evidence which, together with other evidence in the case, resulted in a decision on a proper basis. Thus, Carter has made no showing of unfair prejudice: he cannot demand exclusion of the letter under rule 403.[FN15]

FN15. As earlier stated, because of Carter's pro se status, we have not held him to the requirement of specific invocation of rule 403 articulated in United States v. Long, 574 F.2d 761 (3d Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). See note 4 supra.

III.

Because the dissenting opinion largely addresses subjects which we do not find relevant to our disposition, we feel obliged to record our observations on these matters. The dissent apparently takes no real issue with any aspect of the analysis set forth in part II. above, but notes only that: "Although I do not discuss in detail the several theories on which the majority finds the letter admissible, my silence should not be construed as acquiescence." At 977. Yet, our reading of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

dissent reveals to us that, in fact, there is no disagreement with our holding that the letter is admissible. It is conceded by the dissent that its own hypothetical letter, set forth in its opinion at page 977, is admissible. Yet the differences between the dissent's hypothetical letter and Carter's real one, like the differences between our hypothetical letter and the actual one, go only to probative weight, not admissibility.

The main thrust of the dissent does no more than urge a reversal of the district court on a ground not raised. Essentially, the dissent's point is that the Magistrate erred in not allowing Carter to call as a witness the individual to whom the letter was addressed. Our review of the record compels us to disagree.

[15] When Carter was presented with the letter during his cross-examination, and before he was directed to read it, Carter objected to the letter's relevance. It was at that time, and that time only, that Carter asked to call the recipient as a witness. Recognizing the potential validity of Carter's relevance objection, the Magistrate at that time denied Carter's request, since the letter had neither been admitted in evidence nor read aloud by Carter. The Magistrate stated: "I don't think his (the recipient's) statements will be particularly relevant and I'm not certain at this juncture, Mr. Carter, that this document is relevant." After extensive discussion of the letter during Carter's cross-examination, in which its relevance was made clear, the Magistrate then asked Carter whether he wished to make any other statement. Carter responded "No." Neither at this time nor at any other time did Carter ever renew his request to call the recipient of the letter. Under these circumstances, then, it is clear that Carter's failure to call his witness to explain the meaning of the letter cannot be charged to the court.

In not renewing his request, it may be that Carter recognized what our reading of the record reveals: that no innocent interpretation of the letter is plausible. When questioned by the Magistrate as to the significance of the statement in the letter that "(t)his is a set up my brother . . . . We want to establish a pattern of barbaric brutal harrassment (sic)," Carter himself could only offer the patently questionable explanation that it referred to a "set-up" of inmates by the guards (tr. at 70).

IV.

We conclude that all three grounds urged by Carter

on this appeal, whereby he would have us hold that the district court erred in considering his letter as a matter of evidence, are without merit. We will therefore affirm the October 31, 1978 judgment entered for the defendants and against Carter. Costs will be taxed against the appellant Carter.

*974 GIBBONS, Circuit Judge, dissenting.

I respectfully dissent. My disagreement with the majority on the appropriate legal precepts stems, in part, from their reliance on an incomplete version of the facts. Without being too repetitious, I deem it necessary to set forth a complete version.

I

In his amended complaint, Carter alleged that three of the defendants, Fuiek, Pyles and Levi, wrongfully beat him on September 22, 1977, during a "shakedown" of Carter's cell in Huntingdon's maximum security unit. Carter was placed in the maximum security unit, the Behavioral Adjustment Unit (BAU), because of his participation in an attempted escape which had involved the holding of several guards hostage, one of whom was seriously injured. Carter also seeks to hold the Superintendent of the institution, Hewitt, liable in his official capacity as supervisor of these correctional officers.

The district court referred this matter to the Magistrate "(t)o hear, submit, and file proposed findings of fact and recommendations for the disposition of the matter with the court . . . ." 28 U.S.C. s 636(b)(1)(B) (Supp.1979).

The defendants moved for dismissal or in the alternative, summary judgment, and filed supporting affidavits. Pursuant to Rule 56, Fed.R.Civ.P. 56, the Magistrate advised plaintiff to file affidavits that demonstrated the inappropriateness of summary judgment. A hearing was held on July 24, 1978, at which time, plaintiff presented three witnesses, all of whom were fellow inmates of Carter's.

The procedural posture of this case is not a model of clarity. The Magistrate recommended to the district court that (1) defendant Hewitt's motion for summary judgment be granted on the ground that even assuming the allegations to be true, no legal claim existed because it was not alleged that Hewitt directed any beating or that the beating was a result of his actions; and (2) that defendants Fuiek, Pyles and Levi's motion to dismiss be granted based on his proposed findings of fact which correlated with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

defendants' testimony. However, in adopting the Magistrate's report, the court specifically disposed of the case under Fed.R.Civ.P. 56, rather than under Fed.R.Civ.P. 12 or Fed.R.Civ.P. 53(e)(2). Carter v. Hewitt, Civ.No. 77-1168, slip op. at 2 n. 1, -- F.2d -- at -- n. 1 (Oct. 13, 1978). Such a disposition, at least with respect to Fuiek, Pyles and Levi, is inconsistent with the Magistrate's report. It is apparent that there are material facts at issue with respect to them, and thus the three guard defendants are not entitled to summary judgment as a matter of law.[FN1] Moreover, it is quite clear that the district court never saw a transcript of the testimony to which the majority refers, because that transcript was not prepared from an electromechanical recording until this court ordered it after the notice of appeal was filed, nor is there any affirmative evidence in the record that the district court listened to the recording. In any event, the order was a form of final judgment, reviewable by this court under 28 U.S.C. s 1291 (1976). This court granted Carter's motions for leave to proceed in forma pauperis and for appointment of counsel.

> FN1. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

## II

Because this appeal presents an evidentiary question, a brief review of the testimony is necessary. Carter's witnesses testified to having heard the defendant guards beating him, although they never actually saw anyone strike Carter. There was testimony to the effect that the visit was a "shakedown" a search of Carter and his cell; that Carter asked for medical aid; and that Carter was threatened with incarceration in the glass cage (cells surrounded by a glass wall for additional scrutiny) if he sought medical advice. One witness, McCoy testified that he heard Carter say he *975 had a bloody mouth and another witness, Castle, testified that when he first saw Carter 36 hours later, Carter's face was swollen. There was contradictory testimony by plaintiff's witnesses as to whether the sounds of the beating could be identified as a beating by fists or by a baton or flashlight.

Carter testified that the defendant guards ordered him outside of his cell for a shakedown and that once out of his cell, they began to beat him. He testified that

he was struck by Pyles' baton and fists seven or eight times in the ribs, and that defendant Levi hit him with his baton 20-25 times on his collar bone. He stated that when he attempted to grab Levi's baton, Levi kicked him in the mouth, thereby causing his mouth to bleed. Carter also stated that Fuiek struck him three or four times with his flashlight in the back of the head. He reiterated that he was threatened with the glass cage if he asked for medical attention. He stated that his only noticeable injury was his bloody lip because his clothes covered all his other injuries.

All three defendant guards testified that they had entered Carter's cell for a routine inspection and that no beating was administered to Carter on that day. Instead, each stated that when Carter came out of his cell he grabbed Levi's baton and a pulling contest ensued. Pyle testified that he pulled Carter off Levi, but never struck him. Upon hearing the commotion, Fuiek testified that he came out of the cell and threatened to put his 18 flashlight through Carter's face if Carter did not let go of Levi's baton. At that point, Carter released his hold on the baton. The guards stated that they did not file an "incident" report because no blows were struck and it was not so extraordinary as to require such a report. All three deny striking Carter and don't recall Carter asking for a doctor.

Defendant Hewitt, the superintendent, testified that there is a procedure for filing inmate complaints and Carter had never filed one. Hewitt recalled that Carter had often mentioned alleged harassment by staff and a lack of medical attention. However, Hewitt did not recall that Carter made any specific claims about a beating on September 22, 1977, although Carter claims he did so inform Hewitt. Moreover, Hewitt stated that he generally has directed the guards not to use force until absolutely necessary and he has no knowledge that any civil or criminal actions have ever been successfully concluded against defendants.

Morgan, the infirmary supervisor, testified that on the day in question he conducted his usual daily inspection of the BAU.[FN2] He stated that Carter had not filed any "sick reports" and that although he cannot recall whether or not he spoke to Carter that day, he did not view any bruises or injuries on any subsequent days, and that no fellow inmates informed him that Carter was in need of treatment. This testimony is not inconsistent with Carter's version of his attempt to file a report and that most of his injuries were covered by clothing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
(Cite as: 617 F.2d 961)

FN2. Apparently the inmates have not been informed of the medical procedure because they disagreed as to whether the infirmary supervisor visits the BAU every morning to administer medical care or only visits on an irregular basis to respond to sick reports specifically filed by inmates.

The Magistrate and district court essentially were presented with the question of whether Carter did or did not suffer an unlawful beating on September 22, 1977. There was certainly ample testimony for the Magistrate to have such a factual determination. However, on the basis of the letter that Carter had written, the focus of the case incorrectly shifted to the issue of whether or not Carter had fabricated this brutality complaint.[FN3] Carter's contention is that admission in evidence of this prejudicial letter was reversible error. I agree.

FN3. The letter is quoted in full in the majority's opinion. See Maj. Op. at 964-965 n.1.

III

On cross-examination, Carter was shown a letter that he had written to a fellow prisoner on March 15, 1978. The Magistrate*976 made a specific finding of fact that the letter was written on March 15, 1978, six months after the alleged beating. The majority opinion implies that the date is a disputed issue by stating that Carter objected, "claiming that the letter had been written six months after the alleged beating. . . . The letter, which was undated, generally described to its unidentified recipient how to file a complaint charging prison guard brutality." Maj. Op. at 964 (emphasis added). The fact that the letter was written six months after this suit was commenced is important to an analysis under any of the three rules on which the majority relies to justify its admission. Moreover, the majority's reference to an "unidentified prisoner" is incorrect. The prisoner to whom the letter was written was present in the courtroom, and Carter asked if he could call him as a witness. The Magistrate denied the request, and the prisoner, who had been identified by name, was never called as a witness even after the letter had been admitted.

Carter, who was without counsel, objected to the admission of the letter. The Magistrate reserved decision on its admissibility, but instructed Carter to read it aloud from the witness stand. Carter testified

that he had written the letter because a fellow prisoner had been abused and needed advice on how to proceed. He denied that he was recommending that the prisoner file a false complaint.

The Magistrate determined that whether Carter had been beaten was a matter of credibility and resolved the credibility issue against him. The Magistrate found that the letter was an attempt by Carter "to have his fellow inmate fabricate an alleged beating, similar to the one that (Carter) has alleged here. . . ." App. 15a. Although the Magistrate listed other reasons for rejecting Carter's story, it is evident that the letter was a crucial part of determining Carter's credibility. The Magistrate held that the letter was relevant to Carter's modus operandi and credibility, without stating which evidentiary rules might be applicable.

The district court, in adopting the Magistrate's report, also relied heavily on the letter and quoted the following portion of it as highly relevant to the issue of credibility and falsification:
This is a set up my brothers compile complaints to be used for bullshit courts, possibly news media, and a radio program in Pittsburgh & W.D.A.S. down Philly.
We want to establish a pattern of barbaric brutal harassment and turn it on these chumps to the max.

App. 20a. The district court cited no additional reasons for the letter's admissibility. Although tape recordings were made of the Magistrate's hearing, as noted above they were not transcribed until the case arrived here, and there is no indication that the district judge listened to them. In light of the reliance by both the district court and the Magistrate on this letter, I cannot accept the appellees' contention that if its admission was legal error, that such error was harmless. Moreover, it is significant that appellee's brief does not contend that the letter was properly admitted. Instead, they state that "(a)lthough an argument can be made that it was proper for the district court to admit the challenged letter, the dispositive issue of this appeal is whether the district court, even if it erroneously admitted the letter, committed reversible error." [FN4] The majority does not accept the harmless error contention, but it has constructed for the appellees several theories of admissibility which those parties never urged. Indeed, referring to the appellees' "questionable litigation strategy," they advocate several theories of admissibility on behalf of those parties. In doing so, however, they disregard completely the obvious explanation for the appellees' litigation strategy. That

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

617 F.2d 961
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184
**(Cite as: 617 F.2d 961)**

Page 16

explanation is that the record discloses the exclusion of evidence bearing critically on the probative value of the letter for any of the purposes for which the majority deems it admissible.

FN4. Brief for Appellee at 17.

The majority construes the letter as admissible (1) because it is an admission of a *977 conspiracy to cause the filing of false charges, (2) because if it evidences such a conspiracy it bears upon the credibility of Carter's testimony as to the September 22, 1977 events, and (3) because if it is evidence of such a conspiracy it is evidence that the complaint about the September 22, 1977 events was part of a plan or scheme, or suggests a modus operandi. I do not find it necessary to review in detail the labored effort by which the majority manages to relate a letter written in March 1978 to an event which transpired in September 1977. I merely note that if the connection was self evident establishing it would not require so many words. If the letter said

"I am a member of a conspiracy to file false charges, and the charge filed in September 1977 was made pursuant to that conspiracy",

it would be admissible on all the grounds on which the majority relies. But the letter does not read that way. Rather the majority interprets it as if it was so intended and so understood. It instructs another as to the manner of making a complaint. Carter contends that it was addressed to an inmate who had suffered a beating, as the result of an inquiry from that inmate with respect to legal redress. If the beating and the inquiry took place, then the letter simply cannot have the relevance which the majority attributes to it for any of the three purposes relied upon.

The record is clear that the Magistrate, before he ruled on admissibility, excluded testimony by the addressee which, according to Carter, would have explained the true context of the letter. After the case was closed the Magistrate admitted the missive, and Carter never was given the opportunity to put in evidence of the circumstances surrounding its preparation. We do not know whether the Magistrate, had he heard the testimony of the addressee, who was available in court, would have given the letter an innocent connotation. We do not know that the district court, had the addressee's testimony been recorded and had he listened to it, would have done likewise. But apparently the majority is convinced that, even if the addressee had fully confirmed Carter's innocent explanation, they

would not credit that explanation or his version of the September 22, 1977 events.

Although I do not discuss in detail the several theories on which the majority finds the letter admissible, my silence should not be construed as acquiescence. The discussion of Fed.R.Evid. 608 is particularly disturbing, especially considering that its author joined in the disposition of the Rule 608 issue in United States v. Herman, 589 F.2d 1191, 1196-98 (3d Cir. 1978). Suffice it to observe that on any theory of admissibility the court would be required before ruling to listen, at least, to evidence which might give meaning from the surrounding circumstances to an inherently ambiguous document.

I would affirm the judgment appealed from insofar as it grants summary judgment in favor of defendant Hewitt, since there is no evidence connecting him to the alleged beating. I would reverse and remand insofar as it dismisses the complaint against Fuiek, Pyles and Levi.

C.A.Pa., 1980.
Carter v. Hewitt
617 F.2d 961, 5 Fed. R. Evid. Serv. 1184

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 108**

Westlaw.

306 F.3d 1333                                                                                    Page 1
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

▷
Briefs and Other Related Documents

United States Court of Appeals,Third Circuit.
Mary A. COLEMAN
v.
HOME DEPOT, INC.
Mary A. Coleman, Appellant
Home Depot U.S.A., Inc.,[FN*] Appellant

FN* Pursuant to FRAP 12(a)
Nos. 00-3496, 00-3656.

Argued: April 25, 2002.
Filed: Oct. 9, 2002.

Discharged African-American female employee filed Title VII action against her former employer. The United States District Court for the District of New Jersey, Mary Little Cooper, J., entered judgment on jury verdict for employer. Employee appealed. The Court of Appeals, Becker, Chief Judge, held that: (1) Equal Employment Opportunity Commission (EEOC) letter of determination, though presumptively trustworthy when not challenged under hearsay exception for public records and reports, was not per se more probative than prejudicial, and (2) district court did not abuse its discretion in excluding EEOC letter of determination on basis that its low probative value was substantially outweighed by the problems created by its introduction.

Affirmed.

West Headnotes

[1] Federal Courts 170B ⟜823

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk823 k. Reception of Evidence.
Most Cited Cases
Court of Appeals reviews the admissibility of evidence for abuse of discretion; abuse of discretion is a clear error of judgment, and not simply a different result which can arguably be obtained when applying the law to the facts of the case.

[2] Evidence 157 ⟜333(1)

157 Evidence
    157X Documentary Evidence
        157X(A) Public or Official Acts, Proceedings, Records, and Certificates
            157k333 Official Records and Reports
                157k333(1) k. In General. Most Cited Cases
Report may be untrustworthy, for purposes of determining applicability of hearsay exception for public records and reports, if the report appears to have been made subject to a suspect motivation, for example, if the public official or body who prepared the report has an institutional or political bias, and the final report is consistent with that bias. Fed.Rules Evid.Rule 803(8)(c), 28 U.S.C.A.

[3] Federal Courts 170B ⟜763.1

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                    170Bk763.1 k. In General. Most Cited Cases

**Federal Courts 170B ⟜795**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk795 k. Conduct of Trial in General; Evidence; Judgment. Most Cited Cases
Determinations of Equal Employment Opportunity Commission (EEOC) in letter would, in absence of challenge on appeal or below under hearsay exception for public records and reports, be assumed trustworthy notwithstanding district court's skepticism about whether EEOC had proper factual basis to conclude that reasonable cause existed to believe employer had discriminated against employee, and district court's decision to exclude that letter would be reviewed only under balancing test. Fed.Rules Evid.Rules 403, 803(8)(C), 28 U.S.C.A.

[4] Evidence 157 ⟜146

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                Page 2
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

157 Evidence
   157IV Admissibility in General
     157IV(D) Materiality
      157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
Relevant evidence may be excluded if its probative value is not worth the problems that its admission may cause, e.g. unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

[5] Evidence 157 ☞146

157 Evidence
   157IV Admissibility in General
     157IV(D) Materiality
      157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
Prejudicial effect of admitting evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under balancing test. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

[6] Evidence 157 ☞146

157 Evidence
   157IV Admissibility in General
     157IV(D) Materiality
      157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
Strong presumption exists that relevant evidence should be admitted, and thus for exclusion under balancing test to be justified, the probative value of evidence must be substantially outweighed by the problems in admitting it. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

[7] Evidence 157 ☞146

157 Evidence
   157IV Admissibility in General
     157IV(D) Materiality
      157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
Whether an Equal Employment Opportunity Commission (EEOC) Letter of Determination is more probative than prejudicial is within the discretion of the trial court and is to be determined on a case-by-case basis. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

[8] Evidence 157 ☞146

157 Evidence
   157IV Admissibility in General
     157IV(D) Materiality
      157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
District Court in Title VII case has discretion to exclude probative Equal Employment Opportunity Commission (EEOC) Letters of Determination where listed negative factors such as danger of unfair prejudice, confusion of the issues, misleading jury, undue delay, waste of time, or needless presentation of cumulative evidence substantially outweigh the probative value of the EEOC determination. Fed.Rules Evid.Rule 403, 28 U.S.C.A.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[9] Evidence 157 ☞146

157 Evidence
   157IV Admissibility in General
     157IV(D) Materiality
      157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
For purposes of determining propriety of its exclusion under balancing test in Title VII action, probative value of Equal Employment Opportunity Commission (EEOC) letter of determination was low; report would have been introduced to jury after all evidence had been offered, evidence was at odds with report, report was more conclusory than factual in nature, and value of report was not increased based on agency's expertise. Fed.Rules Evid.Rule 403, 28 U.S.C.A.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[10] Evidence 157 ☞146

157 Evidence
   157IV Admissibility in General
     157IV(D) Materiality
      157k146 k. Tendency to Mislead or Confuse. Most Cited Cases
District court hearing Title VII case did not abuse its discretion in excluding Equal Employment Opportunity Commission (EEOC) letter of determination from evidence on basis that its low probative value was substantially outweighed by problems created by its introduction, even though district court mistakenly focused on unfair prejudice or confusion as basis for exclusion and did not know full extent of evidence relied on by EEOC to determine that employer had wrongly hired African-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

American female employee as cashier, wrongly refused to transfer her to sales position, and wrongly terminated her; EEOC was clearly mistaken in critical conclusion that employee was "highly experienced" and undue delay would be involved in rebuttal of allegations of systematic discrimination raised in letter. Fed.Rules Evid.Rule 403, 28 U.S.C.A.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**\*1335** David A. Krenkel (Argued), Arbus, Krenkel & Monaghan, LLC, Ocean, for Appellant/Cross-Appellee Mary Coleman.

Patrick G. Brady (Argued), John M. O'Connor, Clara H. Rhu, Carpenter, Bennett & Morrissey, Newark, for Appellee/Cross-Appellant Home Depot U.S.A., Inc.

Before BECKER, Chief Judge, SCIRICA and RENDELL, Circuit Judges.

### OPINION OF THE COURT

BECKER, Chief Judge.

Plaintiff Mary Coleman, an African American female, who claims that defendant Home Depot discriminated against her on the basis of race, gender and age when it refused to give her a job in sales and when it terminated her from her position as a cashier, brought suit against Home Depot in the District Court for the District of New Jersey, alleging employment discrimination. The jury found for Home Depot. Coleman's appeal from the judgment of the District Court entered on the jury verdict turns on the District Court's exclusion from evidence of an EEOC Letter of Determination in which the Agency concluded that reasonable cause existed to believe that Home Depot had discriminated against Coleman because of her sex and race in connection with her hiring, request for transfer, and discharge. The District Court excluded the evidence, which was otherwise admissible pursuant to Fed.R.Evid. 803(8)(C), primarily because it found that its probative value was low and that any such value was outweighed by confusion and unfair prejudice. See Fed.R.Evid. 403. Coleman contends that this ruling was an abuse of discretion.

This appeal presents the question whether an EEOC Letter of Determination, which is presumptively probative when not challenged as untrustworthy under Rule 803(8)(C), can nonetheless be excluded due to the considerations identified in Rule 403. See id. (listing the considerations as "unfair prejudice, confusion of the issues, or misleading the jury, or

consideration of undue delay, waste of time, or needless presentation of cumulative evidence"). Although the Circuits are divided on the issue, we conclude that an EEOC Letter of Determination is not *per se* admissible under Rule 403, and that, like other probative evidence, it may be excluded if the countervailing 403 factors substantially outweigh its probative value. While the District Court found that the letter should be excluded because of the risk of unfair prejudice and confusion, instead we find that other Rule 403 factors-undue delay and waste of time-are sufficient on the record to tip the scales in favor of finding that the District Court did not abuse its discretion when it excluded the letter. The judgment of the District Court will therefore be affirmed.

### I. Background Facts

Coleman applied for a position with Home Depot's Lakewood, New Jersey store on July 15, 1996. On her application, she stated that she was applying for "any" position, and represented that she had prior work experience/skills on a cash register, in hardware, plumbing, lumber, paint, and electrical. [SA491]. Within a week of submitting her application, Home Depot called Coleman to its Lakewood store for an interview. Vincent Kobera, the Store Manager, conducted the hiring interview. [SA96].

During the interview, Coleman stated that she was most interested in a sales position, but was told that there was only an opening for a cashier. [A47-48]. She **\*1336** was also told that she would have the opportunity down the line to transfer into a different department. [A48]. Kobera testified that his goal, as an employer, was to "try to put people in where they're going to be most comfortable. I mean when customers come in, they want to deal with someone in electrical who has some working knowledge or some point of reference for that. So, part of the interview process is to try to find that person's-call it niche, if you like, and where they are going to fit with us. And that's why during the interview, we talk about everything that's on the application." [SA185-186]. During the interview Kobera questioned Coleman about her experience in electrical, plumbing, and hardware as indicated on her application form. [SA97-98].

At the end of the interview, Kobera decided not to offer Coleman a position in sales, but offered her a position as a cashier instead. His decision with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 111

306 F.3d 1333                                                                 Page 4
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

respect to sales was based on the fact that during the interview, Mary was "polite, courteous ... [but] when I questioned her about [hardware], she couldn't answer the questions and even told me that she didn't have a lot of knowledge on that, so that was part of it." [SA184]. In this regard, Kobera testified that the hardware department at Home Depot "is really hand tools, power tools, stationary tools in that very specialized area," but when he asked Mary "if a customer came in and wanted to buy a power tool for a gift and they wanted to buy one of the most versatile tools they could buy, what would she suggest. And Mary said she did not know. And then I asked her the same thing with hand tools ... and she told me that when she worked at the hardware store, she really didn't get in to the power tool part of the business .... she said it was more of a small family business. They carried like nuts and bolts and did like pots and pans type-like a little mom and pop hardware store." [SA 227-228]. Thus, at the end of the interview, Kobera offered Coleman a position as a part-time cashier, which she accepted on the spot. [SA99-100].

Coleman began working at Home Depot on July 31, 1996. Before actually beginning work, she received training on the use of the cash register system, including the operation of function keys, paperwork associated with certain types of transactions, and procedures on the use of the register drawer and counting to close the register. [SA127; *see also* Cashier Training Checklist, SA492]. Notwithstanding the training, Coleman received several warnings about her poor job performance as a cashier with respect to handling monies (shortages and overages in her register at the end of the day). [SA102]. Indeed, Coleman received at least nine separate written warnings about her performance in her six month career with Home Depot. [SA133-134; 135; 136-137; 137-138; 138-139; 147; 142; 145; 150-151]. These performance warnings indicated that future problems with her cash transactions would result in more written warnings, and possibly termination.

Despite her poor performance on the cash register, Coleman asked for a transfer from the cashier position into the Hardware Association position. [SA131-132]. This request was denied. The Assistant Store Manager, Kevin McCann, testified that Home Depot does not transfer employees having performance problems from one department to another:
[W]e do not transfer associates from area to area if they have performance issues.... [H]aving a

performance problem, and in her case, a basic skill such as cash handling, which really relates to paying attention to detail and, you know, basic math skills, that could be a problem on the sales floor, as well.

[SA303]. Kobera testified to the same:Q: And during the time that you were the floor manager at [the] Lakewood*1337 [store], did you ever transfer an individual from a department who was having performance problems as the solution to that problem by putting them in another department?
A: No .... it doesn't solve the problem, you don't get to the root of it, you're just moving the problem and letting someone else deal with it.

[SA221].

Home Depot's employee handbook states that after three counseling sessions for the same performance warning, the employee could be terminated. [SA224]. In addition to her six-month performance review, which indicated that Coleman needed improvement, she also received additional training and assistance on the cash register on four or five separate occasions by Jean Amato, an employee at the Lakewood store. [SA158]. Moreover, Anne O'Neil, the Store Customer Service Manager, worked with Coleman to remedy her accuracy problems [SA154-155], as did the head cashier, Sue Gibberson. [SA158]. Despite all this help, Coleman's performance continued to fall short and she continued to receive written warnings. Ultimately, after a customer called the store to complain that Coleman had short-changed him $10.00, Coleman received her last warning and was terminated. [SA151]. With respect to her discharge, Kobera testified:
We had had like-by now it was nine or ten write-ups. And we have given her lots of counseling. She had lots of training.... We had done that, and [her performance] was affecting the customers. I mean when customers start calling the store and saying I'm not happy ... there comes a point where we looked at-I looked at Mary-Kevin and I, we talked about it. But ultimately it was my decision to look at Mary's performance and say I didn't see that it was going to get any better, giving her another chance wasn't going to correct the problem.

[SA230-231].

## II. Procedural History

### A. Agency Level

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                                      Page 5
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

On May 28, 1997, Coleman filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). She claimed that Home Depot discriminated against her on the basis of her sex, race, and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. by: (i) hiring her as a cashier instead of as a sales associate in the Hardware Department; (ii) refusing to transfer her to a sales associate position within the Hardware Department; and (iii) terminating her employment. [A28]. Following an investigation, the EEOC issued a Letter of Determination on January 26, 1998, in which it concluded that reasonable cause existed to believe that Home Depot had discriminated against Coleman because of her sex and race in connection with Coleman's hiring, request for transfer, and discharge. We rescribe the letter in the margin.[FN1] [A30-32].

> FN1. The letter states, in relevant part:
> Evidence reveals that after Charging Party was hired as a cashier, she constantly requested to be transferred to hardware or another sales position in areas in which she was highly experienced. During the same period that she was requesting to be transferred, males with less experience were being hired directly into sales positions. Some of the male applicants had indicated on their employment application that they were applying for available positions and were hired directly into sales positions.
> Since Charging Party was hired as a cashier rather than a sales associate, she experienced performance problems. As a result of not being allowed to transfer to a position she was qualified to perform, Charging Party's employment was affected when her employment was terminated effective February 13, 1997 for not being able to perform the cashier's job.
> Evidence reveals that Charging Party had received and [sic] overall rating of "3" on December 15, 1996. In addition, evidence reveals that a similarly situated white employee, who had received warnings for shorting and/or overage, was allowed to transfer to another department.
> The evidence as a whole makes it reasonable to conclude that Charging Party was discriminated against because of her sex

(Female) and race (Black) with respect to Charging Party's hiring, transfer and/or job assignment and discharge allegation.
> * * *
> During the course of the investigation, the Commission has uncovered evidence which indicates that Respondent has discriminated against females with respect to hiring and other terms and conditions of employment, i.e., wages and transfers and/or job assignments into sales positions.
> Evidence reveals that females were being hired as cashiers at a starting salary of $8.00 regardless of their prior experience. When females applied for an open position, they were placed in the cashier department while males who applied for open positions with no experience in sales were placed in sales jobs at a higher salary.
> Evidence further reveals that males hired as cashiers were subsequently transferred into sales positions. However, the females hired as cashiers who were transferred, were being transferred either to the service desk or refund department, not to sales positions.
> Females have systematically been placed in cashiers' position and not given the opportunity to advance into sales positions.
> Based on the evidence of record, there is reasonable cause to believe that sex (Female) were [sic] motivating factors in Respondent's decision not to hire and/or transfer qualified females into sales positions at a higher rate of pay.
> [A31-32].

*1338 The EEOC concluded that there were no facts to substantiate plaintiff's claim that Home Depot discriminated against her based on her age.

## B. The District Court Suit and the Court's Rationale for Excluding the Evidence

Coleman's civil action alleged that Home Depot had discriminated against her on the basis of her gender and race in violation of Title VII by: (i) hiring her on July 31, 1996 as a cashier instead of as a sales associate and failing thereafter to transfer her from a cashier to sales associate position in the Hardware Department; and (ii) terminating her employment on February 13, 1997.

On June 23, 2000, after the close of discovery and shortly before trial was scheduled, Home Depot

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                 Page 6
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

moved *in limine* to preclude Coleman from introducing into evidence at trial the EEOC's determination letter. Home Depot argued that the record did not support the EEOC's findings, which failed to reference any specific evidence, and that, as a result, the probative value of the Determination Letter was outweighed by its prejudicial effect. At the *in limine* hearing, the District Court delayed ruling on the motion to exclude the report, deciding instead to:

listen to the evidence very carefully, the evidence that is adduced on the plaintiff's case in chief, and I will make a ruling on this before the plaintiff has to rest. So that if all or any part of this EEOC determination is admitted, it's admitted after the Court has had an opportunity to see what reliable evidence there is, to support what the EEOC said.
* * *

I won't exclude the report on the basis that I can't see what evidence the EEOC relied on, but I will test that **\*1339** report against the evidence which is adduced by the plaintiff at trial, not to see whether I am persuaded (that's not my job), not to see whether I am persuaded in the direction that the EEOC determined, but to see whether there is reliable evidence upon which the EEOC determination could reasonably have rested.

[SA9-11].

After considering the testimony and other evidence submitted by Coleman, the District Court granted Home Depot's motion and precluded Coleman from submitting the EEOC Letter of Determination. The District Court reasoned as follows:

Let me give the legal basis for the evidence evaluation first. The law that applies to this determination is straightforward. The United States Supreme Court decided in a 1976 ruling, *Chandler v. Roudebush,* that EEOC findings are admissible under the hearsay rules-that is specifically Rule 803(8)(C)- in a federal trial. The Supreme Court in *Chandler* did not limit the discretion of the trial judge to consider whether despite the hearsay admissibility of the report itself, the report, nevertheless, should be excluded, "If sufficient negative factors are present." That is a quote from the notes of the Advisory Committee on the proposed rules under Rule 803(8)(C).

Thereupon arose a split of authority in the Circuits, but the Third Circuit, as always, clearly held that it is within the discretion of the District Court to admit or to refuse to admit the EEOC's findings of fact and its determination on the merits of the charges. That was the Third Circuit decision in *Walton v. Eaton*

*Corporation....*
* * *

[T]his is a case-by-case determination that must be made. In the jurisprudence that has arisen around the country which has been cited in the parties' briefs, the factors that the Court should consider have emerged and those include whether the report itself presents a danger of unfair prejudice to the defendant, whether time spent during the trial will be unduly lengthened if the report is admitted and the defendant must introduce evidence to expose the weaknesses in the report, thus unduly adding to the length of the trial, what factual basis is stated in the report for both the findings and the conclusions in the EEOC report and whether those factual supports are borne out by the record before the EEOC, and whether the report is conclusory in nature or reflects ample detail and a fair summary of the detail of relevant facts pertaining to the charge. Those are some of the factors that the Courts have weighed in making this case-by-case determination.

The EEOC report in this case does not contain any footnotes or references to exactly what evidence is being relied upon. It simply states, "evidence reveals" or "evidence as a whole" or "based on the evidence of record." I have reviewed the report line by line in order to determine whether it should be excluded or admitted in whole or in part. I conclude that it must be excluded in whole, that it cannot be redacted or admitted in its entirety without creating the very danger of unfair prejudice and confusion which Rule 403 requires the Court to avoid in making discretionary evidentiary rulings.

At the heart of my ruling is the core finding of the EEOC report that-and here I quote from Page 2- "Evidence reveals that after the charging party was hired as a cashier, she constantly requested to be transferred to hardware or another sales position in areas where she was highly experienced. During the same period that she was requesting to **\*1340** be transferred, males with less experience were being hired directly into sales positions."

One of the bases for that "highly experienced" conclusion is stated above in the EEOC letter. It says, "During her interview, the charging party informed the respondent that she had experience in several areas such as plumbing, hardware, electrical, paint and lumber. The charging party has more than 15 years sales experience."

There is no indication in the EEOC determination where this factual basis comes from. The Court has now had the opportunity to review the application form which is in evidence, P-15, and it shows that these areas were checked off. However, the countervailing accounts of what was testified to in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333　　　　　　　　　　　　　　　　　　　　　　　　　　Page 7
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

the interview are not nearly as strong in the trial as stated in the EEOC letter.

Also, the statement that she has more than 15 years sales experience found in the EEOC letter, is not supported even by the application form, P-15 in evidence. If we were to assume it to be truthful and accurate, there is approximately 13 years of experience at the family hardware store listed there. Also, the testimony concerning whether males who had less sales experience were being hired directly into the sales department, is one which is sharply in issue in the course of the trial and it will be open to each party to argue to this jury whether these males had more or less experience than Ms. Coleman indicated during her application and interview.

The finding of the EEOC Commission is that the evidence as a whole makes it reasonable to conclude that the charging party was discriminated against because of her sex (female) and race (black) with respect to the charging party's hiring, transfer and/or job assignment and discharge. It makes additional findings such as, "Has uncovered evidence which indicates that respondent has discriminated against females with respect to hiring and other terms and conditions of employment, i.e., wages and transfers and other job assignments into sales positions."

* * *

All of these findings are not supported by the evidence that has been presented by plaintiff, except for the raw numerical data, as to which I have had to give the jury a limiting instruction as I have admitted that into evidence.

The conclusion of this Court is that substantial evidence has been presented to the jury on the claims brought forward by plaintiff in this case, but it differs from the assertions which are the findings in the EEOC report. For that reason, I find there is little probative value in the EEOC's conclusory statements regarding the same record.

I further find that those conclusory statements regarding the evidence are expressly stated to be the basis of the EEOC's determination and to admit the determinations without revealing that they are based upon findings that are supported by the evidence in this case, would be, I believe, an erroneous ruling in the sound exercise of this Court's discretion.

This jury would, in effect, be receiving an EEOC determination in the nature of an expert opinion on conclusions which this lay jury is as equipped to reach from the evidence and its own experience and instructions in the law where this jury will have had the opportunity to view all of the evidence and will have the ability to draw its own conclusions from the evidence presented regarding whether Ms. Coleman was or was not subjected to disparate treatment in her

*1341 assignments and in her termination in this case.

[A5-11] (emphasis added).

The jury returned a verdict in favor of Home Depot. Coleman appeals, arguing that the District Court abused its discretion in excluding the EEOC determination letter from trial.[FN2] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction based on 28 U.S.C. § 1291.

> FN2. We note that Home Depot is also a cross-appellant in this case; it appealed the District Court's order precluding Home Depot from presenting evidence relating to Coleman's alleged misrepresentations about her employment history. Since the parties did not brief the issue in the present appeal, and, at all events, in light of our holding that the District Court did not abuse its discretion by excluding the EEOC Letter of Determination, Home Depot's appeal is essentially moot.

[1] We review the admissibility of evidence for abuse of discretion. See *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1213 (3d Cir.1995). "An abuse of discretion is a 'clear error of judgment,' and not simply a different result which can arguably be obtained when applying the law to the facts of the case." *SEC v. Infinity Group Co.*, 212 F.3d 180, 195 (3d Cir.2000) (quoting *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 387 (3d Cir.1997)). This standard applies to Rule 803(8)(C) and EEOC determination letters. *Walton v. Eaton Corp.*, 563 F.2d 66, 75 (3d Cir.1977).

### III. Discussion

#### A. Rule 803(8)(C)

Fed.R.Evid. 803(8)(C) provides:
The following are not excluded by the hearsay rule, even though the declarant is not available as a witness.... (8) Records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                    Page 8
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

The rationale of Rule 803(8)(C) is explicated in the advisory committee's note as being grounded on a presumption of reliability of government records. The note explains that it is "assum[ed] that a public official will perform his duty properly." Fed.R.Evid. 803(8)(C) advisory committee's note.    As was explained in *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 505 F.Supp. 1125, 1145 (E.D.Pa.1980), "the drafters of 803(8)(C) were motivated by a variation on the theme underlying all hearsay exceptions-that circumstantial guarantees of trustworthiness are provided by the presumption that governmental officials will perform their duties faithfully. Accordingly, they were agreeable to the receipt into evidence of governmental agency findings." [FN3] With respect to EEOC determinations in particular, the United States Supreme Court itself has held that prior administrative findings made with respect to an employment discrimination claim may be admitted, as of course, pursuant to Fed.R.Evid. 803(8)(C) as evidence at a "federal-sector trial *de novo.*" *Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

> FN3. *See also Melville v. Am. Home Assurance Co.*, 443 F.Supp. 1064, 1112 (E.D.Pa.1977)    ("The conceptual underpinning for this exception, similar to that upon which other hearsay exceptions are based ... is that public records or reports, by virtue of their being based on legal duty and authority, contain sufficient circumstantial guarantees of trustworthiness to justify their use at trial.").

The principal basis on which government records and reports may be excluded is the Rule 803(8)(C) trustworthiness proviso.*1342    As the Rule itself states, the findings are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C).    The advisory committee's note explains:
Factors which may be of assistance in passing upon the admissibility of evaluative reports include: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which conducted; (4) possible motivation problems.... Others no doubt could be added.

Fed.R.Evid. 803(8)(C) advisory committee's note (internal citations omitted). Case law has added to the list of trustworthiness considerations. [FN4]

FN4. In *Zenith Radio Corp.*, for example, the court developed an additional seven factors addressing the adequacy of the investigative/evaluative process of agency determinations:
(1) The finality of the agency findings, *i.e.*, the state of the proceedings at which the findings were made (whether they are subject to subsequent proceedings or *de novo* review), and the likelihood of modification or reversal of the findings.
(2) The extent to which the agency findings are based upon or are the product of proceedings pervaded by receipts of substantial amounts of material which would not be admissible in evidence (*e.g.*, hearsay, confidential communications, ex parte evidence), and the extent to which such material is supplied by persons with an interest in the outcome of the proceeding.
(3) If the findings are products of hearings, the extent to which appropriate safeguards were used (Administrative Procedure Act, Due Process), and the extent to which the investigation complied with all applicable agency regulations and procedures.
(4) The extent to which there is an ascertainable record on which the findings are based.
(5) The extent to which the findings are a function of an executive, administrative, or legislative policy judgment (as opposed to a factual adjudication) or represent an implementation of policy.
(6) The extent to which the findings are based upon findings of another investigative body or tribunal which is itself vulnerable as a result of trustworthiness evaluation.
(7) Where the public report purports to offer expert opinion, the extent to which the facts or data upon which the opinion is based are of a type reasonably relied upon by experts in a particular field.
*Zenith Radio Corp.*, 505 F.Supp. at 1147.

[2] Most notably, a report may be untrustworthy "if the report appears to have been made subject to a suspect motivation.    For example, if the public official or body who prepared the report has an institutional or political bias, and the final report is consistent with that bias." *Federal Rules of Evidence Manual* 1688-89 (Stephen A. Saltzburg et al. eds., 7th ed. 1998); *see also Pearce v. E.F.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                                    Page 9
306 F.3d 1333, 59 Fed. R. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

*Hutton Group, Inc.,* 653 F.Supp. 810, 814 (D.D.C.1987) (excluding findings made in a congressional report because, "[g]iven the obviously political nature of Congress, it is questionable whether any report by a committee or subcommittee of that body could be admitted under rule 803(8)(C) against a private party. There would appear to be too great a danger that political considerations might affect the findings of such a report"). An EEOC report might also be untrustworthy where it is made in contemplation of litigation. *See Harris v. Birmingham Bd. of Educ.,* 537 F.Supp. 716, 721-22 (N.D.Ala.1982), *aff'd in part & rev'd in part,* 712 F.2d 1377 (11th Cir.1983) (finding that an EEOC determination was not trustworthy where it was made six months after litigation had been filed and that "[t]he trustworthiness of the determination is further eroded by the obvious disregard of the affidavits submitted by the defendant to the EEOC. The court is appalled by the numerous erroneous and obviously slanted statements contained in the determination, the list of which is too lengthy to set out").

*1343 [3] While the District Court was skeptical about whether the EEOC had the proper factual basis to come to the conclusions that it did in the EEOC Letter of Determination, none of the aforementioned trustworthiness considerations have been invoked in this case, either here or in the District Court. We assume therefore that the EEOC determinations were trustworthy and review the District Court's decision to exclude the EEOC Letter of Determination only under Rule 403.

**B. Rule 403**

Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. Rule 403 is an "umbrella rule" spanning the whole of the Federal Rules of Evidence. *See Federal Rules of Evidence Manual* 251 (Stephen A. Saltzburg et al. eds., 7th ed. 1998) ("[T]he Trial Judge must apply [Rule 403] in tandem with other Federal Rules under which evidence would be admissible."). Accordingly, it is generally applied to evidence otherwise admissible under Rule 803(8)(C).[FN8] *See, e.g., Zenith Radio Corp.,* 505 F.Supp. at 1146 ("[W]here the probative value of

[evidence admissible pursuant to Rule 803(8)(C)] is outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence attendant upon the opponents' efforts to establish untrustworthiness of the report, the court may exclude the report under F.R.E. 403.").

FN5. The Fifth Circuit has noted that it is possible to confuse "the test for admissibility under Rule 803(8)(C) with that for excluding otherwise admissible evidence under Rule 403." *Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 201 (5th Cir.1992). As that Court has explained: Under Rule 803(8)(C), investigative reports made by government agencies are removed from the rule against hearsay unless circumstances indicate untrustworthiness. Because of this presumption that agency reports are not to be excluded under the hearsay rule, this court has held that the party opposing the admission of the report under Rule 803(8)(C) must prove the report's untrustworthiness.... Rule 403 gives trial courts the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice ..." This court, on several occasions, has found investigative reports and files of the EEOC to be highly probative. We also warned ... that Rule 403 should not be misused in such a way that "would end the presumption that evaluative reports are admissible hearsay under Rule 803(8)(C)." None of these decisions should be read as leaving district courts without discretion under Rule 403 to exclude such reports if their probative value is substantially outweighed by prejudicial effect or other considerations enumerated in the rule.
*Id.* (internal citations omitted).

[4][5][6] Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility. That is, evidence may be excluded if its probative value is not worth the problems that its admission may cause, *e.g.* unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence.[FN6] However, there is a strong presumption that relevant evidence should be admitted, and thus for exclusion *1344

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                Page 10
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

under Rule 403 to be justified, the probative value of evidence must be "substantially outweighed" by the problems in admitting it. As a result, evidence that is highly probative is exceptionally difficult to exclude. See, e.g., United States v. Krenzelok, 874 F.2d 480, 482 (7th Cir.1989) ("Its probative value was ... great." Its prejudicial effect may well have been great too. But when the trial judge is in doubt, Rule 403 requires admission (this is the force of "*substantially* outweighed")....).[FN5]

> FN6. It is worth stressing that the term "*unfair* prejudice" as a factor against which the probative value of evidence is weighed under Rule 403 is often misstated as mere prejudice. Indeed, any evidence that tends to harm a party's case could be said to be prejudicial. Thus, the prejudicial effect of admitting the evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403.

> FN7. An interesting hypothetical question as to the meaning of Rule 403 is posed by positing a report or other evidence whose probative value on the scale of values was 100%. It would appear that, as such, it could not properly be excluded under Rule 403 because it could not be "substantially outweighed" by the countervailing factors.

Rule 403 necessarily requires that the District Court engage in balancing to determine whether the probative value of the evidence is "substantially outweighed" by the negative factors listed in Rule 403. See United States v. Long, 574 F.2d 761, 766 (3d Cir.1978) (noting that even if the District Court does not invoke Rule 403, "the trial judge's balancing will be subsumed in his ruling"). In balancing, "the proper equation places on one side the maximum reasonable probative force for the offered evidence," while "the other side of the equation should include the *likely* prejudicial impact of the evidence." *Federal Rules of Evidence Manual* 242 (Stephen A. Saltzburg et al. eds., 7th ed. 1998). The balancing test in Rule 403 ensures that juries are not presented with evidence that is far less probative than it is prejudicial.

Coleman submits that EEOC reports are necessarily of high probative value, especially given the expertise and long experience of the Agency in employment discrimination matters. She finds

support for this view in federal appellate case law. Smith v. Universal Services, Inc., 454 F.2d 154, 157 (5th Cir.1972); Plummer v. Western Int'l Hotels Co., 656 F.2d 502, 505 (9th Cir.1981). The Smith Court intimated that the probative value of EEOC determinations almost always outweighs any prejudicial impact:

[T]o ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its field investigators in the area of discriminatory employment practices would be wasteful and unnecessary.

The fact that an investigator, trained and experienced in the area of discriminatory practices and various methods by which they can be secreted, has found that it is likely that such an unlawful practice has occurred, is highly probative of the ultimate issue involved in such cases. Its probative value, we believe, at least outweighs any possible prejudice to defendant. "Prejudicial" cannot be equated with "harmful" in all cases; rather it connotes "harmful," plus "non-probative."

454 F.2d at 157.[FN8]

> FN8. We note that the Fifth and Ninth Circuits take the minority view that agency reports are *per se* admissible as the probative value necessarily outweighs the negative factors in Rule 403. The majority view, on the other hand, gives less deference to the probative value of agency reports, refusing to categorically require admission of agency findings. See e.g., Paolitto v. John Brown E.&C., Inc., 151 F.3d 60, 65 (2nd Cir.1998) (adopting the majority position that leaves "the question of whether to admit EEOC ... findings to the sound discretion of the district court"); Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309 (8th Cir.1984) ("While EEOC reports may contain information that would be useful to the jury, their probative value may be outweighed by problems that would result from their admission.").

[7] Although we decline to hold that EEOC reports are *per se* admissible as more probative than prejudicial, the argument*1345 that EEOC reports that are not challenged as untrustworthy are presumptively probative is not without force. But the other Rule 403 factors-especially considerations of undue delay, waste of time, or needless presentation of cumulative evidence, which are often

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 118

306 F.3d 1333                                                                                  Page 11
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

necessary to counter an EEOC report-could "kick-in" and control, especially where the report could be shown to be of low probative value. The weight of the case law holds that Rule 403 may operate on an EEOC report, and that the decision of whether or not an EEOC Letter of Determination is more probative than prejudicial is within the discretion of the trial court, and to be determined on a case-by-case basis. *Hines v. Brandon Steel Decks, Inc.,* 886 F.2d 299, 302 (11th Cir.1989); *United States v. MacDonald,* 688 F.2d 224, 229-30 (4th Cir.1982); *Johnson,* 734 F.2d at 1309; *Cortes,* 977 F.2d at 201-02.

[8] This view is apparently the law of this Circuit, based upon a terse discussion in *Walton,* 563 F.2d at 75. At all events, we think that *Walton* reflects the better view, and we take this opportunity to endorse the majority position in *Walton* and to clarify that a District Court has the discretion to exclude probative EEOC Letters of Determination where the negative factors listed in Rule 403 substantially outweigh the probative value of the EEOC determinations. In other words, we decline Coleman's invitation to conclude that, based on the presumption of admissibility under Rule 803(8)(C), EEOC Letters of Determination are *per se* more probative than prejudicial under Rule 403, and will review the District Court's exclusion of the EEOC letter based on the principles discussed *supra.*

[9] We note in this regard that the assessment of probative value under Rule 403 should take into consideration the proof value of the particular report as and when offered at trial. Here that proof value could be said to be low, given the fact that it would have been introduced to the jury after all the evidence had been offered (which evidence was at odds with the EEOC report), and was more conclusory than factual in nature. *See, e.g., Paolitto,* 151 F.3d at 65; see also *Johnson,* 734 F.2d at 1309. Further its value is not increased based on the agency's expertise, as the District Court seemed to think, because it is not an "expert report." Evaluative public records and reports, admissible under Article VIII of the Federal Rules of Evidence, are distinct from expert opinion evidence, identified in Article VII. They are subject to entirely different standards of admissibility, *et alia.*

### C. Application to This Case

As we have explained, the District Court delayed ruling on the motion to exclude the Letter of Determination at the *in limine* hearing. Rather, the Court allowed Coleman to present her case-in-chief

at trial before making a decision. Referencing *Walton,* the District Court concluded that the risk of unfair prejudice and confusion substantially outweighed the probative value of the EEOC Letter of Determination. The District Court found that the probative value of the document was particularly low since the evidence presented at trial differed from the findings of the EEOC in a critical respect-the EEOC's finding that Coleman was "highly experienced" in sales was clearly undermined by the testimony presented at trial, even by Coleman herself.

We disagree with the District Court's general approach to the Rule 403 calculus. The District Court in effect charged the plaintiff with replicating the record before the EEOC and then evaluated the record produced by plaintiff to see if it justified the report. But neither the plaintiff nor the District Court had access to the whole **\*1346** EEOC record.[FN9] What the District Court had was: (1) A letter from Home Depot to the EEOC about a consent decree entered in a class action case against Home Depot; (2) a response from Home Depot to the EEOC; (3) Coleman's EEOC charge questionnaire, filled out by Coleman herself. It does not appear, however, that the District Court knew how the EEOC came to its determination or that it had access to all the information upon which the EEOC relied. In particular we do not know if the EEOC had any evidence upon which to base its conclusion that a white employee with evaluations as poor as Coleman's was allowed to transfer to another department or that women were systematically hired as cashiers irrespective of their experience and never transferred to sales positions, unlike the male cashiers. *See supra.*

> FN9. The EEOC does not appear to have clear standards for how it gathers information. The Federal Laws Prohibiting Job Discrimination: Questions and Answers, *available at http://www.eeoc.gov/task/pch-lit.html,* states that "[i]n investigating a charge, EEOC may make written requests for information, interview people, review documents, and, as needed, visit the facility where the alleged discrimination occurred."

On the other hand, the District Court was clearly correct about the low probative value of the most critical facet of the EEOC report: that Coleman was not hired as a sales associate despite being a "highly experienced" candidate. Coleman's experience in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 119**