306 F.3d 1333                                                                                          Page 12
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

hardware sales, so central to the Home Depot modus operandi, was exposed by her own testimony to be gossamer. [FN9] That is a matter within her own ken. Yet had the EEOC report been admitted, a great deal of time would have had to have been consumed to counter the report's conclusion about the fate of other employees, male and female.   Because the EEOC Letter of Determination concluded that Home Depot had systematically discriminated against female and minority employees, in order to rebut these expansive allegations, Home Depot would have had to present evidence showing that it did not discriminate when it placed former employees in cashier positions or fired them.   This would certainly have involved a great deal of testimony-a trial within a trial in fact-about the employment histories of a large number of former employees. [FN11]

FN10. Kobera, the Store Manager at the Home Depot where Coleman worked, testified that Home Depot attempts to place employees in sales positions who have a "working knowledge or some point of reference" in the particular area so that they can best assist customers.   For example, Home Depot wanted employees in the hardware department to be able to recommend a versatile power tool to customers. See discussion supra.

FN11. A number of cases have considered the amount of time that it would take to counter a trustworthiness challenge as a consumption of time factor cognizable under Rule 403. See McShain v. Cessna Aircraft Co., 563 F.2d 632, 636 (3d Cir.1977) (holding that the District Court did not abuse its discretion by excluding an NTSB report because the "reception of such reports into evidence would have involved a lengthy ... inquiry into the 'circumstances bearing on the trustworthiness' of the investigators' conclusions.   Thus, it may well have been that, in the course of the eighteen-day trial, the additional probative value of the excluded reports was substantially outweighed by the opportunity to avoid undue delay of waste of time"); see also Zenith Radio Corp., 505 F.Supp. at 1146 ("[W]here the probative value of [evidence admissible pursuant to 803(8)(C)] is outweighed by ... needless presentation of cumulative evidence attendant upon the opponents' efforts to establish

untrustworthiness of the report, the court may exclude the report under F.R.E. 403."). The trustworthiness challenge will generally be disposed of at the in limine hearing stage, but not always.   Moreover, a finding of trustworthiness by the judge does not preclude a trustworthiness challenge by the objecting party at trial.   Therefore since trustworthiness can also become an issue at trial itself, it can bear upon the time-related factors in Rule 403.

*1347 [10] The District Court opined that the EEOC Letter of Determination would be unfairly prejudicial or confusing, but we find the argument that the evidence would have created the potential risk of undue delay and waste of time to be stronger. Weighing undue delay and waste of time against the low probative value of the EEOC determination, it appears that the District Court acted properly.   We are satisfied that the EEOC Letter of Determination wrongly classified Coleman as "highly experienced"-the evidence demonstrated that Coleman knew little about hand and power tools and had only worked in a "mom and pop" hardware stare, see discussion supra-and that it was of such low probative value that the Court could have found that it was "substantially outweighed" by the fact that Home Depot would have had to rebut the EEOC's finding that the company engaged in a pattern of race and gender discrimination by presenting information about numerous former Home Depot employees.

In sum, we conclude that the District Court did not abuse its discretion in deciding that the probative value of the EEOC Letter of Determination was "substantially outweighed" by the problems created by its introduction.   Although the District Court did not know the full extent of the evidence relied upon by the EEOC to conclude that Home Depot had wrongly: (1) hired Coleman as a cashier; (2) refused to transfer her to a sales position; and (3) terminated her, considering that the EEOC clearly was mistaken in the critical conclusion that Coleman was a "highly experienced" employee, the District Court did not abuse its discretion in finding that the EEOC Letter of Determination had such a low probative value that the undue delay that would have been involved in the rebuttal of the allegations of systematic discrimination contained in the EEOC determination "substantially outweighed" that low probative value. The judgment of the District Court will therefore be affirmed.

C.A.3 (N.J.),2002.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                            Page 13
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

Coleman v. Home Depot, Inc.
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl.
Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA)
1876

Briefs and Other Related Documents (Back to top)

- 2001 WL 34136211 (Appellate Brief) Brief of
Appellee Home Depot U.S.A., Inc. (Nov. 19, 2001)
Original Image of this Document (PDF)
- 2001 WL 34136212 (Appellate Brief) Brief and
Appendix Volume I for Appellant, Mary Coleman
(Oct. 15, 2001) Original Image of this Document
with Appendix (PDF)
- 00-3656 (Docket) (Oct. 31, 2000)
- 00-3496 (Docket) (Oct. 19, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

148 F.R.D. 132
148 F.R.D. 132
(Cite as: 148 F.R.D. 132)

Page 1

▷

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
Brenda FALKOWSKI and Edward Falkowski,
Plaintiffs,
v.
Lemuel A. JOHNSON, and S.C.L. Construction, Inc.,
Defendants.
**Civ. A. No. 91-490 MMS.**

April 15, 1993.

Tort-feasor and his employer moved for new trial after jury returned verdict in automobile accident damages case in favor of injured motorist and her husband based on allegedly improper comments of plaintiff's counsel during closing summation. The District Court, Murray M. Schwartz, Senior District Judge, held that: (1) implication of counsel's argument was that insurance was involved in case, and (2) prejudicial effect of inferences made throughout closing argument were not cured by court's instruction.

New trial granted.

West Headnotes

**[1] Federal Civil Procedure ⌘ 1973**
170Ak1973 Most Cited Cases
Extraneous matters introduced by counsel during closing arguments will justify retrial if those matters were reasonably probable to prejudice jury. Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.; U.S.Dist.Ct.Rules D.Del., Rule 83.5(d).

**[2] Federal Civil Procedure ⌘ 1973**
170Ak1973 Most Cited Cases
Extraneous matters introduced by plaintiff's counsel during closing argument for automobile accident case disputing damages, that tort-feasor's employer was uninterested party, that tort-feasor would not pay judgment, and that defense counsel's high tolerance for pain resulted from representing people such as defendants, implied that insurance was involved in case and entitled defendant to new trial. U.S.Dist.Ct.Rules D.Del., Rule 83.5(d); Fed.Rules

Civ.Proc.Rules 59, 59(a), 28 U.S.C.A.

**[3] Federal Civil Procedure ⌘ 1973**
170Ak1973 Most Cited Cases
Trial court's curative instructions did not remove prejudice in automobile accident damages case arising from implied reference by trial counsel to insurance throughout closing argument. U.S.Dist.Ct.Rules D.Del., Rule 83.5(d).
 *133 John M. Bader of Tomar, Simonoff, Adourian & O'Brien, Wilmington, DE; David M. Jakobi, Paoli, PA, of counsel, for plaintiffs.

Robert K. Pearce of Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, DE, for defendants.

OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

Defendants, Lemuel A. Johnson and S.C.L. Construction, Inc., have moved pursuant to Rule 59 of the Federal Rules of Civil Procedure for a new trial or alternatively for remittitur. Docket Item (D.I.) 34. After a three day trial, the jury returned a verdict of $250,000 for plaintiff Brenda Falkowski and $10,000 for her husband, plaintiff Edward Falkowski. D.I. 31. A new trial will be ordered by reason of inappropriate comments of plaintiffs' lead counsel during his closing summation. Accordingly, the motion for remittitur will not be addressed.

I. Facts

Plaintiff Brenda Falkowski was injured in an automobile accident. She filed a complaint against the driver of the other vehicle, Mr. Johnson, and his employer, S.C.L. Construction, Inc. D.I. 1. In its answer, S.C.L. Construction conceded respondeat superior liability, D.I. 5 at ¶ 7, and both defendants later admitted liability. D.I. 19. In his opening address defense counsel conceded Mrs. Falkowski suffered some compensable injury. The only issue remaining for trial was damages. In addition, Mr. Falkowski had a claim for loss of consortium. The motion for new trial is grounded solely upon improper remarks by plaintiffs' lead counsel during closing argument.

During trial plaintiffs' lead counsel for tactical reasons not then clear brought to the jury's attention

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that he was not from the State of Delaware. [FN1] Plaintiffs' counsel began his closing statement by amplifying his out-of-town status:

> FN1. Lead counsel was associated with local counsel pursuant to Local Rule 83.5(d), but local counsel, pursuant to request, was excused from attendance at trial.

Now, you are already aware that I do not normally practice in the State of Delaware. I practice in Chester County, Pennsylvania, which is really, I hope, only regarded by you as a suburb of Wilmington. Since so many of you are citizens here, live or come to work here in Wilmington, please do not regard me as a stranger. I am representing one of your own here. I hope that you will give the people that I represent the same kind of hearing that you would give someone who is represented solely by local counsel. I please ask that you not allow it to in any way interfere with your consideration of this case that I am not normally practicing in Wilmington.

.    .    .    .    .

You may also find that because, in small ways, there is some variances between the procedures and practices in courts that I normally practice, the Court may need to remind me on occasion that there are certain things that I should pay attention to. Again I would ask your indulgence. It is not out of any ill intent on my part. But, instead, I may have different patterns and practices, and there are habits that become ingrained. I am sure all of you appreciate how habits can compel our behavior when we want to try and be otherwise.
D.I. 33 at 2-3.

After turning to the substantive matters of the case, plaintiffs' counsel began his explanation of the defendants' respective interest in the case. With respect to S.C.L. Construction, Inc., counsel stated, "I do want you to know something, and it is very important. S.C.L. Construction didn't care enough about this case to have anyone present." D.I. 33 at 7.

Having implied that S.C.L. Construction, Inc., was not interested in the case, plaintiffs' *134 counsel immediately explained his view of defense counsel. Plaintiffs' counsel stated,
I want to call your attention to some sleights of hand that can occur in a case, because some sleights have occurred here. There is an art of advocacy. Sometimes you notice it and sometimes you don't. A very good magician, you never

notice the tricks of hand that he has, but he has them, or he wouldn't be able to perform magic. [Defense counsel], on several occasions, has called your attention to one area to keep you from looking to where he is performing his magic.
D.I. 33 at 7.

In explaining to the jury the admission of liability by both defendants, plaintiffs' counsel then addressed Mr. Johnson's status. Counsel stated,
Now, normally I would get instructions from the Judge explaining why S.C.L. is liable. Well, there are a couple of reasons. One is because their employee did this while he was in the employ of S.C.L. And S.C.L. is responsible for all [Mr. Johnson's] actions.
Don't waste a lot of sympathy thinking that I am going to be pursuing Mr. Johnson after this trial, because you can't get blood out of a stone. I hope you give me credit with more intelligence than to pursue somebody out of which I can obtain no damages.
D.I. 33 at 8. At this point, defense counsel objected and plaintiffs' counsel stated, "Excuse me, Your Honor. I will withdraw that if you wish. A caution, you may do so." Id.

As a caution, the Court explained,
Members of the jury, there has been a lot said thus far. And [defense counsel] has been very patient because one attorney does not like to object to another during summation. I am going to ask you to keep your eye on the ball during summations, and keeping your eye on the ball means where the attorneys are directly addressing the evidence and the inferences that can be drawn from that evidence, and nothing else.
D.I. 33 at 8.

The issue of insurance arose directly in the closing argument when plaintiffs' counsel referred to the plaintiffs' own insurance. During trial, plaintiffs' counsel in an unorthodox move elicited from plaintiff that she had been reimbursed for her medical special damages by her insurance carrier. In closing argument he revisited the subject. Plaintiffs' counsel stated,
Now, plaintiffs' damages include several areas. And the Judge, His Honor, will instruct you on what those areas of damages are. Those areas of damages include the medical bills that Brenda has incurred. And there are reasons for that. The defendants cannot benefit from the foresight of a plaintiff in obtaining things such as insurance to cover their loss. That is not supposed to benefit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1285, 122 L.Ed.2d 677 (1993). [FN2] To gauge the

148 F.R.D. 132                                                              Page 3
148 F.R.D. 132
(Cite as: 148 F.R.D. 132)

the defendant.

D.I. 33 at 13.    Again, defense counsel objected. Plaintiffs' counsel responded by stating, "I think that is proper argument.    But I don't know about this jurisdiction." *Id.* The Court replied, in turn, that the argument was not proper in this jurisdiction and, in response to plaintiffs' counsel's request for a curative instruction stated,

> Members of the jury, whether there is insurance in this case or there is not is of no relevance to what you are to determine.    You are to determine the amount of damages that the plaintiffs are entitled to.    Similarly, there has been much said about the absence of S.C.L.    I urge you to keep your eye on the ball.    I do not know what that has to do with damages.

*Id.*

Finally, near the conclusion of his closing statement, plaintiffs' counsel stated,

> You know, I think that [defense counsel] has shown that, in the way he has presented evidence, a suggestion through the evidence that, you know, you heard the doctor testify that there are subjective complaints here, subjective complaints there, that perhaps Brenda doesn't suffer from pain or suffer from pain as badly as she says she does. He seems to have a very high tolerance for pain in others.    But that suspicion, which is probably a product of his work in representing people such as the defendants in this case, I suggest that that suspicion should be--

**\*135** D.I. 33 at 18.    Again, defense counsel objected.    The Court, however, found the statements to be argument and not an attack on defense counsel. *Id.* Once more, before the jury plaintiffs' counsel explained, "There are customs in my jurisdiction that differ.    Forgive me." *Id.*

## II. Discussion

Addressing motions for new trials, the United States Court of Appeals for the Third Circuit has stated,

> At the outset, we recognize that not all improper remarks will engender sufficient prejudice to mandate the granting of a new trial.    Our test is whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements.    Often ... a combination of improper remarks are [sic] required to persuade us of prejudicial impact.

*Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 207 (3d Cir.1992) (citation omitted) (quoting *Draper v. Airco,* 580 F.2d 91, 94 (3d Cir.1978)), cert. denied, 507 U.S. 921, 113 S.Ct.

1285, 122 L.Ed.2d 677 (1993). [FN2] To gauge the prejudicial effect of any improper assertions, the appellate court has rested analysis of motions for retrial not necessarily on "individual instances or types of impropriety", but has looked instead to "the argument as a whole." *Draper,* 580 F.2d at 97.

> FN2. Federal Rule of Civil Procedure 59, under which defendants have brought this motion, states, in part:
> A new trial may be granted to all or any of the parties and on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States....
> Fed.R.Civ.P. 59(a).

[1] In considering a motion for retrial, particular attention must be paid to whether "counsel's closing argument to the jury introduces *extraneous matter* which has a reasonable probability of influencing the verdict." *Ayoub v. Spencer,* 550 F.2d 164, 170 (3d Cir.) (emphasis added), cert. denied, 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977).    See also *Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128, 133 (3d Cir.1991) ("The prohibition against use in argument of evidence not in the record is straightforward.").    The prohibition of extraneous matter is confirmed by the pertinent Rules of Professional Conduct upon which the Court of Appeals has also relied in motions for retrial. *See, e.g., Fineman,* 980 F.2d at 208 (relying upon the New Jersey Rules of Professional Conduct).    The particular rule in this case prohibits even an allusion to irrelevant or inadmissible matters.    Delaware Lawyers' Rules of Professional Conduct, Rule 3.4(e) ("A lawyer shall not ... in trial allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence....").    [FN3]    In applying these standards, the Court finds that because extraneous matters were introduced by plaintiffs' counsel during closing arguments, and those extraneous matters were reasonably probable to prejudice the jury, defendants' motion for retrial will be granted.

> FN3. Plaintiffs' lead counsel in this case is not a member of the Delaware Bar, but has been admitted pro hac vice.    D.I. 4.    As such, counsel agreed to submit "to the disciplinary jurisdiction of this Court for any alleged misconduct which occurs in the course of ... this action...."    D.I. 4.    Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 124

148 F.R.D. 132                                                    Page 4
148 F.R.D. 132
(Cite as: 148 F.R.D. 132)

83.6(d)(2) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware incorporates "the Rules of Professional Conduct adopted by the Supreme Court of the State of Delaware."

[2] In determining which, if any, statements may have had a prejudicial effect, the Court first considers if "counsel's closing argument to the jury introduce[d] extraneous matter...." *Ayoub*, 550 F.2d at 170. The only issue at stake in this trial was the amount of damages suffered by the plaintiffs. Despite the solitary issue for trial, in his closing statement, plaintiffs' counsel impugned both defendants and defense counsel on irrelevant grounds. Plaintiffs' counsel indicated that S.C.L. Construction, Inc., was an uninterested party and instructed the jury not to "waste a lot of sympathy thinking that I am going to be pursuing Mr. Johnson after this trial, because you can't get blood out of a stone. I hope you give me credit with more intelligence than to pursue somebody out of which I can obtain no damages." D.I. 33 at *136 8. In addition, plaintiffs' counsel remarked on defense counsel's "high tolerance for pain" as a result of "representing people such as defendants in this case". D.I. 33 at 18.

Who would pay the judgment is irrelevant to the sole issue of damages. Whether plaintiff would be forced to squeeze "blood out of a stone" or would be able to recover from some other source has no bearing on the amount of damages. That subject matter had no place in this trial. Similarly, whom defense counsel frequently represents has no relevance to the issue of damages suffered by plaintiffs. It follows plaintiffs' counsel did introduce extraneous matter into his closing statement.

A finding that extraneous matter found its way into the trial in plaintiffs' closing statement does not end the matter. The Court must next determine if it is reasonably probable that those comments prejudiced the jury. Harmless extraneous matter would not be grounds for retrial. Defendants forcefully argue the statements, while not directly saying so, were calculated to lead the jury to conclude that defendants' insurance carrier, not defendants, would be paying the damages awarded to plaintiffs. The Court agrees. This is best illustrated by plaintiffs' counsel's comment that the jury not "waste a lot of sympathy thinking that I am going to be pursuing Mr. Johnson after this trial, because you can't get blood out of a stone. I hope you give me credit with more

intelligence than to pursue somebody out of which I can obtain no damages." D.I. 33 at 8. Defendants also point to the description of S.C.L. Construction, Inc., as an uninterested party when plaintiffs' counsel explained, "I do want to note something, and it is very important. S.C.L. Construction didn't care enough about this case to have anyone present." D.I. 33 at 7. While stated separately in summation, when taken together these two comments alone tell the jury that some entity other than the defendants would pay the judgment. This effect was compounded by directly introducing insurance, albeit plaintiffs' insurance.

The implication that insurance was involved was also furthered by counsel's remarks concerning defense counsel's "high tolerance for pain" as a result of "representing people such as defendants in this case". D.I. 33 at 18. Such comments, combined with statements explaining the lack of interest in the case on the defendants' parts, would lead a dispassionate listener to the inevitable conclusion that defendants had insurance coverage. Looked at in isolation, any one of these comments could be considered harmless. Together, however, they combine to present a reasonable probability that the jury learned by reason of closing argument of plaintiffs' counsel that an insurance company would pay any award the jury might make.

A jury would, within reasonable probability, inflate the amount of the award if it had reason to infer that an insurance company rather than defendants would pay an award. Indeed, the probability of jury prejudice when insurance coverage has been introduced was one of the reasons behind the prohibition of liability insurance as admissible evidence. The Advisory Notes to Rule 411 of the Federal Rules of Evidence [FN4] explain the exclusion of liability insurance due to the fear "that knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds." The rationale behind the exclusion of insurance from evidence also applies to closing arguments of counsel.

FN4. Rule 411 of the Federal Rules of Evidence states:
Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agency, ownership, or control, or bias or prejudice of a witness. Fed.R.Evid. 411.

The United States Court of Appeals for the Second Circuit has recognized the danger whenever liability insurance coverage is referred to by an attorney. In facts analogous to this case, plaintiff's attorney told the jury that neither the defendant, nor the defendant's father, had any financial interest in the case. *Cuccarese v. Soloman*, 405 F.2d 866 (2d Cir.1969) The appellate court found the "remarks of plaintiff's counsel clearly implied that defendant had insurance to cover **137** a judgment rendered against him." Id. at 867. The court explained, "A reference by counsel to insurance coverage is ground for a mistrial unless it is made for a legitimate purpose." *Id.* (citations omitted). Cf. *Adams Lab., Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1226- 27 (7th Cir.1985) ("[T]o constitute reversible error, references to insurance coverage must be 'due to some misconduct or improper remarks or questions of counsel, oft-times repeated, and calculated to influence or prejudice the jury.' ") (quoting *Kitsch v. Goode*, 48 Ill.App.3d 260, 6 Ill.Dec. 17, 22-23, 362 N.E.2d 446, 451-52 (1977)).

As the Second Circuit Court of Appeals and the Advisory Committee to the Federal Rules of Evidence both recognize, reference at trial to liability insurance coverage may work to prejudice a jury in its deliberations. Here, by alluding to insurance coverage in his closing statement, plaintiffs' counsel brought in extraneous material which had nothing to do with the amount of damage suffered by plaintiff. The only purpose had to be to influence the jury to inflate the award. These allusions, especially in the closing minutes of the trial, makes it reasonably probable that the jury had been prejudiced.

[3] Plaintiffs argue that any prejudice which may have occurred was cured by the Court's instructions to the jury. In considering motions for retrial, the Third Circuit appellate court has indicated that a curative instruction from the court is not necessarily sufficient "to remove the probability of prejudice." *Draper*, 580 F.2d at 97. In this case, the only instruction aimed at eliminating the implication of insurance coverage occurred only after the mention of plaintiff's insurance. The comments which claimed that the defendants had no interest in the case were not followed by instructions to ignore the potential of defendants' insurance coverage. Indeed, if the court were to have mentioned defendants' liability insurance in a cautionary instruction, it could have made matters worse, not better. *See, e.g.,* *Cuccarese*, 405 F.2d at 867 ("The judge's instruction

... that the jury should not consider defendant's ability to pay a judgment in reaching its verdict may have made the situation worse by reminding the jury of prior references to insurance."). Moreover, because the implication of insurance coverage arose over the entire course of the closing statement, it is difficult to see how any curative instruction would suffice.

Finally, any curative effect of the Court's instructions was mitigated by the plaintiffs' counsel's oft-repeated statements that he might make mistakes because of his out-of-state status. By explaining on more than one occasion that he usually practiced in another jurisdiction where certain rules are different, plaintiffs' counsel implied what he was doing was acceptable in other jurisdictions, thereby causing the jury to believe he would be permitted to bring out the fact of defendants' insurance coverage if he were in another district. The jury would then all too easily attribute the errors of plaintiffs' counsel to his out-of-state status, and would be less inclined to follow the Court's instructions. In short, by pre-excusing certain portions of his conduct he deflected the brunt of attempted corrective action by the Court.

In summary, plaintiffs' counsel so effectively planted his comments that by the end of his summation any reasonable juror could not have avoided the strong suspicion, if not conviction, that defendants' insurance carrier would pay any award the jury might make to plaintiffs. Equally troubling is the generalized personal attack on defense counsel's integrity without reference to any specific facts. Plaintiffs' counsel dubiously asserts that conduct such as he exhibited occurs in the jurisdiction in which he practices. Regardless of the accuracy of counsel's questionable assertions, it is not the norm in the Delaware District or the Delaware state courts. Unless and until higher authority orders otherwise, the Court will not permit civility in the courtroom to descend to the lowest common denominator.

An order will issue granting defendants a new trial.

148 F.R.D. 132

**Motions, Pleadings and Filings (Back to top)**

• 1:91cv00490 (Docket) (Sep. 05, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
David G. **FINCH**, Plaintiff,
v.
**HERCULES** INCORPORATED, Defendant.
**No. Civ. A. 92-251 MMS.**

Dec. 22, 1995.

Richard G. Elliott, Jr., and Helen M. Richards, of
Richards, Layton & Finger, Wilmington, DE, for
plaintiff.
Sheldon N. Sandler, and Bhavana Boggs, of Young,
Conaway, Stargatt & Taylor, Wilmington, DE, for
defendant.

*MEMORANDUM OPINION*
MURRAY M. SCHWARTZ, Senior District Judge.

I. INTRODUCTION

*1 Plaintiff David G. Finch ("Finch") has filed suit
against his former employer, defendant Hercules,
Incorporated ("Hercules" or "corporation"),
alleging he was discriminated against based on his
age in violation of the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 621-34.
After over three years of adamantine posturing by
both parties, the case is finally poised for trial.
Before the Court are plaintiff's and defendant's
cross-motions in limine seeking the exclusion of
various evidence and witnesses in the upcoming
trial.

For the reasons set forth below, the Court will grant
in part and deny in part both motions in limine.

II. FACTUAL BACKGROUND

For its fifth recitation of this saga, the Court gleans

the following facts, for the most part, from the
parties' joint Pretrial Stipulation, Docket Item ("D.I.
") 204. Finch is presently age 63 and was born on
July 22, 1932. He started his tenure at Hercules in
1962 as a Systems Analyst, progressing up the
company hierarchy to the helm of the Audit
Department, a position he held for eleven years
until Hercules terminated him in February 1991. At
that time, Finch was titled as General Auditor and
reported to the corporation's Chief Financial
Officer, Arden B. Engebretsen ("Engebretsen").
When terminated, Finch was 58 years old and
earning an annual salary of $102,608.

Finch's termination in 1991 is characterized by
Hercules as part of a reduction-in-force ("RIF"),
which had its genesis in late 1990. The 1991 RIF,
which eliminated 402 employees, was merely one in
a series of staff reductions in an overall program of
restructuring that Hercules had commenced in the
mid-1980s. To assist with the RIF process, Hercules
hired Thomas S. Litras Consultants ("Litras"),
which recommended a forced ranking/paired
comparison process to select the individuals to be
terminated.[FN1] In its proposal for ranking
employees, Litras recommended that the
corporation consider "performance, education,
versatility, flexibility, and continuous service. Age
[[[was] to be the last factor considered, and then
*only if a 'tie-breaker' was required.* If there was a
tie, Hercules was to retain the older employee."
*Finch v. Hercules, Inc.,* 865 F. Supp. 1104,
1112-13 (D. Del. 1994) (emphasis in original;
internal citations omitted). It was agreed that
Hercules' preexisting performance appraisal system
was inadequate to support the required
decisionmaking.

In December, 1990, before any employee had been
selected for termination, the Hercules Board of
Directors appointed Thomas L. Gossage ("Gossage"
) as the corporation's new Chief Executive Officer ("
CEO"). Coincident with these events, Hercules'
Chief Financial Officer ("CFO") Engebretsen also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 127**

Not Reported in F.Supp.                                                                                  Page 2

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

retired, positioning Finch, at least on paper, as directly reporting to the neophyte CEO Gossage. Gossage subsequently gave George MacKenzie (" MacKenzie"), the corporation's Controller, responsibility for Finch's Audit Department.

MacKenzie undertook the forced-ranking of seven managers from the Audit and Controller's Departments. He ranked Finch near the bottom of the list at sixth place. On January 26, 1991, MacKenzie obtained approval for the elimination of the position of General Auditor and, therefore, Finch (as well as the employee who was listed in last place). MacKenzie broke the news to Finch on February 4, 1991; Finch was terminated effective February 28, 1991.

*2 Later in 1991, the successor Chief Financial Officer reinstated the position of General Auditor, but did not interview Finch in the process. Instead, Hercules hired Curtis Tomlin, age 38, for Finch's former position. In response to this entire series of events, armed with his Equal Employment Opportunity Commission right-to-sue letter, Finch brought this action on May 5, 1992. At this point, it is uncertain whether this case will be treated under a "mixed motive" analysis, *see Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989); *Griffiths v. CIGNA,* 988 F.2d 457 (3d Cir.), *cert. denied,* 114 S.Ct. 186 (1993), or a "pretext" mode of analysis, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Miller v. CIGNA,* 47 F.3d 586 (3d Cir. 1995).[FN2]

### III. CROSS-MOTIONS IN LIMINE

Finch has moved in limine for a ruling on the admissibility of various evidence and testimony that Hercules proposes to put forth at trial. Hercules has likewise cross-moved in limine.

#### A. Plaintiff's Motion in Limine

1. Evidence Not Considered by MacKenzie When Force-Ranking Finch

As part of its defense to plaintiff's allegations of age discrimination, Hercules seeks to introduce at trial three types of documentary evidence. First, defendant offers an Indirect Productivity Improvement ("IPI") study performed by outside consultants in 1989 as evidence that Hercules needed a more proactive, involved audit department. *See* D.I. 119 at 486. This IPI study was not factored into any of the adverse employment decisions affecting plaintiff. Second, Hercules seeks to introduce evidence generated contemporaneously with the RIF process. During the latter part of January, 1991, Hercules reviewed the performance of all corporate staff groups for purposes of determining the amount of incentive bonuses (" Management Incentive Compensation Plan" or " MICP") for senior staff employees. Plaintiff asserts, and defendant does not contest, that the results of this MICP evaluation were not known until *after* Hercules decided to terminate Finch. Finally, Hercules seeks to admit Performance Appraisal Reports prepared by Finch for two of his employees.

Plaintiff argues that none of this evidence surfaced until the discovery phase of this litigation; MacKenzie did not consider any of it in his decision to terminate Finch. As such, plaintiff argues, the above documents should be inadmissible as " after-acquired" evidence under *McKennon v. Nashville Banner Publishing Co.,* 115 S.Ct. 879 (1995), and its progeny. The Third Circuit Court of Appeals has characterized after-acquired evidence as "evidence of the employee's ... misconduct or dishonesty which the employer did not know about at the time it acted adversely to the employee ..., but which it discovered at some point prior to, or more typically, during subsequent legal proceedings; the employer then tries to capitalize on the evidence to diminish or preclude entirely its liability for otherwise unlawful employment discrimination." *Mardell v. Harleysville Life Ins. Co.,* 31 F.3d at 1222. The evidence of which plaintiff complains does not involve any misconduct or dishonesty by Finch that would serve as a *post hoc* justification for Hercules terminating him; it therefore does not quite fit the Third Circuit's paradigm as being after-acquired. Nevertheless, "to be admissible in either a mixed motives or pretext case, evidence must be relevant to the proofs or rebuttals of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 128**

Not Reported in F.Supp.                                    Page 3

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

defendant's discriminatory motivation." *Finch v. Hercules, Inc.,* 865 F.Supp. at 1110 n.3 (D. Del. 1994) (citing *St. Mary's Honor Ctr. v. Hicks,* 113 S.Ct. 2742 (1993)). *See also Mardell,* 31 F.3d at 1229 (employee must show that age was a substantial factor motivating the adverse employment decision at the time it was made). The person involved in the forced-ranking of plaintiff, MacKenzie, was not aware of either the IPI study or the MICP evaluation until after the decision to terminate Finch had been made. Consequently, this evidence could not have affected Hercules' motivation in either the forced-ranking process or the ultimate decision to terminate Finch.

**\*3** Hercules counters that the above evidence is not after-acquired evidence, and that the results of the IPI study and the MICP reports are not being introduced as a basis for MacKenzie's termination decision. Rather, defendant seeks to rebut Finch's assertion that his performance as auditor was " consistently excellent." *See* Complaint, D.I. 1 at ¶ 8. Hercules would introduce the evidence to show MacKenzie's decision was not "mistaken and unreasonable," but rather was consistent with the vast majority of other high ranking officials' opinions at Hercules. Answer Brief, D.I. 226 at 3. Plaintiff rejoins by citing Fed. R. Evid. 403 and arguing that the dangers of confusing and misleading the jury and the resultant prejudice substantially outweigh any probative value of this evidence.

The Court agrees that any limited probative utility of the IPI and MICP evidence would be substantially outweighed by the undue prejudice to plaintiff. Because MacKenzie did not consider and did not know of unflattering statistics, they are not probative of his decisionmaking process. Hercules should not be allowed to present, after the fact, further justification for its actions if that justification was completely uncontemplated at the relevant time. At issue is whether a discriminatory animus motivated Hercules in the employment decisions it made adverse to plaintiff at the time those decisions were made. *Fuentes v. Perkasie,* 32 F.3d 759, 765 (3d Cir. 1994); *Mardell,* 31 F.3d at 1229. Accordingly, for purposes of liability, a jury will deliberate as to whether Hercules was so

motivated on the information it availed itself of at the time.[FN3] Admission of the MICP or IPI evidence would serve only to feed the jury facts that are extraneous to its task, yet once presented, would be difficult to "unlearn." Consequently, the Court finds any marginal relevance this evidence may have is substantially outweighed by the dangers of confusion and prejudice.

The Courts views differently, however, the third type of evidence Hercules proffers, *i.e.,* Performance Appraisal Reports authored by Finch as products of his evaluating two subordinate employees. Hercules argues that Finch has: expressed disbelief in his low ranking by MacKenzie and has claimed that it could only be due to a discriminatory motive, because his supervisor gave him good evaluations. Ironically, Finch himself ranked two of his employees, Droney and Mekinc, at the bottom of the forced rankings after having given them good evaluations.

Defendant's Answer Brief, D.I. 226 at 4. Although Finch contends that "Finch's ranking was not based on performance," D.I. 231 at 2, MacKenzie has testified at deposition that his forced ranking of Finch *was* based on performance. D.I. 121 at B-106. The evidence in question is directly relevant to the fact-finder's consideration of whether Hercules employee evaluations necessarily correlate to forced-ranking decisions or an employee's prior performance. Therefore, the Court will allow this evidence to be admitted at trial.

### 2. Evidence of Finch's Reputation

**\*4** Plaintiff next argues that Hercules will try to introduce at trial evidence of Finch's general reputation at Hercules. During discovery, one Hercules employee testified that "[Finch] was not well regarded in Hercules other than by his prior boss." D.I. 119 at A374. Another employee provided a sworn statement that "The general perception within Hercules was that Mr. Finch was a lackluster performer ...." D.I. 212 at 11, citing D.I. 135 at 8.[FN4] Finch argues that such testimony concerning the general view of unidentified persons in Hercules management should be excluded as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 129**

Not Reported in F.Supp.                                                          Page 4

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

hearsay as it is inherently unreliable, prejudicial, and not susceptible to cross-examination. Finch concedes, however, that a witness's testimony as to his or her own personally-held beliefs is susceptible to cross-examination. D.I. 231 at 8. Finally, Finch contends that such testimony is also barred under Fed. R. Evid. 701. Hercules counters by arguing that Finch misunderstands both the type of testimony it seeks to offer as well as the applicable law; it argues that this evidence is "exactly the type of testimony permissible under Rule 701." D.I. 226 at 6.

Fed. R. Evid. 701 allows the introduction of lay opinion testimony if the witness' testimony is " limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Hercules maintains that both of the rule's requirements are easily met. First, as fulfillment of part (a), it argues that its witnesses are Hercules managers who have had the opportunity to interact with Finch and observe his performance; thus, they have first-hand knowledge about management's perceptions regarding Finch's performance. For part (b), Hercules contends that the managers' testimony will assist the jury to understand Finch's low rank resulting from the RIF process. It also argues that this testimony is crucial for an understanding of whether it was unreasonable for MacKenzie to conclude that Finch was an unsatisfactory performer and therefore terminate him.

If, as Hercules represents, its witnesses' testimony will be based on each witness's own perception of Finch, the testimony is not hearsay and is admissible. Plaintiff will be able to cross-examine these witnesses as to the reasons why they formulated their opinions and whether their opinions are rationally based. Although MacKenzie was the actual manager who decided plaintiff's fate, other managers were privy to the same or similar information possessed by MacKenzie regarding plaintiff's performance, assuming Hercules lays the proper foundation under Rule 701(a). Their testimony may corroborate or undermine MacKenzie's decision; either way, this type of testimony is crucial to the fact-finder's consideration

of whether Hercules' proffered explanation of its decision to terminate Finch is worthy of credence.

However, because the testimony of the individual managers will be admissible, Hercules will not be allowed to elicit testimony of Finch's general reputation among the Hercules management. The Court agrees with plaintiff that under these circumstances, the probative value of general reputation testimony will be substantially outweighed by the resultant prejudice to plaintiff. It will be unnecessary to ask each manager about how management in general regarded Finch because each manager will have the opportunity to testify about his or her personal and fact-based opinion of plaintiff. The jury will thus be able to draw its own conclusion as to Finch's reputation by weighing each manager's testimony. Based on this evidence, plus evidence presented by MacKenzie, the jury may or may not infer that it would be reasonable that MacKenzie held these same beliefs.

3. Finch's Membership and Participation in the Mormon Church

**\*5** Plaintiff plans to call at trial Arden Engebretsen, Hercules' former Chief Financial Officer and the administrator to whom plaintiff directly reported. Engebretsen and Finch were members of the same church, the Church of Jesus Christ of Latter-Day Saints, also known as the Mormon Church. During 1977-1980, Finch was a bishop of his and Engebretsen's Mormon congregation; Finch's duties as bishop included counseling members of the congregation, including young adults and teens. In his role as lay bishop, Finch counseled one or more of Engebretsen's children. Hercules argues that evidence of Finch's church-based relationship with Engebretsen is relevant to show that Engebretsen, who was responsible for evaluating Finch's performance, may have been and may still be biased in favor of Finch. Finch agrees that the following evidence is admissible: "that Engebretsen and Finch attend the same church and that, in connection with Finch's church activities, he counseled Engebretsen's children some fifteen years ago."[FN5] D.I. 231 at 12. Finch, however, objects to Hercules placing before the jury any specific reference to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 130**

Not Reported in F.Supp.                                    Page 5

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Finch's denomination, as it is his understanding that the Mormon sect is generally unpopular and not well understood in the eastern United States. As such, Finch argues, all reference to the Mormon Church should be excluded as unduly prejudicial under Rule 403.

Fed. R. Evid. 610 states that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." The rule's advisory committee notes add that while the rule forecloses inquiry into the religious beliefs or opinions of a witness for purposes of showing the witness's character for truthfulness, "an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." The Court agrees that evidence of Finch attending the same church as his supervisor and counseling his supervisor's children is relevant and admissible to show possible bias on the part of Engebretsen. However, Engebretsen's bias, if there is bias, would flow from the nature of the relationship between these two men as members of the same religious community, independent of the specific denomination that community happens to be. Evidence of Finch's and Engebretsen's specific denomination is irrelevant to the substantive issues in this case; even if it were relevant, its probative value is substantially outweighed by the danger of undue prejudice to the plaintiff. While the Court does not necessarily find that the Mormon religion is unpopular in the District of Delaware, the Court does acknowledge the possibility that this evidence will only serve to distract the jury or take on an inflated and unwarranted significance. The Court therefore holds that evidence of Finch's and Engebretsen's membership in the Mormon church is inadmissible.

### 4. Exclusion of Hercules Witnesses

**\*6** Plaintiff also moves to exclude or at least limit the testimony of certain Hercules' witnesses as listed in the Pretrial Stipulation. The grounds for exclusion are several.

### a. Curtis "C.T." Tomlin

Hercules proposes to call Curtis Tomlin, a Harvard-educated, African-American, Certified Public Accountant who, at age 38, was hired in December 1991 as the corporation's new General Auditor. According to defendant, Tomlin was hired when R. Keith Elliott, Hercules' newly appointed Chief Financial Officer, decided to reinstate the General Auditor position. D.I. 226 at 34. Hercules seeks to introduce evidence of Tomlin's credentials and qualifications as probative of Hercules' non-discriminatory motive in re-filling Finch's former position; Finch was not interviewed or considered for rehire. Hercules also would have Tomlin testify regarding the environment in the Audit Department following Finch's eleven years at the department's helm. Tomlin would paint an unflattering portrait of Finch's legacy by characterizing the Audit Department as "dispirited and reactive," one which Tomlin "needed to take considerable steps to improve." D.I. 241 at 30.

Finch argues that he is not alleging that Hercules discriminated against him based on his age when it refused to interview or rehire him in December 1991. Plaintiff argues that the only relevant evidence are Tomlin's hire date, his age, and the position for which he was hired. In his Complaint, Finch chose to allege these very facts as bearing on his age discrimination claim.

The Court agrees that Tomlin's age, date of hire, and position are germane to this action. Plaintiff has argued that the replacement of the 58-year-old Finch by this younger individual is probative of Hercules' discriminatory animus. But, if Finch wishes to offer these facts, Hercules will be allowed to offer proof of Tomlin's credentials as evidence of a legitimate motive underlying its actions. The Court is troubled by Hercules' assumption that the condition in which Tomlin found the Audit Department, eleven months after Finch was terminated, is directly attributable to Finch. During this interim period, the Audit Department was headed by one or more temporary managers who may or may not have contributed to the departmental environment into which Tomlin was thrust. However, it is simply impossible to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 131**

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

determine in advance of trial whether this testimony would be substantially more prejudicial than probative. Accordingly, any ruling on this issue prior to trial would be premature. The Court will entertain argument on this issue during trial, out of the hearing of the jury, just prior to or at the time Tomlin takes the witness stand.

### b. Witnesses Identified By Hercules in the Pretrial Stipulation

In the Pretrial Stipulation, Hercules identified for the first time as trial witnesses several of its present and former employees: David S. Hollingsworth, predecessor CEO to Gossage; Fred L. Buckner, former President; James J. Anthony, Manager of Administration in the Audit Department; William Godfrey, Manager of Computer Audits from 1980 to 1987, Sue A. Murray, who ran the Audit Department on an interim basis after Finch was terminated; and Harry Gordon, who was the Director of Executive Resources in Hercules' Human Resources Department.[FN6]

*7 Plaintiff protests that these witnesses should have been disclosed as responsive to the following series of interrogatories:
4. Was elimination of the position of General Auditor the sole reason for terminating Mr. Finch? [Hercules' Answer: No]
5. If the answer to Interrogatory 5 was no, please state in detail:
a. each additional reason for terminating Mr. Finch; [Hercules' Answer: In connection with the downsizing, and in compliance with the mandates of Hercules' Policy Compliance Committee's requirements, the Financial Managers falling under the supervision of the Controller's Department were ranked. Mr. Finch's performance caused him to be ranked among the two lowest ranked financial managers in a group of seven, and these two employees were terminated.]
b. description of each document which refers to the additional reason;
c. *the name of each person who has knowledge of the additional reasons;*
d. whether any of the additional reasons were communicated to Mr. Finch, and if so, by whom."

D.I. 227, Exh. C (emphasis added). Plaintiff contends that Hercules was noncompliant with its answers to his discovery requests, specifically question 5c, and that consequently, he never had an opportunity to depose the above witnesses. Fed. R. Civ. P. 26(a)(5) allows parties to propound written interrogatories as a part of the discovery process; the rules also provide a harsh penalty for noncompliance with this discovery mechanism. "A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness ... not so disclosed." Fed. R. Civ. P. 37(c)(1). Finch requests these witnesses to be excluded from trial. Plaintiff's Opening Brief, D.I. 212 at 31.

Hercules counters that plaintiff's interrogatories were narrowly focused and, specifically, number 5c was merely "asking for the names of persons who had knowledge of any additional reasons, aside from the position elimination, why Finch was one of those chosen to be RIFed, *i.e.,* knowledge of what those additional reasons were." D.I. 226 at 20. In response to this interrogatory, Hercules identified individuals whom it contends knew *why* Finch was terminated, *i.e.,* that Finch's performance was considered as a factor. The Court agrees that this was a reasonable interpretation of interrogatory 5c, viewed standing alone and especially within the context of the surrounding questions. The interrogatories focus on Hercules' proffered reasons underlying its termination of plaintiff and individuals who were able to proffer those reasons.

In contrast, Hercules now seeks to offer the witnesses in question to testify about the quality (or lack thereof) of Finch's performance; it argues these witnesses did not know that Finch's performance was factored into the forced-ranking and termination decisions. Therefore, defendant argues, a listing of these witnesses was not required by plaintiff's interrogatories. Hercules has tendered a brief description of each of the witnesses in question. James J. Anthony served as Manager of Administration in the Audit Department and reported directly to plaintiff. He would be able to testify about the nature and quality of Finch's performance and present his view as to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 132**

Not Reported in F.Supp.                                                          Page 7

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

functioning of the Audit Department. He was not, however, involved in the decision to terminate Finch.

*8 Sue A. Murray was one of several "interim" managers who ran the Audit Department after Finch was terminated. At trial, she would testify that it was clear that her function in this capacity would be strictly on an interim basis, and that she was granted unencumbered access to the Audit Committee, a Committee of the Hercules Board of Directors. Hercules seeks to rebut plaintiff's assertion that Hercules engaged in "subterfuge" when terminating Finch and eliminating his position on an interim basis. *See* D.I. 204 at 30-31. Hercules would also elicit Murray's testimony regarding problems she encountered when running the Audit Department allegedly stemming from plaintiff's "poor management." D.I. 226 at 34.

Fred Buckner was Hercules' President and Chief Operating Officer during the years antedating the 1991 RIF. Buckner served as the leader of Hercules' President's Team and was also a member of the corporation's Executive Team. These two groups evaluated the performance of different departments within the corporation, D.I. 227, Exh. O at 57; they were also responsible for the MICP evaluation, *supra,* section 1, which has been ruled admissible only if there is bifurcation of liability and damages. Hercules also argues that plaintiff has listed as one of his trial exhibits a document authored by Buckner and that Buckner should be allowed to testify about the document.

William Godfrey worked with Finch from 1980-1987 as Manager of Computer Audits. Hercules states that Godfrey will attest to plaintiff's unique relationship with CFO Engebretsen and his family during that time frame. Godfrey will also testify about Finch's personal activities purportedly occurring during the work day, including sleeping, church business, and reading the newspaper.

David Hollingsworth was Hercules' CEO prior to Gossage. Hercules does not currently plan to call this witness during its case in chief, but wishes to reserve its right to do so if necessary.

The current record shows that none of the above witnesses were positioned to know that Finch's performance played a role in the ultimate decision to terminate him. With one qualification, the Court will allow these witnesses to present their testimony, as outlined by Hercules, at the upcoming trial. If there is no bifurcation, Buckner will not be allowed to testify about the MICP evaluation or any other similar evidence which was not considered in the decision to terminate Finch.

Plaintiff objects to an additional trial witness identified by Hercules, Harry Gordon, who from the mid-1980s until July, 1991, was Hercules' Human Resources Director of Executive Resources. Plaintiff argues that Hercules affirmatively misled him during discovery as to the scope of this witness's knowledge of and involvement with Finch's termination. Hercules initially identified Gordon as an individual who participated in the development of standards or criteria for evaluating employees during or in preparation for its 1991 RIF. However, Hercules later narrowed its characterization of Gordon's expertise in this area by describing Gordon as one who attended a meeting at which the RIF policy was discussed, but who played no role in developing standards or criteria for evaluating employees.

*9 In November, 1992, Finch also asked to discover any Hercules documents related to the "replacement potential of all corporate financial positions" and for "promotability lists" prepared by Human Resources. D.I. 232 at C40. Hercules responded that there were none available at that time. In May, 1995, Finch renewed this same request for documents. Hercules responded by asserting it had just discovered an old notebook of Gordon's in a desk containing notes of business meetings Gordon attended in 1988. Gordon's notes quote Engebretsen, who was Hercules' CFO and Finch's direct supervisor, as declaring the corporation as needing "an accounting guru" and "Need Chief Auditor - repl Finch." D.I. 210, Exh F. at 5. After contacting Gordon, who had retired in July 1991, further probing revealed a 1985 file memo documenting a conversation between Gordon and MacKenzie. MacKenzie is said to have commented that plaintiff was "insecure" and was an "8:00-4:45

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 133**

Not Reported in F.Supp.                                                                                                    Page 8

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

carpooler." *Id.* at 3. Hercules forwarded these and other of Gordon's documents to plaintiff's counsel in June and July of this year. It now seeks to call Gordon as a witness to testify how plaintiff was not highly regarded by his superiors.

Plaintiff argues that he has been prejudiced in his ability to prepare adequately for Gordon's trial testimony and that Hercules should not be allowed to profit from its abuse of the discovery process. Plaintiff therefore seeks to exclude this witness from testifying at trial.

The exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure to be avoided where possible. *Central Maine Power Co. v. Foster Wheeler Corp.,* 115 F.R.D. 295, 297 (D. Me. 1987). However, sometimes, such exclusion is necessary; fidelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities. *Tomlin v. Holecek,* 158 F.R.D. 132, 135 (D. Minn. 1994) (citing *Jochims v. Isuzu Motors, Ltd.,* 144 F.R.D. 350, 356 (S.D. Iowa 1992) ). Accordingly, the "flouting of discovery deadlines causes substantial harm to the judicial system." *Id.* As a sanction for failure to comply with a timing requirement set by the Scheduling Order in this case, the Court is authorized to exclude evidence proffered by the disobedient party. *United States v. 68.94 Acres of Land,* 918 F.2d 389, 396 (3d Cir. 1990). However, the Court also acknowledges that unreasonable adherence to such deadlines, without regard to whether a party was justified for its actions, runs counter to the dominant interest in the trial process, *i.e.,* ascertaining the truth. These competing considerations are properly resolved by the Court in exercising its discretion. *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201 (3d Cir. 1978).

When considering whether to exclude testimony, courts generally look to the following: "the ability of the party to have discovered the witnesses earlier, validity of the excuse offered by the party, willfulness of the party's failure to comply with the court's order, the party's intent to mislead or confuse his adversary, and the importance of the excluded testimony." *Stewart v. Walbridge, Aldinger Co.,*

162 F.R.D. 29, 31 (D. Del. 1995) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904 (3d Cir. 1977), *overruled on other grounds, Goodman v. Lukens Steel,* 777 F.2d 113 (3d Cir. 1985), *aff'd,* 482 U.S. 656 (1987)). Based on these considerations, the court must weigh (1) the prejudice or surprise to the party against whom the excluded witnesses would have testified, (2) the party's ability to cure the prejudice, (3) the extent to which calling undisclosed witness would disrupt the trial process, and (4) bad faith or wilfulness in failing to comply with the court's order. *Meyers,* 559 F.2d at 904-05.

**\*10** At this point, on the eve of trial, the Court is inclined to exclude this witness. Defendant has not offered any compelling justification for why the documents were not produced when first requested during discovery. Hercules enjoyed access to both the documents and was able to reach Gordon for more information (even though he retired three years ago), and should have done as much as part of its duty to diligently produce evidence requested by its opponent. Plaintiff has been both surprised and prejudiced in not being able to depose this witness and prepare accordingly for trial. It would be unfair to plaintiff to have his case preparation impacted and disrupted at this late date. Additionally, there is no evidence that MacKenzie relied on any of this evidence when force-ranking or terminating Finch. On balance, consideration of the above factors weigh in favor of excluding this witness from trial.

B. Defendant's Motion in Limine

1. Evidence of Hercules Financial Earnings After the 1991 RIF

Hercules seeks to preclude at trial evidence of the earnings and financial status of both the corporation and several of its top executives. Plaintiff argues that Hercules has placed its financial condition at issue when its CEO Gossage declared the purpose of the 1991 RIF was to cut indirect costs and put the company back on the path towards being "lean." Plaintiff's Answer Brief, D.I. 228 at 27. Plaintiff also "vigorously disputes Hercules' justification for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 134**

Not Reported in F.Supp.                                                                Page 9

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the RIF" and "believes the RIF, as applied to him, was totally pretextual ...." *Id.* at 27. Specifically, Finch argues that there are substantial reasons to dispute whether Hercules' fiscal health was in serious jeopardy and whether Hercules' proffered economic justification for the RIF is worthy of credence.

Hercules argues that this evidence is not probative of whether the corporation discriminated against plaintiff based on his age. Rather, it asserts, evidence of Hercules' financial wealth would serve to prejudice the jury against defendant and its senior officers by portraying them as "avaricious fat cats who can afford to pay a sizable judgment." D.I. 209 at 2. The Court agrees. First, plaintiff seeks to introduce evidence of Hercules' earnings and argue that the RIF was not economically justified. According to plaintiff, Hercules' annual net earnings/losses were as follows: 1989, the corporation lost $81 million; in 1990, following a RIF, it enjoyed a net income of $96 million; in 1991, it similarly gained $95 million. In addition, plaintiff seeks to introduce the salaries and bonuses of both Hollingsworth and Gossage, Hercules's two most recent Chief Executive Officers. Their salaries ranged from the high six to low seven figures; plaintiff seeks to draw the inference that because Hercules was willing and able to afford such high-priced talent, it must not have been in such economic dire straits as to justify the 1991 RIF.

These figures would seem staggering to those uninformed about the operation of a large, Fortune 500 corporation such as defendant's. Were plaintiff allowed to introduce such evidence, defendant would no doubt find itself required to define in great detail the meaning of these numbers and how they compare with other similarly situated businesses and top executives. Hercules would also likely seek to illustrate the economic projections and reasoning behind the multiple RIF's and whether, in hindsight, the prospective RIF planning correlated to the eventual financial results. In addition, the corporation would explain whether other forces impacted these financial statistics, such as availability and cost of raw materials, market demand, and the economic climate both national and international.

*11 Corporations implementing a RIF generally have an explicit plan to reduce expenses by eliminating jobs. *Hardin v. Hussman Corp.*, 45 F.3d 262, 264 (8th Cir. 1995). Such corporations usually provide decisionmakers with objective criteria by which to decide which jobs to eliminate. *Id.* At trial, plaintiff will have every opportunity to explore Hercules' stated reasons and criteria for terminating him pursuant to the RIF. However, the Court finds there is no requirement for a corporation to be in financial distress before embarking on such a RIF. *Id; Bashara v. Black Hills Corp.*, 26 F.3d 820, 824-25 (8th Cir. 1994). Therefore, the Court is not inclined to allow a mini-trial on the issue of whether Hercules' RIF was an exercise in sound business judgment. The presentation of Hercules' financial history in the years after the 1991 RIF would consume much trial time and serve only to distract attention from the pivotal issue in this case: whether Hercules discriminated against Finch based on his age when it terminated him. Accordingly, the Court holds that the prejudice to defendant resulting from admission of evidence of earnings of Hercules and its senior executives after the would substantially outweigh any probative value this evidence would have.

### 2. Statements by CEO Gossage

Plaintiff proposes to introduce before the jury the following: (1) a newspaper article appearing in the Wilmington *News Journal* containing comments attributed to CEO Gossage; (2) an article published on February 1, 1991 in *Horizons*, an internal Hercules publication; (3) remarks by Gossage to a Hercules executive named William Hosker in January, 1992; (4) remarks allegedly made by Gossage to another Hercules executive named Doyle Miller, and subsequently repeated by Miller to Hosker.

### a. The *News Journal* Article and the *Horizons* Article

Plaintiff seeks to admit a Wilmington *News Journal* article entitled, "Hercules will cut 450 jobs," which quotes Gossage as saying, "The young people in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 135**

Not Reported in F.Supp.                                                    Page 10

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

company want us to bring Hercules back to where it ought to be again .... Older people will see friends impacted and will feel bad about it. But we'll get this behind us." D.I. 119 at A539. In his deposition, Gossage testified that if not a direct quote, the article was a "similar quote" to something he said and at least captured the spirit of what he said. D.I. 121 at B71. The article was published on January 9, 1991, right as final approval was given for the RIF to get underway. D.I. 229 at B65, 68.

Subsequently, *Horizons,* Hercules' internal corporate newsletter, published an article styled in a question and answer format, entitled "Gossage answers employees' questions." In the article, Gossage was asked to amplify his statement published in *The News Journal,* and was quoted as saying:

What I said was that younger employees want to know when the company will get up and turn itself around, and I acknowledged that to those with long service to the company, it was painful to watch what was going on. I'd say it again.

*12 D.I. 121 at B288. Gossage allegedly made these remarks during a presentation at the Hercules Men's Club.

Hercules argues that Gossage's comments should not be admitted at trial for several reasons. First, it contends they are irrelevant and characterizes them as merely "observations about the reaction of Hercules' employees to the voluntary phase of the RIF, and generalities about evolutionary changes in expectations about the permanency of employment in the corporate world." D.I. 209 at 10. Second, it characterizes Gossage's remarks as "stray remarks" that are not indicative of age bias. Under the so-called "stray remark" doctrine, such remarks " made by non-decisionmakers or by decisionmakers unrelated to the decisionmaking process are rarely given great weight" and are not direct evidence of discrimination. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 779 (3d Cir. 1994) (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 545 (3d Cir. 1992), *cert. denied,* 114 S.Ct. 88 (1993)). Hercules maintains that Gossage had "very little to do with the 1991 RIF." D.I. 209 at 14.

The Court disagrees with both of Hercules' assertions. Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. " The rule, therefore, sets a low threshold for relevancy, *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 783 (3d Cir. 1994), *cert. denied,* 115 S.Ct. 1253 (1995); evidence is irrelevant "only when it has no tendency to prove [a consequential] fact," *Spain v. Gallegos,* 26 F.3d 439, 452 (3d Cir. 1994) (citing *Blancha v. Raymark Indus.,* 972 F.2d 507, 514 (3d Cir. 1992)).

Gossage's statements in *The News Journal* and in the *Horizons* newsletter easily satisfy this lenient relevancy standard. In this disparate treatment case, plaintiff seeks to prove a discriminatory motive on the part of Hercules; he may meet his burden either by presenting direct or indirect evidence of unlawful age discrimination. *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 (3d Cir.1988), *cert. denied,* 490 U.S. 1098 (1989). As to Hercules' second contention, the Court finds that Gossage, as the corporation's CEO and leader, was well positioned to set the tone for the 1991 RIF. His highly public statement explaining the RIF to *The News Journal* demonstrates Gossage's intent to exhibit strong leadership at the corporate helm. Consequently, "because discriminatory comments by an executive connected with the decisionmaking process will often be plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant." *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, (3d Cir. 1995). Here, Gossage explicitly distinguished between older and younger employees and how he perceived the younger employees, as opposed to the older ones, as those who wanted to bring the corporation back to a better condition; it is for the jury to weigh the competing inferences generated by these remarks. *See Siegel v. Alpha Wire Corp.,* 894 F.2d 50, 54-55 (3d Cir.), *cert. denied,* 496 U.S. 906 (1990) (reversing district court for holding that the defendant's use of the phrase "old dogs won't hunt" was not sufficiently probative to be admissible). As the Third Circuit Court of Appeals has observed:

*13 [w]hen a major company executive speaks, "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 136**

Not Reported in F.Supp.                                                        Page 11

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

everybody listens" in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.

*Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989). Thus, it is possible that MacKenzie and other Hercules personnel were influenced by Gossage's characterizations of older versus younger employees; drawing or not drawing this inference will also be within the province of the fact-finder at trial. The Court holds this evidence to be relevant to plaintiff's proof of the corporation's anti-age animus.

Hercules adds that even if the remarks are relevant, plaintiff attempts to exploit them "out of context and without any basis in fact." D.I. 209 at 11. Thus, defendant argues, these comments, are misleading and inflammatory, and, if admitted, would be more prejudicial than probative. The Federal Rules of Evidence set forth the standard for this discretionary balancing: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Fed. R. Evid. 403. Thus, to exclude Gossage's remarks under Rule 403, their probative value must be "substantially" outweighed by their potential for prejudice. The Court finds such prejudice lacking here. It is axiomatic that all evidence adverse to a party is prejudicial; under the rule, the prejudice should rise to a level tantamount to being unfair. *Dollar v. Long Mfg., N.C. Inc.*, 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied*, 435 U.S. 996 (1978). At trial, Hercules will be afforded ample opportunity to provide context and explanation for Gossage's remarks. Accordingly, the Court does not find Rule 403 to be a basis for excluding this evidence.

In its Reply Brief, D.I. 233, Hercules does make a final persuasive argument for exclusion of the *Horizons* article: it correctly identifies the article as hearsay under Fed. R. Evid. 802. Hercules argues that if the basis of the article was Gossage's Men's Club speech, then plaintiff must introduce

admissible evidence of the speech, and not a hearsay article about the speech published later. The Court agrees that the Horizons article, even though arguably relevant, must be excluded as inadmissible hearsay.

Finally, Hercules argues that *The News Journal* article should be excluded because to do otherwise would have a chilling effect on free decisionmaking and encroach on an executive's right to speak about Hercules' future. As legal theory for this argument, Hercules relies on the First Amendment to the United States Constitution. The Court finds this assertion emotes more heat than light, as there is no state actor involved in this case against whom the First Amendment could be invoked. Consequently, the Court finds this argument wholly without merit, warranting no further analysis.

### b. Remarks Attributed to Gossage by Hosker

*14 Plaintiff also seeks to call William E. Hosker, who is the retired head of Hercules' Resins Group. In 1992, approximately one year after Finch's termination, Gossage led a reorganization of the corporation. In the reorganization, Hercules established three new groups: Chemical Specialties, Food and Functional Products, and the Hercules Materials Company. D.I. 229 at B43. According to Hosker, Gossage expressed his intent to have in place at the head of each group, positioned immediately below him in the corporate hierarchy, individuals who would be part of a cadre of qualified CEO candidates who would be in their early 50s by the time Gossage retired. Hosker claims Gossage made it clear that Hosker would be passed over because Hosker was already 54 years old. D.I. 58 at 20-21. According to Hosker, Gossage explained that "someone in their late 50s typically looks, expends their energies in preparing their retirement ....[while] younger people have perhaps more energy and a longer period of time in which they can perform their duties." *Id.* at 27.

In its opinion on Hercules' summary judgment motion, the Court refused to consider this evidence. *See Finch v. Hercules*, 865 F. Supp. at 1125. For purposes of admissibility at trial, the Court reaches

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 137**

Not Reported in F.Supp.                                                          Page 12

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

a similar result. While this statement on its face may raise an inference of age discrimination, the issue Gossage's statement was addressing, CEO succession planning, is a far cry from the issue in the instant case. The hiring and promotion of individuals to the position of Chief Executive Officer is treated differently under the ADEA. Under the statute's executive and policy making exception, 29 U.S.C. § 631(c)(1), a company has a right to require its CEO to retire at age 65. [FN7] At summary judgment, the Court held that "[a]ge bias in [such] promotion decisions simply does not make age bias in termination decisions more likely. Further, to the extent this portion of Hosker's testimony is minimally relevant, ... its probative value is substantially outweighed by the danger of unfair prejudice." *Finch v. Hercules,* 865 F.Supp. at 1125. These same considerations apply with full force at this stage of the litigation.

Hosker would also testify about a June 1992 meeting conducted by C. Doyle Miller, Hosker's direct superior. At that meeting, Miller discussed the results of the Management and Organization Review for Hosker's Chemical Specialties Group. While doing so, Miller relayed certain comments that Gossage had allegedly made to him; Hosker dictated a memo to his file that referenced these remarks. Hosker's memo states *inter alia,* that:
The only negative criticism received by Miller was Gossage's statement that the Chemical Company had not aggressively or creatively addressed "tired warriors," who, though contributing to the corporation, were blocking the movement of young, aggressive people, upon whom the future of the company had to be built.

D.I. 229 at B12. As a backdrop to this statement, plaintiff explains that "Gossage planned to get younger employees into the pipeline so that they could rise through developmental positions into the more senior positions and provide the Board with a choice of candidates to replace him when he retired." D.I. 228 at 13. Plaintiff quotes Gossage as testifying that "there has been, since I took over the [CEO] position, an ongoing effort between the Board and myself on a regular basis to talk about my eventual retirement and the candidates who might replace me and what development plans are

in place to prepare them for that eventuality." D.I. 229 at B34.

*15 Hercules correctly notes that this testimony was before the Court at summary judgment as well, and the Court declined to make a definitive ruling pending further illumination of this testimony. In its opinion, the Court requested clarification (1) as to the timing of these statements relative to Finch's termination, (2) whether Gossage actually used the words "tired warriors," (3) if he did use the term, what meaning did he ascribe to the phrase, and (4) whether this remark was targeted specifically to the Chemical Specialties Group. *Finch v. Hercules,* 865 F.Supp at 1125. The record shows that this remark allegedly occurred approximately 16 months following the 1991 RIF and Finch's termination. Miller denies ever using the phrase in any meetings he conducted or hearing Gossage use the phrase. D.I. 210 at Exh. G. The record is silent as to whether Gossage himself admits or denies making this statement and what it meant. Miller's memo defines the remark as directed specifically at his Chemical Specialties Group. D.I. 229 at B12. As such, Hercules argues that it is unrelated to the termination of Finch.

The Court finds the issue of admissibility of this evidence a closer question. Standing alone, the temporal remoteness of the statement is not troubling; it could very well indicate an ongoing corporate anti-age bias. Courts have found on numerous occasions remote statements admissible as circumstantial evidence of age discrimination. *Abrams,* 50 F.3d at 1214 (citing *Lockhart,* 879 F.2d at 54; *Roebuck v. Drexel Univ.,* 852 F.2d 715, 733 (3d Cir. 1988)). However, the hearsay nature of Hosker's memo and the circumstances surrounding the document's generation call into question the document's reliability. At summary judgment, the Court voiced concern about the stratified nature of the statements at issue here: Gossage to Miller to Hosker to Hosker's memo to file. The Court is willing to assume *arguendo* that Gossage and Miller both made this alleged remark in their capacities as corporate agents acting within the scope of their agency or employment. *Finch v. Hercules,* 865 F. Supp. at 1126 and n.21. It is at the next level of hearsay, *i.e.,* Hosker's hearing the remark and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 138**

Not Reported in F.Supp.                                                      Page 13

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

reducing to writing that is troubling.

Plaintiff has argued that it can show that Hosker's memorandum would satisfy the requirements for the business records exception to the hearsay rule, Fed. R. Evid. 803(6). However, even if this document could be admitted under this rule, the inquiry into the admissibility of this evidence does not end here. Hosker may have been motivated to make this record for considerations other than the ordinary course of business. Just a few months earlier, in January 1992, Hosker was passed over for promotion and has testified that he is of the opinion he was discriminated on the basis of his age. D.I. 158, Exh. 1 at 31, 34. He candidly expressed that as result, he felt disadvantaged, and retained an attorney to look into the matter. *Id.* at 31. In June, 1992, when Hosker recorded his impression of the meeting conducted by Miller, he wrote
*16 Upon questioning Doyle as to the definition of " tired, old warriors," I used the phrase "white, old males," and was admonished that while perhaps that was an equivalent connotation, we must refrain from language that speaks to age discrimination. My point was that, in fact, Tom Gossage and Doyle Miller are urging management to find a mechanism to move old people out of key jobs to make way for younger personnel. To further clarify, I asked Doyle for a profile of a typical "tired, old warrior." His words were, "Someone who may be 54 years old, contributing to the corporation and planning to work until age 65. These types of individuals are blocking the ability to move people through."

D.I. 229 at B12. Hosker's memo clearly records Hosker's sentiments as to the meaning of the phrase "tired warriors." Hosker unabashedly interjected the word "old" into the phrase and recorded his own interpretation of the remark, an interpretation consistent with his previous impression that Gossage was discriminating against older managers such as himself. As someone who had already felt wronged by Gossage's conduct, Hosker seized the opportunity to memorialize in writing his subjective impression of what he considered further evidence of age discrimination by his employer. The memo does not set forth an objective explanation of what meaning Gossage attributed to the remark; "tired warriors," standing alone, may or may not implicate

considerations of age. *See EEOC v. Clay Indus.,* 955 F.2d 936, 942 (4th Cir. 1992) (analogous phrase, "dead wood" referred to employee evaluations regardless of age). Considering Hosker's jaundiced eye towards Gossage, the Court views this memo as reflective of Hosker's subjective opinion regarding Gossage's alleged remark. As such, the memo's potential for prejudice in misleading and confusing the jury substantially outweighs it probative value.

Although Hosker's memo will not be admissible at trial, the Court will allow Hosker to testify that he heard Miller relay Gossage's alleged "tired warriors" comment at the May 29, 1992 presentation. Plaintiff will still be afforded opportunity to expose this remark to the jury, and defendant may vigorously cross-examine and present its opposing evidence regarding the nature or even the existence of this remark. In so doing, however, the potential prejudice to Hercules by the extra layer of hearsay, Hosker's memo, will be eliminated.

### 3. Exclusion of Plaintiff's Witnesses

In the Pretrial Stipulation, plaintiff lists five witnesses whom he has never before identified as having information about the subject matter of this case. These witnesses are Maynard Turk, Alexander Searl, James Hunter, Chris Witham, and Gary Dunn. Similar to plaintiff's motion in limine to exclude witnesses, defendant seeks a ruling that these witnesses not be allowed to testify because they should have been, but were not, disclosed during discovery.

In its First Set of Interrogatories, Hercules asked plaintiff to "[i]dentify all persons that you know or believe have information regarding the subject matter of this action, and describe the information." D.I. 210, Exh. K. Plaintiff did not include any of these witnesses in his answer. Under Fed. R. Civ. P. 37(c)(1), the Court may permit witnesses not disclosed during discovery if the failure to disclose the identities was harmless, or if there was " substantial justification" for the non-disclosure.

*17 Plaintiff claims that its failure to disclose these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 139**

Not Reported in F.Supp.                                                    Page 14

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

witnesses' identity was substantially justified because he had no idea, until summary judgment, that Hercules intended to proffer evidence on why it terminated Finch, *i.e.*, justification based on plaintiff's record of performance. D.I. 228 at 32-33. The Court does not find this argument at all convincing. At deposition, MacKenzie explicitly testified that he based his forced ranking of Finch on Finch's performance. D.I. 121 at B-106. Hercules claims that its subsequent termination of Finch was influenced at least in part by the results of the forced-ranking; it could not have been clearer that plaintiff's performance would be at issue. The Court finds that plaintiff should have disclosed the names of these witnesses in response to the above interrogatory and that plaintiff's purported reasons for his nondisclosure do not rise to a level of being substantially justified.

Similarly, the Court does not find the nondisclosure to be harmless; the *Meyers v. Pennypack* considerations outlined above in section 4b, *supra*, with respect to plaintiff's motion to exclude defendant's witnesses now apply in this converse situation. Defendant has been surprised and prejudiced in not being able to depose these witnesses and prepare accordingly for trial. Because it is the eve of trial, with two closely intervening holidays, the Court is unwilling to disrupt defendant's trial preparation with having to notice five deponents and coordinate schedules. It would be unfair to penalize defendant and in effect reward plaintiff's noncompliance. Consequently, these witnesses will not be allowed to testify at trial.

#### 4. Plaintiff's Rebuttal Evidence Regarding his Bonus and Plaintiff's Trial Exhibits

Additionally, plaintiff listed in the Pretrial Stipulation evidence that Hercules asserts as involving the calculation of Finch's bonus; plaintiff argues that this evidence is relevant to his rebuttal case. Because this is rebuttal evidence, plaintiff does not wish to reveal his reasons for offering these documents for fear of exposing his trial strategy. The Court will defer ruling on this evidence until trial because the current record is not fully developed sufficiently to warrant a considered decision.

Similarly, defendant has delineated a laundry list of exhibits it seeks to exclude from trial. In his answering brief, plaintiff has provided brief descriptions of the exhibits and his arguments as to why they should be admissible. The Court has not actually viewed the exhibits nor had the benefit of oral explanation or argument on these exhibits. Out of fairness to both parties and a desire to fully appreciate this evidence, the Court will defer its ruling until such time, either at or before trial, that the parties may be heard more completely on these issues.

#### 5. Defendant's Additional Motion in Limine

On November 29, 1995, defendant filed an additional motion in limine, D.I. 243, seeking a substantive ruling on the issue of the relevant time frame for calculation of plaintiff's damages. Defendant's Reply Brief was filed on December 20, 1995. A review of the briefs makes clear the relief defendant seeks is merits relief masquerading as a motion in limine. The proffered record is not appropriate for consideration of merits relief. Because trial will commence on January 8, 1996, and there is inadequate time to both put this matter in the correct procedural posture, and determine the same, the Court is not inclined to consider any application for merits relief. If it should become necessary, since the matter goes to the appropriate amount of damages, it can be treated by post-trial motion.

#### IV. CONCLUSION

**\*18** For the above discussed reasons, the Court will grant in part and deny in part Plaintiff's Motion in Limine, D.I. 211, and do the same as to Defendant's Motion in Limine, D.I. 209. Defendant's Motion in Limine, D.I. 243, is denied. An appropriate order will issue.

FN1. When force-ranking employees, " evaluators are instructed to identify the '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 140

Not Reported in F.Supp.                                                                        Page 15

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

best employee' and the 'worst' employee with regard to a particular factor, and then the second best and the second worst, and so on down the line." *Finch v. Hercules, Inc.,* 865 F. Supp. 1104, 1111 n.4 (D. Del. 1994) (quoting N. Thompson Powers, *Reductions in Force Under the Age Discrimination in Employment Act,* 2 Lab. Law. 197, 216-217 (1986)). *See generally* this Court's previous opinion, *supra,* for a more extensive treatment of the factual details in this action.

FN2. For a complete summary of how these analyses differ, *see generally, Finch v. Hercules,* 865 F.Supp. at 1118-1119; *Mardell v. Harleysville Life Ins. Co.,* 31 F.3d at 1225 n.6 (3d Cir. 1994), *opinion vacated on other grounds,* 115 S.Ct. 1397 (1995).

FN3. When this issue first surfaced, the court suggested bifurcation of the liability and damages phases of the trial. At that time, Hercules declined the offer. If Hercules wishes bifurcation it should promptly file a motion requesting the same. Under *Mardell,* after-acquired evidence is not admissible in the liability stage of a cause of action brought under the ADEA. *Mardell,* 31 F.3d at 1239; *see also Mardell v. Harleysville Life Ins. Co.,* 65 F.3d 1072, 1073 n.1 (3d Cir. 1995). The evidence the Court holds inadmissible here, *i.e.,* the MICP and IPI evidence, would be admissible in a damages phase of trial were the issue of damages bifurcated from the liability phase of trial.

FN4. The above cited affidavit has been ordered stricken. However, Finch referenced it in his brief as a harbinger of possible prejudicial testimony.

FN5. In plaintiff's opening brief, he argued that evidence pertaining to Finch's counseling of Engebretsen's children should be excluded for several reasons. First, he contended that the evidence is

both irrelevant and too remote in time to be admissible in the upcoming trial. Second, he declared that this evidence should be excluded based on the clergy-communicant privilege. D.I. 212 at 25-26. However, the defendant argued in its answering brief that this evidence is relevant to show that bias on the part of Engebretsen. Hercules also argued that the clergy-communicant privilege does not shield the identity of the communicants or the fact that the communication took place. D.I. 226 at 15-16. Because plaintiff has since conceded that evidence of plaintiff's counseling the Engebretsen children *is* admissible, the Court will not address this issue.

FN6. In his Opening Brief, plaintiff also initially objected to a witness named Patrick Donohue. However, based on Hercules' description of Donohue's proposed testimony, plaintiff subsequently withdrew his objection. D.I. 231 at 16.

FN7. At the pretrial conference in this matter, counsel for Hercules for the first time verified that the company does in fact have such a retirement policy for its CEO. However, this evidence was not known nor necessary to the Court's decision at summary judgment; the Court likewise need not consider it here.

D.Del.,1995.
Finch v. Hercules Inc.
Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:92cv00251 (Docket) (May. 05, 1992)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 141

Westlaw.

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
**(Cite as: 932 F.2d 1563)**

Page 1

▷

United States Court of Appeals,Eighth Circuit.
GARNAC GRAIN CO., INC., Appellant/Cross-
Appellee,
v.
F. Duane BLACKLEY, Donald A. Blackwell,
Frederick M. Borchardt, Stephen G. Butler, Stephen
P. Clark, Ralph W. Clermont, R. Bruce Earls, John
O. Eichhorn, Leland R. Gerhart, Martin F. Gleason,
Jr., Robert J. Graham, Jeffrey H. Green, J. Alan
Harkness, Johnnie G. Henson, Merrill A. Joslin, Jr.,
James B. Judd, Robert E. Lawson, Lawrence J.
Legrand, Richard D. Love, H. Max Lummis, IV,
Edward W. Mehrer, Cecil R. Miller, Jack A.
Newman, Jr., Clifford L. Olson, Charles W. Peffer,
David C. Potter, Brooks R. Read, Daniel S. Reilly, A.
John Robertson, Jr., William M. Rowe, Jr., Richard J.
Sabolik, Joseph R. Sims, Robert W.L. Spencer,
Dennis M. Stevens, James M. Stolze, Richard A.
Toftness, Richard C. Vaughan, Buddy L. Vick,
Michael J. Walters, Appellees/Cross-Appellants.
Kathryn A. Millison, Third-Party Defendant.
Nos. 90-1890, 90-1930.

Submitted Jan. 7, 1991.
Decided May 17, 1991.
As Modified on Denial of Rehearing July 30, 1991.

Corporate client brought action against accounting
firm for accounting malpractice and breach of
contract, alleging that accounting firm's failure to
comply with generally accepted auditing standards in
auditing client's books for various fiscal years
precluded client from discovering and preventing
employee's embezzlement of about $3.4 million.
The United States District Court for the Western
District of Missouri, Dean Whipple, J., entered
summary judgment in favor of accounting firm on
client's claims and in favor of client on accounting
firm's contract counterclaim, and appeals were taken.
The Court of Appeals, Arnold, Circuit Judge, held
that: (1) retired professor who taught auditing
courses for almost 40 years was qualified to testify
that accounting firm violated generally accepted
auditing practices based on review of independent
investigator's report and papers; (2) affidavit of
former partner of independent investigator
contradicting independent investigator's report could
not be admitted to defeat summary judgment; and (3)
principles of comparative fault did not apply to

accounting malpractice claim.

Reversed and remanded in part; affirmed in part.

West Headnotes

**[1] Evidence 157 ☞538**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k538 k. Due Care and Proper Conduct in
General. Most Cited Cases
District court properly concluded that corporate
client's current president was not qualified to provide
expert testimony that accounting firm violated
generally accepted auditing standards in reviewing
client's books, though president had business degree,
where he lacked formal training in accounting or
auditing, he was not certified public accountant, and
he stated at deposition that he did not know "exactly"
what "generally accepted accounting principles"
meant and that he was uncertain how to determine
whether check was "suitably endorsed." Fed.Rules
Evid.Rule 702, 28 U.S.C.A.

**[2] Evidence 157 ☞538**

157 Evidence
    157XII Opinion Evidence
        157XII(C) Competency of Experts
            157k538 k. Due Care and Proper Conduct in
General. Most Cited Cases
District court properly determined that corporate
client's director of accounting was not qualified to
testify that accounting firm failed to comply with
generally accepted auditing standards in auditing
client's books, though director had worked in client's
accounting department for approximately 22 years
and helped implement some of its internal controls,
where he attended only one year of college, he took
only few noncredit night courses in auditing and
accounting, he was not certified public accountant,
and his testimony revealed that he had specialized
knowledge of client and its operations, but not
auditing or generally accepted auditing standards.
Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[3] Evidence 157 ☞538**

157 Evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
**(Cite as: 932 F.2d 1563)**

157XII Opinion Evidence
157XII(C) Competency of Experts
157k538 k. Due Care and Proper Conduct in General. Most Cited Cases
Retired business school professor who taught auditing courses for almost 40 years was qualified to testify as expert that accounting firm violated generally accepted auditing standards in its auditing of client's books, though professor worked only as staff assistant at auditing firm for four years several decades earlier, had no experience in auditing grain operations like those of client, had never reviewed another auditor's work, and was no longer licensed as certified public accountant. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Evidence 157 🔑555.7**

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.7 k. Due Care and Proper Conduct. Most Cited Cases
Opinion of retired professor who taught auditing courses for almost 40 years that accounting firm violated generally accepted auditing standards in its auditing of client's books during fiscal years that employee embezzled about $3.4 million should not have been excluded, though it was based solely on report and work papers of independent investigator that had concluded in report that accounting firm violated generally accepted auditing standards for only one fiscal year. Fed.Rules Evid.Rules 403, 702, 703, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A 🔑2539**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2536 Affidavits
170Ak2539 k. Sufficiency of Showing. Most Cited Cases
Affidavit of nonparty witness, contradicting his previous sworn testimony, cannot defeat motion for summary judgment.

**[6] Federal Civil Procedure 170A 🔑2539**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment

170AXVII(C)3 Proceedings
170Ak2536 Affidavits
170Ak2539 k. Sufficiency of Showing. Most Cited Cases
Affidavit of former partner of independent investigator, which investigated company's books and investigated accounting firm that audited company's books for fiscal years that company employee embezzled about $3.4 million, could not be admitted to contradict conclusion in investigator's report, of which former partner was principal author, that accounting firm did not violate generally accepted auditing standards for some fiscal years, in absence of showing of any newly discovered evidence justifying contradictory opinion.

**[7] Federal Courts 170B 🔑757**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk756 Matters Not Necessary to Decision in Review
170Bk757 k. Specific Questions. Most Cited Cases
Challenge to district court's ruling, in action for accounting malpractice and breach of contract, that Missouri settlement statute governing release of tort-feasors precluded further recovery by client for employee's embezzlement, because client settled with banks for amount greater than remaining claim against accounting firm, was rendered moot by determination on appeal that client was entitled to trial on its claim against accounting firm for entire period of six and one-half years, during which employee embezzled about $3.4 million; it could no longer be said that settlement paid by banks exceeded maximum possible recovery against accounting firm. V.A.M.S. § 537.060.

**[8] Federal Courts 170B 🔑382.1**

170B Federal Courts
170BVI State Laws as Rules of Decision
170BVI(B) Decisions of State Courts as Authority
170Bk382 Court Rendering Decision
170Bk382.1 k. In General. Most Cited Cases
(Formerly 170Bk382)

**Federal Courts 170B 🔑383**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 143**

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
**(Cite as: 932 F.2d 1563)**

Page 3

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(B) Decisions of State Courts as Authority
      170Bk382 Court Rendering Decision
        170Bk383 k. Inferior State Courts. Most Cited Cases
Decisions of Missouri Supreme Court as to Missouri law are binding on federal courts; decisions of various intermediate appellate courts are not binding, but they are persuasive authority, and they must be followed when they are best evidence of what Missouri law is.

**[9] Accountants 11A ⬤➡8**

11A Accountants
  11Ak6 Contracts, Employment, and Compensation
    11Ak8 k. Performance of Contract; Duties and Liabilities. Most Cited Cases
Under Missouri law, principles of comparative fault did not apply to accounting malpractice case, in which only damages were economic.

**[10] Federal Civil Procedure 170A ⬤➡1970.1**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(A) In General
      170Ak1970 Counsel's Conduct and Arguments
        170Ak1970.1 k. In General. Most Cited Cases
      (Formerly 170Ak1970)
Client's receipt of proceeds under fidelity bond for employee's embezzlement could not be admitted in client's action against its accounting firm for accounting malpractice and breach of contract to demonstrate, as exception to rule against admission of evidence of insurance coverage, whether client maintained adequate internal controls or whether client looked to accounting firm to protect it from embezzlement. Fed.Rules Evid.Rule 411, 28 U.S.C.A.

*1565 A. Bradley Bodamer, Overland Park, Kan., for appellant/cross-appellee.
Paul Scott Kelly, Jr., Kansas City, Mo., for appellees/cross-appellants.

Before ARNOLD, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN,

Circuit Judge.
ARNOLD, Circuit Judge.
Garnac Grain appeals several rulings of the District Court culminating in the dismissal of its accounting-malpractice and breach-of-contract claims against partners of the accounting firm Peat, Marwick, Mitchell & Company. [FN1] We affirm in part and reverse in part.

     FN1. Peat, Marwick is now known as Peat, Marwick, Main & Company.

        I.

The events leading to this litigation began in March 1976, when an employee in Garnac's Kansas City office, Kathryn Millison, began embezzling from her employer. Millison accomplished most of her embezzlement by intercepting outgoing Garnac checks payable to vendors, adding her husband's name to the check as a payee, endorsing the check in her husband's name, and depositing the money in their joint bank account. When the cancelled checks arrived in Garnac's bank statement, Millison intercepted the statement, erased her husband's name as payee and his endorsement, and then forged the endorsement of the original payee. Millison continued this scheme undetected until September 1982. Over the course of more than six years, she embezzled a total of approximately $3.4 million.

After discovering Millison's embezzlement, Garnac hired the accounting firm of Price Waterhouse to determine the extent of its losses. During its review of Garnac's books, Price Waterhouse began investigating whether Garnac's accountants since 1948, Peat, Marwick, had violated Generally Accepted Auditing Standards ("GAAS") for the fiscal years ending January 31, 1977 through January 31, 1982, by failing to discover Millison's embezzlement. Thinking that Price Waterhouse was merely determining the extent of the loss, Peat, Marwick cooperated with the investigation. It gave Price Waterhouse access to its audit work papers for the years in question. Only belatedly did Peat, Marwick realize that the investigation extended to its own auditing procedures, but it nevertheless continued to cooperate with Price Waterhouse. After writing several preliminary *1566 drafts with contradictory conclusions, on October 12, 1983, Price Waterhouse issued a final report containing its opinion that Peat, Marwick failed to comply with GAAS for the fiscal year ending January 31, 1982, but not for any of the previous years.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 144

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
**(Cite as: 932 F.2d 1563)**

Page 4

On June 29, 1984, Garnac sued Peat, Marwick for negligence and breach of contract for failing to comply with GAAS for the fiscal years ending January 31, 1977 through January 31, 1982. Garnac claimed that Peat, Marwick's errors precluded it from discovering and preventing Million's embezzlement. Garnac sought recovery of the approximately $3.4 million plus prejudgment interest. Peat, Marwick brought a third-party complaint against Million, her bank which had cashed the altered checks, and four other banks, seeking contribution for any loss attributed to it.[FN2] Peat, Marwick also counterclaimed against Garnac, asserting that Garnac's agent, Price Waterhouse, violated a contract implied in fact by failing to provide Peat, Marwick with preliminary drafts of its report.

> FN2. The banks have been dismissed from this suit after settling with Garnac. The settlement also dismissed a separate suit Garnac brought against the banks.
> We are unaware of Million's current status in this litigation, but Garnac has recovered from her over $1 million of the approximately $3.4 million she embezzled.

II.

Although Price Waterhouse concluded that Peat, Marwick violated GAAS only for the fiscal year ending January 31, 1982, Garnac sued Peat, Marwick for the entire period of Million's embezzlement. Garnac concedes that demonstrating violations of GAAS requires expert testimony, which Price Waterhouse's report does not provide for fiscal years prior to that ending January 31, 1982. It therefore sought additional experts to opine that Peat, Marwick violated GAAS for the remaining periods.

Garnac identified four individuals who would supply its expert testimony. Peat, Marwick moved both to exclude the testimony of these witnesses and for summary judgment on Garnac's pre-1982 claims. The District Court granted the motions, concluding Garnac had a prima facie case only for the fiscal year ending January 31, 1982.

[1][2] Two of Garnac's proposed experts are Garnac employees: Peter Stettler, its current president and former executive vice-president, and Bill Bosilevac, its director of accounting. The District Court concluded that these two witnesses are not qualified under Federal Rule of Evidence 702 to provide expert

testimony that Peat, Marwick failed to comply with GAAS. Finding no abuse of discretion, we affirm. Although Bosilevac is Garnac's director of accounting, he attended only one year of college, and has taken only a few noncredit courses in auditing and accounting. He is not a certified public accountant. Peter Stettler similarly lacks formal training in accounting or auditing. While he has a business degree, he has never taken courses in auditing or internal controls, has had only a basic accounting course, and is not a certified public accountant.

We are mindful of Rule 702 and our own case law's recognition of practical knowledge and experience as providing an adequate basis for expert testimony. See, e.g., *Circle J. Dairy, Inc. v. A.O. Smith Harvestore Products, Inc.*, 790 F.2d 694, 700 (8th Cir.1986). The deposition testimony of these witnesses, however, indicates that their practical knowledge does not provide them with the requisite expertise in auditing or accounting. At Peter Stettler's deposition, for example, he stated that he does not know "exactly" what "generally accepted accounting principles" means. Joint Appendix at 519. He also indicated that he is uncertain how to determine whether a check is "suitably endorsed." *Id.* at 525. Although Bosilevac has worked in Garnac's accounting department for approximately twenty-two years and helped implement some of its internal controls, his testimony reveals that he has specialized knowledge of Garnac and its operations, not auditing or GAAS.

[3][4] **\*1567** Our decision to affirm the District Court's exclusion of the expert testimony of Bosilevac and Peter Stettler does not extend, however, to the exclusion of the testimony of another proposed Garnac expert witness: Howard Stettler.[FN3] Stettler is a professor who has retired from teaching at the School of Business at the University of Kansas. Garnac hired Stettler to oppose Peat, Marwick's motion for summary judgment by providing expert testimony that Peat, Marwick violated GAAS for all the audit years in dispute. On August 30, 1988, the District Court granted Peat, Marwick's motion in limine to exclude Professor Stettler's expert testimony.

> FN3. Howard Stettler and Peter Stettler are not related.

In its decision to exclude Stettler's testimony, the District Court relied on Federal Rules of Evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
**(Cite as: 932 F.2d 1563)**

702, 703, and 403. The Court found that Professor Stettler lacked the qualifications to testify as an expert under Rule 702. Although Professor Stettler taught auditing courses for almost forty years at the University of Kansas, he worked only as a staff assistant at an auditing firm for four years in the 1940's. He has no experience in auditing grain operations like Garnac's, has never reviewed another auditor's work, and his license as a certified public accountant expired in 1981.

As additional support for its decision, the District Court concluded that the basis of Stettler's opinion was unreliable under Rule 703. Professor Stettler concluded in a report dated July 12, 1985, that Peat, Marwick violated GAAS after reading only Price Waterhouse's report. Not only did Price Waterhouse reach conclusions contrary to Stettler's for five of the six audit years, but it expended considerably more effort in reaching its conclusions. Price Waterhouse spent approximately 600 hours preparing its report, while Professor Stettler spent approximately twenty hours preparing his. As a sort of catchall reason for excluding Stettler's testimony, the District Court relied also on Rule 403. The Court reasoned that Stettler's testimony would confuse the jury because it contradicted other expert testimony offered by Garnac, namely that of Price Waterhouse.

While Professor Stettler's use of the Price Waterhouse report alone as the basis of his July 12, 1985 opinion may be the weakest aspect of his proposed expert testimony, it crosses the threshold of admissibility.[FN4] Moreover, Stettler reaffirmed his opinion in a report dated July 15, 1986, after reviewing Peat, Marwick's work papers. Rule 703 allows experts to express their opinions on "facts or data ... perceived by or made known to [them] at or before the hearing." Certainly, Professor Stettler's later review of the work papers and reaffirmation of his previous opinion is permissible under this broad language. The District Court did not mention this second opinion (attached as an exhibit to Peat, Marwick's motion in limine) in its August 30, 1988 decision to exclude Stettler's testimony.

FN4. Peat, Marwick's reliance on *Faries v. Atlas Truck Body Manufacturing Co., 797 F.2d 619 (8th Cir.1986)*, is misplaced. In *Faries*, we held that a district court abused its discretion in admitting into evidence a police officer's expert testimony when the officer based his opinion solely on the statements of an interested eyewitness. In

contrast, Professor Stettler based his opinion on facts supplied to him by an independent investigator, Price Waterhouse.

Perhaps the combined weaknesses of Howard Stettler's methodology and qualifications would lead us to discount his opinion if we were jurors. But we are not jurors. The weaknesses in his opinion and expertise go to the weight to be given his testimony, not its admissibility. See, e.g., *Fox v. Dannenberg, 906 F.2d 1253, 1256-57 (8th Cir.1990)*. Peat, Marwick's criticisms of Professor Stettler's testimony are the subject of cross-examination. They should not be used to exclude his testimony. After both parties question Professor Stettler at trial, it is for the jury to determine the value of his opinion.

[5][6] Garnac's final proposed expert is a former partner of Price Waterhouse, Donald Crews, who was in charge of investigating Millison's embezzlement and was the principal author of the Price Waterhouse **\*1568** report. The parties agree he is qualified to provide expert testimony. On April 23, 1987, Peat, Marwick deposed Crews concerning his role in investigating the embezzlement and writing the Price Waterhouse report. His testimony at the deposition was consistent with the conclusions reached in the report: Peat, Marwick failed to comply with GAAS for the fiscal year ending January 31, 1982. In response to Peat, Marwick's motion for summary judgment on the pre-1982 claims, however, Garnac presented an affidavit signed by Crews on June 28, 1988, indicating that in his opinion Peat, Marwick failed to comply with GAAS as early as 1980. In his affidavit, Crews concluded that a reasonably prudent auditor would have discovered Millison's embezzlement if it had received Garnac's February 1980 bank statement unopened from Garnac, as Peat, Marwick's work papers indicate that it did.

Relying on our decision in *Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir.1983)*, the District Court ruled that Crews's affidavit, contradicting his previous sworn testimony, could not defeat Peat, Marwick's motion for summary judgment. In *Camfield*, we affirmed a district court's grant of summary judgment where a party submitted an affidavit contradicting prior deposition testimony for the express purpose of precluding summary judgment, and thus purported to create a genuine issue of material fact. We noted that the affidavit presented by the plaintiff's president failed to "explain aspects of his deposition testimony, nor [did] the deposition reflect any confusion on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
**(Cite as: 932 F.2d 1563)**

Page 6

Camfield's part that ... require[d] explanation." *Id.* at 1365.

Garnac claims the District Court erred by extending *Camfield* to a non-party, and by reading Crews's affidavit as contradicting his deposition testimony. We disagree. We see no reason to limit the holding of *Camfield* to the affidavits of parties. As one of our sister circuits stated in response to the same argument: "The purpose of summary judgment motions ... is served by a rule that prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony." *Adelman-Tremblay v. Jewel Companies, Inc.,* 859 F.2d 517, 521 (7th Cir.1988).

After reviewing Crews's deposition, we find no confusion on his part or the attorneys' concerning the line of questioning, sufficient to generate a need for further clarification. Garnac's attempt to distinguish Crews's "personal" opinion expressed in his affidavit, and the "institutional" opinion of Price Waterhouse expressed in the report and in his deposition is without merit. Crews's deposition reveals that neither he nor Garnac's attorneys (who declined to cross-examine him at his deposition) perceived this allegedly crucial distinction until Peat, Marwick moved for summary judgment. Moreover, Crews's newly alleged disputed fact concerning whether Peat, Marwick received the February 1980 bank statement unopened was taken into account in the report, see Price Waterhouse Report, Joint Appendix at 361-68, 383, and was certainly known to Crews at the time of his deposition. Thus, the issue of whether the bank statement was received unopened by Peat, Marwick does not involve newly discovered evidence that should preclude summary judgment. See *Camfield,* 719 F.2d at 1365. Accordingly, we agree with the District Court's exclusion of Crews's affidavit. Because it was error, however, to exclude Professor Howard Stettler's testimony, the summary judgment for Peat, Marwick with respect to the five earlier fiscal years (ending on January 31 of 1977 through 1981) must be reversed.

### III.

[7] After the District Court's rulings left Garnac with a prima facie case only for the fiscal year ending January 31, 1982, the Court granted Peat, Marwick's motion for summary judgment on this remaining claim. The Court held that a Missouri statute governing the release of joint tortfeasors precluded further recovery by Garnac because Garnac had

settled with the banks for an amount greater than the remaining claim against Peat, Marwick. That statute provides, in part:

> When an agreement by release, covenant not to sue or not to enforce a judgment is given in good faith to one of two or more persons liable in tort *for the same injury* or wrongful death, such agreement shall not discharge any of the other tort-feasors for the damage unless the terms of the agreement so provide; however *such agreement shall reduce the claim by the stipulated amount of the agreement, or in the amount of consideration paid, whichever is greater.* The agreement shall discharge the tort-feasor to whom it is given from all liability for contribution or noncontractual indemnity to any other tort-feasor.

Mo.Rev.Stat. § 537.060 (1986) (emphasis added).

*1569 On July 28, 1987, the banks settled their litigation with Garnac for $945,000.[FN5] Peat, Marwick's potential liability for the 1982 audit was $591,618.61.[FN6] Thus, Garnac's remaining claim against Peat, Marwick was for an amount less than the bank settlement of $945,000. Applying the language of the statute requiring it to "reduce the claim by the stipulated amount of the agreement," the District Court concluded that Garnac was barred from further recovery.

> FN5. The parties do not dispute that Garnac received a $10,000 settlement from two other banks in 1988. We leave to the District Court to determine what effect, if any, this additional sum has on the application of the Missouri settlement statute.

> FN6. This figure reflects the amount Millison embezzled after Peat, Marwick began conducting its audit for the fiscal year ending January 31, 1982. The figure does not include Garnac's claim for prejudgment interest.

The gist of Garnac's challenge to this ruling of the District Court is that each check Millison embezzled resulted in a separate "claim" or "injury" for purposes of the Missouri settlement statute.[FN7] Consequently, it argues, the Court erred in equating its six and one-half year claim against the banks with its six and one-half month claim against Peat, Marwick. Obviously the whole context of this issue is changed now, in view of our ruling in Part II of this opinion that Garnac is entitled to a trial on its claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
(Cite as: 932 F.2d 1563)

Page 7

against Peat, Marwick for the entire period of six and one-half years. It can no longer be said (and this was an essential predicate of the District Court's ruling) that the settlement paid by the banks exceeds the maximum possible recovery against Peat, Marwick. The question of the Missouri statute's meaning in the situation left by the ruling of the District Court is now moot. If Garnac recovers against Peat, Marwick on remand, the District Court may then address, in the new situation that will then exist, the effect of the Missouri settlement statute.

FN7. Garnac also argues that the settlement statute does not apply to its breach-of-contract claim. Apparently, this argument was not raised below; it was not discussed by the District Court in its order. We therefore decline to address it here.

IV.

Despite the fact that the District Court eliminated the need for a trial on Garnac's claims, it made several rulings in preparation for a trial. In view of our decision to reverse in part, we address two of these rulings.[FN8]

FN8. We are asked to review the District Court's decision, in advance of trial, on motions to "strike" certain jury instructions. We choose not to do so. We cannot be sure of the context in which these issues will arise at trial. It is better not to attempt an advance ruling on such abstract issues.

[8][9] The District Court ruled that under Missouri law, principles of comparative fault apply to Garnac's accounting-malpractice claim. The ruling allows Peat, Marwick to present evidence of Garnac's own negligence at trial. We review this issue of state law de novo, *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), and we reverse. In *Gustafson v. Benda*, 661 S.W.2d 11, 15 (Mo.1983), the Missouri Supreme Court stated that "[i]nsofar as possible this and future cases shall apply the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act...." But the Missouri Supreme Court has not applied comparative fault in all tort cases, see, e.g., *Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491 (Mo.1986) (declining to apply comparative fault in a strict products liability case) (superseded by Mo.Rev.Stat. § 537.765 (1987)), and we do not believe it would

apply such principles to the negligence claim asserted here. In *Murphy v. City of Springfield*, 738 S.W.2d 521, 529-30 (Mo.App.1987), the question presented was whether principles of comparative fault should be applied in an action for negligent misrepresentation. The Court of Appeals for the Southern District said no. The only injury alleged was economic, as opposed to physical harm or death, and this fact was dispositive. "[W]e doubt that Missouri will apply comparative fault any broader than the [Uniform Comparative Fault] Act," 738 S.W.2d at 530, the Court said. Section 1(a) of the Act states that it covers "damages for injury or death to person or harm to property." The commissioners' comments following that section state, among other things, that "*Harms Covered* " are "... confined to physical harm to person or property.... It does not include matters like economic loss resulting from a tort such as negligent misrepresentation." The Missouri Supreme Court in *Lippard* had stated that the Act was not to be literally followed, and that there was no purpose to give special authority to the commissioners' comments, but the Court of Appeals, nonetheless, felt free to look to the Act and the comments for guidance.

*1570 Decisions of the Missouri Supreme Court as to state law are binding on us. Decisions of the various intermediate appellate courts are not, but they are persuasive authority, and we must follow them when they are the best evidence of what Missouri law is. We believe that is the case here. Both the text of the Act, which the Supreme Court attached as an appendix to its opinion in *Gustafson*, and the commissioners' comments indicate that comparative fault does not apply in actions (like the present one) for negligent infliction of economic harm. One might argue that, in cases not covered by the Act, Missouri courts would continue to apply the common law, under which a claimant's fault, large or small, was a complete defense. That was not the course taken, however, in *Murphy*, and we conclude that *Murphy*, which the opinion of the District Court did not discuss, is our best guide of what the Missouri Supreme Court would do. Before *Salve Regina College*, this is the kind of question as to which we might well have deferred to the District Court, on the theory that that Court would know better than we whether the Missouri Supreme Court would be likely to agree with *Murphy*. But in the new climate of de novo review, we think the opposite conclusion is compelled. We can read the same cases that the District Court can, and on that basis we think the better view is to follow *Murphy*. Accordingly, on remand, evidence of Garnac's fault will not be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

932 F.2d 1563                                                                                Page 8
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
(Cite as: 932 F.2d 1563)

admissible for purposes of comparison with the fault of Peat, Marwick.

[10] In the same order, the District Court responded to a motion in limine Garnac filed to exclude from evidence its receipt of payment under a two million dollar fidelity bond from Federal Insurance Company, its insurer.   The Court concluded that receipt of the proceeds under the bond was admissible to demonstrate whether Garnac maintained adequate internal controls, as an exception to Federal Rule of Evidence 411.  Rule 411 provides, in part: "Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully."

We conclude the District Court abused its discretion in ruling that purchase of and recovery on the bond is admissible evidence tending to show that Garnac acted imprudently.   While it may be true that the fidelity bond is not technically "insurance against liability," as Peat, Marwick argues, the bond is insurance.   Consequently, if the jury learns of the fidelity bond, it might improperly reduce Garnac's damages should Garnac prevail.   This is the kind of prejudice Rule 411 was intended to eliminate.   We also reject Peat, Marwick's argument that Garnac's purchase of the bond is admissible to prove Garnac did not look to Peat, Marwick to protect it from embezzlement.   We see no reason why Garnac was not entitled to protection from embezzlement from a number of sources.   Due to the limited record before us on this point, we decline to express an opinion as to whether Peat, Marwick may introduce evidence of Garnac's interest-free use of the insurance proceeds in response to the claim for prejudgment interest.   This issue, in any event, will arise only if Garnac prevails at trial, and it would then be decided by the Court, not the jury.

The final issue before us on appeal is raised by Peat, Marwick:   it claims the District Court erred in granting summary judgment to Garnac on its contract counterclaim.   The appeal on this point is wholly without merit and deserves no discussion.

V.

To summarize:  the District Court erred in excluding the testimony of Professor Howard Stettler.   The summary judgment in favor of Peat, Marwick is reversed, and the cause is remanded for further proceedings consistent with this opinion.   The effect

of the Missouri settlement statute can be reconsidered if need be.   On remand, comparative fault will not apply, and evidence of Garnac's fidelity bond will not be admissible except, possibly, in post-trial proceedings with respect to prejudgment interest.   The judgment in favor of Garnac on Peat, Marwick's counterclaim is affirmed.

It is so ordered.

Supplemental Opinion.

July 30, 1991.
ARNOLD, Circuit Judge.
We have before us a petition for rehearing filed by Peat, Marwick, as well as Garnac's response to it.   The petition is limited *1571 to one point:  whether our panel opinion, filed on May 17, 1991, erred in stating that the defense of contributory negligence (a complete defense at common law) no longer exists in Missouri in cases, like the present one, to which the Uniform Comparative Fault Act does not apply.

We think the point is well taken.   Our discussion of contributory negligence, and our view that it no longer existed as a defense in cases like the present one, was based on our reading of Murphy v. City of Springfield, 738 S.W.2d 521, 529-30 (Mo. App. 1987).   As Peat, Marwick has now pointed out, a subsequent opinion in the same case, 794 S.W.2d 275 (Mo. App. 1990) (Murphy II), creates some doubt about our reading of Murphy I.   We are left in a state of uncertainty and believe that the prudent course is to withdraw the remark about the defense of contributory negligence that we made in the original opinion, and leave the issue to the District Court in the first instance, if it should recur during proceedings on remand.   Accordingly, our discussion of contributory negligence as a complete defense is withdrawn.   We intimate no view as to the proper answer to this question.

If the District Court, on remand, holds that the complete defense of contributory negligence still exists in cases like this, a further question will arise:   What sort of evidence of negligence is admissible?   Peat, Marwick contends, citing cases from other jurisdictions, that evidence of any sort of fault on the part of its client, Garnac, would be admissible.   Garnac, on the other hand, also citing non-Missouri cases, contends that the only sort of negligence that would be relevant would be negligence on its part that somehow interfered with or prevented Peat, Marwick's making a proper audit.   On this view, evidence     that     Garnac's     negligence     helped     its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

932 F.2d 1563
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102
**(Cite as: 932 F.2d 1563)**

Page 9

employee commit embezzlement would not be
admissible.   We leave this question also to the
District Court in the first instance.

We understnad, as Garnac argues in its response to
the petition for rehearing, that we could go ahead and
decide these quesions of Missouri law for ourselves,
given the new climate of *de novo* review of state-law
questions created by *Salve Regina College v. Russell*,
111 S.Ct. 1219 (1991).   We choose not to take this
course.   Questions of law, like other questions,
should normally be decided by the District Court in
the first instance.   This decision and the reasoning
which supports it will be helpful to us in exercising
our reviewing function, if the case is appealed again.

To the extent indicated in this supplemental opinion,
the original panel opinion is modified.   In all other
respects, the petition for rehearing is denied.   We
direct that the mandate now issue forthwith.

C.A.8 (Mo.),1991.
Garnac Grain Co., Inc. v. Blackley
932 F.2d 1563, 33 Fed. R. Evid. Serv. 102

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

34 Fed.Appx. 858                                                              Page 1
34 Fed.Appx. 858, 2002 WL 957330 (C.A.3 (Pa.))
**(Cite as: 34 Fed.Appx. 858)**

C
Briefs and Other Related Documents

This case was not selected for publication in the Federal ReporterNOT PRECEDENTIALThis case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL   Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
Victor JOHNSON,
v.
VANGUARD MANUFACTURING, INC.; and Lynn Ladder and Scaffolding Co., Inc.
**No. 01-1589, 01-1742.**

Submitted Under Third Circuit LAR 34.1(a) Feb. 25, 2002.
Filed May 8, 2002.

Worker brought products liability action in state court against manufacturer and seller of allegedly defective scaffold that collapsed, resulting in injuries. Upon removal, the United States District Court for the Eastern District of Pennsylvania, Berle M. Schiller, J., entered judgment in favor of defendants. Worker appealed. The Court of Appeals, Roth, Circuit Judge, held that trial court did not abuse its discretion in excluding part of worker's expert's testimony regarding whether defective ladder caused worker's injury.

Affirmed.

West Headnotes

**Federal Civil Procedure 170A ⚖ 1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278   k.   Failure   to   Respond;
Sanctions. Most Cited Cases
Trial court did not abuse its discretion in excluding part of worker's expert's testimony regarding whether defective ladder caused worker's injury; it was within the court's discretion to find that the testimony that worker attempted to elicit from expert was properly excluded since it was not provided in his expert

report, and moreover, evidentiary exclusion did not preclude expert from testifying on the issue of causation, and expert presented testimony as to causation later in his testimony. Fed.Rules Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.

**\*858** Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civil Action No. 98-cv-03171) District Judge: Honorable Berle M. Schiller.

Before ROTH and FUENTES, Circuit Judges GIBSON FN*, Circuit Judge.

    FN* Honorable John R. Gibson, Senior Circuit Court Judge for the Eighth Circuit, sitting by designation.

OPINION

ROTH, Circuit Judge.
**\*\*1** Plaintiff Victor Johnson appeals the judgment of the United States District Court for the Eastern District of Pennsylvania.   Johnson sought damages in a products liability action against Vanguard Manufacturing, Inc., and Lynn Ladder and Scaffolding Co., Inc. Johnson's claim arose from a construction accident that occurred on June 4, 1996. Johnson and a co-worker, each standing on his own scaffold, were engaged in the demolition of a wall. They successfully toppled the wall, but a few moments after the wall gave way, Johnson's scaffold collapsed.   As a result, Johnson fell and was injured. Johnson originally filed a complaint in the Court of Common Pleas of Philadelphia County, claiming that the   scaffold   was   defectively   designed   and manufactured by defendant Vanguard Manufacturing, Inc., and sold by defendant Lynn Ladder and Scaffolding Co., Inc. On June 19, 1998, the defendants removed the case to the United States **\*859** District Court for the Eastern District of Pennsylvania.    After a two day trial, the jury returned a verdict in favor of Vanguard.   This appeal followed.

At trial, Johnson presented his testimony, the testimony of his co-worker, and that of a single expert.    The expert was Dr. Campbell Laird, a metallurgist and accident reconstructionist from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

34 Fed.Appx. 858                                                    Page 2
34 Fed.Appx. 858, 2002 WL 957330 (C.A.3 (Pa.))
**(Cite as: 34 Fed.Appx. 858)**

University of Pennsylvania School of Engineering and Applied Science. Based on his investigations, Dr. Laird testified that a pin on the scaffold fractured from fatigue in the course of normal operations, that the pin was manufactured from the wrong type of iron, and that the fracture of the pin and resulting instability of the scaffold was the direct cause of Johnson's injury.    While Johnson was prepared to call an expert in the field of accident reconstruction, he rested his case at the conclusion of Dr. Laird's testimony.

The defense called several expert witnesses.    The defense metallurgist explained that the normal use of the scaffold would not cause a fatigue fracture of the pin, contradicting Laird's testimony.  The accident reconstructionist employed by the defense explained that the accident occurred as a result of the scaffold tipping as Johnson pushed on the wall.  He testified that the pin fracture might have resulted from falling scaffold but that the fracture itself did not cause the collapse.

The jury concluded that while the scaffold was defective, the defect was not a substantial factor in causing Johnson's accident, and found in favor of Vanguard.

Johnson contends that the District Court abused its discretion in excluding part of Dr. Laird's testimony as to accident causation, and that this exclusion prevented Johnson from properly presenting his case. During Johnson's direct examination of Dr. Laird, Vanguard objected when he was questioned as to observations made in the preparation of his report. The objection was based on the fact that the observations were not recorded in Dr. Laird's report. Pursuant to Fed.R.Civ.P. 26(a)(2)(B), an expert witness's report must contain a complete statement of all opinions to be expressed and the data or other information considered by the witness in forming those opinions.   A party that fails to disclose evidence required by Rule 26(a) will not be allowed to use that evidence unless the failure to disclose the evidence is harmless.  See Fed.R.Civ.P. 37(c)(1).

**\*\*2** After reviewing the record, we find that the trial court did not abuse its discretion in excluding part of Dr. Laird's testimony.    It was within the court's discretion to find that the testimony that Johnson attempted to elicit from Dr. Laird was properly excluded since it was not provided in his expert report as required by Fed.R.Civ.P. 26(a)(2)(B). Moreover, this evidentiary exclusion did not preclude Dr. Laird from testifying on the issue of causation.

The record shows that Dr. Laird presented his testimony as to causation later in his testimony.

For the foregoing reasons, we will affirm the judgment of the District Court.  We will, however, deny appellee's request for an award of sanctions and costs under Fed. R.App. P. 38 and 28 U.S.C. § 1927.

C.A.3 (Pa.),2002.
Johnson v. Vanguard Manufacturing, Inc.
34 Fed.Appx. 858, 2002 WL 957330 (C.A.3 (Pa.))

Briefs and Other Related Documents (Back to top)

• 01-1742 (Docket) (Mar. 29, 2001)
• 01-1589 (Docket) (Mar. 09, 2001)
• 2001 WL 34556421 (Appellate Brief) Brief for Appellant and Appendix - Volume I (Jan. 01, 2001) Original Image of this Document (PDF)
• 2001 WL 34556422 (Appellate Brief) Brief of Appellee (Jan. 01, 2001) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

▷
Briefs and Other Related Documents

United States Court of Appeals,Third Circuit.
Sarah A. KIRK, Administratrix of the Estates of
Kirk, Alfred T., Deceased and Kirk, Sarah A. in her
own right
v.
RAYMARK INDUSTRIES, INC.; Eagle-Picher
Industries, Inc.; Keene Corporation; Garlock Inc;
Owens-Corning Fiberglas Corporation; Celotex
Corp.; GAF Corporation; Owens-Illinois Glass
Company, Owens-Corning Fiberglas Corporation,
Appellant.
Nos. 94-1745, 94-1746.

Argued Feb. 14, 1995.
Opinion Filed April 14, 1995.
Panel Rehearing Granted May 22, 1995.
Resubmitted on Supplemental Briefing June 12,
1995.
Decided July 27, 1995.

Administratrix of estate of worker who died of
asbestos-related disease brought products liability
action against several manufacturers of asbestos-
related products, all but two of which settled before
trial. After manufacturer's challenge for cause to
two jurors was denied and manufacturer exercised
peremptory strikes on jurors, the United . States
District Court for the Eastern District of
Pennsylvania, Robert S. Gawthrop, III, J., entered
judgment on jury verdict for worker, and
subsequently awarded delay damages under
Pennsylvania Rules of Civil Procedure, 1994 WL
361528. Manufacturer appealed, and the Court of
Appeals, Cowen, Circuit Judge, held that: (1)
remedy for impairment or denial of statutory right to
peremptory challenges is per se reversal without
requirement of proving prejudice; (2) trial court
abused its discretion in failing to strike for cause
jurors whose responses during voir dire indicated
potential bias against manufacturer; (3) use of
peremptory strikes by manufacturer against jurors
effectively reduced number of peremptory strikes and
required reversal; (4) testimony of expert for
manufacturer in prior, unrelated action was hearsay
and was not admissible under former testimony
exception; (5) interrogatory response of settling
codefendant was not admissible under residual
exception to hearsay rule; and (6) award of delay

damages was proper.

Reversed and remanded for new trial.

West Headnotes

[1] Federal Courts 170B ⟲⟳821

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk821 k. Selection and Impaneling
of Jurors. Most Cited Cases
Court of Appeals reviews for abuse of discretion
district court's decision regarding motion to dismiss
juror for cause.

[2] Jury 230 ⟲⟳131(2)

230 Jury
    230V Competency of Jurors, Challenges, and
Objections
        230k124 Challenges for Cause
            230k131 Examination of Juror
                230k131(2) k. Discretion of Court. Most
Cited Cases
Because trial judge is in best position to assess
credibility and demeanor of prospective jurors,
district courts have ample discretion in determining
how best to conduct voir dire.

[3] Jury 230 ⟲⟳97(1)

230 Jury
    230V Competency of Jurors, Challenges, and
Objections
        230k97 Bias and Prejudice
            230k97(1) k. In General. Most Cited Cases

Jury 230 ⟲⟳103(3)

230 Jury
    230V Competency of Jurors, Challenges, and
Objections
        230k98 Formation and Expression of Opinion
as to Cause
            230k103 Influence of Opinion on Verdict
                230k103(3) k. Belief of Juror That
Opinion Will Not Affect Verdict in General. Most
Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                 Page 2
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

In making determination of impartiality of prospective jurors, district court should not rely simply on jurors' subjective assessments of their own impartiality.

**[4] Jury 230 🔑97(1)**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k97 Bias and Prejudice
            230k97(1) k. In General. Most Cited Cases
Trial court abused its discretion in failing to strike juror for cause in products liability action against manufacturer of products containing asbestos where juror stated that he had "probably eaten a couple of pounds" of asbestos during his career as a mechanic, that he had been a shop steward and received one-sided literature from union regarding asbestos, and that he believed that 97% of older workers in his union had tested positive for asbestos, juror admitted that he was leaning in favor of plaintiff, and juror believed that he was "high on the priority list" of getting asbestos-related disease.

**[5] Jury 230 🔑97(1)**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k97 Bias and Prejudice
            230k97(1) k. In General. Most Cited Cases
Trial court abused its discretion in failing to strike for cause juror in products liability action against manufacturer of products containing asbestos where juror stated in jury questionnaire that he could not be fair to companies that made, supplied, and distributed asbestos-containing products and that he felt it was immoral to produce asbestos if manufacturer knew it was going to cause problem, indicated that he could not be fair if evidence indicated that manufacturer knew asbestos was hazardous, and only after repeatedly being asked if he could be fair responded "Whatever you say, yes."

**[6] Jury 230 🔑97(1)**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k97 Bias and Prejudice
            230k97(1) k. In General. Most Cited Cases
District court's refusal to excuse juror will not automatically be upheld simply because district court

ultimately elicits from prospective juror that he will be fair and impartial, despite earlier statements or circumstances to contrary.

**[7] Federal Courts 170B 🔑644**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
            170BVIII(D)2 Objections and Exceptions
                170Bk644 k. Motions for New Trial. Most Cited Cases
Reference by party in argument in support of motion for new trial to case which held that error of trial court in failing to strike juror for cause which creates prejudicial diminution of peremptory challenges constitutes reversible error preserved for review party's contention that failure of court to strike juror for cause resulted in its using peremptory strike it would not otherwise have had to use and created prejudice warranting reversal, even though party never specifically articulated that impairment of peremptory strike was statutory violation which would warrant reversal.

**[8] Jury 230 🔑136(2)**

230 Jury
    230V Competency of Jurors, Challenges, and Objections
        230k134 Peremptory Challenges
            230k136 Number
                230k136(2) k. Civil Actions and Proceedings. Most Cited Cases
Compelling party to use any number of its statutorily-mandated peremptory challenges to strike juror who should have been removed for cause is tantamount to giving party less than full allotment of peremptory challenges, and denial or impairment of party's statutory right to allotted number of challenges occurs whenever party exercises peremptory challenge to strike prospective juror who should have been removed for cause. 28 U.S.C.A. § 1870.

**[9] Federal Courts 170B 🔑893**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk893 k. Particular Errors as Harmless or Prejudicial. Most Cited Cases
Error of trial court in failing to strike for cause two

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

jurors in products liability action against manufacturer of products containing asbestos, which resulted in manufacturer exercising two peremptory challenges against jurors, created impairment of manufacturer's statutory right to three peremptory strikes which required per se reversal. 28 U.S.C.A. § 1870.

**[10] Federal Courts 170B ☞893**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)6 Harmless Error
        170Bk893 k. Particular Errors as Harmless or Prejudicial. Most Cited Cases
Remedy for impairment or denial of statutory right to exercise peremptory challenges is per se reversal, without any requirement of proving prejudice. 28 U.S.C.A. § 1870.

**[11] Jury 230 ☞33(5.15)**

230 Jury
  230II Right to Trial by Jury
    230k30 Denial or Infringement of Right
      230k33 Constitution and Selection of Jury
        230k33(5) Challenges and Objections
          230k33(5.15) k. Peremptory Challenges. Most Cited Cases
*Batson* decision, which removed prosecutor's unbridled discretion to exercise peremptory challenges when equal protection clause is violated, does not reach situations where equal protection clause is not implicated, and if prosecutor does not exercise peremptory strikes on basis of race, impairment of statutory right to exercise challenges requires per se reversal. U.S.C.A. Const.Amend. 14.

**[12] Jury 230 ☞136(2)**

230 Jury
  230V Competency of Jurors, Challenges, and Objections
    230k134 Peremptory Challenges
      230k136 Number
        230k136(2) k. Civil Actions and Proceedings. Most Cited Cases
Under *Ross*, there is no constitutional violation mandating reversal based on infringement on party's right to use peremptory challenge unless party can show that jury was not impartial; however, rule is inapplicable where injury alleged is statutory and not constitutional injury.

**[13] Habeas Corpus 197 ☞452**

197 Habeas Corpus
  197II Grounds for Relief; Illegality of Restraint
    197II(A) Ground and Nature of Restraint
      197k450 Federal Review of State or Territorial Cases
        197k452 k. Federal or Constitutional Questions. Most Cited Cases
Federal court may overturn state judgment only for constitutional violations.

**[14] Federal Courts 170B ☞754.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk754 Review Dependent on Whether Questions Are of Law or of Fact
          170Bk754.1 k. In General. Most Cited Cases
While ordinarily when new trial is sought by reason of district court's alleged error in allowing introduction of evidence, Court of Appeals reviews for abuse of discretion, where ruling on admissibility of hearsay evidence implicates application of legally set standard, review is plenary.

**[15] Evidence 157 ☞241(1)**

157 Evidence
  157VII Admissions
    157VII(D) By Agents or Other Representatives
      157k240 Agents or Employees
        157k241 In General
          157k241(1) k. In General. Most Cited Cases
Rule which defines admissions of party opponent as non-hearsay requires that declarant be agent of party opponent against whom admission is offered, and precludes admission of prior testimony of expert witness where expert has not agreed to be subject to client's control in giving his or her testimony. Fed.Rules Evid.Rule 801(d)(2)(C), 28 U.S.C.A.

**[16] Evidence 157 ☞241(1)**

157 Evidence
  157VII Admissions
    157VII(D) By Agents or Other Representatives
      157k240 Agents or Employees
        157k241 In General

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

157k241(1) k. In General. Most Cited Cases

Expert witness who is not subject to control of party opponent with respect to consultation and testimony he or she is hired to give cannot be deemed "agent" of party opponent as would allow expert's statements to constitute admissions of party opponent for purposes of rule which defines such statements as nonhearsay. Fed.Rules Evid.Rule 801(d)(2)(C), 28 U.S.C.A.; Restatement (Second) of Agency § 1.

**[17] Evidence 157 ☞241(1)**

157 Evidence
   157VII Admissions
     157VII(D) By Agents or Other Representatives
       157k240 Agents or Employees
         157k241 In General
           157k241(1) k. In General. Most Cited Cases

**Evidence 157 ☞575**

157 Evidence
   157XIII Evidence at Former Trial or in Other Proceeding
     157k575 k. Grounds for Admission in General. Most Cited Cases

Testimony of expert witness who is called to testify on behalf of party cannot later be used against that party in unrelated litigation unless there is finding that expert witness is agent of party and is authorized to speak on behalf of party.

**[18] Evidence 157 ☞241(1)**

157 Evidence
   157VII Admissions
     157VII(D) By Agents or Other Representatives
       157k240 Agents or Employees
         157k241 In General
           157k241(1) k. In General. Most Cited Cases

Testimony by expert witness called by manufacturer of asbestos-containing products in earlier, separate action did not constitute admission by party opponent and was hearsay in subsequent products liability action against manufacturer where there was no showing that expert was agent of manufacturer or was authorized to make statements which would bind manufacturer in prior action. Fed.Rules Evid.Rule 801(d)(2)(C), 28 U.S.C.A.

**[19] Evidence 157 ☞577**

157 Evidence
   157XIII Evidence at Former Trial or in Other Proceeding
     157k577 k. Absence of Witness. Most Cited Cases

It is abuse of discretion for district court to admit former testimony into evidence under former testimony exception to hearsay rule without first making finding of **unavailability**. Fed.Rules Evid.Rule 804(b)(1), 28 U.S.C.A.

**[20] Evidence 157 ☞577**

157 Evidence
   157XIII Evidence at Former Trial or in Other Proceeding
     157k577 k. Absence of Witness. Most Cited Cases

District court abused its discretion in admitting testimony of expert witness for manufacturer of products containing asbestos which was given in earlier, unrelated trial under former testimony exception to hearsay rule in subsequent products liability action where no finding was made on record by trial court that expert was **unavailable**. Fed.Rules Evid.Rule 804(b)(1), 28 U.S.C.A.

**[21] Evidence 157 ☞309**

157 Evidence
   157VIII Declarations
     157VIII(E) Proof and Effect
       157k309 k. Preliminary Evidence. Most Cited Cases

It is proponent of statement offered under exceptions to hearsay rule applicable where declarant is **unavailable** as witness who bears burden of proving **unavailability** of declarant. Fed.Rules Evid.Rule 804, 28 U.S.C.A.

**[22] Evidence 157 ☞577**

157 Evidence
   157XIII Evidence at Former Trial or in Other Proceeding
     157k577 k. Absence of Witness. Most Cited Cases

Worker who brought products liability action against manufacturer of asbestos-containing products failed to use reasonable means to enlist services of expert witness who had testified on behalf of manufacturer in earlier, unrelated action, so that testimony of expert in earlier action was not admissible under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                    Page 5
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

former testimony exception to hearsay rule applicable where declarant is **unavailable**, where worker made no independent attempt to contact expert, offer usual fee, and request attendance at trial, even though worker contended that expert was in another state and could not be subpoenaed. Fed.Rules Evid.Rule 804(b)(1), 28 U.S.C.A.

**[23] Evidence 157 ☞575**

157 Evidence
  157XIII Evidence at Former Trial or in Other Proceeding
    157k575 k. Grounds for Admission in General. Most Cited Cases
Worker who brought products liability action against asbestos manufacturer failed to establish that manufacturer had opportunity and similar motive to develop testimony of expert called by manufacturer at prior, unrelated state court trial, and testimony from earlier trial was not admissible under former testimony exception to hearsay rule, where only document from earlier trial was transcript of testimony and complaint, answer, and jury charge from earlier action were not available so that court could not make well-reasoned determination of whether manufacturer had had similar motive to examine expert in prior action. Fed.Rules Evid.Rule 804(b)(1), 28 U.S.C.A.

**[24] Evidence 157 ☞314(1)**

157 Evidence
  157IX Hearsay
    157k314 Nature and Admissibility
      157k314(1) k. In General. Most Cited Cases
Plain language of residual or catch-all exception to hearsay rule requires that proponent of hearsay statement put adverse party on notice that proponent intends to introduce statement into evidence; proponent must give notice of hearsay statement itself as well as intention specifically to rely on exception as grounds for admissibility of hearsay statement. Fed.Rules Evid.Rule 803(24), 28 U.S.C.A.

**[25] Evidence 157 ☞314(1)**

157 Evidence
  157IX Hearsay
    157k314 Nature and Admissibility
      157k314(1) k. In General. Most Cited Cases
Advance notice requirement of residual or catch-all exception to hearsay rule can be met where

proponent of evidence is without fault in failing to notify adversary and trial judge has offered sufficient time, by means of granting continuance, for opponent to prepare to contest its admission. Fed.Rules Evid.Rule 803(24), 28 U.S.C.A.

**[26] Evidence 157 ☞318(1)**

157 Evidence
  157IX Hearsay
    157k315 Statements by Persons Other Than Parties or Witnesses
      157k318 Writings
        157k318(1) k. In General. Most Cited Cases
Trial court erred in admitting under catch-all or residual exception to hearsay rule interrogatory response of settled codefendant in products liability action against manufacturer of asbestos-containing products where worker who offered interrogatory response failed to provide notice of intent to rely on rule. Fed.Rules Evid.Rule 803(24), 28 U.S.C.A.

**[27] Evidence 157 ☞318(1)**

157 Evidence
  157IX Hearsay
    157k315 Statements by Persons Other Than Parties or Witnesses
      157k318 Writings
        157k318(1) k. In General. Most Cited Cases
Interrogatory response of codefendant who is seeking to avoid liability lacks circumstantial guarantees of trustworthiness which are required to allow admission of response under catch-all or residual exception to hearsay rule. Fed.Rules Evid.Rule 803(24), 28 U.S.C.A.

**[28] Evidence 157 ☞318(1)**

157 Evidence
  157IX Hearsay
    157k315 Statements by Persons Other Than Parties or Witnesses
      157k318 Writings
        157k318(1) k. In General. Most Cited Cases
Interrogatory response of codefendant who had settled prior to trial lacked circumstantial guarantees of trustworthiness and was not admissible under residual exception to hearsay rule in products liability action against manufacturer of asbestos-containing products; settling codefendant had every incentive to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

set forth facts in light most favorable to itself while at same time still answering interrogatories truthfully. Fed.Rules Evid.Rule 803(24), 28 U.S.C.A.

**[29] Federal Courts 170B ☜415**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk415 k. Damages, Interest, Costs and Fees. Most Cited Cases
Provision of Pennsylvania Rules of Civil Procedure allowing award of delay damages is substantive rule and may be applied by federal district court sitting in diversity. Rules Civ.Proc., Rule 238, 42 Pa.C.S.A.

**[30] Federal Courts 170B ☜754.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk754 Review Dependent on Whether Questions Are of Law or of Fact
                    170Bk754.1 k. In General. Most Cited Cases
Review by Court of Appeals of applicability of provision of Pennsylvania Rule of Civil Procedure allowing award of delay damages in diversity case is plenary. Rules Civ.Proc., Rule 238, 42 Pa.C.S.A.

**[31] Interest 219 ☜14**

219 Interest
    219I Rights and Liabilities in General
        219k14 k. Unreasonable or Vexatious Delay in Payment. Most Cited Cases
Nothing in provision of Pennsylvania Rules of Civil Procedure allowing award of delay damages contemplates that plaintiff must forego any rights in order to be entitled to delay damages. Rules Civ.Proc., Rule 238, 42 Pa.C.S.A.

**[32] Interest 219 ☜14**

219 Interest
    219I Rights and Liabilities in General
        219k14 k. Unreasonable or Vexatious Delay in Payment. Most Cited Cases
Delay in products liability action against manufacturer of asbestos-containing products was not caused by plaintiff, and manufacturer was obligated to pay delay damages under Pennsylvania Rules of Civil Procedure on award recovered by plaintiff,

where plaintiff's delay in failing to request remand from multidistrict docket to which action was transferred following bankruptcy proceedings involving asbestos manufacturers was attributable to judge's pretrial order that case could be remanded for trial only if there was finding that manufacturer was acting in bad faith. Rules Civ.Proc., Rule 238, 42 Pa.C.S.A.

**[33] Interest 219 ☜14**

219 Interest
    219I Rights and Liabilities in General
        219k14 k. Unreasonable or Vexatious Delay in Payment. Most Cited Cases
Theory underlying provision of Pennsylvania Rules of Civil Procedure allowing award of delay damages is that delay damages merely compensate plaintiff for money that he or she would have earned on award if he or she had promptly received it; provision also functions to prevent defendant from being unjustly enriched by keeping interest that could be earned during litigation process on what is essentially plaintiff's money. Rules Civ.Proc., Rule 238, 42 Pa.C.S.A.

*151 Joseph M. Greitzer,Jerry Kristal (argued), Greitzer & Locks, Philadelphia, PA, for appellees Sarah A. Kirk, Administratrix of Estates of Kirk, Alfred T., deceased and Kirk, Sarah A. in her own right.
Robert N. Spinelli, W. Matthew Reber (argued), Kelley, Jasons, McGuire & Spinelli, Philadelphia, PA, for appellant Owens-Corning Fiberglas Corp.

Before: STAPLETON, GREENBERG and COWEN, Circuit Judges.

**OPINION OF THE COURT**
COWEN, Circuit Judge.
This asbestos-related personal injury action was tried to a jury in the United States District Court for the Eastern District of Pennsylvania. The jury returned a verdict in favor of the plaintiff in excess of two million dollars. On application by counsel, the district court granted plaintiff delay damages in the amount of $520,684. In these consolidated appeals, we are called on to determine whether: (1) the district court abused its discretion by denying the defendant's challenge for cause of two jurors who allegedly evidenced bias against the defense; (2) the defendant has waived any claim that there was a violation of its statutory right to exercise peremptory challenges; (3) a denial or impairment of the exercise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of peremptory challenges occurs if the defendant uses one or more challenges to remove jurors who should have been removed for cause; and (4) a per se reversal is the appropriate remedy for such impairment or whether the defendant must also make a showing of prejudice. Additionally, we are called upon to determine whether the district court committed an error of law by: (1) allowing plaintiff to introduce into evidence the prior testimony of an out of court expert witness from an unrelated state court action; (2) permitting plaintiff to introduce the interrogatory responses of a co-defendant who settled with the plaintiff prior to trial; (3) awarding plaintiff delay damages pursuant to Rule 238 of the Pennsylvania Rules of Civil Procedure.

Because we conclude the district court abused its discretion in denying the defendant's challenge for cause of two jurors during voir dire, and because we conclude that this effected a denial or impairment of the defendant's statutory right to peremptory challenges requiring per se reversal, we will reverse the judgment of the district court and remand for a new trial on the issue of damages and liability.[FN1] Since it is likely that the hearsay issues and the issue of delay damages may arise again during the new trial, we deem it appropriate to offer the district court guidance. On these subjects, we conclude that the district court erred as a matter of law in allowing the introduction of hearsay evidence, but did not err in ruling that delay damages would be permitted when delay was caused by a judicial stay for which the plaintiff was not responsible.

> FN1. Defendant also argues that the district court abused its discretion in denying: (1) defendant a fair opportunity to prove the liability of a settled co-defendant by denying defendant's request for a continuance to subpoena product identification witnesses; and (2) defendant's request for a new trial on the grounds of excessiveness of the verdict. Because of our decision to reverse the judgment of the district court and remand for a new trial on the issue of damages and liability, we need not address these arguments.

I. Factual and Procedural History

Alfred Kirk ("decedent"), a retired painter, died on July 5, 1988 at the age of 65 from malignant asbestos-induced mesothelioma. Mrs. Sarah Kirk ("Kirk"), suing on behalf of herself and her deceased

husband's estate, filed this diversity action against eight defendants, including Owens-Corning Fiberglas *152 Corporation ("Owens-Corning").[FN2] Kirk alleged that her husband's mesothelioma was caused by exposure to dust from asbestos products during his employment at the New York Shipyard in Camden, New Jersey, during the late 1950's and early 1960's.

> FN2. Of these eight defendants, four were bankrupt at the time of trial. Of the four remaining defendants, Kirk settled with Garlock, Inc., GAF Corporation, and Owens-Illinois prior to trial. Kirk also previously filed an asbestos-related lawsuit in the Philadelphia Court of Common Pleas against Pittsburgh Corning Corporation, H.K. Porter Company, Inc., and Southern Textile Corporation. Of these defendants, two were bankrupt and Kirk settled with Pittsburgh Corning prior to trial.

By order dated July 29, 1991, the Judicial Panel on Multidistrict Litigation ("MDL") transferred all pending federal asbestos personal injury actions to the Eastern District of Pennsylvania. Pursuant to the MDL Panel's Order, all federal asbestos cases were stayed until the summer of 1993.

During jury selection, Owens-Corning challenged for cause two prospective jurors maintaining that the prospective jurors could not be impartial because they revealed considerable potential bias against Owens-Corning during voir dire. The district court refused to strike these prospective jurors for cause, and Owens-Corning was then compelled to utilize two of its three peremptory strikes to remove these prospective jurors.[FN3]

> FN3. We granted panel rehearing for the purpose of determining whether reversal is required when a party is compelled to expend or "waste" any number of its peremptory strikes to remove a prospective juror who should have been removed for cause. In the original panel opinion, we concluded that Owens-Corning was prejudiced by the presence of these two jurors sitting on the jury. We were shocked to learn, in a petition for rehearing in banc, that these two jurors never actually served because Owens-Corning exercised peremptory strikes to remove these jurors. In the original briefing, as well as during

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                    Page 8
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
**(Cite as: 61 F.3d 147)**

argument before this panel, both parties failed to inform the Court that these two jurors were never seated on the jury. We are deeply disturbed by the fact that the briefing in this matter did not make clear to us this crucial fact and caused the Court to waste valuable time and judicial resources.

On December 13, 1993, the trial (which was reverse-bifurcated) began with issues of medical causation and damages. At the conclusion of this phase of the trial, the jury returned a verdict in favor of the Estate of Alfred Kirk for $1.2 million and in favor of Sarah Kirk for $810,000. The liability phase of the trial commenced several days later before the same jury that had previously heard the damages phase. At the conclusion of the liability trial, the jury returned a verdict against Owens-Corning. The jury also found that the decedent was not exposed to dust emitted by any asbestos-containing product manufactured by co-defendant Garlock, Inc. ("Garlock").

Following the jury verdict, Owens-Corning moved for a new trial, alleging several trial errors including: (1) failing to strike two prospective jurors for cause; and (2) allowing the introduction of hearsay evidence. This application was denied by the district court. Kirk filed an application for delay damages pursuant to Rule 238 of the Pennsylvania Rules of Civil Procedure, which the district court granted in the amount of $520,684. Owens-Corning appeals from both the judgment and the award of delay damages.

Owens-Corning argues that the district court made several errors which require reversal of both the damage and liability phases of the trial, and that the district court improperly denied its post-verdict motion for a new trial. Finally, Owens-Corning claims that delay damages should not have been awarded to Kirk, because the delay was caused by the plaintiff filing simultaneous federal and state court actions and/or caused by the MDL order staying all asbestos cases, and was not caused by any bad faith on the part of Owens-Corning. We will address each of these arguments *seriatim*.

The district court had jurisdiction to hear this case pursuant to 28 U.S.C. § 1332. Our jurisdiction is premised on 28 U.S.C. § 1291 as the judgment entered was a final order.

## II. Juror Challenges

### A. Challenges for Cause

[1] Owens-Corning argues that the district court erred in refusing to strike for *153 cause two prospective jurors (juror # 251 and juror # 45) who the defendant argues revealed considerable potential bias against it during voir dire. As a consequence, Owens-Corning claims that it was forced to expend or "waste" two of its peremptory strikes to remove these two jurors from the jury. We review for abuse of discretion a district court's decision regarding a motion to dismiss a juror for cause. *United States v. Polan*, 970 F.2d 1280, 1284 (3d Cir.1992), *cert. denied*, 507 U.S. 953, 113 S.Ct. 1367, 122 L.Ed.2d 745 (1993) (citing *United States v. Salamone*, 800 F.2d 1216, 1226 (3d Cir.1986) (the factual determination by the district court whether a juror can serve impartially is entitled to special deference when reviewed on appeal), *cert. denied*, 498 U.S. 1030, 111 S.Ct. 685, 112 L.Ed.2d 676 (1991)).

[2][3] Because the trial judge is in the best position to assess the credibility and demeanor of the prospective jurors, "district courts have been awarded ample discretion in determining how best to conduct the voir dire." *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir.1993) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981)). In determining whether a particular juror should be excused for cause, our main concern is "whether the juror holds a particular belief or opinion that will 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Salamone*, 800 F.2d at 1226 (citing *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)). "A juror is impartial if he or she can lay aside any previously formed 'impression or opinion as to the merits of the case' and can 'render a verdict based on the evidence presented in court.' " *Polan*, 970 F.2d at 1284 (citing *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)). However, the district court should not rely simply on the jurors' subjective assessments of their own impartiality. *See Waldorf*, 3 F.3d at 710 (district court relied too heavily on jurors' assurances of impartiality); *see also Government of the Virgin Islands v. Dowling*, 814 F.2d 134, 139 (3d Cir.1987) (though a juror swears that he could set aside any opinion he might hold and decide the case on the evidence, a juror's protestation of impartiality should not be credited if other facts of record indicate to the contrary), *aff'd*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 160**

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

Owens-Corning argues that prospective juror # 251 should have been struck for cause because he worked with asbestos-containing products for many years and indicated during voir dire that he was leaning in favor of the plaintiff.    Kirk argues that this prospective juror was properly placed on the jury because when questioned by both the district court and counsel whether he could render a fair and impartial verdict, the prospective juror responded in the affirmative.

[4] We are troubled by the fact that a district judge, despite assurances of impartiality, allowed a prospective juror to serve in a mesothelioma case when the juror's background raised serious questions as to his ability to serve impartially.[FN4]  Specifically, we *154 note the following facts which raise substantial questions of the potential bias of juror # 251: (1) during the course of his work history he had "probably eaten a couple of pounds of [asbestos]"; (2) he was a union shop steward for 35 years and received one-sided literature from the union regarding asbestos;  (3) he believed that 97f the older workers in his local union had tested positive for asbestos in their system;  (4) he had two uncles who died of lung cancer and although they were cigarette smokers, they had been exposed to asbestos during the course of their work lives;  (5) he admitted in the first instance that he was leaning in favor of the plaintiff and against the asbestos company;  (6) he believed that he was "probably high on the priority list" of getting an asbestos-related disease himself; and (7) he knew "a lot of [union] members" who presumably had asbestos-related medical problems.

> FN4. Relevant portions of the voir dire of prospective juror # 251 are as follows:
> Juror 251:  Well, two uncles had cancer, they were mechanics.   Our union did a study on their members.   I am a mechanic, and it was like 97 percent of them tested had some problem with asbestos.  I have eaten a lot of it over the years brakes, clutches up until gets in the air hose, blows it out, you spit black dirt for two days.
> ....
> Mr. Kristal (counsel for Kirk): Do you think that will affect your ability to listen to the evidence and be fair to both sides in this case?
> Juror 251: Well I could only try to be fair is all I could say.  I guess in a way I got to be a little one way, I'm probably high on the priority list myself.   I've been a mechanic

since 1957, up until when they stopped using it, you know, you took a clutch out of a truck, hit it with the air hose and the whole shop is black.
....
Mr. Kristal:  If I didn't prove my case, or show that Mr. Kirk didn't have asbestos disease or I was unable to show Owens-Corning Fiberglas was liable, would you be able to return a verdict against my client?
Juror 251: I wouldn't have any problems at all.
Mr. Kristal:  [I]f I had proven the case, would you be able to find in favor of my client?
Juror 251:  I might lean the other way because I have been there.  I know a lot of members who have been down that road, you know.
Mr. Kristal:  Can you put [your past experience with asbestos] behind you and decide this case on what you hear in the courtroom from the witness stand and follow the Court's instructions?
Juror 251: I believe I could.
Mr. Hewitt (counsel for Owens-Corning): Your two uncles had cancer?
Juror 251: Yes.
Mr. Hewitt:  Do you believe those cancers were related to asbestos?
Juror 251:  I don't know.   They both had lung cancer.
Mr. Hewitt:  Were they around asbestos?
Juror 251:  Mechanics the same as I am, both smoke, so it's anybody's guess.
App. 68-70.
The Court:   He thinks he has asbestos coursing through his system.
....
The Court: I just want to clarify in my own mind, you have been exposed to the brake linings and flakes from brake linings?
Juror 251: Yes.
The Court: For many years now?
Juror 251: Yes, sir.
The Court:  And you think that probably asbestos fibers made their way in through your own system because when you had the air hose-
Juror 251:  You see our Local, I am a member of the Local, and when all this asbestos problem came out, the Union started testing some of the older members. It was like they finally knocked it off like 97 percent of the people tested, tested positive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

for asbestos.    And back then, we didn't know nothing about it.  You took brakes off the truck, took the air hose blew it off, disk, clutch, all asbestos, and I said yesterday, I probably had eaten a couple of pounds of it, and I have never been tested for it, but I have been subject to it.

The Court:  If you are on this case you would be deciding certain questions, concerning somebody who died of asbestos exposure, how much money to award.  Do you think because of your own personal experience perhaps to a certain extent because of your uncles, you are not sure of the cause of the death, whether cigarettes or something to do with asbestos, do you think you could be fair or would you be inclined-

Juror 251:  Like I said, most of what I seen has been against it.  I would have to sit and listen to the case.  If the one attorney can prove that it wasn't, I could handle that.  But at this point right now I only know the one side of it.

The Court:  The way it's going to be, the plaintiff has the burden of proof, not the defendant.  And do you think you could decide the case fairly or do you think because of your own personal experiences you would be sort of caught up in it and tend to favor the plaintiff?

Juror 251:  I think I could do it fairly.  I have been a shop steward for 35 years.  Lots of time I have to go against the company.  That didn't sit too well but I think I could sit and listen to the facts.

....

Juror 251:  I think I could weed through it.  Most of the information I have has been from the side of the Union coming with the asbestos.    And really, it's a one-sided argument.

....

Mr. Hewitt:  I think you indicated earlier that you would lean a little-

Juror 251:  Well, at this point I would have to be [a] liar if I said to you the facts that I had lean in favor of the possibility or the possibility of it happening.    I haven't really had any, a lot of facts thrown to me, where it is not, and like I said, I would have to hear what they have to say, and determine from that.    I just can't crystal-ball, say this gentleman is going to convince me that the client, his client did die from it.  I just have to listen to the facts, and just understand all

the facts that I had about it have been the negative, from your standpoint, so I would have to weed out one or the other.
App. at 76-79.

[5]  Owens-Corning next argues that prospective juror # 45 should have been struck for cause because he had responded to the jury questionnaire that he could not be fair and later repeated at voir dire that he would have a difficult time being fair to the defendant.  Kirk counters by pointing out that when further questioned by the district court as to whether he could render a fair and impartial verdict, the prospective juror responded in the affirmative.[FN5] Again, we are **155 troubled because the second prospective juror: (1) stated in the jury questionnaire that he could not be fair to companies that made, distributed, supplied and/or installed asbestos-containing products;  (2) felt it was immoral to produce asbestos if the company knew it was going to cause a problem;  and (3) indicated that he could not be fair to the defendant if the evidence indicated that Owens-Corning knew that asbestos was hazardous.    Only after being repeatedly asked if he could be fair, the juror answered, "Whatever you say, yes."

FN5.  Relevant portions of the voir dire are as follows:
The Court:  In this case, sir, if you are on this jury can you well and truly try the case based on the evidence as it comes forth from the witness stand and not, with all respects [sic] to the media, based on TV, or radio or newspapers and all of that?  Do you think you could do that, sir?
Juror 45:  Yes, I believe so, because it's possible it could be slanted one way or the other.
....
The Court:  So you answered that you could not be fair to companies that made, distributed, supplied and/or installed asbestos-containing products, what do you mean by that?
Juror 45:  Basically I feel it's sort of immoral to knowingly produce something you know is going to cause a problem.
The Court:  Do you think it's immoral-I am not saying this is the case-to produce something when they don't know anything is wrong with it, they don't know but it turns out later there is something wrong with it?
Juror 45:  I feel if they do find out it should

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                                                          Page 11
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

be corrected.

....

The Court: [D]o you think you could be fair?

Juror 45: Yes.

Mr. Hewitt: One question, if the evidence is that Owens Corning knew that asbestos was hazardous would you have a tough time giving them a fair shake?

Juror 45: Yes, I would.

The Court: What do you mean by giving them a fair shake? Would you have a tough time coming up with a verdict in their favor if you know the [sic] under the evidence and the law they are liable?

Juror 45: Well-

The Court: I would tell you if it comes in, if the evidence and the law did not demonstrate that the plaintiff proved their [sic] case, I am not saying that is not being fair to the defendant, you are being fair, just as you would be fair to the plaintiff if after fairly considering the evidence you find there's not a case made out, you would nevertheless find against her, you are abiding by your oath as a juror.

Juror 45: Whatever you say, yes.

App. at 64-66.

Recently, we had the opportunity to decide a similar case involving a challenge to a district court's refusal to remove several jurors for cause. *Polan,* 970 F.2d at 1284. In that case, which involved a prosecution for conspiracy to distribute and the distribution of illegally prescribed drugs, counsel for the defendant challenged for cause three prospective jurors who revealed during voir dire that either they or members of their families were victims of drug abuse. *Id.* Juror # 1 revealed that one of his brothers had died of a drug overdose and another brother had served a lengthy prison term for drug offenses. *Id.* n. 2. Juror # 2 indicated that she had become dependent upon tranquilizers after experiencing a family tragedy. *Id.* Juror # 3 revealed that his son had abused alcohol and drugs in the past. *Id.* However, all three prospective jurors ultimately assured the court that their past experiences would not affect their decision making and that they would be fair and impartial. After reviewing the record of the voir dire, we concluded that the district court did not abuse its discretion in refusing to strike those prospective jurors. *Polan,* 970 F.2d at 1284.

We find that *Polan* is distinguishable from the case before us. In *Polan,* the defendant wanted the

prospective jurors removed presumably because he believed that some of their past experiences would make them more likely to vote for conviction. With regard to juror # 1, we gave little weight to the theory that an individual whose one brother died of a drug overdose and whose other brother served a prison sentence for drug offenses would be more likely to convict a criminal defendant charged with drug distribution. With regard to juror # 2, we were not convinced that a person who became dependent on sedatives after the shock of a family tragedy would be more likely to convict an individual accused of distributing drugs. Finally, with regard to juror # 3, we gave little credence to the notion that a father who endured his son's alcohol and drug problems would be biased in favor of the prosecution. Thus, when the district court in *Polan* credited the assurances of the three prospective jurors, it implicitly made two findings: (1) that the jurors were telling the truth and (2) despite the experiences and personal biases of the jurors, they could be fair and impartial, precisely because their *156 past experiences and personal biases did *not* make them more likely to convict the defendant.

Here, Owens-Corning objected to jurors # 251 and # 45 being seated on the jury because it believed that their personal biases regarding asbestos and asbestos companies would make them more likely to return a finding of liability and a large damage award against Owens-Corning. Unlike the defendant in *Polan,* Owens-Corning's fear, that the prospective witnesses' past experiences and personal biases would affect their decision, was well-founded.

Juror # 251 inhaled a considerable amount of asbestos, knew people who were suffering from asbestos-related diseases, and thought himself likely to succumb to some asbestos-related disease in the future. Thus, there was good reason to conclude that he would be more likely to return a large damage award because he sympathized with the plaintiff. *See Gumbs v. Pueblo International, Inc.,* 823 F.2d 768, 773 (3d Cir.1987) ("[A] jur[or] may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket."). It is difficult to conceive of a juror who would be more partial to this plaintiff than juror # 251. Because juror # 251's background is replete with circumstances which would call into question his ability to be fair to an asbestos manufacturer, we find that the district judge should have removed this juror for cause.

Juror # 45 stated that he was biased against asbestos

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                          Page 12
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

companies and felt it was immoral knowingly to produce harmful and defective products. The danger existed that this juror would return a verdict of liability against Owens-Corning even if Owens-Corning's products were not responsible for the decedent's injuries. We can think of few admissions more compelling in asbestos litigation than a prospective juror who acknowledges that he would have moral qualms about being fair to an asbestos manufacturer.

[6] We conclude that juror # 45 and especially juror # 251 could not serve fairly and impartially in light of their past experiences and personal biases. The district court relied too heavily on the jurors' assurances of impartiality, and therefore abused its discretion. A district court's refusal to excuse a juror will not automatically be upheld simply because the district court ultimately elicits from the prospective juror that he will be fair and impartial, despite earlier statements or circumstances to the contrary. The application of Owens-Corning to dismiss these two jurors for cause should have been granted.

### B. Peremptory Challenges

Because the district court refused to strike these jurors for cause, Owens-Corning exercised two of its three peremptory strikes to remove these two prospective jurors from the jury. Federal law provides that "[i]n civil cases, each party shall be entitled to three peremptory challenges." 28 U.S.C. § 1870. We must now decide whether: (1) the defendant has waived any claim that there was a violation of a statutory right to exercise peremptory challenges; (2) a denial or impairment of the exercise of peremptory challenges occurs if the defendant uses one or more challenges to strike jurors who should have been removed for cause; and (3) a per se reversal is the appropriate remedy for such impairment or whether the defendant must also make a showing of prejudice.

### 1. Waiver

Kirk argues that we may not now consider on appeal Owens-Corning's contentions that there was a violation of the statutory right to exercise peremptory strikes because the claim was not properly preserved in the trial court.[FN6] We have previously held that "[i]t is well established that failure to raise an issue in the District Court constitutes waiver of the argument." Brenner v. Local 514, United

Brotherhood of Carpenters, 927 F.2d 1283, 1298 (3d Cir.1991).

> FN6. Alternatively, Kirk maintains that to the extent this issue was not waived, the argument must fail on the merits because Owens-Corning failed to show that the jury was not impartial. We will address this argument below. See infra part II.B.3.

*157 [7] Owens-Corning made the following argument before the district court in support of its motion for a new trial:

[T]he district court is compelled to excuse a potential juror when bias is discovered during voir dire, as the failure to do so may require the litigant to exhaust peremptory challenges on persons who should have been excused for cause. This result, of course, extinguishes the very purpose behind the right to exercise peremptory challenges. U.S. v. Daly, 716 F.2d 1499, 1507 (9th Cir.1983) [citing United States v. Allsup, 566 F.2d 68, 71 (9th Cir.1977); United States v. Nell, 526 F.2d 1223, 1229 (5th Cir.1976) ].

Brief of Owens-Corning in Support of its Motion for a New Trial at 3.[FN7] In Daly, the Court of Appeals for the Ninth Circuit additionally stated that "[s]uch an infringement, if it causes a prejudicial diminution of peremptory challenges, constitutes reversible error." Daly, 716 F.2d at 1507 (citing Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir.1981), cert. denied, 463 U.S. 1211, 103 S.Ct. 3545, 77 L.Ed.2d 1394 (1983); Allsup, 566 F.2d at 71; United States v. Boyd, 446 F.2d 1267, 1275 n. 27 (5th Cir.1971)). We believe that Owens-Corning's reference to Daly during the course of its argument to the district court properly preserved for appeal the argument that impairment of a peremptory strike requires reversal. Although Owens-Corning never specifically articulated that the impairment of a peremptory strike was a statutory violation, we are of the opinion that raising the question of the appropriate remedy for the impairment of peremptory challenges fairly places before us the question of whether a statutory right to peremptory challenges has been violated.

> FN7. In Allsup, the court noted that impairment of the right to exercise peremptory challenges is usually deemed to be prejudicial error, without a showing of actual prejudice. 566 F.2d at 71 (citing Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965)). In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                                      Page 13
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

*Nell,* the court stated "it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges." 526 F.2d at 1229 (citing *Swain* ). Although Kirk later argues that *Swain* is no longer good law (and reliance on it is improper), at this stage of the inquiry we are not deciding the issues raised on the merits, but are simply ascertaining whether Owens-Corning has preserved this argument for appeal.

**2. Denial or Impairment of Peremptory Challenges**

[8][9] We must next decide whether a denial or impairment of the exercise of peremptory challenges occurs if a defendant expends or wastes a peremptory challenge to strike a juror who should have been removed for cause. The Supreme Court specifically declined to decide this issue in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), stating, "we need not decide the broader question whether, in the absence of Oklahoma's limitation on the 'right' to exercise peremptory challenges, 'a denial or impairment' of the exercise of peremptory challenges occurs if the defendant uses one or more challenges to remove jurors who should have been excused for cause." *Id.* at 91 n. 4, 108 S.Ct. at 2280 n. 4. We do not believe this to be a difficult issue. Here, the district court failed to strike two jurors who were challenged for cause, and we determine that this failure was error. In order to ensure that these two prospective jurors who exhibited prejudice did not serve on the jury, Owens-Corning utilized two peremptory strikes. We hold that compelling a party to use any number of its statutorily-mandated peremptory challenges to strike a juror who should have been removed for cause is tantamount to giving the party less than its full allotment of peremptory challenges. Because 28 U.S.C. § 1870 requires that each party shall be entitled to three peremptory challenges, "a denial or impairment" of that statutory right occurs whenever a party exercises a peremptory challenge to strike a prospective juror who should have been removed for cause. Here, Owens-Corning's statutory right to three peremptory challenges was impaired.

FN8. In *Ross,* the Court observed that under Oklahoma law, a party is required to expend a peremptory strike in order to preserve for appeal a challenge to the trial court's refusal

to remove that juror for cause. 487 U.S. at 89, 108 S.Ct. at 2279. There is no analogous requirement under federal law.

***158** 3. Remedy*

[10] Relying on *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *overruled on other grounds by Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Owens-Corning argues that the impairment or denial of the statutory right to exercise peremptory challenges requires the common law remedy of per se reversal. The common law remedy of per se reversal has a long history and tradition in our judicial system. As early as the 1890's, the Supreme Court held in *Gulf, Colorado & Santa Fe Ry. Co. v. Shane,* 157 U.S. 348, 15 S.Ct. 641, 39 L.Ed. 727 (1895), that to "impanel a jury in violation of law, and in such a way as to deprive a party of his right to peremptory challenge, constitutes reversible error." *Id.* at 351, 15 S.Ct. at 642. In *Shane,* a civil defendant claimed that the trial judge committed error by failing to adhere to an Arkansas statute that provided each party three peremptory strikes to be used on a list of eighteen prospective jurors. Because the trial judge confined the right to exercise peremptory challenges to only twelve prospective jurors, the Supreme Court concluded, without a showing of prejudice, that the trial court violated the statute. *Id.* Similarly, in *Harrison v. United States,* 163 U.S. 140, 16 S.Ct. 961, 41 L.Ed. 104 (1896), a criminal defendant argued that the trial judge erred in allotting him only three peremptory strikes, instead of the ten to which he was entitled under a federal statute. Because the defendant wanted to exercise five additional peremptory strikes, but was precluded from so doing, the Supreme Court reversed, observing that "[i]f [the defendant] was entitled to ten peremptory challenges, five persons unlawfully took part as jurors in his conviction." *Id.* at 141, 16 S.Ct. at 961. Again, the Court did not require a showing of prejudice for this statutory violation. *See also Lewis v. United States,* 146 U.S. 370, 375-77, 13 S.Ct. 136, 138, 36 L.Ed. 1011 (1892) (statutory right provided by Arkansas law requiring defendant to be present during the exercise of peremptory strikes was violated, thus requiring per se reversal). *Swain* continued the tradition of these cases.[FN9]

FN9. Kirk cites to a case from the same era, *Hopt v. People,* 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708 (1887), which she claims Owens-Corning concedes stands for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                                    Page 14
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

proposition that "an erroneous denial of [a] challenge for cause does *not* constitute reversible error if the party is not prejudiced." Plaintiff/Appellee's Rehearing Reply Brief at 10 (June 12, 1995) (emphasis in original) (citing Supplemental Brief of Appellant at 4 (June 6, 1995)). We are troubled by Kirk's argument. First, Owens-Corning does not concede that a party must show prejudice (*i.e.*, a biased jury) in order for reversal to occur. Rather, Owens-Corning states that there can be no per se reversal unless the party proves that a peremptory strike has been impaired. *See* Supplemental Brief of Appellant at 4 (June 6, 1995) (arguing there can be no per se reversal unless the party is prejudiced by "having to 'waste' its peremptories on biased veniremembers.").

Second, *Hopt* does not stand for such a proposition. In *Hopt*, the defendant argued that the trial judge made several errors in ruling on the competency of four jurors. The trial judge denied all four challenges for cause. However, the district attorney removed one juror peremptorily and the defendant removed two jurors with peremptory strikes. The remaining juror was permitted to sit on the jury, but the Supreme Court ruled that the trial judge did not err in denying this challenge for cause. With regard to the two jurors who were struck by the defendant, the Supreme Court concluded that assuming *arguendo* that the trial judge erred in refusing to strike two jurors for cause, there was no injury to the defendant because he utilized less than thirteen of the fifteen peremptory challenges provided by Utah statute. *Id.* at 436, 7 S.Ct. at 617. As noted in part II.B.2 *supra*, in order to be entitled to per se reversal, a party must first show its statutory right to peremptory strikes was denied or impaired. Because Hopt still had at least one peremptory strike remaining which he failed to use on the remaining juror, he failed to prove an impairment.

Kirk maintains that *Batson* has overruled *Swain* in its entirety, and that *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), requires a specific showing of prejudice-that the jury who actually sat was not impartial-before reversal is required.[FN9]

FN10. We understand Kirk to be making two separate arguments. First, Kirk asserts that assuming *arguendo* Owens-Corning has raised a claim of violation of a Seventh Amendment right to an impartial jury, this argument must fail on the merits because defendant did not object to the jury that was ultimately seated. We need not address this point because Owens-Corning does not rely on any claim that the jury that decided this case was not impartial. *See* Supplemental Brief of Appellant at 10 (June 6, 1995) ("Owens-Corning obviously cannot argue that it has been deprived of any Sixth Amendment right, nor has it asserted any analogous right under the Seventh Amendment.") (footnote omitted); Reply Brief of Defendant/Appellant at 5 n. 3 (June 13, 1995) ("Owens-Corning does not claim that the jury that decided this case was not impartial, nor does Owens-Corning rest its entitlement to a new trial on the Seventh Amendment right to an impartial jury."). Second, as we discuss below, Kirk maintains that *Ross'* requirement of showing jury impartiality should apply to statutory, as well as constitutional, claims of impairment of peremptory challenges.

*159 [11] In *Swain*, a black defendant raised a challenge to the prosecution's use of peremptory challenges to strike six black prospective jurors from the petit jury venire. The Supreme Court announced a general rule that "[t]he denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice." *Swain*, 380 U.S. at 219, 85 S.Ct. at 835 (citing *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136; *Harrison v. United States*, 163 U.S. 140, 16 S.Ct. 961; *Gulf, Colorado & Santa Fe Ry. Co. v. Shane*, 157 U.S. 348, 15 S.Ct. 641). In addition, the *Swain* Court held that striking black members of the petit jury venire does not violate the law, *id.* at 221, 85 S.Ct. at 836, a determination which has since been conclusively overruled in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *See Batson*, 476 U.S. at 89, 106 S.Ct. at 1719 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race...."). *Batson* removed a prosecutor's unbridled discretion to exercise peremptory challenges when the Equal Protection Clause is violated. However, *Batson* did not reach the situation where the Equal Protection Clause is not implicated. Indeed, *Batson* did not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                                    Page 15
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

overrule the portion of *Swain* which held that denial or impairment of a peremptory strike is per se reversible error. Stated differently, if the prosecutor does not exercise peremptory strikes on the basis of race,[FN11] an impairment of that statutory right to exercise peremptory challenges requires per se reversal.

> FN11. In recent years the Supreme Court has recognized additional circumstances under the Equal Protection Clause in which a trial judge may interfere with a party's exercise of peremptory strikes without the consequence of per se reversal. *See Powers v. Ohio,* 499 U.S. 400, 415, 111 S.Ct. 1364, 1373, 113 L.Ed.2d 411 (1991) (under Equal Protection Clause, prosecutor may not exercise peremptory strikes on the basis of race and criminal defendant may object to race-based exclusion of jurors effected through peremptory challenges whether or not defendant and excluded jurors share the same race); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 616, 111 S.Ct. 2077, 2080, 114 L.Ed.2d 660 (1991) (race-based exercise of a peremptory challenge by a private litigant in a civil lawsuit violates equal protection rights of the challenged jurors); *Georgia v. McCollum,* 505 U.S. 42, 59, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992) (Equal Protection Clause prohibits a criminal defendant from engaging in racial discrimination in the exercise of peremptory strikes); *J.E.B. v. Alabama ex. rel. T.B.,* 511 U.S. 127, ----, 114 S.Ct. 1419, 1422, 128 L.Ed.2d 89 (1994) (Equal Protection Clause forbids the exercise of peremptory challenges on the basis of gender as well as on the basis of race). Nevertheless, because the case before us does not involve any of these situations implicated by the Equal Protection Clause, a per se reversal would still be required under the dictates of *Swain.*

Notwithstanding the conclusion that the per se reversal requirement of *Swain* survives after *Batson,* Kirk contends that a more recent Supreme Court case, *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), abolished the per se reversal remedy in requiring the party seeking reversal to demonstrate that the jury actually seated was not impartial. In *Ross,* the petitioner argued that the failure of the trial court to strike a juror for cause and his subsequent "wasting" of a peremptory strike

resulted in a violation of his Sixth and Fourteenth Amendment right to an impartial jury, and his Fourteenth Amendment right to due process. *Ross,* 487 U.S. at 85, 108 S.Ct. at 2277. As an initial matter, the Supreme Court noted that none of the jurors who actually sat and decided the case were challenged for cause by defense counsel. *Id.* at 84, 108 S.Ct. at 2276. Additionally, there was nothing in the record to suggest that any juror who actually sat was not impartial. *Id.* at 86, 108 S.Ct. at 2277. Moreover, the Court observed that any claim that the jury was biased must focus not on the challenged juror who was removed via the exercise of a peremptory strike, but rather on the jurors who ultimately sat. *Id.* The Supreme Court held:

**\*160** [The defendant] was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the *constitutional* right to an impartial jury. We have long recognized that peremptory challenges are not of *constitutional* dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. We conclude that no violation of [the defendant's] [constitutional] right to an impartial jury occurred.

*Id.* at 88, 108 S.Ct. at 2278 (emphasis added) (citations and footnote omitted).

[12] In reaching the question of whether the defendant's Fourteenth Amendment right of due process was violated, the Court observed:
Because peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. As such, the "right" to peremptory challenges is "denied or impaired" only if the defendant does not receive that which state law provides.

*Id.* at 89, 108 S.Ct. at 2279 (citations omitted). Under Oklahoma law, a defendant who disagrees with a trial court's ruling on a challenge for cause is required to exercise a peremptory challenge to remove the juror, or else the defendant waives the right to object on appeal. *Id.* Further, reversal is mandated only if the party exercises all of its peremptory strikes and an incompetent juror sits on the jury. *Id.* Ultimately, the Court concluded, "[a]s required by Oklahoma law, [the defendant] exercised

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                                    Page 16
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
**(Cite as: 61 F.3d 147)**

one of his peremptory challenges to rectify the trial court's error.... But he received all that Oklahoma law allowed him, and therefore his due process challenge fails." *Id. at 91, 108 S.Ct. at 2279-80.* Thus, *Ross* holds that there is no *constitutional* violation mandating reversal unless a party can show that the jury was not impartial. *Ross* is not controlling, however, because Owens-Corning alleges a *statutory,* not a constitutional, injury.

Additionally, quite recently, we have spoken on this issue in a similar case. In *United States v. Rinska, 883 F.2d 262 (3d Cir.1989),* the defendant argued on direct appeal that his right to exercise a peremptory challenge was impaired, thus requiring a new trial. In that case, the defendant was granted an additional peremptory strike, but was later precluded from exercising this strike. The government argued that any error was harmless because a substantial right of the defendant was not affected, that is, the jury that ultimately sat was not impartial. We rejected the government's invitation to perform a harmless error analysis. Rather, we acknowledged that the right to peremptory challenges is a statutory, rather than a constitutional privilege, and that peremptory challenges may be " 'withheld altogether *without impairing the constitutional guaranties* of an "impartial jury" and a fair trial.' " *Id. at 268* (quoting *Frazier v. United States, 335 U.S. 497, 505 n. 11, 69 S.Ct. 201, 206 n. 11, 93 L.Ed. 187 (1948))* (emphasis added). We interpreted "the long line of Supreme Court authority that culminated with *Swain* to say that the denial or impairment of the right to peremptory challenges is reversible error *per se*." *Id.* (quoting *Swain* ) (citations omitted). Though we did not explicitly mention *Ross,* we think it clear that we were distinguishing the case at bar from those cases where a constitutional injury has been alleged. Thus, a showing of prejudice is not required to reverse a verdict after demonstrating that a statutorily-mandated, peremptory challenge was impaired. *See also* 9A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2483, at 124 (1995) ("The denial or impairment of the right [to peremptory challenges] is reversible error without a showing of specific prejudice.") (citing *Swain, 380 U.S. at 219, 85 S.Ct. at 835; Gulf, Colorado & Santa Fe Ry. Co. v. Shane, 157 U.S. 348, 15 S.Ct. 641, 39 L.Ed. 727 (1895); Carr v. Watts, 597 F.2d 830 (2d Cir.1979); Kiernan v. Van Schaik, 347 F.2d 775 (3d Cir.1965)).*

**\*161** We do not stand alone in holding that the denial or impairment of a peremptory strike requires per se reversal. In *United States v. Cambara, 902 F.2d 144*

(1st Cir.1990), the defendant argued that he was unfairly forced to expend a peremptory challenge to strike a juror who should have been excused for cause. *Id. at 147.* In that case, the defendant was entitled by statute to exercise ten [FN12] peremptory strikes and the district court awarded an additional two challenges for a total of twelve. The defendant had exhausted all twelve of his peremptory challenges, but he was not forced to expend one of the ten to which he was entitled under statute. Instead, he was forced to waste one of the two additional strikes. Although the Court of Appeals for the First Circuit held that impairment of an *additional* peremptory challenge does not violate any rights of the defendant, the court recognized that "restricting a defendant's use of the lawful number of peremptory strikes is reversible error if a challenge for cause is erroneously denied." *Id. at 147-48* (citations omitted). *See also Carr v. Watts, 597 F.2d 830, 833 (2d Cir.1979)* (error in denying challenge for cause that compels unnecessary use of peremptories is reversible error); *United States v. Rucker, 557 F.2d 1046, 1049 (4th Cir.1977)* (erroneous refusal to excuse a juror for cause constitutes reversible error despite defendant's use of peremptory challenge where district court's error reduced number of peremptory challenges); *United States v. Nell, 526 F.2d 1223, 1229 (5th Cir.1976)* (same) (citing *Swain* ).[FN11]

> FN12. Pursuant to Rule 24 of the Federal Rules of Criminal Procedure, "[i]f the offense charged is punishable by imprisonment for more than one year ... the defendant [is entitled] to 10 peremptory challenges." Fed.R.Crim.P. 24(b).

> FN13. As in the case at bar, the party in *Carr* argued that the district court impermissibly impaired its statutory right under 28 U.S.C. § 1870 to the exercise of three peremptory challenges. *Id.* at 831.

> FN14. We acknowledge that some of these cases were decided prior to *Ross.* However, because *Ross* is distinguishable, we believe that reliance on pre-*Ross* cases is not inappropriate.

Furthermore, some post-*Ross* cases from other courts of appeals, while not concluding that a per se reversal is mandated, have recognized that *Ross* only speaks to constitutional challenges and does not necessarily control non-constitutional or statutory errors. In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*United States v. Beasley*, 48 F.3d 262 (7th Cir.1995), the district court refused to remove three challenged jurors for cause, whereupon the defendant exercised two of his ten remaining statutorily-mandated peremptory strikes to remove two of the jurors. The defendant then objected to the seating of the third juror. The Court of Appeals for the Seventh Circuit ultimately concluded that the district court did not abuse its discretion in failing to strike the three jurors for cause. However, the *Beasley* court did note that because the peremptory strikes were designated as a matter of federal law, it could be argued that a district court's erroneous refusal to strike a juror for cause would deprive the defendant of a statutory peremptory challenge. *Id.* at 268 n. 5. Additionally, in *United States v. Munoz*, 15 F.3d 395 (5th Cir.), *cert. denied*, 511 U.S. 1134, 114 S.Ct. 2149, 128 L.Ed.2d 876 (1994), the district court refused to remove a juror who was challenged for cause, thus requiring the defendant to exercise a peremptory strike. Although concluding that the district court did not abuse its discretion, the Court of Appeals for the Fifth Circuit observed that *Ross* applied constitutional standards in reviewing a state criminal conviction. It expressed doubt as to whether *Ross* controls a case on direct appeal and further noted that reversal may be proper even though the error alleged at trial was not of constitutional magnitude. *Id.* at 398, n. 1. The *Munoz* court continued, "[w]hile peremptory challenges ... may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal." *Id.*

[13] Kirk argues that all other courts of appeals that have addressed the *constitutional* implications of the use of peremptory challenges, whether raised in habeas corpus proceedings [FN15] or in direct criminal *162 appeals, [FN16] have limited their inquiry and review to the impartiality of the jury selected. We agree that all courts subsequent to *Ross* have correctly required a showing of prejudice in response to an alleged constitutional error before concluding that reversal is warranted. However, Kirk has failed to point to a single case from any court of appeals that recognizes the distinction between constitutional and statutory violations, and holds that *Ross* requires a showing of prejudice for a statutory violation.[FN17] For the reasons stated above, we find *Ross* and other cases dealing with alleged constitutional errors to be distinguishable from the case at bar.

FN15. The habeas corpus cases are distinguishable because a federal court may

overturn a state judgment only for constitutional violations. *See Collins v. Collins*, 998 F.2d 269, 277 (5th Cir.1993) (requires a showing of prejudice when alleging due process violation); *Bannister v. Armontrout*, 4 F.3d 1434, 1443 (8th Cir.1993) (citing *Ross* for proposition that one must show prejudice when alleging a Sixth Amendment violation), *cert. denied*, 513 U.S. 960, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994); *Heath v. Jones*, 941 F.2d 1126, 1132-33 (11th Cir.1991) (in order to prevail on claim of denial of fair and impartial jury, one must show prejudice), *cert. denied*, 502 U.S. 1077, 112 S.Ct. 981, 117 L.Ed.2d 144 (1992); *Gaskins v. McKellar*, 916 F.2d 941, 948-49 (4th Cir.1990) (citing *Ross* for proposition that one must demonstrate prejudice when alleging a Sixth Amendment violation), *cert. denied*, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991).

FN16. These cases fail to recognize the key distinction between violation of the constitutional right to an impartial jury and the deprivation of the federal statutory right to peremptory challenges. *See United States v. Alexander*, 48 F.3d 1477, 1483-84 (9th Cir.1995) (citing *Ross* for proposition that one must show prejudice in order to prevail on a Sixth Amendment claim); *United States v. Mendoza-Burciaga*, 981 F.2d 192, 197-98 (5th Cir.1992) (no constitutional error absent a showing of prejudice), *cert. denied*, 510 U.S. 936, 114 S.Ct. 356, 126 L.Ed.2d 320 (1993); *United States v. Farmer*, 923 F.2d 1557, 1565 (11th Cir.1991) (same).

FN17. Although Kirk cites *Kotler v. American Tobacco Co.*, 926 F.2d 1217 (1st Cir.1990), *vacated on other grounds*, 505 U.S. 1215, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992), *reaffirmed*, 981 F.2d 7 (1st Cir.1992), for the proposition that one must first show prejudice in the context of a statutory violation, *Kotler* does not stand for that proposition. In that case, the court held that absent a showing that a peremptory strike was *impaired or denied*, no reversal is mandated. *Id.* at 1226-27. We have recognized a similar requirement, *see supra* part II.B.2, that is, before one may receive the *remedy* of reversal, one must first prove that the right to exercise peremptory strikes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                                                                                      Page 18
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

has been denied or impaired.

Additionally, Kirk cites *United States v. McIntyre*, 997 F.2d 687, 698 n. 7 (10th Cir.1993), *cert. denied*, 510 U.S. 1063, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994), for the proposition that a non-constitutional or statutory violation only requires a harmless error analysis, and not per se reversal. In that case, the court held that the district court did not abuse its discretion in failing to excuse the juror for cause. *Id.* at 698. In dicta, the court noted that even if the district court had erroneously denied the challenge for cause, no reversal was required because the defendant had failed to show that the jury was impartial. *Id.* at 698 n. 7. To the extent that this dicta is in tension with our resolution of this matter, we reject this argument.

Although Kirk did not bring it to our attention, we are aware of a recent case from the Court of Appeals for the Ninth Circuit that is at odds with our decision today. In *United States v. Annigoni*, 57 F.3d 739 (9th Cir.1995), the defendant attempted to exercise a peremptory strike against an Asian male, and the district court denied the strike based on *Georgia v. McCollum*, 505 U.S. 42, 55, 112 S.Ct. 2348, 2357, 120 L.Ed.2d 33 (1992). The court concluded that the district court erred in disallowing the peremptory strike, because there was an insufficient factual basis from which to conclude that the strike had been motivated by racial prejudice. *Annigoni*, 57 F.3d at 742. Turning to the remedy for such an erroneous denial of a peremptory strike, the court, in part relying on *Ross*, concluded that a "harmless error" analysis rather than per se reversal was mandated. We respectfully disagree with that decision. Because *Ross* does not control the case of a statutory violation, any reliance on *Ross* in this context is misplaced.

Finally, Kirk argues that even if the requirement imposed by *Ross* of showing jury bias only applies to constitutional claims, its logic should nonetheless be extended to any statutory impairment claim, that is, a party should always be required to show that the jury that actually sat was biased. We decline to extend *Ross* in the absence of further guidance from the Supreme Court. We hold that the remedy for impairment or denial of the statutory right to exercise peremptory challenges is per se reversal without any requirement of proving prejudice.

### III. Prior Testimony of Out of Court Witness

During the liability phase of the trial, Owens-Corning offered the expert testimony of Dr. Harry Demopoulos to prove that the overwhelming majority of asbestos-induced mesotheliomas are caused by crocidolite asbestos fiber. This testimony supported Owens-Corning's **\*163** defense that its product, Kaylo, which did not contain crocidolite fiber, could not have caused the decedent's mesothelioma. Over Owens-Corning's objection, Kirk was permitted to read to the jury the prior trial testimony of Dr. Louis Burgher from an unrelated New Jersey State Court asbestos action in 1992. In that case, Dr. Burgher had been an expert witness for Owens-Corning and testified on cross-examination that it was possible for mesothelioma to be caused by chrysotile fibers contaminated with tremolite. Kirk was clearly attempting to discredit Owens-Corning's defense offered through Dr. Demopoulos by revealing to the jury that Owens-Corning's expert witness in a previous case voiced a different and contradictory opinion as to which asbestos fibers cause mesothelioma. After the jury returned a verdict in favor of Kirk, Owens-Corning made a post-trial motion for a new trial based in part on the alleged admission of hearsay evidence, i.e., the prior testimony of Dr. Burgher in an unrelated case. The district court denied this motion.

[14] Normally, when a new trial is sought by reason of a district court's alleged error in allowing the introduction of evidence, we review for abuse of discretion. *Lippay v. Christos*, 996 F.2d 1490, 1496 (3d Cir.1993) (citing *Link v. Mercedes-Benz*, 788 F.2d 918, 921-22 (3d Cir.1986)). However, where as here the ruling on admissibility of hearsay evidence implicates the application of a legally set standard, our review is plenary. *Id.; see also United States v. McGlory*, 968 F.2d 309, 332 (3d Cir.1992).

Owens-Corning argues that the district court erred in allowing the jury to hear this evidence in light of the fact that it was hearsay. Although the record is at best vague as to what the district court's basis was for allowing such testimony, Kirk attempts to justify its admission under two distinct theories-either the testimony was not hearsay pursuant to Rule 801(d)(2)(C) of the Federal Rules of Evidence or it was hearsay, but subject to an exception pursuant to Rule 804(b)(1).[FN8]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

FN18. Alternatively, Kirk argues that assuming *arguendo* it was error to admit the testimony of Dr. Burgher, it was harmless error because the weight of the medical testimony of Kirk's other witnesses was overwhelming. In light of our decision to remand for a new trial because the jury was improperly constituted, we need not address whether any evidentiary errors may be harmless.

### A. Rule 801(d)(2)(C) of the Federal Rules of Evidence

Kirk first attempts to justify the district court's admission of the prior trial testimony of Dr. Burgher by arguing it is an admission by a party opponent since it is a statement by a person authorized by Owens-Corning to speak concerning mesothelioma and is thus not hearsay. *See* Fed.R.Evid. 801(d)(2)(C); [FN19] *see also Precision Piping v. E.I. du Pont de Nemours,* 951 F.2d 613, 619 (4th Cir.1991) (authority in the context of 801(d)(2)(C) means "authority to speak" on a particular subject on behalf of someone else). In her brief, Kirk argues that Dr. Burgher was authorized by Owens-Corning to offer his expert opinion about medical literature regarding mesothelioma and fiber type. Appellee's Brief at 21. At oral argument, Kirk suggested that the testimony of any expert that Owens-Corning has previously used in a trial can be used in future litigation against it as an authorized admission.

FN19. Rule 801(d) of the Federal Rules of Evidence states in relevant part:
(d) Statements which are not hearsay. A statement is not hearsay if–
(2) Admission by party-opponent. The statement is offered against a party and is ...
(C) a statement by a person *authorized by the party* to make a statement concerning the subject.
Fed.R.Evid. 801(d)(2)(C) (emphasis added).

In support of this proposition, Kirk cites *Collins v. Wayne Corp.,* 621 F.2d 777, 782 (5th Cir.1980), which held that **deposition** testimony of an expert employed by a bus manufacturer to investigate an accident was an admission under 801(d)(2)(C). However, in that case the court made a finding that the expert witness was an agent of the defendant and the defendant employed the expert to investigate and analyze the bus accident. *Id.* The court determined

that in giving his **deposition**, the expert was performing the function that the manufacturer had employed him *164 to perform. As such, the court concluded that the expert's report of his investigation and his **deposition** testimony in which he explained his analysis and investigation was an admission of the defendant. *Id.; see also Theriot v. J. Ray McDermott & Co., Inc.,* 742 F.2d 877, 882 (5th Cir.1984) (citing *Collins v. Wayne Corp.,* 621 F.2d 777, 781-82 (5th Cir.1980)) (explaining that *Collins* holds that "an agent's statement, made within the scope of his authority ... is admissible against the principal as an admission").

[15][16] Kirk misconstrues the entire premise of calling expert witnesses. In theory, despite the fact that one party retained and paid for the services of an expert witness, expert witnesses are supposed to testify impartially in the sphere of their expertise. Thus, one can call an expert witness even if one disagrees with the testimony of the expert. Rule 801(d)(2)(C) requires that the declarant be an agent of the party-opponent against whom the admission is offered, and this precludes the admission of the prior testimony of an expert witness where, as normally will be the case, the expert has not agreed to be subject to the client's control in giving his or her testimony. *See Sabel v. Mead Johnson & Co.,* 737 F.Supp. 135, 138 (D.Mass.1990). Since an expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness cannot be deemed an agent. *See Restatement (Second) of Agency* § 1 cmt. a (1958) ("The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act.").

[17][18] Because an expert witness is charged with the duty of giving *his or her* expert *opinion* regarding the matter before the court, we fail to comprehend how an expert witness, who is not an agent of the party who called him, can be authorized to make an admission for that party. [FN20] *See Michael H. Graham, Federal Practice and Procedure: Evidence* § 6722, at 502 (Interim Edition 1992) (the authority of the agent to speak as to a subject must be established at trial). We are unwilling to adopt the proposition that the testimony of an expert witness who is called to testify on behalf of a party in one case can later be used against that same party in unrelated litigation, unless there is a finding that the expert witness is an agent of the party and is authorized to speak on behalf of that party.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 171

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
**(Cite as: 61 F.3d 147)**

Page 20

Accordingly, we find Dr. Burgher's prior trial testimony to be hearsay in the context of the present trial.

> FN20. In the case before us, unlike *Collins,* there was no explicit finding on the record that Dr. Burgher was an agent of the defendant. To the extent that *Collins* holds that an expert witness who is hired to testify on behalf of a party is automatically an agent of that party who called him and consequently his testimony can be admitted as non-hearsay in future proceedings, we reject this rule.

### B. Rule 804(b)(1) of the Federal Rules of Evidence

Because the testimony of Dr. Burgher is hearsay, we must next inquire whether it falls within any of the hearsay exceptions enumerated in the Federal Rules of Evidence. Kirk argues that Dr. Burgher's testimony falls within the former testimony hearsay exception of Rule 804(b)(1). In order for former testimony to be admissible as an exception to the hearsay rule: (1) the declarant must be **unavailable**; (2) testimony must be taken at a hearing, **deposition**, or civil action or proceeding; and (3) the party against whom the testimony is now offered must have had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. *See* Fed.R.Evid. 804(a)(5), (b)(1).[FN21] Because Dr. Burgher testified*165 in open court during the state court action, no one disputes that the second element has been satisfied.

> FN21. Rule 804 of the Federal Rules of Evidence states in relevant part:
> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is **unavailable** as a witness:
> (1) Former testimony. Testimony given as a witness at another hearing of the same or different proceeding, or in a **deposition** taken in compliance with law in the course of the same or another proceeding, *if the party against whom the testimony is now offered,* or, in a civil action or proceeding, a predecessor in interest, *had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.*
> Fed.R.Evid. 804(b)(1) (emphasis supplied).
> "Unavailability" is defined in Rule 804 as follows:

> (a) Definition of **unavailability.** "**Unavailability** as a witness" includes situations in which the declarant-
> (5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance ... *by process or other reasonable means.*
> Fed.R.Evid. 804(a)(5) (emphasis supplied).

[19][20] Regarding the first element, we note that it is an abuse of discretion for a district court to admit former testimony into evidence under Rule 804(b)(1) without a finding of **unavailability.** *See O'Banion v. Owens-Corning Fiberglas Corp.,* 968 F.2d 1011, 1014 (10th Cir.1992) (district court abused its discretion in admitting former testimony of expert where there was no showing of **unavailability**). Because there was no finding on the record as to **unavailability,** if the district court based admitting this testimony on Rule 804(b)(1), we hold that the district court abused its discretion in allowing this former testimony into evidence.

Normally, our inquiry would end here after determining that former testimony cannot be admitted absent specific findings of **unavailability.** However, because of the likelihood that an offer may be made during the retrial of this matter to admit this testimony as former testimony, we believe further discussion is warranted.

[21][22] We observe that it is the proponent of the statement offered under Rule 804 who bears the burden of proving the **unavailability** of the declarant. *United States v. Eufracio-Torres,* 890 F.2d 266, 269 (10th Cir.1989), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990) (citing *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597 (1980); 2 John William Strong et al., *McCormick on Evidence* § 253, at 134 (4th ed. 1992) ("The proponent of the hearsay statement must ... show that the witness cannot be found"). We can find nothing in the record that indicates any "reasonable means" employed by Kirk to procure the services of Dr. Burgher so that he might testify at trial. *See McCormick* § 253, at 134 (mere absence of the declarant, standing alone, does not establish **unavailability**); *see also Moore v. Mississippi Valley State University,* 871 F.2d 545, 552 (5th Cir.1989) (**deposition** inadmissible in civil trial where no evidence to establish **unavailability** offered).

Kirk claims that Dr. Burgher, who is a resident of Nebraska, was beyond her ability to subpoena and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 172

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

Page 21

was thus **unavailable**. *See* Fed.R.Civ.P. 45(c)(3)(A)(ii).[FN22] However, Kirk made no independent attempt to contact Dr. Burgher, offer him his usual expert witness fee, and request his attendance at trial.[FN23] Because Dr. Burgher was never even as much as contacted, Kirk has failed to prove that she used "reasonable means" to enlist his services.

> FN22. Rule 45 of the Federal Rules of Civil Procedure states in relevant part:
> (c) Protection of Persons Subject to Subpoenas.
> (3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it-
> (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person....
> Fed.R.Civ.P. 45(c)(3)(A)(ii).

> FN23. At oral argument, Kirk argued that it was the responsibility of Owens-Corning to locate and contact Dr. Burgher and establish his availability because the district court requested Owens-Corning to determine whether he would be available to testify. To the extent that the district court placed the burden on Owens-Corning to establish the **unavailability** of Dr. Burgher, the district court made an error of law in shifting the burden of proof. Kirk then articulated what we term a "convenience" argument, that is, she argued that Dr. Burgher was Owens-Corning's expert and Owens-Corning was in a better position to locate Dr. Burgher because it had Dr. Burgher's telephone number. To the extent that Kirk is advocating that Owens-Corning should undertake the task of locating a witness for Kirk so that she may use that testimony against Owens-Corning, we reject any such notion. For the same reasons we protect an attorney's work product from discovery, *see* Fed.R.Civ.P. 26(b)(3); *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 394, 91 L.Ed. 451 (1947) ("Inefficiency, unfairness, and sharp practices would inevitably develop.... The effect on the legal system would be demoralizing. And the interests of the clients and the cause of justice would be poorly served."), we do not believe that

Owens-Corning had any duty to assist Kirk in preparing her case.

**\*166** We next address whether Owens-Corning had an opportunity and similar motive to develop the testimony of Dr. Burgher at the prior unrelated state court trial.[FN24] The similarity of motive requirement assures "that the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do at trial if the witness were available to be examined by that party." *United States v. Salerno,* 937 F.2d 797, 806 (2d Cir.1991); *see also* 2 Steven A. Saltzburg & Michael M. Martin, *Federal Rules of Evidence Manual* 400 (5th ed. 1990) ("The way to determine whether or not motives are similar is to look at the similarity of the issues and the context in which the opportunity for examination previously arose.").

> FN24. Again, although we need not reach this issue absent a finding of **unavailability**, because of the likelihood that an offer may be made during the retrial to admit this evidence as former testimony, we believe further discussion is warranted.

[23] There was no finding by the district court that Owens-Corning had an opportunity and similar motive to examine Dr. Burgher. Further, during oral argument, counsel for Kirk indicated that the only document before the district court from the state court trial was the transcript of Dr. Burgher's testimony. The district court did not have the complaint, answer, or jury charge from the state court proceedings. Thus, even if the district court had attempted to make a finding as to opportunity and similar motive, it would have been unable to reach a well-reasoned conclusion based on the information before the district court.[FN25] *See* McCormick § 304, at 317 (courts must look to the operative issue in the earlier proceeding). Accordingly, we must conclude that Kirk failed to prove that Owens-Corning had an opportunity and similar motive to examine Dr. Burgher.

> FN25. For instance, the statement elicited from Dr. Burgher during cross-examination at the state trial may not have warranted redirect by Owens-Corning in light of its theory of defense. *See* McCormick § 302, at 307 ("Circumstances may differ sufficiently between the prior hearing and the present trial to bar admission ... as where

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

                                                              Page 22

questions on a particular subject would have been largely irrelevant at the earlier proceeding."). Because we do not have the pleadings, we cannot determine whether an opportunity and similar motive existed.

### IV. Introduction of Interrogatory of Settled Co-Defendant

Kirk settled the instant action with Garlock and several other defendants prior to trial. At trial, Owens-Corning sought in its cross-claim to prove that the decedent was exposed to products made by Garlock. If the jury were to conclude that the decedent's injuries had been caused in whole or part by exposure to Garlock products, then Owens-Corning could eliminate or substantially reduce its liability. Conversely, it was in Kirk's financial interest to prove that the decedent was exposed to only Owens-Corning products. In an effort to rebut the testimony of an Owens-Corning witness who testified that Garlock gaskets were present in the New York shipyard during the years that the decedent worked there, Kirk read into evidence an interrogatory response which was prepared and filed by Garlock in defense of this action. Of course, at the time this interrogatory was read to the jury, Garlock was no longer a party to this lawsuit. Specifically, counsel for Kirk read the following statement to the jury:

Since Garlock products are bonded and/or encapsulated and treated in such a manner that they do not, when used in the manner for which they were intended, emit meaningful levels of asbestos dust and fibers, no restrictions or limitations on use are necessary.

App. at 513. In response to Owens-Corning's closing remarks, counsel for Kirk reminded the jury:I read you from the Garlock interrogatory, Garlock product is bonded, encapsulated, it does not emit dust.

App. at 545.

Owens-Corning argues that the district court erred in admitting this interrogatory response because the interrogatory answer was pure hearsay. Kirk attempts to justify the admission of this interrogatory response *167 under the catch-all or residual exception, Rule 803(24) of the Federal Rules of Evidence.[FN26] As stated previously, our standard of review is plenary where the admissibility of hearsay evidence "implicates the application of a legally set standard." See supra part III.

FN26. Rule 803 of the Federal Rules of Evidence states in relevant part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having *equivalent circumstantial guarantees of trustworthiness*, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed.R.Evid. 803(24) (emphasis added).

[24][25][26] As a preliminary matter, we note that the plain language of the rule requires the proponent of the hearsay statement to put the adverse party on notice that the proponent intends to introduce the statement into evidence. We have interpreted this to mean that the proponent must give notice of the hearsay statement itself as well as the proponent's intention specifically to rely on the rule as a grounds for admissibility of the hearsay statement. United States v. Pelullo, 964 F.2d 193, 202 (3d Cir.1992) (citing United States v. Furst, 886 F.2d 558, 574 (3d Cir.1989)). Even assuming *arguendo* that Owens-Corning was on notice that Kirk intended to introduce this evidence at trial, we observe from the record that Kirk never gave notice to Owens-Corning that she intended to introduce this evidence under Rule 803(24). App. at 512. We recognize that the advance notice requirement of Rule 803(24) can be met where the proponent of the evidence is without fault in failing to notify his adversary and the trial judge has offered sufficient time, by means of granting a continuance, for the opponent to prepare to contest its admission. See United States v. Bailey,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

581 F.2d 341, 348 (3d Cir.1978)) (the purposes of the rule and the requirement of fairness are satisfied under such circumstances). Because of the lack of notice by Kirk that she intended to rely on Rule 803(24) and the lack of a showing by Kirk as to why it was not possible to provide Owens-Corning with notice, the district court erred in admitting this evidence at trial.

[27][28] Turning to the substance of the rule itself, we note that in order for the hearsay statement to be admitted, it must have "equivalent circumstantial guarantees of trustworthiness." Fed.R.Evid. 803(24); see also Michael H. Graham, Federal Practice and Procedure: Evidence § 6775, at 737-39 (Interim Edition 1992) (factors bearing on trustworthiness include the declarant's partiality, i.e., interest or bias). Owens-Corning argues that the interrogatories of Garlock lack trustworthiness and are self-serving. Kirk submits that the interrogatory answers are trustworthy because they are signed and sworn under penalty of perjury.[FN27] We find that an interrogatory response of a co-defendant who is seeking to avoid liability lacks the "circumstantial guarantees of trustworthiness" that are contemplated by Rule 803(24) of the Federal Rules of Evidence. Garlock had every incentive to set forth the facts in a light most favorable to itself, while at the same time still answering the interrogatories truthfully. See United States v. DeLuca, 692 F.2d 1277, 1285 (9th Cir.1982) (excluding statement under residual hearsay exception because of motive to exculpate oneself*168 after indictment or investigation). Using these interrogatory responses to prove that Garlock products could not have caused the decedent's illness without the opportunity for cross-examination implicates many of the dangers the hearsay rule is designed to prevent. Accordingly, the district court erred in admitting this evidence.

FN27. There is nothing in the record to indicate that the district court made any findings as to the reliability of the Garlock interrogatories. See United States v. Chu Kong Yin, 935 F.2d 990, 1000 (9th Cir.1991) (requiring specific findings regarding the requisite elements of Rule 803(24)); United States v. Tofollo-Cardenas, 897 F.2d 976, 980 (9th Cir.1990) (district court must find that the statements met the requirements of the rule in order for the appellate court to consider the admissibility of the statement under 803(24)).

### V. Delay Damages

Finally, Owens-Corning argues that it was improper as a matter of law for the district court to award delay damages to the plaintiff pursuant to Rule 238 of the Pennsylvania Rules of Civil Procedure because it is a procedural rule and should not be applied by federal courts sitting in diversity. Owens-Corning argues in the alternative that even if it is permissible for a federal court sitting in diversity to award delay damages pursuant to Rule 238, it was improper here because: (1) the entire delay was caused by the plaintiff's strategic decision to file simultaneous federal and state court actions and her failure to request a remand of the federal action from the multidistrict docket when settlement negotiations reached an impasse and (2) the district court miscalculated the damage award in failing to account for a delay of approximately two years that was caused by a judicial stay imposed by the Panel on Multidistrict Litigation. Owens-Corning maintains that because it was not responsible for the delay, it should not be required to pay delay damages for that period.

### A. Rule 238 of the Pennsylvania Rules of Civil Procedure-Substantive or Procedural?

[29] First, we must address Owens-Corning's argument that a federal court sitting in diversity cannot apply Rule 238 of the Pennsylvania Rules of Civil Procedure because it is a procedural rather than a substantive rule. Yet, ultimately, Owens-Corning concedes, as it must, that this question has already been decided by this Court in Fauber v. KEM Transportation and Equipment Co., 876 F.2d 327 (3d Cir.1989). In that case, we held that Rule 238 is substantive and must be followed by federal courts sitting in diversity cases. Id. at 328. Counsel is thus implicitly asking this panel to overrule Fauber. We note that this Court's Internal Operating Procedures prohibit a panel of this Court from overruling a published opinion of a previous panel. See Internal Operating Procedure Rule 9.1 ("[T]he holding of a panel in a reported opinion is binding on subsequent panels."). Because we are bound by Fauber, and in any event do not question its wisdom, we reiterate that it is proper for a federal district court sitting in diversity to award delay damages to a plaintiff under Rule 238 of the Pennsylvania Rules of Civil Procedure.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147                                                          Page 24
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

### B. Did Plaintiff Cause Delay?

Second, Owens-Corning maintains that Kirk was responsible for the delay because she filed simultaneous federal and state court actions and additionally failed to make an application to remand the federal action from the multidistrict docket when settlement negotiations proved fruitless.

[30] Our review of the applicability of Rule 238 in a diversity case is plenary. *Fauber,* 876 F.2d at 329. Rule 238 of the Pennsylvania Rules of Civil Procedure states in relevant part:
(a)(1) At the request of the plaintiff in a civil action seeking monetary relief for ... death[,] ... damages for delay shall be added to the amount of compensatory damages awarded against each defendant ... found to be liable to the plaintiff in the verdict of a jury....
(2) Damages for delay shall be awarded for the period of time
(i) in an action commenced before August 1, 1989, from the date the plaintiff first filed a complaint or from a date one year after the accrual of the cause of action, whichever is later, up to the date of the ... verdict....
(3) Damages for delay shall be calculated at the rate equal to the prime rate as listed in the first edition of the Wall Street Journal published for each calendar year for which the damages are awarded, plus one percent, not compounded.
**\*169** (b) The period of time for which damages for delay shall be calculated under subdivision (a)(2) *shall exclude the period of time,* if any,
(1) *after which the defendant has made a written offer of*
(i) settlement in a specified sum with prompt cash payment to the plaintiff, or
(ii) a structured settlement underwritten by a financially responsible entity, and continued that offer in effect for at least ninety days or until commencement of trial, whichever first occurs, which offer was not accepted and the plaintiff did not recover by award, verdict or decision, exclusive of damages for delay, more than 125 percent of either the specified sum or the actual cost of the structured settlement plus any cash payment to the plaintiff; or
(2) *during which the plaintiff caused delay of the trial.*

Pa.R.Civ.P. 238 (1988) (emphasis added).

According to the plain language of the rule, a defendant must pay delay damages unless the delay falls within the excludable time as set forth in the rule. Owens-Corning concedes that it did not make a settlement offer which would satisfy the rule. Thus, the only other way for the defendant to be relieved from paying delay damages would be if the plaintiff caused the delay.

[31][32] According to Owens-Corning, but for the plaintiff's strategic decision to file a federal asbestos action, the matter could have been resolved long ago in state court. Here, Kirk would have been forced to abandon her remedy in federal court and seek relief only in the state forum. To adopt the rule of law as advocated by Owens-Corning, we would be required to hold that delay is per se attributable to a plaintiff anytime a plaintiff files a diversity action in federal court when a suitable state forum exists. Nothing in Rule 238 contemplates that a plaintiff must forgo any rights in order to be entitled to delay damages, and we are unwilling to adopt such a proposition.

In support of its argument that Kirk was responsible for the delay in failing to request a remand from the multidistrict docket, Owens-Corning relies on *Babich v. Pittsburgh & New England Trucking Co.,* 386 Pa.Super. 482, 563 A.2d 168 (1989). In that case, the plaintiff's motion for delay damages pursuant to Rule 238 was denied by the trial court and plaintiff appealed. *Babich,* 386 Pa.Super. at 487, 563 A.2d at 171. In assessing who was responsible for the almost seven year delay between the commencement of suit and the jury verdict, the court observed:
[T]he chief reasons for delay in this case cannot be attributed to defendants. [One of the defendants] filed a Chapter 11 bankruptcy in federal court six months after [plaintiff's] complaint was filed and [plaintiff] did not successfully obtain relief from the automatic stay until approximately two years and four months later despite cooperation from counsel for the bankruptcy and counsel for the insurance company. The other primary delay in the case was [plaintiff's] failure to place the case at issue in a speedy fashion. [Plaintiff] fails to point to any delay attributable to defendants and we find none upon review of the record.

*Babich,* 386 Pa.Super. at 487, 563 A.2d at 171.

Owens-Corning argues that because Kirk did not seek a remand from the multidistrict docket, she failed to obtain relief from the MDL stay just as the plaintiff in *Babich* failed to obtain relief from the automatic stay. Owens-Corning's reliance on *Babich* is misplaced. In that case plaintiff could have sought relief and moved the trial along, because opposing counsel was cooperating with and assisting counsel. Here, however, according to Judge Weiner's Pretrial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

61 F.3d 147
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701
(Cite as: 61 F.3d 147)

Order, the case could be remanded for trial only if there was a finding that the defendant was acting in bad faith during the settlement negotiations. To the extent that Owens-Corning is found to have acted in bad faith, this would militate against a finding that delay was caused by the plaintiff.

### C. Is Delay Not Caused By The Defendant Excludable?

Third, Owens-Corning argues that because the delay was caused by the MDL Order, it *170 offends traditional notions of fair play and due process to make a defendant pay for another's delay. Owens-Corning asks that the award of delay damages be recalculated and further maintains that it is unconstitutional to impose delay damages on it for this time period because it was never acting in bad faith and the delay was caused by the court. Were we to adopt the rule of law as articulated by Owens-Corning, we would have to redraft Rule 238(b)(2) to state "during which *the defendant* did *not* cause the delay of the trial," instead of "during which the plaintiff caused delay of the trial." We are not so inclined and we find that the plaintiff caused no delay of the trial.

[33] Owens-Corning also argues that notwithstanding the language of the rule, requiring it to pay for delay caused by the judiciary is a violation of due process. Owens-Corning fails to comprehend the theory underlying Rule 238. Delay damages merely compensate a plaintiff for money that he or she would have earned on the award if he or she had promptly received it. *Costa v. Lauderdale Beach Hotel,* 534 Pa. 154, 160, 626 A.2d 566, 569 (1993). The rule also functions to prevent a defendant from being unjustly enriched by keeping interest that could be earned during the litigation process on what is essentially the plaintiff's money. *Id.* n. 6. We find no merit to Owens-Corning's argument that delay damages violate due process in this instance. Accordingly, we find no error in the district court's decision to award delay damages to the plaintiff.

### VI. Conclusion

The refusal to remove two jurors who were challenged for cause was an abuse of discretion. Because the defendant was required to waste two of its peremptory strikes in order to remedy this error, a per se reversal is required. Allowing into evidence the prior testimony of a witness in an unrelated state

court trial was error, as was permitting the introduction into evidence of an answer to an interrogatory by a settled co-defendant. Accordingly, we will reverse the judgment of the district court and remand the matter to the district court for a new trial. Costs taxed against Kirk.

C.A.3 (Pa.),1995.
Kirk v. Raymark Industries, Inc.
61 F.3d 147, 42 Fed. R. Evid. Serv. 883, 155 A.L.R. Fed. 701

Briefs and Other Related Documents (Back to top)

• 1994 WL 16012301 (Appellate Brief) Reply Brief of Appellant Owens-Corning Fiberglas Corporation (Nov. 15, 1994) Original Image of this Document (PDF)
• 1994 WL 16012299 (Appellate Brief) Brief of Appellee Sarah Kirk (Oct. 28, 1994) Original Image of this Document (PDF)
• 1994 WL 16012300 (Appellate Brief) Brief of Appellant Owens-Corning Fiberglas Corporation (Oct. 04, 1994) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.