Westlaw.

723 F.Supp. 1019                                          Page 1
723 F.Supp. 1019
(Cite as: 723 F.Supp. 1019)

c

United States District Court,D. Delaware.
Marion G. MASEMER, Individually and as
Executrix of the Estate of Frank E. Masemer,
deceased, Plaintiff,
v.
DELMARVA POWER & LIGHT COMPANY and
Intercontinental Chemical Services, Inc., Defendants.
**Civ. A. No. 87-54 JRR.**

July 31, 1989.

The widow of a worker who was killed in a work-site accident filed a wrongful death action against the owner of the premises on which the accident occurred and against the utility which operated an overhead power line that caused the worker's electrocution. The premises owner filed a motion to determine the admissibility of Occupational Safety and Health Administration reports, a citation, a notification of penalty, and the owner's payment of the fine. The District Court, Roth, J., held that: (1) the OSHA reports of the work-site accident prepared on the day after the accident were sufficiently trustworthy to be admissible over a hearsay objection as public records; (2) those portions of the reports that contain subsequent remedial measures were not admissible; (3) the OSHA citation and notification of penalty were admissible; and (4) evidence that the premises owner paid the OSHA fine was inadmissible as an offer of compromise, especially in light of the relatively small size of the fine and the possible costs the premises owner would incur if it were to contest the fine.

Ordered accordingly.

West Headnotes

**[1] Evidence 157 ☞318(4)**

157 Evidence
    157IX Hearsay
        157k315 Statements by Persons Other Than Parties or Witnesses
            157k318 Writings
                157k318(4) k. Reports. Most Cited Cases
Occupational Safety and Health Administration reports of work place accident, prepared on day after accident, were sufficiently trustworthy to be

admissible over hearsay exception in civil suit. Fed.Rules Evid.Rule 803(8)(C), 28 U.S.C.A.

**[2] Evidence 157 ☞219.25(1)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in General
            157k219.10 Subsequent Remedial Measures
                157k219.25 Establishing Negligence or Culpable Conduct
                    157k219.25(1) k. In General. Most Cited Cases
        (Formerly 157k140)
Occupational Safety and Health Administration report of investigation of workplace accident was not admissible insofar as report referred to subsequent remedial measures taken by premises owner. Fed.Rules Evid.Rule 407, 28 U.S.C.A.

**[3] Evidence 157 ☞219(3)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in General
            157k219 Acts or Conduct
                157k219(3) k. Compromise or Settlement. Most Cited Cases
Evidence rule barring evidence of offers of compromise did not apply to Occupational Safety and Health Administration citation or notification of penalty against owner of premises at which workplace accident occurred. Fed.Rules Evid.Rule 408, 28 U.S.C.A.

**[4] Evidence 157 ☞219(3)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in General
            157k219 Acts or Conduct
                157k219(3) k. Compromise or Settlement. Most Cited Cases
Fact that premises owner paid Occupational Safety and Health Administration fine was offer of compromise and was inadmissible in wrongful death action brought by worker's widow; although there was no clear evidence that owner disputed either

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

723 F.Supp. 1019
723 F.Supp. 1019
(Cite as: 723 F.Supp. 1019)

amount or validity of citation, it was reasonable for owner not to contest relatively small fine and pay it rather than spend what would have been substantially larger amount in order to avoid paying fine. Fed.Rules Evid.Rule 408, 28 U.S.C.A.

**\*1020** Alan T. Boyd and John H. Newcomer, of Bayard, Handleman & Murdoch, P.A., Wilmington, Del., for plaintiff.
John C. Phillips, Jr., of Phillips and Snyder, P.A., Wilmington, Del., for defendant Intercontinental Chemical Services, Inc.
Paul M. Lukoff, of Prickett, Jones, Elliot, Kristol & Schnee, Wilmington, Del., for defendant Delmarva Power & Light Co.

## MEMORANDUM OPINION

ROTH, District Judge.
This is an action for wrongful death brought by the plaintiff, Marion G. Masemer, individually and as executrix of her deceased husband's estate. The plaintiff contends that on March 19, 1985, the decedent, while delivering crushed limestone to the premises of defendant Intercontinental Chemical Services ("ICS"), backed the truck he was driving into a storage tank and damaged a feed pipe. The plaintiff alleges that, in an attempt to clear the blocked feed pipe, the decedent climbed a ladder to the top of the storage tank, while carrying a piece of pipe. The plaintiff further alleges that at some point the pipe came into contact with an overhead power line operated by defendant Delmarva Power & Light Company ("DP & L"), thereby electrocuting the plaintiff's decedent.

The plaintiff claims that the defendant ICS was negligent, careless, reckless, willful and wanton in violating the safety standards of the Occupational Health and Safety Administration ("OSHA"), 29 C.F.R. § 1910.303(h)(3)(iii). [FN1] Specifically, the plaintiff contends that there was less than the prescribed distance between the top of the tank and the power line.

> FN1. The federal OSHA standards have been adopted in their entirety by the State of Delaware Department of Labor. Therefore, a violation of the federal standard is also a violation of the state standard.

As a result of the decedent's accident, OSHA investigated the site and filed two reports. The first report pertains to David W. Hassler, Inc., the

decedent's employer. The second report covers defendant ICS. In addition, as a result of the investigation, OSHA cited ICS for a violation of its standards and issued a Notification of Penalty subsequent thereto. ICS paid the fine without formally contesting the amount or the fact of the violation. ICS has filed a Motion *in limine* to determine the admissibility of the OSHA reports, the OSHA citation, the OSHA notification of penalty, and its payment of the fine levied by OSHA. [FN2]

> FN2. The plaintiff has also per our instructions addressed the issue of whether a violation of an OSHA standard constitutes negligence *per se*. The defendant has failed to respond to the plaintiff's authority. Based on our own research, we find that the plaintiff's authority is controlling. Therefore, since jurisdiction in this case is based on diversity, requiring us to apply the law of Delaware, the forum state, *Erie RR Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we hold that if a violation of an OSHA standard is proven in this case, that constitutes negligence *per se*. *Carroll v. Getty Oil Co.*, 498 F.Supp. 409 (D.Del.1980); *Rabar v. E.I. du Pont de Nemours & Co.*, 415 A.2d 499, 505 (Del.Super.1980).

## DISCUSSION

[1] A. *The OSHA Reports.* Federal Rule of Evidence ("FRE") 801(c) prohibits the admission of hearsay at trial. FRE 803, however, lists numerous exceptions to the hearsay rule including an exception that allows the introduction into evidence of reports containing factual findings which are the result of "an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate a lack of trustworthiness." FRE 803(8)(C). Recently, in **\*1021** *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), the Supreme Court held that FRE 803 should not be read to bar the introduction of everything other than "facts." Instead, the Court held the Rule did not preclude the introduction of opinions or conclusions contained in such reports as long as two criteria were met. First, all statements in a report that a party seeks to have admitted must be based on factual investigation. *Id.* 109 S.Ct. at 449. Second, any part of a report that is to be admitted must be sufficiently trustworthy. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

723 F.Supp. 1019
723 F.Supp. 1019
**(Cite as: 723 F.Supp. 1019)**

Page 3

Determining whether a report is trustworthy can be troublesome, however. The Supreme Court in _Beech Aircraft_ cited with approval four non-exhaustive factors proposed by the Advisory Committee to aid in the resolution of this question: "(1) the timeliness of the investigation; (2) the investigator's skill and experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." _Id._ 109 S.Ct. at 449 n. 11 (citing Advisory Committee's Notes on Fed.R.Evid. 803(8), 28 U.S.C.App. p. 725). The Court also noted that perhaps the strongest safeguard against introduction of conclusions in reports is "the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions." _Id._ 109 S.Ct. at 449.

Finally, the Advisory Committee's Comments to the Rule indicate that reports are to be presumed to be admissible in the first instance. Only when there are "sufficient negative factors" should a report be excluded. Therefore, the party opposing the introduction of a report bears the burden of coming forward with enough "negative factors" to persuade a court that a report should not be admitted. _See also id._ 109 S.Ct. at 448.

In the matter _sub judice_, the defendant has failed to provide evidence sufficient to place into question the trustworthiness of the OSHA reports and thereby preclude their introduction. The investigation was timely, taking place one day after the accident at issue. The defendant has failed to produce any evidence that would call into question the investigator's experience and skill.[FN3] Because the report emanated from an on-site investigation of the accident site rather than a full-blown investigation, the report may not be as reliable as one prepared after months of investigation, but the plaintiff has not chosen to attack the report on this ground. We therefore conclude that this factor does not preclude the introduction of the OSHA reports. Finally, we find that because this report was prepared by an independent governmental agency charged with investigating accidents in the workplace, there can be no question of bias on the part of the investigator. _See In re Japanese Electronic Products Antitrust Litigation,_ 723 F.2d 238, 268-69 (3d Cir.1983) (subsequent history omitted). For these reasons we find that the OSHA reports are not excludable on lack of trustworthiness grounds.[FN4]

FN3. FRE 803(8)(C) presumes the admissibility of such reports and therefore it

is the responsibility of the party opposing a report's admission into evidence to produce evidence regarding the insufficiency of the investigator's skill and experience. Since the defendant has provided no such evidence, we assume that the investigator had sufficient skill and experience in accordance with the strictures of the Rule.

FN4. The defendant also argues that seven supplemental factors enumerated by the court in _Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,_ 505 F.Supp. 1125 (E.D.Pa.1980), preclude introduction of the OSHA reports. We are not persuaded by their arguments. As that Court noted, several of the seven criteria are "essentially refinements of the Advisory Committee's criteria." _Id._ at 1147 n. 16. Moreover, the Court of Appeals for the Third Circuit has questioned these factors in the context of an investigation performed by a public official pursuant to a duty imposed by law, stating that "the trial court gave undue weight to considerations either legally irrelevant under Rule 803(8)(C) or of only slight relevance, and too little weight to the fact that the investigation was conducted by officials charged with a legal duty to conduct it...." _In re Japanese,_ 723 F.2d at 269.

[2] ICS also seeks to exclude parts of the report that refer to subsequent remedial measures under FRE 407. This Rule provides that:
When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence **\*1022** of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.

Because in our review of the OSHA reports it is apparent that portions of the reports refer to subsequent remedial measures, we will order that these parts be redacted by the plaintiff before their introduction into evidence. _E.g., Beech Aircraft,_ 109 S.Ct. at 449 (other evidentiary rules dealing with relevancy and prejudice provide courts with additional means of excluding portions of evaluative reports).[FN5]

FN5. The plaintiff objects to the length of the defendant's response to the Court's request that the parties reexamine the OSHA reports, arguing that the defendant has raised

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

723 F.Supp. 1019
723 F.Supp. 1019
**(Cite as: 723 F.Supp. 1019)**

Page 4

new arguments without permitting the plaintiff the ability to respond, that "numerous liberties [were taken] with the factual record," and asking that the Supplemental Brief be excluded from the Court's consideration of this matter. Because we view the flurry of letters following our request for reexamination of the OSHA reports as little more than needless bickering, and since we disagree with the plaintiff that the defendant's response was outside the scope of the Court's request, we have considered all materials submitted to the Court relevant to the determinations made in this Memorandum Opinion.

**B.** *The OSHA Citation, OSHA Notification of Penalty, and ICS's Payment of Fine.* The defendant objects to introduction of all of these materials, arguing that FRE 408, which prohibits the introduction of "[e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount ... to prove liability for or invalidity of the claim or its amount," precludes the introduction of all of these materials.

[3] FRE 408 does not speak to evidence of a citation, fine, or notification of penalty being excluded; it only addresses evidence of compromising a disputed claim as to either validity or amount. Consequently, FRE 408 does not bar the admission into evidence of the OSHA citation or the OSHA Notification of Penalty. These will not be excluded.

[4] Somewhat more problematic is whether it is permissible to introduce the fact that ICS paid the OSHA fine.[FN6] There are two major policy reasons behind FRE 408. First, evidence of this nature may be irrelevant in the sense that payment of a fine may be motivated by "a desire for peace rather than from any concession of weakness of position." Advisory Committee's Notes on Fed.R.Evid. 408. According to the Advisory Committee, the strength of this position depends on the size of the fine in relation to the offer and to other circumstances. *Id.* Second, this prohibition promotes the policy of favoring the compromise and settlement of disputes. As it applies to disputes between OSHA and the defendant, application of FRE 408 would promote compromise rather than dragging out every dispute into full-blown agency hearings or full-blown litigation.

FN6. Although FRE 408 strictly addresses only offers of compromise, the Advisory Committee Notes indicate that the prohibition can extend to "completed compromises when offered against a party thereto." Advisory Committee's Notes on Fed.R.Evid. 408.

Viewing the situation in its entirety, we conclude that FRE 408 prohibits the introduction into evidence the fact that ICS paid the OSHA fine. Although the plaintiff makes valid arguments that there is a lack of clear evidence that ICS disputed either the amount or validity of the citation, we find that the circumstances of this situation together with the policy reasons behind barring the introduction of this evidence amply support our conclusion.

We give substantial weight to ICS's contention that it paid the fine in an effort "to secure the peace" between itself and OSHA with which it must deal on a regular basis. In addition, we conclude that in light of the fact that the fine was only $490, it was reasonable for ICS not to contest the fine and pay it rather than to spend what surely would have been substantially more than $490 in an effort to avoid paying the fine. These two reasons support the conclusion that evidence that ICS paid the fine may actually be irrelevant.

**\*1023** Finally, we conclude that permitting the introduction into evidence of ICS's payment of this penalty may undermine the public policy of encouraging compromise and settlement of similar fines by discouraging companies like ICS to quickly settle and pay relatively minor monetary fines of this nature. It would be grossly inefficient to require employers to enter into formal agency proceedings or to initiate litigation just to ensure that their quick settlement of small fine does not transform itself into an admission of negligence or liability.

D.Del.,1989.
Masemer v. Delmarva Power & Light Co.
723 F.Supp. 1019

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 60 F.3D 153

**JEFFREY B. NEWMAN v. GHS OSTEOPATHIC, INC., PARKVIEW HOSPITAL DIVISION, Jeffrey B. Newman, Appellant**

**No. 94-2122**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*60 F.3d 153; 1995 U.S. App. LEXIS 17186; 32 Fed. R. Serv. 3d (Callaghan) 71; 4 Am. Disabilities Cas. (BNA) 1051*

**July 17, 1995, Filed**

**PRIOR HISTORY:** [**1] On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil Action. No. 94-0060).

**DISPOSITION:** Affirmed

**COUNSEL:** George D. Walker, Jr. Donna E. Baker, Larry Pitt & Associates, 1918 Pine Street, Philadelphia, PA 19103, Attorneys for Appellant.

A. James Johnston, Jonathan B. Sprague, Sidney R. Steinberg, Post & Schell, 1800 JFK Boulevard, 19th Floor, Philadelphia, PA 19103, Attorneys for Appellee.

**JUDGES:** BEFORE: MANSMANN, GREENBERG, and SAROKIN, Circuit Judges.

**OPINION BY:** GREENBERG

**OPINION:** [*154] OPINION OF THE COURT

GREENBERG, Circuit Judge.

In this case under the Americans with Disabilities Act, *42 U.S.C. § § 12111*-12117 (ADA). Jeffrey B. Newman appeals from the district court's October 20, 1994 order entering judgment against him and in favor of GHS Osteopathic, Inc.-Parkview Hospital Division, following a bench trial. The appeal raises significant issues regarding compliance with discovery obligations and the burden of proof under the ADA. We will affirm.

1.

We largely draw our statement of the facts from the district court's opinion. Prior to the layoff that led to this lawsuit, Newman worked as a physical therapy aide in Parkview's rehabilitation [**2] department. Newman suffers from a form of nocturnal epilepsy, and he takes medication several times a day to prevent the onset of seizures. The medication makes Newman drowsy, and therefore he sought to combine the 30-minute lunch break and the two 15-minute morning and afternoon breaks which Parkview granted into one hour-long break. Newman used this hour to nap and negate the medication's side effects. Although Parkview's policy prohibited bunching the breaks, several other employees combined them as well.

In May 1992, Kamille Sprenkle of Rehab America, an independent contractor agency, began working with Parkview's Director of the Rehabilitation Department to assist in supervising and running the department. Soon thereafter, she began enforcing the policy against combining the breaks. n1 When Newman protested that he needed to combine the time for medical reasons, Sprenkle referred him to Jennifer Brown, Parkview's director of human resources. Brown, in turn, told Newman that to be exempt from the policy, he would need authorization from a hospital physician. Brown also agreed to exempt Newman from the policy pending the medical evaluation. App. 447. A physician "subsequently [**3] recommended that [Newman] be allowed to continue combining his breaks because such bunching was a reasonable medical necessity." App. 448.

n1 The district court found that "at a January, 1993 meeting of the department heads, Sprenkle was told by her boss at Parkview that the policy against combining the breaks would now be enforced." App. 447.

Beginning in 1992, the hospital's financial situation began to deteriorate, and it instituted a reduction in hours for much of its staff, including Newman. Later that year, the hospital began planning more cuts, including layoffs. In February 1993, Ernest Perilli, Parkview's associate

60 F.3d 153, *; 1995 U.S. App. LEXIS 17186, **;
32 Fed. R. Serv. 3d (Callaghan) 71; 4 Am. Disabilities Cas. (BNA) 1051

executive director of operations, determined that one full-time nonprofessional position in the rehabilitation department should be eliminated, and he consulted Sprenkle (who was on maternity leave) for assistance. She in turn recommended that Parkview eliminate the position of full-time physical therapy aide. Newman was the only employee holding that position. Effective February 19, 1993, [**4] the hospital laid off Newman and six other employees.

On February 5, 1994, Newman filed a complaint against Parkview in the district court, alleging that its decision to lay him off constituted unlawful discrimination under the ADA. Specifically, Newman alleged, among other things, that his layoff resulted from Sprenkle's irritation with his medical need to combine the breaks. He contended that "upon [his] exercise of his ability to continue his break consolidation, Ms. Sprenkle became belligerent in attitude with him." Br. at 5. He further supported his complaint [*155] with certain allegations of actions that occurred after the layoff, which he contended demonstrated that Parkview's proffered reasons for his layoff were pretextual. n2

n2 For instance, Newman says he was told he could take a part-time position as a physical therapy aide without benefits but that he would have to bump his friend out of the position. The district court found that Newman did not take the position because he did not want to cause his friend to be laid off. Newman also points out that soon after his one-year right to recall had expired, a part time aide was given a full time position. The district court attributed this latter development to the fact that Parkview had hired a new independent contractor to supply professional positions to the rehabilitation department and that "the new contractor's aggressive marketing practices . . . resulted in a much higher volume of patients in the rehabilitation department at Parkview." App. 451.

[**5]

During pretrial discovery, Newman propounded interrogatories on Parkview seeking identification of each person Parkview believed had knowledge of his claims and each person it intended to call at trial. Newman also sought to learn the substance of each prospective witness' testimony. Parkview responded by, among other things, referring to its self-executing disclosures, objecting to the scope of the interrogatory requests, and stating that it had not identified its trial witnesses. Its self-executing disclosures stated that:

Defendant believes the following persons are reasonably likely to have information that bears significantly on the claims or defenses in this matter:

Jennifer M. Brown

Plaintiff's job performance; the Hospital's attempts to accommodate Plaintiff's alleged disability; Hospital-wide layoff of February, 1993; Hospital policies and procedures.

Kamille Sprenkle

Plaintiff's job performance; the decision to eliminate the position of full-time Physical Therapy Aid; conversations with Plaintiff regarding his request for an accommodation.

Ernest Perilli

Hospital-wide layoffs [**6] of February, 1993; Hospital policies and procedures.

Newman claims that he never received this list and he further observes that the names and the substance of their testimony were not supplied in response to his interrogatories. Therefore, he made an in limine motion under *Fed. R. Civ. P. 37* to exclude the testimony of Perilli and Brown on the ground that their names and the substance of their testimony were not properly disclosed during pretrial discovery. On October 11, 1994, the district court held a hearing at which it heard argument from both sides. The court concluded that Newman received either the list itself or the cover letter attaching the list. It further determined that even if the latter was the case, it should have been obvious that an enclosure was missing, and Newman should have contacted Parkview's counsel to obtain the missing enclosure. The court therefore de-

60 F.3d 153, *; 1995 U.S. App. LEXIS 17186, **;
32 Fed. R. Serv. 3d (Callaghan) 71; 4 Am. Disabilities Cas. (BNA) 1051

nied Newman's motion, and the case proceeded to a non-jury trial at which Perilli and Brown testified on October 11 and 12.

On October 20, the court issued a bench opinion setting forth its findings of fact and conclusions of law. The court found that Parkview's decision was motivated by legitimate [**7] economic reasons arising from its deteriorating financial situation. It further found that Sprenkle harbored no animosity toward Newman and only reluctantly recommended that Newman's position be eliminated. Consequently, that same day the court entered judgment in Parkview's favor. Newman timely filed this appeal. We have jurisdiction pursuant to *28 U.S.C. § 1291.*

II.

Newman's primary contention is that the district court erred by permitting Perilli and Brown to testify. He claims that *Federal Rules of Civil Procedure 26(a), 26(e)* and *37(c)(1)* required the district court to exclude their testimony.

As amended in 1993, *Fed. R. Civ. P. 26(a)(1)* provides for self-executing disclosures, as it requires a party upon its own initiative to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts . . . ." Rule 26(a)(3)(A) requires [*156] disclosure of "the name . . . of each witness, separately identifying those whom the party expects to present and those whom the party may call if the need arises." Furthermore, Rule 26(a)(5) provides that a party may discover additional matter through, inter [**8] alia, written interrogatories. Under Rule 26(e), a party is under a continuing obligation to supplement its discovery responses.

As also revised in 1993, Rule 37(c)(1) provides that a party who

> without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Rule 37 is written in mandatory terms, and "is designed to provide a strong inducement for disclosure of Rule 26(a) material." *Harlow v. Eli Lilly & Co., 1995 U.S. Dist. LEXIS 7162* at * 7 (N.D. Ill. May 25, 1995). Nonetheless, the rule expressly provides that sanctions should not be imposed if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless. Thus, the rule does not leave district courts without discretion. See, generally, *Fed. R. Civ. P. 37(c)* (Advisory Committee Notes). In fact, one court has held that [**9] "notwithstanding Rule 37(c), the district court may be found to have abused its discretion if [its] exclusion of testimony results in fundamental unfairness in the trial of the case." *Orjias v. Stevenson, 31 F.3d 995, 1005* (10th Cir.) (emphasis added), cert. denied, *115 S. Ct. 511 (1994);* see also *Bronk v. Ineichen, 54 F.3d 425, 432 (7th Cir. 1995)* (interpreting Rule 37(c)(1)) (In ruling on motion to call witness not previously identified, "'district court should consider prejudice or surprise to opposing party, ability of party to cure prejudice, likelihood of disruption, and moving party's bad faith or unwillingness to comply.'") (citation omitted). For our purposes, then, even under Rule 37, "the imposition of sanctions for abuse of discovery under *Fed. R. Civ. Pro. 37* is a matter within the discretion of the trial court." *Orjias, 31 F.3d at 1005; Doe v. Johnson, 52 F.3d 1448, 1464 (7th Cir. 1995)* ("We review the district court's decision to impose Rule 37 sanctions for abuse of discretion.").

We find no abuse of discretion here. After hearing argument from both sides, the district court concluded that the witnesses were identified in Parkview's self-executing [**10] disclosures and that Newman, at a minimum, received the covering letter referring to the list, if not the list itself. Thus, the court concluded that Newman should have sought the list if he had not received it. The court therefore believed that Parkview's possible failure to supply the information in its self-executing disclosures or to disclose it in response to Newman's interrogatories should not have prejudiced him and therefore was harmless. The court's decision is consistent with the Advisory Committee Notes to the 1993 amendments, which state that the "harmless violation" provision was "needed to avoid unduly harsh penalties in a variety of situations: e.g., the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties. . . ." Here, there is no reason to believe that Parkview acted in bad faith; and the court found that Newman knew the names of its witnesses and the scope of their relevant knowledge well before trial. In the circumstances, the district court did not abuse its discretion in refusing to exclude the testimony.

III.

Newman next argues that the district court placed an incorrect burden of proof upon [**11] him. As an initial

60 F.3d 153, *; 1995 U.S. App. LEXIS 17186, **;
32 Fed. R. Serv. 3d (Callaghan) 71; 4 Am. Disabilities Cas. (BNA) 1051

matter, we must address the district court's reliance on cases governing Title VII of the Civil Rights Act of 1964, *42 U.S.C. § § 2000e*, et seq., and the Age Discrimination in Employment Act, *29 U.S.C. § § 621-34*, to determine the standards for indirectly proving disparate treatment under the ADA. n3 The parties on appeal assume that this caselaw informs the standards for [*157] causation under the ADA and we now so hold.

n3 The district court cited only *Griffiths v. CIGNA Corp., 988 F.2d 457 (3d Cir.)*, cert. denied, *126 L. Ed. 2d 145, 114 S. Ct. 186 (1993)*, a Title VII case. But the standards enunciated under Title VII and the ADEA for these types of cases, commonly referred to as pretext cases, are derived from *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, and proceed as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' [McDonnell Douglas, id.], at 802, 93 S. Ct. at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id. at 804, 93 S. Ct. at 1825.*

*Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981).* Of course, at the trial stage, the only relevant question for the factfinder is whether the plaintiff has proven intentional discrimination, and the plaintiff can try to persuade the trier of fact of this by proving that the employer's proffered reasons for the adverse employment decision are pretexts for discrimination. The trier of fact is not required, however, to find intentional discrimination simply because it does not believe the employer's explanation. See

*Miller v. CIGNA Corp., 47 F.3d 586, 596-97 (3d Cir. 1995)* (in banc).

[**12]

In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose -- to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well. Indeed, we routinely use Title VII and ADEA caselaw interchangeably, when there is no material difference in the question being addressed. *DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 724 n.5 (3d Cir. 1995)*. And, the provisions of the ADA itself recognize the parallel nature of the statutes, as they provide that

the powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

*42 U.S.C. § 12117(a).*

In accordance with the foregoing principles, courts addressing the allocations of burdens of proof and persuasion under the ADA uniformly have looked [**13] for guidance to Title VII and ADEA caselaw. See *Ennis v. National Ass'n of Business and Educ. Radio, Inc., 53 F.3d 55, 57 (4th Cir. 1995)* (holding that Title VII burden-shifting rules apply in ADA pretext case); *DeLuca v. Winer Indus., Inc., 53 F.3d 793, 797 (7th Cir. 1995)* (assuming that Title VII prima facie case and burden shifting method applies under ADA); *Aucutt v. Six Flags Over Mid-America, Inc., 869 F. Supp. 736, 743 (E.D. Mo. 1994)* (applying Title VII prima facie case standards to ADA); *West v. Russell Corp., 868 F. Supp. 313, 316 (M.D. Ala. 1994)* ("Generally . . . federal courts have applied the settled principles of employment discrimination law [under Title VII] to the ADA") (citing cases); *Doe v. Kohn Nast & Graf, P.C., 862 F. Supp. 1310, 1318 n.5 (E.D. Pa. 1994)*; *Braverman v. Penobscot Shoe Co., 859 F. Supp. 596, 603 (D. Me. 1994)*; See also *EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1995 U.S. App. LEXIS 12139 at * 5 (7th Cir. May 22, 1995)* (applying Title VII and ADEA caselaw to interpretation of individual liability under ADA); *Carparts Distribution*

60 F.3d 153, *; 1995 U.S. App. LEXIS 17186, **;
32 Fed. R. Serv. 3d (Callaghan) 71; 4 Am. Disabilities Cas. (BNA) 1051

*Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d* [**14] *12, 16 (1st Cir. 1994)* (seeking guidance from Title VII caselaw to determine definition of "employer" under ADA).

In addition, courts routinely employ the Title VII burden-shifting rules in pretext cases brought under the Rehabilitation Act of 1973, *29 U.S.C. § 701* et seq., which prohibits disability discrimination in public employment. See *Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994); Barth v. Gelb, 303 U.S. App. D.C. 211, 2 F.3d 1180, 1185-86 (D.C. Cir. 1993),* cert. denied, ____ U.S. ____, *114 S. Ct. 1538 (1994); Teahan v. Metro-North Commuter R.R. Co., 951 F.2d 511, 514 (2d Cir. 1991),* cert. denied, ____ U.S. ____, *113 S. Ct. 54 (1992); Smith v. Barton, 914 F.2d 1330, 1339-40 (9th Cir. 1990),* cert. denied, *501 U.S. 1217, 111 S. Ct. 2825, 115 L. Ed. 2d 995 (1991).* As the ADA simply expands the Rehabilitation Act's prohibitions against discrimination into the private [*158] sector, Congress has directed that the two acts' judicial and agency standards be harmonized. See *29 U.S.C. §§ 791(g), 793(d), 794(d); 42 U.S.C. § 12117(b).* Therefore, the district court properly looked to ADEA and Title VII caselaw for guidance.

The court in this case relied in particular on *Griffiths v. CIGNA* [**15] *Corp., 988 F.2d 457 (3d Cir.),* cert. denied, *126 L. Ed. 2d 145, 114 S. Ct. 186 (1993),* which it interpreted as requiring a plaintiff in a pretext case to prove that the illicit motive was the sole cause of the adverse employment decision. We since have clarified that in pretext cases a plaintiff need prove only that the illicit factor "played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process." *Miller v. CIGNA Corp., 47 F.3d 586, 598 (3d Cir. 1995)* (in banc). Nevertheless, the court's reliance on *Griffiths* did not prejudice Newman, because it found that his disability played no role in Parkview's decision. In its own words:

Plaintiff's dismissal by the defendant resulted from a bona-fide hospital-wide reduction in force because of financial difficulty and not from any discrimination on the part of defendant against plaintiff due to plaintiff's disability. The plaintiff's epilepsy was not the sole cause, was not a determinative cause, and played no role whatsoever in the defendant's decision to terminate plaintiff's position or to lay off the plaintiff.

App. 453-54. Thus, irrespective of the applicable test, [**16] Newman could not prevail. n4

n4 Newman argues in the alternative that the district court's findings of fact are not supported by the record. The argument is without merit. "We accept the district court's findings of fact unless they are clearly erroneous." *Oberti v. Board of Educ., 995 F.2d 1204, 1220 (3d Cir. 1993); Country Floors, Inc. v. Partnership of Gepner and Ford, 930 F.2d 1056, 1062 (3d Cir. 1991).* The court found the defendant's witnesses to be credible, and essentially believed Parkview's explanation of Newman's layoff. It is well settled that "credibility determinations that underlie findings of fact are appropriate to a bench verdict," *Country Floors, 930 F.2d at 1062,* and rarely will be disturbed. In this case, the district court's findings are adequately supported by the testimony and we decline to disturb them.

IV.

In view of the foregoing conclusions, we will affirm the judgment of the district court.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 2009370 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

ℍ
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
**PHILIPS ELECTRONICS** NORTH AMERICA
CORPORATION and U.S. Philips Corporation,
Plaintiffs,
v.
CONTEC CORPORATION, Compo Micro Tech,
Inc., Seoby Electronics Co., Ltd., Remote Solution
Co., Ltd., f/k/a Hango Electronics Co., Ltd., Hango
Remote Solution, Inc., Defendants.
**No. Civ.A. 02-123-KAJ.**

Aug. 24, 2004.

Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Plaintiffs.
Patricia Smink Rogowski, Connolly, Bove, Lodge
& Hutz, Jack B. Blumenfeld, Morris, Nichols, Arsht
& Tunnell, Kathleen Jennings, Oberly & Jennings,
Andre G. Bouchard, Bouchard, Margules &
Friedlander, David L. Finger, Esq., Wilmington,
DE, for Defendants.

*MEMORANDUM ORDER*
JORDAN, J.

## I. INTRODUCTION AND BACKGROUND

**\*1** On July 26, 2004, I entered a Permanent
Injunction which permanently enjoins and restrains
defendant Compo Micro Tech ("CMT") from
making, using or selling universal remote controls
which incorporate, and are therefore infringing,[FN1]
the scan programming method claimed by U.S.
Patent No. 4,703,359 ("the '359 patent"), which is
owned by plaintiffs Philips Electronics North
America Corporation and U.S. Philips Corporation
(collectively, "Philips").[FN2]   (D.I.446.) Presently
before me is defendant Compo Micro Tech's ("CMT
") Motion to Stay the Injunction Dated July 26,
2004. (Docket Item ["D.I."] 447; the "Motion".)

For the reasons that follow, CMT's Motion will be
denied.

> FN1. *See Philips Elecs. N. Am. Corp. v.
> Contec Corp.,* 312 F.Supp.2d 642, 645
> (D.Del.2004) (granting in part and denying
> in part Philips' motion for summary
> judgment of infringement).

> FN2. For a complete recitation of the
> circumstances leading to the entry of the
> Form of Judgment and the Permanent
> Injunction, *see Philips Elecs. N. Am. Corp.
> v. Contec Corp.,* 2004 U.S. Dist. LEXIS
> 13455 (July 12, 2004).

## II. STANDARD OF REVIEW

A court may stay an injunction pending appeal
pursuant to Federal Rule of Civil Procedure 62(c).
[FN3] In exercising its discretion to issue such a stay,
the Federal Circuit has indicated that a court must
consider four factors: "(1) whether the stay
applicant has made a strong showing that he is
likely to succeed on the merits; (2) whether the
applicant will be irreparably injured absent a stay;
(3) whether issuance of the stay will substantially
injure the other parties interested in the proceeding;
and (4) where the public interest lies." *Standard
Havens Prods. v. Gencor Indus.,* 897 F.2d 511, 512
(Fed.Cir.1990) (citations omitted). However, each
factor need not be given equal weight, *see id.* at 513,
and the court may use a flexible balancing
approach, *see Arthrocare Corp. v. Smith & Nephew,
Inc.,* 315 F.Supp.2d 615, 619 (D.Del.2004).

> FN3. "When an appeal is taken from a ...
> final judgment granting ... an injunction,
> the court in its discretion may suspend,
> modify, restore or grant an injunction
> during the pendency of the appeal upon
> such terms as to bond or otherwise as it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 187**

Not Reported in F.Supp.2d                                                                          Page 2

Not Reported in F.Supp.2d, 2004 WL 2009370 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

considers proper for the security of the rights of the adverse party...." Fed.R.Civ.P. 62(c) (2004).

### III. DISCUSSION

Having considered CMT's assertion that it is entitled to a stay pending appeal (*see* D.I. 451), I find that CMT has not established any of the *Standard Havens* factors sufficient to warrant a stay. First, CMT has not made a strong showing that it is likely to succeed on the merits of its appeal. CMT intends to appeal my construction of the claim term "signal structure identification data".[FN4] (*Id.* at 3.) However, the "possibility of appellate de novo review of [ ] claim construction does not constitute an extraordinary circumstance to merit a stay." *Arthrocare Corp.,* 315 F.Supp.2d at 620 (citing *Eaton Corp. v. Parker-Hannifin Corp.,* 292 F.Supp.2d 555, 582 (D.Del.2003)). Furthermore, at trial, CMT asserted that claim 1 of the '359 patent was invalid as anticipated by a prior art Japanese reference and that claims 3 and 4 were invalid as obvious in light of that reference in combination with three other prior art references. (D.I. 451 at 3.) The jury found that the '359 patent was not invalid. (D.I.419.) CMT intends to appeal that decision, relying on the same arguments it previously advanced, together with the trial testimony of Philips' technical expert, which CMT thinks "supports a finding of invalidity as a matter of law." (D.I. 451 at 3.) While CMT has concisely set forth the points it intends to raise on appeal, it has not set forth convincing evidence that it has a strong likelihood of success on the merits. Therefore, the first factor weighs against the issuance of a stay.

FN4. *See Philips N. Am. Corp. v. Contec Corp.,* 312 F.Supp.2d 592, 598-601 (D.Del.2004) (claim construction).

*2 Second, CMT argues that it will be irreparably harmed if a stay is not granted because it will be " unable to fulfill existing orders for some of its largest customers...." (*Id.*) Such a reason is " insufficient to warrant a stay of an otherwise appropriate injunction." *Fisher-Price, Inc. v. Safety 1st, Inc.,* 279 F.Supp.2d 526, 529 (D.Del.2003); *see*

also *Arthrocare Corp.,* 315 F.Supp.2d at 621 ("one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected") (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 (Fed.Cir.1986); *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 659 F.Supp. 92, 94-95 (D.Del.1987) ( "the loss of customers or business built upon the sale and use of infringing products does not amount, in the context of a patent infringement suit, to irreparable harm from which [the defendant] should be shielded"). Thus, the second factor weighs against issuance of a stay.

Third, CMT says that Philips will not suffer irreparable harm if a stay is granted "because its interests can be fully protected by the payment of damages." (D.I. 451 at 4.) CMT argues that, because Philips has licensed the '359 patent in the past, Philips will be adequately compensated for CMT's continued infringement during the appeals process if CMT deposits, in escrow, an amount equal to $1 per unit for each infringing remote sold from July 26, 2004 through August 31, 2004. (D.I. 451 at 4.) When faced with a nearly identical argument in *Arthrocare Corp.,* this court said that [t]his argument is unpersuasive. Staying the injunction during the appeals process would essentially allow [the defendant] to continue to infringe, thereby further usurping the exclusivity that [the plaintiff] is entitled to enjoy as a result of its patent[ ]. Moreover, [the plaintiff's] patent rights are not compromised simply because it opted to license its patents to select competitors. Once the patentee's patents have been held to be valid and infringed, he should be entitled to the full enjoyment and protection of his patent rights.

315 F.Supp.2d at 621 (internal quotation marks and citation omitted). Though CMT attempts to minimize it request for a stay by limiting it temporally, CMT admittedly stands to profit during the time of any stay by selling its infringing remote controls to its largest customers. (D.I. 451 at 3.) Such a result is insupportable, and I find that the third factor also weighs against entering a stay.

Finally, CMT says that if a stay is not granted,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 188

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 2009370 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

non-parties will suffer harm-specifically, CMT's customers "will have to find an alternate source for the products it contracted months ago to purchase from CMT." (*Id.* at 5.) However, the final *Standard Havens* factor is concerned with where the public interest lies, and, in this case, "public policy favors protection of the rights secured by valid patents." *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1577 (Fed.Cir.1983). Therefore, the fourth factor also weighs against the issuance of a stay.

## IV. CONCLUSION

**\*3** Because all of the four *Standard Havens* factors weigh against issuing a stay, I conclude that entering a stay pending appeal is not justified. Accordingly, it is hereby ORDERED that CMT's Motion (D.I.447) is DENIED.

D.Del.,2004.
Philips Electronics North America Corp. v. Contec Corp.
Not Reported in F.Supp.2d, 2004 WL 2009370 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2385623 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of the Joint Motion for Summary Judgment of Defendants Remote Solution Co, Ltd. and Hango Remote Solution, Inc. (Jul. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2385622 (Trial Motion, Memorandum and Affidavit) Answering Brief of Defendants Remote Solution Co, Ltd. and Hango Remote Solution, Inc. in Opposition to Plaintiffs' Motion for Summary Judgment (Jul. 20, 2005) Original Image of this Document (PDF)
• 1:02cv00123 (Docket) (Feb. 12, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 189**

Westlaw.

537 F.2d 751                                                                                                    Page 1
537 F.2d 751, 2 Fed. R. Evid. Serv. 581, 19 UCC Rep.Serv. 832
(Cite as: 537 F.2d 751)

**H**

United States Court of Appeals,Third Circuit.
POSTTAPE ASSOCIATES, Appellee,
v.
EASTMAN KODAK COMPANY, Appellant.
No. 75-2162.

Argued March 10, 1976.
Decided June 17, 1976.

A partnership engaged in production of documentary films brought an action against a film manufacturer, claiming that defects in film furnished by the manufacturer caused production delays and loss of profits. The United States District Court for the Eastern District of Pennsylvania, 387 F.Supp. 184, 68 F.R.D. 323, Daniel H. Huyett, 3rd J., entered judgment on the jury's verdict for plaintiff in the amount of $143,000, and the film manufacturer appealed. The Court of Appeals, Joseph F. Weis, Circuit Judge, held, inter alia, that the trial court erred in submitting the question of liability to the jury on the basis of the unreasonably dangerous condition of the product in question, and that prejudicial error occurred when the court refused to instruct the jury as to attribution of knowledge of trade usage in limitation of film makers' liability and excluded evidence of plaintiff insurance coverage for defective film.

Reversed and new trial ordered.

West Headnotes

**[1] Products Liability 313A** ⛗88

313A Products Liability
 313AII Actions
  313Ak87 Questions for Jury
   313Ak88 k. Particular Products. Most Cited Cases
Where, in action by producer of documentary films against film manufacturer for lost profits allegedly occasioned because of defective film, evidence showed that flaw in film in no way made it threat to person or tangible property, trial court erred in submitting case to jury under legal theory which involved necessity of proving "unreasonably dangerous" condition in film.

**[2] Contracts 95** ⛗114

95 Contracts
 95I Requisites and Validity
  95I(F) Legality of Object and of Consideration
   95k114 k. Exemption from Liability. Most Cited Cases
Under Pennsylvania law, parties may contractually relieve themselves from consequences of negligent acts, but any agreements must spell out intention of parties with particularity.

**[3] Products Liability 313A** ⛗62

313A Products Liability
 313AI Scope in General
  313AI(B) Particular Products, Application to
   313Ak62 k. Miscellaneous Products. Most Cited Cases
In action by documentary film producer to recover lost profits from film manufacturer for delays allegedly caused by defective film, Uniform Commercial Code, as adopted in Pennsylvania, controlled film manufacturer's attempts, by legend placed on film cans, to limit its liability for defective film. 12A P.S.Pa. §§ 1-201(3), 1-205(3), 2-719, 2-719(1)(b), (2, 3).

**[4] Products Liability 313A** ⛗26

313A Products Liability
 313AI Scope in General
  313AI(A) Products in General
   313Ak26 k. Defenses in General; Limitation of Liability. Most Cited Cases
In action by documentary film producer to recover profits allegedly lost because of defective film, trial court correctly ruled that legend on film boxes was not so clear and unequivocal in limiting film manufacturer's liability for defective film as to support judgment in favor of manufacturer, and that further amplification of alleged agreement to limit liability was required. 12A P.S.Pa. §§ 1-201(3), 1-205(3), 2-719, 2-719(1)(b), (2, 3).

**[5] Federal Civil Procedure 170A** ⛗2173.1(1)

170A Federal Civil Procedure
 170AXV Trial
  170AXV(G) Instructions
   170Ak2173.1 Form, Requisites, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 F.2d 751                          Page 2
537 F.2d 751, 2 Fed. R. Evid. Serv. 581, 19 UCC Rep.Serv. 832
**(Cite as: 537 F.2d 751)**

Sufficiency
    170Ak2173.1(1) k. In General. Most Cited Cases
        (Formerly 170Ak2173.1)
Trial judge is not required to adopt exact wording of point for charge submitted by counsel, but if important issue is timely called to his attention he should instruct jury on that matter; mere permission to counsel to argue the legal principle is not sufficient, because it is judge who gives law to jurors, not lawyers.

**[6] Partnership 289 ☞353**

289 Partnership
    289VIII Limited Partnership
        289k353 k. Members in General. Most Cited Cases

**Partnership 289 ☞375**

289 Partnership
    289VIII Limited Partnership
        289k375 k. Actions by or Against Firms or Partners. Most Cited Cases
Where producer of documentary films was partnership whose general partner was corporation equally owned by two individuals, knowledge of one-half owner of corporation as to custom and usage in film industry for film manufacturer to limit its liability for defective film was attributable to partnership, and trial court's failure, in action by partnership to recover profits allegedly lost because of defective film, to enlighten jurors on such attribution of knowledge therefore constituted error. 59 P.S.Pa. § § 34, 193.

**[7] Federal Civil Procedure 170A ☞1973**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(A) In General
            170Ak1970 Counsel's Conduct and Arguments
                170Ak1973 k. Statements as to Facts, Comments and Arguments. Most Cited Cases
        (Formerly 170Ak1183)

**Federal Courts 170B ☞901.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error

    170Bk901 Exclusion of Evidence
        170Bk901.1 k. In General. Most Cited Cases
        (Formerly 170Bk901, 106k406.6(13))
In action by documentary film producer to recover profits allegedly lost because of delays caused by defective film provided by defendant film manufacturer, trial court committed reversible error in excluding evidence that producer carried liability insurance covering losses due to defective film; such evidence was admissible as showing that producer had actual knowledge of customer film manufacturer's limiting the liability to replacement of defective film. Federal Rules of Evidence, rule 411, 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞1973**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(A) In General
            170Ak1970 Counsel's Conduct and Arguments
                170Ak1973 k. Statements as to Facts, Comments and Arguments. Most Cited Cases
        (Formerly 170Ak1183)
Evidence of liability insurance coverage is generally not admissible when party is accused of acting wrongfully because of likelihood for spillover between insurance and inference of fault; however, if evidence is offered for other relevant purposes, it may be admitted. Federal Rules of Evidence, rule 411, 28 U.S.C.A.

**\*753** Henry T. Reath, Joseph M. Hankins, Duane, Morris & Heckscher, Philadelphia, Pa., for appellant.
Joseph G. Manta, Edward R. Paul, Alan Letofsky, Philadelphia, Pa., for appellee; LaBrum and Doak, Philadelphia, Pa., of counsel.
Earl W. Kintner, Jack L. Lahr, Marc L. Fleischaker, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for Association of Cinema and Video Laboratories, Inc. as amicus curiae.
John C. Fontaine, New York City, Jay Kelly Wright, Washington, D.C., for National Association of Photographic Manufacturers, Inc. as amicus curiae; Hughes, Hubbard & Reed, New York City, of counsel.

Before VAN DUSEN and WEIS, Circuit Judges, and STERN, District Judge.

OPINION OF THE COURT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

JOSEPH F. WEIS, Circuit Judge.
In this case, we are required to evaluate the competing gravitational pulls of the Uniform Commercial Code and the law of torts in a claim for consequential damages arising from the sale of a defective product. We conclude that s 402A of the Restatement of Torts does not apply and that under the circumstances of this case the Commercial Code provides appropriate guidelines for proving an agreement between buyer and seller to limit damages resulting from negligence. Although the trial judge properly charged the jury on the applicability of trade usage to supplement the agreement, we reverse because of trial errors which precluded adequate consideration of that factor.

Plaintiff Posttape Associates was formed in September, 1970 to produce documentary films. Its first effort, scheduled for shooting in October, 1970 and release in April, 1971, was an unrehearsed motion picture of an encounter group, entitled 'Childhood II.' In preparation for the production, Richard Gibson, one of Posttape's principals, contacted two Kodak sales representatives who recommended the use of No. 7252 Ektachrome film for the venture. Subsequently, Gibson ordered 105 four hundred-foot rolls and followed his oral request with a written purchase order. On October 12, 1970, he picked up the film from the Kodak distributor. Each roll was individually packaged and each cannister and box bore the legend:

### 'READ THIS NOTICE

This film will be replaced if defective in manufacture, labeling, or packaging, or if damaged or lost by us or any subsidiary company even though by negligence or other fault. Except for such replacement, the sale, processing, or other handling of this film for any purpose is without warranty or liability. Since color dyes may change in time, this film will not be replaced for, or otherwise warranted against, any change in color.'

The film was shot during a two and a half day period, beginning on October 16, 1970, and was sent to a Kodak-approved developer. During the developing process, scratches appeared on the film which made it commercially worthless. Kodak's attempts to treat the damaged rolls by special means were unsuccessful. As a result, Posttape was required to reshoot the sequences and the film did not reach the market until early 1972. In October, 1971, another film of the alleged same genre, entitled 'Together,' was released

by another producer, was well received by the public, and amassed receipts of more than $3 million.

Alleging breach of warranty, negligence and strict liability, Posttape commenced this suit claiming damages for its increased costs and lost profits because of the defective film. The court ordered the issues of liability and damages to be tried separately. During the liability portion of the trial, Kodak attempted to show that the limitation of damages to replacement of film was a custom and usage of the trade. To establish Posttape's knowledge, it introduced the deposition of another of Posttape's principals, Martin Spinelli, stating that he knew *754 of the trade usage. The defense requested the trial judge to instruct the jury that the partnership should be thereby charged with this knowledge. The court refused the tendered point.

In another effort to demonstrate that Posttape was aware of the trade usage, Kodak sought to introduce evidence of Posttape's purchase of liability insurance covering loss from defective film. The court denied admission of this testimony on the ground of undue prejudice to the plaintiff.

The jury, in answers to special interrogatories on liability, found that:
1. Kodak had been negligent in the manufacture of the film;
2. the film had been in a 'defective condition unreasonably dangerous to the property of plaintiff (including the film itself) at the time of its delivery to plaintiff;' and
3. neither by their intentions nor by the usage of trade at the time did the parties intend to limit Kodak's liability for negligence or strict liability merely to replacement of the film.[FN1]

FN1. 'Interrogatory No. 1, do you find that Defendant Eastman Kodak Company was negligent in the manufacture of the Eastman Ektachrome Commercial 7252 film? The answer is Yes.
Interrogatory No. 2, do you find that the film in question was in a defective condition unreasonably dangerous to property of plaintiff, including the film, itself, at the time of its delivery to plaintiff, pertaining to the doctrine of strict liability? The answer is Yes.
Interrogatory No. 3, do you find from the intentions of the parties and/or the usage of the trade that at the time of the sale of the film in question the parties agreed to the following language contained in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 F.2d 751                                                                Page 4
537 F.2d 751, 2 Fed. R. Evid. Serv. 581, 19 UCC Rep.Serv. 832
**(Cite as: 537 F.2d 751)**

individual film boxes as well as on the film cannisters contained in the boxes:
'Read this notice: This film will be replaced if defective in manufacture, labeling or packaging or if damaged or lost by us or any subsidiary company, even though by negligence or other fault. Except for such replacement, the sale, processing or other handling of this film for any purpose is without other warranty or liability. Since color dyes may in time change, this film will not be replaced for or otherwise warranted against any change in color.'
The answer is No.
Interrogatory No. 4, do you find from the intentions of the parties and/or the usage of the trade that the parties agreed that the language printed on the film box limited defendant's liability for negligence to replacement of the film? The answer is No.
Interrogatory No. 5, do you find from the intentions of the parties and/or the usage of the trade that the parties agreed that the language printed on the film box limited defendant's liability in respect to the doctrine of strict liability to replacement of the film? The answer is No.'

> FN2. The Districe court has addressed various aspects of this case in two reported opinions: 387 F.Supp. 184 (E.D.Pa.1974) (denying plaintiff's motion for summary judgment); and 68 F.R.D. 323 (E.D.Pa.1975) (denying defendant's post-trial motions).

The record contains adequate evidence from which the jury could find Kodak was negligent in the manufacture of the film, and it has conceded a breach of warranty. But the jury also found liability against Kodak under s 402A of the Restatement (Second) of Torts. We meet this issue first.

[1] This is a diversity case, and the parties have agreed that Pennsylvania law applies. In Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966), the Pennsylvania Supreme Court adopted s 402A of the Restatement (Second) of Torts. [FN3] In a recent decision, Berkebile v. Brantley Helicopter Corp.,462 Pa. 95, 337 A.2d 893 (1975), some members of that court questioned the necessity of proving an 'unreasonably dangerous' condition, despite the language in the Restatement. However, since a majority of the *755 court has not rejected that element, it still is viable. See Bair v. American Motors Co., 535 F.2d 249 (3d Cir. May 17, 1976) (Per Curiam), interpreting Berkebile v. Brantley Helicopter Corp., supra. The flaw in the film in no

way made it a threat to person or tangible property. The product was defective and did not perform as expected, but by no stretch of the imagination could it be considered 'unreasonably dangerous.' There was no evidence from which a jury could reach that conclusion, and the trial court erred in submitting the question of s 402A liability. Accordingly, Kodak's motion for judgment on that count should have been granted.

> FN3. Section 402A provides:
> '(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.'

More important here is the issue of whether the seller properly limited the amount of damages which it must pay to buyer notwithstanding the finding of negligence. We note at the outset that defendant does not seek complete exculpation, but instead desires to limit plaintiff's recovery. Though it is possible that an agreement setting damages at a nominal level may have the practical effect of avoiding almost all culpability for wrongful action, the difference between the two concepts is nevertheless a real one. See Cyclops Corp. v. Home Insurance Co., 389 F.Supp. 476 (W.D.Pa.), aff'd, 523 F.2d 1050 (3d Cir. 1975). The distinction becomes more apparent in a situation which the damage level set is substantial rather than minimal, e.g., the Warsaw Convention restricting recovery for death and injury caused by airline accidents.

[2] The line of demarcation between the two types of agreements has significance here because of the findings needed to establish their existence. Pennsylvania permits parties to contractually relieve themselves from the consequences of negligent acts, but any agreement must spell out the intention of the parties with particularity. Keystone Aeronautics Corp. v. R. J. Enstrom Corp., 499 F.2d 146 (3d Cir. 1974); Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205 (3d Cir. 1970); Employers Liability Assurance Corp. v. Greenville Business Men's Assn., 423 Pa. 288, 224 A.2d 620 (1966).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 F.2d 751
537 F.2d 751, 2 Fed. R. Evid. Serv. 581, 19 UCC Rep.Serv. 832
(Cite as: 537 F.2d 751)

We find no Pennsylvania cases which delineate the requirements necessary to establish an agreement for limitation of damages caused by negligence. Presumably in most cases the same rules should apply as in the exculpatory clause situation. However, in commercial sales transactions, at least those in which no personal injury or physical property damage is involved, the Uniform Commercial Code plays a predominant role in governing the relationships between buyer and seller. Since the parties to this case fall into that category, we turn to the Code for appropriate guidance, recognizing that there are problems engendered by the overlapping of tort and sales law.

Typical of the controversy generated by this propinquity is the lively scholarly debate about the proper scope of s 402A of the Restatement (Second) of Torts as opposed to the provisions of the Uniform Commercial Code. The superiority of s 402A to compensate the average consumer for personal injury or property damage from a defective product is commonly acknowledged. However, there is considerably less enthusiasm for its application in a commercial setting when the damages are consequential and arise from a non-dangerous impairment of quality of the product. In this context, even Chief Justice Traynor, an ardent advocate of s 402A under other conditions, has favored the provisions of the Uniform Commercial Code. See Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). Accord, Titus, Restatement (Second) of Torts Section 402A and the Uniform Commercial Code, 22 Stan.L.Rev. 713 (1970); Speidel, Products Liability, Economic Loss and the UCC, 40 Tenn.L.Rev. 309 (1973). A contrary view was espoused by the New Jersey Supreme Court in Santor v. A and M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965). Pennsylvania has not yet made its position clear. See Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968); *756Miller v. Preitz, 422 Pa. 383, 221 A.2d 320 (1966). Murray, Pennsylvania Products Liability: A Clarification of the Search for a Clear and Understandable Rule, 33 U.Pitt.L.Rev. 391 (1972).

The Erie light is not always a bright one and at times we must tread in uncertainty. But having come to a fork in the road, we must make a choice, though the signs may be difficult to read. The Code is there to be seen and we think the Pennsylvania courts would turn toward it were they deciding the case sub judice.

[3] There seems to be no dispute that Pennsylvania law permits an agreement to restrict damages in

circumstances such as those present here. Lacking an opinion of the Pennsylvania Supreme Court to the contrary, we believe that the legislative mandate of the Commercial Code, particularly ss 2-719 and 1-201(3),[FN4] sets forth criteria for such an agreement whether the claim be in tort or contract.[FN5]

FN4. 12A P.S. s 2-719 provides:
'(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,
(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and
(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.
(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.
12A P.S. s 1-201(3) states:
"Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course or performance as provided in this Act (Sections 1-205 and 2-208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1-103). (Compare 'Contract'.)'

FN5. We thus confront an issue to which we referred, but were not required to meet, in Neville Chemical Co. v. Union Carbide, 422 F.2d at 1216 n.16. There are distinguishing factors between this case and Keystone and Neville:
1. The defect and its consequences here could reasonably be said to be within the contemplation of the parties-unlike the highly unusual circumstances in Neville;
2. The defect here posed no danger to property in contrast to the situation in Keystone: there is only commercial loss, not physical loss to property; and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 F.2d 751
537 F.2d 751, 2 Fed. R. Evid. Serv. 581, 19 UCC Rep.Serv. 832
(Cite as: 537 F.2d 751)

only the damages are limited, liability itself is not affected.

[4] On a motion for summary judgment, the trial court held that the legend on the box of film was not so clear and unequivocal under Pennsylvania law as to support a judgment in favor of the defendant and that further amplification was required. We find no error in this ruling. At trial, the judge properly charged the jury that usage of trade of which the parties are or should be aware gives particular meaning to and supplements or qualifies the terms of an agreement.

Section 2-719 permits individuals to limit their damages by agreement, and in its definition of 'agreement,' s 1-201(3) includes the course of dealing or usage of trade as 'circumstances' to establish 'the bargain of the parties in fact.' s 1-205(3) provides that 'any usage of trade . . . of which they are or should be aware give(s) particular meaning to and supplement(s) or qualif(ies) terms of an agreement.' That a party is bound by a trade usage of which he 'should be aware' implies that a limitation of damages may be imposed even if the parties did not explicitly and expressly negotiate it. The totality of the agreement, however, must include a provision, present in the trade usage, or otherwise expressed, that the limited remedy is an exclusive one. s 2-719(1) (b). See 1 R. Anderson Uniform Commercial Code s 2-719:7 (1970, Supp.1975). [FN6] If the limitation**757 is unconscionable or fails of essential purpose, the buyer may be relieved of its strictures. s 2-719(2) and (3).

> FN6. Since this case will be retried, we suggest that the following sentences in the charge given at the first trial be considered for possible amplification in light of our opinion:
> 'A usage of trade of which the parties are or should be aware gives particular meaning to and supplements or qualifies the terms of an agreement. Thus if you find that there was an agreement, you may find that the agreement as suggested by its language or by implication including usage of trade limits plaintiff's recovery to replacement of the film.' (NT 601)
> 'In order for a limitation of liability to be effective, there must be (1) an agreement, and (2) the parties must expressly agree that the limitation of remedy which here is replacement of film is the exclusive remedy.' (NT 616)

Even though a party's actual knowledge is not essential to establish the existence of a trade usage, such evidence is obviously very important to the party asserting the custom. The defense efforts along this line were seriously impaired by two adverse rulings of the trial court.

Richard Gibson and Martin Spinelli owned all of the stock in Posttape, Inc. The corporation, in turn, was the general partner of Posttape Associates, a limited partnership formed to produce motion pictures. In the portion of his deposition read at the trial, Spinelli indicated that he had experience in producing movies. He also admitted knowledge of the legend on the film packages and of Kodak's position that its liability was limited to replacement of film. With these facts in the record, defense counsel submitted to the court a point for charge that, as a matter of law, Spinelli's knowledge was imputable to the plaintiff. The trial court refused the point, expressing some dissatisfaction with the phraseology, but permitted counsel to argue the matter to the jury. However, the charge was devoid of any reference to Spinelli, his position with Posttape Associates, or his knowledge of the limitation.

[5] A trial judge is not required to adopt the exact wording of a point for charge submitted by counsel, James v. Continental Insurance Co., 424 F.2d 1064 (3d Cir. 1970); but if an important issue is timely called to his attention, he should instruct the jury on that matter. 9 C. Wright & A. Miller, Federal Practice and Procedure s 2552 (1971). Mere permission to counsel to argue the legal principle is not sufficient because it is the judge who gives the law to the jurors, not the lawyers.

[6] Spinelli, a fifty-percent owner of Posttapes, Inc.,[FN7] the general partner of Posttape Associates, was in charge of the production of the motion picture. He and Gibson were the only two active persons in the management and operation of Posttape Associates; and, for all practical purposes, they were Posttape, Inc. Realistically, because of the interweaving between the partnership and the corporation, Spinelli's knowledge was as much the knowledge of Posttape Associates as it was of Posttape, Inc. Consequently, the jury should have been instructed that Spinelli's knowledge was attributable to Posttape Associates in the same manner as a partner. See 59 P.S. ss 34 and 193; Estate of Kerchner v. Pennsylvania Liquor Control Board, 4 Pa.Cmwlth. 247, 285 A.2d 891 (1971). The court's failure to enlighten the jurors on this point gave them no standard by which to evaluate Spinelli's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statements or to determine their relevance to the case-
a matter important to the finding of an agreement.

> FN7. We assume that he was also an officer
> and director of the corporation.

[7] We turn now to the exclusion of evidence of
insurance coverage. Richard Gibson, the other owner
of Posttape, Inc., purchased insurance indemnifying
Posttape Associates against, inter alia, defective film.
Aware of this fact, Kodak attempted to introduce and
develop this evidence at trial for purposes of:
'(showing) that Posttape had actual knowledge of the
custom of film manufacturers limiting their liability
to replacement of the limitation of liability clause
(and)
'(attacking) Mr. Gibson's credibility in that he had
stated he had no knowledge of the custom or the
limitation.'

The court excluded the evidence stating that it would
be overly prejudicial to plaintiff**758** and that its
probative value was low. We disagree.

[8] Generally, evidence of liability coverage is not
admissible when a party is accused of acting
wrongfully because of the likelihood for spillover
between insurance and inference of fault. Knowledge
that a party is insured may also affect a verdict if the
jury knows that some of the loss has been paid by
insurance or that it would satisfy a judgment against a
defendant. However, if the evidence is offered for
other relevant purposes, it may be admitted. See
Federal Rule of Evidence 411. Here, the proffered
evidence was relevant to the knowledge of Gibson
and Posttape Associates. It is doubtful that there
would be any prejudice because the parties were both
commercial entities, the injury was not likely to stir
the emotions, and the existence of such coverage
might have been so unusual that the purchase itself
would have significance in the circumstances. The
exclusion of this relevant evidence was far more
prejudicial to the defense than its admission would
have been to the plaintiffs.[FN8]

> FN8. The trial judge ordered that Gibson's
> testimony on insurance be given out of the
> presence of the jury. We approve this
> procedure which produces an accurate
> record for review rather than mere
> speculation.

The failure to charge the jury on the effect of

Spinelli's knowledge and the exclusion of the
evidence on Posttape's insurance coverage both went
to a critical item in the case: the plaintiff's knowledge
of the trade usage. Cumulative errors on this
important point are so serious that they require
reversal.

To summarize then, we remand the cause for a new
trial; but in view of the trial judge's thoughtful use of
interrogatories, the issues on retrial will be limited.
Kodak concedes a breach of warranty, and the record
sufficiently justifies the jury's finding of negligence.
Since the issue of s 402A will not be submitted to a
jury, the only matter left for resolution with respect to
liability is the agreement to limit the extent of
damages. This issue may be submitted to a jury for
answers to special interrogatories after an appropriate
factual background has been presented.

After careful consideration of the damage phase of
the case, we cannot say that the jury's determination
was not affected by the evidence on liability. In the
interest of fairness for both parties, we have
concluded that it is preferable in these circumstances
that the new trial include the amount of damages if it
should be determined that the defendant is liable.

Kodak has raised a number of objections to rulings in
the damage phase of the case, primarily relating to
the testimony of plaintiff's expert. Since the same
objections may recur on the retrial, it is appropriate to
note our view that the rulings by the trial judge on
such objections were within the scope of his
discretion.

The judgment of the district court will be reversed
and a new trial will be ordered limited to the
determination of the existence of an agreement
limiting damages. If that is answered in the negative,
then there will be a new trial on damages.

C.A.Pa. 1976.
Posttape Associates v. Eastman Kodak Co.
537 F.2d 751, 2 Fed. R. Evid. Serv. 581, 19 UCC
Rep.Serv. 832

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 165 F.R.D. 424,AT 430

**DONNA JOY REED, et al, Plaintiff(s), v. MARTIN BINDER, M.D., et al, Defendant(s). DONNA JOY REED, et al, Plaintiff(s), v. MARTIN BINDER, M.D., et al, Defendant(s). DONNA JOY REED, et al, Plaintiff(s), v. MARTIN M. BINDER, M.D., et al, Defendant(s).**

**Civil No. 92-1990 (JHR), Civil No. 92-3180, Civil No. 93-3394**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, CAMDEN VICINAGE DIVISION**

*165 F.R.D. 424; 1996 U.S. Dist. LEXIS 8837; 34 Fed. R. Serv. 3d (Callaghan) 1511*

**March 27, 1996, Decided**

**DISPOSITION:** [**1] Plaintiffs' motion GRANTED.

**COUNSEL:** APPEARANCES:

John F. Kearney, III, Esq., Mount Holly, New Jersey, Attorney for Plaintiffs.

Louis J. Bizzarri, Esq., Assistant United States Attorney, Camden, New Jersey, Attorney for Defendant United States of America.

Richard L. McMonigle, Esq., McKISSOCK & HOFFMAN, Mount Holly, New Jersey, Attorney for Defendants Joseph Krotec, M.D., Jack Jenofsky, M.D., and Richard Krotec, D.O..

John Z. Jackson, Esq., JACKSON, VAURIO & BUCKLEY, Princeton, New Jersey, Attorney for Defendant Robert Siefring, M.D.

Carolyn Sleeper, Esq., PARKER, McCAY & CRISCUOLO, Marlton, New Jersey, Attorney for Defendants Memorial Hospital of Burlington County and Susan Inniss, M.D.

**JUDGES:** ROBERT B. KUGLER, United States Magistrate Judge

**OPINION BY:** ROBERT B. KUGLER

**OPINION:**

[*425] OPINION

KUGLER, Magistrate Judge:

Plaintiffs bring this action against the defendants alleging that a number of medical professionals and their employees negligently failed to diagnose the cancer that ultimately killed Donna Joy Reed. Presently before the court is the motion by the plaintiffs to require that each party bear the costs for the appearance and deposition of that party's [**2] expert witness. For the reasons that follow, the plaintiffs' motion will be granted.

Reed was a disabled and retired veteran of the United States Marine Corps. In January, 1986, she consulted Jeanne Cunningham, a certified nurse practitioner, at the Veterans Affairs Medical Clinic in Philadelphia with a complaint of vaginal warts. Cunningham referred Reed to a clinic at the United States Naval Hospital in Philadelphia.

Thereafter began a series of visits to various doctors. Different treatments were performed on Ms. Reed over the years. A pathology report from a biopsy in May, 1990, revealed she then suffered from moderately differentiated squamous cell carcinoma with involvement of deep and lateral margins. On June 6, 1990, she underwent massive and radical surgery. Five positive lymph nodes were found. She remained in the hospital for two months. After discharge, she received radiation therapy. Tragically, Ms. [*426] Reed died at her home on August 10, 1994, from the cancer. She is survived by her husband, John Reed, and two children, Donna Harris and William Harris.

John Reed states that their combined family income before Donna's death was $ 1,956 per month from his employment and [**3] their separate Veteran's Administration pensions and social security benefits. Since her death, his resultant severe depression caused him to take medication which prevents him from continuing his employment (operating heavy machinery). Donna Harris,

**A 197**

Page 2

165 F.R.D. 424, *; 1996 U.S. Dist. LEXIS 8837, **;
34 Fed. R. Serv. 3d (Callaghan) 1511

who lives with her stepfather John Reed, cannot maintain any employment because of severe emotional and perceptual problems. The family income since Ms. Reed's death is $ 960 per month. John Reed also states he has exhausted his savings and sold some of his tools and his late wife's car. William Harris lives in Delaware with his wife and, as a student, earns approximately $ 330 per week. Plaintiffs' expert witness is Edward Podczaski, M.D., who is charging a reduced rate of $ 100 per hour for his time reviewing the matter and testifying at trial.

The defendants retained experts to testify on their behalf at trial. The United States has two experts, Martin Weisberg, M.D., and Charles J. Dunton, M.D. Dr. Weisberg submitted a report dated November 25, 1994. Of its four pages, only two discuss the facts and his opinion. He testified at deposition on September 8, 1995. He charges $ 250 per hour. n1 Dr. Dunton submitted reports dated December [**4] 15, 1994 (with four paragraphs of fact and analysis), September 20, 1995 (one paragraph) and October 16, 1995 (two sentences). He testified at deposition on October 16, 1995, and charges $ 250 per hour.

n1 Plaintiffs do not contend that any of the hourly rates charged by the defense experts is unreasonable. See *Fed. R. Civ. P. 26(b)(4)(C)*.

Defendants Krotec and Jenofsky also retained two experts, Joseph Riggs, M.D., and John Mikuta, M.D. Dr. Riggs submitted a report dated December 28, 1994, of eight (8) pages and testified at deposition on October 6, 1995. He charges $ 300 per hour. Dr. Mikuta's report of 3 1/2 pages is dated August 23, 1995. He testified at deposition on October 19, 1995, and charges $ 200 or $ 250 per hour (he couldn't recall the precise figure).

Michael Goldberg, M.D., is defendant Siefring's expert. His three page report is dated August 15, 1995. Counsel took his deposition on September 15, 1995. His hourly rate was never revealed but apparently he charged a flat fee of $ 900 [**5] for his testimony.

Defendants Memorial Hospital and Innis retained Robert Giuntoli, M.D., as their expert. His three page report dated February 24, 1995, contains one page of facts, analysis and opinion. His deposition took place on November 16, 1995, and he charges $ 250 per hour.

The length of the depositions is not clear from the transcripts. It seems those of Dr. Giuntoli, Dr. Mikuta and Dr. Riggs took 3 1/2 hours, 5 1/2 hours and 5 hours respectively. There is no record for Doctors Goldberg, Weisberg or Dunton. Plaintiffs' counsel avers that the depositions ranged from three hours to six hours. Comparing the length of the transcripts indicates that is accurate.

Plaintiffs claim defendants should bear the costs of these depositions for two reasons. First, requiring the impoverished survivors of the decedent to bear these costs results in "manifest injustice." Second, the defense expert reports revealed so little information that plaintiffs were compelled to take these depositions to learn what the experts would testify to at trial and to adequately prepare for cross examination.

**MANIFEST INJUSTICE**

The Federal Rules of Civil Procedure provide the mechanism for taking [**6] discovery from experts witnesses. Rule 26(b)(4)(A) provides:

> A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If a report from the expert is required under subdivision (a)(2)(B), the deposition shall not be conducted until after the report is provided.

[*427] That Rule must be read in conjunction with Rule 26(b)(4)(C):

> Unless manifest injustice would result ... the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery ...

Normally then, the party taking the expert's deposition will bear the costs charged by the expert for the testimony. See Advisory Committee Notes to 1993 Amendments, 146 F.R.D. at 638 ("the expert's fees for the deposition will ordinarily be borne by the party taking the deposition.") There is no definition of "manifest injustice." The phrase first appeared in relation to expert testimony with the 1970 Amendments to the Federal Rules of Civil Procedure. This was the first time the Rules expressly permitted discovery from experts. See Advisory Committee Notes to 1970 Amendments, 48 F.R.D. 503-504.

A concern [**7] of the Advisory Committee at that time was the perceived unfairness that would result from permitting one side to obtain without cost the benefit of an expert's work for which the other side paid, often a substantial sum. See *Lewis v. United Air Lines Transp. Corp., 32 F. Supp. 21 (W.D. Pa. 1940); Walsh v. Reynolds Metals Co., 15 F.R.D. 376 (D.N.J. 1954);* Advisory Committee Notes to 1970 Amendments, 48 F.R.D.

165 F.R.D. 424, *; 1996 U.S. Dist. LEXIS 8837, **;
34 Fed. R. Serv. 3d (Callaghan) 1511

505. Thus developed the requirement for paying fees and expenses to the other party or its expert. n2 The Committee further wrote:

> Even in cases where the court is directed to issue a protective order, it may decline to do so if it finds that manifest injustice would result. Thus, the court can protect, when necessary and appropriate, the interests of an indigent party.

Id (emphasis added). In interpreting the Rules, the Advisory Committee Notes, though not conclusive, are a very important source of information and should be given considerable weight. *Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 444, 90 L. Ed. 185, 66 S. Ct. 242 (1946)*. They provide something akin to a legislative history of the Rules. 4 Wright & Miller, Federal [**8] Practice and Procedure, Civil 2d, § 1029.

> n2 The Committee referred to this as a "protective order."

There is very little case law interpreting the portion of the Rule at issue here. Defendant cites *United States v. City of Twin Falls, Idaho, 806 F.2d 862, 879 (9th Cir. 1986)*, cert. denied, *482 U.S. 914 (1987)*, which merely states the general rule that a court must find manifest injustice before it can shift the normal allocation of the fees for an expert's deposition. There is no analysis of "manifest injustice." Plaintiffs rely on *Work v. Bier, 107 F.R.D. 789 (D.D.C. 1985)* where in dicta, the court wrote:

> The Magistrate fully agrees with counsel for the defendants to the effect that the universally accepted rule in federal litigation is that, in the absence of special circumstances (such as an impoverished plaintiff and a very affluent defendant), a party seeking discovery must go where the desired witnesses are normally located ...

*Id. at 793 n.4* Plaintiffs equate [**9] their "special circumstances" with "manifest injustice."

Neither case is particularly helpful in defining "manifest injustice," but that phrase is also found in Rule 16(e) which permits amendment of a final pretrial order

"only to prevent manifest injustice." Again, the cases do not provide an acceptable working definition of the phrase -- but clearly it is a "stringent standard." *Gorlikowski v. Tolbert, 52 F.3d 1439, 1444 (7th Cir. 1995)*. As the Advisory Committee Note to Rule 16(c) states:

> In the case of a final pretrial order, however, a more stringent standard is called for, and the words "to prevent manifest injustice," which appeared in the original rule, have been retained. They have the virtue of familiarity and adequately describe the restraint the trial judge should exercise.

Most courts balance various factors when considering a Rule 16(e) modification. According to *Gorlikowski, supra*, the court must "weigh the possible hardships imposed on the respective parties ... [and] balance the need for doing justice on the merits between the parties ... against the need for [*428] maintaining orderly and efficient procedural arrangements." *52 F.3d at 1444*. Thus, this [**10] court must exercise restraint while balancing the respective hardships.

By its terms, Rule 26(b)(4)(C) permits exceptions to the normal course of payment of expert's fees for deposition testimony. The court finds that this case presents one of those rare situations where manifest injustice would result if those impoverished plaintiffs had to pay the six (6) defense experts for their testimony at deposition. Bearing in mind that each Rule "shall be construed and administered to secure the just, speedy and inexpensive determination of every action," *Fed. R. Civ. P. 1*, the court concludes that the imposing economic obstacle facing these plaintiffs seeking redress for the death of their wife and mother (and chief financial support) requires that these costs be shifted to the defendants.

The court understands what defense counsel refer to as "the reality of how litigation is funded," but the court has no information on the fee arrangement between the plaintiffs and their attorney, and under any circumstance the client remains responsible for the costs of the litigation. n3 Accordingly, the plaintiffs' application pursuant to *Fed. R. Civ. P. 26(b)(4)(C)* will be granted, and the defendants [**11] are ordered to pay the fees charged by their experts for their deposition testimony.

> n3 That a party must pay at least a portion of the fees charged by its expert for the deposition taken by the adversary is not unusual. Where the expert charges more than what a court determines is a "reasonable" fee, the party retaining that ex-

Page 4

165 F.R.D. 424, *; 1996 U.S. Dist. LEXIS 8837, **;
34 Fed. R. Serv. 3d (Callaghan) 1511

pert must pay the amount over and above the "reasonable" rate. See *Schroeder v. Boeing Commercial Airplane Co., 123 F.R.D. 166 (D.N.J. 1988).*

## INADEQUATE DISCLOSURES

As an alternate ground, the plaintiffs contend there was a scarcity of information contained in the defense expert reports. Counsel refers to the disclosure obligations of *Fed. R. Civ. P. 26(a)(2)(B).* n4

N4 Though suit was filed before the effective date of Rule 26(a)(2)(B), it is nevertheless applicable to this case. By Order of the Supreme Court, the amended rules "...shall take effect on December 1, 1993 and shall govern all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings in civil cases then pending." The latter situation is true here, for expert discovery did not commence until well after December 1, 1993. It is just and practicable for the parties to be held to the standards of Rule 26(a)(2)(B). Many courts hold that "to the maximum extent possible, the amended Rules should be given retroactive application," *Wilson v. City of Atlantic City, 142 F.R.D. 603, 605 (D.N.J. 1992); Burt v. Ware, 14 F.3d 256, 258 (5th Cir. 1994); China Resource Products (U.S.A.) Ltd. v. Fayda Int'l Inc., 856 F. Supp. 856, 867 n.24 (D. Del. 1994); Salkey v. Garrett, 1993 U.S. Dist. LEXIS 18500, 1993 WL 547461 at *5 (E.D.N.Y. 1993),* a sentiment with which this court wholeheartedly agrees.

[**12]

The language of Rule 26(a)(2)(B) is deceptively simple:

Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case ... be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the

qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

The Rule requires disclosure of six different categories of information:

1. A complete statement of all opinions that will be expressed at trial and the reasons and basis for the opinion; n5

2. The data and information considered by the expert; n6

[*429] 3. Any exhibits [**13] the expert will use;

4. Qualifications of the expert, including publications for the past ten (10) years;

5. Compensation; and

6. A list of other cases in which the expert has testified during the previous four (4) years.

n5 In simple terminology, this means "how" and "why" the expert reached the conclusions and opinions to be expressed.

n6 Again, in simple language, this means "what" the expert saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions to be expressed.

Rule 26(a)(2)(B) is best understood when read in conjunction with Rule 26(b)(4)(A) which states:

A party may depose any person who has been identified as an expert whose opinion may be presented at trial. If a report from the expert is required under subdivision (a)(2)(B), the deposition shall not be conducted until after the report is provided.

165 F.R.D. 424, *; 1996 U.S. Dist. LEXIS 8837, **;
34 Fed. R. Serv. 3d (Callaghan) 1511

The purpose for these Rules is best explained in the following passages from the Advisory Committee Notes:

> Revised [**14] subdivision (b)(4)(A), authorizes the deposition of expert witnesses. Since depositions of experts required to prepare a written report may be taken only after the report has been served, the length of the deposition of such experts should be reduced, and in many cases the report may eliminate the need for a deposition. n7

> . . .

> The requirement under subdivision (a)(2)(B) of a complete and detailed report of the expected testimony of certain forensic experts may, moreover, eliminate the need for some such depositions or at least reduce the length of the depositions. Accordingly, the deposition of an expert required by subdivision (a)(2)(B) to provide a written report may be taken only after the report has been served." n8

n7 *146 F.R.D. at 635.*

n8 *146 F.R.D. at 638-39.*

The reason for requiring expert reports is "the elimination of unfair surprise to the opposing party and the conservation of resources." n9 *Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 284 (8th Cir. 1995),* [**15] cert. denied, _ U.S. _, 116 S. Ct. 84 (1995). See also *Smith v State Farm Fire and Casualty Co., 164 F.R.D. 49, 53 (S.D.W.V. 1995); Nguyen v. IBP, Inc., 162 F.R.D. 675, 682 (D. Kan. 1995).* The test of a report is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced.

n9 The disclosure requirements of the Rules are also particularly helpful to the court in making rulings limiting or restricting expert testimony pursuant to Evidence Rules 104(a) and 702 and *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).* As Judge Schwarzer has written:

> By requiring the parties to follow the disclosure procedure under *Federal Rules of Civil Procedure 26(a)(2),* the court will have before it a complete statement of the opinions to which the expert will testify and the factual basis. This material, supplemented by memoranda addressed to the evidentiary issues, will provide a helpful record for rulings under Rule 104(a).

Schwarzer, "Management of Expert Evidence," Reference Manual on Scientific Evidence (Federal Judicial Center 1994), p.30.

[**16]
Plaintiffs herein claim they were forced to undertake these depositions because of the inadequacies of the defense expert reports. Close examination of the reports and transcripts of the deposition testimony shows that the plaintiffs are substantially correct. Dr. Weisberg fails to reveal his compensation, his publications for the preceding ten years, and his prior testimony. During the course of the deposition, he revealed there were many documents other than those disclosed in his report which he relied upon in reaching his conclusions. Nor is there a complete analysis in the report of the basis and reasons for his opinions -- there is very little "how" and "why" he reached his conclusions.

The three reports of Dr. Dunton omit his compensation and prior testimony. He also revealed at his deposition additional documents relied on in reaching his conclusions. While his second report attempts in a few sentences to state the basis of his opinion, it clearly is inadequate.

Dr. Riggs in his report merely refers to the data he relied on as "Volume I and Volume II." He did not bring these to the [*430] deposition, but did locate some correspondence (not previously disclosed) which listed the [**17] records. At his deposition, he also revealed for the first time he had reviewed some "literature," such as textbooks, and the "standards of ACOG." He failed to list in his report his compensation, his prior testimony, or his publications. On the other hand, the report is the most "complete" of all those submitted.

Dr. Mikuta failed to state the records or data he relied on. There was no mention in his report of compensation or prior testimony. He did attempt to explain the basis of his conclusions, but it is not very detailed.

165 F.R.D. 424, *; 1996 U.S. Dist. LEXIS 8837, **;
34 Fed. R. Serv. 3d (Callaghan) 1511

The report of Dr. Goldberg does not reveal his compensation or prior testimony. Furthermore, at deposition he revealed for the first time he considered data not listed in his report. Like most of the other reports, there is little analysis of his opinions in the written report.

Dr. Giuntoli did not provide in his report his compensation or prior testimony. He also testified at deposition about documents, articles, texts and reports he considered (other than those listed in his written report). Analysis of his opinion is lacking.

Every defense expert report to some extent failed to meet the disclosure requirements of Rule 26(a)(2)(B). These reports are not [**18] sufficiently detailed, complete and in compliance with the Rule so that the plaintiffs would not be surprised. The reports (with the exception of Dr. Riggs) were brief. While some refer to massive amounts of documents, the opinions are expressed in vague terms with few specific references. See *Smith v. State Farm Fire and Casualty Co., supra.* Plaintiffs' counsel was forced to take these depositions if he wanted to avoid ambush at trial. Having found a violation of Rule 26(a)(2)(B), the court turns to the question of an appropriate remedy.

Sanctions for violation of Rule 26(a)(2)(B) can be severe:

> A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at trial ... any ... information not so disclosed. In addition to or in lieu of this sanction, the court ... may impose other appropriate sanctions ...

Fed. R. Civ. p. 37(c)(1). To impose a sanction the court must first consider whether there is "substantial justification" for the failure and then consider whether the failure was harmless. Counsel do not even address the issue of substantial [**19] justification, nor could they realistically assert they had no obligation to make the disclosures clearly required by the Rule. n10

> n10 To the extent counsel would argue they supplied everything given them by their expert and thus they should be excused from complete compliance, this court agrees with the court in *Nguyen v. IBP, Inc., supra 162 F.R.D. at 681:*

> > The requirements of Rule 26(a) are mandatory as to any expert retained to testify. If the expert is unable or unwilling to make the disclosures he should be excluded as a possibility for retention as an expert witness in the case.
> >
> > . . .
> >
> > A party may not simply retain an expert and then make whatever disclosures the expert is willing or able to make notwithstanding the known requirements of Rule 26.

As to whether the failure is harmless, one court defines that term as follows: "Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to disclosure." *Nguyen v. IBP, Inc., supra,* [**20] *162 F.R.D. at 680.* The omission in most reports of the basis and reasons for the opinions is hardly harmless. Nothing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion. n11

> n11 The insistence of Rule 26(a)(2)(B) on a "complete statement of all opinions to be expressed and the basis and reasons therefore" has another salutary effect. Practitioners should no longer have to face what is referred to in the state courts as a "net opinion." This is defined as an expert's bare conclusion, unsupported by factual evidence. *Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981)* ("...the failure of the expert to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom.") Counsel (and the court) will be able to determine if the expert has a "net opinion" just from the report. Furthermore, it eliminates the dilemma a "net opinion" problem presents to adversarial counsel - whether to rely upon the written report received in discovery or risk taking the expert's deposition and thereby open the door to additional opinions expressed for the first time in the testimony, (usually accepted by the court). See *Gaido v. Weiser, 227 N.J. Super. 175, 193, 545 A.2d 1350 (App. Div. 1988),* aff'd on other grounds, *115 N.J. 310, 558 A.2d 845 (1989).* (deposition testimony differed from the written report, received by the court as a supplemental report).

165 F.R.D. 424, *; 1996 U.S. Dist. LEXIS 8837, **;
34 Fed. R. Serv. 3d (Callaghan) 1511

[**21]

[*431]  With respect to the other disclosure defi-
ciencies, these too are not harmless. Plaintiff's counsel
devoted substantial time in questioning the defense ex-
perts on these matters. For example, the first twenty-five
(25) pages of the deposition testimony of Dr. Mikuta is
devoted to prior testimony, compensation, and the data
or other information considered by the witness.

The failure to comply with the disclosure require-
ments of the Rule frustrates the purpose of the Rules --
the elimination of unfair surprise and the conservation of
resources. *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.,
supra.* Rule 37 compels a sanction.

The court finds the appropriate sanction is to grant
the relief requested by plaintiffs and require the defen-
dants to bear the fees charged by their experts for the
discovery depositions. The court reaches this conclusion
for a number of reasons. First, barring the testimony of
the experts is unduly harsh in this case in which expert
testimony will dominate the proceedings. n12 Second,
the court perceives that attorneys practicing before this
court have not become completely accustomed to the
substantial changes in practice caused by the 1993
Amendments to the [**22] Rules. Voluntary disclosure
has not heretofore been the practice. Third, the language
of Rule 37(c)(1) gives the court broad discretion to fash-
ion a remedy, as the court "may impose other appropriate
sanctions." And, fourth, the only sanction sought by the
moving party is to shift the costs of the deposition.

n12 The sanction specified in the first sen-
tence of Rule 37(c)(1), exclusion of the matters
not disclosed, has little relevance for the disclo-
sure failures here. Defense counsel would not
likely ask their experts on direct examination
about their compensation and prior testimony,
and *Fed. R. Evid. 705* does not require that the

expert during direct examination testify about the
underlying facts and data. Thus that sanction
seems aimed at situations where the report is not
"complete" or does not contain "all opinions." It
is the opinions and the like expressed for the first
time at trial that will be barred pursuant to Rule
37(c)(1). See *Paradigm Sales, Inc. v. Weber
Marking Systems, 880 F. Supp. 1247, 1255 (N.D.
Ind. 1995).*

[**23]

Accordingly, the court having found numerous vio-
lations of the disclosure requirements of *Fed. R. Civ. P.
26(a)(2)(B),* the court imposes the appropriate sanction
of granting the plaintiffs' motion to compel the defen-
dants to bear the fees charged by their experts for testify-
ing at the discovery depositions conducted by the plain-
tiffs' counsel. An appropriate Order shall enter.

ROBERT B. KUGLER

United States Magistrate Judge

ORDER

THIS MATTER having been brought upon motion
before the Court by John F. Kearney, III, Esquire, attor-
ney for the plaintiffs, for an order compelling each party
to bear the costs of its own expert's deposition; and the
Court having considered the moving papers and the op-
position thereto; and for good cause shown herein and in
the accompanying Opinion;

IT IS this 27th day of March, 1996 hereby

**ORDERED** that the plaintiffs' motion is
**GRANTED.**

ROBERT B. KUGLER

United States Magistrate Judge

Westlaw.

212 F.R.D. 470                                                      Page 1

212 F.R.D. 470, 55 Fed.R.Serv.3d 269

**(Cite as: 212 F.R.D. 470)**

**H**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
Leon STAMBLER, Plaintiff,
v.
RSA SECURITY, INC., Verisign, Inc., First Data
Corporation, Omnisky
Corporation, Defendants.
**Civ.A. No. 01-065-SLR.**

Jan. 14, 2003.

Owner of patents for methods of authenticating online transactions sued competitors for infringement. On plaintiff's motion to exclude certain defense witnesses, the District Court, Sue L. Robinson, Chief Judge, held that late-disclosed witnesses would be precluded from testifying.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure** ☞1278
170Ak1278 Most Cited Cases
Factors to be considered when determining whether to exclude late-disclosed witness from testifying are: (1) prejudice or surprise in fact to opposing party, (2) ability of party to cure prejudice, (3) extent of disruption of orderly and efficient trial of case, and (4) bad faith or willfulness of non-compliance.

**[2] Patents** ☞292.4
291k292.4 Most Cited Cases
Nine witnesses not disclosed until less than six weeks before trial would be precluded from testifying in support of patent infringement defendants' summary judgment motions; discovery

had been closed for over four months, late disclosure was unexcused, plaintiff would be prejudiced, and re-opening of fact record would impede court's ability to manage its docket.
*471 Douglas E. Whitney, Maryellen Noreika, J.D. Pirnot, Philip Bangle, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiff. Of Counsel: David S. Shrager, Shrager Spivey & Sachs, Philadelphia, PA.

Fredrick L. Cottrell, III, Richards Layton & Finger, P.A., Wilmington, DE. Of Counsel: William F. Lee , David B. Bassett, Donald R. Steinberg, Mark D. Selwyn, Hale and Dorr, L.L.P., Boston, MA. John D. Lanza, Kia L. Freeman, Testa, Hurwitz & Thibeault, L.L.P., Boston, MA, for Defendant RSA Security, Inc.

Steven J. Balick, John G. Day, Ashby & Geddes, Wilmington, DE. Of Counsel: Thomas W. Winland, Vincent P. Kovalick, Matthew DelGiorno, Finnegan, Henderson, Farabow, Garrett & Dunner L.L.P., Washington, D.C., for Defendant VeriSign, Inc.

William J. Marsden, Jr., Fish & Richardson P.C., Wilmington, DE. Of Counsel: Mathias W. Samuel , Fish & Richardson P.C., Minneapolis, MN. Lawrence Kolodney, Fish & Richardson P.C., Boston, MA, for Defendant First Data Corporation.

**MEMORANDUM OPINION**

SUE L. ROBINSON, Chief Judge.

**I. INTRODUCTION**

On February 2, 2001, plaintiff Leon Stambler ("Stambler") filed this action against defendants RSA Security, Inc. ("RSA Security"), Verisign, Inc. ("Verisign"), First Data Corporation ("First Data") and Omnisky Corporation ("Omnisky") alleging infringement of certain claims of United States

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 204**

212 F.R.D. 470                                                                            Page 2

212 F.R.D. 470, 55 Fed.R.Serv.3d 269

**(Cite as: 212 F.R.D. 470)**

Patent Nos. 5,793,302 (the " '302 patent"), 5,936,541 (the " '541 patent") and 5,974,148 (the " '148 patent") (collectively, the "Stambler patents"). (D.I. 1)

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338(a) and 2201(a). Currently before the court is plaintiff's motion to preclude First Data and Verisign from calling certain witnesses at trial. (D.I. 328) For the following reasons, the court shall grant plaintiff's motion.

**II. BACKGROUND**

The Stambler patents, each entitled "Method for Securing Information Relevant to a Transaction," generally relate to a method of authenticating a transaction, document or party to the transaction using known encryption techniques. (D.I. 293, 294, 295) The patented methods enable parties to a transaction to assure the identity of an absent party and the accuracy of information involved in the transaction. (*Id.*) The patented methods thus provide for secure transactions and prevent fraud. (*Id.*)

**III. DISCUSSION**

Plaintiff argues that nine witnesses should be precluded from testifying at trial due to defendants' belated disclosure of these fact witnesses. Defendants admit that these witnesses were disclosed after the close of fact discovery in the case, but urge the court not to preclude the witnesses from testifying at trial. Following oral argument, the parties represented that the court need only address the motion with regard to three of the witnesses: Mssrs. Kish, Connally and Kathol. [FN1]

> FN1. Defendants intend to offer Mr. Kish to corroborate their expert's testimony regarding invalidity based on the STU-III prior art, Mr. Connally as further support for their defense to infringement under 28 U.S.C. § 1498(a), and Mr. Kathol to provide a history of First Data and its services.

[1] In the Third Circuit, four factors must be considered when determining whether to exclude a witness from testifying: "(1) the prejudice or surprise in fact to the opposing party, (2) the ability of the party to cure the prejudice, (3) the extent of disruption of the orderly and efficient trial of the case, and (4) the bad faith or willfulness of the non-compliance." *Greate Bay Hotel & Casino v. Tose,* 34 F.3d 1227, 1236 (3d Cir.1994) (citing *Beissel v. Pittsburgh and Lake Erie R. Co.,* 801 F.2d 143, 150 (3d Cir.1986)).

[2] There is no reason why defendants did not identify Mssrs. Kish, Connally and Kathol as fact witnesses during fact discovery. Plaintiff will clearly be prejudiced if these witnesses are permitted to now testify **\*472** regarding defenses to this action. Defendants have attempted to cure the prejudice by offering to allow plaintiff to now depose the witnesses. This solution creates more problems than it solves. These witnesses are located throughout the United States. The nine "new" witnesses disclosed are located in at least six different states. The prejudice will only be increased if plaintiff is forced to depose these fact witness less than six weeks before trial.

Furthermore, allowing these witnesses to testify will disrupt the orderly and efficient resolution of this case. Two of these witnesses were identified in response to, or support of, summary judgment motions. Discovery has been closed for over four months. Presently, the court must address the seven pending summary judgment motions.

Allowing defendants to support their summary judgment positions with previously unidentified fact witnesses is clearly prejudicial to plaintiff. Defendants offer to allow depositions of these witness to cure this prejudice. However, re-opening the fact record through depositions at this late stage would impede the court's ability to manage its docket. First the fact record would be re-opened, and then the summary judgment briefs would need to be supplemented to account for the revised record. This is impractical (not to mention disorderly and inefficient) at this late stage. In every trial there comes a time when discovery must

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 205**

212 F.R.D. 470                                                                                    Page 3

212 F.R.D. 470, 55 Fed.R.Serv.3d 269

**(Cite as: 212 F.R.D. 470)**

be closed for the issues to be resolved through summary judgment and/or trial. In the case at bar, that time has long since passed.

**IV. CONCLUSION**

For the reasons stated, the court shall grant plaintiff's motion to preclude First Data and Verisign from calling Mssrs. Kish, Connally and Kathol as witnesses at trial.

212 F.R.D. 470, 55 Fed.R.Serv.3d 269

**Motions, Pleadings and Filings (Back to top)**

• 1:01cv00065 (Docket) (Feb. 02, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 206**

Westlaw.

112 Fed.Appx. 130                                                                                    Page 1

112 Fed.Appx. 130, 2004 WL 2203975 (C.A.3 (N.J.))
**(Cite as: 112 Fed.Appx. 130)**

C

Briefs and Other Related Documents
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
Jerry SZUSTERMAN; 10-12 Sussex Avenue
Corp. Appellants,
v.
**AMOCO OIL COMPANY.**
**No. 03-3360.**

Submitted Under Third Circuit LAR 34.1(a) Sept.
14, 2004.
Decided Sept. 30, 2004.

Appeal from the United States District Court for the
District of New Jersey. (D.C. Civil Action No.
00-cv-04744). District Judge: Honorable Jose L.
Linares.

Stanley B. Cheiken, Philadelphia, PA, Marvin E.
Kramer, Marvin E. Kramer & Associates, Garden
City, NY, for Appellants.
Allan B. Taylor, Steven M. Greenspan, Day, Berry
& Howard, Hartford, CT, for Appellee.

Before SCIRICA, Chief Judge, ALITO and
AMBRO, Circuit Judges.

OPINION

AMBRO, Circuit Judge.
**\*\*1** In 1995, Jerry Szusterman opened a gasoline
station by entering into a franchise agreement with
Amoco Oil Company ("Amoco").[FN1] On
November 27, 2000, Szusterman and 10-12 Sussex
Avenue Corp. ("Sussex") [FN2] brought a suit
against Amoco. Szusterman alleged, *inter alia*,
breach of the implied covenant of good faith and

fair dealing, claiming that his business had
substantially declined because Amoco opened or
allowed to be opened five Amoco-branded gasoline
stations in close proximity to Szusterman's since its
opening. Amoco responded that its agreement with
Szusterman did not grant him any exclusive right to
distribute Amoco gasoline in any particular
geographic area.

> FN1. Amoco is now known as BP
> Products America Inc.

> FN2. Co-plaintiff Sussex is the real
> property owner of Szusterman's gas station
> site. According to Amoco, it has no
> contractual relationship with Sussex. For
> convenience, we refer to Szusterman and
> Sussex jointly and severally only by the
> former's name.

On November 30, 2000, during the discovery
period, the Magistrate Judge approved a pretrial
scheduling order directing the parties to conclude
all discovery by August 30, 2001. Because
Szusterman indicated**\*131** that he planned to
furnish information about his damage claims based
on experts' valuations, the parties were also ordered
to provide information about any of their experts by
June 30, 2001. The record shows that Szusterman
failed to provide Amoco with the basis for his
damage claims or experts' valuations of the alleged
damages despite Amoco's repeated requests for this
information. On August 22, 2001, the Magistrate
Judge modified his pretrial schedule by extending
the discovery deadline by four months until
December 17, 2001 and directing Szusterman to
serve any expert report by October 15, 2001. The
Magistrate Judge warned that there would be no
further extensions of these deadlines. Szusterman
again did not provide information about an expert
witness by the deadline. On February 5, 2002, in
the final pretrial order, the Magistrate Judge stated
that no expert would be permitted to testify at trial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 Fed.Appx. 130                                                           Page 2

112 Fed.Appx. 130, 2004 WL 2203975 (C.A.3 (N.J.))
**(Cite as: 112 Fed.Appx. 130)**

unless information about the expert and his report were provided. Szusterman failed to provide the relevant information.

On February 15, 2002, Szusterman requested additional time to locate an expert. On March 5, 2002, the Magistrate Judge denied that request. He explained that the denial was consistent with the earlier warning. The District Court upheld this decision on March 19, 2002. Upon Szusterman's motion for reconsideration, the District Court again affirmed its decision on April 26, 2002, stating that " there [was] no explanation for [Szusterman's] failure to timely request an extension to disclose an expert." It added that whether Szusterman "had already chosen a tentative expert and did not disclose him because he may not have been available ... does not help [Szusterman]" and that " [Szusterman] should have disclosed [the expert] and later requested leave to change experts if he became unavailable." The District Court concluded that Szusterman "failed to show that the Magistrate Judge[ ]'s Order was clearly erroneous or contrary to the law." *See United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("Review by the district court of the magistrate's determination of the[ ] nondispositive motions is on a 'clearly erroneous or contrary to law ' standard."); *see generally* 28 U.S.C. § 636.

**\*\*2** Thereafter, the record shows that Szusterman did not furnish any facts or methodology based on which he calculated his alleged damages, despite the repeated requests to do so. Amoco thus moved to preclude Szusterman from offering evidence concerning damages and requested summary judgment. On July 8, 2003, the District Court granted Amoco's motion and entered summary judgment against Szusterman.

In ruling to preclude Szusterman from offering evidence of damages at trial, the District Court, among other things, pointed out that Szusterman failed to provide a computation of his alleged $10,000,000 damages required by Federal Rule of Civil Procedure 26(a)(1)(C).[FN3] The Court stated that Szusterman "ha[d] no substantial justification for failing to disclose the information**\*132** that has been requested both by [Amoco] and required in the

pretrial order and under the rules over the last almost three years...." Moreover, as the District Court noted, although Szusterman demanded $10,000,000 in damages, when asked how he had calculated that figure in his deposition, he answered, "I don't know."

> FN3. The Rule provides in pertinent part:
> (a) Required Disclosures; Methods to Discover Additional Matter.
> (1) Initial Disclosures.... *[A] party must, without awaiting a discovery request, provide to other parties:* ...
> (C) *a computation of any category of damages* claimed by the disclosing *party, making available for inspection and copying* as under Rule 34 *the documents or other evidentiary material,* not privileged or protected from disclosure, *on which such computation is based,* including materials bearing on the nature and extent of injuries suffered;....
> Fed. R. Civ. Proc. 26(a)(1)(c) (emphasis added).

Further concluding that the dismissal of the case was the only appropriate sanction, the District Court found that Szusterman's failure to provide required information was not only unjustified, but was prejudicial to Amoco. He explained: "There is no question that[,] without this information, [Amoco] would not be able to respond adequately to damages that are alleged by [Szusterman] and is left to wonder what ... [Szusterman]'s damages and methodologies are...." Plus, the Court found Szusterman's failure to abide by the Federal Rule was willful "because it was clear from the many requests that [he was] aware that this information was necessary, sought and ordered by the Court." Applying the *Poulis* factors,[FN4] the District Court ultimately concluded (on the morning of trial) that sanctions other than dismissal would be ineffective.

> FN4. *See Poulis v. State Farm Fire and Cas. Co.,* 747 F.2d 863, 868 (3d Cir.1984) ("In exercising our appellate function to determine whether the trial court has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 208**

112 Fed.Appx. 130                                                                                      Page 3

112 Fed.Appx. 130, 2004 WL 2203975 (C.A.3 (N.J.))
**(Cite as: 112 Fed.Appx. 130)**

abused its discretion in dismissing, or refusing to lift a default, we will be guided by the manner in which the trial court balanced the following factors, which have been enumerated in the earlier cases, and whether the record supports its findings: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.").

Szusterman moved for reconsideration. On August 26, 2003, the District Court denied that motion. Szusterman appeals. His claim is that the District Court abused its discretion when it (a) affirmed the Magistrate Judge's refusal to extend the deadline further for disclosing Szusterman's experts, (b) excluded his evidence for damages at trial, and (c) ultimately dismissed his case. For the reasons given by the District Court, we agree with its decision to uphold the Magistrate Judge's ruling and to exclude Szusterman's evidence concerning damages at trial. Upon reviewing the record before us, we are convinced that the District Court thoroughly examined Szusterman's arguments, carefully weighed the *Poulis* factors, and reasonably concluded that the dismissal was warranted. Therefore, we affirm.

C.A.3 (N.J.),2004.
Szusterman v. Amoco Oil Co.
112 Fed.Appx. 130, 2004 WL 2203975 (C.A.3 (N.J.))

Briefs and Other Related Documents (Back to top)

• 2004 WL 3759770 (Appellate Brief) Appellants' Reply Brief (Apr. 9, 2004) Original Image of this Document (PDF)
• 2004 WL 3759769 (Appellate Brief) Appellee's Brief (Mar. 26, 2004) Original Image of this Document (PDF)

• 2004 WL 3759768 (Appellate Brief) Appellants' Brief (Feb. 17, 2004) Original Image of this Document (PDF)
• 03-3360 (Docket) (Aug. 13, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 209**

**LISA M. TOLERICO, DARLENE K. DEVINE, DENISE RUMBALSKI, JEANETTE M. BURNS, CHRISTINE BROWNING, Plaintiffs VS. THE HOME DEPOT, Defendant**

**3:CV-99-2262**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

*205 F.R.D. 169; 2002 U.S. Dist. LEXIS 255*

**January 9, 2002, Decided**

**DISPOSITION:** [**1] Defendant's Motion for Summary Judgment as to the claims of plaintiff Jeanette M. Burns was denied. Burns' attorney were sanctioned for failure to comply with discovery order.

**COUNSEL:** For LISA M. TOLERICO, DARLENE K. DEVINE, DENISE RUMBALSKI, JEANETTE M. BURNS, CHRISTINE BROWNING, plaintiffs: Joseph T. Wright, Jr., Danielle M. Mulcahey, Wright & Associates, Patrick J. Donahue, Scranton, PA.

For THE HOME DEPOT, defendant: Judith Everett Harris, Lisa Ann Cooney, Morgan Lewis & Bockius, LLP, Philadelphia, PA.

**JUDGES:** Thomas I. Vanaskie, Chief Judge, Middle District of Pennsylvania.

**OPINION BY:** Thomas I. Vanaskie

**OPINION:**

### [*171] MEMORANDUM

At issue in this employment discrimination action is whether the affidavit of Patrick Donahue, Esq., averring that he delivered to the Equal Employment Opportunity Commission (EEOC) a "Charge Questionnaire" on behalf of plaintiff Jeanette M. Burns within three (3) weeks of her termination of employment with defendant Home Depot U.S.A., Inc. (Home Depot), is sufficient to defeat a summary judgment motion based upon the absence of evidence in EEOC records of receipt of the Charge Questionnaire. A threshold subsidiary issue in this matter is whether the Charge Questionnaire dated April 1, 1998, as well as Attorney Donahue's affidavit, [**2] should be excluded because neither the Charge Questionnaire nor the information expressed in Attorney Donahue's affida-

vit was provided as part of the disclosures mandated by *Rule 26(a)(1) of the Federal Rules of Civil Procedure* or in response to Home Depot's discovery requests. Having carefully considered the issues, I have concluded that the extreme sanction of exclusion of evidence is not warranted, but that Burns' attorneys must pay the counsel fees and expenses incurred by Home Depot as a result of the failure to provide plainly relevant documents, the disclosure of which was required by *Fed.R.Civ.P. 26(a)(1)* and which fell within the ambit of Home Depot's discovery requests. I have also concluded that the evidence tendered on behalf of Ms. Burns is sufficient to compel denial of Home Depot's summary judgment motion.

### I. BACKGROUND

On December 30, 1999, Ms. Burns, along with four other women, brought this action against Home Depot, asserting claims of a sexually hostile work environment, sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e*, et seq., and the Pennsylvania Human Relations [**3] Act (PHRA), *43 Pa. Stat. Ann. § 951*, et seq. Ms. Burns worked for Home Depot from May 15, 1997 until March 25, 1998. She contends that she was compelled to leave her job with Home Depot because of sexual harassment.

In late March or early April of 1998, Ms. Burns, with the assistance of Atty. Donahue, completed an EEOC Charge Questionnaire. (Burns Supplemental Deposition at 32.) n1 Attached to the Charge Questionnaire was an "Employee Statement" on a Home Depot form that identified the alleged harasser and provided some detail as to Ms. Burns' claims. The Charge Questionnaire is dated "4-1-98," and was signed under penalty of perjury by Ms. Burns. (See Exhibit "K" in Plaintiff's Appendix of Exhibits in Opp. to the Home Depot S.J. Mot.)

Page 2

205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

n1 I understand that Home Depot does not concede the accuracy of the testimony presented on the question of completion of the Charge Questionnaire in the early Spring of 1998. For purposes of ruling on Home Depot's summary judgment motion, however, the testimony presented by Ms. Burns and Atty. Donahue on this issue must be accepted as true.

[**4]

On April 8, 1998, Atty. Donahue, along with the other four plaintiffs in this action, traveled to the EEOC office in Philadelphia; Ms. Burns did not accompany Atty. Donahue. (Aff. of Atty. Donahue, P 3, attached as Exhibit "O" to Plaintiff's Appendix of Exhibits [*172] in Opp. to Home Depot's S.J. Mot.). Atty. Donahue claims that he presented the Charge Questionnaire along with Ms. Burns' written statement to the EEOC on April 8, 1998. (Id. at PP 4-6.)

It is undisputed that the April 1, 1998 Charge Questionnaire completed by Ms. Burns was not docketed by the EEOC, nor was a charge number assigned to Burns' claim in April of 1998. Indeed, there is no confirmation from the EEOC that it received this Charge Questionnaire. It is also undisputed that the EEOC did not take any action whatsoever in connection with Ms. Burns' claim as a result of the April 1, 1998 Charge Questionnaire.

In late 1998 or early 1999, Atty. Joseph T. Wright, Jr. and the law firm of Wright & Associates became involved in the representation of Ms. Burns and the other four plaintiffs. (Statement of Wright & Associates Regarding Imposition of Sanctions, P 1.) At that time, Wright & Associates received a copy of the [**5] April 1, 1998 Charge Questionnaire and the Employee Statement appended thereto. (Id.) In September of 1999, Atty. Wright requested the EEOC to issue "right to sue" letters on behalf of all five plaintiffs. (Id., P 3.) Right to sue letters were received for the other four plaintiffs, but not for Ms. Burns. (Id.) According to Atty. Wright, he again inquired of Atty. Donahue as to whether he had pursued administrative remedies on behalf of Ms. Burns, and Atty. Donahue once again confirmed that he had. (Id.)

Upon learning that Atty. Wright had not received a right to sue letter for Ms. Burns, Atty. Donahue contacted the EEOC Philadelphia office. (Donahue Dep. at 19-20.) According to Donahue, he was informed that the EEOC did not have any record of the Burns' Charge Questionnaire and he was directed to "resubmit the paperwork . . . ." (Id. at 20.)

In November of 1999, Atty. Donahue met with Ms. Burns, ostensibly for the purpose of preparing the appropriate documents to send to the EEOC. (Id. at 44.) Atty. Wright was not informed of this meeting or that Atty. Donahue was submitting charging documents on behalf of Ms. Burns at that time. (Statement of Wright & Associates [**6] at P 4; Donahue Dep. at 44.)

By letter dated November 12, 1999, Atty. Donahue submitted to the EEOC on behalf of Ms. Burns a "completed Charge Questionnaire, Sexual Harassment Questionnaire, Dual Filing Request, Charge Information Questionnaire, Harassment Questionnaire, and Allegations of Employment Discrimination Form." The Charge Questionnaire submitted in November of 1999 answered in the negative the following questions:

Have you filed a complaint about the action you think was discriminatory . . . ? Have you filed an EEOC charge in the past?

No reference was made in the November 1999 submissions to the alleged April 8, 1998 delivery of a Charge Questionnaire on behalf of Ms. Burns to the EEOC.

By letter dated December 22, 1999 and addressed to Ms. Burns with a copy to Atty. Donahue, n2 the EEOC asserted that it had no authority to investigate Burns' allegations because her complaint had not been received within 300 days of her alleged termination of employment. n3 The December 22nd letter informed Ms. Burns and Atty. Donahue that if they were of the opinion that the matters of which she was complaining fell within EEOC jurisdiction, they could "recontact" the [**7] EEOC Philadelphia office. By letter dated December 28, 1999, Atty. Donahue advised the EEOC that "Ms. Burns was informed that the filing was outside of the 300-day limit. . ., but she would request that the [*173] EEOC file her charge and issue a right to sue letter on her behalf immediately." (EE 00223.) Ms. Burns is indicated as having been forwarded a copy of Atty. Donahue's letter. There is no indication that a copy of this letter was sent to Atty. Wright.

n2 The December 22, 1999 EEOC letter is included under Tab 13 of the Supporting Documents to Reply Memorandum in Further Support of Defendant's Motion for Summary Judgment as to Plaintiff Jeanette M. Burns, and bears Bates Number EE 00222. Hereinafter, documents produced by Home Depot under Tab 13 and bearing

Case 1:04-cv-01282-JJF    Document 156    Filed 10/02/2006    Page 35 of 52

Page 3
205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

Bates Numbers will be identified by the pertinent Bates number only.

n3 The December 22, 1999 EEOC letter stated:

In your correspondence, you alleged that your most recent date of harm was March 25, 1998. Your correspondence was received in this office on November 19, 1999. Because your complaint was not received within 300 days of the alleged discrimination, the EEOC has no authority to investigate your allegations.

[**8]

On December 30, 1999, a complaint was filed in this Court on behalf of Ms. Burns and the other four plaintiffs. Significantly, as to the other four plaintiffs, the Complaint alleged that "in or about April 1998," each plaintiff had filed a charge of sex discrimination with the EEOC, the charge was assigned a specific "charge number," and "all administrative prerequisites for maintaining this case have been satisfied." (Complaint, PP 9-11 and 13.) As to Ms. Burns, however, the Complaint merely averred that she had filed a charge of sex discrimination with the EEOC and that "all administrative prerequisites for maintaining this case" had been met. (Id., P 12.) The Complaint did not allege an approximate date when Ms. Burns purportedly filed a charge of sex discrimination and did not indicate that a Charge Number had been assigned to her claim. The Complaint was signed by Danielle M. Mulcahey, Esq. as an attorney of Wright & Associates. It also appears that Atty. Mulcahey signed the Complaint on behalf of Atty. Donahue. n4

n4 The signature for Atty. Donahue appears to be in Ms. Mulcahey's handwriting and, following the signature, her initials appear in parentheses. It is disturbing that one lawyer would sign a document covered by *Fed.R.Civ.P. 11* on behalf of another attorney. The presentation of the signed pleading constituted a certification that the allegations and factual contentions contained therein had evidentiary support. *Fed.R.Civ.P. 11(b)(3)*. It would appear that Atty. Donahue could not have made the requisite certification that the administrative prerequisites for maintaining this action on behalf of Mr. Burns had been

satisfied at the time the Complaint was filed because he knew that a right to sue letter had not been received. It is also apparent that he knew at that time that the EEOC did not have a record of having received a Charge Questionnaire on behalf of Ms. Burns prior to November of 1999.

[**9]

By Letter dated January 4, 2000, the EEOC sent to Atty. Donahue a draft charge prepared on the basis of the questionnaires that Ms. Burns had completed in November of 1999. (EE 00226.) The EEOC letter, a copy of which was sent to Ms. Burns, further stated:

In order to preserve [Ms. Burns'] private suit rights under Title VII . . ., please have your client sign and date the charge and return it . . . . After a signed charge is received, it will be docketed (given a number) and then dismissed because it was untimely filed and a Notice of Right to sue will be issued to Ms. Burns.

By Order entered in this action on February 16, 2000, a Case Management Conference was scheduled for April 6, 2000. As part of the requirements for a Case Management Conference, the parties are required to submit a Joint Case Management Plan. In this Plan, the parties are to identify pertinent factual and legal issues and identify the disclosures made pursuant to *Fed.R.Civ.P. 26(a)(1)*. At the time the Case Management Conference was scheduled in this matter, Rule 26(a)(1) required a party, without awaiting a discovery request from any other party, to provide copies of or identifying information [**10] pertaining to relevant documents.

In the Joint Case Management Plan filed in this action on March 30, 2000, Home Depot asserted that Ms. Burns had not filed a charge of discrimination with the EEOC or the PHRC, and thus could not maintain a discrimination claim. Home Depot also raised as a pertinent legal issue the question of whether Ms. Burns' Title VII and PHRA claims were barred by the applicable statute of limitations. While the April, 1998 Charge Questionnaire is undoubtedly pertinent to this issue, plaintiffs' response to the request for identification of categories of documents it had disclosed under Rule 26(a)(1) was, "None."

By Notice dated April 3, 2000, the EEOC informed Ms. Burns and Atty. Donahue that her discrimination charge had been dismissed "because it was not filed within the time limit required by law." (EE 00219.) There is no indication that Atty. Wright was provided a copy of the EEOC Dismissal and Notice of Rights. n5

Page 4

205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

n5 In addition to Atty. Donahue, "Home Depot" is listed as being sent a copy of the Dismissal and Notice of Rights. There is no indication, however, as to an address for Home Depot to which the Notice was sent. Nor is there any indication that Home Depot's counsel in this matter was aware of the Dismissal and Notice of Rights form dated April 3, 2000.

[**11]

[*174] During the course of discovery, Home Depot propounded a request for production of all documents that Ms. Burns had "submitted to any federal, state or local administrative agency, including but not limited to the [EEOC] [and] the [PHRC]." The response to this discovery request, signed by Atty. Wright on August 4, 2000, asserts that "plaintiff has no responsive documents." n6

n6 The response to the pertinent requests for production of documents is included as part of Home Depot's Exhibit 10 to its summary judgment motion.

Armed with the concession that there was no documentation evidencing pursuit of administrative remedies on behalf of Ms. Burns, Home Depot moved for summary judgment on her Title VII and PHRA claims. The brief filed in support of Home Depot's motion relied upon the absence of evidence of the filing of any document with the EEOC or PHRC, as well as the absence of any evidence that Ms. Burns had received a right-to-sue letter from the EEOC.

On January 31, 2001, Ms. Burns' counsel, for the [**12] first time, produced in this case a copy of the April 1, 1998 Charge Questionnaire. Also included with the papers opposing Home Depot's summary judgment motion was Atty. Donahue's Affidavit, in which he asserted:

. He had delivered the Burns' Charge Questionnaire to the EEOC on April 8, 1998;

. He "subsequently learned that the Charge Questionnaire and written statement . . . were never docketed";

. He "immediately sent the information in again. This time, the claim was processed and eventually docketed and given a charge number of 170A00583."

Attached as Exhibit 1 to Atty. Donahue's affidavit was the April 1, 1998 Charge Questionnaire. Atty.

Donahue did not present with his affidavit, however, copies of the documents that he sent to the EEOC in November of 1999. Nor did Ms. Burns' counsel provide at that time the right to sue letter dated April 3, 2000.

As a result of the untimely disclosure of documents and information pertinent to the question of timely exhaustion of administrative remedies, Home Depot submitted to the EEOC a request for information under the Freedom of Information Act (FOIA). It was only as a result of the FOIA request that Home Depot obtained copies of the [**13] documents that Ms. Burns had submitted to the EEOC in November of 1999, along with the EEOC correspondence and notice to plaintiff that her claim was untimely.

On March 7, 2001, Home Depot filed a reply memorandum in support of its summary judgment motion. Apprising the Court of the untimely revelation of information pertinent to the question of exhaustion of administrative remedies, Home Depot requested that no credence be given to the documents submitted in opposition to the summary judgment motion.

The disconcerting conduct of plaintiff's counsel in failing to produce pertinent documents was raised in an Order of this Court dated October 3, 2001. The Order directed that Ms. Burns and her counsel show cause in writing why sanctions should not be imposed for failure to produce documents pertinent to the question of timely exhaustion of administrative remedies. Home Depot was granted leave to conduct discovery on the question of sanctions, including deposing Ms. Burns and her counsel. The October 3rd Order scheduled a hearing on the question of sanctions for October 26, 2001. The hearing was to be preceded by oral argument on the summary judgment motion. The parties were directed [**14] to address at oral argument the question of whether the timeliness of the filing of an administrative charge of discrimination should be determined as of the date that the EEOC acknowledges receipt of a charge of discrimination, or as of the date that the plaintiff claims to have submitted the charging document, irrespective of the absence of any record of its receipt by the EEOC and without consideration of the fact that the adverse party had not received notice of the claim.

[*175] On October 16, 2001, Wright & Associates filed a written statement on the matter of sanctions. Atty. Donahue, however, did not submit a written statement.

A hearing on the summary judgment motion and the question of sanctions was conducted on October 26, 2001. Thereafter, the parties supplied transcripts of the supplemental deposition of Jeanette Burns, taken on October 23, 2001, and the deposition of Atty. Donahue, taken on October 25, 2001. Counsel for Ms. Burns and

Page 5

205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

Home Depot have submitted additional memoranda of law. This matter is now ripe for disposition.

## II. DISCUSSION

### A. Exclusion of Evidence of the Filing of a Charge Questionnaire in April of 1998

**Rule 37(c)(1)** of the Federal [**15] Rules of Civil Procedure, in pertinent part, provides:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

At the time that initial disclosures were due in this case, Rule 26(a)(1)(B) required disclosure of documents in the possession, custody, or control of a party that were relevant to disputed facts alleged with particularity in the pleadings. See *Fed.R.Civ.P. 26(a)(1)(B)* (West circa 1999 Ed.) As noted above, the Complaint alleged that Ms. Burns had filed a charge of sex discrimination with the EEOC and that all administrative prerequisites for maintaining this case had been satisfied. Moreover, Home Depot, in its answer, averred that to the best of its knowledge, Ms. Burns had not filed a charge of discrimination with either the EEOC or PHRC. The April 1, 1998 Charge Questionnaire and the documents submitted to the EEOC in late 1999 and early 2000 were plainly relevant to disputed [**16] facts that had been alleged with particularity in the pleadings. Indeed, it is undisputed that the April 1, 1998 Charge Questionnaire, upon which Ms. Burns relies to contest Home Depot's summary judgment motion, was a document that should have been part of plaintiff's initial disclosures under Rule 26(a)(1). It is also undisputed that the April 1, 1998 Charge Questionnaire was in the possession of Wright & Associates at the time that Rule 26(a)(1) disclosures were to be made. It is, furthermore, indisputable that Atty. Donahue was in possession of the documents submitted to the EEOC in late 1999 and early 2000. There also can be no dispute that Ms. Burns' counsel did not produce the documents in response to an appropriate discovery request, claiming that there were "no responsive documents" that "in any way record, refer or relate to the allegations of the Complaint, and which [Ms. Burns] . . . submitted to any federal, state or local administrative agency, including but not limited to the [EEOC], [and the PHRC]. . . ." (See Ms. Burns' Response to Defendant's First Request for Production of Documents, P 12, included under Tab 10 of the Supporting Documents

to Home Depot's [**17] Reply Memorandum.) Significantly, Atty. Donahue acknowledged reviewing the discovery responses before they were served on Home Depot. (Donahue Dep. at 37.)

**Rule 37(c)(1)** calls for the exclusion of evidence that should have been disclosed pursuant to Rule 26(a) unless (a) the non-disclosing party provides substantial justification for its failure, or (b) the failure to make the required disclosure is harmless. The non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless. See *Stallworth v. E.Z. Serve Convenience Stores, 199 F.R.D. 366, 368 (M.D. Ala. 2001)*. Ms. Burns cannot meet either of these conditions.

"Substantial justification" for the failure to make a required disclosure has been regarded as "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *United States v. Dentsply Intern., Inc., 2000 U.S. Dist. LEXIS 6994, No. Civ. A. 99-5, 2000 WL 654378, *7 (D. Del. May 10, 2000)*. "The test of substantial justification is satisfied if 'there exists a [*176] genuine dispute concerning compliance. [**18] '" *Henrietta D. v. Giuliani, 2001 U.S. Dist. LEXIS 21848, No. 95- CV-0641, 2001 WL 16021114, *5 (E.D. N.Y. Dec. 11, 2001)*. In this case, Atty. Wright does not claim to have withheld the April 1, 1998 Charge Questionnaire on the ground that he reasonably believed that the document fell outside Rule 26(a)(1) disclosure requirements. Instead, he contends that the failure to produce the documents was "inadvertent and due to a misunderstanding." Atty. Donahue, while conceding that he is unable to refute Atty. Wright's assertion that Atty. Wright was unaware of the filings made with the EEOC in late 1999 and early 2000, (Donahue Dep. at 44), offers no excuse for the failure to produce the documents during discovery. n7 Clearly, Ms. Burns' attorneys have not offered "substantial justification" for their failure to produce plainly relevant documents.

---

n7 With respect to the April 1, 1998 Charge Questionnaire, the following exchange occurred at Donahue's deposition:

> Q. Can you tell me why [the April 1, 1998 Charge Questionnaire] was not produced in discovery?
>
> * * *
>
> A. I do not know.

Page 6

205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

Q. You reviewed the discovery, didn't you?

A. Yes. There was enormous amounts of material, so it may have slipped my observation.

Q. Do you believe you have any responsibility for the non-production of [the April 1, 1998 Charge Questionnaire]?

A. As co-counsel, I do.

Donahue Dep. at 60.

[**19]

"A party's misconduct is harmless if it involves an honest mistake, coupled with sufficient knowledge by the other party of the material that has not been produced." *Stallworth, 199 F.R.D. at 369*. This connotation of the term "harmless" is derived from the Committee Note to the 1993 amendments to Rule 37(c), which offers as examples of "harmless" violations of Rule 26(a), the inadvertent failure to disclose the name of a potential witness known to all parties or the failure to list as a trial witness a person listed by another party. See *Burney v. Rheem Mfg. Co., 196 F.R.D. 659, 692 (M.D. Ala. 2000)*. Home Depot was clearly unaware of the existence of the April 1, 1998 Charge Questionnaire and the other documents pertinent to the issue of exhaustion of administrative remedies. Thus, the non-disclosure of the pertinent documents cannot be regarded as "harmless." See *Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1008-09 (8th Cir. 1998)* (affirming exclusion of evidence where defendant had relied upon the absence of that evidence in moving for summary judgment).

If **Rule 37(c)(1)** were limited to the one sentence quoted at the start of this [**20] section of the Opinion, exclusion of the April 1, 1998 Charge Questionnaire and Atty. Donahue's affidavit may be mandated. The second and third sentences of **Rule 37(c)(1)**, however, suggest that exclusion is not so automatic. Those sentences provide:

In addition to or in lieu of [the exclusion] sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may

include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure. [Emphasis added.] n8

n8 The sanctions authorized under Rule 37(b)(2)(A), (B), and (C) include specifying certain facts to be taken as established for purposes of the action, refusing to allow a disobedient party to take a certain position, and dismissing the action.

The fact that Rule 37(c) prescribes that a court [**21] may impose certain sanctions "in lieu of" exclusion has been regarded as conveying a measure of discretion in determining whether to bar evidence based upon a party's failure to comply with Rule 26(a). See, e.g., *Rambus, Inc. v. Infineon Technologies AG, 145 F. Supp. 2d 721, 726 (E.D. Va. 2001)*. Our Court of Appeals has declared that "even under Rule 37, 'the imposition of sanctions for abuse of discovery . . . is a matter within the discretion of the trial court.'" *Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995)*. More recently, in *Nicholas v. Pennsylvania State University, 227 F.3d 133, 148 (3d Cir. 2000)*, our Court of Appeals held:

[*177]

In considering whether the exclusion of evidence is an appropriate sanction for failure to comply with discovery duties, we must consider four factors: (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or wilfulness in failing [**22] to comply with a court order or discovery obligation.

Application of these four factors, which emanate from *Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-05 (3d Cir. 1977)*, overruled on other grounds, *Goodman v. Lukens, 777 F.2d 113 (3d Cir. 1985)*, aff'd, *482 U.S. 656, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)*, is consistent with the admonition that "courts in the Third Circuit should exercise particular restraint in considering motions to exclude evidence." *ABB Air Preheater, Inc. v. Regenerative Environmental*

205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

Equipment Co., 167 F.R.D. 668, 671 (D. N.J. 1996). Thus, trial courts in the Third Circuit have applied the Pennypack factors when considering whether to exclude evidence as a sanction under **Rule 37(c)(1)**. See, e.g., id. at 672; Finch v. Hercules, Inc., 1995 U.S. Dist. LEXIS 19805, No. Civ.A. 92-251, 1995 WL 785100, *17 (D. Del. Dec. 22, 1995); Kotes v. Super Fresh Food Markets, Inc., 157 F.R.D. 18, 20 (E.D. Pa. 1994).

In this case, the second and third Pennypack factors militate against exclusion of evidence because Home Depot has been provided the ability [**23] to cure the prejudice of untimely disclosure by use of FOIA procedures and additional depositions of witnesses, and this case was not scheduled for trial when the untimely disclosure was made so that the progress of this case was not materially impeded by the Rule 26(a) violation. In this regard, it bears reiterating that Ms. Burns is but one of five plaintiffs, and Home Depot had moved for summary judgment on the merits as to three of the five plaintiffs. Home Depot's summary judgment motions as to the other plaintiffs were pending when the untimely disclosure of the April 1, 1998 Charge Questionnaire was made. Also militating against the exclusion sanction is the absence of bad faith or wilfulness on the part of plaintiffs' counsel in failing to produce the plainly relevant documents. As pointed out by Atty. Wright, it was plainly in Ms. Burns' best interests to disclose the existence of the April 1, 1998 Charge Questionnaire. Furthermore, I find credible his declaration that he was unaware of the filings made on behalf of Ms. Burns by Atty. Donahue in late 1999 and early 2000. While Atty. Donahue may have had a strong motive to conceal the existence of the EEOC filings made in 1999 [**24] and 2000, the exclusion of that evidence would not benefit Home Depot as that evidence supports Home Depot's timeliness challenge. Thus, application of the Pennypack factors compels rejection of the exclusion sanction.

Although evidence will not be excluded, Ms. Burns' attorneys bear responsibility for the consequences of their purported "inadvertence." Home Depot was fully justified in moving for summary judgment based upon the state of the record developed during the course of discovery. But for the failure of Ms. Burns' attorneys to produce pertinent documents, Home Depot would not have been induced to move for summary judgment based upon the absence of evidence of exhaustion of administrative remedies. Under these circumstances, Ms. Burns' attorneys shall be required to pay the fees and expenses incurred by Home Depot in moving for summary judgment and filing the initial memorandum of law in support of that motion. Home Depot also incurred fees and expenses in obtaining documents that should have been produced by Ms. Burns' attorneys. Accordingly, Ms. Burns' attorneys will be required to pay the fees and ex-

penses incurred in connection with the FOIA request. Finally, the failure [**25] to produce the required documents necessitated a supplemental deposition of Ms. Burns and a deposition of Atty. Donahue. Plaintiffs' counsel will be required to pay the fees and expenses incurred in taking those depositions. As both Wright & Associates and Atty. Donahue serve as co-counsel for Ms. Burns, and as each shoulders responsibility for the failure to comply with Rule 26(a), [*178] each will be responsible for 50 percent of the monetary sanction imposed by this decision. n9

> n9 The hours expended by Home Depot's counsel in filing its reply brief and its post-argument brief were the product of Home Depot's decision to continue to seek summary judgment knowing that there was some evidence suggesting a timely filing of an administrative charge of discrimination. The fees and expenses for such work, therefore, cannot be attributed to the untimely nature of the disclosure of the evidence on which Ms. Burns now relies. Accordingly, Ms. Burns' attorneys are not responsible for payment of fees and expenses incurred in connection with the filing of the reply brief and post-argument brief. Moreover, the oral argument conducted by the Court in this matter was based upon an issue identified by the Court, and was not the result of the untimely nature of the disclosure of the April 1, 1998 Charge Questionnaire. Accordingly, plaintiffs' counsel will not be required to reimburse Home Depot the fees and expenses incurred in connection with the oral argument. Because the hearing on the question of sanctions was conducted immediately after the oral argument, apportionment of time between the oral argument and the hearing on sanctions would be difficult. Accordingly, Ms. Burns' attorneys will not be required to pay the fees and expenses incurred in connection with the hearing on the question of sanctions.

[**26]

## B. Significance of the April 1, 1998 Charge Questionnaire and Donahue Affidavit

Under EEOC regulations, a charge of employment discrimination "is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b). Consistent with this pragmatic approach to determining the sufficiency of a charge of employment discrimination, courts have found

Page 8

205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

a verified charge questionnaire to be sufficient to toll the running of the time period within which a discrimination charge must be filed. See, e.g., *McGarrah v. Kmart Corp., 1999 U.S. Dist. LEXIS 10495,* *7, No. 3:97- CV-2386 (N.D. Tex. July 2, 1999).*

Burns asserts that the April 1, 1998 Charge Questionnaire qualifies as a charge of employment discrimination, an assertion with which Home Depot does not take issue. Burns further asserts that Atty. Donahue's affidavit provides adequate evidence of receipt of the Charge Questionnaire by the EEOC within a few weeks of the termination of Burns' employment. Home Depot vigorously disputes [**27] this assertion, framing the dispositive issue as "whether Atty. Donahue's Affidavit is sufficient summary judgment evidence . . . ." (Supplemental Brief in Support of S.J. Mot. (Dkt. Entry 57) at 4.)

In support of its contention that Atty. Donahue's affidavit is not sufficient to create a genuine issue as to whether the Charge Questionnaire was received by the EEOC in April of 1998, Home Depot relies upon the presumption of accuracy to which EEOC public records are entitled. Home Depot thus asserts that "the fact that the Burns-EEOC file does not contain the 'April Questionnaire' or any other timely charge is admissible evidence tending to show that the EEOC received no timely charge." (Id. at 9.)

While the absence of an entry in the EEOC record may indeed be admissible, see *Fed. R. R. Ev. 803(7),* Home Depot has not advanced any authority that the absence of evidence of receipt of the Charge Questionnaire is conclusive on the issue. Thus, while Home Depot may be entitled to admit evidence of the absence of any EEOC record pertaining to the April 1, 1998 Charge Questionnaire, Atty. Donahue's affidavit is sufficient to call into question the accuracy of the EEOC records.

Home [**28] Depot insists, however, that the failure of Burns' attorney to respond to the EEOC's invitation to contest its determination that the November, 1999 filing was untimely constitutes an admission that forecloses Ms. Burns from contending otherwise. Although it may be that the silence of Burns' attorney in the wake of the EEOC invitation to submit information on its timeliness determination constitutes an admission under *Fed. R. Ev. 801(d)(2),* as argued by Home Depot, it does not follow that such an admission precludes Burns from now contending otherwise. Indeed, Home Depot has not cited any authority for the novel proposition that an evidentiary admission under *Fed. R. Ev. 801(d)(2)* precludes a party from taking a [*179] contrary position. Instead, Home Depot appears to be contending that there is such "an overwhelming quantity of evidence showing that the EEOC did not receive a timely charge," (Supplemental

Brief in Support of S.J. Mot. at 4), that no reasonable jury could conclude otherwise.

In this case, Ms. Burns testified at her supplemental deposition that she completed a Charge Questionnaire in late March or early April of 1998. (Burns' Supplemental Dep. at 32.) She further confirmed [**29] that the April 1, 1998 Charge Questionnaire submitted as an attachment to Atty. Donahue's affidavit was the document that she had completed at that time. (Id.) She further testified that Atty. Donahue had informed her in April or May of 1998 that he had delivered the completed Charge Questionnaire to the EEOC. (Id. at 47.) It is undisputed that Atty. Donahue was at the EEOC Philadelphia Office in early April, 1998, and presented documents on behalf of Ms. Burns' co-plaintiffs.

Summary Judgment is not warranted where the opposing party presents evidence that is more than merely colorable. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* In this case, there is more than Atty. Donahue's "assertion" of the submission of the Charge Questionnaire in April of 1998. There is the evidence that the document in question was in fact completed at that time, as well as the evidence that Atty. Donahue was at the Philadelphia EEOC Office in early April, at which time he delivered charge questionnaires on behalf of co-plaintiffs. This evidence is sufficient to create a genuine dispute as to whether the Burns Charge Questionnaire [**30] was also delivered to the EEOC in April of 1998. As Home Depot has not contended that the EEOC must have acknowledged receipt of the Charge Questionnaire in order to stop the running of the limitations clock, n10 and there is a genuine dispute as to whether the EEOC actually received the April 1, 1998 Charge Questionnaire in early April of 1998, summary judgment on the timeliness of Ms. Burns' EEOC filing is precluded.

n10 This Court's Order of October 3, 2001 had invited the parties to address the question of whether an EEOC acknowledgment of receipt of a charging document was required to toll the limitations period. Home Depot has not cited any authority or made any argument to this effect, apparently conceding that acknowledgment of receipt is not necessary.

## III. Conclusion

For the reasons set forth above, Home Depot's summary judgment motion will be denied. Plaintiffs' attorneys, however, will be sanctioned for their failure to

Case 1:04-cv-01282-JJF    Document 156    Filed 10/02/2006    Page 41 of 52

Page 9

205 F.R.D. 169, *; 2002 U.S. Dist. LEXIS 255, **

comply with their discovery duties. An appropriate Order follows. [**31]

Thomas I. Vanaskie, Chief Judge

Middle District of Pennsylvania

FILED: 1/9/02

**ORDER**

**NOW, THIS 9th DAY OF JANUARY, 2002,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment as to the claims of plaintiff Jeanette M. Burns (Dkt. Entry 18) is **DENIED.**

2. Wright & Associates and Atty. Patrick J. Donahue shall each pay 50 percent of the reasonable attorneys' fees and expenses incurred by the defendant in (a) moving for summary judgment and filing a brief in support of that motion; (b) obtaining documents from the Equal Employment Opportunity Commission pursuant to the Freedom of Information Act; and (c) deposing plaintiff and Atty. Donahue in October of 2001.

3. Within **twenty (20) days** from the date of this Order, Home Depot shall submit an itemized statement of fees and expenses incurred in connection with the items described in the preceding paragraph. Wright & Associates and Atty. Donahue may file objections to Home Depot's itemization within **fifteen (15) days** of service of the itemization.

4. Wright & Associates and Atty. Donahue shall pay their respective shares [**32] of the sanction imposed by this Order within **thirty (30) days** of this Court's determination as to the amount of fees and expenses to which Home Depot is entitled.

5. A status conference shall be conducted in Chambers on **Wednesday, February 13, 2002 at 10:00 a.m.** in Room 401 of the William J. Nealon Federal Bldg. & U.S. Courthouse, [*180] 235 N. Washington Avenue, Scranton, PA.

Thomas I. Vanaskie, Chief Judge

Middle District of Pennsylvania

Westlaw.

322 F.3d 218                                                                    Page 1

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

**H**

Briefs and Other Related Documents

United States Court of Appeals,Third Circuit.
Reginald D. WARE; Ware Communications, Inc.
v.
RODALE PRESS, INC. Ware Communications,
Appellant
**No. 02-1533.**

Submitted Under Third Circuit LAR 34.1(a) Jan.
21, 2003.
Filed Feb. 28, 2003.

In breach of contract action, defendant corporation filed motion in limine to preclude introduction of evidence of damages at trial as sanction for plaintiff corporation's repeated noncompliance with discovery requests and orders. The United States District Court for the Eastern District of Pennsylvania, 2002 WL 89604,Herbert J. Hutton, J., granted motion and dismissed claim. Plaintiff corporation appealed. The Court of Appeals, Ambro, Circuit Judge, held that: (1) imposition of order excluding introduction of damages evidence was warranted, and (2) dismissal was warranted.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ☞763.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763    Extent    of    Review
Dependent on Nature of Decision Appealed from
                    170Bk763.1 k. In General. Most
Cited Cases
In reviewing a trial court's decision to exclude evidence as a sanction for noncompliance with discovery orders, which results in dismissal of the

action, the Court of Appeals considers the manner in which the trial court balanced the following factors, and whether the record supports its findings: (1) the extent of the party's personal responsibility, (2) the prejudice to the adversary caused by the failure to meet orders and respond to discovery, (3) a history of dilatoriness, (4) whether the conduct of the party or the attorney was willful or in bad faith, (5) the effectiveness of sanctions other than dismissal, and (6) the meritoriousness of the claim or defense. Fed.Rules Civ.Proc.Rule 37(b)(2)(B), 28 U.S.C.A.

**[2] Federal Courts 170B ☞820**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk820    k.    Depositions    and
Discovery. Most Cited Cases
Although the district court's discovery sanction of exclusion of evidence which results in dismissal of the claim may be extreme, the appellate court's standard of review is deferential. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond;
Sanctions. Most Cited Cases
Exclusion of damages evidence at trial, as sanction for plaintiff's repeated noncompliance with discovery requests and orders related to disclosure of damages, which resulted in dismissal of breach of contract action, was warranted; although there was no evidence that plaintiff, as opposed to its counsel, was personally responsible for noncompliance with discovery, defendant was prejudiced by plaintiff's failure to provide damages information, as damages evidence was only filed one week before trial, in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 219

322 F.3d 218                                                                                 Page 2

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

exchange for extension of time plaintiff agreed to stipulation that included threat of exclusion of damages evidence if plaintiff failed to comply with discovery order, plaintiff advised that it had not completed damages determination five years after alleged breach of contract and eight months after filing lawsuit, partial exclusion of damages and alternative sanctions were not tenable, and plaintiff offered no other explanation for counsel's noncompliance, other than both sides were in a paper war. Fed.Rules Civ.Proc.Rule 37(b)(2)(B), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⇐1636.1**

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(E) Discovery and Production of Documents and Other Tangible Things
         170AX(E)5 Compliance; Failure to Comply
            170Ak1636 Failure to Comply; Sanctions
               170Ak1636.1 k. In General. Most Cited Cases
Corporate defendant was prejudiced by corporate plaintiff's counsel's failure to provide specific information and documentation concerning plaintiff's claimed damages, as would support district court's exclusion of damages evidence as sanction, in breach of contract action, where defendant was forced to file motion to compel evidence and motion to bar evidence at trial, and damages evidence was provided only one week before trial without any supporting documentation, impeding defendant's ability to defend action.

**[5] Federal Civil Procedure 170A ⇐1451**

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(C) Depositions of Parties and Others Pending Action
         170AX(C)6 Failure to Appear or Testify; Sanctions
            170Ak1451 k. In General. Most Cited Cases
Partial exclusion of damages evidence was not warranted as alternative sanction to imposition of

order excluding damages evidence, in breach of contract claim; although plaintiff corporation's representative gave deposition testimony estimating damages, such testimony lacked support, and plaintiff corporation did not provide damages calculation separate from imprecise claims in deposition. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**[6] Damages 115 ⇐189**

115 Damages
   115IX Evidence
      115k183 Weight and Sufficiency
         115k189 k. Breach of Contract in General. Most Cited Cases
Under Pennsylvania law, dismissal of breach of contract claim was warranted, based upon plaintiff's failure to provide evidence from which factfinder could determine damages to reasonable certainty, where plaintiff was barred from presenting expert testimony or documentation supporting damages claimed, and the parties' agreements upon which breach of contract claim was based contained formulas to determine appropriate compensation for parties in event contract was terminated, which required reference to facts other than those that could be presented through defendant's testimony. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**[7] Contracts 95 ⇐326**

95 Contracts
   95VI Actions for Breach
      95k326 k. Grounds of Action. Most Cited Cases
Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.

**[8] Damages 115 ⇐189**

115 Damages
   115IX Evidence
      115k183 Weight and Sufficiency
         115k189 k. Breach of Contract in General. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 220**

322 F.3d 218                                                                Page 3

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

To prove damages in a breach of contract claim, under Pennsylvania law, a plaintiff must give a factfinder evidence from which damages may be calculated to a reasonable certainty.

**[9] Damages 115 ☞189**

115 Damages
   115IX Evidence
      115k183 Weight and Sufficiency
         115k189 k. Breach of Contract in General.
Most Cited Cases
At a minimum, "reasonable certainty," as required to prove damages in a breach of contract claim under Pennsylvania law, embraces a rough calculation that is not too speculative, vague or contingent upon some unknown factor.

**\*219** Paul B. Birden, Jr., Voorhees, NJ, for Appellant.
Patrick J. Reilly, Paul A. McGinley, Gross, McGinley, LaBarre & Eaton, LLP, Allentown, PA, for Appellee.

Before BECKER, NYGAARD, and AMBRO, Circuit Judges.

### OPINION OF THE COURT
AMBRO, Circuit Judge.
Appellant Ware Communications, Inc. ("WCI") sued Appellee Rodale Press, Inc. ("Rodale") for, *inter alia*, breach of contract. After repeated noncompliance with discovery requests and orders, the District Court sanctioned WCI by precluding it from introducing any evidence of damages at trial. Because this made it impossible for WCI to establish a required element of its breach of contract claim, the District Court dismissed the claim. WCI appeals both the sanction and dismissal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

**\*220** I. BACKGROUND AND PROCEDURAL HISTORY

This case has a lengthy procedural history, much of which is not implicated by this appeal. The relevant events are as follows. In 1992, Reginald Ware and his publishing company, WCI, approached Rodale, also a publishing company, with an idea for a magazine. The parties in December 1993 agreed to publish *Rodale's Heart & Soul*, a healthy lifestyle magazine directed to African-American women. The operative agreements granted Rodale termination rights upon thirty days notice if advertising sales did not meet budget projections. On July 25, 1995, Rodale informed WCI that it was terminating the contract on this ground. It also advised WCI that a Rodale employee had brought sexual harassment allegations against Reginald Ware personally.

WCI and Ware sued Rodale in 1995 in the Eastern District of Pennsylvania for fraudulent misrepresentation, breach of contract, and invasion of privacy. Rodale counterclaimed for sexual harassment. Judge Robert S. Gawthrop III dismissed the fraudulent misrepresentation and breach of contract claims. The parties went to trial on the remaining claims in October 1997, but after the close of Plaintiff's case-in-chief the District Court granted judgment as a matter of law to Rodale on Ware's invasion of privacy claim. Rodale's sexual harassment counterclaim was submitted to the jury, which found in favor of Ware. WCI and Ware appealed the District Court's dismissal of the breach of contract claim, and our Court reversed and remanded this claim.

On remand, WCI and Ware filed an amended complaint (to be precise, the third amended complaint) alleging breach of contract, misappropriation, breach of the duty of good faith and fair dealing, and breach of fiduciary duty.[FN1] In May 2000 the Court dismissed with prejudice all except WCI's breach of contract claim.[FN2]

FN1. In August 1999, following the death of Judge Gawthrop, the case was reassigned to Judge Herbert J. Hutton.

FN2. This included the dismissal of Ware personally as a party to the suit.

Even for that remaining claim, there was pretrial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 221

322 F.3d 218                                                                                    Page 4

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

wrangling. On June 8, 2000, Rodale forwarded to WCI a Request for Production of Documents and Interrogatories, which included a request for substantiation of WCI's damages calculation. Responses were due one month later. WCI did not respond. On August 24, 2000, one and a half months after the response was due, Rodale filed with the District Court a Motion to Compel. WCI again did not respond.

On September 19, 2000, the District Court entered an Order directing WCI to respond to the June 8, 2000, discovery request and interrogatories within fifteen days. Once more, WCI did not respond within the required time period. Two days after the deadline had lapsed, WCI sought an extension of time. On October 16, 2000, the parties entered into a Stipulation that extended to October 18, 2000, the deadline for WCI to answer Rodale's outstanding discovery requests. The Stipulation provided that " [s]hould the Plaintiff fail to provide such full and complete responses, the parties agree that the Plaintiff shall be prohibited from presenting any evidence in support of its claim at the time of trial of the within action." WCI timely replied to the Stipulation, but offered the following statement as to its damages calculation: "Plaintiff has not completed its determination of damages. Specifically, documents that are relevant to Plaintiff's calculation are in the possession*221 of Defendant. Plaintiff will seek to obtain the documents through discovery."

On October 31, 2000, the District Court entered a scheduling Order that provided for discovery to close on January 8, 2001, all dispositive motions to be filed by January 15, 2001, and the case put into the trial pool on January 29, 2001. On November 21, 2000, Rodale sent a letter to WCI indicating dissatisfaction that it had not yet received an adequate damages calculation. Rodale noted that the alleged breach of contract occurred over five years previously. Thus Rodale expected that WCI by this point knew what damages it had suffered, and "therefore request[ed] that [WCI] forthwith provide answers to the interrogatories concerning damages, and provide any documentation you have to support that." If not, Rodale indicated that it would "file a motion in *limine* at the time of trial

asking the Court to prohibit the introduction into evidence of any damages testimony or other evidence." Yet again WCI did not respond.

On January 7, 2002-the eve of the trial (set to begin January 14, 2002) *and one year (minus one day) after discovery had closed*-WCI filed a pretrial memorandum that included a damages calculation. Rodale responded by a motion in *limine* to preclude WCI from introducing any evidence of damages at trial. The trial was postponed, and on January 23, 2002, the District Court granted Rodale's motion. Because WCI thus was precluded from introducing any evidence in support of a necessary element of its breach of contract claim, the District Court dismissed the claim. *Ware Communications, Inc. v. Rodale Press, Inc.*, 2002 WL 89604 (E.D.Pa. Jan.23, 2002). This appeal followed.

## II. EXCLUSION OF EVIDENCE AS A SANCTION

Federal Rule of Civil Procedure 37(b)(2)(B) authorizes a district court to sanction a party's failure to comply with a discovery order by " prohibiting that party from introducing designated matters into evidence." We previously have noted that "[a]lthough the exclusion of evidence for violation of a discovery order is an 'extreme sanction,' " a trial court's decision to do so "will not be disturbed on appeal absent a clear abuse of discretion." *In re TMI Litig.*, 193 F.3d 613, 721 (3d Cir.1999) (internal citations omitted).

[1][2] Exclusion under Rule 37(b)(2)(B) is particularly extreme when the sanction is tantamount to dismissing the claim, as it was here. In *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 868 (3d Cir.1984), we explained:
In exercising our appellate function to determine whether the trial court has abused its discretion in dismissing ... we will be guided by the manner in which the trial court balanced the following factors .. . and whether the record supports its findings: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 222

322 F.3d 218                                                                                           Page 5

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

(emphases omitted). *See also Emerson v. Thiel Coll.,* 296 F.3d 184, 190-91 (3d Cir.2002) (applying the *Poulis* factors). Each factor need not be satisfied for the trial court to dismiss a claim. *Hicks v. Feeney,* 850 F.2d 152, 156 (3d Cir.1988). They "should be weighed by the district courts in order to assure that the 'extreme' sanction of dismissal ... is reserved for the *222 instances in which it is justly merited." *Poulis,* 747 F.2d at 870. And though the sanction may be extreme, the appellate court's standard of review is deferential. In *Poulis,* for example, "[u]nder these circumstances, although we might not have reached the same result as did this district court judge, we cannot say that the district court abused its discretion in ordering the dismissal." *Id.*

The District Court in this case explained its findings on each of the six *Poulis* factors, and concluded that: [t]he balance weighs in favor of precluding Plaintiff's evidence on damages, thereby effectively dismissing Plaintiff's breach of contract claim against Defendant. The Court is mindful that the exclusion of evidence is an "extreme" sanction. However, "[t]he court has authority to employ the ' most severe in the spectrum of sanctions provided by statute' to ensure compliance with its discovery orders and to deter all parties in this litigation from engaging in discovery misconduct." In the instant case, Plaintiff's utter failure to provide Defendant with a damages calculation until the eve of trial is inexcusable, particularly in light of the repeated requests by Defendant, Orders of this Court, and the excessive length of time provided for discovery in this case.

2002 WL 89604, at *7 (internal citations omitted). WCI argues on appeal that each of the District Court's findings-and thus its conclusion as well-constituted an abuse of discretion.

*A. Extent of Plaintiff's Personal Responsibility*

[3] The District Court found that Rodale presented no evidence and made no allegation that WCI-as opposed to WCI's counsel-was responsible for the failures to meet discovery deadlines, and therefore this factor does not weigh in favor of precluding the damages evidence. Rodale counters that this finding is contradicted by the record, as Reginald Ware, the alter ego of WCI and the only plaintiff's witness to testify as to damages, refused on a number of occasions to appear for a scheduled deposition. Notwithstanding, we need not disturb the District Court's finding on this point. Again, no single *Poulis* factor is dispositive, and even assuming that WCI does not bear responsibility for its counsel's conduct, consideration of the remaining factors still compels affirming the District Court's decision to sanction WCI and dismiss the breach of contract claim.

*B. Prejudice to Defendant*

The District Court found that Rodale had been " clearly prejudiced by Plaintiff's counsel's failure to provide specific information and documentation concerning the damages calculation in a timely fashion." *Id.* The District Court noted that while " prejudice" for the purpose of *Poulis* analysis does not mean "irremediable harm," the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy is sufficiently prejudicial. This is a correct statement of law. *See Curtis T. Bedwell and Sons, Inc. v. Int'l Fidelity Ins. Co.,* 843 F.2d 683, 693-94 (3d Cir.1988) (rejecting appellant's argument that "the district court should not have dismissed its claim ... unless the harm to the other parties amounted to ' irremediable prejudice' "). The District Court noted that WCI's failure to provide timely and specific information as to damages caused prejudice to Rodale in the following forms: Rodale had to file two motions (the motion to compel evidence and the motion to preclude evidence at trial); and when WCI finally made some effort to file its damages calculation, it did so only one week before trial and without *223 supporting documentation, impeding Rodale's ability to prepare a full and complete defense.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A 223

322 F.3d 218                                                                  Page 6

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

WCI's most vigorous arguments on appeal are directed to the District Court's findings on this point. None are persuasive. First, WCI argues that Reginald Ware's deposition testimony on November 20, 2000-six weeks before the January 8, 2001 deadline for the close of discovery-" practically gave [Rodale] a road map of [WCI's] claimed damages and how [Ware] arrived at them." Appellant's Br. at 14. The operative agreements between the parties contain formulas for dividing compensation between WCI and Rodale during the terms of the agreements, in the event of a termination of the agreements for cause, and in the event of a sale of the magazine. Each formula generally provides for a 80%-20% split between Rodale and WCI, but the calculations require factoring in a number of variables involving net profits, cash received, book value, operating deficits, *etc.* Reginald Ware's deposition testimony arguably gave some indication that claimed damages were derived from the formulas in the agreement, but it did not provide even a reasonably precise estimate of the amount WCI intended to seek at trial, or what evidence WCI would introduce to establish its claim.[FN3]

> FN3. See, for example, the following exchange:
> Q. What is the dollar amount of damages that you are seeking?
> A. I think it's going to start-we haven't finalized anything, but I think I should start around 12 million.
> Q. How did you arrive at that figure?
> THE WITNESS: Should I go into this?
> MR. PARRISH: If you want.
> THE WITNESS: Okay. The magazine was sold in a firesale for four million. Okay. I should be entitled to twenty percent of that which is $800,000. In addition to that, when Rodale stole the magazine-well, when Rodale breached the contract, we were receiving $40,000 a month. If you factor in $40,000 a month for six years of lost wages, that comes to about 5.3-2, so that's six million there. And in addition to that, when Rodale started the rumor which was-the false

rumor about sexual harassment, which was proven in court that it did not occur, and that Ware Communications did not breach the contract, the damage from that alone should start at about four million, which takes us to-I don't know seven-around 11 or so. Then in addition to that, the model of the twenty percent of net profits, had Rodale not breached the contract, again, the magazine was projected to make approximately three and a half million dollars a year. And a multiple of eight would take that to-if you take three times eight-takes it to 24, and we should be entitled to twenty percent of that, which is another five million. So that's where I'm, at least, at 12.
App. at 68-70. *See also infra* Part III (concluding that the deficiencies in WCI's damages evidence were grounds for dismissing its breach of contract claim).

[4] WCI's second argument is that fault for the delays is more appropriately ascribed to Rodale, or at least to both parties. According to WCI, that Rodale waited until January 2002 to inform the District Court it was unprepared to defend against WCI's claimed damages indicates an absence of prejudice. This line of reasoning (or, more to the point, rationalizing) overlooks entirely that Rodale's motion to preclude was prompted by the pretrial memorandum WCI filed in January 2002 on the eve of trial. WCI asserts that the parties were engaged in a " 'paper war' ... with both sides filing numerous and sundry motions, all of which simply delayed trial and forced the Court to deal with them. " Appellant's Br. at 16. This argument underwhelms. As the District Court noted, we have construed prejudice to include the burden that a party must bear when forced to file motions in response to the strategic discovery tactics of an adversary. 2002 WL 89604, at *3. *Accord*224 *Curtis T. Bedwell and Sons,* 843 F.2d at 693-94. WCI's eleventh-hour filing of its damages calculation left Rodale with approximately one week to evaluate and rebut the information. In this context, it was hardly an abuse of discretion for the District Court to conclude that "Plaintiff's actions have clearly resulted in prejudice to Defendant."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 224**

322 F.3d 218                                                              Page 7

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

2002 WL 89604, at *3.

*C. History of Dilatoriness*

*D. Willful and Bad Faith Conduct*

The District Court addressed the third and fourth *Poulis* factors independently-and found that both supported sanctions-but WCI addresses them as a single concept on appeal. As to dilatoriness, the District Court noted that after WCI's counsel failed to respond to Rodale's June 8, 2000 Request for Production of Documents and Interrogatories, Rodale had to file a Motion to Compel a month and a half after responses were due. WCI did not respond to the discovery requests nor answer the motion to compel. The District Court entered an Order on September 19, 2000, directing WCI to respond within fifteen days. As noted, WCI once more failed to respond timely. The parties agreed to a Stipulation, which included the threat of exclusion of evidence should WCI provide incomplete information, but WCI proceeded to answer that it had not completed its determination of damages. Concluded the District Court: " Therefore, by October of 2000, eight months since the lawsuit commenced in this Court, and five years after the breach of contract action was originally brought before a court of this District, Plaintiff still had not completed its determination of damages." *Id.* at *4. As to willfulness and bad faith, the District Court pointed to many of the same violations by WCI, and also noted that "[n]o excuse has been proffered for the excessive procrastination of Plaintiff's counsel." *Id.* at *5.

Nor is any excuse to be found in WCI's brief on appeal. Its argument may be reduced to the proposition that the delays were the result of a " paper war" between two parties equally at fault. Again, this overlooks that, as the plaintiff in this matter, WCI bore the responsibility for providing a damages calculation. It failed repeatedly to satisfy this requirement in anything close to a timely and thorough fashion. That the parties may have fought over ancillary matters-a point which Rodale contests and is not entirely clear from the

record-does not support a conclusion by us that the District Court abused its discretion in finding a history of dilatoriness and bad faith by WCI.

*E. Effectiveness of Alternative Sanctions*

The District Court found that no other sanction besides exclusion (and consequently dismissal) would remedy the prejudice to Rodale, which had been deprived of a full opportunity to examine WCI's damages claim, as it was revealed only one week before trial was scheduled and without any supporting documentation. At this very late stage of a protracted litigation, the District Court found that it was neither appropriate nor economical to reopen discovery to allow Rodale the necessary time to investigate the damages claim. This was particularly so because WCI agreed in the October 2000 Stipulation that further noncompliance with discovery orders would be penalized by exclusion.

[5] WCI's argument before us is twofold. First, it alleges that the District Court more appropriately should have excluded that portion of the damages calculation in the pretrial memorandum that was " over and above" the calculations provided in Reginald Ware's deposition. In other *225 words, the District Court should have effected a "partial exclusion" of only the new damages. There are at least a couple of problems with this argument. As noted above, the deposition testimony was (at best) tentative, imprecise, and unsupported. In addition, to the extent that Reginald Ware's deposition statements may be deciphered, his figures address the same variables as found in the sparse calculations found in the pretrial memorandum-*i.e.*, advertising commissions, sale price of the magazine, and forecasted net profits. In other words, the pretrial memorandum does not proffer a " new" damages calculation, or at least it does not do so in a form cleanly separable from those referenced in the deposition testimony. Partial exclusion would appear to be untenable.

WCI's second argument is that the District Court alternatively should have levied money sanctions on plaintiff's counsel, as permitted by Rule 37. It is true that Plaintiff's counsel still has not provided

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 225**

322 F.3d 218                                                                      Page 8

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

any explanation for his conduct. But even if we opt for money sanctions rather than exclusion of evidence, this does not support concluding that the District Court abused its discretion in ordering dismissal. *See Poulis,* 747 F.2d at 870.

*F. Meritoriousness of Claim or Defense*

The District Court found that because WCI's contract claim previously had withstood Rodale's 12(b)(6) motion to dismiss, it was meritorious. Neither party offers any reason to disturb this conclusion.

\* \* \* \* \*

The District Court concluded that the great weight of the *Poulis* factors support sanctions in the form of exclusion and dismissal. WCI's arguments on appeal are unpersuasive, and the continued absence of any explanation for counsel's tactics-beyond simply "both sides were in a paper war"-bolsters our belief that the District Court did not abuse its discretion in ruling to exclude WCI's damages evidence and dismiss its breach of contract claim.

### III. DISMISSAL OF BREACH OF CONTRACT CLAIM ABSENT EXCLUDED EVIDENCE

[6] WCI's other principal argument on appeal is that the District Court abused its discretion in dismissing the contract claim because WCI still could prove damages without documentation. It seems to be making the rather novel assertion that certain damages still could be defined and recovered without any supporting evidence. To reiterate, the October 16, 2000 Stipulation stated that "[s]hould the Plaintiff fail to provide such full and complete responses, the parties agree that Plaintiff shall be prohibited from presenting any evidence in support of its claim at the time of trial of the within action." WCI argues that because this language refers to " claim" in the singular, the District Court should have allowed it to prove damages not covered by the Stipulation. This assertion is implausible. " Claim" plainly refers to the breach of contract

claim, not any one claim of damages among many ( *e.g.*, a claim for lost profits from the sale price of the magazine, a claim for lost monthly wages, *etc.*).

[7][8][9] The District Court stated in a footnote that WCI's damages calculation "is insufficient to warrant a trial on the merits." 2002 WL 89604, at *6 n. 5. Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999). To prove *226 damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a "reasonable certainty." *ATACS Corp. v. Trans World Communications, Inc.,* 155 F.3d 659, 668 (3d Cir.1998). "At a minimum, reasonable certainty embraces a rough calculation that is not ' too speculative, vague or contingent' upon some unknown factor." *Id.* at 669 (quoting *Spang & Co. v. United States Steel Corp.,* 519 Pa. 14, 545 A.2d 861, 866 (1988)). The District Court concluded that

Plaintiff failed to provide any supporting documentation or expert reports or analysis to support its damages calculations. Plaintiff produced no evidence or documentation concerning costs and expenses Plaintiff avoided by not having to perform its sales duties under the contract. Nor has Plaintiff provided the basis for the itemized advertised commissions. In fact, the damages calculations, as presented, evince little more than the opinion of Reginald Ware. "It is true ... that the Pennsylvania law of contracts allows for some uncertainty in calculating damages...." *ATACS Corp.,* 155 F.3d at 670. However, "[w]hile mathematical certainty is not required, the plaintiff must introduce sufficient facts upon which the jury can determine the amount of damages without conjecture." *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983); *see also Scully v. U.S. WATS, Inc.,* 238 F.3d 497, 515 (3d Cir.2001). After years of discovery, Plaintiff ... has failed to present evidence upon which the factfinder could base a damages calculation to a reasonable certainty.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 226**

322 F.3d 218                                                                                    Page 9

322 F.3d 218, 55 Fed.R.Serv.3d 291
**(Cite as: 322 F.3d 218)**

2002 WL 89604, at *6 n. 5.

WCI makes no argument that the District Court's statements of law are incorrect. Instead, WCI contends that, without any supporting documentation, "the Appellant could have testified in *his* case in chief that *he* received monthly wages of Forty Thousand Dollars ($40,000.00) a month." Appellant's Br. at 27 (emphasis added). But WCI is the Appellant here; Ware has been dismissed as a party to this suit. And even if we were considering Ware's, and not WCI's, alleged damages, Ware's deposition testimony reveals that his damages calculation was an incomplete (and hardly precise) estimate, not evidence upon which a factfinder could determine damages to a reasonable certainty. [FN4] The operative agreements contained a number of formulas to determine the compensation to which each party was entitled in the event the contract was terminated. Calculating these formulas required information on several factors relating to the financial health of the magazine. A factfinder's ability to award WCI damages resulting from a breach of contract required far more specific evidence than could be provided by the testimony of Reginald Ware as to the damages that he personally suffered.

        FN4. *See supra* note 3.

In sum, WCI has provided no reason to conclude that the District Court abused its discretion in dismissing the breach of contract claim, for WCI failed to present evidence from which a factfinder could determine damages with reasonable certainty.

### IV. CONCLUSION

For the reasons stated, we conclude that the District Court did not abuse its discretion in concluding that, after many months of acrimony, delays, and warnings (one of which was in a formal stipulation), WCI's last-minute submission of an incomplete and unsupported damages calculation merited exclusion of the evidence and dismissal*227 of the breach of contract claim. In any event, WCI did not introduce evidence upon which a factfinder could

calculate damages with reasonable certainty, thus supplying yet another reason that the District Court did not abuse its discretion in dismissing the breach of contract claim.

C.A.3 (Pa.),2003.
Ware v. Rodale Press, Inc.
322 F.3d 218, 55 Fed.R.Serv.3d 291

Briefs and Other Related Documents (Back to top)

• 2002 WL 32129338 (Appellate Brief) Brief of Appellee, Rodale Press, Inc. (Oct. 21, 2002) Original Image of this Document (PDF)
• 2002 WL 32872598 (Appellate Brief) Brief of Appellee, Rodale Press, Inc. (Oct. 21, 2002) Original Image of this Document (PDF)
• 2002 WL 32872597 (Appellate Brief) Brief for Appellant (Sep. 16, 2002) Original Image of this Document (PDF)
• 2002 WL 32129339 (Appellate Brief) Brief for Appellant (Feb. 22, 2002) Original Image of this Document (PDF)
• 02-1533 (Docket) (Feb. 22, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 227**

Westlaw.

DE ST TI 18 § 905                                                    Page 1
  18 Del.C. § **905**

C

DELAWARE CODE ANNOTATED
TITLE 18. **INSURANCE** CODE
PART I. **INSURANCE**
CHAPTER 9. KINDS OF **INSURANCE**; LIMITS OF RISK; REINSURANCE
SUBCHAPTER I. KINDS OF **INSURANCE**
   § 905  "Surety **insurance**" defined.

(a) Surety **insurance** includes:

   (1) Fidelity **insurance**, which is **insurance** guaranteeing the fidelity of persons
   holding positions of public or private trust;

   (2) **Insurance** guaranteeing the performance of contracts, other than **insurance**
   policies, and guaranteeing and executing bonds, undertakings and contracts of
   suretyship;

   (3) **Insurance** indemnifying banks, bankers, brokers, financial or moneyed
   corporations or associations against loss, resulting from any cause, of bills
   of exchange, notes, bonds, securities, evidences of debt, deeds, mortgages,
   warehouse receipts or other valuable papers, documents, money, precious metals
   and articles made therefrom, jewelry, watches, gems, precious and semiprecious
   stones, including any loss while the same are being transported in armored
   motor vehicles or by messenger, but not including any other risks of
   transportation or navigation; also **insurance** against loss or damage to such an
   insured's premises or to his/her furnishings, fixtures, equipment, safes and
   vaults therein caused by burglary, robbery, theft, vandalism or malicious
   mischief, or any attempt thereat.

(b) Transaction of surety **insurance** does not confer power on the insurer to
guarantee titles to real estate.

(18 Del. C. 1953, § **905**; 56 Del. Laws, c. 380, § 1; 70 Del. Laws, c. 186, § 1.)

           <General Materials (GM) - References, Annotations, or Tables>


NOTES, REFERENCES, AND ANNOTATIONS

Bankruptcy action as underlying claim. -- Summary judgment in directors and
officers' (D&O) declaratory judgment action against corporation's D&O insurer
required insurer to defend and indemnify D&O in corporation's creditors'
committee's underlying action that was derived from the corporation's bankruptcy
trustee's authorization under 11 U.S.C.S. § § 105, 1103(c)(5), 1109(b) (and not
the corporation as the debtor in possession); the D&O policy's "insured versus
insured" (one insured being the D&O and the other insured being the corporation)
clause did not exclude coverage when the underlying action was derivatively brought
on behalf of the bankruptcy estate (indirectly for the creditors and corporation)

        © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

                                                                    **A 228**

```
DE ST TI 18 §  905                                              Page 2
  18 Del.C. §  905
```

in reliance on the trustee's power to bring the suit and the bankruptcy court's authority under 11 U.S.C.S. § 105(a) to craft flexible remedies. Cirka v. Nat'l Union Fire Ins.,  -- A.2d -- (Del. Ch. Aug. 6, 2004).

Current through 75 Del. Laws, Ch. 257

Delaware Code Annotated.  Copyright 2006 by the State of Delaware.

All rights reserved.

DE ST TI 18 § **905**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**A 229**