**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 04-1282-JJF |
| | ) | |
| ALSTOM POWER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF AES PUERTO RICO, L.P.'S _DAUBERT_ MOTION TO
EXCLUDE CERTAIN TESTIMONY OF EXPERT WITNESSES
PROFFERED BY DEFENDANT ALSTOM POWER, INC.**


John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
Ann N. Sagerson
James L. Tuxbury
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  October 2, 2006                    Attorneys for AES Puerto Rico, L.P.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARDS ................................................................................................... 2

I.    *DAUBERT* MOTION #1 – DR. RONALD BALLINGER:  DR. BALLINGER
      LACKS EXPERTISE IN THE OPERATION AND MAINTENANCE OF
      THE RELEVANT POLLUTION CONTROL EQUIPMENT, AND HIS
      TESTIMONY ON THAT SUBJECT THEREFORE SHOULD BE BARRED .............. 4

      A.    Testimony To Be Excluded. .......................................................................... 4

      B.    Analysis. ....................................................................................................... 5

II.   *DAUBERT* MOTION #2 – DR. MARLIN ANDERSON:  DR. ANDERSON
      LACKS EXPERTISE IN THE OPERATION AND MAINTENANCE OF
      THE CDS, AND HIS TESTIMONY ON THAT SUBJECT AND ON LEGAL
      ISSUES IN THE CASE SHOULD BE BARRED ...................................................... 9

      A.    Testimony To Be Excluded. ........................................................................ 10

      B.    Analysis. ..................................................................................................... 11

III.  *DAUBERT* MOTION #3 – DR. OTAKAR JONAS:  DR. JONAS LACKS
      EXPERTISE ON THE CAPABILITIES OF THE POLLUTION CONTROL
      EQUIPMENT, AND HIS TESTIMONY ON THAT SUBJECT AND ON
      LEGAL ISSUES IN THE CASE SHOULD BE BARRED. ..................................... 14

      A.    Testimony To Be Excluded. ........................................................................ 14

      B.    Analysis. ..................................................................................................... 15

IV.   DAUBERT MOTION #4 – JOSEPH MAIR:  MR. MAIR'S TESTIMONY
      SHOULD BE EXCLUDED BECAUSE IT CONSTITUTES CONTRACT
      INTERPRETATION. ............................................................................................ 17

      A.    Testimony To Be Excluded. ........................................................................ 17

      B.    Analysis. ..................................................................................................... 20

CONCLUSION ............................................................................................................ 21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ATACS Corp. v. Trans World Commc'ns, Inc.,* 155 F.3d 659 (3d Cir. 1998) .............................16

*Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110 (3d Cir. 1987).......................................3, 14, 20

*Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006).......................3, 16, 20

*Brown v. Se. Pa. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.),*
    35 F.3d 717 (3d Cir. 1994)........................................................................................................2

*Burton v. Danek Medical, Inc.*, 1999 WL 118020 (E.D. Pa. Mar. 1, 1999) ...................................9

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316 (3d Cir. 2003) .........................................8

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).................................................1, 2

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002).....................................8

*Earle M. Jorgenson Co. v. T.I. U.S. Ltd.*,
    1992 WL 331466 (E.D. Pa. Nov. 3, 1992) ...........................................................................4

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) .....................................................................3

*Gallatin Fuels, Inc. v. Westchester Fire Insurance Co.*,
    410 F. Supp. 2d 417 (W.D. Pa. 2006).............................................................................3, 13

*Hauck v. Michelin North America*, 343 F. Supp. 2d 976 (D. Colo. 2004) .....................................5

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................................................2

*In re Diet Drugs*, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001).............................................6, 12, 16

*In re TMI Litig. Cases Consol. II*,
    911 F. Supp. 775 (M.D. Pa. 1996).................................................................................8, 13

*McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266 (6th Cir. 1988).................................................12

*Pell v. E.I. Dupont De Nemours & Co.*, 231 F.R.D. 186 (D. Del. 2005)......................................12

*Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*,
    2006 WL 2241018 (D. Del. Aug. 4, 2006) ..................................................................3, 20

*Redman v. John D. Brush & Co.*, 111 F.3d 1174 (4th Cir.1997)...................................................13

*Salas ex rel. Salas v. Wang*, 846 F.2d 807 (3d Cir. 1988) .............................................................3

*Surace v. Caterpillar, Inc.*, 111 F.3d 1039 (3d Cir. 1997).............................................................3

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004) .................................................................3, 9

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000).............................................................................2

**RULES**

Fed. R. Evid. 702 ................................................................................................................ *passim*

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny, plaintiff AES Puerto Rico L.P. ("AES-PR") moves to exclude certain testimony of the following expert witnesses proffered by defendant ALSTOM Power Inc. ("ALSTOM"):  Ronald Ballinger, Sc.D., Marlin Anderson, Ph.D., Otakar Jonas, Ph.D., and Joseph Mair, CPA.

## INTRODUCTION

It is axiomatic under Rule 702 that an expert must be qualified in every area of his proffered testimony.  An expert qualified in one area may not offer testimony in another area in which he is unqualified.  Several of ALSTOM's experts fail this threshold qualification requirement by proffering "expert" testimony on subjects outside their areas of expertise and experience.  Rather than offer opinions founded on their expertise, these experts attempt simply to parrot statements and conclusions they have read in company and third-party documents produced in this litigation.  But the ability to summarize company documents is not a substitute for actual qualifications.  In addition, several of ALSTOM's designated experts seek to offer legal opinions interpreting the language of the contract at issue in this litigation and opining on the rights and obligations of AES-PR and ALSTOM pursuant to the contract.  Not only are ALSTOM's experts unqualified to give expert testimony on contract interpretation, but testimony as to legal conclusions is prohibited by the Federal Rules of Evidence.  Accordingly, this Court should exclude the testimony identified below from Drs. Ballinger, Anderson, and Jonas and Mr. Mair.

## LEGAL STANDARDS

The standard for admissibility of expert testimony under Federal Rule of Evidence 702,[1] announced in *Daubert*, is "exacting."  *See Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).  *Daubert* assigns to the district court a "gatekeeping requirement . . . to ensure the reliability and relevancy of expert testimony," and to ensure that experts employ "intellectual rigor" in performing their analyses.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The court must use extra diligence in evaluating the reliability of proposed expert testimony because "[e]xpert evidence can be both powerful and quite misleading [to the jury] because of the difficulty in evaluating it."  *Daubert*, 509 U.S. at 595 (quotation marks omitted).

Expert testimony must meet several criteria to be deemed reliable under *Daubert*. The testimony's proponent bears the burden to prove its admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592 n.10.  Any step that renders a proposed expert witness's analysis unreliable under *Daubert* renders the expert's testimony inadmissible.  *See Brown v. Se. Pa. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.)*, 35 F.3d 717, 745 (3d Cir. 1994) (hereinafter "*Paoli II*").

Key among the *Daubert* requirements for purposes of this motion is that the proposed witness must be "qualified as an expert" on the particular issues in dispute.  *See* Fed. R. Evid. 702; *Paoli II*, 35 F.3d at 741.  Although the Third Circuit has a liberal standard for expert

---

[1] Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

qualifications, it has recognized that a witness must possess a minimum "floor" of qualifications in order to give expert testimony on a subject. *Elcock v. Kmart Corp.*, 233 F.3d 734, 742 (3d Cir. 2000). This threshold qualification requirement is based on the purpose of expert testimony, which is to assist the trier of fact in reaching a decision. *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987).

It also is true that although an expert may be qualified to give testimony in one area, that does not qualify him to give testimony on all the different subject matters in dispute in a lawsuit. *See Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055-56 (3d Cir. 1997) (electromechanical engineer not permitted to give expert testimony on habituation in case involving design of tractor); *Aloe Coal Co.*, 816 F.2d at 114 (tractor salesman not qualified to give expert testimony on cause of tractor fire). Moreover, when an expert gives testimony outside the scope of his expertise, that testimony not only runs afoul of Rule 702's qualification requirements, but also it potentially violates Rule 403 because of the serious risk of jury confusion from the mingling of the witness's qualified and unqualified testimony. *See United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) (testimony outside the "scope of a witness' expertise" may violate Rule 403").

In addition, the Federal Rules of Evidence do not permit an expert to offer legal opinions in the guise of expert testimony. *See Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, No. Civ. A. 04-940-JJF, 2006 WL 2241018, at *1 (D. Del. Aug. 4, 2006) (*citing Salas ex rel. Salas v. Wang*, 846 F.2d 897, 905 n.5 (3d Cir. 1988)). Testimony as to legal conclusions is prohibited because it encroaches on the court's role to explain the law to the jury. *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Interpretation of a contract is a legal judgment as to which expert testimony is forbidden. *See Gallatin Fuels, Inc. v. Westchester Fire*

*Ins. Co.*, 410 F. Supp. 2d 417, 421 (W.D. Pa. 2006) (expert's proposed testimony on contract construction constitutes "impermissible legal conclusions"); *Earle M. Jorgenson Co. v. T.I. U. S. Ltd.*, No. Civ. A. No. 90-2024, 1992 WL 331466, at *2-3 (E.D. Pa. Nov. 3, 1992) (attorney expert precluded from giving testimony regarding the "meaning of the contract").

I.    *DAUBERT* MOTION #1 – DR. RONALD BALLINGER:  DR. BALLINGER LACKS EXPERTISE IN THE OPERATION AND MAINTENANCE OF THE RELEVANT POLLUTION CONTROL EQUIPMENT, AND HIS TESTIMONY ON THAT SUBJECT THEREFORE SHOULD BE BARRED.

"*I can't claim that I'm an expert at CDS or ESP technology by any stretch of the imagination.*"

That statement was the candid self-evaluation of Ronald Ballinger, Sc.D., whom ALSTOM has designated to give expert testimony, *inter alia,* on the proper operation and maintenance of the critical pollution control equipment at issue in this litigation – the circulating dry scrubber ("CDS") and the electrostatic precipitator ("ESP").  *See* A005 (Ballinger Dep. at 33:3-5).  Dr. Ballinger's unambiguous admission, along with his lack of any other discernable expertise in the operation and maintenance of the CDS or ESP, disqualify him under Fed. R. Evid. 702 from offering expert testimony on those subjects.

A.    Testimony To Be Excluded.

Dr. Ballinger is a Professor at the Massachusetts Institute of Technology and is associated with a company known as Altran Solutions Corporation ("Altran").  In his expert report, Dr. Ballinger first offers an opinion as to the "immediate cause" of the corrosion in the ESP, which he contends was the "presence of a corrosive environment consisting of an aqueous solution containing sulfuric and hydrochloric acid."  A025 (Ballinger Expert Report at 7).  AES-PR is not in this motion challenging Dr. Ballinger's qualifications to offer that opinion.

4

Dr. Ballinger's report goes further, however, setting forth a number of opinions regarding AES-PR's purported deficient operation and maintenance of the CDS and ESP equipment and concluding that those deficiencies were the "root cause" of the corrosion.  *See* A025-26 (Ballinger Expert Report at 7-8).  Those opinions are not based on Dr. Ballinger's own expertise, but instead reflect either the "extensive analysis of operational and maintenance data" by "[t]he Altran team," A025 (Ballinger Expert Report at 7), or Dr. Ballinger's parroting of company documents produced in the litigation, *see, e.g.*, A010 –11 (Ballinger Dep. at 221:21 – 222:21) (concluding, for example, that AES-PR's CDS spray water nozzle maintenance was deficient simply because certain company and third-party documents critiqued the maintenance). Dr. Ballinger also sets forth a number of "additional opinions" regarding the capabilities of the CDS and ESP equipment and AES-PR's alleged deficiencies in operating and maintaining the equipment.  *See* A026 -27 (Ballinger Expert Report at 8-9).  Again, Dr. Ballinger does not claim that these opinions were the product of his own expertise, but instead that they resulted from the same "detailed analysis of the operating and maintenance data."  A026 (Ballinger Expert Report at 8).

## B.     Analysis.

Dr. Ballinger's lack of expertise regarding the capabilities, operation, and maintenance of CDSs and ESPs was readily apparent during his deposition.  Several times during his testimony, Dr. Ballinger disclaimed expertise on CDSs and ESPs.  *See* A005 (Ballinger Dep. at 33:1-5) ("I can't claim that I'm an expert at CDS or ESP technology by any stretch of the imagination."); A014 (Ballinger Dep. at 229:3-4) ("But I'm not an expert on CDS design.  That is true."); A016 (Ballinger Dep. at 383:10) ("I'm not an expert on ESPs."); A017 (Ballinger Dep. at 392:12) ("That's right.  I'm not a CDS expert."); *see also Hauck v. Michelin*

*N. Am., Inc.*, 343 F. Supp. 2d 976, 982-83 (D. Colo. 2004) (proffered tire-failure expert's admission that he was not an expert in tire design and manufacture precluded him from giving opinion on cause of tire failure).

Dr. Ballinger's lack of expertise also is evident from his responses to specific questions about the operation and maintenance of CDSs and ESPs. Dr. Ballinger's expert report states that in his "expert" opinion, AES-PR did not properly maintain the CDS water nozzles and did not know how to interpret "broomstick" tests used to monitor the nozzles' operation. A030 (Ballinger Expert Report at 12). Questioning at his deposition revealed, however, that Dr. Ballinger reached those conclusions based not on his own expertise in CDS nozzle maintenance, but instead simply by reading critiques by an AES-PR consultant of certain operators' maintenance practices. *See* A012 (Ballinger Dep. at 225:1-9) ("basis [for conclusions regarding nozzle maintenance] is the fact that there were communications and instances where people would say in documents that . . . the nozzles are not functioning"). Dr. Ballinger conceded that he himself has no expertise on proper cleaning procedures for the CDS water nozzles, A009 (*id.* at 215:5-8), or the proper interpretation of the "broom stick test," *id.* at 215:2-4. Without specialized knowledge to bring to bear on CDS water nozzle maintenance, simply repeating or summarizing conclusions from company documents will not assist the trier of fact and thus is not proper expert testimony. *See In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *10 (E.D. Pa. Feb. 1, 2001) (expert testimony based on reading and interpreting documents without specialized expertise will not assist trier of fact and is inadmissible under Rule 702).

Dr. Ballinger likewise acknowledged that he has "no idea" whether or not the CDS was designed with a tolerance to handle a certain amount of imperfections in the CDS spray water nozzles. A013 (Ballinger Dep. at 228:6-11). One would expect that an expert in CDS

operation and maintenance would be aware – or at least have some idea – of the tolerances built

into the design of the equipment, and how those tolerances impact operation and maintenance

practices. Dr. Ballinger, however, clarified the scope of his knowledge regarding CDS design: "I

know a little bit about what CDSs do in their function, and I learned enough, as part of this work,

to understand a little bit. *But I'm not an expert on CDS design. That is true.*" A013 – 014; *id.*

at 228:22 – 229:4 (emphasis added).

        Moreover, Dr. Ballinger also intends to testify that, in light of rising CDS inlet

temperatures, somehow the CDS spray water system must have malfunctioned and started

sending a mistaken "call" for excessive water into the CDS and then into the ESP. *See* A029–30

(Ballinger Expert Report at 11-12). Yet when Dr. Ballinger was asked how the CDS spray water

system operates, he testified: "There is a control system. Beyond that, that's what I know."

A006 (Ballinger Dep. at 52:10-18). Later, when asked if he examined how the CDS spray water

control system operated, Dr. Ballinger testified that he had not, and that he was "not a control

system guy." A015 (*Id.* at 321:5-8). Yet, despite not being a "control system guy," Dr.

Ballinger seeks to give "expert" testimony that somehow the control system for the CDS spray

water system malfunctioned, sending excess water into the CDS and causing the corrosion in the

ESP. *See* A029–30 (Ballinger Expert Report at 11-12).

        In addition to simply repeating conclusions in company documents, Dr. Ballinger

also invokes the opinions of other purported Altran experts in areas where he lacks expertise

himself. For example, during his deposition, Dr. Ballinger testified that he relied on Dr. David

Kalmanovitch, a former Altran employee, for the data analysis on CDS inlet temperatures

because Dr. Kalmanovitch was "more familiar with power plants." A007-08 (Ballinger Dep.. at

135:13 – 136:2). Dr. Ballinger cannot end-run the expert qualification requirements simply by

regurgitating the analyses of others with the expertise he lacks. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Dr. Ballinger's *curriculum vitae* confirms the absence of any prior education or experience in the capabilities, operation or maintenance of CDSs and ESPs. Fourteen of the twenty-nine pages in Dr. Ballinger's expert report are dedicated to reciting his extensive education, work experience, research, and publications. *See* A034–47 (Ballinger Expert Report at 16-29). But nowhere in those fourteen pages is there any mention of study, work experience, or research on the operation and maintenance of CDSs or ESPs. *Id.; see* A002-04 (Ballinger Dep. at 30:20 31:1; 31:16 – 32:11) (acknowledging absence of research or prior consulting work on CDSs or ESPs). *See also In re TMI Litig. Cases Consol. II*, 911 F. Supp. 775, 797-98 (M.D. Pa. 1996) (meteorological expert permitted to testify about radioactive gas dispersion in the atmosphere, but not the levels of radiation exposure to the residences in the surrounding areas, based in part on lack of qualifications). It appears from his *curriculum vitae* that Dr. Ballinger is most qualified in the field of nuclear science, and also has some general experience with respect to corrosion. Indeed, Dr. Ballinger's *curriculum vitae* identifies his areas of expertise as "materials selection and engineering of nuclear engineering systems and environmental degradation and life assessment of these systems." A038 (Ballinger Expert Report at 20). Nothing in Dr. Ballinger's *curriculum vitae* suggests that he is familiar with the operation and maintenance of CDSs and ESPs, much less an expert in that equipment.

Dr. Ballinger's experience with respect to nuclear science and corrosion generally cannot be used to bootstrap expertise in the specific areas of CDS or ESP maintenance and operation. *See Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003)

(professor with doctorate degree only permitted to give expert testimony within scope of study and experience); *Burton v. Danek Med., Inc.*, No. CIV.A. 95-5565, 1999 WL 118020, at *3-4 (E.D. Pa. Mar. 1, 1999) (board certified neurologist prohibited from giving expert testimony on spinal surgery).  If Dr. Ballinger were permitted to offer expert opinions outside the scope of his general experience and expertise, there is a serious danger that the jury could become confused as to the weight it should give such opinions.  *See Cruz*, 363 F.3d at 194.  This risk is especially noteworthy because, as  a professor of nuclear science at M.I.T., Dr. Ballinger's testimony may carry undue weight with a jury in areas where he is not qualified.

For the above reasons, Dr. Ballinger lacks the necessary "knowledge, skill, experience, training, or education" to offer expert opinions on the capabilities, operation and maintenance of CDSs and ESPs.  Therefore, under Rule 702, Dr. Ballinger should be prohibited from providing testimony relating to these topics.

## II. *DAUBERT* MOTION #2 – DR. MARLIN ANDERSON:  DR. ANDERSON LACKS EXPERTISE IN THE OPERATION AND MAINTENANCE OF THE CDS, AND HIS TESTIMONY ON THAT SUBJECT AND ON LEGAL ISSUES IN THE CASE SHOULD BE BARRED.

Dr. Anderson's expert report reads more like ALSTOM's closing argument than an expert report.  The report offers opinions on the operation and maintenance of the CDS that Dr. Anderson is unqualified to provide and that merely constitute his personal opinions regarding the weight of the evidence in the case.  In addition, he seeks to opine as to legal conclusions on matters in dispute in the case, a subject that is not appropriate for expert testimony.  Under Fed. R. Evid. 702, this Court should bar ALSTOM from eliciting testimony from Dr. Anderson regarding the operation and maintenance of the CDS, his personal views about the weight of the evidence, and his opinions as to legal conclusions.

### A.    Testimony To Be Excluded.

In Dr. Anderson's expert report, he provides an opinion that the immediate cause of the corrosion in the ESP was "below dew point operation." *See* A066 (Anderson Expert Report at 1). He also presents an opinion regarding the impact of ash resistivity on precipitator performance. A072 (Anderson Expert Report at 7). AES-PR is not in this motion challenging Dr. Anderson's qualifications to offer those opinions or the appropriateness of those opinions as expert testimony.

Much of the remainder of Dr. Anderson's report focuses, however, on the proper operation and maintenance of the CDS, a specialized area in which Dr. Anderson has no experience or education. For example, Dr. Anderson opines that AES-PR failed to follow proper operation and maintenance procedures for: 1) taking wet bulb temperatures; 2) maintaining a 30 degree approach temperature; 3) accounting for rising CDS inlet temperatures; 4) accounting for chlorides in the CDS; 5) servicing the CDS spray water nozzles; and 6) raising the CDS outlet temperature during sootblowing. *See* A066-76 (Anderson Expert Report at 1-11). Dr. Anderson's opinions on these topics are not based on any specialized knowledge, but instead are derived merely from reading, and repeating the conclusions of, documents in this litigation.

Dr. Anderson also offers three opinions that are nothing more than legal conclusions. These opinions concern: (1) the obligations purportedly imposed on AES-PR by the accelerated corrosion warranty; (2) ALSTOM's alleged lack of responsibility under its contract for installing sootblowing logic; and (3) whether or not the operating instructions provided by ALSTOM or its subcontractor to AES-PR during commissioning modify AES-PR's warranty obligations. Such legal opinions are improper under the Federal Rules of Evidence and should be excluded at trial.

B.    **Analysis.**

Dr. Anderson's resume demonstrates that he has no discernable education or experience in the operation and maintenance of a CDS.  A085-87 (Anderson Expert Report at 20-22).  Moreover, during his deposition he repeatedly conceded that, prior to this engagement, he had no working experience with CDS technology.  *See e.g.,* A057 (Anderson Dep. at 23:14-17) (acknowledging that he has not worked with a CDS prior to this engagement); A060-61 (Anderson Dep. at 160:22 – 161:2) ("[T]his is the first circulating dry scrubber that I've worked with."); A063 (Anderson Dep. at 294:1-2) ("I've never worked with a CDS before, no.").

Without any prior study or work experience with CDSs, the only expertise that Dr. Anderson apparently called upon in rendering his "expert" opinions regarding the CDS was literacy.  Several times during his deposition, Dr. Anderson admitted that what he refers to in his report as his "expert" opinions are nothing more than reading and copying from a document.  *See e.g.,* A058-59 (Anderson Dep. at 72:8 – 73:14) (opinion regarding number of times AES-PR should have taken wet bulb readings taken directly from EEC's O&M manual); A062 (Anderson at 186:12-21) (acknowledging with respect to opinion that AES-PR personnel failed to interpret "broomstick" tests that "That's basically what I did, yes, I read the words on the page.").

Dr. Anderson's regurgitation of company documents for his "opinions" highlights his lack of experience with CDS operation and maintenance.  For example, in his expert report, Dr. Anderson opines that AES-PR could not properly set the CDS outlet temperature because it did not take measurements of the chlorides in the ash.  A068-69 (Anderson Expert Report at 3-4).  One might think from reading this passage in his report that Dr. Anderson had some specialized knowledge or experience to draw that conclusion, which would inform and assist the jury regarding the factors to consider in setting the CDS outlet temperature.  That would be

11

incorrect.  The following exchange exposes that Dr. Anderson's "expert" opinion again was

based, not on specialized knowledge, but merely on reading EEC's O&M manual:

> Q. So, what about your education or experience would permit you to draw an expert conclusion that without knowing the chloride content of the ash samples, it is not possible to determine the correct CDS outlet temperature?
>
> Dr. Anderson:  **The fact that I'm able to read an operation and maintenance manual**, and see that, as the chloride content increases, I need to adjust my temperature in order to compensate for that increase in chlorides, and **that requires being able to read and follow the instructions in the manual.**

A061 (Anderson Dep. at 161:3-14) (emphasis added).

Simply reading and interpreting documents – without bringing specialized

knowledge to bear on that interpretation - will not assist the trier of fact, and thus cannot form

the basis of admissible testimony under Rule 702.  *See In re Diet Drugs*, 2001 WL 454586, at

*10.  Moreover, mere recitation of conclusions found in documents invades the province of the

fact-finder.  It is the jury's role to weigh evidence and draw commonsense conclusions from that

evidence – not an expert's.  *See Pell v. E.I. Dupont De Nemours & Co.*, 231 F.R.D. 186, 192 (D.

Del. 2005) ("[T]estimony of an expert that constitutes mere personal belief as to the weight of

the evidence invades the province of the fact-finder.") (*citing McGowan v. Cooper Indus., Inc.*,

863 F.2d 1266, 1273 (6th Cir. 1988).

Dr. Anderson cannot use his experience with ESPs to leverage expertise in CDSs.

Dr. Anderson tries to blur the distinction between CDSs and ESPs by stating that his opinion

applies to the pollution control system at AES-PR.  A066 (Anderson Expert Report at 1).  But

Dr. Anderson's work with ESPs cannot make up for his lack of qualifications with CDSs.  *See In

re Diet Drugs*, 2001 WL 454586, at *7 ("[A] party cannot qualify as an expert generally by

showing that the expert has specialized knowledge or training which would qualify him or her to

opine on some other issue.") (*citing Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th

Cir. 1997)); *see also In re TMI Litig. Cases Consol. II*, 911 F. Supp. at 797-98.

        In addition, Dr. Anderson's report purports to render several legal opinions,

including:  (1) the scope of AES-PR's operation and maintenance obligations under its contract

with AES-PR, *see* A067 (Anderson Expert Report at 2); (2) ALSTOM's responsibilities pursuant

to the contract with respect to installing and checking the DCS computer logic, *see* A070

(Anderson Expert Report at 5); and (3) whether the instructions and operating procedures

provided during commissioning modify the warranty obligations of AES-PR, *see* A074

(Anderson Expert Report at 9).  But opinions identifying a party's rights and obligations under a

contract are impermissible legal conclusions.  *See Gallatin Fuels, Inc.*, 410 F. Supp. 2d at 421.

Accordingly, the Court should bar Dr. Anderson from testifying regarding these legal opinions.

        Finally, even if legal opinion testimony were permissible, Dr. Anderson is not

qualified to offer opinions regarding contract interpretation.  As Dr. Anderson acknowledged

during his deposition, he does not have legal training and his interpretation of the contract is that

of a "layperson."  *See* Fed. R. Evid. 702 (expert must have specialized knowledge, experience or

education).  When asked about his opinion that AES-PR failed to maintain proper records and

failed to meets its burden of proving its warranty claim, Dr. Anderson explained the basis for this

opinion:

> **Dr. Anderson**: It is my opinion based upon my reading of the
> O&M manual and the contract, what is required under the contract
> in terms of the warranty.
>
>     And since I'm not a lawyer, I guess I would to say that
> that's a lay opinion but based on my reading of the contract.

A064 (Anderson Dep. at 297:4-11). Without specialized education or experience in contract interpretation, Dr. Anderson's "lay person" interpretation of the rights and obligation of the parties under the contract should be excluded. *See Aloe Coal Co.*, 816 F.2d at 114.

For the reasons set forth above, Dr. Anderson should be barred under Rule 702 from offering opinions regarding the operation and maintenance of the CDS and regarding his legal conclusions of the rights and obligations of the parties under the contract.

## III. *DAUBERT* MOTION #3 – DR. OTAKAR JONAS: DR. JONAS LACKS EXPERTISE ON THE CAPABILITIES OF THE POLLUTION CONTROL EQUIPMENT, AND HIS TESTIMONY ON THAT SUBJECT AND ON LEGAL ISSUES IN THE CASE SHOULD BE BARRED.

### A. Testimony To Be Excluded.

Dr. Jonas's expert report contains a lengthy discussion of the design and capabilities of the water treatment system at the AES-PR facility. *See generally,* A103-157 (Jonas Expert Report). AES-PR does not in this motion challenge Dr. Jonas's qualifications to offer these opinions. Dr. Jonas's report, however, diverges from his area of expertise and offers an opinion on the capabilities of the CDS and ESP, and a legal conclusion on AES-PR's damages. In particular, Dr. Jonas opines that the CDS and ESP could have been operated at a CDS outlet temperature of 175 degrees Fahrenheit, and because AES-PR failed to operate the CDS at that temperature, it voided the accelerated corrosion warranty. A129, A139 (Jonas Expert Report at 4-5, 7-1). Dr. Jonas lacks any qualifications to render that opinion. ALSTOM also seeks to elicit a legal opinion from Dr. Jonas that AES-PR's damages are too speculative to be recovered. A134, A135-37 (Jonas Expert Report at 5-4 and 6-1 to 6-3). The Court should bar ALSTOM from eliciting these opinions.

B.     **Analysis.**

Prior to Dr. Jonas's engagement by ALSTOM in this case, he had no experience with operational problems in CDSs or ESPs.  A153-56 (Jonas Expert Report at A-1 – A-4); *see also* A097 (Jonas Dep. at 66:15-18) (acknowledging that his prior work in water audits, failure analysis, root cause analysis, or litigation never involved looking at problems in the CDS or ESP).  The most significant exposure Dr. Jonas had to CDS operation was editing a book that contained a chapter on scrubbers (of which CDS technology is one type) – although Dr. Jonas did not write that chapter.  A091; A096 (Jonas Dep. at  32:2-14; 44:16-20).  In the area of ESPs, Dr. Jonas has done work with his own particulate matter monitoring device on ESPs.  A092-94 (Jonas Dep. at  38:18 – 40:10).  But Dr. Jonas testified that if his particular monitoring device identified a possible operating problem with the ESP, he would tell his client that they needed to hire an ESP specialist.  A094-95 (Jonas Dep. at 40:11 - 41:1).  Dr. Jonas candidly admitted, "I won't call myself a specialist on, on ESP."  A094 (Jonas Dep. at  40:16-17).

Despite the fact that Dr. Jonas is a self-described non-specialist in ESPs and has no prior experience in the operation of CDSs, if permitted he will opine that the CDS and ESP at the AES-PR facility could operate with both high chlorides in the CDS spray water and high CDS outlet temperatures, which is a critical issue of factual dispute.  *See* A129, A140 (Jonas Expert Report at 4-5, 7-2).  Dr. Jonas bases his opinion on reading a "spreadsheet of plant data which shows allegedly many days of operation hundred seventy, hundred seventy-five and at the same time opacity was okay."  A098-99 (Jonas Dep. at  229:13-230:6).  He also testified that his assistant observed that the plant currently is operating, so he concludes that the CDS and ESP must be capable of operating without emissions violations.  *See id.*  But that observation ignores the relationship between temperature and water quality.  Without any specialized expertise in

CDS operation, Dr. Jonas cannot provide context beyond what is written in the documents he recites.  As with Drs. Ballinger and Anderson, reciting from a document – without specialized expertise – will not assist the trier of fact and is not proper expert testimony under Rule 702.  *See In re Diet Drugs*, 2001 WL 454586, at *10.

It is well established that, under the Federal Rules of Evidence, an expert is precluded from offering opinions regarding legal conclusions. *See Berckeley Inv. Group, Ltd.*, 455 F.3d at 217.  Dr. Jonas, however, violates this prohibition in his expert report's discussion of AES-PR's damages.  A135-37 (Jonas Expert Report at 6-1-6-3).  Dr. Jonas concludes that AES-PR's damages are too speculative because they are based on estimates for repairs.  A137, A139 (Jonas Expert Report. at 6-3 and 7-1); *see also* A100 (Jonas Dep. at 290:11-12) ("And what bothers me the most about these costs is that they are just estimates.").  He also complains that AES-PR's damages changed too much between AES-PR's filing of its Complaint and its submission of its interrogatory responses.  A100 (Jonas Dep. at 290:6:-9).  In essence, Dr. Jonas's opinion is that he is unconvinced that AES-PR has met its burden of proof on damages. But the law, and not Dr. Jonas, sets the burden by which AES-PR must prove its damages, and it is the jury that will decide whether AES-PR has met that burden.  *See ATACS Corp. v. Trans World Comm'ns, Inc.*, 155 F.3d 659, 669-70 (3d Cir. 1998) (plaintiff must prove damages to "reasonable certainty").  Dr. Jonas's purported expert opinion is merely a legal conclusion and an attempt to weigh the evidence.  Moreover, even if legal conclusions were proper for an expert, Dr. Jonas  is not qualified to offer a legal opinion regarding speculativeness.  He does not have any legal training or experience that would qualify him to render that opinion.  A101 (Jonas Dep. at 291:5-7).

Accordingly, the Court should bar Dr. Jonas from offering expert testimony on the operational capabilities of the pollution control equipment at AES-PR and legal conclusions regarding the purported speculativeness of AES-PR's damages.

## IV.   DAUBERT MOTION #4 – JOSEPH MAIR:  MR. MAIR'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT CONSTITUTES CONTRACT INTERPRETATION.

The Court is the arbiter of the law, and an expert witness may not intrude upon the province of the Court by offering an opinion regarding the proper interpretation of the law governing a case.  Yet ALSTOM's sole purpose for calling Joseph Mair, an accounting expert, is to elicit his opinion interpreting the law governing this case.  Mr. Mair, if permitted, will testify that, under his interpretation of the corrosion warranty at issue in this case, AES-PR may not recover damages for costs incurred after November 28, 2006.  Mr. Mair's construction of the corrosion warranty is erroneous as a matter of law, it constitutes inadmissible legal opinion testimony, and in any event he is unqualified to offer an expert opinion on the interpretation of a contract.  Accordingly, ALSTOM should be prohibited from eliciting at trial testimony from Mr. Mair regarding his interpretation of the corrosion warranty.

### A.   Testimony To Be Excluded.

In Part III, Article 1.6 of the contract governing this case, ALSTOM represents that it will "warrant" AES-PR's pollution control equipment against the consequences of accelerated corrosion.  In addition, in Part III, Article 1.1.1 of the contract, ALSTOM warranted:

> that the Work shall comply with the provisions of this Contract and all specifications and drawings referred to in this Contract, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Contractor . . .  [and] that all materials, equipment and supplies furnished by Contractor for the Work shall be new and fit for their

specified purposes as set forth in this Contract and be in full
compliance with the requirements of this Contract.

A160 (Contract, Part III, art. 1.1.1).  ALSTOM also warranted that if any violation of the

warranties arose during the warranty period, ALSTOM would furnish "engineering, labor,

equipment and materials necessary to correct such defect and cause the Work to comply fully

with the foregoing warranties."  *Id.*  The specifications for the pollution control equipment at

issue provided that the "design service life" of the CDS and ESP would be 25 years.  A167, 172

(CDS and ESP design specifications).

Notwithstanding ALSTOM's warranty that it would supply pollution control

equipment with a working life of 25 years, ALSTOM argued in its motion for summary

judgment that it is subject to damages for breach of warranty for costs incurred only during the

first four years of the life of the equipment.  *See* D.I. 91 at 5, 31-32.  ALSTOM bases its

argument on an erroneous reading of Article 1.6 of the Contract, which states in part:

> The Contractor shall warrant for a period of twenty-four (24)
> months from performance acceptance the scrubbers, precipitators .
> . . against the consequence of accelerated corrosion outside of
> industry standards for power-generated facilities with dry
> scrubbing systems to the extent that the corrosion has materially
> affected or is reasonably expected to materially affect in the next
> two (2) years (i) the structural integrity of the Equipments of any
> portion thereof or (ii) the ability of the Equipment to mechanically
> perform.

A161-162 (Contract, Part III, art. 1.6).  ALSTOM contends that it warranted the pollution control

equipment for two years from performance acceptance; that it warranted the equipment against

corrosion expected to materially affect the equipment within the next two years; and that when

18

those two two-year periods are added together, it results in a four-year warranty period that limits ALSTOM's damages to those costs incurred during the first four years of the equipment's life.

ALSTOM's construction of the contract language is faulty.  The first two-year period in Article 1.6 provides that the warranty applies to claims *submitted* "for a period of twenty-four (24) months."  The second two-year period addresses the severity of the corrosion at issue and specifies that the warranty applies only to accelerated corrosion that is so severe that it is likely to cause structural or mechanical failure of the equipment within two years (corrosion "reasonably expected to materially affect in the next two (2) years" the structural integrity or performance of the equipment).  Neither of these time periods addresses the durability of the pollution control equipment that ALSTOM warranted or the duration of time AES-PR has to implement its remedy if its submits a valid warranty claim in the initial two-year period, as it did here.  Simply put, if – as is the case here – corrosion is discovered within two years of performance acceptance that is so severe that it is expected to cause structural or mechanical failure within two years, ALSTOM has warranted to repair the equipment to comply with the contract specifications, which in this case provide for equipment that should control the plant's pollution for 25 years.  A167, 172 (CDS and ESP Design Specifications).  There is no time limit for completion of these repairs.

If permitted to testify, Mr. Mair will interpret the corrosion warranty in the same manner as ALSTOM's counsel.  According to Mr. Mair's expert report, he interprets Part III, Article 1.6 of the Contract to bar AES-PR's ability to recover any corrosion-related damages that will be incurred after November 28, 2006.  A183-84  (Mair Expert Report at 2-3).  Specifically, he contends that the corrosion warranty contains a two-year warranty with a "24 month look forward period."  A184 (Mair Expert Report at 3).  Mr. Mair will testify that AES-PR therefore

cannot recover any operation and maintenance costs for its reverse osmosis system and crystallizer (installed to prevent further accelerated corrosion) if the costs are not incurred by November 28, 2006, which is four years after the date that the AES-PR plant began commercial operation.  *Id.* at 3.   Although Mr. Mair's expert report disclaims any intent to provide a legal judgment about the applicability of Article 1.6, A185 (Mair Expert Report at 4), he made clear during his deposition that his opinion regarding the limitation on AES-PR's damages is based on his *interpretation* of the corrosion warranty.  *See* A174-75 (Deposition of Joseph Mair at 45:4 – 46:10).

      **B.**      **Analysis.**

      ALSTOM has presented Mr. Mair to offer a legal opinion - namely whether the warranty provision of the Contract limits AES-PR's warranty damages to those incurred before November 28, 2006.  That testimony is exactly the type of legal conclusion testimony that courts consistently have barred as encroaching on the domain of the court.  *See Berckeley Inv. Group*, 455 F.3d at 217; *Proctor & Gamble*, 2006 WL 2241018, at *1 ("The Rules of Evidence do not permit expert testimony as to legal conclusions.").  Mr. Mair, therefore, should be prohibited from offering his opinion regarding the proper interpretation of the corrosion warranty.

      Furthermore, Mr. Mair also should be barred from offering such testimony because he is unqualified as an expert on contract interpretation.  It is axiomatic that an expert witness must be qualified to give expert testimony.  *See* Fed. R. Evid. 702.  At a minimum, an expert witness must possess skills or knowledge that are greater than those of the average layman.  *See Aloe Coal Co.*, 816 F.2d at 114.  Mr. Mair, however, lacks any qualifications to offer a legal opinion.  He is not a lawyer, has no legal training, and never before has provided expert testimony on contract interpretation.  A176; A178 (Mair Dep. at 55:17-20; 65:7-9).  In

fact, Mr. Mair, himself, testified that his interpretation of the contract was that of a "layman."

A177 (Mair Dep. at 58:1-5).

Accordingly, ALSTOM should be prohibited from offering testimony from Mr.

Mair regarding his interpretation of the corrosion warranty.

## CONCLUSION

For the foregoing reasons, AES-PR respectfully requests that the Court grant its

Motion and exclude from trial the proffered testimony identified above for Dr. Ballinger, Dr.

Anderson, and Dr. Jonas, and the entire proffered testimony of Joseph Mair, CPA.

Respectfully submitted,

OF COUNSEL:
Dane H. Butswinkas                          /s/ John S. Spadaro
R. Hackney Wiegmann                         John S. Spadaro (Bar No. 3155)
Daniel D. Williams                          MURPHY SPADARO & LANDON
Ann N. Sagerson                             1011 Centre Road, Suite 210
James L. Tuxbury                            Wilmington, DE 19805
WILLIAMS & CONNOLLY LLP                     Tel. (302) 472-8100
725 Twelfth Street, N.W.                    Fax (302) 472-8135
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: October 2, 2006                      Attorneys for AES Puerto Rico, L.P.

## <u>CERTIFICATE OF SERVICE</u>

On October 2, 2006, Plaintiff served its Memorandum of Points and Authorities in

Support of Plaintiff AES Puerto Rico, L.P.'s *Daubert* Motion To Exclude Certain Testimony of

Expert Witnesses Proffered by Defendant Alstom Power, Inc. by electronic filing and first class

mail, postage prepaid, on:

> Richard R. Wier, Esq.
> Daniel W. Scialpi, Esq.
> Two Mill Road
> Suite 200
> Wilmington, Delaware 19806

and by e-mail and first class mail, postage prepaid, on

> James E. Edwards, Esq.
> Anthony Vittoria, Esq.
> Ober, Kaler, Grimes & Shriver
> 120 East Baltimore Street
> Baltimore, Maryland 21202-1643



/s/ John S. Spadaro