# PART III - GENERAL TERMS

## 1.0 WARRANTIES

**1.1.1** Contractor warranties Duke/Fluor Daniel Caribbean S.E. ("D/FDC") and Owner that the Work shall comply with the provisions of this Contract and all specifications and drawings referred to in this Contract, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Contractor. Contractor further warranties D/FDC and Owner that all materials, equipment and supplies furnished by Contractor for the Work shall be new and fit for their specified purposes as set forth in this Contract and be in full compliance with the requirements of this Contract. As described in this Agreement, if any defect in the Work in violation of the foregoing warranties arises within the period set forth below, Contractor shall upon receipt of prompt written notice from D/FDC or Owner of such defect promptly furnish, at no cost to D/FDC or Owner, design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties.

**1.2** Contractor, at its expense, (including, without limitation, costs of removal, packing, transportation and reinstallation) shall remedy promptly any defective Work which exists during the applicable warranty period as set forth in this Article 1.0, and of which D/FDC gives written notice within a reasonable time after discovery of the defect or damage. Upon such notification by D/FDC, Contractor shall promptly commence and proceed to make all needed adjustments, repairs, additions, corrections, and replacements which arise out of or are necessitated by such defective Work or damage. Contractor shall conduct such warranty work on a overtime schedule basis if D/FDC determines such a schedule is necessary to avoid or minimize the effects of an outage or load reduction and D/FDC shall reimburse Contractor the premium differential for performing warranty work on an overtime basis. Contractor shall coordinate its warranty Work with D/FDC to minimize interference to D/FDC's and Owner's operations. D/FDC will permit reasonable access to as much of the Unit(s) as Contractor may reasonably require for performance of warranty Work, but any costs of uncovering Work shall be the responsibility of the Contractor. Contractor shall perform warranty Work so that such adjustments, repairs, additions, corrections, and replacements do not degrade the performance of, nor impair the use of the Equipment, Materials or other Work in question, other systems, or the Unit(s) as a whole to an extent that the Equipment, Materials, or other Work, systems or Unit(s) will not meet the requirements of this Contract in all respects, and Contractor shall repair or replace all other facilities to the extent they are destroyed or damaged as result of Contractor's performance of warranty Work.

**1.2.1** The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance with the following exceptions:

    a.      The warranty period for the Boiler Hot Loop shall be twenty-four (24) months after Performance Acceptance;

    b.      The warranty period shall be extended for corrective Work as set forth below.

**1.2.2** At the mutual agreement of Contractor and D/FDC, warranty Work provided hereunder may be deferred until the time of the Unit's next regularly scheduled maintenance outage, provided that such outage shall commence not later than six (6) months after D/FDC's notice to Contractor of the defective condition, and the warranty provisions hereunder shall apply notwithstanding that such outage occurs

**A160**

ALDEC05 - 01589

after the time the warranty would otherwise expire. Contractor shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

1.3 The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Contractor's submittal to D/FDC of written Notice of Completion unless D/FDC, within ten (10) days thereafter, furnishes Contractor with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Contractor warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

1.3.1     In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, D/FDC shall so notify Contractor in writing prior to expiration of the Warranty Period, as applicable, and Contractor shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

1.3.2 A chronic failure ("Chronic Failure") shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, D/FDC and Contractor shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance.

1.4 In the event Contractor shall have been notified in writing of any defects in the Work in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, D/FDC and Owner shall have the right upon written notice to Contractor to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay D/FDC or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with back-up documentation supporting written claim.

1.5 In the event of an emergency when, in the reasonable judgment of D/FDC, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by D/FDC, or by a third party chosen by D/FDC, without giving prior notice to Contractor, and the reasonable cost of the remedial work shall be paid by Contractor but Contractor shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by D/FDC to Contractor as soon as practical.

1.6 The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years

ALDEC05 - 01590

(i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Contractor and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth in Article 1.3, applicable to this Article 1.6.

**1.7** Contractor agrees that D/FDC may assign its rights under this warranty and other parts of this Contract to Owner and Owner's Lenders, and Contractor hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

**1.8** Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feedstocks from the limits specified in the Contract are excluded from any warranty obligations of the Contractor.

**1.9** Contractor's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

**1.10** ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

## 2.0 INSPECTION, TESTING AND QUALITY CONTROL

**2.1** Contractor shall inspect all materials, supplies and equipment which are to be incorporated in the Work. In addition, Contractor shall conduct a continuous program of construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to D/FDC for review and approval, and shall be in sufficient detail to delineate those items to be inspected and the manner in which they are to be inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

**2.2** Contractor shall, during the course of performance of the Work hereunder, without additional compensation, make or cause to be made all tests required by this Contract. D/FDC may require additional inspections and tests for which Contractor shall be compensated for. Contractor shall furnish D/FDC with satisfactory documentation of the results of all inspections and tests. For those tests which are specifically listed in the Contract as "D/FDC Witness Tests", D/FDC shall be given not less than five (5) working days notice by Contractor in order that D/FDC and/or Owner may witness any such tests.

**2.3** D/FDC and Owner and their representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Work and all

# DUKE/FLUOR DANIEL CARIBBEAN, S.E.

Specification No.:  W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.03-0001
Revision: 2
May 10, 2001
Page: 1 of 27

CARIBBEAN ARCHITECTS & ENGINEERS (CAE)

FLUOR DANIEL CARIBBEAN, INC. (FDCI)

DUKE/FLUOR DANIEL CARIBBEAN (DFDC)

DUKE/FLUOR DANIEL INTERNATIONAL (DFDI)

DUKE/FLUOR DANIEL INTERNATIONAL SERVICES (DFDIS)

AES PUERTO RICO,  L. PARTNERSHIP (AES-PR)

AES-PR TOTAL ENERGY PROJECT

GUAYAMA, PUERTO RICO

## CIRCULATING DRY SCRUBBER
## FLUE GAS CLEANING SYSTEM

### SCOPE OF SUPPLY AND TECHNICAL REQUIREMENTS
### MATERIALS, EQUIPMENT, FACILITIES, AND DOCUMENTS

RECEIVED
JUN 04 2001
TECNICAL DOCUMENT CONTROL

Revision 0 - Conformance Specification - February 17,1997

## REVISION LOG

| 1 | February 4, 1998 | 6 |  |
| 2 | May 10, 2001 | 7 |  |
| 3 |  | 8 |  |
| 4 |  | 9 |  |
| 5 |  | 10 |  |



# DUKE/FLUOR DANIEL
## CARIBBEAN, S.E.

Specification No.: W419-15-170...03-0001
Revision: 2
May 10, 2001
Page: 2 of 27

## DUKE/FLUOR DANIEL
### VERIFICATION OF SPECIFICATION

Owner: _____ AES Puerto Rico, L.P. (AES-PR) _____

Title of Specification: _____ AES Puerto Rico Total Energy Project _____

_____ Circulating Dry Scrubber Flue Gas Cleaning System _____

Specification Number: _____ W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.03-0001 _____

Revision: _____ 02 _____

In accordance with established procedures, the quality of this specification has been assured. Signatures certify that the above specification was originated, checked, and approved as noted below:

| | | |
|---|---|---|
| Prepared By: | _Robert F Day Jr_ | Date: 5/11/01 |
| Checked By: | _A. M. Jansen_ | Date: 5-11-01 |
| Inspected By: Mechanical | | Date: 5-14-01 |
| Electrical | | Date: 5-15-01 |
| Civil | _Michael B. Tile_ | Date: 5-15-01 |
| Layout | _John R Medli_ | Date: 5-15-01 |
| Approved By: Eng. Mgr. | | Date: 5/15/01 |



DUKE FLUOR DANIEL
CARIBBEAN, S.E.

Specification No.: W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.03-0001
Revision: 2
May 10, 2001
Page: 3 of 27

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1.0 | COVER SHEET | 1 |
| 2.0 | VERIFICATION SHEET | 2 |
| 3.0 | TABLE OF CONTENTS | 3 |
| 4.0 | GENERAL | 5 |
| 4.1 | SCOPE | 5 |
| 4.2 | INSTALLATION SITE | 5 |
| 4.3 | DEFINITIONS | 5 |
| 4.4 | CODES AND STANDARDS | 6 |
| 5.0 | ATTACHMENTS | 8 |
| 6.0 | INSTALLATION AND OPERATING CONDITIONS | 8 |
| 6.1 | INSTALLATION DESIGN CRITERIA | 8 |
| 6.2 | OPERATING CONDITIONS | 10 |
| 6.3 | PERFORMANCE GUARANTEES | 11 |
| 7.0 | EQUIPMENT AND SERVICES TO BE FURNISHED | 11 |
| 7.1 | EQUIPMENT TO BE FURNISHED BY SELLER | 11 |
| 7.2 | TERMINAL POINTS | 12 |
| 8.0 | DESIGN REQUIREMENTS | 12 |
| 8.1 | GENERAL | 12 |
| 8.2 | ABSORBER/REACTOR VESSEL | 14 |
| 8.3 | REAGENT STORAGE SYSTEM | 15 |
| 8.4 | ASH RECIRCULATION SYSTEM | 16 |
| 8.5 | FLUE GAS COOLING WATER SYSTEM | 17 |
| 8.6 | COOLING WATER TANK | 17 |
| 8.7 | PUMPS | 18 |
| 8.8 | DUCTS | 19 |
| 8.9 | INSULATION AND LAGGING | 19 |
| 8.10 | STRUCTURAL STEEL | 20 |
| 8.11 | LADDERS, PLATFORMS AND STAIRS | 20 |
| 8.12 | EXPANSION JOINTS | 21 |
| 8.13 | INSTRUMENTATION AND CONTROLS | 21 |



A165

DUKE/FLUOR DANIEL
CARIBBEAN, S.E.

Specification No.: W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.03-0001
Revision: 2
May 10, 2001
Page: 4 of 27

## TABLE OF CONTENTS (Cont'd)

**9.0    SPECIAL REQUIREMENTS**                                    22

    9.1    PRE-AWARD MEETING                               22
    9.2    PACKAGING AND SHIPPING                          22
    9.3    MISCELLANEOUS REQUIREMENTS                      22
    9.4    NOISE                                           22
    9.5    MATERIAL ORIGIN OF MANUFACTURE                  22

**10.0    QUALITY ASSURANCE**                                     23

**11.0    DELIVERY**                                              23

**12.0    DRAWINGS**                                              23

    12.1    GENERAL                                        23
    12.2    SPECIFIC                                       24

**13.0    INSTRUCTION MANUALS**                                   25

**14.0    TESTS AND INSPECTIONS**                                 25

**15.0    SPARE PARTS**                                           26

**16.0    INFORMATION TO BE FURNISHED**                           26

    16.1    PRIOR TO AWARD OF ORDER                        26
    16.2    AFTER AWARD OF ORDER                           26

**17.0    DISCREPANCIES AND INTERPRETATION**                      26

**18.0    CONFORMANCE WITH SPECIFICATIONS**                       27

**19.0    CONSTRUCTION SERVICES**                                 27

**20.0    TECHNICAL DIRECTION**                                   27

**21.0    SUBMISSION OF PROPOSALS AND PRICES**                    27



Specification
Circulating Dry Scrubber

**A166**

# DUKE/FLUOR DANIEL CARIBBEAN, S.E.

Specification No. W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.03-0...
Revision: 2
May 10, 2001
Page: 5 of 27

**1.0 COVER SHEET**

Attached.

**2.0 VERIFICATION SHEET**

Attached.

**3.0 TABLE OF CONTENTS**

Attached.

**4.0 GENERAL**

**4.1 SCOPE**

1. This specification establishes the minimum requirements for the design, materials, fabrication, and shop testing for complete Circulating Dry Scrubber Flue Gas Desulfurization Packages (CDS) for the AES Puerto Rico Total Energy Project. Each CDS Package shall be complete with all the accessories, as described in the following sections of this specification, required for proper operation.

2. This specification shall be used in conjunction with the associated Circulating Fluidized Bed (CFB) Boiler specification W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.00-0001 and the Electrostatic Precipitator (ESP) specification W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.03-0002 included in the Contract. Seller is to provide a complete package, from the boiler through to each stack inlet, to meet all the performance guarantees as outlined in these specifications.

3. The Station will consist of two (2) nominal 255 MW generating units, with each generating unit consisting of one (1) coal fired, circulating fluidized bed (CFB), balanced draft boiler, one (1) CDS Package, one (1) ESP Package, and one (1) reheat turbine generator. Reliability and availability of the facility must be maximized to ensure dependable service. Design service life is twenty-five (25) years.

4. Each CDS Package shall consist of one (1) CDS absorber/reactor vessel designed to process 100% of boiler MCR gas flow. Each CDS Package shall include all structural steel, ductwork, duct supports, valves, dampers, instrumentation, control system, and auxiliary equipment required for a complete system. Scope shall also include a lime receiving, preparation, storage, and conditioning system, ash recirculation system, and flue gas cooling water system.

**4.2 INSTALLATION SITE**

The installation site will be located near Guayama, Puerto Rico. The site is accessible via barge and roads for unloading plant equipment.

**4.3 DEFINITIONS**

The following definitions shall apply to this specification:

| | | |
|---|---|---|
| Owner | - | AES Puerto Rico, L.P. (AES-PR) |
| Engineer | - | Caribbean Architects & Engineers (CAE) |
| | - | Duke/Fluor Daniel Caribbean S.E. (DFDC) |
| Buyer | - | Duke/Fluor Daniel Caribbean S.E. |



# DUKE/FLUOR DANIEL CARIBBEAN, S.E.

Specification № : W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.03-0 02
Revision: 2
May 10, 2001
Page: 1 of 29

CARIBBEAN ARCHITECTS & ENGINEERS (CAE)

FLUOR DANIEL CARIBBEAN, INC. (FDCI)

DUKE/FLUOR DANIEL CARIBBEAN (DFDC)

DUKE/FLUOR DANIEL INTERNATIONAL (DFDI)

DUKE/FLUOR DANIEL INTERNATIONAL SERVICES (DFDIS)

AES PUERTO RICO, L. PARTNERSHIP (AES-PR)

AES-PR TOTAL ENERGY PROJECT

GUAYAMA, PUERTO RICO

ELECTROSTATIC PRECIPITATOR (ESP)
FLUE GAS CLEANING SYSTEM

SCOPE OF SUPPLY AND TECHNICAL REQUIREMENTS
MATERIALS, EQUIPMENT, FACILITIES, AND DOCUMENTS

Revision 0 - Conformance Specification - February 17, 1997

**REVISION LOG**

| 1 | February 4, 1998 | 6 | |
| 2 | May 10, 2001 | 7 | |
| 3 | | 8 | |
| 4 | | 9 | |
| 5 | | 10 | |

RECEIVED
JUN 0 6 2021
TECHNICAL
DOCUMENT
CONTROL



Specification
ESP

AESPR 021845

AESPR-021845

A168

W419:15170903000002 [file://C:TEMP-W419151709000000111.tif]                                    Page

# DUKE/FLUOR DANIEL
## CARIBBEAN, S.E.

Specification No.: W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.03-0002
Revision: 2
May 10, 2001
Page: 2 of 29



### DUKE/FLUOR DANIEL
### VERIFICATION OF SPECIFICATION

Owner: _____ AES Puerto Rico. L.P. (AES-PR) _____

Title of Specification: _____ AES Puerto Rico Total Energy Project

_____ Electrostatic Precipitator Flue Gas Cleaning System

Specification Number: _____ W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.03-0002

Revision: _____ 02

In accordance with established procedures, the quality of this specification has been assured. Signatures certify that the above specification was originated, checked, and approved as noted below:

| | | | |
|---|---|---|---|
| Prepared By: | | *Robert J Day Jr* | Date: 5/11/01 |
| Checked By: | | *Bri C Powell* | Date: 5/11/01 |
| Inspected By: | Mechanical | *CBP* | Date: 5/11/01 |
| | Electrical | | Date: 5-11-01 |
| | Civil | *WMB for Richard Wiles* | Date: 5/11/01 |
| | Layout | *John L Mueller* | Date: 5-11-01 |
| Approved By: | Eng. Mgr. | *MJCK* | Date: 5-11-01 |

AES

Specification
ESP

AESPR 021846

**AESPR-021846**

**A169**

DUKE/FLUOR DANIEL
CARIBBEAN, S.E.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1.0 | COVER SHEET | 1 |
| 2.0 | VERIFICATION SHEET | 2 |
| 3.0 | TABLE OF CONTENTS | 3 |
| 4.0 | GENERAL | 5 |
| | 4.1 SCOPE | 5 |
| | 4.2 INSTALLATION SITE | 5 |
| | 4.3 DEFINITIONS | 5 |
| | 4.4 CODES AND STANDARDS | 6 |
| 5.0 | ATTACHMENTS | 8 |
| 6.0 | INSTALLATION AND OPERATING CONDITIONS | 8 |
| | 6.1 INSTALLATION DESIGN CRITERIA | 8 |
| | 6.2 OPERATING CONDITIONS | 10 |
| | 6.3 PERFORMANCE GUARANTEES | 11 |
| 7.0 | EQUIPMENT AND SERVICES TO BE FURNISHED | 11 |
| | 7.1 EQUIPMENT TO BE FURNISHED BY SELLER | 11 |
| | 7.2 TERMINAL POINTS | 12 |
| 8.0 | DESIGN REQUIREMENTS | 13 |
| | 8.1 GENERAL | 13 |
| | 8.2 ELECTROSTATIC PRECIPITATOR | 16 |
| | 8.2.1 Precipitator | 16 |
| | 8.2.2 Hoppers | 17 |
| | 8.2.3 Weather Enclosures | 17 |
| | 8.2.4 Precipitator Access | 18 |
| | 8.2.5 Rappers | 19 |
| | 8.2.6 Transformer-Rectifier Sets | 19 |
| | 8.2.7 Controls | 20 |
| | 8.3 AUXILIARY EQUIPMENT | 21 |
| | 8.3.1 Ductwork and Appurtenances | 21 |
| | 8.3.2 Insulation and Lagging | 21 |
| | 8.3.3 Structural Steel | 22 |
| | 8.3.4 Ladders, Platforms and Stairs | 22 |
| | 8.3.5 Expansion Joints | 23 |



Specification
ESP

DUKE/FLUOR DANIEL
CARIBBEAN, S.E.

Specification No.: W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.03-0002
Revision: 2
May 10, 2001
Page: 4 of 29

## TABLE OF CONTENTS (Cont'd)

| | | |
|---|---|---|
| 9.0 | SPECIAL REQUIREMENTS | 23 |
| | 9.1 PRE-AWARD MEETING | 23 |
| | 9.2 WELDING | 23 |
| | 9.3 NOISE | 23 |
| | 9.4 NAMEPLATES | 24 |
| | 9.5 PACKAGING AND SHIPPING | 24 |
| | 9.6 MISCELLANEOUS REQUIREMENTS | 24 |
| 10.0 | QUALITY ASSURANCE | 24 |
| 11.0 | DELIVERY | 24 |
| 12.0 | DRAWINGS | 25 |
| | 12.1 GENERAL | 25 |
| | 12.2 SPECIFIC | 25 |
| 13.0 | INSTRUCTION MANUALS | 27 |
| 14.0 | TESTS AND INSPECTIONS | 28 |
| 15.0 | SPARE PARTS | 28 |
| 16.0 | INFORMATION TO BE FURNISHED BY BIDDER | 29 |
| | 16.1 WITH PROPOSAL | 29 |
| | 16.2 AFTER AWARD OF ORDER | 29 |
| 17.0 | DISCREPANCIES AND INTERPRETATION | 29 |
| 18.0 | CONFORMANCE WITH SPECIFICATIONS | 29 |
| 19.0 | CONSTRUCTION SERVICES | 29 |
| 20.0 | TECHNICAL DIRECTION | 29 |
| 21.0 | SUBMISSION OF PROPOSALS AND PRICES | 29 |



Specification
ESP

AESPR 021848

AESPR-021848

A171

# DUKE/FLUOR DANIEL CARIBBEAN, S.E.

Specification No.: W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.03-0002
Revision: 2
May 10, 2001
Page: 5 of 29

**1.0 COVER SHEET**

*Attached.*

**2.0 VERIFICATION SHEET**

*Attached.*

**3.0 TABLE OF CONTENTS**

*Attached.*

**4.0 GENERAL**

**4.1 SCOPE**

1.  This specification establishes the minimum requirements for the design, materials, fabrication, and shop testing for complete Electrostatic Precipitator (ESP) Flue Gas Cleaning Packages for the AES Puerto Rico Total Energy Project. Each ESP Package shall be complete with all the accessories, as described in the following sections of this specification, required for proper operation.

2.  This specification shall be used in conjunction with the associated Circulating Fluidized Bed (CFB) Boiler specification W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.00-0001 and the Circulating Dry Scrubber (CDS) specification W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.03-0001 included in the Contract. Seller is to provide a complete package, from the boiler through to each stack inlet, to meet all the performance guarantees as outlined in these specifications.

3.  The Station will consist of two (2) nominal 255 MW generating units, with each generating unit consisting of one (1) coal fired, circulating fluidized bed (CFB), balanced draft boiler, one (1) CDS Package, one (1) ESP Package, and one (1) reheat turbine generator. Reliability and availability of the facility must be maximized to ensure dependable service. Design service life is twenty-five (25) years.

4.  Each ESP Package shall consist of a dual chamber, sixteen inch plate spacing, electrostatic precipitator designed to process 100% of the total boiler gas flow from one unit. Each ESP Package shall include all structural steel, ductwork, duct supports, valves, dampers, instrumentation, control system, and auxiliary equipment required for a complete system.

**4.2 INSTALLATION SITE**

The installation site will be located near Guayama, Puerto Rico. The site is accessible via barge and roads for unloading plant equipment.

**4.3 DEFINITIONS**

The following definitions shall apply to this specification:

Owner       -   AES Puerto Rico, L.P. (AES-PR)
Engineer    -   Caribbean Architects & Engineers (CAE)
            -   Duke/Fluor Daniel Caribbean S.E. (DFDC)
Buyer       -   Duke/Fluor Daniel Caribbean S.E.
Bidder      -   Firm proposing to supply the subject equipment



Specification
ESP

AESPR 021849

AESPR-021849

A172

**Joseph F. Mair, CPA**

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3    AES PUERTO RICO, L.P.        *

4            Plaintiff           *

5        v.                      *        CIV. NO. 04-1282-JJF

6    ALSTOM POWER, INC.          *

7            Defendant           *        Pages 1 - 98

8                        - - - - - - - - - - -

9

10

11

12    Videotaped deposition of Joseph F. Mair, C.P.A.

13                Baltimore, Maryland

14            Thursday, April 6, 2006

15

16

17

18

19                                        ORIGINAL

20    Job No. 173876

21    Reported by:  Kathleen R. Turk, RPR-RMR

A173

**Joseph F. Mair, CPA**

Page 45

1        Q        So you were asked to opine on the

2    standard of care essentially for an accountant?

3        A        Yes.

4        Q        Okay.  Let me draw your attention back to

5    Page 2, if you're still on it.

6                 You say -- your first sentence under

7    Summary of Opinion, you state that the number of

8    years used by Mr. Rosenberg in the computation of

9    the present value of the -- operations and

10   maintenance expenses for the Reverse Osmosis

11   System and the Crystallizer is not appropriate.

12                What was your basis for that opinion?

13       A        The period of time that the present value

14   of, of reverse osmosis, or the operating and

15   maintenance cost for the reverse osmosis process

16   and the crystalizer, you know, I believe should

17   have been limited to a four-year period, you know,

18   starting with November 28th, 2000, you know, and

19   2.

20       Q        Which based --

21       A        So --

**A174**

Joseph F. Mair, CPA

Page 46

1          Q     Oh, sorry.

2          A     Because, in general, you know, I believe

3     the warranty provisions of the contract appear to

4     indicate that there's at most a four-year warranty

5     period.

6          Q     So your basis that the expenses should

7     only go out until four years after date of

8     acceptance is based on your reading of the

9     warranty language?

10         A     That's right.

11         Q     Which part of the warranty?

12         A     I read the entire warranty.

13         Q     Umh-humh.

14               And --

15         A     Assuming that the entire warranty is, you

16    know, the attachment that I have in the report.

17         Q     So the only -- so the extent you, you say

18    you read the warranty, it refers to the attachment

19    to your report?

20         A     Yes.

21         Q     Did you read any other parts of the

A175

**Joseph F. Mair, CPA**

Page 55

1     Q   -- your reading of the con --

2     A   Yes.

3     Q   Your reading of the warranty --

4     A   Yeah.

5     Q   -- how did the parties determine whether

6   there's accelerated corrosion?

7     A   Oh, if it's -- well, I'd have to find the

8   section.

9        Offhand, I don't recall.

10    Q   Go ahead.

11       (Witness complying.)

12    A   Well, not being an engineer, but in

13  general I would, you know, guess that it would be

14  corrosion that's outside of the industry standards

15  for power-generated facilities.

16    Q   Umh-humh.

17       Are you an attorney, Mr. Mair?

18    A   No.

19    Q   Do you have any legal training?

20    A   No.

21    Q   Let's go back to Page 2.

**A176**

**Joseph F. Mair, CPA**

Page 58

1       A    Well, not being an attorney, I don't have

2    any, you know, knowledge of, you know, warranty

3    law.

4           I'm, you know, just, you know, reading

5    this more or less as a layman --

6       Q    Umh-humh.

7       A    -- in terms of what the plain language,

8    you know, of this warranty says.

9       Q    All right.

10      A    And relating to the, you know, the costs

11    themselves, I'm not an engineer, I'm not familiar

12    with the operations of, you know, power plants, so

13    I don't know whether these costs are really, you

14    know, necessary to, you know, enable the plant to

15    operate.

16      Q    Right.

17           So when you say you did contract -- when

18    you read the contract as, as a layman, you said?

19      A    Yes.

20      Q    Do you have any expertise in contract

21    interpretation?

**Esquire Deposition Services**

DC 1-800-441-3376          MD 1-800-539-6398          VA 1-800-752-8979

Joseph F. Mair, CPA

Page 65

1       contracts.

2           Q       Umh-humh.

3           A       So I mean, it's inherently, you know,

4       related to construction, you know, these type of

5       prevailing wage cases.

6           Q       Umh-humh.

7                   Have you ever been asked to render an

8       opinion on contract interpretation?

9           A       No.

10          Q       When did you begin writing this report?

11          A       Probably the first week in March.

12          Q       And, and let me just back up one minute

13      just to make sure we're clear here.

14                  When you state that the warranty's

15      limited to the four years, the November, 2006, and

16      the language that you read -- strike that.

17                  Let's just, to be clear, your opinion

18      with regard to the four-year limit on the

19      warranty, that interpretation of the contract was

20      never suggested to you prior to you rendering that

21      opinion?

DC 1-800-441-3376          Esquire Deposition Services          VA 1-800-752-8979
                           MD 1-800-539-6398

**Joseph F. Mair, CPA**

Page 96

```
1              CERTIFICATE OF NOTARY PUBLIC

2         I, Kathleen R. Turk, the officer before whom the

3    foregoing deposition was taken, do hereby certify that

4    the witness whose testimony appears in the foregoing

5    deposition was duly sworn by me; that the testimony of

6    said witness was taken by me in stenotype and thereafter

7    reduced to typewriting under my direction; that said

8    deposition is a true record of the testimony given by

9    said witness; that I am neither counsel for, related to,

10   nor employed by any of the parties to the action in

11   which this deposition was taken; and, further, that I am

12   not a relative or employee of any attorney or counsel

13   employed by the parties hereto, nor financially or

14   otherwise interested in the outcome of the action.

15

16                           Kathleen R. Turk

17                           Kathleen R. Turk

18                           Notary Public in and for the

19                           State of Maryland

20   My Commission Expires:

21   March 1, 2007.
```

A179

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,

                    Plaintiff

         v.

ALSTOM POWER, INC.,

                    Defendant

Civil Action No. 04-1282-JJF

## **EXPERT REPORT OF JOSEPH F. MAIR, CPA**

Submitted by: *[signature]*

Joseph F. Mair, CPA
NIHILL & RIEDLEY, PC
The Public Ledger Bldg., Ste. 800
150 S. Independence Mall West
Philadelphia, PA 19106
(215) 238-8450
March 17, 2006

EXHIBIT
Mair 1

nihill & riedley
A Professional Corporation

A180

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    Introduction ...................................................................................    1

II.   Statement of Assignment.............................................................    1

III.  Expert Qualifications ...................................................................    1

IV.   Documents Considered and Information Relied Upon ..........................    2

V.    Summary of Opinions ..................................................................    2

VI.   Statement of the Reasons and Basis of the Opinion.............................    2

VII.  Compensation.............................................................................    4

Exhibits



Expert Witness Report of Joseph F. Mair, CPA
In
*AES Puerto Rico, L.P.*
*v.*
*Alstom Power, Inc.*
*Case No.: 04-1282-JJF*
*United States District Court, District of Delaware*

## I.  INTRODUCTION

This report is being submitted in connection with the case captioned AES Puerto Rico, L.P., Plaintiff v. Alstom Power, Inc., Defendant.  In general, AES Puerto Rico, L.P. alleges in its complaint that the defendant, Alstom Power, Inc., failed to honor its warranty obligations in connection with the construction of a 454-megawatt co-generation coal fired power plant in Guayana, Puerto Rico.

## II.  STATEMENT OF ASSIGNMENT

I have been engaged by Ober/Kaler, counsel for the defendant in this matter, and I have been requested to offer my opinions regarding the expert witness report of Stuart A. Rosenberg, CPA dated February 24, 2006.

## III.  EXPERT QUALIFICATIONS

I am a principal and shareholder of Nihill & Riedley, P.C., an accounting firm located in Philadelphia, Pennsylvania.  My practice has been concentrated in construction related matters since becoming a shareholder in 1989.  I have previously been engaged as an expert in a variety of construction and other matters.  My *Curriculum Vitae* is attached as **Exhibit C**.

n
nihill & riedley
A Professional Corporation

Alstom Power, Inc.
25084

March 17, 2006
Page 2

IV.  **DOCUMENTS CONSIDERED AND INFORMATION RELIED UPON**

In connection with this assignment, I have reviewed or considered the following documents and information:

- The Complaint;
- Plaintiff's Responses to Alstom Power, Inc.'s First Set of Interrogatories;
- Plaintiff's Supplemental Response to Alstom Power, Inc.'s Interrogatory No. 10;
- The Expert Report of Stuart A. Rosenberg, CPA, CVA dated February 24, 2006;
- The Expert Report of Jack R. McDonald Ph.D dated February 26, 2006;
- Plaintiff's Responses to Alstom Power, Inc.'s Second Set of Interrogatories; and
- Documents produced by the plaintiff in support of damages actually incurred, including invoices, purchase orders, cancelled checks and contracts.

V.  **SUMMARY OF OPINION**

The number of years used by Mr. Rosenberg in the computation of the present value of operations and maintenance ("O&M") expenses for the Reverse Osmosis System and the Crystallizer is not appropriate. The date of the present value computation should extend only to November 28, 2006, four (4) years from the date of November 28, 2002 on which AES Puerto Rico, L.P took over commercial operations of the plant. The computation of the present value of costs to be incurred through November 28, 2006 for the Reverse Osmosis System is $89,053. The computation of the present value of costs to be incurred through November 28, 2006 for the Crystallizer would be $0 as no costs were projected to be incurred until 2008 by the plaintiff.

VI.  **STATEMENT OF REASONS AND BASIS FOR THE OPINION**

Mr. Rosenberg's computations of the present value of the O&M costs for both the Reverse Osmosis System and the Crystallizer are based on the 22 year period of the "remaining years in the PPA [Power Purchase Agreement] between AES-PR and the Puerto Rico Electric Power Company."



nihill & riedley
A Professional Corporation

**A183**

Alstom Power, Inc.
25084

March 17, 2006
Page 3

Part III, Article 1.6 of the contract between AES Puerto Rico, LP and Alstom Power, Inc., relating to warranties in part states

> The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years (i) the structural integrity of the Equipment or any portion thereof or (ii) the ability of the Equipment to mechanically perform.

Article 1.6 further states that

> There shall be no re-warranty or extended warranty obligation as set forth in Article 1.3, applicable to Article 1.6.

The full text of the warranty section is attached as **Exhibit A**.

Based upon these provisions the present value computation should not extend beyond four (4) years from the start of commercial operations by AES Puerto Rico, L.P. (the initial 24 month warranty period plus the 24 month look forward period). Four (4) years from the commercial operations date of November 28, 2002 is November 28, 2006. It is assumed that performance acceptance occurred at the time that AES Puerto Rico, L.P. took over control of the plant and began commercial operations. Although the use of a "mid-year convention" utilized in the plaintiff's expert report is not unreasonable, for purposes of this computation of a shorter period to November 28, 2006, the O&M costs relating to the Reverse Osmosis System were assumed to be incurred monthly (1/12 of $100,000) and the present value computed monthly. The revised Reverse Osmosis System computation resulting in a total present value of $89,053 is attached as **Exhibit B**. The discount or interest rate of 4.73% used by Mr. Rosenberg has also been use in this computation.



nihill & riedley
A Professional Corporation

**A184**

Alstom Power, Inc.                                                    March 17, 2006
25084                                                                        Page 4

Because no O&M costs were projected to be incurred prior to 2008, the present value of O&M costs related to the Crystallizer through November 28, 2006 are zero.

This opinion is not intended to make a legal judgment as to the applicability of Article 1.6 or a technical judgment relating to the necessity of the costs incurred. This opinion assumes that Article 1.6 is applicable to the type of costs upon which the present value is being computed and that these costs are appropriate costs necessary to correct the "consequences of accelerated corrosion." To the extent that the O&M costs are not appropriate remedies to the "consequences of accelerated corrosion" the present value of these costs would be reduced.

These opinions and this report may be revised if additional information or documents are made available.

VII.    **Compensation**

Nihill & Riedley, P.C. is being compensated at rates between $40.00 and $160.00 per hour. As the engagement is continuing, the total amount of our compensation at completion is unknown.



nihill & riedley
A Professional Corporation

**A185**

# Exhibit A

## PART III - GENERAL TERMS

**1.0 WARRANTIES**

1.1.1 Contractor warranties Duke/Fluor Daniel Caribbean S.E. ("D/FDC") and Owner that the Work shall comply with the provisions of this Contract and all specifications and drawings referred to in this Contract, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Contractor. Contractor further warranties D/FDC and Owner that all materials, equipment and supplies furnished by Contractor for the Work shall be new and fit for their specified purposes as set forth in this Contract and be in full compliance with the requirements of this Contract. As described in this Agreement, if any defect in the Work in violation of the foregoing warranties arises within the period set forth below, Contractor shall upon receipt of prompt written notice from D/FDC or Owner of such defect promptly furnish, at no cost to D/FDC or Owner, design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties.

1.2 Contractor, at its expense, (including, without limitation, costs of removal, packing, transportation and reinstallation) shall remedy promptly any defective Work which exists during the applicable warranty period as set forth in this Article 1.0, and of which D/FDC gives written notice within a reasonable time after discovery of the defect or damage. Upon such notification by D/FDC, Contractor shall promptly commence and proceed to make all needed adjustments, repairs, additions, corrections, and replacements which arise out of or are necessitated by such defective Work or damage. Contractor shall conduct such warranty work on a overtime schedule basis if D/FDC determines such a schedule is necessary to avoid or minimize the effects of an outage or load reduction and D/FDC shall reimburse Contractor the premium differential for performing warranty work on an overtime basis. Contractor shall coordinate its warranty Work with D/FDC to minimize interference to D/FDC's and Owner's operations. D/FDC will permit reasonable access to as much of the Unit(s) as Contractor may reasonably require for performance of warranty Work, but any costs of uncovering Work shall be the responsibility of the Contractor. Contractor shall perform warranty Work so that such adjustments, repairs, additions, corrections, and replacements do not degrade the performance of, nor impair the use of the Equipment, Materials or other Work in question, other systems, or the Unit(s) as a whole to an extent that the Equipment, Materials, or other Work, systems or Unit(s) will not meet the requirements of this Contract in all respects, and Contractor shall repair or replace all other facilities to the extent they are destroyed or damaged as result of Contractor's performance of warranty Work.

1.2.1 The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance with the following exceptions:

    a.    The warranty period for the Boiler Hot Loop shall be twenty-four (24) months after Performance Acceptance;

    b.    The warranty period shall be extended for corrective Work as set forth below.

1.2.2 At the mutual agreement of Contractor and D/FDC, warranty Work provided hereunder may be deferred until the time of the Unit's next regularly scheduled maintenance outage, provided that such outage shall commence not later than six (6) months after D/FDC's notice to Contractor of the defective condition, and the warranty provisions hereunder shall apply notwithstanding that such outage occurs after the time the warranty would otherwise expire.

**A187**

Contractor shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

1.3 The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Contractor's submittal to D/FDC of written Notice of Completion unless D/FDC, within ten (10) days thereafter, furnishes Contractor with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Contractor warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

1.3.1  In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, D/FDC shall so notify Contractor in writing prior to expiration of the Warranty Period, as applicable, and Contractor shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

1.3.2  A chronic failure ("Chronic Failure") shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, D/FDC and Contractor shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance.

1.4 In the event Contractor shall have been notified in writing of any defects in the Work in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, D/FDC and Owner shall have the right upon written notice to Contractor to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay D/FDC or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with back-up documentation supporting written claim.

1.5 In the event of an emergency when, in the reasonable judgment of D/FDC, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by D/FDC, or by a third party chosen by D/FDC, without giving prior notice to Contractor, and the reasonable cost of the remedial work shall be paid by Contractor but Contractor shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by D/FDC to Contractor as soon as practical.

1.6 The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to

**A188**

materially affect in the next two (2) years (i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Contractor and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth in Article 1.3, applicable to this Article 1.6.

**1.7** Contractor agrees that D/FDC may assign its rights under this warranty and other parts of this Contract to Owner and Owner's Lenders, and Contractor hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

**1.8** Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feedstocks from the limits specified in the Contract are excluded from any warranty obligations of the Contractor.

**1.9** Contractor's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

**1.10** ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

## 2.0 INSPECTION, TESTING AND QUALITY CONTROL

**2.1** Contractor shall inspect all materials, supplies and equipment which are to be incorporated in the Work. In addition, Contractor shall conduct a continuous program of construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to D/FDC for review and approval, and shall be in sufficient detail to delineate those items to be inspected and the manner in which they are to be inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

**2.2** Contractor shall, during the course of performance of the Work hereunder, without additional compensation, make or cause to be made all tests required by this Contract. D/FDC may require additional inspections and tests for which Contractor shall be compensated for. Contractor shall furnish D/FDC with satisfactory documentation of the results of all inspections and tests. For those tests which are specifically listed in the Contract as "D/FDC Witness Tests", D/FDC shall be given not less than five (5) working days notice by Contractor in order that D/FDC and/or Owner may witness any such tests.

**A189**

# Exhibit B

**AES Puerto Rico. L.P. v. Alstom Power, Inc.**
**Reverse Osmosis System**
**Present Value of O&M Costs**

| | |
|---|---|
| Computation Start Date | 01/01/2006 |
| Annual Rate | 4.73% |
| Annual Reverse Osmosis O&M costs | $100,000 |
| Monthly Reverse Osmosis O&M costs | $8,333 |

Formula $\qquad PV = Amt / (1 + (n \times r))$

PV = Present Value
Amt = Amount for which PV is computed
n = Period
r = Rate for the period n

| | Computation Date | Monthly O&M Costs | Present Value |
|---|---|---|---|
| 1 | 01/31/06 | 8,333 | 8,301 |
| 2 | 02/28/06 | 8,333 | 8,271 |
| 3 | 03/31/06 | 8,333 | 8,238 |
| 4 | 04/30/06 | 8,333 | 8,207 |
| 5 | 05/31/06 | 8,333 | 8,174 |
| 6 | 06/30/06 | 8,333 | 8,143 |
| 7 | 07/31/06 | 8,333 | 8,112 |
| 8 | 08/31/06 | 8,333 | 8,080 |
| 9 | 09/30/06 | 8,333 | 8,050 |
| 10 | 10/31/06 | 8,333 | 8,018 |
| 11 | 11/28/06 | 7,778 | 7,458 |

Net Present Value of O&M Payments $\qquad$ 89,053

**A191**

# Exhibit C

# JOSEPH F. MAIR, C.P.A.

**EXPERIENCE:**

**1989 – present**    **Shareholder** - Nihill & Riedley, P.C.

Practice is concentrated in the Construction and Surety Industry. Conducted and supervised the financial evaluation of numerous construction companies. The companies were engaged in almost all types of contracts including highway, general construction, steel erection, mechanical, curtain-wall, electrical, cogeneration, water and waste treatment plants, and coal mining/reclamation companies. In addition to the initial financial evaluation of construction companies the typical engagements will also include the oversight of the companies in wind down, liquidation and bankruptcy situations for sureties and the resolution of financial issues typical to construction companies, such as claims, disputes with owners regulatory agencies.    Engaged as an expert and/or provided testimony in matters related construction claims, trust fund statutes, prevailing wage cases and accountants professional liability matters.

**1985 - 1989**    **Associate** - Nihill & Riedley, P.C.

Conducted and supervised the financial evaluation of numerous construction companies.  The companies were engaged in a variety of contracts including highway, general construction, steel erection, mechanical, curtain-wall, electrical and cogeneration. Supervised the accounting and contract administration of more than $500 million in surety completion work in numerous contractor default situations. Related duties included the negotiation of change orders, incentive payments, claims with both owners and contractors, and the preparation of reports for insurers and trustees in bankruptcy proceedings.  Provided expert assistance to owners and attorneys in connection with construction and insurance claims, professional liability and other litigation.    These tasks have included the audit of contractors, investigations of alleged fraud and financial evaluations of companies.   Other engagements have included the investigation of fidelity bond losses and alleged misconduct on the part of directors and officers of various insurance and construction companies, criminal and civil tax defense, accountants professional liability, indemnity investigations and underwriting investigations.

**1983 - 1985**    **Revenue Agent** - Insurance Specialist, Internal Revenue Service.

Planned, conducted and supervised audit of major life and casualty insurance companies.  These audits involved some of the most complex



nihill & riedley
'A Professional Corporation'

**A193**

**JOSEPH F. MAIR, C.P.A.**
**Page 2**

federal income tax issues.

1982 - 1983     **Joint Committee Coordinator** - Insurance Specialist, Internal Revenue Service.

Acted as liaison between the House & Senate's Joint Committee on Taxation and the Internal Revenue Service Mid-Atlantic Region. Conducted quality reviews of all audits of insurance companies and various other banks and financial institutions examined in the Mid-Atlantic Region. Reviewed and analyzed proposed legislative changes relating to insurance companies and financial institutions.

**District Program Manager** - Internal Revenue Service.

Coordinated the examination of international issue returns in the Philadelphia District.

1981 - 1982     **Revenue Agent** - Insurance Specialist.

Planned, conducted and supervised audit of major life and casualty insurance companies. These audits involved some of the most complex federal income tax issues.

1974 - 1982     **Revenue Agent** - Internal Revenue Service.

Performed audits of federal corporate, partnership, fiduciary and individual tax return. Was responsible for preparation of audit programs, audits of returns and conducting closing negotiations.

## EDUCATION AND PROFESSIONAL AFFILIATIONS

➢     Certified Public Accountant licensed in Pennsylvania

➢     B.S. - Accounting, Drexel University

➢     Member, American Institute of Certified Public Accountants

➢     Member, Pennsylvania Institute of Certified Public Accountants

➢     Member National Bond Claims Association

➢     Sponsor / Member Eastern Bond Claims Review



nihill & riedley
A Professional Corporation

**A194**

**JOSEPH F. MAIR, C.P.A.**
**Page 3**


**ARTICLES PUBLISHED**

"Coordination of Legal Construction and Accounting Professionals"; Eastern Bond Claims Review, April 20, 1998.

"Surety, Fidelity and Accountant Liability, When Do You Have a Case"; Andrews Professional Liability Reporter Volume 13, Issue 4., 2003.


**TRIAL OR DEPOSITION TESTIMONY IN PAST FOUR YEARS**

None.



nihill & riedley
A Professional Corporation



The Public Ledger Building ▪ Suite 800 ▪ 150 South Independence Mall West ▪ Philadelphia, PA 19106
215.238.8450 *telephone* ▪ 215.238.8469 *fax* ▪ www.nihillriedley.com

**A196**

## CERTIFICATE OF SERVICE

On October 2, 2006, Plaintiff served its Appendix to Memorandum of Points and

Authorities in Support of Plaintiff AES Puerto Rico, L.P.'s *Daubert* Motion To Exclude Certain

Testimony of Expert Witnesses Proffered by Defendant Alstom Power, Inc. by electronic filing

and first class mail, postage prepaid, on:

> Richard R. Wier, Esq.
> Daniel W. Scialpi, Esq.
> Two Mill Road
> Suite 200
> Wilmington, Delaware 19806

and by e-mail and first class mail, postage prepaid, on

> James E. Edwards, Esq.
> Anthony Vittoria, Esq.
> Ober, Kaler, Grimes & Shriver
> 120 East Baltimore Street
> Baltimore, Maryland 21202-1643


/s/ John S. Spadaro