## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AES PUERTO RICO, L.P.,        ) | |
|        ) | |
|      Plaintiff,     ) | |
|     v.        ) | Civ. No. 04-1282-JJF |
|        ) | |
| ALSTOM POWER, INC.,      ) | |
|        ) | |
|      Defendant.    ) | |

## APPENDIX TO MEMEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTIONS IN LIMINE ON EVIDENTIARY
## MATTERS OF PLAINTIFF AES PUERTO RICO, L.P.

### (Pages A01 through A76)

John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
Ann N. Sagerson
James L. Tuxbury
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  October 2, 2006

Attorneys for AES Puerto Rico, L.P

# INDEX

Excerpt Contract No. W419-44-C0001 (2/24/98)...............................................A01

Letter from Anthony Vittoria to Daniel D. Williams (10/13/05) ....................A08

Dr. Marlin Anderson deposition transcript excerpts (4/12/06)..........................A10
**[pp. 1, 193-195, 332]**

      Exhibit No. 1:  Excerpt from Expert Report of
                    Dr. Marlin Anderson (3/20/06)............................................A15

Dr. Ronald Ballinger deposition transcript excerpts (4/11/06) ........................A17
**[pp. 1, 215-216, 425]**

      Exhibit No. 2:  Excerpt from Expert Report of
                    Dr. Ronald Ballinger (3/20/06) ...........................................A21

Letter from James Edwards to Daniel D. Williams (2/16/06)...........................A24

AES PR Complaint Against D/FD (6/9/03) .......................................................A25

Release and Settlement Agreement (10/31/03) ..................................................A45

Joint Defense Agreement (10/28/04)...................................................................A68

## SIGNATURE DOCUMENT

### CONTRACT NO. W419-44-C0001

THIS CONTRACT IS entered into, effective as of **February 24, 1998** by and between **Duke/Fluor Daniel Caribbean S.E.** (hereinafter referred to as "Duke/Fluor Daniel Caribbean S.E." or "DFDC")

whose address is:          **Duke/Fluor Daniel Caribbean S.E.**
                           **P.O. Box 1011**
                           **Charlotte, NC  28201-1011**

and **Combustion Engineering, Inc.** (hereinafter referred to as "Contractor" or "ABBCE"),
whose address is:                          LICENSE NUMBER    TBD

                           **ABB Combustion Engineering Systems**
                           **Combustion Engineering, Inc.**
                           **P.O. Box 500**
                           **2000 Day Hill Road**
                           **Windsor, CT  06095-0500**

In consideration of the agreements herein contained, the parties hereto contract and agree as follows:

**ARTICLE   1.0**              **CONTRACT DOCUMENTS**

This Contract shall consist of this Signature Document and the following documents, and the exhibits, drawings, specifications and documents referred to therein, all of which by this reference are incorporated herein and made a part of this Contract:

          DEFINITION OF TERMS
          PART I      -      SCOPE OF WORK
          PART II     -      COMMERCIAL TERMS
          PART III    -      GENERAL TERMS

Said Contract sets forth the entire Contract and agreement between the parties pertaining to the Work and supersedes all inquiries, proposals, agreements, negotiations and commitments, whether written or oral, prior to the date of execution of this Contract, pertaining to said Work of this Contract.  The provisions of this Contract may be changed only by a writing executed by Duke/Fluor Daniel Caribbean S.E. and Contractor.  Trade custom and trade usage are superseded by this Contract and shall not be applicable in the interpretation of performance of this Contract.

**ARTICLE   2.0**              **PRECEDENCE**

In cases of express conflict between PARTS of the Contract, specifications, drawings or exhibits, the order of precedence shall be as follows:

          -      **Signature Document**
          -      **Definition of Terms**
          -      **PARTS I AND II**
          -      **PART III**

**ALDEC05 - 01491**

In the event of an express conflict between the documents listed above, or between any other documents which are a part of the Contract, Contractor shall notify DFDC immediately and shall comply with DFDC's resolution of the conflict.

**A01**

**ARTICLE   3.0            SCOPE OF WORK**

Except as otherwise expressly provided elsewhere in this Contract, Contractor shall supply all services, things, and items of expense necessary to perform, and shall perform, the Work generally described as:

**Design, Manufacture, Supply, Delivery, Erection, and Startup Assistance of the Circulating Fluidized Bed Boilers, Circulating Dry Scrubber Flue Gas Desulfurization Systems, and Electrostatic Precipitators.**

said work being more particularly described in PART I - SCOPE OF WORK (herein referred to as "Work"), for and in connection with the

AES PUERTO RICO TOTAL ENERGY PROJECT

said Work to be performed on a site to be designated by Duke/Fluor Daniel Caribbean S.E. at or in the vicinity of Guayama, Puerto Rico.

Contractor acknowledges that Contractor's Work done under this Contract is part of Duke/Fluor Daniel Caribbean S.E's obligation to AES Puerto Rico L.P. (hereinafter referred to as "Owner") under the Engineering, Procurement and Construction Services Agreement between AES Puerto Rico L.P and Duke/Fluor Daniel Caribbean S.E. dated effective as of <u>April 3, 1996</u> (the "EPC Contract").  Contractor hereby agrees to assume full responsibility for all its obligations under this Contract between ABBCE and DFDC.

**ARTICLE   4.0            CONTRACT PRICE**

Contractor's full compensation for full and complete performance by Contractor of all the Work and compliance with all terms and conditions of this Contract shall be as set forth in PART II - COMMERCIAL TERMS.

**ARTICLE   5.0            CAPTIONS**

Titles and captions used in this Contract are for convenience only and shall not be used in the interpretation of any of the provisions of this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Contract on the day and year below written, but effective as of the day and year first set forth above.

| <u>COMBUSTION ENGINEERING, INC.</u> | <u>DUKE/FLUOR DANIEL CARIBBEAN S.E.</u> |
|---|---|
| BY: | BY: _C L Ray Jr._ |
| TITLE: | TITLE: _PRESIDENT_ |
| DATE: _2/24/98_ | DATE: _2/24/98_ |

**ALDEC05 - 01492**

**A02**

# DUKE/FLUOR DANIEL
## CARIBBEAN S.E.

Revision: 1
February 4, 1998
Page: 1 of 33

---

## Part I
## SCOPE OF WORK

1.0     **SCOPE OF WORK - GENERAL**

1.1     Except as otherwise expressly provided herein, Contractor shall supply all the design, engineering, manufacture, delivery, installation, inspection, factory testing, field testing, labor, equipment, materials, tools, warehousing services, and each and every item of expense necessary for the supply, handling, delivery, erection, startup, and testing of the CFB Boilers, Circulating Dry Scrubbers, Electrostatic Precipitators and all appurtenances, herein after called the Work.

1.2.     Scope shall include technical field support and consultation services during performance testing, initial operation of all equipment furnished, and training of Owner's operating and maintenance personnel.

2.0     **SCOPE OF SUPPLY AND TECHNICAL REQUIREMENTS**

2.1     All equipment shall be furnished and all Work shall be performed in strict accordance with the following described specifications, drawings, and other documents, which by this reference are made a part hereof.

2.1.1     <u>Specifications</u>

| SPECIFICATION NO. | REV. | TITLE |
|---|---|---|
| | | |

2.1.1.1    W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.00-0001    1     Circulating Fluidized Boiler and Appurtenances

2.1.1.2    W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.03-0001    1     Circulating Dry Scrubber

2.1.1.3    W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.03-0002    1     Electrostatic Precipitator

2.1.1.4    AES-GPR-1       0     General Project Requirements (GPR)

2.1.2     <u>Attachments</u>

2.1.2.1    None

2.3     **CODES, REGULATIONS & STANDARDS**

-American National Standards Institute (ANSI)
-National Electrical Code (NEC)
-Underwriters' Laboratories (UL)
-Institute of Electrical & Electronic Engineers (IEEE)

A03

---



after the time the warranty would otherwise expire. Contractor shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

1.3 The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Contractor's submittal to D/FDC of written Notice of Completion unless D/FDC, within ten (10) days thereafter, furnishes Contractor with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Contractor warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

1.3.1    In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, D/FDC shall so notify Contractor in writing prior to expiration of the Warranty Period, as applicable, and Contractor shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

1.3.2 A chronic failure ("Chronic Failure") shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, D/FDC and Contractor shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance.

1.4 In the event Contractor shall have been notified in writing of any defects in the Work in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, D/FDC and Owner shall have the right upon written notice to Contractor to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay D/FDC or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with back-up documentation supporting written claim.

1.5 In the event of an emergency when, in the reasonable judgment of D/FDC, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by D/FDC, or by a third party chosen by D/FDC, without giving prior notice to Contractor, and the reasonable cost of the remedial work shall be paid by Contractor but Contractor shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by D/FDC to Contractor as soon as practical.

1.6 The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years

Contract\ABBT&C2
(Rev. 2/23/98)                     Page 2                                                    A04

ALDEC05 - 01590

(i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Contractor and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth in Article 1.3, applicable to this Article 1.6.

**1.7** Contractor agrees that D/FDC may assign its rights under this warranty and other parts of this Contract to Owner and Owner's Lenders, and Contractor hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

**1.8** Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feedstocks from the limits specified in the Contract are excluded from any warranty obligations of the Contractor.

**1.9** Contractor's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

**1.10 ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.**

## 2.0 INSPECTION, TESTING AND QUALITY CONTROL

**2.1** Contractor shall inspect all materials, supplies and equipment which are to be incorporated in the Work. In addition, Contractor shall conduct a continuous program of construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to D/FDC for review and approval, and shall be in sufficient detail to delineate those items to be inspected and the manner in which they are to be inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

**2.2** Contractor shall, during the course of performance of the Work hereunder, without additional compensation, make or cause to be made all tests required by this Contract. D/FDC may require additional inspections and tests for which Contractor shall be compensated for. Contractor shall furnish D/FDC with satisfactory documentation of the results of all inspections and tests. For those tests which are specifically listed in the Contract as "D/FDC Witness Tests", D/FDC shall be given not less than five (5) working days notice by Contractor in order that D/FDC and/or Owner may witness any such tests.

**2.3** D/FDC and Owner and their representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Work and all

equipment, material, scaffolding and like items, leaving Owner's premises and the vicinity clean, safe and ready for use.

**7.2**  In the event Contractor shall fail to maintain its work area as described above and in a manner satisfactory to D/FDC, and Contractor has failed to effect such cleanup or removal promptly after receipt of written notice to do so, D/FDC shall have the right without further notice to Contractor to perform such cleanup and remove such items on behalf of, and at the expense of Contractor.  D/FDC may store items removed at a place of its choosing on behalf of Contractor and at Contractor's risk and expense. D/FDC shall promptly notify Contractor of such place of storage.  Contractor shall promptly reimburse D/FDC for the costs of such cleanup, removal and storage.

**7.3**  On or before completion of the Work, Contractor shall remove, transport and dispose of any Hazardous Material transported onto the Facility Site by Contractor or any of its subcontractors, or created, used or handled as part of Contractor's or any of its subcontractor's construction activities at the Facility Site.  All cleanup and disposal shall be conducted in accordance with all Applicable Laws and Applicable Permits.  Contractor shall notify D/FDC immediately upon the discovery of the presence of any Hazardous Material on, or the release of Hazardous Material on or from, the Facility Site.

## 8.0 SUBCONTRACTORS AND PURCHASE ORDERS

**8.1**  Contractor shall not subcontract performance of any work that will be performed at the jobsite and which has a value of $100,000 or greater without first notifying D/FDC of the intended subcontracting and obtaining D/FDC's Notice of Non-Objection in writing of the subcontracting and the subcontractor. Issuing of the Notice of Non-Objection shall not be unreasonably withheld. If requested by D/FDC, Contractors shall furnish D/FDC a copy of the subcontract (with price deleted if the subcontracted work is part of fixed price Work of Contractor under this Contract).  Contractor agrees to include applicable Articles from this Contract in subcontracts but shall maintain responsibility for administration of such subcontracts.

**8.2**  Contractor guarantees that its subcontractors will comply fully with the terms of this Contract applicable to the portion of the Work performed by them.  If any portion of the Work which has been subcontracted by Contractor is not prosecuted in accordance with this Contract then upon written notification from D/FDC, Contractor shall take corrective action to assure that the subcontractor's work is brought into compliance with the Contract.  If after thirty (30) days of Contractor receiving written notice of such non-conformance, subcontractor has failed to reasonably bring the Work into compliance with the Contract to the reasonable satisfaction of D/FDC, then on written request of D/FDC the subcontractor shall be replaced at no additional cost to D/FDC and shall not be employed again on the Work.

**8.3**  D/FDC shall have the right from time to time to attend progress review meetings that Contractor holds with its subcontractors.

**8.4**  Contractor shall only purchase materials and equipment from suppliers listed in attachment 14 of the technical specifications.

## 38.0 ASSIGNMENTS

Contractor shall not assign this Contact wholly or in part, voluntarily, by operation of law, or otherwise without first obtaining the written consent of D/FDC. Any assignment of the Contract in violation of the foregoing shall be at the option of D/FDC, void. Subject to the foregoing, the provisions of this Contract shall extend to the benefit of and be binding upon the successors and assigns of the parties hereto. D/FDC reserves the right at its sole option to assign this Contract to Owner, Owner's designated agent, Owner's Lenders, or to D/FDC's affiliates. In the event that Contractor needs to split the Contract to include work in Puerto Rico, Contractor reserves the right to add Combustion Engineering Caribe, Inc. to this Contract.

## 39.0 LAWS AND REGULATIONS

**39.1** Both parties shall comply strictly with local, municipal, state, federal and governmental laws, orders, codes and regulations applicable to their operations as they relate to this Contract.

**39.2** Contractor shall not, under any circumstances apply to or enter into negotiations with any governmental authority or agency for acceptance of variations from or revisions to safety or health, or air, water or noise pollution laws or regulations relating to this Contract or to the performance thereof, without D/FDC and Owner's prior written approval.

**39.3** Neither party shall, under any circumstances, cause or permit their operations as they relate to this Contract, the discharge, emissions or release of any hazardous substance and/or waste, pollutant, contaminant or other substance in violation of any applicable laws, rules or regulations which are now or hereafter promulgated by any governmental authorities having jurisdiction over the Work. Contractor shall comply with all legal regulatory requirements applicable to the Work performed under this Contract and shall be responsible for compliance with all hazardous waste, health and safety, notice, training, and environmental protection laws, rules, regulations and requirements, including, but not limited to, the Resource Conservation and Recovery Act. "Hazardous Waste" includes all substances which are or may be identified as such in 40 C.F.R Part 261 or other applicable laws or regulations. Contractor shall submit material safety data sheets, OSHA Form 20, as required. As an inducement to award of this Contract, Contractor warrants full compliance and that it will adhere to all applicable project hazardous waste procedures and if necessary, obtain or arrange for at its expense all identification numbers, permits, applications and other things required in connection with the activities under this Contract. Contractor agrees that it will not store any hazardous wastes at the jobsite for periods in excess of ninety (90) days or in violation of the applicable site storage limitations imposed by law, the Owner or D/FDC, whichever shall be more restrictive. Contractor further agrees that it will not permit any accumulation in excess of the small quantity generator exclusion of 40 C.F.R. Part 261 or other applicable law, as amended. Contractor agrees to take, at its expense all actions necessary to protect third parties, including without limitation, employees and agents of Owner and D/FDC from any exposure to, or hazards of, hazardous and/or toxic wastes or substances generated or utilized in Contractor's operations. Contractor agrees to report to the appropriate governmental agencies all discharges, releases and spills of hazardous substances and/or wastes required to be reported by law and to immediately notify Owner and D/FDC of same.

**39.4** This Contract shall be subject to the law and jurisdiction of the State of Delaware, unless expressly designated otherwise within this Contract.

# OBER | KALER
### A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699
www.ober.com

**Anthony F. Vittoria**
afvittoria@ober.com
410-347-7692

**Offices In**
Maryland
Washington, D.C.
Virginia

October 13, 2005

## Via Facsimile and First-Class Mail

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

> Re:    *AES Puerto Rico, LP v. ALSTOM Power Inc.*
>        Civil Action No. 04-1282-JJF

Dear Dan:

I am writing in response to your letter of October 11, 2005 regarding the shut-down of Unit 1.

First and foremost, ALSTOM appreciates AES's cooperation in regard to ALSTOM's inspection of the Plant. In that regard, ALSTOM agrees that its representatives will observe all safety protocols and instructions. ALSTOM further agrees that its representatives will not manipulate any equipment or request that equipment be manipulated. Finally, ALSTOM agrees that its representatives will not question AES personnel about the Plant or its equipment.

In regard to material samples, ALSTOM is amenable to a protocol for sample removal. That being said, your letter seems to indicate that AES's experts may be at the Plant during this shut-down. If that is the case, are you proposing that the experts discuss the matter at the Plant as the need arises? If AES's experts will not be there, I am sure that we can agree upon a protocol prior to the inspection. Indeed, I would be more than willing to draft such a protocol, which would include the samples being marked, documented, photographed and divided between the parties.

As to logistics, the ALSTOM representatives intend to arrive at the Plant between 9 a.m. and 9:30 a.m. on Tuesday, October 18, 2005. ALSTOM understands that there is a chance that some of the equipment may not be open at that time because it has not cooled sufficiently. If that proves to be the case, ALSTOM proposes that its representatives begin their inspection by viewing the equipment that does not need to cool, such as the control room(s) and the reverse osmosis system.

**A08**

O B E R | K A L E R
A Professional Corporation

Daniel D. Williams, Esquire
October 13, 2005
Page 2


    Finally, in regard to a continuation of ALSTOM's inspection on October 28, 2005, ALSTOM would simply ask that AES keep ALSTOM informed as to when AES expects to complete the shut-down. If the shut-down lasts past October 28, ALSTOM requests that it be given the opportunity to continue its inspection, for the reasons set forth in my letter of October 10, 2005.

    I look forward to hearing from you regarding these matters.


          Sincerely,

          Anthony F. Vittoria

AFV:
cc:    James E. Edwards, Jr., Esquire
       Michael A. Schollaert, Esquire
       Kevin S. Corwin, Esquire

AFV/774476

**Marlin Anderson, Ph.D.**

Page 1

1        IN UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3

4    AES PUERTO RICO, LP,      )

5          Plaintiff,          )

6             v.               ) Case No:   04-1281JJF

7    ALSTOM POWER, INC.,       )

8          Defendant.          )

9               - - - - - - - - - - -

10

11            VIDEOTAPED DEPOSITION OF

12            MARLIN H. ANDERSON, Ph.D.

13

14            Wednesday, April 12, 2006

15

16

17

18

19                              ORIGINAL

20

21    Reported by:  Lori G. Mackenzie, RPR

22    Job No:  173882

A10

Marlin Anderson, Ph.D.

Page 193

1          MR. VITTORIA:  Objection.  Form.

2          THE WITNESS:  That's correct.

3   BY MS. SAGERSON:

4          Q.    The middle of that paragraph you

5   indicate that:  "During a visit to the plant in

6   October 2005, it was noted that only one bolt and

7   nut was installed on each CDS water lance flanges

8   instead of the three required."

9          Do you see that?

10         A.    Yes.

11         Q.    Is that an observation that you

12  personally made in October 2005?

13         A.    It is.

14         Q.    And that was in Unit 1; is that

15  correct?

16         A.    Unit 1 and Unit 2.

17         Q.    What documents did you review that

18  indicate that this was a recurring practice?

19         A.    How's that?

20         Q.    The next sentence of your report

21  reads:  "There are documents in evidence that

22  state that this was a recurring practice."

A11

Marlin  Anderson, Ph.D.

Page 194

1         A.      That may on my part -- let me see.

2    I do not recall what documents I'm referring to

3    at that time.

4              During our visit to the plant, we

5    had plant personnel pull two of the nozzles or

6    two of the lances for us to look at the lances.

7              And I asked one of those people if

8    that was normal practice, and was told, yes, it

9    was.

10        Q.    Who did you ask?

11        A.    I do not know the man's name.  I

12   can, there was a gentleman by the name of, I

13   believe Raphael, who was our guide at the time.

14             And there were two maintenance

15   people that came and pulled the probe for us.

16        Q.    Did you ask any other questions of

17   my client while you were there?

18        A.    I asked several questions really.

19        Q.    Were any attorneys from Williams &

20   Connolly present during this inspection?

21        A.    I do not know any attorneys from

22   there.

A12

## Marlin Anderson, Ph.D.

1    Q.    And you were there on behalf of Ober

2    Kaler during this inspection?

3    A.    That's correct.  Yes.

4    Q.    Did Ober Kaler attorneys tell you

5    not to communicate with the AES personnel?

6    A.    I do not recall them saying that.

7    Q.    Next sentence reads:  "Not only was

8    this a possible source for in-leakage, but the

9    potential for high velocity jet of air hitting

10   the nozzle spray pattern could distort the spray

11   and reduce the evaporation rate in the localized

12   regions."

13         Do you see that?

14   A.    Yes.

15   Q.    Is it your opinion that air leakage

16   did occur or just that it was, had the potential

17   to occur because of the one bolt, one nut?

18         MR. VITTORIA:  Objection to the

19   form.

20         THE WITNESS:  It's highly -- it's

21   highly probable that it did occur.

22   BY MS. SAGERSON:

A13

**Marlin Anderson, Ph.D.**

Page 332

```
 1              CERTIFICATE OF COURT REPORTER

 2      STATE OF MARYLAND )

 3      COUNTY OF ANNE ARUNDEL)

 4          I, LORI G. MACKENZIE, the reporter before

 5      whom the foregoing deposition was taken, do

 6      hereby certify that the witness whose testimony

 7      appears in the foregoing deposition was sworn by

 8      me; that the testimony of said witness was taken

 9      by me in machine shorthand and thereafter

10      transcribed by computer-aided transcription; that

11      said deposition is a true record of the testimony

12      given by said witness; that I am neither counsel

13      for, related to, nor employed by any of the

14      parties to the action in which this deposition

15      was taken; and, further, that I am not a relative

16      or employee of any attorney or counsel employed

17      by the parties hereto, or financially or

18      otherwise interested in the outcome of this

19      action.

20                     LORI G. MACKENZIE

                       Notary Public in and for the

21                     State of Maryland

22      My Commission expires August 1, 2009
```

A14



**Evaluation of the Operations and Maintenance of the Air Pollution Control Equipment at the AES Puerto Rico Facility in Guayama, Puerto Rico**

## I. BACKGROUND

Dr. Marlin Anderson, co-owner and president of APCO Services, Incorporated, has been asked by Ober|Kaler to render an opinion concerning the air pollution control equipment associated with two generating units at the AES Puerto Rico facility in Guayama, Puerto Rico. The facility began commercial operation in November, 2002 after initial startup of the units during the late spring and early summer of that year. Excessive corrosion of precipitator internals was discovered in the Unit #2 precipitator in November, 2003 and in the Unit #1 precipitator in January, 2004.

The Guayama facility has two generating units, each capable of generating 226 MW (net). They also provide process steam to nearby manufacturing facilities. Steam is generated by fluidized bed combustors (FBC); the combustors are followed by fluidized heat exchangers (FBHE). The coal used to fire the combustors contains a maximum of 1% sulfur and 0.1% chlorine by weight. Limestone is used in the bed material of the FBC to remove 70-80% of the sulfur oxides from the flue gas. Additional sulfur oxides are removed in the CDS using hydrated lime, $Ca(OH)_2$. The Plant's cooling tower uses secondary waste effluent water from the Puerto Rico Aqueduct and Sewer Authority (PRASA). Water from cooling tower blow-down is processed in a reverse osmosis (RO) system and sidestream softener. The RO reject water and some of the waste water from the softener makes up much of the water used to reduce the temperature of the gas in the circulating dry scrubber (CDS or scrubber) vessel. Reducing gas temperature and increasing the moisture content increases the reaction rate of the sulfur oxide scrubbing. A dense bed of hydrated lime and fly ash is used in the scrubbing vessel to bring the gas into intimate contact with the hydrated lime. The electrostatic precipitator (ESP) following the scrubber removes particulate from the gas stream before the gas exits the stack.

## II. ANALYSIS AND CONCLUSIONS

It is my opinion that the corrosion of the precipitator plates in the ESP was caused by below dew point operation and moisture carryover from the CDS. The corrosion warranty offered with the equipment was based upon operating the CDS and ESP in a prescribed manner with regard to water and coal chloride content. The warranty also required that the equipment be maintained as prescribed in the operations and maintenance manual provided with the equipment (the Operations and Maintenance Manuals or O&M Manuals) and that proper records be maintained.

### A. Precipitator Inlet Temperature

It is critical that the temperature of the flue gas entering the ESP be well above the moisture dew point and that there is no moisture carryover into the ESP. In the presence of moisture, the salts produced by the scrubbing process, as well as residual acids, are very corrosive on the mild steel collecting plates. For that reason, the Operations and

**A15**

correct CDS outlet temperature. Data showing a strong correlation between water conductivity and chloride concentration (as suggested in the Manuals) were developed in February 2004 from data taken during the fall of 2003, long after the corrosion problem was discovered. Little data were found that showed the chloride concentration in the precipitator ash. Nevertheless, AES could have collected the data as required in the Operation and Maintenance Manuals but failed to do so and then use the data to set the CDS outlet temperature in the manner prescribed in the Manuals.

## C. Scrubber Spill-Back Nozzles

High volume spill-back atomizing nozzles are used to introduce moisture into the scrubber. These nozzles, when properly maintained, introduce water droplets having a mass median diameter on the order of 100 microns. The scrubber is designed so that the residence time of the gas within the scrubber vessel is long enough to allow for complete evaporation of droplets of this size or less. According to the Operations and Maintenance Manuals, nozzles were to be cleaned and inspected once per shift during initial operation of the scrubber and records kept. Spray patterns were to be observed on a regular basis with nozzle tips and swirl plates being replaced, as needed, to ensure proper spray patterns from the nozzles. Test stands were provided for testing nozzles and spare spray lances were also supplied. Plant personnel were instructed in procedures for testing the nozzles and what indications would indicate an improperly operating nozzle. The "broomstick" test was to be used to determine if nozzles were not performing properly.

The documents that I have reviewed indicate that AES personnel did not understand how to interpret the results of the "broomstick" test. According to these documents, AES personnel viewed the presence of wet ash to be acceptable on many "broomstick" tests. Instead, wet ash would indicate a poorly performing nozzle. The failure to correctly interpret the results of the "broomstick" test would result in a failure to detect and correct problems with poorly performing nozzles, and the documents that I have reviewed indicate that this occurred.

In leakage of tramp air can be very detrimental to both scrubber and precipitator performance. It can also lead to accelerated corrosion due to localized cooling of metal surfaces. For this reason, the Operations & Maintenance Manuals stress that all doors and other penetrations be properly sealed in order to avoid in leakage. During a visit to the plant in October 2005, it was noted that only one bolt and nut was installed on each CDS water lance flanges instead of the three required. This was seen on both units. There are documents in evidence that state that this was a reoccurring practice. Not only was this a possible source for in-leakage, but the potential for a high velocity jet of air hitting the nozzle spray pattern could distort the spray and reduce the evaporation rate in localized regions. This obvious deficiency is evidence of generally poor maintenance practices and violates the requirements in the Manuals.

Operating logs and daily reports recorded several instances where scrubber hoppers and/or air slides were plugged due to moist ash. This would be indicative of over spraying of water or poor atomization of the water being injected. Wet ash in these areas would increase the probability that wet ash or moisture droplets were being carried over

**A16**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4      --------------------- X

5   AES PUERTO RICO,        )

6   L.P.,                   )   No. 04-1282-JJF

7          Plaintiff,       )

8      vs.                  )

9   ALSTOM POWER, INC.,     )

10         Defendant.       )

11     ----------------------------- X

12

13             Videotaped Deposition of

14           Ronald George Ballinger, ScD

15           Tuesday, April 11, 2006

16             Baltimore, Maryland

17

18

19

20   Pages 1 - 427                ORIGINAL

21   Job No.: 173880

22   Reported by:  Deborah Larson Hommer, RPR

A17

Ronald Ballinger

Page 215

1    part, here in the front.

2        Q.    Now, you don't purport to be an

3    expert on broomstick tests for CDSs?

4        A.    No, but I can read.

5        Q.    And you don't purport to have any

6    expertise on CDS spray nozzle cleaning

7    procedures, correct?

8        A.    That would be correct.

9        Q.    But you did read about these topics

10   in the manuals, and that's the basis for your

11   testimony?

12           MR. VITTORIA:  Objection.

13   Mischaracterizes the testimony.  Objection to

14   the form.

15           THE WITNESS:  The basis would be,

16   in part, reading the manuals and then talking

17   with people.

18           BY MR. WILLIAMS:

19       Q.    Which people?

20       A.    Talked to people at the plant.

21       Q.    Which people at the plant did you

22   speak with?

Ronald Ballinger

Page 216

1      A.    The operating people at the plant.

2      Q.    You spoke with operating people at

3   the plant in March 2006?

4      A.    No.   I spoke with operating people

5   at the plant in -- with reinforcement, if you

6   will -- when we went down there at the end of

7   March.

8      Q.    I guess that was my question.   Are

9   you saying you spoke with operating people at

10  the plant in March 2006?

11     A.    I did speak with operating people

12  at the plant in March 2006.

13     Q.    Did you speak with plant operators

14  who had been operating the plant in 2003?

15     A.    I have no idea.   I believe so.   I

16  mean, they were pretty long-term employees.

17     Q.    On what do you base that belief?

18     A.    Based on their knowledge of the

19  plant, the people that showed us around.

20  Pretty decent folks.

21     Q.    Who specifically are you referring

22  to?

A19

Ronald Ballinger

Page 425

1            CERTIFICATE OF NOTARY PUBLIC

2

3        I, Deborah Larson Hommer, RPR, the officer

4    before whom the foregoing deposition was

5    taken, do hereby certify that the witness

6    whose testimony appears in the foregoing

7    deposition was duly sworn by me; that the

8    testimony of said witness was taken by me in

9    stenotype and thereafter reduced to

10   typewriting under my direction; that said

11   deposition is a true record of the testimony

12   given by said witness; that I am neither

13   counsel for, related to, nor employed by any

14   of the parties to the action in which this

15   deposition was taken; and, further, that I am

16   not a relative or employee of any attorney or

17   counsel employed by the parties hereto, nor

18   financially or otherwise interested in the

19   outcome of the action.

                 _Deborah L. Hommer_

20              Notary Public in and for

                the State of Maryland

21   My Commission Expires:

     July 01, 2008

22

                                              A20

# Expert Witness Disclosures -  AES Puerto Rico v. ALSTOM

## Report No. 11-0542-00-LR-001

Prepared for:

## Ober, Kaler, Grimes & Shriver

### March 20, 2006

_K C Ball_ ____ 3/20/06
Ronald Ballinger, Ph.D.     Date



EXHIBIT
Ballinger 2
4-11-06     DH

Altran Solutions 451 D Street Boston, MA 02210  PH: 617•204•1000  | FAX: 617•204•1010

**A21**

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

conditions in the CDS and the relationship between temperature and CDS spray flow was lost – most likely resulting in a "call" for increased spray water flow, which would introduce even more moisture into the system. As described in item 5 below, these increasingly moist conditions would have been further exacerbated beginning in July/August, 2003 when the CDS inlet temperature increased above 280°F.

4. Once the aggressive environment was established, corrosion rates would have been as high as the order inches/year. This corrosion rate was capable of complete perforation of the 0.040 inch ESP plates within months.

### 3.3. Additional Opinions

In addition to the opinions provided above, the detailed analysis of the operating and maintenance data from the Plant has resulted in the following additional opinions:

1. The author could find little or no statistical correlation between opacity and the chloride content of the CDS spray water.

2. The system was capable of, and did, operate within the required specifications once the initial operational issues were addressed.

3. The Operations and Maintenance Manuals ("O&M Manuals) for the equipment and other Plant documentation contained repeated cautions regarding operation of the Plant under conditions where the ESP environment dropped below the dewpoint. The O&M Manuals contained procedures which, if followed, would have minimized the risk that the ESP environment would drop below the dewpoint. Yet there was clear evidence that wet conditions were occurring, including, particularly, observation of "snowballing" on the ESP electrodes and observation of wet ash in the CDS (September 2003) prior to the inspections in November 2003 and January 2004 of Unit #2 and #1, respectively.

4. There was clear evidence of poor maintenance of the CDS spray nozzles, in spite of cautions in the O&M Manuals that maintenance of these items was critical to the proper operation of the CDS spray system. After the discovery of the corrosion, both AES-PR and its consultant, John Toher, observed maintenance practices that would result in the nozzles spraying unatomized water. As a further example, Plant inspection by Altran Solutions staff revealed nozzle flange attachment bolts missing. Improper attachment would allow for the introduction of air into the system which would compromise the operation of the system.

5. Analysis of the Plant data for the period from January 1, 2003, to December 31, 2003 indicated a steady increase (with periods of approximately constant temperature) in the CDS inlet temperature from approximately 260°F to approximately 285-290°F. In the July/August timeframe, there are a significant number of cases where the temperature exceeded 280°F, which is the CDS inlet operating parameter specified by the equipment supplier in its Operating and

A22

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001

The most likely explanation for the carryover of wet ash can be traced to malfunctioning and poorly maintained nozzles. In this case, incomplete atomization would lead to incomplete (lower efficiency) vaporization, which would have resulted in a call from the control system for more CDS spray flow for the same CDS outlet temperature. Complete atomization of the CDS spray is essential for the removal of energy from the gas stream thus lowering the temperature. A fine mist allows for the heat (energy) to gain access to the water. For a given power generation rate, the amount of combustion generated gases will be a constant. The flow rate of gases through the system will thus also be a constant. For steady state conditions, the throughput of gas in the CDS will be a constant and hence the energy content of the stream. The residence time in the system will also be approximately constant. This means that the amount of time that a volume of gas will be in contact with the CDS spray will also be a constant. The amount of energy delivered to the spray water will thus depend on the time (a constant) and the area over which the energy is transferred (the surface area of the spray droplets). For a given volume of water, the finer the droplet size the higher the surface area. Hence, a fine droplet size results in a larger amount of surface area through which to transfer the energy. This will result in more efficient energy transfer and thus a more effective temperature reduction.

People in the desert southwest are very familiar with this process. One way to cool the surrounding air is to use a fine water mist. The fine mist cools the local air by evaporation. However, if the misting system malfunctions, the cooling effect disappears. In the case of the CDS spray, as the droplet size becomes larger, there will come a point at which the amount of time available will simply be too short to allow complete evaporation. When this occurs there will be excess water in the system and the temperature reduction will be limited. If the nozzles are not functioning properly then larger water droplets will be present and incomplete evaporization will occur. The un-evaporated spray water then would be carried over to the ESP. Maintenance records indicate that nozzle maintenance was not consistent and frequent malfunctioning occurred. Additional anecdotal confirmation was obtained during the Plant visit. Figure 4 shows a series of photos showing the nozzle(s) and the installation. Clogging was observed and the flange at the installation point was attached with only a single (out of four) nuts being tightened. This was observed on all installed nozzles of Units #1 and 2 during an onsite visit by Altran Solutions in October 2005. Additionally, the O&M Manuals calls for frequent cleaning and other maintenance of spray nozzles and verification of spray pattern using the "broomstick" test. Maintenance logs and other evidence indicate that nozzle inspection and testing was not performed at appropriate frequencies and that AES-PR did not understand how to interpret the "broomstick" test, thus interfering with its ability to diagnose and correct malfunctioning nozzles

## 4.4. The Role of Chloride

The O&M Manuals called for the operator to adjust the margin to the dewpoint as a function of chloride concentration in the CDS spray water. According to the O&M Manuals, CDS outlet temperature should be adjusted in a range between 156 to 176°F for chloride concentration in the CDS spray water ranging from 1,100 to 4,300 ppm, respectively. AES failed to measure the chloride content of the CDS spray water

A23



O B E R | K A L E R
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699
www.ober.com

**James E. Edwards, Jr.**
jeedwards@ober.com
410-347-7330

**Offices In**
Maryland
Washington, D.C.
Virginia

February 16, 2006

## VIA FACSIMILE AND FIRST-CLASS MAIL

Daniel D. Williams, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

> Re:   AES Puerto Rico, LP v. ALSTOM Power Inc.
>        Civil Action No. 04-1282-JJF

Dear Dan:

This letter follows my letter to you dated February 10, 2006 regarding the inspection of Unit 2 during the next anticipated shutdown.

ALSTOM's original request contemplated the inspection of both Unit 1 and Unit 2. At this juncture, we anticipate sending consultants to conduct the inspection, probably without counsel, and believe that counsel for AES also need not be present during the inspection. Accordingly, please let me know by Friday, February 17, whether AES will permit the inspection of Unit 2 during the next contemplated shutdown and provide current information concerning when that shutdown will occur.

We appreciate your cooperation.

Sincerely yours,

James E. Edwards, Jr.

JEEJr/bak

**A24**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| Plaintiff, | ) ) ) | Civ. No. _____ 03 - 544 |
| v. | ) | |
| DUKE/FLUOR DANIEL CARIBBEAN S.P.; DUKE/FLUOR DANIEL INTERNATIONAL; DUKE/FLUOR DANIEL INTERNATIONAL SERVICES; FLUOR DANIEL CARIBBEAN, INCORPORATED; CARIBBEAN ARCHITECTS & ENGINEERS; FLUOR CORPORATION; and DUKE CAPITAL CORPORATION, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

1.     On or about April 3, 1996, Plaintiff AES Puerto Rico, L.P.

("AES") entered into an Agreement for Engineering, Procurement and Construction

Services ("Agreement") with Duke/Fluor Daniel Caribbean S.P. and its constituent

partners (collectively "Contractor") in which Contractor agreed, inter alia, to

engineer, to design, and to construct for AES a 454-megawatt co-generation coal-

fired power plant in Guayama, Puerto Rico (the "power plant" or the "plant").  The

Agreement is a "turnkey" contract; in other words, for a fixed sum, Contractor

assumes the risks associated with engineering, designing, and building the plant,

and agrees to turn over to AES a completed plant at a time specified in the

**A25**

Agreement. The Agreement provides for adjustments to the contract price for failure to satisfy its engineering, design, and performance requirements and for failure to meet the Agreement's schedule.

2.     The Agreement specifies a time limit within which Contractor is to build the power plant according to specified requirements and turn it over to AES. The Agreement provides that, for each day that Contractor is late, Contractor is required to pay to AES a late-completion rebate beginning at $100,000 per day and escalating to $300,000 per day, depending on the length of the delay. It also provides that, if the plant cannot meet specified criteria within six months of the promised completion date, Contractor must pay AES the Minimum Performance Guarantee Payment or the Performance Guarantee Payments to compensate AES for the diminished value of the power plant as delivered by Contractor.

3.     Under the Agreement, before the project is completed, AES is to prepare a Punch List setting forth all items of work which remain to be performed in order to ensure that the power plant fully complies with all of the standards and requirements set forth in the Agreement. The Agreement obligates Contractor to complete the Punch List items within a fixed period of time. If Contractor fails to do so, it must compensate AES for the cost of having another contractor complete the items.

4.     Contractor's obligations, including its obligation to pay the late-completion rebates, the Minimum Performance Guarantee Payment, the

2

**A26**

Performance Guarantee Payments, and its obligation to reimburse AES for any costs to complete Punch List items not completed by Contractor, are guaranteed in favor of AES through guarantees with affiliates of certain of Contractor's constituent partners ("Guarantors").

5.    The time it has taken Contractor to complete the power plant has far exceeded the contractual time limit.  The Agreement specifies that Contractor deliver a plant capable of performing as promised by the Guaranteed Completion Date, but in fact Contractor has failed to deliver such a plant by that date or within six months of the Guaranteed Completion Date.

6.    Contractor owes AES the Minimum Performance Guarantee Payment because it has failed to demonstrate that the plant could achieve the promised lime and urea use guarantees and the plant has failed to meet the required emissions standards.  In the alternative, even if Contractor were to demonstrate that it had achieved the Minimum Performance Criteria (which it cannot do), it would owe AES the Performance Guarantee Payments because it has failed to demonstrate that the plant could achieve the promised heat rate, lime and urea use guarantees.

7.    Contractor has failed to make the late-completion rebate payments as required and pay the Minimum Performance Guarantee Payment when due, and Guarantors have failed to make the payments in place of Contractor.  Contractor has also failed to make any Performance Guarantee

3

A27

Payments, and Guarantors have failed to make the payments in place of Contractor.

8.    Contractor has failed to complete the Punch List items, forcing AES to engage other contractors to complete the work. Contractor has failed to reimburse AES for the cost of using other contractors to complete the items, and Guarantors have failed to make the reimbursement payments in place of Contractor.

9.    AES brings this action to remedy these contract breaches.

## PARTIES

10.    Plaintiff AES Puerto Rico, L.P. is a limited partnership formed pursuant to the laws of Delaware. Its partners are two foreign corporations, AES Puerto Rico, Inc. and AES Monroe Holdings, B.V. AES Puerto Rico, Inc. is a corporation incorporated in Cayman with its principal place of business in Cayman. AES Monroe Holdings B.V. is a corporation incorporated in the Netherlands with its principal place of business in the Netherlands.

11.    Defendant Duke/Fluor Daniel Caribbean S.P. is a partnership formed pursuant to the laws of Puerto Rico. It is comprised of four partners: Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers. (Duke/Fluor Daniel Caribbean S.P. and these four partners are referred to collectively as "Contractor.") Duke/Fluor Daniel Caribbean S.P. agreed to engineer, to design, to provide procurement services for, and to construct the power plant.

4

**A28**

12.    Defendant Duke/Fluor Daniel International is a partnership formed pursuant to the laws of Nevada, and a partner in Duke/Fluor Daniel Caribbean S.P. It signed the Agreement and, in Article 26.13 of the Agreement, agreed to be held jointly and severally liable to AES for each and every obligation of Contractor under the Agreement.

13.    Defendant Duke/Fluor Daniel International Services is a partnership formed pursuant to the laws of Nevada, and a partner in Duke/Fluor Daniel Caribbean S.P. It signed the Agreement and, in Article 26.13 of the Agreement, agreed to be held jointly and severally liable to AES for each and every obligation of Contractor under the Agreement.

14.    Defendant Fluor Daniel Caribbean, Inc. is a corporation incorporated in Delaware with its principal place of business in Puerto Rico. It is a partner in Duke/Fluor Daniel Caribbean S.P. It signed the Agreement and, in Article 26.13 of the Agreement, agreed to be held jointly and severally liable to AES for each and every obligation of Contractor under the Agreement.

15.    Defendant Caribbean Architects & Engineers is a Puerto Rico partnership and a partner in Duke/Fluor Daniel Caribbean S.P. It signed the Agreement and, in Article 26.13 of the Agreement, agreed to be held jointly and severally liable to AES for each and every obligation of Contractor under the Agreement.

16.    Defendant Fluor Corporation is a corporation incorporated in Delaware with its principal place of business in California. It directly or indirectly

5

**A29**

owns a substantial equity investment in one or more of the other defendant entities. As required by Article 2.1.28 of the Agreement, simultaneously with the execution of the Agreement, Fluor Corporation executed a guarantee in which it irrevocably and unconditionally guaranteed the payment of all of Contractor's obligations under the Agreement.

17.    Defendant Duke Capital Corporation is a Delaware corporation with its principal place of business in North Carolina. It is the successor corporation of Church Street Capital Corporation. It directly or indirectly owns a substantial equity investment in one or more of the other defendant entities. As required by Article 2.1.28 of the Agreement, simultaneously with the execution of the Agreement, Duke Capital Corporation (doing business as Church Street Capital Corporation) executed a guarantee in which it irrevocably and unconditionally guaranteed the payment of all of Contractor's obligations under the Agreement. (Duke Capital Corporation and Fluor Corporation are referred to collectively as "Guarantors").

## JURISDICTION

18.    This Court's jurisdiction over the subject matter of this action is founded on diversity of citizenship. See 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000.

19.    Plaintiff is a partnership. Both of plaintiff's constituent partners are citizens of foreign states.

**A30**

20.    Defendants are three domestic corporations and four domestic partnerships. All of the defendant corporations are citizens of states in the United States. On information and belief, all partners in the defendant partnerships are citizens of states in the United States.

21.    This Court has personal jurisdiction over all of the defendants. In Article 22.1.2(a) of the Agreement, Contractor consented to this Court's jurisdiction. Fluor Corporation and Duke Capital Corporation are guarantors of obligations under the Agreement and are each incorporated in Delaware.

## FACTS COMMON TO ALL COUNTS

A.    **Contractor's Obligations Under the Agreement.**

22.    On or about April 3, 1996, AES and Contractor entered into the Agreement for, _inter alia_, the engineering, design, and construction of a 454-megawatt coal-fired co-generation power plant in Guayama, Puerto Rico. Contractor promised to build the power plant to meet agreed specifications in a set period of time in exchange for a fixed payment from AES. The parties amended the Agreement several times through various Change Orders. (References herein to the Agreement refer to the Agreement as amended through the Change Orders.)

23.    Pursuant to the Agreement, work is formally to commence, and the timeline for completion to begin, when AES issues a Notice to Proceed. AES issued the Notice to Proceed on November 15, 1999.

24.    The Agreement specifies that the plant is to be completed by the Guaranteed Completion Date, which is the date 31 months after issuance of the Notice to Proceed.

7

**A31**

25.    Because the Notice to Proceed was issued on November 15, 1999, the Guaranteed Completion Date was June 15, 2002. AES and Contractor agreed to extend the June 15, 2002 Guaranteed Completion Date by 3.5 days in light of delays arising from Hurricane Debby. Thus, the Guaranteed Completion Date is midway through June 19, 2002.

26.    Pursuant to the Agreement, on or before the Guaranteed Completion Date, Contractor is to achieve Performance Acceptance or else pay late-completion rebates.

27.    Contractor delivered its first Notice of Performance Acceptance on November 9, 2002, almost five months after the Guaranteed Completion Date. By letter dated November 9, 2002, AES properly rejected that Notice because Contractor had not satisfied the criteria for Performance Acceptance specified in Article 6.3.1 of the Agreement. Contractor performed additional work and issued a second Notice of Performance Acceptance on November 28, 2002. Like the first, that Notice was deficient because Contractor had not satisfied the criteria for Performance Acceptance specified in Article 6.3.1 of the Agreement. AES properly rejected the second Notice of Performance Acceptance on January 6, 2003.

28.    Article 6.3.4 of the Agreement provides that Performance Acceptance shall be deemed to occur, with the exception noted below, six months after the Guaranteed Completion Date. Solely by virtue of Article 6.3.4, and except for purposes of continued accrual of late-completion rebates, Performance

Acceptance was deemed achieved when the six months expired on December 19, 2002.

29.    Article 6.3.4 of the Agreement provides that, if Contractor fails to pay the Minimum Performance Guarantee Payment or Performance Guarantee Payments, as appropriate, within 10 days after Performance Acceptance is deemed to be achieved, then late-completion rebates shall continue to accrue even though Performance Acceptance has been deemed achieved.  Because Contractor has failed to pay the Minimum Performance Guarantee Payment or Performance Guarantee Payments within such time, and still has not made any such payment, the late-completion rebates continue to accrue to this day.

30.    The rebate amount due for each day is determined according to a schedule in Article 7.2 of the Agreement.  The schedule is as follows:

| Days Late | Rebate for Each Day |
|---|---|
| Day 1 through Day 18 | $100,000 |
| Day 19 through Day 37 | $200,000 |
| Day 38 and greater | $300,000 |

The total amount of late-completion rebates owed is in excess of $50 million and growing.

31.    Contractor has breached the Agreement, and is in default, because, inter alia, it has not made the late-completion rebate payments when due.  Article 7.2.2 of the Agreement specifies that late-completion rebates are to be paid by the tenth day of each month for the late days in the previous month.  Contractor failed to make late-completion rebate payments for June, July, August, September, October, November, and December 2002, and January, February, March, April,

9

**A33**

May, and June 2003, as required under the Agreement. Late-completion rebates are continuing to accrue to this day.

32. Contractor also is liable to AES for the Minimum Performance Guarantee Payment specified in Article 9 of the Agreement. It owes this payment because, inter alia, the plant failed in its contractually-mandated Performance Test to satisfy the minimum performance criteria with respect to the Lime and Urea Use Guarantees, and because the plant did not meet emissions standards, and thus could not operate safely and in accordance with all applicable laws and permits within six months of the Guaranteed Completion Date. The amount of the Minimum Performance Guarantee Payment owed exceeds $40 million.

33. In the alternative, if Contractor were to demonstrate that it had achieved the Minimum Performance Criteria (which it cannot do), then Contractor would be liable to AES for the Performance Guarantee Payments specified in Article 8 of the Agreement, because the plant failed in its contractually-mandated Performance Test to satisfy the Heat Rate Guarantees set forth in Article 8.1.2 and the Lime, Limestone and Urea Use Guarantees set forth in Article 8.1.3.

34. The Agreement provides that the Minimum Performance Guarantee Payment and Performance Guarantee Payments are due within 10 days of deemed Performance Acceptance. The Minimum Performance Guarantee Payment is set by a formula specified in Article 9.2 of the Agreement and the Performance Guarantee Payments are set by formulae specified in Articles 8.1.2 and 8.1.3. Although the payment date, December 29, 2002, has long since passed,

**A34**

Contractor has not paid the Minimum Performance Guarantee Payment or the Performance Guarantee Payments. Accordingly, Contractor is in breach of contract and in default under the Agreement.

35. The Agreement provides that AES is to provide a Punch List setting forth all items which remain to be performed in order to ensure that the power plant fully complies with all of the standards and requirements set forth in the Agreement. AES has delivered a Punch List to Contractor and has updated it.

36. Contractor has failed to complete the Punch List items. Because certain Punch List items would not be and were not completed on time, AES was forced to engage other contractors to complete the work. Contractor is required promptly to reimburse AES for the costs of the other contractors' work, but it has not done so. Its failure to reimburse AES is a breach of the Agreement and a default under the Agreement.

37. Under Article 26.1 of the Agreement, interest accrues on any amount owed by a party that is not paid within 30 days of the due date. The interest rate is determined by a formula specified in the Agreement. AES is entitled to interest on: each missed late-completion rebate payment beginning on the date that such payment was due and continuing each day thereafter; the Minimum Performance Guarantee Payment (or the Performance Guarantee Payments) from the date that the payments were due; and the amounts AES is owed as reimbursement for hiring other contractors to complete the Punch List items.

**A35**

38.    Because Contractor has defaulted on the Agreement by failing to pay when due the late-completion rebates, Minimum Performance Guarantee Payment (or the Performance Guarantee Payments), and reimbursement for the cost of completing Punch List items, it must reimburse AES for AES's "costs and expenses reasonably incurred (including reasonable attorneys' fees and expenses) in enforcing [AES's] rights and remedies" under the Agreement.  See Article 22.3 of the Agreement.  Such costs and expenses include costs and expenses incurred before and after this action was filed.

**B.    Guarantors' Obligation To Pay the Amounts Owed by Contractor.**

39.    Concurrently with execution of the Agreement, on or about April 3, 1996, Fluor Corporation and Duke Capital Corporation each entered into substantially identical guarantees ("Guarantees") in which each irrevocably and unconditionally guaranteed payment of all of Contractor's obligations under the Agreement.  The Duke Capital Corporation guarantee is in the name of the corporation's predecessor, Church Street Capital Corporation.

40.    Under the Guarantees, Guarantors agree to perform or pay any obligation under the Agreement if Contractor fails to do so punctually and fully.  In Section 4 of the Guarantees, Guarantors expressly waive the right to receive any notice from AES of any liability under the Agreement and additionally waive the right to receive notice of any demand for payment.

41.    Guarantors' obligations to AES have accrued and are owing because Contractor has failed to make the late-completion rebate payments when

12

**A36**

those payments became due, it failed to make the Minimum Performance Guarantee Payment (or Performance Guarantee Payments) when the payment became due, and it failed to reimburse AES for completion of the Punch List items.

<u>COUNT I</u>
**<u>Breach of Contract for Failure To Pay Late-Completion Rebates</u>**

**(Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers)**

42.    Plaintiff repeats and re-alleges paragraphs 1 through 41 as if fully set forth herein.

43.    Contractor failed to achieve Performance Acceptance by the Guaranteed Completion Date.  Contractor owes AES late-completion rebates in amounts determined by the schedule set forth in Article 7.2 of the Agreement, which amounts continue to accrue to this day.

44.    Contractor is in material breach of the Agreement pursuant to Article 17.1 of the Agreement, and in default, because, <u>inter alia</u>, Contractor has failed to pay late-completion rebates as they have become due.

45.    Under Article 26.1 of the Agreement, AES is entitled to interest on amounts not paid by Contractor within 30 days of the due date, and continuing each day thereafter for each missed payment.

46.    Accordingly, Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers are each jointly and

13

**A37**

severally liable to AES for all late-completion rebates and interest as a result of the foregoing breaches.

## COUNT II
### Breach of Contract for Failure To Pay the Minimum Performance Guarantee Payment or the Performance Guarantee Payments

**(Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers)**

47.     Plaintiff repeats and re-alleges paragraphs 1 through 46 as if fully set forth herein.

48.     The plant failed to satisfy the Minimum Performance Guarantee and Performance Guarantees before deemed Performance Acceptance.

49.     Contractor was required to pay AES the Minimum Performance Guarantee Payment by December 29, 2002. Contractor failed to make the Minimum Performance Guarantee Payment by that date, and still has not made the payment.

50.     In the alternative, Contractor was required to pay AES the Performance Guarantee Payments by December 29, 2002. Contractor failed to make the Performance Guarantee Payments by that date, and still has not made the payments.

51.     Contractor is in material breach of the Agreement pursuant to Article 17.1 of the Agreement, and in default, because, inter alia, Contractor has failed to pay the Minimum Performance Guarantee Payment (or the Performance Guarantee Payments) when due.

14

**A38**

52.    Under Article 26.1 of the Agreement, AES is entitled to interest on amounts not paid by Contractor within 30 days of the due date.

53.    Accordingly, Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers are each jointly and severally liable to AES for the Minimum Performance Guarantee Payment (or the Performance Guarantee Payments) and interest as a result of the foregoing breach.

### COUNT III
### Breach of Contract for Failure To Reimburse AES for Completion of Punch List Items

**(Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers)**

54.    Plaintiff repeats and re-alleges paragraphs 1 through 53 as if fully set forth herein.

55.    Contractor was required to complete all Punch List items but it has failed to do so. Contractor's breach has forced AES to engage other contractors to complete the Punch List items. Contractor has failed to reimburse AES promptly for the costs of completing the Punch List items, and it is anticipated that Contractor will continue to fail to reimburse AES promptly for such costs as the Punch List items are completed.

56.    Contractor is in material breach of the Agreement pursuant to Article 17.1 of the Agreement, and in default, because, _inter alia_, Contractor has failed promptly to reimburse AES for the costs of completing the Punch List items.

15

**A39**

57.    Under Article 26.1 of the Agreement, AES is entitled to interest on amounts not paid by Contractor within 30 days of the due date.

58.    Accordingly, Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers are each jointly and severally liable to AES for the costs of completing the Punch List items and interest as a result of the foregoing breach.

### COUNT IV
### <u>Attorneys' Fees and Other Expenses</u>

**(Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers)**

59.    Plaintiff repeats and re-alleges paragraphs 1 through 58 as if fully set forth herein.

60.    Article 22.3 of the Agreement provides that, if Contractor is "in default" under the Agreement, then AES is entitled to reimbursement for "its costs and expenses reasonably incurred (including reasonable attorneys' fees and expenses) in enforcing its rights and remedies" under the Agreement.

61.    Contractor is in default under the Agreement because it has failed to pay the late-completion rebate payments on the tenth day of the month following each month that such payments accrued, it has failed to pay the Minimum Performance Guarantee Payment (or the Performance Guarantee Payments) when due, and it has failed to reimburse AES promptly for completion of the Punch List items.

16

**A40**

62.    Accordingly, Duke/Fluor Daniel Caribbean, S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers are each jointly and severally liable to AES for all of its costs and expenses, including attorneys' fees, incurred both before and after the commencement of this action, to enforce AES's rights under the Agreement.

### COUNT V
### Breach of Contract for Failure To Make Payments Not Paid by Contractor
### (Fluor Corporation and Duke Capital Corporation)

63.    Plaintiff repeats and re-alleges paragraphs 1 through 62 as if fully set forth herein.

64.    Guarantors each executed Guarantees in which they agreed to make all payments owed by Contractor under the Agreement that Contractor fails to make.

65.    Guarantors have failed to make any of the payments owed by Contractor even though they agreed in the Guarantees to be liable for such payments in the same amount and at the same time as Contractor. Guarantors are in breach of contract for failing to make such payments.

66.    Fluor Corporation and Duke Capital Corporation are each jointly and severally liable to AES for the late-completion rebates, the Minimum Performance Guarantee Payment (or the Performance Guarantee Payments), all amounts to reimburse AES for completion of the Punch List items, and interest

17

**A41**

beginning on each day that Contractor failed to make each required payment, and continuing each day thereafter for each missed payment.

**COUNT VI**
**Attorneys' Fees and Other Expenses**

**(Fluor Corporation and Duke Capital Corporation)**

67.    Plaintiff repeats and re-alleges paragraphs 1 through 66 as if fully set forth herein.

68.    Section 1 of the Guarantees provides that AES is entitled upon demand to reimbursement for "any and all reasonable expenses (including, without limitation, attorneys' fees and disbursements) incurred by [AES] in enforcing or attempting to enforce any rights under this Guarantee."

69.    Plaintiff hereby demands payment from Fluor Corporation and Duke Capital Corporation for all such expenses, including attorneys' fees and disbursements related to enforcement of its rights under the Guarantees. Such expenses include expenses incurred before and after the filing of this action and continuing through final payment of all amounts owed.

WHEREFORE, plaintiff demands judgment as follows:

(a)    That the Court hold all defendants jointly and severally liable for damages for failure to pay late-completion rebates as those rebate payments have become (and are continuing to become) due, plus interest pursuant to the formula specified in Article 26.1 of the Agreement through the date of final payment;

A42

(b)    That the Court hold all defendants jointly and severally liable for damages for failure to pay the Minimum Performance Guarantee Payment, or, in the alternative, the Performance Guarantee Payments, plus interest pursuant to the formula specified in Article 26.1 of the Agreement through the date of final payment;

(c)    That the Court hold all defendants jointly and severally liable for damages for the cost to complete the Punch List items, plus interest pursuant to the formula specified in Article 26.1 of the Agreement through the date of final payment;

(d)    That the Court hold all defendants jointly and severally liable for the payment of all expenses, including attorneys' fees and disbursements, incurred by AES in connection with collection of late-completion rebates, the Minimum Performance Guarantee Payment (or the Performance Guarantee Payments), amounts to complete the Punch List items, and interest;

(e)    That the Court award plaintiff its costs incurred in connection with this litigation; and

19

**A43**

(f)    That the Court award such other relief as it deems just and

proper.

Respectfully submitted,

By:    *John S. Spadaro*
John S. Spadaro
Bar No. 3155
Murphy Spadaro & Landon
824 Market Street, Suite 700
Wilmington, DE 19801
(302) 654-4600
Fax:  (302) 654-4775

Dane H. Butswinkas
R. Hackney Wiegmann
Mary Beth Long
Daniel D. Williams
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
Fax:  (202) 434-5029

Attorneys for AES Puerto Rico, L.P.

Dated:  June 9, 2003

20

**A44**