IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | * | |
| Plaintiff, | * | |
| v. | * | C.A. No. 04-1282-JJF |
| ALSTOM POWER INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT'S OPPOSITION
TO PLAINTIFF'S MOTION IN LIMINE ON EVIDENTIARY MATTERS**

ALSTOM Power Inc. ("ALSTOM"), defendant, by its counsel, submits this Opposition to the Motion In Limine on Evidentiary Matters filed by Plaintiff, AES Puerto Rico, L.P. ("AES-PR"). For the reasons set forth below, the Court is requested to deny Plaintiff's requests to exclude evidence and testimony.

**I.    Opposition To Motion In Limine On Evidentiary Matter #1: Evidence Regarding AES-PR's Inability To Dispose Of Ash Rock In The Dominican Republic Is Relevant And Probative.**

In its motion, AES-PR seeks to exclude evidence of a lawsuit filed against AES-PR by the Dominican Republic alleging, among other improprieties, that AES-PR illegally dumped coal ash from the Puerto Rico facility that is the subject of this lawsuit in the Dominican Republic. Apart from possible rebuttal to evidence that AES-PR may submit regarding its environmental sensitivity, ALSTOM does not intend to offer evidence of the allegations leveled against AES-PR in that lawsuit.[1]

---

[1] ALSTOM has not submitted the Complaint filed by the Dominican Republic as an exhibit for trial.

ALSTOM does intend to offer evidence and elicit testimony regarding AES-PR's inability to market and transport ash rock,[2] as AES-PR intended, to entities such as the Dominican Republic. One of AES-PR's claims in this action, albeit undocumented and wholly unsupported, is that ALSTOM is somehow responsible for the cost of alterations to the water treatment system at AES-PR's power plant – a water system that ALSTOM neither designed nor installed. AES-PR will contend that improvements to its water system are required to allow it to satisfy a "zero liquid discharge" requirement[3] for its facility and simultaneously meet emissions guarantees – a fact ALSTOM strongly contests. The evidence will show, however, that AES-PR experienced a host of water disposal problems at its facility, including the inability to use water in the planned production of ash rock because of AES-PR's problems with the sale and transport of that material. Furthermore, those problems, independent of any water disposal problems AES-PR attempts to attribute to ALSTOM, led to AES-PR's inability to comply with its zero liquid discharge status.

AES-PR's inability to dispose of water in the production of ash rock is directly related to AES-PR's dispute with the Dominican Republic. Importantly, the dispute resulted in the cessation of shipments of ash rock to the Dominican Republic. Without a market for its ash, AES-PR was unable to dispose of water as it expected. In turn, AES-PR encountered difficulties complying with its zero liquid discharge status due to excess water. Consequently, AES-PR's inability to achieve zero liquid discharge – the basis for approximately 85% of the damages sought from ALSTOM – was attributable, in part, to the Dominican Republic's refusal to accept shipments of ash rock from AES-PR.

---

[2]Ash rock, also referred to as manufactured aggregate, is a product manufactured using water and ash from the facility's combustion process.

[3]Zero liquid discharge means that AES-PR is prohibited from discharging any water off-site.

2

AES-PR does not move to exclude such evidence and, indeed, concedes its relevance in its Motion. Specifically, the Motion states, "termination of the coal ash is relevant to ALSTOM's (incorrect) assertion that AES-PR reduced production of ash rock, which in turn allegedly caused AES-PR difficulties in disposing of water on-site at the plant." (AES-PR's Motion *in Limine* ("Motion"), at p. 3.) Further, AES-PR concedes that such evidence is admissible. (*Id.*) ("ALSTOM need not invoke allegations of environmental improprieties to support its theory."). Therefore, it is respectfully submitted that ALSTOM should be permitted to offer evidence and elicit testimony to demonstrate the AES-PR's inability to achieve zero liquid discharge at the facility – the single largest component of AES-PR's damages in this lawsuit – was due, in part, to its inability to dispose of ash rock. Such evidence is indisputably relevant and admissible.

ALSTOM further notes, however, that should AES-PR introduce evidence of its environmental stewardship, ALSTOM should maintain the right to introduce evidence of its environmental improprieties as rebuttal, or impeachment, evidence. Indeed, AES-PR is expected to introduce testimony and exhibits touting its environmental awareness and sensitivity. ALSTOM submits that testimony regarding the lawsuit and allegations filed against AES-PR by the Dominican Republic would be appropriate as rebuttal under those circumstances.

II. **Opposition To Motion In Limine On Evidentiary Matter #2: ALSTOM Should Not Be Precluded From Explaining The Responsibilities Of Project Participants In Relation To The Pollution Control System.**

AES-PR, by its Motion, seeks to bar ALSTOM from presenting evidence that attempts to shift responsibility to EEC for any design defects that may have caused corrosion to the pollution control system. In addition, AES-PR has moved to have this Court exclude any evidence that its damages, if any, should be recovered from EEC rather than ALSTOM. Contrary to AES-PR's

3

assertions, ALSTOM neither seeks to shift responsibility for any design defects to EEC nor will it argue that any damages should more properly be recovered from EEC. Rather, what ALSTOM plans to present, and what it should not be prohibited from explaining to the jury, are the responsibilities of all Project participants in relation to the facility's pollution control system; this includes the duties of AES-PR, D/FD (the EPC design-build contractor for the entire facility), and EEC, the designer and manufacturer of the pollution control equipment. In particular, it is imperative that the jury understand which entities were responsible for the design and specification of the pollution control system. This information is both relevant and necessary if the jury is to make an informed decision regarding liability.

ALSTOM intends to introduce evidence that it was required to subcontract with EEC for the pollution control system based on the Project specifications. Accordingly, evidence related to the "sole source" nature of the specifications should be permitted because it relates directly to liability. While ALSTOM does not believe, nor does it intend to argue, that EEC's pollution control system was defective, if the jury determines that the system was defective, it should also be aware that the parties' contract required ALSTOM to meet a very precise pollution control equipment specification that was designed by D/FD with assistance from AES-PR. ALSTOM could be exculpated if the jury were to find that the contract and the project specifications left ALSTOM with no alternative but to contract with EEC to develop the pollution control system and that it was this limitation, with the accompanying design problems, that were the source of any alleged pollution control system failures. When a contract restricts a contractor to a specific product, available from a single source, or requires it to perform work in accordance with plans and specifications other than its own, a resulting defect cannot be said to constitute a breach of an express warranty. *Ridley Invest. Co. v. Croll*, 192 A.2d 925, 927 (Del. 1963) (holding that a

4

contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if he performs his work without neglect and in a workmanlike manner); *see also Wood-Hopkins Contracting Co. v. Masonry Contractors, Inc.*, 235 S.2d 548, 552 (Fla. App. 1970).

Accordingly, it is submitted that ALSTOM should be permitted to offer evidence and elicit testimony regarding the design and specification of the Project's pollution control system and the project responsibilities of each participant, including EEC. Accordingly, ALSTOM respectfully requests that AES-PR's motion to exclude be denied.

### III. Opposition To Motion In Limine On Evidentiary Matter #3: ALSTOM's Experts Formed Their Opinions And Drafted Their Reports Independent Of Any *Ex Parte* Communications And ALSTOM Did Not Violate The Rules Of Professional Conduct.

AES-PR requests the Court to exclude two narrow opinions made by ALSTOM's experts – that AES-PR did not properly fasten the CDS nozzle flanges and that AES-PR failed to properly maintain the CDS water nozzles – allegedly because those opinions are based upon *ex parte* communications with AES-PR personnel during site inspections of the plant.[4] (Motion, at pp. 8, 11.) The allegations set forth by AES-PR in its Motion are factually and legally incorrect. First and foremost, ALSTOM's experts did not exclusively rely on *ex parte* communications with AES-PR personnel to formulate any of the opinions proffered in this case. Rather, ALSTOM's experts developed their opinions based upon observations during the site inspections and the review of documentary evidence. Any incidental statements made by AES-PR personnel

---

[4] Importantly, AES-PR fails to identify any specific communications which formed the basis of Dr. Ballinger's opinion regarding the CDS water nozzle maintenance practices. Moreover, Dr. Ballinger did not cite any communications as the basis for his opinion. Therefore, AES-PR is attempting to exclude Dr. Ballinger testimony on this subject without identifying a single alleged *ex parte* communication forming the basis of his opinion. An off-handed comment that Dr. Ballinger spoke with AES-PR personnel at the plant cannot justify exclusion of his testimony.

5

in the course of escorting the experts during the site inspection merely confirmed what ALSTOM's experts had independently observed and concluded. Accordingly, ALSTOM experts may offer their opinions without reliance on the alleged *ex parte* communications.

Contrary to the representations made by AES-PR, neither of the challenged expert reports mentions reliance on any communications with AES-PR personnel. (*See* Anderson Expert Report, p.4; Appendix at B 004 ("During a visit to the Plant in October 2005, it was *noted* that only one bolt and nut was installed in each CDS water lance flanges . . . This was *seen* on both units . . . There are documents in evidence that state this is a reoccurring practice.") (Emphasis added.).) (*See* Ballinger Expert Report, p. 8, 12; Appendix at B 032 and B 036 ("Plant *inspection* by Altran Solutions staff *revealed* nozzle flange attachment bolts missing . . . Clogging was *observed* and the flange at the installation point was attached with only a single (out of four) nuts being tightened.") (Emphasis added.)) Indeed, Drs. Anderson and Ballinger's reports are based exclusively on observations and documents.

AES-PR insinuates that such communications were the sole basis for their opinions. (Motion, p. 8 ("Based upon these *ex parte* communications, Dr. Anderson concluded that AES-PR improperly attached the CDS spray nozzle bolts and that it could have led to the corrosion in the ESP.")) In an effort to advance its argument, AES-PR ignores the photographic and documentary evidence cited by ALSTOM's experts and offered as exhibits in this matter. (*See* Exhibit D-102; Appendix at B 062 ("*[W]e do not put back all the 3 nuts, just put back one nut and even that one nut is not tightened.*") (Emphasis in original.).) (*See also* Exhibits D-168, D-170 and D-171, photos of missing bolt nuts; Appendix at B 063, B 064 and B 065.) The expert reports refer to this same evidence. (*See* Anderson Expert Report, p.4; Appendix at B 004 ("There are documents in evidence that state this was a reoccurring practice.")) (*See* Ballinger

6

Expert Report, p. 12; Appendix at B 036 ("Figure 4 shows a series of photos showing the nozzles(s) and the installation."))  The expert opinions were based upon personal observations, photographs, and exhibits – all proper foundations for expert opinions.

In addition, ALSTOM adamantly disagrees with AES-PR's allegations that ALSTOM's counsel violated Rules 4.2 and 5.3 of the American Bar Association Model Rules of Professional Conduct.  Counsel for ALSTOM advised its experts not to engage in substantive discussions with AES-PR personnel.  Obviously (and appropriately), ALSTOM's experts were not left unaccompanied at the plant during the inspections.  AES-PR required an escort at all times and advised that the escort would provide access to equipment and its components as requested by ALSTOM's experts.  Therefore, some level of communications between ALSTOM's experts and AES-PR personnel was a logistical necessity in conducting the site inspections.  For example, if ALSTOM experts desired to inspect one of the scrubber water nozzles, they were required to ask AES-PR personnel to remove the nozzle from the port to permit inspection.  Such discourse was an absolute necessity and was not, in fact, the basis for any expert opinions.

The occurrence of such incidental communication does not render otherwise independently formed opinions inadmissible, nor does it constitute improper conduct by counsel. Furthermore, conversations with non-supervisory or non-managerial employees are not a violation of the Rules of Professional Conduct.[5]  In the absence of such facts, AES-PR has no basis to request exclusion of expert testimony.

---

[5] Comment 7 of Rule 4.2 only prohibits communications with "a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer . . . or has authority to obligate the organization . . . for purposes of civil or criminal liability."  Communications with individuals outside of those identified in Comment 7 do not constitute a violation of Rule 4.2.  *See, e.g. Hill v. Shell Oil Co.*, 209 F. Supp.2d 876, 878 (N.D. Ill. 2002).  None of the communications that is the subject of AES-PR's motion in limine involved individuals described in Comment 7.

Because ALSTOM's experts' opinions and reports were based on independent observations and documents, and not *ex parte* communications, and because ALSTOM did not violate the Model Rules of Professional Conduct, AES-PR's request to exclude expert opinions should be denied.

### IV. Plaintiff's Motion In Limine On Evidentiary Matter #4: Motion To Exclude References To AES-PR Having "Assumed The Risk" Of Corrosion.

ALSTOM does not intend to argue that AES-PR has "assumed the risk" of corrosion and accordingly, withdraws any related jury instructions.

### V. Opposition To Motion In Limine On Evidentiary Matter #5: The Amount Of AES-PR's Settlement With D/FD Is Relevant And Probative Of AES-PR's Claim For Damages.

AES-PR seeks to exclude the amount of money paid to AES-PR by D/FD pursuant to the Release and Settlement Agreement ("Settlement Agreement") entered into between these parties. As ALSTOM understand AES-PR's Motion, AES-PR is not objecting to the introduction of the Settlement Agreement. Rather, AES-PR requests that the Court preclude ALSTOM from referring to the monetary value of the settlement and suggests "the dollar value of the settlement should be redacted." (Motion, at p. 12.)

In support of its Motion, AES-PR contends that settlement in not relevant and unfairly prejudicial. At the same time, however, AES-PR admits its relevance by seeking to introduce excerpts of the Settlement Agreement to prove that D/FD assigned its warranty rights to AES-PR. First, under Federal Rule of Evidence 106, ALSTOM is entitled to the introduction of the Settlement Agreement in its entirety, including the amount of the settlement. Rule 106 provides, "[w]hen a writing . . . or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part . . . which ought in fairness to be considered

8

contemporaneously with it." The settlement amount is undeniably relevant and its exclusion would be prejudicial to ALSTOM, not AES-PR.

AES-PR recites in its motion that the settlement was, in part, for "defective or incomplete work."[6] (Motion, at p. 13.) AES-PR has released D/FD – the designer and constructor who was responsible for the entire plant – from all its obligations with respect to defective or incomplete work. Indeed, among its many responsibilities, D/FD was responsible for the design and construction of the Plant's water treatment system and compliance with its zero liquid discharge status. AES-PR, nevertheless, now seeks approximately $37,500,000 in damages – over 85% of the damages sought – from ALSTOM to modify and correct the plant's defective water design so that it can comply with its zero liquid discharge status. AES-PR seeks these damages despite having already received $4,000,000 in compensation from D/FD and releasing D/FD for claims within its scope of work. (*See* Settlement Agreement, at p. 7; Appendix at B 072.)

In fact, evidence reveals that AES-PR has already used a portion of the proceeds from D/FD settlement to repair the same "incomplete or defective work" that it now seeks to recover from ALSTOM in this lawsuit. For example, in devising the initial solution to its water problem, AES-PR stated it will "pay for [the secondary reverse osmosis system] by utilizing $1,600,000 of the $4,000,000 in proceeds from the Duke/Fluor Daniel settlement that were placed in a reserve account to complete the plant and repair defective items." (*See* Exhibits D-98, at 1, and D-113, at 1 and 7; Appendix at B 097, B 101 and B 107.) AES-PR now seeks recovery for the same repairs from ALSTOM. (*See* Exhibit P-192; Appendix at B 108.) (*See also* Plaintiff's Supplemental Responses to ALSTOM Power, Inc.'s Interrogatory No. 10; Appendix at B 113.)

---

[6] Paragraph 2.3 of the Settlement Agreement allocates the settlement amount of $43,750,000 amongst various defects and liabilities, including "Four Million Dollars ($4,000,000) owed to AES for incomplete and defective work." (*See* Settlement Agreement, at p.7; Appendix at B 072.)

9

Evidence that a plaintiff has already been compensated for a portion of its claim, and the amount thereof, is indisputably relevant.

Furthermore, the evidence is probative of AES-PR's attempt to extract further compensation from ALSTOM for work and equipment outside of ALSTOM's scope of work. While AES-PR may regret settling its claims regarding the plant's water treatment system with D/FD, AES-PR is not entitled to recover additional compensation from ALSTOM based upon an unrelated corrosion warranty claim. Indeed, AES-PR seeks to introduce an excerpt of the Settlement Agreement to prove assignment of the warranty claim. ALSTOM, in fairness, should be entitled to introduce the entire agreement, including the settlement amount, to inform the jury that AES-PR has already released and been compensated for incomplete and defective work with respect to the plant's water treatment system. Such evidence is relevant, not prejudicial, and should not, therefore, be excluded. *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344, n.6 (3d Cir. 2002); *Bullen v. Chaffinch*, 336 F. Supp.2d 342, 354 (D. Del. 2004) (favoring admission of evidence under Rule 403).

Therefore, it is respectfully submitted that AES-PR's request to preclude ALSTOM from offering evidence and eliciting testimony regarding the amount of its settlement with D/FD should be denied.

ALSTOM respectfully requests that the Court deny Plaintiff's Motion *in Limine* with regard to Evidentiary Matters Nos. 1, 2, 3 and 5.

                                        ALSTOM POWER INC.

                                        /s/ Richard R. Wier, Jr.
                                        Richard R. Wier, Jr. (#716)
                                        RICHARD R. WIER, JR., P.A.
                                        Two Mill Road, Suite 200
                                        Wilmington, Delaware 19806
                                        (302) 888-3222

        John Anthony Wolf
        James E. Edwards, Jr.
        Anthony F. Vittoria
        Michael A. Schollaert
        OBER, KALER, GRIMES & SHRIVER
        A Professional Corporation
        120 East Baltimore Street
        Baltimore, Maryland  21202-1643
        (410) 685-1120
        Fax:  (410) 547-0699

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that, on this 9th day of October, 2006, copies of the foregoing Opposition To Plaintiff's Motion In Limine on Evidentiary Matters and proposed Order were filed with the Court using CM/ECF, which will send copies of those documents to:  John S. Spadaro, Esquire, Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware 19805.  In addition, courtesy copies were served, via electronic, upon Daniel D. Williams, Esquire, Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C. 20005.

        /s/ Richard R. Wier, Jr.
        Richard R. Wier, Jr. (#716)