**Evaluation of the Operations and Maintenance of the Air Pollution Control
Equipment at the AES Puerto Rico Facility in Guayama, Puerto Rico**

## I. BACKGROUND

Dr. Marlin Anderson, co-owner and president of APCO Services, Incorporated, has been
asked by Ober|Kaler to render an opinion concerning the air pollution control equipment
associated with two generating units at the AES Puerto Rico facility in Guayama, Puerto
Rico. The facility began commercial operation in November, 2002 after initial startup of
the units during the late spring and early summer of that year. Excessive corrosion of
precipitator internals was discovered in the Unit #2 precipitator in November, 2003 and
in the Unit #1 precipitator in January, 2004.

The Guayama facility has two generating units, each capable of generating 226 MW
(net). They also provide process steam to nearby manufacturing facilities. Steam is
generated by fluidized bed combustors (FBC); the combustors are followed by fluidized
heat exchangers (FBHE). The coal used to fire the combustors contains a maximum of
1% sulfur and 0.1% chlorine by weight. Limestone is used in the bed material of the
FBC to remove 70-80% of the sulfur oxides from the flue gas. Additional sulfur oxides
are removed in the CDS using hydrated lime, $Ca(OH)_2$ The Plant's cooling tower uses
secondary waste effluent water from the Puerto Rico Aqueduct and Sewer Authority
(PRASA). Water from cooling tower blow-down is processed in a reverse osmosis (RO)
system and sidestream softener. The RO reject water and some of the waste water from
the softener makes up much of the water used to reduce the temperature of the gas in the
circulating dry scrubber (CDS or scrubber) vessel. Reducing gas temperature and
increasing the moisture content increases the reaction rate of the sulfur oxide scrubbing.
A dense bed of hydrated lime and fly ash is used in the scrubbing vessel to bring the gas
into intimate contact with the hydrated lime. The electrostatic precipitator (ESP)
following the scrubber removes particulate from the gas stream before the gas exits the
stack.

## II. ANALYSIS AND CONCLUSIONS

It is my opinion that the corrosion of the precipitator plates in the ESP was caused by
below dew point operation and moisture carryover from the CDS. The corrosion
warranty offered with the equipment was based upon operating the CDS and ESP in a
prescribed manner with regard to water and coal chloride content. The warranty also
required that the equipment be maintained as prescribed in the operations and
maintenance manual provided with the equipment (the Operations and Maintenance
Manuals or O&M Manuals) and that proper records be maintained.

### A. Precipitator Inlet Temperature
It is critical that the temperature of the flue gas entering the ESP be well above the
moisture dew point and that there is no moisture carryover into the ESP. In the presence
of moisture, the salts produced by the scrubbing process, as well as residual acids, are
very corrosive on the mild steel collecting plates. For that reason, the Operations and

Maintenance Manuals from the manufacturer of this equipment contain very specific instructions regarding the operation and maintenance of the equipment to avoid moisture carryover and limit the risk of corrosion.

It is my opinion that AES Puerto Rico (AES) has failed to operate the air pollution control equipment in accordance with the procedures set forth in the Operation and Maintenance Manuals. The Operations and Maintenance Manuals state that the temperature of the gas entering the ESP is dependent upon the chloride content of the CDS cooling water and the chlorine content of the coal. A nominal 30°F approach to adiabatic saturation temperature is to be used for low chloride concentrations with the approach temperature rising to 50°F at the highest allowable concentrations. In order to ensure that the temperature be maintained above these levels, wet bulb temperature measurements were to be made frequently during the early operation of the equipment. This was to be done so that operating temperatures for various loads and operating conditions could be established. Wet bulb temperatures were to be done less frequently once the relationships between load, chloride content and dew point temperatures were established. The Operations and Maintenance Manuals required that these wet bulb temperatures and the operating conditions associated with each measurement be recorded along with other measurements and operating conditions and that these records be properly maintained.

Such records are intended, among other things, to assist the operator in monitoring the on-going operation and maintenance of the equipment. In the event that a claim is made on the warranty, such records also provide the basis for determining whether the operator of the equipment has satisfied its obligation to operate and maintain the equipment in accordance with the procedures set forth in the Operations and Maintenance Manuals. The incomplete records maintained by AES prior to the discovery of the corrosion are not sufficient to demonstrate that it operated and maintained the CDS and ESP in accordance with the procedures in the Manuals.

## B. Wet Bulb Temperature Measurements

The documents and testimony that I have reviewed indicate that an insufficient number of wet bulb temperatures were taken and many of those taken were taken at locations which would not accurately describe the wet bulb temperature at the precipitator inlet. The wet bulb temperature should include the moisture being added to the flue gas stream in the scrubber after the water has evaporated. This means that the wet bulb temperature should be taken at a location between the outlet of the scrubber and the inlet of the precipitator. Taking wet bulb temperatures upstream of the scrubber would yield an artificially low wet bulb temperature, since the moisture added in the scrubber would not be included. Taking wet bulb temperatures downstream of the precipitator, as some AES employees indicated, would also bias the wet bulb temperature toward lower levels, due to the introduction of purge air into the precipitator and in-leakage through rotary air lock valves.

There are records indicating that wet bulb temperatures of 129-131°F were obtained at times, while CDS operating temperatures were 148-150°F. Thus, the operating

2

temperature was significantly lower than the 30°F approach to adiabatic saturation temperature minimum required for low chloride concentrations. Some correspondence reviewed indicated that long periods of operation were done at temperatures of 20-25°F approach to adiabatic saturation. Operating the air pollution control equipment (APCE) in this manner was a definite failure to operate in accordance with the O & M Manual.

The EEC design specifications listed a maximum continuous CDS inlet temperature 280°F corresponding to a design flow rate of 911,586 ACFM (actual cubic feet per minute). The calculated flue gas moisture at design inlet conditions was 9.34%. Reducing the gas temperature to 156°F at the exit of the CDS was calculated to increase the moisture content of the gas to 13.5%. This would have led to a wet bulb temperature of approximately 126°F. The average Unit #1 CDS inlet temperature recorded by the DCS at the beginning of 2003 was approximately 265°F. The average inlet temperature steadily increased from 165°F to approximately 285°F by the end of that year. The increase in CDS inlet temperature with time was seen at all loads. This increase in temperature would have required a greater volume of water per volume of flue gas in order to lower the flue gas temperature to a CDS outlet temperature of 150-155°F at which AES was operating. The trend of the CDS spray-water control value position shows a decrease in valve position corresponding to the increase in CDS inlet temperature confirming the increase in water flow needed to cool the gas stream to the desired temperature. The increase in gas moisture would have increased the wet-bulb temperature, which would have decreased the approach to adiabatic saturation temperature. Assuming the mass of gas being treated did not change, approximately 163 GPM of water would have been required to reduce the temperature of the gas from 285°F to 155°F and the approach to adiabatic saturation temperature would have decreased to approximately18°F if the outlet temperature remained constant, well below the temperature values that were specified in the O & M manual.

Because the wet bulb temperature was often taken at the incorrect location, the approach to adiabatic saturation was probably even lower than the 20°-25°F range. As a result, it is my opinion that AES failed to measure the wet bulb temperature correctly and often enough and operated the CDS at temperatures below the 30°F approach temperature. This was done in what apparently was a mistaken attempt to minimize opacity excursions. It was later learned that there was little difference in opacity, if any, between operating at an ESP inlet temperature of 155°F and operating at a temperature of 175°F. Instead, the opacity problem was found to be primarily due to ash re-entraining from the hoppers, air in-leakage through rotary valves in the hoppers, and rapping the collector plates too infrequently.

The chloride content of the ash affects the evaporation rate of the moisture added to the gas stream. This is the reason that, as indicated in the Manuals, the approach to adiabatic saturation temperature must be increased as the chlorides being introduced into the system are increased. The O&M Manuals specify that a higher CDS outlet temperature be used with high chlorides in the ash. Plant personnel were required to take water and ash samples and analyze for chloride levels on a regular basis. These data were to be recorded and records kept. Without these results, it is not possible to determine the

3

correct CDS outlet temperature. Data showing a strong correlation between water conductivity and chloride concentration (as suggested in the Manuals) were developed in February 2004 from data taken during the fall of 2003, long after the corrosion problem was discovered. Little data were found that showed the chloride concentration in the precipitator ash. Nevertheless, AES could have collected the data as required in the Operation and Maintenance Manuals but failed to do so and then use the data to set the CDS outlet temperature in the manner prescribed in the Manuals.

## C. Scrubber Spill-Back Nozzles

High volume spill-back atomizing nozzles are used to introduce moisture into the scrubber. These nozzles, when properly maintained, introduce water droplets having a mass median diameter on the order of 100 microns. The scrubber is designed so that the residence time of the gas within the scrubber vessel is long enough to allow for complete evaporation of droplets of this size or less. According to the Operations and Maintenance Manuals, nozzles were to be cleaned and inspected once per shift during initial operation of the scrubber and records kept. Spray patterns were to be observed on a regular basis with nozzle tips and swirl plates being replaced, as needed, to ensure proper spray patterns from the nozzles. Test stands were provided for testing nozzles and spare spray lances were also supplied. Plant personnel were instructed in procedures for testing the nozzles and what indications would indicate an improperly operating nozzle. The "broomstick" test was to be used to determine if nozzles were not performing properly.

The documents that I have reviewed indicate that AES personnel did not understand how to interpret the results of the "broomstick" test. According to these documents, AES personnel viewed the presence of wet ash to be acceptable on many "broomstick" tests. Instead, wet ash would indicate a poorly performing nozzle. The failure to correctly interpret the results of the "broomstick" test would result in a failure to detect and correct problems with poorly performing nozzles, and the documents that I have reviewed indicate that this occurred.

In leakage of tramp air can be very detrimental to both scrubber and precipitator performance. It can also lead to accelerated corrosion due to localized cooling of metal surfaces. For this reason, the Operations & Maintenance Manuals stress that all doors and other penetrations be properly sealed in order to avoid in leakage. During a visit to the plant in October 2005, it was noted that only one bolt and nut was installed on each CDS water lance flanges instead of the three required. This was seen on both units. There are documents in evidence that state that this was a reoccurring practice. Not only was this a possible source for in-leakage, but the potential for a high velocity jet of air hitting the nozzle spray pattern could distort the spray and reduce the evaporation rate in localized regions. This obvious deficiency is evidence of generally poor maintenance practices and violates the requirements in the Manuals.

Operating logs and daily reports recorded several instances where scrubber hoppers and/or air slides were plugged due to moist ash. This would be indicative of over spraying of water or poor atomization of the water being injected. Wet ash in these areas would increase the probability that wet ash or moisture droplets were being carried over

4

into the precipitator. In either case, this would lead to moist deposits on the precipitator plates and an increase in the rate of corrosion.

## D. Soot Blowing

The Operations and Maintenance Manual also required that the precipitator inlet temperature be increased during soot blowing, since soot blowing increases the moisture content of the flue gas and, thereby, raises the dew point temperature. This increase in operating temperature was to be done automatically through the distributive control system (DCS), or manually by the operator. EEC provided logic to adjust the CDS outlet temperature when soot blowing to ALSTOM, and ALSTOM furnished that logic to Duke/Fluor Daniel, the prime contractor for the Project. The DCS was not in ALSTOM's scope of work. As a result, ALSTOM is not responsible for any failure to incorporate the logic provided by EEC in the DCS. The documents that I have reviewed indicate that AES did not automatically or manually adjust the outlet temperature of the CDS during soot blowing as required in the Operations and Maintenance Manuals. Contrary to the opinions of others, it is my opinion that the additional moisture introduced into the system during soot blowing is sufficient to require that this procedure be followed to minimize the risk of corrosion. While the increase in wet bulb temperature might be only 1.5-2°F at full-load during soot blowing, it could be a factor of 2 higher than this at half-load.

## E. Early Operating Experience

In sum, AES failed to operate and maintain the equipment in accordance with the Operations and Maintenance Manuals supplied with the equipment prior to the discovery of the extensive damage to the precipitator collecting plates. This included failure to measure pertinent operating parameters, failure to maintain proper records, failure to clean and maintain spray nozzles as required, and operating at CDS outlet temperatures lower than those specified for specific operating conditions. The failure to operate and maintain the equipment in accordance with the procedures in the Operations and Maintenance Manuals created a significantly greater risk of corrosion.

During the commissioning period and following the turnover of the units to AES, the plant experienced problems with stack opacity and particulate emissions from the precipitator. Tests indicated high velocities in the hoppers below the collection zones of the precipitator. Also, there was evidence that air was leaking by the seals in the rotary valves isolating the hoppers from the air slides. Additional baffling was added to the hoppers to minimize the gas flow below the collecting plates, and the rotary valves on the fifth and sixth rows of hoppers were replaced by double dump valves.

While these changes improved performance, occasional opacity exceedences continued to occur during normal operations in the summer and fall of 2003. Many of the opacity violations were traced to operational problems such as: startup and shutdown of the CDS system, high hopper levels, TR set trips due to high hopper levels, wet ash in CDS hoppers and other malfunctions. Several theories as to the cause of other opacity violations were put forth. One was that high chlorides were leading to high spark rates, causing tripping of TR sets leading to the opacity spikes. It was further felt that operating

B 005

at higher temperature might be exacerbating the chloride issue. AES apparently believed that lowering the CDS outlet temperature improved precipitator performance and reduced opacity violations. Both units were operated by AES at approximately 150°F CDS outlet temperature for most of 2003. It is my opinion that, at this temperature, there were extended periods of time when the unit was operating well below 30°F approach to adiabatic saturation temperature, even with moderate chlorides in the ash and flue gas.

During much of this period, fly ash from the precipitator was being re-circulated through the boiler in order to enhance limestone utilization. This had the potential of increasing the chloride content in the ash. The chloride compounds tend to volatize at the FBC temperatures freeing chlorine which reacts with moisture to form hydrochloric acid. The acid will react with lime at lower temperatures to form calcium chloride, but the net effect of this reaction is to increase the chlorine content of the ash. This process continues until a new equilibrium in mass balance is reached. A similar phenomenon is seen with the buildup of alkali metals in cement kilns where the alkali in the kiln dust can be as much as an order of magnitude higher than that seen in the raw feed. Although required to do so in the Operations and Maintenance Manuals, AES also failed to monitor the chloride content of the ash until the fall of 2003, even though EEC and ALSTOM personnel had requested this information on several occasions.

August and September 2003 were months in which a number of the reportable opacity violations were experienced. A review of these data indicate that most violations were short in duration, 1-3 violations within a one-hour period with relatively long periods of acceptable operation between violations. Only two examples were found during these months where the hourly average opacity exceeded the limit. In most cases, the hourly average opacity was well below the 20% limit for the hour in which the violations occurred. As an example, on September 2, there were four six-minute average violations in a period of 24 minutes with the highest average opacity being 35.3%. Prior to this period, the six-minute averages ranged from 8-23%, and after the six-minute average ranged from 6-13%. The hourly average, for the hour in question, was 18% with the hourly averages for the day ranging from 4-18%. Chloride content of the ash or of the cooling water would not vary rapidly enough to generate the isolated incidences of violation.

Data correlating opacity to chloride concentration in the water at 155°F and at 165-171°F show a very limited increase in hourly-average opacity with an increase in chloride content for both temperatures. There was also a limited increase in opacity with temperature. In both cases, however, opacity violations were not seen. The time periods over which the data were obtained were 10/15/2003 to 11/23/2003 for the 155°F results and 12/2/2003 through 1/29/2004 for the 165-171°F results. In both cases, significant scatter was seen in the data. A linear fit indicated that opacity ranged from approximately 0.5% to 3.1% for chlorides ranging from 0-3,500 ppm for the 155°F data and opacity ranged from 1.5%-4.3% for a chloride range of 0-3,000 ppm for the higher temperature data at 165°-171°F. This limited increase in opacity is most likely due to an increase in chloride content, and an increase in concentration of fine particulate corresponding with the increase in chlorides. The increase in opacity associated with the

6

B 006

increase in temperature was most likely due to the approximately 4% increases in volume of gas being treated, due to the increase in temperature. In both cases, however, opacity was well below the 20% limit. Based on these results, it is my opinion that the pollution control equipment was capable of operating as designed at higher temperatures with higher chlorides and could control opacity within the specified limits. This opinion is also based on my analysis of fly ash resistivity.

## F. Ash Resistivity

Fly ash resistivity has a significant impact on precipitator performance. Resistivity has a strong dependence upon chemical composition of the ash, flue gas composition and temperature. Resistivity also influences the voltages and currents obtainable in an electrostatic precipitator. Coal and ash chemistry for an August 15, 2002 coal sample were used to predict resistivity as a function of temperature using a model developed at Southern Research Institute by Dr. Roy Bickelhaupt. These results are presented as an attachment. A moisture concentration of 14% was assumed for the predictions, since this was the moisture level measured during compliance testing. One curve presented in the figure was calculated assuming no $SO_3$ and a second showing the predicted resistivity with a calculated amount of $SO_3$ based upon a correlation between $SO_2$ and $SO_3$. The AES ash should contain little or no $SO_3$. Also, the coal ash chemistry would not be representative of the ash being collected in the precipitators. For that reason, a laboratory measured resistivity curve for cement dust, measured with 14% moisture concentration, is also included in the plot. Cement kiln dust has high calcium content and some other components similar to those one would see in the AES fly ash. Thus, it is my opinion that the resistivity as a function of temperature for the AES ash would be bounded by the upper and lower curves of Figure 2.

7

B 007

| | |
|---|---|
| O.O.S.<br>2-1 | 40kV 58mA<br>2-2 |
| O.O.S.<br>2-3 | 46kV 12mA<br>2-4 |
| O.O.S.<br>2-5 | 29kV 10mA<br>2-6 |
| 69kV 96mA<br>2-7 | 70kV 189mA<br>2-8 |
| 69kV 664mA<br>2-9 | 69kV 941mA<br>2-10 |
| 69kV 864mA<br>2-11 | 64kV 1137mA<br>2-12 |

All but 2-12 @ kV limits

2-12 @ primary current limit

O.O.S. - Out of Service

Figure 2. Unit #2 Precipitator Electrical Readings, 10/21/05

The ideal range of resistivity for good electrostatic precipitator performance is $1\text{-}2 \times 10^{10}$ ohm-cm. Higher resistivity tends to lower precipitator power levels while much lower resistivities have a tendency to increase re-entrainment. Based upon the data presented in Figure 1, I conclude that increasing the temperature from 150°F to 176°F would have no detrimental affect on electrical conditions and could benefit performance by reducing re-entrainment.

## G. Observed Performance

During the site visit in October 2005, Unit #2 was in operation with three of the twelve TR sets out of service. Opacity was still in the 3-4% range. Figure 1 is a diagram showing the location of the TR sets that were out of service. The voltage and current readings for the sets that were in service are also given. Secondary voltage limits were reduced in order to eliminate sparking on the three inlet fields. All fields except Field 2-12 were operating at secondary voltage limit, while Field 2-12 was operating at secondary current limit. None of the fields were sparking. Opacity was still in the 3-4% range. The guarantee states that the precipitators should be able to maintain compliance with one field out of service. In this case, three fields were out of service and power was limited to the three inlet fields of the other chamber with the precipitator still being able to maintain compliance with emission requirements.

The data referred to earlier regarding opacity versus chloride concentration in the water at 165-171°F also give a clear indication that the precipitators are capable of operating as

8

designed. Both resistivity calculations and electrical data indicate that resistivity is not limiting performance. The above electrical readings were taken after the damage to the plates had occurred. Even with three TR sets out of service and damaged plates in several fields, the precipitator is able to maintain compliance. During the visit an internal inspection of the Unit #1 precipitator indicated that little if any additional corrosion damage had been experienced since the operating temperature had been raised. Based on observations, it is my opinion that the air pollution control equipment is capable of operating as designed.

## H. AES' Responsibilities

AES is part of a large corporate family that owns and operates a number of power-generating stations worldwide. AES should have a competent engineering staff capable of understanding the ramifications of operating equipment in a prescribed manner. As required under their contracts, ALSTOM and EEC provided technical advice and training during the startup and commissioning phase of the Puerto Rico plant. However, this did not relieve AES of its responsibility for operating the plant as set forth in the Operations and Maintenance Manuals. There is evidence that key management personnel at the plant failed to read the O & M manuals concerning the operation of the air pollution control equipment and that they failed to participate in the training provided by the equipment supplier. Such failures constitute a breach of industry standard practices when dealing with complex air pollution control equipment.

Based on my experience, operating procedures issued in the field during startup, when troubleshooting in order to determine the source of a problem, do not become standard operating procedure unless such operating procedure are formally approved by all parties involved, including the upper management of the supplier and the changes become part of a revised Operations and Maintenance Manual. That is the case, in part, because most warranties require that the equipment be operated in the prescribed manner as indicated in the Manual.

In this case, there is evidence that commissioning personnel from EEC, when repeatedly requested to do so by AES personnel, provided revised shut-down and start-up procedures for the CDS and refined nozzle cleaning procedures. ALSTOM, in turn, provided several of the procedures generated by EEC to Duke/Fluor Daniel. Based on my experience in the industry, the shut-down and start-up and nozzle cleaning procedures prepared by EEC would not modify the procedures in the Operations and Maintenance Manuals unless they were accepted in writing by Duke/Fluor Daniel on behalf of AES. The documents that I have reviewed do not indicate that Duke/Fluor Daniel ever accepted these procedures or agreed in writing that they would modify the terms of the Operations and Maintenance Manuals.

AES apparently contends in this litigation that it relied on the "Start-Up Procedures" provided by EEC during normal operations of the air pollution control equipment. If that is the case, AES' conduct is a serious violation of industry practice. There are two start-up procedures that were provided by EEC and forwarded by ALSTOM to Duke/Fluor Daniel, both of which are three-page summaries indicating how the CDS should be shut

9

down and started under different circumstances. The first is labeled "CDS Re-Start Procedure," and the second is labeled "CDS Cold Start-Up At Low Load." The first procedure is a summary of the steps to be taken to shut down the CDS, and then restart it while it is still warm. The second is a procedure to shut down the CDS and re-start it after it has cooled. There is no indication in either of these documents or any other versions of start-up procedures prepared by EEC that they apply to normal operation of the equipment. In my opinion, no reasonably prudent and experienced operator of a power generating facility would view these shut-down and start-up procedures as modifications to the procedures for normal operation and maintenance of the equipment in the Operations and Maintenance Manuals, including the operation and maintenance procedures in Chapter 9 of the Manuals that are specifically designated to minimize the risk of corrosion. Doing so would be a violation of industry standards. In addition, the start-up and normal operation and maintenance procedures for the equipment are set forth in entirely separate chapters in the Manuals.

Following the discovery of the damage to the Unit #2 precipitator, AES made a hurried decision to order plates to replace the plates in the first four fields of that precipitator and requested delivery on an expedited basis. The original plates were constructed from 18-gauge mild carbon steel. AES decided to order 16-gauge Corten plates. The 16-gauge plates are approximately 25% thicker than the 18-gauge plates. The Corten alloy also is more expensive than the mild steel plate by a factor of 2. Steel is sold by the pound so both of these changes in specification of the new plates increased the per plate cost by a factor of approximately 2.5. AES has not shown that the original collector plates were inadequate. It is my opinion that the specified plates satisfied industry standards and, but for the corrosion, were adequate for their intended purpose. Thus, the replacement plates ordered by AES represent an enhancement. The enhancement represents at least fifty percent (50 %) of the cost of the replacement collector plates.

It is my understanding that Corten replacement plates were delivered to the plant in the spring of 2004. These plates were stored in an open field at the time of my visit in 2005. Many of these plates were damaged beyond use due to improper storage, and will have to be replaced.

## III. SUMMARY OF OPINIONS

In summary, in addition to the analysis and opinions described above, it is my opinion that:

A. AES failed to operate and maintain the equipment in accordance with the Operations and Maintenance Manuals supplied with the equipment prior to the discovery of the extensive damage to the precipitator collecting plates. This included failure to measure pertinent operating parameters, failure to maintain proper records, failure to clean and maintain spray nozzles as required and operating at CDS outlet temperatures lower than those specified for specific operating conditions. Based on its failure to maintain proper records, AES cannot meet its burden of establishing that it operated and maintained the equipment in accordance

B 010

with the Operations and Maintenance Manuals as a condition of making a claim under the accelerated corrosion warranty. The failure to operate and maintain the equipment in accordance with the Operations and Maintenance Manuals also created a greater risk of corrosion.

B. AES is a sophisticated owner with personnel capable of understanding the consequences of operating the air pollution control equipment in ways that do not correspond to the operating instructions included with the equipment. It is contrary to industry standards for a sophisticated operator of a power generating station to regard field-generated operating procedures or statements made in the field by an employee of a supplier as modifications to the supplier's Operations and Maintenance Manuals. The operating procedures that were issued by EEC during commissioning applied only to nozzle cleaning and shutdown and startup of the equipment. It would be a serious violation of industry standards to regard these documents or statements made in the field by employees of a supplier as modifications of the operations and maintenance procedures for normal operating conditions in the Operations and Maintenance Manuals.

C. Key AES management personnel were not familiar with the Operations and Maintenance Manuals and did not avail themselves of the training provided by the equipment suppliers. This also constitutes a violation of industry standards.

D. The scrubbers and precipitators were capable of performing as designed and as required in order to meet plant emission limits at the temperatures specified to minimize the risk of corrosion when chlorides are present in the water and/or the ash. The corrosion experienced was not due to design deficiencies, but to improper operation and maintenance. As supplied, the precipitator internals would have met the corrosion guarantee if properly operated and maintained.

E. The Corten plates purchased to replace those damaged by corrosion represent a significant enhancement over the original equipment for which AES should not expect compensation. The original plates had a limited life expectancy of which AES should have been aware. Replacing the original plates with plates having a longer life expectancy should be at AES's expense.

This Report is based on analysis of documents and information currently available to the author. I reserve the right to supplement the analysis and opinions set forth above upon receipt of further documents and information in the course of the litigation.

Appended are a list of materials reviewed in forming my opinions, a list of publications, Marlin Anderson's resume indicating his qualifications and the fee for his services.

*Marlin S. Anderson* 3-20-06

Marlin Anderson. Ph.D.

11

B 011



Figure 2.     DUST RESISTIVITY

Sample: AESPR Coal Ash          14.0% H2O
Sample date: 8/15/02            E = 4 kV/cm

12

B 012

## APPENDIX A
## LIST OF MATERIALS REVIEWED

### Documents

The following documents were reviewed as a part of this investigation:

1. Environmental Elements Corporation, "Operation and Maintenance Manuals," August 2001

2. Duke/Fluor Daniel Carribean S.E., Specifications for Circulating Fluidized Bed Boiler and Appurtances, Circulating Dry Scrubber Flue Gas Cleaning System, and Electrostatic Precipitator (ESP) Flue Gas Cleaning System, May 10, 2001

3. Notes: Rational for Approach Temperature, November 1, 1999.

4. EEC questions for ABB/CE, November 23, 1999

5. B. VanHooser email, "Subject: AESPR: ABBCE & EEC CDS, Vessel Corrosion Re: Bank's Engineer's Report," July 7, 2002

6. AESPR CFB Boiler/CDS/ESP Meeting, February 10-11, 2000

7. Interoffice Memo Meeting Notes-ABB/DFD/AES, February 18, 2000

8. EEC REPORT NO. 7511, 3D Gas Flow Model Study, May, 2000

9. EEC Operation and Maintenance Training for Flue Gas Cleaning System, February 15, 2001

10. AESPR Maintenance and Monitoring Plan Flue Gas Cleaning System, May 4, 2001

11. EEC Facsimile No., Reference: Start-up, July 7, 2002

12. K. Hognefelt Trip Report Memorandum, "Subject: AES Puerto Rico-CDS Startup," July 29, 2002

13. B. VanHooser email, "Subject: RE: AES/PR: CDS Operation Delays," July 30, 2002,

14. Process Improvement, Inc., "Dry Scrubber Application Document", August 8, 2002

15. EEC CDS/ESP Open Issues, Revised September 27, 2002

13

16. K. Hognefelt Trip Report Memorandum, "Subject: AES Puerto Rico," October 15, 2002

17. K. Hognefelt Memorandum, "Subject: Summary AES Puerto Rico Trip Report," October 16, 2002

18. DFDC Summary Source Sampling, December 10, 2002

19. R. McParland email, "Subject: RE: AES-PR Air Emissions Testing Results Re: Draft of Conference Call Minutes of 12/18/02 and 12/19/02- Begin Retesting on Jan 3-2003," December 23, 2002

20. AES Letter, "Subject: AES Puerto Rico Performance Acceptance," December 30, 2002

21. Email from T. Coleman, January 8, 2003

22. DFDC Memo, "Subject: Status Report," January 27, 2003

23. W. Jarvis email, "Subject: Emission Testing Update," January 28, 2003

24. Draft copy by T. Hadidsaz. Sr., "Troubleshooting on the Unit One (1) & (2) Boiler Environmental Element Precipitators (P1 & P2)," February 13-22, 2003

25. Mark XXIII Enterprises, Inc. visit, "Subject: AES Puerto Rico," March 4, 2003

26. ALSTOM Technical Services Report, AES-Puerto Rico Gas Distribution Testing Unit 2, March 6-22, 2003

27. ALSTOM Technical Services Report AES-Puerto Rico Precipitator Hopper testing, March 27, 2003

28. GE Betz, Incomplete Water Analysis Report, April 2, 2003

29. Mark XXIII Enterprises, Inc., "Subject: AES-Puerto Rico Gas Distribution Testing Unit 2 EEC Precipitator, March 6-22, 2003," May 22, 2003

30. Notes from May 24-May 26, 2003

31. T. Wardell email, "Subject: CDS/ESP operations", June 10, 2003

32. AES Draft Report, "Gas Distribution & Field No 1 Hopper Catch Improvement, May 29- June 27, 2003," July 9, 2003

33. HMC Memo, J. Toher, Re: Site Visit Observations, August 14, 2003

14

34. IJMC Memo, J. Toher, Re: Polishing Scrubber Punch List, August 14, 2003

35. A. Dyer email, "Subject: Controlling Opacity," August 30, 2003

36. P. Stinson, Progress Report I, September 12, 2003

37. D. Stone email, "Subject: RE: ESP, CDS Corrosion Maintenance Plan.doc, September 15, 2003

38. AES CDS/ESP Operation Notes, September 19, 2003

39. F. Pagaduan email, "Subject: FW: Night Shift Outage Report", September 21, 2003

40. K. Hognefelt Trip Report, "Subject: Tuning of AES Puerto Rico CDS & ESP Trip Date 9/22/2003-9/26/2003," September 29, 2003, (pg. 1-5)

41. A. Dyer email, "Subject: RE: Opacity", October 3, 2003

42. K. Hognefelt emails, "Subject: RE: ESP CDS Air Slides," October 8, 2003

43. P. Stinson email, "Subject: RE: ESP CDS Air Slides", October 8, 2003

44. C. Reyes email, "Subject: RE: Opacity", October 14, 2003

45. ALSTOM Analysis Report, October 15, 2003

46. K. Hognefelt email, "Subject: Ash sample ANALYZE," October 16, 2003

47. IJMC Memo, J. Toher, "Re: Polishing Scrubber Punch List," October 27, 2003,

48. IJMC Memo, J. Toher," Re: Site Visit Observations," October 27, 2003

49. P. Stinson email, "RE: Resolution of Opacity Problem," November 3, 2003

50. K. Hognefelt email, "Subject: Unit 2 Precip Pictures," November 20, 2003

51. AES Puerto Rico Field Service Engineering Trip Report, November 25, 2003,

52. K. Hognefelt Trip report, "Subject: Visit to AES Puerto Rico 11/23/03-11/25/03, November 26, 2003

53. AES Letter, "Subject: Summary of the stabilization effort for The Electrostatic precipitator servicing the #2 Boiler," December 3, 2003

54. Notes from conversation with T. Storbeck recorded by P. Stinson, December 2003

55. Mark XXIII Enterprises, Inc. AES P.R. Unit 2 ESP Inspection Report, December 7, 2003

56. W. Yu email "Subject: Dew Point." December 30, 2003

57. AES Diagram showing Sneakage and Gas Distribution testing on site

58. W. Yu email, "Subject: Dew Point", December 30, 2003

59. Daily Opacity Report, Unit 1, 2003

60. AES CDS Makeup Water Logs, September 11, 2003-January 9, 2004

61. ENSR Letter to W. Vela, "Subject: Proposal to Conduct Measurements for Moisture and Dew Point at the Guayama Cogeneration Facility", January 7, 2004

62. E. Sostre report, "Subject: Unit 1 Inspection," January 11, 2004

63. E. Pagaduan email, "Subject: Unit 1 forced Outage Update," January 11, 2004

64. A. Dyer email, "Subject: RE: CDS/ESP Corrosion," January 12, 2004

65. M. Esmacher email, "Subject: ESP issues at AES," January 13, 2004

66. W. Jarvis, K. Hognefelt, T. Jarvis emails, "Subject: RE: CDS/ESP Corrosion, January 13, 2004

67. L. Lindau emails, "Subject: RE: CDS/ESP Corrosion-Again", January 16, 2004

68. P. Stinson emails, "Report on Opacity," January 2, 2004

69. P. Stinson email "RE: Opacity Report," January 16, 2004

70. P. Stinson email. "Subject: RE AES/PR: RO Waste Water Injection," January 17, 2004

71. W. Jarvis, L. Lindau, K. Porje, K. Hognefelt, E. Sostre emails, "Subject: RE: Report on Opacity," January 17-20, 2004

72. GE Betz Metallurgical Lab Report, January 21, 2004

73. L. Lindau, K. Hognefelt, M. Borden emails, "Subject: RE: CDS/ESP

16

Corrosion," January 27, 2004

74. IJMC Letter, Re: ESP Corrosion, January 28, 2004

75. Boiler Lead Operator Log, March 18, 2003 to February 1, 2004

76. P. Stinson to W. Yu, R. McParland, E. Pagaduan, C. Little, January 30, 2004

77. W. Yu, P. Stinson, J. Toher, emails, "Subject: Missing Attachment", January 30, 2004

78. J. Toher email, "Subject: RE: Missing Attachment February 4, 2004

79. Microbeam Technologies, Inc., Report "Analysis of ESP Corrosion", February, 2004

80. W. Jarvis email, "Subject: RE: CDS Inlet Conditions", February 3, 2004

81. L. Lindau Email, "Subject: RE: CDS Inlet Conditions, effect of ash recirculation," February 4, 2004

82. P. Stinson email, "Subject: Unit 1 Chloride vs Opacity vs CDS temp," February 4, 2004

83. H. Bonilla email, "Subject: RE: CDS nozzles,", February 5, 2004

84. "Request for Capital Expenditure Approval, AES Puerto Rico Water Treatment Modification (ESP Corrosion Elimination) Project", February 8, 2004

85. "Request for Capital Expenditure Approval, AES Puerto Rico Water Treatment Modification (ESP Corrosion Elimination) Project", February 11, 2004

86. P. Stinson email, "Subject: Results of CDS Survey", February 12, 2004

87. P. Stinson email, "Subject: Results of CDS Survey", February 12, 2004

88. C. Little emails, "Subject: RE: Results of CDS Survey", February 12, 2004

89. ALSTOM Memorandum, "Subject: Puerto Rico Experience," February 19, 2004

90. Email from K. Hognefelt, February 19, 2004

91. IJMC, March 9 Trip Reports, March 12, 2004

92. Email from J. Toher, March 16, 2004

17

93. IJMC Letter to R. Rodiguez, C. Kiss and E. Sostre, Report covers activities and recommendations during the Unit 2 outage between April 25and April 29, 2005 April 30, 2005

94. PowerPoint Presentation, Consumables, Opacity

95. Report Technical Improvements

96. AES Puerto Rico ESP Collectors Corrosion Report, June 15, 2004

97. AES Puerto Rico Letter to William Jarvis, June 22, 2004

98. W. Jarvis emails, "Subject: AES/PR: ESP Collector Plate Corrosion,"

99. ALSTOM Letter to Al Dyer, "Subject: Findings from Investigations into the ESP Corrosion", July 2, 2004

100. ALSTOM Letter to AESPR, Ref: Electrostatic Precipitator Corrosion Operating Logs, July 30, 2004

101. W. Jarvis, D Beers emails, "Subject: AES/PR: Final Draft Altran Report, September 9, 2004

102. Letter Report No. 11-0256-00-LR-001, "Laboratory Condition Assessment of Electrostatic Precipitator (ESP) Collecting Plates Removed from AES Puerto Rico Power Generation Plant in Guayama, Puerto Rico," September 9, 2004

103. IJMC Letter to C. Kiss, Report covers activities and recommendations during the Unit 1 outage between October 4 and October 7, 2004, October 10, 2004

104. J. Tober email, "Subject: March 9 Trip Report," November 11, 2004

105. Deposition of Mr. Elias Sostre, Official Transcript of Proceedings Before the United States District Court for the District of Delaware, January 20, 2006

106. Videotaped Deposition of Gary Bates Taken on Behalf of the Defendant in the United States District Court for the District of Delaware, January 26, 2006

107. Videotaped Deposition of William B. VanHooser in the United States District Court for the District of Delaware, February 7, 2006

108. SAIC Report to Williams & Connolly LLP on behalf of AES Puerto Rico, L P. prepared by Richard R. Lunt, February 24, 2006, SAIC Reference No: 06-5628-00-8799-101

18

B 018

109.   IJMC Expert Report for John G. Toher, February 26, 2006, p. 1-12

110.   Four Operation and Maintenance Video Tapes from Control Room Library

111.   Boiler Lead Operator Log, March 18, 2003 to February 1, 2004

B 019

## APPENDIX B

### LIST OF PUBLICATIONS

Authored or Co-authored by Marlin H. Anderson, Jr.

1. Pilot Demonstration of Fine Particle/High Resistivity Electrostatic Precipitators, E.P.A. Report, U.S. Environmental Protection Agency, Research Triangle Park, Project 4100-1, [1979].

2. Charge Measurements of Individual Particles Exiting Laboratory Precipitators with Positive and Negative Corona at Various Temperatures, Paper presented at ASME Industrial Pollution Control Symposium, J. Appl. Phys., 51, 3632, EPA, [1980].

3. Proof of Concept Testing of ESP Retrofit Technologies for Low and High Resistivity, Fly Ash, EPRI Conference, 3rd Symposium of Environmental Protection Agency (EPA) Transfer and Utilization of Particulate Control Technology, Paper No. 5A1, March 9-13, 1981.

4. Particle Charge Measurements, Report Proceedings of International Conference of Electrostatic Precipitation, EPRI, IGCI, APC Association, October 1981, p. 499-514.

5. Precharger System Evaluations, Report Proceedings of International Conference of Electrostatic Precipitation, Southern Research Institute. October 1981.

6. High Intensity Ionizer Testing and Analysis, Report prepared for Electric Power Research Institute by Southern Research Institute, RP 1456-02, [1982].

7. Aspects of Modeling the Physical Mechanisms in the Electrostatic Precipitator, Report Industrial Pollution Control Symposium, ASME, January 30-February 3, 1983, p. 145-152.

8. Electrostatic Precipitation Test Program at TVA's 20-MW AFBC Pilot Plant, Report, [1986].

9. Review of the Application of Electrostatic Precipitation for Particulate Control of Fluidized-Bed Combustion of Coal/Limestone Mixtures, Report, Electric Power Research Institute, November 28, 1986.

Reports prepared by Marlin H. Anderson, Jr. for Electric Power Research Institute

10. EPRI Technical Report, Skewed Gas Flow Report, EPRI, [2004]

11. EPRI Technical Report, High-Frequency Power Supplies for Electrostatic Precipitators, EPRI, [2004].

12. EPRI Technical Report, Indigo Agglomerator Report, EPRI, July, 2005

13. EPRI Technical Report, State-of-the-Art Power Supplies for Electrostatic Precipitators, EPRI, 2005 update.

14. EPRI Technical Report, Report Preparation for Advanced Power Supply Concepts, EPRI, February 2006, to be published.

15. EPRI Technical Report, Advanced Power Supplies Update Final Report, EPRI, Product ID 1010361, March, 2006.

## APPENDIX C

### RESUME OF MARLIN H. ANDERSON, JR.

| | |
|---|---|
| ADDRESS: | 305 Marietta Drive |
| | Hopkinsville, Kentucky 42240 |

| | |
|---|---|
| PHONE: | (270) 885-5420 |
| FAXSIMILE: | (270) 554-5420 |
| E-MAIL: | apco1@hesenergy.net |

### GENERAL INFORMATION

| | |
|---|---|
| Consultant and President | -1984 to present |
| Vice President and General Manager | -1983 to 1984 |
| Senior Physicist and Director of Field Services | -1982 to 1983 |
| Research Physicist | -1978 to 1982 |
| Assistant Professor | -1975 to 1978 |

### EDUCATION

| | |
|---|---|
| B.A. - Physics and Mathematics, Huntingdon College | -1965 |
| M.S. - Physics and Mathematics, Auburn University | -1968 |
| Ph.D. - Physics, Auburn University | -1977 |

### MEMBERSHIPS

Hopkinsville Kiwanis Club
Kappa Mu Epsilon
Sigma Xi
Who's Who in American Colleges and Universities (1965)

### CONSULTANT

As a consultant, Marlin Anderson has provided technical services to industry including: equipment inspection, analysis and optimization of system performance, on-site training programs and courses, and specialty testing. He has been involved in programs for the evaluation of precipitator and fabric filter performance with the application of new technologies including the APS Ionizer, DRI Pre-charger, $NO_x$ catalytic conversion and fluidized-bed combustion. Most recently, he has been involved in helping utilities evaluate options for responding to changes in clean-air legislation. In these studies, the effects of coal switching on ESP performance have been evaluated along with the effects of potential precipitator upgrades. Mathematical modeling has been used as a diagnostic and as a predictive tool in his work. In 1986, he and James D. Parsons formed APCO

21

**B 021**

Services, Inc., a consulting firm, through which their services are provided. APCO Services performs physical model studies and laboratory resistivity measurements, along with other specialized evaluations. Dr. Anderson has provided expert witness services in litigation involving air pollution control matters.

## VICE PRESIDENT AND GENERAL MANAGER

In this position, he was primarily responsible for the technical services offered by Crestmont Associates, Inc. Dr. Anderson was responsible for the direction of the staff of The Environmental Control Technology Division (ENCOT), which was composed of professionals, technicians and construction workers. He was actively involved in all phases of the business including theoretical analysis of existing performance capabilities, use of mathematical modeling techniques for projection of precipitator performance, inspection of control devices, testing, presentation of findings and recommendations applicable to improved emission control capabilities, scheduling estimating and marketing.

## SENIOR PHYSICIST AND DIRECTOR OF FIELD SERVICES

Dr. Anderson joined Paul and McDonald Associates, Inc. in March, 1982 as a Senior Physicist. In that capacity, he was involved in assisting users of particulate control technology, vendors and architect/engineers in providing effective particulate emission control. This included the evaluation of available particulate control technology for meeting specific needs, evaluation of the impact of different fuel sources on process operation and control device performance, process evaluations and the assessment of appropriate equipment needs.

## RESEARCH PHYSICIST

In 1978, Dr. Anderson joined Southern Research Institute as a Research Physicist in the Institute's Control Device Division. He conducted research dealing with the fundamental mechanisms involved in particulate collection devices such as: electrostatic precipitators, fabric filters and scrubbers. He was involved in the development of a mathematical model of electrostatic precipitator performance and in the measurement of parameters associated with the precipitation process. From 1979 to 1982, he was a Program Manager for projects, which involved the pilot scale evaluation of new particulate control technology.

Dr. Anderson has been involved in the development of techniques and hardware for measuring electric potential distributions in wire duct geometries and for measuring the charge on individual particles charged in an electrostatic precipitator. He has been involved in the field evaluation of the High Intensity Ionizer, electrostatic precipitators, baghouses and a baghouse after a catalytic reactor for $NO_x$ removal. He has had experience in the design of mechanical devices, vacuum equipment and digital electronic circuitry. Dr. Anderson has presented his work at meetings, in published reports and in journal articles.

B 022

## APPENDIX D

FEE FOR SERVICE: $125.00/Hour

## APPENDIX E

EXPERT TESTIMONY IN PAST FOUR YEARS: None

# Expert Witness Disclosures - AES Puerto Rico v. ALSTOM

## Report No. 11-0542-00-LR-001

Prepared for:

## Ober, Kaler, Grimes & Shriver

### March 20, 2006

Ronald Ballinger, Ph.D.          Date          3/20/06

Altran Solutions 451 D Street Boston, MA 02210 PH: 617•204•1000 | FAX: 617•204•1010

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

# TABLE OF CONTENTS

Cover Page. ...........................................................................................................................................1
Table of Contents.................................................................................................................................2
List of Figures......................................................................................................................................2

1.0    INTRODUCTION ....................................................................................................... ..... ...4

2.0    DATA AND INFORMATION CONSIDERED ....................................................................4

3.0    OPINIONS........................................................................................................................7
    3.1.    Immediate Cause ............. ...... ...................................................................................7
    3.2.    Root Cause........................................................................................................................7
    3.3.    Additional Opinions.........................................................................................................8

4.0    SUMMARY OF ANALYSIS AND SUPPORT FOR OPINIONS ........ ....................................9
    4.1.    Dewpoint Corrosion..........................................................................................................9
    4.2.    Root Cause-Operational Considerations.........................................................................10
    4.3.    Detailed Operating Procedures and Plant Data Analysis ....................................................10
    4.4.    The Role of Chloride ......................................................................................................12
    4.5.    Time Period Over Which Degradation Occurred ....... ..........................................................13

5.0    REFERENCES ....................................................................................................... ..... ...............14

6.0    QUALIFICATIONS .................................................................................................... ............166

7.0    PUBLICATIONS ...........................................................................................  ...............................222

8.0    PRIOR TESTIMONY .................................................................................................................299

9.0    COMPENSATION ................................................................................................. ...............................299

## ATTACHMENTS

Attachment 1 – Report Figures (8 pages)

# List of Figures

Figure 1.  Plot of opacity, CDS inlet temperature, CDS outlet temperature and CDS valve position vs time for Unit #2 (January 2003 to 2004). Only full power points are plotted......................... A-2

Figure 2.  Plot of Unit 2 CDS valve position and CDS inlet temperature as a function of time for the the year 2003. Only full power points plotted. ........................................................................ A-3

Figure 3.  Plot of CDS spray valve position vs. CDS inlet temperature for Unit #2. Only full power data plotted.......................................................................................................... ........... A-4

Figure 4.  Photographs showing poor nozzle installation and clogging. ........................................... A-5

Figure 5.  CDS spray water chloride concentration and opacity as a function of time for the period October 15, 2003 to January 29, 2004........ .............. ...................................................... A-6

Figure 6.  Opacity vs. chloride concentration for Unit #1 over the period October 15, 2003 to January 29, 2004. ...................................................................................................................................... A-7

B 026

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

Figure 7. Expanded plot of Unit 2 CDS valve position and CDS inlet temperature as a function of time for the period July-November 2003. Only full power points plotted. .............................. A-8

3

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

## 1.0   INTRODUCTION

Altran Solutions Corporation (formerly Altran Corporation) was initially contracted to perform an assessment of the cause of degradation of carbon steel electrostatic precipitator (ESP) collecting plates. These plates were removed from Unit #2 of AES Puerto Rico's power generation plant in Guayama, Puerto Rico (the "Plant"). The cause of the degradation was determined to be from corrosion in a wet acid environment/dewpoint corrosion. Altran Solutions Corporation was then asked to expand the investigation to determine the most probable root cause of the wet acid environment that was the cause of the degradation and respond to certain opinions expressed by experts engaged by AES Puerto Rico, L. P. ("AES-PR"), the owner of the Plant. This report summarizes the findings of Altran's investigation.

The author was the supervising member of a team of scientists at Altran Solutions Corporation  Opinions detailed in this report have been derived from either personal investigation or the evaluation of work performed by the Altran investigation team.  The author has reviewed all of the documents provided for the investigation and the opinions set forth below are those of the author.

## 2.0   DATA AND INFORMATION CONSIDERED

As part of this investigation the following documents were reviewed:
1. Deposition of Paul Stinson, February 9, 2006.
2. Deposition of Elias Sostre, January 20, 2006, including exhibits.
3. Expert Report for John Toher, February 26, 2006.
4. Expert Report of Richard R. Lundt, February 24, 2006.
5. Duke/Fluor Daniel Carribean S.E. Circulating Fluidized Bed Boiler and Appurtances, Scope of Supply and Technical Requirements, Materials, Equipment, Facilities and Documents.  May 10, 2001.
6. Boiler Water Injection Procedure, AES PR Nov 2005.
7. Boiler Water Injection Test on 9/3/05 Preliminary Report, September 20, 2005.
8. Complaint AES P.R. L.P.  Plaintiff v. ALSTOM Power Inc.  Civ. No. 04-1282 U.S. District Court, Delaware, September 20, 2004.
9. Plaintiff's Response to ALSTOM Power Inc. First Set of Interrogatories, May 14, 2005.
10. Plaintiff's Response to ALSTOM Power Inc. Second Set of Interrogatories, November 21, 2005.
11. Plaintiff's Responses to ALSTOM Power Inc.'s First Set of Requests for Admission, November 28, 2005.
12. Duke/Fluor Daniel Carribean S.E. Circulating Fluidized Dry Scrubber Flue Gas Cleaning System. Scope of Supply and Technical Requirements, Materials, Equipment, Facilities and Documents.  May 10, 2001.
13. Excess Emissions Reports (Bates AESPR 136107 - 136178).
14. Email from Gary Mattice to Fred Campbell *et alia*.  Subject: Demonstration Procedure/EEC # E977 with Attachment -- CDS Restart October 3, 2002.
15. Email from Time Maidenford to Charlie Lyda (Duke/Fluor Daniel). Subject:  CDS and ESP Procedures with attachments, October 27, 2002.
16. EEC Operation and Maintenance Manuals Volumes 1, 2 and 3.

4

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

17. EEC Operation and Maintenance Manuals Volume 8, Section 12, August 2001.

18. Opacity, $NO_x$ and $SO_x$ Deviations above Permit Levels.

19. Daily Opacity Report Units 1 and 2, 2002 through December 2004.

20. Excess Emissions Report 2003.

21. Control Room Logs.

22. EEC Training Manuals (Copy of G. Bates), September 2001.

23. AES Unit 1 and Unit 2 Performance Logs, October 2002 through November 2005.

24. GE Betz Metallurgical Laboratory Report, January 21, 2005.

25. Altran Corporation Letter Report 11-0256-00-LR-001, September 9, 2004.

26. Microbeam Technologies, Inc. "Analysis of ESP Plate Corrosion", Report No. 721, February 2004.

27. ALSTOM Power Inc. ESP Collectors Corrosion Report, June 15, 2004, Report MSE 04-R-12.

28. Email from Paul Stinson to E. Sostra, Subject: Opacity, September 24, 2003.

29. Email from Al Dyer to Paul Stinson, Subject: Opacity, October 3, 2003.

30. Email from John Toher to Bill Vanhooser, Subject: AES-PR/Maintenance with attachment, May 7 2001.

31. Email from Leif Lindau to Bill Jarvis et alia, Subject: AES/PR: CDS Inlet Conditions, effect (sic) of ash recirculation. February 4, 2004.

32. Email from Bill Jarvis to Karl Hognefelt, Subject: AES/PR: Chloride Content in Fly Ash, with attachments, February 3, 2004.

33. Email from Paul Stinson to Al Dyer, Subject: ESP Corrosion at AES-PR, November 24, 2003.

34. Email from Al Depaoli to Tracy Jarvis, Subject: CDS Causing Corrosion? January 19, 2004

35. Email from Al Dyer to Tracy Jarvis, Subject: Your Help is Needed, January 12, 2004.

36. Emails from John Toher to Csaba Little, Subject: Water Nozzles, May 19, 2004, May 26, 2004, and July 1, 2004.

37. Email from Csaba Little to Puerto Rico Leaders, Subject: Precipitator Work – inlet temp/acid dew pt, December 23, 2003.

38. Email from Paul Stinson to Elias Sostre, Subject: Opacity, September 23, 2003.

39. Email from Paul Stinson to Karl Hognefelt, Subject: Distillations of water, January 28, 2004 (with attachments).

40. Email from Paul Stinson to Puerto Rico Leaders, Puerto Rico Lead Operator, Subject: Report on Opacity, January 2, 2004.

41. Email from Bill Jarvis to Karl Hogenfelt, Subject: AES/PR Chloride Content in Fly Ash, February 3, 2004 (with attachments).

42. Email from Elias Sostre to Paul Stinson *et alia*, Subject: Unit 1 ESP Inspection, January 11, 2004.

43. Email from Ernest Pagaduan to Puerto Rico People, Subject: U1 force Outage, January 11, 2004.

44. Email from Mel Esmacher (GE Infrastructure) to Robert Hargrave (GE Infrastructure), Subject: ESP Issues at AES, January 13, 2004.

45. Email from Bill Jarvis to Thomas Wardell et alia, Subject: CDS/ESP Corrosion, January 13, 2004.

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

46. Email from Leif Lindau to Stefan Ahman *et alia*, Subject: CDS/ESP Corrosion - Again, January 17, 2004.
47. Email from Bill Jarvis to Thomas Wardell *et alia*, Subject: Report on Opacity, date illegible. Bates Nos. W-017-01923 through W-017-01929.
48. Email from Leif Landau to Karl Hogenfelt, Subject: CDS/ESP Corrosion, January 27, 2004.
49. Email from Paul Stinson to WeiLi Yu *et alia*, Subject: Missing Attachment, January 30, 2004.
50. Email from Bill Jarvis to Karl Hogenfelt *et alia*, Subject: AES/PR CDS Inlet Conditions, February 3, 2004.
51. Email from Al Dyer to Karl Hogenfelt *et alia*, Subject: Report on Opacity, February 10, 2004.
52. Email from John Toher to Csaba Little, Subject: March 09 Trip Report, March 16, 2004.
53. Email from John Toher to Csaba Little, Subject: March 09 Trip Report, March 21, 2004.
54. Letter to William Jarvis from Al Dyer, June 21, 2004.
55. Letter from William Jarvis to Al Dyer, July 2, 2004.
56. ALSTOM Memorandum from Karl Hogenfelt to Nils Bringfors, Subject: Puerto Rico Experience, February 19, 2004.
57. U1 and U2 FA Reinjection Pressure spreadsheets.
58. Draft Report of November 14, 2003 "Experience Sharing Report".
59. Letters from IJM Consulting (John Toher) to Csaba Kiss, Paul Stinson.
60. Letter to Larry Copeland, Duke/Fluor Daniel from Stewart Ferguson, AES Puerto Rico, Subject: Environmental Compliance, December 12, 2002, with attachments.
61. Log Book of Lead Operator Elias Sostre, August 1, 2003 through November 8, 2005.
62. Qualification Book Boiler Area, Bates Nos. AESPR-085375 through AESPR-085379.
63. Request for Capital Expenditure Approval, Bates Nos. AESPR-006865 through AESPR-006871, February 8, 2004.
64. AES – ABB- DFD Meeting Minutes, February 10 and 11, 2000.
65. CDS Start Up Procedure 3/11/04. Bates Nos. AESPR-085855 through AESPR-085858.
66. CDS Make-up Water Log Book.
67. Paul Stinson "Notes from Conversation with Terry Storbeck, Black Hills Power", December 2003.
68. Paul Stinson, Progress Report 2, September 26, 2003.
69. Various Calculations (No author or dates). Bates Nos. AESPR 007339 through AESPR 007345.
70. DCS Logs 9/19/02 through November 10, 2004.
71. Review of photographs, video, and sketches taken during inspection of Unit 1 ESP, October 2005 by Dr. Kalmanovitch (Altran Solutions) and Dr. Anderson (Apco Services).
72. FL Smidth handwritten status notes on status of repairs to Unit 2 ESP November 27, 2003 (Bates Nos. FLS-0078 through FLS-0082 and photographs.

6

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

## 3.0   OPINIONS

The following are the author's opinions regarding the immediate cause of ESP degradation and the most probable root cause of the corrosive environment that was the cause of the ESP degradation:

### 3.1.   Immediate Cause

1. The immediate cause of the ESP degradation was the presence of a corrosive environment consisting of an aqueous solution containing sulfuric ($H_2SO_4$) and hydrochloric (HCl) acid.

2. The damage most probably occurred after March, 2003 for Unit #2 and after September, 2003 for Unit #1. These dates correspond to inspections for the respective Units where no significant degradation was observed. The damage on the Unit #2 plates was first observed during a November 2003 inspection and for Unit #1 during a January, 2004 inspection. Since the type of degradation that occurred would have been essentially impossible to miss (perforated plates with corrosion product debris present) the conclusion is that the period of accelerated corrosion occurred after these inspections.

3. The cause of the wet acid environment was most probably the operation of the ESP at a temperature below the dewpoint for the conditions in the ESP and otherwise uncontrolled migration of moisture from the Circulating Dry Scrubber (CDS) to the ESP.

### 3.2.   Root Cause

The Altran team conducted an extensive analysis of operational and maintenance data from both units. As a result of this analysis, the following conclusions were drawn regarding the higher level root cause of the aggressive environment in the ESP:

1. AES-PR operated the Plant in such a way that excess water was injected into the CDS beyond that necessary to reduce the CDS outlet temperature to the desired value.

2. Due to inadequate operation and maintenance, the water injection (CDS spray) gradually became incapable of providing proper atomization. As a result of this situation, a significant fraction of the water was not vaporized. The excess water carried over into the ESP where it provided for an aggressive wet environment that resulted in accelerated corrosion.

3. When the CDS spray nozzles malfunctioned due to improper maintenance, the environment within the CDS became inhomogeneous in that there were most likely regions where the unevaporated water existed. The temperature measuring system was then rendered incapable of providing an accurate determination of

7

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

conditions in the CDS and the relationship between temperature and CDS spray flow was lost – most likely resulting in a "call" for increased spray water flow, which would introduce even more moisture into the system. As described in item 5 below, these increasingly moist conditions would have been further exacerbated beginning in July/August, 2003 when the CDS inlet temperature increased above 280°F.

4. Once the aggressive environment was established, corrosion rates would have been as high as the order inches/year. This corrosion rate was capable of complete perforation of the 0.040 inch ESP plates within months.

### 3.3. Additional Opinions

In addition to the opinions provided above, the detailed analysis of the operating and maintenance data from the Plant has resulted in the following additional opinions:

1. The author could find little or no statistical correlation between opacity and the chloride content of the CDS spray water.

2. The system was capable of, and did, operate within the required specifications once the initial operational issues were addressed.

3. The Operations and Maintenance Manuals ("O&M Manuals) for the equipment and other Plant documentation contained repeated cautions regarding operation of the Plant under conditions where the ESP environment dropped below the dewpoint. The O&M Manuals contained procedures which, if followed, would have minimized the risk that the ESP environment would drop below the dewpoint. Yet there was clear evidence that wet conditions were occurring, including, particularly, observation of "snowballing" on the ESP electrodes and observation of wet ash in the CDS (September 2003) prior to the inspections in November 2003 and January 2004 of Unit #2 and #1, respectively.

4. There was clear evidence of poor maintenance of the CDS spray nozzles, in spite of cautions in the O&M Manuals that maintenance of these items was critical to the proper operation of the CDS spray system. After the discovery of the corrosion, both AES-PR and its consultant, John Toher, observed maintenance practices that would result in the nozzles spraying unatomized water. As a further example, Plant inspection by Altran Solutions staff revealed nozzle flange attachment bolts missing. Improper attachment would allow for the introduction of air into the system which would compromise the operation of the system.

5. Analysis of the Plant data for the period from January 1, 2003, to December 31, 2003 indicated a steady increase (with periods of approximately constant temperature) in the CDS inlet temperature from approximately 260°F to approximately 285-290°F. In the July/August timeframe, there are a significant number of cases where the temperature exceeded 280°F, which is the CDS inlet operating parameter specified by the equipment supplier in its Operating and

8

Maintenance Manuals. At the same time the CDS outlet temperature remained essentially constant at just over 150°F. Analysis of the relationship between CDS inlet temperature and CDS valve position (the lower the valve position the higher the CDS spray flow into the CDS) showed that, once the CDS inlet temperature exceeded 280°F, the linear relationship between CDS inlet temperature and CDS valve position was lost. There were many cases where, for the same temperature and load conditions (gas flow volume), the valve position varied from approximately 20% open to 0% open. For the same amount of energy being removed from the system both, cannot be true. Instead, this is a clear indication that excess water was being injected into the CDS beyond that necessary to cool the system. The excess water would not have evaporated and would have been carried over to the ESP. Proper operation and maintenance of these systems by AES-PR would have identified and corrected this problem.

6. Ash re-injection, while not increasing the total amount of chloride in the system, would increase the average chloride content in the CDS. This would require, according to the O&M Manuals, an increase in the CDS outlet temperature. This increase was not implemented and would thus have increased the risk of moisture in the ESP.

## 4.0   SUMMARY OF ANALYSIS AND SUPPORT FOR OPINIONS

### 4.1.  Dewpoint Corrosion

Acid dewpoint corrosion has been recognized as a significant issue for the degradation of mild steel since the 1940s. The causes and characteristics of this form of corrosion are well documented [1-4]. Briefly, the combustion process produces products that can include water vapor, sulfur oxides ($SO_2$ and $SO_3$), hydrochloric gas (HCl), and nitrogen oxides ($NO_x$). While most of these products are removed through the use of various forms of "scrubber" systems, it is possible for residual amounts of these products to exist in the gas stream down stream of the scrubber systems. As long as the gas stream remains dry (above the dewpoint) this is not a problem, and particulates are cleaned up in the electrostatic precipitator. However, if the temperature in the system drops below the dewpoint of water, condensation will occur and any residual sulphur oxide and hydrogen chloride gases can be dissolved to form $H_2SO_4$ and HCl, both of which are corrosive to the mild steel ESP plates. The condensation and presence of water is significant because corrosion, of the type observed in the ESP, cannot occur without the presence of an aqueous phase (water).

In the absence of other condensable gasses, the dewpoint is simply the point where water vapor begins to condense from the atmosphere. When other condensable gases, such as $SO_3$, $SO_2$, HCl or $NO_2$ are present, the dewpoint will differ from the water dewpoint. This lower dewpoint is sometimes referred to as the "acid dewpoint". For the concentrations of the above gases present in the Plant in question, the deviation of the dewpoint has been well characterized [5-6]. However, an important point is that, with the exception of $NO_2$, the water dewpoint will be above the dewpoint of the other gases

9

unless their concentrations in the gas are abnormally high. Thus, when the water dewpoint is reached, the acids will be dissolved in the condensing water, thereby accelerating the rate of corrosion. The dissolved acid can either collect as a film on Plant surfaces or be incorporated into the ash which will also collect on surfaces. The concentration of $H_2SO_4$ in the condensed film can exceed 40 wt% [1]. In any case, the resulting environment will consist of a wet acid containing environment. This environment is extremely corrosive to mild steel [1,3,7]. Corrosion rates in excess of 0.1-0.35 inches/year are possible [1,3,7]. The addition of HCl to the environment can result in an additional factor of at least 2 over that for $H_2SO_4$ alone [1].

Another important factor is the effect of water vapor concentration on the dewpoint. As the water vapor partial pressure in the atmosphere increases, so does the dewpoint. Thus, for cases where excess water is present locally in the gas phase (e.g. due to malfunctioning spray systems), the local dewpoint can exceed the dewpoint based on average water vapor pressure.

In the case at hand, the presence of accelerated corrosion, consumption within months, coupled with the forensic evidence, establishes conclusively that a wet environment containing acid had to exist when the corrosion occurred. Thus, it is my opinion that the system was operated below the dewpoint and/or that other moisture carried over from the CDS to the ESP and was not evaporated. Moreover, the corrosion rates would have been high enough to cause the observed damage even absent the presence of HCl in the system. That is, the same damage would have occurred even if the fuel had been chloride free and the CDS spray water had also been chloride free.

### 4.2. Root Cause-Operational Considerations

Altran Solutions conducted a detailed examination of the operational and maintenance data for the Plant. Combined with the results of an on-site inspection, that examination allowed me to assess how it was possible for the dewpoint to have been breached leading to wet conditions in the ESP. The investigation was divided into two phases: (1) detailed analysis of Plant data and its compliance with recommended operating procedures as specified in the O&M Manuals; and (2) the results of an on-site inspection.

### 4.3. Detailed Operating Procedures and Plant Data Analysis

The author, after examination of the O&M Manuals, as well as other documents listed in Section 2 of this document, has concluded that these documents were extremely clear regarding the requirements necessary for the prevention of accelerated corrosion of the ESP. The requirement for margin with respect to the dewpoint is mentioned on multiple occasions. This and other related topics are thoroughly discussed in Volume 1, Section 9. In this section it is clearly stated that the CDS outlet temperature must be controlled to limit the approach temperature to 30°F or greater. Moreover, the effect of chloride content in the CDS spray water is also clearly discussed. For the range of chloride concentrations expected (1100-4300 ppm) the recommended CDS outlet temperature scales from 156-176°F [8]. Stressed in the O&M Manuals is the necessity for keeping

**B 034**

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

the CDS spray system functioning properly, including frequent inspection and cleaning (and replacement if necessary) of the spray nozzles. The nozzle manufacturer provided maintenance and inspection procedures in the O&M Manuals [9]. If followed, these procedures in the O&M Manuals would be effective in reducing the risk of corrosion in the ESP.

Altran Solutions obtained Plant data from both units over the period October 2002-November 2004. A complete list of the data reviewed is presented in Section 2 of this disclosure. The critical period for this analysis was the period from the beginning of March 2003 to the end of January 2004. Figures 1-3 show selected results of this analysis for Unit #2. The results were similar for Unit #1. Figure 1 shows opacity, CDS inlet, outlet temperature and CDS spray valve position vs. time for this period. Figures 2 and 3 plot selected variables in more detail. It is important to remember that the lower the CDS spray valve position value the higher the spray flow into the CDS. Figure 2 focuses on CDS valve position and inlet temperature for this time period while Figure 3 plots CDS valve position as a function of CDS inlet temperature during this period. Only data points for full power operation are plotted; i.e. gas flow rates greater than 600 acfm. The data shows a steady, but incremental, increase in the CDS inlet temperature during the year. At the same time, the CDS outlet temperature (ESP inlet temperature) remains essentially constant. During this period, the chloride content of the CDS spray water would have been expected to have varied between 1,200-4,000 ppm which, according to the O&M Manuals, should have resulted in a concurrent adjustment of the CDS outlet temperature to assure margin to the dewpoint. Figure 2 shows more detail regarding the relationship between CDS valve position and CDS inlet temperature. Beginning in July 2003, as the CDS inlet temperature increased and then went beyond 280°F, the operating parameter reflected in the supplier's O & M Manuals, a high degree of variability in the CDS valve position is observed. Figure 3 amplifies the relationship between CDS valve position and CDS inlet temperature.

Also plotted in Figure 3 is a best fit relationship between the CDS valve position and temperature. The amount of energy required for the reduction of the CDS gas temperature to the desired outlet temperature will be directly proportional to the CDS inlet temperature for a constant outlet temperature. The temperature reduction is achieved through the evaporation of the spray water. However, after about July 2003, an inconsistency is observed. Figure 3 shows that more than one CDS valve position apparently existed for the same CDS inlet temperature and constant CDS outlet temperature. Since the spray water flow rate is proportional to the CDS valve position, fully closed resulting in maximum flow (approximately 172 gpm), there is an estimated discrepancy of approximately 30 gpm from the actual measured flow at full power during these times. This represents an approximately 20% water excess beyond that necessary to achieve the CDS outlet temperature. Because the CDS outlet temperature remained constant even as the flow of water increased, the excess water would not have been vaporized and would then have carried over to the ESP. That this carryover of moisture occurred in this period of time is shown in observations noted by ALSTOM's Karl Hogenfelt when he inspected the inside of the Unit 2 ESP on September 23, 2003.

B 035

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

The most likely explanation for the carryover of wet ash can be traced to malfunctioning and poorly maintained nozzles. In this case, incomplete atomization would lead to incomplete (lower efficiency) vaporization, which would have resulted in a call from the control system for more CDS spray flow for the same CDS outlet temperature. Complete atomization of the CDS spray is essential for the removal of energy from the gas stream thus lowering the temperature. A fine mist allows for the heat (energy) to gain access to the water. For a given power generation rate, the amount of combustion generated gases will be a constant. The flow rate of gases through the system will thus also be a constant. For steady state conditions, the throughput of gas in the CDS will be a constant and hence the energy content of the stream. The residence time in the system will also be approximately constant. This means that the amount of time that a volume of gas will be in contact with the CDS spray will also be a constant. The amount of energy delivered to the spray water will thus depend on the time (a constant) and the area over which the energy is transferred (the surface area of the spray droplets). For a given volume of water, the finer the droplet size the higher the surface area. Hence, a fine droplet size results in a larger amount of surface area through which to transfer the energy. This will result in more efficient energy transfer and thus a more effective temperature reduction.

People in the desert southwest are very familiar with this process. One way to cool the surrounding air is to use a fine water mist. The fine mist cools the local air by evaporation. However, if the misting system malfunctions, the cooling effect disappears. In the case of the CDS spray, as the droplet size becomes larger, there will come a point at which the amount of time available will simply be too short to allow complete evaporation. When this occurs there will be excess water in the system and the temperature reduction will be limited. If the nozzles are not functioning properly then larger water droplets will be present and incomplete evaporization will occur. The un-evaporated spray water then would be carried over to the ESP. Maintenance records indicate that nozzle maintenance was not consistent and frequent malfunctioning occurred. Additional anecdotal confirmation was obtained during the Plant visit. Figure 4 shows a series of photos showing the nozzle(s) and the installation. Clogging was observed and the flange at the installation point was attached with only a single (out of four) nuts being tightened. This was observed on all installed nozzles of Units #1 and 2 during an onsite visit by Altran Solutions in October 2005. Additionally, the O&M Manuals calls for frequent cleaning and other maintenance of spray nozzles and verification of spray pattern using the "broomstick" test. Maintenance logs and other evidence indicate that nozzle inspection and testing was not performed at appropriate frequencies and that AES-PR did not understand how to interpret the "broomstick" test, thus interfering with its ability to diagnose and correct malfunctioning nozzles

## 4.4. The Role of Chloride

The O&M Manuals called for the operator to adjust the margin to the dewpoint as a function of chloride concentration in the CDS spray water. According to the O&M Manuals, CDS outlet temperature should be adjusted in a range between 156 to 176°F for chloride concentration in the CDS spray water ranging from 1,100 to 4,300 ppm, respectively. AES failed to measure the chloride content of the CDS spray water

12

B 036

regularly until late September, 2003. Figure 5 shows the CDS spray water chloride concentration and opacity as a function of time for the period October 15, 2003 to January 29, 2004.

While the chloride content of the CDS spray water varied from approximately 1100-4000 ppm during this period of time, the data do not indicate that AES-PR operators made any attempt to adjust the CDS outlet temperature accordingly. Failure to make these adjustments would have caused an increased risk of corrosion during high chloride conditions. An increase in chloride content of the CDS spray water would results in an increase in the acid dewpoint. As pointed out above, the O&M Manuals direct the operator to increase the CDS outlet temperature as the CDS spray water chloride content increased. Based on the O&M Manuals, a reasonable course of action would have been to increase the CDS outlet temperature in linear fashion from 156° to 176°F as the chloride content increased from 1100 to the 4,300 ppm upper limit. This would correspond to an approximate 1°F increase in CDS outlet (ESP inlet) temperature for each 150 ppm increase in CDS spray water chloride concentration.

With respect to an effect of chloride concentration in the CDS spray on the opacity of the Plant, we could find no correlation between these variables. Figure 6 shows the opacity for Unit #1 plotted as a function of CDS water chloride concentration. No statistically significant correlation exists.

With respect to the effect of fly ash re-injection from the ESP to the CFB, which began in July, 2003, this would have had two significant results: (1) The fly-ash would have had a different consistency (particle size distribution, chemistry, water absorption characteristics) than the ash being produced directly from coal combustion. This would have effected the evaporation rate of the CDS spray water that would be absorbed by the ash. (2) While the overall chloride loading of the system would not have changed, the average concentration of chloride in the CDS would have been elevated. In order to evaporate the water absorbed by the re-injected ash, a higher temperature would be required. The net effect of these results would have been to require a higher CDS outlet temperature in order to minimize the risk of moisture remaining in the ash, which, if not dried, would result in increased corrosion. An increase in the CDS outlet temperature would be required as stated in the O&M Manuals.

### 4.5. Time Period Over Which Degradation Occurred

As pointed out above, for wet acid conditions the corrosion rates for mild steel can be in the range 0.1-0.35"/year. The ESP plates on this Plant were approximately 0.04" thick. Thus, under even the most "benign" set of wet acid conditions, perforation of the ESP plates could have occurred in less than three months. The question then arises – over what period of time did the degradation of the ESP plates occur? In order to estimate this we observe the following:

1. We know that inspections by Plant and other personnel took place in September 2003 and March 2003 for Units 1 and 2 respectively. During these inspections, excessive corrosion was not observed. If we contend, as the AES-PR does, that the

13

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

corrosion damage took place over the entire period of operation of the Plant – approximately 1 year from the time of turn-over – then this would mean that, at least for Unit 1, approximately two thirds of the corrosion would have taken place prior to the inspection in September 2003. During the inspection in January 2004, where the corrosion damage was found, this damage was accompanied by the presence of large amounts of obvious corrosion products. Yet, no mention is made, in the results of the September, 2003 inspection of corrosion products being present. This contradicts the contention that two-thirds of the corrosion already had taken place in September, 2003.

2. All of the parties, in effect, agree that the corrosion damage was due to a wet acid condition [10-13]. Given that corrosion rates of 0.1-0.35 inches/year are possible, and if as has been contended, the corrosion took place on a continuous basis, how is this possible given the above observation? For that to be the case, either the corrosion rates are wrong, the inspection was in error, or the corrosion damage occurred over a much shorter period of time. It is my opinion that the corrosion took place in a wet acid environment, most probably during the period July 2003 to the time when the damage was observed.

It has been pointed out earlier that during the period July-December 2003 the CDS valve position exhibited anomalous behavior. Figure 7 shows an expanded plot of the CDS valve position data for the period July-November(15) 2003 for Unit 1. From this data, it is clear that the behavior of the CDS spray system was not "normal". If we assume that normal valve position was approximately 23% then any other position lower than this would have resulted in excess water being introduced into the CDS. The data indicates that this likely occurred frequently during this period. Examination of the data for periods prior to this date indicate that valve behavior was much more consistent, with an extremely small number of deviations of the type which began to occur in July 2003. The conclusion from this is that, when the CDS inlet temperature exceeded 280°F, the anticipated operating parameter, excess water was being injected. Since the CDS outlet temperature remained essentially constant during this period, this excess water was then carried over to the ESP and was responsible for the wet acid environment that caused the damage. This explanation is consistent with both the inspection observations and the range of corrosion rates that would be expected for these conditions.

## 5.0 REFERENCES

1. Holmes, D. R., editor. "Dewpoint Corrosion", Institute of Corrosion Science and Technology, Ellis Horwood, Ltd, 1985.
2. Huijbregts. W. M. M., Leferink, R. G. I, "Latest advances in the understanding of dewpoint corrosion: corrosion and stress corrosion cracking in combustion gas and condensates", Anti-Corrosion Methods and Materials, Vol. 51. No. 3, 2004, pp. 173-188
3. Uhlig's Corrosion Handbook, Second Edition, John Wiley & Sons, Inc., 2000, page 520.
4. Metal Corrosion in the Atmosphere, A Symposium presented at the Seventh Annual Meeting for American Society for Testing and Materials, Boston, Mass., 25-30 June, 1967, ASTM Special Technical Publication No. 435, p 360.
5. Kiang, Y. "Predicting Dewpoint of Acid Gases", Chemical Engineering, Feb. 1981, p. 127.

14

B 038

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

6. Verhoff, F. H., Banchero, J.,"Predicting Dewpoints of Flu Gases", Chemical Engineering Progress: Insulation Practice, Vol. 70, No. 8, 1974, pp. 71-72.
7. Whitman, R., Russell, R., Ind. Eng. Chem., 17, 348 (1925)
8. Section 4.1 of Environmental Elements Corporation's O&M Volume 1, August 2001 issue.
9. Section 14 of Environmental Elements Corporation's O&M Volume 8, August 2001 issue.
10. GE Betz Metallurgical Laboratory Report, January 21, 2005.
11. Altran Corporation Letter Report 11-0256-00-LR-001, September 9, 2004.
12. Microbeam Technologies, Inc. "Analysis of ESP Plate Corrosion", Report No. 721, February 2004.
13. ALSTOM Power, ESP Collectors Corrosion Report, June 15, 2004, Report MSE 04-R-12.

B 039

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001

## 6.0   QUALIFICATIONS

### PROFESSOR RONALD GEORGE BALLINGER

65 Burnham Road                                              Massachusetts Institute of Technology
Andover, MA  01810                                           185 Albany Street, NW22-117
(978) 475-1226                                               Cambridge, MA 02139
E-Mail: hvymet@mit.edu                                       (617) 253-05118, FAX (617) 253-0807

| | |
|---|---|
| **TITLE** | Professor, Departments of Nuclear Science and Engineering and Materials Science and Engineering, Massachusetts Institute of Technology (Promoted from Associate Professor effective 6/1/2005). |
| **EDUCATION** | MASSACHUSETTS INSTITUTE OF TECHNOLOGY |

Sc.D. degree in Nuclear Materials Engineering titled "Corrosion Fatigue of Nickel Base Alloys for Nuclear Applications." February 1982.

S.M. degree in Materials Science, February, 1978.

S.M. degree in Nuclear Engineering, September 1977. Thesis title: "The Anisotropic Mechanical Behavior of Zircaloy-2." (Both degrees).

WORCESTER POLYTECHNIC INSTITUTE

S.B. degree in Mechanical Engineering, with high distinction, February, 1975.  Emphasis on Materials Science.

**ORGANIZATION AND SOCIETY MEMBERSHIPS**

President, MIT Student Section, American Nuclear Society, 1977-78

Vice President, MIT Student Section American Nuclear Society, 1976-77

Member, Tau Beta Pi
Associate Member, Sigma XI
Member, Pi Tau Sigma
Member, American Nuclear Society
Member, American Society for Metals
Member, National Association of Corrosion Engineers
Member, American Society for Testing and Materials

**AWARDS AND**

1971-72 CRC Engineering Science Achievement Award, Worcester

16

**B 040**

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001

| | |
|---|---|
| **PRIZES** | Polytechnic Institute |
| | Metallurgy and Materials Science Prize, 1973, Sponsored by the Boston Section of the AIME and given in honor of Professor Morris Cohen |
| | 1975 George Eastman Award for Outstanding Graduate Class of 1975, Worcester Polytechnic Institute |
| | 1985 MIT American Nuclear Society Outstanding Professor Award |
| | 1985 MIT Graduate Student Council Teaching Award |
| | 1988 Carl Richard Soderberg Professorship in Power Engineering |
| | 2003 MIT Joel & Ruth Spira Award for Outstanding Teaching |
| **PATENTS** | Patent Number 4785142, Issued 11/15/88. European Patent Number 0285952, Issued 3/1/92 |
| | Title: "Superconductor Cable". |
| | Patent is for a new high strength, Low Coefficient Expansion (COE) alloy for use as a structural material for $Nb_3Sn$ superconducting cables. The use of this new alloy will allow higher current carrying capability by the superconductor and, thus, higher fields and/or smaller hardware. The new alloy also has use in high temperature gas turbine engine applications. |
| **RESEARCH** | Mechanical behavior of structural materials and environmental degradation of materials with emphasis on corrosion, corrosion fatigue and stress corrosion cracking behavior in high temperature aqueous systems including:(1) irradiation assisted stress corrosion cracking in Water Reactor Systems, (2) stress corrosion cracking in Pressurized Water Reactor steam generator materials, (3) high temperature materials for advanced reactor systems. Environmental degradation, processing, conditioning, and storage of metallic uranium nuclear fuel. The modeling of high temperature aqueous chemistry in cracks and crevices including the effect of radiolysis on irradiation assisted stress corrosion cracking. High temperature aqueous electrochemical analytical and measurement techniques including in-core aqueous chemistry. Environmental degradation of aircraft structural materials. |
| | Advanced fatigue and fracture mechanics techniques and analysis. Relationships between structure, properties and performance. Failure analysis, life prediction and extension of engineering components. |

17

B 041

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

Material performance at low temperatures for superconducting and structural applications.

Development of advanced reactor systems including gas cooled, liquid metal cooled, and alternative fueled light water reactors. Specialized materials development for advanced reactor systems. Fuel performance modeling. Reactor engineering for advanced concept systems, Turbo-machinery development for direct and indirect cycle Brayton systems.

**PROFESSIONAL**        Professor, Departments of Nuclear Science and Engineering and
**EXPERIENCE**          Materials Science and Engineering, MIT Effective June 1, 2005.

Associate Professor, Departments of Nuclear Engineering and Materials Science and Engineering, MIT. 1987-June, 2005.

Assistant Professor, Department of Nuclear Engineering and Materials Science and Engineering, MIT. 1982 - 1987.

Member, International Cyclic Crack Growth Review Group 1982-1985

Member, International Cooperative Working Group on Irradiation Assisted Stress Corrosion Cracking. 1985-1992

Entropy Ltd., South Great Road, Lincoln, MA. Consultant on Nuclear Fuel Performance Modeling. 1978 -1985

Chairman, SPEAR Fuel Rod Reliability Code Workshop, Lincoln. MA. September 25 and 26, 1980.

Session co-chairman. International Conference on Environmental Cracking of metals, Kohler, WI, Oct. 2-7, 1988.

Workshop Host. International Working Group on Irradiation Assisted Stress Corrosion Cracking, Cambridge, MA. April 10-13, 1989.

U. S. Department of Energy, Independent Technical Assessment Team for Dry Storage of N-Reactor Fuel. Jan. 1994-Sept. 1994

U. S. Department of Energy Technical Assistance Group (TAG) for Disposition of N-Reactor Fuel, Jan.1995-2001

U. S. Department of State Technical Advisory Committee on Conditioning of North Korean Reactor (DPRK) Fuel    , Jan. 1995-2003

B 042

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

U. S. Department of Energy Technical Advisory Committee on Disposition of Savannah River Reactor Site Metallic Fuel. Jan.-Aug. 1996

U. S. Department of Energy Technical Advisory Committee on Disposition of metallic fuel stored at INEL. June 1996-2002

Member, Executive Committee-Materials Science and Technology Division, American Nuclear Society. 1999-Present

Advisory Committee on Reactor Safeguards: Member, *Ad Hoc* Subcommittee on a Differing Professional Opinion: Voltage-Based Repair Criteria, September-December 2000.

Secretary/Treasurer. Materials Science and Technology Division, American Nuclear Society, 2003-2004

Vice Chair/Chair Elect. Materials Science and Technology Division, American Nuclear Society, 2004-2005

Member, Department of Energy Independent Technology Review Group (ITRG) for the Design Features and Technology Uncertainties for the Next Generation Nuclear Plant, 2003-2004.

Member, Department of Energy Technical Review Group for Power Conversion Technology Assessment for the Next Generation Nuclear Plant, 2004.

Member, Idaho National Laboratory Materials Review Board, 2003-Present

Member, International Cooperative Group on Environmentally Assisted Cracking of Light Water Reactor Materials. 2003-Present

| | |
|---|---|
| **MILITARY SERVICE** | U.S. Naval Nuclear Power Program:  Most Advanced rating, E-6. Served as Engineering Watch Supervisor on an operating nuclear submarine.  Three years as instructor and Leading Petty Officer, M-Division at the SIC Naval Reactor Prototype. |
| **BACKGROUND** | Born and raised in West Hartford. Connecticut. |
| **REFERENCES** | Furnished upon request. |

B 043

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

**Professor R.G. Ballinger**

**Professor of**
**Nuclear Science and Engineering and**
**Materials Science and Engineering**
**Massachusetts Institute of Technology**

S.B Mechanical Engineering, Worcester Polytechnic Institute, 1975
S.M. Nuclear Engineering, Massachusetts Institute of Technology, 1977
S.M. Materials Science, Massachusetts Institute of Technology, 1978
Sc.D. Nuclear Materials Engineering, Massachusetts Institute of Technology, 1982

Ronald G. Ballinger is a Professor of Nuclear Science and Engineering and Materials Science and Engineering (Promotion effective June 1, 2005). Professor Ballinger is also Head of the H.H. Uhlig Corrosion Laboratory in the Department of Materials Science and Engineering at MIT. Professor Ballinger is active in the teaching of graduate and undergraduate subjects in reactor design, corrosion engineering, chemistry, mechanical behavior and physical metallurgy.

Professor Ballinger served for 8 years in the nuclear navy before attending college. After receiving his B.S. in Mechanical Engineering from Worcester Polytechnic Institute in 1975 he did his graduate work at MIT. He received his S.M. in Nuclear Engineering in 1977 and in Materials Science in 1978. He received his Sc.D. in Nuclear Materials Engineering in 1982 with a thesis entitled "Corrosion Fatigue of Nickel Base Alloys for Nuclear Applications." After receiving his Sc.D. he joined the faculty with a joint appointment as an Assistant Professor in the Nuclear Engineering and Materials Science and Engineering Departments. He was promoted to Associate Professor in 1987 and received tenure in 1989. He has been promoted to Full Professor, effective June 1, 2005.

Professor Ballinger's areas of specialization are materials selection and engineering of nuclear engineering systems and environmental degradation and life assessment of these systems. Specific areas of active research are as follows: (1) environmental effects on material behavior, (2) physical metallurgical and electrochemical aspects of environmentally assisted cracking in aqueous systems, (3) stress corrosion cracking and hydrogen embrittlement in Light Water Reactor systems, (4) failure analysis of engineering structures, (5) the effect of radiation on aqueous chemistry, (6) experimental fatigue and fracture mechanics, (7) degradation of materials properties and their effects on component life, (8) nuclear fuel performance including, gas reactor coated particle fuel and environmental degradation, processing, and storage of metallic uranium fuel, and (9) materials development for advanced reactor and fusion systems including, supercritical water, supercritical $CO_2$, liquid metal, high temperature gas reactor and cryogenic structural applications.

Professor Ballinger has taught the MIT Nuclear Science and Engineering Department's courses related to fuel development and performance since his joining the faculty. He currently teaches these courses as well as corrosion and chemistry courses in the Department of Materials Science and Engineering.

**B 044**

Professor Ballinger spent his sabbatical leave at the EPRI where he participated in the organization and implementation of a new program to improve steam generator reliability. In this capacity he organized and conducted one of the first workshops that brought together the world experts in the area of stress corrosion cracking in alloy 600 to discuss the state of our current knowledge in this area and to make recommendations for future research.

Professor Ballinger has authored or co-authored more than 100 scientific publications and is a member of several professional societies including the National Association of Corrosion Engineers, The American Society for Metals, The Electrochemical Society, The American Nuclear Society, and the American Society for Testing and Materials. Professor is currently Vice Chair/Chair-Elect of the Materials Science and Technology Division of the American Nuclear Society.

Professor Ballinger is a member of the International Cooperative Group on Environmentally Assisted Cracking of Light Water Reactor Materials (ICG-EAC). The ICG-EAC is charged with the development of methodology for understanding of Light Water Reactor (LWR) materials.

Professor Ballinger has served or is serving on several DOE committees dealing with the stabilization, processing and disposition of metallic uranium fuel from the production reactors as well as from research reactors including teams to evaluate options for the Hanford, Savannah River, and INEL sites. He also is, or has been, a member of several DOE committees to evaluate advanced reactor options and materials for these options. These committees include: (1) the DOE Independent Technical Review Group (ITRG): Design Features and Technology Uncertainties for the Next Generation Nuclear Plant. The ITRG was tasked with evaluating options for the Next Generation Nuclear Plant (NGNP), (2) The DOE Power Conversion Unit Study Committee tasked with evaluation options for the NGNP power conversion unit, and (3) the Idaho National Laboratory Materials Review Board.

Professor Ballinger has consults in the nuclear industry in the areas of environmental degradation of materials and failure root cause and analysis. In recent years his focus has been in the steam generator reliability area. Professor Ballinger has been active in the analysis on steam generator tubing failures throughout the industry and has represented the utility as a consultant at the NRC. R&D efforts in his research laboratory have included the development of stress corrosion crack initiation and growth data for actual steam generator tubing under prototypic environmental conditions.

In the regulatory area Professor Ballinger has participated as a voting member of the Advisory Committee on Reactor Safeguards in the area of environmental degradation of steam generator materials and the safety implications of this degradation as a member of the *Ad Hoc* Subcommittee on a Differing Professional Opinion: Voltage-Based Repair Criteria during the September-December 2000 time period. In this capacity Professor Ballinger provided expert input in the steam generator degradation area and gained valuable working experience with the ACRS members and staff.

21

## 7.0   PUBLICATIONS

R. G. Ballinger, W. G. Dobson. R. R. Biederman, "Oxidation Reaction Kinetics of Zircaloy-2 in an Unlimited Steam Environment," *J. Nuc. Materials*, 62, 2, 3, November 1976.

W. G. Dobson, R. R. Biederman, R. G. Ballinger, "Zircaloy-4 Oxidation in Steam under Transient Oxidizing Conditions," ASTM, STP 663, 1977.

R. G. Ballinger, and R. M. N. Pelloux. "The Anisotropic Mechanical Behavior of Zircaloy-2," Third International Conference on Mechanical Behavior of Materials, Cambridge UK, August 1979, Vol. 2, pp 685-695.

G. S. Was, H. H. Tischner, E. L. Hall. R. M. Latanision. R. G. Ballinger, and R. M. N. Pelloux, "Effects of Heat Treatment on Segregation and Precipitation of Trace Elements in Inconel 600," presented by Environmental Fracture Session 1, Fall Meeting of TMS-AIME, Milwaukee, September 1979.

R. G. Ballinger and R. M. N. Pelloux, "The Effect of Anisotropy on the Mechanical Behavior of Zircaloy-2," *J. Nucl. Materials*, 97, No. 3, April 1981.

R. G. Ballinger, R. Christensen, R. Eilbert, S. Oldberg, E. Rumble, and G. S. Was, "Clad Failure Modeling Progress," Fifth International Conference on Zirconium in the Nuclear Industry, August 1980.

R. G. Ballinger, R. M. Latanision. W. C. Moshier, and R. M. N. Pelloux. "The Role of Uncertainty in the Measurement of Crack Length by Compliance Techniques," International Conference on Subcritical Crack Growth, Freiberg (W. Ger.). May 13-15, 1981, pp 261-285.

R. G. Ballinger et al., "Fission Gas Release and Fuel Reliability at Extended Burnup" Topical Meeting on LWR Extended Burnup, Fuel Performance and Utilization, Williamsburg, VA, April 4-8, 1982. pp 4-35.

C. K. Sheeks, W. C. Moshier, R. G. Ballinger. R. M. Latanision, and R. M. Pelloux, "Fatigue Crack Growth of Alloys X-750 and 600 in Simulated PWR and BWR Environment," International Symposium on Environmental Degradation of Materials in Nuclear Power Systems, Myrtle Beach, S.C., August 22-25, 1983.

R. G. Ballinger, W. C. Moshier, K. N. Siebein, and R. M. Latanision, "A Study of the Thermal Aging Behavior in Alloy 600 Tubing," 9th International Congress on Metallic Corrosion, Toronto, Canada, June 3-7, 1984, pp 265-273

C. K. Sheeks. R. G. Ballinger, R. M. Latanision. "Fatigue Crack Growth of Inconel Alloy X-750 in Simulated PWR and BWR Environments," 9th International Congress on Metallic Corrosion, Toronto, Canada, June 3-7, 1984, pp 310-316.

R. G. Ballinger, G. E. Lucas, and R. M. Pelloux, "The Effect of Plastic Strain on the Evolution of Crystallographic Texture in Zircaloy-2." *J. Nucl. Materials*, 126 (1984). pp 53-69

22

R. G. Ballinger, J. W. Prybylowski, and C. K. Elliott, "Effect of Processing History and Chemistry on the Structure of Nickel Base Superalloys," Second International Symposium on Environmental Degradation of Materials in Nuclear Power Systems - Water Reactors, Monterey, CA, Sept. 9-12, 1985.

R.G. Ballinger, and J. W. Prybylowski, "An Overview of Advanced High Strength Nickel Base Alloys for LWR Applications," EPRI Workshop on Advanced High Strength Materials for LWR Internal Applications, Clearwater Beach, FL, March 12-13, 1986.

J. W. Prybylowski, R. G. Ballinger, "The Influence of Microstructures on Environmentally Assisted Cracking of Alloy 718," Corrosion '86, Houston, TX, March 17-21, 1986.

R. G. Ballinger, et. al. "Low Coefficient of Expansion Structural Materials Development for Conductor Applications," 9th Annual Cryogenic Structural Materials Workshop, Reno, NV, October 6-8, 1986.

J. W. Prybylowski, R. G. Ballinger, "The Influence of Microstructure on Environmentally Assisted Cracking of Alloy 718", *Corrosion*, 43, No.2 (1987), pp 111-117.

J. L. Martin, R. G. Ballinger, et al., "Tensile, Fatigue and Fracture Toughness Properties of a New Low Coefficient of Expansion Cryogenic Structural Alloy, Incoloy 9XA," Int'l Conf. on Cryogenic Materials and Cryogenic Engineering. St. Charles, IL, June 14-18, 1987.

M. Morra, R. G. Ballinger, et al., "Incoloy 9XA, A New Low Coefficient of Thermal Expansion Sheathing Alloy of Use in ICCS Magnets," Int'l Conf. on Cryogenic Materials and Cryogenic Engineering, St. Charles, IL, June 14-15, 1987.

M. M. Steeves, et. al., "The US-DPC, A Poloidal Coil Test Insert for the Japanese Demonstration Poloidal Coil Test Facility," Tenth Int'l Conf. on Magnet Technology, September 21-25, 1987, Boston, MA.

I. S. Hwang, R. G. Ballinger, K. Hosoya, "High Temperature Electrochemistry of Precipitation Hardened Nickel Base Alloys in Aqueous Systems," 172nd Mtg. of the Electrochemical Society, Honolulu, HI, October 18-23, 1987.

J. W. Prybylowski, R. G. Ballinger, and C. Elliott, "Quantitative Analytical Electron Microscopy of Multiphase Alloys." *J. Electron Microscopy Technique*, 11, 1988.

K. Hosoya, R. Ballinger, J. Prybylowski, I.S. Hwang, "The Role of Microstructure in Environmentally Assisted Cracking of Nickel-Base Alloys," *Corrosion*, 44, 1988, pp 838-853.

M. J. Driscoll, et. al., "The MIT In-Pile Loops for Coolant Chemistry and Corrosion Studies." 1988 JAIF Int'l. Conf. on Water Chemistry in Nuclear Power Plant, April 19-22, 1988, Tokyo, Japan.

B 047

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

R. G. Ballinger, C. S. Elliott, and I. S. Hwang, "Corrosion Fatigue of Alloy X-750 in Aqueous Environments," Int'l. Conf. on Environment Induced Cracking of Metals, October 2-7, 1988, Kohler, WI

H. Becker, and R. G. Ballinger, "316LN Forgings for Alcator C-Mod; Metallurgical and Design Considerations," 11th Cryogenic Structural Materials Workshop, Colorado Springs, CO, October 18-19, 1988.

I. S. Hwang, R. G. Ballinger, and K. Hosoya, Electrochemistry of Multiphase Nickel-Base Alloys-in Aqueous Systems," J. Electrochemical Society, Vol. 136, No. 7, 1989

Morra, M, R.G. Ballinger, and I.S. Hwang, "The Relationship Between Processing, Sturcture, and Properties of a New High Strength, Low Coefficient of Expansion Alloy for Cryogenic Service," 1989 TMS Annual Meeting, Las Vegas, NV, February 27 - March 2, 1989.

S. C. Luckhardt, et al. "Measurements of Neutron and Gamma Ray Emission Rates and Calorimetry in Electrochemical Cells Having Palladium Cathodes," APS Meeting Baltimore, MD, June 1, 1989.

O. K. Harling, et al. "Engineering Activities at the MIT Research Reactor in Support of Power Reactor Technology," 1989 ANS Reactor Operations Topical Meeting, Charlotte, NC, August 6-9, 1989.

M. Steeves, et. al., "Progress in the Manufacture of the U.S. DPC Test Coil," IEEE Transactions on Magnetics, Vol. 25, No. 2(1989)

D. Albagli et. al., "Measurement of Neutron and Gamma Ray Emission Rates, Other Fusion Products, and Power in Electrochemicasl Cells Having Palladium Cathodes, "J. of Fusion Energy, Vol. 9, No. 2(1990), pp. 133-148.

K Kumar, I.S. Hwang, R.G. Ballinger, C.R. Dauwalter, A. Stecyk, "Analysis of Palladium Cathodes Used for Heavy Water Electrolysis," Fusion Technology, Vol. 19, No. 1(1991), pp. 178-187.

R.L. Tobler, R.P. Reed, I.S. Hwang, M.M. Morra, R.G. Ballinger, H. Nakajima, S. Shimamoto, "Charpy Impact Tests Near Absolute Zero", Journal of Testing & Evaluation, Vol. 19, No. 1(1991), pp 34-40.

I.S. Hwang and R.G. Ballinger, "A Multi-frequency A.C. Potential Drop Technique for the Detection of Small Cracks", J. Meas. Science and Technology, 3 (1992), pp 62-74.

I.S. Hwang, M.M. Morra, R.G. Ballinger, H. Nakajima, S.Shimamoto, and R.L. Tobler, "Charpy Absorbed Energy and $J_{IC}$ As Measures of Cryogenic Fracture Toughness", Journal of Testing and Evaluation, JTEVA, Vol. 20, No. 4, July 1992, pp. 248-258.

A. Turnbull, R. Ballinger, I. Hwang, M. Morra, M. Psaila-Dombrowski, " Hydrogen Treanport in Nickel Base Alloys". Metallurgical Transactions, In Press.

24

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

M. Morra, R. Ballinger, I Hwang, "Incoloy 908, A New Low Coefficient of Expansion Alloy For High Strength Cryogenic Applications-Physical Metallurgy", Metallurgical Transactions, In Press.

M.M. Morra, I.S. Hwang, R.G. Ballinger, M.M. Steeves and M.O. Hoenig, "Effect of Cold Work and Heat Treatment on the 4°K Tensile, Fatigue and Fracture Toughness Properties of Incoloy 908", 11th International Conference on Magnet technology (MT-11), Tsukuba, Japan, Aug. 28-Sept. 1, 1989.

A. Turnbull, R.G. Ballinger, I.S. Hwang, and R.M. Gates, "The Influence of Microstructure on Hydrogen Transport in Nickel-Base Alloys", Proceedings of the Fourth International Conference on The Effect of Hydrogen on The Behavior of Materials, Jackson Lake Lodge, Moran, Wyoming, September 12-15, 1989, pp 121-132.

M. Psaila-Dombrowski, A. Turnbull, R. Ballinger, "Implications of Crevice Chemistry for Cracking of BWR Recirculating Inlet Safe-Ends", UK Corrosion 90, Surrey, October 29-31, 1990.

O.K. Harling, G.E. Kohse, M.J. Driscoll, and R.G. Ballinger, "In-Pile Facilities for LWR Materials and Chemistry Studies at the MIT Research Reactor", to be presented at the JAIF Intl. Conf. on Water Chemistry in Nuclear Power Plant, Fukui City, Japan, April 22-25, 1991.

T. Oka, R. Ballinger, I Hwang, "Modelling of Hydrogen Assisted Cracking of Ni-Base Alloy X-750 in Water", International Symposium on Environmental Degradation of Materials in Nuclear Power Systems-Water Reactors, Monterey, CA, 8/25-8/31/91.

P. Lidar, R Ballinger, I Hwang, " The Use of Potential Drop Techniques for the Evaluation of Environmentally Assisted Cracking of Austenitic Alloys", International Symposium on Environmental Degradation of Materials in Nuclear Power Systems-Water Reactors, Monterey, CA, 8/25-8/31/91.

T. Shoji, K. Yamaki, R. Ballinger, I. Hwang, "Grain Boundary Segregation and Intergranular Stress Corrosion Cracking Susceptibility of Austenitic Stainless Steels in High Temperature Water", International Symposium on Environmental Degradation of Materials in Nuclear Power Systems-Water Reactors, Monterey, CA, 8/25-8/31/91.

J. Murphy, R. Ballinger, H. Becker, D. Gwinn, S. Methew, " Turbogenerator Flywheel For Alcator C-Mod", 14th Symposium on Fusion Engineering, San Diego, CA, 10/1-10/3/91.

I. Hwang, R. Ballinger, M. Morra, M. Steeves, " Mechanical Properties of Incoloy 908-An Update", ICMC/CEC 91, Huntsville AL, 4/1/-4/5/91.

I. S. Hwang, R.G. Ballinger, M.M. Morra, B. Tao, and S. Mathew, " Improved Mechanical Properties of Alloy 718 by Anneal and Direct Aging Process for Nuclear Fusion Applications", International Symposium on the Metallurgy and Applications of Superalloys 718, 625 and Various Derivatives, ASM/NACE, June 23-26, 1991. Pisstburgh, PA, pp 621-634.

25

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

M. Psaila-Dombrowski, A. Turnbull, and R.G. Ballinger, " Modelling the Electrochemistry in Cracks and Crevices in Boiling Water Reactor Environments", Conference on Life Prediction of Corrodible Structures, Cambridge. U.K., September 23-26, 1991.

R.L. Tobler. R.P. Reed, I.S. Hwang, M.M. Morra, R.G. Ballinger, H. Nakajima, S. Shimamoto, "Charpy Impact Tests Near Absolute Zero", Journal of Testing & Evaluation, Vol. 19, No. 1(1991), pp 34-40.

I.S. Hwang and R.G. Ballinger. "A Multi-frequency A.C. Potential Drop Technique for the Detection of Small Cracks", J. Meas. Science and Technology, 3 (1992), pp 62-74.

I.S. Hwang, M.M. Morra, R.G. Ballinger. H. Nakajima, S.Shimamoto, and R.L. Tobler, "Charpy Absorbed Energy and $J_{IC}$ As Measures of Cryogenic Fracture Toughness", Journal of Testing and Evaluation, JTEVA, Vol. 20, No. 4, July 1992, pp. 248-258.

A. Turnbull, R. Ballinger, I. Hwang, M. Morra, M. Psaila-Dombrowski. " Hydrogen Treanport in Nickel Base Alloys". Metallurgical Transactions, Vol. 23A, Dec. 1992., pp 3231-3244.

M. Morra, R. Ballinger, I Hwang, "Incoloy 908, A New Low Coefficient of Expansion Alloy For High Strength Cryogenic Applications-Physical Metallurgy". Metallurgical Transactions, Vol. 23A. Dec. 1992, pp 3177-3192.

Y. Watanabe, R. Ballinger, O. K. Harling, G.E. Kohse, "Effects of Neutron Irradiation on Transpassive Corrosion Behavior of Austenitic Stainless Steels", *Corrosion* 51 (9), (1995): 651-659

C. H. Jang, I. S. Hwang, R. G. Ballinger, M. M. Steeves, " Development of High Toughness Weld for Incoloy 908", Adv. in Cryogenic Eng., Vol. 340B, 1323-1330.

M. M. Morra, S. Nicol, L. Toma, I. S. Hwang, M. M. Steeves. R. G. Ballinger, " Stress Accelerated Grain Boundary Oxidation of Incoloy Alloy 908 in High Temperature Oxygenous Atmospheres", Adv. in Cryogenic Eng., Vol. 340B, 1291-1298.

R. G. Ballinger, A. B. Johnson, Jr., K. A. Simpson, "Kinetic and Thermodynamic Bases to resolve Issues Regarding Conditioning of Uranium Metal Fuels", DOE Spent Nuclear Fuel Chalangcs & Initiatives, Salt Lake City, UT, 12/13-12/16/94.

T. Shoji, S. Suzuki, R. Ballinger, "Theoretical Prediction of SCC Growth Behavior-Threshold and Plateau Growth Rate". Seventh International Symposium on Environmental Degradation of Materials in Nuclear Power Systems-Water Reactors, Breckenridge. CO, 8/7-8/10/95, 881-892.

C. H. Jang, D. C. Grundy, R. G. Ballinger. M. M. Steeves, " Characterization of Simulated Production Welds in Alloy 908", Adv. in Cryogenic Eng., In Press.

M. M. Morra, M. M. Steeves, R. G. Ballinger, "The Effects of Oxygen Concentration, Stress, Temperature and Cold Work on the Constant-Load Stress-Rupture Behavior of Incoloy Alloy 908", Adv. in Cryogenic Eng.. In Press.

B 050

## Altran Solutions
## Expert Witness Disclosures 11-0542-00-LR-001

B. W. Brisson, R. G. Ballinger, A. R. McIlree, "IGSCC Crack Initiation and Growth in Mill Annealed Alloy 600 Tubing in High Temperature Caustic", *Corrosion*, 54 (7), 1998, pp 504-514.

.B. W. Brisson, R. G. Ballinger, A. R. McIlree, "IGSCC Crack Initiation in Mill Annealed Alloy 600 Tubing in High Temperature Caustic", Eighth International Symposium on Environmental Degradation of Materials in Nuclear Power Systems-Water Reactors, Amelia Island, FL, 8/10-8/14/97.

A. Chatelain, B. Anderson, R. G. Ballinger, G. Wikmark, "Enhanced Corrosion of Zirconium-Base Alloys in Proximity to Other Metals: The Shadow Effect", International Topical Meeting on Light Water Reactor Fuel Performance, Park City, UT, 4/10-4/13/2000.

Y. Long, Y. Yuan, R. G. Ballinger, E.E. Pilat, and M. S. Kazimi,, "A Fission Gas Release Model for High Burnup PWR Thoria Fuel," Nuclear Technology,June, 2002

J. Lim, R. Ballinger, "Development of a Facility for Liquid Metal-Structural Material Interaction", ANS Winter Meeting, Washington, DC, November 10-12, 2000.

J. Wang. and R. G. Ballinger, "An Integrated Fuel Performance Model for the Modular Pebble Bed Reactor", ANS Winter Meeting, Reno, NV, November 2001.

J. Wang. and R. G. Ballinger, "A Fracture Mechanics Based Failure Model for TRISO Fuel Particles", ANS Winter Meeting, Reno, NV, November 2001.

J. Lim, P. W. Stahle, R. G. Ballinger, "A Test System for Experimental Studies of Liquid Metal Structural Material Interaction", ANS Winter Meeting, Reno, NV, November 2001.

C. Y. Wang, R. G. Ballinger, P. W. Stahle, E. Demetri, and M. Koronowski, "Turbo Machinery for an Indirect, Closed, Intercooled, Helium Cycle Pebble Bed Reactor System", ANS Winter Meeting, Reno, NV. November 2001.

A. Kadak, et. Al. "The MIT Pebble Bed Reactor", ANS Winter Meeting, Reno, NV, Nov. 12-15, 2001.

Y. Long, Y. Yuan, M. S. Kazimi, and R. G. Ballinger, "A Fission Gas Release Model for High Burnup Thoria Fuel," Trans. ANS, Reno, NV, Nov. 2001.

M. Takayasu, R. G. Ballinger, R. B. Goldfarb, A. A. Squitieri, P. J. Lee, and D. C. Larbalestier "Multifilamentary $Nb_3Sn$ Wires Reacted in Hydrogen Gas Environment", , Presented at CEC-ICMC 2001, 1-09A-04, submitted to Advances in Cryogenic Engineering

C. Y. Wang, R. G. Ballinger, P. W. Stahle, E. Demetri, and M. Koronowski, "Design of a Power Conversion System for an Indirect Cycle, Helium Cooled, Pebble Bed Reactor System, HTR-2002, Petten, Netherlands, April 22-24, 2002, pp 164-174.

27

B 051

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

Y. Long, R. G. Ballinger, J. E. Meyer and M. S. Kazimi, "RIA Investigation for High Burnup ThO2-UO2 Fuel," ANS Annual Meeting, Hollywood, FL, June 2002

Y. Long, Y. Yuan, R. G. Ballinger, E.E. Pilat, and M. S. Kazimi,, "A Fission Gas Release Model for High Burnup PWR Thoria Fuel," Nuclear Technology, Vol. 138, No. 3, June, 2002

B. Andersson, M. Limback, G. Wikmark, E. Hauso, T. Johnsen, R. G. Ballinger, and A. C. Nystrand, " Test Reactor Studies of the Shadow Corrosion Phenomena", Zirconium in the Nuclear Industry: Thirteenth International Symposium, ASTM STP 1423, G. D. Moan and P. Rudling, Eds., ASTM International, West Conshohocken, PA 2002, pp. 583-615. **NOTE: This paper was the awarded the John Schemel best paper award.**

J. Lim, R. G. Ballinger, and P. W. Stahle, "Experimental Study of the Corrosion of Fe-Si Alloys in Liquid Pb," ANS Annual Winter Meeting, Washington, DC, November 2002

H. J. Maclean, and R. G. Ballinger, "Silver Migration and Release in Thin Silicon Carbide," ANS Annual Winter Meeting, Washington, DC, November 2002.

C. Wang, R. G. Ballinger, H. C. No, "Dynamic Modeling of Modular Pebble Bed Reactor System," ANS Annual Winter Meeting, Washington, DC, November 2002.

J. Lim, R. G. Ballinger, E. Loewen, "The Effect of Silicon on the Corrosion of Iron in Lead-Bismuth Eutectic". Invited paper for Eleventh International Conference on Nuclear Engineering", ICONE-11. Tokyo. Japan, April 20-23, 2003.

J. Wang, R. G. Ballinger. "The Effect of Design and Uncertainty on Coated Particle Fuel Reliability", ANS Annual Summer Meeting, San Diego, CA June 1-5, 2003

J. Lim, R. G. Ballinger, P. W. Stahle, "Experimental Studies on the Corrosion of Fe-Si, Fe-Cr, and Fe0Cr-Si Alloys in Pb-Bi Eutectic". ANS Annual Summer Meeting, San Diego. CA June 1-5, 2003.

J. Lim. R. G. Ballinger, P. W. Stahle, "Fe-Cr-Si Alloy Development for Pb-Bi Eutectic Service", Global 2003, New Orleans, LA, November 16-20, 2003.

H. J. Maclean, and R. G. Ballinger, "Silver Migration in SiC: A New Perspective", Global 2003. New Orleans, LA, November 16-20, 2003.

J. Wang, R. G. Ballinger, "An Improved Coated Particle Fuel Failure Model", Global 2003, New Orleans, LA, November 16-20, 2003.

Wang, J., MacLean, H., Ballinger, R. G., "An Integrated Fuel Performance Model for the Modular Pebble Bed Reactor". Nuclear Technology, Vol. 147, No 4, October 2004

28

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

Ballinger, R. G, and Lim, J. "An Overview of Corrosion Issues for the Design and Operation of lead and Lead-Bismuth Cooled Reactor Systems", Nuclear Technology, Vol. 147, No. 3. September, 2004, pp. 418-435.

Loewen, E. P., Ballinger, R. G., and Lim, J. "Corrosion Studies in Support of a Medium Power Lead Cooled Reactor", Nuclear Technology, Vol. 147, No. 3, September 2004, pp. 436-457.

J. Wang, R. G. Ballinger. J. T. Diecker. "Design Optimization and Analysis of Coated Particle Fuel Using Advanced Fuel Performance Modeling Techniques", Second Topical Meeting on High Temperature Reactors 2004 (HTR-2004). Beijing, China, September 22-24, 2004.

J. Wang, R. G. Ballinger, "Fracture Mechanics Based Coated Particle Fuel Failure Models", Second Topical Meeting on High Temperature Reactors 2004 (HTR-2004), Beijing. China, September 22-24, 2004.

J. Wang, R. G. Ballinger. H. J. MacLean, J. T. Diecker, "TIMCOAT: An Integrated Fuel Performance Model for Coated Particle Duel", Second Topical Meeting on High Temperature Reactors 2004 (HTR-2004), Beijing, China, September 22-24, 2004.

H. J. MacLean. R. G. Ballinger, "Silver Ion ImPlantation and Annealing in CVD Silicon Carbide: The Effect of Temperature on Silver Migration", Second Topical Meeting on High Temperature Reactors 2004 (HTR-2004), Beijing, China, September 22-24, 2004.

C. Wang, R. G. Ballinger, P. W. Stahle, E. Dimetri, M. Koronowski, „Power Conversion System Design for an Indirect Cycle, Helium Cooled Pebble Bed Reactor System", ANS Annual Winter Meeting, Washington. DC November 15-18, 2004.

MacLean, H. J.. Ballinger, R. G., Kolaya, L. E., Simonson, S. A., Lewsi, N., and Hanson, M. E., "The Effect of Annealing at 1500°C on Migration and Release of Ion ImPlanted Silver in CVD Silicon Carbide", Journal of Nuclear Materials, In Press.

Books

R. G. Ballinger, The Anisotropic Mechanical Behavior of Zircaloy-2. Garland Publishing Co., Inc., New York, 1979.

## 8.0  PRIOR TESTIMONY

During the last 4 years Professor Ballinger's expert witness involvement has been limited to involvement in arbitrations only. No depositions have been taken and no recorded testimony at hearings has occurred.

## 9.0  COMPENSATION

The hourly rate for this work was $208.00.

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment 1
Page 1 of 8

## ATTACHMENT 1 – Report Figures

A-1

B 054

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment 1
Page 2 of 8



**Figure 1.  Plot of opacity, CDS inlet temperature, CDS outlet temperature and CDS valve position vs. time for Unit #2 (January 2003 to 2004).  Only full power points are plotted.**

Λ-2

B 055

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment 1
Page 3 of 8



**Figure 2.  Plot of Unit 2 CDS valve position and CDS inlet temperature as a function of time for the year 2003. Only full power points plotted.**

B 056

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment 1
Page 4 of 8



**Figure 3. Plot of CDS spray valve position vs. CDS inlet temperature for Unit #2. Only full power data plotted.**

A-4

B 057

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment I
Page 5 of 8



**Figure 4.  Photographs showing poor nozzle installation and clogging.**

A-5

B 058

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment 1
Page 6 of 8



**Figure 5. CDS spray water chloride concentration and opacity as a function of time for the period October 15, 2003 to January 29, 2004.**

Λ-6

B 059

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment 1
Page 7 of 8



**Figure 6. Opacity vs. chloride concentration for Unit #1 over the period October 15, 2003 to January 29, 2004.**

B 060

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001
Attachment 1
Page 8 of 8



**Figure 7. Expanded plot of Unit 2 CDS valve position and CDS inlet temperature as a function of time for the period July-November 2003. Only full power points plotted.**

A-8

B 061

| From: | Csaba Little |
|---|---|
| Sent: | Tuesday, February 3, 2004 11:56 AM |
| To: | Anibal Davila; Manuel Gonzalez; Hector Colon; Hector Lebron; Edmundo Rodriguez; Maria del Carmen Aponte; Ubaldo Rivera; Carlos Gonzalez; Angel Vazquez; Ricardo Rivera; Rubenio Valentin; Rafael Sandel |
| Cc: | Puerto Rico Lead Operator |
| Subject: | CDS nozzles |

Guys!

Today I have noticed a non proper practice that we have been doing.

I observed on unit 2 we have air ingress via all the 5 CDS water nozzle ports. The reason is behind, on the connecting flanges *we do not put back all the 3 nuts, just put back one nut and even that one nut is not tightened!* On some cases we do not even have the rubber gasket between the metal flange faces! I felt air ingress in all the 5 ports! The port- at which the nozzle was not in- was also taking air due to the not proper blind ? just a rubber gasket and an aluminum stripe will not seal the hole!

This air ingress may contribute to the Corrosion problem with ESP, on the long run could cause corrosion problem in the CDS and does not help with the Opacity.

-It is important to use rubber gasket between the flanges and after each installation of the guns, tight all the 3 nuts on the bolts. After this, make sure by touching, there is not air sucking to the CDS.
-The port which is not being used, should be sealed with rubber gasket and standard steel blind flange. I will ask the maintenance to produce/procure the necessary blinds!

I hope you understand this small thing can cause big trouble and we have to do as per best practice!!

Gracias

Csaba

AESPR-1/1831





B 064



04.01.2006

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement is made and entered into and dated as of October 31, 2003, among and between AES Puerto Rico, L.P. ("AES") and Duke/Fluor Daniel Caribbean S.E., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., Caribbean Architects & Engineers, Fluor Corporation and Duke Capital Corporation (collectively the "D/FD Parties"). (AES and the D/FD Parties are referred to collectively as the "Parties.")

WHEREAS, on or about April 3, 1996, AES and Duke/Fluor Daniel Caribbean S.E., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers entered into an Agreement for Engineering, Procurement and Construction Services, and on several occasions subsequently amended it in writing (referred to as amended as the "EPC Contract") for a power plant and associated facilities to be constructed near Guayama, Puerto Rico (as more fully described in the EPC Contract, the "Project");

WHEREAS, on or about April 3, 1996, Fluor Corporation and Duke Capital Corporation each executed guarantees that, among other things, guarantee performance of specified obligations under the EPC Contract ( the "Guarantees"),

WHEREAS, on or about June 9, 2003, AES filed a Complaint, which was subsequently amended, against all of the D/FD Parties in the United States District Court for the District of Delaware styled *AES Puerto Rico, L.P. v. Duke/Fluor Daniel Caribbean S.P., et al.* alleging, among other things, breach of the EPC Contract and the Guarantees (as amended, the "Complaint");

WHEREAS, on or about August 22, 2003, the D/FD Parties filed a Counterclaim against AES in the United States District Court for the District of Delaware entitled *Defendants'*

AESPR 136927                    T./Contracts/AES Settlement Agreement 1041USci doc

*Answer to Plaintiff's Amended Complaint and Counterclaim* alleging, among other things, affirmative defenses, breaches and claims for relief with respect to the EPC Contract and the Guarantees (the "Counterclaim");

WHEREAS, the D/FD Parties deny the allegations in the Complaint and AES denies the allegations in the Counterclaim; and

WHEREAS, the Parties wish to enter into a full and final settlement of any and all claims that they have or may have against each other now or hereafter arising out of or relating to the Project, the EPC Contract, the Guarantees, the Complaint and the Counterclaim, except for any and all claims that the Parties may now or hereafter have with respect to the Retained Rights (as defined in Section 3.2 hereof).

NOW, THEREFORE, AES (on the one hand) and the D/FD Parties (on the other hand), in consideration of the mutual promises set forth below, the sufficiency of which is hereby acknowledged and accepted, agree as follows:

## 1.    REPRESENTATIONS AND WARRANTIES

Each of the Parties represents and warrants, with respect to itself in the case of AES and with respect to the D/FD Parties in the case of each of the D/FD Parties, as follows:

1.1.    The Parties, and each of them, have the full power and authority to enter into and perform this Release and Settlement Agreement. The signatories are authorized to execute this Release and Settlement Agreement on behalf of themselves and their respective partnerships or corporations.

1.2.    The Parties, and each of them, have received no notice and have no knowledge of any judgment, restraining order, consent decree or judicial or administrative prohibition binding upon them, which would be violated by their entry into this Release and

2

AESPR 136928

B 067

Settlement Agreement or by their consummation of the transactions contemplated by this Release and Settlement Agreement.

1.3.    No authorization, approval, or consent of any governmental authority is required by AES and/or the D/FD Parties in connection with the execution and performance by them of this Release and Settlement Agreement.

1.4    The Parties have not assigned or otherwise transferred any rights under or in connection with the EPC Contract including without limitation any rights to any claims against any of the Parties, except for AES's assignment of its rights and interests under the EPC Contract and the Guarantees as acknowledged and consented to by the D/FD Parties in the Acknowledgment and Consent Agreements, each dated as of May 15. 2000, among Banco Santander Puerto Rico, as Collateral Agent, Credit Lyonnais New York Branch, as Administrative Agent, Bankers Trust Company, as Bond Trustee, AES and, with respect to the assignment of the EPC Contract, each of the D/FD Parties that are signatory to the EPC Contract, and, with respect to the assignment of each of the Guarantees, the D/FD Party that is signatory to the applicable Guarantee being assigned (collectively, the "Consent Agreements").

1.5    The Parties hereby acknowledge and agree that the effectiveness of this entire Release and Settlement Agreement (including, without limitation, any releases contained in this Release and Settlement Agreement and any obligations contained in this Release and Settlement Agreement) is subject to the express condition precedent that the Collateral Agent (as defined in the Consent Agreements) shall have consented in writing, without condition, to this Release and Settlement Agreement (the "AES Lender Consent"), which AES Lender Consent AES agrees to use its reasonable efforts to obtain in a timely manner, and AES shall have

AESPR 136929

3

B 068

notified the D/FD Parties in writing of its receipt of such consent and provided a copy thereof to the D/FD Parties within fourteen (14) days of the date of this Settlement and Release Agreement.

## 2.   TERMS AND CONDITIONS

2.1.    The D/FD Parties agree, subject to the occurrence of the AES Lender Consent and a copy thereof having been provided to the D/FD Parties within fourteen (14) days of the date of this Settlement and Release Agreement, to pay AES Forty Three Million, Seven Hundred Fifty Thousand Dollars ($43,750,000) (the "Settlement Amount") as follows:

a)    The D/FD Parties, and each of them, fully release any claim to the retainage AES currently holds pursuant to Section 4.2.4 of the EPC Contract, which amount totals Thirty-One Million, Eight Hundred Twenty Three Thousand, Nine Hundred Twenty Dollars ($31,823,920), and to any and all other payments that may now or hereafter be due to any of the D/FD Parties under the EPC Contract, and agree that AES shall have no obligation, either now or in the future, to pay that sum, or any portion of that sum, or any other amount arising out of or in connection with the EPC Contract, the Guarantees or the Counterclaim, to the D/FD Parties or any of them or any Subcontractor (as defined in the EPC Contract) or any other Person claiming by, through or under any of the D/FD Parties or in connection with the Services and other work to be performed by the D/FD Parties under the EPC Contract or Guarantees; provided, however, that this Section 2.1(a) (including, without limitation, the release given by the D/FD Parties herein) is conditioned upon (i) the occurrence of the AES Lender Consent and a copy thereof having been provided to the D/FD Parties within fourteen (14) days of the date of this Settlement and Release Agreement, and (ii) the filing by AES of a dismissal with prejudice of the Complaint in full accordance with Section 2.2 of this Release and Settlement Agreement; and

AESPR 136930

4

b)    Within three (3) business days of the D/FD Parties' receipt of the

AES Lender Consent (but not less than ten (10) days from the date of this Release and

Settlement Agreement), and provided that the AES Lender Consent was received by the D/FD

Parties within fourteen (14) days of the date of this Release and Settlement Agreement, the D/FD

Parties shall (i) sign and deliver to AES's counsel, Williams & Connolly LLP, a motion to

dismiss and proposed order dismissing with prejudice the Counterclaim against AES in the

action pending before the United States District Court for the District of Delaware, which

motion and proposed order of dismissal shall be in the form attached hereto as Exhibit "A", and

(ii) deliver to AES's counsel, Williams & Connolly LLP, the Contractor's Final Lien Waiver and

the Subcontractor's Final Lien Waivers required by Section 2.6 of this Release and Settlement

Agreement, and (iii) pay AES the sum of Eleven Million, Nine Hundred Twenty-Six Thousand,

Eighty Dollars ($11,926,080), which payment is to be made by way of a wire transfer of

immediately available funds for deposit into a trust account maintained by AES's counsel,

Williams & Connolly LLP, and the wiring information for such account is as follows (as may be

modified in writing by AES):

> Bank Name:  Bank of America
>
> Account Name: Williams & Connolly LLP
>
> ABA No:  054001204
>
> Account No:  002086538402

Said funds, motion to dismiss and lien waivers are to be held in trust by Williams & Connolly

LLP, with (x) the motion to dismiss to be filed with the Court and the lien waivers to be released

to AES by Williams & Connolly LLP only if AES files the motion for dismissal with prejudice

of the Complaint in full accordance with Section 2.2 of this Release and Settlement Agreement,

5

AESPR 136931

B 070

and if such motion to dismiss with prejudice the Complaint is not so filed by AES within the

seven (7) day period specified in Section 2.2 of this Release and Settlement Agreement, the

motion to dismiss signed by the D/FD Parties, the lien waivers and the funds which were

delivered to Williams and Connolly LLP shall be returned to the D/FD Parties and shall be of no

force or effect; and (y) the funds to be released to AES by Williams & Connolly LLP only upon

the issuance by the Court of an order dismissing the Complaint with prejudice. For the

avoidance of doubt, the Parties hereby agree that, upon (1) the occurrence of the AES Lender

Consent and a copy thereof having been provided to the D/FD Parties within fourteen (14) days

of the date of this Release and Settlement Agreement, and (2) the delivery by the D/FD Parties of

the motion to dismiss, lien waivers and funds required by Section 2.1 hereof, the releases set

forth in this Release and Settlement Agreement (including without limitation the mutual releases

set forth in Section 3.1 hereof) shall be valid, final, irrevocable and unconditional and shall not

be affected in any way by any failure of the Court to issue any order requested by the motions

contemplated hereunder.

2.2.    Within seven (7) days after the date that AES's counsel, Williams &

Connolly LLP, receives the motion to dismiss signed by the D/FD Parties, the lien waivers and

the check required by Section 2.1 of this Release and Settlement Agreement, AES shall file a

motion to dismiss in the United States District Court for the District of Delaware requesting an

order dismissing with prejudice the Complaint in full, which motion and proposed order of

dismissal shall be in the form attached hereto as Exhibit "B". The Parties shall cooperate to

secure the orders of dismissal of the Complaint and Counterclaim consistent with the terms of

this Release and Settlement Agreement in as expeditious a timeframe as possible. Without

limitation of the foregoing, the Parties will, if necessary, cooperate in the filing of a motion or

6

motions for summary judgment seeking the dismissal of the Complaint and Counterclaim on the basis of the mutual releases contained in the Release and Settlement Agreement.

      2.3    The Parties agree that the Settlement Amount was determined on the basis of the following:

      a.    Six Million, Fifty Thousand Dollars ($6,050,000) owed to AES for failure to meet the "Heat Rate Guarantees" contained in Section 8.1.2 of the EPC Contract.

      b.    Thirty-Five Million, Three Hundred Thousand Dollars ($35,300,000) owed to AES for "Late Completion Payments" for failure to achieve "Performance Acceptance" on or before the "Guaranteed Completion Date" pursuant to Article 7 of the EPC Contract, which Guaranteed Completion Date the Parties agree is hereby extended for thirty (30) days of excusable delay under the EPC Contract (including, without limitation, the delay associated with Hurricane Debby, Tropical Storm Dean, fume release from Phillips plant, delay in first fire on oil, delay in first fire on coal, electrical disturbance, ammonia test and electrical trip).

      c.    Four Million Dollars ($4,000,000) owed to AES for incomplete and defective work (including Punch List items), including Three Million Dollars ($3,000,000) for incomplete or defective work on the boilers related to the size of coal particles from the coal crusher which are usable by the boilers (but which does not include the Unit #2 boiler refractory repairs, for which warranty obligations continue as part of the Retained Rights under Section 3.2 hereof).

      d.    Four Million, One Hundred Thousand Dollars ($4,100,000) owed to the D/FD Parties for outstanding change order claims.

      e.    Two Million, Five Hundred Thousand Dollars ($2,500,000) owed to AES for repair work performed prior to the date hereof as a result of the turbine blade failure

T:/Contracts/AES Settlement Agreement 103103r1.doc

AESPR 136933

B 072

experienced by the Project's Unit #1 on or about May 14, 2003 due to steam turbine defects, and for repairs necessary to correct the vibration problem in the Unit #2 steam turbine.

.          The Parties hereby acknowledge and agree that the Settlement Amount agreed-upon and determined as set forth in this Article 2 is final and irrevocable and not subject to challenge or adjustment for any reason whatsoever, and is a fair and reasonable representation of their final settlement of all of their respective rights and claims being released and resolved hereunder, and further hereby acknowledge and agree that the Settlement Amount shall not be subject to change regardless of any value actually received by or any costs or damages actually sustained by any of the Parties in connection with or as a result of the Project, the EPC Contract or the Guarantees.

2.4      The Parties agree that, subject to (a) the occurrence of the AES Lender Consent and a copy thereof having been provided to the D/FD Parties within fourteen (14) days of the date of this Settlement and Release Agreement and (b) the delivery by the D/FD Parties of the motion to dismiss, lien waivers and funds required by Section 2.1 hereof, "Performance Acceptance" (as defined in the EPC Contract), the "Minimum Performance Criteria" (as defined in the EPC Contract) and "Project Completion" (as defined in the EPC Contract) have been achieved.  The Parties also agree that AES took possession and control of the Facility (as defined in the EPC Contract) effective as of November 28, 2002, whereupon risk of loss and responsibility for the operation and maintenance of the Facility transferred to AES.

2.5      Subject to (a) the occurrence of the AES Lender Consent and a copy thereof having been provided to the D/FD Parties within fourteen (14) days of the date of this Settlement and Release Agreement, and (b) AES filing a motion to dismiss with prejudice the Complaint in full accordance with Section 2.2, the D/FD Parties agree to fully indemnify the

8

AESPR 136934

B 073

Indemnified Parties (as defined in the EPC Contract) from and against any Damages (as defined in the EPC Contract) resulting from any liens, claims, security interests or other encumbrances against any of the Indemnified Parties or the Facility (as defined in the EPC Contract) that are filed now or in the future against any of the Indemnified Parties or the Facility by any Subcontractor (as defined in the EPC Contract) (or by any Person (as defined in the EPC Contract) asserting such Subcontractors' claims) on account of non-payment of any amount alleged to be payable by any of the D/FD Parties or any Subcontractor in connection with the Services (as defined in the EPC Contract) or other work to be performed by the D/FD Parties under the EPC Contract or the Guarantees, including without limitation any such Damages resulting from the claims filed by Brand Scaffold Builders, Inc., against certain of the Indemnified Parties in the United States District Court for the District of Puerto Rico, Case No. 03 1507(JAF). For the avoidance of doubt, Subcontractors (as defined in the EPC Contract) includes Subcontractors of all tiers (including Subcontractors of Subcontractors).

2.6     In accordance with and subject to Section 2.1(b) thereof, the D/FD Parties are required to deliver to AES's counsel, Williams & Connolly LLP, (a) the Contractor's Final Lien Waiver required under Section 2.1.22.1 of the EPC Contract in the form set forth in Appendix I-1 to the EPC Contract, with no exceptions listed for any claims other than Permitted Liens (as defined in the EPC Contract) that satisfy the requirements of clause (i) of the proviso to Section 2.1.22.1 of the EPC Contract; and (b) Subcontractor's Final Lien Waivers in substantially the form of Appendix I-3 to the EPC Contract (or such other form as may be reasonably acceptable to AES) from each of the Subcontractors with a subcontract or purchase order in excess of $100,000 as required by Section 4.6.2 of the EPC Contract to the extent that the D/FD Parties have not already done so; provided, however, that if the D/FD Parties do not

9

deliver such final lien waivers from any such Subcontractors, AES hereby agrees that, in lieu of requiring that final lien waivers be furnished from such Subcontractors, it shall accept the indemnity contained in Section 2.5 hereof as being "other collateral" satisfactory to it for purposes of complying with the requirements of Section 2.1.22.3 of the EPC Contract and this Section 2.6.

        2.7.    The Parties agree to the mutual release set forth in Section 3.1 of this Release and Settlement Agreement.

### 3.    MUTUAL RELEASE

        3.1.    Subject to and upon (a) the occurrence of the AES Lender Consent with a copy thereof having been given to the D/FD Parties within fourteen (14) days of the date of this Release and Settlement Agreement, (b) the delivery by the D/FD Parties of the payment, motion to dismiss and lien waivers required by Section 2.1 (b) hereof, and (c) with respect only to the release of Claims (as defined below) given by the D/FD Parties as described below in this Section 3.1, AES's filing of a motion to dismiss with prejudice the Complaint in full accordance with Section 2.2 hereof, and except solely with respect to the Retained Rights (as defined in Section 3.2 hereof) and the rights and obligations of the Parties provided elsewhere in this Release and Settlement Agreement: AES (on the one hand) and the D/FD Parties (on the other hand), and each of them, for themselves and for their partners, insurers, agents, employees, officers, directors, corporate parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, attorneys, predecessors, successors, and assigns of any of them (individually and collectively, the "Releasors"), for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, do hereby fully remise, release, acquit and forever discharge each other and their respective partners, insurers, agents, employees, officers, directors,

10

corporate parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, attorneys, predecessors, successors, and assigns of any of them (individually and collectively, the "Releasees"), of and from any and all claims, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, damages of any kind (including without limitation all special, incidental, indirect and consequential damages), and demands whatsoever in law or in equity arising out of or relating to the Project, the EPC Contract and the Guarantees (hereinafter "Claims"), including but not limited to the matters alleged in the Complaint and the Counterclaim, and including but not limited to all Claims for amounts due to any of the D/FD Parties under or in connection with the EPC Contract (which includes without limitation all withheld payments under the EPC Contract (including the retainage), all scope change order requests/notices and any performance-related bonuses), and including but not limited to any claim that Releasors were induced to agree to this Release and Settlement Agreement by any statements not reflected in this Release and Settlement Agreement and any claim by Releasors for alleged fraud or misrepresentations in connection with this Settlement and Release Agreement, and including but not limited to all Claims for amounts due to AES under or in connection with the EPC Contract (which includes without limitation any Claim for breach of warranties or guarantees, any Claim for liquidated damages, any claim for delay in the performance or completion of any of the Services (as defined the EPC Contract), any Claim for punch list items, and any Claim for any incomplete or defective Services (as defined in the EPC Contract)) whether such Claims be presently known or unknown, discoverable or undiscoverable, which the Releasors ever had, now have, or which they or their successors or assigns hereafter can, shall, or may have against the Releasees, now and in the future.

**AESPR 136937**

11

**B 076**

3.2.    Notwithstanding anything to the contrary in Section 3.1 of this Release and Settlement Agreement, (a) the following provisions of the EPC Contract shall remain in full force and effect to the benefit of all Parties: Section 3.3; Article 10; Article 11 (solely with respect to the repair to be made by the D/FD Parties to the boiler refractory on the Project's Unit #2 during an outage scheduled during November, 2003, as referenced in the October 17, 2003, and August 22, 2003 letters to AES from Duke/Fluor Daniel Caribbean S.E. (and provided that AES provides the D/FD Parties with access to the Facility allowing them to perform such repairs during an outage commencing in November, 2003), and any warranty claim by AES with respect to such repair, and such warranty will expire no later than six (6) months after the earlier of (i) the completion of the repairs, or (ii) November 30, 2003); and Articles 19, 20, 22, 23, 24, and 26 (except for Sections 26.1 and 26.14) in their entirety; and (b) the Guarantees shall remain in full force and effect with respect to any obligations of any of the D/FD Parties arising from the provisions enumerated in the preceding clause (a) of this Section 3.2 (any and all such continuing provisions and obligations are referred to herein collectively as the "Retained Rights").

3.3    Notwithstanding the foregoing, or anything else in this Release and Settlement Agreement or the EPC Contract to the contrary, the Parties acknowledge that various of the D/FD Parties have asserted claims against certain of their subcontractors and suppliers (including, without limitation, Alstom Power, Inc.), which claims (which include, but are not limited to, the claims made against Alstom Power, Inc. ("API") in the third party complaint filed in the Delaware lawsuit, which lawsuit is described in the third "Whereas" clause of this Agreement) are not released pursuant to this Release and Settlement Agreement, and that the D/FD Parties shall be entitled to prosecute such claims against such subcontractors and suppliers and shall be entitled to all settlements and other recoveries therefrom, and AES hereby agrees to

12

AESPR 136938

B 077

provide reasonable cooperation to the D/FD Parties in connection with the D/FD Parties' informational requirements for the prosecution of such claims (including, without limitation, access to the Project and to non-confidential books, records and personnel of AES).

## 4.    LIMITED ASSIGNMENT OF SUBCONTRACTOR WARRANTIES

4.1    Subject to and upon (a) the occurrence of the AES Lender Consent with a copy thereof having been given to the D/FD Parties within fourteen (14) days of the date of this Release and Settlement Agreement, (b) the delivery by the D/FD Parties of the payment, motion to dismiss and lien waivers required by Section 2.1 (b) hereof, and (c) AES's filing of a motion to dismiss with prejudice the Complaint in full accordance with Section 2.2 hereof, Duke/Fluor Daniel Caribbean S.E. ("D/FD Caribbean") hereby assigns to AES the warranties contained in Articles 1.2, 1.3, 1.4, 1.5, and 1.6 of Part III, General Conditions of the Contract, dated February 24, 1998, between D/FD Caribbean and Combustion Engineering, Inc. for supply and erection of boilers, among other things, for the Project; the warranties contained in Articles 1.2, 1.3, 1.4, and 1.5 of Part III, General Terms of the Purchase Order dated December 8, 1999, between D/FD Caribbean and ABB Power Generation, Inc. for supply and erection of steam turbines, among other things, to be installed in the Project; and any and all other subcontractor or supplier warranties provided to D/FD Caribbean by other subcontractors and suppliers for the Project, and each of the other D/FD Parties hereby assigns to AES any and all warranties provided to such D/FD Party by any subcontractor or supplier for the Project, (collectively the "Subcontractor Warranties"); **provided, however**, that the assignment by D/FD Caribbean and by the other D/FD Parties as set forth herein is limited solely to rights under the Subcontractor Warranties for (a) defects which first appear after the date of this Release and Settlement Agreement (other than any rights in connection with the D/FD Parties' continuing warranty obligations hereunder with

13

respect to the Unit #2 boiler refractory repairs included within the Retained Rights pursuant to Section 3.2 hereof), and (b) future costs of repairing currently existing defects in the precipitator and scrubber which have been identified in currently existing warranty claims    It is specifically understood and agreed that except with respect to the rights under the Subcontractor Warranties described in subclauses (a) and (b) immediately above, the D/FD Parties are not assigning any rights to AES, and it is specifically understood that the D/FD Parties reserve and retain all rights to make claims against all subcontractors and suppliers except with respect to the rights described in said subclauses (a) and (b).  Without limiting the foregoing, for the avoidance of doubt, and by way of illustration, the D/FD Parties retain and reserve all rights to make claims against and recover damages and all other costs and fees from Combustion Engineering, Inc., ABB Power Generation, Inc., API, and their predecessors, successors, parents, subsidiaries, affiliates, partners, assigns and related entities (collectively, "Alstom") for delay damages, liquidated damages, performance guarantee damages, impact damages, interference damages, acceleration damages, indemnification, and all costs and damages of any kind whatsoever incurred by the D/FD Parties as a result of any breach of warranty or other breach of contract, negligence or other wrongful conduct by Alstom.

4.2    AES agrees that the D/FD Parties make no representations, promises, warranties, or guarantees concerning the Subcontractor Warranties assigned by the D/FD Parties to AES pursuant to Article 4.1 above, including, but not limited to, any representations, warranties, or guarantees that the Subcontractor Warranties, or the assignment thereof, are valid, enforceable, or cover any particular defect, including, but not limited to, the specific defects referred to in Section 4.1 above.  It is understood that AES shall have no rights against, claims

14

AESPR 136940

B 079

against, or recourse against the D/FD Parties arising out of or relating in any manner to the Subcontractor Warranties, or the assignment of those warranties.

## 5.    MISCELLANEOUS PROVISIONS

5.1.    The Parties shall execute such further instruments and documents and shall perform such further acts as may be reasonably necessary or convenient to carry out and perform the terms and provisions of this Release and Settlement Agreement.

5.2.    This Release and Settlement Agreement constitutes the entire understanding among and between the Parties with respect to the subject matter hereof, supersedes any and all prior negotiations and agreements of the Parties with respect to the subject matter hereof, and shall not be modified except by an instrument in writing executed by the Parties.

5.3.    The Parties expressly agree and acknowledge that this Release and Settlement Agreement is in full accord and satisfaction of disputed claims; that the provisions of this Release and Settlement Agreement constitute a fair, reasonable and adequate settlement and determination of their rights and obligations; and that they have entered into this Release and Settlement Agreement freely and voluntarily after consultation with counsel. This Release and Settlement Agreement is not to be considered as an admission of liability by or against AES and/or the D/FD Parties in any proceeding, except with respect to the obligations and liabilities expressly set forth herein.

5.4.    This Release and Settlement Agreement is the product of negotiation and preparation by and among the Parties and their respective counsel. The Parties expressly acknowledge and agree that this Settlement Agreement shall not be deemed to be prepared or drafted by any particular party or its attorneys, and will be construed accordingly. Any rule of

15

AESPR 136941

B 080