construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Release and Settlement Agreement.

5.5.    This Release and Settlement Agreement shall be construed in accordance with and governed by the laws of the State of Delaware in effect as of the date of execution of this Release and Settlement Agreement.

5.6.    The Parties agree that they will be responsible for their own costs and attorneys' fees arising out of the Complaint and Counterclaim. If any Party to this Release and Settlement Agreement shall commence any action against any other Party because of a breach of this Release and Settlement Agreement, the prevailing Party(ies) shall be entitled to reasonable costs and attorneys' fees.

5.7.    This Release and Settlement Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Release and Settlement Agreement. Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Release and Settlement Agreement.

[SIGNATURES START ON NEXT PAGE]

16

FROM CHADBOURNE & PARKE

(MON) 11. 17' 03 11:49/ST. 11:41/NO. 4862440975 P 20

IN WITNESS WHEREOF, the Parties hereto have executed this Release and

Settlement Agreement.

AES Puerto Rico, L.P.

By: _____

Its _____

Date: ~~October~~ ~~, 2003~~
      November 10, 2003

Duke/Fluor Daniel Caribbean S.E., by
Duke/Fluor Daniel International, Its General
Partner,

By _____

Its _____

Date: October ___, 2003

Duke/Fluor Daniel International

By: _____

Its _____

Date: October ___, 2003

Duke/Fluor Daniel International
Services

By: _____

Its _____

Date: October ___, 2003

Fluor Daniel Caribbean, Inc.

By: _____

Its _____

Date: October ___, 2003

17

T:/Contracts/AES Settlement Agreement 103103sl.doc.

AESPR 136943

**B 082**

IN WITNESS WHEREOF, the Parties hereto have executed this Release and
Settlement Agreement.

AES Puerto Rico, L.P.

By: _____

Its _____

Date: October ___, 2003

Duke/Fluor Daniel Caribbean S.E., by
Duke/Fluor Daniel International, Its General
Partner,

By _____

Its _____ CFO _____

Date: October 31, 2003


Duke/Fluor Daniel International

By _____

Its _____ CFO _____

Date: October 31, 2003


Duke/Fluor Daniel International
Services

By _____

Its _____ CFO _____

Date: October 31, 2003


Fluor Daniel Caribbean, Inc.

By: _____

Its _____

Date: October ___, 2003

17

T:/Contracts/AES Settlement Agreement 103103cl.doc.

AESPR 136944

B 083

FROM CHADBOURNE & FARKE                    (MON) 11. 17' 03 11:49/ST. 11:41/NO. 4862440925 P 22

IN WITNESS WHEREOF, the Parties hereto have executed this Release and

Settlement Agreement.

AES Puerto Rico, L.P.                       Duke/Fluor Daniel Caribbean S.E., by
                                            Duke/Fluor Daniel International, Its General
                                            Partner,

By                                          By:

Its                                         Its

Date:  October ____, 2003                   Date:  October ____, 2003

                                            Duke/Fluor Daniel International

                                            By:

                                            Its

                                            Date:  October ____, 2003

                                            Duke/Fluor Daniel International
                                            Services

                                            By:

                                            Its

                                            Date:  October ____, 2003

                                            Fluor Daniel Caribbean, Inc.

                                            By:

                                            Its    UP

                                            Date:  October ____, 2003

17
                                            T:/Contracts/AES Settlement Agreement 103103cl.doc.

AESPR 136945

Caribbean Architects & Engineers

By.    _Baby Young_

Its    _PARTNER_

Date:   October ___, 2003

Fluor Corporation

By:    _____

Its    _____

Date:   October ___, 2003

Duke Capital Corporation

By:    _____

Its    _____

Date:   October ___, 2003

Williams & Connolly LLP has executed this Release and Settlement Agreement confirming its role of accepting funds and items from the D/FD Parties and holding them in trust as described in this Release & Settlement Agreement.

Williams & Connolly LLP

By:    _____

Its    _____

Date:   October ___, 2003

18

AESPR 136946

B 085

FROM CHADBOURNE & PARKE

(MON) 11. 17' 03 :1·50/ST. 11:41/NO. 4862440925 P 24

Caribbean Architects & Engineers

By: _____

Its _____

Date:  October ___, 2003


Fluor Corporation

By: _____

Its  _SENIOR VP_

Date:  October ___, 2003


Duke Capital Corporation

By _____

Its _____

Date:  October ___, 2003


Williams & Connolly LLP has executed this Release and Settlement Agreement confirming its role of accepting funds and items from the D/FD Parties and holding them in trust as described in this Release & Settlement Agreement.

Williams & Connolly LLP

By: _____

Its _____

Date:  October ___, 2003


18

T./Contracts/AES Settlement Agreement 103103c1.doc.

AESPR 136947

B 086

FROM CHADBOURNE & PARKE

(MON) 11. 17' 03 11:50/ST. 11:41/NO. 4862440925 P 25

Caribbean Architects & Engineers

By: _____

Its _____

Date:  October ___, 2003


Fluor Corporation

By: _____

Its _____

Date:  October ___, 2003


Duke Capital Corporation

By: _____ cmp

Its   Vice President & Treasurer
      November 17, 2003
Date: ~~October~~ ___, 2003


Williams & Connolly LLP has executed this Release and Settlement Agreement confirming its role of accepting funds and items from the D/FD Parties and holding them in trust as described in this Release & Settlement Agreement.

Williams & Connolly LLP

By: _____

Its _____

Date:  October ___, 2003


18

AESPR 136948

Caribbean Architects & Engineers

By: _____

Its _____

Date: November ____, 2003

Fluor Corporation

By: _____

Its _____

Date: November ____ , 2003

Duke Capital Corporation

By: _____

Its _____

Date: November ____, 2003

Williams & Connolly LLP has executed this Release and Settlement Agreement confirming its role of accepting funds and items from the D/FD Parties and holding them in trust as described in this Release & Settlement Agreement.

Williams & Connolly LLP

By: _____

Its _____

Date:   November 10, 2003

18

## EXHIBIT A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AES PUERTO RICO, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DUKE/FLUOR DANIEL CARIBBEAN | ) |
| S.P.; DUKE/FLUOR DANIEL | ) C.A. No. 03-544-JJF |
| INTERNATIONAL; DUKE/FLUOR | ) |
| DANIEL INTERNATIONAL SERVICES; | ) |
| FLUOR DANIEL CARIBBEAN, | ) |
| INCORPORATED; CARIBBEAN | ) |
| ARCHITECTS & ENGINEERS; FLUOR | ) |
| CORPORATION; and DUKE CAPITAL | ) |
| CORPORATION, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| | ) |
| DUKE/FLUOR DANIEL CARIBBEAN | ) |
| S.E.; DUKE/FLUOR DANIEL | ) |
| INTERNATIONAL; DUKE/FLUOR | ) |
| DANIEL INTERNATIONAL SERVICES, | ) |
| FLUOR DANIEL CARIBBEAN, | ) |
| INCORPORATED; CARIBBEAN | ) |
| ARCHITECTS & ENGINEERS; | ) |
| | ) |
| Third Party Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| ALSTOM POWER, INC. | ) |
| | ) |
| Third Party Defendant. | ) |
| | ) |
| | ) |

## MOTION FOR VOLUNTARY DISMISSAL OF COUNTERCLAIM

19

Defendants Duke/Fluor Daniel Caribbean S.P., Duke/Fluor Daniel International,
Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean
Architects & Engineers (collectively "D/FD") hereby move the Court to dismiss with prejudice
D/FD's Counterclaim in this action against Plaintiff AES Puerto Rico, L.P., pursuant to Rule
41(a)(2) of the Federal Rules of Civil Procedure on the ground that D/FD and AES Puerto Rico,
L.P. have settled their disputes pursuant to a settlement agreement between them. D/FD is not
dismissing its Third Party Complaint, or any portion thereof, against Alstom Power, Inc. and will
continue to pursue all of its claims in this action against Alstom Power, Inc.

Dated this _____ day of ___ . _____, 2003.

> Donald E. Reid (#1058)
> Jason A. Cincilla (#4232)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, Delaware 19899-1347
> Telephone: (302) 658-9200
> Facsimile: (302) 658-3989
> Attorneys for Defendants and Third Party
> Plaintiffs

OF COUNSEL:
Fred T. Lowrance
Michael S. Malloy
Parker, Poe, Adams & Bernstein L.L.P.
Three Wachovia Center, Suite 3000
401 S. Tryon Street
Charlotte, North Carolina 28202-1935
Telephone: (704) 372-9000
Facsimile: (704) 334-4706

20

AESPR 136951

B 090

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AES PUERTO RICO, L.P., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DUKE/FLUOR DANIEL CARIBBEAN | ) |
| S.P.; DUKE/FLUOR DANIEL | )    C.A. No. 03-544-JJF |
| INTERNATIONAL; DUKE/FLUOR | ) |
| DANIEL INTERNATIONAL SERVICES; | ) |
| FLUOR DANIEL CARIBBEAN, | ) |
| INCORPORATED; CARIBBEAN | ) |
| ARCHITECTS & ENGINEERS; FLUOR | ) |
| CORPORATION; and DUKE CAPITAL | ) |
| CORPORATION, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| _____ | ) |
| | ) |
| DUKE/FLUOR DANIEL CARIBBEAN | ) |
| S.E.; DUKE/FLUOR DANIEL | ) |
| INTERNATIONAL; DUKE/FLUOR | ) |
| DANIEL INTERNATIONAL SERVICES; | ) |
| FLUOR DANIEL CARIBBEAN, | ) |
| INCORPORATED; CARIBBEAN | ) |
| ARCHITECTS & ENGINEERS; | ) |
| | ) |
| Third Party Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| ALSTOM POWER, INC. | ) |
| | ) |
| Third Party Defendant. | ) |
| _____ | ) |

21

T:/Contacts/AES Settlement Agreement 103103cl.doc.

AESPR 136952

B 091

## ORDER OF DISMISSAL OF COUNTERCLAIM

This matter is before the Court on the motion of Defendants Duke/Fluor Daniel Caribbean S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., and Caribbean Architects & Engineers (collectively "D/FD") to dismiss with prejudice D/FD's Counterclaim in this action against Plaintiff AES Puerto Rico, L.P., pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure on the ground that D/FD and AES Puerto Rico, L.P. have settled their disputes pursuant to a settlement agreement between them.

Having considered the motion of D/FD, for the reasons set forth therein and other good cause shown, IT IS HEREBY ORDERED THAT the Counterclaim of D/FD against Plaintiff AES Puerto Rico, L.P. is hereby dismissed with prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure

Dated this _____ day of _____, 2003.

_____
Joseph J. Farnan, Jr.
United States District Court Judge

AESPR 136953

22

B 092

EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DUKE/FLUOR DANIEL CARIBBEAN | ) | |
| S.P.; DUKE/FLUOR DANIEL | ) | C.A. No. 03-544-JJF |
| INTERNATIONAL; DUKE/FLUOR | ) | |
| DANIEL INTERNATIONAL SERVICES; | ) | |
| FLUOR DANIEL CARIBBEAN, | ) | |
| INCORPORATED; CARIBBEAN | ) | |
| ARCHITECTS & ENGINEERS; FLUOR | ) | |
| CORPORATION; and DUKE CAPITAL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| _____ | ) | |
| DUKE/FLUOR DANIEL CARIBBEAN | ) | |
| S.E.; DUKE/FLUOR DANIEL | ) | |
| INTERNATIONAL; DUKE/FLUOR | ) | |
| DANIEL INTERNATIONAL SERVICES; | ) | |
| FLUOR DANIEL CARIBBEAN, | ) | |
| INCORPORATED; CARIBBEAN | ) | |
| ARCHITECTS & ENGINEERS; | ) | |
| | ) | |
| Third Party Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALSTOM POWER, INC. | ) | |
| | ) | |
| Third Party Defendant. | ) | |
| _____ | ) | |

## MOTION FOR VOLUNTARY DISMISSAL OF COMPLAINT

AESPR 136954

23

T:/Contracts/AES Settlement Agreement 103103cl.doc

B 093

Plaintiff AES Puerto Rico, L.P hereby moves the Court to dismiss with prejudice its

Complaint in this action against Defendants Duke/Fluor Daniel Caribbean S.P., Duke/Fluor

Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc.,

Caribbean Architects & Engineers, Fluor Corporation, and Duke Capital Corporation, pursuant

to Rule 41(a)(2) of the Federal Rules of Civil Procedure on the ground that Plaintiff and

Defendants have settled their disputes pursuant to a settlement agreement between them.

Dated this _____ day of _____, 2003.

> John S. Spadaro
> Bar No. 3155
> Murphy Spadaro & Landon
> 824 Market Street, Suite 700
> Wilmington, DE 19801
> Telephone: (302) 654-4600
> Facsimile: (302) 654-4775
>
> Dane H. Butswinkas
> R. Hackney Wiegmann
> Mary Beth Long
> Daniel D. Williams
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, DC 20005
> Telephone: (202) 434-5000
> Facsimile: (202) 434-5029
>
> Attorneys for AES Puerto Rico, L.P.

AESPR 136955

24

**B 094**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DUKE/FLUOR DANIEL CARIBBEAN S.P.; DUKE/FLUOR DANIEL INTERNATIONAL; DUKE/FLUOR DANIEL INTERNATIONAL SERVICES; FLUOR DANIEL CARIBBEAN, INCORPORATED; CARIBBEAN ARCHITECTS & ENGINEERS; FLUOR CORPORATION; and DUKE CAPITAL CORPORATION, | ) ) ) ) ) ) ) ) ) | C.A. No. 03-544-JJF |
| | ) | |
| Defendants, | ) | |
| | ) | |
| | ) | |
| DUKE/FLUOR DANIEL CARIBBEAN S.E.; DUKE/FLUOR DANIEL INTERNATIONAL; DUKE/FLUOR DANIEL INTERNATIONAL SERVICES; FLUOR DANIEL CARIBBEAN, INCORPORATED; CARIBBEAN ARCHITECTS & ENGINEERS; | ) ) ) ) ) ) | |
| | ) | |
| Third Party Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALSTOM POWER, INC. | ) | |
| | ) | |
| Third Party Defendant. | ) | |
| | ) | |

AESPR 136956

25

T:/Contracts/AES Settlement Agreement /03103cl doc.

## ORDER OF DISMISSAL OF COMPLAINT

This matter is before the Court on the motion of Plaintiff AES Puerto Rico, L.P. ("AES") to dismiss with prejudice its Complaint in this action against Defendants Duke/Fluor Daniel Caribbean S.P., Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., Caribbean Architects & Engineers, Fluor Corporation, and Duke Capital Corporation, pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure on the ground that Plaintiff and Defendants have settled their disputes pursuant to a settlement agreement between them.

Having considered the motion of AES, for the reasons set forth therein and other good cause shown, IT IS HEREBY ORDERED THAT the Complaint of AES against Defendants Duke/Fluor Daniel Caribbean S.P , Duke/Fluor Daniel International, Duke/Fluor Daniel International Services, Fluor Daniel Caribbean, Inc., Caribbean Architects & Engineers, Fluor Corporation, and Duke Capital Corporation is hereby dismissed with prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure

Dated this _____ day of _____ ., 2003.

_____  _____
Joseph J. Farnan, Jr.
United States District Court Judge

**AESPR 136957**

26

**B 096**

**AES Puerto Rico**

**Weekly Report**

From January 25, 2004 through January 31, 2004

1. **Operational Statistics**

Week of: 1/25/2004

| Capacity: | | Unit#1 | | | Unit#2 | | | Facility | |
|---|---|---|---|---|---|---|---|---|---|
| | week | month | year | week | month | year | week | month | year |
| Period Hours - hrs | 168 | 744 | 744 | 168 | 744 | 744 | 168 | 744 | 744 |
| Outage Hours - hrs | 0.0 | 313.7 | 313.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Equivalent Derated Hours - hrs | 0.0 | 13.9 | 13.9 | 0.0 | 0.0 | 0.0 | 0.0 | 163.9 | 163.9 |
| Equivalent Availability - % | 100.0% | 58.5% | 56.0% | 100.0% | 100.0% | 100.0% | 100.0% | 78.0% | 78.0% |
| **Energy Production:** | | | | | | | | | |
| Gross - MWH | 38,007 | 81,256 | 91,256 | 37,845 | 174,092 | 174,092 | 75,852 | 255,348 | 255,348 |
| Gross - MW average | 226 | 212 | 212 | 224 | 234 | 234 | 450 | 357 | 357 |
| Net - MWH | 33,765 | 80,417 | 80,417 | 33,484 | 155,346 | 155,346 | 67,197 | 235,763 | 235,763 |
| Net - MW average | 201 | 187 | 187 | 199 | 209 | 209 | 400 | 317 | 317 |
| Auxiliaries - % | 11.5% | 11.6% | 11.0% | 11.0% | 10.8% | 10.8% | 11.2% | 11.1% | 11.1% |
| Capacity Factor - % | 89.7% | 49.1% | 49.1% | 87.9% | 91.6% | 91.6% | 88.3% | 89.9% | 69.9% |
| Dispatch Factor - % | 65.7% | 53.2% | 53.2% | 87.9% | 91.6% | 91.6% | | | |
| **Process Steam:** | | | | | | | | | |
| High Pressure - klbs | | | | | | | 37 | 1,620 | 1,620 |
| Low Pressure - klbs | | | | | | | 1,650 | 8,999 | 8,999 |
| Energy Equivalence - MWhr | | | | | | | 155 | 950 | 950 |
| **Material Handling:** | | | | | | | | | |
| Coal - Shon TONS | 15,108 | 30,624 | 30,624 | 14,803 | 59,023 | 59,023 | 30,043 | 106,249 | 106,249 |
| Limestone - Short TONS | 605 | 1,138 | 1,138 | 501 | 3,213 | 3,013 | 1,055 | 4,161 | 4,151 |
| Ash Rock Produced - Short Tons | 1,884 | 4,467 | 4,467 | 1,628 | 9,551 | 9,551 | 3,412 | 14,018 | 14,018 |
| **Performance:** | | | | | | | | | |
| Gross Heat Rate - BTU/KWH | 8,900 | 9,711 | 9,711 | 9,005 | 9,079 | 9,079 | 8,950 | 9,090 | 9,090 |
| Net Heat Rate - BTU/KWH | 10,138 | 10,536 | 10,536 | 10,129 | 10,174 | 10,174 | 10,110 | 10,250 | 10,230 |
| Equivalent Net Heat Rate - BTU/KWH | | | | | | | 10,097 | 10,189 | 10,189 |

2. **Operations and Maintenance**

1. Availability

   - Plant 12-month rolling availability continues to be below contractual amount of 90%. Preliminary PPA 12-month rolling average availability at the end of January 2004 was 81.6%.

   - No unit trips or de-rates during the one week period.

   - Due to additional forced outages on the units, analysis are showing us that there are no financial downside risks of submitting a force majeure claim to PREPA for the Unit #1 catastrophic blade failure occurred in May 14, 2003. If we are successful in this claim, it will provide us with approximately 5% through 2004 Depending on the forced outage rate of the units during future months this will prevent additional loss of revenues by capacity payments downward adjustments anywhere from $0.5 to $4 million. PREPA is hesitant in granting us force majeure due to the precedence it would set. However, they are willing, and expressed in concept their agreement, to work out an alternative to force majeure that would provide the same benefit as force majeure. A settlement letter was sent to PREPA on December 22, 2003, and we are awaiting a response from PREPA. If the settlement is accepted by PREPA, it would result in AES PR paying PREPA approximately $2.0 million, however, we would avoid incurring an additional $6.5

AESPR-431609

million in availability decreases between now and June 2004 for a net benefit to AES PR
of approximately $4.5 million

2   Environmental

| Reportable CEMS Exceedances: | | | | | | |
|---|---|---|---|---|---|---|
| | Unit 1 Week | Unit 1 MTD-January | Unit 2 Week | Unit 2 MTD-January | Facility Week | Facility MTD-January |
| SOx | 0 | 0 | 0 | 5 | 0 | 5 |
| NOx | 0 | 0 | 0 | 2 | 0 | 2 |
| CO | 0 | 0 | 0 | 0 | 0 | 0 |
| Opacity | 1 | 3 | 0 | 4 | 1 | 7 |

3.  Safety

Statistics:

| | AES | | | CONTRACTOR | | |
|---|---|---|---|---|---|---|
| | 25-31 Jan | Jan | 2004 | 25-31 Jan | Jan | 2004 |
| TYPE OF EVENT | LAST WEEK | MTD | YTD | LAST WEEK | MTD | YTD |
| NEAR MISS | 0 | 0 | 0 | 0 | 0 | 0 |
| DOCTOR VISIT | 0 | 0 | 0 | 0 | 0 | 0 |
| PROPERTY DAMAGE | 0 | 0 | 0 | 0 | 0 | 0 |
| LTA | 0 | 1 | 1 | 0 | 0 | 0 |
| FIRST AID | 0 | 1 | 1 | 1 | 1 | 1 |
| FATALITY | 0 | 0 | 0 | 0 | 0 | 0 |
| RESTRICTED DAYS | 0 | 0 | 0 | 0 | 0 | 0 |
| OSHA RECORDABLE | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL LOST DAYS | 3 | 9 | 9 | 0 | 0 | |
| TOTAL EVENTS | 0 | 2 | 2 | 1 | 1 | 1 |
| DAYS WITHOUT LTA | 13 | 13 | 13 | N/A | N/A | N/A |
| DAYS WITH LTA | | | | N/A | N/A | N/A |

4.  Consumables/Opacity

  • Limestone and urea usage has decreased approximately 33% since the start of the
    initiative and continues to stay at the lower levels. However, Lime usage continues to run
    at higher levels in part to trying to raise the temperature level in the Electrostatic
    Precipitator (ESP).
  • Further inspection of the ESP on Unit #1 during the outage has indicated that there is
    significant corrosion, similar to Unit #2, in the ESP. We are in process of ordering
    material to upgrade the cells in unit #2 and will do the same for unit #1. Money from the
    DFD settlement that is presently escrowed to fix the plant will be used to offset the costs
    for the materials and repairs so we do not anticipate any impact our 2004 cash flow unless
    we need to bring the units down prior to June 2004 in which we would incur additional
    decreases in our capacity payments. Our current plan is to spread the repairs over a 2 to 3
    year period to minimize the impact on current year cash flow. Additionally we are
    working to increase the temperature entering the ESP and identifying different sources of
    cooling water into the CDS in an effort to decrease the corrosion that is occurring. Our
    present hypothesis is that the high chlorides in the water along with the temperature
    entering into the ESP being below the dew point are leading to the noted corrosion in the

AESPR-431610

ESP. The difficulties in increasing the temperature have been controlling opacity, so we are additionally exploring options in decreasing the chlorides in the water. We have been able to change the blend of water that we are using which has decreased the amount of chlorides in the water, however, they continue to be higher than what we need long-term. Two weeks ago we had engineers from GE Betz on site evaluating our water treatment processes. On potential solution may be to add a 2nd reverse osmosis system to the process. Anticipated cost would be between $750,000 to $1.3 million and could be done without taking the units off line. This would also be less expensive than adding a crystallizer to the process which could cost in excess of $10 million. We will continue to work with GE Betz to reach a final decision so that the best economical solution can be implemented as quickly as possible to arrest further corrosion of the ESPs. We expect to have final information and documentation within the coming week

3.   Monthly KPI's






4.   Financials

*   Fitch rating, BBB (stable), Moody's Ban3 (stable). Fitch is planning a site visit on February 18, 2004.

*   Main financial indicators

|  | Current Rates | Budget | Nov. 25 Election |
|---|---|---|---|
| 3-Month | 1.13% | N/A | N/A |
| 12-Month | 1.48% | 1.60% | 1.45% |
| Short-Term Hedged | | | |
| Amount (millions USD) | $    122.6 | | |

Note:  On Nov. 25 we elected 1 year LIBOR to limit interest rate sensitivity for the year.

*   We have started working with Arlington to evaluate hedging the $122.8 million beyond November 25, 2004.

AESPR-431611

REDACTED

6. **Contact Persons**
   - Al Dyer
   - Carlos Reyes
   - Eric Lundberg

AESPR-431612

| From: | Felipe Ceron |
|---|---|
| Sent: | Sunday, February 15, 2004 4:49 PM |
| To: | John Ruggirello |
| Cc: | Al Dyer |
| Subject: | RV. NEW Water Treatment Investment at AES-PR (Urgent) |
| Attach: | Request For Capital Expenditure.doc |

Hello John,

We need your approval for the capital expenditure escribed in Al's memo attached. I hev reviewed it and recommend your approval.

The project consist in the modification of the water treatment system to improve the quality of water. At present the water is causing corrosion in the electrostatic precipitator. Temporarily corrosion has been reduced by making some operational changes that have resulted in higher lime consumption and some other disadvantages.

Project cost is $ 1.6 million that would be withdrawn from the $ 4 million proceeds from the DFD settlement that are in a reserve account, earning less than 1% interests and cannot be sent as a dividend Time to complete the project is 6 months.

Main benefits are:
1. Reduction in Lime usage of $ 0.25 million a month. At present lime usage has increased by that amount as a result of the operational changes (higher temperatures) applied to reduce the level of corosion.
2. Deferral of the replacement of the corroded plates in the electrostatic precipitator.

Please advise.
Best regards,

Felipe

    ----Mensaje original-----
    De: Al Dyer
    Enviado el: Miércoles 11-02-2004 14:40
    Para: Felipe Ceron
    CC: Pedro Carrizo; Eric Lundberg; Carlos Reyes; Rod Jorgensen; Tracy Jarvis; Ron McParland; Ernest Pagaduan, David Stone; Bill Vela; Brian Thompson; Paul Stinson
    Asunto: NEW Water Treatment Investment at AES-PR (Urgent)

Felipe,

The way we understand the new corporate internal controls for Capital Expenditures beyond 25% of our budget is for EO approval. As a minimum we need your approval to proceed with this project. There is a need to expedite the project as soon as possible to ?Arrest? the on-going corrosion of the Electrical Static Precipitators.

Regards
ABD

*Al Dyer*
 Puerto Rico

(787) 866 8117 x 233

CONFIDENTIALITY: This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium. Without Prejudice.

AESPR-185853

### Introduction

This project has been identified after discovering the corrosion problem in the Electrostatic Precipitators (ESP) during the Unit 2 November 2003 outage and the Unit 1 January 2004 outage. The ESP collector plates are experiencing accelerated corrosion confined primarily in the areas where the plates contain residual stresses resultant from the forming process. The corrosion is more severe in the inlet compartments and decreases with the flow of the gasses through the precipitators. The final two compartments are showing signs of just moderate to light corrosion.

The plant has been in commercial operation for 15 months and we predict the precipitator plates to have a remaining useful service life of less than 1 year at original design conditions. AES-PR is pursuing this as a Warranty issue with Alstom (Boiler) however to date they have been unresponsive.

Through investigation and testing it has been determined that the cause of the corrosion can be contributed to high levels of chlorides and other dissolved solids in the water sprays utilized in the Circulating Dry Scrubber (CDS) upstream of the precipitators. The current design is to use the waste water from the RO unit for the CDS while sending the cleaned water to the cooling tower for makeup.

We have been able to implement temporary changes to our processes that have slowed the corrosion. These changes are:

- Elevating the temperature of the gases leaving the CDS through decreasing the spray to keep the gasses passing through the precipitators above the dew point which prohibits the chlorides from forming a corrosive compound. *Increasing the temperatures adversely affects the SO2 removal efficiency of the CDS and has increased our lime consumption significantly.* .
- Blending CDS makeup water with clean filtered water has reduced chloride concentration from 2800 PPM to approximately 1000 PPM. *Modifying the plant water balance jeopardizes the overall plant filter water make up capabilities.*
- Augmenting the cooling water makeup system with cleaner water from the boiler water make up system. *This augmentation is done by using other water sources such as the Patillas canal and well water. However this configuration can not be sustained for extended periods of time since our water supply contracts do not allow for this mode of operation.* .

The above temporary changes have been implemented merely to provide additional time to evaluate a long-term solution. Based on our evaluation we request the approval of additional capital expenditures at AES Puerto Rico for $1.6M to add a second reverse osmosis system and other supporting equipment.

### Project Description and Execution

The project consists of modifying the side stream system configuration such that the waste brine is routed for utilization as either, (a) ash yard dust suppression, (b) ash pug mill make up water or (c) alternate CDS make up source. Additionally, the existing sidestream RO unit will be replaced with 2 RO units to provide the required waste recovery. The graphics below provide a comparison of the current facility water flow diagram and the proposed flow diagram with the new system configuration.

AESPR-185854





ACSPR-185855

## Water Quality Improvement

The RO equipment will be provided by GE-Betz. The modification will allow the facility to provide the required CDS makeup flow while reducing the chloride concentration from the present 1000 PPM to approximately 65 PPM. GE-Betz is providing a performance guarantee that includes a liability clause in which they commit spending additional funds, up the full value of the contract to meet their obligations. The contract provides for adequate engineering and commissioning time to ensure the new equipment will be seamlessly integrated into the existing system. Both GSO and the Compliance Group have been involved in the review cycle. Duke Fluor Daniel (DFD) provided technical due diligence and confirms the proposed modification is a viable solution to eliminate the chloride contribution to ESP corrosion and continue operating within our zero liquid discharge obligations. **Due to the urgency of this project, AES-PR , GSO and DFD worked directly with GE-Betz to develop a cost effective solution** and did not solicit additional quotations.

## Operations & Maintenance

The project scope also includes additional pretreatment filtration equipment upstream of the RO. These filters will significantly decrease the present RO membrane fouling and result in fewer membrane replacements and chemical cleanings.

## Permitting

- Environmental review indicates existing permits are sufficient for the new system configuration, with only an administrative change to the "Water Treatment Operations" permit being required.
- Necessary construction permits can be obtained within planned project schedule.

## Project Execution Strategy

- Lump sum, fixed price for water treatment equipment (GE Betz)
- AES to procure water distribution equipment (budgetary estimates already confirmed)
- AES has secured DFD engineering services for overall system design, including integration review, development of all necessary engineering drawings.
- AES to utilize local contract services for equipment installation. .
- AES & GE-Betz to jointly commission.
- Planned project duration is 5 months upon issuance of PO for RO equipment.
- Project can be implemented with the facility on line and no impact to operations or availability.

## Alternatives Investigated

- **Metallurgy change in ESP collector plates**. In order to handle the wet chlorides, a duplex stainless or a high nickel alloy material would be required. AES-PR found no ESP applications utilizing these types of materials. Based on AES-PR experience upgrading to "Core Ten"

AESPR-185856

collector plate material, estimated cost for this upgrade of materials to be $6M, plus installation costs estimated to be $2M. These costs do not include potential exposure to loss of revenue.

- Installation of a Crystallizer. Evaluated using a crystallizer to reduce the waste stream from the RO to a dry material for disposal in landfill. Equipment estimates received from GE-Betz and DFD indicate capital costs to be between $6-7M. Assuming a 30% installation cost puts this option at $9M, plus a significant procurement and construction cycle. This option also has a substantial O&M cost.

- Continue operating facility with modified water balance and high CDS outlet temperature. This option has an annual cost of $3M for additional lime consumption and does not adequately arrest the ESP corrosion. After initial ESP plate replacement, this option would ultimately require further ESP collector plate replacements

## Financial Analysis and Impact to Budget

| Analysis Inputs | | |
|---|---|---|
| Project Cost | $ | 1,600,000 |
| Savings Per Month | | 250 000 |
| Time to Install (months) | | 6 |
| Life of Project (years) | | 10 |
| Analysis Results | | |
| Simple Payback (months) | | 6 |
| NPV (15%) | $ | 12,479,290 |
| IRR | | 157% |

- Project Cost- $1,600,000
  - Reverse Osmosis System
    Pug Mill modifications to handle higher chlorides
  - Additional Storage Tank and interconnection improvements

- Benefits
  - Decrease Lime usage of $250,000 per month. Due to the need to run at higher temperatures to decrease the rate of corrosion, we are consuming an additional $250,000 of lime.
  - Another benefit is the deferment of replacing the corroded plates in the ESP. Although there is significant corrosion to the ESP, if the corrosion is arrested we will be anticipate

AESPR-185857

being able to run at least 3 more years before needing to replace the plates. The cost for replacement will be $6 million, assuming no impact to capacity payments due to the availability hit. Due to the uncertainty of the length of time that this repair can be deferred, we have not included the time value benefit in our analysis above.

- **Payment/Impact to Budget**
  - We will pay for this project by utilizing $1,600,000 of the $4,000,000 in proceeds from the Duke/Fluor Daniel settlement that were placed in a reserve account to complete the plant and to repair defective items. There is no risk in utilizing the funds for this project. As the funds on deposit in the account are earning less than one percent interest and cannot be sent as a dividend from the project, these are the lowest cost funds available to pay for the project.
  - By proceeding with this project as quickly as possible we will be able to limit the negative impact to our budget that the additional lime consumption is causing. As the payment for the project will be done from a reserve account, no negative impacts to operating cash flow will result by proceeding with this project.

**Conclusions**

This project has the shortest lead time and lowest net cost associated as compared to the other options. It will allow AES-PR to operate closer to the power stations design basis (water make up, zero liquid discharge, CDS operating temperature, consumable usage). Completing this project will arrest ESP collector plate corrosion, and extend the life of the existing ESP collector plates. Additionally, operating will low chloride CDS make up water has shown to significantly improve ESP performance

Failure to proceed may result in:
- Significant facility downtime
- Complete corrosion of the ESP collector plates
- Increased lime consumption of 30-40%

AESPR-185858

**B 107**



**AES**
**Puerto Rico**

## CAPITAL PROJECT

Account Number 1401-07-000
AR Date February 6, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Reverse Osmosis Process-Water Treatment Modification (ESP Corrosion Elimination) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendor Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 02/06/04 | Rafael Graul Mdh Caribe | - | CRP/10447674 | 890.00 | 02/06/04 CK 10964 |
| 02/10/04 | Environmental Resources Management | - | 1550218 | 4,006.22 | 02/12/04 CK 10998 |
| 02/06/04 | Puerto Rico Wire Products, Inc. | 04-0165 | 9256993-001 | 229.00 | 03/12/04 CK 10998 |
| 02/19/04 | Puerto Rico Wire Products, Inc. | 04-0165 | 9256993-002 | (76.00) | 03/12/04 CK 11111 |
| 02/10/04 | Fastenal Company | 04-0168 | PRMER153367 | 242.19 | 03/12/04 CK 10974 |
| 02/10/04 | Miguel Ortiz | - | 434164 | 100.00 | 02/26/04 CK 10846 |
| 02/20/04 | CIB Corporation | 04-0238 | F43309 | 381.15 | 03/19/04 CK 11008 |
| 02/26/04 | La Electrical | 04-0254 | 50666 | 276.90 | 03/04/04 CK 11161 |
| 02/23/04 | Pump Biz, Inc. | 04-0177 | 2980 | 4,533.00 | 03/12/04 CK 10968 |
| 02/16/04 | Universal Steel Trading Corp. | 04-0157 | 165747 | 343.60 | 03/16/04 CK 11007 |
| 02/29/04 | A/P Accrual | | | 1,260.00 | |
| | Balance as of February 29, 2004 | | | 12,232.65 | |
| | A/P Accrual reversing entry | | | (1,260.00) | |
| 03/01/04 | | | | | |
| 02/27/04 | McMaster-Carr | 04-0263 | 84911084 | 68.97 | 03/26/04 CK11165 |
| 03/01/04 | Ferry Products | 04-0219 | IN20243 | 100.60 | 03/31/04 CK11220 |
| 03/03/04 | Sadler & Johnson | 04-0233 | 3B-2051 | 1,260.00 | 04/06/04 CK11291 |
| 03/26/04 | Eagle USA Airfreight AMEX (C. Ketria) | American Express | 0E2504 | 488.00 | 03/12/04 CK10044 |
| 03/04/04 | Vivex Equipment Rental | 04-0263 | 9E24073 | 81.00 | 03/12/04 CK11009 |
| 03/06/04 | United Parcel Service (Freight Mailcarter) | 04-0263 | A1077V104 | 29.14 | 03/16/04 CK11182 |
| 02/19/04 | Normand Lumber & Hardware (Credit Card) | Banco Popular CK | CK031004 | 149.70 | 03/23/04 CK11098 |
| | Balance as of March 31, 2004 | | | 876.41 | |
| 04/06/04 | Bury Brothers, Inc. | Red Jorgensen | 43260 | 680.00 | |
| 03/28/04 | Caribbean Irrigation Sales (BPPR Credit Card) | Caban Ratria | 22447 | 2,278.00 | |
| | Balance as of April 30, 2004 | | | 1,959.00 | |
| 04/30/04 | Grayber International PR | 04-0449 | 20ió46 | 142.16 | 05/28/04 CK11848 |
| 05/13/04 | Environmental Resources Management | - | 1550019 | 1,960.00 | |
| 05/03/04 | Junta de Calidad Ambiental | Bill Vela | WASTEWATER | 3,000.00 | 05/11/04 CK11668 |
| 05/03/04 | Junta de Calidad Ambiental | Bill Vela | WATER | 100.00 | 05/11/04 CK11669 |
| 05/10/04 | Secretario de Hacienda | Bill Vela | CLAPROS/04 | 1,388.00 | 05/11/04 CK11672 |
| 05/10/04 | Secretario de Hacienda | Bill Vela | ROM000504 | 6,921.00 | 05/11/04 CK11673 |
| 05/23/04 | The Nu-Tex Company | 04-0654 | 00013911 | 31,688.00 | 08/20/04 CK11893 |
| 05/20/04 | Surplus Material & Equipment | 04-0574 | 3679 | 44,008.00 | |
| | Balance as of May 30, 2004 | | | 79,185.16 | |
| 05/29/04 | UPS | - | A1077V224 | 17.30 | 06/03/04 CK11972 |
| 05/28/04 | Bury Brothers, Inc. | 04-0567 | 43331 | 1,377.50 | 06/30/04 CK 12001 |
| 06/04/04 | Environmental Resources Management | Bill Vela | 1550218 | 3,446.00 | 06/16/04 CK 12050 |
| 06/04/04 | Environmental Resources Management | Bill Vela | 1550210 | 1,886.00 | 06/16/04 CK 12000 |
| 06/08/04 | Caribbean Irrigation Sales | 04-0733 | 00024220 | 16,763.67 | 06/18/04 CK 12067 |
| 05/28/04 | Puerto Rican International Companies | 04-0384 | 80333 | 8,941.89 | 06/28/04 CK 12156 |
| 05/28/04 | Puerto Rican International Companies | 04-0384 | 80333-B | 2,624.50 | 06/28/04 CK 12150 |
| 05/28/04 | Puerto Rican International Companies | 04-0384 | 80333-C | 6,665.33 | 06/28/04 CK 12150 |
| 05/28/04 | Puerto Rican International Companies | 04-0384 | 80334 | 37,875.23 | 06/28/04 CK 12150 |
| 05/28/04 | Puerto Rican International Companies | 04-0384 | 80334-B | 6,303.50 | 06/25/04 CK 12150 |
| 05/28/04 | Puerto Rican International Companies | 04-0384 | 80334-C | 17,338.24 | 06/25/04 CK 12150 |
| 05/01/04 | Puerto Rican International Companies | 04-0384 | 80342 | 7,623.12 | 06/25/04 CK 12150 |
| 05/08/04 | Puerto Rican International Companies | 04-0384 | 80348-C | 6,251.17 | 06/25/04 CK 12150 |
| 05/01/04 | Puerto Rican International Companies | 04-0384 | 80342-B | 1,307.00 | 06/25/04 CK 12150 |
| 06/16/04 | Sadler & Johnson | 04-0750 | 60N692 | 630.00 | 07/15/04 CK 12427 |
| 06/23/04 | General Electric del Caribe, Inc. | 04-0777 | 985-03067Z | 180.00 | 07/22/04 CK 12489 |
| 06/16/04 | Rafael Beotraz Caribe | 04-2749 | 937173 | 1,216.80 | 07/15/04 CK 12430 |
| 05/31/04 | LCE | - | 100-025421 | 5,126.00 | 06/18/04 CK 12082 |
| 05/21/04 | LCE | - | 100-025422 | 5,126.00 | 06/04/04 CK 12082 |
| 06/30/04 | Accounts Payable Accrual | June | | 4,106.50 | N/A |
| 06/30/04 | Spare Parts | June | JE-J0605 05 | 2,311.25 | N/A |
| | Balance as of June 30, 2004 | | | 126,682.42 | |
| 02/26/04 | G.E. Osmonics | 04-0191 | (400)034960! | 149,006.80 | 0  -1/04 MC03-033 |

PLAINTIFF'S EXHIBIT
P-192

B 108

k



**AES**
**Puerto Rico**

<u>CAPITAL PROJECT</u>

Account Number 1401 07 000
AR Date February 6, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Reverse Osmosis Process - Water Treatment Modification (ESP Corrosion Elimination ) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring at the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 08/03/04 | Environmental Resources Management | | 1500022 | 1,629.80 | 09/02/04 CK 12977 |
| 08/16/04 | Sherry Electrical Services & Associates | 04-1040 | 04-0008 | 1,676.80 | 08/26/04 CK 12787 |
| 08/05/04 | Steel and Pipes, Inc. | 04-1008 | 726386 | 1,480.00 | 08/10/04 CK 13061 |
| 08/13/04 | CIB Corporation | 04-1047 | 768307 | 123.52 | 09/30/04 CK 13139 |
| 08/11/04 | JQ Controls Automation | 04-0948 | 104-393 | 2,132.60 | 09/10/04 CK 13044 |
| 08/09/04 | JQ Controls Automation | 04-0948 | 104-387 | 3.70 | 09/10/04 CK 13044 |
| 08/20/04 | Sherry Electrical Services & Associates | | 04-0004 | 1,676.80 | 08/27/04 CK 12890 |
| 08/16/04 | Steel and Pipes, Inc. | 04-1008 | 729443 | 1,375.00 | 09/30/04 CK13175 |
| 08/19/04 | Steel and Pipes, Inc. | 04-1089 | 729490 | 83.50 | 10/08/04 CK 13871 |
| 08/19/04 | Wholesale Electric del Caribe, Inc. | 04-1083 | 1034039-00 | 834.38 | 10/08/04 CK13276 |
| 08/17/04 | Warren del Caribe | 04-1040 | 48290 | 342.00 | 09/30/04 CK 13186 |
| 06/01/04 | HM Caribe, Inc. | Calvo Bottle | AMEX 06/04 | 711.80 | 07/09/04 CK 12446 |
| 08/16/04 | CIB Corporation | 04-1060 | P4553P | 364.35 | 09/30/04 CK 13139 |
| 07/27/04 | JQ Controls Automation | 04-0948 | 104-363 | 3,808.00 | 08/27/04 CK 12863 |
| 07/30/04 | JQ Controls Automation | 04-0948 | 104-368 | 104.90 | 08/27/04 CK 12863 |
| 07/23/04 | Overnite Transportation Co. | 04-0936 | 508216-601 | 144.13 | 08/27/04 CK 12881 |
| 08/06/04 | CIB Corporation | 04-1025 | P07521 | 816.00 | 09/02/04 CK 12948 |
| 08/20/04 | CIB Corporation | 04-1090 | P43506 | 91.20 | 10/08/04 CK 13241 |
| 08/24/04 | Graybar International PR | 04-1110 | 207642 | 58.70 | 10/08/04 CK 13247 |
| 08/24/04 | Graybar International PR | 04-1118 | 207739 | 33.00 | 10/15/04 CK 13244 |
| 08/20/04 | Magratrol | 04-1061 | 434409 | 2,911.00 | 10/08/04 CK 13235 |
| 08/25/04 | Puerto Rico Wire Products, Inc. | 04-1126 | P316052-001 | 1,350.00 | 10/08/04 CK 13040 |
| 08/26/04 | Bastion & Johnson | 04-1089 | 543620 | 379.30 | 10/15/04 CK 13382 |
| 08/30/04 | Cintron Oliani | | 9824 | 82.38 | 09/02/04 CK 13002 |
| 07/09/04 | Bury Brothers, Inc. | 04-1154 | 48364 | 11,812.31 | 09/02/04 CK 12936 |
| 07/30/04 | Bury Brothers, Inc. | 04-1154 | 48396 | 10,447.15 | 09/02/04 CK 12936 |
| 07/31/04 | UPS | 04-0064 | A1071V314 | 15.63 | 09/02/04 CK 13001 |
| 08/14/04 | UPS | 04-1089/04-1001 | A1071V334 | 177.24 | 08/02/04 CK 13001 |
| 08/31/04 | Accounts Payable Accrual | JE-J075 00 | A/P Accrual | 537,324.21 | N/A |
| 08/31/04 | To Record Cost of Sales | | | 2,803.79 | N/A |
| 08/31/04 | Accrual Outages Invoices | | | 242.76 | N/A |
| | Balance as of August 31st, 2004 | | | 708,780.10 | |
| 09/01/04 | Accounts Payable Accrual | JE-J075 08 | A/P Accrual | (537,329.21) | N/A |
| 09/01/04 | Accrual Outages Invoices | | | (242.76) | N/A |
| 09/10/04 | Hemisphere Aircomb | | CNF7098 | 304.00 | 09/30/04 CK 13015 |
| 08/30/04 | Bastion & Johnson | 04-1089 | 543634 | 86.00 | 10/15/04 CK 13382 |
| 08/05/04 | Admaco | | 005279688 | 952.56 | 09/30/04 CK 13126 |
| 08/27/04 | Ansaco, Inc. | 04-1037 | 608-035146.2 | 2,400.00 | 09/10/04 CK 13019 |
| 07/24/04 | AST Maintenance Services | | 201 | 2,480.00 | 09/21/04 CK 13082 |
| 08/30/04 | Brand Services | | 391-426 | 242.76 | 09/30/04 CK 13198 |
| 09/10/04 | JR Puertas & Associates | 04-1069 | 1200 | 1,395.35 | 09/30/04 CK 13151 |
| 09/01/04 | Manta Worldwide Forwarding | 04-1180 | 3270662980 | 600.85 | 09/30/04 CK 13142 |
| 09/01/04 | Puerto Rican International Companies | 04-0364 | 80378 | 20,540.30 | 08/30/04 CK 13199 |
| 09/01/04 | Puerto Rican International Companies | 04-0364 | 803778 | 11,998.22 | 04/30/04 CK 13199 |
| 09/01/04 | Puerto Rican International Companies | 04-0364 | 80379 | 60,874.61 | 08/30/04 CK 13109 |
| 09/01/04 | Puerto Rican International Companies | 04-0364 | 803778 | 74,323.42 | 09/30/04 CK 13190 |
| 08/20/04 | Sherry Electrical Services & Associates | | 04-0006 | 2,347.52 | 09/21/04 CK 13095 |
| 08/09/04 | Sherry Electrical Services & Associates | | 04-0002 | 961.12 | 08/12/04 CK 13683 |
| 07/07/04 | Bi-State Rubber, Inc. | | 054043 | 1,572.30 | 09/30/04 CK 13131 |
| 08/14/04 | Camara de Fluye | 04-1087 | 30075 | 1,953.17 | 09/14/04 CK 13077 |
| 07/08/04 | GE Osmonics | 04-0191 | 1400146214 | 521,52.3.80 | 03/08/04 WTOD-189 |
| 09/21/04 | Caribbean Irrigation Sales | 04-1280 | 04-1280 | 10,294.78 | 05/21/04 CK 13008 |
| 09/03/04 | Storr-PR, Inc. | | 1550023 | 1,512.82 | 10/08/04 CK 13298 |
| 08/03/04 | Overnite Transportation Co. | 04-1033 | 842591031 | 264.11 | 09/30/04 CK 13164 |
| 08/06/04 | Overnite Transportation Co. | 04-1033 | 566180830 | 138.47 | 09/30/04 CK 13164 |
| 08/30/04 | Steel and Pipes, Inc. | 04-1152 | 732387 | 708.00 | 10/15/04 CK 13392 |
| 08/30/04 | Bury Brothers, Inc | 04-1154 | 45439 | 13,388.02 | 03/30/04 CK 13130 |
| 08/27/04 | Bury Brothers, Jr | 04-1116 | 45450 | 7,149.50 | 09/30/04 CK 13130 |
| 08/27/04 | CIB Corporation | 04-1090 | P45479 | 43.68 | 10/15/04 CK 13332 |

04/08/2005 1:11 PM



**AES**

**Puerto Rico**

CAPITAL PROJECT

Account Number 1401-07-000
AR Date February 8, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Reverse Osmosis Process- Water Treatment Modification (ESP Corrosion Elimination ) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is
occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
| 09/13/04 | La Casa de los Tornillos | 04-1256 | 730740 | 12.94 | 10/29/04 CK 13484 |
| 09/10/04 | Universal Steel Trading Corp. | 04-1251 | 172143 | 818.00 | 10/15/04 CK 13399 |
| 08/27/04 | Badian & Johnson | 04-1273 | 268247 | 87.20 | 10/29/04 CK 13901 |
| 09/24/04 | American Express (Teddy Diaz) | AMEX | C. Kervis | 1,032.95 | 10/13/04 CK 13894 |
| 10/10/04 | Banco Popular (Harrington) | Visa | C. Kervis | 356.58 | 10/29/04 CK 13430 |
| 10/31/04 | Accounts Payable Accrual Journal Entry | JE-J1005 | - | 23,636.23 | N/A |
| 10/31/04 | Spare Parts Expense | JE-J1008 | - | 1,007.77 | N/A |
| | Balance as of October 31st, 2004 | | | 188,197.94 | |
| 11/01/04 | Accounts Payable Accrual Journal Entry | JE-J1005 | - | (23,636.23) | N/A |
| 10/22/04 | Fastenal Company | 04-1922 | PRMEB116902 | 426.94 | 12/02/04 CK 13951 |
| 07/07/04 | EMA-PR, Inc. | Bill Voie | 1550001 | (1,500.95) | 08/05/04 CK 12674 |
| 08/05/04 | EMA-PR, Inc. | Bill Voie | 1550002 | (1,022.30) | 09/02/04 CK 12977 |
| 10/25/04 | Puerto Rican International Companies | 04-0384 | 80388 | 1,295.75 | 12/02/04 CK 13892 |
| 10/11/04 | Bery Brothers, Inc. | 04-1184 | 45481 | 11,646.51 | 11/11/04 CK 13664 |
| 10/14/04 | Bery Brothers, Inc. | 04-1254 | 45900 | 8,922.51 | 11/11/04 CK 13664 |
| 10/20/04 | Automation Technologies, Inc. | 04-1825 | 048526 | 8,600.00 | 11/23/04 CK 13717 |
| 10/25/04 | Fastenal Company | 04-1522 | PRMEB116909 | 242.25 | 12/02/04 CK 13884 |
| 10/26/04 | Puerto Rican International Companies | 04-0364 | 80393-B | 1,950.42 | 11/23/04 CK 13779 |
| 10/25/04 | UPS | 04-1507 | A1071V434 | 366.82 | 11/11/04 CK 13667 |
| 10/21/04 | Caribbean Irrigation Sales, Inc. | 04-0713 | 00014220 | 14,991.78 | 11/12/04 CK 13698 |
| 08/18/04 | Overnite Transportation Co. | 04-1033 | 642990638 | 243.11 | 11/19/04 CK 13713 |
| 10/31/04 | Brasil Services | - | 291-431 | 1,400.12 | 12/02/04 CK 13832 |
| 10/04/04 | Teddy Diaz Factoring PR (American Express) | Calvin Kervis | AMEXE04604 | 360.00 | 11/23/04 CK 11/23/04 |
| 09/17/04 | Cortes Industrial Organization | 04-1295 | 54630 | 280.00 | 11/23/04 CK 13724 |
| 11/23/04 | S E S A Electrical Services | - | 04-0010 | 756.40 | 11/30/04 CK 13832 |
| 11/10/04 | M.R. Francescheni, Inc. | 04-1957 | 187701 | 6,995.70 | 12/02/04 CK 13805 |
| 11/18/04 | Univar USA, Inc. | 04-1250 | BR-235090 | 300.00 | |
| 07/22/04 | Carribean Architects & Engineers | - | 90026744 | 23,971.16 | 11/02/04 CK 13637 |
| 09/15/04 | Carribean Architects & Engineers | - | 90026728 | 11,063.83 | 11/02/04 CK 13637 |
| 11/30/04 | Spare Parts Expense | JE-J1008 | - | 636.32 | N/A |
| | Balance as of November 30, 2004 | | | 88,843.34 | |
| 10/26/04 | GE Osmonics, Inc. | 04-1284 | 10400838 | 4,950.00 | 12/17/04 CK 14054 |
| 08/14/04 | Centers de Jesus | 04-1057 | 00078 | (9.77 58) | 09/14/04 CK 13077 |
| 12/13/04 | Puerto Rican International Companies | - | 80406 | 7,900.00 | 01/14/05 CK 14276 |
| 09/14/04 | Raymond Professional Group | 04-0584 | 128767 | 9,590.00 | 12/17/04 CK 14076 |
| 12/21/04 | Patent Construction Systems | 04-1671 | 5046612000 | 1,302.87 | 12/31/04 CK 14181 |
| 12/25/04 | Patent Construction Systems | 04-1671 | 5046611900 | 1,123.32 | 12/31/04 CK 14181 |
| 12/31/04 | Accounts Payable Accrual Journal Entry | JE-J1005 | Journal Entry | 1,405.80 | N/A |
| | Balance as of December 31st, 2004 | | | 26,114.41 | |
| 01/01/05 | Accounts Payable Accrual Journal Entry | JE-J1005 | Journal Entry | (1,405.80) | N/A |
| 11/30/04 | Megafrost International, Inc. | 04-1208 | 603781 | 1,405.80 | 01/07/05 CK 14205 |
| 08/17/04 | Caribbean Irrigation Sales, Inc. | 04-1280 | 26305 | 10,264.78 | 09/21/04 CK 13088 |
| 08/17/04 | Caribbean Irrigation Sales, Inc. | 04-1280 | 26305 | (10,264.50) | 09/21/04 CK 13088 |
| 12/20/04 | Caribbean Irrigation Sales, Inc. | 04-1280 | 27998 | 6,289.50 | 01/25/05 CK 14316 |
| 01/03/05 | Caribbean Irrigation Sales, Inc. | 04-1280 | 28130 | 14,500.00 | 01/25/05 CK 14316 |
| 11/30/04 | Overnite Transportation Co. | 04-1208 | 367027304 | 232.64 | 01/14/05 CK 14271 |
| 12/31/04 | Brasil Services | - | 291-464 | 1,022.40 | 01/31/05 CK 14364 |
| | Balance as of January 31st, 2005 | | | 51,849.88 | |
| 02/03/05 | Secretario de Hacienda | - | - | 3,900.00 | 02/11/05 CK 14577 |
| 10/30/04 | Centers de Jesus | 04-1859 | 206 | 936.11 | 02/11/05 CK 14579 |
| 12/22/04 | S E S A Electrical Services | 04-1048 | 04-0017 | 670.72 | 12/30/04 CK 14123 |
| 02/15/05 | Patent Construction Systems | 04-1671 | 5046611900 | 897.82 | 02/28/05 CK 14715 |
| | Balance as of February 28th, 2005 | | | 5,604.65 | |
| 02/11/05 | Automation Technologies, Inc. | 04-0142 | 50210 | 2,252.50 | 03/18/05 CK 14802 |
| 02/18/05 | Puerto Rican International Companies | 04-1539 | 80420 | 4,100.00 | 03/18/05 CK 14840 |
| 03/15/05 | Patent Construction Systems | 04-1671 | 5046611900 | 897.82 | 04/01/05 CK 15075 |
| | Balance as of March 31st, 2005 | | | 7,280 .. | |

B 111



**Puerto Rico**

_CAPITAL PROJECT_

Account Number 1401-07-000
AR Date February 6, 2004
AR Originator Tracy Jarvis - Water Treatment Team Leader
AR Title Reverse Osmosis Process- Water Treatment Modification (ESP Corrosion Elimination ) Project
AR Description Modification of the Water Treatment System to improve water chemistry that will help to stop the damage and corrosion that is occurring in the precipitator.
AR Amount $1,600,000.00

| Invoice Date | Vendors Name | Purchase Order No. | Invoice Number | Invoice Amount | Date and Payment Reference |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| Total Amount Used in 1401-07-000 |  |  |  | 1,766,559.12 |  |
| Total Amount Approved in Capex 1401-07-000 |  |  |  | 1,600,000.00 |  |
| Balance in Capex 1401-07-000 |  |  |  | (166,559.12) |  |
| Percentage Over run |  |  |  | -11.66% |  |

Capex Recommended Status
☐ Closed
☐ Supplemental
☐ Continue

4/13/2004 1:19 PM

LAPE3 LCR 2004.xls

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,

        Plaintiff,

    v.                  Civ. No. 04-1282-JJF

ALSTOM POWER, INC.

        Defendant.

## PLAINTIFF'S SUPPLEMENTAL RESPONSES TO ALSTOM POWER, INC.'S INTERROGATORY NO. 10

Plaintiff AES Puerto Rico L.P. ("AES-PR") supplements its responses to Defendant ALSTOM Power, Inc.'s (ALSTOM's) interrogatory 10 as follows:

### GENERAL OBJECTIONS

The general objections set forth in AES-PR's Responses to ALSTOM's First Set of Interrogatories are incorporated herein by reference and serve as additions to AES PR's supplemental response to Interrogatory No. 10.

### SUPPLEMENTAL RESPONSE TO INTERROGATORY No. 10

The following supplemental response is made subject to and without waiver of any of the general objections incorporated by reference above.

### INTERROGATORY NO. 10

For any work performed on or materials/equipment provided for the CDS and/or ESP equipment, itemize the payments made by you to any vendor, subcontractor and/or any other entity by date, amount, and reason for payment.

SUPPLEMENTAL RESPONSE

Subject to the general objections incorporated by reference above, and without waiver thereof, AES-PR states that it has made and/or expects to make the following payments:

Water Treatment

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| Various (list provided as Attachment A to initial response to interrogatory) | 02-06-04 -- 03-31-05 | $1,786,559.12 | Reverse Osmosis System Capital Cost |
| ChemTreat, Others | Ongoing | $877,154 | Operation and maintenance of reverse osmosis system (Based $100,000/yr and 10% discount rate) |
| Various | 2005/2006 | $50,000 (est.) | Boiler water injection project installation |
| Drummond | 24 months | $7,568,000 (est.) | O&M cost for injection of high-chloride water into the boiler |
| Various | 24 months | $220,752 (est.) | CDS clean water supplement |
| Various | 24 months | $1,314,000 (est.) | Other water supply changes |
| Various | To begin in 2006 | $512,000 (est.) | Crystallizer -- engineering, permits, relocation |
| To be determined | 2006 | $7,000,000 (est.) | Crystallizer -- procurement |
| To be determined | 2006/2007 | $7,000,000 (est.) | Crystallizer -- Construction |
| To be determined | 2006 | $1,400,000 | Crystallizer -- construction/procurement contingency (10%) |
| Various | Ongoing | $6,578,655 (est.) | Crystallizer -- O&M costs (est. $750,000/yr, incl. 650kW/h and 10% discount rate) |
| Total | | $34,307,120.12 | |

2

B 114

Collection Plates

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| EEC | Various | $925,120.00 | Replacement collecting plates for Unit 2 |
| PIC | Various | $40,649.10 | Labor |
| ICE | Various | $240,409.74 | Freight |
| Raymond | Various | $2,942.49 | Consulting |
| FL Smidth Airtech | 12/31/2003 | $92,935.28 | Consulting/Inspection |
| EEC | Various | $219,250.00 | ESP rigitrodes |
| Various | | $1,400,000.00 (est.) | Replacement collection plates (incl. related parts, consulting, inspection, labor and shipping, w/o costs associated with storage) for Unit 1 |
| | | $2,000,000.00 (est.) | Labor to install all plates |
| Total | | $4,921,306.61 | |

Stabilization Program

| VENDOR | DATE | AMOUNT | REASON OF PAYMENT |
|---|---|---|---|
| Various | Various | $481,069.00 | Other costs related to initial stabilization of corroded plates |
| Various | Various | $54,544.45 | Additional work during July 2004 |
| Various | Various | $53,812.99 | Additional work during October 2004 outage |
| Various | Various | $3,075.54 | Additional work during April 2005 outage |
| TOTAL | | $592,501.98 | |

3

B 115

AES PR supplements this response by referring ALSTOM to the documents AES PR is producing in response to ALSTOM's first set of requests for production. See Fed. R. Civ. P. 33(d).

_____/s/ John S. Spadaro_____

John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: January 17, 2006     Attorneys for AES Puerto Rico, L.P.

B 116

## VERIFICATION

I, Allan B. Dyer, declare under penalty of perjury that:

1.    I am President of AES Puerto Rico, L.P.

2.    I have read the foregoing supplemental response of AES Puerto Rico

L.P. to ALSTOM Power Inc.'s Interrogatory No. 10 and, to the best of my

knowledge, information and belief, they are true and accurate.

January 17, 2006
Date

Allan B. Dyer

5

Westlaw.

336 F.Supp.2d 342                                            Page 1
336 F.Supp.2d 342
**(Cite as: 336 F.Supp.2d 342)**

**H**
Briefs and Other Related Documents

United States District Court,D. Delaware.
Corporal William BULLEN and, Corporal Jeffrey
Giles, Plaintiffs,
v.
Colonel L. Aaron CHAFFINCH, individually and in
his official capacity as Superintendent of the
Delaware State Police; James L. Ford, Jr.,
individually and in his official capacity as Secretary
of the Department of Safety and Homeland Security
of the State of Delaware, and Division of State Police
Department of Public Safety and Homeland Security,
State of Delaware, Defendants.
**No. CIV.A.02-1315-JJF.**

Sept. 17, 2004.

**Background:** White state police officers brought
employment discrimination action against state
officials, alleging that they were not promoted
because of their race. After jury returned verdict in
favor of plaintiffs, defendants moved for judgment as
a matter of law or for new trial.

**Holdings:** The District Court, Farnan, J., held that:

(1) evidence was insufficient to establish that state
used illegal racial quota system for making
promotions;

(2) reasons given for striking black prospective jurors
was not pretext for race discrimination;

(3) e-mail written by civilian employee of state
division of state police discussing the recruiting
process used by that division was relevant; and

(4) evidence was sufficient to support award of
$150,000 to each of the officers.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑2331

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2331 k. In General. Most Cited Cases
In addition to situation in which the jury's verdict is
against the clear weight of the evidence, a new trial is
also appropriately granted in circumstances in which
the court finds that:  (1) damages are excessive, (2)
substantial trial errors were made, or (3) a party has
improperly used peremptory challenges to exclude
potential jurors on the basis of their race. Fed.Rules
Civ.Proc.Rule 59(a), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** 🔑2313

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(A) In General
      170Ak2313 k. Discretion of Court. Most
Cited Cases

**Federal Civil Procedure 170A** 🔑2339

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2338 Verdict or Findings Contrary to
Law or Evidence
        170Ak2339 k. Weight of Evidence. Most
Cited Cases
The decision to grant or deny a new trial is
committed to the sound discretion of the district
court; however, where the ground for a new trial is
that the jury's verdict was against the great weight of
the evidence, the court should proceed cautiously,
because such a ruling would necessarily substitute the
court's judgment for that of the jury. Fed.Rules
Civ.Proc.Rule 59, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑2338.1

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2338 Verdict or Findings Contrary to
Law or Evidence
        170Ak2338.1 k. In General. Most Cited
Cases

**Federal Civil Procedure 170A** 🔑2373

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

336 F.Supp.2d 342
336 F.Supp.2d 342
**(Cite as: 336 F.Supp.2d 342)**

170A Federal Civil Procedure
   170AXVI New Trial
      170AXVI(C) Proceedings
         170Ak2372 Hearing and Determination
            170Ak2373    k.    Presumptions;
Construction of Evidence. Most Cited Cases
In determining whether to grant a motion for a new
trial, the court need not view the evidence in the light
most favorable to the verdict winner; however, a new
trial should only be granted where a miscarriage of
justice would result if the verdict were to stand, the
verdict cries out to be overturned, or where the
verdict shocks court's conscience.    Fed.Rules
Civ.Proc.Rule 59. 28 U.S.C.A.

**[4] Civil Rights 78 1238**

78 Civil Rights
   78II Employment Practices
      78k1236  Affirmative  Action;  Remedial
Measures
         78k1238  k.  Race, Color, Ethnicity, or
National Origin. Most Cited Cases
Evidence in employment discrimination action was
insufficient to establish that state used illegal racial
quota system for making promotions in its division of
state police; evidence indicated only that the division
wanted to increase the number of minority officers
promoted, not that there was a fixed ratio or target
number of black officers that the division sought to
promote.

**[5] Constitutional Law 92 221(1)**

92 Constitutional Law
   92XI Equal Protection of Laws
      92k214 Discrimination by Reason of Race,
Color, or Condition
         92k221 Constitution of Juries
            92k221(1)  k.  In General.  Most Cited
Cases
Equal Protection Clause prohibits discrimination on
the basis of race in the selection of a petit jury.
U.S.C.A. Const.Amend. 14.

**[6] Jury 230 33(5.15)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k33 Constitution and Selection of Jury
            230k33(5) Challenges and Objections
               230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases

When a peremptory strike exercised by a party is
challenged, the court must undertake a three step
analysis: first, the moving party must make a prima
facie showing that a peremptory challenge has been
exercised on the basis of race; second, once that
showing is made, the non-moving party must offer a
race-neutral explanation for striking the juror in
question; third, the court must determine whether the
moving party has shown purposeful discrimination.

**[7] Jury 230 33(5.15)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k33 Constitution and Selection of Jury
            230k33(5) Challenges and Objections
               230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
Determination whether explanation for each
peremptory strike was facially race-neutral does not
require that the explanation be persuasive or even
plausible; rather, the reason offered will be deemed
race neutral unless a discriminatory intent is inherent
in the non-movant's explanation.

**[8] Jury 230 33(5.15)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k33 Constitution and Selection of Jury
            230k33(5) Challenges and Objections
               230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
Explanation for allegedly race-based peremptory
challenge which is otherwise racially neutral on its
face is not infirm solely because its repeated
application would have a disparate impact on a
particular racial group.

**[9] Jury 230 33(5.15)**

230 Jury
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k33 Constitution and Selection of Jury
            230k33(5) Challenges and Objections
               230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
That one black prospective juror lived in same rural
area as one state official named as defendant and that
another black prospective juror lived in city that was
stronghold for other defendants' political party were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

336 F.Supp.2d 342
336 F.Supp.2d 342
**(Cite as: 336 F.Supp.2d 342)**

Page 3

race-neutral explanations for plaintiffs' exercise of
peremptory challenges in employment discrimination
case. U.S.C.A. Const.Amend. 14.

**[10] Jury 230 🔑 33(5.15)**

230 Jury
  230II Right to Trial by Jury
    230k30 Denial or Infringement of Right
      230k33 Constitution and Selection of Jury
        230k33(5) Challenges and Objections
          230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
State police officer's striking of black prospective
jurors in employment discrimination case because
they lived in same rural area as one state official
named as defendant or lived in city that was
stronghold for other defendants' political party was
not pretext for race discrimination; comparison of
jurors remaining on the jury to those who were
stricken indicated that plaintiffs' counsel acted
consistently with his explanations.    U.S.C.A.
Const.Amend. 14.

**[11] Federal Civil Procedure 170A 🔑2336**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2333 Trial Errors
        170Ak2336 k. Instructions. Most Cited
Cases
In evaluating a motion for a new trial due to an
alleged legal error in the jury instructions, the Court
must determine whether an error was in fact
committed, and whether that error was so prejudicial
that the denial of a new trial would be inconsistent
with substantial justice.

**[12] Federal Civil Procedure 170A 🔑2182.1**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(G) Instructions
      170Ak2182 Construction and Effect of
Charge as a Whole
        170Ak2182.1 k. In General. Most Cited
Cases
In determining whether jury instructions were
erroneous, the court should examine the jury
instructions as a whole and should not scrutinize
specific instructions in a vacuum.

**[13] Federal Civil Procedure 170A 🔑2173.1(1)**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(G) Instructions
      170Ak2173.1    Form,    Requisites,    and
Sufficiency
        170Ak2173.1(1) k. In General. Most
Cited Cases

**Federal Civil Procedure 170A 🔑2176.3**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(G) Instructions
      170Ak2176 Requests
        170Ak2176.3 k. Instructions Already
Given. Most Cited Cases
Trial court has broad discretion concerning the
particular language used in a jury instruction, and
need not give a proposed instruction if the essential
points are already covered by the instructions given.

**[14] Federal Civil Procedure 170A 🔑2173.1(1)**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(G) Instructions
      170Ak2173.1    Form,    Requisites,    and
Sufficiency
        170Ak2173.1(1) k. In General. Most
Cited Cases
Jury instructions must fairly and adequately submit
the issues in the case to the jury; trial court abuses its
discretion with respect to jury instructions if the
instruction was capable of confusing and thereby
misleading the jury.

**[15] Civil Rights 78 🔑1434**

78 Civil Rights
  78III Federal Remedies in General
    78k1433 Instructions
      78k1434 k. In General. Most Cited Cases
Court is permitted to instruct the jury as to the
elements of the prima facie case of race
discrimination where certain elements are in dispute
and require fact finding by the jury.

**[16] Civil Rights 78 🔑1556**

78 Civil Rights
  78IV Remedies Under Federal Employment
Discrimination Statutes
    78k1556 k. Instructions. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

336 F.Supp.2d 342
336 F.Supp.2d 342
(Cite as: 336 F.Supp.2d 342)

Page 4

It is not per se inappropriate for the jury to know the elements of the prima facie case of race discrimination, provided that the jury is not given the confusing burden and legalistic jargon of the *McDonnell Douglas* burden shifting framework.

## [17] Federal Civil Procedure 170A ⬤⟞2334

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(B) Grounds
            170Ak2333 Trial Errors
                170Ak2334 k. Evidence. Most Cited
Cases
A new trial is warranted based on a court's decision to admit or exclude evidence, if that ruling affects a substantial right of a party.

## [18] Evidence 157 ⬤⟞146

157 Evidence
    157IV Admissibility in General
        157IV(D) Materiality
            157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
A trial judge is given broad discretion in weighing the probative value of evidence against its potential prejudicial effect.    Fed.Rules Evid.Rule 403, 28 U.S.C.A.

## [19] Evidence 157 ⬤⟞146

157 Evidence
    157IV Admissibility in General
        157IV(D) Materiality
            157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
Rule requiring probative value of evidence to be weighed against its potential prejudicial effect should be exercised sparingly to exclude evidence, because such evidence is concededly probative; thus, the balance under the rule should generally be struck in favor of admissibility.    Fed.Rules Evid.Rule 403, 28 U.S.C.A.

## [20] Civil Rights 78 ⬤⟞1542

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1542 k. Admissibility of Evidence;
Statistical Evidence. Most Cited Cases
E-mail written by civilian employee of division of state police discussing the recruiting process used by

that division was relevant in employment discrimination action brought by white officers who claimed they were denied promotion because of their race; e-mail could be viewed as the benchmark from which state officials began efforts to secure a work force more reflective of state's population.    Fed.Rules Evid.Rule 401, 28 U.S.C.A.

## [21] Damages 115 ⬤⟞127.1

115 Damages
    115VII Amount Awarded
        115VII(A) In General
            115k127.1 k. In General. Most Cited Cases
(Formerly 115k128)

## Federal Civil Procedure 170A ⬤⟞2343

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(B) Grounds
            170Ak2343 k. Amount of Recovery in
General. Most Cited Cases
In evaluating the damages award, the dispositive legal question is whether, given the evidence presented, the jury's award was so irrational as to shock the judicial conscience; the court is obligated to uphold the award of damages if a reasonable basis exists in the record to support the award.

## [22] Federal Civil Procedure 170A ⬤⟞2377

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(C) Proceedings
            170Ak2377 k. Remittitur. Most Cited Cases
Remittitur is appropriate when the trial judge concludes that a jury verdict is clearly unsupported by the evidence and exceeds that amount needed to make plaintiff whole, i.e., to remedy the effect of the employer's discrimination; if remittitur is awarded it should be set at the maximum recovery that does not shock the judicial conscience.

## [23] Civil Rights 78 ⬤⟞1572

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1572 k. Mental Suffering, Emotional
Distress, Humiliation, or Embarrassment. Most Cited
Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

336 F.Supp.2d 342
336 F.Supp.2d 342
(Cite as: 336 F.Supp.2d 342)

Page 5

## Civil Rights 78 ☞1574

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1569 Monetary Relief; Restitution
         78k1574 k. Measure and Amount. Most Cited Cases

Testimony of two white state police officers that they were humiliated when they were not promoted and that their family lives suffered was sufficient to support award of $150,000 to each of them in their employment discrimination action, although officers' testimony was not corroborated by medical or other expert evidence, or by the testimony of their family members.

\*345 Thomas S. Neuberger, Esquire and Stephen J. Neuberger, Esquire of the Neuberger Firm, P.A., Wilmington, DE, for Plaintiffs.

Richard G. Placey, Esquire and Richard M. Donaldson, Esquire of Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, DE, Of Counsel: Edward T. Ellis, Esquire and Robert J. Fitzgerald, Esquire of Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, for Defendants.

## OPINION

FARNAN, District Judge.

Pending before the Court is the Motion Of Defendants For Judgment As A Matter Of Law Or, In the Alternative, For A New Trial (D.I.121-1, 121-2) filed by Defendants Colonel L. Aaron Chaffinch, James L. Ford, Jr. and the Division of State Police, Department of Safety and Homeland Security of the State of Delaware. For the reasons set forth below, the Court will grant Defendants' Motion For Judgment As A Matter Of Law on Plaintiffs' claim that the Delaware State Police had reserved a certain fixed number, proportion or percentage of opportunities for promotion exclusively for certain minority groups and that such quota caused Plaintiffs not to be promoted in the latter part of 2001. The Court will also deny Defendants' Motion For A New Trial as it pertains to all other issues raised by Defendants.

## BACKGROUND

### I. Procedural Background

The procedural background of this action has been set forth by the Court in its decision regarding Plaintiffs' Motion For Full And/Or Partial Summary Judgment. Since the Court's ruling on that motion, a jury trial was held on Plaintiffs' claims. On special interrogatories, the jury found that each Plaintiff had proven by a preponderance of the evidence that (1) Defendants did not promote him to the rank of Sergeant between September 6, 2002 and December 31, 2001 because of his race; (2) the vacant sergeant positions to which Plaintiffs Bullen and Giles would have been promoted had they not been white were on the Governor's Task Force and the Counterterrorism Unit, respectively; (3) in the latter part of 2001, the Delaware State Police reserved a fixed number, portion\*346 or percentage of opportunities for promotion exclusively for certain minority groups, and (4) such quotas caused Plaintiffs not to be promoted in the latter part of 2001. The jury also found that Defendants' actions were the proximate cause of damage to Plaintiffs, and the jury awarded Plaintiff Bullen $30,000 for future lost wages and Plaintiff Giles $20,000 for future lost wages. The jury also awarded each Plaintiff $150,000 as compensatory damages. The judgment was later amended pursuant to a stipulation between the parties to include $4,300 in past lost wages for Plaintiff Bullen and $3,500 in past lost wages for Plaintiff Giles. (D.I.127, B746, 749).

The parties agreed to a stipulated briefing schedule for post-trial motions, and that schedule was amended by subsequent agreement of the parties. The parties have fully briefed several post-trial motions, including the instant Motion For Judgment As A Matter Of Law, Or In The Alternative, For A New Trial. [FN1]

    FN1. The Court will address Plaintiffs' remaining post-trial motions by separate Memorandum Opinions and/or Orders.

### II. Factual Background

The Court has set forth the factual background of this action in its previously issued decision on Plaintiffs' summary judgment motion. The Court will supplement this background when necessary during its discussion of the issues raised by Defendants' Motion.

## DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

336 F.Supp.2d 342
336 F.Supp.2d 342
(Cite as: 336 F.Supp.2d 342)

Page 6

## I. Standard Of Review

A. *Renewed Motion For Judgment As A Matter Of Law Pursuant To Rule 50(b)*

Pursuant to Federal Rule of Civil Procedure 50, judgment as a matter of law may be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).    In assessing the sufficiency of the evidence, the court must review all of the evidence in the record and view the evidence in the light most favorable to the non-moving party, giving the non-moving party the benefit of all fair and reasonable inferences that could be drawn from the evidence presented. *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (en banc). In addition, the court may not weigh the evidence, make credibility determinations or substitute its version of the facts for the jury's version. *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *McDaniels v. Flick*, 59 F.3d 446 (3d Cir.1995).

Motions for judgment as a matter of law are granted "sparingly" and only in those circumstances in which "the record is critically deficient of the minimum quantum of evidence in support of the verdict." *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir.2003). Although the plaintiff must produce more than a "mere scintilla of evidence" to sustain the jury's verdict, "the court should only overturn the verdict if it is 'so unreasonable' that the movant is entitled to judgment as a matter of law." *Lafate v. Chase Manhattan Bank*, 123 F.Supp.2d 773, 777 (D.Del.2000) (citations omitted).    Stated another way, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party." 9A Charles R. Wright & Arthur R. **\*347** Miller, *Federal Practice & Procedure* §   2524 at 249-266 (3d ed.1995).

B. *Legal Standard For The Grant Of A New Trial*

[1] In pertinent part, Federal Rule of Civil Procedure 59(a) provides:
A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which

there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed.R.Civ.P 59(a).    Perhaps the most common reason to grant a new trial is where the court determines that the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice. However, a new trial is also appropriately granted in circumstances in which the court finds that:  (1) damages are excessive, *see Woodson v. Scott Paper Co.*, 109 F.3d 913, 936 (3d Cir.1997); *Garrison v. Mollers N Am., Inc.*, 820 F.Supp. 814, 820 (D.Del.1993);  or (3) a party has improperly used peremptory challenges to exclude potential jurors on the basis of their race, *see Harrison v. Ryan*, 909 F.2d 84, 88 (3d Cir.1990).

[2] The decision to grant or deny a new trial is committed to the sound discretion of the district court. *Allied Chemical Corp v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980), *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282 (1993) (reviewing district court's grant or denial of new trial motion under deferential "abuse of discretion" standard).   However, where the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993).

[3] In determining whether to grant a motion for a new trial, the court need not view the evidence in the light most favorable to the verdict winner.  However, a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks our conscience." *Williamson*, 926 F.2d at 1352;  *see also Price*, 40 F.Supp.2d at 550.

## II. Whether Defendants Are Entitled To Judgment As A Matter Of Law

[4] By their Motion, Defendants contend that they are entitled to judgment as a matter of law because the jury's findings that Defendants maintained a racial quota for promotions at the DSP in the latter part of 2001 and this quota affected Plaintiffs' promotional opportunities are not supported by the evidence. Specifically, Defendants challenge the sufficiency of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

three types of evidence offered by Plaintiffs: (1) evidence concerning the 1998 recruiting process; (2) the 1999 Dillman Memorandum; and (3) evidence regarding the government's desire to have the work force at the DSP reflect the diversity of the population of the State of Delaware. Defendants contend that the 1998 evidence of recruiting practices at the DSP is irrelevant to Plaintiffs' claims of discriminatory non-promotions in 2001, and therefore it is an insufficient basis upon which to support the jury's findings. Defendants also contend that the 1999 Dillman Memorandum also does not support Plaintiffs' quota assertion.*348 because the Memorandum was merely a statistical accounting of the promotion ratio for minorities and women as compared to white males for the time period beginning in 1997 and ending in 1999, a period two years earlier than the events at issue in this case. Defendants maintain that this analysis was done to determine whether the promotion system was yielding a discriminatory result, and not to encourage discrimination in favor of or against any particular group. As for the evidence regarding the government's desire to have a diversified workforce at the DSP, Defendants contend that this evidence is an indefinite expression of an open-ended target and not a rigid certitude amounting to a quota.

> FN2. Defendants do not raise a Rule 50 challenge to the jury's verdict of discrimination under the pretext analysis.

The Supreme Court has explained that "[a] 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.' " *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 2342, 156 L.Ed.2d 304 (2003). Reviewing the record evidence in the light most favorable to Plaintiffs, the Court concludes that the jury's finding that the DSP maintained an illegal quota is not supported by the evidence. Although Plaintiffs presented evidence that race was a substantial and motivating factor governing promotion decisions and that attempts were made by Defendants to manipulate the promotional process so as to promote more black officers than white officers, the Court finds that this evidence does not demonstrate the existence of a quota in late 2001. The Court also finds that evidence regarding the DSP's use of a quota system for hiring and promotion decisions in the late 1990s fails to demonstrate that Defendants continued to use such a system in the later part of 2001.

Plaintiffs point to evidence demonstrating that political and administrative forces in the State of Delaware and in the DSP sought to be more aggressive in their efforts to create a workforce that reflects the diversity of the State's population. Plaintiffs contend that this evidence, coupled with the evidence demonstrating the DSP's prior use of a quota, demonstrates that Defendants continued to use a quota system. In the Court's view, however, the evidence does not bear out Plaintiffs' assertion. While evidence of the policies and statements of the Governor and DSP personnel demonstrates an aggressive effort toward equal opportunity initiatives, the Court is not persuaded that such evidence as a matter of law demonstrates the use of a quota system, as that term has been defined by the Supreme Court. No evidence was offered at trial that there was a fixed ratio or target number of black officers that the DSP sought to promote, but only that the DSP wanted to increase the number of minority officers promoted. In the Court's view, such a generalized effort to achieve more minority representation in the command ranks of the DSP does not prove with the requisite certainty that a quota was established. In fact, under certain circumstances such an effort may be admirable. Accordingly, the Court concludes that the jury's findings that Defendants maintained an illegal quota system and that a quota system adversely affected Plaintiffs' promotional opportunities must be set aside as unsupported by the record evidence, and therefore, the Court will grant Defendants' Motion For Judgment As A Matter Of Law on the jury's quota findings.

### III. Whether Defendants Are Entitled To A New Trial On The Remaining Portions Of The Jury's Verdict

With respect to the remaining portions of the jury's verdict on Plaintiffs' discrimination claims under the pretext analysis, Defendants contend a new trial is warranted.*349 Specifically, Defendants raise five grounds in support of their motion for a new trial: (1) Plaintiffs used their peremptory challenges in a discriminatory manner; (2) the Court's jury instructions were erroneous; (3) the Special Verdict Form was confusing and misleading to the jury; (4) the Court erred with respect to certain evidentiary rulings; and (5) the jury's damage award is against the great weight of the evidence.

A. *Whether Plaintiffs Exercised Peremptory Challenges On The Basis Of The Race Of Potential*

336 F.Supp.2d 342
336 F.Supp.2d 342
(Cite as: 336 F.Supp.2d 342)

Page 8

*Jurors*

Defendants contend that they are entitled to a new trial, because Plaintiffs improperly removed five potential jurors because they were minorities. Defendants contend that Plaintiffs used 80% of their peremptory strikes, four out of five, to remove minority women, and that the reasons offered by Plaintiffs' counsel for removing these potential jurors was a pretext for race discrimination. Although Defendants initially refer to five potential jurors, it is evident from their argument, that they challenge only two of Plaintiffs' strikes, those against Juror 8 and Juror 22.

[5][6] It is well-established that the Equal Protection Clause prohibits discrimination on the basis of race in the selection of a petit jury. *Batson v. Kentucky,* 476 U.S. 79, 88, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Riley v. Taylor,* 277 F.3d 261, 275 (3d Cir.2001) (en banc). When a peremptory strike exercised by a party is challenged, the court must undertake a three step analysis. First, the moving party must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, once that showing is made, the non-moving party must offer a race-neutral explanation for striking the juror in question. Third, the court must determine whether the moving party has shown purposeful discrimination. *Miller-El v. Cockrell,* 537 U.S. 322, 328-329, 123 S.Ct. 1029, 154 L.Ed 2d 931 (2003).

[7][8] Applying this analysis, the Court first observes that Defendants' need to make a prima facie showing has been mooted, because Plaintiffs offered an explanation for their peremptory challenges before the Court addressed the adequacy of any prima facie showing. *DeJesus,* 347 F.3d at 505. Thus, the Court will proceed to the second step to determine if Plaintiffs' explanation for each peremptory strike was facially race-neutral. This step does not require that the explanation be persuasive or even plausible. Rather, the reason offered will be deemed race neutral unless a discriminatory intent is inherent in the non-movant's explanation. *Id.* Further, an "explanation which is otherwise racially neutral on its face is not infirm solely because its repeated application would have a disparate impact on a particular racial group." *United States v. Uwaezhoke,* 995 F.2d 388, 392 (3d Cir.1993).

[9] With respect to Juror 8, Plaintiffs contend that this juror was stricken because she lives less than 10 miles from Defendant Chaffinch, just on the other side of the Kent/Sussex line. Plaintiffs contend that

they "did not want jurors who live near [Defendant] Chaffinch in rural western Sussex County." (B96-97). With respect to Juror 22, Plaintiffs contend that this juror was stricken because she lives in the City of Wilmington, a historically Democratic stronghold, and thus, is a likely Democratic voter. Because Plaintiffs' case criticized the actions and policies of a popular Democratic Governor and four other statewide elected Democratic representatives of the City of Wilmington, Plaintiffs maintain that they sought to strike residents of the City of Wilmington. The Court finds that Plaintiffs' explanations *350 are facially neutral, and therefore, the Court must proceed to the third step of the *Batson* inquiry.

[10] At the third step of the *Batson* inquiry, the burden of proof is on Defendants to prove intentional race discrimination. As the Supreme Court has explained:

In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of [counsel's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'[1]

*Hernandez v New York,* 500 U.S. 352, 358-359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), *quoted in DeJesus,* 347 F.3d at 507.

Defendants contend that Plaintiffs' proffered explanations are a pretext for racial discrimination. Defendants contend that the Court must compare stricken black jurors to sitting white jurors to determine whether the asserted justifications for striking the black jurors are pretextual. Plaintiffs agree that such a comparison is necessary and contend that once such a comparison is made it is evident that Plaintiffs' peremptory strikes were not exercised on the basis of race. The Court agrees with Plaintiffs. In seeking to strike all jurors who lived in the City of Wilmington, Plaintiffs did not only strike a black juror, Juror 22, but also struck a white juror, Juror 20. Defendants claim that Jurors 3 and 9, who were also white, were not bumped. However, as evidenced by their zip codes, Jurors 3 and 9 were not residents of the City of Wilmington, but lived outside the city limits in areas north and east of the City of Wilmington. (D.I. 137, Tab A, B). Further, the only juror that actually lived within the city limits who was permitted to remain on the jury

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was a black juror, Juror 5, whose brother was a New Castle County police officer. (B73-74). Based on these comparisons, the Court finds that Plaintiffs' counsel did not exercise a peremptory challenge with respect to Juror 22 on the basis of race.

With respect to Juror 8, Defendants argue that this juror was purportedly challenged because she lived in the same county as Defendant Chaffinch, yet Plaintiffs did not challenge Juror 2, a white juror who also lived in Sussex County. After considering the residence of these two jurors, the Court finds that the county where each of these jurors resides is less important than the physical proximity of the juror's residence to Defendant Chaffinch's residence. For example, Juror 8 lives in Harrington, a town which is less than 10 miles from Defendant Chaffinch's home. By contrast, Juror 2 lives in Millsboro which is on the southeastern side of Sussex County, more than 30 miles from Defendant Chaffinch's home. (D.I. 137, Tab D, E). In the Court's view, the geographical proximity between these two juror and Defendant Chaffinch is quite different, and the Court finds this difference to be consistent with the explanation provided by Plaintiffs' counsel for the exercise of a peremptory challenge against Juror 8.

In sum, the Court is not persuaded that Plaintiffs' counsel exercised peremptory challenges in a discriminatory manner. A comparison of the jurors remaining on the jury to those who were stricken, as well as the Court's observations regarding the demeanor of Plaintiffs' counsel, lead the Court to conclude that Plaintiffs' counsel acted consistently with his explanations and that his explanations were not a pretext for racial discrimination. Because the Court finds no basis to support Defendants'*351 claim of race discrimination in the selection of jurors, the Court declines to order a hearing on this issue. Accordingly, the Court concludes that Defendants are not entitled to a new trial on *Batson* grounds.

### B. *Whether A New Trial Is Warranted Based On Defendants' Claim That The Jury Instructions Were Erroneous*

Defendants next contend that a new trial is warranted, because the Court gave a causation instruction that was confusing and contained incorrect statements of law concerning the Plaintiffs' burden. Defendants contend that the Court should have given the following instruction requested by Defendants.
In order for Plaintiffs Bullen and Giles to establish their claims they must prove by a preponderance of

the evidence that Defendants Chaffinch, Ford and the DSP intentionally discriminated against them.

(D.I. 135 at 37). By denying to give this instruction, Defendants contend the Court failed to instruct the jury as to its ultimate function of determining whether Defendants had intentionally discriminated against Plaintiffs.

Defendants also contend that the Court should have sustained its objection to the Court's instruction related to Plaintiffs' prima facie case. Specifically, the Court instructed the jury on Plaintiffs' prima facie case as follows:
In order for plaintiffs to prevail on their claim against defendants for race discrimination based on indirect evidence, they must prove the following elements by a preponderance of the evidence:
1) both plaintiffs are white;
2) they were qualified to be Sergeants;
3) there were vacancies for the position of Sergeant;
4) all the persons remaining on Band B to fill the vacancies under the then current list were all white;
5) the list was frozen and allowed to expire without making any promotions because of race;
6) a new list was created; and
7) black candidates were treated more favorable on the new list.

(Tr. Vol. E at 12-13). Defendants contend that this formulation of the prima facie case was erroneous because it contained two unnecessary elements. Specifically, Defendants contend that Element 4 should have directed the jury to consider the candidates on Band C, as well as Band B, because the number of candidates on Band B was small and Plaintiffs attempted to prove at least four Sergeant openings. Defendants also contend that Element 7 is ambiguous, because it asked the jury whether "black candidates were treated more favorably on the new list." Defendants further contend that Element 4 becomes more problematic in combination with Element 7, because Band B contained only white Sergeant candidates, so anything happening in the next promotion cycle would be more favorable than the zero number of promotable blacks in Band B from the 2000-2001 list.

[11][12][13][14] In evaluating a motion for a new trial due to an alleged legal error in the jury instructions, the Court must determine "whether an error was in fact committed, and (2) whether that error was so prejudicial that [the] denial of a new trial would be inconsistent with substantial justice." *Lafate,* 123 F.Supp.2d at 785 (citations omitted). In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

336 F.Supp.2d 342                                                                    Page 10
336 F.Supp.2d 342
**(Cite as: 336 F.Supp.2d 342)**

making these determinations, the court should examine the jury instructions as a whole and should not scrutinize specific instructions in a vacuum. *Id.* The trial court has broad discretion concerning the particular language used in a jury instruction, and need not give a **\*352** proposed instruction if the essential points are already covered by the instructions given. *Grazier v. City of Phila.*, 328 F.3d 120, 126 (3d Cir.2003). However, the jury instructions must fairly and adequately submit the issues in the case to the jury. *Figg Corp. v. Dow Corning, Corp.*, 962 F.2d 1119, 1124 (3d Cir.1992). The Court abuses its discretion with respect to jury instructions "if the instruction was capable of confusing and thereby misleading the jury." *Grazier,* 328 F.3d at 126.

With respect to Defendants' argument that the Court's jury instructions failed to instruct the jury on its ultimate decision to determine whether Plaintiffs were intentionally discriminated against on the basis of race, the Court concludes that the jury charge taken as a whole properly instructed the jury. Although the Court declined to give the instruction proposed by Defendants, the Court instructed the jury no less than four times throughout the charge that it had to find that Plaintiffs were not promoted because of their race.    (B880, B881, B882, B884). Defendants are not entitled to any particular form of instruction, and the Court is persuaded that the charge taken as a whole fairly and adequately instructed the jury as to the applicable legal requirements.    *See Shaw v. Lauritzen*, 428 F.2d 247, 251 (3d Cir.1970).

[15][16]  With respect to the Court's instructions regarding the elements of a prima facie case, the Court likewise concludes that its instructions were not erroneous. The Court is permitted to instruct the jury as to the elements of the prima facie case where, as here, certain elements are in dispute and require fact finding by the jury. *See Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 347 n. 1 (3d Cir 1999). In this case, Defendants outlined virtually the same elements that the Court provided to the jury as part of the Plaintiffs' burden of proof, and Defendants disputed all of the elements except that Plaintiffs were white.  (B1108, D.I.87, 85).    Thus, it was appropriate for the Court to apprise the jury of the elements of the prima facie case.  Further, it is not *per se* inappropriate for the jury to know the elements of the prima facie case, provided that the jury is not given the confusing burden and legalistic jargon of the *McDonnell Douglas* burden shifting framework. *Pivirotto,* 191 F.3d at 348 n. 1. Indeed, it is the elements of the prima facie case taken together with

the factfinder's belief or disbelief of the defendants' proffered reasons for its adverse employment actions which enable the jury to decide the ultimate question of whether the defendants unlawfully discriminated against the plaintiffs. *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1066-1071, *see also Reeves,* 530 U.S. at 143-148, 120 S.Ct. 2097; *Smith* 147 F.3d at 280 (stating that "the jurors must be instructed that they are entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met *if they find that the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision* ") (emphasis added).

In this case, the Court did not provide the jury with any legalistic jargon or nuances and set forth a recitation of what Defendants themselves believed needed to be proven by Plaintiffs.    As for Defendants' contention that the jury instruction was erroneous because it failed to direct the jury to consider Band C of the 1999 promotion list, the Court concludes that in the context of the instant case, the instruction at issue was proper.  The Court understands that a stand alone consideration of the instruction could result in a conclusion that the instruction is deficient.    However, even if Defendants are correct, the Court believes any error was harmless.    If the jury had been instructed to consider Band C, one additional black officer would **\*353** have been eligible for promotion, and thus, if all bands created under the alternate list (Bands A, B, and C) were considered, a total of 5 black officers would have been eligible for promotion.  (PX 1, 5, B901-904, B913-915;  D.I. 137 at Tab F).    Thus, whether Band B was considered or not considered by the jury, black officers would have fared better under the alternate list.    Accordingly, the Court concludes that if the instruction is erroneous because of the exclusion of Band C, the error was harmless in that it would not, in the Court's view, have affected the jury's analysis of the issue for which the instruction was given.

### C. Whether A New Trial Is Warranted Based On Defendants' Claim That The Special Verdict Form Was Erroneous

Defendants next contend that a new trial is warranted, because the Special Verdict Form erroneously includes dates during which Defendant Chaffinch was not responsible for the promotion process. Specifically, the Special Verdict Form asked the jury

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to determine whether Defendants decided not to promote Plaintiffs "between September 6, 2001, and December 31, 2001." Defendants contend that this interrogatory is misleading because Defendant Chaffinch was not responsible for any promotion decisions prior to assuming the role of Acting Superintendent on October 1, 2001. Defendants also contend that the jury could have agreed with Defendants that the promotion freeze was lifted at the end of September 2001 and that is why Plaintiffs were not promoted in September 2001.

Plaintiffs contend that it was appropriate to include the period from September 6 though December 31, 2001, because the evidence supported Plaintiffs' argument that a promotions freeze went into effect on September 6, 2001. Plaintiffs contend that, based on the testimony of Defendant Ford, the jury could have concluded that Defendant Chaffinch approved, ratified, sanctioned and otherwise abided by the promotions freeze. Plaintiffs further point out that Defendant Ford was in office on September 6th and was the person who ordered the promotions freeze. Thus, Defendant Ford is properly accountable for the freeze.

Reviewing the parties' arguments in light of the evidence adduced at trial and the interrogatories posed in the Special Verdict Form, the Court concludes that it was not error to include the September 6, 2001 date in the interrogatories. Plaintiffs presented evidence of an indefinite promotion freeze and evidence that Defendant Chaffinch abided by this freeze. Further, the evidence supported Defendant Ford's liability for the promotion freeze. The parties discussed this issue with the Court during the prayer conference, and Defendants acknowledged that there was a promotion freeze in September 2001. (Tr. Vol. D at 26). Accordingly, the Court concludes that the jury was properly asked to consider the time frame beginning with the September 6, 2001 date, as the relevant date from which the discrimination against Plaintiffs began.[FN3]

> FN3. In its decision on a motion for partial summary judgment filed in this case, the Court stated the relevant time frame for Plaintiffs' claims was October 1, 2001 through December 31, 2001. In setting this time frame, the Court was considering only the date that Defendant Chaffinch assumed his role as Acting Superintendent and not the date on which the promotions freeze

commenced. This issue was more thoroughly discussed at the prayer conference, and it was evident to the Court that the parties agreed that the import of the instruction was that Colonel Chaffinch was acting pursuant to a freeze initiated on September 6, even though Colonel Chaffinch didn't assume his role as Acting Supervisor until October 1. (Tr. Vol. D at 24-25). The Court gave the parties the opportunity to alter the instruction if they believed it could be worded more clearly, but the parties declined to offer other proposals.

**\*354 D. *Whether A New Trial Is Warranted Based On Certain Evidentiary Rulings***

Defendants next contend that the Court erred with respect to two evidentiary rulings: (1) the Court's decision to admit the Dillman e-mail describing the 1998 recruiting process, and (2) the Court's decision declining to admit the Blunt-Bradley Report. Defendants contend that the 1998 Dillman e-mail is irrelevant and unfairly prejudicial under Federal Rule of Evidence 403. As for the Blunt-Bradley Report, Defendants contend that the report in its entirety was relevant to the issues in the case and should have been admitted in full.

[17][18][19] A new trial is warranted based on a court's decision to admit or exclude evidence, if that ruling affects a substantial right of a party. *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 180 (3d Cir.2000). With respect to the admissibility of evidence under Rule 403, "a trial judge is given broad discretion in weighing the probative value of evidence against its potential prejudicial effect." *U.S. v. Guerrero*, 803 F.2d 783, 785 (3d Cir.1986). Rule 403 should be exercised "sparingly" to exclude evidence, because such evidence is "concededly probative." *Blancha v. Raymark Indus.*, 972 F.2d 507, 516 (3d Cir.1992). Thus, the balance under Rule 403 should generally be struck in favor of admissibility. *Id.*

[20] With respect to the 1998 Dillman e-mail concerning the recruiting process, the Court concludes that this evidence was properly admitted. In the Court's view, the 1998 e-mail is relevant evidence. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. R. 401. Plaintiffs argued that the Governor's administration

sought to be more aggressive than previous administrations with respect to minority hiring and promotions. Thus, as Plaintiffs' contended at trial, the 1988 e-mail could be viewed as the benchmark from which Defendants' began efforts to secure a work force more reflective of the population of the State of Delaware. Given the position Mr. Dillman held as a civilian employee of the DSP, the Court is persuaded that allowing the jury to know and consider his views in the context of the factual issues the jury was asked to decide was not error.   Mr. Dillman's discussion of the recruiting process is evidence probative of the intent of Defendants regarding the employment practices of the DSP. In reaching the decision to admit Mr. Dillman's e-mail, the Court considered the typically difficult task a plaintiff encounters concerning evidence of a defendant's intent in discrimination cases, and the ability of Defendants in this case to address or rebut the contents of the e-mail.

Because the Court found the e-mail evidence relevant to the intent issues in this case, as indicated above, the Court considered whether the e-mail was unduly prejudicial. Plaintiffs' evidence of intent in this case was built on the employment decisions made by Defendants prior to Defendant Chaffinch assuming the duties of Superintendent and then connecting that history to the promotional process that involved Plaintiffs here. In this context, the Court found that the 1998 Dillman e-mail was not unduly prejudicial to Defendants, and therefore, the Court concludes that the e-mail was properly admitted into evidence.

*355 To the extent that the Blunt-Bradley report was admitted to support Plaintiffs' pretext case such that the admissibility of the report is not mooted by the Court's decision to grant judgment as a matter of law in favor of Defendants on the quota issue, the Court concludes that the proper balance was struck to avoid undue prejudice.   In declining to admit the entire report, but allowing the parties to use relevant portions of the report through testimony of witnesses, the Court concludes Defendants were not prejudiced. The jury did not need to have the full document, and by allowing relevant testimony, the issue of the jury considering irrelevant evidence was avoided.    In sum, the Court's ruling allowed the jury to consider all relevant portions of the report.

E. *Whether The Jury's Damage Award Is Against The Weight Of The Evidence Such That A New Trial Is Warranted*

Defendants next contend that a new trial is warranted, because the jury's damages award is excessive and against the weight of the evidence.    Defendants contend that Plaintiffs failed to present direct and substantial evidence of actual injury.    Defendants point out that Plaintiffs did not present any evidence of professional medical or psychiatric counseling, and Defendants did not present testimony from their peers that Plaintiffs were held in any less esteem. Defendants contend that Plaintiffs only presented their testimony in support of the claims that they suffered physical and emotional distress, and that this testimony is not sufficient to justify the jury's damages award of $150,000 to each Plaintiff.

[21] In evaluating the damages award, "[t]he dispositive legal question is whether, given the evidence presented, the jury's award was so irrational as to shock the judicial conscience." *Tormenia v. First Investors Realty Co., Inc.*, 251 F.3d 128, 138 (3d Cir.2000).    The Court is obligated to uphold the award of damages if a reasonable basis exists in the record to support the award.    *Evans v. Port Auth. of N.Y. and N.J.*, 273 F.3d 346, 351-352 (3d Cir.2001).

[22] Similarly, a remittitur is appropriate when the "trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds that amount needed to make plaintiff whole, i.e., to remedy the effect of the employer's discrimination." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir.1995).    If remittitur is awarded it should "be set at the 'maximum recovery' that does not shock the judicial conscience." *Evans*, 273 F.3d at 351-352.

[23] The Court finds that a sufficient evidentiary basis exists to support the damages award of the jury in this case and that it is not excessive so as to shock the judicial conscience.    As the Third Circuit has recognized, "racial discrimination is vicious, destructive, and debilitating." *Evans*, 273 F.3d at 354.    The testimony of both Plaintiffs Giles and Bullen demonstrated that Plaintiffs suffered personally and professionally as a result of Defendants' discrimination.    Plaintiffs testified that they were committed to their careers as police officers early in life and were well regarded by their peers.    Plaintiffs testified that the DSP is a small community, and the atmosphere had a "soap opera" quality where everyone talked about everything that was going on.    Plaintiffs testified that they were humiliated by Defendants' failure to promote them. Both Plaintiffs testified that their peers knew there were promotion vacancies and questioned them as to

why they were "blacklisted" and who they had "upset."

**\*356** Both Plaintiffs further testified that their family lives also suffered. Plaintiff Giles testified that he couldn't sleep at night and suffered from mood swings. Plaintiff Giles testified that he took his anger out on his children and wife. Plaintiff Bullen testified that he became withdrawn and short-tempered and that he lost his happy go lucky attitude and sense of humor. Plaintiff Bullen further testified that he lost 15-20 pounds as a result of stress he endured from his failure to be promoted.

Defendants contend that this testimony is insufficient to support the damages awarded, because Plaintiffs testimony was not corroborated by medical or other expert evidence, or by the testimony of Plaintiffs' family members. However, such corroboration and expert testimony is not required. *See Evans,* 273 F.3d at 352 n. 5; *Bolden v. SEPTA,* 21 F.3d 29, 34 (3d Cir 1994). The Court observed the demeanor, expressions and attitude of Plaintiffs as each testified and concluded Plaintiffs' testimony was highly credible. Both Plaintiffs testified that it was difficult for them to talk about their feelings. Plaintiff Bullen testified that he was a tough man who came from the "John Wayne generation" and that expressing emotion is "a sign of weakness." In the Court's view, Plaintiff Bullen had genuine difficulty testifying about the impact Defendants' actions had on him and his family. With regard to Plaintiff Giles, the Court observed that he hung his head while testifying about how his relationships with his children and wife were affected by his experiences with the promotion process at the DSP. In sum, the Court finds that the exhibitions of emotion by Plaintiffs were genuine. The Court is likewise convinced that Plaintiffs suffered injury to their reputation within the ranks of the DSP, humiliation and emotional distress, all of which are consistent with the jury's award of damages. Accordingly, the Court concludes that reasonable and substantial evidence supports the jury's damages award, and therefore, the Court will deny Defendants' request for a new trial on this ground.

## CONCLUSION

For the reasons discussed, the Court will grant Defendants' Motion For Judgment As A Matter Of Law on Plaintiffs' claim that the Delaware State Police had reserved a certain fixed number, proportion or percentage of opportunities for promotion exclusively for certain minority groups and that such quota caused Plaintiffs not to be promoted in the latter part of 2001. The Court will deny Defendants' Motion For A New Trial as it pertains to all other issues raised by Defendants.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this 17th day of September 2004, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendants' Motion For Judgment As A Matter Of Law (D.I.121-1) on Plaintiffs' claim that the Delaware State Police had reserved a certain fixed number, proportion or percentage of opportunities for promotion exclusively for certain minority groups and that such quota caused Plaintiffs not to be promoted in the latter part of 2001 is *GRANTED.*

2. Defendants' Motion For A New Trial (D.I.121-2) on all other grounds raised by Defendants is *DENIED.*

D.Del.,2004.
Bullen v. Chaffinch
336 F.Supp.2d 342

Briefs and Other Related Documents (Back to top)

• 1:02CV01315 (Docket) (Jul. 24, 2002)

END OF DOCUMENT

Westlaw.

903 F.Supp. 975
903 F.Supp. 975
**(Cite as: 903 F.Supp. 975)**

Page 1

P
Briefs and Other Related Documents

United States District Court,S.D. West Virginia.
Doris COLE, Plaintiff,
v.
APPALACHIAN POWER COMPANY, et al.,
Defendants.
**Civ. A. No. 1:94-0517.**

July 13, 1995.

Employee brought action against employer, alleging sexual harassment in violation of Title VII. Employer filed motion for protective order which would prohibit employee's counsel from interviewing certain of its other employees, and employee filed motion to clarify status of employees. The District Court, Feinberg, United States Magistrate Judge, held that: (1) counsel's ex parte interviews of employees from five delineated classes were impermissible; but (2) counsel's ex parte interviews of employees who merely witnessed events at issue in action were permissible.

Ordered accordingly.

West Headnotes

**[1] Attorney and Client 45 🔑 32(12)**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k32 Regulation of Professional Conduct, in General
                45k32(12) k. Relations, Dealings, or Communications with Witness, Juror, Judge, or Opponent. Most Cited Cases
Attorney's ex parte interviews of the following classes of a represented organization's employees are inappropriate: (1) officials of organization, i.e., those having managerial responsibility, (2) other persons whose act or omission in connection with matter may be imputed to organization for purposes of civil or criminal liability, i.e., those who have legal power to bind the organization in the matter, (3) those who are responsible for implementing advice of organization's lawyers, (4) any members of organization whose own interests are directly at stake in representation, i.e., any person who is independently represented by

counsel directly or indirectly by membership in class, partnership, joint venture or trust, and (5) agent or servant whose statement concerns matter within scope of agency or employment, which statement was made during existence of relationship and which is offered against organization as admission. Fed.Rules Evid.Rule 801(d)(2)(D), 28 U.S.C.A.; W.Va.Rules of Prof.Conduct, Rule 4.2.

**[2] Attorney and Client 45 🔑 32(12)**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k32 Regulation of Professional Conduct, in General
                45k32(12) k. Relations, Dealings, or Communications with Witness, Juror, Judge, or Opponent. Most Cited Cases
Attorney's ex parte interviews of employees who are mere witnesses to an event for which employing organization is sued, i.e., mere holders of factual information, are permitted. Fed.Rules Evid.Rule 801(d)(2)(D), 28 U.S.C.A.; W.Va.Rules of Prof.Conduct, Rule 4.2.

**[3] Attorney and Client 45 🔑 32(12)**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k32 Regulation of Professional Conduct, in General
                45k32(12) k. Relations, Dealings, or Communications with Witness, Juror, Judge, or Opponent. Most Cited Cases
Any person who is independently represented by counsel may not be interviewed ex parte by plaintiff's or defendant's attorney. W.Va.Rules of Prof.Conduct, Rule 4.2.

**[4] Attorney and Client 45 🔑 32(12)**

45 Attorney and Client
    45I The Office of Attorney
        45I(B) Privileges, Disabilities, and Liabilities
            45k32 Regulation of Professional Conduct, in General
                45k32(12) k. Relations, Dealings, or Communications with Witness, Juror, Judge, or Opponent. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Prior to interviewing unrepresented witness who is employee of represented organization, attorney or investigator shall fully disclose their representative capacity to employee, shall state reason for seeking the interview as it concerns attorney's client and the employer, shall inform individual of his or her right to refuse to be interviewed, shall inform the person that he or she has right to have their own counsel present, and shall not, under any circumstances, seek to obtain attorney-client or work product information from the employee. W.Va.Rules of Prof.Conduct, Rule 4.3.

\*976 Sharon Steorts and Carl Hostler, Charleston, WV, for plaintiff.

Thomas Winn, Victor Cardwell, Diane Baun, Clinton Morse, Roanoke, VA, C Davis, Bluefield, WV, and Bill Turner, Lewisburg, WV, for defendants.

### *MEMORANDUM ORDER*

FEINBERG, United States Magistrate Judge.
Pending before the court is plaintiff's Motion to Clarify the Status of Employees, and defendant's Motion for Protective Order. The court has received additional materials from the parties relating to the Motion. At issue is whether plaintiff's counsel may interview *ex parte* certain named employees of defendant. In particular, the court is faced with the competing interests of plaintiff's legitimate search for witnesses in a civil action relating to her employment, and the ethical considerations raised by the witnesses being agents/servants of defendant.

This Court's Local Rule 3.01 provides that, among other Codes, "the Code of Professional Conduct as adopted by the Supreme Court of Appeals of West Virginia provide[s] the basic ethical considerations and disciplinary rules for the conduct of attorneys practicing in this court."

Rule 4.2 of the West Virginia Rules of Professional Conduct provides as follows:
In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

W.Va.Rules of Professional Conduct, Rule 4.2 (1988). The Official Comment to the Rule gives some additional explanation:In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in

representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.

The Official Comment would prohibit *ex parte* interviews with three classes of an organization's employees:

1. Those having a managerial responsibility;

2. Any other person;

(a) Whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability; or

(b) Whose statement may constitute an admission on the part of the organization.

The Comment's language, "whose statement may constitute an admission on the part of the organization," is an unmistakable reference to Evidence Rule 801(d)(2)(D), which provides as follows:
**(d) Statements which are not hearsay.** A statement is not hearsay if–
**(2) Admission by party-opponent.** The statement is offered against a party and is ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship,....

The Supreme Court of Appeals of West Virginia ("State Supreme Court") stated that the Official Comment to Rule 4.2 is not part of the Rule and is not considered "binding," in *Dent v. Kaufman*, 185 W.Va. 171, 174, 406 S.E.2d 68, 71 (1991). In *Dent*, the State Supreme Court was asked to decide whether all employees of a corporate defendant are \*977 "parties" to a lawsuit for the purpose of Rule 4.2. The Court adopted the approach used in *Niesig v Team I*, 76 N.Y.2d 363, 558 N.E.2d 1030, 559 N.Y.S.2d 493 (1990), which it quoted as follows:
The test that best balances the competing interests, and incorporates the most desirable elements of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other approaches, is one that defines "party" to include corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation's "alter egos") or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel. All other employees may be interviewed informally.

\* \* \* \* \* \*

In practical application, the test we adopt thus would prohibit direct communication by adversary counsel "with those officials, but only those, who have the legal power to bind the corporation in the matter or who are responsible for implementing the advice of the corporation's lawyers, or any member of the organization whose own interests are directly at stake in a representation." (Wolfram, [Modern Legal Ethics ], § 11.6, at 613.) This test would permit direct access to all other employees, and specifically- as in the present case-it would clearly permit direct access to employees who were merely witnesses to an event for which the corporate employer is sued.

Niesig, 76 N.Y.2d at 374-75, 559 N.Y.S.2d at 498-99, 558 N.E.2d at 1035-36; Dent, 185 W.Va. at 175, 406 S.E.2d at 72.[FN1] The New York court, in adopting this test, specifically rejected an approach which was based on Rule 801(d)(2)(D), Federal Rules of Evidence, "which is different from the New York State rule (see, Loschiavo v. Port Auth., 58 N.Y.2d 1040, 462 N.Y.S.2d 440, 448 N.E.2d 1351 (1983); Kelly v. Diesel Constr. Div., 35 N.Y.2d 1, 358 N.Y.S.2d 685, 315 N.E.2d 751 (1974))." 76 N.Y.2d at 374, 559 N.Y.S.2d at 498, 558 N.E.2d at 1035. Therefore the Dent case is based upon reasoning which specifically excluded from consideration Federal Rule of Evidence 801(d)(2)(D) which is in full force in this Court, and in West Virginia State courts via West Virginia Rules of Evidence 801(d)(2)(D).

> FN1. Professor Wolfram's treatise provides an excellent exposition of the issue. He writes as follows:
> To what extent is a lawyer prohibited from interviewing employees of a corporation or other entity represented by another lawyer? [The anticontact] rules seek to prevent lawyers from gaining for their clients an unfair advantage over other represented persons and to protect the client against intrusions by an opposing lawyer into the

confidential client-lawyer relationship. They are not meant to protect others whose interests might be impaired by factual information willingly shared by the contacted employee. Contact by a lawyer with a corporate employee will typically do little, if anything, to impair the corporate lawyer's own ability to gather information or to advise members of the organization about legal matters. Therefore, attorney-client privilege policies are largely irrelevant. So an employee whose position in a matter is only that of a holder of factual information should be freely accessible to either lawyer.

The court concludes that the Dent holding effectively eliminates the portion of the Official Comment to Rule 4.2 which concerns statements which constitute admissions. Evidence Rule 801(d)(2)(D) is not mentioned in the decision. The Dent opinion reminds the reader that "what we are dealing with here are rules of professional conduct, not rules of evidence. As the Supreme Court of Washington has said, '[i]t is not the purpose of the rule to protect a corporate party from the revelation of prejudicial facts.' Wright v. Group Health Hosp., 103 Wash.2d 192, 200, 691 P.2d 564, 569 [1984]." [FN2] The Dent opinion gives a concrete example of an appropriate ex parte interview:

> FN2. When Wright was decided, the State of Washington had not adopted an evidence rule equivalent to 801(d)(2)(D). Morrison v. Brandeis University, 125 F.R.D. 14, 17 (D.Mass.1989), Collings, Magistrate Judge.

In fact, a hospital employee could tell opposing counsel that he saw a surgeon snorting cocaine in the men's room before surgery, and his statement, no matter how damning to the surgeon or the hospital, would never constitute an admission by the surgeon or the hospital. It would be entirely proper for plaintiff's counsel in a *978 medical malpractice case to have an informal interview with such an employee. Dent, 185 W.Va. at 176, 406 S.E. 2d at 73.

Dent would prohibit ex parte interviews of three classes of an organization's employees:
1. Officials
(a) Who have the legal power to bind the corporation in the matter (the corporation's "alter egos"); or
(b) Who are responsible for implementing the advice of the corporation's lawyers; or
2. Any member of the organization whose own

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

903 F.Supp. 975
903 F.Supp. 975
(Cite as: 903 F.Supp. 975)

managerial responsibility);

2. Other persons whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability (those who have the legal power to bind the organization in the matter);

3. Those who are responsible for implementing the advice of the organization's lawyers;

4. Any members of the organization whose own interests are directly at stake in a representation (i.e., any person who is independently represented by counsel directly or indirectly by membership in a class, partnership, joint venture, or trust);

5. An agent or servant whose statement concerns a matter within the scope of the agency or employment, which statement was made during the existence of the relationship and which is offered against the organization as an admission. However, *ex parte* interviews of employees who are "mere witnesses" to an event for which the organization is sued (i.e., holders of factual information), are permitted. *Dent,* 185 W.Va. at 176, 406 S.E.2d at 73.

[3] Having listed these five classes, the court now considers the named employees of defendant who plaintiff's attorney wishes to contact. The court has no knowledge of any of these employees being independently represented by counsel. Any person who is so represented may not be interviewed *ex parte* by plaintiff's attorney (or, of course, by defendant's attorney).

For the foregoing reasons, it is hereby ORDERED that plaintiff's Motion to Clarify Status of Employees is granted as set forth below, and defendant's Motion for Protective Order is granted in part and denied in part, as set forth below.

Plaintiff's attorney may interview *ex parte* the following individuals as persons who may have factual information:

1. Betty Freeman, Plant Secretary, secretary to Plant Manager, Sandy Pennington;

2. Nancy Riddle, Maintenance Mechanic B;

3. Angela Mann, Senior Clerk;

4. Bob Fielden, Utility Worker A;

5. Clifford Long, Equipment Operator B;

6. Billy Neal, Coal Equipment Operator;

7. Richard Wall, Equipment Operator B;

8. Ricky Miller, Maintenance Mechanic A;

9. Larry Mann, Maintenance Mechanic A;

10. Teresa Bowles, Equipment Operator A;

11. Hazel Sadler, Maintenance Mechanic C;

12. Nate Brim, Senior Stores Attendant;

13. Howard Dickerson, Maintenance Mechanic B;

14. Greg Lee, Maintenance Mechanic B;

15. Jim Robinette, Coal Sampler;

16. Jeff Long, Equipment Operator A;

17. Rick Ould, Maintenance Mechanic A.

*980 Plaintiff's attorney may not interview *ex parte* the following individuals, for the reason that they fall into one or more class(es):

A. Sonny Wiley, Maintenance Supervisor (classes 1 and 2);

B. Roger Wheeler, Shift Operating Engineer (classes 1 and 2);

C. Jana Walls, Senior Chemist (classes 1, 2, and 5);

D. Mackie Mullins, Unit Supervisor (classes 1 and 2).

Other employees, Harry Johnson, M.N. Repass, N.L. Shrader, J.M. Ferrell, D.H. Hargro, J.W. Worrell, O.K. Nance, and Joe Rider are not covered by this Memorandum Order. They shall not be contacted *ex parte* by plaintiff's attorney until further Order of the court. Defendant has not had an opportunity to respond to these names.

Plaintiff has requested authority to interview *ex parte* "any other plant employees who volunteer to speak, except those managers already deposed." It is hereby ORDERED that the requested authority is denied.

[4] When plaintiff's attorney attempts to conduct *ex*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*parte* interviews with the named employees, Rule 4.3 of the Code controls.     The attorney or her investigator     shall     (1)     fully     disclose     their representative capacity to the employee, (2) state the reason for seeking the interview as it concerns the attorney's client and the employer, (3) inform the individual of his or her right to refuse to be interviewed, (4) inform the person that he or she has the right to have their own counsel present, and (5) not, under any circumstances, seek to obtain attorney-client or work product information from the employee.     *McCallum v. CSX Transportation, Inc* . 149 F.R.D. 104, 112 (M.D.N.C.1993).

Plaintiff requested that the court order defendant to provide a place at its facilities for plaintiff's attorney to interview these employees.     It is hereby ORDERED that the request is denied.

S.D.W.Va ,1995.
Cole v. Appalachian Power Co.
903 F.Supp. 975

Briefs and Other Related Documents (Back to top)

• 1:94CV00517 (Docket) (Jun. 27, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

306 F.3d 1333                                                                                      Page 1
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

▷

Briefs and Other Related Documents

United States Court of Appeals,Third Circuit.
Mary A. COLEMAN
v.
HOME DEPOT, INC.
Mary A. Coleman, Appellant
Home Depot U.S.A., Inc., <sup>FN*</sup> Appellant

FN* Pursuant to FRAP 12(a)
**Nos. 00-3496, 00-3656.**

Argued: April 25, 2002.
Filed: Oct. 9, 2002.

Discharged African-American female employee filed Title VII action against her former employer. The United States District Court for the District of New Jersey, Mary Little Cooper, J., entered judgment on jury verdict for employer. Employee appealed. The Court of Appeals, Becker, Chief Judge, held that: (1) Equal Employment Opportunity Commission (EEOC) letter of determination, though presumptively trustworthy when not challenged under hearsay exception for public records and reports, was not per se more probative than prejudicial, and (2) district court did not abuse its discretion in excluding EEOC letter of determination on basis that its low probative value was substantially outweighed by the problems created by its introduction.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⊙⃗823**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk823 k. Reception of Evidence.
Most Cited Cases
Court of Appeals reviews the admissibility of evidence for abuse of discretion; abuse of discretion is a clear error of judgment, and not simply a different result which can arguably be obtained when applying the law to the facts of the case.

**[2] Evidence 157 ⊙⃗333(1)**

157 Evidence
  157X Documentary Evidence
    157X(A) Public or Official Acts, Proceedings, Records, and Certificates
      157k333 Official Records and Reports
        157k333(1) k. In General. Most Cited Cases
Report may be untrustworthy, for purposes of determining applicability of hearsay exception for public records and reports, if the report appears to have been made subject to a suspect motivation, for example, if the public official or body who prepared the report has an institutional or political bias, and the final report is consistent with that bias. Fed.Rules Evid.Rule 803(8)(c), 28 U.S.C.A.

**[3] Federal Courts 170B ⊙⃗763.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
          170Bk763.1 k. In General. Most Cited Cases

**Federal Courts 170B ⊙⃗795**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
        170Bk795 k. Conduct of Trial in General; Evidence; Judgment. Most Cited Cases
Determinations of Equal Employment Opportunity Commission (EEOC) in letter would, in absence of challenge on appeal or below under hearsay exception for public records and reports, be assumed trustworthy notwithstanding district court's skepticism about whether EEOC had proper factual basis to conclude that reasonable cause existed to believe employer had discriminated against employee, and district court's decision to exclude that letter would be reviewed only under balancing test. Fed.Rules Evid.Rules 403, 803(8)(C), 28 U.S.C.A.

**[4] Evidence 157 ⊙⃗146**

306 F.3d 1333                                                                                          Page 2
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

157 Evidence
   157IV Admissibility in General
       157IV(D) Materiality
           157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
Relevant evidence may be excluded if its probative
value is not worth the problems that its admission
may cause, e.g. unfair prejudice, confusion of the
issues, misleading the jury, undue delay, waste of
time, or needless presentation of cumulative
evidence. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

## [5] Evidence 157 ☜146

157 Evidence
   157IV Admissibility in General
       157IV(D) Materiality
           157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
Prejudicial effect of admitting evidence must rise to
the level of creating an unfair advantage for one of
the parties for the evidence to be excluded under
balancing test.    Fed.Rules Evid.Rule 403, 28
U.S.C.A.

## [6] Evidence 157 ☜146

157 Evidence
   157IV Admissibility in General
       157IV(D) Materiality
           157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
Strong presumption exists that relevant evidence
should be admitted, and thus for exclusion under
balancing test to be justified, the probative value of
evidence must be substantially outweighed by the
problems in admitting it. Fed.Rules Evid.Rule 403,
28 U.S.C.A.

## [7] Evidence 157 ☜146

157 Evidence
   157IV Admissibility in General
       157IV(D) Materiality
           157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
Whether an Equal Employment Opportunity
Commission (EEOC) Letter of Determination is more
probative than prejudicial is within the discretion of
the trial court and is to be determined on a case-by-
case basis. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

## [8] Evidence 157 ☜146

157 Evidence
   157IV Admissibility in General
       157IV(D) Materiality
           157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
District Court in Title VII case has discretion to
exclude probative Equal Employment Opportunity
Commission (EEOC) Letters of Determination where
listed negative factors such as danger of unfair
prejudice, confusion of the issues, misleading jury,
undue delay, waste of time, or needless presentation
of cumulative evidence substantially outweigh the
probative value of the EEOC determination.
Fed.Rules Evid.Rule 403, 28 U.S.C.A.; Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

## [9] Evidence 157 ☜146

157 Evidence
   157IV Admissibility in General
       157IV(D) Materiality
           157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
For purposes of determining propriety of its
exclusion under balancing test in Title VII action,
probative value of Equal Employment Opportunity
Commission (EEOC) letter of determination was
low; report would have been introduced to jury after
all evidence had been offered, evidence was at odds
with report, report was more conclusory than factual
in nature, and value of report was not increased based
on agency's expertise. Fed.Rules Evid.Rule 403, 28
U.S.C.A.; Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

## [10] Evidence 157 ☜146

157 Evidence
   157IV Admissibility in General
       157IV(D) Materiality
           157k146 k. Tendency to Mislead or
Confuse. Most Cited Cases
District court hearing Title VII case did not abuse its
discretion in excluding Equal Employment
Opportunity Commission (EEOC) letter of
determination from evidence on basis that its low
probative value was substantially outweighed by
problems created by its introduction, even though
district court mistakenly focused on unfair prejudice
or confusion as basis for exclusion and did not know
full extent of evidence relied on by EEOC to
determine that employer had wrongly hired African-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

American female employee as cashier, wrongly
refused to transfer her to sales position, and wrongly
terminated her; EEOC was clearly mistaken in
critical conclusion that employee was "highly
experienced" and undue delay would be involved in
rebuttal of allegations of systematic discrimination
raised in letter.    Fed.Rules Evid.Rule 403, 28
U.S.C.A.; Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

\*1335 David A. Krenkel (Argued), Arbus, Krenkel &
Monaghan, LLC, Ocean, for Appellant/Cross-
Appellee Mary Coleman.

Patrick G. Brady (Argued), John M. O'Connor, Clara
H. Rho, Carpenter, Bennett & Morrissey, Newark,
for Appellee/Cross-Appellant Home Depot U.S.A.,
Inc.

Before BECKER, Chief Judge, and SCIRICA and
RENDELL, Circuit Judges.

## OPINION OF THE COURT

BECKER, Chief Judge.

Plaintiff Mary Coleman, an African American
female, who claims that defendant Home Depot
discriminated against her on the basis of race, gender
and age when it refused to give her a job in sales and
when it terminated her from her position as a cashier,
brought suit against Home Depot in the District Court
for the District of New Jersey, alleging employment
discrimination.    The jury found for Home Depot.
Coleman's appeal from the judgment of the District
Court entered on the jury verdict turns on the District
Court's exclusion from evidence of an EEOC Letter
of Determination in which the Agency concluded that
reasonable cause existed to believe that Home Depot
had discriminated against Coleman because of her
sex and race in connection with her hiring, request
for transfer, and discharge.    The District Court
excluded the evidence, which was otherwise
admissible pursuant to Fed.R.Evid. 803(8)(C),
primarily because it found that its probative value
was low and that any such value was outweighed by
confusion and unfair prejudice.    See Fed.R.Evid.
403. Coleman contends that this ruling was an abuse
of discretion.

This appeal presents the question whether an EEOC
Letter of Determination, which is presumptively
probative when not challenged as untrustworthy
under Rule 803(8)(C), can nonetheless be excluded
due to the considerations identified in Rule 403. See
id. (listing the considerations as "unfair prejudice,
confusion of the issues, or misleading the jury, or

consideration of undue delay, waste of time, or
needless presentation of cumulative evidence"),
Although the Circuits are divided on the issue, we
conclude that an EEOC Letter of Determination is
not *per se* admissible under Rule 403, and that, like
other probative evidence, it may be excluded if the
countervailing 403 factors substantially outweigh its
probative value. While the District Court found that
the letter should be excluded because of the risk of
unfair prejudice and confusion, instead we find that
other Rule 403 factors-undue delay and waste of
time-are sufficient on the record to tip the scales in
favor of finding that the District Court did not abuse
its discretion when it excluded the letter.    The
judgment of the District Court will therefore be
affirmed.

### 1. Background Facts

Coleman applied for a position with Home Depot's
Lakewood, New Jersey store on July 15, 1996.  On
her application, she stated that she was applying for
"any" position, and represented that she had prior
work experience/skills on a cash register, in
hardware, plumbing, lumber, paint, and electrical.
[SA491].    Within a week of submitting her
application, Home Depot called Coleman to its
Lakewood store for an interview.    Vincent Kobera,
the Store Manager, conducted the hiring interview.
[SA96].

During the interview, Coleman stated that she was
most interested in a sales position, but was told that
there was only an opening as a cashier.  [A47-48].
She \*1336 was also told that she would have the
opportunity down the line to transfer into a different
department.  [A48]. Kobera testified that his goal, as
an employer, was to "try to put people in where
they're going to be most comfortable.    I mean when
customers come in, they want to deal with someone
in electrical who has some working knowledge or
some point of reference for that.    So, part of the
interview process is to try to find that person's-call it
niche, if you like, and where they are going to fit with
us.    And that's why during the interview, we talk
about everything that's on the application." [SA185-
186].    During the interview Kobera questioned
Coleman about her experience in electrical,
plumbing, and hardware as indicated on her
application form. [SA97-98].

At the end of the interview, Kobera decided not to
offer Coleman a position in sales, but offered her a
position as a cashier instead. His decision with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                                      Page 4
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
(Cite as: 306 F.3d 1333)

respect to sales was based on the fact that during the
interview, Mary was "polite, courteous ... [but] when
I questioned her about [hardware], she couldn't
answer the questions and even told me that she didn't
have a lot of knowledge on that, so that was part of
it." [SA184]. In this regard, Kobera testified that the
hardware department at Home Depot "is really hand
tools, power tools, stationary tools in that very
specialized area," but when he asked Mary "if a
customer came in and wanted to buy a power tool for
a gift and they wanted to buy one of the most
versatile tools they could buy, what would she
suggest. And Mary said she did not know. And
then I asked her the same thing with hand tools ... and
she told me that when she worked at the hardware
store, she really didn't get in to the power tool part of
the business .... she said it was more of a small family
business. They carried like nuts and bolts and did
like pots and pans type-like a little mom and pop
hardware store." [SA 227-228]. Thus, at the end of
the interview, Kobera offered Coleman a position as
a part-time cashier, which she accepted on the spot.
[SA99-100].

Coleman began working at Home Depot on July 31,
1996. Before actually beginning work, she received
training on the use of the cash register system,
including the operation of function keys, paperwork
associated with certain types of transactions, and
procedures on the use of the register drawer and
counting to close the register. [SA127; *see also*
Cashier    Training    Checklist,    SA492].
Notwithstanding the training, Coleman received
several warnings about her poor job performance as a
cashier with respect to handling monies (shortages
and overages in her register at the end of the day).
[SA102]. Indeed, Coleman received at least nine
separate written warnings about her performance in
her six month career with Home Depot. [SA133-134;
135; 136-137; 137-138; 138-139; 147; 142; 145;
150-151]. These performance warnings indicated
that future problems with her cash transactions would
result in more written warnings, and possibly
termination.

Despite her poor performance on the cash register,
Coleman asked for a transfer from the cashier
position into the Hardware Association position.
[SA131-132]. This request was denied. The
Assistant Store Manager, Kevin McCann, testified
that Home Depot does not transfer employees having
performance problems from one department to
another:
[W]e do not transfer associates from area to area if
they have performance issues....    [H]aving a

performance problem, and in her case, a basic skill
such as cash handling, which really relates to paying
attention to detail and, you know, basic math skills,
that could be a problem on the sales floor, as well.

[SA303]. Kobera testified to the same:Q: And during
the time that you were the floor manager at [the]
Lakewood*1337 [store], did you ever transfer an
individual from a department who was having
performance problems as the solution to that problem
by putting them in another department?
A: No .... it doesn't solve the problem, you don't get
to the root of it, you're just moving the problem and
letting someone else deal with it.

[SA221].

Home Depot's employee handbook states that after
three counseling sessions for the same performance
warning, the employee could be terminated.
[SA224]. In addition to her six-month performance
review, which indicated that Coleman needed
improvement, she also received additional training
and assistance on the cash register on four or five
separate occasions by Jean Amato, an employee at
the Lakewood store. [SA158]. Moreover, Anne
O'Neil, the Store Customer Service Manager, worked
with Coleman to remedy her accuracy problems
[SA154-155], as did the head cashier, Sue Gibberson.
[SA158]. Despite all this help, Coleman's
performance continued to fall short and she continued
to receive written warnings. Ultimately, after a
customer called the store to complain that Coleman
had short-changed him $10.00, Coleman received her
last warning and was terminated. [SA151]. With
respect to her discharge, Kobera testified:
We had had like-by now it was nine or ten write-ups.
And we have given her lots of counseling. She had
lots of training....    We had done that, and [her
performance] was affecting the customers. I mean
when customers start calling the store and saying I'm
not happy ... there comes a point where we looked at-
I looked at Mary-Kevin and I, we talked about it.
But ultimately it was my decision to look at Mary's
performance and say I didn't see that it was going to
get any better, giving her another chance wasn't going
to correct the problem.

[SA230-231].

## II. Procedural History

### A. Agency Level

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                    Page 5
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

On May 28, 1997, Coleman filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). She claimed that Home Depot discriminated against her on the basis of her sex, race, and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* by: (i) hiring her as a cashier instead of as a sales associate in the Hardware Department; (ii) refusing to transfer her to a sales associate position within the Hardware Department; and (iii) terminating her employment. [A28]. Following an investigation, the EEOC issued a Letter of Determination on January 26, 1998, in which it concluded that reasonable cause existed to believe that Home Depot had discriminated against Coleman because of her sex and race in connection with Coleman's hiring, request for transfer, and discharge. We rescribe the letter in the margin.[FN1] [A30-32].

FN1. The letter states, in relevant part:
Evidence reveals that after Charging Party was hired as a cashier, she constantly requested to be transferred to hardware or another sales position in areas in which she was highly experienced. During the same period that she was requesting to be transferred, males with less experience were being hired directly into sales positions. Some of the male applicants had indicated on their employment application that they were applying for available positions and were hired directly into sales positions.
Since Charging Party was hired as a cashier rather than a sales associate, she experienced performance problems. As a result of not being allowed to transfer to a position she was qualified to perform, Charging Party's employment was affected when her employment was terminated effective February 13, 1997 for not being able to perform the cashier's job.
Evidence reveals that Charging Party had received and [sic] overall rating of "3" on December 15, 1996. In addition, evidence reveals that a similarly situated white employee, who had received warnings for shorting and/or overage, was allowed to transfer to another department.
The evidence as a whole makes it reasonable to conclude that Charging Party was discriminated against because of her sex

(Female) and race (Black) with respect to Charging Party's hiring, transfer and/or job assignment and discharge allegation
* * *
During the course of the investigation, the Commission has uncovered evidence which indicates that Respondent has discriminated against females with respect to hiring and other terms and conditions of employment, i.e., wages and transfers and/or job assignments into sales positions.
Evidence reveals that females were being hired as cashiers at a starting salary of $8.00 regardless of their prior experience. When females applied for an open position, they were placed in the cashier department while males who applied for open positions with no experience in sales were placed in sales jobs at a higher salary.
Evidence further reveals that males hired as cashiers were subsequently transferred into sales positions. However, the females hired as cashiers who were transferred, were being transferred either to the service desk or refund department, not to sales positions.
Females have systematically been placed in cashiers' position and not given the opportunity to advance into sales positions.
Based on the evidence of record, there is reasonable cause to believe that sex (Female) were [sic] motivating factors in Respondent's decision not to hire and/or transfer qualified females into sales positions at a higher rate of pay.
[A31-32].

**\*1338** The EEOC concluded that there were no facts to substantiate plaintiff's claim that Home Depot discriminated against her based on her age.

### B. The District Court Suit and the Court's Rationale for Excluding the Evidence

Coleman's civil action alleged that Home Depot had discriminated against her on the basis of her gender and race in violation of Title VII by: (i) hiring her on July 31, 1996 as a cashier instead of as a sales associate and failing thereafter to transfer her from a cashier to sales associate position in the Hardware Department; and (ii) terminating her employment on February 13, 1997.

On June 23, 2000, after the close of discovery and shortly before trial was scheduled, Home Depot

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moved *in limine* to preclude Coleman from introducing into evidence at trial the EEOC's determination letter. Home Depot argued that the record did not support the EEOC's findings, which failed to reference any specific evidence, and that, as a result, the probative value of the Determination Letter was outweighed by its prejudicial effect. At the *in limine* hearing, the District Court delayed ruling on the motion to exclude the report, deciding instead to:

listen to the evidence very carefully, the evidence that is adduced on the plaintiff's case in chief, and I will make a ruling on this before the plaintiff has to rest. So that if all or any part of this EEOC determination is admitted, it's admitted after the Court has had an opportunity to see what reliable evidence there is, to support what the EEOC said.
* * *

I won't exclude the report on the basis that I can't see what evidence the EEOC relied on, but I will test that **\*1339** report against the evidence which is adduced by the plaintiff at trial, not to see whether I am persuaded (that's not my job), not to see whether I am persuaded in the direction that the EEOC determined, but to see whether there is reliable evidence upon which the EEOC determination could reasonably have rested.

[SA9-11].

After considering the testimony and other evidence submitted by Coleman, the District Court granted Home Depot's motion and precluded Coleman from submitting the EEOC Letter of Determination. The District Court reasoned as follows:

Let me give the legal basis for the evidence evaluation first.      The law that applies to this determination is straightforward. The United States Supreme Court decided in a 1976 ruling, *Chandler v. Roudebush*, that EEOC findings are admissible under the hearsay rules-that is specifically Rule 803(8)(C)- in a federal trial. The Supreme Court in *Chandler* did not limit the discretion of the trial judge to consider whether despite the hearsay admissibility of the report itself, the report, nevertheless, should be excluded, "If sufficient negative factors are present." That is a quote from the notes of the Advisory Committee on the proposed rules under Rule 803(8)(C).

Thereupon arose a split of authority in the Circuits, but the Third Circuit, as always, clearly held that it is within the discretion of the District Court to admit or to refuse to admit the EEOC's findings of fact and its determination on the merits of the charges. That was the Third Circuit decision in *Walton v. Eaton*

*Corporation....*
* * *

[T]his is a case-by-case determination that must be made.   In the jurisprudence that has arisen around the country which has been cited in the parties' briefs, the factors that the Court should consider have emerged and those include whether the report itself presents a danger of unfair prejudice to the defendant, whether time spent during the trial will be unduly lengthened if the report is admitted and the defendant must introduce evidence to expose the weaknesses in the report, thus unduly adding to the length of both the findings and the conclusions in the EEOC report and whether those factual supports are borne out by the record before the EEOC, and whether the report is conclusory in nature or reflects ample detail and a fair summary of the detail of relevant facts pertaining to the charge. Those are some of the factors that the Courts have weighed in making this case-by-case determination.

The EEOC report in this case does not contain any footnotes or references to exactly what evidence is being relied upon.      It simply states, "evidence reveals" or "evidence as a whole" or "based on the evidence of record." I have reviewed the report line by line in order to determine whether it should be excluded or admitted in whole or in part. I conclude that it must be excluded in whole, that it cannot be redacted or admitted in its entirety without creating the very danger of unfair prejudice and confusion which Rule 403 requires the Court to avoid in making discretionary evidentiary rulings.

At the heart of my ruling is the core finding of the EEOC report that-and here I quote from Page 2- "Evidence reveals that after the charging party was hired as a cashier, she constantly requested to be transferred to hardware or another sales position in areas where she was highly experienced. During the same period that she was requesting to **\*1340** be transferred, males with less experience were being hired directly into sales positions."

One of the bases for that "highly experienced" conclusion is stated above in the EEOC letter.      It says, "During her interview, the charging party informed the respondent that she had experience in several areas such as plumbing, hardware, electrical, paint and lumber. The charging party has more than 15 years sales experience."

There is no indication in the EEOC determination where this factual basis comes from. The Court has now had the opportunity to review the application form which is in evidence, P-15, and it shows that these areas were checked off.      However, the countervailing accounts of what was testified to in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the interview are not nearly as strong in the trial as stated in the EEOC letter.
Also, the statement that she has more than 15 years sales experience found in the EEOC letter, is not supported even by the application form, P-15 in evidence. If we were to assume it to be truthful and accurate, there is approximately 13 years of experience at the family hardware store listed there.
Also, the testimony concerning whether males who had less sales experience were being hired directly into the sales department, is one which is sharply in issue here in the course of the trial and it will be open to each party to argue to this jury whether these males had more or less experience than Ms. Coleman indicated during her application and interview.
The finding of the EEOC Commission is that the evidence as a whole makes it reasonable to conclude that the charging party was discriminated against because of her sex (female) and race (black) with respect to the charging party's hiring, transfer and/or job assignment and discharge. It makes additional findings such as, "Has uncovered evidence which indicates that respondent has discriminated against females with respect to hiring and other terms and conditions of employment, i.e., wages and transfers and other job assignments into sales positions."
* * *
All of these findings are not supported by the evidence that has been presented by plaintiff, except for the raw numerical data, as to which I have had to give the jury a limiting instruction as I have admitted that into evidence.
The conclusion of this Court is that substantial evidence has been presented to the jury on the claims brought forward by plaintiff in this case, but it differs from the assertions which are the findings in the EEOC report. For that reason, I find there is little probative value in the EEOC's conclusory statements regarding the same record.
I further find that those conclusory statements regarding the evidence are expressly stated to be the basis of the EEOC's determination and to admit the determinations without revealing that they are based upon findings that are supported by the evidence in this case, would be, I believe, an erroneous ruling in the sound exercise of this Court's discretion.
This jury would, in effect, be receiving an EEOC determination in the nature of an expert opinion on conclusions which this lay jury is as equipped to reach from the evidence and its own experience and instructions in the law where this jury will have had the opportunity to view all of the evidence and will have the ability to draw its own conclusions from the evidence presented regarding whether Ms. Coleman was or was not subjected to disparate treatment in her ***1341** assignments and in her termination in this case.

[A5-11] (emphasis added).

The jury returned a verdict in favor of Home Depot. Coleman appeals, arguing that the District Court abused its discretion in excluding the EEOC determination letter from trial.[FN2] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction based on 28 U.S.C. § 1291.

FN2. We note that Home Depot is also a cross-appellant in this case; it appealed the District Court's order precluding Home Depot from presenting evidence relating to Coleman's alleged misrepresentations about her employment history. Since the parties did not brief the issue in the present appeal, and, at all events, in light of our holding that the District Court did not abuse its discretion by excluding the EEOC Letter of Determination, Home Depot's appeal is essentially moot.

[1] We review the admissibility of evidence for abuse of discretion. *See Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1213 (3d Cir.1995). "An abuse of discretion is a 'clear error of judgment,' and not simply a different result which can arguably be obtained when applying the law to the facts of the case." *SEC v. Infinity Group Co.*, 212 F.3d 180, 195 (3d Cir 2000) (quoting *In re TMI Wells Contamination Litig.*, 120 F.3d 368, 387 (3d Cir.1997)). This standard applies to Rule 803(8)(C) and EEOC determination letters. *Walton v. Eaton Corp.*, 563 F.2d 66, 75 (3d Cir.1977).

### III. Discussion

#### A. Rule 803(8)(C)

Fed.R.Evid. 803(8)(C) provides:
The following are not excluded by the hearsay rule, even though the declarant is not available as a witness.... (8) Records, reports, statements or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

（略）
…

The rationale of Rule 803(8)(C) is explicated in the advisory committee's note as being grounded on a presumption of reliability of government records. The note explains that it is "assum[ed] that a public official will perform his duty properly." Fed.R.Evid. 803(8)(C) advisory committee's note.    As was explained in *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 505 F.Supp. 1125, 1145 (E.D.Pa.1980), "the drafters of 803(8)(C) were motivated by a variation on the theme underlying all hearsay exceptions-that circumstantial guarantees of trustworthiness are provided by the presumption that governmental officials will perform their duties faithfully.    Accordingly, they were agreeable to the receipt into evidence of governmental agency findings." [FN3]    With respect to EEOC determinations in particular, the United States Supreme Court itself has held that prior administrative findings made with respect to an employment discrimination claim may be admitted, as of course, pursuant to Fed.R.Evid. 803(8)(C) as evidence at a "federal-sector trial *de novo.*" *Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

> FN3. *See also Melville v. Am Home Assurance Co.,* 443 F.Supp 1064, 1112 (E.D.Pa.1977)    ("The    conceptual underpinning for this exception, similar to that upon which other hearsay exceptions are based ... is that public records or reports, by virtue of their being based on legal duty and    authority,    contain    sufficient circumstantial guarantees of trustworthiness to justify their use at trial.").

The principal basis on which government records and reports may be excluded is the Rule 803(8)(C) trustworthiness proviso.**1342**    As the Rule itself states, the findings are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness."    Fed.R.Evid. 803(8)(C).    The advisory committee's note explains:

Factors which may be of assistance in passing upon the admissibility of evaluative reports include:  (1) the timeliness of the investigation;  (2) the special skill or experience of the official;  (3) whether a hearing was held and the level at which conducted; (4) possible motivation problems....  Others no doubt could be added.

Fed.R.Evid. 803(8)(C) advisory committee's note (internal citations omitted).  Case law has added to the list of trustworthiness considerations. [FN4]

FN4. In *Zenith Radio Corp.,* for example, the court developed an additional seven factors addressing the adequacy of the investigative/evaluative process of agency determinations:

(1) The finality of the agency findings, *i.e.,* the state of the proceedings at which the findings were made (whether they are subject to subsequent proceedings or *de novo* review), and the likelihood of modification or reversal of the findings.

(2) The extent to which the agency findings are based upon or are the product of proceedings pervaded by receipts of substantial amounts of material which would not be admissible in evidence (*e.g.*, hearsay, confidential communications, ex parte evidence), and the extent to which such material is supplied by persons with an interest in the outcome of the proceeding.

(3) If the findings are products of hearings, the extent to which appropriate safeguards were used (Administrative Procedure Act, Due Process), and the extent to which the investigation complied with all applicable agency regulations and procedures.

(4) The extent to which there is an ascertainable record on which the findings are based.

(5) The extent to which the findings are a function of an executive, administrative, or legislative policy judgment (as opposed to a factual adjudication) or represent an implementation of policy.

(6) The extent to which the findings are based upon findings of another investigative body or tribunal which is itself vulnerable as a result of trustworthiness evaluation.

(7) Where the public report purports to offer expert opinion, the extent to which the facts or data upon which the opinion is based are of a type reasonably relied upon by experts in a particular field.

*Zenith Radio Corp.,* 505 F.Supp. at 1147.

[2] Most notably, a report may be untrustworthy "if the report appears to have been made subject to a suspect motivation.    For example, if the public official or body who prepared the report has an institutional or political bias, and the final report is consistent with that bias."    *Federal Rules of Evidence Manual* 1688-89 (Stephen A. Saltzburg et al. eds., 7th ed. 1998);  *see also Pearce v. E.F.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                                                  Page 9
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

*Hutton Group, Inc.,* 653 F.Supp. 810, 814 (D.D.C.1987) (excluding findings made in a congressional report because, "[g]iven the obviously political nature of Congress, it is questionable whether any report by a committee or subcommittee of that body could be admitted under rule 803(8)(C) against a private party. There would appear to be too great a danger that political considerations might affect the findings of such a report"). An EEOC report might also be untrustworthy where it is made in contemplation of litigation. *See Harris v. Birmingham Bd. of Educ.,* 537 F.Supp. 716, 721-22 (N.D.Ala.1982), *aff'd in part & rev'd in part,* 712 F.2d 1377 (11th Cir.1983) (finding that an EEOC determination was not trustworthy where it was made six months after litigation had been filed and that "[t]he trustworthiness of the determination is further eroded by the obvious disregard of the affidavits submitted by the defendant to the EEOC. The court is appalled by the numerous erroneous and obviously slanted statements contained in the determination, the list of which is too lengthy to set out").

**\*1343** [3] While the District Court was skeptical about whether the EEOC had the proper factual basis to come to the conclusions that it did in the EEOC Letter of Determination, none of the aforementioned trustworthiness considerations have been invoked in this case, either here or in the District Court. We assume therefore that the EEOC determinations were trustworthy and review the District Court's decision to exclude the EEOC Letter of Determination only under Rule 403.

### B. Rule 403

Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. Rule 403 is an "umbrella rule" spanning the whole of the Federal Rules of Evidence. *See Federal Rules of Evidence Manual* 251 (Stephen A. Saltzburg et al. eds., 7th ed. 1998) ("[T]he Trial Judge must apply [Rule 403] in tandem with other Federal Rules under which evidence would be admissible."). Accordingly, it is generally applied to evidence otherwise admissible under Rule 803(8)(C).[FN5] *See, e.g., Zenith Radio Corp.,* 505 F.Supp. at 1146 ("[W]here the probative value of

[evidence admissible pursuant to Rule 803(8)(C)] is outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence attendant upon the opponents' efforts to establish untrustworthiness of the report, the court may exclude the report under F.R.E. 403.").

> FN5. The Fifth Circuit has noted that it is possible to confuse "the test for admissibility under Rule 803(8)(C) with that for excluding otherwise admissible evidence under Rule 403." *Cortes v. Maxus Exploration Co.,* 977 F.2d 195, 201 (5th Cir.1992). As that Court has explained:
> Under Rule 803(8)(C), investigative reports made by government agencies are removed from the rule against hearsay unless circumstances indicate untrustworthiness. Because of this presumption that agency reports are not to be excluded under the hearsay rule, this court has held that the party opposing the admission of the report under Rule 803(8)(C) must prove the report's untrustworthiness.... Rule 403 gives trial courts the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice ..." This court, on several occasions, has found investigative reports and files of the EEOC to be highly probative. We also warned ... that Rule 403 should not be misused in such a way that "would end the presumption that evaluative reports are admissible hearsay under Rule 803(8)(C)." None of these decisions should be read as leaving district courts without discretion under Rule 403 to exclude such reports if their probative value is substantially outweighed by prejudicial effect or other considerations enumerated in the rule.
> *Id.* (internal citations omitted).

[4][5][6] Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility. That is, evidence may be excluded if its probative value is not worth the problems that its admission may cause, *e.g.* unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence.[FN6] However, there is a strong presumption that relevant evidence should be admitted, and thus for exclusion **\*1344**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

under Rule 403 to be justified, the probative value of evidence must be "substantially outweighed" by the problems in admitting it. As a result, evidence that is highly probative is exceptionally difficult to exclude. *See, e.g., United States v. Krenzelok*, 874 F.2d 480, 482 (7th Cir.1989) ("Its probative value was ... great." Its prejudicial effect may well have been great too. But when the trial judge is in doubt, Rule 403 requires admission (this is the force of "*substantially* outweighed")....).[FN7]

> FN6. It is worth stressing that the term "*unfair* prejudice" as a factor against which the probative value of evidence is weighed under Rule 403 is often misstated as mere prejudice. Indeed, any evidence that tends to harm a party's case could be said to be prejudicial. Thus, the prejudicial effect of admitting the evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403.

> FN7. An interesting hypothetical question as to the meaning of Rule 403 is posed by positing a report or other evidence whose probative value on the scale of values was 100%. It would appear that, as such, it could not properly be excluded under Rule 403 because it could not be "substantially outweighed" by the countervailing factors.

Rule 403 necessarily requires that the District Court engage in balancing to determine whether the probative value of the evidence is "substantially outweighed" by the negative factors listed in Rule 403. *See United States v. Long*, 574 F.2d 761, 766 (3d Cir.1978) (noting that even if the District Court does not invoke Rule 403, "the trial judge's balancing will be subsumed in his ruling"). In balancing, "the proper equation places on one side the maximum reasonable probative force for the offered evidence," while "the other side of the equation should include the *likely* prejudicial impact of the evidence." *Federal Rules of Evidence Manual* 242 (Stephen A. Saltzburg et al. eds., 7th ed. 1998). The balancing test in Rule 403 ensures that juries are not presented with evidence that is far less probative than it is prejudicial.

Coleman submits that EEOC reports are necessarily of high probative value, especially given the expertise and long experience of the Agency in employment discrimination matters. She finds

support for this view in federal appellate case law. *Smith v. Universal Services, Inc*, 454 F.2d 154, 157 (5th Cir.1972); *Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502, 505 (9th Cir.1981). The *Smith* Court intimated that the probative value of EEOC determinations almost always outweighs any prejudicial impact:

[T]o ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its field investigators in the area of discriminatory employment practices would be wasteful and unnecessary.

The fact that an investigator, trained and experienced in the area of discriminatory practices and various methods by which they can be secreted, has found that it is likely that such an unlawful practice has occurred, is highly probative of the ultimate issue involved in such cases. Its probative value, we believe, at least outweighs any possible prejudice to defendant. "Prejudicial" cannot be equated with "harmful" in all cases; rather it connotes "harmful," plus "non-probative."

454 F.2d at 157.[FN8]

> FN8. We note that the Fifth and Ninth Circuits take the minority view that agency reports are *per se* admissible as the probative value necessarily outweighs the negative factors in Rule 403. The majority view, on the other hand, gives less deference to the probative value of agency reports, refusing to categorically require admission of agency findings. *See e.g., Paolitto v. John Brown E.& C., Inc.*, 151 F.3d 60, 65 (2nd Cir.1998) (adopting the majority position that leaves "the question of whether to admit EEOC ... findings to the sound discretion of the district court"); *Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309 (8th Cir.1984) ("While EEOC reports may contain information that would be useful to the jury, their probative value may be outweighed by problems that would result from their admission.").

[7] Although we decline to hold that EEOC reports are *per se* admissible as more probative than prejudicial, the argument\*1345 that EEOC reports that are not challenged as untrustworthy are presumptively probative is not without force. But the other Rule 403 factors-especially considerations of undue delay, waste of time, or needless presentation of cumulative evidence, which are often

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                              Page 11
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

necessary to counter an EEOC report-could "kick-in" and control, especially where the report could be shown to be of low probative value. The weight of the case law holds that Rule 403 may operate on an EEOC report, and that the decision of whether or not an EEOC Letter of Determination is more probative than prejudicial is within the discretion of the trial court, and to be determined on a case-by-case basis. *Hines v. Brandon Steel Decks, Inc.,* 886 F.2d 299, 302 (11th Cir.1989); *United States v. MacDonald,* 688 F.2d 224, 229-30 (4th Cir.1982); *Johnson,* 734 F.2d at 1309; *Cortes,* 977 F.2d at 201-02.

[8] This view is apparently the law of this Circuit, based upon a terse discussion in *Walton,* 563 F.2d at 75. At all events, we think that *Walton* reflects the better view, and we take this opportunity to endorse the majority position in *Walton* and to clarify that a District Court has the discretion to exclude probative EEOC Letters of Determination where the negative factors listed in Rule 403 substantially outweigh the probative value of the EEOC determinations. In other words, we decline Coleman's invitation to conclude that, based on the presumption of admissibility under Rule 803(8)(C), EEOC Letters of Determination are *per se* more probative than prejudicial under Rule 403, and will review the District Court's exclusion of the EEOC letter based on the principles discussed *supra.*

[9] We note in this regard that the assessment of probative value under Rule 403 should take into consideration the proof value of the particular report as and when offered at trial. Here that proof value could be said to be low, given the fact that it would have been introduced to the jury after all the evidence had been offered (which evidence was at odds with the EEOC report), and was more conclusory than factual in nature. *See, e.g., Paolitto,* 151 F.3d at 65; see also *Johnson,* 734 F.2d at 1309. Further its value is not increased based on the agency's expertise, as the District Court seemed to think, because it is not an "expert report." Evaluative public records and reports, admissible under Article VIII of the Federal Rules of Evidence, are distinct from expert opinion evidence, identified in Article VII. They are subject to entirely different standards of admissibility, *et alia.*

## C. Application to This Case

As we have explained, the District Court delayed ruling on the motion to exclude the Letter of Determination at the *in limine* hearing. Rather, the Court allowed Coleman to present her case-in-chief

at trial before making a decision. Referencing *Walton,* the District Court concluded that the risk of unfair prejudice and confusion substantially outweighed the probative value of the EEOC Letter of Determination. The District Court found that the probative value of the document was particularly low since the evidence presented at trial differed from the findings of the EEOC in a critical respect-the EEOC's finding that Coleman was "highly experienced" in sales was clearly undermined by the testimony presented at trial, even by Coleman herself.

We disagree with the District Court's general approach to the Rule 403 calculus. The District Court in effect charged the plaintiff with replicating the record before the EEOC and then evaluated the record produced by plaintiff to see if it justified the report. But neither the plaintiff nor the District Court had access to the whole **\*1346** EEOC record.[FN9] What the District Court had was: (1) A letter from Home Depot to the EEOC about a consent decree entered in a class action case against Home Depot; (2) A response from Home Depot to the EEOC; (3) Coleman's EEOC charge questionnaire, filled out by Coleman herself. It does not appear, however, that the District Court knew how the EEOC came to its determination or that it had access to all the information upon which the EEOC relied. In particular we do not know if the EEOC had any evidence upon which to base its conclusion that a white employee with evaluations as poor as Coleman's was allowed to transfer to another department or that women were systematically hired as cashiers irrespective of their experience and never transferred to sales positions, unlike the male cashiers. *See supra.*

> FN9. The EEOC does not appear to have clear standards for how it gathers information. The Federal Laws Prohibiting Job Discrimination: Questions and Answers, *available at* http://www.eeoc.gov/task/pch-lit.html, states that "[i]n investigating a charge, EEOC may make written requests for information, interview people, review documents, and, as needed, visit the facility where the alleged discrimination occurred."

On the other hand, the District Court was clearly correct about the low probative value of the most critical facet of the EEOC report: that Coleman was not hired as a sales associate despite being a "highly experienced" candidate. Coleman's experience in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

306 F.3d 1333                                                                                                    Page 12
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl. Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA) 1876
**(Cite as: 306 F.3d 1333)**

hardware sales, so central to the Home Depot modus operandi, was exposed by her own testimony to be gossamer. [FN9] That is a matter within her own ken. Yet had the EEOC report been admitted, a great deal of time would have had to have been consumed to counter the report's conclusion about the fate of other employees, male and female.    Because the EEOC Letter of Determination concluded that Home Depot had systematically discriminated against female and minority employees, in order to rebut these expansive allegations, Home Depot would have had to present evidence showing that it did not discriminate when it placed former employees in cashier positions or fired them.    This would certainly have involved a great deal of testimony-a trial within a trial in fact-about the employment histories of a large number of former employees. [FN12]

> FN10. Kobera, the Store Manager at the Home Depot where Coleman worked, testified that Home Depot attempts to place employees in sales positions who have a "working knowledge or some point of reference" in the particular area so that they can best assist customers.    For example, Home Depot wanted employees in the hardware department to be able to recommend a versatile power tool to customers.    *See* discussion *supra*.

> FN11. A number of cases have considered the amount of time that it would take to counter a trustworthiness challenge as a consumption of time factor cognizable under Rule 403.    *See McShain v. Cessna Aircraft Co.*, 563 F.2d 632, 636 (3d Cir 1977) (holding that the District Court did not abuse its discretion by excluding an NTSB report because the "reception of such reports into evidence would have involved a lengthy ... inquiry into the 'circumstances bearing on the trustworthiness' of the investigators' conclusions.    Thus, it may well have been that, in the course of the eighteen-day trial, the additional probative value of the excluded reports was substantially outweighed by the opportunity to avoid undue delay of waste of time"); *see also Zenith Radio Corp.*, 505 F.Supp. at 1146 ("[W]here the probative value of [evidence admissible pursuant to 803(8)(C)] is outweighed by ... needless presentation of cumulative evidence attendant upon the opponents' efforts to establish

untrustworthiness of the report, the court may exclude the report under F.R.E. 403.").    The trustworthiness challenge will generally be disposed of at the *in limine* hearing stage, but not always.    Moreover, a finding of trustworthiness by the judge does not preclude a trustworthiness challenge by the objecting party at trial.    Therefore since trustworthiness can also become an issue at trial itself, it can bear upon the time-related factors in Rule 403.

**\*1347** [10] The District Court opined that the EEOC Letter of Determination would be unfairly prejudicial or confusing, but we find the argument that the evidence would have created the potential risk of undue delay and waste of time to be stronger Weighing undue delay and waste of time against the low probative value of the EEOC determination, it appears that the District Court acted properly.    We are satisfied that the EEOC Letter of Determination wrongly classified Coleman as "highly experienced"-the evidence demonstrated that Coleman knew little about hand and power tools and had only worked in a "mom and pop" hardware stare, *see* discussion *supra*-and that it was of such low probative value that the Court could have found that it was "substantially outweighed" by the fact that Home Depot would have had to rebut the EEOC's finding that the company engaged in a pattern of race and gender discrimination by presenting information about numerous former Home Depot employees.

In sum, we conclude that the District Court did not abuse its discretion in deciding that the probative value of the EEOC Letter of Determination was "substantially outweighed" by the problems created by its introduction.    Although the District Court did not know the full extent of the evidence relied upon by the EEOC to conclude that Home Depot had wrongly: (1) hired Coleman as a cashier; (2) refused to transfer her to a sales position; and (3) terminated her, considering that the EEOC clearly was mistaken in the critical conclusion that Coleman was a "highly experienced" employee, the District Court did not abuse its discretion in finding that the EEOC Letter of Determination had such a low probative value that the undue delay that would have been involved in the rebuttal of the allegations of systematic discrimination contained in the EEOC determination "substantially outweighed" that low probative value.    The judgment of the District Court will therefore be affirmed.

C.A.3 (N.J.),2002.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Coleman v. Home Depot, Inc.
306 F.3d 1333, 59 Fed. R. Evid. Serv. 431, 84 Empl.
Prac. Dec. P 41,355, 89 Fair Empl.Prac.Cas. (BNA)
1876

Briefs and Other Related Documents (Back to top)

• 2001 WL 34136211 (Appellate Brief) Brief of
Appellee Home Depot U.S.A., Inc. (Nov. 19, 2001)
Original Image of this Document (PDF)
• 2001 WL 34136212 (Appellate Brief) Brief and
Appendix Volume I for Appellant, Mary Coleman
(Oct. 15, 2001) Original Image of this Document
with Appendix (PDF)
• 00-3656 (Docket) (Oct. 31, 2000)
• 00-3496 (Docket) (Oct. 19, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

209 F.Supp.2d 876                                                          Page 1
209 F.Supp.2d 876
**(Cite as: 209 F.Supp.2d 876)**

# H

United States District Court,N.D. Illinois,Eastern
Division.
Daron HILL, et al., Plaintiffs,
v.
SHELL OIL COMPANY, et al., Defendants.
**No. 98 C 5766.**

March 20, 2002.

African-American consumers brought civil rights
putative class action against corporate owners of
gasoline stations and dealers operating stations,
alleging that defendants required African-Americans
to pre-pay while other customers could pay after
fueling. Defendants moved for protective order
prohibiting plaintiffs from videotaping defendants'
employees and alleged employee agents.    The
District Court, Moran, Senior District Judge, held
that· (1) station attendants were represented parties
within meaning of ethical rule prohibiting contact
with represented parties, and (2) interactions between
attendants and customers, recorded in secret
videotapes, did not rise to level of communication
protected by rule prohibiting contact with represented
party.

Motion denied.

West Headnotes

**[1] Attorney and Client 45 🔑32(12)**

45 Attorney and Client
    451 The Office of Attorney
        451(B) Privileges, Disabilities, and Liabilities
            45k32 Regulation of Professional Conduct,
in General
                45k32(12) k. Relations, Dealings, or
Communications with Witness, Juror, Judge, or
Opponent. Most Cited Cases
The purpose of rule of professional conduct
governing interactions with represented parties is to
prevent lawyers from circumventing opposing
counsel to get careless statements from adverse
parties, to protect the integrity of the attorney-client
relationship, to prevent the inadvertent disclosure of
privileged information, and to facilitate settlement by
channeling disputes through lawyers familiar with the
negotiation process. Ill.Rules of Prof.Conduct, Rule

4.2.

**[2] Attorney and Client 45 🔑32(12)**

45 Attorney and Client
    451 The Office of Attorney
        451(B) Privileges, Disabilities, and Liabilities
            45k32 Regulation of Professional Conduct,
in General
                45k32(12) k. Relations, Dealings, or
Communications with Witness, Juror, Judge, or
Opponent. Most Cited Cases
Gasoline station attendants were "represented
parties," as employees whose acts or omissions could
be imputed to organization, in context of rule of
professional conduct prohibiting contact with
represented parties, on station owners' and operators'
motion to prohibit investigative videotaping in
African-American customers' class action alleging
that defendants required pre-payment for fuel by
African-Americans but not others; conduct of station
attendants was at heart of litigation and was offered
as example of alleged discrimination. Ill.Rules of
Prof.Conduct, Rule 4.2.

**[3] Attorney and Client 45 🔑32(12)**

45 Attorney and Client
    451 The Office of Attorney
        451(B) Privileges, Disabilities, and Liabilities
            45k32 Regulation of Professional Conduct,
in General
                45k32(12) k. Relations, Dealings, or
Communications with Witness, Juror, Judge, or
Opponent. Most Cited Cases
Gasoline station attendants were "represented
parties," as employees whose admissions could
constitute employer admissions, in context of rule of
professional conduct prohibiting contact with
represented parties, on station owners and operators'
motion to prohibit investigative videotaping in
African-American customers' civil rights action
alleging defendants required pre-payment by African-
American customers, but not other customers; if
plaintiffs intended to enter employees' statements as
evidence of employer's admission, then employees
were prohibited from contact.        Fed.Rules
Civ.Proc.Rule  26(c),  28  U.S.C.A.;   Fed.Rules
Evid.Rule 801(d)(2)(D), 28 U.S.C.A.;  Ill.Rules of
Prof.Conduct, Rule 4.2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt Works

209 F.Supp.2d 876
209 F.Supp.2d 876
**(Cite as: 209 F.Supp.2d 876)**

Page 2

## [4] Attorney and Client 45 ☞32(12)

45 Attorney and Client
  45I The Office of Attorney
    45I(B) Privileges, Disabilities, and Liabilities
      45k32 Regulation of Professional Conduct, in General
        45k32(12) k. Relations, Dealings, or Communications with Witness, Juror, Judge, or Opponent. Most Cited Cases
Interactions between gasoline service station attendants and African-American customers and other persons posing as customers, recorded in secret videotapes which showed attendants reacting, or not reacting, to the customers did not rise to the level of communication protected by the rule of professional conduct prohibiting contact with represented parties, on defendants' motion to prohibit future investigative videotaping under discovery rule, in African-American consumers' civil rights action, alleging disparate treatment, against station owners and operators. Fed.Rules Civ.Proc.Rule 26(c), 28 U.S.C.A.; Ill.Rules of Prof.Conduct, Rule 4.2.

*877 Thomas R. Meites, Micheal M. Mulder, Paul Wilham Mollica, Johanna Josie Raimond, Meites, Mulder, Burger & Mollica, Chicago, IL, for plaintiffs.
Steven Francis Molo, Gerald C. Peterson, Norman K. Beck, Winston & Strawn, Chicago, IL, Gerald David Zansitis, Peter Francis Heraty, Jones, Ware & Grenard, Chicago, IL, Thaddeus Leonard Wilson, Brookins & Wilson, Chicago, IL, Ray G. Rezner, James Robert Vogler, Randall Lee Oyler, Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, Chicago, IL, R. Delacy Peters, Jr., Beverly Cassandra Bryant, The Peters Law Firm, Chicago, IL, Manuel Sanchez, John Scott Huntley, Allison Smith Heverin, Sanchez & Daniels, Chicago, IL, Daniel Thomas Grosso, MacKelvie & Associates, P.C., Connie P. Limperis, Fisher and Phillips, L.L.P., Chicago, IL, George B. Collins, Christopher Robert Bargione, Adrian M. Vuckovich, Collins & Bargione, Chicago, IL, Joseph Michael Gagliardo, Gregory Robert James, Jr., Clifford Raymond Perry, III, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, IL, Robert Joseph Meyer, Sheryl A. Pethers, Debrai G. Haile, Swanson, Martin & Bell, Chicago, IL, Debrai G. Haile, Wessels & Pautsch, Chicago, IL, Cary S. Fleischer, Alan R. Dolinko, Jeralyn Hartwick Baran, Chuhak & Tecson, Chicago, IL, Timothy Alan Wolfe, Meckler, Bulger & Tilson, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

MORAN, Senior District Judge.
Plaintiffs bring this purported class action on behalf of African-American customers of Shell-brand gas stations, alleging that Shell-brand stations require that African-American customers prepay for gasoline while allowing white customers to pay after pumping gas. Defendants Shell Oil Company, Motiva Enterprises, LLC, and Equilon Enterprises (collectively "Shell defendants"), move for a protective order prohibiting plaintiffs from videotaping Shell defendants' employees and alleged employee agents. For the following reasons, the motion is denied.

Over the last six years plaintiffs have, as part of their investigation of alleged discrimination, on occasion videotaped employees of Shell stations and independent dealerships. The taping occurred prior to and after the filing of this action, most recently with the assistance of counsel in January and February of 2001. Plaintiffs first made defendants aware of this taping in 1998, and defendants raised concerns after the February 2001 taping. The basic scenario in each tape consists of an African-American customer and a white customer (those aiding in the investigation) driving into the station within minutes of each other, and using the same pump. Defendants claim that plaintiffs had substantive discussions with employees during these taped visits in order to determine if the stations engaged in the alleged discrimination.

Shell defendants move for a protective order prohibiting future investigative videotaping under Federal Rule of Civil Procedure 26(c). They argue that a protective order is necessary to prevent violations of ethical rules, specifically Northern District of Illinois Rules of Professional Conduct 4.2 and alternatively Rule 4.3. See *878 N.D.Ill.LR 83.54.2, 83.54.3. Since employees are represented parties under Rule 4.2 there is no need to address defendants' arguments under Rule 4.3, which governs interactions with non-represented parties.

[1] Rule 4.2 states that

[d]uring the course of representing a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by another lawyer in that matter unless the first lawyer has obtained the prior consent of the lawyer representing such other party or as may otherwise be authorized by law.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

B 151

209 F.Supp.2d 876
209 F.Supp.2d 876
(Cite as: 209 F.Supp.2d 876)

Page 3

The purpose of this rule is to prevent lawyers from circumventing opposing counsel to get careless statements from adverse parties; to protect the integrity of the attorney-client relationship; to prevent the inadvertent disclosure of privileged information; and to facilitate settlement by channeling disputes through lawyers familiar with the negotiation process. *Guillen v. City of Chicago,* 956 F.Supp. 1416, 1427 (N.D.Ill.1997).

Plaintiffs assert that Rule 4.2 is not implicated in this case because the employees in the tapes are not represented parties; the interactions that occurred are not the type of communication prohibited by this rule; and the investigation does not offend the policies underlying this rule. Additionally, plaintiffs argue that the defendants strategically delayed bringing this motion and it should be denied for lack of timeliness. While there may be strategy in bringing this motion while a class certification motion is pending, defendants have not waited too long to be heard, especially in light of the history and negotiations that have led up to its filing.

We first address whether the station employees are represented parties as contemplated by Rule 4.2. Plaintiffs rely on *Apple Corps Ltd. MPL v. Int'l Collectors Soc.,* 15 F.Supp.2d 456 (D.N.J.1998), to support their assertion that we should narrowly define represented parties. Unlike the case before us, *Apple Corps* was decided under the "litigation control group" definition of represented parties, which includes only an organizational entity and members of its litigation control group. New Jersey courts have found that lower level employees who were not significantly involved in the determination of a corporation's legal position are not covered by Rule 4.2. *Id* at 474.

[2] The Northern District of Illinois' comment to Rule 4.2 provides three categories of corporation employees that are considered represented for purposes of the rule's prohibition: employees who have managerial responsibility on behalf of the organization; employees whose acts or omissions in the matter can be imputed to the organization; and employees whose admissions would be binding on the organization. *Orlowski v. Dominick's Finer Foods, Inc.,* 937 F.Supp 723, 728 (N.D.Ill 1996); *Weibrecht v. Southern Illinois Transfer, Inc.,* 241 F.3d 875, (7th Cir.2001). Since Shell defendants' station attendants do not appear to have managerial responsibilities as contemplated by the rule, they are not represented parties under the first category.

However, the second two categories of protected employees are applicable here.

In determining whether Rule 4.2 covers non-managerial employees, courts have recognized the tension between a party's need to conduct low-cost informal discovery, and an opposing party's need to protect employees from making ill-considered statements or admissions. *See e.g. In re Air Crash Disaster Near Roselawn, Indiana,* 909 F.Supp. 1116, 1121 (N.D.Ill 1995); *Orlowski v. Dominick's Finer Foods, Inc.,* 937 F.Supp. 723, 730 (N.D.Ill.1996). The conduct of station attendants **879 is at the heart of this litigation, and it is being offered as an example of the alleged discrimination of the defendants. As a result, the employees fall under the second category of Rule 4.2: employees whose acts or omissions in the matter at issue can be imputed to the organization. *Weibrecht,* 241 F.3d at 883 (employee is covered by Rule 4.2 since his decision about how many workers to use and whether to require safety equipment would be imputed to employer in negligence suit).

[3] The station employees are also potentially covered under the admissions category of Rule 4.2. The scope of employee statements that constitute employer admissions is provided in Federal Rule of Evidence 801(d)(2)(D), which allows an employee's statement to be used against an employer as an admission if it is made during the existence of the employment relationship and concerns a matter within his agency or employment. If the employee's statements could be brought in as an admission against the defendant employer, then the employees are covered by Rule 4.2's prohibition. *In re Air Crash,* 909 F.Supp. at 1122. Put another way, if a plaintiff does not intend to enter the employee's statements as evidence of the employer's admission, then Rule 4.2 is not implicated and plaintiff is free to have informal contact with non-managerial employees. *Orlowski* at 735; *B.H. v. Johnson,* 128 F.R.D. 659, 662 (N.D.Ill.1989); *Kole v. Loyola University of Chicago,* 1997 WL 47454, *4 (N.D.Ill.1997) (employees are represented if anything the employees do or say could bind the defendants in this lawsuit).

[4] Since the station employees are represented parties under Rule 4.2, we must determine if the rule prohibits videotaping these employees in the manner that has been presented. Plaintiffs claim that any contact between the employees and plaintiff investigators consists of normal customer business transactions and lies outside the scope of the rule's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prohibition. *Apple Corps Ltd., MPL v. Int'l Collectors Soc.,* 15 F.Supp.2d 456 (D.N.J.1998); *Gidatex v. Campaniello Imports, Ltd.,* 82 F.Supp.2d 119 (S.D.N.Y.1999). In *Gidatex,* plaintiff used private investigators who secretly taped conversations with defendant's salespeople. The court found that the sales clerks were represented parties under New York's disciplinary rules since the plaintiff was seeking to use the sales clerks' statements to impute liability to the defendant employer. *Id.* at 125. While the investigators did have conversations with the sales clerks about products, the court found no violation of Rule 4.2 since the investigators "did not interview the sales clerks or trick them into making statements they otherwise would not have made. Rather, the investigators merely recorded the normal business routine...." *Id.* at 126.

Defendants ask that we follow a South Dakota case which is factually similar to *Gidatex* but which came to the opposite conclusion. See *Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.,* 144 F.Supp.2d 1147 (D.S.D 2001). In *Midwest Motor Sports,* defense counsel hired investigators to go to plaintiff's store, pose as consumers, record any interactions and elicit evidence to be used in the pending case. *Id.* at 1152. The court found that the audio-taping of the salesman without his knowledge violated Rule 4.2 since the secret taping was an act of trickery. *Id.* at 1159 Even if the salesman was not a represented party under Rule 4.2, the court found there was a professional conduct violation under Rule 4.3 (prohibiting misrepresenting intentions to an unrepresented party), since the investigators engaged the salesman in conversation without disclosing their purpose. *Id.* at 1158.

**\*880** Although *Midwest Motor Sports* is considerably more restrictive than *Gidatex,* we think there is a discernable continuum in the cases from clearly impermissible to clearly permissible conduct. Lawyers (and investigators) cannot trick protected employees into doing things or saying things they otherwise would not do or say. They cannot normally interview protected employees or ask them to fill out questionnaires. They probably can employ persons to play the role of customers seeking services on the same basis as the general public. They can videotape protected employees going about their activities in what those employees believe is the normal course. That is akin to surveillance videos routinely admitted. See *Fisher v. National R.R. Passenger Corp.,* 152 F.R.D. 145, 150-55 (S.D.Ind.1993).

Here we have secret videotapes of station employees reacting (or not reacting) to plaintiffs and other persons posing as consumers. Most of the interactions that occurred in the videotapes do not involve any questioning of the employees other than asking if a gas pump is prepay or not, and as far as we can tell these conversations are not within the audio range of the video camera. These interactions do not rise to the level of communication protected by Rule 4.2. To the extent that employees and plaintiffs have substantive conversations outside of normal business transactions, we will consider whether to bar that evidence when and if it is offered at trial.

### CONCLUSION

For the above reasons, defendants' motion for a protective order is denied.

N.D.Ill.,2002.
Hill v. Shell Oil Co.
209 F.Supp.2d 876

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 Del. 208, *; 192 A.2d 925, **;
1963 Del. LEXIS 151, ***; 6 A.L.R.3d 1389

LEXSEE 192 A2D 925

**RIDLEY INVESTMENT COMPANY, Plaintiff-Below, Appellant, v. HELEN P. CROLL, et al., Defendants-Below, Appellees**

**No. 88**

**Supreme Court of Delaware**

**56 Del. 208; 192 A.2d 925; 1963 Del. LEXIS 151; 6 A.L.R.3d 1389**

**June 17, 1963, Decided**

**PRIOR HISTORY:** [***1]

Appeal from the Superior Court in and for New Castle County.

**DISPOSITION:**

The judgment below is affirmed.

**LexisNexis(R) Headnotes**

*Contracts Law > Performance > Impossibility of Performance > General Overview*

[HN1] Mere inconvenience or substantial increase in the cost of compliance will not excuse a promisor from the duty to perform his contractual obligations.

*Torts > Negligence > Duty > General Overview*

[HN2] A contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if he performs his work without neglect and in a workmanlike manner.

**COUNSEL:**

Donald W. Booker and Alfred J. Lindh for the Plaintiff-Below, Appellant.

Rodney M. Layton and William F. Quillen (of the firm of Richards, Layton and Finger) for the Defendants-Below, Appellees.

**JUDGES:**

TERRY, C. J., WOLCOTT and CAREY, J. J., sitting.

**OPINION BY:**

TERRY

**OPINION:**

[*209] [**925] TERRY, Chief Justice.

On March 12, 1959, plaintiff, Ridley Investment Company, entered into a written contract which obligated defendant [*210] to construct four post office buildings, including one at Milton, Delaware, which is the subject of the present controversy. The plans and specifications for the construction were prepared by plaintiff. When defendant began excavation, soft soil was discovered, and defendant immediately informed plaintiff of this condition. At plaintiff's request, defendant engaged the services of an experienced workman in the field of foundation support, who recommended that additional piling be placed beneath the exterior walls. Plaintiff concurred in this recommendation, authorized the additional piling, [**926] and paid defendant for the additional [***2] expense incurred in providing such piling. Shortly thereafter, Mr. Sharp, the workman referred to above, recommended to defendant that additional piling be placed beneath the floor itself. Although the evidence before the trial court sitting without a jury was conflicting, the court found that defendant had imparted this information to plaintiff, who, after some delay, informed defendant that no additional piling was necessary and that the work should proceed in accordance with the plans and specifications furnished to defendant.

After the installation of the floor, substantial settling of the foundation and the building occurred. Plaintiff was required by postal authorities to correct this defect and brought this action to recover the expenses incurred in effecting such repairs. The trial court gave judgment for the defendant, and it is from this decision that plaintiff prosecutes this appeal.

At the outset, it should be noted, as contended by plaintiff, that the present case does not present the question of impossibility of performance. The evidence be-

fore the court indicates that it was, in fact, possible to build an adequate structure on the site in question. It is equally [***3] true, as contended by plaintiff, that [HN1] mere inconvenience or substantial increase in the cost of compliance [*211] will not excuse a promisor from the duty to perform his contractual obligations. See *Safe Harbor Fishing Club v. Safe Harbor Realty Co.*, 34 Del.Ch. 28, 107 A.2d 635 (Court of Chancery, 1953). This contention, however, begs the question which is raised here, i. e., which party bears the responsibility for insuring that the structure is adequate for the purposes to be served by it. If defendant had no duty other than to follow the plans and specifications provided by the plaintiff, the fact that it was possible to build a better structure by following alternative plans and specifications would be legally irrelevant.

In support of its contention that the defendant breached its duty, plaintiff has cited *White v. Mitchell*, 123 Wash. 630, 213 P. 10 (1923). This case is clearly distinguishable since the court, in White, indicated that the owner had no business experience and relied upon the judgment of the defendant contractor. The cases of *Schools Trustees of Trenton v. Bennett*, 27 N.J. Law 513 (1859), and *Lonergan v. San Antonio Loan and Trust Co.*, [***4] 101 Tex. 63, 104 S.W. 1061, 106 S.W. 876, 22 L.R.A.,N.S., 364 (1907), cited by plaintiff, appear to support the position propounded by plaintiff. However, a close examination of these cases indicates matters not found in the instant case. In the Bennett case, the court found that the contractor had made an absolute and un-qualified promise to construct an adequate building; no discussion is given to the question of which party prepared the specifications. In Lonergan, the court noted that the specifications were prepared by an independent architect and that the plaintiff-owner had no great experience in this field. Accordingly, the court held that defendant must bear the loss resulting from a defect in the specifications prepared by the architect. To the extent that the Lonergan decision stands for the proposition that a contractor may not avoid liability by following plans [*212] and specifications prepared by the owner or his agent in a workmanlike manner, we do not adhere to that opinion.

The lower court held that defendant was exonerated from liability because the damages resulted from a defect in the plans and specifications prepared by the owner and which were followed [***5] by defendant in a work-manlike manner. Plaintiff contends here that the court below failed to distinguish between defects inherent in the plans and specifications and defects extrinsic to such specifications, such as a latent defect in the soil. This argument is untenable, since plans and specifications do not exist in a vacuum; they are made for a particular building at a particular place. The defect [**927] in the plans and specifications for the building in question was the failure to make provision for adequate pilings and other support for the floor; the fact that these plans and specifications might provide for an adequate building in some other place does not render the plans and specifications less defective for the location in question.

Plaintiffs contends, however, that there is little or no decisional authority supporting the position taken by the lower court with respect to the legal duty of a contractor when defective plans and specifications are present. Plaintiff contends that such cases as *Filbert v. City of Philadelphia*, 181 Pa. 530, 37 A. 545 (1897), are inapposite since they involve public works projects, where the discretion of a contractor is much more [***6] circumscribed than on a private construction project. This argument is wholly untenable. The great weight of authority supports the proposition, enunciated by the lower court, that [HN2] a contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if he performs his work without neglect and in a workmanlike manner. See *Draube v. Rieth*, 114 So.2d 879 (La Court of [*213] Oppeals, 1959); *Blue Bell, Inc. v. Cassidy*, 200 F.Supp. 443 (U.S.D.C.N.D.Miss.Ed., 1961); *Fuchs v. Parsons Construction Co.*, 172 Neb. 719, 111 N.W.2d 727 (1961); Corbin on Contracts, Sec. 1338; 9 Am.Jur., Building and Construction Contracts, Sec. 28.

Plaintiff's course of conduct during the construction period also indicated that it understood that it had the responsibility to change the specifications to provide additional support and to furnish additional compensation to defendant for such services. As noted above the lower court found that plaintiff was informed of the need for additional support under the wall area and informed defendant that such additional support was not necessary. Although plaintiff contests this finding of the lower court, [***7] it is supported by competent evidence in the record and will not be disturbed here. *E. I. DuPont deNemours & Co. v. I. D. Griffith, Inc.*, 11 Terry 348, 130 A.2d 783 (1957). Even if defendant was obligated under the contract to produce a structure free from any defects, plaintiff's instructions to defendant, despite the admonition given it, would excuse defendant from any further liability. See *Glass v. Wiesner*, 172 Kan. 133, 238 P.2d 712 (1951).

The judgment below is affirmed.

235 So. 2d 548, *; 1970 Fla. App. LEXIS 6437, **;
61 A.L.R.3d 786

LEXSEE 235 SO 2D 548

## WOOD-HOPKINS CONTRACTING CO., a corporation, Appellant, v. MASONRY CONTRACTORS, INC., Appellee

### No. M-44

### Court of Appeals of Florida, First District

### 235 So. 2d 548; 1970 Fla. App. LEXIS 6437; 61 A.L.R.3d 786

### May 26, 1970

**LexisNexis(R) Headnotes**

*Contracts Law > Contract Conditions & Provisions > Implied Warranties > General Overview*
*Real Property Law > Purchase & Sale > Remedies > Duty to Disclose*
*Real Property Law > Torts > Construction Defects*
[HN1] If there is a latent defect in bricks sold, caused by unfit clay, and not discoverable by the exercise of care and skill in inspecting them after they are manufactured, and a contractor in good faith and without knowledge of the defect buys the bricks and uses them in constructing a building which is accepted by the owner, the contractor is without fault though the defect in the bricks is subsequently developed by their exposure to the weather, and he is not answerable to the owner for the latent defect or liable for the amount of damage to the building caused by such defect.

*Contracts Law > Contract Conditions & Provisions > Implied Warranties > General Overview*
[HN2] A builder is not liable for the result of latent defects in material purchased from a reputable dealer.

**COUNSEL:** [**1]

Martin Sack, Jr., Jacksonville, for Appellant.

Edward H. Robinson, Jacksonville, for Appellee.

**JUDGES:**

Wigginton, Judge. Johnson, C.J., and Spector, J., concur.

**OPINION BY:**

WIGGINTON

**OPINION:**

[*549] Defendant contractor has appealed a final judgment in favor of plaintiff subcontractor for the balance claimed to be due plaintiff under its masonry subcontract with defendant. The case was tried by the court without a jury and the material facts are not in dispute. Appellant contends that the trial court applied to the facts an erroneous principle of law in holding that it was indebted to its subcontractor in the amount claimed.

Appellant was the general contractor for the construction of an apartment building in Atlanta, Georgia. The contractor entered into a contract with subcontractor by which the latter agreed to furnish all necessary labor, material, and equipment to install and clean all masonry work in the building in strict accordance with the plans and specifications. The general conditions of the contract specified the type of brick masonry material which the subcontractor was required to install as follows:

> "Face brick shall be 24 inch x 2 1/4 inch x 3 inch and shall [**2] be used for all brick exposed in the finished work. Face brick shall be Miami Stone, color as selected by the Architect. * * *"

The Miami Stone face brick specified in the contract is a distinctive concrete product manufactured solely by Miami Stone of the Southeast, Inc., and has unique face characteristics, physical appearance in texture. The subcontractor purchased from the manufacturer the type of brick as specified, and properly installed it in [*550] the building in strict accordance with the plans and specifications. When the masonry work performed by the subcontractor was substantially completed, it was discovered that water leakage had occurred through the brick installation into the interior of the building. Investigation and chemical analysis revealed that the leakage was occurring through the mortar bond between the Miami Stone

caused by a failure of the mortar to adhere to the brick. Expert testimony indicated that an acidic component of the stone reacted with the mortar to destroy its surface alkalinity. The alkaline characteristic of the mortar resulting from its content of cement and lime reacted against the acid surface of the brick preventing [**3] a tight bond between the mortar and the brick, thus allowing water to seep through the wall into the building. An expert engineer who performed an analysis of the masonry work expressed his opinion that the acid on the bricks' surface resulted from a defect in its manufacture or treatment - possibly a mold releasing compound which allowed the removal of the brick from the mold during manufacture which the manufacturer had failed to remove or clean from the brick before selling and delivering them to the subcontractor. The contractor, upon discovery of the condition caused by the latent defect in the brick, called upon the subcontractor to correct the condition by waterproofing the exterior walls of the building. Upon the subcontractor's refusal to accede to this demand, the contractor proceeded to have the condition corrected at a cost of $12,255.00.

Because of the foregoing, the contractor withheld from final payment due the subcontractor the cost of correcting the defective condition of the walls for which amount the subcontractor brought this suit. At the conclusion of the evidence the trial court rendered judgment in favor of the subcontractor for the balance of the contract [**4] price due him without deducting therefrom any amount expended by the contractor in making the exterior walls of the building watertight.

The general conditions of the contract between the parties contain the following provisions:

> "Unless otherwise specified all materials shall be new and both workmanship and materials shall be of good quality. The Contractor shall, if required, furnish satisfactory evidence as to kind and quality of materials.
>
> * * *
>
> "The Contractor shall remedy any defects due to the faulty materials or workmanship and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final payment, or from the date of the Owner's substantial usage or occupancy of the Project, whichever is earlier, and in accordance with the terms of any special guarantees provided in the Contract. The Owner shall give notice of observed defects with reasonable promptness. All questions arising under this Ar-

ticle shall be decided by the Architect subject to arbitration, notwithstanding final payment."

By this appeal the contractor contends that the subcontractor purchased from the manufacturer brick containing [**5] a latent defect which prevented a watertight bonding of the mortar and the brick thereby resulting in a seepage of water into the interior of the building. Appellant contends that under the terms of the contract quoted above the subcontractor expressly warranted that the materials to be used by him would be new and of good quality, and that he would remedy any defect due to faulty materials used by him in the performance of his subcontract. Based upon these provisions of the contract appellant asserts that appellee breached its express warranty that the materials furnished would be of good quality as a consequence of which appellant is entitled to damages in the amount it was required [*551] to expend in correcting the condition caused by the latent defect in the brick, and the court erred in denying this claim.

There is no dispute but that the type of brick specified in the contract was of a particular type manufactured by only one supplier. The subcontractor purchased and installed the exact type of brick called for in the specifications. The latent defect present in the brick was not discernible by the exercise of care and skill in inspecting them, and was present in [**6] the brick through no fault and with no knowledge of the subcontractor. There is no dispute but that the brick were installed strictly in accordance with the plans and specifications of the contract, and no fault was found in the workmanlike manner in which the installation was made.

The general rule on the question presented by this appeal is enunciated by the author of American Jurisprudence as follows:

> "* * * Moreover, it has been held that [HN1] if there is a latent defect in bricks sold, caused by unfit clay, and not discoverable by the exercise of care and skill in inspecting them after they are manufactured, and a contractor in good faith and without knowledge of the defect buys the bricks and uses them in constructing a building which is accepted by the owner, the contractor is without fault though the defect in the bricks is subsequently developed by their exposure to the weather, and he is not answerable to the owner for the latent defect or liable for the amount of damage to the building caused by such defect." n1

"* * * Moreover, it has been held that [HN2] a builder is not liable for the result of latent defects in material purchased from a reputable dealer." n3

n1  13 Am.Jur.2d 29, Building, Etc. Contracts, § 27.

[**7]

The foregoing rule stems, at least in part, from the case of Wisconsin Red Pressed Brick Co. v. Hood n2 in which, under an essentially similar factual situation as present in the case sub judice, the Supreme Court of Minnesota said:

> "But appellant contends that Hood [subcontractor] is responsible to it [contractor] for the latent defect in the bricks, and that it is entitled to recoup against him the amount of damage to the buildings caused by such defect. We cannot agree with appellant. Undoubtedly, if Hood had manufactured the brick himself, he would then, so to speak, be manufacturer of both the brick and the buildings, and would be liable for the damage to the buildings caused by such latent defect in the brick. But Hood did not manufacture the brick, had no knowledge of the defect in them, acted in good faith, and exercised reasonable care and skill. No amount of care and skill would have discovered the defect, and his contract was completed, and the building accepted by the refrigerator company, before the defect was discovered. Even though an article is furnished for a particular use, if the vendor is not the grower or manufacturer, there is, as a general rule, [**8] no implied warranty against latent defects. * * *"

The fact that the building involved in the Hood case quoted above had been completed and was accepted by the owner before the defect was discovered would appear to be immaterial to the decision.

n2  Wisconsin Red Pressed Brick Co. v. Hood (1897), 67 Minn. 329, 69 N.W. 1091.

The author of Corpus Juris Secundum states the rule applicable to the question considered herein to be as follows:

n3  17A C.J.S., Contracts § 515d, p. 857

From the foregoing authorities it would appear that under the facts of [*552] this case appellee incurred no liability for the damages caused by the latent defect in the brick under the [**9] legal theory of implied warranty. Furthermore, since the damages suffered were caused by a latent defect in the brick not discernible by the exercise of reasonable diligence, it cannot be said that appellee can be held liable in damages on the theory of negligence. Indeed, appellant does not contend that appellee's liability is based upon either of the foregoing legal theories.

It is appellant's position that by the provisions of its contract above quoted appellee expressly warranted that the brick to be furnished by it would be of good quality, and that this warranty was breached because of the latent defect in the brick which caused the damages suffered. Such position overlooks or fails to take into account the legal significance of the entire provision of the contract which constitutes the express warranty sued upon. The provision referred to is as follows:

> "Unless otherwise specified all materials shall be new and both workmanship and materials shall be of good quality. The Contractor shall, if required, furnish satisfactory evidence as to kind and quality of materials."

It is our view that the covenant to furnish materials "of good quality" is qualified [**10] by the "unless otherwise specified" phrase of this provision by virtue of the specification which requires appellee to purchase and install only Miami Stone which the owner knew was manufactured by and could be procured only from one manufacturer, to wit, Miami Stone of the Southeast, Inc. By requiring appellee to furnish only brick of a certain distinctive type produced by a single manufacturer, appellee was relieved and held harmless from its covenant to furnish only brick "of good quality". Under the terms of the contract appellee had no freedom of choice either as to the selection of the type of brick it would furnish or the manufacturer from whom such material could be

procured. Having released appellee from the covenant to furnish brick "of good quality" by having "otherwise specified" that only Miami Stone be used in the performance of the masonry subcontract, the fact that the brick used by appellee contained a latent defect unknown to it cannot be said to constitute a breach of express warranty.

For the reasons above stated we are inclined to the view that the trial court did not err in holding the subcon-

tractor harmless for the damages caused by the latent defect in the [**11] brick specified by the owner and architect in this case. If either appellant or the owner of the building has a claim for damages caused by the latent defect present in the brick purchased from the manufacturer, it does not lie against the subcontractor herein. The judgment appealed is accordingly affirmed.

JOHNSON, C.J., and SPECTOR, J., concur.