IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,          *

      Plaintiff,           *

    v.                 *     C.A. No. 04-1282-JJF

ALSTOM POWER INC.,         *

      Defendant.         *

*    *    *    *    *    *    *    *    *    *    *

## ALSTOM POWER INC.'S OPPOSITION TO DAUBERT MOTION OF AES PUERTO RICO, L.P. TO EXCLUDE CERTAIN EXPERT WITNESS TESTIMONY AT TRIAL

ALSTOM Power Inc. ("ALSTOM"), defendant, submits the following Opposition to AES Puerto Rico, LP's ("AES-PR") Daubert Motion to Exclude Certain Testimony of ALSTOM's Expert Witnesses. Because Ronald Ballinger, Sc.D, Marlin Anderson, Ph.d, Otakar Jonas, Ph.d and Joseph Mair, CPA have specialized technical knowledge that will assist the trier of fact as required under Fed. R. of Evid. 702, AES-PR's Motion should be denied.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise; if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule "represents the logical outgrowth and memorialization of the Supreme Court's landmark cases establishing the standards for admitting expert testimony" – namely *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Calhoun v. Yamaha Motor Corp, U.S.A.*, 350 F.3d 316, 320 (3d Cir. 2003).

The United States Court of Appeals for the Third Circuit has explained that Rule 702, when viewed through the prism of *Daubert*, "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corporation*, 233 F.3d 734, 741 (3d Cir. 2000) citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994) ("*Paoli II*").

**Criteria 1 – qualifications** – requires the witness to possess specialized expertise. *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003). This criteria must be evaluated "liberally" so that a "broad range of knowledge, skills and training," including "practical experience as well as academic training and credentials" can qualify an expert. *Paoli II*, 35 F.3d at 741-43; *American Tech. Resources v. United States*, 893 F.2d 651, 656 (3d Cir. 1990); *see also Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (a proffered expert's qualifications should be evaluated under a rather liberal standard); *Paoli II*, 35 F.3d at 741 (explaining that the court has applied the specialized knowledge requirement "liberally").

**Criteria 2 – reliability** – requires that the proffered testimony be the product of a reliable methodology. *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999). That is, the expert's opinion must be based on the "'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Paoli II*, 35 F.3d at 742, quoting *Daubert*, 509 U.S. at 590.

This reliability requirement also should be liberally construed and should not be "used as a tool by which the court excludes all questionably reliable evidence." *In re Paoli R.Yard PCB Litig.*, 916 F.2d 829, 857 (3d Cir. 1990) ("*Paoli I*"). Rather, the "ultimate touchstone" for

reliability is "helpfulness to the trier of fact," which turns on whether "the expert's 'technique or principle is sufficiently reliable so that it will aid the jury in reaching accurate results.'" *Paoli II* 35 F.3d at 744 citing *Deluca v. Merrell Dow Pharm. Inc.*, 911 F.2d 941, 956 (3d Cir. 1990). Because reliability and its subset of helpfulness to the trier of fact are liberally construed, there is a "strong preference for admission" under this criteria as well. *Paoli II*, 35 F.3d at 745 (quoting *Paoli I*, 916 F.2d at 857 and citing *United States v. Downing*, 753 F.2d 1224, 1235 (3d Cir. 1985)).

      **Criteria 3 – fit** – requires that the "expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. As *Daubert* itself explains, "fit" means that the testimony helps the trier of fact connect the dots between the science and the facts of the case: "The Rule 702 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry ...." *Daubert*, 509 U.S. at 591-92; *see also* *United States v. Downing*, 753 F.2d at 1237 (fit considers "the proffered connection between the scientific research or test result to be presented, and [the] particular disputed factual issues in the case"). As with criteria 1 and 2, the Third Circuit does not use "fit" to shut the door on expert evidence that might assist the trier of fact: "[o]nce again, we emphasize that the standard is not that high." *Paoli II*, 35 F.3d at 745.

      Under *Daubert* then, the trial court acts as the "gatekeeper" and evaluates the proffered evidence in light of the qualification, reliability and fit criteria. *Paoli II* at 741; *Calhoun*, 350 F.3d at 321. The trial court's discretion on "the permissible scope of expert testimony is quite broad." *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 423 (3d Cir. 2006). As one commentator on Rule 702 has succinctly explained:

        while *Daubert* assigns Trial Judges the role of gatekeepers, it does
        not authorize [them] to act as 'super-experts' or scrutinize experts

3

in such a way as to exclude all but the perfect expert testimony ... it is not up to the trial judges to pick apart an expert's testimony and exclude it if there is any flaw, no matter how minute. The task of the gatekeeper after *Daubert* is to ensure that the expert reached her opinion by the same avenues that the expert used in her day-to-day work.

2 Stephen A. Saltzburg, et al., *Federal Rules of Evidence Manual* 1239-40 (7th ed. 1998). Stated slightly differently, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system...." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996).

In responding to AES-PR's attempt to "pick apart" ALSTOM's experts and keep the jury from hearing all of their opinions, this commentary puts AES-PR's Motion to Exclude in sharp focus. As explained below, ALSTOM's four experts, and all of the opinion testimony they will offer, meet the *Daubert* criteria as applied in this Circuit and those opinions should therefore be admitted at trial.

## FACTUAL BACKGROUND

AES-PR's primary claim in this case is one for breach of the accelerated corrosion warranty in ALSTOM's contract. That claim arises from the discovery of corrosion of collecting plates in the Electrostatic Precipitators ("ESP" or "Precipitator"), one of two types of air pollution control equipment installed at AES-PR's power plant in Puerto Rico. This Court already has determined that, as a prerequisite to this claim, AES-PR has the burden of proving that it satisfied certain conditions precedent in ALSTOM's contract. Those conditions precedent include, among other things: (i) correctly setting the operating temperature of a second component of the air pollution control equipment, the Circulating Dry Scrubber ("CDS" or "Scrubber") based upon operating data; (ii) maintaining water nozzles in the CDS used to cool the flue gas; and (iii) keeping proper operation and maintenance records of these activities.

4

Much of the proposed testimony by individuals that ALSTOM will call to offer expert opinions at trial will focus upon: (i) AES-PR's failure to adequately operate and maintain the air pollution control equipment as required under Operation and Maintenance Manuals ("O&M Manuals") prepared by the company that supplied the equipment to ALSTOM; (ii) the AES-PR contention that certain operating and maintenance procedures were modified; (iii) the design of the air pollution control equipment and its capacity to satisfy air pollution control requirements while being operated in the manner necessary to minimize the risk of corrosion; and (iv) the cause of the corrosion complained of by AES-PR.

As explained below, all of ALSTOM's trial experts are exceedingly well educated and trained engineers and scientists with the appropriate requisite knowledge and experience to express their opinions. As to each opinion, the proposed testimony is based on sufficient facts and data and is the product of reliable principles and methods that have been applied reliably to the facts of this case in a manner that will assist the fact-finder in reaching a verdict.

## ARGUMENT

### I.    Ronald Ballinger, Sc.D.

AES-PR argues that Dr. Ballinger "lacks the necessary 'knowledge, skill, experience, training or education' to offer expert opinions on the capabilities, operation and maintenance of CDSs and ESPs... [and] should be prohibited from providing testimony relating to those topics." AES-PR Memorandum of Points and Authorities ("AES-PR Memorandum" at p. 9). Based upon well-developed Third Circuit law, Dr. Ballinger's expertise far exceeds the liberally construed *Daubert* "qualification" criteria. Thus, AES-PR's demand to exclude his testimony rings hollow.

First, Dr. Ballinger is a tenured Professor in the Departments of Nuclear Science and Engineering and Materials Science and Engineering at the world renowned Massachusetts

Institute of Technology ("MIT"). He attained that position after eight years of service in the United States Navy in its Nuclear Power Program, including service as Engineering Watch Supervisor on an operating nuclear submarine. That service was followed by extensive formal education, including: (i) a Bachelors of Science Degree in Mechanical Engineering with an emphasis on Materials Science at Worcester Polytechnic Institute; and (ii) extensive education at MIT, where he earned a Masters Degree and Ph.d. in Materials Science and Materials Engineering.[1] Among others, Dr. Ballinger currently teaches courses in corrosion and chemistry in MIT's Department of Materials Science and Engineering. (*See* Ex. 1, p. 20; Appendix at B 005) Furthermore, he has researched "corrosion cracking behavior in high temperature aqueous systems including: (1) irradiation assisted stress corrosion cracking in Water Reactor Systems, (2) stress corrosion cracking in Pressurized Water Reactor steam generator materials" and has researched "failure analysis, life prediction and extension of engineering components." (*See* Ex. 1, p. 17; Appendix at B 002).

Plainly, Dr. Ballinger is a sophisticated engineer with specialized and particular technical knowledge about corrosion and how corrosion occurs in mechanical systems like the air pollution control equipment at issue in this case. His "specialized expertise" includes "practical experience" (such as extensive research on corrosion and a teaching position in the Materials Science and Engineering Departments at MIT) and "academic training" (such as an S.B. degree in Mechanical Engineering, an S.M. degree in Materials Science and an Sc.D degree from MIT in Nuclear Materials Engineering based on corrosion research). Consequently, his expertise far exceeds the liberally construed *Daubert* "qualification" criteria. *See Schneider v. Fried*, 320

---

[1] *See* Ballinger 6.0 Qualifications, which is attached as Ex. 1; Appendix at B 001 - B 014, and produced by ALSTOM as part of its Expert Witness Disclosures in this case.

F.3d at 405 (a witness is qualified if he possesses "specialized expertise"); *American Tech Resources v. United States*, 893 F.2d at 656 (specialized knowledge can include practical experience and academic training); *Paoli II*, 35 F.3d at 741; *Waldorf*, 142 F.3d at 625, (*Daubert* "qualifications" criteria is to be viewed "liberally").[2]

Next, AES-PR theorizes that Dr. Ballinger's lack of prior experience with "ESPs and CDSs" prevents him from opining on the maintenance and operation of such equipment. (AES-PR Memorandum at p. 8). While Dr. Ballinger had not previously worked with this particular type of pollution control equipment per se, he has extensive knowledge and familiarity with the mechanisms of power plants and their operational systems. (Affidavit of Ronald Ballinger ¶ 1, which is attached as Ex. 2; Appendix at B 015 - B 016). Moreover, he has extensive experience conducting analyses of the root cause of aqueous corrosion -- the type of corrosion at issue here -- in mechanical systems that are analogous to and, indeed, far more complex than the air pollution control equipment at issue in this case. (*See* Ex. 2, ¶ 2; Appendix at B 015).

As a sophisticated engineer with substantial experience analyzing aqueous corrosion in a wide variety of mechanical equipment, Dr. Ballinger is well-qualified to apply this scientific, technical engineering knowledge about aqueous corrosion and mechanical systems generally, to the maintenance, operation and capabilities of the air pollution control equipment at issue here. Though not cited in the AES-PR Memorandum, the Third Circuit's decision in *Tormenia v. First*

---

[2] Although AES-PR cites *In re TMI Litigation*, 911 F. Supp. 775 (M.D. Pa. 1996) (extensive subsequent history omitted) as support for its assertion that an expert's technical knowledge must be pin point precise to be considered qualified (AES-PR Memorandum at p. 8), *TMI* does *not* stand for that proposition. Rather, the meteorologist's testimony in that case was excluded through the *Daubert* reliability and fit criteria, not the qualification criteria. 911 F. Supp. at 799. AES-PR has not questioned the reliability or fit of Dr. Ballinger's opinions, only his qualifications.

*Investors Realty Co.*, 251 F.3d 128 (3d Cir. 2000) establishes that Dr. Ballinger's expertise fully satisfies the qualification criteria.

In *Tormenia*, defendants argued that a mechanical engineering professor without much revolving door experience was not qualified to testify about a defective revolving door mechanism. 251 F. 3d at 135-136. The Third Circuit completely disagreed, holding that the professor's extensive mechanical engineering and teaching background could be generalized to revolving door mechanisms. According to the court: "Mr. Yorra's testimony appears to have combined general principles of physical science with his own experience pertaining to mechanisms like the revolving door at issue ... [he has] taught courses in many fields of mechanical engineering... [and his] experience with mechanical devices that employ the same principles at issue here was found sufficient to qualify him as an expert witness." *Id.*

The logic of *Tormenia* applies with equal force in this case. Thus, the Court should permit Dr. Ballinger to testify about the maintenance and operation of the air pollution control equipment based upon his extensive teaching and research background and "his experience with mechanical devices that employ the same principles." 250 F.3d at 136.

The standard for admitting expert testimony is simply not as high as AES-PR suggests, and allowing Dr. Ballinger to testify will assist the trier of fact in understanding the highly technical issues of fact in this case. *See e.g., Columbia Communications v. EchoStar*, (4th Cir. 2001 No. 99-1761) (allowing an expert with an electrical engineering and computer science background and twenty years of experience to testify about satellite design and testing because his "specialized knowledge...was beyond the lay ken of the jury [and] would assist the jury.") (*slip op.* at p. 11). AES-PR will have the opportunity to cross-examine Dr. Ballinger, and attempt to "pick apart" his testimony at that time. After all, "the trial court's role as [*Daubert*]

gatekeeper is not intended to serve as a replacement for the adversary system...." *U.S. v. 14.38 Acres of Land*, 80 F.3d at 1078; *Federal Rules of Evidence Manual*, p. 1239-40.

Lastly, AES-PR argues that the Court should preclude Dr. Ballinger's testimony about maintenance and operation of the air pollution control equipment because "he read critiques by an AES-PR consultant of certain operator's maintenance practices [and] summarizing conclusions from company documents is not proper expert testimony." (AES-PR Memorandum at p. 6). In fact, the Third Circuit's decision in *Jaasma Trust v. Shell Oil Company*, 412 F.3d 501 (3d Cir. 2005), also not cited by AES-PR, disposes neatly of AES-PR's assertion.

In *Jaasma*, Shell Oil sought to exclude plaintiff's expert from testifying about "merely a summary" of environmental reports Shell itself prepared and which plaintiff's expert did not independently test or verify. The *Jaasma* Court rejected Shell's theory out of hand, stating:

> This argument has no support. We do not require an expert to base his or her opinions on independent data collection or field research; rather, the question is 'whether an expert's data is of a type reasonably relied on by experts in the field and whether there are good grounds to rely on this data to draw the conclusion reached by the expert.'

412 F.3d at 514. *See also Eclipse Electronics v. Chubb Group*, 176 F. Supp. 2d 406, 412 (E.D. Pa. 2001) (holding that "[a]n expert should not be required to 'reinvent the wheel' and start his inquiry from square one in order to be deemed qualified under *Daubert*... [but] may rely on research, studies, and expertise of others, so long as they are of the sort of information regularly relied on by experts in the field").

In this case, the documents AES-PR quarrels about were prepared by AES-PR's own employees. Presumably, AES-PR does not consider these reports to be so unreliable that they could not constitute data "of a type reasonably relied on by experts in the field." *Jaasma*, 412 F.3d at 514. As *Jaasma* clarifies, Dr. Ballinger did not need to independently collect data on

9

something about which data had already been collected – by AES-PR's own employees no less.[3]
AES-PR's summary argument accordingly provides no basis for excluding the testimony.[4]

For all these reasons Dr. Ballinger does not "lack qualifications" to testify on the operation, maintenance and capability of ESPs and CDSs and he should testify to assist the trier of fact with the technical issues this case presents.

## II.    Marlin Anderson, Ph.d

As it did with Dr. Ballinger, AES-PR seeks to exclude Dr. Marlin Anderson from testifying "on the proper operation and maintenance of the CDS, a specialized area in which [he] has no experience or education." (AES-PR Memorandum at p. 10). AES-PR's challenge to Dr. Anderson's *Daubert* criteria 1 "qualifications" fails because Dr. Anderson has an abundance of the sort of "specialized expertise," practical experience and academic training and credentials the Third Circuit requires of testifying experts. *Schneider*, 320 F. 3d at 405.

First, Dr. Anderson has extensive practical experience.  His resume and attached Affidavit explain that he "used wet bulb temperatures to determine flue gas moisture content on a regular basis." (Affidavit of Marlin H. Anderson at ¶ 4, which is attached as Ex. 3; Appendix

---

[3] AES-PR's suggestion that it is improper for ALSTOM's experts to rely, in part, on critical assessments of the operation and maintenance of the equipment by AES-PR's own employees is even more troublesome given the paucity of records kept and produced by AES-PR regarding the critical operation and maintenance procedures at the times that are relevant in this case.

[4] Likewise, the fact that Dr. Ballinger had one of his colleagues, Dr. David Kalmanovitch, compile and analyze AES-PR data that Dr. Ballinger relied upon in formulating his opinions, is no reason to exclude Dr. Ballinger's testimony.  To the contrary, Dr. Ballinger's reliance upon the product of Dr. Kalmanovitch's work is entirely proper where, as here, Dr. Ballinger believes that the analysis and summarization of that data by Dr. Kalmanovitch, himself an expert in the power industry, was reliable and something that an expert reasonably should rely upon in formulating his opinions. (*See* Ex. 2, ¶3; Appendix at B 015). *Jaasma*, 412 F.3d at 514; *Eclipse*, 176 F. Supp. 2d at 412.

at B 017). This is one of the critical operating procedures that AES-PR was required to perform based on the O&M Manuals in order to minimize the risk of corrosion of the air pollution control equipment. (*See* Ex. 3 at ¶ 14; Appendix at B 017). Dr. Anderson has "considerable experience working with Electrostatic Precipitators in circumstances where it was critical that sufficiently high operating temperatures be maintained in order to avoid accelerated corrosion due to operation below the dried or moisture dew point." (*See* Ex. 3 at ¶ 5; Appendix at B 017). The corrosion of the collecting plates in the Precipitators at AES-PR's facility is the central issue in the case and significant component of Dr. Anderson's testimony. Dr. Anderson also has analyzed and worked with "pollution control equipment and corrosion in that equipment" (*See* Ex. 3 at ¶ 6; Appendix at B 018); has worked with equipment using nozzles and "wet scrubbers at coal field power plants." (*See* Ex. 3 at ¶¶ 8, 9; Appendix at B 018). Finally, Dr. Anderson has worked with "spray dryers" that have "small particles of hydrated lime to react with $SO_2$ in order to remove it from the flue gas stream," the very same process that occurs in the CDSs at AES-PR's power plant. (*See* Ex. 3 at ¶ 10; Appendix at B 018).

Secondly, his academic training and credentials include a masters degree in Physics and Mathematics and a Ph.d in Physics from Auburn University and research into such topics as "fundamental mechanisms involved in particulate collection deficiencies such as: electrostatic precipitators, fabric filters and scrubbers." (*See* Anderson CV at p. 22; Appendix at B 022, which is attached as Ex. 4 and was provided previously to AES-PR).

Dr. Anderson's extensive background and expertise with respect to "scrubbers" and other equipment analogous to the CDSs at issue in this litigation more than meets the Third Circuit's liberal *Daubert* qualification threshold for experts. *Waldorf v. Shuta*, 142 F.3d 625; *Paoli II*, 35 F.3d at 741. Plainly, the workings of this type of scrubber system is "beyond the lay ken of the

jury" and testimony about how it was operated and how it was maintained will be helpful as a

"touchstone" to the trier of fact in deciding what caused the corrosion at the plant.  *See Columbia*

*Communications*, slip op. at 11;  *Paoli II*, 35 F.3d at 744.

Next, AES-PR asserts that Dr. Anderson has no "discernable education or experience in

the operating and maintenance of a CDS" and "cannot use his experience with ESPs to leverage

experience in CDS." (AES-PR Memorandum at p. 12).  As to the first point, it is true that Dr.

Anderson has not worked with CDSs before because they are rare in this country.  To that end,

the deposition testimony upon which AES-PR is relying is misleading.  As to the second point,

AES-PR is simply wrong.

As Dr. Anderson explains in  his Affidavit:

> The acronym 'CDS' refers to a specific type of scrubber
> that was at one time marketed and sold in the United States
> by Environmental Elements Corporation under a license
> from a German company known as Lurgi.    To my
> knowledge, there are very few instances in which this
> scrubber has actually been utilized in the United States.

(*See* Ex. 3 at ¶ 15; Appendix B 019).  In fact, as Dr. Anderson's Affidavit makes clear, he has

substantial experience throughout the course of his career in analyzing and working with

scrubbers and other closely analogous equipment used in the power industry and cement industry

to accomplish evaporative cooling such as that performed by the CDS at AES-PR's power plant.

(*See* Ex. 3 at ¶¶ 4, 7, 9 – 13; Appendix at B 017 - B 018).  Dr. Anderson has extensive

experience working with scrubbers, of which the CDS is but one type, and is in no way

borrowing from his experience with Electrostatic Precipitators, an entirely different kind of

equipment, in formulating opinions about the CDS in this case.  (*See* Ex. 3 at ¶ 16; Appendix at

B 019).

As explained previously, an expert with extensive teaching and research background and "experience with mechanical devices that employ the same principles" may extrapolate that experience to similar devices. *Tormenia*, 251 F.3d at 135-36. Based upon Dr. Anderson's extensive research and practical experience with scrubbers, gas steam removal systems, pollution control equipment and corrosion in such equipment, he should be allowed to opine on the proper operation and maintenance of the CDSs in this case. The extent to which Dr. Anderson has prior experience with the particular type of scrubber known as a CDS is a matter for cross-examination and not a basis to exclude Dr. Anderson's opinions. *See United States v. 14.38 Acres of Land*, 80 F.3d at 1078.

AES-PR follows its attack on Dr. Anderson's credentials with the equally unsupported argument that all Dr. Anderson did was read some AES-PR documents and manuals and "regurgitate" them to support his opinions on the improper operation and maintenance of the CDSs. (AES-PR Memorandum at p. 11). Based on that erroneous premise, AES-PR then claims that "simply reading and interpreting documents – without bringing specialized knowledge to bear on the interpretation – does not assist the trier of fact." (AES-PR Memorandum at p. 12).

This absurd proposition utterly ignores Dr. Anderson's academic and practical experience with pollution control equipment, including scrubbers, and with other processes very much like the CDS that Dr. Anderson believes AES-PR misoperated and failed to maintain. Even suggesting, implicitly, if not explicitly, that just "anyone" could pick up, read, understand and offer insightful comment about a highly technical document like the EEC's O&M manual strains credulity. In fact, Dr. Anderson's opinions regarding AES-PR's failure to properly operate and maintain the CDS and the rest of the air pollution control equipment are based: on his review of

the documents and other data; on knowledge gained during two visits to the site to examine the air pollution control equipment; and, of course, the application of his background and experience to that information. (*See* Ex. 3, ¶ 16; Appendix at B 019).

Moreover, Dr. Anderson was well within legal and evidentiary bounds in reviewing and considering documents concerning how the air pollution control equipment was maintained – most of which were prepared by AES-PR's own employees. *See Jaasma*, 412 F.3d 514 (an expert can consider scientific documents prepared by an opposing party in reaching his opinion); *see also Eclipse Electronics v. Chubb*, 176 F. Supp. 2d at 412 (engineer's expert opinion on the effects that "an environment could have on electronic connectors..." was reliable although based in part on documents the expert reviewed).

AES-PR next argues that Dr. Anderson's testimony should be disallowed because it constitutes "legal opinion" on "(1) the scope of AES-PR's operation and maintenance obligations under its contract...; (2) ALSTOM's [contract] responsibilities to install and check the DCS computer logic; and (3) whether the instructions and operating procedures provided during commissioning modify [AES-PR] warranty obligations." (AES-PR Memorandum at p. 13). Reliance on what AES-PR glibly refers to as "legal opinion" does not afford a valid basis for excluding the testimony either.

Taking these points in reverse order, it is ironic that two of AES-PR's own experts have offered opinions in their Rule 26 disclosures on *precisely* the same subject matter:  the circumstances under which operations and maintenance manuals can be modified.  In his report, Richard R. Lunt opined as follows:

> That AES deferred to the updated instructions is consistent with
> industry practice.  Operating conditions set forth in O&M manuals
> prepared during the design and construction phases of a project are
> frequently modified during startup when a system is "tuned" to the

> specific conditions of an application. Such adjustments are then
> usually documented either by changes to the O&M manual or
> through issue of one or more supplemental guidance documents.
> Supplemental guidance was the case here.

(*See* Excerpt from Report of Richard R. Lunt, which is attached as Ex. 5 at p. 7; Appendix at B

025). Similarly, John Toher, a second expert witness designated by AES-PR, offered the

following opinion:

> It is standard in the industry to follow the direction of the
> manufacturer's field personnel during commissioning. This
> supercedes the written manuals until such time as the manuals
> are updated with all field revisions.

(*See* Excerpt from Report of John Toher, which is attached as Ex. 6 at p. 5; Appendix at B 027).

The opinion expressed by Dr. Anderson on the industry standards applicable to the

modification of operations and maintenance manuals for similar equipment in the power industry

is both responsive to the opinions expressed by Messrs. Lunt and Toher and an appropriate subject

for expert testimony. *See Jaasma*, 412 F. 3d at 513-14; *Eclipse*, 176 F. Supp at 412. If, however,

the Court should decide that this is not an appropriate subject for expert testimony, then no such

testimony should be offered by any of these witnesses.

As to points one and two, AES-PR plays fast and loose with what it refers to as "legal

opinions." Point one refers to Dr. Anderson's opinion that AES cannot meet its burden of showing

that it operated and maintained the air pollution control equipment in accordance with the

procedures set forth in the O&M Manuals because "it failed to maintain proper records." (AES-

PR Memorandum at p. 13). (*See* Anderson Report, which is attached as Ex. 7 at p. 10; Appendix

at B 029). This statement hardly constitutes a "legal opinion." Instead, it is the discerning

observation of a  highly experienced engineer who has read and analyzed the procedures in the

O&M Manuals for the equipment at issue in light of numerous analyses of operation and

maintenance manuals for air pollution control equipment at other facilities in his 30+ years of engineering.[5]  Indeed, it is only an engineer with experience like that of Dr. Anderson, and certainly not an attorney, who can make this technical assessment for the fact-finder in this case.[6]

Similarly, point two—"that the DCS was not in ALSTOM's scope of work [and] ALSTOM is not responsible for any failure to incorporate the logic provided by EEC in the DCS" -- is more of an opinion as to the "ultimate issue" with respect to this narrow point than a "legal conclusion." As the Third Circuit has noted:

> It is not unfairly prejudicial to allow an expert to testify as to the ultimate issue.  Jurors may properly take an expert's impressive experience and credentials into account when determining the weight of the expert's testimony.

*United States v. Rutland*, 372 F. 3d 543 (3d Cir. 2004).  In this case, Dr. Anderson's testimony regarding his opinion on this "ultimate issue" will assist the jury in making a determination of what is a factual, and not merely legal, matter.

### III.    Otakar Jonas, Ph.d

---

[5] The support for AES-PR's characterization of this opinion from the deposition of Dr. Anderson also is misleading.  In addition to testifying that he read the O&M Manual and the Contract (See Excerpt from Deposition of Marlin Anderson, which is attached as Ex. 8 at pp. 296-97; Appendix at B 033 - B 034), Dr. Anderson testified earlier in his deposition regarding his finding that AES-PR "failed to operate and maintain equipment in accordance with the operations and maintenance manuals" based on "[t]he fact that proper records were not kept concerning wet bulb temperatures, the chloride content of the water, chloride content of the ash, all of those things that were to have been kept and records maintained."  (*See* Ex. 8 at pp. 215-16; Appendix at B 031 - B 032).

[6] Moreover, Dr. Anderson's testimony is not the sort of "ipse dixit" —it is because I say so—expert testimony that Rule 702 abhors.  Rather, it is the type of helpful information by a qualified technical expert that may assist the jury and should be admitted for that very reason. *See e.g. Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584 (D.N.J. 2002), citing *General Electric v. Joiner*, 522 U.S. 136 (1992).

AES-PR seeks to prevent Dr. Jonas from offering two narrow opinions that are set forth in his report:   (i) his opinion that "the CDS and ESP could have been operated at a CDS outlet temperature of 175°F, and because AES-PR failed to operate the CDS at that temperature, it voided the accelerated corrosion warranty"; and (ii) what AES-PR characterizes as a "legal opinion" that AES-PR's damages are too speculative to be recovered."  (AES-PR Memorandum at p. 17).  In fact, AES-PR has mischaracterized both of these opinions as well as Dr. Jonas' qualifications to offer them at trial.

As to the first challenge on "operational capabilities," AES-PR once again focuses on the expert's qualifications:  "Dr. Jonas' report, however, diverges from his area of expertise."  (AES-PR Memorandum at p. 14).  Despite AES-PR protests, Dr. Jonas' academic training and practical experience surpass the liberally construed *Daubert* qualification criteria.

Like Dr. Ballinger and Dr. Anderson, Dr. Jonas has considerable technical educational experience and practical experience in relevant fields of engineering that afford him the specialized expertise required to render the opinions he has expressed in his case.  (*See* Resume of Otakar Jonas, a copy of which is attached as Exhibit 9 at A-1; Appendix at B036 and which has previously been provided to AES-PR).  Dr. Jonas has Bachelors and Masters Degrees in Engineering that he obtained while living in Czechoslavakia, has studied corrosion at Lehigh University, and has a Ph.D. in Power Engineering from the Czech Tech. University.  He is a member of the National Association of Corrosion Engineers and is licensed as a Professional Engineer in Corrosion.  (*Id.*).  His resume also reflects his experience "with corrosion and failure analysis" and his "review [of] system and component design and operation of over one hundred utility and industrial, nuclear and fossil, power systems."  (*Id.* at A-2; B 036).

Thus, Dr. Jonas possesses the sort of specialized and particular technical knowledge about power systems and the components of those systems to easily qualify him to testify under *Daubert*. *See American Tech Resources*, 893 F.2d at 656; *Paoli II*, 345 F.3d at 741.

In its Memorandum, AES-PR is actually parsing two opinions expressed by Dr. Jonas' Report. The first is: "The ESP could have operated at a CDS outlet temperature of 170°F that is required to reduce the risk of corrosion and satisfy emission requirements...." (*See* Excerpt from Report of Otakar Jonas, which is attached as Ex. 10 at p. 4-5; Appendix at B 044). The second appears to be a compilation of opinions expressed in the Report to the effect that the CDS could successfully operate with high chlorides in the cooling water at the high operational temperatures required to minimize the risk of corrosion. (*See* Ex. 10 at p. 7-2; Appendix at B 049). Based upon his educational background in engineering and corrosion, his knowledge of corrosion, and his assessment of the design and operation of over 100 utility and industrial, nuclear and fossil power systems, Dr. Jonas also is qualified to examine the design of the air pollution control equipment and records relating to its operation and maintenance for the purpose of offering opinions with respect to its capabilities, including the opinion challenged by AES-PR in its Memorandum.

Moreover, like Dr. Ballinger and Dr. Anderson, Dr. Jonas is not disqualified merely because he had "no prior experience in the operation of CDSs." (AES-PR Motion at p. 15). As the Third Circuit explained in *Tormenia*, an expert with extensive teaching and research background and "experience with mechanical devices that employ the same principles" to parlay that experience to similar mechanical devices and systems" should be permitted to testify. *Tormenia*, 251 F.3d at pp. 135-36.

AES-PR then complains that Dr. Jonas offered what it characterizes as a "legal conclusion" on AES-PR's damages by pointing out that they are based on estimates for repairs

and that the amount of damages vastly increased from the time the Complaint was filed until Interrogatories were answered. (AES-PR Memorandum at p. 16). From those two statements, AES-PR leaps headlong to its unsubstantiated conclusion that "in essence, Dr. Jonas' opinion is that he is unconvinced that AES-PR has met its burden of proof on damages [which is an improper] legal conclusion and attempt to weigh the evidence." (AES-PR Memorandum at p. 16).

AES-PR's mischaracterization of Dr. Jonas' testimony unduly seeks to hamstring ALSTOM. Dr. Jonas did not *say* that AES-PR has not met its burden of proof, AES-PR did. What Dr. Jonas said is that "AES-PR has provided a large number of studies and cost estimates [and moved from an] entire corrosion-related claim of $5.9 million [to] $34,307,120.12." (*See* Ex. 10 at p. 6-1; Appendix at B 045). In doing so, Dr. Jonas merely described AES-PR's own documents; he did render any legal conclusions.

Dr. Jonas further stated that in his opinion, "the estimated costs are excessive, vague and speculative." (*Id.* at p. 6-2; Appendix at B 046). Once again, it is AES-PR that characterizes this testimony as an inadmissible legal conclusion, which it is not. Dr. Jonas did not say that AES-PR has not established its damages to the required degree of legal certainty, which would, of course, be impermissible. Instead, based upon his examination of the few documents that AES-PR had produced in support of its claimed damages, and based upon his extensive experience with power plant systems and repair, he opined AES-PR's damages are excessive, speculative and vague "because the technical basis for the processes described and the new designs and costs

have not yet been properly established." (*See* Ex. 10 at p. 6-1; Appendix at B 045).[7]  Such an

opinion is permissible and can be "picked apart" by AES-PR during cross-examination.

## IV.    Joseph Mair, CPA

AES-PR wraps up its *Daubert* Motion with an attack on the expert testimony of John

Mair, CPA.  Particularly, AES-PR challenges Mr. Mair's opinion that the corrosion warranty

"prohibits AES-PR from recovering operation and maintenance cost if not incurred by

November 28, 2006."  (AES-PR Motion at pp. 19-20)  Mr. Mair is unqualified to render this

opinion, according to AES-PR "because he is not a lawyer and has no legal training." (*Id.* At p.

20).

In the Expert Witness Report of Stuart A. Rosenberg, CPA, submitted by AES-PR, Mr.

Rosenberg has computed "the net present value ("NPV") as of January 1, 2006 for each of the

aforementioned O&M expense categories over the remainder period of the 25 year Power

Purchase Agreement ("PPA") between AES-PR and the Puerto Rico Electric Power Company."

(*See* Excerpt from Report of Stuart A. Rosenberg, a copy of which is attached as Ex. 11 at p. 3;

Appendix at B 052).  In calculating the net present value of certain operation and maintenance

expenses for a period of 25 years, Mr. Rosenberg has attempted to construe the remedy to which

AES-PR claims that it is entitled under the accelerated corrosion warranty in ALSTOM's

contract.  Thus, based upon his own experience in construction accounting and his reading of the

warranty, ALSTOM's expert, Mr. Mair, has opined that the AES-PR net present value

calculation has been performed incorrectly:  that the net present value *should* be calculated for

---

[7] Ironically, despite its challenge to Dr. Jonas' opinions regarding the speculative nature
and lack of technical documentation for its claimed damages, AES-PR has belatedly rushed to
bolster the very things identified by Dr. Jonas by producing additional documents well after the
close of discovery.  As set forth in ALSTOM's Motion filed on October 2, 2006, documents
produced belatedly by AES-PR and after the close of discovery should be excluded from
evidence at trial.

the period ending November 28, 2006 and not for a period of 25 years. If Mr. Mair is not permitted to offer this testimony, then the premise for Mr. Rosenberg's net present value calculation, and the calculation itself, also should be excluded.

Furthermore, applying the Third Circuit's rulings in *Buford v. Wellington Trust Co.*, 841 F.2d 51 (3d Cir. 1988) defeats AES-PR's challenge to Mr. Mair's testimony. In *Buford*, the court permitted expert testimony on the application of a disputed term in a business contrast by explaining:

> The term...is not defined, and the parties to the contract dispute the term's intent. The trial court did not commit an abuse of discretion in permitting the jury to hear [the expert's] interpretation and to make its own finding as to what was intended. The intention of the parties was in this respect a disputed issue of fact.

841 F.2d at 55.

This case should be similarly treated.[8] Mr. Mair is a CPA with almost 20 years of experience in construction industry damages and finances. His resume and expert report describe his "concentration in construction matters since 1989," describe that he has "supervised the financial evaluation of numerous construction companies," "negotiate[ed] change orders, incentive payments, claims with both owners and contractors," and has been engaged as an expert in construction matters. (*See* Resume of John Mair, CPA, a copy of which is attached as Ex. 12; Appendix at B 053 - B 055). If AES-PR's Mr. Rosenberg is permitted to testify regarding the document that is not even part of the contract, then Mr. Mair should be permitted to give his opinion on the warranty provisions and let the jury "make its own finding." *Buford*, 841 F.2d at 55.

---

[8] *But see Gallatin Fuels, Inc. v. Westchester Fire*, 410 F. Supp. 2d 417 (W.D. Pa. 2006) (expert could not testify about how certain insurance policy terms should be construed).

## CONCLUSION

For the reasons set forth above, ALSTOM requests that the Court deny AES-PR's Motion to Exclude Certain Expert Witness Testimony at trial.

Respectfully submitted,

ALSTOM POWER INC.


/s/  Richard R. Wier, Jr.
Richard R. Wier, Jr. (#716)
RICHARD R. WIER, JR., P.A.
Two Mill Road
Suite 200
Wilmington, DE 19801
(302) 888-3222


James E. Edwards, Jr.
Anthony F. Vittoria
Michael A. Schollaert
OBER, KALER, GRIMES & SHRIVER
A Professional Corporation
120 East Baltimore Street
Baltimore, Maryland 21202-1643
Phone:  (410) 685-1120
Fax:     (410) 547-0699


## CERTIFICATE OF SERVICE

I CERTIFY that on October 9, 2006 ALSTOM Power Inc., defendant, by its counsel, served its Opposition To Daubert Motion Of AES Puerto Rico, LP To Exclude Certain Expert Witness Testimony At Trial by hand delivery on John S. Spadaro, Esquire, Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware 19805, and by electronic mail and

first-class mail on Daniel D. Williams, Esquire, Williams & Connolly, LLP, 725 Twelfth Street,

N.W., Washington, D.C. 20005, attorneys for AES Puerto Rico, L.P.

/s/  Richard R. Wier, Jr.
Richard R. Wier, Jr. (#716)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES-PR PUERTO RICO, L.P.                    *

       Plaintiff                         *

       v.                               *     C.A. No. 04-1282-JJF

ALSTOM POWER INC.                           *

       Defendant                         *

\*       \*       \*       \*       \*       \*       \*

## ORDER

    Upon consideration of Plaintiff's Daubert Motion, Defendant's Opposition, and any other argument, it is hereby ORDERED, on this ___ day of October 2006, that Plaintiff's Daubert Motion To Exclude Certain Expert Witness Testimony at Trial is hereby DENIED.

    **ORDERED**, this _____ day of _____, 2006.


                         _____
                         Judge Joseph J. Farnan, Jr.
                         United States District Court for
                         The District of Delaware

cc:     John S. Spadaro, Esquire
        Richard R. Wier, Jr., Esquire