**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

AES PUERTO RICO, L.P.,

Plaintiff,

v.

ALSTOM POWER, INC.,

Defendant.

Civ. No. 04-1282-JJF

**MEMORANDUM OF PLAINTIFF AES PUERTO RICO, L.P. IN OPPOSITION TO ALSTOM POWER, INC.'S MOTIONS *IN LIMINE* NOS. 1-9**

John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel (302) 472-8100
Fax (302) 472-8135

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
Ann N. Sagerson
James L. Tuxbury
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: October 9, 2006

Attorneys for AES Puerto Rico, L.P.

**TABLE OF CONTENTS**


I. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 1 – DOCUMENTS PRODUCED AFTER THE DISCOVERY CUT-OFF DATE AND SPECIFIED WITNESSES. .....1

II. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 2 – REBUTTAL/ SUPPLEMENTAL EXPERT TESTIMONY. .....7

III. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 3 – TESTIMONY AND EVIDENCE MENTIONING LIBERTY MUTUAL INSURANCE COMPANY. .....8

IV. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 4 – ALSTOM'S JOINT DEFENSE AGREEMENT WITH ITS SUBCONTRACTOR'S SURETY. .....13

V. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 5 – DEPOSITION TESTIMONY OF WILLIAM VAN HOOSER. .....17

VI. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 6 – ORAL EVIDENCE SUPPORTING EQUITABLE ESTOPPEL. .....17

VII. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 7 – WHETHER ORAL STATEMENTS OF ALSTOM'S SUBCONTRACTOR ARE HEARSAY. .....22

VIII. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 8 – PARTS OF THE CONTRACT'S "WARRANTIES" SECTION. .....26

IX. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 9 – EXHIBITS ALSTOM CLAIMS ARE UNTRUSTWORTHY. .....29

CONCLUSION .....34

## TABLE OF AUTHORITIES

### FEDERAL CASES

*AES Puerto Rico, L.P. v. ALSTOM Power, Inc.*, 429 F. Supp. 2d 713 (D. Del. 2006) 21, 26-27, 28

*Bechtel v. Robinson*, 886 F.2d 644 (3d Cir. 1989)....19

*Benitec Australia Ltd. v. Commonwealth Scientific and Indus. Research Org.*, Civ. A. No. 04-889-JJF, 2005 U.S. Dist. LEXIS 3545 (D. Del. Mar. 8, 2005)....20

*Blakey v. Continental Airlines*, No. 93-2194, 1997 WL 1524797 (D.N.J. Sept. 9, 1997)....8

*Butler v. Home Depot, Inc.*, Nos. C-94-4335, C-95-2182, 1997 WL 375285 (N.D. Cal. Apr. 24, 1997)....8

*Delaware v. Van Arsdall*, 475 U.S. 673 (1984)....15

*Douglas v. Owens*, 50 F.3d 1226 (3d Cir. 1995)....15

*Eastland Mortgage Co. v. Verex Assurance, Inc.*, Nos. 91-6368, 92-6045, 1992 WL 339068 (10th Cir. Nov. 17, 1992)....11

*Finch v. Hercules Inc.*, No. Civ. A. 92-251-MMS, 1995 WL 785100 (D. Del. Dec. 22, 1995)....6

*Garee v. McDonell*, 116 F.2d 78 (7th Cir. 1940)....12

*Heidelberger Druckmaschinen AG v. Ohio Elec. Engravers, Inc*, No. 98-C-7946, 2000 WL 631382 (N.D. Ill. May 12, 2000)....3

*Horvath v. Rimtec Corp.*, 102 F. Supp. 2d 219 (D.N.J. 2000)....25

*Jacobs Press Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, Nos. 94-1046, 94-1087, 1997 WL 90665 (4th Cir. 1997)....12

*In re Modular Structures, Inc.*, 27 F.3d 72 (3d Cir. 1994)....12

*Philips Electric North American Corp. v. Contec Corp.*, No. Cir. A. 02-123-KAJ, 2004 WL 769371 (D. Del. Apr. 5, 2004)....3

*Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751 (3d Cir. 1976)....11, 13

*Ravotti v. Sunderland*, 115 Fed. Appx. 560 (3d Cir. 2004)....11

*Salem v. City of Sarasota*, No. 804CV297T24EAJ, 2005 WL 1571883 (M.D. Fla. Jun. 30, 2005)....23

*Szusterman v. Amoco Oil Co.*, 112 Fed. Appx. 130 (3d Cir. 2004) ... 3

*Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487 (D. Del. 2005) ... 25

*Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 262 F. Supp. 2d 358 (D. Del. 2003) ... 28

*U.S. v. Abel*, 469 U.S. 45 (1984) ... 15

*U.S. v. Am. Ins. Co.*, 18 F.3d 1104 (3d Cir. 1994) ... 12

*U.S. v. Smalley*, 754 F.2d 944 (11th Cir. 1985) ... 15

*Ware v. Rodale Press, Inc.*, 322 F.3d 218 (3d Cir. 2003) ... 3

**STATE CASES**

*E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108 (Del. 1985) ... 28

*Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95 (Del Ch. 2006) ... 20

*Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28 (Del. 1972) ... 20

*Wilson v. Am. Ins. Co.*, 209 A.2d 902 (Del. 1965) ... 19

*Wolf v. Globe Liquor Co.*, 103 A.2d 774 (Del. 1954) ... 19, 22

**FEDERAL RULES**

Fed. R. Civ. P. 26 ... 2

Fed. R. Evid. 401 ... 13, 14, 25, 29

Fed. R. Evid. 402 ... 13, 30, 33

Fed. R. Evid. 403 ... 13, 26, 30

Fed. R. Evid. 408 ... 13, 17

Fed. R. Evid. 411 ... 8, 11, 12, 13, 17

Fed. R. Evid. 801 ... 23, 24, 25

Fed. R. Evid. 802 ... 25, 33

Fed. R. Evid. 901 ... 30, 33

## MISCELLANEOUS

3 S. Symons, *Pomeroy's Equity Jurisprudence* (5th ed. 1941) .................... 20

Restatement (Second) of Contracts (1981) .................... 28

4 Bruner & O'Connor Construction Law .................... 12

23 C. Wright & K. Graham, Federal Practice and Procedure .................... 11

6 James Wm. Moore *et al.*, Moore's Federal Practice (3d ed. 1997) .................... 7

13 Williston on Contracts (4th ed. 2004) .................... 12, 20

Plaintiff AES Puerto Rico, L.P. ("AES-PR") submits this combined opposition to Defendant ALSTOM Power, Inc.'s Motions *in Limine* Nos. 1-9.

# I. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 1 – DOCUMENTS PRODUCED AFTER THE DISCOVERY CUT-OFF DATE AND SPECIFIED WITNESSES.

## A. ALSTOM's Motion Ignores That the Documents It Seeks To Exclude Were Not Created Until After the Discovery Cut-off Date and Were Timely Produced.

ALSTOM's motion is pure gamesmanship intended to exclude plainly relevant evidence regarding AES-PR's damages. ALSTOM has been on notice since the beginning of this case that some of AES-PR's damages claims represented good-faith estimates of costs to be incurred in the future. Indeed, in its Complaint, AES-PR made abundantly clear that the exact measure of its costs to remedy the accelerated corrosion in its pollution control equipment was not presently known. *See* Compl. ¶ 21 (AES-PR "expects that, when the repairs and modifications are completed, the costs will total approximately $5,900,000."). AES-PR's response to an ALSTOM interrogatory requesting an itemization of damages likewise explained: "Because all of the work has not yet been completed, the[] estimates [of damages] are subject to revision." B.126-27. As AES-PR advised ALSTOM, AES-PR's damages figures have required revision, and documents memorializing its damages have continued to be generated and timely produced to ALSTOM.

ALSTOM now seeks to exclude updated cost estimates from three third-party vendors and contracts disclosing actual costs AES-PR will incur, all of which were created and sent to AES-PR in the ordinary course of business after the close of fact discovery. ALSTOM cites no authority for the proposition that a case should be tried based on an obsolete record. The jury in this case is entitled to know the actual expenses that AES-PR will incur as a result of the accelerated corrosion in the pollution control equipment ALSTOM supplied, and AES-PR has

complied fully with its discovery obligations by producing the documents as soon as they came into existence.

ALSTOM demands exclusion of seven documents it claims were produced late, even though each of these documents was not created until well after the discovery cut-off date and even though each was produced to ALSTOM within days of coming into AES-PR's possession. The discovery cut-off date in this action was March 10, 2006. When AES-PR received relevant documents responsive to ALSTOM's requests after that date, it immediately produced them pursuant to Fed. R. Civ. P. 26(e)(2). The seven documents that ALSTOM seeks to exclude all were created after March 10, 2006 – thus production by March 10, 2006 literally was impossible. The sources and dates of creation of the documents to which ALSTOM objects are as follows:

| Document | Source | Date |
|---|---|---|
| P-135 | GE | April 11, 2006 |
| P-136 | GE | April 12, 2006 |
| P-137 | Aquatech | April 13, 2006 |
| P-138 | Aquatech | April 17, 2006 |
| P-139 | Aquatech | April 19, 2006 |
| P-207 | FL Smidth | August 29, 2006 |
| P-208 | Aquatech | September 6, 2006 |

The documents dated April 11-19, 2006 are letters from GE and Aquatech containing cost estimates relating to the brine crystallizer that the plant is installing as part of its remedy for the defective pollution control equipment. These letters were produced to ALSTOM on April 20, 2006, between one day and one week after their creation. *See* B.124. The August 29, 2006 document is a proposal for installation of replacement collector plates for the pollution control equipment. The September 6, 2006 document is a formal letter of intent for procurement

of the brine crystallizer. These two documents were produced to ALSTOM on September 6 and 7, 2006 respectively, also between one day and one week after their creation. *See* B.130; B.129. When a party has good reason for producing documents after the discovery cut-off date, courts permit use of the documents. *See, e.g., Heidelberger Druckmaschinen AG v. Ohio Elec. Engravers, Inc.*, No. 98-C-7946, 2000 WL 631382 at *5 (N.D. Ill. May 12, 2000) (refusing to strike documents produced after close of fact discovery). In this case, AES-PR clearly had good cause – the documents were not created until after March 10, 2006 – and AES-PR produced them immediately after they came into the company's possession. There is no plausible basis to exclude these documents.

In support of its argument, ALSTOM cites case law concerning a wholly different circumstance – where a party fails to produce documents <u>that it had in its possession prior to the discovery cut-off date</u>. For example, in ALSTOM's principal case, *Philips Elec. N. Am. Corp. v. Contec Corp.*, No. Cir. A. 02-123-KAJ, 2004 WL 769371 (D. Del. Apr. 5, 2004), documents were excluded from trial only because the court first found that the party had "failed to persuade [the court that the documents] could not have been produced during the . . . discovery period." *Id.* at *1 ("[I]s there any reasonable excuse for [the] delay . . .? I have not heard it, if there is."). That, of course, is not the case here because the documents about which ALSTOM complains did not even exist during the discovery period.

ALSTOM mischaracterizes two Third Circuit cases as relating to "exclu[sion of] damages-related documents," when each of those cases concerned a party that, with ample opportunity to do so, failed to provide any itemization of its damages prior to trial. *See* Mot. 5 (*citing Ware v. Rodale Press, Inc.*, 322 F.3d 218, 221 (3d Cir. 2003); *Szusterman v. Amoco Oil Co.*, 112 Fed. Appx. 130 (3d Cir. 2004)). During discovery in this case, AES-PR provided

detailed interrogatory responses explaining its damages calculations, stating which components were based on estimates, and stating which reflected actual costs incurred to date. When AES-PR received documents from vendors revising prior estimates, and incurred the expenses it previously had estimated, it immediately provided supplemental documents to ALSTOM reflecting such revisions. Not only do the Third Circuit cases on which ALSTOM relies not relate to the use of damages documents created after the close of fact discovery, they are inapposite because the circumstance they do discuss – failure to itemize damages – is not an issue in this case.[1]

ALSTOM further claims that the documents created and produced in April 2006, after the close of fact discovery, were from "entities that had never been identified" during discovery. That is demonstrably false. The documents are letters from two water treatment companies: Aquatech and GE. In ALSTOM's Rule 30(b)(6) deposition of AES-PR on damages issues on January 18, 2006 and again on March 9, 2006, AES-PR's corporate designee specifically identified GE and Aquatech as the two companies bidding to supply a crystallizer for the facility. *See* B.022; B.038. Indeed, ALSTOM clearly was aware of the role of these companies – it issued a subpoena *duces tecum* to GE on August 17, 2005. *See* B.095-106. ALSTOM did not depose any GE or Aquatech individuals because it had used all ten of the

---

1 ALSTOM attempts to buttress this irrelevant argument by distorting the record. Attaching a misleadingly myopic sample of deposition excerpts, ALSTOM falsely claims that "AES-PR's corporate designee was unable to provide any insight into the facts or methodology upon which AES-PR based its claim for damages." Mot. 2, 6. The testimony it cites shows the opposite. For example, at A.001-03, the corporate designee explained that the cost to replace the collector plates was based on an oral estimate that AES-PR's engineering team had received from a vendor. The excerpt ends at the bottom of A.003 where the witness is identifying the vendor as FL Smidth. And AES-PR's corporate designee gave detailed descriptions of other components of AES-PR's damages claims. *See, e.g.*, B.036-37 (explaining costs for water supply changes); B.020-21 (explaining which costs in interrogatory responses reflect paid invoices and which reflect estimates).

depositions this Court authorized it to take, not because it was unaware of the identities of these companies.

Similarly, ALSTOM complains about P-207, a letter from FL Smidth that AES-PR produced immediately upon receipt, but ALSTOM certainly was aware of FL Smidth's role during discovery. ALSTOM issued a subpoena *duces tecum* to FL Smidth on August 17, 2005, *see* B.107-18, and wrote to the company after the close of fact discovery to demand that FL Smidth update its document production, B.128 (letter from ALSTOM attorney Anthony Vittoria). Clearly, ALSTOM thought it appropriate for documents post-dating March 10, 2006 to be produced in this litigation – it demanded exactly that from a non-party. Having done so, it is surprising for ALSTOM to be claiming prejudice when one of the post-discovery documents is to be introduced into evidence in the trial of this action.[2]

**B. ALSTOM's Request to Exclude Witnesses Ignores the Parties' Agreement as to the Scope of ALSTOM's Witness Identification Interrogatory.**

ALSTOM seeks to exclude three witnesses not identified in AES-PR's response to ALSTOM Interrogatory No. 2, but it ignores that the parties agreed that AES-PR's response to that interrogatory would be limited to provision of a list of employees performing "specific job functions." That agreement is memorialized in a letter ALSTOM's counsel sent to this Court on December 15, 2005. B.119-21 ("ALSTOM will submit requests for the identities of AES-PR employees performing specific job functions. . . . AES-PR will timely [a]nswer ALSTOM's narrowed Interrogatory."). None of the three individuals ALSTOM seeks to exclude from

---

[2] The subpoenas ALSTOM issued to GE and FL Smidth reveal just how disingenuous ALSTOM's claim of prejudice is. ALSTOM argues that it is "prejudice[d]" because it has been "deprived of the opportunity to . . . serve third-party subpoenas" to the vendors that supplied budget documents to AES-PR after the discovery cut-off, Mot. 3, when, in fact, ALSTOM served subpoenas on those vendors seven months before the close of fact discovery and demanded that the responses to the subpoenas be supplemented after the close of fact discovery.

testifying at trial performed any of the "specific job functions" on the list ALSTOM submitted to AES-PR; thus, AES-PR had no obligation to list their names in response to ALSTOM's interrogatory.

On the same date that ALSTOM informed the Court of the parties' agreement to limit the interrogatory to employees performing "specific job functions," ALSTOM's counsel submitted the list of job functions to counsel for AES-PR. That list consisted of persons performing technical duties on specified pieces of the power plant's equipment. *See* B.122-23. The three witnesses ALSTOM now seeks to exclude did not perform any of these job functions. They are: Stewart Ferguson, the former President and Construction Manager for the facility; Gamaliel Rivera, the Chief Financial Officer for the facility; and John Baecher, Esq., an outside attorney for AES-PR. All three witnesses have limited testimony for trial concerning company documents and general matters related to the facility – none will testify about any of the specific, technical job functions itemized on ALSTOM's counsel's list. Not surprisingly, ALSTOM's motion does not even attempt to claim that these individuals performed any of the job functions on ALSTOM's list.

When a party submits a targeted interrogatory requesting a list of individuals with specific knowledge, the opposing party may call trial witnesses not listed in its interrogatory response because not within the scope of the interrogatory. *See Finch v. Hercules Inc.*, No. Civ. A. 92-251-MMS, 1995 WL 785100, at *7-8 (D. Del. Dec. 22, 1995). ALSTOM relies on *Finch*, but fails to inform the Court of this holding. Mot. 7. In *Finch*, this Court determined that, because "a listing of these witnesses was not required by" the limited scope of the interrogatories, "the Court will allow these witnesses to present their testimony . . . at the upcoming trial." 1995 WL 785100 at *7-8. So too here. Because the three witnesses identified

will present general testimony about the facility and its documents and business records, and not specific technical testimony about the equipment described in ALSTOM's amendment to its Interrogatory No. 2, the witnesses should be permitted to testify at trial.

Moreover, ALSTOM cannot plausibly claim undue surprise with respect to two of the three witnesses, as they were identified by name during a corporate designee deposition and in documents produced in the litigation. During ALSTOM's Rule 30(b)(6) deposition of AES-PR on damages, the company's corporate designee specifically identified Mr. Rivera as someone with whom he met concerning the company's records documenting the amounts of its damages, which will be the subject of Mr. Rivera's testimony. *See* B.018-19. Similarly, during ALSTOM's Rule 30(b)(6) deposition of AES-PR on liability and other issues, the company's corporate designee specifically identified Mr. Ferguson. B.041-42. Mr. Ferguson is mentioned in eight of ALSTOM's trial exhibits (D-11, 16, 18, 19, 21, 26, 34, and 139), and Mr. Rivera is mentioned by name in two of ALSTOM's trial exhibits (D-137, 147). Because these individuals were identified in depositions and document productions, ALSTOM simply has no basis to claim unfair surprise. *See* 6 James Wm. Moore *et al.*, Moore's Federal Practice § 26.131 (3d ed. 1997) ("A party does not have a duty to amend [interrogatory responses] if additional or corrective information has otherwise been made known to the other parties during the discovery process or in writing.").

## II. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 2 – REBUTTAL/ SUPPLEMENTAL EXPERT TESTIMONY.

ALSTOM's motion to exclude unidentified testimony of AES-PR's experts is premature and should be denied. ALSTOM has not cited any proffered testimony that it contends is outside the scope of AES-PR's expert reports, and thus there is no context for the Court to evaluate ALSTOM's motion. *See Blakey v. Continental Airlines*, No. 93-2194, 1997

WL 1524797, *12 (D.N.J. Sept. 9, 1997) (denying as premature motion to exclude prior statements until court could evaluate statements within context of trial); *Butler v. Home Depot, Inc.* Nos. C-94-4335, C-95-2182, 1997 WL 375285, at *1 (N.D. Cal. Apr. 24, 1997) (denying motion *in limine* to exclude testimony based on witnesses' depositions because court unable to evaluate admissibility without specific context of testimony at trial). ALSTOM's motion should be denied because it is an improper request for the Court to issue a generic order that the parties abide by the relevant rules. *See Butler*, 1997 WL 375285, at *1 (noting that court will not issue order that would "merely admonish the parties to comply with [certain Federal Rules of Evidence]").

## III. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 3 – TESTIMONY AND EVIDENCE MENTIONING LIBERTY MUTUAL INSURANCE COMPANY.

ALSTOM has moved pursuant to Federal Rule of Evidence 411 to exclude numerous exhibits and testimony merely because they make mention of its subcontractor's surety, Liberty Mutual Insurance Company ("Liberty"). Contrary to ALSTOM's suggestion, AES-PR is not seeking to use the fact of ALSTOM's subcontractor's "insurance" to suggest negligence or other wrongful conduct; instead, it is offering the exhibits and testimony in question because they contain critical admissions by ALSTOM that support AES-PR's breach of contract claim and contradict ALSTOM's current litigation positions. Rule 411 specifically allows such testimony. Furthermore, Liberty is not ALSTOM's liability insurer, but ALSTOM's <u>subcontractor's surety</u>, and therefore Rule 411 is inapplicable here in any event.

### A. ALSTOM Seeks To Exclude Its Own Statements Against Interest Merely Because the Documents Name Its Subcontractor's Surety.

In March 1999, ALSTOM subcontracted with Environmental Elements Corp. ("EEC") to supply the pollution control equipment for the AES-PR facility. In the contract, EEC

provided ALSTOM with an accelerated corrosion warranty covering the pollution control equipment. EEC's warranty to ALSTOM is, for all practical purposes, identical to the corrosion warranty that ALSTOM provided to AES-PR. EEC in turn purchased a performance bond from Liberty in the amount of EEC's obligations in its subcontract with ALSTOM.

In November 2003, massive accelerated corrosion was discovered within the pollution control equipment, and AES-PR placed ALSTOM on notice that the accelerated corrosion was covered by the warranty in its contract with ALSTOM. ALSTOM's current position in this litigation is that the accelerated corrosion is not covered by its warranty, and that the pollution control equipment does not suffer any flaws and will work as designed to limit the plant's emissions (as measured in terms of opacity). However, ALSTOM's contemporaneous documents addressing its warranty from EEC – all of which ALSTOM seeks to exclude through its motion – tell a different story.

After AES-PR gave notice to ALSTOM of the accelerated corrosion, William Jarvis of ALSTOM gave instructions on November 20, 2003, to notify EEC and Liberty that "we hold them responsible for the repairs under their corrosion warranty." B.177. The next day, November 21, 2003, ALSTOM informed EEC and Liberty that the accelerated corrosion was "the responsibility of EEC/Liberty Bond Services for repair and replacement either as equipment non-conformance or under their corrosion warranty provisions." B.178.

Because EEC had failed to remedy the problems with the pollution control equipment, ALSTOM initiated communications directly with Liberty. ALSTOM's communications conveyed that Liberty, as surety, was required to step into EEC's shoes and remedy the accelerated corrosion. ALSTOM's communications with Liberty contain numerous admissions against interest that contradict ALSTOM's current litigation positions. A sampling

of the admissions, all of which are in exhibits ALSTOM has moved to exclude, are provided below:

- "Corrosion is evident in this unit. . . . Please note that we consider this a warranty item for EEC and as such hereby give notice." B.180-81 (January 13, 2004 letter from ALSTOM to Liberty).
- "EUB Windsor asked Karl Hognefelt from ECS Knoxville to inspect Unit 2 to review the problem during the Nov. outage. He felt this was the worst case of corrosion he had seen in his 25+ year career. It was strongly suspected that the corrosion resulted from the chlorides in the Circulating Dry Scrubber makeup water. The chlorides originate from the RO brine water which was the specified design for the makeup water. . . . EEC provided the operating instructions at site. We now believe that these did not address the chloride levels." B.182-83 (January 20, 2004 internal ALSTOM email).
- Invoice to Liberty "for costs accumulated in correction of Environmental Elements non-conformances." B.184 (January 29, 2004 letter from ALSTOM to Liberty).
- "Due to breech [sic] of contract by EEC, ALSTOM looks to Liberty Mutual to assume responsibility for warranty under the bond obligations. The material purchased by AES is required to maintain operation of the plant. . . . This work was necessitated as a result of deficiencies in equipment supplied by EEC and due to breech [sic] of contract and abandonment of the work by EEC." B.189-89c (February 27, 2004 ALSTOM letter to Liberty consultant).
- "AES is required under it's [sic] contracts to provide electricity and meet air emissions standards. The seriousness of the ESP corrosion is jeopardizing the ESP performance and thus their ability to meet the emissions standards. AES was forced to take action to replace the materials due to lack of response from Liberty Mutual. ALSTOM believes the Liberty Mutual is obligated under the Bond to assume EEC's responsibilities for the Corrosion Warranty and request your plan for addressing the Warranty." B.190-91 (March 1, 2004 ALSTOM email to Liberty).
- Invoice to Liberty stating that "[t]his work is covered under EEC's 2 years corrosion warranty." B.192-93 (March 11, 2004 ALSTOM letter to Liberty).
- "I believe the chlorides are very well stated in the original spec to EEC and in the Lurgi process calculations. . . . But they are right in that the chloroides (sic) are criical (sic) to both the plume problem and to the corrosion, but that is another story which is none of their business." B.211-12 (July 12, 2004 internal ALSTOM email).

**B. Federal Rule of Evidence 411 Does Not Allow ALSTOM To Shield Its Admissions from Disclosure Merely Because ALSTOM's Documents Name an Insurance Company.**

ALSTOM focuses on the first sentence of Federal Rule of Evidence 411, which bars "[e]vidence that a person was or was not insured against liability . . . upon the issue whether the person acted negligently or otherwise wrongfully." But Rule 411 does not end there. It continues "This rule does not require exclusion of evidence of insurance against liability when offered for another purpose . . . ." *See* Rule 411. It is well established that documents and testimony are not inadmissible merely because they make mention of insurance if they are offered for a purpose other than establishing the existence of insurance, or in the words of the rule, "that a person" has insurance, *id.* (emphasis added). *See, e.g., Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751, 758 (3d Cir. 1976) ("If the evidence [of liability insurance] is offered for other relevant purposes, it may be admitted."); *Ravotti v. Sunderland*, 115 Fed. Appx. 560, 564-65 (3d Cir. 2004); 23 C. Wright & K. Graham, Federal Practice and Procedure § 5368 ("intertwined admissions" admissible under Rule 411).

Here, AES-PR is not offering documents or evidence to establish the fact that ALSTOM's subcontractor EEC has a pool of insurance funds to pay a judgment, or to create an inference that, because EEC decided to secure a surety bond, it knew its conduct would be negligent. It is offering ALSTOM's communications for reasons unrelated to the fact of insurance: to show ALSTOM's knowledge that the equipment it supplied was defective; the nature and cause of the accelerated corrosion; and that the accelerated corrosion the equipment experienced is covered by ALSTOM's warranty to AES-PR. *Eastland Mort. Co. v. Verex Assurance, Inc.*, Nos. 91-6368, 92-6045, 1992 WL 339068 (10th Cir. Nov. 17, 1992), is on point. There, the Tenth Circuit held that evidence mentioning an insurer was not barred by Federal Rule of Evidence 411 where it was used "to establish the breach of a material condition through

evidence of an admission made by [the insured]." *Id.* at *3; *see also Garee v. McDonell*, 116 F.2d 78, 79 (7th Cir. 1940) (admitting telegram sent by defendant to liability insurer admitting liability).

Furthermore, Federal Rule of Evidence 411 is inapplicable because Liberty is not ALSTOM's liability insurer. *See Jacobs Press Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, Nos. 94-1046, 94-1087, 1997 WL 90665, at *8 n.15 (4th Cir. 1997) (Rule 411 "pertains only to the admissibility of evidence of 'liability insurance.'"). A performance bond simply assures that the obligations of the principal will be fulfilled. It does not protect against liability, but instead against the risk of insolvency. *See* 13 Williston on Contracts § 37:30 (4th ed. 2006) ("The performance bond assures the completion of the contemplated construction work."). As EEC's surety, Liberty "stands in the shoes" of EEC. *See In re Modular Structures, Inc.*, 27 F.3d 72, 74 n.1 (3d Cir. 1994); *U.S. v. Am. Ins. Co.*, 18 F.3d 1104 (3d Cir. 1994) (surety bond obligated surety "to stand in the shoes" of the principal). In stepping into EEC's shoes, Liberty assumed EEC's rights and responsibilities to perform EEC's contract with ALSTOM; it effectively became EEC. *See* 4 Bruner & O'Connor Construction Law § 12:43 ("The surety is entitled to assert against the obligee its principal's claims for additional compensation, right of set off and defenses against liability arising out of or related to the contract."). ALSTOM does not contest that communications between it and EEC regarding the deficiencies in EEC's work and EEC's failure to honor its warranty are relevant and admissible. That Liberty stepped into EEC's shoes does not suddenly make like communications between ALSTOM and Liberty inadmissible.[3]

---

[3] In addition, Federal Rule of Evidence 411 is inapplicable because the existence of Liberty as EEC's insurer does not of itself imply that ALSTOM or EEC "acted negligently or otherwise

Additionally, there is little risk of prejudice to ALSTOM from the mention of Liberty's existence. The parties to this lawsuit are "both commercial entities [and] the injury [is] not likely to stir the emotions." *See Posttape Assocs.*, 537 F.2d at 758. The performance bond is that of a non-party; it is less than one-half the amount necessary to satisfy AES-PR's damages; and in any event there will be no evidence that the bond is available to satisfy the judgment in this case.

Finally, ALSTOM itself must not believe that mention of Liberty's existence will lead to undue prejudice, otherwise it presumably would not have included two exhibits mentioning Liberty on its own exhibit list. *See* B.271-74; B.275-76. ALSTOM cannot simultaneously use documents naming Liberty and insist that AES-PR not do so.

## IV. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 4 – ALSTOM'S JOINT DEFENSE AGREEMENT WITH ITS SUBCONTRACTOR'S SURETY.

ALSTOM moves to prohibit admission of the Joint Defense Agreement between ALSTOM and Liberty under Federal Rules of Evidence 401, 402, 403, 408, and 411. The Joint Defense Agreement is relevant, probative evidence. Prior to this litigation, ALSTOM informed Liberty that the corrosion in the pollution control equipment was covered under EEC's accelerated corrosion warranty, even invoicing Liberty for the cost of replacing the corroded equipment. After entering into its Joint Defense Agreement with Liberty, however, ALSTOM reversed field and now claims that the accelerated corrosion warranty is void because of failure to fulfill certain conditions precedent. The Joint Defense Agreement is relevant to assess the motivation for this reversal. In addition, ALSTOM intends to call witnesses at trial who have a prior affiliation with either EEC or Liberty and whose work ALSTOM previously criticized, but

---

wrongfully." Fed. R. Evid. 411. Unlike with insurance, the existence of a performance bond could not be construed to create an inference of negligence or wrongful conduct.

now embraces. These witnesses include one of ALSTOM's retained testifying experts, Dr. Ballinger. The Joint Defense Agreement will assist the jury to assess the credibility of ALSTOM's witnesses.

Immediately after the accelerated corrosion was discovered in AES-PR's pollution control equipment in November 2003, ALSTOM informed EEC's surety, Liberty, that ALSTOM considered the corrosion to be covered by EEC's accelerated corrosion warranty. B.179. EEC's accelerated corrosion warranty to ALSTOM is substantially identical to ALSTOM's accelerated corrosion warranty to AES-PR. *Compare* B.218 (EEC's accelerated corrosion guarantee) *with* B.005-06 (ALSTOM's accelerated corrosion guarantee). Even after an ALSTOM employee conducted an investigation of the corrosion at AES-PR, *see* B.186-88, ALSTOM continued to insist that Liberty honor EEC's accelerated corrosion warranty. ALSTOM eventually sent Liberty an invoice for the costs of AES-PR's replacement collector plates. B.184; B.185.

On September 20, 2004, AES-PR filed this lawsuit against ALSTOM for breach of contract. D.I. 1. Shortly thereafter, on October 28, 2004, ALSTOM entered into a Joint Defense Agreement with Liberty. B.198. Under that agreement, ALSTOM and Liberty recognized a "mutuality of interests" in defending against AES-PR's warranty claim. B.198. After entering into the Joint Defense Agreement, ALSTOM's efforts to obtain payment from Liberty came to an abrupt halt and ALSTOM now maintains that the accelerated corrosion warranty is void for failure to fulfill conditions precedent.

Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence that

challenges the credibility of a witness virtually always is relevant and thus admissible. *See U.S. v. Smalley*, 754 F.2d 944, 951 (11th Cir. 1985) ("Matters affecting the credibility of the witness are always relevant on cross-examination."); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1984) ("We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.") (internal quotations omitted).

One method of challenging the credibility of a witness is to confront the witness with evidence demonstrating bias. *See U.S. v. Abel*, 469 U.S. 45, 51-52 (1984) (witness's membership in secret prison gang with defendant admissible to show bias of witness towards defendant). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Id.* at 52; *see also Douglas v. Owens*, 50 F.3d 1226, 1230 (3d Cir. 1995) ("To properly evaluate a witness, a jury must have sufficient information to make a discriminating appraisal of a witness's motives and bias.").

The Joint Defense Agreement is a watershed event in ALSTOM's change of position regarding the validity of its accelerated corrosion warranty claim against EEC and Liberty. Prior to entering into the Joint Defense Agreement, ALSTOM maintained that repair of the corrosion was covered by its subcontractor's accelerated corrosion warranty. B.192-93. Now, ALSTOM claims that the accelerated corrosion warranty is void for failure to fulfill conditions precedent. It obviously is relevant for the trier of fact in weighing the credibility of ALSTOM's current position to know that ALSTOM has changed its tune after teaming with Liberty in an attempt to defeat AES-PR's claim.

The Joint Defense Agreement also is relevant because ALSTOM intends to call to testify at trial two non-company witnesses who have prior affiliations with EEC and Liberty, William Van Hooser and Ronald Ballinger. *See* D.I. 127 (Joint Pretrial Order at 64-65, ALSTOM Witness List). That ALSTOM and Liberty Mutual are cooperating is relevant evidence of bias for the jury in weighing the credibility of these witnesses. For example, prior to this litigation, ALSTOM was highly critical of EEC's work on the pollution control equipment and, by implication, that of EEC's project manager, Mr. Van Hooser. B.169 (letter from ALSTOM stating that "[EEC's] equipment is defective"). Now, ALSTOM is defending Mr. Van Hooser's work and intends to call him on ALSTOM's behalf. AES-PR is entitled to present the Joint Defense Agreement as the explanation for ALSTOM's about-face.

Likewise, prior to this litigation, while ALSTOM and Liberty were at odds over the validity of ALSTOM's accelerated corrosion warranty claim, Dr. Ballinger issued a report on the corrosion at the AES-PR facility on behalf of Liberty Mutual in an attempt to refute the validity of ALSTOM's claim that the corrosion was covered by warranty. *See* B.047-84. At that time, ALSTOM was critical of Dr. Ballinger's work, noting that his report lacked any root cause analysis and appeared to have ignored the impact of chlorides. B.196. Now, after the creation of the Joint Defense Agreement, ALSTOM is utilizing Dr. Ballinger's services as an expert witness, and his expert opinions have expanded to include opinions regarding AES-PR's operation and maintenance practices, a subject on which Dr. Ballinger previously was silent. *Compare* B.092-94 (Ballinger's current expert report) *with* B.047-84 (September 2004 Altran report authored by Dr. Ballinger and others). The Joint Defense Agreement is relevant to explore the credibility and bias of Dr. Ballinger.

ALSTOM's assertion that the Joint Defense Agreement must be excluded under Federal Rule of Evidence 411 is wrong. As discussed in detail in the previous section, Rule 411 does not automatically bar all evidence that mentions Liberty. Moreover, Rule 411 specifically excludes from its scope evidence that shows bias. Fed. R. Evid. 411 ("This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as . . . bias."). ALSTOM's reliance upon Fed. R. Evid. 408 is equally misplaced. The Joint Defense Agreement is not evidence of a settlement or offer to comprise, as it specifically contemplates that ALSTOM and Liberty Mutual may have claims against each other after AES-PR's litigation concludes. B.201. Moreover, Rule 408, like Rule 411, explicitly excludes from its scope evidence that shows bias. Fed. R. Evid. 408 ("This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias. . . ."). Because this evidence is being offered, in part, to prove bias, Rules 408 and 411 are inapposite.

## V. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 5 – DEPOSITION TESTIMONY OF WILLIAM VAN HOOSER.

As long as Mr. Van Hooser is available to testify live at trial pursuant to AES-PR's subpoena, AES-PR does not intend to play his deposition testimony during its case in chief (except possibly as impeachment). AES-PR respectfully requests that this motion be denied without prejudice until AES-PR determines whether Mr. Van Hooser will comply with AES-PR's subpoena.

## VI. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 6 – ORAL EVIDENCE SUPPORTING EQUITABLE ESTOPPEL.

ALSTOM moves to exclude oral evidence supporting equitable estoppel on the ground that AES-PR purportedly is seeking to use such evidence to modify the written contract between the parties. ALSTOM is incorrect. The evidence AES-PR will introduce demonstrates

that ALSTOM and its subcontractor modified (or directed AES-PR to modify) the operations and maintenance manuals ("O&M manuals") governing the pollution control equipment at issue, not the contract between the parties. The evidence in this case is overwhelming that the parties always anticipated that the O&M manuals would require modification during the commissioning phase of construction when ALSTOM and its subcontractor actually began to operate the equipment. In any event, it is black letter law in Delaware that oral evidence, actions, and omissions may support an assertion of equitable estoppel, notwithstanding the existence of a written contract.

**A. ALSTOM Is Estopped from Relying on O&M Manuals That It and Its Subcontractor EEC Changed During Commissioning.**

In February 1998, ALSTOM contracted to provide, *inter alia*, air pollution control equipment for the AES-PR power plant. Although the contract anticipated that detailed parameters and procedures for operating and maintaining the pollution control equipment would be forthcoming, those parameters and procedures were not specified in the contract itself. Instead, over three years later, in August 2001, ALSTOM and its subcontractor, EEC, issued O&M manuals governing the pollution control equipment. Almost one year after that, ALSTOM and EEC completed construction of the air pollution control equipment and began commissioning the equipment.

During commissioning, ALSTOM and EEC had significant problems achieving reliable operation of the equipment. *See, e.g.,* B.157-62. In an attempt to overcome those problems, ALSTOM and EEC made a number of modifications to the August 2001 manuals including, most importantly, instructing AES-PR always to maintain the circulating dry scrubber outlet temperature at a 30°F approach to adiabatic saturation (rather than the 50°F approach specified in the manuals when high chloride water was in use). B.152-55; B.045.

As a result of ALSTOM's and EEC's instructions, the air pollution control equipment experienced severe, accelerated corrosion. AES-PR has filed suit to recover under the contract's warranty provisions for its costs incurred as a result of the accelerated corrosion. ALSTOM seeks to defeat AES-PR's warranty claim by, *inter alia*, asserting that AES-PR failed to fulfill conditions precedent in the contract by following the instructions that ALSTOM and EEC provided during commissioning rather than the instructions in the August 2001 O&M manuals. AES-PR contends that, based on ALSTOM's and EEC's representations, omissions, and inequitable conduct during commissioning, ALSTOM is estopped from asserting failure to fulfill conditions precedent based on any departures by AES-PR from the August 2001 O&M manuals.[4]

**B. Estoppel May Be Proved By Evidence of Oral Statements.**

Under Delaware law, equitable estoppel applies "when a party by [its] conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to [that party's] detriment." *Bechtel v. Robinson*, 886 F.2d 644, 650 (3d Cir. 1989) (*quoting Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903-04 (Del. 1965)). A party "whose conduct has brought the situation about [is] estopped from asserting his legal rights against the party so misled." *Wolf v. Globe Liquor Co.*, 103 A.2d 774, 776 (Del. 1954).

It is well established that equitable estoppel may be premised on a party's spoken words as well as its written statements, omissions, or actions. *See Bechtel*, 886 F.2d at 650 ("Equitable estoppel in the modern sense arises from the <u>conduct</u> of a party, using that word in

---

4 AES-PR also contends that ALSTOM: 1) waived any claims that AES-PR failed to follow the instructions in the August 2001 O&M manuals, and 2) hindered AES-PR's performance of any conditions precedent, and thus AES-PR's alleged failure to fulfill such conditions precedent is excused. In this motion ALSTOM does not challenge AES-PR's use of oral evidence to support its waiver and prevention arguments.

its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything.") (*quoting* 3 S. Symons, *Pomeroy's Equity Jurisprudence* § 802 (5th ed. 1941)) (initial emphasis in original, subsequent emphasis added). That rule applies with full force even if the contract in question provides that it may be modified only in writing. *See Eureka VIII LLC v. Niagara Falls Holdings LLC*, 899 A.2d 95, 109 & n.26 (Del. Ch. 2006) (citing "venerable authority" that oral evidence and conduct may support equitable estoppel and waiver even though contract requires that modifications be in writing).[5]

ALSTOM's motion *in limine* to bar AES-PR from relying on oral evidence and conduct to prove estoppel is based exclusively on this Court's decision in *Benitec Australia Ltd. v. Commonwealth Scientific and Indus. Research Org.*, Civ. A. No. 04-889-JJF, 2005 U.S. Dist. LEXIS 3545 (D. Del. Mar. 8, 2005). In *Benitic*, this Court held that "Delaware courts generally reject attempts to invoke equitable estoppel" to modify "the terms of the written agreement between the parties." *Id.* at *15 (emphasis added). *Benitec* is inapposite here. AES-PR is not attempting to modify any term of the parties' contract. Instead, it is invoking equitable estoppel to prevent ALSTOM from relying on instructions in O&M manuals that were provided to AES-PR over three years after the contract had been executed and nearly one year before ALSTOM had placed the pollution control equipment in operation. There is no evidence (and ALSTOM does not cite any) to suggest that all of the various parameters and procedures in the August 2001

[5] Delaware law also recognizes that a party through its conduct may waive a contract term that requires that modifications be made in writing. *See, e.g., Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) (notwithstanding contract term requiring that contract modifications be in writing, parties may waive contract requirements "by their conduct"); *see also* 13 Williston on Contracts § 39:26 (4th ed. 2004) ("It is well settled that a party to a written contract may orally, or by implication from conduct, waive performance of a contract term or condition inserted in the contract for his or her benefit, and the waiver does not require writing.").

O&M manuals, which comprise nine volumes and hundreds of pages, constitute terms of the contract.

There is no basis to prevent AES-PR from introducing evidence to explain that one of the reasons its operations and maintenance practices departed from the terms of the original O&M manual was ALSTOM's and EEC's instructions to do so during commissioning. Indeed, this Court already has rejected ALSTOM's argument. In denying ALSTOM's summary judgment motion, the Court held that "there is a genuine issue of material fact as to whether ALSTOM is estopped from asserting the condition precedent due to the deviations from the provisions of these manuals during commissioning." *AES Puerto Rico, L.P. v. ALSTOM Power, Inc.*, 429 F. Supp. 2d 713, 718 (D. Del. 2006). In addition, the manuals themselves provide that the "'customer may decide to alter or customize the maintenance'" procedures. *Id.*

Moreover, ALSTOM and EEC always anticipated that the O&M manuals would be modified during commissioning. *See* B.032-33 ("When the equipment actually gets in operation, these procedures need to be changed given conditions. . . . I mean, equipment, you design something to operate or you have expectation of things to operate at a certain place. But when you start up and you operate, that may change."); B.045; B.174-76 (ALSTOM asked Liberty Mutual which of the "9 formal revisions to the operating procedures" AES-PR should follow). The expectation that the O&M manuals would be modified is fully consistent with industry practice. *See* B.088. Indeed, even Mr. Van Hooser, EEC's project manager, agreed that he expected the August 2001 O&M manuals to require modification when the plant began operation. *See* B.028-29.

Here, ALSTOM and EEC modified the August 2001 O&M manuals during commissioning through their written and oral instructions and demonstrations to AES-PR's

operators. The modifications were made in an attempt to make the equipment operate properly. Having made those modifications, ALSTOM cannot now bar AES-PR from introducing evidence that it followed ALSTOM's and EEC's modified instructions rather than those in the original August 2001 EEC manuals. *See Wolf*, 103 A.2d at 776 (A party "whose conduct has brought the situation about [is] estopped from asserting [its] legal rights against the party so misled.").

## VII. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 7 – WHETHER ORAL STATEMENTS OF ALSTOM'S SUBCONTRACTOR ARE HEARSAY.

ALSTOM moves to exclude evidence or argument pertaining to purported oral hearsay statements by employees of EEC on the basis that the statements are hearsay, are not relevant, and are likely to confuse the jury. ALSTOM is mistaken on all counts.[6]

### A. EEC Acted on ALSTOM's Behalf as Its Subcontractor During Commissioning.

Prior to AES-PR's initiation of this lawsuit, ALSTOM took the position that its subcontractor EEC was responsible for AES-PR's accelerated corrosion warranty claim because EEC designed the air pollution equipment and was partially responsible for training the AES-PR operators on how to operate the equipment. Now, ALSTOM tries to escape liability by seeking to exclude oral instructions and training provided by that same subcontractor.[7]

ALSTOM contracted to supply and construct the power plant's boilers and air pollution control equipment. As part of its scope of work, it agreed to provide "technical field support and consultation services during performance testing, initial operation of all equipment

---

6 *See also* AES-PR's Response to Issue No. 6.

7 Not surprisingly, ALSTOM seeks to admit EEC "hearsay" statements that it finds beneficial to its case. *See, e.g.*, B.269-70 (ALSTOM letter transmitting EEC Training Videos to D/FD for AES-PR personnel).

furnished, and training of Owner's operating and maintenance personnel." *See* B.003 (§ 1.2). ALSTOM entered into a subcontract with EEC to provide the air pollution control equipment. *See* B.213-68. The ALSTOM/EEC subcontract obligated EEC to provide commissioning personnel to serve in an advisory role during commissioning and to "assist with answering questions during the commissioning of the equipment." *See* B.237 (§ J.4). ALSTOM, under its contract to supply the boilers and air pollution control equipment, at all times remained responsible for the work of its subcontractor, EEC. *See* B.007 (Part III, § 8.2).

**B. Oral Statements Made by EEC Are Not Hearsay.**

**1. EEC's Statements Are Not Hearsay Because AES-PR Does Not Seek To Prove the Truth of the Matters Asserted.**

The training instructions provided by EEC personnel do not constitute hearsay because AES-PR is not seeking their admission to prove the truth of the matters asserted in the instructions. *See* Fed. R. Evid. 801(c) (defining hearsay as statement offered in evidence to prove truth of the matter asserted). AES-PR does not seek the admission of EEC's instructions to prove the veracity of the instructions themselves (indeed, AES-PR contends that the instructions were seriously flawed and caused a massive failure of the equipment). Rather, AES-PR seeks their admission to show that the statements were made and the effect the statements had on the AES-PR operators. *See, e.g., Salem v. City of Sarasota,* No. 804CV297T24EAJ, 2005 WL 1571883, at * 5 (M.D. Fla. Jun. 30, 2005) ("Where the significance of the statement lies solely in the fact that it was made, rather than the veracity of the out-of court declarant's assertion, the statement is not hearsay."). Accordingly, the statements should be admitted as non-hearsay statements to prove something other than the truth of the matter asserted.[8]

[8] ALSTOM's motion ignores that, to be hearsay, a statement must be offered for its <u>truth</u>. Its motion misstates Rule 801(c) as covering statements "offered to prove the matter asserted," Mot.

**2. The Statements Made by EEC Are Admissible as Admissions of Party Opponents.**

Federal Rule of Evidence 801(d)(2) exempts from the hearsay rule a statement offered against a party if the statement is, *inter alia*, "(B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801. The statements made by EEC fall into all three of these categories.

First, it is clear from ALSTOM's contract with EEC that EEC (1) was authorized by ALSTOM to make statements regarding the operation and maintenance of the air pollution control equipment, and (2) acted as ALSTOM's agent in training the AES-PR operators on the air pollution control equipment. *See* B.237 (EEC will "assist with answering questions during the commissioning of the equipment"). In addition, there is overwhelming documentary evidence that ALSTOM expected and permitted EEC to give instructions to AES-PR concerning the operation and maintenance of the air pollution control equipment. Indeed, ALSTOM required EEC to do so and on numerous occasions transmitted EEC's revised operating instructions to D/FD and/or AES-PR personnel. *See, e.g.*, B.131; B.137; B.138; B.139; B.152; B.156; B.166 (ALSTOM email noting that EEC revised the operation procedures continuously up until the last day they were on site). And, as noted above, ALSTOM was responsible under the contract for EEC's work. *See* B.007 (Part III, §8.2)

---

1, when the Rule actually says "offered in evidence to prove the truth of the matter asserted." Rule 801(c) (emphasis added).

In addition, EEC's oral statements are admissible as adoptive admissions under Rule 801(d)(2)(B). "Adoption can be manifested by any appropriate means, such as language, conduct or silence." *See Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 500 (D. Del. 2005) (*quoting Horvath v. Rimtec Corp.*, 102 F. Supp. 2d 219, 223 n.3 (D.N.J. 2000)). ALSTOM and EEC personnel both were present at AES-PR during the commissioning phase of the project when EEC was providing operating instructions and training to the AES-PR operators. As noted above, ALSTOM clearly authorized EEC to make such statements, <u>but at the very least</u>, it adopted the statements by its "language, conduct [and] silence."

EEC's oral statements therefore are admissible as adoptive admissions under Rule 802(d)(2)(B), vicarious admissions under Rule 802(d)(2)(C), and authorized admissions under Rule 801(d)(2)(D).

**C. EEC's Statements are Highly Relevant.**

ALSTOM's second argument to exclude EEC's training instructions is that the statements "must be deemed irrelevant because they do not provide probative support of AES-PR's waiver defense." *See* Mot. 2. This argument, too, is meritless. First, Rule 401 defines relevant evidence as "evidence having any tendency to make the existence <u>of any fact</u> that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). EEC's training instructions are relevant to a number of facts and issues in this case including, for example, AES-PR's breach of contract claim, AES-PR's estoppel argument, AES-PR's prevention argument, and AES-PR's claim for damages. In addition, these statements are highly probative of AES-PR's claim that ALSTOM waived certain of its contractual rights. ALSTOM claims that it is not liable under its accelerated corrosion warranty because AES-PR did not follow certain operating instructions in the original O&M manuals. AES-PR claims that ALSTOM waived its right to require adherence

to the original O&M manuals because ALSTOM authorized (indeed, contractually obligated) its subcontractor EEC to train AES-PR operators, and EEC instructed AES-PR to operate the equipment in a manner that differed in certain respects from the original O&M manual. Thus, EEC's oral instructions are directly relevant to AES-PR's waiver defense.

**D. EEC's Statements Are More Probative than Prejudicial.**

Finally, ALSTOM's half-hearted attempt to bar the admission of these statements pursuant to Rule 403 is unavailing. ALSTOM states that "even if not hearsay and totally irrelevant, evidence regarding oral statements made by EEC personnel clearly would have a tendency to confuse and mislead the jury, and properly would be barred by application of FRE 403." Mot. 2. ALSTOM makes no attempt to explain how the oral statements of EEC would "confuse and mislead" the jury. To the contrary, it would be confusing to the jury not to explain the training that EEC provided AES-PR regarding the operation of the air pollution control equipment. For all of the reasons articulated throughout this opposition, the statements made by EEC and the training provided by EEC are directly relevant to the issues in dispute and are far more probative than prejudicial.

## VIII. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 8 – PARTS OF THE CONTRACT'S "WARRANTIES" SECTION.

ALSTOM seeks an order from this Court prohibiting AES-PR from discussing various parts of the "Warranties" section of the contract. But ALSTOM already has lost this argument once – at summary judgment, it raised this same contention, arguing that "neither [¶ 1.1.1 nor ¶ 1.2] is at issue in this case," and that only ¶ 1.6 of the contract, which contains specific language concerning the corrosion warranty, applies. D.I. 114 at 15. In its opinion denying ALSTOM's summary judgment motion, this Court ruled that "there are numerous genuine issues of material fact as to which warranties apply. . . ." *AES Puerto Rico, L.P.*, 429 F.

Supp. 2d at 719. ALSTOM offers no compelling basis for the Court to revisit that ruling – indeed its motion simply ignores that the issue has been addressed previously by the Court.

On the merits, ALSTOM's argument plainly fails. While ALSTOM contends that each paragraph of the warranty section of the contract, Section 1.0, creates a separate and independent warranty, it is forced to acknowledge that the first paragraph it seeks to prohibit AES-PR from mentioning, ¶ 1.1.1, "provide[s] protection against defects, generally." Mot. 1 (emphasis added). In this respect ALSTOM is correct. Paragraph 1.1.1 provides general terms concerning the standard that the equipment it supplied must meet, and it applies generally to all of the specific guarantees contained in subsequent paragraphs in the "Warranties" section of the contract. *See* A.29-31 ("Warranties" section of Contract).

In asking for an order from this Court to shield ¶¶ 1.1.1 and 1.2 from the jury, ALSTOM argues incorrectly that "AES-PR's primary claim in this case, however, does not involve a defect." Mot. 1. AES-PR's claim most certainly does. The pollution control equipment ALSTOM supplied was grossly defective and its defects caused equipment that should have lasted for at least 25 years to rust away in just over a year's time. AES-PR's Complaint in this matter says so unequivocally. *See* Compl. ¶ 13 (quoting ¶ 1.1.1 of the contract warranting that the equipment "shall be free from defects"); Compl. ¶ 14 (quoting ¶ 1.2 of the contract). ALSTOM's argument that AES-PR does not claim ALSTOM's equipment is defective simply ignores AES-PR's allegations in this case.

ALSTOM's insistence that the jury hear only about ¶ 1.6 of the contractual warranties is particularly odd because ALSTOM itself relies on paragraphs of the "Warranties" section other than ¶ 1.6 in its defense of this action. At summary judgment, ALSTOM argued that ¶ 1.8, relating to out-of-specification feedstock, barred AES-PR's claim. *See* D.I. 91 at 29 &

n.117; *but see AES Puerto Rico*, 429 F. Supp. 2d at 718 (rejecting ALSTOM's argument because ALSTOM provided no evidence that the alleged deviations, even if they had occurred, caused the corrosion). At summary judgment, AES-PR did not dispute that ¶ 1.8 applies because all paragraphs of the "Warranties" section must be read as a whole. Similarly, ALSTOM appears to agree that ¶ 1.7, concerning assignment of the warranties, and ¶ 1.9, concerning access to operating records, apply to warranty claims under ¶ 1.6. There is no textual reason to conclude that ¶ 1.6 stands alone and that the other paragraphs in the contract's "Warranties" section do not apply to it.[9]

In addition, ALSTOM's argument that the "general[]" terms of the warranty, ¶ 1.1.1, have no application to ¶ 1.6 cannot be reconciled with the fundamental case law governing contract interpretation. It is a "well established principle[] of contract law" that "a contract must be read as a whole." *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 262 F. Supp. 2d 358, 365 (D. Del. 2003); *accord E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (requiring consideration of "the agreement's overall scheme"); Restatement (Second) of Contracts § 202(2) (1981). The contractual warranties in this case are contained in "1.0 Warranties," a section of the contract with 14 individual paragraphs. *See* A.029-31. The jury is entitled to consider all 14 of these paragraphs when determining the scope and meaning of the warranty applicable to AES-PR's claim.

---

[9] ALSTOM's argument concerning contract § 52.0, which provides that if a remedy is specified in the contract, "such remedy shall be *an exclusive remedy for such occurrence*," Mot. 2, has no relevance here. AES-PR is not asking for some extra-contractual remedy, which is what § 52.0 is designed to prevent. Rather, AES-PR seeks only what it is due under the contract.

## IX. OPPOSITION TO ALSTOM MOTION *IN LIMINE* # 9 – EXHIBITS ALSTOM CLAIMS ARE UNTRUSTWORTHY.

ALSTOM titles its motion one to exclude "untrustworthy" exhibits and professes to have presented only those documents which are "truly questionable, 'roadkill.'" *See* Mot. 1 n.2. Despite ALSTOM's assurance that it has presented only "truly questionable" documents, the vast majority of the exhibits to which ALSTOM objects are readily identifiable on their face, many have been authenticated by witnesses during depositions and others were produced from ALSTOM's own files.[10]

1. <u>Exhibits P-6 and P-185 – "Flue Gas Cleaning System Performance Selection"</u>

ALSTOM mistakenly represents that these exhibits are "working draft" documents and then argues that because they are draft documents they are "irrelevant to the facts and issues in this case."

First, these are not "working draft" documents. P-6 is a signed version of specifications related to the Flue Gas Cleaning System. P-185 was authenticated by ALSTOM's William Jarvis (ALSTOM's Project Manager for the AES-PR project) and is identical to P-6 in every respect, except it is unsigned. Certain specifications in these exhibits did change throughout the project, but most did not. The date on which the parties were aware of the specifications that did not change is directly relevant to the issues in this case. AES-PR has no intention of using these exhibits to suggest to the jury that superseded specifications in this

[10] In addition, several of ALSTOM's arguments are based on the proposition that documents that are drafts are irrelevant to the facts and issues in this case. First, ALSTOM is almost uniformly wrong that the exhibits are draft documents. But even if they were, Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Draft documents of key players discussing key issues involved in this litigation clearly have a tendency to make the existence of certain facts more or less probable.

exhibit are the "official" specifications, and ALSTOM will have an opportunity at trial to cross-examine AES-PR's witnesses about the information contained therein.

2. Exhibits P-32, P-114, and P-130 – "Draft Documents"

ALSTOM claims that these exhibits should be excluded pursuant to Rules 402, 403 and 901 because they are "unsigned," lack authentication, and are irrelevant because they are draft documents. ALSTOM is wrong on all three counts.

First, P-32 is not a draft document. It has an electronic signature and was authenticated at the deposition of Mr. Jarvis, the author of the document. The document is directly relevant to the facts and issues in this case, and there is nothing untrustworthy or prejudicial about the letter. Even assuming *arguendo* that the letter never was disseminated (as ALSTOM claims without record support), the fact that ALSTOM's project manager had knowledge of the issues addressed in the letter is the very reason AES-PR seeks its admission.

Second, P-114 is not a draft document. The exhibit was produced by ALSTOM, the attachment to P-114 contains a signature, and an ALSTOM employee admitted at her deposition that it "looks like something [she] would write."[11] The letter and attached invoice are directly relevant to the facts and issues in this case. Indeed, this exhibit is a letter from ALSTOM to its subcontractor invoicing the subcontractor for "warranty claims submitted by AES for replacement of ESP internal components that have failed due to corrosion." It is difficult to understand how ALSTOM can maintain that the exhibit is not relevant.

Finally, P-130 is a second invoice from ALSTOM to its subcontractor for the replacement of ESP internal components, this one dated February 25, 2005. The exhibit was

---

[11] *See* B.013.

authenticated by Linda Rothe, ALSTOM's procurement manager. *See* B.014-15. There is no question what the document is, and it clearly is relevant to the facts and issues in this case.

3. Exhibit P-68 – "Unsigned Purchase Order"

ALSTOM argues that, because this document is unsigned, it should be excluded. Exhibit P-68 is an AES-PR purchase order that AES-PR seeks to admit in support of its damages claims. AES-PR will call a witness at trial to authenticate the document. There is no requirement in the Federal Rules of Evidence that a document must be signed to be admissible, and ALSTOM cites to none.

4. Exhibits P-73, P-83, P-102, P-118, P-120, P-123, P-125, and P-127 – "Unsigned Checks"

Here again, ALSTOM argues that simply because these file copies of checks do not contain a handwritten signature, they should be excluded from evidence. These exhibits are records of checks issued by AES-PR that support its damages in this case. AES-PR will present a witness at trial who will authenticate these exhibits. If ALSTOM is concerned with their authenticity, ALSTOM may cross-examine the witness at trial.

5. Exhibit P-126 – "Unsigned Van Hooser Letter"

ALSTOM argues that Exhibit P-126 is hearsay because it was "written by a non-party and sent to another non-party." *See* Mot. 2. That argument is disingenuous. First, Mr. Van Hooser (the author of the document) was the project manager for ALSTOM's subcontractor, EEC (who designed the pollution control equipment at issue in this litigation), and he currently serves as a litigation consultant for ALSTOM's counsel in this action. The recipient, Altran Corporation, is the consulting company that employs one of ALSTOM's testifying experts, Dr. Ronald Ballinger. Dr. Ballinger testified at his deposition that he relied on this document in rendering his expert opinions. AES-PR seeks to admit the document to show what ALSTOM's

experts were told about the technical issues in this case. Because there is no question about the source or nature of the document, and because ALSTOM's testifying expert, Dr. Ballinger, relied on it in reaching his conclusions, it should be admitted.

6. P-131 – "Unsigned Letter Proposal"

ALSTOM takes the strained (and irrelevant) position that because this letter relates to AES-PR's damages and was created after this lawsuit was initiated, it was a document "prepared for litigation" and thus constitutes inadmissible hearsay. The fact that the document relates to damages and was created after this lawsuit was initiated hardly makes it a document "prepared for this litigation." As ALSTOM is well aware, ALSTOM's faulty equipment has created costs for AES-PR well into the future. Thus, AES-PR has incurred and paid costs after the initiation of this suit for which it seeks reimbursement from ALSTOM. The exhibit is a proposal which was sent by a vendor to AES-PR. The author and recipients are clearly identified, the document is dated, and the subject matter is clear. AES-PR will call a witness at trial to authenticate this exhibit.

7. Exhibits P-135, P-136, P-137, P-138, P-139, P-207, and P-208 – "Proposals Produced After the Close of Discovery"

For AES-PR's response with respect to these documents, *see* AES-PR's Opposition to ALSTOM's Motion *in Limine* # 1, *supra.*

8. Exhibits P-140 and P-179 – "Drawings by Counsel"

ALSTOM argues that these drawings are inaccurate and therefore should be excluded as inadmissible hearsay. First, there are no hearsay statements in these exhibits – they are simple diagrams of the air pollution control equipment at AES-PR. Second, ALSTOM and EEC witnesses testified at deposition that both of these exhibits are accurate representations of a simplified version of the air pollution control equipment at AES-PR. *See* B.009-10; B.025-26.

9. Exhibits P-149, P-150, and P-151 – "Physical Exhibits"

ALSTOM argues that because ALSTOM has not inspected these exhibits, they should be excluded. These physical exhibits currently reside in the offices of counsel for AES-PR, and counsel for AES-PR has offered – on more than one occasion – to make these exhibits available for ALSTOM's inspection. *See, e.g.*, B.125 (April 25, 2006 email from Williams to Edwards). Those offers remain open to this day. That counsel for ALSTOM has not taken the opportunity to inspect the exhibits does not bar their introduction at trial.

Moreover, ALSTOM's employees, ALSTOM's counsel and its experts have traveled to the Puerto Rico plant and inspected firsthand the results of the accelerated corrosion. And during discovery, AES-PR produced dozens of photographs of the corroded components to ALSTOM. Particularly given that ALSTOM, its counsel, and its experts have seen the corrosion damage in person and in photographs produced in discovery, there is no basis to withhold from the jury actual physical pieces of the corroded equipment, which will give the jury an appreciation of the damage involved.

10. Exhibit P-154 – "Unidentified Spreadsheet"

ALSTOM argues that Exhibit P-154 should be excluded pursuant to Rules 402, 802 and 901. This exhibit is an inventory and cost list kept electronically by AES-PR in the ordinary course of its business. The exhibit reflects certain damages AES-PR has incurred in this case and thus clearly is relevant. Before using this document at trial, AES-PR will have a witness testify to its authenticity, explain its relationship to the facts and issues in this case, and confirm that it is a record kept in the ordinary course of AES-PR's business.

11. Exhibit P-200 – Draft Write-Up

ALSTOM's entire argument for exclusion of this document is that it was a draft document that never was disseminated. In fact, it is not a draft document and was transmitted to at least eight people, including ALSTOM and AES-PR personnel, *see* B.152-55, and it has been authenticated at several depositions. *See, e.g.*, B.032; B.027.

## CONCLUSION

For the foregoing reasons, Defendant ALSTOM Power, Inc.'s Motions *in Limine* Nos. 1-9 should be denied.

Respectfully submitted,

/s/ John S. Spadaro
John S. Spadaro (Bar No. 3155)
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel. (302) 472-8100
Fax (302) 472-8135

Attorneys for AES Puerto Rico, L.P.

OF COUNSEL:
Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
Ann N. Sagerson
James L. Tuxbury
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated: October 9, 2006

**CERTIFICATE OF SERVICE**

On October 9, 2006, Plaintiff served Memorandum of Plaintiff AES Puerto Rico, L.P. in Opposition to ALSTOM Power, Inc's Motions *in Limine* Nos. 1-9 by electronic filing and first class mail, postage prepaid, on:

Richard R. Wier, Esq.
Two Mill Road
Suite 200
Wilmington, Delaware 19806

and by e-mail and first class mail, postage prepaid, on:

James E. Edwards, Esq.
Anthony Vittoria, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, Maryland 21202-1643

/s/ John S. Spadaro