**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

---

|  |  |  |
|---|---|---|
| AES PUERTO RICO, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civ. No. 04-1282-JJF |
| | ) | |
| ALSTOM POWER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

**APPENDIX TO MEMEMORANDUM OF PLAINTIFF AES PUERTO RICO, L.P.
IN OPPOSITION TO ALSTOM POWER, INC.'S MOTIONS IN LIMINE NOS. 1-9**

**(Pages B.001 through B.276)**

<div style="margin-left:50%">

John S. Spadaro
Bar No. 3155
MURPHY SPADARO & LANDON
1011 Centre Road, Suite 210
Wilmington, DE 19805
Tel (302) 472-8100
Fax (302) 472-8135

</div>

OF COUNSEL:

Dane H. Butswinkas
R. Hackney Wiegmann
Daniel D. Williams
Ann N. Sagerson
James L. Tuxbury
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel. (202) 434-5000
Fax (202) 434-5029

Dated:  October 9, 2006                    Attorneys for AES Puerto Rico, L.P

## INDEX

Contract No. W419-44-C0001 (2/24/98)................................................................B.001

Karl Hognefelt deposition transcript excerpts (1/10/06) ......................................B.008

Linda Rothe deposition transcript excerpts (1/13/06)..........................................B.012

Allan Dyer 30(b)(6) deposition transcript excerpts (1/18/06) ..............................B.017

William Van Hooser deposition transcript excerpts (2/7/06) ................................B.024

Thomas Coleman deposition transcript excerpts (2/23/06) ..................................B.031

Allan Dyer 30(b)(6) deposition transcript excerpts (3/9/06) ................................B.035

David Stone deposition transcript excerpts (3/10/06)..........................................B.040

William Jarvis deposition transcript excerpts (3/14/06) ......................................B.044

September 2004 Altran report...............................................................................B.047

Richard Lunt expert report (2/24/06) ...................................................................B.085

Ronald Ballinger expert report (3/20/06)..............................................................B.090

GE subpoena (8/17/05) .........................................................................................B.095

F.L. Smidth subpoena (8/17/05) ...........................................................................B.107

Scialpi letter to Judge Farnan (12/15/05).............................................................B.119

Vittoria email to Williams (12/15/05)...................................................................B.122

Sagerson letter to Edwards (4/20/05)....................................................................B.124

Williams email to Edwards (4/25/05) ...................................................................B.125

Interrogatory response excerpt (5/13/05)..............................................................B.125a

Vittoria letter to F.L. Smidth (6/15/06).................................................................B.128

Williams letter to Edwards (9/6/06)......................................................................B.129

Williams email to Edwards (9/7/06)......................................................................B.130

Plaintiff's Exhibit 28 ..................................................................................................B.131

Plaintiff's Exhibit 32 ..................................................................................................B.137

Plaintiff's Exhibit 33 ..................................................................................................B.138

Plaintiff's Exhibit 39 ..................................................................................................B.139

Plaintiff's Exhibit 42 ..................................................................................................B.152

Plaintiff's Exhibit 43 ..................................................................................................B.156

Plaintiff's Exhibit 44 ..................................................................................................B.157

Plaintiff's Exhibit 45 ..................................................................................................B.163

Plaintiff's Exhibit 51 ..................................................................................................B.166

Plaintiff's Exhibit 60 ..................................................................................................B.169

Plaintiff's Exhibit 61 ..................................................................................................B.170

Plaintiff's Exhibit 62 ..................................................................................................B.174

Plaintiff's Exhibit 74 ..................................................................................................B.177

Plaintiff's Exhibit 75 ..................................................................................................B.178

Plaintiff's Exhibit 80 ..................................................................................................B.179

Plaintiff's Exhibit 88 ..................................................................................................B.180

Plaintiff's Exhibit 95 ..................................................................................................B.182

Plaintiff's Exhibit 100 ................................................................................................B.184

Plaintiff's Exhibit 101 ................................................................................................B.185

Plaintiff's Exhibit 107 ................................................................................................B.186

Plaintiff's Exhibit 108 ................................................................................................B.189

Plaintiff's Exhibit 109 ................................................................................................B.190

Plaintiff's Exhibit 114 ................................................................................................B.192

Plaintiff's Exhibit 128 ................................................................................................B.196

Plaintiff's Exhibit 129 ................................................................................................B.197

Plaintiff's Exhibit 183 ................................................................................................B.206

Plaintiff's Exhibit 196 ................................................................................................B.211

Defendant's Exhibit 6 ................................................................................................B.213

Defendant's Exhibit 32 ..............................................................................................B.269

Defendant's Exhibit 127 ............................................................................................B.271

Defendant's Exhibit 284 ............................................................................................B.275

## SIGNATURE DOCUMENT

## CONTRACT NO. W419-44-C0001

THIS CONTRACT IS entered into, effective as of **February 24, 1998** by and between **Duke/Fluor Daniel Caribbean S.E.** (hereinafter referred to as "Duke/Fluor Daniel Caribbean S.E." or "DFDC")

whose address is:    **Duke/Fluor Daniel Caribbean S.E.**
**P.O. Box 1011**
**Charlotte, NC  28201-1011**

and **Combustion Engineering, Inc.** (hereinafter referred to as "Contractor" or "ABBCE"),

whose address is:                         **LICENSE NUMBER   TBD**

**ABB Combustion Engineering Systems**
**Combustion Engineering, Inc.**
**P.O. Box 500**
**2000 Day Hill Road**
**Windsor, CT  06095-0500**

In consideration of the agreements herein contained, the parties hereto contract and agree as follows:

**ARTICLE  1.0**            **CONTRACT DOCUMENTS**

This Contract shall consist of this Signature Document and the following documents, and the exhibits, drawings, specifications and documents referred to therein, all of which by this reference are incorporated herein and made a part of this Contract:

           DEFINITION OF TERMS
           PART I    -    SCOPE OF WORK
           PART II   -    COMMERCIAL TERMS
           PART III -    GENERAL TERMS

Said Contract sets forth the entire Contract and agreement between the parties pertaining to the Work and supersedes all inquiries, proposals, agreements, negotiations and commitments, whether written or oral, prior to the date of execution of this Contract, pertaining to said Work of this Contract.  The provisions of this Contract may be changed only by a writing executed by Duke/Fluor Daniel Caribbean S.E. and Contractor.  Trade custom and trade usage are superseded by this Contract and shall not be applicable in the interpretation of performance of this Contract.

**ARTICLE  2.0**            **PRECEDENCE**

In cases of express conflict between PARTS of the Contract, specifications, drawings or exhibits, the order of precedence shall be as follows:

           -     Signature Document
           -     Definition of Terms
           -     PARTS I AND II
           -     PART III



PLAINTIFF'S EXHIBIT
P-1

ALDEC05 - 01491

In the event of an express conflict between the documents listed above, or between any other documents which are a part of the Contract, Contractor shall notify DFDC immediately and shall comply with DFDC's resolution of the conflict.

B.001

**ARTICLE    3.0**                    **SCOPE OF WORK**

Except as otherwise expressly provided elsewhere in this Contract, Contractor shall supply all services, things, and items of expense necessary to perform, and shall perform, the Work generally described as:

**Design, Manufacture, Supply, Delivery, Erection, and Startup Assistance of the Circulating Fluidized Bed Boilers, Circulating Dry Scrubber Flue Gas Desulfurization Systems, and Electrostatic Precipitators.**

said work being more particularly described in PART I - SCOPE OF WORK (herein referred to as "Work"), for and in connection with the

**AES PUERTO RICO TOTAL ENERGY PROJECT**

said Work to be performed on a site to be designated by Duke/Fluor Daniel Caribbean S.E. at or in the vicinity of Guayama, Puerto Rico.

Contractor acknowledges that Contractor's Work done under this Contract is part of Duke/Fluor Daniel Caribbean S.E's obligation to AES Puerto Rico L.P. (hereinafter referred to as "Owner") under the Engineering, Procurement and Construction Services Agreement between AES Puerto Rico L.P and Duke/Fluor Daniel Caribbean S.E. dated effective as of April 3, 1996 (the "EPC Contract"). Contractor hereby agrees to assume full responsibility for all its obligations under this Contract between ABBCE and DFDC.

**ARTICLE    4.0**        **CONTRACT PRICE**

Contractor's full compensation for full and complete performance by Contractor of all the Work and compliance with all terms and conditions of this Contract shall be as set forth in PART II - COMMERCIAL TERMS.

**ARTICLE    5.0**            **CAPTIONS**

Titles and captions used in this Contract are for convenience only and shall not be used in the interpretation of any of the provisions of this Contract.

IN WITNESS WHEREOF, the parties hereto have executed this Contract on the day and year below written, but effective as of the day and year first set forth above.

_____         _____
       **COMBUSTION ENGINEERING, INC.**          **DUKE/FLUOR DANIEL CARIBBEAN S.E.**

BY: _____              BY: _____

TITLE: _____              TITLE: _PRESIDENT_____

DATE: _2/24/98_____              DATE: _2/24/98_____

ALDEC05 - 01492

B.002

# DUKE/FLUOR DANIEL
## CARIBBEAN S.E.

---

### Part I
### SCOPE OF WORK

**1.0**    **SCOPE OF WORK - GENERAL**

1.1    Except as otherwise expressly provided herein, Contractor shall supply all the design, engineering, manufacture, delivery, installation, inspection, factory testing, field testing, labor, equipment, materials, tools, warehousing services, and each and every item of expense necessary for the supply, handling, delivery, erection, startup, and testing of the CFB Boilers, Circulating Dry Scrubbers, Electrostatic Precipitators and all appurtenances, herein after called the Work.

1.2.    Scope shall include technical field support and consultation services during performance testing, initial operation of all equipment furnished, and training of Owner's operating and maintenance personnel.

**2.0**    **SCOPE OF SUPPLY AND TECHNICAL REQUIREMENTS**

2.1    All equipment shall be furnished and all Work shall be performed in strict accordance with the following described specifications, drawings, and other documents, which by this reference are made a part hereof.

2.1.1    <u>Specifications</u>

| | SPECIFICATION NO. | REV. | TITLE |
|---|---|---|---|
| 2.1.1.1 | W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.00-0001 | 1 | Circulating Fluidized Boiler and Appurtenances |
| 2.1.1.2 | W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.03-0001 | 1 | Circulating Dry Scrubber |
| 2.1.1.3 | W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.03-0002 | 1 | Electrostatic Precipitator |
| 2.1.1.4 | AES-GPR-I | 0 | General Project Requirements (GPR) |

2.1.2    <u>Attachments</u>

2.1.2.1    None

**2.3**    **CODES, REGULATIONS & STANDARDS**

-American National Standards Institute (ANSI)
-National Electrical Code (NEC)
-Underwriters' Laboratories (UL)
-Institute of Electrical & Electronic Engineers (IEEE)

---



## PART III - GENERAL TERMS

### 1.0 WARRANTIES

**1.1.1** Contractor warranties Duke/Fluor Daniel Caribbean S.E. ("D/FDC") and Owner that the Work shall comply with the provisions of this Contract and all specifications and drawings referred to in this Contract, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Contractor. Contractor further warranties D/FDC and Owner that all materials, equipment and supplies furnished by Contractor for the Work shall be new and fit for their specified purposes as set forth in this Contract and be in full compliance with the requirements of this Contract. As described in this Agreement, if any defect in the Work in violation of the foregoing warranties arises within the period set forth below, Contractor shall upon receipt of prompt written notice from D/FDC or Owner of such defect promptly furnish, at no cost to D/FDC or Owner, design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties.

**1.2** Contractor, at its expense, (including, without limitation, costs of removal, packing, transportation and reinstallation) shall remedy promptly any defective Work which exists during the applicable warranty period as set forth in this Article 1.0, and of which D/FDC gives written notice within a reasonable time after discovery of the defect or damage. Upon such notification by D/FDC, Contractor shall promptly commence and proceed to make all needed adjustments, repairs, additions, corrections, and replacements which arise out of or are necessitated by such defective Work or damage. Contractor shall conduct such warranty work on a overtime schedule basis if D/FDC determines such a schedule is necessary to avoid or minimize the effects of an outage or load reduction and D/FDC shall reimburse Contractor the premium differential for performing warranty work on an overtime basis. Contractor shall coordinate its warranty Work with D/FDC to minimize interference to D/FDC's and Owner's operations. D/FDC will permit reasonable access to as much of the Unit(s) as Contractor may reasonably require for performance of warranty Work, but any costs of uncovering Work shall be the responsibility of the Contractor. Contractor shall perform warranty Work so that such adjustments, repairs, additions, corrections, and replacements do not degrade the performance of, nor impair the use of the Equipment, Materials or other Work in question, other systems, or the Unit(s) as a whole to an extent that the Equipment, Materials, or other Work, systems or Unit(s) will not meet the requirements of this Contract in all respects, and Contractor shall repair or replace all other facilities to the extent they are destroyed or damaged as result of Contractor's performance of warranty Work.

**1.2.1** The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance with the following exceptions:

    a.    The warranty period for the Boiler Hot Loop shall be twenty-four (24) months after Performance Acceptance;

    b.    The warranty period shall be extended for corrective Work as set forth below.

**1.2.2** At the mutual agreement of Contractor and D/FDC, warranty Work provided hereunder may be deferred until the time of the Unit's next regularly scheduled maintenance outage, provided that such outage shall commence not later than six (6) months after D/FDC's notice to Contractor of the defective condition, and the warranty provisions hereunder shall apply notwithstanding that such outage occurs

B.004

ALDEC05 - 01589

after the time the warranty would otherwise expire. Contractor shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

1.3 The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Contractor's submittal to D/FDC of written Notice of Completion unless D/FDC, within ten (10) days thereafter, furnishes Contractor with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Contractor warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

1.3.1     In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, D/FDC shall so notify Contractor in writing prior to expiration of the Warranty Period, as applicable, and Contractor shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

1.3.2 A chronic failure ("Chronic Failure") shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, D/FDC and Contractor shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Contractor extend beyond 24 months after Performance Acceptance.

1.4 In the event Contractor shall have been notified in writing of any defects in the Work in violation of Contractor's foregoing guarantees and shall fail to promptly and adequately correct such defects, D/FDC and Owner shall have the right upon written notice to Contractor to correct or to have such defects corrected for the account of Contractor, and Contractor shall promptly pay D/FDC or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with back-up documentation supporting written claim.

1.5 In the event of an emergency when, in the reasonable judgment of D/FDC, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by D/FDC, or by a third party chosen by D/FDC, without giving prior notice to Contractor, and the reasonable cost of the remedial work shall be paid by Contractor, but Contractor shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by D/FDC to Contractor as soon as practical.

1.6 The Contractor shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, induced draft fans, interconnecting duct work and duct work from the induced draft fans to the stack flange against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years

Contract\ABBT&C2
(Rev. 2/23/98)                          Page 2

(i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Contractor's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Contractor's Operation and Maintenance manuals, Owner's specified operating parameters, and typical system operation at baseload and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Contractor and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth in Article 1.3, applicable to this Article 1.6.

1.7 Contractor agrees that D/FDC may assign its rights under this warranty and other parts of this Contract to Owner and Owner's Lenders, and Contractor hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

1.8 Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feedstocks from the limits specified in the Contract are excluded from any warranty obligations of the Contractor.

1.9 Contractor's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

1.10 ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

2.0 INSPECTION, TESTING AND QUALITY CONTROL

2.1 Contractor shall inspect all materials, supplies and equipment which are to be incorporated in the Work. In addition, Contractor shall conduct a continuous program of construction quality control for all Work. Contractor's quality control program and inspection procedures for the foregoing shall be submitted in writing to D/FDC for review and approval, and shall be in sufficient detail to delineate those items to be inspected and the manner in which they are to be inspected, and shall adequately describe all construction quality control activities contemplated, including provision for adequate documentation of Contractor's performance of such quality control and inspection.

2.2 Contractor shall, during the course of performance of the Work hereunder, without additional compensation, make or cause to be made all tests required by this Contract. D/FDC may require additional inspections and tests for which Contractor shall be compensated for. Contractor shall furnish D/FDC with satisfactory documentation of the results of all inspections and tests. For those tests which are specifically listed in the Contract as "D/FDC Witness Tests", D/FDC shall be given not less than five (5) working days notice by Contractor in order that D/FDC and/or Owner may witness any such tests.

2.3 D/FDC and Owner and their representatives, and others as may be required by applicable laws, ordinances and regulations, shall have the right at all reasonable times to inspect the Work and all

equipment, material, scaffolding and like items, leaving Owner's premises and the vicinity clean, safe and ready for use.

7.2  In the event Contractor shall fail to maintain its work area as described above and in a manner satisfactory to D/FDC, and Contractor has failed to effect such cleanup or removal promptly after receipt of written notice to do so, D/FDC shall have the right without further notice to Contractor to perform such cleanup and remove such items on behalf of, and at the expense of Contractor.  D/FDC may store items removed at a place of its choosing on behalf of Contractor and at Contractor's risk and expense. D/FDC shall promptly notify Contractor of such place of storage.  Contractor shall promptly reimburse D/FDC for the costs of such cleanup, removal and storage.

7.3  On or before completion of the Work, Contractor shall remove, transport and dispose of any Hazardous Material transported onto the Facility Site by Contractor or any of its subcontractors, or created, used or handled as part of Contractor's or any of its subcontractor's construction activities at the Facility Site.  All cleanup and disposal shall be conducted in accordance with all Applicable Laws and Applicable Permits.  Contractor shall notify D/FDC immediately upon the discovery of the presence of any Hazardous Material on, or the release of Hazardous Material on or from, the Facility Site.

## 8.0 SUBCONTRACTORS AND PURCHASE ORDERS

8.1  Contractor shall not subcontract performance of any work that will be performed at the jobsite and which has a value of $100,000 or greater without first notifying D/FDC of the intended subcontracting and obtaining D/FDC's Notice of Non-Objection in writing of the subcontracting and the subcontractor. Issuing of the Notice of Non-Objection shall not be unreasonably withheld. If requested by D/FDC, Contractors shall furnish D/FDC a copy of the subcontract (with price deleted if the subcontracted work is part of fixed price Work of Contractor under this Contract).  Contractor agrees to include applicable Articles from this Contract in subcontracts but shall maintain responsibility for administration of such subcontracts.

8.2  Contractor guarantees that its subcontractors will comply fully with the terms of this Contract applicable to the portion of the Work performed by them.  If any portion of the Work which has been subcontracted by Contractor is not prosecuted in accordance with this Contract then upon written notification from D/FDC, Contractor shall take corrective action to assure that the subcontractor's work is brought into compliance with the Contract.  If after thirty (30) days of Contractor receiving written notice of such non-conformance, subcontractor has failed to reasonably bring the Work into compliance with the Contract to the reasonable satisfaction of D/FDC, then on written request of D/FDC the subcontractor shall be replaced at no additional cost to D/FDC and shall not be employed again on the Work.

8.3  D/FDC shall have the right from time to time to attend progress review meetings that Contractor holds with its subcontractors.

8.4  Contractor shall only purchase materials and equipment from suppliers listed in attachment 14 of the technical specifications.

VIDEO DEPOSITION OF KARL HOGNEFELT
January 10, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.,                :        ORIGINAL

            Plaintiff,                :
vs.                                            Civ. No. 04-1282-JJF
                                      :
ALSTOM POWER, INC.,
                                      :
            Defendant.


APPEARANCES:

                    FOR THE PLAINTIFF:
                    Daniel D. Williams, Esq.
                    Ann N. Sagerson, Esq.
                    Williams & Connolly LLP
                    725 Twelfth Street, N.W.
                    Washington, D.C. 20005


                    FOR THE DEFENDANT

                    James E. Edwards, Jr., Esq.
                    Ober Kaler
                    120 E. Baltimore Street
                    Baltimore, Maryland, 21202-1643


Also Present:  Matt Poplin, Videographer


B.008

**Karl Hogenefelt**

Page 18

1          A.      Yes, I do.

2          Q.      **And the ash can be disposed, which**

3 **will be at point H on my diagram, do you see that?**

4          A.      Yes, it's -- I see it, but it's -- it

5 doesn't correspond with the actual area, because the

6 outlet front for the disposal is in a little bit

7 different position.

8          Q.      **Could you just draw that onto the**

9 **diagram, please.**

10          A.      The disposal of the ash is here going

11 to the side.   It's not over in this area.

12          Q.      **Can you please mark that L on the**

13 **diagram?**

14          A.      L. Okay.

15          Q.      **Thank you.   Thanks.   Then the ash can**

16 **be reinjected into the boiler, and that's letter I on**

17 **my diagram, do you see that?**

18          A.      I don't know about that system.   I

19 can't comment on that because I've not been involved

20 in anything of the reinjection into the boiler so--

21          Q.      **Okay.   Well, putting aside that**

22 **system, does this diagram as you've modified it,**

23 **accurately reflect a simplified version of the**

24 **pollution control equipment at AES Puerto Rico's**

25 **plant?**

                                                B.009

**Karl Hogenefelt**

Page 19

1        A.      It shows a very simple way of showing

2 it, yes.  The basic things is there, I think.

3        **Q.      Okay.  So going back to the beginning**

4 **of the boiler.  Coal was burned in the boiler,**

5 **correct?**

6        A.      Yeah.

7        **Q.      And it creates smoke?**

8        A.      Yes.

9        **Q.      I understand.**

10       A.      We call it ash.

11       **Q.      You call it ash?**

12       A.      Yeah, I mean it -- we call it -- it's

13 -- when you combust the coal, it will be ash left

14 over and of course depending on what type of coal

15 quality you use, you get different type of ash.

16              And that will go with the flue gases

17 out through the boiler, some of it.  Some ash will

18 fall down in the bottom and taken out in the boiler

19 also.

20       **Q.      So exiting the top of the boiler is**

21 **fly ash mixed in with flue gas?**

22       A.      That's correct.

23       **Q.      That gas passes through -- I'm sorry**

24 **-- strike that.  That gas with the ash passes through**

25 **point B on this diagram?**

B.010

280

1                    C E R T I F I C A T E

2

3    STATE OF TENNESSEE:

4    COUNTY OF KNOX:

5              I, Georgette H. Mitchell, Registered

6    Professional Reporter, Certified Court Reporter (TN)

7    and Notary Public, do hereby certify that I

8    administered the oath to the deponent, that I

9    reported in machine shorthand the above testimony,

10   that the foregoing pages, numbered 1 to 280

11   inclusive, were done by computer-aided transcription

12   under my supervision and constitute a true and

13   accurate record of the proceedings, and that there

14   has not been a request made by the deponent to review

15   the transcript.

16             I further certify that I am not an attorney

17   or counsel for any of the parties, nor a relative or

18   employee of any attorney or counsel connected with

19   the action, nor financially interested in the action.

20             Witness my hand and official seal this the

21   25th day of January, 2006.

22                    _Georgette H. Mitchell_

23                    GEORGETTE H. MITCHELL
                       Registered Professional
24                     Reporter, Certified
                       Court Reporter (TN)
25                     My commission expires: 4-6-08.

B.011



Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4

5    AES PUERTO RICO, L.P., )

6         Plaintiff,        )

7    VS.                    )    No. 04-1282-JJF

8    ALSTOM POWER, INC.,    )

9         Defendant.        )

10

11

12

13

14

15

16        VIDEOTAPED DEPOSITION OF LINDA ROTHE, a witness

17    called on behalf of the Plaintiff, pursuant to the Federal

18    Rules of Civil Procedure, before Esmeralda Guzman, a

19    Certified Shorthand Reporter and Notary Public in and for

20    the State of Connecticut, taken at Alstom Power, Inc., 2000

21    Day Hill Road, Windsor, Connecticut, taken on Friday,

22    January 13, 2006, commencing at 9:41 a.m.

23

24    Job No. 172540

COPY

B.012

**Linda Rothe**

Page 176

1                   for identification.)

2       Q.   (By Mr. Williams)   I'm handing you what's been

3    marked Rothe Exhibit 38.   Is Rothe Exhibit 38 the cover

4    letter you put on the invoice that we discussed which is

5    marked Exhibit 37?

6       A.   This appears to be a generic cover letter probably

7    formatted by finance when they generate the -- oh, no,

8    okay, this is specific.   Let me read the rest of it.   I'm

9    sorry.   I do not recall writing this letter.   And it has no

10   signature, which is odd to me.   So it looks like something

11   I would write, but I'm kind of baffled by the fact that

12   there's no to and no signature.   Unless it went along with

13   a stack of invoices and maybe I put a cover letter on all

14   of them.   I'm kind of at a loss.   It looks like something I

15   would write, but I don't specifically recall writing it.

16      Q.   Looking at the letter, is it -- strike that.

17   Looking at the letter and the attached January 29, 2004

18   invoice, is it now consistent with your recollection that

19   you submitted an invoice to EEC for warranty claims

20   submitted by AES for replacement of the ESP internal

21   components that had failed due to corrosion?

22                   MR. VITTORIA:   Objection,

23              mischaracterizes the testimony.

24                   THE WITNESS:   It's consistent with

B.013

**Linda Rothe**

Page 195

1    Q.  (By Mr. Williams)  Who else could it have been?

2              MR. VITTORIA:  Objection.

3              THE WITNESS:  That's why I say that.

4      I don't recall.

5    Q.  (By Mr. Williams)  But in any event, you were

6    conveying Alstom's position with regard to TASC

7    Consulting's July 2, 2004 letter to you.  Correct?

8              MR. VITTORIA:  Objection.

9              THE WITNESS:  Yes.

10   Q.  (By Mr. Williams)  Okay.  You can put that exhibit

11   aside.

12              (Exhibit 45, 2/25/05 Statement,

13        marked for identification.)

14   Q.  (By Mr. Williams)  Miss Rothe, I'm showing you

15   what's been marked Exhibit Number 45.  Can you identify

16   this document for the record, please?

17   A.  It is a statement generated by finance of

18   outstanding invoices.

19   Q.  And when you refer to finance, you're talking

20   about Alstom's finance department?

21   A.  Yes.

22   Q.  And it's dated February 25, 2005.  Correct?

23   A.  It is.

24   Q.  And it refers to outstanding invoices to EEC.

B.014

**Linda Rothe**

1    Correct?

2        A.  Yes.

3        Q.  In other words, it refers to invoices for amounts

4    that EEC owes to Alstom?

5                    MR. VITTORIA:  Objection.

6        Q.  (By Mr. Williams)  Is that accurate?

7                    MR. VITTORIA:  Objection.

8                    THE WITNESS:  It does.

9        Q.  (By Mr. Williams)  One of the invoices listed is

10   invoice CS-04-301.  Correct?

11       A.  It is.

12       Q.  And that's the invoice that we looked at earlier

13   today.  Correct?

14       A.  Yes.

15       Q.  That invoice is Exhibit 37?  Counsel will show it

16   to you.

17       A.  Yes, okay.

18                    MR. VITTORIA:  Objection.

19                    THE WITNESS:  We have a discrepancy

20                in the amount.  The amounts aren't the

21                same.  The invoice number is the same.

22                301.  There may have been a supplement to

23                the original.  I don't know.  But this is

24                dated '05, February '05, January '04.

**Esquire Deposition Services**

DC 1-800-441-3376          **MD 1-800-539-6398**          VA 1-800-752-8979

**Linda Rothe**

Page 212

1    STATE OF CONNECTICUT

2    HARTFORD, SS.

3

4         I, Esmeralda Guzman, a Certified Shorthand

5    Reporter and Notary Public in and for the State of

6    Connecticut, do hereby certify that the foregoing

7    transcript of the deposition of Linda Rothe, having

8    previously been sworn on January 13, 2006, is true and

9    accurate to the best of my knowledge, skill, and ability.

10        I further certify that I am not a relative or

11   employee or attorney or counsel of any of the parties

12   hereto, nor am I a relative or employee of such attorney or

13   counsel; nor do I have any interest in the outcome or

14   events of this action.

15        IN WITNESS WHEREOF, I have hereunto set my hand

16   and seal this 6th day of February 2006.

17

18            *Esmeralda Guzman*

19            ESMERALDA GUZMAN

20

21   My Commission Expires:

22   September 30, 2010

23

24

B.016

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.       * C.A. NO.:  04-1282(JJF)
                       *
    Plaintiff          *
                       *
    Vs.               *
                       *
ALSTOM POWER, INC.,      *
                       *
    Defendant         *
*****************************

THE 30(B)(6) DEPOSITION OF MR. ALLAN DYER
(CORPORATE DESIGNEE)

DATE      :    January 18, 2006

TIME:     :    9:30 A.M.

OFFICE    :    Ober, Kaler, Grimes & Shriver, P.S.C.
                120 East Baltimore Street
                Baltimore, Maryland 21202-1643

HELD AT   :    Axtmayer, P.S.C.
                250 Ponce de León Avenue
                Suite 404
                Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

    Daniel D. Williams, Esq.

FOR DEFENDANT:

    Anthony Vittoria, Esq.

NOTARY PUBLIC:

    Liana I. Loyola, Esq.

**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927



B.017

15

1    Q    Who did you speak with?

2    A    Well, to be clear, this exhibit talks about

3   pieces of equipment that are in my plant, and I talk

4   about them every day, to a variety of people.  And I

5   don't track on, you know, what topics I talk to the

6   people.

7    Q    Okay.  I understand that.  I'm really just

8   trying to get did you talk to any of those people in

9   preparation for this deposition today, specifically with

10  this deposition in mind?

11   A    I did.

12   Q    Okay.  And who was that?

13   A    Our technical people.

14   Q    Do you recall any names?

15   A    Yeah.  I mean, to be clear, there's issues

16  in... there's items in here that we're dealing with, or

17  contemplating all the time, because they are equipment

18  that's in our power station.

19   But I do know all the names of the employees, but

20  I'm not sure that I can accurately say which ones I

21  talked to on which items.

22   Q    Okay.  Do you remember any names of any

23  technical people that you spoke to in preparation for

24  this deposition?

25   A    I do, I remember some of the names, yes.



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

**B.018**

1      Q    And who are they?

2      A    I had discussions with our engineering team

3 leader.

4      Q    And who is that?

5      A    David Stone.

6      Q    Anyone else?

7      A    Yes, our accounts payable.

8      Q    And who is that?

9      A    Lillian Alicea.

10     Q    Can you spell that last name for me?

11     A    I believe it's spelled A-L-I-C-E-A.

12     Q    Alright.  Anyone else?

13     A    To a much lesser extent, the CFO.

14     Q    And who is that?

15     A    Gamaliel Rivera.  G-A-M-A-L-I-E-L Rivera.

16     Q    Okay.  Can you think of anyone else?

17 MR. WILLIAMS:

18     Just to be clear to those meetings; without counsel

19 present?

20 BY MR. VITTORIA:

21     Q   Anyone, any person other than your legal

22 counsel, that you spoke to in preparation for this

23 meeting.

24 MR. WILLIAMS:

25     I'll object to questions about meetings with



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

1  question pending?

2  MR. VITTORIA:

3      There was.

4  MR. WILLIAMS:

5      What is it?

6  BY MR. VITTORIA:

7      Q    Do you know whether AES has invoiced, or been

8  invoiced for $3,075.54 relating to the work in line item

9  No. 4, the "stabilization program" chart of Exhibit No.

10  4?

11  MR. WILLIAMS:

12      Objection, asked and answered.

13  THE DEPONENT:

14      To the best of my knowledge, the numbers that we're

15  presenting here today, where we say we have made those

16  payments, to the best of my knowledge, we would have

17  those invoices.

18  BY MR. VITTORIA:

19      Q    Okay, that was my next question. Has AES paid

20  those invoices?

21      A    To the best of my knowledge, any sums on these

22  tables, and invoices associated with them, have been

23  paid.

24      Q    Okay, well, let's go back up to the "Collect-

25  ion Plates" chart in Exhibit No. 4, and we discussed

1    this line item, the line item for "various."  Do you see

2    that one?

3         A    Yes.

4         Q    And do you see the amount for that is $1.4

5    million?

6         A    Yes.

7         Q    And in parentheses, underneath that amount, it

8    says "EST." end parentheses, do you see that?

9         A    I do.

10        Q    Does that mean that's an estimate?

11        A    That is our estimate, that's correct.

12        Q    Okay.  Has AES Puerto Rico been invoiced for

13   the amount contained in that "various" line item of the

14   "Collection Plates" chart?

15        A    We have not; that's clearly an estimate.

16        Q    Okay.

17   MR. VITTORIA:

18        What number is this?

19   (Whereupon, a document was marked for identification as

20   Exhibit 5 of the deposition.)

21   BY MR. VITTORIA:

22        Q    Mr. Dyer, I'm handing you what's been marked

23   as Exhibit No. 5, and I ask you take a look at it.

24   MR. WILLIAMS:

25        Do you want the Witness to read the whole document?



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

258

```
 1   estimates for the crystallizer obtained by AES Puerto
 2   Rico?
 3        A    It appears to, yes.
 4        Q    Let's turn to the next line item on, item
 5   number on Exhibit No. 3.  "To be determined," and the
 6   reason for payment states, "Crystallizer-construction."
 7   Do you see that?
 8        A    Mmhm.
 9        Q    Okay.  And the estimate for that is $7
10   million.  Do you see that?
11        A    Yes, sir.
12        Q    Okay, upon what is that estimate based?
13        A    To my understanding, it is based on the two
14   companies we were talking to.
15        Q    And who are the two companies that you were
16   talking to?
17        A    I believe the engineering department, and our
18   other team members, were having conversations with G.E.
19   Betz, and I believe the other company is Aquatech.
20        Q    Has AES Puerto Rico received estimates from
21   the two entities about which you were talking for that
22   line item?
23   MR. WILLIAMS:
24        Objection, vague, referring to "that line item."
25
```



268

CERTIFICATE OF COURT REPORTER

I, MATTHEW J. CLUTTEUR SHORT, Court Reporter, and member of Crespo Rodríguez, Inc.:

DO HEREBY CERTIFY:  That the foregoing transcript is a full, true and correct record of the testimony given which was taken down by me, and thereafter reduced to the typewritten form.

I FURTHER CERTIFY:  That I am not in any way involved or interested in the outcome of said action.

WITNESS my hand this 24 of January, 2006 in San Juan, Puerto Rico.

_____

MATTHEW J. CLUTTEUR SHORT
Court Reporter



**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

B.023

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3    AES PUERTO RICO, L.P.      *

4          Plaintiff           *

5      v.                      *      CIV. NO. 04-1282-JJF

6    ALSTOM POWER, INC.        *

7          Defendant           *      Pages 1 - 248

8                    - - - - - - - - - - -

9

10

11

12    Videotaped deposition of William B. VanHooser

13              Baltimore, Maryland

14          Tuesday, February 7, 2006

15

16

17                                   **COPY**

18

19

20    Job No. 172632

21    Reported by:  Kathleen R. Turk, RPR-RMR

**William B. VanHooser**

Page 23

1    consulting engineering firms; others are suppliers

2    who supply components that are used by fabric

3    filters and spray dry absorbers.

4                    (Thereupon, VanHooser

5                    Deposition Exhibit No. 1

6                    was marked.)

7        Q    (By Ms. Sagerson) Mr. VanHooser, we've

8    just handed you an exhibit marked Exhibit No. 1,

9    and this is a diagram that was prepared by an

10   attorney in my firm.

11           And do you see at Point A there's a

12   representation of a boiler?

13       A    Yes.

14           MR. VITTORIA:  Just for the record,

15   I'm going to -- I'm obviously objecting to the

16   dep -- the exhibit as not to scale and -- well,

17   that's fine for right now.

18       Q    And do you see that there is a path

19   leading from the boiler past Point B to -- into

20   the CDS?

21       A    Yes.

**William B. VanHooser**

Page 24

1    Q    And then there's a path leading from the

2    CDS which is past Point D into the ESP?

3    A    I see that.

4    Q    And does this diagram accurate --

5    accurately reflect a simplified version of the air

6    pollution control equipment at the AES Puerto Rico

7    plant?

8    A    Yes, a simplified version.

9    Q    Okay.  And you understand that coal is

10   burned in the boiler and creates smoke, correct?

11             MR. VITTORIA:   Objection.

12   A    Yes.

13   Q    And is smoke the same thing as flue gas?

14   A    No.

15   Q    What's the difference?

16   A    Flue gas will tain -- contain the gaseous

17   combustion products, and smoke generally refers to

18   a particulate, particulate-laden gas in the flue

19   gas, a particulate-laden -- a solid particulate in

20   the flue gas.

21   Q    And burning coal creates both smoke and

**William B. VanHooser**

Page 127

1    as written is an instruction to allow the operator

2    to, to adjust the bed differential pressure

3    according to boiler, boiler load, and why it was

4    marked out, I'm not sure.

5          I, I don't -- I can't answer why that was

6    marked out.

7    Q    Okay.

8                         (Thereupon, VanHooser

9                          Deposition Exhibit No. 17

10                         was marked.)

11   Q    (By Ms. Sagerson) You've been handed what

12   is marked Exhibit No. 17.

13         Do you recognize this document?

14   A    Yes.

15         MR. VITTORIA:  For the record, the

16   document doesn't have any Bates numbers.  It has

17   no indication where it came from.

18   Q    And do you recognize this as a revised

19   version of Exhibits No. 16, 15, 14, and 13?

20   A    It appears -- although, the heading at

21   the top is different, this is a CDS Cold Start --

**William B. VanHooser**

Page 215

1   was drafted in August, 2001, correct?

2       A    This indicates that this is -- the status

3   of this submittal is the issue, which means the

4   draft had already been put together, had been sent

5   to AES, had been sent to Alstom, we had gotten

6   comments back, we had incorporated those comments,

7   we had revised and resubmitted and had been

8   accepted, and this is, I believe, this is the,

9   the, the final issue, so it's not the draft issue.

10      Q    Okay.  And you understood that certain

11  operations and maintenance indicators in this

12  manual may have to change as a result of the

13  commissioning and start-up phase, correct, as you

14  learned more information regarding the air

15  pollution control equipment?

16              MR. VITTORIA:  Objection.

17              Objection to the form of the

18  question and objection, lack of foundation.

19      A    That's typical of any air pollution

20  control system is that, you know, conditions

21  change, and typically, you know, generally, the,

**William B. VanHooser**

Page 216

1    the systems are flexible enough that they can

2    accommodate that.

3         Q    Okay.  I think this is the last document.

4                        (Thereupon, VanHooser

5                        Deposition Exhibit No. 34

6                        was marked.)

7         Q    (By Ms. Sagerson) You have been handed

8    what has been marked as Exhibit No. 34.

9         Do you recognize this document?

10                   MR. VITTORIA:  For the record, I

11   would note that there are no Bates numbers on this

12   document or indication from where this document

13   was produced.

14                   Pending that notation, you can

15   answer.

16        A    Okay.  This appears to be one of many

17   documents that Duke/Fluor Daniel issued as

18   specifications for the air pollution control

19   system.

20        Q    And the air pollution control system

21   includes the circulating dry scrubber, correct?

**William B. VanHooser**

Page 246

```
1               CERTIFICATE OF NOTARY PUBLIC

2          I, Kathleen R. Turk, the officer before whom the

3     foregoing deposition was taken, do hereby certify that

4     the witness whose testimony appears in the foregoing

5     deposition was duly sworn by me; that the testimony of

6     said witness was taken by me in stenotype and thereafter

7     reduced to typewriting under my direction; that said

8     deposition is a true record of the testimony given by

9     said witness; that I am neither counsel for, related to,

10    nor employed by any of the parties to the action in

11    which this deposition was taken; and, further, that I am

12    not a relative or employee of any attorney or counsel

13    employed by the parties hereto, nor financially or

14    otherwise interested in the outcome of the action.

15

16                      Kathleen R. Turk

17                      Kathleen R. Turk

18.                     Notary Public in and for the

19                      State of Maryland

20    My Commission Expires:

21    March 1, 2007.
```

**Thomas Coleman**

Page 1

```
1               UNITED STATES DISTRICT COURT

2                  DISTRICT OF DELAWARE

3

4        --------------------------------------X

5     AES PUERTO RICO, LP

6

7     VS              Civ. No. 04-1282-JJF

8

9     ALSTOM POWER, INS.

10       --------------------------------------X

11

12

13               Deposition of Thomas Coleman taken in

14     accordance with the Federal Rule of Civil

15     Procedure at the Law Offices of Coudery Ecker &

16     Murphy, 760 Main Street Hartford, Connecticut,

17     Before Holly Murphy, a Licensed Shorthand

18     Reporter and Notary Public, in and for the State

19     of Connecticut at 9:38 AM on February 23, 2006.

20

21

22

23                                    COPY

24

25     Job No. 172990
```

**Thomas Coleman**

1    BY MS. SAGERSON:

2        Q.    I'm handing you what has been marked as

3    Exhibit 22.  I would ask if you recognize this as

4    an EEC procedures -- strike that.

5            I would ask if you recognize this as an

6    EEC document related to the CDS cold start up?

7        A.    Yes, I do.

8        Q.    Do you see that it's dated November 14,

9    2002?

10       A.    Yes, I do.

11       Q.    Do you recall reviewing this document

12    on or around the November 2002 time fame?

13       A.    Yes, I do.

14       Q.    What was the purpose of your review of

15    this document?

16       A.    This was the modification to the

17    original start up procedure.

18       Q.    To the original EEC operations manual?

19            MR. EDWARDS:  Objection.  Calls for

20    legal conclusion.  You can answer.

21       A.    As with any piece of equipment there is

22    a start up procedure guideline given.  When the

23    equipment actually gets in operation, these

24    procedures need to be changedgiven conditions.

25            It's not specific to EEC supplied

**Thomas Coleman**

Page 120

```
 1    equipment or our supplied equipment or a DFD

 2    supplied equipment.

 3            It's the nature.  I mean, equipment, you

 4    design something to operate or you have

 5    expectation of things to operate at a certain

 6    place.  But when you start up and you operate,

 7    that may change.

 8        Q.    Change is based on the experience;

 9    correct?

10        A.    Yes.

11        Q.    So EEC, ALSTOM, DFD may provide

12    operations manuals prior to the start up phase

13    but through experience and fine tuning of the

14    equipment, many of those procedures will change;

15    is that correct?

16            MR. EDWARDS:  Objection.  You can

17    answer.

18        A.    Not totally change.  Very minimal

19    changes.  It's something that you basically owe

20    the customer is, you know, anything that would

21    change equipment wise or operation wise or

22    enhancements, you owe them information on that

23    piece of equipment.

24        Q.    So that they understand how to run the

25    equipment?
```

**Thomas Coleman**

Page 155

```
 1          C E R T I F I C A T E

 2

 3          I hereby certify that I am a Notary

 4     Public, in and for the State of Connecticut, duly

 5     commissioned and qualified to administer oaths.

 6          I further certify that the foregoing

 7     deposition was taken by me stenographically in

 8     the presence of counsel and reduced to

 9     typewriting under my direction, and the foregoing

10     is a true and accurate transcript of the

11     testimony.

12          I further certify that I am neither of

13     counsel nor attorney to either of the parties to

14     said suit, nor am I an employee of either party

15     to said suit, not of either counsel in said suit,

16     nor am I interested in the outcome of said cause.

17          Witness my hand as Notary Public this

18     23rd day of February, 2006.

19

20     Holly M. Murphy

21     Holly M. Murphy

22          NOTARY PUBLIC in and for the

23          State of Connecticut.

24          00177

25
```

**Esquire Deposition Services**
DC 1-800-441-3376      MD 1-800-539-6398      VA 1-800-752-8979

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, L.P.          *     C.A. NO.:  04-1282(JJF)
                              *
        Plaintiff             *
                              *
     Vs.                      *
                              *
ALSTOM POWER, INC.            *
                              *
      Defendant               *
*******************************

30(B)(6) DEPOSITION OF MR. ALAN DYER
(Corporate Designee)
(Continuation)

DATE     :    March 9, 2006

TIME:    :    8:00 P.M.

OFFICE   :    Ober, Kaler, Grimes & Shriver, P.S.C.
              120 East Baltimore Street
              Baltimore, Maryland 21202-1643

HELD AT  :    Axtmayer, P.S.C.
              250 Ponce de León Avenue
              Suite 404
              Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

    Daniel D. Williams, Esq.

FOR DEFENDANT:

    Anthony Vittoria, Esq.

NOTARY PUBLIC:

    Liana I. Loyola, Esq.

**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927


B.035

1    water supplement" and "other water supply changes"?

2         A    CDS water supplement is taking filtered water

3    that would normally go to our boiler makeup, and

4    supplement it.

5         Q    Okay, and what is "other water supply

6    changes"?

7         A    Other water supply changes refers to the inlet

8    waters coming into our plant.

9         Q    And what changes specifically are contemplated

10    by that line item?

11    MR. WILLIAMS:

12         Objection to characterization of the document.

13    THE DEPONENT:

14         May I ask you to repeat the question?

15    BY MR. VITTORIA:

16         Q    What changes are specifically contemplated by

17    the item that says, "Other water supply changes"?

18    MR. WILLIAMS:

19         Objection to form.

20    THE DEPONENT:

21         The major change is using what we refer to in our

22    documents as "Patillas Canal Water." And using it as

23    much as we can, in place of the PRASA water. The

24    Patillas water is, I believe, five times the price of

25    the PRASA water. The PRASA water is the only water that

16

1   we're guaranteed.

2   BY MR. VITTORIA:

3       Q    Okay, now let's look at the next line, "For

4   crystallizer engineering permits." Do you see the

5   estimate for that is $512,000?

6       A    I see that line, and I see that estimate.

7       Q    Those costs will, in fact, be much less than

8   that, isn't that correct?

9       A    I have no reason to believe that they'll be

10  much less.

11      (Whereupon, a document has been marked for

12  identification as Exhibit D of the deposition.)

13      Q    I'm handing you what's been marked as Exhibit

14  D, and ask you to take a look at that exhibit.

15      A    I've reviewed Exhibit D.

16      Q    And do you see on Exhibit D that Ms. Siberon

17  has estimated the cost for permits and local fees to be

18  $21,000?

19      A    I see that.

20      Q    And that's for, at least this particular

21  appraisal for crystallizer, the engineering costs would

22  be $4,000 for design drawings and documents, PT stamped?

23  MR. WILLIAMS:

24      Objection to the characterization of the document.

25



27

1    Q    Well, let's move off of that.  The next item

2    in the interrogatory answer has a $7 million estimate

3    for crystallizer construction.  Do you see that?

4    A    I do, sir.

5    Q    And upon what has AES Puerto Rico based that

6    estimate?

7    A    I believe we got that estimate from one of our

8    suppliers.

9    Q    Do you recall which supplier that was?

10   A    I do not.  It would be either Aquatech or

11   General Electric.

12   Q    Okay, if you could turn back to page three of

13   Exhibit G, page three of the proposal, that is, the

14   chart.

15   A    Uh-huh?

16   Q    You mentioned it before, you see the text

17   below, it says, "The budget pricing is only for

18   equipment supplied.  For economic payback, the valuation

19   of installation costs also need to be considered."

20   And then it goes on to say, "Based on our expe-

21   rience, the installation costs are approximately 80

22   percent cost of the equipment value."  Do you see that?

23   A    I do.

24   Q    Did AES Puerto Rico take that information into

25   consideration when it made its estimate of $7 million

1    CERTIFICATE OF COURT REPORTER

2

3        I, MATTHEW J. CLUTTEUR SHORT, Court Reporter, and

4    member of Crespo Rodríguez, Inc.:

5        DO HEREBY CERTIFY:  That the foregoing transcript

6    is a full, true and correct record of the testimony

7    given which was taken down by me, and thereafter reduced

8    to the typewritten form.

9        I FURTHER CERTIFY:  That I am not in any way

10   involved or interested in the outcome of said action.

11       WITNESS my hand this ___24th___ of ___March___,

12   2006 in San Juan, Puerto Rico.

13

14

15

16

17

18       _____

19       MATTHEW J. CLUTTEUR SHORT

20       Court Reporter

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AES PUERTO RICO, LP              *    C.A. NO.: 04-1282(JJF)
                                 *
        Plaintiff                *
                                 *
        Vs.                      *
                                 *
ALSTOM POWER, INC.               *
                                 *
        Defendant                *
******************************

DEPOSITION OF MR. DAVID STONE
30(b)(6)

DATE      :    March 10, 2006

TIME:     :    9:30 A.M.

OFFICE    :    Ober, Kaler, Grims & Shriver, P.S.C.
               120 East Baltimore Street
               Baltimore, Maryland 21202-1643

HELD AT   :    Axtmayer, P.S.C.
               250 Ponce de León Avenue
               Suite 404
               Hato Rey, Puerto Rico

APPEARANCES

FOR PLAINTIFF:

     Daniel D. Williams, Esq.

FOR DEFENDANT:

     Anthony Vittoria, Esq.

NOTARY PUBLIC:

     Liana I. Loyola, Esq.

**CRESPO & RODRIGUEZ, INC.**
Taquígrafos de Récord
TELS: (787) 758-5930 / (787) 763-8018
FAX: (787) 767-8217
A-6 Yale Street, Santa Ana
Río Piedras, Puerto Rico 00927



B.040

1    MR. WILLIAMS:

2        Objection to Counsel's testimony as to what the

3    attachment is.

4    THE DEPONENT:

5        This document would indicate that there's a list of

6    meeting attendees, which includes AES.

7    BY MR. VITTORIA:

8        Q     Includes Stuart Ferguson, correct?

9        A     Stuart Ferguson's name is on the, under AES.

10       Q     Is Mr. Ferguson an employee of AES Puerto

11   Rico?

12       A     Stuart Ferguson is currently not an employee

13   of AES Puerto Rico.

14       Q     Has he been an employee in the past?

15       A     Stuart Ferguson was an employee of AES Puerto

16   Rico.

17       Q     And when was that?

18   MR. WILLIAMS:

19       Objection.  Outside the scope of the deposition.

20   THE DEPONENT:

21       He was working on the project before I came on

22   board with the company in January, 2000.  I'm unsure of

23   the exact time that he started on the project.

24   BY MR. VITTORIA:

25       Q     Was he on site?

1          A     He... Stuart, at the beginning of the project,

2     when I was hired, was not full-time on the site. He

3     would make site visits during early construction of the

4     facility.

5          Q     And did he later become on-site?

6          A     Stuart arrived on site later.

7          Q     Do you remember when?

8     MR. WILLIAMS:

9          Objection.  Outside the scope.

10    THE DEPONENT:

11         I recall Stuart arriving sometime in the next

12    summer, the summer of 2000, I believe; it might've been

13    the fall of 2000.  I don't remember the exact time.

14    BY MR. VITTORIA:

15         Q     Do you know Vigai Singh is?

16         A     I, I do know a Vigai Singh.

17         Q     A Vigai Singh who's an employee of AES, or AES

18    Puerto Rico?

19         A     I do know Vigai Singh...

20    MR. WILLIAMS:

21         Objection, compound. Go ahead.

22    THE DEPONENT:

23         I do know a Vigai Singh.  I don't know whether he

24    was ever officially an AES Puerto Rico employee.

25

376

1                    CERTIFICATE OF COURT REPORTER

2

3          I, MATTHEW J. CLUTTEUR SHORT, Court Reporter, and

4     member of Crespo Rodríguez, Inc.:

5          DO HEREBY CERTIFY:  That the foregoing transcript

6     is a full, true and correct record of the testimony

7     given which was taken down by me, and thereafter reduced

8     to the typewritten form.

9          I FURTHER CERTIFY:  That I am not in any way

10    involved or interested in the outcome of said action.

11         WITNESS my hand this 24th of March,

12    2006 in San Juan, Puerto Rico.

13

14

15                              _____

16                              MATTHEW J. CLUTTEUR SHORT

17                              Court Reporter

18

19

20

21

22

23

24

25

**CRESPO & RODRIGUEZ, INC.**
TEL. (787) 758-5930 • FAX: (787) 767-8217

B.043

Page 1

1           IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF DELAWARE

2

3

                              C.A. No. 04-1282-JJF

4

5   AES PUERTO RICO, L.P.

6   VS

7   ALSTOM POWER, INC.

8

9

10

11

12           Videotaped Deposition of:  WILLIAM JARVIS,

13   taken pursuant to the Federal Rules of Civil Procedure

14   before Barbara L. Murphy, Licensed Shorthand Reporter,

15   License No. 305 and Notary Public within and for the

16   state of Connecticut, held at the offices of Cowdery,

17   Ecker and Murphy, 750 Main Street, Hartford,

18   Connecticut on March 14, 2006 commencing at 9:42 a.m.

19

20

21

22

23

24                                   **COPY**

25   Job No. 172947b

**William Jarvis**

Page 45

1               MR. EDWARDS:  Same objection.

2               THE WITNESS:  I'm not aware.

3       Q.   (By Mr. Williams)  Did Alstom expect that

4  AES would follow the revised start-up procedures

5  issued by EEC during the fall of 2002?

6       A.   Yes.

7       Q.   And it never advised AES that following the

8  revised start-up procedures would void any of the

9  warranties for the equipment?

10      A.   Did not.

11      Q.   Did Alstom ever request that EEC update its

12  August 2001 O and M manual to include the revised

13  procedures EEC was issuing?

14      A.   Did not.

15      Q.   But Alstom did expect that in the fall of

16  2002 EEC would issue revised operating procedures,

17  correct?

18               MR. EDWARDS:  Objection.  Foundation.

19  You can answer.

20               THE WITNESS:  Can you restate the

21  question, please?

22               MR. WILLIAMS:  Let's do it this way.

23  I'll withdraw the question.  You can put that exhibit

24  aside.

25               (Exhibit No. 7, offered and marked.)

**William Jarvis**

<div align="right">Page 296</div>

C E R T I F I C A T E

1

2          I hereby certify that I am a Notary Public, in

3    and for the state of Connecticut, duly commissioned

4    and qualified to administer oaths.

5          I further certify that the deponent named in

6    the foregoing deposition was by me duly sworn, and

7    thereupon testified as appeared in the foregoing

8    deposition; that said deposition was taken by me

9    stenographically in the presence of counsel and

10   reduced to typewriting under my direction, and the

11   foregoing is a true and accurate transcript of the

12   testimony.

13         I further certify that I am neither of counsel

14   nor attorney to either of the parties to said suit,

15   nor am I an employee of either party to said suit, nor

16   of either counsel in said suit, nor am I interested in

17   the outcome of said cause.

18         Witness my hand and seal as Notary Public this

19   20th day of March, 2006.

20

21

22

                 Barbara L. Murphy, LSR
23               Notary Public

24

My Commission Expires:

25   June 30, 2007