Altran Corporation
Letter Report 11-0256-00-LR-001
Attachment 1 Report Figures
Page 16 of 18



**Figure 29. EDS Spectrum Taken at Location 2 of Figure 27**



**Figure 30. EDS Spectrum Taken at Location 3 of Figure 27**

Altran Corporation
Letter Report 11-0256-00-LR-001
Attachment 1 Report Figures
Page 17 of 18



**Figure 31. EDS Spectrum Taken at Location 4 of Figure 27**



**Figure 32. EDS Spectrum Taken at Location 5 of Figure 27**

B.073          ALTRAN 000027

Altran Corporation
Letter Report 11-0256-00-LR-001
Attachment 1 Report Figures
Page 18 of 18



**Figure 33. EDS Spectrum Taken at Location 6 of Figure 27**



**Figure 34. Section Loss v. Exposure Time for Carbon Steel Exposed to Various Environment Types, Reference [5]**

B.074                    ALTRAN 000028

Altran Corporation
Letter Report 11-0256-00-LR-O01
Attachment 2 References
Page 1 of 10

# ATTACHMENT 2 – References

B.075        ALTRAN 000029

# REFERENCE 1

08-26-2004   08:55   From-TASC CONSULTING              2122449514        T-285   P-001/004   F-643



## TASC Consulting Services, L.L.C.
## FACSIMILE

New York Office: 224 West 35th Street, Room 610 • New York, New York 10001 • (212) 244-9588 • FAX (212) 244-9514
Philadelphia Office: 6 East Hinckley Avenue, Suite 203 • Ridley Park, PA 19078 • (610) 521-5060 • FAX (610) 521-5338
Baltimore Office: (410) 683-8375 • (410) 683-8381

| | | | |
|---|---|---|---|
| **To:** | Thomas J. McKrell | **Date:** | August 26, 2004 |
| | *Altran* | | |
| **Fax #:** | (617) 204-3080 | **Pages:** | 4, including this cover sheet. |
| **From:** | Ruth Marino | | |

**Subject:** AES Puerto Rico / ALSTOM

**COMMENTS:**

Per Drew Beers' request, enclosed please find a copy of a letter from ALSTOM dated February 2, 2004 transmitting ESP plate and ash build-up samples.

If any part of this facsimile is not received, please contact TASC at (212) 244-9588.

*CONFIDENTIALITY NOTICE: This facsimile contains information which may also be legally privileged and which is intended only for the use of the Addressee(s) named above. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this facsimile, or the taking of any action in reliance on the contents of this telecopied information, may be strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the entire facsimile to us at the above address via the U.S. Postal Service.

Thank you.

2        B.076        ALTRAN 000030

08-26-2004  09:55   From-TASC CONSULTING        2122449514      T-285  P 002/004  F-643

Alston-15



# ALSTOM

| Power

February 2, 2004
LM21

RECEIVED
FEB - 4 2004

TASC Consulting Services, L.L.C.
224 West 35th Street, Suite 610
New York, NY  10001

Attn:  Mr. Dreu Beers

Subject :  AES Puerto Rico, ESP Plate Samples
           Environmental Elements Corporation – ESP Corrosion
           Performance and Payment Bond No. 17-002-963 ("Bond")
           ALSTOM Purchase Order 50730 IO

Reference:  Your Letter of January 16, 2004

Dear Dreu:

As requested in the referenced letter, enclosed please find AES Puerto Rico Unit #2 ESP Plate Samples
#1, #2 and #3 as well as Ash Build-up Samples collected between panels.

Sincerely,

Linda P. Rothe
Project Procurement Manager
ALSTOM Power Inc.

Cc  Liberty Mutual Insurance Company
    Liberty Bond Services
    Interchange Corporate Center
    450 Plymouth Road, Suite 400
    Plymouth Meeting, PA  19462

    Attn: Frank Hucks
    Senior Surety Counsel

    W.Jarvis
    T. Kehoe

ALSTOM Power Inc
2000 Day Hill Road
Windsor, CT 06095
Tel  (860) 285-9713
Fax  (860) 285-1315

ALTRAN 000031

Altran Corporation
Letter Report 11-0256-00-LR-001
Attachment 2 References
Page 4 of 10

08-26-2004  09:56    From-TASC CONSULTING                2122449514          T-285  P 003/004  F-643



ALTRAN 000032

Altran Corporation
Letter Report 11-0256-00-LR-001
Attachment 2 References
Page 5 of 10

08-26-2004  09:56   From-TASC CONSULTING          2122449514          T-285  P 004/004  F-643

 COURIER REQUEST 

ALST O M

2000 Day Hill Road
Windsor, CT 06095-0500                                    No.

| SENDER INFORMATION Use Typewriter or Ball Point Pen Only - Must Complete All Shaded Fields |
| --- |

| Date: 2/3/04 | Sender Keep Bottom Copy | Employee Name | Shop Number |
| | | Barbara Rohrbach | |
| Phone 285-4062 | | Special Instructions | Carrier Name |
| Required Delivery Date | No. Of Pieces | | Carrier PRO/AWB No |
| ASAP | 1 | | |

| SHIP TO |
| --- |

| Recipients Name | Recipients Phone |
| --- | --- |
| Mr. Dreu Beers | |
| Company | Suite/Room/Floor |
| TASC Consulting Services, L.L.C. | Suite 610 |
| Street Address | |
| 224 West 35th Street | |
| P.O. Box (Via U.S. Post Office Only) | |
| City/State | Zip | Country |
| New York, NY | 10001 | |

| DOMESTIC | | INTERNATIONAL |
| --- | --- | --- |
| COURIER | U.S. POST OFFICE | COURIER |
| ECONOMY | 1-Day Express Mail | 2 Day (Fed X) |
| 2 Day (Fed X) | 1-3 Days 1st Class Priority | 2 Day (Fed X) |
| OVERNIGHT | 5-10 Days Parcel Post | U.S. POST OFFICE |
| 7:30 PM (Fed X Standard Air)* | Certified (Not Insured) | 3-6 Days I.P.A |
| 10:30 AM (Fed X Priority 1)* | Registered (Insured) | 3-8 Days 1st Class Air |
| Saturday (Fed X) Not available in All Locations | UPS | 4-9 Days Air Printed Matter |
| Other (Specify) | Next Day Air | 7-14 Days Air Parcel Post |
| *Delivery Commitment Later in Some Areas | Second Day Air | 4-6 Weeks Sea Parcel Post |
| | 4-8 Day Ground | |
| Same Day - Call x5642 | All Shipments Insured for $100 | |
| | Additional Insurance $ | |

| CONTENTS INFORMATION - REQUIRED FOR INTERNATIONAL SHIPMENTS | | | |
| --- | --- | --- | --- |
| Box # | Contents Description | Quantity | $ Value |
| | ESP Plate Samples and Ash Build-up Samples (ref Linda Rothe's letter dated February 2, 2004) | | |

| GENERAL LEDGER CHARGE NUMBERS | | | | |
| --- | --- | --- | --- | --- |
| TYPE OF CHARGE | % | CONTRACT/DEPT | SUBLEDGER | PURCHASE ORDER |
| Department Freight | | | | |
| Contract Freight | 100 | 65005697 | | |
| Capital Appropriation | | | | |
| R&D Project | | | | |
| Supplemental Work Order | | | | |

G DHL DOC                                                                2/3/04

Page 1

## REFERENCE 2

August 27, 2004

Altran Corporation

451 D Street

Boston, Ma. 02210

Reference: TASC / AES-PR

Subject: Technical Report 11-025-00-LR-001

Revision 0

Dear Mr Thomas McKrell,

At your request, I am pleased to provide additional input to help complete the subject report. The following data was taken from project specifications issued by Alstom Power and from contract drawings and documents prepared by EEC on AES-PR job number 420584. Additionally, comments relative to visual observations are based on personal inspection of the system and documented in daily reports. The origin of all other data is acknowledged herein

An internal inspection of the Unit 2 electrostatic precipitator (ESP) was performed by AES personnel sometime in the March 2003 timeframe. During that inspection, extensive corrosion of the collecting plates was discovered. I became aware of this information as a result of AES placing an order for replacement collecting plates through EEC (my ex-employer).

Other dates pertinent to your report are listed below:

- Start Shipping Unit 2 Plates April 2001
- Finish Shipping Unit 1 Plates October 2001
- Unit 2 Initial Operation  April 4, 2002
- Unit 1 Initial Operation  May 7, 2002

I should also point out that no corrosion of the collection plates was observed during an inspection of the Unit 2 ESP by the writer and by Robert Kohl (AES Consultant) in October 2002

Process information that is missing in the report is listed below:

- ESP Inlet Flue Gas Temperature  155°F
- Flue Gas Dewpoint  120°F (physical measurement by writer)
- Flue Gas Chemistry  Data will be forwarded under separate cover
- Coal Analysis  Data will be forwarded under separate cover

- CDS Spray Water Analysis Data will be forwarded under separate cover

I hope this answers all of your questions. If you need additional information, please advise

Regards,


William VanHooser

Cc: D. Beers (TASC)

C. Fitzgerald (TASC)

**B.081**    **ALTRAN 000035**

## REFERENCE 3

# ENVIRONMENTAL
# ELEMENTS
# CORPORATION

P.O. Box 1318        Date: 8/26/04

Baltimore, MD 21203  **DRAWING TRANSMITTAL**

TO                                          SUBJECT:

Altran Corporation                          AES-PR
451 D Street                                ESP Collecting Plates
Boston, Ma. 02210                           Material Certification Sheets

Attention: Thomas McKrell                   EEC M.O. 420584

We are sending you: ☒ Herewith For: ☐ Approval ☐ Approved

☐ Under Separate Cover ☐ Your Files ☐ Marked Up Prints

☐ Express Mail ☐ Distribution ☐ Field Use

Via: ☐ Air Courier ☐ Reference ☐ Fabrication

☐ Parcel Post ☐ Approved For ☐ Certified

☐ U.P.S. Construction ☐ Final

☐ Preliminary ☐ Comments

(1) Prints of the following: ☒ As Requested ☒ Information Only

☐ Reproducibles of the following drawings in

Sepia_Vellum_Mylar_Aperture Card.

1. Material Certification Sheets for the Collecting Plates supplied for the AES-PR project, EEC Job No. 420584.
2. Material Certification Sheets for the Discharge Electrodes supplied for the AES-PR project, EEC Job No. 420584.

**B.082**

**ALTRAN 000036**

## SAMPLE DELIVERY RECEIPT

D E L I V E R Y   R E C E I P T                    PAGE 01

DELV RECT # 09-798671
SHIP DATE   07/18-01
CUST ACCT # 2699730-00

TO  ENVIRONMENTAL ELEMENTS CORP
TO

P O BOX 22577
BALTIMORE          MD 21203

**Ryerson Tull**

SHIP  TECO INC
TO    1606 BUSH ST                                           LOAD TEC03    ITEMS  1

BALTIMORE          MD 21230                    TRAILER 10 JC        FOB 0
                                               TRACTOR 10           SHIP TERMS PPD
(301)368-6000                                                       CARRIER BILLING LOAD

                                                              QUANTITY
                                                              SHIPPED  U/M          19150 EA.

CUST ORDER       REFERENCE        DESCRIPTION                 30-300    LBS
19               933091 01 01 001 COIL CR CO 1018 RS 45-60    30-300    GR
REQN/JOB # 319981                 .04 x 28-3/16                     2   QTY
     DATE 01-08-01                NO COLOR IDENT                    2   BDL
T/R WITH SHIPMENT
SALESREP # 590    EXT. 0337

                    NET      GROSS       HEAT #          COIL #      TECO COIL NO
              1     19,200   19,200      916486          814-13698
              2     19,100   19,100      916486          814-13697

INSTRUCTIONS:

RECEIVED BY  Paul V Marsh   DATE  1-23-01

LAST PAGE

FORM 855 120-3 APR 99

ALTRAN 000037

Altran Corporation
Letter Report 11-0256-00-LR-001
Attachment 2 References
Page 10 of 10

## SAMPLE TEST REPORT

Ispat Inland Inc.
a subsidiary of
Ispat International N.V.

**TEST REPORT**

INV # F110924

Ispat Inland Inc.
QUALITY DEPARTMENT 2-106
3210 WATLING STREET
EAST CHICAGO,Indiana 46312

SOLD TO
JOSEPH T. RYERSON & SON INC
TEST REPORT DESK
BOX 7349
PHILADELPHIA   PA   19101

SHIP TO
J T RYERSON & SON INC
5200 GRAYS AVE
PHILADELPHIA PA 19143
KPIN/100

| SHIPMENT NO. | MILL ORDER NO. 9A6349 |
| F364672 | 2348809 2 COLD STRIP |
| REPORT DATE | ORDER DATE | INVOICE NO. |
| 09/29,1999 | 09/29,1999 | F110924 |

462324

SPECIFICATION

INLAND / COLD ROLLED SHEET STEEL / COILS / CSB / AISI SAE 1010 / MATTE
/ INLAND / COLD ROLLED / LIGHTLY OILED / CUT EDGE

Mary Lynn Gergen-South
Section Manager
Mat. Testing & Reporting

A2LA ACCREDITED
QS-9000 • ISO 9001
Certificate Numbers: 1366

PAGE  1  OF  1

* * * HEAT ANALYSIS REPORT * * *

| ITEM NO. | ORDER DESCRIPTION | QUANT. | WEIGHT (LBS) | HEAT NO. | COIL/LIFT NUMBER | * * * TEST RESULTS * * * |
|---|---|---|---|---|---|---|
| .0400 IN X 28.1875 IN COIL | | 1 | 18140 | 916486 | 814-13698 | |
| | | 1 | 18140 | 916486 | 814-13697 | |

| HEAT NO. | HEAT ANALYSIS (Wt.%) | | | | | | | | | | | |
| | C | Mn | P | S | Si | Cu | Ni | Mo | Cr | V | Al | Ti |
| 916486 | .09 | .34 | .009 | .012 | .02 | .02 | .02 | <.02 | .04 | <.008 | <.008 | .04 | .001 |

JTR GEN INST SPEC M-100 PAR 9 . 9.10
HEAT NUMBER SERIES
D =DOMESTIC        10000 THRU 32999
MELTED AND        48000 THRU 48999
ROLLED        50000 THRU 74999
D1=FOREIGN MELT        41000 THRU 43999
DOMESTIC ROLLED        70000 THRU 74995

B.084        ALTRAN 00003



From Science to Solutions™

**Report to:**
**Williams & Connolly LLP**
**on behalf of**
**AES Puerto Rico, L.P.**

RE: AES Puerto Rico, L.P.
v.
Alstom Power Inc.

**Prepared for:**
**Williams & Connolly LLP**
**725 Twelfth Street, N.W.**
**Washington, DC 20005-5901**

**24 February 2006**

**Prepared by:**

*Richard R Lunt*    07-24-06
Richard R. Lunt    Date

Scientific Applications International Corp.
FOCIS Division.
7 Wells Avenue
Newton, MA 02459

SAIC Reference No: 06-5628-00-8799-101

B.085

**AES PR L.P. v. Alstom Power Inc.**

## Table of Contents

1.0    Introduction ................................................................................................ 1

2.0    Scope of Analysis ......................................................................................... 1

3.0    Summary of Qualifications ........................................................................... 1

4.0    Overall Conclusions ..................................................................................... 2

5.0    Basis of Analysis ......................................................................................... 2
    5.1    Interviews and Discussions ................................................................. 3
    5.2    Documents ........................................................................................... 3

6.0    Discussion of Findings, Opinions and Conclusions .................................. 5
    6.1    Cause of ESP Corrosion ...................................................................... 5
        6.1.1    Ash Chloride Levels and CDS Approach Temperature .......... 5
        6.1.2    Impact of Ash Re-Injection .................................................... 7
    6.2    Conformance to Operation and Maintenance Requirements ................ 8
        6.2.1    CDS Outlet Temperatures ...................................................... 9
        6.2.2    Flue Gas Adiabatic Saturation (Wet-Bulb) and Approach Temperatures ....... 9
        6.2.3    Nozzle Inspection and Cleaning ............................................ 14
    6.3    Conformance with Chloride Design Criteria ...................................... 15
        6.3.1    Chloride Content of Coal ...................................................... 16
        6.3.2    Chloride Content of CDS Spray Water .................................. 16

### Tables

Table 6-1:    Summary of EEC Material Balances (100% MCR) ............................. 6
Table 6-2:    Estimated Range of Flue Gas Wet-Bulb Temperatures ...................... 10
Table 6-3:    Summary of Soot Blowing Impacts on Wet-Bulb Temperature ........... 11
Table 6-4:    Summary of Analysis of DCS Temperature Data for Unit 2 CDS ........ 13
Table 6-5:    Unit 2 Wet-Bulb Temperature Measured by Robert Kohl vs. DCS Data ..... 13
Table 6-6:    Summary of Maximum Chloride Contributions to CDS Ash ............... 15

### Appendices

Appendix A:    Curriculum Vita for Richard R. Lunt
Appendix B:    Richard R. Lunt Compensation Rate
Appendix C:    Calculation of Chloride Levels in the Flue Gas and CDS Ash With and Without Ash Re-Injection
Appendix D:    DCS Temperature Data and Analysis for Unit 2 CDS

## 1.0    Introduction

Dr. Richard R. Lunt, a Principal in the FOCIS Division of SAIC, Inc. ("FOCIS"), has been engaged by Williams & Connolly LLP ("Williams & Connolly") to provide expert testimony on behalf of AES Puerto Rico, L.P. ("AES") in the matter of AES Puerto Rico, L.P. v. Alstom Power Inc. The matter involves, in part, the alleged failure on the part of Alstom Power Inc. ("Alstom") to provide a properly designed air pollution control (APC) system consisting of a circulating dry scrubber (CDS) and electrostatic precipitator (ESP) for control of sulfur dioxide ($SO_2$), particulate matter and opacity.

## 2.0    Scope of Analysis

Williams & Connolly has requested that Dr. Lunt evaluate the design of the APC systems and the operating conditions and maintenance activities between June 2002 and December 2003, relative to the corrosion experienced in the ESPs. Specific emphasis was requested in the following areas.

1.  Cause of corrosion of the ESP plates and the potential impacts of: chloride content of the ash; CDS operating temperature; ash re-injection on the levels of chloride in the gas and ash; and other operating and maintenance practices that could have contributed to the corrosion experienced.

2.  Conformance of operation and maintenance to system specifications, supplier guidance and instructions, and related industry practices.

This report presents the results of Dr. Lunt's evaluation. The opinions expressed herein are to a reasonable degree of scientific and engineering certainty and are based upon the information available as of the date of this report. If additional information becomes available, Dr. Lunt reserves the right to modify the opinions and conclusions expressed herein.

## 3.0    Summary of Qualifications

Dr. Lunt is a chemical engineer with over 30 years experience in air pollution control (APC) systems encompassing technology development, process evaluation and full-scale implementation. He has been directly involved in the original design, or subsequent modifications, of over twenty commercial applications for $SO_2$ control at utility power stations, chemical plants and metallurgical facilities. His experience covers most all principal commercial $SO_2$ control technologies; and he has worked with both system suppliers and owners. Of particular relevance to this assignment are eleven combined particulate and $SO_2$ control projects involving spray drying or circulating dry scrubbing. These projects have included various aspects of technology development, technology evaluation, preliminary design, review of detailed design and/or performance assessment.

Dr. Lunt's curriculum vita is provided in Appendix A. His compensation rate is provided in Appendix B.

### 4.0    Overall Conclusions

1.  The root cause for the corrosion in the ESPs can be traced to design deficiencies in the APC system. These design deficiencies were manifested by the decision made during commissioning to operate the CDSs at an approach temperature[1] ($\Delta T_{AS}$) of approximately 30 F in order to achieve the opacity limit required for environmental compliance. The corrosion resulted from the high levels of chloride and the low approach temperature that caused excess moisture in the ash. The selection of the approach temperature was made by Environmental Elements Corporation (EEC) and/or Alstom. This 30 F approach temperature is within the overall range initially established by EEC, but this low an approach temperature was anticipated to be for low chloride conditions. EEC had originally recommended a much higher approach temperature for high chloride conditions explicitly to avoid corrosion. The lower approach temperature ultimately led to corrosion of the ESP carbon steel plates.

2.  The corrosion experienced would have occurred at this range of approach temperature and chloride concentration even had the CDS water spray system continuously performed exactly as designed. Any perturbations in water spray patterns or droplet size due to buildup on the nozzles would not have been causal factors in the corrosion.

3.  Ash re-injection to the boilers was also not a cause of corrosion, and it is unlikely even to have increased the rate of corrosion to any significant degree. Ash re-injection has no appreciable impact on the total mass loading of chloride to either the CDS or ESP, nor on the level of chloride in the collected ash. The amount of chloride in the CDS ash is only a function of the amount of chloride in the coal, the concentration of chloride in the spray water used for the CDS and the outlet temperature of the CDS (which affects the amount of spray water used).

4.  AES operated the plant in conformance with design specifications (e.g., boiler load, coal supply, CDS water supply and ash re-injection). For all practical purposes, AES also operated and maintained the dry scrubber system in accordance with the instructions and functional guidance provided during commissioning by Alstom and EEC specifically with regard to CDS outlet temperature, CDS pressure drop, monitoring of the CDS operation and maintenance of CDS spray nozzles. Overall, AES exercised appropriate judgment in interpreting and implementing EEC's directives consistent with industry practice.

### 5.0    Basis of Analysis

The opinions and conclusions presented in this report are based upon information derived from the following general sources.

*   Observations during a plant visit on 10 January 2006.

*   Discussions with AES plant personnel.

---

[1] Approach temperature ($\Delta T_{AS}$) for dry $SO_2$ scrubbing systems is defined as the difference between the measured gas temperature (called the "dry bulb temperature") and the temperature of the gas if it were fully saturated with water (100% relative humidity) by water spray cooling (sometimes referred to as the "wet bulb temperature").

- Discussions with other individuals knowledgeable about the plant conditions and operation.
- Review of documents pertaining to plant design specifications, contractors' proposals, CDS system design, equipment supplier operating and maintenance instructions, the plant's electronic data files, and plant operating and maintenance logs.

Specific sources are delineated in the following sections.

### 5.1    Interviews and Discussions

<u>AES Plant Personnel</u>

Carlos Alequin, Water Treatment Leader

Al Dyer, President and Plant Manager

Csaba Kiss, Maintenance Team Leader

Elias Sostre, Control Room Team Leader

David Stone, Engineering/Commercial Team Leader

WeiLi Yu, Instrument Team Leader

<u>Other</u>

Tracy Jarvis, AES Deepwater (former Water Treatment Team Leader at AES Puerto Rico)

John Toher, IJM Consulting

### 5.2    Documents

The following documents were reviewed as a part of this investigation.

1.  EEC's "Operation and Maintenance Manual, August 2001 Issue", Volume 1

2.  "CDS Nozzle Cleaning Logs" [AESPR 000558-772]

3.  Control Room Reference document "CDS Water Nozzle Cleaning Procedure", dated 13 October 2002 [AESPR 000200-3]

4.  Control Room Reference document "CDS Cold Startup, Preliminary Steps to CDS Startup", dated 14 November 2002

5.  "Laboratory Condition Assessment of Electrostatic Precipitator (ESP) Collecting Plates Removed from AES Puerto Rico Power Generation Plant in Guayama, Puerto Rico [ALTRAN 000001-38]

6.  Lief Lindau emails and "AES Puerto Rico ESP Collectors Corrosion Report" [AL1-05551-79]

7.  "AES Puerto Rico ESP Collectors Corrosion Report" [AL1-05580-5604]

8.  William Jarvis letter to AES PR dated 02 July 2004 and attached report "AES Puerto Rico ESP Collectors Corrosion Report" dated 15 June 2004

9.  "Analysis of ESP Plate Corrosion" [AESPR-066365-81]

10. "AES P.R. Unit 2 ESP Inspection", Mark XXIII Enterprises, Inc. [AESPR-066464-69]

11. "Metallurgical Lab Report", GE Betz [AESPR-066649-54]

# Expert Witness Disclosures -  AES Puerto Rico v. ALSTOM

## Report No. 11-0542-00-LR-001

Prepared for:

## Ober, Kaler, Grimes & Shriver

### March 20, 2006

Ronald Ballinger, Ph.D.          Date

Altran Solutions 451 D Street Boston, MA 02210  PH: 617•204•1000  | FAX: 617•204•1010

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001

# TABLE OF CONTENTS

Cover Page.................................................................................................................................1
Table of Contents......................................................................................................................2
List of Figures...........................................................................................................................2

1.0    INTRODUCTION ..........................................................................................................4

2.0    DATA AND INFORMATION CONSIDERED .............................................................4

3.0    OPINIONS.......................................................................................................................7
    3.1.    Immediate Cause ...................................................................................................7
    3.2.    Root Cause .............................................................................................................7
    3.3.    Additional Opinions..............................................................................................8

4.0    SUMMARY OF ANALYSIS AND SUPPORT FOR OPINIONS .................................9
    4.1.    Dewpoint Corrosion..............................................................................................9
    4.2.    Root Cause-Operational Considerations.............................................................10
    4.3.    Detailed Operating Procedures and Plant Data Analysis ...................................10
    4.4.    The Role of Chloride ..........................................................................................12
    4.5.    Time Period Over Which Degradation Occurred ...............................................13

5.0    REFERENCES ..............................................................................................................14

6.0    QUALIFICATIONS ....................................................................................................166

7.0    PUBLICATIONS .........................................................................................................222

8.0    PRIOR TESTIMONY ..................................................................................................299

9.0    COMPENSATION .......................................................................................................299

**ATTACHMENTS**

Attachment 1 – Report Figures (8 pages)

# List of Figures

Figure 1.  Plot of opacity, CDS inlet temperature, CDS outlet temperature and CDS valve position vs time for Unit #2 (January 2003 to 2004). Only full power points are plotted..........................A-2
Figure 2.  Plot of Unit 2 CDS valve position and CDS inlet temperature as a function of time for the the year 2003. Only full power points plotted. ..........................................................................A-3
Figure 3.  Plot of CDS spray valve position vs. CDS inlet temperature for Unit #2.  Only full power data plotted. ..........................................................................................................................A-4
Figure 4.  Photographs showing poor nozzle installation and clogging. ..........................................A-5
Figure 5.  CDS spray water chloride concentration and opacity as a function of time for the period October 15, 2003 to January 29, 2004..................................................................................A-6
Figure 6.  Opacity vs. chloride concentration for Unit #1 over the period October 15, 2003 to January 29, 2004. ..........................................................................................................................A-7

**B.091**

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001

## 3.0   OPINIONS

The following are the author's opinions regarding the immediate cause of ESP degradation and the most probable root cause of the corrosive environment that was the cause of the ESP degradation:

### 3.1.   Immediate Cause

1. The immediate cause of the ESP degradation was the presence of a corrosive environment consisting of an aqueous solution containing sulfuric ($H_2SO_4$) and hydrochloric (HCl) acid.

2. The damage most probably occurred after March, 2003 for Unit #2 and after September, 2003 for Unit #1. These dates correspond to inspections for the respective Units where no significant degradation was observed. The damage on the Unit #2 plates was first observed during a November 2003 inspection and for Unit #1 during a January, 2004 inspection. Since the type of degradation that occurred would have been essentially impossible to miss (perforated plates with corrosion product debris present) the conclusion is that the period of accelerated corrosion occurred after these inspections.

3. The cause of the wet acid environment was most probably the operation of the ESP at a temperature below the dewpoint for the conditions in the ESP and otherwise uncontrolled migration of moisture from the Circulating Dry Scrubber (CDS) to the ESP.

### 3.2.   Root Cause

The Altran team conducted an extensive analysis of operational and maintenance data from both units. As a result of this analysis, the following conclusions were drawn regarding the higher level root cause of the aggressive environment in the ESP:

1. AES-PR operated the Plant in such a way that excess water was injected into the CDS beyond that necessary to reduce the CDS outlet temperature to the desired value.

2. Due to inadequate operation and maintenance, the water injection (CDS spray) gradually became incapable of providing proper atomization. As a result of this situation, a significant fraction of the water was not vaporized. The excess water carried over into the ESP where it provided for an aggressive wet environment that resulted in accelerated corrosion.

3. When the CDS spray nozzles malfunctioned due to improper maintenance, the environment within the CDS became inhomogeneous in that there were most likely regions where the unevaporated water existed. The temperature measuring system was then rendered incapable of providing an accurate determination of

7

**Altran Solutions**
**Expert Witness Disclosures 11-0542-00-LR-001**

conditions in the CDS and the relationship between temperature and CDS spray flow was lost – most likely resulting in a "call" for increased spray water flow, which would introduce even more moisture into the system. As described in item 5 below, these increasingly moist conditions would have been further exacerbated beginning in July/August, 2003 when the CDS inlet temperature increased above 280°F.

4. Once the aggressive environment was established, corrosion rates would have been as high as the order inches/year. This corrosion rate was capable of complete perforation of the 0.040 inch ESP plates within months.

## 3.3. Additional Opinions

In addition to the opinions provided above, the detailed analysis of the operating and maintenance data from the Plant has resulted in the following additional opinions:

1. The author could find little or no statistical correlation between opacity and the chloride content of the CDS spray water.

2. The system was capable of, and did, operate within the required specifications once the initial operational issues were addressed.

3. The Operations and Maintenance Manuals ("O&M Manuals") for the equipment and other Plant documentation contained repeated cautions regarding operation of the Plant under conditions where the ESP environment dropped below the dewpoint. The O&M Manuals contained procedures which, if followed, would have minimized the risk that the ESP environment would drop below the dewpoint. Yet there was clear evidence that wet conditions were occurring, including, particularly, observation of "snowballing" on the ESP electrodes and observation of wet ash in the CDS (September 2003) prior to the inspections in November 2003 and January 2004 of Unit #2 and #1, respectively.

4. There was clear evidence of poor maintenance of the CDS spray nozzles, in spite of cautions in the O&M Manuals that maintenance of these items was critical to the proper operation of the CDS spray system. After the discovery of the corrosion, both AES-PR and its consultant, John Toher, observed maintenance practices that would result in the nozzles spraying unatomized water. As a further example, Plant inspection by Altran Solutions staff revealed nozzle flange attachment bolts missing. Improper attachment would allow for the introduction of air into the system which would compromise the operation of the system.

5. Analysis of the Plant data for the period from January 1, 2003, to December 31, 2003 indicated a steady increase (with periods of approximately constant temperature) in the CDS inlet temperature from approximately 260°F to approximately 285-290°F. In the July/August timeframe, there are a significant number of cases where the temperature exceeded 280°F, which is the CDS inlet operating parameter specified by the equipment supplier in its Operating and

B.093

Altran Solutions
Expert Witness Disclosures 11-0542-00-LR-001

Maintenance Manuals. At the same time the CDS outlet temperature remained essentially constant at just over 150°F. Analysis of the relationship between CDS inlet temperature and CDS valve position (the lower the valve position the higher the CDS spray flow into the CDS) showed that, once the CDS inlet temperature exceeded 280°F, the linear relationship between CDS inlet temperature and CDS valve position was lost. There were many cases where, for the same temperature and load conditions (gas flow volume), the valve position varied from approximately 20% open to 0% open. For the same amount of energy being removed from the system both, cannot be true. Instead, this is a clear indication that excess water was being injected into the CDS beyond that necessary to cool the system. The excess water would not have evaporated and would have been carried over to the ESP. Proper operation and maintenance of these systems by AES-PR would have identified and corrected this problem.

6. Ash re-injection, while not increasing the total amount of chloride in the system, would increase the average chloride content in the CDS. This would require, according to the O&M Manuals, an increase in the CDS outlet temperature. This increase was not implemented and would thus have increased the risk of moisture in the ESP.

## 4.0   SUMMARY OF ANALYSIS AND SUPPORT FOR OPINIONS

### 4.1.   Dewpoint Corrosion

Acid dewpoint corrosion has been recognized as a significant issue for the degradation of mild steel since the 1940s. The causes and characteristics of this form of corrosion are well documented [1-4]. Briefly, the combustion process produces products that can include water vapor, sulfur oxides ($SO_2$ and $SO_3$), hydrochloric gas (HCl), and nitrogen oxides ($NO_x$). While most of these products are removed through the use of various forms of "scrubber" systems, it is possible for residual amounts of these products to exist in the gas stream down stream of the scrubber systems. As long as the gas stream remains dry (above the dewpoint) this is not a problem, and particulates are cleaned up in the electrostatic precipitator. However, if the temperature in the system drops below the dewpoint of water, condensation will occur and any residual sulphur oxide and hydrogen chloride gases can be dissolved to form $H_2SO_4$ and HCl, both of which are corrosive to the mild steel ESP plates. The condensation and presence of water is significant because corrosion, of the type observed in the ESP, cannot occur without the presence of an aqueous phase (water).

In the absence of other condensable gasses, the dewpoint is simply the point where water vapor begins to condense from the atmosphere. When other condensable gases, such as $SO_3$, $SO_2$, HCl, or $NO_2$ are present, the dewpoint will differ from the water dewpoint. This lower dewpoint is sometimes referred to as the "acid dewpoint". For the concentrations of the above gases present in the Plant in question, the deviation of the dewpoint has been well characterized [5-6]. However, an important point is that, with the exception of $NO_2$, the water dewpoint will be above the dewpoint of the other gases

9

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF    <u>Maryland</u>

AES Puerto Rico, L.P.

V.

ALSTOM Power Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]   04-1282-JJF

TO:   GE Infrastructure Water & Process Technologies
4636 Somerton Road
Trevose, PA 19053-6783

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See attached Schedule A.

| PLACE   First Services, 1601 Market St., Philadelphia, PA 19103 | DATE AND TIME September 21, 2005 9:00 a.m. |
|---|---|

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 08/17/05 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Anthony F. Vittoria, Esquire, Ober, Kaler, Grimes & Shriver, 120 E. Baltimore St., Baltimore, MD 21202-1643, 410-347-7692

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

**B.95**

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                        DATE                                        SIGNATURE OF SERVER

                                                                    _____
                                                                    ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**B.96**