Linda P. Rothe
03/01/2004 04:29 PM
Phone: +001 860-285-9713
Dept: 5275

To:     "Hucks, Frank" <Frank.Hucks@LibertyMutual.com>
cc:     beersman24@yahoo.com, William M Jarvis/USWIN01/Power/ALSTOM@GA
Subject:  RE: Accelerated Corrosion Warranty

Security Level:?    Internal

AES is required under it's contracts to provide electricity and meet air emissions standards. The seriousness of the ESP corrosion is jeopardizing the ESP performance and thus their ability to meet the emissions standards.

AES was forced to take action to replace the materials due to lack of response from Liberty Mutual. ALSTOM believes the Liberty Mutual is obligated under the Bond to assume EEC's responsibilities for the Corrosion Warranty and request your plan for addressing the Warranty.

"Hucks, Frank" <Frank.Hucks@LibertyMutual.com>



Hucks, Frank <Frank.Hucks@LibertyMutual.com>
03/01/2004 03:58 PM
Phone:
Dept:

To:     Linda P. Rothe/USWIN01/Power/ALSTOM@GA
cc:     beersman24@yahoo.com, William M Jarvis/USWIN01/Power/ALSTOM@GA
Subject:  RE: Accelerated Corrosion Warranty

Security Level:?    Internal

I thought AES had bought replacement plates from EEC and they were being shipped by EEC and installed by AES and that we just had to determine what had caused the corrosion.

Frank Hucks

-----Original Message-----
From: linda.p.rothe@power.alstom.com
[mailto:linda.p.rothe@power.alstom.com]
Sent: Monday, March 01, 2004 3:56 PM
To: Hucks, Frank
Cc: beersman24@yahoo.com; william.m.jarvis@power.alstom.com
Subject: Accelerated Corrosion Warranty

Dear Frank,

Our initial notice of a problem with deterioration of collector panels was



PLAINTIFF'S
EXHIBIT
P-109

ALDEC05 - 01144

B.190

made by e-mail on November 21, 2003, looking for response by month's
end.
This was  followed up by  LM-18 notice dated December 11, 2003 looking
for
your plan for correction by December 16 and again  by LM 18a dated
January
13, 2004 with further inspection findings.

We are disappointed that Liberty has not responded to these requests.
AES
has again pressed ALSTOM for this plan and we need your input by
Wednesday,
March 3, 2004 in order to respond as requested.

Frank,  I believe that we are entitled to timely actions regarding our
claims and hope we can count on your input by Wednesday.

Please advise.

Linda

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you
are not a named recipient, please notify the sender immediately and do not disclose the contents to
another person, use it for any purpose or store or copy the information in any medium.

ALDEC05 - 01145

B.191

# ALSTOM



Power Environment
Utility Boiler Business

March 11, 2004

Invoice Number : CS-04-301
Invoice Date : 01/29/2004
Amount : $1,568,530.02

This invoice is for warranty claims submitted by AES for replacement of ESP internal components that have failed due to corrosion.  This work  is covered under EEC's 2 years corrosion warranty.  ALSTOM has not paid AES for this claim.

This material was purchased by AES from EEC.  EEC designed and manufactured these components.  ALSTOM finds it ironic that EEC apparently profited from its failure to honor its warranty, but this is an issue between Liberty Mutual and its principal EEC.

Per our previous correspondence we believe that Liberty Mutual has an obligation to assume these warranty obligations and feel that Liberty Mutual should provide this warranty directly to AES.

ALSTOM Power Inc.
2000 Day Hill Road
Windsor, CT 06095-0500
Tel: (860) 688-1911
Fax: (860) 285-9512



PLAINTIFF'S
EXHIBIT
P-114
PENGAD 800-631-6989

L-010648

B.192

# ALSTOM

## Power Environment

Utility Boiler Business

## INVOICE

EEC
3700 Kopper Street
P.O. Box 1318
Baltimore, MD 21203

Attn:   Mr. Bill Van Hooser

Date:        January 29, 2004
Invoice No.:    CS-04-301
Your Ref. No.:   P.O. 507301O
Due Date:      Upon Receipt
Our Ref. No.:    65005697
Page 1 of 1

| DESCRIPTION | | | | AMOUNT |
|---|---|---|---|---|
| | AES Puerto Rico Project | | | |
| PCC | DESCRIPTION | | | |
| 205 | AES Invoice – API-001  Precipitator Curtains | Consulting Services – Unit 2 | | 92,935.28 |
| | | ESP Curtains Fabrications | | 219,250.00 |
| | | Precip Curtains Labor | | 140,777.21 |
| | | Nov. 2003 Outage | | 26,403.89 |
| | | Scaffold Services | | 21,450.00 |
| | | Sum | | 500,816.38 |
| 205 | Material | Collecting Plates | | 925,120.00 |
| | | Material Total | | 925,120.00 |
| | | Total Labor & Material | | 1,425,936.38 |
| INDIRECT OVERHEAD COST (PER SECTION 18 OF PURCHASE ORDER) | | | 10% | 142,593.64 |
| TOTAL AMOUNT DUE THIS INVOICE UPON RECEIPT | | | US $ | 1,568,530.02 |
| Interest @ 4% per month will be assessed | | | | |

Please Note: There are outstanding invoices which we have not received.
              Those invoices will be billed as soon as we receive them.

ALSTOM Power Inc.
Power Boilers

Kaila R. T. Quow
Senior Financial Analyst

| Payment shall be required via wire transfer to the following account: | |
|---|---|
| Bank: | Bank One |
| Account: | ALSTOM Power Inc. |
| Account No.: | 57-54720 |
| ABA Number: | 071000013 |
| Notes: | Please reference our invoice no. |

2000 Day Hill Road
Windsor, CT 06095
Tel: 860-285-5082

L-010649

B.193

This page intentionally left blank.

**This page intentionally left blank.**

**Frank Gabrielli**
09/13/2004 04:02 PM
Phone: + 1-860-285-5746
Dept: PD&T Mechanical Sys & Materials Eng

**To:**     William M Jarvis/USWIN01/Power/ALSTOM@GA
**cc:**     Frank Gabrielli/USWIN01/Power/ALSTOM@GA, Karl Hognefelt/USKNL01/Power/ALSTOM@GA
**Subject:** Re: AES/PR: Final Draft Altran Report 📄

**Security Level:?** Internal

Bill,

I reviewed the referenced report.   It is basically a collection of analytical data/results without a root cause analysis.  The report provides a reference to show the exceptionally high corrosion rate of these plates when compared to other "wet" corrosion processes but provides no discussion or evaluation of the analytical results that would account for this aggressive corrosion.  A conclusion was made that "Chemical analysis confirms the scale on the outside of the plates to be an iron oxide corrosion product. This type of oxide is typical of that expected for corrosion with sulfuric acid."  It is well established that  iron oxide is the corrosion by-product of almost all aqueous corrosion processes (of carbon steel).  Also, there were no analytical results that provided a direct link to sulfuric acid or even a discussion of a possible scenario that would form a reasonable basis for sulfuric acid corrosion.  As a matter of fact, the ESD spectrums of chemical substances at the metal surface indicate chlorine (chlorides) to be more abundant than sulfur and in some cases it is the only significant corrosive species present (figure 22).  The impact of chorides( hydrochloric acid)  or the significance of their presence at the metal/scale interface (corrosion zone) seemed to have been ignored.

I would not classify this as an assessment or root cause analysis report.

Frank


William M Jarvis

---

**William M Jarvis**
09/10/04 08:39 AM
Phone: +1-860-285-9059
Dept:

---

**To:**     Frank Gabrielli/USPPL/AAP-TEMP, Karl Hognefelt/USKNL01/Power/ALSTOM
**cc:**
**Subject:** AES/PR: Final Draft Altran Report

**Security Level:?** Internal

Gentelmen,

At long last the report on the study of the AES/PR ESP plates commissioned by Liberty Mutual.

Would appreciate comments from your group.



PLAINTIFF'S
EXHIBIT
P-128

B.196

PRIVILEGED AND CONFIDENTIAL

<u>JOINT DEFENSE AGREEMENT</u>

This Joint Defense Agreement (the "Agreement") is entered into effective as of October 28, 2004 by and between ALSTOM Power Inc. ("ALSTOM") and Liberty Mutual Insurance Company ("Liberty Mutual"). For purposes of this Agreement, the term "Parties" shall refer to ALSTOM, Liberty Mutual, their respective affiliates and their respective counsel.

WHEREAS, Duke/Fluor Daniel Caribbean, S.E. ("D/FD Caribbean") entered into an EPC Contract with AES Puerto Rico ("AES"), the Owner, to design and construct a power-generating facility in Guuyama, Puerto Rico (the "Project"), and ALSTOM entered into a Purchase Order with D/FD Caribbean under which ALSTOM agreed to furnish and install two boilers and related pollution-control equipment;

WHEREAS, ALSTOM and Environmental Elements Corporation ("EEC") entered into a Purchase Order (the "EEC Purchase Order") under which EEC agreed to supply certain pollution-control equipment in connection with the construction of the Project;

WHEREAS, EEC, as Principal, and Liberty Mutual, as Surety, issued to ALSTOM's predecessor, as obligee, a Performance and Payment Bond, Bond No. 17-022-963, in the amount of Fourteen Million Six Hundred Sixty Three Thousand Eight Hundred One Dollars ($14,663,801) (the "Bond");

WHEREAS, certain disputes have arisen pursuant to which AES has filed an action against ALSTOM for alleged breach of warranty relating to equipment



PLAINTIFF'S
EXHIBIT
P-129

A-DB-00119

supplied by EEC under the EEC Purchase Order during the construction of the Project, which action is styled AES Puerto Rico, L.P. v. ALSTOM Power Inc., Civ. No. 04-1282-JJF, in the United States District Court for the District of Delaware (the "AES Litigation");

WHEREAS, Liberty Mutual, in its capacity as EEC's Surety, is defending ALSTOM's interests in the AES Litigation;

WHEREAS, ALSTOM and Liberty Mutual believe that they have a mutuality of interests in defending the claims that AES has asserted against ALSTOM in the AES Litigation as well as other claims that may arise and be asserted by AES or D/FD Caribbean in the future with respect to equipment supplied by EEC to ALSTOM under the EEC Purchase Order on the Project ("Other Project Claims") and that disclosure to and cooperation with each other regarding matters of common interest is essential in their joint interest in defending against AES's claims and any future claims that may arise from the Project; and

WHEREAS, both ALSTOM and Liberty Mutual, as well as their respective counsel, are of the opinion that it is in their mutual best interest to exchange information with each other on a confidential basis and cooperate in certain joint defense efforts without waiving any applicable privilege or allowing any confidential information to be disclosed to third parties.

NOW, THEREFORE, in order to accomplish the goals set forth above and in order to memorialize their understanding regarding their joint defense efforts,

B.198

A-DB-00120

ALSTOM and Liberty Mutual agree, on their own behalf and on behalf of their respective counsel, as follows:

1.    The preambles to this Agreement are incorporated herein as if set forth in full.

2.    For purposes of this Agreement, "Confidential Material" includes all information, including, but not limited to, documents, communications, factual material, mental impressions, legal analysis, memoranda, and interview reports relating to the AES Litigation and/or to Other Project Claims, exchanged or communicated between the Parties (including their respective counsel, including, but not limited to, Ober|Kaler for ALSTOM and Niles, Barton & Wilmer for Liberty Mutual) in connection with the joint defense efforts made pursuant to this Agreement. Confidential Material includes any information conveyed orally, by electronic media or in writing. The fact of this Agreement and its contents also constitute Confidential Material pursuant to this Agreement.

3.    The Parties intend, in light of their mutual interests and the recognized joint defense privilege, that the legal privileges and protections of attorney-client communications, attorney work product or otherwise shall apply to all Confidential Material provided by and exchanged between the Parties to the same extent as if the Confidential Material had not been disclosed. The Parties intend that the exchange of Confidential Material between the Parties shall not constitute a waiver of any applicable privilege. It is further understood that all work jointly undertaken or shared among the Parties or their counsel in connection

B.199

A-DB-00121

with the AES Litigation or any Other Project Claims is being undertaken or shared pursuant to the "joint defense doctrine."

4.    To ensure the protection of the work product of counsel, as well as privileged or confidential business, technical, financial or other information, the Parties agree that Confidential Material shall not be disclosed in any way, by any Party other than the Party that provided the Confidential Material, to anyone other than:  (a) the Parties to this Agreement and their respective counsel; and (b) consultants and experts retained for purposes of the AES Litigation or Other Project Claims by any Party, provided that any such consultant or expert has read this agreement and agrees to be bound by its terms.  Unless otherwise ordered by a court or other tribunal after appropriate objection, the Parties agree not to disclose any Confidential Material received pursuant to this Agreement to any person not specified in this Paragraph 4 without the prior express written consent of the Party that provided the Confidential Material.

5.    Nothing contained herein shall limit the right of either Party or its counsel to use or disclose any documents or information (a) that constitute or are derived from ordinary business records relating to the Project that ALSTOM would be entitled to obtain from EEC or Liberty Mutual or Liberty Mutual would be entitled to obtain from ALSTOM by virtue of the relationships established by the Purchase Order and the Bond, or (b) that have been or may in the future be independently obtained by the Party or its counsel.

4                                    B.200

A-DB-00122

6.    Subject to Paragraph 5, the Parties agree that all Confidential Material disclosed pursuant to this Agreement shall be used only in connection with the AES Litigation and/or Other Project Claims, and shall not be used for any other purpose without the prior express written consent of the Party that provided the Confidential Material.  In particular, but without limitation, the Parties acknowledge that, to the extent AES prevails against ALSTOM in the AES Litigation or succeeds with respect to other claims ALSTOM may assert, ALSTOM and Liberty potentially could end up having claims against one another.  The Parties agree that they may elect to withdraw from this Agreement and thereafter assert legal claims against the other if they so choose.  The Parties expressly agree that in such an event, however, and subject to Paragraph 5, they will not use in any subsequent proceedings against the other any Confidential Material received from the other Party and that they will not use any Confidential Material received from the other Party to cross-examine any employee or representative of the Party who provided such material, unless such information is obtained through independent, legal means.

7.    Each Party agrees that at the conclusion of the AES Litigation and/or Other Project Claims, the Parties, within ten (10) days of the request of the other, shall, upon request of the other, return all documentary or electronic media Confidential Material (and copies thereof) to the Party that provided such Confidential Material.

5

B.201

A-DB-00123

8.    The existence of this Agreement and of the joint defense shall not be used by either Party in any manner in any litigation or other proceeding involving the Parties.

9.    Either Party to this Agreement may withdraw from the Agreement by notifying the other Party in writing.  Such withdrawal shall not affect the attorney-client and work product privileges and other protections that exist pursuant to this Agreement prior to any such withdrawal.  Any Party that withdraws from this Agreement must continue to assert the attorney-client privilege and work product protection with respect to all Confidential Material covered by this Agreement unless and until such privileges/protections are expressly waived by all Parties hereto.  Upon withdrawal from this Agreement, the withdrawing Party shall, upon request of the other, promptly return any and all documentary or electronic media Confidential Material provided by any other Party to the Agreement, and the other Party shall promptly return any and all such Confidential Material received from the withdrawing Party.

10.    Nothing in this Agreement shall obligate a Party to disclose or share any information that it determines should not be disclosed, or prevent a Party from imposing additional conditions under which information may be shared or disclosed.

11.    Nothing in this Agreement shall be construed to prevent any counsel from continuing to represent their respective clients in the event of a future legal dispute between the Parties.  It is the Parties' express intent that each Party's respective counsel be permitted to continue their representation in any legal dispute

B.202

A-DB-00124

between the Parties.  It is further agreed that no counsel who has participated as part of the joint defense under this Agreement shall be disqualified, by virtue of this Agreement or such participation, from examining or cross-examining any Party's representative who testifies at any proceeding.

12.    The Parties acknowledge that disclosure of any Confidential Material in violation of the Agreement will cause the Parties to suffer irreparable harm for which there is no adequate remedy at law.  Each Party hereto acknowledges that immediate injunctive relief is an appropriate and necessary remedy for any violation or threatened violation of the Agreement.

13.    If any person who is not a party hereto requests or demands, by subpoena or otherwise, any Confidential Material received by a Party from another Party, the Party that has received the request or demand shall immediately notify the supplying Party.  Each Party will then take all reasonable steps necessary to preserve all applicable rights and privileges with respect to such Confidential Material and shall cooperate fully with the other Party in any proceedings relating to the disclosure of such Confidential Material.

14.    This Agreement shall, subject to the Parties' rights of withdrawal, remain in full force and effect until such time as all claims relating to the AES Litigation and/or Other Project Claims are finally resolved, through dismissal, settlement, final adjudication and appeal, or otherwise.

15.    The Parties and their respective counsel understand and agree that all information and material exchanged among the Parties and their counsel prior to

B.203

A-DB-00125

the signing of this Agreement that would have constituted Confidential Material had this Agreement been in place at the time of the exchange shall now constitute Confidential Material and shall be subject to the provisions of this Agreement.

16.    Any waiver in any particular instance of the rights and limitations contained herein shall not be deemed, and is not intended to be, a general waiver of any rights or limitations contained herein and shall not operate as a waiver beyond the particular instance.

17.    Any amendments or modifications to this Agreement must be in writing and signed by all the Parties to the Agreement.

18.    Nothing in this Agreement shall prevent the Parties from entering into joint defense agreements with other parties, and this agreement shall not be deemed to supersede or nullify, in whole or in part, any joint defense agreement any Party has entered into prior to the date of this Agreement.

19.    The execution of this Agreement and the exchange of consideration set forth herein shall not be construed or interpreted as an admission of any wrongdoing or liability of any sort or kind on the part of the Parties, and any breach, wrongdoing, or liability is expressly denied.

20.    This Agreement shall be construed in accordance with the laws of Maryland, regardless of the applicability or provisions of any other states' laws or rules concerning conflicts of laws.

21.    The Parties mutually covenant and agree, each to the other, that the statements, representations, agreements and covenants contained herein are

8

B.204

A-DB-00126

contractual in nature and not mere recitations of facts, and that the agreement and covenants herein shall be binding upon the parties hereto and their respective successors and assigns.

22.    This Agreement may be executed in one or more counterparts, which may be photocopies or facsimile transmissions of the original, but which shall constitute the same instrument. Photocopies or facsimile transmissions of signatures shall be deemed original signatures and shall be fully binding on the Parties to the same as original signatures.

ALSTOM POWER INC.

By: _____

LIBERTY MUTUAL INSURANCE COMPANY

By: _____

9

B.205

# ALST○M



ALSTOM Power Inc.                                          December 20, 2002
Power Boilers

Environmental Elements
3700 Koppers Street
Baltimore, MD  21203

Attn:  Mr. Rob Kimberl

Subject:  AES Puerto Rico-EEC Nonconformances

Reference:  API Purchase Order 50730 IO



Dear Rob,

**Recent failure of EEC to respond as promised to Alstom's repeated requests for
presentation of a detailed plan and schedule for correction of non-conformances,
replacement equipment, and services required to secure stable operation of EEC
supplied  CDS/Precipitator scope makes it necessary for us to present our
formalized notification to EEC of remaining items requiring action to support
fulfillment of EEC's obligations shown below.**

**EEC's detailed plan and schedule for completion of these items is required no
later than the close of business December 27, 2002.  EEC's failure to respond by
this date will result in determination that EEC is unable and/or unwilling to
comply with API's directive and will result in our notice to Liberty Mutual
Insurance Company that EEC has defaulted in performance of work under API
Purchase order No. 50730 IO.**

# CDS / ESP Outstanding Items

1.____Opacity Spikes.

**Start-up and normal operating procedures for the CDS and ESP have been
modified countless times without attaining consistent reliable operation.  Stack
opacity spikes exceeding the maximum permissible levels continue.  A number of
these philosophies have been implemented in the DCS control logic for automatic
operation, but considerable manual operator intervention and attention is**

Linda P. Rothe
ALSTOM Power Inc.
P O. Box 500
2000 Day Hill Road
Windsor, CT  06095-0500
Tel: (860) 285-9713
Fax: (860) 285-4645



PLAINTIFF'S
EXHIBIT
P-183

B.206

ALDEC05 - 00977

2

required and operating procedures outside of the prescribed procedures are required to correct opacity spikes. EEC advised by letter dated November 6, 2002 that two or three gas baffles are needed to correct this deficiency. API believes that air-slides for ash diversion from the ESP ash hoppers closest to the ESP gas outlet may also be required.

## 2.    Operation Coverage Post 100 Hour Reliability Test

With the CDS & ESP equipment in its current state, it requires continuous expert monitoring and manual manipulation by the operators both locally and remotely from the main unit control room to remain in compliance with the stack opacity and SO2 emission limits. This requires at least one process knowledgeable person present in the control room, and one equipment knowledgeable person in the field at all times. EEC has not demonstrated that the CDS/ESP is reliably operable. EEC personnel are required to continue on site until reliable operation can be consistently obtained.

## 3.    ID Fan Inlet Duct Design Deficiency.

The duct design and construction of the ID Inlet duct does not meet the specifications. EEC to advise how this will be corrected and a time schedule to complete the work.

## 4.    Hydrated Lime Storage and Feed System /Gravimetric & Bypass Volumetric Feeder

To date the Hydrated lime feed system has not been successfully commissioned. The manufacturer's representative was on site for several weeks in attempts to commission the system. This system could not be commissioned due to design, equipment selection, and configuration problems. The feed system needs to be redesigned to accomplish reliable accurately metered feed rate control. This requires Mechanical, Electrical and Controls modification.
The intermediate weigh bin vent line repeatedly plugs. This is a generic problem as it exists on both units. Alstom does not agree that the EEC suggested modifications provide for the element of control and measurement required by the contract. EEC is to provide a plan and time schedule for implementation that will allow the weigh belt feeder to function as intended.

## 5.    Unit 1 Hydrated Lime Storage Silo Damage

The walls of the silo buckled inwards in the area of the sidewall supports. The tank design is deficient. EEC advised that Talboa Tank had been subcontracted to complete this repair. EEC has taken no action. EEC to provide a time schedule for correcting this design deficiency.

ALDEC05 - 00978

3

## 6.    Medium Air Pressure Blower Capacity

The medium pressure blowers cannot maintain design outlet pressure when
supplying fluidization air for its design consumers i.e. Hydrated Lime Storage Silo
and Weigh Bin, Ash Disposal Silos and First Row ESP Ash Hoppers.
The blower capacity needs to be increased to suite the requirements of the
consumers.

## 7.    ESP Hopper Outlet Rotary Valve Failures

Rotary valves continue to bind up causing severe mechanical damage to the rotor
shaft and drive.  This is not due to construction debris.
Replacement vanes are required to replace the damaged vanes.
Root cause needs to be identified and corrected.  Replacement sprockets for the
rotary valves have broken.  EEC needs to replace these.

## 8.    Silo Level Monitoring Probe Replacement

The current level probes used on the Hydrated Lime Silo, Ash Disposal Bins and
the ESP ash hoppers have proven to be very unreliable.
These probes fail indicating product with no product present, and also fail the
opposite way, indicating no presence of product when product is present.
Reliable level probes are required.

## 9.    ESP Transformer / Rectifier Contactor Failure - Design

As per Alstom TIR # 1146 , the contactors used in the TR set controllers have
failed prematurely and the remaining ones show signs of immanent failure.
One of the failed contactors was inspected and it was found that the securing
method for the stationary contacts was poorly designed and leads to poor
electrical contact and resultant overheating. Replacement contactors suitable for
the application are required.
T/R ADP3200 controllers- They have ZERO reliability, there have been approx. 12
failures during S/U and commercial operation. These continue to fail.  EEC needs
to replace with more reliable controllers.

B.208

ALDEC05 - 00979

4

## 10.    TR Set High Current cable terminations

One of the TR Set Controllers electrical isolators failed, and it was found that the root cause is most likely the poor termination arrangement of the cabling. The cabling used is a multi strand trailing type cable used for its flexibility using screw type terminals for the termination of this    type of cable is unsuitable - compression terminal lugs are required for this type of cable.
This was discussed with EEC's Mr. Rich Hoch, and he agreed that these terminations should be redone with the appropriate termination lugs.

## 11.    CDS Water Injection Nozzle Tip Fouling

Nozzle tips or mouthpieces reliability- AES has used 2 spares 1 during S/U and one recently. These were manufactured out of tolerance. EEC is aware of this but has not taken action. After last weeks events of the unit 2 CDS plugging, AES borrowed 6 from the unit in Wyoming that has an EEC CDS. EEC needs to supply replacement nozzle tips.

## 12.    CDS Water Injection Pressure Gauge Replacement

The pressure gauges on the CDS Water injection system have failed as a result of overpressure and pulsation.
Replacement pressure gauges with suitable overpressure and pulsation protection are required for this system.

## 14.    Handrail

The Hand Rails at the stair landings do not conform to OSHA requirements. These are installed according to the drawings provided by EEC. EEC to provide a plan and a time schedule for replacing the handrail. This is a safety issue for which EEC is liable.

## 15.    Nozzle Quick Disconnects

All 10 of quick disconnects have failed due to corrosion. The water supply side have the internals removed because of the amount of corrosion that had occurred has made them inoperable. This is a safety concern to AES. EEC needs to replace with corrosion resistant couplings.

B.209

ALDEC05 - 00980

5

16.  Open TIRs

There are some parts that were provided by AES from their warehouse.  EEC needs to replace (TIRs are still open).  There are also several parts needed now to repair 3 T/Rs, as identified under separate cover.

17.  Heating Elements

The heating elements on the Medium pressure blowers are defective.  EEC to replace.

18.  Latest rev of controls and logic-

Also need to review this with AES and make some modifications to prevent another CDS pluggage occurrence.

19.  Corrosion Guarantee

EEC's position has been reviewed and is rejected.

We require your timely submittal of the detailed corrective action plan no later than December 27, 2002.

Sincerely,

Linda P. Rothe
Alstom Power Inc.

Cc:  W. B. Vanhooser
     J.  Titus
     W. Jarvis
     J. Sams
     E. Bulewich
     P. Moynagh
     L. Chen
     J.  Packard
     T. Wardell

| From: | Leif Lindau |
|---|---|
| Sent: | Monday, July 12, 2004 11:30 AM |
| To: | Karl Hognefelt |
| Cc: | Stefan Ahman |
| Subject: | Re: AES/PR: ESP Modifications |

I beleive the chlorides are very well stated in the original spec to EEC and in the Lurgi process calculations. So maybe you can forward that.

But they are right in that the chloroides are criical to both the plume problem and to the corrosion, but that is another story which is none of their business.

Leif Lindau

**Karl Hognefelt**
Global Technology
ALSTOM Environmental Control Systems;
Phone: + 865-694-5237
2004-07-12 16:04

To: Leif Lindau/SEFIN01/Power/ALSTOM@GA
cc:
Subject: AES/PR: ESP Modifications

Leif
For your info and comments.
Mvh/Karl
----- Forwarded by Karl Hognefelt/USKNL01/Power/ALSTOM on 07/12/2004 10:02 AM -----

**William M Jarvis**

Phone: +1-860-285-9059
07/12/2004 09:38 AM

To: Karl Hognefelt/USKNL01/Power/ALSTOM
cc: "Edwards, James" <jeedward@ober.com>
Subject: AES/PR: ESP Modifications

Hi Karl,

Welcome back!  Hope you are not too swamped with work.  We met with Liberty Mutual and EEC last week and so I wanted to update you.

**PLAINTIFF'S EXHIBIT**
P-196
PENGAD 800-631-6983

HOGN-EMAIL-001063

**HOGN_EMAIL-001063**

**B.211**

Liberty Mutual/EEC took the position, based on a conversation with John Toher (consultant to AES), that all of the flow studies, correction devices, and modification work on the ESP were unnecesary because the performance issues were actualy caused by "excess" chlorides. Toher apparantly analyzes the AES/PR operating data each month and has concluded that chlorides cause the opacity variances. He apparently feels that the Chlorides change the resistivity of the gas thereby preventing the ash from being collected by the fields, allowing the ash to flow to the back of the ESP. He further concludes that the elimination of gas bypasing the collector plates was unneccesary.

This of course is all determined after our work to correct the gas bypassing and rotary air lock valve leakage. They brought up the argument that the field test did not replicate the model test because it was not tested in the same location. They did not argue however that the field test represented the actual gas flow.

They also talked about the chlorides not allowing the gas to dry out. No one from EEC nor Liberty Mutual could articulate the details of this theory, but they are convinced that this is the root cause of the ESP problems.

Once you get caught up, I would like to get your thoughts on this.

Regards,
Bill

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

HOGN-EMAIL-001064

HOGN_EMAIL-001064

B.212



**ASEA BROWN BOVERI**

## PURCHASE ORDER

**ABB Combustion Engineering Systems**
**Combustion Engineering, Inc.**
2000 Day Hill Road
Post Office Box 500
Windsor, CT 06095-0500
Tel. (860) 688-1911 FAX (860) 285-9730

Date:  03/30/99
Page:  1

P. O. Number:
**50730 IO**

TO:
ENVIRONMENTAL ELEMENTS CORP.
3700 KOPPERS ST.
P.O. BOX 1318
BALTIMORE MD  21203

SHIP TO:
To Be Advised

| CONTRACT NAME | CONTRACT NUMBER | BUYER NAME | SUPPLIER CODE | INV TAX |
|---|---|---|---|---|
| AES PUERTO RICO | 65005697 | L. R. JANNELLE | 00202282 | N |

| PAYMENT TERMS | FOB POINT | SHIPPING CHARGES | SHIP VIA |
|---|---|---|---|
| Net 30 Days | FOB:CONSOLIDATION POINT | Freight, Third Party Billing | To Be Advised |

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|---|---|---|---|---|---|---|
| 1 | 1.00 | EA | DUCT TO PRECIPITATOR 32240901 Unit # 001 | 03/03/00 | .00 | $.00 |
| 2 | 1.00 | LT | MTL PRECIPITATOR 32591000 Unit # 001 | 03/03/00 | 20,000.00 | $20,000.00 |
| 3 | 1.00 | EA | MTL GAS DUCT TO I.D. FAN 32240960 Unit # 001 | 03/03/00 | .00 | $.00 |
| 4 | 1.00 | EA | CIRCULATING DRY SCRUBBER 32592500 Unit # 001 | 06/02/00 | .00 | $.00 |
| 5 | 1.00 | EA | FRT EXPORT PREP/PKG 88831330 | 03/03/00 | .00 | $.00 |

There are 2 units on this contract.  Quantities shown are
for one unit.

This purchase order is issued to supercede the letter of
intent dated December 29, 1998 for the complete design,
manufacture, and supply of Air Pollution Control Equipment
for the AES Puerto Rico Total Energy Project as described by
the following documents :

ABBCE RFQ 73301197A  dated August 19,1997
EEC Proposal 420584  dated August 27, 1997
EEC Pricing Letter dated October 30, 1997
DFD Specification No. W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.03-0001, Revision 1,
2/4/98
DFD Specification No. W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.03-0002, Revision 1,
2/4/98
DFD Specification No. AES-GPR-I, 2/4/98
DFD Specification No. W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.00-001, Rev. 1, 2/4/98

This purchase order authorizes Environmental Elements to
invoice for engineering incurred to the agreed upon
preliminary notice value as stated in line item 2. This will
be deducted from the total price upon final notice to
proceed. EEC agrees that costs incurred in excess of this
value prior to Notice To Proceed, shall be at EEC's risk. In
the event of termination of this Project, all parties hereby
waive any and all liability or claim against the other for

D-006

EEC-05441

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

Date:   03/30/99

Page:   2

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|----|----|----|----|

any direct, indirect, or consequential damage or loss, and
each party hereby waives any rights against the other,
however caused, including fault, negligence, or strict
liability.

TERMINATION OF NOTICE OF INTENT

This Purchase Order shall terminate upon the first to occur
of the following. 1. The filing by or against a party of a
petition or application for any proceeding relating to such
party as debtor under any bankruptcy or insolvency law of
any jurisdiction. 2. A cancellation by the Purchaser's
Customer or Owner. 3. August 31, 1999, unless it is extended
by mutual agreement of both parties. 4. A change order is
issued notifying EEC of Notice to Proceed.

Price

The price for the base scope of supply is $14,527,570.00 for
two units including options for; Primer SSPC-2, Galvanized
Support Steel, Commissioning, Air & Water Piping, Data
Management System, Electricals and Special Packing
Containers. Options will be maintained for shipment to
destination and performance/payment bonding. Purchaser and
Seller shall endeavor to obtain shared cost reduction
through such methods as alternative sourcing. A formal plan
will be jointly developed and implemented. Cost breakdowns
provided in the proposal phase shall be utilized.

Schedule                                    *including startup* _(initials)_

_(initials) 28_    The parties agree that they will be working with an overall
13 month project completion _from_ Notice to Proceed and that
the overall project schedule is a work in progress. The
parties are currently working with the schedule parameters
in the referenced proposal and the DDIMSR document for
engineering. A final conformed project schedule will
replace the referenced document upon full notice to proceed.
A milestone payment schedule will be negotiated as
appropriate.

Terms and Conditions of Purchase

Terms and Conditions of Purchase are in process of
negotiation. Those provided hereinbelow represent ABB/CE's
current position and comments received by Environmental
Elements are in review for return to EEC. Finalized Terms
and Conditions will be included in the change order for
engagement of the full scope of supply.

1.    ACCEPTANCE

      The contract ("contract") between Purchaser and
Seller shall consist of the terms written on the face
hereof, these printed terms and conditions and any detailed
specifications, drawings and samples specifically
incorporated by reference on the face hereof. Seller's
acknowledgement of receipt of this Purchase Order, or
shipment of goods or commencement of services ordered
hereunder, shall constitute acceptance of the contract.
Purchaser hereby objects to any different or additional

EEC-05442

# PURCHASE ORDER

## ABB Combustion Engineering Systems

**ABB** ASEA BROWN BOVERI

Date: 03/30/99

Page: 3

P. O. Number:
**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|--------------------------|---------------------|------------|----------|

terms in any proposal, acknowledgement, acceptance or other instrument of the Seller. Purchaser's acceptance of any instrument of Seller is expressly conditioned on Seller's assent to any additional or different terms included in these printed terms and conditions or written on the face hereof. In the event of conflict between the terms written on the face hereof and these printed terms and conditions, the terms written on the face hereof shall prevail.

2.    DELIVERY

      Time is of the essence, and Seller shall notify Purchaser immediately in writing of any delay or threatened delay in Seller's performance under the contract. Purchaser may cancel this Purchase Order in whole or in part without any liability, if the delivery or completion date(s) in the contract are not satisfied, provided that if such delay is due to causes beyond the control of Seller and such causes were not reasonably foreseeable by Seller at the time of entering into this contract, and Purchaser exercises its option to cancel this Purchase Order, the provisions of Paragraph 7 hereof shall apply. In addition, Seller shall not be relieved, under any circumstances, of the obligation to procure alternative suppliers or materials with respect to subcontracted or purchased labor, materials or services, except by written consent of Purchaser.

3.    APPROVAL OF DESIGNS, DRAWINGS AND PROCEDURES

      Purchaser's approval of Seller supplied drawings, manufacturing procedures, calculations, and other documents shall not relieve the Seller of any responsibility for the goods delivered or services performed hereunder or any requirements or warranties under the contract, whether express or implied.

4.    INSPECTION

      Purchaser, or its representatives, shall have the right to inspect and test the goods or services ordered hereunder at any time prior to delivery or performance, and to finally inspect such goods and results of such services within a reasonable time after delivery at the ultimate destination or completion of their performance. The goods or services shall not be deemed accepted until after such final inspection. The making or failure to make any inspection of, or payment for, or acceptance of, the goods or services, shall in no way impair Purchaser's right to reject or revoke its acceptance of nonconforming goods and services or to seek any other remedies to which Purchaser may be entitled.

5.    WARRANTY

      Seller warrants Purchaser that the Work shall comply with the provisions of this Purchase Order and all specifications and drawings referred to in this Purchase Order, and that the Work shall be free from defects in materials and workmanship and in full compliance with any design or engineering furnished by Seller. Seller further warrants Purchaser that all materials, equipment and supplies furnished by Seller for the Work shall be new and fit for

B.215

# ABB
**ASEA BROWN BOVERI**

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

Date:   03/30/99

Page:   4

P. O. Number:
**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|--------------------------|--------------------|------------|----------|

their specified purposes as set forth in this Purchase Order
and be in full compliance with the requirements of this
Purchase Order.  As described in this Purchase Order, if any
defect in the Work in violation of the foregoing warranties
arises within the period set forth below, Supplier shall
upon receipt of prompt written notice from Purchaser of such
defect promptly furnish, at no cost to Purchaser, design and
engineering, labor, equipment and materials necessary to
correct such defect and cause the Work to comply fully with
the foregoing warranties.

Seller, at its expense, (including, without limitation,
costs of removal, packing, transportation and
reinstallation) shall remedy promptly any defective Work
which exists during the applicable warranty period as set
forth above, and of which Purchaser gives written notice
within a reasonable time after discovery of the defect or
damage.  Upon such notification by Purchaser, Seller shall
promptly commence and proceed to make all needed
adjustments, repairs, additions, corrections, and
replacements which arise out of or are necessitated by such
defective Work or damage.  Seller shall conduct such
warranty work on a overtime schedule basis if Purchaser
determines such a schedule is necessary to avoid or minimize
the effects of an outage or load reduction and Purchaser
shall reimburse Seller the premium differential for
performing warranty work on an overtime basis if reimbursed
by Purchaser's Customer.  Seller shall coordinate its
warranty Work with Purchaser to minimize interference to
facility operations.  Purchaser will permit reasonable
access to as much of the Unit(s) as Seller may reasonably
require for performance of warranty Work, but any costs of
uncovering Work shall be the responsibility of the Seller.
Seller shall perform warranty Work so that such adjustments,
repairs, additions, corrections and replacements do not
degrade the performance of, nor impair the use of the
Equipment, Materials or other Work in question, other
systems, or the Unit(s) as a whole to an extent that the
Equipment, Materials, or other Work, systems or Unit(s) will
not meet the requirements of this Purchase Order in all
respects, and Seller shall repair or replace all other
facilities to the extent they are destroyed or damaged as
result of Seller's performance of warranty Work.

WARRANTY PERIOD

The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance with
the following exception that the warranty period shall be
extended for corrective Work as set forth below.

At the mutual agreement of Seller and Purchaser, warranty
Work provided hereunder may be deferred until the time of
the Unit (s) next regularly scheduled maintenance outage,
provided that such outage shall commence not later than six
(6) months after Purchaser 's notice to Seller of the
defective condition, and the warranty provisions hereunder
shall apply notwithstanding that such outage occurs after
the time the warranty would otherwise expire.  Seller shall
not be liable or responsible for any such warranty work if
the outage is not commenced within the stated six (6)
months.

EEC-05444

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

ABB
ASEA BROWN BOVERI

Date: 03/30/99

Page: 5

P. O. Number:
**50730 IO**

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|-----|------|------|------|------|

The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Seller extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Seller 's submittal to Purchaser of written Notice of Completion unless Purchaser, within ten (20) days thereafter, furnishes Seller with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Seller warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, Purchaser shall so notify Seller in writing prior to expiration of the Warranty Period, as applicable, and Seller shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

CHRONIC FAILURE

A chronic failure ( Chronic Failure ) shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, Purchaser and Seller shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Supplier extend beyond twenty-four (24) months after Performance Acceptance.

In the event Seller shall have been notified in writing of any defects in the Work in violation of Seller 's foregoing guarantees and shall fail to promptly and adequately correct such defects, Purchaser and Owner shall have the right upon written notice to Seller to correct or to have such defects corrected for the account of Seller, and Seller shall promptly pay Purchaser or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with backup documentation supporting written claim.

In the event of an emergency when, in the reasonable judgment of Purchaser, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may be made by Purchaser, or by a third party chosen by Purchaser, without giving prior notice to Seller, and the reasonable cost of the remedial work shall be paid by Seller but Seller shall have no responsibility or liability

B.217

EEC-05445

PURCHASE ORDER

**ABB Combustion Engineering Systems**

ABB
ASEA BROWN BOVERI

Date:  03/30/99

Page:   6

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|-----|----------|----------|----------|----------|

(including warranty) for such remedial work. Notice of this course of action will be provided by Purchaser to Seller as soon as practical.

ACCELERATED CORROSION

The Seller shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators, and interconnecting duct work against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years (i) the structural integrity of the Equipment of any portion thereof or (ii) that ability of the Equipment to mechanically perform. Seller 's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Seller 's Operation and Maintenance manuals, Owner 's specified operating parameters, and typical system operation at base load and specified capacity factors.  Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner.  Upon demonstration that corrosion exceeds the level described above, the Seller and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions.  In the event that the parties are unable to reach a mutual Purchase Order either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator.  There shall be no re-warranty or extended warranty obligation, as set forth above, applicable to this corrosion warranty.

Seller agrees that Purchaser may assign its rights under this warranty and other parts of this Purchase Order to Owner and Owner 's Lenders, and Seller hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feed stocks from the limits specified in the Purchase Order are excluded from any warranty obligations of the Seller.

Seller's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

6.    CHANGES

This Purchase Order shall not be changed or otherwise modified except upon the prior written authorization of a

EEC-05446

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

Date: 03/30/99

Page: 7

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|-------------------------|---------------------|------------|----------|

duly authorized representative of Purchaser.  Purchaser shall have the right to make any changes in the work ordered under this Purchase Order and Seller agrees to perform this Purchase Order in accordance therewith.  If in Seller's opinion such changes will cause an increase or decrease in the cost of, or time required for, performance hereunder, Seller shall notify Purchaser promptly.  If additional cost or time is required, Seller shall not proceed without written authorization from Purchaser and if Purchaser directs Seller to proceed, Purchaser shall make an equitable adjustment in the price and delivery/completion schedule.

7.      TERMINATION

In addition to any other rights Purchaser may have with respect to cancellation or termination, (which, in the event of Seller's default of the provisions hereof, shall include, without limitation, the right to recover attorney's fees and costs of collection), Purchaser shall have the right at any time, with or without cause, to terminate further performance of all or any part of the work for which Seller's performance is not yet completed by giving notice of termination to the Seller. On the date of such termination stated in said notice, Seller shall discontinue performance of the Work and shall preserve and protect tools, construction equipment and facilities on jobsite, materials and plant equipment purchased for or committed to the Work (whether delivered to the Jobsite or on order), Work in progress and completed Work (whether at jobsite or other locations) pending Purchaser's instructions and, if requested by it, shall turn over the same to Purchaser/Purchaser's Customer, or Owner, including title to said materials and plant equipment, provided the Seller has been paid in full for such material and equipment or dispose of same in accordance with Purchaser's instructions.

Upon receipt of said notice, Seller shall advise Purchaser of its outstanding orders and subcontracts pertaining to performance of the terminated work and, upon request, furnish Purchaser with complete copies.  Seller shall place no further orders or subcontracts for materials, equipment, services, or facilities, except as may be necessary for completion of such portion of the Work as is not terminated; Seller shall promptly make every reasonable effort to procure cancellation, upon terms satisfactory to Purchaser, of all orders and subcontracts to the extent they relate to the performance of Work terminated; or, as directed by Purchaser, shall assign to it or Owner such of its subcontracts and orders as are designated by Purchaser, or shall take such other action relative to such subcontracts or orders as may be directed by Purchaser.

If in Purchaser's opinion Seller is not in default under this Purchase Order at the time such notice is given, Purchaser will make an equitable termination payment to Seller based on the proportion of the work completed, and reasonable costs incurred in connection with the terminated work.  Such payment shall not exceed that fraction of the total Purchase Order price which is allocable to the work performed and any such payment shall be subject to audit by Purchaser.  Seller shall submit his claim for a termination payment within thirty days after receiving notice of termination, and shall take prompt action to minimize costs

EEC-05447

**ABB**

ASEA BROWN BOVERI

PURCHASE ORDER

ABB Combustion Engineering Systems

Date:    03/30/99

Page:    8

P. O. Number:

50730 IO

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|-----|-----|-----|

which form part of such claim. Seller shall deliver
promptly in accordance with Purchaser's delivery
instructions all completed goods and work in process. In
the event that, for any reason, it is determined that Seller
was not in default, the termination for convenience
provisions of this Section shall apply. In no event shall
Purchaser be liable for any special, indirect, incidental or
consequential damages of any nature, including, but not
limited to, under-utilization of labor or facilities, loss
of revenues or anticipated profits, potential damage to
business reputation, or loss of business or business
opportunity, whether based on contract, tort (including
negligence), strict liability or otherwise.

In no event shall total payment to Seller exceed the
Contract Price.
The provisions of this Contract, which by their nature
survive final acceptance of the Work, shall    remain in full
force and effect after such termination.

8.    TITLE AND RISK OF LOSS

Seller agrees to deliver to the Purchaser title to the goods
covered by this Purchase Order, free and clear of all liens,
claims and encumbrances. Title and risk of loss to goods
delivered hereunder shall pass to Purchaser upon receipt by
Purchaser at Purchaser's plant or at another delivery
location designated by Purchaser, unless otherwise agreed in
writing.

9.    COMPLIANCES

Seller warrants that all goods delivered and
services rendered hereunder shall be in strict compliance
with all applicable laws and regulations to which the goods
and services are subject, including the laws and regulations
of the country of manufacture and final shipment. Seller
shall indemnify and hold harmless the Purchaser and the
Purchaser's customers from all loss, liability and fines
incurred by any of them as a result of Seller's failure to
so comply.

10.    INDEMNITY

Seller agrees to defend, indemnify and hold harmless
Purchaser, Purchaser's Customer and Owner, the Owner's
lenders, the Utility, the PREPA, and the Steam Host, the
affiliated companies of each, and all of their directors,
officers, employees, agents and representatives, from and
against:

Any claim, demand, cause of action, liability, loss or
expense arising by reason of Seller's actual failure (or if
asserted, to defend until proven not liable) to comply with
any applicable law, ordinance, regulation, rule or order
applicable to Seller under this Contract, or with this
Contract. This Section includes, but is not limited to,
fines or penalties by government authorities and claims
arising from Seller's actual or asserted failure to pay
taxes for which Seller is liable to pay hereunder.

Any claim, demand, cause of action, liability, loss or

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

Date:   03/30/99

Page:   9

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|----|----------|----------|----------|----------|

expense arising from actual violation or infringement of
rights (or, if asserted, to defend until proven not liable)
in any applicable patent, copyright, proprietary
information, trade secret or other property right caused or
alleged to be caused by the use of goods, materials,
equipment, methods, processes, designs or information,
including construction methods, construction equipment and
temporary construction facilities, furnished by Seller or
its subcontractors in performance of the Work.  Should any
goods or services provided by Seller become the subject of a
claim of infringement of a patent, copyright or other
property right, Seller shall, at Seller's option, either
procure for Purchaser/Purchaser's Customer and Owner the
right to continue using such goods or services, replace same
with equivalent, non-infringing goods or services, or modify
the goods or services so that the use thereof becomes
non-infringing, provided that any such modification or
replacement is of equal quality and provides equal
performance to the infringing goods or services.  Seller's
obligations under this paragraph shall not apply to any
goods, equipment processes, methods, designs or information
to the extent that it was subsequently altered, modified or
changed by Purchaser/ Purchaser's Customer/Owner or used or
operated by Purchaser/Purchaser's Customer/Owner in a manner
in intended by this Contract.

Any claim, demand, cause of action, liability, loss or
expense arising from injury to or death of third persons
(including employees of Purchaser/ Purchaser's Customer/
Owner, Contractor and Contractor's subcontractors) or from
damage to or loss of tangible property (but exclusive of
property damage to the extent covered by the proceeds of the
Builders All Risk Insurance or other insurance provided by
Purchaser/Purchaser's Customer and/or Owner) caused by any
negligent acts or omissions of Seller or its subcontractors;
if the Seller and/or its subcontractors is/are on the site
to perform Warranty Work.    Seller's defense and indemnity
obligations hereunder include claims and damages arising
from non-delegable duties of Purchaser/Purchaser's Customer
or Owner or arising from use by Seller of construction
equipment, tools, scaffolding or facilities furnished to
Seller by Purchaser/Purchaser's Customer or Owner.

Any claim, demand, cause of action, liability, loss or
expense for actual or alleged contamination, pollution, or
public or private nuisance, to the extent arising out of any
acts or omissions of Seller, or its subcontractors.

In the event of joint or concurrent negligence on the part
of the Purchaser or any other indemnified party, the
liability, and any associated indemnity obligations shall be
reduced by the negligence attributable to such indemnified
party.  Seller's defense and indemnity obligations shall
include the duty to reimburse any reasonable attorneys' fees
and expenses incurred by Purchaser/Purchaser's Customer or
Owner for legal action to enforce Seller's indemnity
obligations, but only to the extent Purchaser/Purchaser's
Customer or Owner is successful in such actions.

In the event that the indemnity provisions in this Contract
are contrary to the law governing this Contract, then the
indemnity obligations applicable hereunder shall be
construed to have the same economic effect on the parties.

EEC-05449

# PURCHASE ORDER

**ABB Combustion Engineering Systems**

Date:   03/30/99

Page:   10

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|-----|----------------------------|----------------------|------------|----------|

With respect to claims against Purchaser/Purchaser's Customer or Owner by employees of Seller or its subcontractors, the indemnity obligations created under this Article shall not be limited by the fact of, amount, or type of benefits or compensation payable by or for Seller, its subcontractors or suppliers under any workers' compensation, disability benefits, or other employee benefits acts or regulations, and Seller waives, against Purchaser/Purchaser's Customer or Owner, any limitation of liability arising from workers' compensation or such other acts of regulations.

If there is a dispute between the parties regarding Seller's obligations hereunder, Purchaser shall be entitled to retain from payments otherwise due Seller such amounts as shall reasonably be considered necessary to satisfy any claims, suits or liens for damages that fall within Seller's indemnity obligations under this Article 29.0, until such claims suits or liens have been settled and satisfactory evidence to that effect has been furnished to Purchaser.

Seller acknowledges specific payment of $10.00 incorporated into the Contract Price as legal consideration for Seller's indemnity obligations as may be provided in this Contract.

Notice and Defense: Promptly after receipt by Purchaser of any claim or notice of the commencement of any action, proceeding or investigation as to which the indemnity provided for this Article applies, such indemnified party shall notify Seller in writing of such fact. Seller shall assume on behalf of the indemnified party the defense thereof with counsel of the indemnified party's choice or which shall be reasonably acceptable to Purchaser; provided that such indemnified party shall have the right to be represented by independent counsel of its own selection and at its own expense. Purchaser/Purchaser's Customer and Owner shall provide reasonable support and assistance to the Seller in connection with the defense of any claim to which the indemnity herein shall apply.

11.   **ASSIGNMENT AND SUBCONTRACTING**

Seller shall not assign this Purchase Order to subcontract the whole or any part thereof without the Purchaser's prior written consent. Seller's purchase of raw materials or standard commercial articles shall not be deemed a subcontract.

12.   **EQUAL EMPLOYMENT OPPORTUNITY**

In performing this Purchase Order, Seller agrees to comply with Executive Order 11246, as amended, the Rehabilitation Act of 1973, and the Vietnam Era Veterans Readjustment Assistance Act of 1972, and the equal opportunity clauses contained therein are hereby incorporated into the Purchase Order.

13.   **TITLE TO DRAWINGS AND OTHER TECHNICAL INFORMATION**

EEC-05450

**ABB**
ASEA BROWN BOVERI

**ABB Combustion Engineering Systems**

Date:   03/30/99

Page:   11

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|----|----------------------------|----------------------|-----------|----------|

Engineering and related data, calculations, plans, maps, drawings, computer programs and specifications furnished by Purchaser/Purchaser's Customer or Owner in connection with the Work (referred to in this Article as "Purchaser's Documents") shall remain Purchaser/Purchaser's Customer or Owner's property. Seller agrees not to use or release to others any such Purchaser's Documents for purposes other than the Work performed hereunder unless prior written consent to the contrary is given by Purchaser. Seller shall give Purchaser receipts for Purchaser's documents furnished by Purchaser/Purchaser's Customer or Owner and shall be responsible for their safekeeping and return to Purchaser/Purchaser's Customer or Owner upon request, upon termination or completion of this Contract, or upon termination or completion of the Work to which such Purchaser's documents apply.

Seller shall release Purchaser/Purchaser's Customer and Owner from all liability which may arise as a result of the use of Purchaser's Documents, whether by Contractor or third parties to whom Seller discloses said documents and information, for purposes other than the Work and Units provided under this Contract as set forth above. This Article shall apply mutatis mutandi to Purchaser/Purchaser's Customer and Owner.

Any drawings, data or information supplied by Seller hereunder shall remain the sole and exclusive property of Contractor but may be used by Purchaser/Purchaser's Customer and Owner solely for the purpose of evaluation, facilitating and/or completing construction, maintenance, operation and/or repair of the subject Facility and not for any other unrelated purpose.

14.    PUBLICITY

       Seller shall obtain the consent of Purchaser prior to any publicity regarding any order hereunder, and Purchaser shall have the right to participate in the content of any such proposed publicity.

15.    APPLICABLE LAW

       Unless otherwise provided on the face hereof, this Purchase Order shall be governed in all respects in accordance with the law of the State of Connecticut without giving effect to principles of choice of law thereof.

16.    LIMITATION OF LIABILITY

In no event shall Seller's liability for any matter relating to this Contract, including, without limitation, warranties, breach of contract, tort [including negligence] and lawsuits, but excluding any patent indemnity or third party liability under Article 10, exceed either individually or in the aggregate an amount equal  to the Contract Price. In no event shall Purchaser or Seller be liable for incidental, special or consequential damages of any kind, including, without limitation, loss of revenue, loss of profits, loss of use of the facility or damages associated therewith. The

EEC-05451

**ABB**
ASEA BROWN BOVERI

**ABB Combustion Engineering Systems**

Date:   03/30/99

Page:   12

P. O. Number:
**50730 IO**

| Item | Quantity | UN | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|-------------------------|--------------------|-----------|----------|

foregoing notwithstanding, in no event shall Seller's
liability for Liquidated Damages exceed, in the aggregate,
an amount equal to thirty percent (30%) of the Contract
Price.  Where a remedy is specified in the Contract for an
occurrence, such remedy shall be an exclusive remedy for
such occurrence; where no remedy is specified in the
Contract for an occurrence, the remedy at law shall apply
subject to the provision of this Article 16. Furthermore,
it is specifically understood and agreed that the payment of
any liquidated damages provided for in the Contract shall
constitute Seller's sole obligation and
Purchaser/Purchaser's Customer's and/or Owner's sole and
exclusive remedies for Seller's failure to meet the Contract
schedule and/or Performance Guarantees.  All releases,
waivers or limitations of liability specifically expressed
in this Contract apply equally to Seller's subcontractors,
suppliers and vendors of any tier.  All releases, waivers or
limitations of liability specifically expressed in this
Contract apply notwithstanding the negligence, strict
liability, fault, or breach of warranty or contract of the
party whose liability is so released or limited.

## 17. WAIVER AND RELEASE OF LIEN

With each milestone payment invoice, Seller shall furnish
partial lien waivers (in substantially the form shown as
Attachment _____ ) which partial lien waiver will waive
Seller's lien rights for all work performed through the
cutoff date of such invoice.  Purchaser may withhold payment
of invoices until Seller furnishes such partial lien
waivers.  Such partial lien waiver may be conditioned upon
receipt of the associated payment. In addition, Seller shall
provide, if requested by the Owner prior to disbursement of
funds to Purchaser/Purchaser's customer required to make
such scheduled Seller payment, copies of such partial lien
waivers from subcontractors and suppliers with subcontracts
or purchase orders with a contract price or purchase order
price of $100,000 or more as are necessary to support
Seller's invoice.

A final lien waiver will be required to effect final
payment.

## 18.  BACKCHARGES

A backcharge is a cost sustained by Purchaser and
chargeable to Seller, which shall either be paid by Seller
or, at Purchaser's option, deducted from amounts owed to
Seller.  Without limitation and by way of example only,
backcharges may result from:

Services performed by Purchaser, at Seller's
request, for work which is within Seller's Scope of Work
under this Contract, or

Costs sustained by Purchaser as a result of
Seller's non-compliance with the provisions of this Contract

EEC-05452

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

ABB
ASEA BROWN BOVERI

Date: 03/30/99

Page: 13

P. O. Number:
**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|--------------------------|---------------------|------------|----------|

or Seller's act or omission or negligence.

Upon identification by Purchaser of an actual or anticipated backcharge, Purchaser will issue Contractor with a backcharge notice.

The backcharge cost shall include:

    a. • Labor: at actual cost plus 15% to cover payroll additives;

    b. Material: at actual supplier and freight invoice cost delivered to jobsite;

    c. Construction Equipment: at actual third party rental cost or at Purchaser's equipment rental rates whichever may be applicable;

    10% shall be added to Paragraph's a. through c. above for indirect costs, overhead, supervision and administration.

## 19.0 LIQUIDATED DAMAGES

### GENERAL

Purchaser and Seller agree that, at Release of this Contract, the Schedule of this Contract will be assigned specific dates based on the agreed upon durations from Release. Seller guarantees the dates that will be established based on the durations stated in the Schedule of this Contract to be the firm date for completion by Seller of all activities pertaining to each specific milestone.

Seller shall meet the Ship Dates and Performance Guarantees set forth in this Section 19.0. The parties agree that failure of Seller to meet these dates and Performance Guarantees will do Purchaser harm and that damages for failure to meet said guarantees are extremely impracticable or impossible to predict or calculate, and accordingly Seller shall be liable for liquidated damages to Purchaser for failure to achieve Ship Dates or Performance Guarantees as specified , which liquidated damages Seller will pay to Purchaser. Seller acknowledges and affirms that the amounts of liquidated damages set forth herein do not constitute a penalty, but rather are a fair estimate and assessment of damages which are uncertain and not readily ascertainable. The liquidated damages set forth in this Section 19.0 are the sole and exclusive remedies of Purchaser for failure of Seller to meet Ship Dates or Performance Guarantees. The parties agree that liquidated damages are in lieu of actual damages and Purchaser will not attempt to recover actual damages for Seller's failure to achieve the guarantees stipulated in this Section 19. All liquidated damages specified herein are cumulative and no liquidated damages shall be deemed to supplement, replace, supersede or in any way reduce any other liquidated damages for which Seller is responsible.

### LIQUIDATED DAMAGES FOR LATE DRAWINGS AND DATA SUBMITTAL

The Seller recognizes that Purchaser will suffer damages in

EEC-05453

**B.225**

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

Date:   03/30/99

Page:   14

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|-----|-----|-----|-----|

the event of delay in schedules for submittal of Final
drawings and data four working days prior to those specified
in the DDMISR.  Seller shall submit drawings and data
packages to arrive at Purchaser on or before the specified
dates.  Documents submitted shall be in accordance with the
requirements of this Contract.  Documents that do not meet
these requirements will be returned to the Seller and will
not be accepted until resubmitted and received in proper
form and content by Purchaser.  The parties agree that the
sum of $500.00 per calendar day is a reasonable and fair
estimate of damages and loss which Purchaser would suffer
for each such calendar day that Seller is late in submitting
each drawing package or data package.  It is therefore
agreed that, in the event of such failure by Seller, Seller
shall pay to Purchaser the sum of $500.00 for each calendar
day by which the actual date of each drawing package or data
package is later than the said firm drawing package or data
package submittal date.


LIQUIDATED DAMAGES FOR LATE SHIPMENT

In the event that the delivery of all or any portion of the
equipment and materials are delayed beyond the delivery date
specified, the following liquidated damages shall be imposed
on the seller:

1/2 % per day or part of for the first twenty (20) days
beyond the required ship date. 1% per day or part of
thereafter.

The above percentages are to be applied to the total value
of the purchase order.


LIQUIDATED DAMAGES FOR TECHNICAL PERFORMANCE

Seller guarantees the performance of the equipment and other
Work covered by this Purchase Order to be in accordance with
the guaranteed data as set forth in the following Confirmed
Equipment Specifications, which Guarantees are sometimes
referred to as "Performance Guarantees":

-       Circulating Fluidized Bed Boiler
Specification W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.00-0001, Revision 1;
-       Circulating Dry Scrubber FGDS Specification
W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.03-0001, Revision 1; and
-       Electrostatic Precipitator Specification
W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.03-0002, Revision 1.

Seller's achievement of these Performance Guarantees will be
demonstrated over a four (4) hour test period as set forth
in the Performance Test Plan  which will occur during the
Performance Test. Seller's achievement of these Performance
Guarantees will be tested per the methods specified in the
Performance Test Plan.

It is agreed that the actual damages and loss which
Purchaser would incur as a result of Seller's default in its
obligation to meet the Performance Guarantees would be
impractical and difficult to determine and that the sums
listed below are a reasonable and fair estimate of the
damages and loss which Purchaser would suffer by Seller's

EEC-05454

**B.226**

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|------|------|----------|

failure to meet the Performance Guarantees.  It is, therefore, agreed that Seller shall pay Purchaser the following liquidated damages for any shortfalls in meeting the Performance Guarantees:

A. Auxiliary Power Consumption:

$2,733 for each full KW that the Equipment is in excess of the guarantee value, as defined in the performance section of the technical specification.

B. Lime:

$6,585 per each full pound per hour of Lime that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

PAYMENT OF LIQUIDATED DAMAGES

Seller agrees that all sums payable by Seller to Purchaser as liquidated damages pursuant to this Section 10 shall be paid promptly to Purchaser or, at Purchaser's option, may be deducted by Purchaser from the price to be paid to Purchaser hereunder.  The liquidated damages are agreed to be a reasonable estimate of actual damages, not a penalty.

The liquidated damages set forth in this Section 19.0 are the sole and exclusive remedies of Purchaser for failure of Seller to meet Performance Acceptance or Performance Guarantees, however, shall not constitute a waiver of any rights of Purchaser to damages or other remedies of Purchaser under other Sections of this Contract not related to Seller's failure to meet Performance Acceptance and/or Performance Guarantees.

Seller's liability for liquidated damages shall be limited in accordance with Article 16of this Contract, provided, however, that liquidated damages shall not be deemed to be incidental, special or consequential damages.

REMEDIES

In the event the Performance Test results indicate lower than specified and/or guaranteed performance, Seller will be given the opportunity, which is reasonably possible under the circumstances, to rectify the equipment and the unit will be retested.

In the event of any deficiencies in Seller's equipment and design relative to the specifications and/or performance guarantees in the Technical Specification which are not covered by liquidated damages, Seller will correct these deficiencies to conform to the performance guarantees as set out in the specification.

20.0 INSURANCE

Before any Work is performed under this Contract, Seller shall, as its sole cost, obtain and maintain in force the following insurance coverages:

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**


ASEA BROWN BOVERI

Date:   03/30/99

Page:   16

P. O. Number:

**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|----|----|----|

Worker's Compensation Insurance, including occupational
illness or disease coverage, or other similar social
insurance in accordance with the laws of the nation, state,
commonwealth, territory or province exercising jurisdiction
over the employee and Employer's Liability Insurance with a
limit of $1,000,000 per occurrence and in the aggregate.

Comprehensive or Commercial General Liability Insurance,
including Contractual Liability, Products and Completed
Operations Liability (with the Completed Operations coverage
to remain in effect for two (2) years following Performance
Acceptance), Explosion, Collapse, and Underground Hazards,
Personal Injury Liability (with the standard contractual and
employee exclusions eliminated), Elevators and Escalators,
Employers Liability, and Broad Form Property Damage
Liability coverages with a combined single limit of
$1,000,000 per occurrence and in the aggregate.  Such
insurance shall protect against losses arising out of
explosion, collapse or underground hazards. The Policy shall
name Purchaser/Purchaser's Customer, its affiliates, Owner's
Lenders and Owner as additional insureds with respect to
liability or losses based upon or arising out of Seller's
Work under this Agreement. Seller shall evidence that such
coverage has been extended to the aforesaid additional
insureds through provision of either a specific endorsement
to its policy or through a Certificate of Insurance issued
by its insurance broker on behalf of its insurance company
that states that the additional insureds are additional
insureds as required herein.

Automobile Liability Insurance covering use of all owned,
non-owned and hired automobiles with a combined single limit
of $1,000,000 per occurrence and in the aggregate for bodily
injury and property damage liability.  This policy shall be
endorsed to name Purchaser/Purchaser's Customer, its
affiliates and Owner and Owner's Lenders as additional
insureds with respect to liability based upon or arising out
of the activities of Seller pursuant to this Contract.

Tools and Equipment Insurance covering physical damage to or
loss of all major tools and equipment, office furniture and
equipment, and vehicles for which Seller is responsible
throughout the course of the Work.

"Umbrella" or Excess Liability Insurance, over the
Comprehensive or Commercial General Liability, Automobile
Liability and Employer's Liability, with a coverage limit of
$10,000,000.

The foregoing insurance coverages shall be primary and
non-contributing with respect to any other insurance or self
insurance which may be maintained by Purchaser/Purchaser's
Customer, Owner, Owner's Lenders, the Electric Utility and
Steam Host to which Owner will be furnishing electricity and
steam, and the Puerto Rico Aqueduct and Sewer Authority.
Seller's Comprehensive General Liability and Automobile
Liability Insurance policies shall contain a Cross Liability
and Severability of interest clause.  Seller shall obtain
from each of its insurers a waiver of subrogation in favor
of Purchaser/Purchaser's Customer, its affiliates, Owner,
Owner's Lenders, the Electric Utility and Steam Host to
which Owner will be furnishing electricity and steam, and

EEC-05456

**PURCHASE ORDER**

**ABB Combustion Engineering Systems**

| Item Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|---|---|---|---|---|---|

the Puerto Rico Aqueduct and Sewer Authority with respect to
losses arising out of or in connection with the Work. Seller
shall cause its insurance underwriters to issue Certificates
of Insurance satisfactory in form to Purchaser (ACCORD form
or equivalent) evidencing that the coverages, coverage
extensions, policy endorsements and waivers of subrogation
required under this Contract are maintained in force and
that not less than 30 days written notice will be given to
Purchaser/Purchaser's Customer, Owner and Owner's Lenders
prior to any material modification or cancellation of the
policies.

Builder's Risk Insurance covering loss or damages to
materials and equipment at the Jobsite that are and/or will
be incorporated into the completed Facility shall be
provided by D/FDC or Owner.   Contractor and its
subcontractors shall be additional named insured on the
Builders Risk Insurance Policy and such policy shall provide
a waiver of subrogation in favor of Contractor.  Contractor
shall be responsible for the payment of the applicable
deductible (but in no event shall said deductible exceed
$25,000 per occurrence) and other uninsured amounts for each
loss or damage to such materials or equipment which are in
the care, custody and control of Contractor.

Changes in Seller's insurance costs or escalations in
premiums related to insurance programs and limits agreed to
herein shall not be the basis for any increase in the price
of the Work unless such change is due to changes in the
Work.  However, the additional cost for any other insurance
required to be put into place by Purchaser/Purchaser's
Customer or Owner shall be borne by Purchaser/Purchaser's
Customer or Owner.

All insurance coverage provided by the Seller shall be on an
occurrence basis unless such coverage is not commercially
available, in which event the parties shall agree upon
replacement coverage on a claims made basis which provides,
to the fullest extent possible, the same coverage as would
be provided on an occurrence basis.

21.   Year 2000 Compliance
Seller hereby irrevocably represents and warrants that the
delivered product, software, or systems are Year 2000
compliant and that neither the performance nor functionality
of the product, software or system, operating alone and/or
together with other products, software and/or systems, are
and will be affected by dates prior to, during and after
Year 2000; in particular;

    no value for current date will cause any interruption in
the operation of the product, software or system,
    the product shall calculate, manipulate and represent all
data values within the application domain correctly for the
purposes for which they were intended,
    in all interfaces and data storage, the century in any
date is specified either explicitly or by unambiguous
inferencing rules,
    the Year 2000, and all the leap years beyond the year
2000, must be recognized as leap years,
    cause loss of functionality specified in the Agreement
under which the product software or system were originally
furnished.

EEC-05457

B.229

**PURCHASE ORDER**

ABB Combustion Engineering Systems

Date:   03/30/99

Page:   18

P. O. Number:
**50730 IO**

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|-----|----------------------------|-----------------------|------------|----------|

In the event of any breach of any of the above warranties,
seller shall promptly, upon receipt of notice of
non-conformity from Purchaser, holding Purchaser harmless
from any cost and expense, repair the defect, replace the
defective product, software and/or system with product,
software and/or system complying with the above warranties,
and/or take such other actions as are reasonably
satisfactory to Purchaser and its customer to restore full
warranty compliance additionally and without cost to
Purchaser. Seller shall, upon demand, provide to Purchaser
copies of Seller's Year 2000 Compliance Testing Procedures
and testing results applicable to the product, software
and/or systems furnished in connection with this Agreement
or P.O.

Seller further warrants that all its facilities are Year
compliant in accordance with the British Standards.


22.0 DELAYS

   In the event Seller or Purchaser is delayed in performing
any of their respective obligations in the Contract (other
than the payment of money) and such delay is caused by a
Force Majeure Event defined as; acts of God, war, riots,
civil insurrection, acts of the public enemy, accidents,
acts of civil or military authority, sabotage, epidemics,
revolution, injunction, terrorism, quarantine, strikes and
labor disputes (except as excluded below), fires, floods,
landslides, tidal wave, hurricane, lightning, explosion or
earthquakes,  or other similar events, beyond the reasonable
control of the party delayed, such delay shall be excused
and the period of such delay shall be added to the time for
performance as required.  Force Majeure Events do not
include strikes, work stoppages and labor disputes or unrest
of any kind involving employees of Seller or any of its
subcontractors employed on the Facility Site (provided,
however, that if such events are beyond the control of the
Seller or any of its subcontractors and are not caused by
the actions or failure to act of Seller or any of its
subcontractors, such events shall be Force Majeure Events),
late delivery of materials or equipment (except to the
extent caused by a Force Majeure Event), and economic
hardship.   In the event any such delay due to the foregoing
causes or events occurs or is anticipated, the party delayed
or anticipating delay shall promptly notify the other party
in writing of such delay or expected delay and the cause and
estimated duration of such delay.  In the event of a delay
due to the foregoing causes or events, whether such delay is
excused or not, the party delayed shall, at no cost to the
other party, exercise reasonable diligence to shorten and
avoid the delay and shall keep the other party advised as to
the continuance of the delay and steps taken to shorten or
terminate the delay.  Seller shall not in any event be
entitled to additional or extra compensation by reason of
Seller having been delayed in performance of its obligations
due to the foregoing causes or events whether such delay was
excused or not.  Seller or Purchaser shall, within five (5)
working days of becoming knowledgeable of the commencement
of any such delay, give to the other written notice thereof

**PURCHASE ORDER**

ABB Combustion Engineering Systems

Date: 03/30/99

Page: 19

P. O. Number:
**50730 IO**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-------------------------|--------------------|------------|----------|

and of the anticipated results thereof.  Within two (2)
working days of the termination of any such delay, Seller or
Purchaser shall file a written notice with the other
specifying the actual duration of the delay.  If the delay
was beyond the control and without the fault or negligence
of  Seller or Purchaser, as the case may be,  and not
foreseeable at the effective date of this Contract, Seller
or Purchaser shall be entitled to an equitable extension of
the time of performance of this Contract, provided that the
extension of time is of no greater scope and of no longer
duration than is reasonably required by the delay. Seller
shall not be entitled to, and hereby expressly waives
recovery of, and damages suffered by reason of the delays
contemplated by this Section 13.0 and extension of time
shall constitute Seller's sole remedy for such delays.

The time of completion of any and all Work items scheduled
in the Contract shall not be extended because of
non-extraordinary weather conditions or other natural
non-extraordinary phenomena including, but not limited to
normal rain, high temperature, wet grounds, and high winds.

The inability of Seller to obtain permits or licenses
required for the progress of its Work shall not be
considered a reason for force majeure claim.

**23.0 WORK RULES**

Seller agrees to use its reasonable efforts to comply with
Purchaser's/Purchaser's Customer's and Owner's rules
governing the conduct of Seller and Seller's employees,
agents and subcontractors at and about the jobsite.  Seller
agrees that it shall ensure that its supervisory personnel,
employees, agents and subcontractors at the jobsite comply
strictly with such rules.  Purchaser/Purchaser's Customer
and Owner reserve the right to, from time to time, revise
any such rules, and Seller shall comply fully with such
rules as revised in accordance with the foregoing
provisions.

-----------------------------------------------------------
                              FIRM TOTAL NET PRICE    $20,000.00
-----------------------------------------------------------
           QUALITY ASSURANCE NOTIFICATION

Notification for final inspection is required for material
or fabrication of components on this order.  Criteria for
notification are defined in this order.
-----------------------------------------------------------
           INVOICE INSTRUCTIONS
   Mail original and two copies of invoices with a copy of
the bill of lading and receipted freight bill to:

   ABB COMBUSTION ENGINEERING SYSTEMS
   COMBUSTION ENGINEERING INCORPORATED
   P. O. BOX 339
   WINDSOR, CT  06095

   In order to assure prompt payment, all invoices must
include the purchase order number and be itemized in the
EXACT line item format of the purchase order.  Line item

EEC-05459

**B.231**



**PURCHASE ORDER**
ABB Combustion Engineering Systems

Date:  03/30/99

Page:  20

P. O. Number:
**50730 IO**

numbers must be shown together with the appropriate charges.

  Netting Code:    N/A
  INFORM Code:     N/A
  ABACUS Code:     N/A

     Any invoice not submitted in this manner shall be
returned to the supplier.
-----------------------------------------------------------------

EEC-05460



PURCHASE ORDER
ACKNOWLEDGMENT

# PURCHASE ORDER
## ACKNOWLEDGMENT

**ABB Combustion Engineering Systems**

Date:  03/30/99

Page:   21

P. O. Number:
**50730 IO**

| Contract: | 65005697 | - AES PUERTO RICO |
|---|---|---|

This order consists of    21    pages.

**ACCEPTANCE**
    Please indicate your acceptance of this order
subject to the terms and conditions as shown on the face
and reverse side and the required shipping schedule by
signing after the words "accepted by" and returning this
acknowledgement to:

ABB·COMBUSTION ENGINEERING, SYSTEMS
COMBUSTION ENGINEERING, INCORPORATED
2000 Day Hill Road
Windsor, CT  06095

ATTN: L. R. JANNELLE
Purchasing Department 5275-2228

Accepted By: _____

    Title: Vice President

    Date: 4-14-99

ABB COMBUSTION ENGINEERING SYSTEMS
COMBUSTION ENGINEERING, INCORPORATED
Purchasing Department

By: _____ 3-30-99

EEC-05461

**B.233**