

## PURCHASE CHANGE ORDER

**ABB Combustion Engineering Systems**
Combustion Engineering, Inc.
2000 Day Hill Road
Post Office Box 500
Windsor, CT 06095-0500
Tel. (860) 688-1911  FAX (860) 285-9730

Date:  12/29/99

Page:  1

P. O. Number: CO#:
**50730 IO   1**

TO:
ENVIRONMENTAL ELEMENTS CORP.
3700 KOPPERS ST.
P.O. BOX 1318
BALTIMORE MD  21203

SHIP TO:
To Be Advised

| CONTRACT NAME | CONTRACT NUMBER | BUYER NAME | SUPPLIER CODE | INV TAX |
|---|---|---|---|---|
| AES PUERTO RICO | 65005697 | L. R. JANNELLE | 00202282 | N |

| PAYMENT TERMS | FOB POINT | SHIPPING CHARGES | SHIP VIA |
|---|---|---|---|
| Net 30 Days | FOB CONSOLIDATION POINT | Freight, Third Party Billing | To Be Advised |

This change order number 1 is issued to formalize Full Notice to Proceed on this purchase order as shown in line items six through ten below.  These will supersede line items one through 5 of the original purchase order for preliminary notice to proceed.

A.  Contract Value:

The base scope includes primer paint, SSPC-2, Galvanized Support Steel, 16 man months of erection and commissioning supervision, air and water piping, data management system, electrical materials and equipment and special packing containers.  Purchaser and Seller shall endeavor to obtain shared cost reduction through such methods as alternative sourcing.  A formal plan will be jointly developed and implemented.

Base = $14,527,570 Esc. = 143,126 Bond = 173,705 (30 months) – Seismic = 76,000 Less PrecipitatorHoppers (256,600)

Total    $14,663,801

B.  Payment Terms

a.  100% of the bond price ($173,705) upon receipt of Seller's performance bond by ABB/CE, January, 2000

b.  Of the Balance of Order Value ($14,490,096) (both date and milestone event must be met)

10% upon receipt of signed acknowledgment of p.o. (less $20,000 paid)

5% upon submittal of final general arrangements March 1, 2000

5% upon submittal of final p&id's July 1, 2000

5% upon  final mechanical erection package September 1, 2000

70% pro rata upon shipment
     or substantiated notice of readiness to ship
     October-2000 thru June 2001 (see schedule item D below)

5% upon completion of commissioning with submittal of a 10% irrevocable letter of credit valid through the initial warranty period of 12 months from commercial acceptance

API 0672537



**PURCHASE CHANGE ORDER**
ABB Combustion Engineering Systems

Date:  12/29/99
Page:  2
P. O. Number:  CO#:
**50730 IO  1**

transitioning to 5% valid throughout the warranty for accelerated corrosion which begins at the end of the initial warranty period and extends for a period of an additional 12 months.

C.  Bonding:  A full performance and payment bond will be provided upon notice to proceed valid for 30 months.

D.  Schedule:  (Dates shown below are commencement ship dates.  Completion dates are plus thirty days per category)

| | Unit #2 ship date | Unit #1 ship date |
|---|---|---|
| ESP Support Steel | 31-Oct-00 | 29-Nov-00 |
| Casing | 31-Oct-00 | 29-Nov-00 |
| Support Girders | 27-Dec-00 | 10-Jan-01 |
| Inlet & outlet nozz. | 7-Feb-01 | 16-Mar-01 |
| Rigitrode Frames | 19-Mar-01 | 2-Apr-01 |
| Collecting surface | 12-Mar-01 | 2-Apr-01 |
| Penthouse (cold roof) | 8-Apr-01 | 7-May-01 |
| Penthouse (hot roof) | 26-Mar-01 | 18-Apr-01 |
| Rappers | 6-May-01 | 31-May-01 |
| Convey & Rot. Equip. | 12-Mar-01 | 2-Apr-01 |
| Electrical | 17-Mar-01 | 10-Apr-01 |
| Insul & Lagging | 6-Apr-01 | 15-Apr-01 |
| CDS Support Steel | 27-Dec-00 | 10-Jan-01 |
| CDS Center sect. | 7-Feb-01 | 16-Mar-01 |
| Lime storage Bin | 3-Feb-01 | 12-Mar-01 |
| Air slide | 8-Apr-01 | 7-May-01 |
| misc. piping | 19-Mar-01 | 19-Apr-01 |

E. Precipitator Ash Hoppers:

The total estimated weight for hoppers is 386,000 lbs.  If the total weight exceeds the estimate by 2%, EEC will compensate CE for excess weight. If the total weight is more than 2% less than estimated, then ABB/CE will compensate EEC it's share of the amount saved. Compensation to either party shall be made at the rate of .66/lb.

Weights are calculated weights based on drawings.

API 0672538



**PURCHASE CHANGE ORDER**

ABB Combustion Engineering Systems

ASEA BROWN BOVERI

Date: 12/29/99

Page: 3

P. O. Number: CO#:

**50730 IO   1**

F. **Performance Guarangee Offsets:**

ABB/CE can not currently allow for Liquidated Damages offsets but has sought provision under it's prime contract. An amendment will be made should such provision be granted.

ABB/CE and EEC agree to work cooperatively throughout the contract to optimize the overall performance/consumptions of the systems in order to minimize Liquidated Damages for both parties.

G. **Cancellation Schedule:**

| Month | Current Month | Cumulative |
|---|---|---|
| 1 | 3.5 | 3.5 |
| 2 | 4.0 | 7.5 |
| 3 | 4.5 | 12.0 |
| 4 | 6.0 | 18.0 |
| 5 | 6.0 | 24.0 |
| 6 | 7.0 | 31.0 |
| 7 | 9.0 | 40.0 |
| 8 | 9.0 | 49.0 |
| 9 | 8.0 | 57.0 |
| 10 | 8.0 | 65.0 |
| 11 | 6.0 | 71.0 |
| 12 | 5.0 | 76.0 |
| 13 | 4.0 | 80.0 |
| 14 | 3.0 | 83.0 |
| 15 | 2.0 | 85.0 |
| 16 | 2.0 | 87.0 |
| 17 | 2.0 | 89.0 |
| 18 | 1.0 | 90.0 |
| 19 | 1.0 | 91.0 |
| 20 | 1.0 | 92.0 |
| 21 | 1.0 | 93.0 |
| 22 | 1.0 | 94.0 |
| 23 | 1.0 | 95.0 |
| 24 | 1.0 | 96.0 |
| 25 | 1.0 | 97.0 |
| 26 | 1.0 | 98.0 |
| 27 | .5 | 98.5 |
| 28 | .5 | 99.0 |
| 29 | 1.0 | 100.0 |

H. **SDDR:**

ABB/CE will be receiving an updated SDDR at which time final negotiations for liquidated damages for final submittals will be completed with EEC.

I. ABB/CE's comments to EEC's comments and exceptions, transmitted electronically on December 27, 1999 are an incorporated reference document to this purchase order. It is recognized that EEC is currently not ISO 9000 certified.

J. **Erection Package**

In Support of the Request for Quotation (RFQ), for the Construction and Commissioning of the Precipitator and Circulating Dry Scrubber (CDS) for the AES Puerto Rico Project, EEC will need to provide information support and

API 0672539



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

ASEA BROWN BOVERI

Date:  12/29/99

Page:  4

P. O. Number:  CO#:

**50730 IO  1**

services. As a minimum, the following types of information is to be supplied by EEC to ABBCE in the preparation of the RFQ document:

1. A complete set of erection drawings, including vendor equipment drawings.

2. A set of erection and commissioning procedures including vendor equipment installation and operational instructions.

3. An Equipment Summary that lists the entire field supplied components, lists of the number of pieces, physical sizes and weights.

4. Construction Requirements that delineate a material delivery schedule that is compatible with ABBCE's Construction Schedule. Quality Control Procedures that ensure that the construction and commissioning activities are consistent with the installation and operational requirements set forth by ABBCE.

5. A construction and commissioning schedule in a Primavera, P3 format that delineates all major activities in the erection and commissioning of the equipment.

6. Narratives that define the scope of the work activities related to the installation of the equipment consistent with the Contract Material Supply.

7. All list of any special tools and equipment necessary for the installation and commissioning of the equipment.

8. A participatory review with ABBCE of the RFQ documents prior to issuance to Sub Contractors. Review and comments of the Sub Contractor proposals and assistance with any technical and commercial questions that may occur during the proposal process.

In support of the Construction and Commissioning of the EEC supplied equipment, EEC will provide to ABBCE the following support:

1. Assistance with Construction and Commissioning planing activities that will impact the installation of the equipment or as needed in support of discussions with the installation Contractor(s), DFD and or with AES related to the erection and commissioning of the equipment.

2. A review of the any special erection requirements and procedures by the sub contractor necessary for the proper installation of the equipment.

3. A qualified and experienced Construction Superintendent, who will assigned to the AES Puerto Rico site for the duration of the EEC equipment installation. This Construction Superintendent, who will be in an advisory role to ABBCE's designated Construction Manager to assist with answering questions during the erection of the equipment.

4. A qualified and experienced Commissioning engineer, who will assigned to the AES Puerto Rico site for the duration of the EEC equipment commissioning. This Commissioning Engineer, who will be in an advisory role to ABBCE's designated Commissioning Manager to assist with answering questions during the commissioning of the equipment.

API 0672540

# PURCHASE CHANGE ORDER

**ABB Combustion Engineering Systems**

**ABB**
ASEA BROWN BOVERI

Date:  12/29/99
Page:  5

P. O. Number:   CO#:
**50730 IO   1**

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|-----|----------------------------|----------------------|------------|----------|

There are 2 units on this contract.  Quantities shown are for one unit.

**Terms and Conditions of Purchase**

**1. ACCEPTANCE**

The contract ("contract") between Purchaser and Seller shall consist of these terms and conditions and any detailed specifications, drawings and samples specifically incorporated by reference on the face hereof.  Seller's written acknowledgement of receipt of this Purchase Order or shipment of goods or commencement of services ordered hereunder, shall constitute acceptance of the contract.  Any pre-printed terms on the back of the Purchase order are expressly excluded.   These terms and referenced documents shall be interpreted in the following order of precedence in the case of conflict or ambiguity:   1) those on the face of the purchase order and 2) those contained herein.

**2.    DELIVERY**

Time is of the essence, and the parties shall operate in accordance with the project schedule.   Seller shall notify Purchaser immediately in writing of any delay or threatened delay in Seller's performance under the contract. Purchaser may terminate this Purchase Order in whole or in part in accordance with the provisions of Section 7.8 hereof.

**3.    APPROVAL OF DESIGNS, DRAWINGS AND PROCEDURES**

Purchaser's approval of Seller supplied drawings, manufacturing procedures, calculations, and other documents shall not relieve the Seller of any responsibility for the goods delivered or services performed hereunder or any requirements or warranties under the contract. THERE ARE NO IMPLIED WARRANTIES .

**4.    INSPECTION**

Purchaser, or its representatives, shall have the right to inspect and test the goods or services ordered hereunder at any time prior to delivery or performance.   Final inspection shall be in accordance with the specifications.The goods or services shall not be deemed accepted until after such final inspection.  The making or failure to make any inspection of, or payment for, or acceptance of, the goods or services, shall in no way impair Purchaser's right to reject or revoke its acceptance of nonconforming goods and services or to seek any other remedies to which Purchaser may be entitled.

**5.    WARRANTY**

Seller warrants Purchaser that the Work shall comply with the provisions of this Purchase Order and all specifications and drawings referred to in this Purchase Order, and that the Work shall be free from defects in materials and



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

Date: 12/29/99

Page: 6

P. O. Number: CO#:

**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|--------------------------|--------------------|------------|----------|

workmanship and in full compliance with any design or engineering furnished by Seller. Seller further warrants Purchaser that all materials, equipment and supplies furnished by Seller for the Work shall be new and fit for their specified purposes as set forth in this Purchase Order and be in full compliance with the requirements of this Purchase Order. As described in this Purchase Order, if any defect in the Work in violation of the foregoing warranties arises within the period set forth below, Supplier shall upon receipt of prompt written notice from Purchaser of such defect promptly furnish, at no cost to Purchaser, design and engineering, labor, equipment and materials necessary to correct such defect and cause the Work to comply fully with the foregoing warranties.

Seller, at its expense, (including, without limitation, costs of removal, packing, transportation and reinstallation) shall remedy promptly any defective Work which exists during the applicable warranty period as set forth above, and of which Purchaser gives written notice within a reasonable time after discovery of the defect or damage. Upon such notification by Purchaser, Seller shall promptly commence and proceed to make all needed adjustments, repairs, additions, corrections, and replacements which arise out of or are necessitated by such defective Work or damage. Seller shall conduct such warranty work on a overtime schedule basis if Purchaser determines such a schedule is necessary to avoid or minimize the effects of an outage or load reduction and Purchaser shall reimburse Seller the premium differential for performing warranty work on an overtime basis. Seller shall coordinate its warranty Work with Purchaser to minimize interference to facility operations. Purchaser will permit reasonable access to as much of the Unit(s) as Seller may reasonably require for performance of warranty Work, but any costs of uncovering Work shall be the responsibility of the Seller. Seller shall perform warranty Work so that such adjustments, repairs, additions, corrections and replacements do not degrade the performance of, nor impair the use of the Equipment, Materials or other Work in question, other systems, or the Unit(s) as a whole to an extent that the Equipment, Materials, or other Work, systems or Unit(s) will not meet the requirements of this Purchase Order in all respects, and Seller shall repair or replace all other facilities to the extent they are destroyed or damaged as result of Seller's performance of warranty Work.

WARRANTY PERIOD

The Warranty Period means that period extending:

Until twelve (12) months after Performance Acceptance or (36) months from delivery whichever is earlier, with the following exception that the warranty period shall be extended for corrective Work as set forth below.

At the mutual agreement of Seller and Purchaser, warranty Work provided hereunder may be deferred until the time of the Unit (s) next regularly scheduled maintenance outage, provided that such outage shall commence not later than six (6) months after Purchaser 's notice to Seller of the defective condition, and the warranty provisions hereunder shall apply notwithstanding that such outage occurs after

API 0672542

# PURCHASE CHANGE ORDER

**ABB Combustion Engineering Systems**

Date: 12/29/99

Page: 7

P. O. Number:   CO#:
**50730 IO  1**

ABB
ASEA BROWN BOVERI

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|----|-----------------|----------------|------------|----------|

the time the warranty would otherwise expire. Seller shall not be liable or responsible for any such warranty work if the outage is not commenced within the stated six (6) months.

The warranty period shall be extended to cover each of the specific repairs, adjustments, additions, corrections, and replacements furnished under the warranty for a period of twelve (12) months from the date of such repair, adjustment, addition, correction, or replacement, except as provided in the following two paragraphs but in no case shall any warranty or re-warranty obligation of Seller extend beyond 24 months after Performance Acceptance. A repair, addition, adjustment, correction, or replacement shall be deemed to be completed upon Seller 's submittal to Purchaser of written Notice of Completion unless Purchaser, within ten (10) days thereafter, furnishes Seller with a written statement of reasons as to why such repair, addition, adjustment, correction, or replacement is not complete. Seller warrants that the repair, addition, adjustment, correction, or replacement will be consistent with the warranties herein throughout the duration of the applicable warranty period.

In the event any adjustment, repair, addition, correction, or replacement made pursuant to this warranty is ineffective in remedying the defective condition in question, Purchaser shall so notify Seller in writing prior to expiration of the Warranty Period, as applicable, and Seller shall proceed to conduct further warranty Work consistent with its obligation under this Article until the defective condition is remedied.

CHRONIC FAILURE

A chronic failure ( Chronic Failure ) shall be deemed to occur when any piece of Equipment and/or Materials, or part or component thereof, fails during the Warranty Period and fails a second time during the extended warranty period from the same cause(s). In the event of a Chronic Failure, Purchaser and Seller shall consult with each other and others as appropriate to reach mutual agreement as to the cause of the failure and as to the appropriate remedy. The warranty for the repair(s) shall then be extended for a period of twelve (12) months from the completion of the repair but in no case shall any warranty or re-warranty obligation of Supplier extend beyond twenty-four (24) months after Performance Acceptance.

In the event Seller shall have been notified in writing of any defects in the Work in violation of Seller 's foregoing guarantees and shall fail to promptly and adequately correct such defects, Purchaser and Owner shall have the right upon written notice to Seller to correct or to have such defects corrected for the account of Seller, and Seller shall promptly pay Purchaser or Owner the reasonable costs incurred in correcting such defects upon submittal of a written claim with backup documentation supporting written claim.

In the event of an emergency when, in the reasonable judgment of Purchaser, delay could cause serious loss or damage, the adjustments, repairs, additions, corrections, and replacements necessary to remedy any defective Work may

API 0672543

B.240



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

**ASEA BROWN BOVERI**

Date:    12/29/99

Page:    8

P. O. Number:    CO#:

**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|------|----|----|

be made by Purchaser, or by a third party chosen by Purchaser, without giving prior notice to Seller, and the reasonable cost of the remedial work shall be paid by Seller but Seller shall have no responsibility or liability (including warranty) for such remedial work. Notice of this course of action will be provided by Purchaser to Seller as soon as practical.

ACCELERATED CORROSION

The Seller shall warrant for a period of twenty-four (24) months from performance acceptance the scrubbers, precipitators and interconnecting duct work against the consequences of accelerated corrosion outside of the industry standards for power-generated facilities with dry scrubbing systems to the extent that the corrosion has materially affected or is reasonably expected to materially affect in the next two (2) years (i) the structural integrity of the Equipment or any portion thereof or (ii) that ability of the Equipment to mechanically perform. Seller 's corrosion guarantee is conditioned upon operation and maintenance of the system in accordance with Seller 's Operation and Maintenance manuals, Owner 's specified operating parameters, and typical system operation at base load and specified capacity factors. Corrosion shall be monitored by a mutually agreed upon mapping program to be conducted by Owner. Upon demonstration that corrosion exceeds the level described above, the Seller and Owner shall use best faith efforts to mutually agree on the appropriate remedial actions. In the event that the parties are unable to reach a mutual agreement either as to the extent of corrosion or the appropriate remedy, the issue shall be referred to a mutually agreeable third party mediator. There shall be no re-warranty or extended warranty obligation, as set forth above, applicable to this corrosion warranty.

Seller agrees that Purchaser may assign its rights under this warranty and other parts of this Purchase Order to Owner and Owner 's Lenders, and Seller hereby consents to the same and shall fully honor its obligations hereunder in the event of any such assignment.

Consumable items, normal wear and tear (e.g. including, but not limited to, wear on refractory surfaces and maintenance thereof and/or sacrificial items such as weld overlay, tube shields, etc.) and erosion, corrosion or chemical attack to any portion of the boiler system caused in whole or part by deviations in the fuel or feed stocks from the limits specified in the Purchase Order are excluded from any warranty obligations of the Seller.

Seller's representatives shall have reasonable access to test and operating records, the equipment, and other information they deem necessary to satisfy themselves of the validity of a claim under this warranty.

ALL IMPLIED WARRANTIES INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED AND WAIVED.

PERFORMANCE GUARANTEES.

API 0672544

B.241



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

ASEA BROWN BOVERI

Date:   12/29/99

Page:   9

P. O. Number:   CO#:
**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|-------------------------|--------------------|-----------|----------|

Seller guarantees the performance of the equipment and other Work covered by this Purchase Order to be in accordance with the guaranteed data as set forth in the following Confirmed Equipment Specifications, which Guarantees are sometimes referred to as "Performance Guarantees":

- Circulating Fluidized Bed Boiler Specification W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.00-0001, Revision 1;
- Circulating Dry Scrubber FGDS Specification W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.03-0001, Revision 1; and
- Electrostatic Precipitator Specification W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.03-0002, Revision 1.

**6.    CHANGES**

This Purchase Order shall not be changed or otherwise modified except upon the prior written authorization of a duly authorized representative of Purchaser.  Purchaser shall have the right to make any changes in the work ordered under this Purchase Order and Seller agrees to perform this Purchase Order in accordance therewith.  If in Seller's opinion such changes will cause an increase or decrease in the cost of, or time required for, performance, Seller shall notify Purchaser promptly.  If additional cost or time is required, Seller shall obtain written authorization from Purchaser before proceeding .  If Purchaser directs Seller to proceed, Purchaser shall make an equitable adjustment in the price and delivery/completion schedule.

**7. TERMINATION**

7.1  In the event that Seller shall default in the performance of any material obligation to be performed by Seller under this Contract and shall fail to commence corrective action within five (5) working days following written notice thereof from Purchaser and shall thereafter fail to diligently pursue such corrective action, Purchaser may, without prejudice to any other rights or remedies Purchaser may have, hold in abeyance payments to Seller for Work not in compliance with the Contract and/or terminate Contractor's right to continue performance of this Contract by written notice to Seller specifying the date of termination.  In the event of such termination, Purchaser may take possession of the Work at the jobsite and any or all materials and plant equipment (whether delivered to the jobsite or on order therefor by Seller), Seller's tools and construction equipment at jobsite and finish the Work by whatever method Purchaser may deem expedient.

7.2  In the event of termination by Seller under Section 7.1, Seller shall, upon request by Purchaser, promptly advise it of all outstanding subcontractors, rental agreements and purchase orders which Seller has with others pertaining to performance of the Work and furnish Purchaser with complete copies thereof.  Upon request by Purchaser, Seller shall assign to Purchaser, Purchaser's Customer or Owner, Seller's title to materials and plant equipment for the Work and those subcontracts, rental agreements and purchase orders designated by Purchaser.  Upon such assignment Seller shall have no responsibility for work performed under such assigned items after assignment.

API 0672545

B.242



# PURCHASE CHANGE ORDER

## ABB Combustion Engineering Systems



ASEA BROWN BOVERI

Date: 12/29/99

Page: 10

P. O. Number: CO#:

**50730 IO  1**

| Item | Quantity | UM | Description MSG / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|------------------------|-------------------|------------|----------|

7.3  In the event of termination by Purchaser under Section 7.1, Seller shall not be entitled to receive any further payment until the Work is completed.  Upon completion and final acceptance of the Work, Purchaser will determine the total cost incurred in completing the Work including, without limitation, additional overhead, reasonable legal and other costs incurred by Purchaser to effect such termination and to complete the Work.  If the total costs noted above exceed the balance of the Contract price unpaid at the time of the termination, Seller shall, promptly after receipt of an invoice, pay to Purchaser the amount of such excess which shall be the reasonable actual cost.  Purchaser shall have the right to recover from Seller and is authorized to set-off against and deduct from any excess payable to Seller any other damages as allowed for under this Contract and suffered by Purchaser, Purchaser's Customer or Owner due to said default or event giving rise to the termination or due to other defaults of Seller in complying with the terms of this Contract.  A waiver by Purchaser of one default by Seller shall not be considered to be a waiver of any subsequent default by Seller, nor be deemed to amend or modify the terms of this contract.

7.4  Upon commencement of a case by or against Seller under applicable bankruptcy law, or any general assignment by Seller for the benefit of its creditors, or the appointment of a receiver to take charge of Seller's assets, and provided the same renders Seller unable to perform its obligations, Purchaser may treat Seller as in default under Section 7.1 and may exercise any of the remedies of this Article.

7.5  Seller shall be considered in default from complying with the express obligations of this Contract whenever by reason of strikes, picketing or disputes of any nature between Seller, and directed solely at Seller,  and any individual, group or organization at the Jobsite, Seller persistently, repeatedly, or for any period of twenty (20) consecutive working days, should be unable to supply enough properly skilled workers or proper materials or equipment to execute the Work at the Jobsite.

7.6  Purchaser shall have the right at any time, with or without cause, to terminate further performance of all or part of the Work by written or telegraphic notice to Seller specifying the date of termination.  On the date of such termination stated in said notice, Seller shall discontinue performance of the Work and shall preserve and protect tools, construction equipment and facilities on jobsite, materials and plant equipment purchased for or committed to the Work (whether delivered to the Jobsite or on order), Work in progress and completed Work (whether at jobsite or other locations) pending Purchaser's instructions and, if requested by it, shall turn over the same to Purchaser/Purchaser's Customer, or Owner, including title to said materials and plant equipment, provided the Seller has been paid in full for such material and equipment or dispose of same in accordance with Purchaser's instructions.

7.7  Upon receipt of said notice, Seller shall advise Purchaser of its outstanding orders and subcontracts pertaining to performance of the terminated work and, upon

API 0672546

B.243

**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

Date: 12/29/99

Page: 11

P. O. Number: CO#:

**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|-------------------------|--------------------|------------|----------|

request, furnish Purchaser with complete copies. Seller shall place no further orders or subcontracts for materials, equipment, services, or facilities, except as may be necessary for completion of such portion of the Work as is not terminated; Seller shall promptly make every reasonable effort to procure cancellation, upon terms satisfactory to Purchaser, of all orders and subcontracts to the extent they relate to the performance of Work terminated; or, as directed by Purchaser, shall assign to it or Owner such of its subcontracts and orders as are designated by Purchaser, or shall take such other action relative to such subcontracts or orders as may be directed by Purchaser.

7.8   If Seller has reasonably performed all obligations under this Contract up to the date of termination, Seller shall recover from Purchaser an amount based upon the Cancellation Schedule contained herein which amount shall constitute complete and full settlement for such termination. In no event shall total payment to Seller exceed the Contract Price.

7.9   The provisions of this Contract, which by their nature survive final acceptance of the Work, shall remain in full force and effect after such termination.

8.     **TITLE AND RISK OF LOSS**

Seller agrees to deliver to the Purchaser title to the goods covered by this Purchase Order, free and clear of all liens, claims and encumbrances. Title and risk of loss to goods delivered hereunder shall pass to Purchaser upon delivery, unless otherwise agreed in writing. F.O.B. to be stated in the purchase order.

9.     **COMPLIANCE**

Seller warrants that all goods delivered and services rendered hereunder shall be in strict compliance with all applicable laws and regulations to which the goods and services are subject, including the laws and regulations of the country of manufacture and final shipment unless otherwise provided in the agreed specification. Seller shall indemnify and hold harmless the Purchaser and the Purchaser's customers from all loss, liability and fines incurred by any of them as a result of Seller's failure to so comply.

10. **INDEMNITY**

Seller agrees to defend, indemnify and hold harmless Purchaser, Purchaser's Customer and Owner, the Owner's lenders, the Utility, the PREPA, and the Steam Host, the affiliated companies of each, and all of their directors, officers, employees, agents and representatives, from and against:

Any claim, demand, cause of action, liability, loss or expense arising by reason of Seller's actual failure (or if asserted, to defend until proven not liable) to comply with any applicable law, ordinance, regulation, rule or order applicable to Seller under this Contract, or with this Contract. This Section includes, but is not limited to,

API 0672547

B.244





**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

Date: 12/29/99

Page: 12

P. O. Number: CO#:

**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|--------------------------|---------------------|------------|----------|

fines or penalties by government authorities and claims
arising from Seller's actual or asserted failure to pay
taxes for which Seller is liable to pay hereunder.

Any claim, demand, cause of action, liability, loss or
expense arising from actual violation or infringement of
rights (or, if asserted, to defend until proven not liable)
in any applicable patent, copyright, proprietary
information, trade secret or other property right caused or
alleged to be caused by the use of goods, materials,
equipment, methods, processes, designs or information,
including construction methods, construction equipment and
temporary construction facilities, furnished by Seller or
its subcontractors in performance of the Work. Should any
goods or services provided by Seller become the subject of a
claim of infringement of a patent, copyright or other
property right, Seller shall, at Seller's option, either
procure for Purchaser/Purchaser's Customer and Owner the
right to continue using such goods or services, replace same
with equivalent, non-infringing goods or services, or modify
the goods or services so that the use thereof becomes
non-infringing, provided that any such modification or
replacement is of equal quality and provides equal
performance to the infringing goods or services. Seller's
obligations under this paragraph shall not apply to any
goods, equipment processes, methods, designs or information
to the extent that it was subsequently altered, modified or
changed by Purchaser/ Purchaser's Customer/Owner or used or
operated by Purchaser/Purchaser's Customer/Owner in a manner
in intended by this Contract.

Any claim, demand, cause of action, liability, loss or
expense arising from injury to or death of third persons
(including employees of  Purchaser/ Purchaser's Customer/
Owner, Contractor and Contractor's subcontractors) or from
damage to or loss of tangible property (but exclusive of
property damage to the extent covered by the proceeds of the
Builders All Risk Insurance or other insurance provided by
Purchaser/Purchaser's Customer and/or Owner) caused by any
negligent acts or omissions of Seller or its subcontractors;
provided, however, that Seller's indemnification obligation
for damage to the Facility shall not extend beyond the
Performance Acceptance Date or during the Warranty Period,
if the Seller and/or its subcontractors is/are on the site
to perform Warranty Work.   Seller's defense and indemnity
obligations hereunder include claims and damages arising
from non-delegable duties of Purchaser/Purchaser's Customer
or Owner or arising from use by Seller of construction
equipment, tools, scaffolding or facilities furnished to
Seller by Purchaser/Purchaser's Customer or Owner.

Any claim, demand, cause of action, liability, loss or
expense for actual or alleged contamination, pollution, or
public or private nuisance, to the extent arising out of any
acts or omissions of Seller, or its subcontractors.

In the event of joint or concurrent negligence on the part
of the Purchaser or any other indemnified party, the
liability, and any associated indemnity obligations shall be
reduced by the negligence attributable to such indemnified
party. Seller's defense and indemnity obligations shall
include the duty to reimburse any reasonable attorneys' fees
and expenses incurred by Purchaser/Purchaser's Customer or

API 0672548

B.245



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

Date:  12/29/99

Page:   13

P. O. Number:  CO#:

**50730 IO  1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|--------------------------|--------------------|------------|----------|

Owner for legal action to enforce Seller's indemnity obligations, but only to the extent Purchaser/Purchaser's Customer or Owner is successful in such actions. With respect to claims against Purchaser/Purchaser's Customer or Owner by employees of Seller or its subcontractors, the indemnity obligations created under this Article shall not be limited by the fact of, amount, or type of benefits or compensation payable by or for Seller, its subcontractors or suppliers under any workers' compensation, disability benefits, or other employee benefits acts or regulations, and Seller waives, against Purchaser/Purchaser's Customer or Owner, any limitation of liability arising from workers' compensation or such other acts of regulations.

If there is a dispute between the parties regarding Seller's obligations hereunder, Purchaser shall be entitled to retain from payments otherwise due Seller such amounts as shall reasonably be considered necessary to satisfy any claims, suits or liens for damages that fall within Seller's indemnity obligations under this Article 29.0, until such claims suits or liens have been settled and satisfactory evidence to that effect has been furnished to Purchaser.

Seller acknowledges specific payment of $10.00 incorporated into the Contract Price as legal consideration for Seller's indemnity obligations as may be provided in this Contract.

Notice and Defense: Promptly after receipt by Purchaser of any claim or notice of the commencement of any action, proceeding or investigation as to which the indemnity provided for this Article applies, such indemnified party shall notify Seller in writing of such fact. Seller shall assume on behalf of the indemnified party the defense thereof with counsel of the indemnified party's choice or which shall be reasonably acceptable to Purchaser; provided that such indemnified party shall have the right to be represented by independent counsel of its own selection and at its own expense. Purchaser/Purchaser's Customer and Owner shall provide reasonable support and assistance to the Seller in connection with the defense of any claim to which the indemnity herein shall apply.

11.    ASSIGNMENT AND SUBCONTRACTING

Seller shall not assign this Purchase Order to subcontract the whole or any part thereof without the Purchaser's prior written consent. Seller's purchase of raw materials or standard commercial articles shall not be deemed a subcontract.

12.    EQUAL EMPLOYMENT OPPORTUNITY

In performing this Purchase Order, Seller agrees to comply with Executive Order 11246, as amended, the Rehabilitation Act of 1973, and the Vietnam Era Veterans Readjustment Assistance Act of 1972, and the equal opportunity clauses contained therein are hereby incorporated into the Purchase Order.

13.    TITLE TO DRAWINGS AND OTHER TECHNICAL INFORMATION

API 0672549

B.246

**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

**ABB**

ASEA BROWN BOVERI

Date:  12/29/99

Page:  14

P. O. Number:  CO#:

**50730 IO  1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|----|----|----|----|

Engineering and related data, calculations, plans, maps, drawings, computer programs and specifications furnished by Purchaser/Purchaser's Customer or Owner in connection with the Work ("Purchaser's Documents") shall remain Purchaser/Purchaser's Customer's or Owner's property. Seller agrees not to use or release to others any Purchaser's Documents for purposes other than to perform the Work unless prior written consent is given by Purchaser. Seller shall give Purchaser receipts for Purchaser's documents upon request.   Seller shall be responsible for their safekeeping and return upon request, termination or completion of this Purchase Order.

Any drawings, data or information supplied by Seller hereunder shall remain the sole and exclusive property of Seller but may be used by Purchaser/Purchaser's Customer and Owner solely for the purpose of evaluation, facilitating and/or completing construction, maintenance, operation and/or repair of the subject Facility and not for any other unrelated purpose.

14.    PUBLICITY

Seller shall obtain the consent of Purchaser prior to any publicity regarding any order hereunder, and Purchaser shall have the right to participate in the content of any such proposed publicity.

15.    APPLICABLE LAW

Unless otherwise provided on the face hereof, this Purchase Order shall be governed in all respects in accordance with the law of the State of Delaware without giving effect to principles of choice of law thereof.

16.    LIMITATION OF LIABILITY

In no event shall either party be liable for any special, indirect, incidental or consequential damages of any nature, including, but not limited to, under-utilization of labor or facilities, loss of revenues or anticipated profits, potential damage to business reputation, or loss of business or business opportunity, whether based on contract, tort (including negligence), strict liability or otherwise.

In no event shall Seller's liability for any matter relating to this Purchase Order, including, without limitation, warranties, breach of contract, tort (including negligence) and lawsuits, but excluding any patent indemnity or third party liability, exceed either individually or in the aggregate an amount equal to the Purchase Order Price.

In no event shall Seller's liability for Liquidated Damages exceed, in the aggregate, an amount equal to thirty percent (30%) of the Purchase Order Price. Where a remedy is specified in the Purchase Order for an occurrence, such remedy shall be an exclusive remedy for such occurrence; where no remedy is specified in the Purchase Order for an occurrence, the remedy at law shall apply . Furthermore, it is specifically understood and agreed that the payment of any liquidated damages provided for in the Purchase Order

API 0672550



 **PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

Date: 12/29/99

Page: 15

P. O. Number: CO#:

**50730 IO   1**

**ASEA BROWN BOVERI**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|--------------------------|--------------------|------------|----------|

shall constitute Seller's sole obligation and Purchaser/Purchaser's Customer's and/or Owner's sole and exclusive remedies for Seller's failure to meet the Purchase Order schedule and/or Performance Guarantees.  All releases, waivers or limitations of liability specifically expressed in this Purchase Order apply equally to Seller's subcontractors, suppliers and vendors of any tier.  All releases, waivers or limitations of liability specifically expressed in this Contract apply notwithstanding the negligence, strict liability, fault, or breach of warranty or contract of the party whose liability is so released or limited.

**17.  WAIVER AND RELEASE OF LIEN**

With each milestone payment invoice, Seller shall furnish partial lien waivers (in substantially the form shown as Attachment ___I___ ) which partial lien waiver will waive Seller's lien rights for all work performed through the cutoff date of such invoice.  Purchaser may withhold payment of invoices until Seller furnishes such partial lien waivers.  Such partial lien waiver may be conditioned upon receipt of the associated payment.  Upon request, Seller shall provide partial lien waivers from subcontractors and suppliers supplying goods or services with a total price of $100,000 or more.  A final lien waiver conditioned upon receipt of the final payment will be required to effect final payment.

**18.  BACKCHARGES**

A backcharge is a cost sustained by Purchaser and chargeable to Seller, which shall either be paid by Seller or, at Purchaser's option, deducted from amounts owed to Seller.  Without limitation and by way of example only, backcharges may result from:

Services performed by Purchaser, at Seller's request, for work which is within Seller's Scope of Work under this Purchase Order, or

Costs sustained by Purchaser as a result of Seller's non-compliance with the provisions of this Purchase Order or Seller's act or omission or negligence.

Upon identification by Purchaser of an actual or anticipated backcharge, Purchaser will issue Seller  a backcharge notice.  The backcharge cost shall include:

     a.     Labor:  at actual cost plus 15% to cover payroll additives;

     b.     Material:  at actual supplier and freight invoice cost delivered to jobsite;

     c.     Construction Equipment:  at actual third party rental cost or at Purchaser's equipment rental rates whichever may be applicable;

     10% shall be added to Paragraph's a. through c. above for indirect costs, overhead, supervision and

API 0672551

**B.248**



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

Date:  12/29/99

Page:  16

P. O. Number:  CO#:

**50730 IO    1**

ASEA BROWN BOVERI

| Item | Quantity | UM | Description<br>WBS / Status | Required<br>Ship Date | Unit Price | Extended |
|------|----------|-----|--------------|-----------|-----------|----------|

administration.

**19.0     LIQUIDATED DAMAGES**

**GENERAL**

Seller shall meet the Ship Dates and Performance Guarantees
set forth in this Section 19.0.  The parties agree that
failure of Seller to meet these dates and Performance
Guarantees will do Purchaser harm and that damages for
failure to meet said guarantees are extremely impracticable
or impossible to predict or calculate, and accordingly
Seller shall be liable for liquidated damages to Purchaser
for failure to achieve Ship Dates or Performance Guarantees
as specified , which liquidated damages Seller will pay to
Purchaser.  Seller acknowledges and affirms that the amounts
of liquidated damages set forth herein do not constitute a
penalty, but rather are a fair estimate and assessment of
damages which are uncertain and not readily ascertainable.
The liquidated damages set forth in this Section 19.0 are
the sole and exclusive remedies of Purchaser for failure of
Seller to meet Ship Dates or Performance Guarantees.  The
parties agree that liquidated damages are in lieu of actual
damages and Purchaser will not attempt to recover actual
damages for Seller's failure to achieve the guarantees
stipulated in this Section 19.  All liquidated damages
specified herein are cumulative and no liquidated damages
shall be deemed to supplement, replace, supersede or in any
way reduce any other liquidated damages for which Seller is
responsible.

**LIQUIDATED DAMAGES FOR LATE DRAWINGS AND DATA SUBMITTAL**

The Seller recognizes that Purchaser will suffer damages in
the event of delay in schedules for submittal of Final
drawings and data four working days prior to those specified
in the DDMISR.  Seller shall submit drawings and data
packages to arrive at Purchaser on or before the specified
dates.  Documents submitted shall be in accordance with the
requirements of this Contract.  Documents that do not meet
these requirements will be returned to the Seller and will
not be accepted until resubmitted and received in proper
form and content by Purchaser.  The parties agree that the
sum of $500.00 per calendar day is a reasonable and fair
estimate of damages and loss which Purchaser would suffer
for each such calendar day that Seller is late in submitting
each drawing package or data package.  It is therefore
agreed that, in the event of such failure by Seller, Seller
shall pay to Purchaser the sum of $500.00 for each calendar
day by which the actual date of each drawing package or data
package is later than the said firm drawing package or data
package submittal date.

**LIQUIDATED DAMAGES FOR LATE SHIPMENT**

In the event that the delivery of all or any portion of the
equipment and materials are delayed beyond the delivery date
specified, the following liquidated damages shall be imposed
on the seller:

1/4 % per day or part of for each day or part of that

API 0672552

**B.249**



**PURCHASE CHANGE ORDER**

ABB Combustion Engineering Systems

ABB
ASEA BROWN BOVERI

Date:  12/29/99

Page:  17

P. O. Number:  CO#:

**50730 IO  1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-------------------------|--------------------|------------|----------|

shipment (or notice of readiness in case of purchaser arranged shipment) is beyond the required ship date.

The above percentages are to be applied to the total value of the purchase order.

### LIQUIDATED DAMAGES FOR TECHNICAL PERFORMANCE

Seller guarantees the performance of the equipment and other Work covered by this Purchase Order to be in accordance with the guaranteed data as set forth in the following Confirmed Equipment Specifications, which Guarantees are sometimes referred to as "Performance Guarantees":

- Circulating Fluidized Bed Boiler Specification W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.00-0001, Revision 1;
- Circulating Dry Scrubber FGDS Specification W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.03-0001, Revision 1; and
- Electrostatic Precipitator Specification W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.03-0002, Revision 1.

Seller's achievement of these Performance Guarantees will be demonstrated over a four (4) hour test period as set forth in the Performance Test Plan which will occur during the Performance Test. Seller's achievement of these Performance Guarantees will be tested per the methods specified in the Performance Test Plan.

It is agreed that the actual damages and loss which Purchaser would incur as a result of Seller's default in its obligation to meet the Performance Guarantees would be impractical and difficult to determine and that the sums listed below are a reasonable and fair estimate of the damages and loss which Purchaser would suffer by Seller's failure to meet the Performance Guarantees.  It is, therefore, agreed that Seller shall pay Purchaser the following liquidated damages for any shortfalls in meeting the Performance Guarantees:

A. Auxiliary Power Consumption:

$2,733 for each full KW that the Equipment is in excess of the guarantee value, as defined in the performance section of the technical specification.

B. Lime:

$6,585 per each full pound per hour of Lime that the Facility is in excess of the guarantee value, as defined in the performance section of the technical specification.

C. Pressure drop:  $30,336/0.1 inch w.c. for each 0.1 inch w.c. in excess of the guarantee value as defined in the performance section of the technical specification.

D. Performance Acceptance:  $50,000/day for each day of failure to achieve performance acceptance for reasons attributable to nonconformance of EEC supplied equipment.

API 0672553

**B.250**

# PURCHASE CHANGE ORDER

**ABB Combustion Engineering Systems**

**ABB**

ASEA BROWN BOVERI

Date: 12/29/99

Page: 18

P. O. Number:   CO#:

**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|------|------|------|

**PAYMENT OF LIQUIDATED DAMAGES**

Seller agrees that all sums payable by Seller to Purchaser as liquidated damages pursuant to this Section 10 shall be paid promptly to Purchaser or, at Purchaser's option, may be deducted by Purchaser from the price to be paid to Purchaser hereunder.  The liquidated damages are agreed to be a reasonable estimate of actual damages, not a penalty.

The parties agree that Purchaser shall reasonably assess any failure by Seller to meet a date against which liquidated damages are attached, in order to ascertain whether any such failure has had the expected negative impact.  If in Purchaser's sole opinion, the impact was not significant, it will not be applied.

The liquidated damages set forth in this Section 19.0 are the sole and exclusive remedies of Purchaser for failure of Seller to meet Performance Acceptance or Performance Guarantees, however, shall not constitute a waiver of any rights of Purchaser to damages or other remedies of Purchaser under other Sections of this Contract not related to Seller's failure to meet Performance Acceptance and/or Performance Guarantees.

Seller's liability for liquidated damages shall be limited in accordance with this Purchase Order provided, however, that liquidated damages shall not be deemed to be incidental, special or consequential damages.

**REMEDIES**

In the event the Performance Test results indicate lower than specified and/or guaranteed performance, Seller will be given the opportunity, which is reasonably possible under the circumstances, to rectify the equipment and the unit will be retested.

In the event of any deficiencies in Seller's equipment and design relative to the specifications and/or performance guarantees in the Technical Specification which are not covered by liquidated damages, Seller will correct these deficiencies to conform to the performance guarantees as set out in the specification.

**20.0 INSURANCE**

Before any Work is performed under this Purchase Order, Seller shall, as its sole cost, obtain and maintain in force the following insurance coverages:

Worker's Compensation Insurance, including occupational illness or disease coverage, or other similar social insurance in accordance with the laws of the nation, state, commonwealth, territory or province exercising jurisdiction over the employee and Employer's Liability Insurance with a limit of $500,000 per occurrence and in the aggregate.

Commercial General Liability Insurance, including Contractual Liability, Products and Completed Operations Liability (with the Completed Operations coverage to remain in effect for two (2) years following Performance Acceptance), Explosion, Collapse, and Underground Hazards,

API 0672554

B.251



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

ASEA BROWN BOVERI

Date: 12/29/99

Page: 19

P. O. Number: CO#:

**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|------------------------|-------------------|------------|----------|

Personal Injury Liability (with the standard contractual and
employee exclusions eliminated), Elevators and Escalators,
Employers Liability, and Broad Form Property Damage
Liability coverages with a combined single limit of
$1,000,000 per occurrence and in the aggregate. The Policy
shall name Purchaser/Purchaser's Customer, its affiliates,
Owner's Lenders and Owner as additional insureds with
respect to liability or losses based upon or arising out of
Seller's Work under this Purchase Order. Seller shall
evidence that such coverage has been extended to the
aforesaid additional insureds through provision of either a
specific endorsement to its policy or through a Certificate
of Insurance issued by its insurance broker on behalf of its
insurance company that states that the additional insureds
are additional insureds as required herein.

Automobile Liability Insurance covering use of all owned,
non-owned and hired automobiles with a combined single limit
of $1,000,000 per occurrence and in the aggregate for bodily
injury and property damage liability.  This policy shall
name Purchaser/Purchaser's Customer, its affiliates and
Owner and Owner's Lenders as additional insureds with
respect to liability based upon or arising out of the
activities of Seller pursuant to this Purchase Order .

Tools and Equipment Insurance covering physical damage to or
loss of all major tools and equipment, office furniture and
equipment, and vehicles for which Seller is responsible
throughout the course of the Work.

"Umbrella" or Excess Liability Insurance, over the
Commercial General Liability, Automobile Liability and
Employer's Liability, with a coverage limit of $10,000,000.

The foregoing insurance coverages shall be primary and
non-contributing with respect to any other insurance or self
insurance which may be maintained by Purchaser/Purchaser's
Customer, Owner, Owner's Lenders, the Electric Utility and
Steam Host to which Owner will be furnishing electricity and
steam, and the Puerto Rico Aqueduct and Sewer Authority.
Seller's Commercial General Liability and Automobile
Liability Insurance policies shall contain a Cross Liability
and Severability of interest clause.  Seller shall obtain
from each of its insurers a waiver of subrogation in favor
of Purchaser/Purchaser's Customer, its affiliates, Owner,
Owner's Lenders, the Electric Utility and Steam Host to
which Owner will be furnishing electricity and steam, and
the Puerto Rico Aqueduct and Sewer Authority with respect to
losses arising out of or in connection with the Work. Seller
shall cause its insurance underwriters to issue Certificates
of Insurance satisfactory in form to Purchaser (ACCORD form
or equivalent) evidencing that the coverages, coverage
extensions, policy endorsements and waivers of subrogation
required under this Purchase Order  are maintained in force
and that not less than 30 days written notice will be given
to Purchaser/Purchaser's Customer, Owner and Owner's Lenders
prior to any material modification or cancellation of the
policies.

Builder's Risk Insurance covering loss or damages to
materials and equipment at the Jobsite that are and/or will
be incorporated into the completed Facility shall be

API 0672555

B.252



**PURCHASE CHANGE ORDER** 

ABB Combustion Engineering Systems

ABB
ASEA BROWN BOVERI

Date: 12/29/99

Page: 20

P. O. Number: CO#:

**50730 IO  1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|-------------------------|--------------------|------------|----------|

provided by D/FDC or Owner. Purchase Order or and its subcontractors shall be additional named insured on the Builders Risk Insurance Policy and such policy shall provide a waiver of subrogation in favor of Seller. Seller shall be responsible for the payment of the applicable deductible (but in no event shall said deductible exceed $25,000 per occurrence) and other uninsured amounts for each loss or damage to such materials or equipment which are in the care, custody and control of Seller.

Changes in Seller's insurance costs or escalations in premiums related to insurance programs and limits agreed to herein shall not be the basis for any increase in the price of the Work unless such change is due to changes in the Work. However, the additional cost for any other insurance required to be put into place by Purchaser/Purchaser's Customer or Owner shall be borne by Purchaser/Purchaser's Customer or Owner.

All insurance coverage provided by the Seller shall be on an occurrence basis unless such coverage is not commercially available, in which event the parties shall agree upon replacement coverage on a claims made basis which provides, to the fullest extent possible, the same coverage as would be provided on an occurrence basis.

21. Year 2000 Compliance

Seller hereby irrevocably represents and warrants that the delivered product, software, or systems are Year 2000 compliant and that neither the performance nor functionality of the product, software or system, operating alone and/or together with other products, software and/or systems, are and will be affected by dates prior to, during and after Year 2000; in particular;

  no value for current date will cause any interruption in the operation of the product, software or system,
  the product shall calculate, manipulate and represent all data values within the application domain correctly for the purposes for which they were intended,
  in all interfaces and data storage, the century in any date is specified either explicitly or by unambiguous inferencing rules,
  the Year 2000, and all the leap years beyond the year 2000, must be recognized as leap years,
  cause loss of functionality specified in the Agreement under which the product software or system were originally furnished.

In the event of any breach of any of the above warranties, seller shall promptly, upon receipt of notice of non-conformity from Purchaser, holding Purchaser harmless from any cost and expense, repair the defect, replace the defective product, software and/or system with product, software and/or system complying with the above warranties, and/or take such other actions as are reasonably satisfactory to Purchaser and its customer to restore full warranty compliance additionally and without cost to Purchaser. Seller shall, upon demand, provide to Purchaser copies of Seller's Year 2000 Compliance Testing Procedures and testing results applicable to the product, software

API 0672556





**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

ASEA BROWN BOVERI

Date:  12/29/99

Page:  21

P. O. Number:   CO#:

**50730 IO   1**

| Item | Quantity | UN | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|-----|-----|-----|

and/or systems furnished in connection with this Agreement or P.O.

Seller further warrants that all its facilities are Year compliant in accordance with the British Standards.

**22.0 DELAYS**

In the event Seller or Purchaser is delayed in performing any of their respective obligations in the Contract (other than the payment of money) and such delay is caused by a Force Majeure Event defined as; acts of God, war, riots, civil insurrection, acts of the public enemy, accidents, acts of civil or military authority, sabotage, epidemics, revolution, injunction, terrorism, quarantine, strikes and labor disputes (except as excluded below), fires, floods, landslides, tidal wave, hurricane, lightning, explosion or earthquakes, or other similar events, beyond the reasonable control of the party delayed, such delay shall be excused and the period of such delay shall be added to the time for performance as required. Force Majeure Events do not include strikes, work stoppages and labor disputes or unrest of any kind involving employees of Seller or any of its subcontractors employed on the Facility Site (provided, however, that if such event are beyond the control of the Seller or any of its subcontractors and are not caused by the actions or failure to act of Seller or any of its subcontractors, such events shall be Force Majeure Events), late delivery of materials or equipment (except to the extent caused by a Force Majeure Event), and economic hardship.  In the event any such delay due to the foregoing causes or events occurs or is anticipated, the party delayed or anticipating delay shall promptly notify the other party in writing of such delay or expected delay and the cause and estimated duration of such delay.  In the event of a delay due to the foregoing causes or events, whether such delay is excused or not, the party delayed shall, at no cost to the other party, exercise reasonable diligence to shorten and avoid the delay and shall keep the other party advised as to the continuance of the delay and steps taken to shorten or terminate the delay. Seller shall not in any event be entitled to additional or extra compensation by reason of Seller having been delayed in performance of its obligations due to the foregoing causes or events whether such delay was excused or not.  Seller or Purchaser shall, within five (5) working days of becoming knowledgeable of the commencement of any such delay, give to the other written notice thereof and of the anticipated results thereof.  Within two (2) working days of the termination of any such delay, Seller or Purchaser shall file a written notice with the other specifying the actual duration of the delay.  If the delay was beyond the control and without the fault or negligence of  Seller or Purchaser, as the case may be,  and not foreseeable at the effective date of this Contract, Seller or Purchaser shall be entitled to an equitable extension of the time of performance of this Contract, provided that the extension of time is of no greater scope and of no longer duration than is reasonably required by the delay. Seller shall not be entitled to, and hereby expressly waives recovery of, and damages suffered by reason of the delays

API 0672557

**B.254**



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

Date: 12/29/99

Page: 22

P. O. Number: CO#:

**50730 IO   1**

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|-----|----------|----------|----------|----------|

contemplated by this Section 12.0 and extension of time shall constitute Seller's sole remedy for such delays.

The time of completion of any and all Work items scheduled in the Contract shall not be extended because of non-extraordinary weather conditions or other natural non-extraordinary phenomena including, but not limited to normal rain, high temperature, wet grounds, and high winds.

The inability of Seller to obtain permits or licenses required for the progress of its Work shall not be considered a reason for force majeure claim.

**23.0 WORK RULES**

Seller agrees to use its reasonable efforts to comply with any rules, including later revisions, governing the conduct of Seller and Seller's employees, agents and subcontractors at and about the jobsite.

**************** SOFTWARE DELIVERABLES ********************

| Item | Quantity | UM | Description | Ship Date | Unit Price | Extended |
|------|----------|-----|----------|----------|----------|----------|
| 6 | 1.00 | LT | FLUE GAS CLEANING SYSTEM PRIORITY DRAWINGS & DOCUMENTS 32590000 190 Engineering Release | 01/12/99 | .00 | $.00 |

Priority drawings and documentation denoted by an asterisk (*) in the Drawings and Documents List shall be submitted for each line item on or before the date indicated.

| 7 | 1.00 | LT | FLUE GAS CLEANING SYSTEM DWGS & DOCUMENTS-see matrix 32590000 190 Engineering Release | 01/12/99 | .00 | $.00 |

Balance of drawings and documentation for each line item is to be submitted in accordance with the schedule in the Drawings and Documents List.

| 8 | 1.00 | LT | FLUE GAS CLEANING SYSTEM INSTRUCTION MANUALS 32590000 DIM Inst. Manuals Issued By Seller | 07/31/00 | .00 | $.00 |

Instruction Manuals for each line item shall be in accordance with the requirements contained in Section II.

**************** HARDWARE DELIVERABLES ********************

| 9 | 1.00 | LT | FLUE GAS CLEANING SYSTEM 32590000 190 Engineering Release Unit # 002 Storage Code:C (See Section III.E for Storage Code Definitions) | 10/31/00 | 14,643,801.00 | $14,643,801.00 |

The following are the governing customer specifications for this project.

Ref.: Duke/Fluor Daniel Specification CFB Boiler 367400-O-SP-4-SB-1, Revision 2, dated November 29, 1999, and related attachments; Specification Circulating Dry Scrubber 367400-O-SP-4-FC-1, Revision 2, dated November 15, 1999, and related attachments; Specification

API 0672558



**PURCHASE CHANGE ORDER**

ABB Combustion Engineering Systems

Date: 12/29/99

Page: 23

P. O. Number:  CO#:

**50730 IO  1**

ASEA BROWN BOVERI

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|-----|-----|-----|

Electrostatic Precipitator 367400-O-SP-4-FC-2, Revision 2, dated November 15, 1999 and related attachments; General Project Requirements, Document No. 367400-O-SP-4-00-1, Revision 3, dated November 11, 1999, and related attachments.  The above listed items are in your possession.

The following deviations to the above referenced contract documents are as follows:

1.) Erection services for the equipment supplied by EEC will be by others.

2.) The supply and installation of the insulation and lagging will be by others.

3.) The siding and roofing associated with the CDS enclosure and EPS enclosure below the ESP hoppers will be supplied and installed by others.

4.) EEC will supply a lime silo for each unit for a total of two for the contract.

5.) NEMA 4 enclosures are acceptable for outdoor service for the CDS and ESP.

6.) EEC will supply a cooling water system with tank and pumps for each unit for a total of two for the contract.

7.) The walkway between the CDS and the boiler will be supplied and erected by DFD.

8.) The ESP will be double chamber design.

9.) Provision for future ESP inlet dampers will be removed from the contract specifications.

10.) Finish painting:
For Equipment;  In accordance with Manufacturers Standard

For uninsulated plate products;  is performed in the field by others.

11.) Flue gas terminal points for the EEC equipment are at the inlet flange to the CDS and the outlet flange of the gas duct at the ID fan inlet expansion joint.

Attached find three pages "Flue Gas Cleaning System" Performance Selection, Revision 4, dated 12/27/99.

Although it is acknowledged that the basis of this purchase order relates to the revision 1 documents (Performance Selection, Revision 3),review and commentary of the governing revisions are in process.  Final acceptance and purchase order amendment is pending completion of this review.

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|-----|-----|-----|
| 10 | 1.00 | LT | FLUE GAS CLEANING SYSTEM 32590000 190 Engineering Release Unit # 001 | 11/24/00 | .00 | $.00 |

API 0672559



**PURCHASE CHANGE ORDER**

ABB Combustion Engineering Systems

ASEA BROWN BOVERI

Date: 12/29/99

Page: 24

P. O. Number:  CO#:

**50730 IO  1**

| Item | Quantity | UM | Description NBS / Status | Required Ship Date | Unit Price | Extended |
|------|----------|----|-----|-----|-----|-----|
| | | | Pricing is included in line item 9. | | | |

---

|  | | FIRM TOTAL NET PRICE | $20,000.00 |
| Previous | | | |
| Net Change | | | $14,643,801.00 |
| Revised | | FIRM TOTAL NET PRICE | $14,663,801.00 |

---

INDEX:
-----

```
     I.   TECHNICAL REQUIREMENTS
    II.   INSTRUCTION MANUAL SPECIFICATIONS
   III.   QUALITY ASSURANCE REQUIREMENTS
    IV.   COMMERCIAL REQUIREMENTS
     V.   SHIPPING INSTRUCTIONS
    VI.   FIELD SERVICE
   VII.   ACCEPTANCE
```

I.  TECHNICAL REQUIREMENTS:
    ----------------------

REQUIRED SHIP DATE is the day by which all pieces of that
item have been completely fabricated, prepared per the
Shipping Instructions and arrived at the point of shipment
shown above.

---

ITEM STATUS GLOSSARY:

Item Status indicates the work that the Seller has been
released to perform for that item per the definitions
below.  Any work performed by the Seller which has not
been released by the Purchaser is at the Seller's risk
and subject to change.

190:  Engineering Release; Seller is released for
Engineering Only upon receipt of the Purchase Order.

193:  Fabrication Release; Seller is released for
fabrication and shall comply with the required ship date.

DIM:  Seller is released to Deliver Instruction Manuals.

UNIT OF MEASURE GLOSSARY:

```
EA - Each
FT - Feet
GA - Gallons
LB - Pounds
LF - Linear Feet
LM - Linear Meters
LT - Lot
MT - Metric Tons
MT - Meters
MW - Thousand Pounds
PC - Pieces
SF - Square Feet
SM - Square Meter
```

API 0672560



**PURCHASE CHANGE ORDER**
ABB Combustion Engineering Systems

Date: 12/29/99
Page: 25
P. O. Number: CO#:
**50730 IO   1**

Total scope shall comply with the attached specification
unless superseded by a Purchaser initiated Purchase Change
Order, or a Supplier Document Transmittal Letter.
--------------------------------------------------------

DRAWING AND DATA FORMAT:

Drawings and technical documents submitted by the seller
shall be in accordance with the following requirements:

1.) Two original size copies of drawings and data sheets
shall be submitted.

2.) Drawings and related technical documents are to be in
accordance with ASME Y14.100M - 1998.

3.) Drawings, data sheets and transmittal letters shall
include the following information in the header section of
the document or near the title block of a drawing:

Contract Name:  AES PUERTO RICO L. PARTNERSHIP (AES-PR)
Unit Name:  AES PUERTO RICO TOTAL ENERGY PROJECT
DFDC P.O. NO.: 3674004SB0001
Purchaser's Contract No.:  65005697
Purchaser's P.O. No.:
Purchaser's WBS No.:     < insert WBS Number >
--------------------------------------------------------

II.  INSTRUCTION MANUAL SPECIFICATIONS

   Instruction manuals are required on all line items
   except where noted.
A. SCOPE
   1. Scope of Supply is:
      DESIGN, OPERATION AND MAINTENANCE MANUALS
      Final copies of Seller instruction manuals per the
      Purchaser Specifications.
      (Refer to items B. and C.)
      (a)  Quantity of manuals required in English 8-1/2" X
           11" format:   Fifty-five (55)
      (b)  Date manuals required: On or before
           equipment ship date, but in no case later
           than July 31, 2000.
      (c)  The Purchaser will accept a reproducible
           electronic file in addition to one hard copy.
           This is in lieu of the quantity defined in A.1.a
           and B.2.a.4.
   2. By acceptance of this Purchase Order, the Seller
      grants the right for the Purchaser to reproduce the
      Seller's instruction manual information in order
      to comply with Purchaser's specifications.
   3. Notes pertaining to Scope of Supply:
      If final manuals cannot be provided by the date
      indicated, a memorandum, on Seller's letterhead,
      stating the reason for the delay must be forwarded
      for inclusion in the Purchaser's manuals.
B. PURCHASER SPECIFICATIONS
   1. Manual Identification Requirements:
      All final manuals must be accompanied by a FLY SHEET
      that lists:
      (a) Purchaser Information:
          (1) Purchaser's Client:
              Duke/Fluor Daniel
          (2) Job name:  AES Puerto Rico

API 0672561

B.258



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

ASEA BROWN BOVERI

Date:  12/29/99

Page:  26

P. O. Number:  CO#:

**50730 IO  1**

(3) Contract number: 65005697
(4) Purchase order number
(5) WBS code (per purchase order)
(6) Tag number (from purchase order or approved drawing)

(b) *Seller Information:*
(1) Seller's order number (if different from Purchaser's order number)
(2) Equipment model number
(3) Equipment type
(4) Equipment serial number
(5) Equipment design data

2. Manual Binding Requirements:
(a) Material must be submitted as follows unless otherwise stated:
(1) Separate sets not exceeding 75mm (3") in thickness
(2) Indexed and collated
(3) ~~Unboxed~~, 3-hole ~~punched~~ or unpunched
(4) English 8-1/2" X 11" paper or multiples which permits accordion folding into 8-1/2" X 11" format.

(b) The Purchaser will not accept folded, full size prints. They will be returned for reduction.

3. Instruction Manual Content Requirements:
Seller's standard manual with fly sheet, as defined in B.1, certified General Arrangement Drawings and binding requirement as defined in B.2, PLUS adjustments to incorporate contract required information. Additional costs per manual (if applicable) are to be shown. (Refer to Section C. Contract Required Information.)

4. Notes Pertaining to Content Requirements
(a) Seller's manual submitted for review that does not adequately address the "Contract Required Information" will be returned with comments.
(b) Sellers are reminded that all instruction manual specifications, including the certified General Arrangement Drawings requirement must be forwarded to Seller's sub-contractors. All sub-contractor data is to be included in fly sheets and instruction manuals.

5. Submittal of Instruction Manuals
(a) All Sellers must submit ONE COPY of the fly sheet and either the actual manual, or a synopsis of manual intent, in a reproducible electronic file or hard copy, for REVIEW AND APPROVAL by the Purchaser.
(b) The review copy must be submitted to the Purchaser at the same time as preliminary drawings or other technical data is submitted for review and approval.
(c) Three additional hard copies of the manual must be shipped with your equipment. (This copy is not included in the quantity shown under SCOPE.)

C. CONTRACT REQUIRED INFORMATION
The Seller's instruction manuals must include the following:
1. General Specifications
(a) Manuals shipped with equipment must include short and long term storage procedures and installation instructions.
(b) The manuals shall include instructions only for the actual equipment supplied and not for alternative or optional equipment. If generic

API 0672562

B.259



**PURCHASE CHANGE ORDER**

ABB Combustion Engineering Systems

Date: 12/29/99

Page: 27

P. O. Number: CO#:
50730 IO   1

documents are included the non-applicable portions shall be crossed out.
  (c) All documents, illustrations, specifications, instructions and lists shall be in the English language, and all units in the English and metric systems.

2. Design Specifications
  (a) The manuals shall include system description, including design basis, function, location and modes of operation.
  (b) Design data shall include performance curves, heat balance diagrams, material specifications and running clearances, settings and limitations.
  (c) Design data shall include instrument and valve lists itemizing function, type, number, range and alarms.

3. Operation Specifications
  (a) Commissioning information shall include all procedures for installation, testing and adjustment of the supplied equipment.
  (b) Operating information shall include all procedures for operating during commissioning, start-up, normal operation, shut down, standby, emergency and fault conditions.
  (c) Operating information shall include the normal range of system variables, operating limitations, and hazard conditions for all supplied equipment and systems.

4. Maintenance Specifications
  (a) A recommended spare parts list, a list of mandatory spare parts furnished, and a list of suggested strategic spare parts shall be provided with all parts and special tools identified by the original manufacturer's part number and quantity.
  (b) A preventive maintenance and inspection schedule shall be provided for all supplied equipment and systems.
  (c) A lubrication schedule with equivalents for known international destinations shall be provided showing requirements and specifications for all supplied equipment.
  (d) Maintenance procedures shall include assembly and dismantling with associated tests and check-ups prior to returning equipment to service.

--------------------------------------------------------

III.   QUALITY ASSURANCE REQUIREMENTS

A.   QA PROGRAM REQUIREMENTS

CATEGORY 1 - ITEMS (QA-10-1): The Seller shall have an implemented Quality Processes program which utilizes the quality systems described in the current edition of International Standard ISO 9001 as a guide in its formulation. Generally this requires demonstration of a Seller's capability to control the design and the processes that determine the acceptability of the product or service supplied.

QUALITY PROGRAM APPROVAL (QA15-1A): When sub-tier contractors or sub-tier suppliers are used, the Seller's QA program and quality planning must provide for and assure that all applicable technical and quality requirements

API 0672563



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

ASEA BROWN BOVERI

Date:  12/29/99

Page:  28

P. O. Number:  CO#:
**50730 IO  1**

imposed in the Purchaser purchase order are transmitted to the sub-tier contractor or supplier.

B.      QA DOCUMENTATION REQUIREMENTS

QUALITY CONTROL PLAN (QA23-1): The Seller shall prepare and submit a Quality Control Plan (QCP) to be used to identify pertinent inspection, tests and events for manufacture of components.  The QCP shall contain the component name, the production operation and the required inspection, test and examination activities being performed by the Seller.  The QCP shall contain the Purchaser's contract name and purchase order number, and shall provide for the Purchaser's and or Purchaser's client to designate witness or hold points.  It shall be submitted to the Quality address indicated in the Deliverables Matrix.

DOCUMENTATION AVAILABILITY (QA23): The Seller shall make available for review and use at his facilities copies of all drawings, procedures, records, and assistance necessary for Purchaser and/or its client's representative to assess the condition of components or services being provided under this purchase order.

DOCUMENTATION SUBMITTAL (QA23A): Copies of plans, procedures, inspection and test reports, records or certifications required for material and components being supplied through this purchase order shall be submitted if and when specified in "QA Documentation Submittals".  These documents, when submitted, shall be appropriately bound, identified, indexed and shall reference the Purchaser purchase order number and boiler "unit" number (for multiple unit orders). They shall be submitted to the Quality address indicated in the Deliverables Matrix.

QA DOCUMENTATION SUBMITTALS (QA24A):

| TYPE/APPLIC. OF DOCUMENT SUBMITTAL TIME | # COPIES |
|---|---|
| Quality Control Plan 3 weeks after receipt of order | 2 |
| Inspection Notification(s) 15 working days prior to each event | 1 |
| Shop Test Procedures 45 days prior to testing | 2 |

C.      FABRICATION/INSPECTION GENERAL REQUIREMENTS

NOTIFICATION DEFINITION (QA41A): Purchaser and/or its client may predesignate operations required to be observed. The operations will be specifically identified either in this purchase order or through the submittal of Seller Quality Control or Test Plans, if required.  The Seller is obligated to advise Purchaser Quality fifteen (15) working days (North American Sellers) or twenty (20) working days (non-North American Sellers) in advance of the operation so that it may be observed.  These notification points may be further defined as witness or hold points.

NOTIFICATION RESPONSIBILITY, PURCHASER UTILITY (QA41-3A): The Seller's quality planning shall include responsibilities for monitoring Purchaser and/or its

API 0672564



**PURCHASE CHANGE ORDER**

ABB Combustion Engineering Systems

Date:    12/29/99

Page:    29

P. O. Number:    CO#:

**50730 IO  1**

client's surveillance notification points in order to provide timely notification as defined in the purchase order. If notification is required, evidence of notification must be available.  All notifications shall identify the Purchaser purchase order, the item(s), the date/location, and the test/inspection and shall be submitted to the Quality address indicated in the Deliverables Matrix.

Notification points designated by Purchaser and/or its client that are bypassed by the Seller may result in re-performance of the activity at the Seller's expense. Purchaser shall not be held liable for delays caused by the Seller's failure to notify and/or for re-performance of the activity.

QUALITY RESPONSIBILITY (QA42): Unless otherwise authorized, the Seller shall ensure that all work has been fully inspected and accepted to its satisfaction before requesting witness by Purchaser QC. The cost of repeat witness of the same activity on the same component or equipment may be backcharged to the Seller. Review, witness or acceptance of inspections, tests or work activities by Purchaser and/or its client shall not relieve the Seller of responsibility for providing components or services in complete compliance to this purchase order and the Seller requisite standards.

NONCOMPLIANCE (QA43): Purchaser reserves the right to stop work for noncompliance to contract requirements or to the Seller's QA Program approved by Purchaser.

NONCONFORMANCE REPORTS (QA43-1): Should Purchaser and/or its client representative find a condition not in compliance with requirements, a nonconformance report (NCR) may be issued to the Seller.  The Seller shall not continue to work on or ship the materials covered in the NCR until the nonconformance is corrected in a manner acceptable to Purchaser, or unless otherwise instructed by Purchaser.

DEVIATION REQUESTS (QA43-2): Deviations from the requirements of this order may be requested by the Seller through the Purchaser Project Procurement Manager as designated in this order.  The deviation request shall include the Purchaser order number, the requirement, and complete details of: (a) the deviation, location and extent, (b) cause, (c) proposed alternative procedure or action, (d) justification/advantage. Submittal of requests for deviations shall not relieve the Seller of responsibility for compliance to this order unless Purchaser has formally accepted the deviation as contractually binding.  Additional charges for any Purchaser design departures necessitated by the deviation may be assessed to the Seller.

D.      FABRICATION/INSPECTION SPECIFIC REQUIREMENTS

INSPECTION - INPROCESS - SPECIFIC (QA61.1): All welding to be performed on non-boiler or non-piping parts shall be accomplished by welders and procedures qualified in accordance with AWS D1.1.

INSPECTION - INPROCESS - SPECIFIC (QA61.2): For all shop tests that the Purchaser and or/its client will witness the Seller shall submit test procedures.

SHIPPING RELEASE (QA73A): Purchaser shipping release

API 0672565



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

**ASEA BROWN BOVERI**

Date:   12/29/99

Page:   30

P. O. Number:   CO#:

**50730 IO   1**

shall not be given until the component has been inspected or accepted by Purchaser & or its client.  No component may ship unless the Purchaser has released it.  The Seller shall have documented evidence of release available for review. Materials or equipment shipped without respecting this requirement will be rejected and may be returned to the Seller at the Seller's expense.

**E.    STORAGE CODES**

**PACKAGE MARKING FOR STORAGE (QA90A):** One of the following requirements may appear below the purchase order line items in order to direct the storage of components. The Seller shall include this storage code and wording on the packing list and the shipping bill of materials sent with the shipment. The storage type code and wording shall be marked on the shipment /packaging/crating in close vicinity to the shipping marks.

| | | |
|---|---|---|
| Storage Code | A | --- Indoor with climate controls. |
| Storage Code | B | --- Indoor and heated. |
| Storage Code | C | --- Indoor. |
| Storage Code | D | --- Outdoor with corrosion protection. |
| Storage Code | E | --- Outdoor |

Any special storage instructions required to maintain the Seller's warranty shall also be included with the shipment and / or marked on the shipment.

----------------------------------------------------------------

**SHIPPING INSTRUCTIONS**

**SELLERS SHIPPING BILL OF MATERIAL**

The Seller must create a Shipping Bill Of Material for each Purchase Order line item.  The Shipping Bill Of Material (SBOM) is a list of ALL shipped loose parts furnished by the Seller.  The SBOM(s) must be submitted to the Purchaser's Expediter at least eight (8) weeks prior to the ship date(s) shown on this order.   The SBOM is not a packing list and should not contain package information. The Sellers packing list(s) must reflect the content of the SBOM(s).  Items on the SBOM that are not shown on the packing list(s) upon completion of the shipment(s) will be deemed short shipped and may delay payment of the Sellers invoice(s).

A SBOM needs to be issued electronically to ABB in ABB/CE's Pre-defined file format, generated directly from Suppliers computer system in order to limit typographical and format errors.  An electronic copy of the SBOM needs to be maintained and kept on file by the Supplier until the completion of the contract.  In the event that revisions are required, a complete, modified SBOM needs to be re-issued to ABB/CE.  There are two types of file formats available to create an electronic SBOM:  Flat File or EDI (Electronic Data Interchange).   The methods of issuing/transmitting a Flat File format to ABB/CE include:  Electronic Mail (via internet or ABB/CE Lotus Notes), Dial-In (if Internet access is not available) and mail the file on a 3.5 inch diskette through the US Mail or other mail carrier.  The type of format and the method of electronic SBOM must be agreed upon by ABB/CE prior to submission.

Detailed instructions for completing the SBOM and packing list(s) will be provided to the Seller upon request.

API 0672566



**PURCHASE CHANGE ORDER**

**ABB Combustion Engineering Systems**

ASEA BROWN BOVERI

Date:  12/29/99

Page:  31

P. O. Number:  CO#:

**50730 IO   1**

**SELLERS PACKING LISTS**

Packing lists must clearly define the content of each package matching the equipment shown on the SBOM.  Each packing list must show the:

Sellers Company Name and Origin Point of Shipment Country of origin Purchaser's Project Name Purchaser's Contract Number Purchaser's Purchase Order Number Purchase Order Line Number with associated WBS number Purchaser's Unit Number The Purchaser's BAR CODE NUMBER assigned to the package. Package description, i.e. box, case, bundle, skid, with weights and dimensions Sellers SBOM line item numbers Material Description and Tag Numbers as Described in the Purchase Order &        SBOM Quantity of each item packed Seller reference number

Affix one copy of the packing list to the outside of the package in a waterproof envelope.  When practical, place one copy inside the package. One copy of the packing list must be provided to the Purchaser Expediter.

Sample packing lists are available from the Purchaser's Expediter.

When truck or rail shipments must cross country borders, the Seller must provide packing list(s) on a per truck or rail car basis.  The value of the cargo shown on the shipment invoice must be obtained from the Purchaser prior to shipment.  To this end, the Seller must determine the percent of the Purchase Order value to be shipped on each truck or rail car and request a Purchaser's shipping invoice at least 24 hours prior to shipment.  The Purchaser's shipment invoice will be sent to the Seller promptly.

**BAR CODES**

Two identical numbered bar code labels shall be applied to the outside of all FINAL export packed packages or bundles of parts.  Sellers who print their own bar code labels must follow the Purchaser's instructions provided with the transmittal letter assigning the numbers.  Sellers who do not print labels will be given labels and instructions.

**PRESHIPMENT PROCESS**

1.  Send the SBOM(s) to the Purchaser's Expediter 2.  Send the Packing List to the Purchaser's Expediter

The packing list(s) will be compared to the SBOM(s).  Once the Sellers packing list(s) agrees with the content of the Sellers SBOM(s) for both partial and complete shipments, the contents are then deemed "packed out" and the Purchaser or his Freight Forwarder will provide shipping release and instructions.  The seller shall provide the packing list(s) prior to the required ship date to allow time for the preshipment process.

**USA CARRIERS**

USA Sellers are to arrange for cargo pick-up by contacting one of the following carriers at least 24 hours in advance of each shipment:

API 0672567



## PURCHASE CHANGE ORDER

**ABB Combustion Engineering Systems**

Date: 12/29/99

Page: 32

P. O. Number:   CO#:

**50730 IO   1**

Rail & Barge Shipments - When a rail or barge shipment is necessary, the seller must request specific shipping instructions at least 45 days prior to shipment.

Truck load - Anderson Truck Lines 800-328-2316, ask for Gene Lemke at extension 7614; Schneider National 800-482-2737, ask for Diane Venveghel at extension 6896; TRISM Specialized Carriers 800-955-8768, ask for Doris Morris.

Less than truck load - UPS (under 100 lbs. ship prepaid and invoice); Consolidated Freightways Overnite Transportation Yellow Freight System

FREIGHT BILLING INSTRUCTIONS

Shipments within the USA shall be billed "FREIGHT THIRD PARTY" or as shown on the face of this order.  When freight is to be billed freight third party, the Seller must mark the following instructions on the bill of lading:

" Send freight bills with a copy of the Bill of Lading to: ABB Combustion Engineering Systems c/o Payment & Logistics Services, Bin No. 0156 ABB Combustion Engineering Systems: PO Number_____ Ormond Beach, FL 32175-1325"

Shipments from international Sellers, outside the USA, shall ship "FOB PORT OF EXPORT" unless noted otherwise on the face of this order.  The Purchaser's Freight Forwarder will coordinate international shipments.

The Purchaser's Buyer shown on the face of this order must approve any deviations from these instructions before shipment.  Sellers will be held responsible for all unauthorized deviations from these instructions.

MARKING INSTRUCTIONS

Shipping marks must be stenciled using waterproof, indelible, and legible material(s) and where space permits should be at least one (1) inch (2.54 cm) tall.  Packages or pieces which are not conducive to direct marking may be equipped with plaques or tags which are secured to the equipment.  Bar code labels are not a substitute for the marking requirements described above.

The supplier is responsible for stenciling care marks and issuing special equipment handling instructions.  Suppliers must provide any special lifting devices needed to handle equipment safely.  Special instructions shall be printed on the bill of lading and stenciled on the pieces / packaging. Instruction marks such as "FRAGILE", "MOISTURE CAUTION", "SLING HERE", "C.G. - CENTER OF GRAVITY", "THIS END UP", "RADIOACTIVE MATERIALS" are considered standard handling instructions.

Weights must be marked on all equipment and packages, including materials that are shipped loose.  This will assist consolidators or export packers in their container stuffing, skidding and boxing efforts.

EXPORT MARKS

Equipment must be stenciled (space permitting) on the two (2) longitudinal sides with the MAIN SHIPPING MARKS defined in the attachment to this PURCHASE ORDER or traffic

API 0672568

B.265



## PURCHASE CHANGE ORDER

### ABB Combustion Engineering Systems

Date:   12/29/99

Page:   33

P. O. Number:   CO#:

**50730 IO   1**

supplement.

Contract material must be segregated and packaged per unit.
Containerized multi-unit cargo must be separated within the
container(s).  Deviations must be approved by the Purchaser.

Spare parts must be packed separately.  In addition to the
marks described above, mark the words:  "SPARE PARTS"

Tools must be packaged separately.  In addition to the marks
described above, mark the word: "TOOLS"

HAZARDOUS MATERIALS

Hazardous materials such as some paints, lubricants,
solvents, etc., must be packaged and marked by the supplier
in accordance with the latest statutory regulations for the
relevant forms of transport.

MSDS sheets, classification marks and UN numbers must be
clearly identified on all relevant Supplier furnished
paperwork.  All hazardous goods shall be packed separately
from any other goods.  Material specific "Material Safety
Data Sheets" and all other dangerous or hazardous goods
forms shall be given to our Purchaser's Expediter Two (2)
weeks prior to shipment.

PACKING

Item packaging shall be provided to protect equipment such
as polished parts, small machined and electrical pieces,
which can be individually wrapped and contained within inner
and/or outer packaging.  The supplier shall pack parts such
as these with water/moisture-proofing/absorbing and/or rust
preventative materials including desiccants and VCI when
required.

Open crates or pallets are not acceptable forms of export
packaging unless specifically approved for the application
by the ABB Combustion Engineering Systems Transportation
Department.

HIGH, WIDE AND HEAVY EQUIPMENT

Within thirty (30) days after purchase order award, the
supplier is to submit a detailed list of all items which
will exceed 35 feet in length and/or 7 feet wide and/or 7
feet tall and/or 40,000 pounds when packed for shipment.

Itemized part descriptions shall include our P.O. line
number, equipment description, manufacturing location(s),
quantities, and predicted as-fabricated and
as-packed/skidded dimensions and weights.
-----------------------------------------------------------

"All other terms and provisions of the purchase
order remain in full force and effect."
-----------------------------------------------------------

API 0672569

B.266



# PURCHASE CHANGE ORDER ACKNOWLEDGMENT

## ABB Combustion Engineering Systems

Date: 12/29/99

Page: 34

P. O. Number: CO#:
**50730 IO  1**

| Contract: | 65005697 | - AES PUERTO RICO |
|---|---|---|

This order consists of   34   pages.

**ACCEPTANCE**
Please indicate your acceptance of this order subject to the terms and conditions included in this purchase order and the required shipping schedule by signing after the words "accepted by" and returning this acknowledgement to:

ABB COMBUSTION ENGINEERING, SYSTEMS
COMBUSTION ENGINEERING, INCORPORATED
2000 Day Hill Road
Windsor, CT  06095

ATTN: L. R. JANNELLE
Purchasing Department 5275-2228

Accepted By: _____

Title: Sr. VP - Operations

Date: 12-30-99

ABB COMBUSTION ENGINEERING SYSTEMS
COMBUSTION ENGINEERING, INCORPORATED
Purchasing Department

By: _____ 12-29-99
                      12/29/99

API 0672570

B.267



# PURCHASE ORDER

**ABB Combustion Engineering Systems**
**Combustion Engineering, Inc.**
**2000 Day Hill Road**
**Post Office Box 500**
**Windsor, CT 06095-0500**
**Tel. (860) 688-1911  FAX (860) 285-9730**

ABB
ASEA BROWN BOVERI

Date:   03/30/99
Page:   1

P. O. Number:
**50730 IO**

TO:
ENVIRONMENTAL ELEMENTS CORP.
3700 KOPPERS ST.
P.O. BOX 1318
BALTIMORE MD 21203

SHIP TO:
To Be Advised

| CONTRACT NAME | CONTRACT NUMBER | BUYER NAME | SUPPLIER CODE | INV TAX |
|---|---|---|---|---|
| AES PUERTO RICO | 65005697 | L.R. JANNELLE | 00202282 | N |

| PAYMENT TERMS | FOB POINT | SHIPPING CHARGES | SHIP VIA |
|---|---|---|---|
| Net 30 Days | FOB:CONSOLIDATION POINT | Freight, Third Party Billing | To Be Advised |

| Item | Quantity | UM | Description WBS / Status | Required Ship Date | Unit Price | Extended |
|---|---|---|---|---|---|---|
| 1 | 1.00 | EA | DUCT TO PRECIPITATOR 32240901 Unit # 001 | 03/03/00 | .00 | $.00 |
| 2 | 1.00 | LT | MTL PRECIPITATOR 32591000 Unit # 001 | 03/03/00 | 20,000.00 | $20,000.00 |
| 3 | 1.00 | EA | MTL GAS DUCT TO I.D. FAN 32240960 Unit # 001 | 03/03/00 | .00 | $.00 |
| 4 | 1.00 | EA | CIRCULATING DRY SCRUBBER 32592500 Unit # 001 | 06/02/00 | .00 | $.00 |
| 5 | 1.00 | EA | FRT EXPORT PREP/PKG 88831330 | 03/03/00 | .00 | $.00 |

There are 2 units on this contract.   Quantities shown are
for one unit.

This purchase order is issued to supercede the letter of
intent dated December 29, 1998 for the complete design,
manufacture, and supply of Air Pollution Control Equipment
for the AES Puerto Rico Total Energy Project as described by
the following documents :

ABBCE RFQ 73301197A  dated August 19,1997
EEC Proposal 420584  dated August 27, 1997
EEC Pricing Letter dated October 30, 1997
DFD Specification No. W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.03-0001, Revision 1,
2/4/98
DFD Specification No. W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.03-0002, Revision 1,
2/4/98
DFD Specification No. AES-GPR-I, 2/4/98
DFD Specification No. W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.00-001, Rev. 1, 2/4/98

This purchase order authorizes Environmental Elements to
invoice for engineering incurred to the agreed upon
preliminary notice value as stated in line item 2. This will
be deducted from the total price upon final notice to
proceed. EEC agrees that costs incurred  in excess of this
value prior to Notice To Proceed, shall be at EEC's risk. In
the event of termination of this Project, all parties hereby
waive any and all liability or claim against the other for

# ORIGINAL

API 0672571



**ALSTOM**

**POWER BOILERS**
**FIELD OPERATIONS**
**AES TOTAL ENERGY**
**PROJECT, Puerto Rico**

AES TRAINING VIDEO TAPES

PLEASE FIND ATTACHED VIDEO'S FROM THE EEC AND ALSTOM
TRAINING SESSIONS.

- EEC TRAINING (OCTOBER 1 / 2, 2001): - 4 VIDEO TAPES, ESP &
  CDS.
- ALSTOM TRAINING (OCTOBER 8 THROUGH 12, 2001): - 9 VIDEO
  TAPES, CFB OPERATION.

Best Regards,

Fred W Campbell
Commissioning Manager

Received from Alstom: -

Name:

Company: -

Date: -

**B.269**

**D-032**

ALSTOM-000384

## SECRECY AGREEMENT

This Agreement made this 25th day of October 2001, by and between ALSTOM Power Integrated C-E Services, Inc., 2000 Day Hill Road, Windsor, Connecticut 06095-0568, USA, (hereinafter referred to as ICESI) and (Duke Fluor Daniels, AES Puerto Rico), (hereinafter referred to as (D/FD AES).

### WITNESSETH:

Whereas, ICESI will conduct training programs at (AES Total Energy Project) for the purpose of instructing personnel on the operation and/or maintenance of systems and equipment furnished by ALSTOM Power, and

Whereas, confidential and proprietary information will be disclosed (Alstom Power Boilers) during such programs, and

Whereas, (ICESI) wishes to videotape the program presentations.

Now, therefore, the parties hereto agree as follows:

1. (D/FD AES) shall receive said information in confidence and shall exercise all reasonable precautions to safeguard the confidential and proprietary nature of said information and to prevent the unauthorized use or disclosure thereof or any part or parts thereof to any third party without ICESI's prior written approval and consent.

2. The videotapes may be used for the internal use of (D/FD AES). "No right under any technology, patent or patent application of ICESI is expressly or impliedly granted to (D/FD AES) by ICESI under this Agreement."

3. The obligations of this agreement shall terminate 10 years from the date hereof and shall not apply to any information disclosed hereunder which:

   a. was in D/FD's possession prior to the disclosure hereunder, or
   b. is or becomes generally available to the public, or
   c. is made available to D/FD by a third party who, as far as can reasonably be determined, had a right to disclose it.

In witness whereof, the parties hereto have executed this agreement as of the day and year first set forth above.

By _____
Fred W Campbell
API Commissioning Manager
ALSTOM Power Integrated C-E SERVICES, INC.

By _____
Commissioning Manager
D/FD
AES Total Energy Project

**B.270**

ALSTOM-000385

# ALSTOM

**Power Environment**

Utility Boiler Business

July 2, 2004

AES/Puerto Rico
Carr #3, KM 142.0
Bo. Jobos
Guayama, Puerto Rico  00785

Attention:      Mr. Allan B. Dyer

Dear Mr. Dyer,

Per our recent telephone conversation this letter serves to summarize ALSTOM's findings from the investigations into the ESP corrosion first reported to ALSTOM in AES's letter dated November 28, 2003.

Expertise on dry FGD technology resides within ALSTOM, however, we lack specific experience with the Lurgi process supplied by EEC and the AES/PR process water cycle designed and supplied by DFD. Nevertheless, drawing on a number of varied internal resources, ALSTOM has continued to investigate and work with AES to understand and seek resolution to the numerous issues with the EEC supplied CDS/ESP system.

In summary this is what we know to date about the corrosion issue.

The corrosion results from high concentrations of chloride compounds in the flue gas that when combined with low gas temperatures, leads to corrosion of the ESP surfaces. When present with water, the chlorides form very corrosive compounds. The corrosion seems to be limited to the ESP collector plates and discharge electrodes where ash accumulates and resides for a period of time on surfaces in the direct flow of the gas stream.

The CDS operated with an outlet temperature set point of 154 degrees Fahrenheit during most of the operating history. Subsequent to the discovery of the corrosion, this set point has been raised to 171 degrees Fahrenheit while simultaneously reducing the chlorine content of the CDS spray water. This resulted in improved control of opacity and an ability to run steadily at very low opacity levels. It is expected that these actions should greatly reduce the potential for corrosion.

ALSTOM's analysis of the surface deposits and the corrosion products on the collection plates as well as the ash samples collected in the ESP during the November outage on Unit 2, has shown that large quantities of chlorine were present in each case. The ash is hygroscopic and will absorb moisture from the gas when temperature conditions are right. Under these conditions the water and chlorine combine to form an aggressive corrodant (hydrochloric acid) that attacks and destroys the carbon steel plates. Based on our experience, with the concentrations of chlorides measured, we would expect the rate of corrosion to be as much as 1mm per year. This would indicate that the life expectancy of the collector plates is between 1/2 to 1 year.

By design, chlorides are introduced into the CDS/ESP by two means:

2000 Day Hill Road
Windsor, CT 06095
Tel: 860-285-5082
Fax: 860-285-4645

**B.271**

AESPR 000235

AES2-04-01106

1.  As per the cycle specified by DFD, the spray water for the CDS is cooling tower blowdown that has been treated in a sidestream softener and passed through an RO unit, all provided by DFD. This water contains chlorides as Cl. The maximum concentration was specified as 4,300 mg./liter. Although there are no provisions for permanently monitoring the chloride content of the spray water and the data was not regularly measured or recorded, it is believed that the concentration of chlorides in the water generally averaged around 3,000-mg./ liter. The concentration of chlorides was not rigidly controlled and spikes to higher concentration occurred.

2.  The coal also contains a very small amount of chlorides that enter the CDS/ESP as products of combustion. DFD specified the chloride content as 0.03% of the total ash with a range of 0% to 0.1%. Chlorine content of the few samples where we measured this constituent was less than 0.01%. We assume that this is typical.

It appears that EEC and Lurgi accounted for these chlorides in their design as indicated by the mass balance charts included in the Operating and Maintenance Manuals provided by EEC. The charts indicate that the CDS outlet temperature must be increased with increasing levels of chlorides entering the CDS. They note that this is a very critical control parameter to prevent corrosion.

In analyzing this phenomenon, we find it significant that corrosion was not evident in the ESPs as late as April 2003 on Unit 2, and as late as July 2003 on Unit 1. Work was performed internal to the ESP's during plant outages in these time periods. There was no evidence to indicate that corrosion was occurring. The corrosion then occurred during a period of 4 to 5 months. This considered along with the very rapid rate at which the corrosion proceeded, leads to the conclusion that changes occurred in one or more of the operating parameters.

We have considered the following as potential influences on the corrosion:

1.  Increase in the amount of chlorides entering the CDS/ESP.
2.  Poor atomization of the spray water leading to carryover of wet ash and localized decrease and/or stratification of gas temperature.
3.  Elevated flue gas wet bulb temperature due to sootblowing.
4.  Localized decrease in gas temperature due to insufficient fluidizing air temperature and/or in leakage of cold air.

We will discuss each of these in sequence.

1. Increased Chlorides to the CDS/ESP:

ALSTOM is unaware of any changes in the Cl content of either the coal or spray water during the operating period prior to the discovery of the corrosion. Please advise if any increases occurred in either of these parameters.

We understand that AES instituted a program of continuous injection of ESP ash into the boilers in August 2003. Our analysis has shown concentrations of Cl as high as 0.82% in this ESP ash. This is cause for concern. In the first approximation, recirculation of this ash would not lead to any net change in ash composition and thus should not increase the potential for corrosion. However, this recirculation of ash results in a significant increase of Cl concentration in the boiler and results in a net increase in mass flow of chlorides to the CDS/ESP.

When the ESP ash is recirculated through the boiler, the Cl in the ash is converted to HCl, a severe corrodant, in the boiler. This increase in mass of chlorides consumes the Ca(OH)2 in the CDS/ESP at a faster rate; this results in a decrease of the excess CA(OH)2 in the product.

B.272

AESPR 000236

AES2-04-01107

The reaction proceeds as follows:

$Ca(OH)_2 + HCl \rightarrow CaOHCl$     (absorption reaction in the CDS/ESP)

$Ca(OH)_2 + CaCl_2 \rightarrow 2CaOHCl$     (reaction between recirculated product and fresh $Ca(OH)_2$)

$CaOHCl + SO_2 \rightarrow CaSO_3 + HCl$     (absorption of $SO_2$)

$CaOHCl \rightarrow CaO + HCl$     (generation of HCl in the boiler)

Since it contains excess $Ca(OH)_2$, which increases the pH, the bulk product in circulation in the CDS/ESP is only moderately corrosive. The $Ca(OH)_2$ is critical from the corrosion point of view since it passivates the steel. This is evident in the many areas where the product is free flowing; no corrosion damage is evident. However, where deposits of this material build up, thus increasing the residence time in the gas stream, the $Ca(OH)_2$ is consumed by the $SO_2$ and any Cl in the gas. The $Ca(OH)_2$ is converted to $CaCO_3$, $CaSO_4$, and $CaCl_2$. These by-products are significantly more corrosive than the base product.

With an increase in the mass flow of chlorides, more $Ca(OH)_2$ is consumed. It can be concluded that the recirculation of ESP ash through the boiler leads to increased corrosion potential.

2. Poor Atomization of Spray Water:

Operation of the CDS is critically dependent upon complete atomization of the spray water injected into the CDS. The atomizers are designed to "mist" the water as it enters the CDS. Any wear or pluggage in the atomizer nozzles will reduce the effectiveness of the spray water pattern. The resultant larger "droplets" of water leads to over-wetting of the ash which in turn results in localized temperature stratification. Depending on the relationship of this stratification to the temperature sensors in the CDS outlet, the control system may not sense this change. This will lead to wet ash and additional moisture entering the ESP, which in turn would condense on the ESP collecting surfaces.

Our analysis shows that the damage to the ESP collector plates was caused by aqueous corrosion. Appreciable quantities of iron chlorides ($FeCl_2$ or $FECl_3$) found in the collector plate samples confirm the presence of hydrochloric acid (HCl). This strong acid would account for the rapid progression of the corrosion. Water had to be present to cause these corrosion compounds.

3. Sootblower Operation:

This is another potential source of water. Operation of the sootblowers introduces additional moisture in the gas stream and can elevate the flue gas wet bulb temperature. Due to the low ash content of the fuel, there was never a need to operate the sootblowers during the commissioning and/or early operations of the boiler. If due to the injection of flyash or changes in the coal, the sootblowers are now operated more frequently, then the controls should be modified to ramp the CDS outlet temperature higher during a sootblowing cycle.

4. Parasitic Air Leakage/Fluidizing Air Temperature:

Leakage of outside air into the ESP through valve packing, access door gaskets, rod out ports, or leaks in the air slides can be a major contributor to corrosion. This parasitic air is at a lower temperature than the flue gas and therefore this leakage will result in localized cooling and will cause moisture in the flue gas to condense in the ESP.

B.273

AESPR 000237

AES2-04-01108

Additionally, localized decreases in temperature can result from decreases in fluidizing air temperature. This localized decrease in temperature will also cause the moisture in the gas to condense in the ESP.

ALSTOM continues to study these phenomena, however we are confident that controlling the CDS outlet temperature to the parameters specified in the EEC operating manuals will slow down or even completely arrest the corrosion. In the meantime we have the following recommendations:

1) Discontinue reinjection of ESP ash into the boiler.

2) Closely monitor the total amount of chlorides entering the CDS.

3) Insure that EEC instructions regarding the relationship between CDS outlet temperature and total chloride levels are followed.

4) Regularly test the spray pattern and frequently clean the CDS water injection nozzles. Replace worn nozzles immediately.

5) Eliminate all sources of parasitic air leakage around valves, access/inspection doors, rod out ports, air slides, etc.

6) Clean fluidizing air heaters and filters and check temperature.

7) Insure Fluidizing Air to the air slides, the fluidizing pads, etc is properly regulated and has the same temperature as the gas or higher.

8) Modify the controls to set CDS outlet temperature higher during sootblowing cycles.

We also direct your attention to Section 9.1 of the EEC Operation and Maintenance manuals for additional periodic maintenance regimes.

Attached as part of this letter is a report detailing our analytical testing and the results of that testing. Should you have any questions, please do not hesitate to contact me.

We had expected to receive the results of EEC's and Liberty Mutual's independent of the corrosion. We will forward this upon receipt.

This letter is sent with full reservation of all rights.

Sincerely,

William M. Jarvis
Project Manager


Attachment

cc:    E. Bulewich

**B.274**

AESPR 000238

AES2-04-01109

William M Jarvis
04/17/2003 07:18 PM
+1-860-285-9059

To: Thomas Coleman/USWIN01/Power/non-ALSTOM, David
Hughes/USWIN01/Power/non-ALSTOM, Thomas L.
Wardell/USWIN01/Power/ALSTOM@GA, Linda P.
Rothe/USWIN01/Power/ALSTOM@GA, TigerTColeman@aol.com
cc: Gary Mattice/USWIN01/Power/ALSTOM, Karl
Hognefelt/USKNL01/Power/ALSTOM, Karl E
Lang/USWIN01/Power/ALSTOM@GA, Ed
Bulewich/USWIN01/Power/ALSTOM@GA
Subject: AES/PR: ESP Rotary Vlaves

To bring you all up to speed on this.  EEC confirmed today that they will not pursue a solution to the problems. ASC Valves supplied the rotary valves to EEC.  Tom W., Linda, and I had long conversations with ACS Valves today.  Status as follows:

Material now in stock. Four valve rotors will ship latest 4/29. These will have adjsutable seal rotors, with a clearance of 0.004" to 0.007". There is some concern about operating these valves at the temperature of 280 deg F during initial startup. May need to include logic to block operation until CDS is I/S. Tom Coleman: not urgent but your input needed.

ACS is trying to expedite earlier shipment. Linda is pursuing this. We will air freight to PR. (Karl Lang please note we will need advance clearance et al.)

Scheduling ACS rep to be on site week of 4/28 to assist with installation/checkout of valves.  Need parts on site for this.  Rep is not available the following week.

Following calculated data from ACS:

|  |  |  | 20 RPM | 12 RPM |
|---|---|---|---|---|
| 16 RPM |  |  |  |  |
|  |  | Capacity: | ?? | 4 tph |
| 2 tph |  |  |  |  |
|  | clearance: 0.010 - 0.016 | Displaced Loss: 15 cfm | 9 cfm | 4.5 cfm |
|  | clearance: 0.004- 0.007 | Clearance Loss:5 cfm | 5 cfm | 5 cfm |
| 2.5 cfm |  | Clearance Loss | 2.5 cfm | 2.5 cfm |

Clearly the biggest influence on leakage is the so called "Displaced Loss" which is the volume contianed in the rotor pockets.  We will also try slowing down the valves to reduce leakage. These now operate at 12 rpm. ACS is calculating sprocket sizes to slow to 6 rpm.

Based on conversation with Tom Coleman, the hi alarms on the back hoppers came in after 7 to 9 hours of operation.  We very roughly estimated this to equate to to 4 tons of ash at the hi level probe. This being the case (Tom Wardell can you work with engineering to confirm this amount?), 6 rpm appears to be more than enough to keep the hoppers evacuated with the valves running continuously per EEC procedures. We may even be able to go slower; leakage would presumably decrease.  Karl H.: your input to Tom W. would be greatly appreciated.  Would it make sense to have different speeds on each of the last two rows??

Once we arrive at desired speed, and ACS confirms sprocket size and calculated valve capacity at that speed, we will order enough sprockets to modify valves on last two hoppers. We will eventualy do both units but need to concentrate on unit 2 first and insure this works.

Additionally, we are looking at possibilty of venting the air slide to front of ESP.  Concerns is with the

D-284

KNOX-001-00447

B.275

amount (and pressure) of fluidizing air introduced for the air slides.

By copy to BUd. please issue a PCC for collection of all costs (home office, labor, and material).  Please advise number by L/N so all can charge time sheets accordingly.  This is a B/C to EEC and/or Liberty Mutual as bonding agent.

WMJ

CONFIDENTIALITY : This e-mail and any attachments are confidential and may be privileged. If you are not a named recipient, please notify the sender immediately and do not disclose the contents to another person, use it for any purpose or store or copy the information in any medium.

KNOX-001-00448

**B.276**

## CERTIFICATE OF SERVICE

On October 9, 2006, Plaintiff served its Appendix to Memorandum of Plaintiff

AES Puerto Rico, L.P. in Opposition to ALSTOM Power, Inc.'s Motions *in Limine* Nos. 1-9 by

electronic filing and first class mail, postage prepaid, on:

> Richard R. Wier, Esq.
> Two Mill Road
> Suite 200
> Wilmington, Delaware 19806

and by e-mail and first class mail, postage prepaid, on

> James E. Edwards, Esq.
> Anthony Vittoria, Esq.
> Ober, Kaler, Grimes & Shriver
> 120 East Baltimore Street
> Baltimore, Maryland 21202-1643

/s/ John S. Spadaro